**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5091**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees*,

*v.*

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

## EMERGENCY MOTION FOR AN ADMINISTRATIVE
## STAY AND STAY PENDING APPEAL

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
CATHERINE PADHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7712*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5091*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiffs are National Treasury Employees Union, National

Consumer Law Center, National Association for the Advancement of

Colored People, Virginia Poverty Law Center, Eva Steege, Ted Steege, And

CFPB Employee Association. Defendants are Russell Vought, in his official

capacity as Acting Director of the Consumer Financial Protection Bureau,

and the Consumer Financial Protection Bureau.

Amici are Tzedek DC, 203 Members of Congress, and the States of

New York, New Jersey, Arizona, California, Colorado, Connecticut,

Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan,

Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island,

Vermont, Washington, Wisconsin, and the District of Columbia.

Janice Wolk Grenadier filed a motion to intervene in district court,

but her intervention motion was denied.

### B.    Rulings Under Review

Appellants have appealed the memorandum opinion and the order

granting plaintiffs' motion for a preliminary injunction in *National Treasury*

*Employees Union v. Vought*, No. 25-381 (D.D.C.), Dkt. Nos. 87, 88. That

opinion and order are attached to this motion.

**C.     Related Cases**

This case has not previously been before this Court, and counsel is

aware of no other related cases currently pending in this court or in any

other court.

*/s/ Catherine Padhi*
Catherine Padhi

# INTRODUCTION

The district court in this case believed that judicial intervention was necessary to preserve the existence and minimum statutory functions of the Consumer Financial Protection Bureau (CFPB) pending the resolution of plaintiffs' claims. Yet instead of prohibiting defendants from eliminating the agency or falling below any statutory minimum baseline, the district court entered an extraordinary eight-part injunction whose requirements sweep far beyond the putative problem it identified. In effect, the district court has indefinitely frozen CFPB as it stood before President Trump's inauguration. There is no legal basis for that relief, which stymies lawful reforms and imposes restrictions on an Executive Branch agency akin to judicial receivership. Defendants therefore respectfully request an emergency stay pending appeal, and an immediate administrative stay.

The government has repeatedly explained that, absent congressional action, the Bureau will remain open and continue to perform its statutory functions. Although a preliminary injunction narrowly tailored to ensuring that result would therefore have been unwarranted, the government would not have necessarily needed to seek emergency relief from this Court. But

the district court fashioned relief that went far beyond addressing its stated concern, commandeering significant swaths of agency administration.

Despite recognizing that CFPB has discretionary authorities—and despite acknowledging the impropriety of judicial intrusion into the ways in which the Executive Branch exercises its discretion—the district court imposed sweeping restrictions and affirmative requirements affecting administration of *all* routine Bureau operations, personnel decisions, and contract management. Apparently treating the CFPB as it existed on January 19, 2025, as the benchmark for minimum statutory compliance, the district court ordered CFPB to rehire every employee, reinstate every contract, and refrain from reducing its workforce or stopping work that CFPB's leadership may believe is inconsistent with the President's priorities.

This is lawless. These commands have no anchor in statute. They do not track any specific CFPB duties Congress made obligatory. Nothing in any statute requires President Trump to maintain, organize, or administer the Bureau in the same manner as did President Biden. Nor does anything prohibit the Bureau's leadership from using normal tools—including, as appropriate, reductions-in-force and contract terminations—to administer

2

the Bureau as they think the public interest warrants, within the broad parameters established by statute.

Instead of enforcing the law, the district court's preliminary injunction impermissibly micromanages the Executive's lawful discretion in a way entirely foreign to our constitutional system. It is the President who is publicly accountable for the Bureau's operations, not the district court. Yet the district court has seized the Bureau's reins. The district court offered no explanation for deeming its far-reaching directives necessary to ensure the Bureau's continued operation, nor any other justification for this intrusion into executive affairs.

Because the government is likely to succeed in challenging the preliminary injunction; because the Bureau will continue to perform its minimum statutory functions, and plaintiffs will not suffer any cognizable harm absent an injunction; and because the government and the public interest will be irreparably injured from permitting the district court to indefinitely suspend political control over the Bureau during this appeal, a stay pending appeal is warranted.

In addition, the government respectfully requests that the Court grant an immediate administrative stay while this motion is pending.

3

Absent such relief, the government will be required to certify by Friday, April 4, that the Bureau has brought itself into compliance with the district court's overbroad and unjustified injunction.

## STATEMENT

### A.    Statutory Background

In 2010, Congress created the Consumer Financial Protection Bureau (CFPB), an agency within the Federal Reserve System, as part of a series of reforms enacted in response to the 2008 financial crisis. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (12 U.S.C. § 5301 et seq.); *see* S. Rep. No. 176, 111th Cong., 2d Sess. 2 (2010). The Dodd-Frank Act transferred to CFPB certain consumer financial protection authorities of several existing agencies, and it created other new powers not previously exercised. The statute directs CFPB "to implement and, where applicable, enforce Federal consumer financial law" to ensure, among other things, that consumer financial markets are "fair, transparent, and competitive." 12 U.S.C. § 5511(a).

In service of these goals, the statute requires CFPB to establish units to, among other things, conduct consumer finance research, provide financial education services, and collect and track consumer complaints in

4

a centralized database. *See* 12 U.S.C. § 5493(b); *see also id.* § 5493(d)-(e), (g).

Beyond these specific requirements, the Dodd-Frank Act also gives CFPB

broad discretion to supervise providers of financial services, impose

reporting requirements, take various enforcement actions, and promulgate

rules prohibiting "unfair, deceptive, or abusive acts or practices in

connection with any transaction with a consumer for a consumer financial

product or service." 12 U.S.C. § 5531(b); *see id.* § 5512(b)(1).

### B.    Factual Background

Following the January 2025 presidential transition, CFPB underwent

significant leadership changes and an accompanying period of internal

reassessment. While initial communications and actions caused the district

court to believe the Administration intended to wind down all agency

operations, subsequent developments—including clarifications from new

Bureau leadership—made clear that the Bureau will remain open and

continue performing its congressionally mandated duties.

1. On January 31, the President appointed Treasury Secretary Scott

Bessent as Acting Director of the agency. Dkt. No. 87 ("Op."), at 9-10.

Shortly thereafter, on February 7, the President appointed Russell Vought,

the Director of the Office of Management and Budget, as the Acting CFPB

Director. Op. 11. Under the new leadership of Bessent and Vought, the agency instituted a temporary freeze on certain activities while it conducted a broader evaluation of CFPB's operations. For instance, on February 3, Acting Director Bessent directed staff to refrain from taking certain actions, including issuing rules or guidance, commencing or settling enforcement actions, and making most litigation filings, without express approval. Op. 10. Adam Martinez, CFPB's Chief Operating Officer, characterized this as "a common practice at the beginning of a new administration and/or during the transition of a new head of agency," based on Martinez's 25 years of government experience. Martinez Decl. ¶ 3, Dkt. No. 31-1, at 2-3.

On February 8, Acting Director Vought sent a similar email directing staff not to undertake these and other tasks "unless expressly approved by the Acting Director or required by law." Op. 12. Two days later, on February 10, he sent an email directing staff not to perform any work tasks without approval from the agency's new Chief Legal Officer, Mark Paoletta. Op. 14. Concurrently, growing protests at CFPB's D.C. headquarters prompted safety and security concerns, and agency

leadership directed employees not to come into the office. Op. 13-14; Martinez Decl. ¶¶ 8, 12-16.

In addition to these internal directives, the agency took certain discretionary steps to streamline the agency's operational footprint and improve efficiency, causing some to believe that a wind down of CFPB operations was underway. *See* Supp. Martinez Decl. ¶ 3, Dkt. No. 47-1, at 1. For instance, agency leadership began plans to cancel the CFPB headquarters lease based on a determination that the office space was unnecessary for the agency's needs. *See* Martinez Decl. ¶¶ 17-18, 20. On February 11, 2025, CFPB terminated approximately 85 probationary employees. Op. 16. The agency also instructed staff to begin vacating office space and canceling non-essential contracts. Op. 16-17. Around the same time, CFPB informed the Federal Reserve that it would not require new funding for the third quarter of fiscal year 2025, because existing funds "were sufficient for the Bureau to carry out its statutory mandates for the next fiscal quarter." Martinez Decl. ¶ 26.

2. As the new leadership team established itself and evaluated the agency's operations, however, the Bureau made clear that it remained committed to fulfilling the CFPB's statutory obligations. Supp. Martinez

7

Decl. ¶¶ 3-4 (noting that since the week of February 10, "a great deal has

evolved at the CFPB"); Martinez Decl. 31-1 ¶ 19-20. As Chief Operating

Officer Martinez explained, the new agency leadership is not seeking a

"closure of the agency," but is instead focused on "running a substantially

more streamlined and efficient bureau" with "refocus[ed] … priorities,"

while ensuring that the agency continues to "perform each of [its] critical

statutory responsibilities." Supp. Martinez Decl. ¶¶ 3-4.

    This perspective was reflected in communications to agency staff. On

February 27, Martinez assured various divisions that "statutorily required

work and/or work required by law are authorized." Op. 26-27. On March

2, Chief Legal Officer Mark Paoletta sent an all-hands email emphasizing

that "[e]mployees should be performing work that is required by law and

do not need to seek prior approval to do so." Op. 30; *see* Op. 29 ("On behalf

of Acting Director Vought, I am writing to you to ensure that everyone is

carrying out any statutorily required work."). This email highlighted that

earlier communications regarding work stoppage had excepted tasks

"required by law" or identified how to seek express approval, and

explained that "[t]hese measures were intended to ensure that new

leadership could establish operational control over the agency while

ensuring that it would continue to fulfill its statutory duties." Op. 29.

Agency leadership thus made clear by early March that CFPB would

continue to perform all functions required by law.

### C.    This Litigation

Plaintiffs are two CFPB employee organizations, three consumer

advocacy organizations, and the husband of a deceased pastor who had

student loans. Am. Compl. ¶¶ 13-18, Dkt. No. 7; Dkt. No. 84.

On February 13, 2025, plaintiffs filed an amended complaint alleging

that CFPB's actions and Vought's appointment violate separation of

powers, the Federal Vacancies Reform Act, and the Administrative

Procedure Act. Dkt. No. 7. Plaintiffs sought a temporary restraining order

and administrative stay later that day. Dkt. No. 10. Upon the parties'

agreement, the Court issued an order converting plaintiffs' motion for a

temporary restraining order into a motion for a preliminary injunction.

Dkt. No. 19. The Court also entered a consent order imposing temporary

restrictions on defendants while plaintiffs' motion for a preliminary

injunction remained pending. Dkt. No. 19.

The district court held an evidentiary hearing on March 10-11.

Plaintiffs continued to argue that the agency was improperly winding

down its operations. *See* Op. 69, 74. The government, on the other hand, presented evidence showing that while CFPB had initially undertaken a broad reassessment of all aspects of its operation, the agency had since clarified its commitment to maintaining statutorily required functions while emphasizing that the agency leadership continued to evaluate how best to allocate resources and personnel in accordance with the administration's policy priorities. *See* Op. 97.

On March 28, 2025, the district court granted plaintiffs' motion for a preliminary injunction. The court found that plaintiffs were likely to succeed on the merits of their APA and constitutional claims challenging the alleged closure of the Bureau, concluding that the agency's early actions supported the conclusion that it had exceeded its authority by initiating a stop to its statutorily required functions. *See* Op. 35, 61-101. In reaching this decision, the court dismissed the Bureau's repeated assurances—including statements made by Bureau leadership—as insufficient to dispel concerns that a "plan" to "shut the agency down entirely" is "unchanged" and that "defendants have absolutely no intention of operating the CFPB at all." Op. 65. The court expressed skepticism about the defendants' representations regarding the agency's

10

commitment to remaining operational to carry out those functions required by statute and declared that continued judicial oversight was necessary.

On that basis, the court entered an eight-part injunction requiring CFPB to, among other things, rehire all terminated employees, reinstate all terminated contracts, and refrain from engaging in reductions-in-force or attempting to stop work through any means. Dkt. Nos. 87, 88. The court directed the government to certify by Friday, April 4, that the Bureau has brought itself into compliance with the court's injunction. Order 3.

After awarding the eight-part injunction, the district court further directed plaintiffs to explain why it should not award even more relief. Specifically, the court ordered plaintiffs "to inform the Court by March 31, 2025 why [they are] no longer seeking the restriction in the February 14 consent order prohibiting defendants from transferring or relinquishing money from the Reserve Fund other than to satisfy ordinary operating obligations, and whether the interim order should include a restriction on using or disbursing money in the Civil Penalty Fund for anything other than reimbursing consumers." Minute Order, Dkt. No. 88 (March 28, 2025).

Defendants filed a notice of appeal on March 29, 2025. Dkt. No. 90.

11

## ARGUMENT

In considering a stay pending appeal, this Court examines "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). Each of the factors strongly counsels in favor of prompt relief.[1]

## I.    The Government Is Likely To Succeed On Appeal Because The Preliminary Injunction Sweeps Far Beyond The Putative Problem Identified By the District Court.

A preliminary injunction is "an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008), whose sole function is "to preserve the relative positions of the parties until a trial on the merits can be held," *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Constitutional and

---

[1] Plaintiffs oppose this motion. Consistent with Fed. R. App. P. 8(a), the government expressly requested a stay from the district court in its opposition to preliminary relief. Dkt. No. 31, at 40. The district court granted the preliminary injunction without addressing that request. *See* Rule 8(a)(2)(A)(ii) (district court "failed to afford the relief requested").

equitable principles require that such extraordinary relief be no broader than necessary to accomplish this purpose. *Cf. Gill v. Whitford*, 585 U.S. 48, 73 (2018).

Here, the district court believed that an injunction was necessary to preserve CFPB's existence and continued operation. In fact, that concern was unfounded: the Bureau's leadership repeatedly explained that the CFPB will remain open and discharge its statutorily required functions. But even if the court's concerns had been justified, there would have been no plausible justification for the eight-part preliminary injunction that the court entered. That injunction sweeps far beyond anything that could be necessary to address the court's stated concern. And it appears to reflect a deeply problematic premise: that the CFPB as it existed on January 19, 2025, should be the benchmark for minimum statutory compliance, and that any departure from that model carries a taint of illegality. Neither statute nor precedent supports such a conclusion.

1. The district court predicated its award of preliminary relief on its belief that CFPB was on the brink of irreversible closure, such that immediate relief was necessary to keep the agency open to perform its statutory duties. Specifically, the court believed that, absent preliminary

13

relief, "CFPB will be dissolved and dismantled completely in approximately thirty days, well before this lawsuit has come to its conclusion." Op. 112. This belief—which is incorrect and based on outdated evidence since clarified by the current agency leadership, *supra* pp. 7-9— formed the entire justification for the district court's injunction. *See* Op. 3 (stating that the preliminary injunction was needed to prevent the "eliminat[ion] of the agency before the Court has the opportunity to decide whether the law permits ... it"); Op. 101 (justifying the need for immediate relief on the grounds that "[o]nce the agency is gone, there will be no opportunity to afford relief at a later point in the litigation."); *see also* Op. 62-65 (relying on statutory "provisions mandating the existence of, and the functions to be carried out by, the CFPB" and agreeing with plaintiffs that defendants intend "to eliminate the agency … in violation of the statutory imperatives of the Dodd-Frank Act" and "have absolutely no intention of operating the CFPB at all"). As the district court itself summarized the matter: "The motion for preliminary injunction to be decided boils down to one question: should the Court take action to preserve [the] Consumer Financial Protection Bureau now, before the case concerning its fate has been resolved?" Op. 1.

Given that stated concern, the court could perhaps have entered a narrow injunction requiring defendants to keep CFPB open and fulfill whatever the court specified to be congressionally mandated obligations. As noted, the government strongly disputes that any such injunction would be necessary; CFPB's leadership has already made clear that the agency will continue to exist and will continue performing its statutorily required functions. Nonetheless, such an injunction would at least have been tailored to the justifications the district court articulated.

But instead of entering an injunction so tailored, the district court imposed sweeping and intrusive requirements that have no plausible basis in the statutes creating CFPB or defining its minimum responsibilities. For instance, the injunction:

- requires CFPB to "reinstate all probationary and term employees terminated between February 10, 2025 and the date of this order," without regard to whether those employees are necessary to carry out statutory duties;

- requires CFPB to "rescind all notices of contract termination issued on or after February 11, 2025," and prevents CFPB from "finaliz[ing] the termination of any contract" even after a contract is "halted" based on an individualized assessment that a particular contract is "unnecessary for the agency to fulfill its statutory functions";

15

– requires CFPB to "provid[e] Elevated Case Management" to "monitor and respond" to consumer complaints;

– prevents CFPB from "issu[ing] any notice of reduction-in-force to any CFPB employee," or otherwise "terminat[ing] any CFPB employee, except for cause related to the individual employee's performance or conduct," regardless of whether the agency determines that fewer employees are needed in light of leadership's choices regarding discretionary agency functions; and

– prevents CFPB from "enforc[ing] the February 10, 2025, stop-work order or requir[ing] employees to take administrative leave in furtherance of that order," or using any other means "to achieve the outcome of a work stoppage," even with respect to work that Congress left to the agency's discretion whether and how to perform.

Order 2-3, Dkt. No. 88. The injunction thus blocks standard workforce decisions, resource allocations, and administrative directives that do not threaten the agency's duties required by statute.

2. Indeed, the preliminary injunction is built on a contradiction: to ensure that the Bureau remains open and functional, the district court enjoined the Bureau's political leadership from using ordinary management tools that are available to all open and functioning agencies. The district court opined that "agency is either open or it's not," and declared that it was issuing the preliminary injunction for the purpose of ensuring that CFPB remains "open." Op. 46; *see also, e.g.*, Op. 1, 3, 61, 101.

16

Yet agencies that remain fully "open" possess broad discretion to allocate resources and make personnel decisions, under the control of politically appointed leadership. The impermissible effect of the district court's injunction is to require the Bureau to operate as it stood before the presidential transition—and without any of the normal tools that "open" executive agencies possess. Even more remarkably, the district court provided not a word of explanation—anywhere in its 100-plus page opinion—for why it is necessary to impose these requirements to ensure that the Bureau satisfies its minimum statutory responsibilities.

For instance, the injunction requires that the Bureau rescind *all* notices of contract termination issued after February 11, regardless of whether the contract was terminated consistent with the agency's statutory obligations and in reflection of adjusted priorities. *See* Order 3. The injunction also prohibits CFPB from finalizing any subsequent contract termination, even if the agency has "halted" that contract "based on an individualized assessment" that "the contract involved is unnecessary for the agency to fulfill its statutory functions." Order 3. These requirements are inexplicable. Agencies routinely enter into and terminate contracts based on their needs and priorities, and the district court has no basis for

17

curtailing the agency's discretion to do so merely to further the stated goal of keeping the agency open.

The district court also had no basis for superintending the agency's management of its personnel through a preliminary injunction. *See Sampson v. Murray*, 415 U.S. 61, 84 (1974) (emphasizing "the general unavailability of preliminary injunctions in Government personnel cases"). The district court required the agency to reinstate "all probationary and term employees" terminated in a given period without any inquiry into whether the reinstatement of these employees was necessary for the agency to fulfill its statutory obligations. Order 2.[2]

In the same vein, the district court prohibited the Bureau from making use of any reductions in force, a lawful and established tool of workforce management, regardless of reason. The court nowhere explains why keeping CFPB open requires prohibiting all workforce adjustments. Nor could it, given that the ability to conduct reductions in force is a power

---

[2] The district court stated incorrectly that CFPB's Acting Director, Russell Vought, is also the head of the Office of Personnel Management, and it suggested that this relationship may have improperly affected the decision process. *See* Op. 42-44. Russell Vought is the Director of the Office of Management and Budget, not the Office of Personnel Management.

enjoyed by nearly every agency in the Executive Branch. The district court even enjoined the Bureau to adopt specific information-technology policies, requiring the agency to provide all remote employees with "laptop computers that are enabled to connect securely to the agency server through the Citrix Virtual Desktop or another similar program." Order 2. While an agency may well determine that remote employees should be issued laptop computers configured with the Citrix Virtual Desktop, those decisions are properly entrusted to agency management. In the absence of an unusual statutory requirement—and no one has cited any such statute here—a district court has no valid basis for issuing orders of this kind.

The district court's prohibition on temporary work stoppages further exemplifies the mismatch between the injunction and the court's articulated concerns. Nearly every agency, including CFPB, has the authority to make policy choices about how to implement statutory directives—whether mandatory or discretionary—and it is not uncommon for agency leadership to reevaluate these policy choices at the start of a new administration. *See* Martinez Decl. ¶¶ 3, 11. The district court, however, failed to distinguish between a temporary directive during a transition period, on the one hand, and the wholesale elimination of an

19

agency on the other. Consequently, the district court improperly prevented the agency from making use of a legitimate management tool by enjoining it from "reinstitut[ing] or seek[ing] to achieve the outcome of a work stoppage, whether through a stop-work order … or any other means." Order 2.

This restriction cannot be justified by the district court's stated concern about the continued existence of the agency. As an initial matter, the district court's conclusion that the agency's February 10 "stop work" e-mail serves as evidence of an ongoing effort to eliminate the agency is incorrect. As explained above, *supra* pp. 7-9, agency leadership has repeatedly made clear that the intent of this pause was not to stop work in furtherance of statutory obligations, but rather to "ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties." Op. 29. The agency's directives properly acknowledge its discretion to reevaluate how best to allocate resources and prioritize discretionary activities, and they firmly reject the notion that the agency would cease to carry out its mandatory responsibilities. The court acknowledged the agency's

20

statements but erred in dismissing them as "window dressing." Op. 2; *supra* pp. 7-9.

In any event, even if the district court's concerns about the goals or likely effects of the February 10 order were justified, the court erred in relying on that order as a basis for its sweeping prohibition on temporary work stoppages in their entirety. If it had an evidentiary basis to do so, the court could perhaps have narrowly enjoined the Bureau from conducting work stoppages that precluded the fulfillment of specific statutory functions or responsibilities. But the court did not do so, nor did it explain its choice to issue a broader injunction. Instead, the court effectively required the continuation of all Bureau activities as of January 19, 2025, regardless of their connection to statutory mandates. This severely restricts the discretion of agency management and interferes with the President's ability to ensure oversight and accountability of an Executive Branch agency.

This overreach is particularly striking given the court's own observation that "this case is not about how the executive exercises his discretion." Op. 107. The court explicitly noted that its analysis would be different "if the Court were being asked to enjoin a decision on how

21

vigorously the CFPB will enforce particular provisions." *Id.* In that case, the court conceded, agency discretion over enforcement priorities "would bear heavily on the analysis." *Id.*; *see also Heckler v. Chaney*, 470 U.S. 821 (1985). But the injunction contradicts the court's acknowledgment of the judiciary's limited role in interfering with an agency's discretionary "realignment of priorities," *id.* (citing *Heckler*, 470 U.S. 821): The court stated that the injunction was necessary to prevent CFPB from "dismantling and shutting down the agency entirely in violation of statutory mandates," yet imposed an injunction that restricts lawful agency discretion in ways entirely unrelated to keeping the agency open.

Because the preliminary injunction is, at best, untethered to the district court's stated goal of ensuring "that the CFPB will still be standing when the Court reaches the merits of this case," Op. 61, the government is likely to succeed on appeal.

## II.    The Remaining Factors Favor A Stay.

The equitable factors likewise weigh decisively in the government's favor, and "the public interest and balance of equities factors merge" where, as here, "the government is the party" against whom an injunction is sought. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

1. As explained above, there is no basis for enforcing a preliminary injunction that does not correspond to the justification offered by the district court, and the government and the public will suffer irreparable harm absent a stay. As it stands, the injunction impinges on the agency's flexibility to shift resources and make staffing decisions—tools essential to the management of any agency. The preliminary injunction undermines Executive Branch governance and irreparably burdens the President's political accountability and authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Indeed, by imposing sweeping and intrusive restrictions on the agency's management and operations, the district court locked the agency into a static operational structure that prevents leadership from determining how best to fulfill the agency's statutory obligations in line with the President's policy priorities. The district court stated that its goal was to keep the agency open and operational, but preventing the agency from adjusting priorities or managing personnel will hinder CFPB's long-term ability to fulfill its statutory duties, not protect it.

2. For similar reasons, a stay would not harm plaintiffs. The district court was unequivocal that it was awarding preliminary relief for the

23

purpose of preserving the agency's existence and ensuring that it would continue to be able to fulfill its statutory responsibilities. Because the court's injunction departed from that goal, however, a stay would not subject plaintiffs to the injury the court sought to prevent. Indeed, there is no risk that this injury would materialize absent a stay, as the government has repeatedly explained that CFPB will remain open and will continue to carry out its congressionally mandated activities. *See, e.g.*, Martinez Decl. ¶ 22 ("The Bureau is committed to performing its statutory obligations, including those listed in 12 U.S.C. § 5493(b)(3)(A), entitled 'Collecting and tracking complaints.' The Bureau is maintaining a single, toll-free telephone number, a website, and a Consumer Complaint Database to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services.").

## III.    At A Minimum, The Court Should Enter A Partial Stay.

At a minimum, this Court should stay the portions of the district court's injunction that most severely intrude on the agency's day-to-day operations.

Provisions 2 and 3 of the injunction require the reinstatement of all probationary and term employees, regardless of circumstance, and prevent

24

any reductions of force, even if such reductions would not affect the agency's ability to carry out its statutorily mandated activities. Together, these provisions effectively eliminate all Executive discretion over personnel matters—even those unrelated to agency closure or statutory requirements. Indeed, they prevent even ordinary staffing adjustments routinely made by new administrations. The district court's articulated concern about ensuring the agency's continued operation provides no basis for such extreme restraints on agency personnel actions.

Provision 4 similarly reaches far beyond what is necessary to ensure the agency's continued operation by preemptively prohibiting the agency from temporarily pausing work activities while agency priorities are reassessed. As explained above, temporary work pauses can serve legitimate management purposes and are an important tool of agency management during presidential transitions. Preserving such Executive Branch discretion is particularly important for agencies that—like CFPB— have enforcement discretion requiring evaluation of "the many variables involved in the proper ordering of its priorities." *Heckler*, 470 U.S. at 831-832 (noting the "general unsuitability for judicial review of agency decisions to refuse enforcement"). By broadly prohibiting work stoppages,

25

the injunction unnecessarily intrudes on day-to-day operations and enforcement discretion.

Provision 7 requires reinstatement of all terminated contracts regardless of whether any given contract is consistent with current agency priorities or necessary to fulfill any statutory duties. This provision, moreover, prohibits the agency from finalizing any subsequent decision to terminate a contract—even if the agency has "halted" the contract based on an individualized assessment that it is unrelated to CFPB's congressionally mandated functions, that the contractor's performance is unsatisfactory, or that the contract is duplicative of other work. A provision that, as here, burdens routine contract management unrelated to agency closure cannot be justified as necessary to ensure the agency's continued operation.

Finally, despite the government's request for a brief stay of any injunction to permit appeal, *see supra* p. 12 n.1, provision 8 requires the agency to ensure and certify to compliance with the injunction by this Friday, April 4, likely before this Court has an adequate opportunity to consider whether the injunction should be stayed in whole or part. As noted above, the government requests an immediate administrative stay of this provision at a minimum to allow the Court time to act on the motion

26

for a stay pending appeal to minimize the disruption entailed by, *e.g.*, the injunction's requirement that the agency rehire employees and rescind contract terminations.

## CONCLUSION

For the foregoing reasons, this Court should enter a stay pending appeal, putting an administrative stay in place while it considers this motion.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney*
  *General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney*
  *General*

MARK R. FREEMAN
MELISSA N. PATTERSON
*/s/ Catherine Padhi*
CATHERINE PADHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7712*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5091*
  *catherine.m.padhi@usdoj.gov*

MARCH 2025

27

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5157 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Catherine Padhi*
Catherine Padhi

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2025, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals by using the appellate CM/ECF system. Service will be

accomplished by the appellate CM/ECF system.

/s/ *Catherine Padhi*

Catherine Padhi

**ADDENDUM**

## TABLE OF CONTENTS

**Relevant Record Materials, pursuant to Fed. R. App. P.
8(a)(2)(B)(iii)**

Preliminary Injunction (March 28, 2025) (Dkt. No. 88) ................................ A1

Memorandum Opinion (March 28, 2025) (Dkt. No. 87) ............................... A4

Amended Complaint (Feb. 13, 2025) (Dkt. No. 7) ..................................... A116

Martinez Declaration (Feb. 24, 2025) (Dkt. No. 31-1) ............................... A148

Supplemental Martinez Declaration (March 2, 2025) (Dkt. No. 47-1) ..... A169

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RUSSELL VOUGHT *in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al.*, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 25-0381 (ABJ)

## <u>ORDER</u>

Plaintiffs' Motion for Temporary Restraining Order [Dkt. # 10] was converted with the parties' consent to a Motion for Preliminary Injunction on February 14, 2025. *See* Order [Dkt. # 19]. Upon consideration of the motion, defendants' opposition [Dkt. #31], plaintiffs' reply [Dkt. # 40], the parties' supplemental submissions, the arguments advanced and evidence introduced during the hearings conducted on March 3, 10, and 11, 2025, and the full record in this case, and for the reasons set forth in the accompanying Memorandum Opinion [Dkt. # 87], it is hereby **ORDERED** that the motion is **GRANTED**. In accordance with Fed. R. Civ. Proc. 65(a) and (d)(1) and (2)(A)–(C), defendant Vought and defendant Consumer Financial Protection Bureau ("CFPB") are enjoined as set forth below until further order of this Court. This order shall bind the defendants, their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, such as personnel from the Department of Government Efficiency ("DOGE") or the U.S. Digital Service.

It is hereby **ORDERED** that:

1

1. Defendants, shall maintain and shall not delete, destroy, remove, or impair any data or other CFPB records covered by the Federal Records Act (hereafter "agency data") except in accordance with the procedures described in 44 U.S.C. Chapter 33. This means that Defendants shall maintain and shall not delete, destroy, remove, or impair agency data from any database or information system controlled by, or stored on behalf of, the CFPB. The term "agency data" includes any data or CFPB records stored on the CFPB's premises, on physical media, on a cloud server, or otherwise. The defendants must take all necessary steps to ensure that its contractors do the same.

2. Defendants shall reinstate all probationary and term employees terminated between February 10, 2025 and the date of this order, including but not limited to, Julia Barnard, the Private Student Loan Ombudsman.

3. Defendants shall not terminate any CFPB employee, except for cause related to the individual employee's performance or conduct; and defendants shall not issue any notice of reduction-in-force to any CFPB employee.

4. Defendants shall not enforce the February 10, 2025 stop-work order or require employees to take administrative leave in furtherance of that order, and defendants shall not reinstitute or seek to achieve the outcome of a work stoppage, whether through a stop-work order, an order directing employees to take administrative leave, or any other means.

5. To ensure that employees can perform their statutorily mandated functions, the defendants must provide them with either fully-equipped office space, or permission to work remotely and laptop computers that are enabled to connect securely to the agency server through the Citrix Virtual Desktop or another similar program.

6. Defendants shall ensure that in accordance with 12 U.S.C. §5492(b)(3), the CFPB Office of Consumer Response continues to maintain a single, toll-free telephone number, a website, and a database for the centralized collection of consumer complaints

regarding consumer financial products and services, and that it continues to monitor and respond to those complaints, including by providing Elevated Case Management.

7.    Defendants shall rescind all notices of contract termination issued on or after February 11, 2025, and they may not reinitiate the wholesale cancellation of contracts. This provision does not prohibit the defendants from ordering that work or services under specific contracts be halted based on an individualized assessment that the contract involved is unnecessary for the agency to fulfill its statutory functions. To ensure that this Court can award full relief at the end of the case, however, the defendants may not finalize the termination of any contract.

8.    Defendants shall file a report with the Court by April 4, 2025 confirming that all individuals and entities that fall within Fed. R. Civ. Proc. 65(d)(2)(A), (B), and (C) have received actual notice of this Order, and that the defendants are in compliance with this Order.

9.    The Court's temporary consent order issued on February 14, 2024 [Dkt. # 19] and the March 3, 2025 Minute Order issued in light of the parties' Notice of Agreement [Dkt. # 53] and Notice of Agreement (Corrected) [Dkt # 65], are hereby **VACATED.**

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  March 28, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
NATIONAL TREASURY                   )
EMPLOYEES UNION, *et al.*,           )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )
                                    )    Civil Action No. 25-0381 (ABJ)
RUSSELL VOUGHT                      )
*in his official capacity as*        )
*Acting Director of the*             )
*Consumer Financial*                 )
*Protection Bureau, et al.*,         )
                                    )
          Defendants.               )
_____)

**<u>MEMORANDUM OPINION</u>**

*"CFPB RIP"*
Elon Musk – February 7, 2025

*"The CFPB has been a woke and weaponized agency against disfavored industries and*
*individuals for a long time. This must end."*
Russell Vought – February 8, 2025

*"That was a very important thing to get rid of."*
President Donald Trump – February 10, 2025

The motion for preliminary injunction to be decided boils down to one question: should the Court take action to preserve the the Consumer Financial Protection Bureau now, before the case concerning its fate has been resolved? That is an extraordinary step, and before it can step in, the Court must conclude that the plaintiffs are likely to succeed on their claims, that they would suffer irreparable harm in the meantime if the Court lets the lawsuit run its course, and that an injunction would be in the public interest.

The Court has made those findings, and the answer is an overwhelming yes: the Court can and must act.

The evidence presented in connection with the motion – the testimony of the agency's Chief Operating Officer and other witnesses, and the agency's own documents, produced by both sides – showed that Russell Vought, the Acting Director of the CFPB, ordered all employees to stop work on February 10, 2025. As of that date, the defendants were fully engaged in a hurried effort to dismantle and disable the agency entirely – firing all probationary and term-limited employees without cause, cutting off funding, terminating contracts, closing all of the offices, and implementing a reduction in force ("RIF") that would cover everyone else. These actions were taken in complete disregard for the decision Congress made 15 years ago, which was spurred by the devastating financial crisis of 2008 and embodied in the United States Code, that the agency must exist and that it must perform specific functions to protect the borrowing public. The elimination of the agency was interrupted only because plaintiffs sought and obtained the Court's intervention on the day the overwhelming majority of the employees were going to be fired.

That slowed, but did not deter, the defendants. The shut down activities continued for the next two weeks, and it wasn't until the Sunday afternoon before the Monday when the Court was scheduled to hold a hearing that agency officials turned around and announced to the surprised staff that they were supposed to have been performing their statutorily mandated duties all along.

The testimony and the contemporaneous documents suggest that those last minute communications were nothing more than window dressing, and that nothing has changed. The defendants are still engaged in an effort to implement a Presidential plan to shut the agency down entirely and to do it fast. Absent an injunction freezing the status quo – preserving the agency's data, its operational capacity, and its workforce – there is a substantial risk that the defendants will complete the destruction of the agency completely in violation of law well before the Court can rule on the merits, and it will be impossible to rebuild.

It may be that defendants decided to authorize the resumption of some work and the reactivation of some contracts in light of a belated, but genuine recognition that there were certain duties that had to be performed to comply with the law while the agency was still open. The material in the record and the chronology suggest, though, that the change of heart was more likely a charade for the Court's benefit. Either way, it's purely temporary; the Court's oversight is the only thing holding the defendants back. If the Court denies the motion for interim relief, the RIF

notices that have already been prepared will go out before the ink is dry on the Court's signature, the employees will be back on administrative leave for just thirty days before they are gone, and the defendants will pull the plug on the CFPB.

This is precisely the sort of situation preliminary injunctions were designed to address. If the defendants are not enjoined, they will eliminate the agency before the Court has the opportunity to decide whether the law permits them to do it, and as the defendants' own witness warned, the harm will be irreparable.

*    *    *

On February 9, 2025, Plaintiffs National Treasury Employees Union ("NTEU"), National Consumer Law Center ("NCLC"), National Association for the Advancement of Colored People ("NAACP"), Virginia Poverty Law Center, Rev. Eva Steege, and the CFPB Employee Association filed this action against the Acting Director of the CFPB, Russell Vought, and the CFPB itself. *See* Compl. [Dkt. # 1]. Plaintiffs challenge decisions made and actions taken by the defendants to carry out President Trump's vow to have the Consumer Financial Protection Bureau ("CFPB") "totally eliminated." *See* Am. Compl. ¶ 47, n.14, citing Joey Garrison (@joeygarrison), X (Feb. 10, 2025), https://x.com/joeygarrison/status/1889132023933022283?Mx=2.

Pending before the Court is plaintiffs' motion for a temporary restraining order, Pls.' Mot. for TRO [Dkt. # 10], which, with the parties' consent, was deemed to be a motion for preliminary injunction. *See* Order [Dkt. # 19]. This motion is fully briefed. Defs.' Opp. to Pls.' Mot. for Prelim. Inj. [Dkt. # 31] ("Defs.' Opp."); Pls.' Reply Mem. in Support of Pls.' Mot. [Dkt. # 40] ("Pls.' Reply"). The Court has also had the benefit of briefs filed by three amici curiae: twenty-two states and the District of Columbia, Br. of Amici Curiae States of N.Y., N.J., Ariz., Cal., Colo., Conn., Del., Haw., Ill., Me., Md., Mass., Mich., Minn., Nev., N.M., N.C., Or., R.I., Vt., Wash., Wis., and D.C. in support of Pls.' Mot. for a Prelim. Inj. [Dkt. # 24] ("States' Br."); non-profit Tzedek DC, Amicus Br. of Tzedek DC [Dkt. # 33]; and Br. of 203 Members of Congress

3

as Amici Curiae [Dkt. # 84] ("Members' Br.").  For the reasons set out in detail below, plaintiff's motion will be granted, and the Court will enter an order to preserve the status quo while the case moves forward on the merits.

## STATUTORY BACKGROUND

The Consumer Financial Protection Bureau was created in response to a severe economic crisis that gripped the nation.  In 2008, "the subprime mortgage market collapsed, precipitating a financial crisis that wiped out over $10 trillion in American household wealth and cost millions of Americans their jobs, their retirements, and their homes.  In the aftermath, . . . [t]hrough the Treasury Department, the administration encouraged Congress to establish an agency with a mandate to ensure that 'consumer protection regulations' in the financial sector 'are written fairly and enforced vigorously.'"  *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 205 (2020), quoting Dept. of Treasury, Financial Regulatory Reform:  A New Foundation 55 (2009).  Congress acted on these proposals, and as part of the Wall Street Reform and Consumer Protection Act, commonly referred to as the Dodd-Frank Act, Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010), it established the CFPB to serve as "an independent financial regulator within the Federal Reserve System."  *Seila L.,* 591 U.S. at 206.

The statute provides that the agency "shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws."  12 U.S.C. §5491(a); *see generally*, Title X, Dodd-Frank Act, also known as the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5491 et. seq.

> Congress tasked the CFPB with "implement[ing]" and "enforc[ing]" a large body of financial consumer protection laws to "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." . . . Congress transferred the administration of 18 existing federal statutes to the CFPB, including the Fair Credit

> Reporting Act, the Fair Debt Collection Practices Act, and the Truth in
> Lending Act. . . . In addition, Congress enacted a new prohibition on "any
> unfair, deceptive, or abusive act or practice" by certain participants in the
> consumer-finance sector.

*Seila L.*, at 206, citing 12 U.S.C. §§ 5511(a), 5481(12), (14); *see also id.* § 5581.[1]

As a result of the consolidation of functions accomplished by the statute, the CFPB is now "the only federal agency authorized to supervise the nation's largest banks for their compliance with consumer financial protection laws. It also supervises nonbanks of all sizes in certain market segments, like mortgage companies and payday lenders, as well as larger nonbank participants in other consumer financial market segments, like credit reporting agencies, digital payment apps, and debt collectors." Members' Br. at 13. "To date, the CFPB has returned more than $21 billion improperly taken from at least 205 million consumers, in addition to at least $5 billion in civil penalties made available to compensate consumers in cases where the business that took their money is insolvent." *Id.* at 12.

The statute mandates that the CFPB maintain specific subject matter offices and units, produce specific periodic reports, and provide testimony and reports to Congress.

---

1    *See* Members' Br. at 2. "The CFPB was born out of the most severe economic and financial crisis since the Great Depression. Congress thoroughly investigated the root causes of the 2008 crisis and determined that regulatory failures were largely to blame. Because responsibility for consumer financial protection was dispersed across federal agencies, consumers were, at best, a secondary consideration for regulators. After an exhaustive legislative process, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 . . .. One of the greatest achievements of that bipartisan effort was to consolidate consumer financial protection in a single agency, the CFPB, that would be a watchdog for consumers, armed with the legal authority necessary to prevent another financial meltdown." *Id.*

## I.    Required Offices and Positions

The CFPB is statutorily required to maintain:

- a Consumer Advisory Board to "advise and consult with the Bureau in the exercise of its functions . . . and to provide information on emerging practices in the consumer financial products or services industry," 12 U.S.C. § 5494(a);

- a unit that has "a single, toll-free telephone number, a website, and a database" to centralize the collection and monitoring of and the responses to consumer complaints about consumer financial products or services, 12 U.S.C. § 5493(b)(3)(A);

- "a unit whose functions shall include providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities," 12 U.S.C. § 5493(b)(2);

- "a unit whose functions shall include researching, analyzing, and reporting on" a number of specific issues, including "developments in markets for consumer financial products or services," "areas of risk to consumers," and "access to fair and affordable credit for traditionally underserved communities," 12 U.S.C. § 5493(b)(1);

- "the Office of Fair Lending and Equal Opportunity" which "shall . . . provid[e] oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau;" coordinate fair lending efforts with other agencies and regulators; and work with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education, 12 U.S.C. § 5493(c)(1);

- an "Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions," 12 U.S.C. § 5493(d);

- an "Office of Service Member Affairs, which shall be responsible for developing and implementing initiatives for service members and their families," 12 U.S.C. § 5493(e); and

- an "Office of Financial Protection for Older Americans . . . to facilitate the financial literacy of individuals" 62-years-old and older "on protection from unfair, deceptive, and abusive practices and on current and future financial choices," 12 U.S.C. § 5493(g)(1).

The statute also requires the CFPB to have "a Private Education Loan Ombudsman . . . to provide timely assistance to borrowers of private education loans."  12 U.S.C. § 5535(a).  The Ombudsman must "receive, review, and attempt to resolve informally complaints from borrowers of loans . . . including, as appropriate attempt[ing] to resolve such complaints in collaboration with the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in private education loan programs."  *Id.* § 5535(c)(1).

## II.    Required Research and Reports

The statute requires the Bureau to produce research, reports, and information on specific topics, including credit rates and credit cards, *see* 15 U.S.C. §§ 1646(a), (b); *id.* § 1632(d)(3); market developments for consumer financial products or services and consumer access to those products, 12 U.S.C. § 5493(b)(1); depository institutions and aggregate lending patterns, *id.* § 2809(a); and emerging risks to consumers, *id.* § 5512(c)(3).  And it must make "[a]ll public data assets published by the Bureau" publicly available and freely available for download.  *Id.* § 5499.

The CFPB Director and offices within the Bureau are also required to report to Congress. *See* 12 U.S.C. § 5493(b)(3)(C) (requiring the Director to report annually to Congress on the complaints received by the Bureau in the prior year regarding consumer financial products and services, including information and analysis about complaint numbers, complaint types, and, as applicable, information about resolution of complaints); *id.* § 5493(c)(2) (D) (requiring an annual report from the Office of Fair Lending and Equal Opportunity); *id.* § 5493(d)(4) (requiring an annual report from the Director on financial literacy activities and strategy to improve financial literacy of consumers); *id.* § 5535(d) (requiring an annual report from the Private Education Loan Ombudsman).  And the Director must report to the President and testify before Congress semi-annually.  *Id.* § 5496.

### III.    Rulemaking, Enforcement, and Supervision

In addition to these statutorily mandated activities, Congress gave the CFPB specific rulemaking, enforcement, and supervisory authority.  Congress granted the Bureau rulemaking authority, *see* 12 U.S.C. § 5512, specifically permitting it to promulgate regulations that identify "unfair, deceptive, or abusive" practices and establish disclosure requirements to aid consumers' understanding of financial products and services.  *See id.* § 5531(b); *id.* §§ 5532, 5533.  Congress also granted the Bureau enforcement authority, authorizing it to conduct investigations, hearings, and adjudication proceedings, and to initiate civil litigation and refer criminal matters to the U.S. Attorney General.  *Id.* §§ 5561–67.  And Congress granted the CFPB supervisory powers, *id.* §§ 5514–16, authorizing it to examine and require periodic reports from financial institutions, *id.* §§ 5514, 5515, including payday lenders, private education lenders, insured depository institutions, and credit unions with more than $10 billion in assets.  *Id.* § 5514(a)(1)(B), (D)–(E), (b)(1); *id.* § 5515(b)(1).

In addition, the Bureau is required by the statute to report on these authorized activities.  *See, e.g.*, 12 U.S.C. § 5496(c) (requiring the Director's semi-annual report to Congress to include "(4) an analysis of complaints about consumer financial products or services that the Bureau has received and collected in its central database on complaints during the preceding year; (5) a list, with a brief statement of the issues, of the public supervisory and enforcement actions to which the Bureau was a party during the preceding year; (6) the actions taken regarding rules, (7) ) an assessment of significant actions by State attorneys general or State regulators relating to Federal consumer financial law;" and "(8) an analysis of the efforts of the Bureau to fulfill the fair lending mission of the Bureau").

### IV. The CFPB's Funding

The CFPB does not rely on annual appropriations for its funding. *Seila L.*, 591 U.S. at 207. Rather, it "receives funding directly from the Federal Reserve, which is itself funded outside the appropriations process through bank assessments." *Id.* at 207–08, citing 12 U.S.C. §§ 5497(a)(1), (2)(A)(iii), 2(B) ("Each year, the CFPB requests an amount that the Director deems 'reasonably necessary to carry out' the agency's duties, and the Federal Reserve grants that request so long as it does not exceed 12% of the total operating expenses of the Federal Reserve (inflation adjusted)."). This arrangement was approved by the Supreme Court in *CFPB v. Community Financial Services Association of America, Ltd.*, 601 U.S. 416 (2024).[2]

The Bureau's annual budget in recent years has exceeded 500 million dollars, *Seila L.*, 591 U.S. at 208, citing CFPB, Fiscal Year 2019: Ann. Performance Plan and Rep., p. 7, and in its first five years alone, it "obtained over $11 billion in relief for over 25 million consumers, including a $1 billion penalty against a single bank in 2018." *Id.* at 206, citing CFPB, Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2015, p. 3. The brief filed by Members of Congress reports that the total is now more than $21 billion. Members' Br. at 3, 12.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**Friday, January 31**        President Trump fires CFPB Director Rohit Chopra. *See* Email from CFPB Office of the Director (Feb. 3, 2025) [Dkt. # 23-1] ("Feb. 3 Email").

---

2       Given that circumstance, it is not clear that the February 26, 2025 guidance from Russell Vought, in his capacity as Director of OMB ("tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working citizens"), has much bearing on the CFPB. *See* Mem. from Russell T. Vought, Director, Off. of Mgmt. and Budget, and Charles Ezell, Acting Director, Off. of Pers. Mgmt., to Heads of Exec. Dep'ts and Agencies (Feb. 26, 2025) [Dkt. # 70-2] at Page 1–7 of 7.

|  | Effective date of appointment of Secretary of Treasury Scott Bessent as CFPB Acting Director. *See* Feb 3 Email. |
|---|---|
| **Monday, February 3** | CFPB Office of the Director email to DL_CFPB_AllHands; DL_ CFPB_AllHands_Contractors |

Subject:  Instructions from Acting Director

Colleagues,

Secretary of the Treasury Bessent has been named Acting Director of the CFPB, effective January 31, 2025. As Acting Director, Secretary Bessent is committed to appropriately stewarding the agency pending new leadership.   In order to promote consistency with the goals of the Administration, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau are directed:

- Not to approve or issue any proposed or final rules or formal or informal guidance.
- To suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not to commence, take additional investigative activities related to, or settle enforcement actions.
- Not to issue public communications of any type, including publication of research papers.
- Not to approve or execute any material agreements, including related to employee matters or contractors.
- Not to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Feb. 3 Email.

| Tuesday, February 4 | Acting Director Bessent emails all CFPB staff and contractors directing them "[n]ot to initiate supervisory designation proceedings or designate any nondepository institution for supervision." Am. Compl. ¶ 37. |
|---|---|
| Thursday, February 6 | Officials from the Department of Treasury notify CFPB officials in the evening that two United States Department of Government Efficiency ("DOGE") Service officials would need access to CFPB's headquarters. First Decl. of Adam Martinez [Dkt. # 31-1] ("First Martinez Decl.") ¶ 6; Testimony of Adam Martinez, Tr. of Evidentiary Hr'g (Mar. 10, 2025) [Dkt. # 73] ("Mar. 10 Tr.") at 19. |
| | Members of DOGE, including Christopher Young, enter CFPB headquarters. Decl. of Daniel J. Kaspar, NTEU Director of Field Operations [Dkt. # 14-1] ("Kaspar Decl.") ¶ 6; Martinez Testimony, Mar. 10 Tr. at 20. |
| Friday, February 7 | CFPB management and DOGE personnel Christopher Young, Jordan Wick, and Jeremy Lewin have a follow-up meeting. DOGE representatives gain access to all non-classified CFPB systems. Kaspar Decl. ¶ 6; First Martinez Decl. ¶ 7; Martinez Testimony, Mar. 10 Tr. at 21. |
| | Christopher Young of DOGE is officially detailed to CFPB. Martinez Testimony, Mar. 10 Tr. at 21, 137–38. DOGE staff are designated as senior advisors of CFPB. Martinez Testimony, Mar. 10 Tr. at 144. |
| | The "CFPB homepage at consumerfinance.gov – the launching pad for most American consumers' interactions with the CFPB – was changed to a '404 - Site Not Found' error message." Third Decl. of Erie Meyer, CFPB Chief Technologist [Dkt. # 38-9] ¶ 19. |
| | Elon Musk posts "CFPB RIP," accompanied by a tombstone emoji, to his personal X account. Kaspar Decl. ¶ 6; Am. Compl. ¶ 39, citing https://x.com/elonmusk/status/1887979940269666769. |
| | CFPB General Counsel and Senior Advisor to the Director Seth Frotman is terminated. Decl. of Seth Frotman [Dkt. # 38-13] ¶ 1; *see also* Martinez Testimony, Mar. 10 Tr. at 125 (testifying that Mark Paoletta joined the CFPB as Chief Legal Officer around this date). |
| | The President designates Director of the Office of Budget and Management Russell Vought as Acting Director that evening. First Martinez Decl. ¶¶ 9–10; Am. Compl. ¶ 38. |

**Saturday, February 8**                8:50 a.m.  Acting Director Vought sends email all CFPB employees.

From:  Vought, Russell
To: _DL_CFPB_AllHands
Subject:  Directives on Bureau Activities
Date:  Saturday, February 8, 2025 8:50:28 PM

Dear Colleagues,

I am honored that President Trump designated me as Acting Director of the Bureau on February 7, 2025. As Acting Director, I am committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources. To that end, I am directing that, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau shall:

- Not approve or issue any proposed or final rules or formal or informal guidance.
- Suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not commence, take additional investigative activities related to, or settle enforcement actions.
- Not open any new investigation in any manner, and cease any pending investigations.
- Not issue public communications of any type, including publication of research papers and compliance bulletins.
- Not approve or execute any material agreements, including related to employee matters or contractors.
- Not make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.
- Cease all supervision and examination activity.
- Cease all stakeholder engagement.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Russell T. Vought

*See* Email from Russell Vought (Feb. 8, 2025) [Dkt. # 23-2] ("Feb. 8 Email").

Vought sends a letter to Federal Reserve Chair Jerome Powell stating that the CFPB does not need funds for Third Quarter FY 2025. Ex. G to First Martinez Decl. [Dkt. # 31-1] at Page 22 of 22.[3]

Vought posts on X: "The CFPB has been a woke & weaponized agency against disfavored industries and individuals for a long time. This must end." *See* @russvought, X (Feb. 8, 2025); Ex. F to Decl. of A. Roston & A. Scible [Dkt. # 38-17] ("Roston/Scible Decl.").

**Sunday, February 9**    Chief Operating Officer Adam Martinez emails all CFPB employees and contractors.

To: _DL_CFPB_AllHands
Subject: Please Read: DC Headquarters Building Operating Status (2/10-2/14)
Date: Sunday, February 9, 2025 1:39:00 PM

(This message is for DC Headquarters Staff and Contractors)

Dear Colleagues:

The DC Headquarters Building will be closed this week (2/10-2/14). Employees and contractors are to work remotely unless instructed otherwise from our Acting Director or his designee.

Thank you.
Adam
Adam Martinez
Chief Operating Officer

---

3    Citations to filings with the court include the docket number of the filing, [Dkt. # __], pin cites to page or paragraph numbers appearing in the original documents, and where available, Bates numbers placed on a document by the parties at the bottom right corner. For filings containing multiple documents in a single docket entry, the Court includes pin cites to the PDF page numbers at the top right of the document placed on the filing by the court's Electronic Case Filing system: "at Page __ of __."

Email from Adam Martinez (Feb. 9, 2025) [Dkt. # 23-3] ("Feb. 9 Email").

Plaintiffs file the instant lawsuit.  Compl. [Dkt. # 1].

**Monday, February 10**    8:30 a.m.    Vought sends email to all CFPB employees and contractors.

> To:  DL CFPB AllHands
> Subject:  Additional Directives on Bureau Activities
> Date:  Monday, February 10, 2025 8:30:43 AM
>
> Good morning, CFPB staff,
>
> As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is [REDACTED]. Otherwise, employees should stand down from performing any work task. Thank you for your attention on this matter.
>
> Best,
> Russ Vought
> Acting Director
> Bureau of Consumer Financial Protection

Email of Feb. 10 [Dkt. # 23-4] ("Feb. 10 Email" or "stop work email").[4]

Adam Martinez meets with the Office of Personnel Management ("OPM") regarding the mechanics for a Reduction in Force ("RIF"). Martinez Testimony, Mar. 10 Tr. at 46, 126–27.

---

[4]    The exhibits introduced by the parties and counsel for both sides have referred to this email as the "stop work" order or email, and the Court will refer to it in the same manner in this opinion. *See* Pls.' TRO Mem. [Dkt. # 14] at 12; Defs.' Opp. at 34; Mar. 10 Tr. at 49, 56 (counsel for defendants referring to Acting Director Vought's "stop-work email" and "the stop-work order"); Defs.' Ex. 3 [Dkt. # 56-1] at page 5 of 116, CFPB_00005 (Chief Legal Officer Paoletta referring to the email as "the stop work order").

8:45 a.m. In response to the stop work email, CFPB Chief Information Officer Christopher Chilbert emails Adam Martinez to clarify the level of support to be provided in light of the order.

> I want to clarify the level of support we should be providing based on this email. I think the minimum is:
>
>> 1) Onboarding new political leadership and providing them with necessary service desk support to them
>>
>> 2) Performing security monitoring tasks for our networks
>>
>> 3) Supporting US DOGE members with requests
>>
>> 4) Perform any maintenance tasks needed to ensure that the HMDA application, Consumer Complaint Database operate, ServiceNow, and Microsoft365 platform (email/SharePoint) continue to operate.
>>
>> 5) Support any other requests from the Acting Director or new political leadership.
>
> I think this is the minimum, but I want to confirm before giving the team direction.

Defs.' Ex. 1 [Dkt. # 56-1] at Pages 1–2 of 116, CFPB_00001–2.[5]

8:54 a.m. Martinez responds to Chilbert and agrees: "That is all correct. The USDS Team [also referred to as DOGE] will let you or me know if any other work is needed." Defs.' Ex. 1 [Dkt. # 56-1] at Page 1 of 16, CFPB_00001.

11:58 a.m. Chilbert replies to Martinez, requesting authorization to create list of contractors necessary to support operational emergencies. Defs.' Ex. 1 [Dkt. # 56-1] at Page 1 of 116, CFPB_00001.

---

5    Defendants' exhibit list appears at [Dkt. # 70-3].

4:43 p.m.  CFPB Assistant Director, Research Jason Brown tells Chief Legal Officer Mark Paoletta that the Office of Research has stopped work on publishing Average Prime Offer Rate (APOR). Defs.' Ex. 3 [Dkt. # 56-1] at Page 5 of 116, CFPB_00005.

7:15 p.m.  Chief Legal Officer Paoletta replies to Brown:  "The task of doing the work to publish the Average Prime Offer Rate (APOR) and publishing it are exempted from the stop work order."  Defs.' Ex. 3 [Dkt. # 56-1] at Page 5 of 116, CFPB_00005.

President Trump tells a reporter that he intends to have the CFPB "totally eliminated" and "we did the right thing.  The CFPB was a very important thing to get rid of, and it was also a waste.  I mean, number one, it was a bad group of people running it, but it was also a waste."  *See* Alejandra Jaramillo, *Trump confirms goal to "totally eliminate" the Consumer Financial Protection Bureau*, CNN (Feb. 10, 2025), Ex. G to Roston/Scible Decl. [Dkt. # 38-17].

**Tuesday, February 11**  Approximately 85 CFPB probationary employees are fired.  Decl. of Peyton Diotalevi, NTEU National Counsel [Dkt. # 41-1] ("Diotalevi Decl.") ¶ 4; Kaspar Decl. ¶ 16; Martinez Testimony, Mar. 10 Tr. at 128; Testimony of Alex Doe, Tr. of Evidentiary Hr'g (Mar. 11, 2025) [Dkt. # 74] ("Mar. 11 Tr.") at 45; *see also* Template of Notification of Termination During Probationary Period, Pls.' Ex. C [Dkt. # 60-1] at Page 7 of 107.

10:27 a.m.  CFPB Chief Financial Officer Jafner Gueye tells deputies to identify which "contracts directly support a statutory requirement, meaning that we would not be able to meet a statutory requirement without this contract."  Pls.' Ex. F [Dkt. # 60-1] at Page 14–15 of 107.

11:10 a.m.  Email from Consumer Response and Education identifying contracts that directly support its statutory requirements (attachment not provided).  Pls.' Ex. F [Dkt. # 60-1] at Page 14 of 107.

12:36 p.m.  Adam Martinez emails Chief Legal Officer Paoletta and James Bishop to introduce them to Chief Financial Officer Jafner Gueye:  "1. At your convenience he will be ready to provide you a briefing on the Civil Penalty Fund including the contractor/vendor that serves as the Bureau's intermediary and the process for disbursements of funds to consumers. 2. Jafnar is currently in communications with the Federal Reserve regarding the Bureau's ability to return money to either Treasury or the Federal Reserve if needed."  Pls.' Ex. E [Dkt. # 60-1] at Page 12 of 107.

12:47 p.m.  Email from Joshua Galicki to contracting officers with subject line "Urgent Action: Contract Termination and Continuation Notifications (Emails)" with instructions on how to issue contract termination notifications.  Galicki states, "We need to get these Termination Notifications out ASAP."  Pls.' Ex. A [Dkt. # 60-1] at Page 2 of 107; *see also* Decl. of Charlie Doe [Dkt. # 38-4] ("Charlie Doe Decl.") ¶¶ 5–6 (stating the Bureau issued "an urgent directive to the contracting department to cancel all of the agency's contracts.  I am aware of only two exceptions to this initial directive:  the contract for storing litigation data and the database that houses employees' financial disclosure information").

4:32 p.m.  Chief Legal Officer Paoletta emails Chief Financial Officer Gueye on behalf of Acting Director Vought, "Subject: Cancellation of CFPB contracts," directing "the cancellation of all contracts in the following divisions:  Enforcement (102 contracts), Supervision (16 contracts), External Affairs (3 contracts), Consumer Response (20 contracts), Office of Director (33 contracts), and Legal Division (all except 2 contracts – FD Online Licenses and litigation data)" and the contract for concrete repairs.  Defs.' Ex. 4 [Dkt. # 56-1] at Page 6 of 116, CFPB_00006; *see also* Martinez Testimony, Mar. 10 Tr. at 162–64.

5:14 p.m.  Josha Galicki emails contracting officers advising them of the directive to terminate all Enforcement, Supervision, External Affairs, Consumer Response, and Office of Director contracts.  Pls.' Ex. B [Dkt. # 60-1] at Page 5 of 107.

**Wednesday, February 12**  6:51 p.m.  Adam Martinez emails Chief Financial Officer Gueye, Jordan Wick, Christopher Young, and OPM Deputy Associate Director, HR Strategy Jason Parman approving the Statement of Work for "RIF Consulting Services," under which CFPB is to pay OPM initial funding of $171,925.  Pls.' Ex. II [Dkt. # 66-1] at Page 3–4 of 60.

**Thursday, February 13**  Plaintiffs file an amended complaint and motion for temporary restraining order.  Am. Compl. [Dkt. # 7]; Mot. for TRO [Dkt. # 10].

3:30 p.m.  The RIF team, including Alex Doe, Adam Martinez, and others meet with Jordan Wick, Jeremy Lewin, and OPM officials.  Alex Doe Testimony, Mar. 11 Tr. at 38.  Jeremy Lewin and Jordan Wick talk off screen with Acting Director Vought, and Wick tells the group that they want formal RIF notices to go out no later than February 14.  *Id.* at 41–44.

Approximately 130 CFPB term employees were fired. Diotalevi Decl. ¶ 4; Martinez Testimony, Mar. 10 Tr. at 128; Alex Doe Testimony, Mar. 11 Tr. at 45.

Post on X regarding tip line for the public to report "being pursued by CFPB enforcement or supervision staff, in violation of Acting Director Russ Vought's stand down order." Diotalevi Decl. ¶ 6; Pls.' Ex GG [Dkt. # 60-1] at Page 103 of 107.

Julie Barnard is terminated from her temporary excepted service appointment as a Markets & Policy Fellow. She is also the Student Loan Ombudsman. The stated reason for her termination is the February 11, 2025 Executive Order. Pls.' Ex. H [Dkt. # 60-1] at Page 19–20 of 107; Decl. of Julia Barnard [Dkt. # 38-10] ("Barnard Decl.") ¶ 2.

5:01 p.m. Adam Martinez emails Michael Mahoney of OPM attaching CFPB's "request for an exception to the RIF 90-day rule for competitive areas." Pls.' Ex. JJ [Dkt. # 66-1] at Page 7–8 of 60.

> This memorandum serves as the Consumer Financial Protection Bureau's (CFPB) request for an exception to the competitive area 90-day rule. . . . **The CFPB is responding to Executive Order Implementing The President's "Department of Government Efficiency" Workforce Optimization initiative – The White House dated February 11, 2025 and the CFPB Acting Director's work stoppage order dated February 10, 2025**.

Pls.' Ex. JJ [Dkt. # 66-1] at Page 9–11 of 60 (emphasis added); *see also* Martinez Testimony, Mar. 10 Tr. at 48–49 (confirming the two justifications).

RIF team receives the templates from OPM for firing the 1200 employees "at night on the 13th." Alex Doe Testimony, Mar. 11 Tr. at 46–47.

10:10 p.m. Jeremy Lewin emails Adam Martinez that "[w]e owe Acting Director Vought an update at 10am tomorrow." Pls.' Ex. JJ [Dkt. # 66-1] at Page 6 of 60.

10:12 p.m. Martinez, Lewin, and others are informed that OPM approved the exception request. Pls.' Ex. JJ [Dkt. # 66-1] at Page 6 of 60.

**Friday, February 14**

12:55 a.m.  Plaintiffs file their supporting memorandum and exhibits for the motion for a temporary restraining order.  Pls.' Mem. in Supp. for Mot. for TRO [Dkt. # 14] ("Pls.' TRO Mem.").

8:28 a.m.  Adam Martinez emails [REDACTED] advising that the request for an exception to the RIF ninety-day rule for competitive areas was approved.  Pls.' Ex. JJ [Dkt. # 66-1] at Page 6 of 60.

8:30 a.m.  RIF team including Adam Martinez meets to review OPM templates.  Alex Doe Testimony, Mar. 11 Tr. at 47.

10:00 a.m.  RIF team including Adam Martinez meets with OPM.  Alex Doe Testimony, Mar. 11 Tr. at 47.

11:08 a.m.  The Court sets a scheduling hearing for 2:00 p.m. that afternoon.  *See* ECF Notice of Hr'g (Feb. 14, 2025).

11:36 a.m.  [REDACTED] emails Jason Parman of OPM HR Strategy about the Exception Template:  "Attached are templates of Reduction in Force notifications with and without Severance Pay."  Pls.' Ex. MM [Dkt. # 66-1] at Page 21 of 60.

12:27 p.m.  CFPB's Office of Human Capital sends email:

> On Monday, February 10th CFPB's Acting Director issued guidance for Bureau staff to pause work tasks.  In accordance with the Acting Director's guidance employees should exercise administrative leave until otherwise instructed.  For staff who have been asked to work by the Acting Director, the Chief Legal Officer, or another designee (i.e. through their leadership chain, etc.) they should record that time as they normally would.  All time not in a working status should be reflected in webTA under the "Admin/Excused Absence" leave transaction category.

Pls.' Ex. J [Dkt. # 60-1] at Page 27 of 107.

12:38 p.m.  Adam Martinez emails [REDACTED], forwarding a 12:34 email he sent to Chris Young, Jeremy Lewin, Jordan Wick, copying Mark Paoletta and others:

> My team and I had a productive conversation with OPM this morning to work out any identified risks and answer follow-up questions regarding today's actions and notifications to staff.  OPM shared that

typically during the 30-day notice, employees work during this time to transfer any duties. Mark P. just happened to call me, and I was able to ask for clarification and expectations for the first phase of notifications.

We are going to place all staff on administrative leave for the 30-day notice period. This will provide the flexibility for our new leadership team to call back staff to fulfill closeout duties such as enforcement cases. If there are pockets of staff who we later determine do not need to be called back, we can immediately offboard them (i.e., terminate access) for the duration of the notice period. I will provide you all notice right before the letters go out, along with the final numbers. This will all be done this afternoon.

Pls.' Ex. KK [Dkt. # 66-1] at Page 13 of 60.

1:36 p.m. Adam Martinez receives email from [REDACTED] notifying him of the hearing on plaintiffs' motion for a temporary restraining order in this case:

Hi Adam, Wanted to make sure you were aware there is a hearing for a temporary restraining order or preliminary injunction related to today's activities scheduled for 2pm today. While we will continue preparing, it's just a consideration when deciding when to send out the notices.

Pls.' Ex. LL [Dkt. # 66-1] at Page 15 of 60; Alex Doe Testimony, Mar. 11 Tr. at 51.

Alex Doe was instructed that Adam "wanted me to reach out to OPM and tell them that they needed to provide the attachments right away and that we no longer had until close of business. . . . he wanted me to forward my email to him so he could reach out to some of their senior leadership and get those attachments quicker." Alex Doe Testimony, Mar. 11 Tr. at 52.

1:44 p.m. [REDACTED] sends email to OPM urgently requesting materials for RIFs: "Thanks for everything you're doing, but we need the last set of attachments now. We cannot wait until COB. We also need an answer on the attached question about the guidance. Apologies, but we have been instructed we do not have until COB." Pls.' Ex. MM [Dkt. # 66-1] at Page 17 of 60; Martinez Testimony,

Mar. 10 Tr. at 135–36 (testifying that the people on this email are members of the RIF team and that this email was not a mistake).

2:00 p.m.  Court hearing begins.

2:27 p.m.  [REDACTED] sends email attaching list of employees to be fired.  Pls.' Ex. NN [Dkt. # 66-1] at Page 24 of 60.

3:07 p.m.  OPM official emails Adam Martinez attaching the signed February 14, 2025 Letter from OPM Associate Director, Workforce Policy and Innovation Veronica Hinton approving the request for an exception to the sixty-day notice requirement for a RIF.

> The Office of Personnel Management (OPM) approves, with one exception, the Consumer Financial Protection Bureau's (CFPB) February l3, 2025, request for OPM approval of an exception to the 60-day notice period provided given to employees selected for release through a reduction in force (RIF).  **Your request indicates that a RIF is necessary due to the impact of the Executive Order (EO) titled, "Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative" (February 11, 2025), and the CFPB Acting Director's work stoppage order dated February 10, 2025.**
>
> OPM approves your request in accordance with 5 CFR 351.801 (b).

Pls.' Ex. OO [Dkt. # 66-1] at Page 26, 28 of 60; *see also* Martinez Testimony, Mar. 10 Tr. at 48.

4:57 p.m.  Adam Martinez emails [READACTED] confirming that "I'm dual hatted right now with Ops and OHC.  I will be on the RIF list but in next group."  Pls.' Ex. PP [Dkt. # 66-1] at Page 30 of 60.

5:04 p.m.  The Court enters the parties' Consent Order, reflecting the parties' agreement that plaintiffs' motion for a TRO will be deemed a motion for preliminary injunction and that the agreement would remain in place until the resolution of motion.  The Order provides that defendants shall not:  delete, destroy, remove, or impair any data, database, or other CFPB records; terminate any CFPB employee, except for cause related to the specific employee's performance or conduct; issue any notice of reduction-in-force to any CFPB employee; or transfer, relinquish, or return any money from the CFPB's reserve funds.  Order.  Order [Dkt. # 19].  **The Court sets a hearing on plaintiffs' motion for a preliminary injunction on Monday, March 3, 2025 at 10:00 a.m.**  *Id.*

Alex Doe "reache[s] out to Adam's other senior advisor" at around 5:00 p.m. and advises that "RIFs [can] not occur until March 3rd." Alex Doe Testimony, Mar. 11 Tr. at 52–53.

7:00 p.m. to 10:00 p.m. "[E]mails go[ ] back and forth at 7:00, and all the way up to near 10 o'clock about these [RIF] notices and fields for them and what to code them under." Alex Doe Testimony, Mar. 11 Tr. at 54.

9:56 p.m. Email regarding materials for RIFs: "Hi you all. Here's the proposed coding for the separation actions. Can you please review and approve for me? . . . [W]e will need to key these over the weekend so they are there Tuesday morning." Pls.' Ex. QQ [Dkt. # 66-1 at Page 32 of 60.

1:21 p.m. Adam Martinez emails Regional Office Staff and Contractors that CFPB regional offices will remain closed the week of February 17–21. Pls.' Ex. K [Dkt. # 60-1] at Page 29 of 107.

**Tuesday, February 18**  8:15 a.m. Email from [REDACTED] to Adam Martinez and Christopher Chilbert requesting authorization to repair the website's homepage and stating that DOGE personnel "damaged the website by deleting the homepage." Pls.' Ex. L [Dkt. # 60-1] at Page 31 of 107; Decl. of Adam Scott [Dkt. # 38-6] ("Scott Decl.") ¶ 2.

9:32 a.m. Christopher Chilbert responds that he does not have authorization to reactivate the website: "My understanding is that the decision to delete the homepage was made by Acting Director Vought, and it was not an error made by the members of the DOGE team." Pls.' Ex. L [Dkt. # 60-1] at Page 31 of 107; Scott Decl. ¶ 3.

**Wednesday, February 19**  10:12 a.m. Mark Paoletta emails Adam Martinez and Jafner Gueye: "To follow up on my conversation with Adam just now, I am directing you to not terminate or suspend any contracts without specific authorization from Acting Director Vought or me." Defs.' Ex. 50 [Dkt. # 66-2] at Page 2 of 14, CFPB_00118.

The first RIF team meeting after Court's February 14 Consent Order is held, including Adam Martinez and OPM officials. Alex Doe Testimony, Mar. 11 Tr. at 54. Martinez is "more focused on the transfer of functions at that meeting . . . explaining that he had had conversations with new leadership and the chief legal officer about what the wind-down of an agency really meant, and that there were . . . functions that would need to transfer, and OPM was pressing us to identify where those would transfer and we did not yet have an answer." *Id.* at 55. "Q. Did he refer at this meeting to winding down the Agency? A. He did. Q. What did you understand that to mean?

22

A. Closing of the Agency." *Id.* at 54–56. "And he used that phrase, 'the closure of the Agency'? A. He did." *Id.* at 57. Martinez said or implied the plan was on pause because of the order. *Id.* at 57–58.

7:19 p.m. Mark Paoletta emails Adam Martinez, Jafner Gueye, and Anthony Licata directing them to rescind contract termination notices. Defs.' Ex. 51 [Dkt. # 66-2] at Page 3 of 14, CFPB_00119.

President Trump announces in an interview that his administration has "virtually shut down the out of control CFPB." Lesley Stahl, *Why the Consumer Fin. Protection Bureau is being targeted by Trump, DOGE*, CBS News (Feb. 23, 2025), Ex. P to Roston/Scible Decl. [Dkt. # 38-17].

|  |  |
|---|---|
| **Thursday, February 20** | An "internal meeting" is held "with some human capital colleagues that are not part of the RIF team . . . . And in that meeting, [Adam Martinez] was a lot more specific about what exactly the plan was for the Bureau." Alex Doe Testimony, Mar. 11 Tr. at 58. |

"[Martinez] said there would no longer be a CFPB. He said that we were legitimately shutting down. He said that we would be wiped out within 30 days. He said that the White House had instructed us to cancel all of our committees and advisory boards and travel cards and purchase cards and to only keep any contracts that were necessary to effectuate the closure of the Agency within 30 days. . . . Adam said there would be no positions to compete for. Q. No positions to compete for, you understood that to mean because the entire divisions would be eliminated? A. Because the Agency would be eliminated. He was a lot more specific in that meeting that was just the CFPB." Alex Doe Testimony, Mar. 11 Tr. at 59.

"During meetings about the CFPB's shut-down that took place between Monday, February 18 and Tuesday, February 25, staff were told by Senior Executives that the CFPB would be eliminated except for the five statutorily mandated positions; that the CFPB would exist in name only; and that, once this Court's injunction was over, everything would need to be either removed from the building or destroyed. Staff were told by Senior Executives that the CFPB would no longer have an employee location and that data could not be stored at any CFPB location because there wouldn't be any locations left. Staff were told that no DHS, OIG, GAO, OMB, Internal Controls, Congressional, or other compliance would be necessary because the CFPB would 'not exist' and it would no longer be 'our problem.'" Decl. of Drew Doe [Dkt. # 38-5] ("Drew Doe Decl.") ¶ 7.

"Senior Executives explained that the work stoppage on February 10 was characterized as a work stoppage to avoid the 10-day legal limit on administrative leave."  Drew Decl. ¶ 8.

7:04 p.m.  Jordan Wick emails Russell Vought and Mark Paoletta

Subject:  More contracts to cut

Hi all, Please see attached for the next tranche of contracts for which we recommend immediate termination – they're composed of the following:

- Consumer Credit Information Surveys and Panels, which will no longer be used
- Various support services (user research and testing, financial mgmt., internal controls, and identity access software), all of which we can do without

These contracts represent $8.4M in obligated value. @Vought, Russell (CFPB), let us know if you approve cancelling these and then the rest of the team will proceed.

Defs.' Ex. 52 [Dkt. # 66-2] at Page 5 of 14, CFPB_00121.

**Friday, February 21**       A CFPB Realty Officer sends an email stating that the "CFPB's main focus" is "moving out of [its] large headquarters building" on "a very, very tight timeframe . . . (30 days)."  The email also states that the Bureau will move out "of the regional offices with San Francisco being the first one."  Diotalevi Decl. ¶ 15.

11:15 a.m.  Deputy General Counsel Sonya White emails Adam Martinez.  "Subject:  Legal Assistance with Procurement Template for Contract Termination" "Josh reached for a legal review on the contract termination template.  Confirming that LD is authorized to assist?"  Defs.' Ex. 5 [Dkt. # 56-1] at Page 7 of 116, CFPB_00007.

11:30 a.m.  Adam Martinez replies to Sonya White.

Hi Sonya – (+Mark P. and Dan for Situational Awareness) Legal Division is authorized to support all operational matters being exercised on behalf of our new leadership and our regulatory/statutorily requirements including:

Procurement/Contract Actions
Financial Management Actions
Human Capital Actions

24

Labor Relations Actions
Employee Relations Actions
Ethics Actions including vetting of new PAS/SCH
Cs
Technology and Infrastructure Support
Administrative Operations Actions (Security, facilities, maintenance)
Data Governance/Administration
EEO Processing Counsel Support
Reasonable Accommodation Counsel Support

Mission related support should be coordinated directly through Mark or Dan.

Defs.' Ex. 5 [Dkt. # 56-1] at Page 7 of 116, CFPB_00007.

Twenty-two states and the District of Columbia file amicus brief in support of plaintiffs' motion for a preliminary injunction. States' Br.

|  |  |
|---|---|
| **Monday, February 24** | Defendants file opposition to the motion for preliminary relief, attaching Declaration of Adam Martinez. Defs.' Opp. [Dkt. # 31]; First Martinez Decl. |
| **Tuesday, February 25** | 8:53 a.m. Senior Litigation Counsel Rebecca Smullin sends email stating that her Consumer Sentinel Account, which has information subject to litigation holds, is being deactivated. Defs.' Ex. 8 [Dkt. # 56-1] at Page 14 of 116, CFPB_00014. |
|  | 1:25 p.m. Liane Fiano in the Office of Communications emails LaShaun Warren and copies Adam Martinez and others. "I no longer have access to Sprinklr, which is where [our] social media backup records are maintained. We have hard copy exports for Director Chopra's account, but everything else lived within Sprinklr and on our public channel. As the public channels were removed unexpectedly, we may not be in compliance with our records retention requirements." Defs.' Ex. 7 [Dkt. # 56-1] at Page 12–13 of 116, CFPB_00012–13. |
|  | Tzedek DC files amicus brief in support of plaintiffs' motion for a preliminary injunction. Tzedek DC Amicus Br. [Dkt. # 33]. |
| **Wednesday, February 26** | 10:14 a.m. Email regarding discontinuation of Citrix Virtual Desktop: "The Citrix Virtual Desktop will be unavailable after Friday, February 28, 2025, at 11:59 PM EST." Pls.' Ex. M [Dkt. # 60-1] at Page 33 of 107. This is the program that allows |

employees to securely log in to the CFPB system when they are not at a CFPB computer.  Diotalevi Decl. ¶ 20.

Russell Vought, in his capacity as OMB Director, issues memo: Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative.  *See* Mem. from Russell T. Vought, Director, Off. of Mgmt. and Budget, and Charles Ezell, Acting Director, Off. of Pers. Mgmt., to Heads of Exec. Dep'ts and Agencies (Feb. 26, 2025) [Dkt. # 70-2] at Page 1–7 of 7.

**Thursday, February 27**    OPM and RIF team meet.  "[W]e discussed some guidance that came out from Acting Director Vought, but in his OMB capacity. It was giving him guidance about RIFs for federal agencies." "[Adam] said he would discuss it further with acting leadership and that he would let us know – 'us' being the RIF team both at CFPB and at OPM – that he would let us know if the plan changed. And that has never – to this day has never happened." Alex Doe Testimony, Mar. 11 Tr. at 60–61.

11:25 a.m.  Email "Subject:  Pickup of Personal Belongings and Return of Equipment from the CFPB HQ: . . . We recognize that you have personal property, work materials. and federal records in your office or cubicle.  To prepare to vacate the building, the Operations team has packed up your personal belongings for pickup at 1700 G Street." Pls.' Ex. O [Dkt. # 60-1] at Page 37 of 107.

4:18 p.m.  Email from Adam Martinez to Research, Monitoring, and Regulation ("RMR")

> Subject:  Statutory/Legal Required Work
> Date:  Thursday, February 27, 2025 4:18:00 PM
> Attachments:  Directives on Bureau Activities.msg
>
> Hi RMR Colleagues – Good afternoon.
>
> Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.
>
> On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau. He did exclude areas approved by him or required by law. We want to ensure that you are aware that statutorily required work and/or work required by law are authorized.

26

Your teams are authorized to continue carrying out these responsibilities. Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director. Alternatively, you are always welcome to reach out to me if needed. I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam
Adam Martinez
Chief Operating Officer

Defs.' Ex. 16 [Dkt. # 56-1] at Page 34 of 116, CFPB_00034.

11:55 p.m. Plaintiffs file reply and supplemental declarations disputing First Martinez Declaration. Pls.' Reply [Dkt. # 40]; Pls.' Suppl. Decls. [Dkt. # 38].

As of February 27, "[n]o member of the Escalated Case Management [is] perform[ing] any work since at least the February 10th stop-work order." Emory Doe Decl. [Dkt. # 48-3] ¶¶ 4–5.

RMR employees remain confused because Martinez's February 27 email does not reference the February 10 stop work email of Vought: "no work in my office has restarted." Decl. of Greer Doe [Dkt. # 48-5] ("Greer Doe Decl.") ¶ 8.

| | |
|---|---|
| **Friday, February 28** | 8:54 a.m. Adam Martinez emails Gueye Jafnar and others, directing them to reinstate the ETK (Entellitrack) contract. ETK is the database and workstream for EEO, reasonable accommodation, and anti-harassment/bullying cases, and are required to be proceed by law. |

- This is in response to email highlighting "inability to access EEO complaints"
- "Some vendors that were asked to 'turn back on' operations were able to, others cannot be back on so easily."
- "we will not be able to run statutorily required reports"

Defs.' Ex. 19 [Dkt. # 56-1] at Page 39–41 of 116, CFPB_00039–41.

10:18 a.m.    Deputy Associate Director and Acting Associate Director, Research, Monitoring, and Regulations Janis Pappalardo emails Adam Martinez, "In light of your e-mail and discussion yesterday, my understanding is that we can resume all regular work related to fulfilling statutory obligations, including regular management activities. Is that correct?" Defs.' Ex. 20 [Dkt. # 56-1] at Page at 44 of 116, CFPB_00044.

10:20 a.m. Martinez replies to Pappalardo that her understanding that "regular work related to fulfilling statutory obligations, including regular management activities" can be resumed is correct. Defs.' Ex. 20 [Dkt. # 56-1] at Page 44 of 116, CFPB_00044.

10:33 a.m.  Principal Deputy Assistant Director, Supervision Policy & Operations Cassandra Huggins emails Martinez, "To be clear, the Feb. 8 email directed us to cease all supervision and examination activity. Am I correct that directive still stands?" Defs.' Ex. 22 [Dkt. # 56-1] at Page 51 of 116, CFPB_00051.

10:49 a.m.  Text message telling Francis Doe to "stand down until further notice." Pls.' Ex. S [Dkt. # 60-1] at Page 50 of 107; *see* Decl. of Francis Doe [Dkt. # 48-4] ("Francis Doe Decl.") ¶¶ 6–9 (Francis Doe in RMR and two colleagues receives a direct text to their personal cell phones, stating: "In response to Adam Martinez's email, John [McNamara] has instructed us to stand down until further notice." After further emails, declarant emailed Mr. McNamara again, asking "To clarify, should I get started or wait for guidance?" Mr. McNamara responded that I should "[w]ait for guidance." Having not received any further guidance, I continue to remain unauthorized to perform any work. Despite Mr. Martinez's February 27 email, my understanding is that the stop-work order issued on February 10th remains in effect.").

10:58 a.m.  Adam Martinez responds to Huggins' 10:33 a.m. email: "That is correct. If there are any reports to congress per statute or anything like that, I'd recommend reaching out to Mark. Other divisions are raising questions about reports or other statutory requirements. I'm personally trying to be helpful to just ensure people know they can ask questions or seek clarification, even it's just on operational issues."  Defs.' Ex. 22 [Dkt. # 56-1] at Page 50–51 of 116, CFPB_00050–51.

5:11 p.m.   Assistant Director of Research Jason Brown emails Research staff, telling them to resume "statutory work" – "We

stopped most of our statutory work, I know, not because of the February 8 email, but because of the February 10 email. I clarified this point with the COO."   Brown states that "the Research environment not functioning as before."  Pls.' Ex. Q [Dkt. # 60-1] at Page 41 of 107.

203 Members of Congress file amicus brief in support of plaintiffs' motion for a preliminary injunction.  Members' Br.

**Saturday, March 1**   1:59 p.m.   Christopher Young sends Teams message to Adam Martinez asking if they are "prepared to implement the RIF" if the "judge lift[s] the TRO."  Defs.' Teams Exchange Ex. [Dkt. # 70-1] at Page 1–2 of 2, CFPB_00131–32.

**Sunday, March 2**   Defendants file Supplemental Declaration of Adam Martinez. [Dkt. # 47-1] ("Second Martinez Decl.").

Plaintiffs file Second Declaration of Matthew Pfaff [Dkt. # 48-2] ("Second Pfaff Decl."); Declaration of Emory Doe [Dkt. # 48-3]; Decl. of Francis Doe [Dkt. # 48-4]; and Declaration of Greer Doe [Dkt. # 48-5].

3:33 p.m.   Adam Martinez emails all CFPB employees and contractors on behalf of Chief Legal Officer Mark Paoletta.

> Subject:  All Hands Message re:  Work Required by Law
> Date:  Sunday, March 2, 2025 3:33:06 PM
>
> Message from Mark Paoletta, Chief Legal Officer
>
> On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.
>
> On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director.  On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood

this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

Defs.' Ex. 24 [Dkt. # 56-1] at Page 56 of 116, CFPB_00056.

| | |
|---|---|
| **Monday, March 3** | 8:45 a.m.  Office of Supervision Examinations staff member Caitlyn Sellers emails supervision staff, instructing them to "continue to comply with the stop work order."  Pls.' Ex. V [Dkt. # 60-1] at Page 58 of 107. |

10:00 a.m.  Court hears argument on plaintiffs' motion for a preliminary injunction.  It sets an evidentiary hearing for Monday, March 10, 2025. *See* Minute Entry (Mar. 3, 2025).

10:02 a.m.  [REDACTED] emails Adam Martinez.  "Hi, Adam, Based on every email starting 2/10 the unambiguous guidance was to stop all work tasks, no stipulation of statute requirements was made.  As of today, Consumer Complaint Database (CCDB) has not had been refreshed with new data since 02/22/2025 and displays an error banner . . . ."  Pls.' Ex. Z [Dkt. # 60-1] at Page 73 of 107.

11:33 a.m.  CFO Gueye reply to Nykea Bolton email: "In general we are very narrowly turning back contracts (or portions of contracts) that directly support statutory requirements. . . . Specifically can you outline for each contract what (statutorily required) action will not be able to be accomplished at all without the contract?  I can't stress enough that this needs to be as specific as possible.  We'll need to be prepared to have someone on the team

defend this justification to external parties. All PCards across the bureau have been cancelled. We've been authorized to reopen one for the entire bureau with a very limited limit so we are triaging the requests as they come in. I'm using the same criteria as above (i.e. directly being indispensable to meet a statutory requirement)." Defs.' Ex. 29 [Dkt. # 56-1] at Page 98–99 of 116, CFPB_00098–99.

11:39 a.m. Chief Financial Officer Gueye replies to Chilbert email: "[W]e're getting a lot of requests to turn contracts back on. I will send out guidance shortly but for your awareness we are not turning back on every contract we've had. We're taking a very narrow approach: if without the contract the Bureau can't meet a statutory requirement then it will be considered for reactivation. Meaning that a contract enhancing our ability to meet a statutory requirement is not enough to get it back on. It needs to be the only way the bureau can currently meet that requirement. Also as you're providing justifications please be prepared to have to defend those to external patties. We've been routinely asked to provide for names of the people providing the justification." Defs.' Ex. 38 [Dkt. # 56-1] at Page 96 of 116, CFPB_00096; Martinez Testimony, Mar 10 Tr. at 85 (Martinez does not believe guidance has been sent out).

12:31 p.m. Email providing term employee with notification of termination (approved on February 15) pursuant to "E.O. 14210 and the stop work email from Russ Vought." Pls.' Ex. CC [Dkt. # 60-1] at Page 89–90 of 107.

3:52 p.m. Regional Director, Midwest Region John Schroeder emails supervision examiners asking them to "refrain from all work activity other than ministerial tasks" pending further guidance, forwarding Paoletta's March 2 email. Pls.' Ex. U [Dkt. # 60-1] at Page 55–56 of 107.

Email notifying supervision staff that Martinez and Paoletta's March 2 emails do not authorize them to carry out activities "required by law." Pls.' Ex. W [Dkt. # 60-1] at Page 63 of 107.

**Tuesday, March 4**    7:50 a.m. Email providing probationary employee with Notification of Termination (approved on February 13) pursuant to "E.O. 14210 and the stop work email from Russ Vought." Pls.' Ex. BB [Dkt. # 60-1] at Page 85–87 of 107.

8:38 a.m. Chris Chilbert sends email to Chief Financial Officer Jafner Gueye and others request to pay for Google Analytics platform, without which CFPB "will lose all historical data." Pls.' Ex. EE [Dkt. # 60-1] at Page 95 of 107.

8:45 a.m. Christopher Chilbert sends email to someone who has asked to fix the homepage: "I believe it is important to restore the home page as soon as possible, but that is not currently authorized." Pls.' Ex. DD [Dkt. # 60-1] at Page 92 of 107.

8:58 a.m. Gueye sends email advising that there is a problem with PCards, and that there is only one PCard exception, which has "a very limited total limit." Pls.' Ex. EE [Dkt. # 60-1] at Page 94 of 107.

OPM and RIF hold team meeting, with Martinez no longer attending. "On the 4th, it was mostly about a cost estimate for the final phase after the 1200, doing, you know, reduction in force on the rest of the positions." Alex Doe Testimony, Mar. 11 Tr. at 61–62.

White House issues statement that "President Trump ordered the" CFPB "to halt operations." The White House, "President Trump is Making Government Work for You Again," Pls.' Ex HH [Dkt. # 60-1] at Page 105–107 of 107.

| | |
|---|---|
| **Wednesday, March 5** | 7:27 a.m. Email advising of indefinite postponement of mandatory training. Pls.' Ex. SS [Dkt. # 66-1] at Page 37 of 60. |
| | 10:01 a.m. Email from Cassandra Huggins emails regional examiners directing them to prepare a report requested by Mark Paoletta on their supervision examination activity. Pls.' Ex. UU [Dkt. # 66-1] at Page 42 of 60. |
| **Thursday, March 6** | OPM and RIF hold another team meeting on work OPM needs the RIF team to do to help define competitive levels. Martinez is no longer attending meetings. Alex Doe Testimony, Mar. 11 Tr. at 63. |
| | 1:08 p.m. Email regarding reporting on supervision activity and return to administrative leave. Pls.' Ex. WW [Dkt. # 66-1] at Page 53 of 60. |
| | 6:17 p.m. Bruce McNitt emails John McNamara about the impact of contract cancellations on the Office of Markets. Pls.' Ex. XX [Dkt. # 66-1] at Page 55–56 of 60. |
| **Friday, March 7** | 10:07 a.m. Email from head of Office of Students team indicating that they are currently unable to perform required complaint-review function. Pls.' Ex. ZZ [Dkt. # 66-1] at Page 60 of 60. |
| **Monday, March 10** | The Court holds evidentiary hearing at which Adam Martinez testifies. *See* Minute Entry (Mar. 10, 2025); Mar. 10 Tr. |

**Tuesday, March 11**          The Court holds evidentiary hearing at which Adam Martinez concludes his testimony, and Alex Doe and Matthew Pfaff testify. *See* Minute Entry (Mar. 11, 2025); Mar. 11 Tr.

## ANALYSIS

## V.    THE COURT MAY EXERCISE SUBJECT MATTER JURISDICTION OVER THIS CASE.

"[E]very federal court has a 'special obligation to satisfy itself' of its own jurisdiction before addressing the merits of any dispute." *Dominguez v. UAL Corp.,* 666 F.3d 1359, 1362 (D.C. Cir. 2012), quoting *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986). As an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies." *Allen v. Wright,* 468 U.S. 737, 750 (1984).

### A.    The Court has jurisdiction to decide Counts One, Three, and Four.

In Count One, plaintiffs have alleged both statutory and constitutional violations, and it is a fundamental proposition of constitutional law that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Counts Three and Four are predicated on the APA. These are the claims that will underlie this ruling,[6] and the Court has jurisdiction to hear them and to impose injunctive relief.

While the decisions in this case implemented Presidential directives, the President is not the defendant in this action: plaintiffs sued Russell Vought, in his official capacity as Acting Director of the CFPB, and the agency itself. In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the Supreme Court remedied the President's wrongful seizure of the nation's

---

6    Given that finding, and the fact that the relief to be granted will be predicated on those counts, the Court need not address the merits of Count Two, which asserts that the firing of the CFPB Director did not create a "vacancy" that could be filled under Federal Vacancies Reform Act, 5 U.S.C. §3345, and that therefore, the appointment of defendant Vought as Acting Director of the CFPB violated the Appointments Clause. U.S. Const. art. II, § 2, cl. 2.

steel mills through an injunction to his subordinates, and that case continues to be cited for the proposition that "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v. David,* 448 F.2d 1067, 1072, n.12 (D.C. Cir. 1971).

In *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996), the D.C. Circuit reiterated the "bedrock principle that our system of government is founded on the rule of law." And it explained that therefore:

> it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments. In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.

*Id.* at 978 (internal citations and quotation marks omitted).

These principles apply to cases raising constitutional questions as well as statutory questions; "the court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself." *Trudeau v. FTC,* 456 F.3d 178, 190, n.22 (D.C. Cir. 2006), quoting *Hubbard v. EPA,* 809 F.2d, 1 at 11, n.15 (1986). *See also id.* at 343 ("the 'APA's waiver of sovereign immunity applies to any suit whether under the APA or not'"), citing *Chamber of Com. v. Reich,* 74 F.3d 1322, 1328 (D.C. Cir. 1996).[7]

---

7    *See also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 491, n.2 (2010), in which the Supreme Court recognized its power to hear challenges to the constitutionality of governmental action on separation of powers principles, citing *Correctional Servs. Corp. v. Malesko,* 534 U.S. 61, 74 (2001) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell v. Hood,* 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . ."); and *Ex parte Young*, 209 U.S. 123, 149, 165, 167 (1908).

Count One alleges that the defendants' actions to dismantle and shut down the CFPB are unconstitutional because they exceed the executive's authority and usurp the legislature's authority: "[t]he CFPB was established as a federal agency by Congress by statute, the Dodd Frank Act, signed into law in 2010, and can be eliminated only by Congress." Am. Compl. ¶ 79.

This claim is likely to succeed as there is no mystery about what is going on as the President and his delegees, Elon Musk and Russell Vought, have made their actions and intentions clear.

On February 6, officials representing the Department of the Treasury notified the CFPB that individuals from United States DOGE Service would need access to the building that evening. First Martinez Decl. ¶ 6. A follow-up meeting was held on February 7. *Id.* ¶ 7. On that date, the President designated Russell Vought, Director of the Office of Management and Budget, to serve as the Acting Director of the CFPB, *id.* ¶ 10; Feb. 8 Email, and by that evening, Musk had already posted "CFPB RIP" and a tombstone emoji on his social media site X. Kaspar Decl. ¶ 6.

On February 8, Vought suspended rulemaking, investigative, public communication, and litigation activities, but also ordered that "effective immediately," all CFPB employees shall "cease all supervision and examination activity," and "cease all stakeholder engagement." Feb. 8 Email. By February 10, the day Vought ordered all employees to stop all work, President Trump acknowledged that his goal was to have the agency "totally eliminated," and he added that "we did the right thing. The CFPB was a very important thing to get rid of, and it was also a waste. I mean, number one, it was a bad group of people running it, but it was also a waste." *See* Am. Compl. ¶¶ 2, 47, n.14, citing @factpostnews, X (Feb. 10, 2025), https://x.com/joeygarrison/status/18891320239 33022283?Mx=2.

### 1.    The constitutional claims are not barred by *Dalton v. Spector.*

Defendants argue that this Court has no power to hear the constitutional claim that underlies Count One, as it is nothing more than a statutory claim, and they cite *Dalton v. Specter*, 511 U.S. 462, 472 (1994), for that principle.  But the holding in that case arose in a situation that is not at all analogous to the situation here.  In *Dalton,* the plaintiffs sought to enjoin the Secretary of Defense from closing the Philadelphia Naval Shipyard.  The President had made the decision to do so pursuant to the Defense Base Closure and Realignment Act of 1990, 10 U.S.C. § 2687. As the opinion explains in detail, the Act established an "elaborate selection process" that concludes with a set of recommendations on the President's desk:   the Secretary issues recommendations for closure or realignment after he has given notice and an opportunity for public comment; the Secretary submits the recommendations to Congress and to the Defense Base Closure and Realignment Commission, an independent body whose members are appointed by the President and confirmed by the Senate; and the Commission conducts hearings, resulting in the transmittal of a report and recommendations to the President, who has the decision-making authority.  *Id.* at 464–65.  The Act then sets out a timetable for the President's approval or disapproval of the recommendations and the submission of any certification of approval to Congress.  *Id.*

The Court made quick work of the plaintiffs' claims challenging the actions of the Secretary and the Commission, finding that they could not be reviewed under the APA because they were not "final agency actions;" they were simply recommendations to the President, who had the ultimate decision-making authority.  *Id.* at 476.  The actions of the President could not be reviewed under the APA because the President is not an "agency" under that Act.  *Id.*

Thus, the question of jurisdiction in *Dalton* boiled down to the issue of whether the President exceeded his authority under the Act, and that, according to the Court, could not be characterized as a constitutional question. First, it observed:

> Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution. On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority.

*Id.* at 472, citing, *inter alia, Harmon v. Brucker,* 355 U.S. 579, 581 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' non-constitutional claim that respondent [Secretary of the Army] acted in excess of powers granted him by Congress ").[8] The Court then distinguished the situation before it from what had been at issue in *Youngstown*:

> In *Youngstown,* the Government disclaimed any statutory authority for the President's seizure of steel mills. The only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces. Because no statutory authority was claimed, the case necessarily turned on whether the Constitution authorized the President's actions. *Youngstown* thus involved the conceded *absence* of *any* statutory authority, not a claim that the President acted in excess of such authority. The case cannot be read for the proposition that an action taken by the President in excess of his statutory authority necessarily violates the Constitution.

---

[8]    The Court also cited *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 691, n.11, (1949), which stated that sovereign immunity would not shield an executive officer from suit if the officer acted either unconstitutionally or beyond his statutory powers. It commented that there was a difference: "[i]f all executive actions in excess of statutory authority were *ipso facto* unconstitutional . . . there would have been little need in *Larson* for our specifying unconstitutional and ultra vires conduct as separate categories." *Id.* Count One alleges that the decision to close the agency is contrary to statute and the constitution; if the defendants do not defend on the grounds that the President was exercising his constitutional authority, the Court may not need to reach the constitutional question.

*Id*. at 473 (citations omitted) (emphasis in original).  Applying that reasoning, the Court found that the respondents' claim that the Secretary's action was inconsistent with the Act was at bottom a statutory claim.  It held that "[w]here a statute, such as the 1990 Act, commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."  *Id*. at 477.

That ruling does not serve as any sort of impediment here.  While the government disputes whether it is engaged in the elimination of the agency as a matter of fact, it is not suggesting that doing so would have been an exercise of discretion authorized by the statute in question as the Secretary's actions were in *Dalton*.  *See* Defs.' Opp. at 28–29.  Nor are plaintiffs solely alleging that defendants in this case exceeded any statutory authority accorded to the agency under the Dodd-Frank Act; their argument is that Acting Director Vought's actions to close the agency on behalf of the President violated both the separation of powers inherent in the Constitution and the statute that created the CPPB and assigned it mandatory duties.  *See* Am. Compl. ¶¶ 2, 9, 10, 76–80, and 92.

There are significant differences between the abrupt closure of a federal agency by the executive and the implementation of the multi-layered administrative, executive, and Congressional process that led to the closure of a shipyard.  Therefore, it is telling here that the *Dalton* Court took pains to emphasize that it was not repudiating *Marbury v. Madison* or the "nearly two centuries of constitutional adjudication" that followed; the "conclusion that judicial review is not available for respondents' claim follows from our interpretation of an Act of Congress, by which we and all federal courts are bound."  511 U.S. at 477.  Since there is no act of Congress that empowers the President to shut down the CFPB in his discretion, *Dalton* does not

apply, and the Court has jurisdiction to perform its traditional duty and consider both the statutory and constitutional claims.

> **2.     The APA claims are properly predicated on discrete, final agency action.**

Defendants argue that the Court lacks jurisdiction to consider the APA claims because, as they characterize the complaint, plaintiffs are simply voicing a generalized grievance about agency policy or management, and such claims are not cognizable under *Lujan v. Defenders of Wildlife Federation*, 504 U.S. 555 (1992) and *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"). *See* Defs.' Opp. at 14–15 ("Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. They do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of Defendants' management of the CFPB."); *id.* at 17 ("Plaintiffs are unlikely to succeed on their APA claims because they are sweeping programmatic challenges unavailable under the APA."). Defendants also pluck one sentence from *Biden v. Texas,* 597 U.S. 785, 809 (2022), and repeat that "the APA does not permit review of an 'abstract decision.'" Defs.' Opp. at 18, citing 597 U.S. at 809. But they do not suggest that the holding of that case bears on this dispute in any other way. *See* Defs.' Opp. at 18.

Defendants' repeated incantation of the words "programmatic" and "abstract" cannot change the character of what is actually going on, and there is at least one discrete order before the Court that is ripe for review.

Plaintiffs' claims under the Administrative Procedure Act are predicated on sections 706(2)(C) and 706(2)(A). Am. Compl. ¶¶ 90, 93. Section 706(2)(C) provides that "the reviewing court shall . . . hold unlawful and set aside agency action . . . found to be in excess of statutory jurisdiction, authority or limitations," and (2)(A) directs the reviewing court to hold unlawful and

set aside agency action found to be "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(C), (2)(A).

Congress specified what it meant by these terms. According to the definitions section of the statute, "agency action" includes "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §551(13). The word "order" in that series is defined to mean "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." *Id.* § 551(6). There is no question that on February 10, 2025, Acting Director Vought ordered CFPB employees to stop work. But was that order "final" such that it would be a reviewable agency action? The statute further explains that when undertaking this review, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. *Id.* § 706 ("Scope of Review").

The test to be applied when a court is ensuring itself of its jurisdiction to review agency action was set out in *Bennet v. Spear,* 520 U.S. 154 (1997). "As a general matter, two conditions must be satisfied for agency action to be 'final': First the action must mark the 'consummation of the agency's decision-making process, . . . it must not be of a merely tentative of interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 177–78 (citations omitted).

The thrust of defendants' opposition to the pending motion is that Acting Director Vought's February 8 email was nothing more than the typical pause in regulatory and enforcement activities that would mark the arrival of any new administration.

> Incoming Presidents of both parties have routinely issued directives that pause policy-related decision-making to allow the reevaluation of those

policies that were under consideration or under development but not
finalized by the prior administration.  Consistent with this practice, on
January 20, 2025, President Trump ordered agencies across the government
to freeze regulatory actions so that new agency leadership may reevaluate
policies and enforcement priorities.

In line with these principles, on February 8, 2025, Russell Vought, Acting
Director of the Consumer Financial Protection Bureau e-mailed all CFPB
staff to direct that, unless "required by law" or "expressly approved by the
Acting Director," staff were not to take substantive actions that might reflect
policy decisions inconsistent with new leadership's views on the best way
to meet the agency's statutory responsibilities.

After this directive, Plaintiffs . . . filed the present motion.

Defs.' Opp. at 1; *see also* Defs.' Opp. at 28–29.

The problem for the defendants is that this explanation is largely irrelevant, and it is
factually incorrect.  It is true that plaintiffs filed their initial complaint the day after the February 8
directive.  *See* Compl. [Dkt. #1].  But the February 13 motion for a temporary restraining order
was *not* filed at that time; it came after the February 10 stop work order and the actions that
followed in its wake.  *See* Mot. for TRO [Dkt. #10].  And the February 8 email is not the basis for
plaintiffs' request for interim relief, nor will it be the subject of this order.  The Court's concern is
February 10.

Defendants do posit that the February 10 "Vought 'stop work' email" does not satisfy the
*Bennett* test either, but they do that by trying – unsuccessfully – to blur the obvious distinction
between what happened on Vought's first day at the agency and what he did two days later, relying
on the arguments advanced concerning the February 8 email in their brief.  *See* Defs.' Opp. at 18
("[T]he e-mail marks the initiation, not the consummation, of the agency's decision-making
process.  As described in more detail *infra* at 28–33, the Vought e-mail's directive to pause some
agency activities reflects a decision by CFPB leadership that agency personnel should not advance
the prior administration's policies until new leadership has an opportunity to reevaluate agency

priorities.  That decision is thus 'preliminary' in nature and 'not directly reviewable.'") (internal citation omitted).

The record shows that the February 10 stop work order marked the end of whatever decision-making process the Acting Director found to be necessary, and that it had immediate, concrete legal consequences.  While the February 8 "Directive on Bureau Activities" carved out activities "expressly approved by the Acting Director or required by law," the "Additional Directives" issued on February 10 superseded those instructions with a straightforward, unqualified statement:  "[p]lease do not perform any work tasks."  The order did include the information that if there were "urgent matters," employees could "alert" the Acting Director "through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task."  Feb. 10 Email.[9]  The email concluded by reiterating, "[o]therwise, employees should stand down from performing any work task."  *Id.*

The consequences were swift.  As of February 10, agency employees understood that no work meant no work.[10]  *See* Martinez Testimony, Mar. 10 Tr. at 206.  On February 11 and 12, all eighty-five probationary employees were terminated.  *See, e.g.*, Alex Doe Testimony, Mar. 11 Tr. at 45.  On what grounds?  The Notification of Personnel Action issued by the Office of Personnel Management, headed by the very same Director, Russell Vought, cited only two sources of

---

9    As will be set out in more detail below, there were some requests for approval that were granted, but those generally involved operational needs – keeping the lights on and the computers running, or doing the work needed to effectuate the RIFs and contract terminations.

10    As of the day before, February 9, employees were informed that the CFPB headquarters building would be closed, and the President had already announced on January 20, 2025 that agencies in the executive branch "shall, as soon as practicable, take all necessary steps to terminate remote work arrangements and require employees to return to work in-person at their respective duty stations on a full-time basis."  Return to In-Person Work, https://www.whitehouse.gov/ presidential-actions/2025/01/return-to-in-person-work/.

authority: the Executive Order 14210 of February 11 and "the stop work email from Russ Vought Entitled 'Additional directives on Bureau Activities'" dated February 10. *See* Notices of Personnel Action, Pls.' Ex. BB [Dkt. # 60-1] at Page 86 of 107; Pls.' Ex. CC [Dkt. # 60-1] at Page 90 of 107. In short, the February 10 work stoppage order had an immediate impact on probationary employees' legal rights and obligations. *See id.* at Pages 87, 91 of 107 (second page of Notices explaining the contents of the first page and the employee's rights).

Also, on February 11, agency staff received direction to terminate contracts with outside vendors, affecting the contractors' rights and obligations, and a template for accomplishing this task was circulated. Pls.' Ex. B [Dkt. # 60-1] at 5 of 107; Template of Notification of Termination During Probationary Period, Pls.' Ex. C [Dkt. # 60-1] at Page 7 of 107.

On February 12, with the probationary and term employees out of the way, the CFBP entered into an agreement with OPM to receive "RIF Assistance." Pls.' Ex. II [Dkt. # 66-1] at Page 3 of 60. The objective was to fire approximately 1175 employees as soon as possible, leaving only a skeleton crew to oversee the functions associated with the RIF. Pls.' Ex. JJ [Dkt. # 66-1] at Page 10 of 60.

To do that, it was necessary to ask OPM to exempt the CFPB from the ninety-day notice period ordinarily required when an agency implements a RIF, which is supposed to give the discharged employees an opportunity to compete for the positions that remain. Since it had already been determined that there would be no open positions to fill, because the agency was shutting down completely, the agency submitted a request for an exception to the ninety-day period on February 13. Pls.' Ex. JJ [Dkt. # 66-1] at Pages 9–11 of 60.

What did the CFBP identify as the "circumstances" that would warrant giving notice less than 90 days before a proposed reduction? It wrote: "[t]he CFPB is responding to Executive Order

Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative . . . dated February 11, 2025 and the CFPB Acting Director's work stoppage order dated February 10, 2025." *Id.* at 11.

Unsurprisingly, the Office of Personnel Management approved the request the next day, again citing only two reasons: the Executive Order of February 11, and "the CFPB Acting Director's work stoppage order dated February 10, 2025." Pls.' Ex. OO [Dkt. # 66-1] at Page 28 of 60.

Given this set of exchanges between the two departments operating under Russell Vought's direct control, the defendants' suggestion that the document that both agencies referred to as a "work stoppage order" was merely interlocutory, and not a "final order" from which legal consequences flowed, is entirely unsustainable.

And the consequences kept on coming. On February 13, "term" employees, who were hired under a temporary/excepted appointment were terminated, and again, the Executive Order and "the stop work email from Russ Vought" were identified as the justifications. *See* Pls.' Ex. QQ [Dkt. # 66-1] at Page 32–33 of 60.

On February 14, the CFPB's Chief Operating Officer Adam Martinez was informed by OPM that employees typically work during the notice period, even if it has been truncated to thirty days, so he asked Mark Paoletta, Director Vought's legal advisor at both OPM and the CFPB, for "clarification and expectations." Pls.' Ex. KK [Dkt. # 66-1] at Page 13 of 60. After that conversation, Martinez communicated that all staff would be placed on administrative leave for the thirty-day notice period. *See id.* The Operations Manager of the CFPB Office of Human Capital then disseminated instructions that "employees should exercise administrative leave until

otherwise instructed" – why? – "[i]n accordance with the Acting Director's guidance" of February 10. Pls.' Ex. J [Dkt. # 60-1] at Page 27 of 107.

Count Three specifically includes the issuance of the stop work directive as one of defendants' orders that constitutes final action under the APA. Given the facts set forth above, the Court finds that the amended complaint presents at least one final, discrete agency action for the Court's review under the APA.

However, that is not the only focus of the complaint. Defendants point to plaintiffs' iteration of the series of steps taken by agency leadership, including the February 10 work stoppage order, and plaintiffs' description of those circumstances as an unlawful effort "to dismantle an agency that Congress established," Am. Compl. ¶ 9, *see also, e.g.,* Am. Compl. ¶¶ 2, 4, 10, 80, 91, 92, 94, as an indication that the complaint amounts to nothing more than a "programmatic" challenge that does not pass muster under the APA given the Supreme Court's pronouncements in *Lujan* and *SUWA*. Defs.' Opp. at 15–16.

But this lawsuit is not a challenge of any agency "program." It does not challenge any exercise of the agency's discretionary authority to regulate activities within its purview or to enforce particular statutory provisions. It is a challenge to the wholesale cessation of activities – the decision to shut down the agency completely – which is not within the executive's authority. Defendants can hardly complain that the focus of the action is too broad; it was the Acting Director who chose to paint with a broad brush, not plaintiffs.

Defendants quote *SUWA* for the proposition that "the purpose of the APA's discrete agency action requirement is: 'to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack

both expertise and information to resolve." Defs.' Opp. at 16, quoting *SUWA,* 542 U.S. at 66–67.[11]

None of those principles is at risk here. The decision to close an agency is not a theoretical or hypothetical concept – it's real. The agency is either open or it's not. It is either responding to calls from consumers or it's not. There is nothing abstract about firing employees, cutting off the funding stream, terminating contracts, or stopping all work; plaintiffs are not engaged in a "policy" disagreement with the agency, but a battle for its existence. Therefore, in the Court's view, even if the February 10 work stoppage order does not satisfy the requirements of a "final order," the

---

11    By introducing and editing the quoted language from the *SUWA* opinion in this manner, defendants leave out the circumstances that were being discussed in that case, which are easily distinguished from the case at hand. In *SUWA,* the petitioners were challenging an agency's "failure to act" under section 706(1) of the APA.  542 U.S. at 61–62.  And while the Supreme Court made it clear that like the actions that can be set aside under section 706(2), an agency action that can be compelled under section 706(1) must be a discrete one, 542 U.S. at 63, it also went to some lengths to liken section 706(1) to a writ of mandamus and explain that "a claim under 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* action that it is *required to take.*" *Id.* at 64 (emphasis in original). *See also id.* at 65 ("The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not mandated by law. . . .") (emphasis in original).

   "With these principles in mind," the Court then turned to one of the claims before it and found that the statute the petitioners were seeking to enforce in that claim left the agency with a great deal of discretion as to how to achieve the broad statutory objectives. *Id.* at 65–66.  It was in that context that the Court made the quoted remarks about "[t]he principal purpose of the APA limitations we have discussed – and of the traditional limitations upon mandamus from with they were derived," and went on to express concern about the situation that would arise "if courts were empowered to enter general orders compelling compliance with broad statutory mandates[,]" and find that "the prospect of pervasive oversight by federal courts over the manner and pace of agency compliance *with such congressional directives* is not contemplated by the APA." *Id.* at 66–67 (emphasis added).

   Here, plaintiffs are not invoking the APA to compel compliance with *any* statutory provision under section 706(1); while it will be prudent to ensure than any interim relief ordered is enforceable without the Court's taking on the problematic role of managing the agency's day-to-day operations, the cited section of *SUWA* does not bear on this Court's subject matter jurisdiction or the merits of plaintiff's APA claims.

APA claims in Counts Three and Four can be construed as challenging a final, concrete decision to shut down the agency entirely.[12]

The fact that the effort was temporarily stymied or slowed down by the Court's intervention and entry of a consent order to freeze the situation does not mean that the decision is not yet finalized or that it was ever abandoned. As will be explained in more detail below, notwithstanding defendants' considerable efforts to paper over what they were assiduously trying to accomplish in one stroke before the Court ruled at the TRO hearing on February 14, their subsequent attempts to deny what was afoot are at odds with the undisputed facts in the record and the documents produced by both sides. Indeed, only two days after the agency's Legal Officer – who like the police chief in *Casablanca* who was "shocked, shocked" to find gambling going on – professed to be surprised that some employees were not working, the White House posted a message on its "Work for You Again" webpage boasting: "President Trump ordered the Consumer Financial Protection Bureau – the brainchild of Elizabeth Warren, which funneled cash to left-wing advocacy groups – to halt operations." Pls.' Ex HH [Dkt. # 60-1] (underlining in original). In

---

12    Count One could also be construed as being brought under section 706(2)(B) of the APA, which authorizes the reviewing court to set aside agency action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

sum, the impending closure of the agency is also an action that can be a subject of review under the APA.[13]

### B.    There are plaintiffs with standing to bring this action.

"[T]o give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,'" which include standing, ripeness, mootness, and the political question doctrine. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), citing *Allen*, 468 U.S. at 750; *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (standing is a necessary "predicate to any exercise of our jurisdiction"). To establish Article III standing, a plaintiff must show that it has "suffered an injury in fact" that "is fairly traceable to the challenged action of the defendant," and it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000),

---

13    Defendants have directed the Court to the memorandum opinion and order issued in *Mayor and City Council of Baltimore v. Consumer Financial Protection Bureau,* Civ. No. MJM-25-458, 2025 WL 814500 (D. Md. Mar. 14, 2025). *See* Defs.' Notice of Suppl. Auth. [Dkt. # 78] (pointing out that "the court emphasized and explained that '[t]he distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to' the APA's 'conception of the separation of powers;'" and that "the *Baltimore* court rejected plaintiffs' assertion that they could 'challenge a disembodied and unrealized [purported] decision to drain the CFPB of its operating funds and reserves'").

The district court's thoughtful analysis in that case does not bear on the resolution of this one. The *Baltimore* lawsuit dealt solely with the funding of the agency, and in particular, Vought's February 8 letter to Jerome Powell and the fact that the CFO was communicating with the Federal Reserve later that week about the possibility of transferring funds back to the Federal Reserve. 2025 WL 814500 at *12–14. Whether those circumstances were sufficiently final to be amenable to judicial review does not aid in answering the questions addressed here: was the February 10 stop work order final, and has there been a reviewable decision to close the agency entirely? Moreover, the court in *Baltimore* based its factual conclusions on what was taking place on the declarations and documents before it; it did not have the benefit of the full evidentiary hearing held in this case, which cast some of those declarations and documents in a distinctly different light.

quoting *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted); *see also Banner Health v. Price*, 867 F.3d 1323, 1333–34 (D.C. Cir. 2017).

A plaintiff must show a personal interest in the dispute at all stages of litigation, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008), demonstrating standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. When seeking a preliminary injunction, a plaintiff must show standing with specific facts supported by affidavit or other evidence. *See Elec. Priv. Info. Ctr. v. United States Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (holding that in the context of a preliminary injunction, courts consider "whether the plaintiff has a substantial likelihood of standing – that is, whether the plaintiff is likely to be able to demonstrate standing at the summary judgment stage"), quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

While "plaintiffs must demonstrate standing for each claim that they press," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), it is not necessary that each plaintiff in a case show standing for each claim; a showing that one plaintiff has standing is sufficient. *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362 (D.C. Cir. 2003) ("[UAW] clearly has standing, and we need not consider whether the other plaintiffs do."), citing *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996). And plaintiffs need not await the harm to occur before they can sue or obtain relief: "a person exposed to a risk of future harm may pursue forward looking, injunctive relief to prevent the harm." *TransUnion LLC*, 594 U.S. at 436, citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, n.5 (2013); *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

The six plaintiffs in this case include three member organizations – a union and an association that both represent CFPB employees, and a membership-based advocacy group; two

consumer advocacy groups; and the estate of an individual consumer who passed away during the pendency of this case.  *See* Am. Compl. ¶¶ 13–18.  The Court finds that some of them have presented specific facts supported by affidavit or other evidence to demonstrate that they have standing, and therefore, it need not address them all at this stage.

### 1.      Injury in fact

An injury in fact is an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, as opposed to merely conjectural or hypothetical.  *Lujan,* 504 U.S. at 560.  An injury is particularized if it affects the plaintiff in a personal and individual manner.  *Id.* at 560 n.1.

### (a)      Member Organizations

The National Treasury Employees Union is a union that represents CFPB employees, Am. Compl. ¶ 13; *see* Kaspar Decl. ¶ 2, and the CFPB Employee Association is an association of current and former CFPB employees, including probationary employees who have already been fired. Am. Compl. ¶ 18; Decl. of Christina Coll [Dkt. # 38-15] ("Coll Decl.") ¶¶ 2–3.  Defendants contend that plaintiff CFPB Employee Association has not established standing.  Defs.' Opp. at 9–10.

A union or other member organization can assert organizational standing on its own behalf, associational standing on behalf of its members, or both.  *Equal Rts. Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011), citing *Abigail All. For Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006).  An organization has standing on its own behalf if it satisfies the same standing test that applies to individuals:  an actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.  *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990).  An

organization has associational standing if it can show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Bhd. of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1135 (D.C. Cir. 2005), quoting *United Food & Comm. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (internal quotation omitted).

Actions by a defendant that "make it more difficult for" an organization "to accomplish [its] primary mission . . . provide injury for purposes both of standing and irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("The United States Supreme Court has made plain that a 'concrete and demonstrable injury to [an] organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests' and thus suffices for standing."), quoting *Havens Realty Corp.*, 455 U.S. 363, 379 (1982) (holding that generalized grievances or an abstract concern with a subject that could be affected by the case does not confer standing, but a showing that alleged illegal action will increase the resources the group must devote to programs independent of the lawsuit challenging the action does).

The CFPB Employee Association has shown both organizational and associational standing. The association's membership is made up entirely of CFPB employees, "dedicated public servants," including probationary and term employees, and its purpose to advance CFPB employees and the mission of the agency. Coll Decl. [Dkt. # 38-15] ¶¶ 2–3. Given that the association's existence depends on the existence of an agency workforce, the actions by defendants to eliminate the CFPB would undoubtedly "make it more difficult for" the association "to

accomplish [its] primary mission." *League of Women Voters*, 838 F.3d at 9. This is enough to demonstrate an injury in fact to support organizational standing. *See id.*

Moreover, the CFPB Employee Association has demonstrated associational standing. Defendants terminated probationary and term CFPB employees en masse and without cause during the week of February 10 and is poised to fire the remaining employees. Alex Doe Testimony, Mar. 11 Tr. at 45; Alex Doe Decl. [Dkt. # 38-2] at 4.[14] Association members who have serious health issues or have family members with serious health issues face the risk of concrete and actual or immanent harm if they lose the health care coverage that comes with their jobs. *See* Coll Decl. ¶¶ 4–6 (identifying a fired term employee member, who recently learned that she could have a chronic auto-immune condition and planned to have further medical testing in late March or early April, expects that she will lose her CFPB health insurance during the critical stage of establishing a treatment plan with her doctor); *id.* ¶ 7 (another member who is still employed but at risk of termination is the insurance provider for the family; she has a spouse on full medical leave with an ongoing serious medical condition and termination would result the inability to provide the necessary medical care for them). These harms to its members are sufficient to demonstrate injury in fact for the CFPB Employee Association.

---

14      The parties have both addressed the potential significance of the district court decision in *Maryland v. U.S. Dept. of Agric.,* No. JKB-25-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025), which ordered a number of federal agencies, including the CFPB, to reinstate probationary employees and prohibiting further reductions in force without notice. Pls.' Notice of Suppl. Auth. [Dkt. # 80]; Defs.' Response to Notice of Suppl. Auth. [Dkt. # 82] (attaching a declaration from Adam Martinez, identified now as the Acting Chief Human Capital Officer of the CFPB, which attests that the probationary employees have been reinstated). The Court appreciates the agency's compliance with a court order. But it does not find that the decision in a different case and a different district, challenging a much broader set of executive actions, on grounds different than those advanced here, being brought by the states as opposed to the organizations and individuals found to have standing here, should control the interim management of this case, particularly given the fact that the government has already appealed it, and the finality of it is uncertain.

Defendants argue that in seeking a preliminary injunction, a plaintiff-association must identify a particular member who has standing. Defs.' Opp. at 37 n.11, citing *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 334 (D.D.C. 2021).

The Court is satisfied that the detailed descriptions of individual members' circumstances without their names are sufficient to show that at least one identified association member has suffered an injury in fact, particularly given the personal medical information involved.[15]

Plaintiff National Association for the Advancement of Colored People, which is also a membership organization, also has demonstrated the necessary injury in fact. The NAACPS's "mission is to achieve equality, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." Decl. of Keisha D. Bross, Ex. 3 to Pls.' TRO Mem. [Dkt. # 14-3] ("Bross Decl.") ¶ 2. This includes working to protect and educate its members on consumer financial protection issues, *see* Bross Decl. ¶¶ 3–7, and the organization has provided evidence that this work has been harmed as a result of defendants' actions. The NAACP has been forced to cancel plans to provide CFPB resources at

---

15    NTEU's members also have a personal stake in this matter. *See* Kaspar Decl. ¶ 18 (identifying an NTEU member whose spouse and child each received separate cancer diagnoses with thirty days of each other and who faces imminent harm from the potential loss of health care coverage and the inability to obtain life insurance coverage in the future); *id.* ¶ 22 (identifying one employee who was very close to completing ten years in government prior to termination and will likely lose eligibility for the Public Service Loan Forgiveness). But it is not necessary to address defendants' arguments that the district court lacks jurisdiction to hear challenges to employment actions against members of NTEU, Defs.' Opp. at 11–14, or that those claims constitute improper "claim splitting" by the plaintiffs, *id.* at 7–9, at this time. While the actions against employees that have been taken or threatened are among the facts alleged in the complaint, the Court need not decide now whether it can or should address their legality when the case proceeds on the merits; at this point, its focus is the closure of the agency as a whole.

the association's state-by-state conferences "to protect members in the respective state from financial harm," Bross Decl. ¶ 6, as well as an educational program offered with the CFPB for its members on "housing discrimination, CFPB financial protection, and how to protect financial rights." Bross Decl. ¶ 7. These are actual harms that impede the work of the organization and constitute an injury in fact. *League of Women Voters*, 838 F.3d at 9.

Furthermore, NAACP members have suffered an injury in fact. Juanita West-Tillman is an NAACP member who lost everything in the recent Altadena fire in California. Decl. of Juanita West-Tillman [Dkt. # 38-14] ("West-Tillman Decl.") ¶¶ 1–2. The CFPB had been providing direct assistance to NAACP members who were victims of the California fires, including connecting NAACP members with resources to help them get back on their feet, but this ended when the CFPB stopped work in early February. West-Tillman Decl. ¶ 4. West-Tillman has been the target of numerous financial scams and predatory schemes targeting fire victims, and she has "had a difficult time determining what assistance was legitimate and what was fraudulent." West-Tillman Decl. ¶ 3. She planned to take advantage of and rely on CFPB's assistance, but defendants' stop work order and other actions leave her and other NAACP members at risk of becoming victims of financial predators. *Id.* ¶¶ 3–4. This is not mere speculation; it is a concrete, actual harm to NAACP member West-Tillman.

### (b)    Consumer Advocacy Organizations

Plaintiffs National Consumer Law Center and Virginia Poverty Law Center have also presented sufficient evidence to show they have suffered an injury in fact. The National Consumer Law Center is both a customer of and a vendor to the Bureau. It researches, publishes, and conducts presentations and seminars on matters that affect low-income consumers, and it relies heavily on the CFPB's reports and consumer database for that work. *See* Decl. of Richard Dubois,

Ex. 6 to Pls.' TRO Mem. [Dkt. # 14-6] ("Dubois Decl.") ¶¶ 3–4, 10–13.[16]  Losing this data will

undermine a key part of its mission and work, *id.*, and this type of informational injury has long

been accepted as sufficient to confer standing.  *See Action All. of Senior Citizens of Greater Phila.

v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (organization suffered cognizable injury when

government cut off "generous flow of information" on which it relied); *Drs. for Am. v. Off. of Pers.

Mgmt.*, 2025 WL 452707, at *9 (D.D.C. Feb. 11, 2025) ("The denial of information these doctors

wish to use in their routine activities has inhibit[ed] . . . their daily operations and thereby caused

an injury both concrete and specific to the work in which they are engaged.") (internal quotation

marks omitted) (alternations in original).

Further, defendants' termination of most of CFPB's contracts, including its contract with

NCLC, is an injury in fact.  The Bureau terminated its subscription to NCLC's manual and

cancelled the three-part training series NCLC had been retained to provide to CFPB staff.  *See

Dubois Decl.* ¶¶ 7–8 ("The CFPB's contract is the largest single publications contract for NCLC

and significant[ly] assists in funding NCLC's publications work."); Feb. 11, 2025 Email from

CFPB Supervisory Contracting Officer Braden Sanner to NCLC, Pls.' Ex. D [Dkt. # 60-1] at Page

10 of 107 (directing NCLC "to stop work on the subject contract immediately").  NCLC's work

will increase as a result of defendants' actions:  in the absence of the CFPB, it will have to organize

more trainings and publish more materials; it will have to use more resources to support the legal

service providers that will have to handle the diverted consumer complaints; and it will have to

---

16    *See* 12 U.S.C. § 5493(b)(3)(A) (requiring the bureau to maintain a database of consumer
complaints and responses); 12 U.S.C. § 5499 (requiring all public data assets published by
the bureau to be made publicly available); *see also* 12 U.S.C. § 5493(b)(1), (3)(c), (d)(4); *id.*
§ 5496(c); 15 U.S.C. § 1646(a), (b); *id.* § 1632(d)(3); *id.* § 2809(a); and *id.* § 5512(c)(3) (requiring
reports from various units and the Director).

dramatically increase its advocacy in the states and redirect advocacy to multiple agencies and litigation that would otherwise not be necessary. Dubois Decl. ¶ 15. This is injury in fact.

The other consumer advocacy organization, the Virginia Poverty Law Center, works to "break down systemic barriers that keep low-income Virginians in the cycle of poverty." Decl. of James Speer, Ex. 5 to Pls.' TRO Mem. [Dkt. # 14-5] ("Speer Decl.") ¶ 2. It relies on CFPB's Consumer Response unit to assist it in providing aid to consumers who call VPLC's predatory lending helpline, and "[i]f the complaint system goes away entirely or becomes so unreliable that it cannot be depended upon, it will make fulfilling our consumer-protection mission much harder." *Id.* ¶¶ 9–10, 15–16, 24. This also constitutes injury in fact.

### (c)    Individual Consumer

Finally, at the time this action was filed, individual plaintiff Reverend Eva Steege was engaged in receiving assistance from the CFPB when defendants stopped the Bureau's work. At the time, Steege was 83-years old and a Pastor of the Evangelical Lutheran Church. *See* Decl. of Pastor Eva Steege, Ex. 2 to Pls.' TRO Mem. [Dkt. # 14-2] ("Steege Decl.") ¶ 1. She incurred student loans when pursuing higher education at the Lutheran Theological Seminary. *Id.* ¶ 2. When she submitted her February 13 declaration to the Court, Steege was in hospice care, and she was only expected to live for another six months. *Id.* ¶ 1–2. It was her hope to resolve the debt and spare her family that burden after she died. *Id.* ¶ 2. She had been trying to enroll in the Public Service Loan Forgiveness Program to no avail, and contacted the CFPB for help. *Id.* ¶¶ 2–3.

On January 23, 2025, Steege met with CFPB employees and the Student Loan Ombudsman, who explained that she qualified for not only loan forgiveness under the program, but also a $15,000 refund of overpayments. *Id.* ¶ 4. Steege was scheduled to have a follow-up

meeting on Monday, February 10, *id.*, but after Vought issued the stop work order, and defendants fired the Ombudsman, Pls.' Ex. H [Dkt. # 60-1] (Barnard termination notice); Decl. of Julia Barnard [Dkt. # 38-10] ("Barnard Decl.") ¶ 2, the CFPB cancelled the meeting. Steege Decl. ¶ 7; Barnard Decl. ¶ 14. Steege's fear of leaving her surviving family members saddled with her student loan debt came to pass on March 15, when she died. *See* Suggestion of Death [Dkt. # 83]. Now that her husband, Ted Steege, has been substituted as a plaintiff in her stead, Min. Order (March 26, 2025) (granting motion to substitute), he has standing on his own behalf and on behalf of her estate to pursue her claim.[17]

## 2. Causation and Redressability

"It is well established that '[c]ausation, or traceability, examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff.'" *Grocery Mfrs. Ass'n v. EPA,* 693 F.3d 169, 176 (D.C. Cir. 2012) (alteration in original), quoting *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C. Cir. 1996); *see also Freedom Republicans, Inc. v. FEC,* 13 F.3d 412, 418 (D.C. Cir. 1994) ("fair traceability turns on the causal nexus between the agency action and the asserted injury"). Further, plaintiffs must demonstrate that it is "'likely,' as opposed to merely 'speculative,' that their injuries

---

17    Defendants argue that the PSLF program is administered by the Department of Education, *see* Defs.' Opp. at 22–23, 38, but this is of no moment. The CFPB works hand-in-hand with the Department to assist consumers trying to enroll in the PSLF; "[m]any of the issues that borrowers like Pastor Steege face related to federal student loans are, in fact, related to the acts and practices of private student loan servicing companies." Barnard Decl. ¶¶ 11–12; *see* 12 U.S.C. § 5535(c)(2) (providing that the student loan ombudsman works to "ensure coordination in providing assistance to and serving borrowers seeking to resolve complaints related to their private education or *Federal* student loans") (emphasis added). And contrary to defendants' assertion, *see* Defs.' Opp. at 38, Steege showed that her efforts to apply own were unsuccessful, and her time was indeed running out. Steege Decl. ¶¶ 1–3. This is enough to establish injury in fact.

will be 'redressed by a favorable decision.'" *Lujan,* 504 U.S. at 561, quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38 (1976).

Defendants do not dispute that plaintiffs' claimed injuries in fact are traceable to defendants' actions or that efforts to shut down the CFPB. The challenged actions – including the stop work order from Vought, and the decision to shutter the Bureau, implemented by cancelling CFPB contracts, terminating term and probationary employees, and preparing to execute widespread RIFs – directly threaten the very existence of the CFPB Employee Association and have placed its terminated employee members and their families at risk. They have caused the NAACP to cancel planned trainings and programs and halted direct support Bureau staff were giving to NAACP members trying to differentiate between legitimate financial support and unscrupulous criminals preying on who were victims of the Altadena fires. They will cause both NCLC and VPLC to expend more resources on their missions, and they have left Pastor Steege's heirs at risk of inheriting unresolved student debt. Nor do defendants dispute that a ruling from this Court in plaintiffs' favor would redress these injuries.

Accordingly, Court finds that several plaintiffs have demonstrated that they meet the requirements for Article III standing and that is has jurisdiction over this case. *See TransUnion LLC*, 594 U.S. at 431; *UAW-Lab. Emp. & Training Corp.*, 325 F.3d at 362.

## VI.   A PRELIMINARY INJUNCTION IS NECESSARY TO PRESERVE THE STATUS QUO.

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011), quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Rule 65

authorizes a district court to issue interim relief to prevent irreparable injury and to preserve the status quo while the district court assesses the merits of a case. *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025), citing *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation.") (cleaned up). A district court "ha[s] authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition" until it can determine how to proceed, as "the law contemplates the possibility of a decision either way, and therefore must provide for it." *Id.* at *3, quoting *United States v. Shipp*, 203 U.S. 563, 573 (1906).

"The standard for obtaining either a TRO or a preliminary injunction is identical." *Id.*, citing *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011). When considering a motion for a preliminary injunction, the Court must consider whether the movant has met its burden of demonstrating that: (1) it "is likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) an injunction serves the public interest. *Winter*, 555 U.S. at 20.

For some time, the Court of Appeals adhered to a "sliding-scale" approach, where "a strong showing on one factor could make up for a weaker showing on another." *Sherley*, 644 F.3d at 392. However, in *Sherley*, the Court explained that because the Supreme Court's decision in *Winter* "seemed to treat the four factors as independent requirements," it had more recently "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-

standing requirement for a preliminary injunction.'" *Id.* at 393, quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).[18]

Whatever the status of the sliding scale analysis might be, the D.C. Circuit has clearly stated that a failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction. *See Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006). As another court in this district has observed, "absent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." *Navistar, Inc. v. EPA*, Civil Action No. 11-cv-449 (RLW), 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (alteration omitted), quoting *Hubbard v. United States*, 496 F. Supp. 2d 194, 198 (D.D.C. 2007).

Moreover, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been a "basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959).

The Court finds that a consideration of each of the factors supports the issuance of a preliminary injunction in this case. The testimony before the Court and the declarations and exhibits submitted by both sides have established that the requested relief is absolutely necessary

---

18      The Court of Appeals has not gone further to clarify whether the sliding scale approach is inconsistent with *Winter*, and the manner in which courts should weigh the four factors "remains an open question" in this Circuit. *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). *See also League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) ("Because appellants satisfy each of the four preliminary injunction factors, this case presents no occasion for the court to decide whether the 'sliding scale' approach remains valid after *Winter*."); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (reiterating that the Court has not yet decided the issue).

to preserve the status quo so that the CFPB will still be standing when the Court reaches the merits of this case.

A.       **Likelihood of Success of the Merits**

1.       **Plaintiffs are likely to succeed on their ultra vires and constitutional claims in Count One.**

As defendants' many citations to Article II of the United States Constitution imply, there is an Article I.  And Article I, Section 1 provides: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States . . . ."  U.S. Const. art. I, § 1.

Article I, Section 8 lists the powers of Congress, including "[t]o regulate Commerce . . . among the several States," and "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8.  This power includes the authority to create new federal agencies and official positions.  *See Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (under the Necessary and Proper Clause, "Congress may undoubtedly . . . create 'offices'").  As Chief Justice Marshall explained more than 200 years ago, the framers included this provision "in a constitution, intended to endure for ages to come . . . to be adapted to the many *crises* of human affairs."  *M'Culloch v. State*, 17 U.S. 316, 415 (1819) (emphasis in original).

Under the Constitution, the President does not have legislative authority.  Instead, Article II vests executive power in "a President of the United States of America," who "shall take Care that the Laws be faithfully executed."  U.S. Const. art. II § 3 (the Take Care Clause).  The Supreme Court has repeatedly emphasized the breadth of the President's discretion to determine how this should be done, but it has also drawn a clear demarcation between executing, or implementing, the laws and making them in the first place.

61

> In the framework of our Constitution, the President's power to see
> that the laws are faithfully executed refutes the idea that he is to be
> a lawmaker. The Constitution limits his functions in the lawmaking
> process to the recommending of laws he thinks wise and the vetoing
> of laws he thinks bad. And the Constitution is neither silent nor
> equivocal about who shall make laws which the President is to
> execute.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). After all, members of

Congress are democratically elected too.

Congress exercised its legislative power in 2010 in response to a genuine, devastating

financial crisis. It created the Consumer Financial Protection Bureau and gave it a job to do:

> There is established in the Federal Reserve System, an independent bureau
> to be known as the "Bureau of Consumer Financial Protection", which shall
> regulate the offering and provision of consumer financial products or
> services under the Federal consumer financial laws.

12 U.S.C. § 5491(a). The Dodd-Frank Act was quite specific about what that regulation would

entail, including: "establishing a single, toll-free telephone number, a website, and a database . . .

to facilitate the centralized collection of, monitoring of, and response to consumer complaints

regarding consumer financial products or services," 12 U.S.C. § 5493(b)(3)(A); designating a

Private Education Loan Ombudsman within the Bureau "to provide timely assistance to borrowers

of private education loans," *id.* § 5535(a); establishing an Office of Financial Protection for Older

Americans, *id.* § 5535(g)(3)(B), an Office of Service Member Affairs, *id.* § 5535(d)(2), and the

Office of Fair Lending and Equal Opportunity, *id.* § 5493(c); and researching, analyzing, and

reporting on market developments for consumer financial products and services and consumer

access to those products and services. *See* 15 U.S.C. §§ 1646(a), (b); *id.* § 1632(d)(3). In

accordance with the Constitution, these provisions mandating the existence of, and the functions

to be carried out by, the CFPB were enacted by the legislative branch and signed into law by the

President of the United States.

Plaintiffs allege in Count One that defendants were intent on executing the current President's plan to eliminate the agency and to do so in a hurry, in violation of the statutory imperatives of the Dodd-Frank Act and contrary to the constitutional limitations on executive authority and the Take Care Clause.[19]  Am. Compl. ¶¶ 75–80.

It is fundamental to the separation of powers embodied in the Constitution that "[t]he President's power . . . must stem from either an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.  Defendants do not even try to maintain that the Constitution or any statute accorded the President the authority to dismantle the agency.  Instead, in their February 24 opposition to the motion for preliminary injunction, they denied that it was happening at all, or that there was any imminent risk of its happening in the near future if the Court declined to act.

> [O]n February 8, 2025, Russell Vought, Acting Director of the Consumer Financial Protection Bureau ("CFPB"), e-mailed all CFPB staff to direct that, unless "required by law" or "expressly approved by the Acting Director," staff were not to take substantive actions that might reflect policy decisions inconsistent with new leadership's views on the best way to meet the agency's statutory responsibilities. As Acting Director Vought explained, he was "committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources."
>
>                               \*      \*      \*

---

19    Plaintiffs characterize Count One as a claim seeking "non-statutory review of official and agency action," an effort to "enjoin[] and declare unlawful official action that is ultra vires."  Am. Compl. ¶ 75.  As a "weapon in the arsenal for attacking federal administrative action," an *ultra vires* claim requires the Court to determine whether defendants "plainly act[ed] in excess of [their] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022), quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  The count complains that defendants overstepped both the constitutional and statutory limitations on their authority: paragraph 76 invokes the Take Care Clause in Article II of the Constitution; paragraph 79 of the amended complaint alleges that "[t]he CFPB was established as a federal agency by Congress by statute, the Dodd-Frank Act, signed into law in 2010, and can be eliminated only by Congress"; and paragraph 80 asserts that "[d]efendants' actions to eliminate the CFPB exceed executive authority, usurp legislative authority conferred upon Congress by the Constitution, defendant Vought was not lawfully appointed, and his actions are ultra vires and should be enjoined."

> Given . . . disruptive protests involving the CFPB's own staff, CFPB leadership has closed the CFPB Headquarters Building and tightened staff supervision, making sure that they are focused only on aspects of the mission that are, in fact, urgently required by law, as determined by the Chief Legal Officer. Under this internal procedure, work requests have been approved to allow the CFPB to maintain its statutory obligations.
>
> Remarkably, the CFPB employee groups and other Plaintiffs now spin these actions and others as being part of a "coordinated campaign by the new administration to eliminate the" CFPB. But President Trump has nominated Jonathan McKernan . . . to be the new CFPB Director, and the Senate Banking Committee will hold a hearing on his nomination this week – actions that are inconsistent with Plaintiffs' view of current events. Similarly, as Acting Director Vought noted in a letter to the Federal Reserve, the "Bureau's new leadership will run a substantially more streamlined and efficient bureau[.]" The predicate to running a "more streamlined and efficient bureau" is that there will continue to be a CFPB.

Defs.' Opp. at 1–2 (internal citations and footnote omitted) (alteration in original). This rosy depiction of events, designed to assuage the Court, was accompanied by the February 24, 2025 Declaration of Adam Martinez, the Chief Operating Officer of the CFPB, First Martinez Decl., which was a carefully worded and highly selective account that was immediately contradicted by a second series of declarations and exhibits submitted by the plaintiffs. The defendants' witness was then placed in the awkward position of submitting another declaration, in which he acknowledged the accuracy of the facts set forth by plaintiffs' declarants, including their accounts of his own statements, but he still voiced the assurance that the agency was complying with its statutory obligations. *See* Second Martinez Decl.

The plaintiffs and the defendants have both provided the Court with numerous exhibits – communications within the CFPB and with OPM and other third parties, such as contractors – and there is no dispute as to their authenticity for purposes of this motion. In short, there is no dispute as to the facts of what took place and what was said; the parties differ as to what it all means.

It is now clear to the Court that the omissions from the first declaration rendered it to be highly misleading, if not intentionally false.  Defendants' initial effort to persuade the Court in their opposition that employees were hard at work on their statutory duties even after they were ordered to stand down on February 10 has been shown to be unreliable and inconsistent with the agency's own contemporaneous records, and the defendants' eleventh hour attempt to suggest immediately before the hearing that the stop work order was not really a stop work order at all was so disingenuous that the Court is left with little confidence that the defense can be trusted to tell the truth about anything.

After consideration of the record as a whole, then, including all of the declarations and exhibits submitted by both sides, and the testimony introduced by both sides at the hearing, the Court finds that it is likely that plaintiffs will succeed on the merits.  The evidence reveals that: the defendants were in fact engaged in a concerted, expedited effort to shut the agency down entirely when the motion for injunctive relief was filed; while the effort to do so was stalled by the Court's intervention, the plan remains unchanged; and the defendants have absolutely no intention of operating the CFPB at all.  While the President is free to propose legislation to Congress to accomplish this aim, the defendants are not free to eliminate an agency created by statute on their own, and certainly not before the Court has had an opportunity to rule on the merits of the plaintiffs' challenge.

### (a) The agency was in shut down mode as of February 10.

In his first declaration, Adam Martinez characterized the February 3 email from the then Acting Director of the CFPB, Secretary of the Treasury Bessent, and the February 8 email from the current Acting Director, Russell Vought, as being consistent with typical practice during a Presidential transition. *See* First Martinez Decl. ¶¶ 2, 3, 11 ("It is not unusual for these types of

steps to be taken at an agency at the beginning of a new administration and during the transition period for new leadership."). He described the February 10 email as a communication providing both validation that the building was closed and "instructions regarding work tasks." *Id.* ¶ 14. He averred that "[s]ince the arrival of the Acting Director, the new leadership is engaging in ongoing decision-making to assess how to make the Bureau more efficient and accountable. Our leadership has worked to comply with statutorily required functions . . . . " *Id.* ¶19. The declaration noted that on Saturday, February 8, Vought's first day on the job, the new Acting Director wrote a letter to the Chair of the Federal Reserve Bank to say that the agency would not need any funds for the third quarter of 2025. *Id.* ¶ 27, citing Ex. G to First Martinez Decl. It recounted that the agency headquarters building was closed on February 9, *see* Feb. 9 Email, and Martinez asserted that "[t]he closure of the CFPB's Headquarters pursuant to the February 9 and 10 emails has not prevented the CFPB from performing statutory functions." First Martinez Decl. ¶ 20.

But the declaration makes no reference to the fact that Vought's February 10 email to all employees contained the directive, "[p]lease do not perform *any* work tasks." *See* Feb. 10 Email (emphasis added).

In fact, as Martinez acknowledged during his testimony, by February 10, the agency was barreling full speed ahead in an effort to dismantle the agency completely by the end of the week. At the hearing, primarily on cross-examination, Martinez described a succession of circumstances that bore no resemblance to the impression his declaration had been drafted to convey. The work stoppage order was issued on Monday the 10th, and according to Martinez, effective that day, "most employees were taking administrative leave;" in fact, they were "told to take it." Martinez Testimony, Mar. 10 Tr. at 52. *See also* Feb. 14 email from Human Capital Operations Manager with Updated Timekeeping Instructions, Pls.' Ex. J [Dkt. # 60-1] at Page 27 of 107; Pfaff

Testimony, Mar. 11 Tr. at 76 (testimony of Chief of Staff for the Office of Consumer Response: "We closed our laptop lids and walked away.").[20]

A meeting with OPM, the agency that was also under the control of Russell Vought, was convened that same day, to plan and execute a full-scale Reduction in Force. *See* Martinez Testimony, Mar. 10 Tr. at 128. At the meeting, Martinez explained to his team that the CFPB was going to fire "the vast majority of its employees," and that new leadership was asking that it be accomplished "as quickly as possible." *Id.* at 126–28. Agency employees who were still within their one-year probationary period were fired that Monday, and those still within their two-year probationary periods were fired by Tuesday the 11th. *Id.* at 45, 128. This affected approximately 75 to 85 people. Mar. 10 Tr. at 51; *see also* Diotalevi Decl. [Dkt. # 41-1] ¶ 4.

Also on February 11, Mark Paoletta, who had been identified in the February 10 email as the Chief Legal Officer of the CFPB, sent an email to Gueye Jafnar, the agency's Chief Financial Officer, Martinez, the Chief Operating Officer, and Jordan Wick, one of the DOGE employees who by then had been deputized as an employee of the CFPB, saying:

> On behalf of Acting Director Vought, I have reviewed CFPB contracts and authorize and direct the cancellation of all contracts in the following divisions: Enforcement (102 contracts), Supervision (16 contracts), Consumer Response (20 contracts), Office of Director (33 contracts), and Legal Division (all except 2 contracts . . .). Further, on behalf of the Acting Director, I direct the cancellation of the contract for concrete repairs.

_____

20    The new leadership found out almost immediately that the agency's Office of Research was responsible for calculating the Average Prime Offer Rate ("APOR"), an essential piece of data for banks and mortgage lenders, and as of 7:15 p.m. on the evening of the 10th, Chief Legal Officer Mark Paoletta directed that the work to publish it would continue. *See* Defs.' Ex. 3 [Dkt. # 56-1] at Page 4–5 of 116, CFPB_00004–5. But this did not interrupt the effort to close the agency down in any way.

Defs.' Ex. 4 [Dkt. # 56-1] at Page 6 of 116, CFPB_0006.  *See also* Pls.' Ex. A [Dkt. # 60-1] (Feb. 11 "Urgent Action" email to contracting officers: "We need to get these Termination Notices out ASAP.").  The record reflects that notices of cancellation started going out that day.  *See, e.g.*, Pls.' Ex. D [Dkt. # 60-1] (Feb. 11 email to NCLC referencing the "blanket Stop Work Order" and notifying the organization to stop work on the contract immediately).  *See also* Charlie Doe Decl. ¶¶ 3–4 ("instructions to contracting officers did not reflect a change in policy direction, but rather a wholesale termination of the contracts needed to keep the CFPB running," and contracting officers were told to work overtime to do so despite the work stoppage).

While the CFO gave various offices the opportunity to identify those contracts that directly supported a statutory requirement, "meaning that we would not be able to meet a statutory requirement without [it]," Pls.' Ex. F [Dkt. # 60-1], some of those contracts were terminated anyway.  *See* Decl. of Matthew Pfaff ("First Pfaff Decl.") [Dkt. # 38-7] ¶ 27 ("I reviewed the list of contracts managed by Consumer Response and determined that five contracts directly supported a statutory requirement. All five contracts were nevertheless terminated for convenience . . . .").[21] And the termination letters did not include instructions to vendors to preserve their data or records. Mar. 10 Tr. at 174.

By Thursday the 13th, 130 employees with "not to exceed" fixed terms had been told to pack their bags.  *See* Diotalevi Decl. ¶ 14; Mar. 10 Tr. at 52.[22] This included the employee who served in the statutorily mandated position of Student Loan Ombudsman.  Pls.' Ex. H.  Also by

---

21    Martinez testified on direct that there were some instances in which staff members were able to contact Paoletta and request permission to reactivate; he characterized those as "a couple of high-priority issues that would have been devastating had it stopped."  Mar. 10 Tr. at 77.

22    The workforce was also reduced as some employees accepted the "fork-in-the-road" early retirement option. Mar. 10 Tr. at 51.

February 13, the agency had established a tip line through which banks and other stakeholders in the community could report enforcement or supervision staff who were still asking them for information. Diotalevi Decl. ¶ 6; Pls.' Ex GG [Dkt. # 60-1].[23]

On that Thursday, there was a lot of work to do to effectuate the RIF. Alex Doe's Human Capital team had been directed to help with the effort. The record contains her declaration, and she testified at the evidentiary hearing as well. *See* Alex Doe Decl. [Dkt. # 38-2]; Mar. 11 Tr. at 33–67. She recounted that at a meeting on Thursday the 13th, Martinez explained that the agency was in "wind-down mode," and its statutory functions were going to be transferred to other agencies. Decl. of Blake Doe [Dkt. # 38-3] ¶ 3; Second Martinez Decl. ¶ 3 (confirming Blake Doe declaration as accurate); Mar. 11 Tr. at 39. The plan was to terminate the agency's approximately 1200 employees by eliminating whole offices, divisions and units, and RIF notices were being prepared that day. Mar. 11 Tr. at 40; Alex Doe Decl. ¶ 3. Jeremy Lewin, another DOGE representative who had become a CFPB employee, told the group that they wanted the formal notices to go out by the 14th. Mar. 11 Tr. at 41–42. According to Alex Doe, and as confirmed by Martinez, the Bureau was to "reduce altogether" in a second step sixty to ninety days after that. *See* Mar. 10 Tr. at 129–30 (Martinez describes that account as "absolutely correct" based on the facts he had at the time). *See also* Pls.' Ex. JJ [Dkt. # 66-1] ("CFPB Memo to Michael Mahoney, OPM") at Page 9–11 of 60 (identifying 1175 positions to be included in the first RIF). At approximately 10:00 p.m. that evening, Jordan Wick reminded Martinez that Acting Director

---

23      That same day, the CFO was already in communication with the Federal Reserve regarding the Bureau's ability to return money to either Treasury or the Federal Reserve if necessary. *See* Pls.' Ex. E [Dkt. # 60-1].

Vought was expecting an update by 10:00 a.m. the next day.  Pls.' Ex. JJ [Dkt. # 66-1] at Page 6 of 60.

To achieve the desired level of speed, it was necessary to ask OPM for an exception from the usual ninety-day notice period, and to give the employees only thirty days, and that request was submitted on Thursday.  *See* CFPB Memo to Michael Mahoney, OPM, Pls.' Ex. JJ.  In that document, the CFPB identified Vought's stop work order as the extraordinary circumstance that would justify such haste.  *Id.* at Page 11 of 60.  Martinez was informed via email that evening that the request for the exception had been granted, and the formal approval was transmitted on February 14.  *See* Pls.' Ex. JJ.

On Friday morning, then, the team was awaiting the completion of the OPM documents that would be attached to the RIF notices.  The CFPB RIF team gathered at 8:30 a.m. to review templates provided by OPM, and along with Martinez, they met with OPM at 10:00 a.m.  Alex Doe Testimony, Mar 11 Tr. at 47.

Just after 12:00 a.m. that morning, though, the plaintiffs had filed an amended complaint coupled with a motion for a temporary restraining order.  Am. Compl.  By approximately 11:00 a.m., the Court had set a scheduling hearing for 2:00 p.m. that afternoon.  Martinez was notified by email of this development at approximately 1:36 p.m.; the sender noted, "[w]hile we will continue preparing, it's just a consideration when deciding when to send out notices."  Pls.' Ex. LL [Dkt. # 66-1].  And, indeed, it was a "consideration."  As Alex Doe reported, members of the termination team contacted OPM immediately and insisted that their counterparts speed up:

"Thanks for everything you're doing, but we need the last set of attachments now.  **We cannot wait until COB**."  Pls.' Ex. MM [Dkt. # 66-1] (emphasis added);[24] *see also* Mar. 11 Tr. at 52.

The hearing began as scheduled, and while the lawyers were addressing the Court or conferring with each other during a break that had been provided to see if they could work out a short-term solution themselves, the RIF efforts proceeded apace.  At 2:27 p.m., a list of the employees to be fired was transmitted.  Pls.' Ex. NN [Dkt. # 66-1].[25]  But they didn't get it done in time.

By 5:00 p.m., the Court had docketed a consent order negotiated by the parties, which provided that until the Court ruled on plaintiffs' motion, which was to be deemed a motion for preliminary injunction, the defendants could not:  delete, destroy, or impair any data, database or other CFPB record; terminate any CFPB employee, except for cause related to the specific employee's performance or conduct; issue any notice of reduction-in-force to any CFPB employee; or transfer, relinquish, or return any money from the CFPB's reserve funds.  Order (Feb. 14, 2025) [Dkt. # 19].   Nonetheless, the CFBP RIF team and OMB continued to exchange documents and nail down the technical details as to how the necessary forms would be completed until approximately 10:00 pm.  Alex Doe Testimony, Mar. 11 Tr. at 54; *see* Pls.' Ex. QQ [Dkt. # 66-1] ("[W]e will need to key these over the weekend so they are there Tuesday morning.").

---

24    *See* Martinez Testimony, Mar. 10 Tr. at 134–35 (Martinez confirms names redacted from the exhibit were members of the termination team).

25    Thirteen employees of the Office of Director/Office of Civil Rights were excepted from the proposed RIF because "[i]n a February 14, 2025, meeting with OPM staff CFPB clarified this competitive area should be removed from the request."  Pls.' Ex. OO [Dkt. # 66-1] at 28 of 60.

Martinez, who had provided a sworn declaration attesting to his personal familiarity with the transition process for new administrations, had to acknowledge at the hearing that none of this was normal.

> THE COURT: . . . [A]t the beginning of your testimony we talked about the initial email from the secretary of Treasury being [a] pretty normal, kind of transitional kind of email. And the first email from the Acting Director Vought also, generally, pretty typical. Would you say that sending out an order that says "Do no work" is typical?
>
> THE WITNESS: No.
>
> THE COURT: Would you say that canceling all the contracts before the analysis as to whether these are duplicative, worthwhile, not worthwhile is typical?
>
> THE WITNESS: No.
>
> THE COURT: Would you say that firing all probationary employees and two-year employees from the get-go is typical?
>
> THE WITNESS: No.
>
> THE COURT: Would you say that trying to implement a RIF without notice before the new director is even put in place is typical?
>
> THE WITNESS: No.
>
> THE COURT: And would you say putting the rest of the employees on administrative leave with an order to do no work is typical?
>
> THE WITNESS: No.

Mar. 10 Tr. at 121–22. He also conceded on cross examination that while he had stated in his declaration that "new leadership" was working to comply with its statutory functions, "winding down an agency would not be consistent with statutory obligations," and that they were in fact winding down during the week of February 10. Mar. 10 Tr. at 126.

> **(b)**    **The shutdown did not stop after the consent order was entered on February 14; the efforts continued as if nothing had changed.**

The record also establishes that even with the consent order in place, the effort continued over the next two weeks; the work stoppage remained in effect, and the shutdown was very much alive, although temporarily stalled by the Court.

Employees remained on administrative leave, and they were not performing their work duties. *See* Second Pfaff Decl. [Dkt. # 48-2] ¶ 4 ("None of the activities listed in my original declaration, including responding to escalated issues via the Escalated Case Management Team, are currently happening.").

On February 18, Martinez was informed by the CFPB Chief Information Officer that the unavailability of the agency's home page online was no accident.

> My understanding is that the decision to delete the home page was made by Acting Director Vought, and it was not an error made by the members of the DOGE team.

Pls.' Ex. L [Dkt. # 60-1].

Furthermore, during the week of February 17, the RIF was still being planned and discussed. Alex Doe, who had a poised and calm, but firm demeanor, and came across as extremely credible, testified that the RIF team met again on Wednesday, February 19. Mar. 11 Tr. at 54. Martinez was more focused on the transfer of functions at that meeting, "explaining that he had had conversations with new leadership and the chief legal officer about what the wind-down of an agency really meant, and that there were, you know, functions that would need to transfer, and OPM was pressing us to identify where those would transfer and we did not yet have an answer." Alex Doe Testimony, Mar. 11 Tr. at 55.

> MR. GUPTA [counsel for plaintiffs]:   Did he refer at this meeting to winding down the Agency?

DOE:  He did.

MR. GUPTA:  What did you understand that to mean?

DOE:  Closing of the Agency. . . .

MR. GUPTA:  And he used that phrase, "the closure of the Agency"?

DOE:  He did.

Mar. 11 Tr. at 56–57.

In the event there was any doubt about the intentions of the executive branch during this period, on February 19, the President reiterated in an interview with CBS News that his administration had "virtually shut down the out-of-control CFPB."  Ex. P to Roston/Scible Decl. [Dkt. # 38-17], Lesley Stahl, *Why the Consumer Fin. Protection Bureau is being targeted by Trump, DOGE*, CBS News (Feb. 23, 2025).

Martinez supplied more details to agency staff during a meeting on Thursday, February 20. Alex Doe testified:

> The next day we had an internal meeting with some human capital colleagues that are not part of the RIF team but we needed to loop them in . . . . And in that meeting, he was a lot more specific about what exactly the plan was for the Bureau. . . .
>
> Adam said there would no longer be a CFPB.  He said that we were legitimately shutting down.  He said that we would be wiped out within 30 days.  He said that the White House had instructed us to cancel all of our committees and advisory boards and travel cards and purchase cards and to only keep any contracts that were necessary to effectuate the closure of the Agency within 30 days. . . . Adam said there would be no positions to compete for.
>
> [MR. GUPTA]:  No positions to compete for, you understood that to mean because the entire divisions would be eliminated?

[DOE]:  Because the Agency would be eliminated.  He was a lot more
specific in that meeting that was just the CFPB.

Mar. 11 Tr. at 58–59. [26]

Just as Martinez's second declaration confirmed the accuracy of Alex Doe's, his  testimony

was consistent with hers as well.  He testified that there were meetings during the week of February

17 to talk about the RIF.  His understanding was that "the vast majority of the workforce [would]

be terminated," and he was talking with the acting leadership, whom he identified as Paoletta and

the DOGE personnel who had been designated as senior leaders of the CFPB, about who would

inherit the agency's "administrative portfolio."  Mar. 10 Tr. at 142–44.  He agreed that he told his

---

26      The declaration of another employee details what CFPB staff were told in similar terms:

> During meetings about the CFPB's shut-down that took place between
> Monday, February 18 and Tuesday, February 25, staff were told by Senior
> Executives that the CFPB would be eliminated except for the five statutorily
> mandated positions; that the CFPB would exist in name only; and that, once
> this Court's injunction was over, everything would need to be either
> removed from the building or destroyed.   Staff were told by Senior
> Executives that the CFPB would no longer have an employee location and
> that data could not be stored at any CFPB location because there wouldn't
> be any locations left. Staff were told that no DHS, OIG, GAO, OMB,
> Internal Controls, Congressional, or other compliance would be necessary
> because the CFPB would "not exist" and it would no longer be "our
> problem."

Drew Doe Decl. [Dkt. # 38-5] ¶ 7; *id.* ¶ 10 ("One Senior Executive said that CFPB will become a
'room at Treasury, White House, or Federal Reserve with five men and a phone in it.'").

Martinez did not vouch for the accuracy of Drew Doe's account in his supplemental
declaration as he did for the declarations of Alex Doe and Blake Doe.  But he did not dispute it
either. He offered that he was not aware of the identity of the "senior officials' described and that
D. Doe "does not testify that those statements were premised on directive from Acting Director
Vought or the CFPB Chief Legal Officer."  The declaration also observed that D. Doe's suggestion
that the agency was going to be reduced down to only five positions would be "inconsistent with
Acting Director Vought and the Chief Legal Officer's directives." Supp. Decl. of Adam Martinez,
[Dkt. # 47-1] ¶ 5.

colleagues at a meeting that week that entire divisions, offices and units were still going to be abolished, and that "the impediment to going forward was this Court's order on the 14th."  Mar. 10 Tr. at 145–46.

Martinez confirmed that throughout that week, it was still the goal to dismantle the agency "as fast as possible."  Mar. 10 Tr. at 149.  Since the agency had received the requested approval from OPM to provide its employees with only thirty days' notice, he told his staff at the February 20 meeting that the whole agency would be completely wiped out in thirty days.  Mar. 10 Tr. at 150.  He conceded at the March 10 hearing that he had no information about the fate of the agency's statutory functions, Mar. 10  Tr. at 149–50, and that but for the Court's order, the agency would already have been gone:  the process to release the headquarters had begun, and the five regional offices were being eliminated.  Mar. 10 Tr. at 152–53.  Martinez, who had been with the agency since its inception, seemed to genuinely care about its mission, and as he saw it, once the RIF was implemented, the situation would be irreparable; after the RIF, there would not be any jobs the employees could compete for.  Mar. 10 Tr. at 153.

The paper record reflects a number of additional events occurring at a rapid-fire pace:

- On Thursday, February 20, Jordan Wick sent an email to Paoletta and Vought with the subject:  "More contracts to cut." ("Please see attached for the next tranche of contracts for which we recommend immediate termination – they're composed of the following: . . . Consumer Credit Information Surveys and Panels, which will no longer be used . . . Various support services (user research and testing, financial mgmt., internal controls, and identity access software), all of which we can do without.").  Defs.' Ex. 10 [Dkt. # 66-2], CFPB_00121.

- A February 21 email from a CFPB Realty officer stated that as of that date, the "CFPB's main focus was 'moving out of [its] large headquarters building' on a 'very very tight time frame . . . (30 days).'"  Diotalevi Decl. ¶ 15.  The Bureau was also moving out of its regional offices, beginning with San Francisco.  *Id.*

- Also on February 21, the Chief Information Officer wrote to Martinez that the FDIC was asking about the status of the agency's statutorily required data collection under the Home Mortgage Disclosure Act, and stated "[w]e are doing our best effort to

support the data collection, but it is at risk due to several contracts being terminated. We've requested that three of them be turned on, at least temporarily." Defs.' Ex. 6 [Dkt. # 56-1] at Page 9 of 116, CFPB_0009.

▪ Notwithstanding the fact that the building was closed, on February 26, employees were informed that they would lose their ability to work remotely in two days. *See* Pls.' Ex. M [Dkt. # 60-1] ("The Citrix Virtual Desktop will be unavailable after Friday, February 28, 2025, at 11:59 PM EST."). This is the program that enables employees to log in securely when they are not at a CFPB computer. Diotalevi Decl. ¶ 20.

▪ And on Thursday, February 27, employees were told that it was time to pick up their belongings for good. *See* Pls.' Ex. O [Dkt. # 60-1] ("Subject: Pickup of Personal Belongings and Return of Equipment from the CFPB HQ . . . We recognize that you have personal property, work materials, and federal records in your office or cubicle. To prepare to vacate the building, the Operations team has packed up your personal belongings for pickup at 1700 G Street.").

▪ By March 3, purchase cards were cut off. *See* Defs.' Ex. 29 [Dkt. # 56-1], CFPB_0098.

It was not until February 27, two weeks after the Court's order concerning the deletion of data, that the Chief Information Security Officer instructed agency staff to identify whether CFPB data or records were at risk of being deleted due to contract terminations, Feb. 27 Email, Defs.' Ex. 18 [Dkt. # 56-1] CFBP_00037, and a number of offices responded to express concerns about the loss of data needed for litigation or EEO compliance and uncertainty about whether it was too late to revive the contracts. *See, e.g.*, Feb. 28 Email, Defs.' Ex. 19 [Dkt. # 56-1] CFBP_00041; Mar. 10 Tr. at 179–81. The testimony also revealed that GSA's cut-off of purchase cards hampered the agency's ability to pay its bills and preserve historical data. *See* Mar. 10 Tr. at 183–84.

The defendants have highlighted a number of emails to suggest that after the blanket orders relating to work and contracts were issued on February 10 or 11, agency leadership circled back and took steps to approve certain activities or reactivate specific contracts related to statutorily mandated activities. The Court acknowledges that the new leadership relented in some circumstances when its employees insisted that the agency was legally required to complete some aspects of its work, *see, e.g.*, Feb. 27 email from Paoletta to Office of Fair Lending, Defs.' Ex. 13

[Dkt. # 56-1], CFPB_00029 (approving certain work, although the email contained the caveat, "[a]ny action or communication to an outside party should be sent to me and Daniel Shapiro for review and approval before being transmitted"), or when they discovered – after the notices to terminate contracts had already been sent – that certain contracts clearly supported statutory functions. *See* Feb. 20 Email, Defs.' Ex. 51 [Dkt. # 66-2], CFPB_00120.

These appropriate steps by the new leadership are a matter of record, but the Court cannot find that they reflect that the ship changed course, or that the administration ever abandoned its plan to shut the CFPB down. If anything, the scramble to revive legally required activities serves to underscore how complete the shutdown was as of February 10, and how little thought and attention was given to any particular contract or agency activity before it was eliminated. *See* Mar. 10 Tr. at 71–72 ("THE COURT: So is it fair to say that there's thought going into it but only after, it's like shoot first and ask questions later? MARTINEZ: That's what it felt like.").

Also, a close examination of the materials in the record reveals that the approvals were narrow and grudging, and primarily related to operations – databases, phones, facilities, and human resources – but not the staffing or outward facing communications that had been in place to serve consumers directly. In other words, when it was doing anything, the agency was largely doing what was statutorily mandated to manage *itself* internally: responding to FOIA requests, maintaining records, complying with regimens governing employment and accommodating disabled employees. *See, e.g.*, Feb. 21 Email from Martinez to Sonya White, Defs.' Ex. 5 [Dkt. # 56-1] CFPB_00007 ("Legal Division is authorized to support **all operational matters** being exercised on behalf of our new leadership and our regulatory/statutory requirements, including: Procurement/Contract Actions, Financial Management Actions, Human Capital Actions, Labor Relations Actions, Technology and Infrastructure Support, Administrative Operations Actions

(Security, Facilities, Maintenance), Data Governance/Administration, EEO Processing Counsel Support, Reasonable Accommodation Counsel Support," but "mission related support should be coordinated directly through Mark or Dan.") (emphasis added); *see also* Feb. 27 Email, Defs.' Ex. 26 [Dkt. # 56-1], CFPB_00062 (specifying that External Affairs team has been "1) reviewing contracts for termination, (2) terminating the advisory councils and (3) prepping and packing 1700 G Street due to the termination of the lease, a few other things:  unless otherwise directed, we will abide by the guidance issued and will continue to raise items that are statutorily mandated").

It is also notable that when the agency solicited information about contracts that needed to be revived to fulfill statutory directives, those communications were not particularly inviting. Employees were admonished that the agency was taking a "very narrow approach," and that "if you're providing justifications, please be prepared to defend those to external parties." *See, e.g.*, Mar. 3 Email, Defs.' Ex. 29 [Dkt. # 56-1] CFPB_00098–99  ("In general we are very narrowly turning back contracts (or portions of contracts) that directly support statutory requirements. . . Specifically can you outline for each contract what (statutorily required) action will not be able to be accomplished at all without the contract?  I can't stress enough that this needs to be as specific as possible.  We'll need to be prepared to have someone on the team defend this justification to external parties. All PCards across the bureau have been cancelled. We've been authorized to reopen one for the entire bureau with a very limited limit so we are triaging the requests as they come in.").  If that wasn't sufficiently chilling, the CFO added, "[w]e've been routinely asked to provide for names of the people providing the justification."  Mar. 3 Email, Defs.' Ex. 38 [Dkt. # 56-1] CFPB_00096.

Meanwhile, the effort to identify additional contracts to cancel remained underway.  Defs.' Ex. 52 [Dkt. # 66-2] CFPB_00121.  And while the Chief Financial Officer stated, "[w]e're getting

a lot of requests to turn contracts back on. I will send out guidance soon for your awareness,"
Mar. 3 Email, Defs.' Ex. 38 [Dkt. # 56-1] CFPB_00096, the Chief Operating Officer, Martinez,
testified that he did not believe that any such guidance had been provided.  Mar. 10 Tr. at 85.[27]

In the weeks after February 14, while limited activities related to the shutdown continued
to move forward, and while the basic operational support needed as the agency tottered on its last
legs was being provided, most staff members were complying with the February 10 directive and
not performing their ordinary work to advance the mission of the agency.   On Thursday,
February 26, plaintiffs submitted a declaration from Matthew Pfaff, the Chief of Staff of the Office
of Consumer Response, "the unit responsible for 'the centralized collection of, monitoring of, and
response to consumer complaints,' as well as sharing data, as required by 12 U.S.C.
§5493(b)(3)(A)-(D)."[28]  First Pfaff Decl. ¶ 1.  He took issue with the representations in the first
Martinez declaration, and he reported that Consumer Response complied with the Acting
Director's February 10 direction that staff "not perform any work tasks."

> As a result of this compliance, the operations related to the Consumer
> Complaint Database are *not* continuing.  And many of the contracts needed
> for work related to the Consumer Complaint database have *not* remained
> intact and operational.

---

27    It turned out that reactivating contracts was easier said than done.  *See* Feb. 28 Email, Defs.'
Ex. [Dkt. # 56-1] CFBP_00040 ("Some vendors that were asked to 'turn back on' operations were
able to, others cannot be back on so easily.").

28    "When individuals or their representatives submit a complaint to the CFPB, the complaint
is submitted to and included in a case management system. This case management system allows
consumers, companies, and the CFPB to securely share information and engage in the complaint
process. This case management system is also how both the CFPB and companies can deliver
timely responses to consumers as required by law. Information from the case management system
populates other systems to meet data sharing requirements with federal and state agencies, as well
as with the public via the Consumer Complaint Database. People – both federal employees and
contractors – make this entire operation run successfully."  First Pfaff Decl. ¶ 8.

*Id.* ¶ 9 (internal quotations omitted) (emphasis in original).  He averred that on February 13, he prepared a list of the teams within Consumer Response that "align to specific statutory obligations," and that as of the 27th, none of those teams had been activated to work.  "As a result, the complaint handling operation has experienced a significant disruption":

> Complaints referred by congressional offices, states, and most federal agencies are not being review and sent to companies. These complaints require federal staff to review and process.

> Complaints about companies that are not yet participating in the complaint program are not being addressed. These complaints require federal staff review and a manual invitation to participate in the program. . . .

> Incomplete complaints are not being processed or worked by anyone. These complaints require federal staff to conduct outreach to consumers for additional information. . . .

> Complaints are not being "monitored." Consumer Response has a team of subject matter experts who monitor complaints to ensure that consumers are receiving timely, accurate, and complete responses to their complaints. Subject matter experts also monitor complaints for emergent issues across market and at companies. This ongoing monitoring provides a necessary check on the complaint program to ensure that consumers receive meaningful responses. Without this work, company responses are likely declining in quality. . . .

> Escalated issues are not being addressed. Consumer Response's Escalated Case Management team responds to consumers who are facing imminent foreclosure, may be a risk to other or themselves, and other sensitive issues.

> Complaint systems, including the case management system and systems for sharing data, are not being maintained. Complaint systems require federal and contractor staff to monitor and respond to issues affecting system health. Automatically generated error notices indicate the system has already experienced problems. If these errors are not addressed, at some point, the system will break entirely. Additionally, companies that receive complaints through this system have received error notices that they are unable to export complaints out of the system, which will impede their ability to review and respond to complaints.

> Stakeholder support tickets are not being resolved. Consumer Response receives hundreds of support tickets every month from company, congressional, and government stakeholders. Support tickets range from companies trying to remedy potential privacy concerns to resetting

> passwords. These tickets are not being reviewed and resolved, which is almost certainly frustrating the ability of stakeholders to complete their work. . . .
>
> Complaints submitted by servicemembers and their families are not being monitored. It is my understanding that no one from the Office of Servicemember Affairs has been activated to work.
>
> Student loan complaints are not being reviewed and informally resolved. The Student Loan Ombudsman role is vacant. Mr. Martinez seemingly suggests that the CFPB Ombudsman is an appropriate substitute.
>
> Audits and quality controls have halted. Consumer Response maintains an audit function that ensures complaint processes and procedures are being followed, and vendors are appropriately interacting with members of the public.
>
> Activities to monitor and safeguard the system to prevent bad actors from misusing it have stopped.

First Pfaff Decl. ¶¶ 12–13, 15, 17, 19–21, 23–26.

It was not until after that, on Thursday, February 27, that "the Chief Legal Officer activated work related to compliance with the agency's critical statutory responsibilities in the area of the Office of Consumer Response." Second Martinez Decl. ¶ 8. During the 17 days when that work had been prohibited, though, 16,000 unanswered complaints had accumulated. Pfaff Testimony, Mar. 11 Tr. at 74; *see also* Mar. 3 Email, Pls.' Ex Z [Dkt. # 60-1] at Page 73 of 107.

Late that afternoon, Adam Martinez circulated an email to the Office of Research, Monitoring, and Regulations concerning "Statutory/Regulatory Work," which hearkened back to Acting Director Vought's February 8 instructions and omitted any reference to the February 10 stop work:

> Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau. He did exclude areas approved by him or required by law. We want to ensure that you are aware that statutorily required work and/or work required by law are authorized.

Your teams are authorized to continue carrying out these responsibilities. Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director. Alternatively, you are always welcome to reach out to me if needed. I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Feb. 27 Email, Pls.' Ex. P [Dkt. # 60-1] at Page 39 of 107; Defs.' Ex. 16 [Dkt. # 56-1] at Page 34 of 116, CFPB_00034. Similar emails were sent to the Office of Supervision, and External Affairs. Defs.' Exs. 23 and 18 [Dkt. # 56-1] at Pages 55 and 37 of 116, CFPB_00055 and CFPB_00037.

Agency employees immediately recognized the communication as a change, *see, e.g.*, Feb 28 Email, Pls.' Ex. R [Dkt. # 60-1] at Page 44 of 107 (email stating "[t]he other offices in RMR have received notification from their management that Adam Martinez changed his guidance and we are now allowed to work on statutorily mandated work"), and they saw through the effort to pretend that the February 8 directions had never been superseded. *See* Feb. 28 Email, Pls.' Ex. Q [Dkt. # 60-1] at Page 41 of 107 (email from Assistant Director of Research Jason Brown directing his staff to resume work, but emphasizing, "[w]e stopped most of our statutory work, I know, not because of the February 8 email, but because of the February 10 email. I clarified this point with the COO"); *see also* Mar. 3 Email, Pls.' Ex. Z [Dkt. # 60-1] at Page 71 of 107 ("Based on every email starting 2/10, the unambiguous guidance was to stop all work tasks, no stipulation of statutory requirements was made. As of today, Consumer Complaint Database has not been refreshed with new data since 2/25/05."). Martinez was promptly deluged with requests to start

working again.  Mar. 10 Tr. at 97; *see also* Feb. 28 Email, Defs.' Ex. 20 [Dkt. # 56-1] CFPB_00044 (seeking clarification that they "can *resume* all regular work related to fulfilling statutory obligations. . . .") (emphasis added).  And yet, shortly after some employees learned they had been reactivated, they received instructions to ignore the new guidance until further notice.  *See* Pls.' Ex. S [Dkt. # 60-1] ("In response to Adam Martinez's email, John has instructed us to stand down until further notice."); *see also* Francis Doe Decl. ¶ 6.

As the emails were circulating within the agency, no one had any illusions about the RIF waiting in the wings.  *See* Mar. 1 Teams Exchange [Dkt. # 70-1] at Page 1 of 2, CFPB 00131 (message from Chris Young to Martinez "just trying to get a sense of our status," and inquiring, "[s]hould the judge lift the TRO on March 3rd, are we prepared to implement the RIF?").

As Alex Doe testified on March 11, the RIF team met with OPM and Martinez again on the February 27th.

> [W]e discussed some guidance that came out from Acting Director Vought, but in his OMB capacity. It was giving him guidance about RIFs for federal agencies. . . .
>
> [Adam] said he would discuss it further with acting leadership and that he would let us know – "us" being the RIF team both at CFPB and at OPM – that he would let us know if the plan changed.
>
> And that has never – to this day has never happened.

Mar. 11 Tr. at 60.

### (c)    Paoletta's March 2 email suggesting that employees were supposed to be working all along has little evidentiary value.

As the March 1 email to Martinez reflects, agency leadership was well-aware that a hearing on the pending motion for preliminary injunction – which had been supported by declarations swearing that as of February 10, work had been stopped – was scheduled to take place Monday, March 3 at 10:00 am.  At 4:18 on the afternoon of Sunday, March 2, the agency's Chief Legal

Officer was moved to address "all hands" who were still on deck.  Like Martinez, Paoletta invoked

the February 8 email as if it was still the operative document.  But his email also included a

stunning mischaracterization of the February 10 order:

> On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.
>
> On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director.  **On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email.** These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.
>
> It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear:  Employees should be performing work that is required by law and do not need to seek prior approval to do so.  If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.
>
> Thank you for your attention to this matter

Mar. 2 Email, Defs.' Ex. 25 [Dkt. # 56-1] CFPB_00058 (emphasis added).

Paoletta's description of the February 10 order cannot be squared with the plain language

of the Vought directive, nor is it consistent with the manner in which the February 10 order was

understood by the staff, implemented by the agency, or used to justify massive layoffs.

- After being ordered to "stand down from performing any work task," the employees stood down.

- Probationary and term employees were fired in accordance with the February 10 order.

- The remaining agency employees were placed on administrative leave in accordance with the order.

- The agency called for the immediate cancellation of contracts because of the order.

- The agency justified the need for a shortened notice period before a RIF of just under 1200 employees by pointing to the order.

- Employees would remain on administrative leave for that thirty-day period in conformance with the order.

- The agency cancelled meetings with consumers in need of assistance, including Pastor Steege, because of the order.

The fact that Paoletta expounded upon the February 10 order for the first time almost three weeks after it was issued, and the fact that he suddenly did so on a weekend afternoon immediately before the Court was scheduled to hear the case, support an inference that the March 2 characterization was not what the order was intended to mean all along. Also, Paoletta's new spin on the order does not make sense: if the February 8 directive authorizing the performance of statutory duties was supposed to remain in force, there would have been no need to issue the February 10 email at all.

Furthermore, Paoletta insults the reader's intelligence when he feigns surprise that few employees were working. *See* Mar. 10 Tr. at 204 (Martinez testified that as of the date the email was sent, "honestly, I knew there was a good portion of the agency that was not working"). Furthermore, Martinez testified that the stop work order was never rescinded. Mar. 10 Tr. at 184.

Defendants' suggestion that the plaintiffs and agency staff simply misread or misunderstood the February 10 email is belied by the fact that when the CFPB, under the direction of its Acting Director, Russell Vought, provided Vought's OPM with the justification for accelerating a RIF of all but the employees needed to implement the RIF, it pointed to that very "work stoppage order." *See* Pls.' Ex. OO [Dkt. # 66-1] at Page 28 of 60. It is also belied by the

February 10 email sent to Martinez by the Chief Information Officer Christopher Chilbert, Feb. 10

Email, Defs.' Ex. 1 [Dkt. # 56-1] CFPB_0001, twenty minutes after Vought's email was received.

He identified the minimum level of support his office should be providing "based on this email,"

and it involved supporting DOGE and the new leadership, providing security monitoring for the

networks, and making sure that the agency's essential technology was operational. *Id.* at

CFPB_00002. The CIO even found it necessary to ask whether it would be "an acceptable work

task" to "identify a list of contractors who would be necessary to support operational emergencies."

*Id.* at CFPB_00001. *See also* Feb. 27 Email, Defs.' Ex. 21 [Dkt. # 56-1] CFPB_00047

(Enforcement Division staffer seeking confirmation that even though she had been directed to

work with contracting officers to ensure that data was being preserved, that work was authorized

by the Acting Director).

There are multiple other emails in the record that also reveal the employees' confusion and

their trepidation about asking to perform work tasks. *See, e.g.*, Feb. 27 Email, Defs.' Ex. 12 [Dkt.

# 56-1] CFPB_00026 (from a Senior Enforcement Attorney and Military Affairs Liaison: "I've

written previously on other issues; please do not take this email as insubordination. I request permission to perform the following urgent work tasks . . . .).[29]

The defendants' attempt to intimidate the employees was on full display in the courtroom when Pfaff, the head of the Office of Consumer Response, was subjected to a  cross examination that insinuated that the shutdown of the statutorily  required consumer complaint system – the heartbeat of the agency subscribed to by more than 70 stakeholders, Members of Congress, and state regulators, and the only existing means within the federal government to resolve the over 350,000 consumer complaints per year – was *his* fault.  The witness handled this audacious attempt to blame the closure of the most important office in the agency on him with aplomb:

> MR. HOLLAND (counsel for defendants):  In your first declaration, do you recall in paragraph 9 characterizing this email as directing staff not to perform any work tasks and to stand down from performing any work task?

---

[29]    *See also* Monday, Mar. 3, 10:02 a.m. email from Cassandra Huggins of Supervision comparing Martinez's Feb. 27 email with Vought's Feb. 8 email and asking, "Please confirm that the message you sent is not intended to authorize the reinstatement of supervision/examination activity despite the fact that the Bureau is required by law to conduct these activities."  Defs.' Ex. 33 [Dkt. # 56-1] at Page 82 of 116, CFPB_00082.  Martinez encourages Huggins to communicate with Paoletta, but states, "you are correct that the email sent out yesterday does not change the specific work stoppage in the bullet points issued on 8 February." *Id.*  After Paoletta sends out the new instructions on Sunday afternoon, Huggins reaches out to him for clarification as to whether Vought's Feb. 8 order prohibiting all supervision and examination activity remained in force.  Defs.' Ex. 44 [Dkt. # 56-1] CFPB_00113.  Approximately two hours later, she informed her concerned staff about the current status of her inquiries.  Defs.' Ex. 45 [Dkt. # 56-1] at Page 115 of 116, CFPB_00115; Pls.' Ex. W [Dkt. # 60-1] at Page 63 of 107 ("We have requested and received clarification that their message was <u>not</u> intended to authorize the reinstatement of supervision/examination activity, . . . .") (emphasis in original).  Notwithstanding the rampant confusion generated by his own email, Paoletta immediately took Huggins to task.  *See* Mar. 4, 4:51 p.m. Email, Pls.' Ex. FF [Dkt. # 60-1] at Pages 98–100 of 108 ("I am writing to raise significant concerns regarding an internal agency communication you apparently sent yesterday that directly contradicts an email from me . . . . [P]rovide your answer to me by 6 pm today.").  Huggins responded:  "I am attaching, as requested, the email that I sent to Supervision staff. I did not provide this email to the media, and I do not know who did.  I did not intend to undermine the new administration's ability to supervise agency staff- my only intention was to ensure that our staff did not act against the direction in the February a email from Acting Director Vought to cease all supervisory and examination activity." *Id.*

PFAFF:  Correct.

MR. HOLLAND:  But the email says more than that, doesn't it?

PFAFF:  The email says to get approval in writing before doing any work tasks. It also says, "Please alert me through Mark Paoletta if there are any urgent matters."

MR. HOLLAND:  "If there are urgent matters please alert me through Mark Paoletta," right?

PFAFF:  Yes.

MR. HOLLAND:  Despite that directive, you did not contact Mark Paoletta for consumer response approval to address all of the urgent and piling-up consumer complaints; isn't that right?

PFAFF:  I understood "urgent" to mean something out of the nonordinary course of business.

MR. HOLLAND:  You didn't think that, like, someone not being able to have their, like, imminent foreclosure complaint addressed was urgent?

PFAFF:  I consider it urgent, but I would – I would remind you that 1013 creates an obligation on the director to create the unit that over sees the handling of complaints.

Mar. 11 Tr. at 94.[30]

All in all, Paoletta's claim in the March 2 email that the stop work order was something other than a clear order to cease agency actions across the board proved to be unsustainable.  And the evidence showed that emails purporting to get things up and running again could not be taken on face value, either, as the employees found out that being reactivated on paper did not mean they could actually do the work.

THE COURT:  We've [got an] email from the head of Research, Monitoring, and Regulation on March 3rd, after they were all told on March

---

30    Counsel asked additional questions pointedly blaming the work stoppage on other employees instead of the Acting Director.  Mar. 11 Tr. at 95.

2nd not only should you be doing statutory-authorized, but you don't have
to ask.  He said we would do it, but we lost our people.  We lost our
contractors and we lost our data.

On February 27, after he said everybody do your statutory-authorized work,
the Consumer Response Center said, yeah, but we need the people.

MARTINEZ:  Right.

THE COURT:  We can't do it without people. Office of Fair Lending said
we can't do what we did do without talking to people, but we have to get
permission to talk to people.

MARTINEZ:  Right.

THE COURT:  So, just saying statutory-authorized doesn't really answer
the question, does it?

MARTINEZ:  No.

Mar. 10 Tr. at 76–77.  *See also* Mar. 3 Email, Pls.' Ex. Y [Dkt. # 60-1] (listing the challenges faced

by Research, Monitoring, and Regulation in resuming its work, including *inter alia*, "[l]oss of

personnel.  The firing of much of our staff impacts our ability to complete assignments as planned.

. . ;" "[l]oss of IT.  Several contracts that have supported our work have been cancelled. . .;" [and]

"[l]oss of data.  Several of our data contracts have been cancelled. . . .").

> **(d)**    **The suggestion in the Chief Operating Officer's March 2
> supplemental declaration that the situation had changed with
> the arrival of new "adults in the room" is not persuasive, since
> the agency has been managed by the same people all along.  The
> agency is still at risk, and Martinez lacks personal knowledge of
> any facts to support his "hope" that it is not.**

There was additional drafting for the Court's consumption on Sunday, March 2.  Since

plaintiffs had filed supplemental declarations casting doubt on Martinez's first declaration with

their February 27 reply, *see* Pls.' Suppl. Decls. [Dkt. # 38-1–17], defendants docketed a second

declaration from Martinez in response at 4:33 p.m.  *See* Second Martinez Decl.  This time, the

agency had Martinez admit that the accounts submitted by plaintiffs' declarants were "not

inaccurate," and he agreed that in fact, he had referred to the "closure of the agency" during the

week of February 10.  *Id.* ¶ 3.  But he attributed that information and those events to DOGE:

> Prior to Russell Vought's designation as Acting Director of CFPB, agency
> staff had received guidance from DOGE-associated personnel consistent
> with those statements, which I believed at the time to reflect the position of
> agency leadership, and continued to believe reflect agency leadership's
> position for a brief time thereafter.

*Id.* ¶ 3.  Martinez maintained that "new leadership," though, was taking a more methodical

approach, "taking time to assess, listen, and explore the state of the Bureau."  *Id.* ¶ 4.

The contradiction at the heart of these statements is apparent from the face of the

declaration, which also reminds the Court that Vought became Acting Director on February 7 –

*before* the actions that took place the week of February 10.  *Id.*  Yet the Chief Operating Officer

tried to maintain: "[r]ather than a closure of the agency, Acting Director Vought's new leadership

has focused on running a substantially more streamlined and efficient bureau, refocusing its

priorities, and 'right sizing' of the agency."  *Id.*

Martinez's suggestion that it was all a misunderstanding that got cleared up when new

leadership stepped in was undermined by exhibits showing that current leadership was the engine

behind the shutdown in the first place, and that Vought or Paoletta was involved in every step

along the way.  After the plaintiffs' second round of declarations blew huge holes in his assertions,

Martinez was forced to concede on the stand that when it came to anything other than the

operations under his purview, he did not have personal knowledge about what was actually going

on.

When asked about the statement in paragraph 22 of his first declaration that "operations

related to the consumer complaint database [were] continuing," he explained he was only talking

about operations – "what the minimum requirement was to ensure that the site didn't go down or

if the public could still access some form of complaint . . .[;] what was necessary to keep the

database going" and "to keep the lights on." Martinez Testimony, Mar. 10 Tr. at 196.

> THE COURT:  So in that paragraph 22 of your first declaration where you
> talked about the Bureau's maintaining the toll-free number, the website, the
> database, operations related to the database are continuing, contracts needed
> for work related to the database have remained intact and operational, all
> you were intending to convey was the operations side? Again, not the
> programming.
>
> MARTINEZ:  That is correct.

*Id.* at 197–98.

> THE COURT:  Assuming it's open, is it fair to say that [the hotline] [is]
> only as good as the response to what people leave on the hotline? . . . [I]t's
> great that the hotline is always open, it needs to be opened, it's statutorily
> authorized and required.  But how it's working is a question that's different
> from whether it's open.
>
> MARTINEZ:  Correct. I don't have the inside knowledge to know who
> picks up the phone and who provides advice or what they do on the back
> end of that.

*Id.* at 91–92.  After Martinez could not answer questions about not only Consumer Response, but

also the Research Division and the Office of Markets, *see id.* at 224–28, counsel for plaintiffs

asked, "So in general . . . just to be really clear, and that way I'll stop asking you specific questions,

all of the offices in the mission side of the organization, you don't have insight into what's

happening on the ground?"

> MARTINEZ:  I have no insight. I usually don't have insight into those
> specific groups. Again, those groups have historically, over the last four
> years, reported to the chief of staff. That's an entirely different
> programmatic SME, subject matter expert, responsibility.

*Id.* at 228.

Martinez also explained on cross examination that when it came to his conversations with

Paoletta about reinstating contracts, his knowledge was limited to "a small number of technology

contracts[;]" "[t]he only contracts that I know that I reviewed were some that I reviewed specifically with Mark Paoletta, who needed some guidance about operational contracts." *Id.* at 171–72.

Martinez was asked about the statement in paragraph 19 of his new declaration that "[o]ur leadership has worked to comply with statutorily-required functions":

> MS. BENNETT: So when you said that, your information . . . it's just based on what Mark Paoletta told you, right?
>
> MARTINEZ: Yes, yes.
>
> MS. BENNETT: It's not based on any insight into the mission side of the agency, right?
>
> MARTINEZ: Not at all.
>
> MS. BENNETT: Okay. And, in fact, at that time, if you know, most of the functions were not up and running, right?
>
> MARTINEZ: That's what I know now.

*Id.* at 187–88.

The Court does not need to find, and it is not inclined to find, that Martinez intentionally lied. His second declaration and his sworn live testimony during the hearing acknowledged the truth of what the plaintiffs' witnesses were saying, and once on the stand, he freely admitted what he did not know. At times, he appeared anguished by both the demise of the agency and by his being cast in the role of agency spokesman; there were multiple painful pauses when you could see the battle between his conflicting loyalties to his new employers and to the truth playing out on his face, and he grimaced or turned red before he answered. He had the demeanor of an abused wife brought to court by her husband to drop the charges.

Moreover, Martinez's testimony established that he has no idea what the leadership of the agency is planning beyond firing all of the employees. He is well aware that even though there

was no RIF on February 14, the RIF team is still meeting.  *See id.* at 231–32.  And he agreed with plaintiffs' counsel summary:  "[s]o you are saying . . . not that the plan to terminate the vast majority of the employees is off the table, but that . . . they are taking into account the procedural requirements in a way that they may not have before?"  MARTINEZ: "Yes."  *Id.* at 232.  When asked if it was his testimony that Acting Director Vought and Paoletta "do not currently intend to wind down the agency," he did not answer the question directly.

> MARTINEZ:  My understanding is that they have recognized that there are statutory requirements that need to be fulfilled within the agency, but I don't know how many people, I don't know what functions.  I have no knowledge of what their thinking is right now in terms of capacity or size of the agency. But, yes, my understanding is that they are committed to fulfilling the statutory requirements of the Agency.

> MS. BENNETT:  Okay. But you have no idea what that means to them, right?

> MARTINEZ:  I have no idea what that means.  I will find out once we're building out this report that needs to go to OMB with regards to the reduction in force across the federal government.  But I have no idea as of right now what they're thinking. . . .

> THE COURT:  And you don't know whether that means . . . they recognize that they will be fulfilled by the CFPB or if finding a home in some other agency does the trick?

> THE WITNESS:  Correct.

> THE COURT:  You don't know what they're thinking on that?

> THE WITNESS:  I have no idea.

*Id.* at 229–30.

Martinez did have a good understanding of the impact Paoletta's March 2 missive had on the surprised agency employees.

> THE COURT:  . . . [T]hen it's 3:30 p.m. on the Sunday before the last hearing when [Paoletta] goes:  Do your statutorily-required work and you

don't have to ask anybody for permission first.  So up until that point they still had to ask for permission?

THE WITNESS:  That was my understanding of what people were doing, yes.

THE COURT:  And what happened after that – it went out Sunday, it looks like on Monday, while we were all here in court, a lot of the supervisors are saying, well, wait, what do you mean?  Do I have to ask permission?  Do I not have to ask permission? There was a little bit of confusion going on in the building. Is that fair to say?

THE WITNESS:  There was a lot of confusion in the building.

THE COURT:  Would you say there's still a lot of confusion in the building?

THE WITNESS:  I would say, from a lot of accounts, there's still a [lot] of confusion about what's going on.

\*       \*       \*

BY MR. ROSENBERG [counsel for defendants]:  Would you say that there's less confusion today than there was a couple week ago as to what functions –

THE WITNESS:  There's less confusion today.  I think there's hope.  I have hope for the future.  I think that people are – I think people want to go back to work and they want to do the work they were hired to do.

THE COURT:  So sitting here right now, you think there's still people not working?

THE WITNESS:  It would not surprise me if there were people still not working.

THE COURT: I think I asked you this earlier:  You can't tell me how many people have come off administrative leave to do this statutorily-authorized work that everybody is committed to having them do.

THE WITNESS:  I cannot answer that, ma'am.

*Id.* at 66–68.

On re-direct examination the next morning, the witness returned to his theme of the salutary

effects of having adults in the room, but that did not amount to much after follow-up questioning.

> MARTINEZ: . . . If there's anything positive out of any of this, it's that we
> have a better understanding and an inventory of what the cause and effect
> could be in the future for turning off specific contracts and the devastation
> it could have on the Agency.  So we have a lot more information today than
> we had before that.  And all of this is happening through adults at the table
> that were able to interact with that understands how government is supposed
> to run and is savvy enough to know the consequences of not following
> normal government protocol, which, in my opinion, is the public, its
> accountability with the public, obviously with the court system, but
> Congress as well.

> THE COURT:  But I thought you told me yesterday that while this is not
> being done in as rushed a fashion . . . [t]he end game is to end up with no
> CFPB, and the very important functions, they will go somewhere else.

> MARTINEZ:  That was the week of the 10th.

> THE COURT:  Well, I thought the week of the 10th was just no CFPB.  But
> I thought you're saying, they're still talking about how do we get rid of the
> employees – we're going to keep the contracts we need until this is done,
> but how do we get this down so that whatever has to be gone to some other
> agency can go, but we're not going to be here?

> MARTINEZ:  The week of the 10th, that was absolutely correct.  But the
> other question –

> THE COURT:  All right.  Well, yesterday I got the distinct impression that
> you were saying they're doing it in a much more methodical fashion, but
> that's the goal.

> MARTINEZ:  The goal, as I understand – I don't have what the end goal is
> for this team right now.

> THE COURT:  Okay. So you don't know. . . .

> MARTINEZ:  I don't know.  I don't know.  I – what I know is that we have
> OMB guidance that we've been directed to follow, and I don't know what
> they're going to mandate as part of that.  I just – I have absolutely no clue
> what the end result is for the Bureau.

*Id.* at 23–25.

At end of his testimony, then, all that was left of Martinez's ability to attest that the agency would continue to do its work was a "hope," and a hope grounded in little or no information.

> **(e)** **The Court cannot stay its hand based on defendants' assurances that statutorily mandated work is being performed, because defendants now claim that they do not know what that means.**

In its opposition, and throughout the hearings on the motion, the defense was adamant that no injunction was needed since employees had repeatedly been instructed that they could, and should, perform statutory mandated duties, and that was what was happening. At the conclusion of the evidentiary hearing, the Court asked if that was the case, why would the defendants object to the provision in plaintiffs' proposed interim order that the agency should not interfere with, prohibit, or suspend the employees' performance of those mandated duties?

> THE COURT: I'm saying something about their claims makes me want to have interim relief, and you're telling me, "There is nothing to see here, Judge, because we are all in on statutorily required duties." What is offensive about an order confirming that?
>
> MR. ROSENBERG: There is ambiguity as to what the scope of those statutorily required duties are.

*Id.* at 115. This took the Court by surprise, and counsel tried to backpedal a little bit.

> THE COURT: So you're saying that every one of these emails is ambiguous that you've been showing me all day, and the order that was issued on February 27th and the order that was issued on March 2nd are ambiguous?
>
> MR. ROSENBERG: No.

*Id.* at 116. But then he reiterated, "[i]t's too broad to know. It's vague." *Id.* at 117.

> THE COURT: Does the director – acting director of the Consumer Financial Protection Bureau, today, know what the statutorily required duties are? And did Mr. Paoletta know when he sent out the emails that you have asked me to rely on and to comfort me that the statutorily required duties are under control, does that have meaning for you or does that not have a meaning for you?

> MR. ROSENBERG: It has a meaning in the sense that the Agency's operations are broad.

*Id.* As counsel explained it, it was up to the employees to tell the leaders of the agency what its duties were. *Id.*[31]

The frustrating exchange on this subject ended with the following:

> THE COURT: . . . [T]he fact that you all agreed to something that became a court order . . . had a direct and immediate effect on the dismantling of this agency, your own witness testified to that, your own documents demonstrate that. But the conversation hasn't ended. It's continued. So, the question is: What is the appropriate thing to order? And it seems to me that you're saying the term "statutory obligations" is too broad and not enforceable. . . . [Y]ou're also saying I don't have the authority to do it, but if I think I have the authority to do it under the unique circumstances of this case, are you telling me you don't know what they mean?
>
> MR. ROSENBERG: Yes.

*Id.* at 123–24.

With that, what little was left of the defendants' contention they were intent on doing what the law required them to do collapsed like a balloon at the end of the Macy's Thanksgiving Day Parade. The defendants cannot expect the Court to be comforted by their recent announcement to employees that they should perform their statutory functions when they are simultaneously

---

31    *See also* Mar. 11 Tr. at 120:

> MR. ROSENBERG: . . . that's part of the problem . . . the statutory functions that plaintiffs have identified appear to be literally everything that the Agency does.
>
> THE COURT: . . . [Y]ou used the term more often than they did. This term is taken straight from the February 27 email . . . and then the March 2nd email, which was actually sent to someone saying . . . , "How can you dare defy my clear order?" . . . So somebody thought it was clear when they wrote it in an email. So somebody in your side knows what it means.

insisting that the term is so vague, no one – not even the Acting Director of the agency – knows what it means.

### 2. The plaintiffs are likely to succeed on the merits of their APA claims.

The same evidence that underlies Count One also establishes a likelihood of success on the merits of the APA claims alleging at least one discrete, final action taken in violation of law and without a rational basis to support it: the February 10 order. The stop work order stopped all work, including statutorily mandated work, and the flurry of emails circulated on the eve of the hearing on the motion were little more than a transparent effort to pretend otherwise. And as the documents and the witnesses' testimony revealed, there was little or no analysis undertaken before the employees were ordered to put their pencils down, before all of the agency's contracts were cancelled, *see, e.g.*, Martinez Testimony, Mar. 10 Tr. at 70–71, before the probationary employees

were fired, or before the effort to accomplish a complete reduction in force by the end of the week was initiated.[32]

More importantly, even if some employees did prevail on their management and obtain permission to perform some of their mandated duties on some of the days between February 8 and today, the implementation of the President's unlawful decision to close the agency has simply been slowed, not reversed. As the defendants are chomping at the bit to wrap things up, it will take nothing less than a court order to maintain the status quo pending the resolution of this case. As

---

32      It is important to note that, generally, the defendants did not assert in their opposition to the motion that any of this was the product of thoughtful analysis. They did not suggest that DOGE or the new leadership had uncovered fraud or wasteful spending; instead, they tried to persuade the Court that agency was open for business and the employees had been encouraged and authorized to perform their statutory duties all along.

Counsel did try to tell the Court that when Vought made his decision to stop the flow of funding from the Federal Reserve on Saturday, February 8, his very first day on the job, he reviewed information provided by the Chief Financial Officer reflecting the funds available to the agency, and he made a decision, "given his expertise in budgetary matters and looking at the necessary documents," and "consistent with his view that he wanted to . . . make a more streamlined and efficient Bureau," that he had more than enough on hand for the next quarter. Tr. of Proceedings (Mar. 3, 2025) [Dkt. # 58] at 53–54. Counsel advised the Court that "the materials [Vought] considered in making that decision" had been provided to the District Court in Maryland in opposition to a preliminary injunction motion there. *Id.* at 55. A review of that docket revealed, though, that the Maryland court had been provided with a single piece of paper listing the amount of money in the Civil Penalty Fund, which is not available to be used for day-to-day operations, and the total of the obligated and unobligated funds on hand comprising the "Bureau Fund." *See Mayor & City Counsel of Balt. v. Consumer Fin. Prot. Bureau*, Civ. Action No. 25-00458-MJM [Dkt. # 29-1]. As of February 8, 2025, the Bureau Fund had a balance of $412,346,065.32 in unobligated funds, of which $220,000,000 was internally earmarked for a "reserve fund" for financial contingencies, which the Acting Director decided on day one to discontinue. *Id.* The submission did not include any documents concerning expenses or potential contingencies that were relied upon in connection to Vought's decision that the reserve was superfluous and that the cash on hand was sufficient. On Sunday, employees were informed that the building was closed, and on Monday, the first working day of Vought's tenure, the RIF meetings began and the stop work email was issued. One could draw a reasonable inference that Vought's analysis that no additional funds were required was more likely based on his understanding when he assumed the position that soon, the agency would not be operating at all.

Martinez explained, "I now realize how much damage can be done . . . just within a couple of days." *Id*. at 74.

> **B.    Plaintiffs will suffer irreparable harm.**

The second element to be established is that plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. The D.C. Circuit "has set a high standard for irreparable injury" – it "must be both certain and great; it must be actual and not theoretical" and it must be "beyond remediation." *Chaplaincy of Full Gospel Churches v. Eng.,* 454 F.3d 290, 297 (D.C. Cir. 2006), quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). It explains:

> The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Id.* at 297–98 (emphasis in original), quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Plaintiffs in this case will face irreparable harm without preliminary relief. The shutdown will take little more than a month, if that. The record reflects that the RIF notices giving employees thirty days' notice are ready and waiting. The decision to place employees on administrative leave during those thirty days has been made, with the understanding that they can be called back not to serve consumers, but "to fulfill close out duties." Pls.' Ex. KK. The CFPB building is already closed, arrangements to cancel the lease and move out in thirty days were made five weeks ago, and the technology to work remotely has been cancelled. Once the agency is gone, there will be no opportunity to afford relief at a later point in the litigation. There will be no opportunity to be

reinstated or rejoin a healthcare plan because there will be no jobs left to compete for after the RIF. There will be no hotline to call and no one to assist at the other end of the line.

Before the instant motion was filed, the agency was already in "wind-down mode," Martinez Testimony, Mar. 10 Tr. at 54, firing term and probationary employees and putting most of the other employees on administrative leave. Martinez Testimony, Mar. 10 Tr. at 128. They also terminated most of its contracts before walking back a "very narrow" set of those terminations in the face of this litigation. Defs.' Ex. 38 [Dkt. # 56-1] at Page 96 of 116, CFPB_00096. The record shows that reactivating work after just a few weeks of "stop work" has proven difficult; the Consumer Response function is experiencing "a large and unprecedented backlog" of more than 16,000 consumer complaints that will take weeks, if not months, to work through. First Pfaff Decl. ¶ 16; Pfaff Testimony, Mar. 11 Tr. at 90–92. As it stands in its "current state," defendants' challenged actions have the Bureau and its functions "hobbl[ing] along." Pfaff Testimony, Mar. 11 Tr. at 91.

Defendants remain poised to fire "most of [the] remaining staff, leaving a Bureau that [can't] actually perform any functions, or no Bureau at all." Alex Doe Decl. ¶ 3; *see* Pls.' Ex. OO [Dkt. # 66-1] (OPM approval of exception to the 60-day notice period for a RIF). If its contracts are finally terminated, the Consumer Response system will "collapse," as will other functions of the Bureau. Pfaff Testimony, Mar. 11 Tr. at 91. *See also* Drew Doe Decl. [Dkt. # 38-5] ¶ 6 (stating that "[t]he hasty termination of almost all of the Bureau's contracts resulted in systems and services being turned off"); Martinez Testimony, Mar. 10 Tr. at 194–96 (explaining that the contract terminations disrupted the CFPB's statutorily required Home Mortgage Disclosure Act work). And if those and other CFPB contracts are fully terminated, they cannot just be turned back on. *See* Charlie Doe Decl. ¶ 10. It will take "six months to a year or more" to enter new contracts. *Id.*

Allowing defendants to execute their plans without preliminary relief will cause irreparable harm to the Bureau, the plaintiffs in this case, and plaintiffs' members and constituents.

The NAACP, National Consumer Law Center, and Virginia Poverty Law Center will no longer be able to serve their members and constituents with consumer protection services and advocacy. VPLC routinely relies on the Consumer Response system to carry out is mission. *See* Speer Decl. ¶¶ 10, 15–16, 24. But the Vought stop work order and contract cancellations has put it in peril. *See* Pls.' Ex. Z (stating the CCDB has not had been refreshed with new data since February 22); Pfaff Testimony, Mar. 11 Tr. at 91. The VPLC's Chief Executive Officer avers that it would be "difficult if not impossible" for VPLC to replicate the Consumer Response complaint tool – "sending the complaint to the company, backed by a federal agency and with a deadline to respond, while also sending it to other state and federal agencies that may be able to help" – and would strain VPLC's limited resources. Speer Decl. ¶ 16.

Moreover, both VPLC and NCLC rely on CFPB data and reports to carry out their mission and face irreparable harm if that data disappears. VPLC uses CFPB information "about trends or widespread illegal activities that they have discovered through their consumer complaint process" to support its education work, which would be impossible to replicate without access to the consumer complaint database. Speer Decl. ¶ 23. NCLC uses CFPB data in its comprehensive digital treatise series, which "is intertwined with CFPB website materials" and "link extensively to CFPB materials on the CFPB's website." Dubois Decl. ¶ 9. It that data were allowed to disappear, "this material will go out of date and not be replaced by updated CFPB resources." *Id.* ¶¶ 9–10; *see also id.* ¶¶ 4–5.

Defendants' efforts to terminate the Bureau's contracts and other actions that risk destroying CFPB's data would harm these plaintiffs. *See* Pls.' Ex. EE [Dkt. # 60-1] at Page 95 of

107 (March 4, 2025 email warning "we will lose all historical data on our Google Analytics platform if we don't pay the bill"); Defs.' Ex. 6 [Dkt. # 56-1] at Page 9 of 116, CFPB_0009 (Feb. 21, 2025 email from Christopher Chilbert to Adam Martinez stating, "We are doing our best effort to support the data collection, but it is at risk due to several contracts being terminated."); Defs.' Ex. 18 (Feb. 27, 2025) [Dkt. # 56-1] at Page 37 of 116, CFPB_00037 (email directing recipients "to identify if CFPB data or records are at risk of being deleted due to contract cancellations"). And this harm is irreparable because, as one contracting officer explained, without the parties' March 3 agreement, "many of the CFPB's contracts would have been fully and irrevocably terminated by the end of this week" and "the Bureau has not taken any efforts to preserve CFPB data that is possessed by vendors whose contracts are terminated.  Charlie Doe Decl. [Dkt. # 38-4] ¶¶ 10, 12.

Shutting down the CFPB would "unquestionably make it more difficult" for VPLC and NCLC to accomplish their primary missions, and this harm "provide[s] injury for purposes both of standing and irreparable harm."  *League of Women Voters*, 838 F.3d at 9.

Further, plaintiffs' members face irreparable harm.  NAACP member Junita West-Tillman has already suffered devastating losses from the Los Angeles wildfires.  West-Tillman Decl. ¶ 2.  Now she and other NAACP members are being targeted by mortgage scammers, and she has "had a difficult time determining what assistance was legitimate and what was fraudulent."  *Id.* ¶ 3.  Without the CFPB, which West-Tillman planned to reach out to for assistance, she and others like her face the "the financial scams that were rampant post-fire" on their own, Bross Decl. ¶ 3, and risk being "unable to recover money lost to financial predators."  West-Tillman Decl. ¶ 4.  Further, a CFPB Employee Association member who defendants terminated will not have health coverage if she remains terminated as she seeks to deal with a possible auto-immune condition, *see* Coll

Decl. ¶ 6, and another employee who is the insured member of her family and faces termination if defendants execute their planned RIF risks losing health coverage for her spouse who has an ongoing serious medical condition. *See id.* ¶ 7. These harms go beyond mere financial losses that can be paid for later. Association members and their family members with serious health conditions face "great" harm if those conditions are left untreated. *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297; *see Risteen v. Youth for Understanding*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) ("The loss of health insurance benefits – particularly for those who are unemployed – constitutes irreparable harm[.]").[33] These are irreparable harms to the organizational plaintiffs' members.

Finally, plaintiff Pastor Eva Steege has already suffered irreparable harm: she died on March 15 without resolving her student loans. *See* Suggestion of Death [Dkt. # 83]; Steege Decl. ¶ 9 ("If I do not receive public service loan forgiveness and the large refund that I am owed before my death, my family could be forced to pursue a death discharge that will not provide them with the refund that they are counting on so that they can use the money for basic needs after I pass."). The defense argument that Steege faces no irreparable harm "from allegedly not being able to immediately meet with CFPB staff," Defs.' Opp. at 38, ignored both her terminal illness and her statement that she had "attempted to submit the necessary forms and provide the required documentation multiple times but . . . encountered issues with miscommunication, conflicting

---

33    *See, e.g., Commc'ns. Workers of Am. District 1, AFL–CIO v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir. 1990) (the threat of termination of medical benefits to striking workers constitutes irreparable harm); *Whelan v. Colgan,* 602 F.2d 1060, 1062 (2d Cir. 1979) ("[T]he threatened termination of benefits such as medical coverage for workers and their families obviously raised the specter of irreparable injury.").

guidance, delays, and errors in processing."  Steege Decl. ¶ 2.[34]  It also ignored that "all prior Ombudsmen serving during the Obama, Trump, and Biden Administrations dealt with federal student loan issues regularly."  Barnard Decl. ¶ 5.  The irreparable harm that has already come to pass for Pastor Eva Steege is enough to grant preliminary relief.  *See Obergefell v. Kasich*, No. 13-CV-501, 2013 WL 3814262, at *7 (S.D. Ohio July 22, 2013) ("Dying with an incorrect death certificate that prohibits Mr. Arthur from being buried with dignity constitutes irreparable harm. . . . A later decision allowing an amendment to the death certificate cannot remediate the harm to Mr. Arthur, as he will have passed away.").

### C.    The balance of the equities and the public interest weigh in favor of preliminary relief.

The remaining two requirements to be assessed before the issuance of a preliminary injunction are whether the balance of equities tilts in the plaintiffs' favor and whether the injunction would be in the public interest.  *See Winter*, 555 U.S. at 20.  Generally, when one party is the government, these factors tend to merge and are considered together.  *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Defendants devote less than a page to this issue in their brief, and they have only identified one public interest that is at stake:  the public's interest in the democratically-elected President's prerogative to pursue his policy objectives.  *See* Opp. at 39–40 ("The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for the CFPB."), citing *Heckler v. Chaney,* 470 U.S. 821, 831–32 (1985).  *See also* May 3 Tr. at 111

---

34    The Court also notes that half of the staff of the Department of Education have recently been terminated, which undermines defendants' argument.  *See* U.S. Dep't of Ed. Press Release, (Mar. 11, 2025) https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force.

– 114.[35]  This is a significant interest in connection with any executive agency, and if the Court were being asked to enjoin a decision on how vigorously the CFPB will enforce particular provisions within the statute, or concerning whether agency resources should be allocated to facilitate more robust supervision of non-traditional, non-depository lenders, as opposed to more active monitoring of larger, depository banking institutions, it would bear heavily on the analysis.

But this case is not about how the executive exercises his discretion, and the defendants' citation of *Heckler* is misplaced. What happened in February was not merely a realignment of priorities. The Court has found after an evidentiary hearing and the review of an extensive record, that the plaintiffs are likely to establish that the defendants stopped all work, and that they took, and plan to take, additional concrete steps to dismantle and shut down the agency entirely, in violation of statutory mandates.  Plaintiffs are likely to prove that even if some statutorily required work resumed when the stop work order was relaxed, defendants have already made a decision to abandon their statutory obligations to the many members of the public who are consumers.  And it is likely to be shown that in doing so, the defendants overstepped their statutory and constitutional authority and usurped the power of the members of Congress, who were democratically elected by the people in every state in the union.  Finally, the Court has also found that defendants are poised to complete that process if the motion for an injunction is denied, and

---

35    While this was the only governmental or public interest identified, defense counsel declined to provide any further information as to what the administration's policy with respect to the CFPB might be, maintaining that whether there is a public interest in ensuring that the agency carries out its statutory duties to help people goes to the merits, not the public interest factor. Mar. 3 Tr. at 111–14.

that the closure of the agency will be swift, complete, and irreversible. In those extraordinary circumstances, an injunction advances the public interest.[36]

It is notable that when the Supreme Court found the Dodd-Frank Act's restrictions on the removal of the Director to be unconstitutional, it insisted that those provisions were severable from the rest of the statute, in part because eliminating the agency and sending its functions back to whence they came would be entirely unworkable.

> Petitioner assumes that, if we eliminate the CFPB, regulatory and enforcement authority over the statutes it administers would simply revert back to the handful of independent agencies previously responsible for them. But, as the Solicitor General and House of Representatives explain, that shift would trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena. One of the agencies whose regulatory authority was transferred to the CFPB no longer exists . . . (Office of Thrift Supervision). The others do not have the staff or appropriations to absorb the CFPB's 1,500-employee, 500-million-dollar operations. And none has the authority to administer the Dodd-Frank Act's new prohibition on unfair and deceptive practices in the consumer-finance sector.

*Seila L.*, 591 U.S. at 236–37 (citations omitted).

The amicus briefs filed by public officials and governmental entities include information that bears on the balance of the equities and the public interest in an injunction. While defense counsel declined to weigh in on the public interest in the agency's mission, the amici did. Like

---

36    While this case pits private parties against a governmental entity, it is relevant to the public interest and balance of the equities analysis that it is likely that the challenged action exceeded the executive's authority under the Constitution. *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016), quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."). *See also Centro Tepeyac v. Montgomery Cnty*, 722 F.3d 184 (4th Cir. 2013). While that case arose in a different context, that is, a state's alleged violation of the First Amendment, the court cited "precedent that counsels that 'a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.' . . . It also teaches that 'upholding constitutional rights surely serves the public interest.'" *Id.* at 191, quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

the Supreme Court, they highlight the singular role played by the CFPB and the costly vacuum that would be created by its absence.

The Court received a brief from 203 Members of Congress, a group that includes "members who sponsored Dodd-Frank, participated in drafting it, serve or served on committees with jurisdiction over the federal financial regulatory agencies and the banking industry, and currently serve in the leadership or served in the leadership when Dodd-Frank was passed." Members' Br. at 1 . Based on that experience:

> They are thus familiar with the essential role that the Consumer Financial Protection Bureau (CFPB or the Bureau) plays in Dodd-Frank's framework. Significantly, based on their experiences, amici know that Congress created the CFPB as a new agency with consolidated consumer financial protection authority and gave the Bureau extensive—and in many cases exclusive—mandatory responsibilities and obligations to regulate the very financial institutions whose conduct led to the 2008 financial crisis.

*Id.* They warn the Court:

> Defendants' stop-work order will have severe consequences for the American people. The CFPB has been a resounding success. It has delivered more than $21 billion back to consumers who have been defrauded by entities like large banks, loan servicers, debt collectors, and payday lenders, some of which were previously not subject to federal supervision. Among the many ways the CFPB has protected consumers, it has confronted the unlawful practices of some of the country's largest financial institutions in lawsuits and enforcement actions, provided certainty and guidance to financial institutions of all sizes, enforced protections against discrimination in consumer financial markets, and halted predatory targeting of servicemembers and their families.
>
> *          *          *
>
> If Defendants are successful in their attacks on the CFPB, they will have destroyed the framework Congress created for safeguarding the finances of millions of consumers. As a result, entire swaths of the market will go unprotected from the type of predatory conduct that caused the 2008 crisis because no other federal or state agency has the necessary authority to fill many of the regulatory gaps the Bureau's absence would leave.

Members' Br. at 3 and 4. *See also id.* at 13 ("A sudden halt to the CFPB's important—and mandatory—work would also be devastating for consumers, small businesses, and the country's overall financial stability. . . . [S]upervision would cease, leaving many financial institutions unmonitored and unchecked; and enforcement of many consumer financial protection laws would be limited, leaving millions of consumers with little recourse for the money they lose to unlawful financial practices.).

The Members of Congress also emphasize the importance of the statutorily mandated offices that support service members and seniors who are particularly vulnerable to predatory practices. *Id.* at 6, 18. They also emphasize the key role the agency plays in helping to manage and reduce managing lenders' legal risks, so that consumers can continue to have the access to the credit they need for such things as mortgages, credit cards, and auto loans. *Id.* at 16.

The brief filed by the twenty-two states and the District of Columbia warns of a distinct harm to the public interest given the particular role that states play in our federal system. They make it clear that they cannot fulfill the enormous role of monitoring lenders and responding to consumer complaints on their own.

> The loss of CFPB's partnership has concrete and far-reaching implications: from collaborating on supervisory examinations, to sharing of complaints and trend data, to providing training, to partnering on joint investigations and litigations, the CFPB has been a force multiplier for States' consumer-protection efforts. Absent a preliminary injunction to prevent the sudden loss of these significant contributions, the States will be unexpectedly stretched.

States' Br. at 12.

> While the CFPB has supervisory authority over approximately 200 of the largest financial institutions in the country, it shares supervisory authority with States and augments States' own supervisory efforts in a number of important ways. First, States rely on the CFPB to supervise compliance with federal consumer-protection laws by very large national banks, over which the CFPB has "exclusive authority," 12 U.S.C. § 5515(b)(1). Information

gleaned from this supervision is regularly shared with the States and can inform States' decisions on how to supervise and identify risk within the financial institutions under their direct supervision. Second, the CFPB and States each have supervisory authority over the largest state-chartered banks, nonbank entities offering consumer financial products such as nonbank mortgage lenders and payday lenders, and emerging markets such as digital payments. Because many States' decisions about how best to allocate resources have relied on the CFPB's role in these areas, the CFPB's sudden absence will create gaps in supervision that will be difficult to fill at all, let alone promptly. The resulting vacuum will uniquely burden States.

*Id.* at 13.

The states explain that there would be no substitute for the CFPB's statutorily mandated consumer complaint system and its intake process that identifies and prioritizes complaints involving imminent foreclosures, referring them to local counselors who can assist with timely resolution. *Id.* at 7–8. They also emphasize that the CFPB is the only federal regulator with supervisory authority over nonbank mortgage lenders. *Id.* at 7. These observations all point to the need to preserve the status quo while the case is decided.

Finally, when weighing this factor, the Court finds that a preliminary injunction that leaves the agency standing during the pendency of this case will not harm the only public interest identified by the defendants: the public interest in the President's exercise of his Article II powers to accomplish his policy objectives. *See* Defs.' Opp. at 38–40. That is because Article II explicitly requires him to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3. If the President finds the Consumer Financial Protection Act to be unsatisfactory, the administration will remain completely free to advance his agenda by proposing legislation that reconfigures the agency in a manner that is consistent with his policy preferences. It will then be up to Congress to weigh the advantages of any specific proposal aimed at streamlining the agency against the benefits of sustaining the CFPB, which has been fulfilling its mission to return billions of dollars to consumers at no cost to the taxpayers since 2010.

## CONCLUSION

In sum, the Court cannot look away or the CFPB will be dissolved and dismantled completely in approximately thirty days, well before this lawsuit has come to its conclusion. For all of the reasons set forth above, the Court will **GRANT** [Dkt. # 10] plaintiffs' motion and issue a preliminary injunction that maintains the agency's existence until this case has been resolved on the merits, reinstating and preserving the agency's contracts, work force, data, and operational capacity, and protecting and facilitating the employees' ability to perform statutorily required activities. The Court is aware of the modifications the plaintiffs have made to their proposed order, as well as the objections lodged by the defendants to previous iterations of the proposed order, and it is mindful that its order must be sufficiently specific to be enforceable, while also broad enough to afford the agency and its leadership the discretion they are accorded under the statute when carrying out their regulatory, enforcement, and supervisory responsibilities.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: March 28, 2025

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION,
    800 K Street, NW
    Washington, DC 20001,

NATIONAL CONSUMER LAW
CENTER,
    7 Winthrop Square
    Boston, MA 02110

NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF
COLORED PEOPLE,
    4805 Mt. Hope Drive,
    Baltimore, MD 21215

VIRGINIA POVERTY LAW
CENTER,
    919 East Main Street
    Richmond, VA 23219,

PASTOR EVA STEEGE,
    address omitted per LCvR 5.1,

CFPB EMPLOYEE
ASSOCIATION,
    1015 15th Street, NW
    Washington, DC 20005,

      *Plaintiffs*,

      v.

RUSSELL VOUGHT, in his official
capacity as Acting Director of the
Consumer Financial Protection
Bureau,
    1700 G Street NW
    Washington, DC 20552, and

Civil Action No. 25-cv-381-ABJ

**FIRST AMENDED COMPLAINT**

**TEMPORARY RESTRAINING
ORDER REQUESTED**

CONSUMER FINANCIAL
PROTECTION BUREAU,
1700 G Street NW
Washington, DC 20552,

   *Defendants.*

## INTRODUCTION

1. In the aftermath of the 2008 financial crisis, Congress established the Consumer Financial Protection Bureau and charged it with supervising and regulating financial institutions across the country as well as assisting consumers harmed by those institutions. That mandate to the Executive Branch has led to the recovery of billions of dollars for average Americans and, as Congress required, produced a more "fair, transparent, and competitive" market for financial products and services. 12 U.S.C. § 5511. Congress established the CFPB through the exercise of its constitutional power to regulate commerce, and Congress has the ability to eliminate the CFPB through that same power. Congress has not done so.

2. In defiance of Congress's role in our constitutional system and the separation of powers, President Trump has resolved to "totally eliminate[]" the CFPB.

3. To carry out that plan, he fired the CFPB's director and illegally installed Russell Vought as the acting director on February 7. That same day, Elon Musk posted on his social media account "CFPB RIP."

4. With a series of escalating actions beginning on February 8, Vought took drastic steps to make that promise a reality. First, he instructed CFPB staff and contractors to "immediately" stop all work that involved promulgating rules and

guidance, investigations, public communications, supervision of covered entities contracting, and litigation. He then informed the Federal Reserve that the CFPB would not take any additional funding for its operations in the next quarter. The next day, Vought directed staff "not [to] perform any work tasks" at all—including tasks mandated by statute. He also directed staff not to come into the office. Just one day later, February 10, Vought announced that the CFPB's Washington, DC headquarters was closed—and has since taken steps to cancel the lease on the building.

5.      Vought didn't stop there. The next day, February 11, he cancelled $100 million of contracts with companies that enabled the CFPB to do all aspects of its work, from processing consumer complaints to litigation to supervision. That same day, he took the dramatic step of firing, in indiscriminatory fashion, 70 probationary employees. To add insult to injury, he communicated the news via a mail-merged form email that didn't bother to personally address the fired employees who viewed the email on their phones.

6.      On February 12, the Bureau's statutorily mandated consumer complaint went dark, cutting off one of the Bureau's most direct links with consumers in dire financial straits. The Bureau's Consumer Response function is now functioning at diminished capacity at best, threatening a vital lifeline that collects hundreds of thousands of consumer complaints a month.

7.      Vought is not expected to stop there. On information and belief, Vought intends to return the CFPB's operating reserves to the Federal Reserve. Given that

3

he has already informed the Federal Reserve that the CFPB will not take any additional funding, that would eliminate its entire budget. And Vought has planned another mass layoff that may occur imminently—as early as today or tomorrow.

8. American consumers are already suffering the consequences. Plaintiff Pastor Eva Steege—an 83 year old Lutheran pastor whose doctors have told her she has less than six months to live—can no longer discharge her student loan debt before she dies because the CFPB cancelled its meeting with her and the Bureau's statutorily mandated Student Loan Ombudsman's office has been forced to shut its doors. Meanwhile, military servicemembers and their families who are owed refund payments based on a consent order between a predatory car title lender and the CFPB are not getting those refunds because the payments must first be approved by CFPB employees—who, of course, cannot work.

9. Neither the President nor the head of the CFPB has the power to dismantle an agency that Congress established. By suspending the statutorily mandated activities of the CFPB, Trump and Vought's shutdown of the CFPB runs afoul of core constitutional separation of powers principles, Congress's express statutory directive, and the Administrative Procedure Act.

10. Trump and Vought's actions to disable the CFPB have already caused mass confusion and imposed significant and irreparable harm on consumers across the country. Absent immediate relief, the defendants will continue to upend the lives of countless civil servants. Consumers who were relying on the CFPB to help resolve urgent financial disputes—disputes that, absent the CFPB's intervention, can lead to

foreclosure or the inability to get a loan or rent an apartment—have been abandoned. Even litigation that was already pending against financial institutions that scammed consumers and exploited ordinary Americans has come to a halt, and the agency is not conducting any new enforcement actions. All supervision of financial institutions has been cancelled. With each day that the agency remains shut down, the financial institutions that seek to prey on consumers are emboldened—harming their law-abiding competitors and the consumers who fall victim to them.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely, the United States Constitution and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706.

12.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because the defendants are officers and agencies of the United States.

## PARTIES

13.    Plaintiff National Treasury Employees Union is the exclusive bargaining representative of employees at 37 federal departments and agencies, more than 1,000 of whom work at the CFPB. About sixty probationary employees who were fired were represented by NTEU.

14.     Plaintiff National Consumer Law Center uses the tools of advocacy, education, and litigation to fight for economic justice for low-income and other vulnerable people who have been abused, deceived, discriminated against, or left

behind in our economy. NCLC interacts with and relies on the CFPB in many ways: the Bureau purchases NCLC's publications and hires NCLC to conduct trainings for CFPB employees; NCLC's treatises and reports rely heavily, and link to, the CFPB's reports and data; and NCLC uses the CFPB's complaint database to draft reports.

15.    Plaintiff National Association for the Advancement of Colored People is the oldest and largest civil rights organization in the United States. Its mission is to achieve equality, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. The NAACP was actively working with the CFPB to address predatory practices targeted at its members in the wake of the Los Angeles wildfires.

16.    Plaintiff Virginia Poverty Law Center is a 501(c)(3) nonprofit organization that since 1978 has worked to break down systemic barriers that keep low-income Virginians in the cycle of poverty through advocacy, education, litigation, and direct counseling and referral services. It routinely relies on the CFPB's consumer response function, consumer complaint database, and CFPB research and publications to serve its client base.

17.    Plaintiff Rev. Eva Steege is an 83-year-old retired pastor of the Evangelical Lutheran Church in America. Pastor Steege took on student loans to pursue higher education at a seminary, to fulfill her calling as a pastor. Because of her advanced chronic obstructive pulmonary disease, Pastor Steege has been told that she has no longer than six months to live. She is entitled to discharge her loans under

the Public Service Loan Forgiveness Program, and the CFPB was helping her do so. Pastor Seege wants to ensure that she discharges her debt before she dies, so that she will not burden her surviving family, and because she could pass on to her family as much as $15,000 of overpayments. Pastor Steege had a meeting scheduled with the Bureau this week that was suddenly cancelled because of the CFPB's unlawful closure. Absent the CFPB's assistance, it is unlikely that she will be able to discharge her debt and get her overpayments returned before she passes away.

18.    Plaintiff CFPB Employee Association is a membership organization of dedicated public servants committed to advocating for the interests of the Consumer Financial Protection Bureau. Its members include current and former employees of the CFPB, including probationary employees who were recently terminated.

19.    Defendant Russell Vought is the Acting Director of the Consumer Financial Protection Bureau. He is sued in his official capacity.

20.    Defendant Consumer Financial Protection Bureau is an agency of the United States.

## BACKGROUND

**Statutory Creation of the CFPB**

21.    In July 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), Pub. L. No. 111-203, 124 Stat. 1376, 1376 (2010), "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to

protect the American taxpayer by ending bailouts, [and] to protect consumers from abusive financial services practices." *Id.*

22.    Title X of the Dodd-Frank Act, titled the Consumer Financial Protection Act of 2010 (CFP Act), established the CFPB as an "independent bureau" within the Federal Reserve System. 12 U.S.C. § 5491(a). Congress tasked the CFPB with "implement[ing]" and "enforc[ing]" a large body of financial consumer protection laws to "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a). Congress required the CFPB's "principal office" to be located in Washington, D.C. *Id.* § 5491(a).

23.    The CFPB is headed by a single Director, who is appointed by the President with the advice and consent of the Senate. 12 U.S.C. § 5491(b)(1)–(2). Congress required that the Bureau's Deputy Director, who is "appointed by the Director," shall "serve as acting Director in the absence or unavailability of the Director." *Id.* § 5491(b)(5).

24.    The CFP Act charges the CFPB with numerous mandatory duties to protect consumers and taxpayers. including duties related to the supervision of financial institutions, research and education, enforcement, and rulemaking. *See generally* P.L. 111-203, Title X, §§ 1001–1100H. Among other things, Congress required the CFPB to perform the following activities:

    a.    ***Obligations to Monitor and Respond to Consumer Complaints.*** The CFP Act requires the CFPB to "collect[]," "monitor[]," and

"respon[d] to consumer complaints regarding consumer financial products or services." *Id.* § 5493(b)(3)(A). The CFPB is further required to "establish … reasonable procedures to provide a timely response to consumers" for complaints or inquiries. *Id.* § 5534. Those complaints can and do "help consumers get resolution to the problems they encounter."[1]

b.   ***Research, Reporting, and Information Obligations.*** The Act imposes on the CFPB numerous research, reporting, and information obligations. For example, the CFPB is required to "research[], analyz[e], and report[]" on market developments for consumer financial products or services and consumer understanding of and access to financial products. *Id.* § 5493(b)(1). In addition, it is required to publish and disseminate information about credit rates and credit cards. *See* 15 U.S.C. §§ 1646(a), (b); *id.* § 1632(d)(3). And the CFPB must "provide staff and data processing resources" to the Federal Financial Institutions Examination Council, 12 U.S.C. § 2809(c), and to compile information on depository institutions and aggregate lending patterns, *id.* § 2809(a).

c.   ***Obligations to establish specific offices.*** Congress further required the CFPB to establish offices that perform specified tasks or aid specific groups of consumers. For example, the CFP Act requires that a Private Education Loan Ombudsman "provide timely assistance to borrowers of

---

[1] CFPB, *Four million complaints: More than just a milestone* (Sep. 29, 2023), https://www.consumerfinance.gov/about-us/blog/four-million-complaints-more-than-just-a-milestone/.

private education loans." *Id.* § 5535(a). Among other things, the Ombudsman is required to "compile and analyze data on borrower complaints regarding private education loans" and, in accordance with regulations, "receive, review, and attempt to resolve informally complaints" from loan borrowers. *Id.* §§ (c)(1)(3).

In addition, the statute requires the CFPB to establish an Office of Financial Protection for Older Americans that "shall … monitor certifications or designations of financial advisors who advise seniors and alert the Commission and State regulators of certifications or designations that are identified as unfair, deceptive, or abusive" and "conduct research … to educate and counsel seniors about personal finance management." *Id.* §§ (g)(3)(B), (D).

The Act also requires the establishment of several other offices, including the Office of Service Members Affairs, which "shall be responsible for developing and implementing initiatives for service members and their families," *id.* § (e)(1); the Office of Financial Education, which is mandated to "implement a strategy to improve the financial literacy of consumers" through various "activities including providing opportunities for consumers to access" services, information, and assistance," *id.* § (d)(2); and the Office of Fair Lending and Equal Opportunity, which provides oversight and enforcement of various federal laws and "work[s] with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education," *id.* § 5493(c).

d.    ***Supervision***. The Dodd-Frank Act gives the CFPB broad supervisory authority to examine financial institutions for compliance with federal consumer financial laws. 12 U.S.C. §§ 5514, 5515. For example, the CFPB "shall require reports and conduct examinations on a periodic basis" of payday lenders and private education lenders. *Id.* § 5514(b)(1). In addition, for insured depository institutions and credit unions with more than $10 billion in assets, the CFPB "shall have exclusive authority to require reports and conduct examinations on a periodic basis" to "assess[] compliance" with federal law, "obtain information" about the activities, systems and procedures of the entity, and "detect[] and assess[] risks to consumers and to markets for consumer financial products and services." 12 U.S.C. § 5515(b)(1).

25.    The Act also confers rulemaking authority on the CFPB. *See* 12 U.S.C. § 5512(b). The CFPB has the authority to prescribe rules identifying acts or practices that are "unfair, deceptive, or abusive," *id.* § 5531(b), and rules imposing disclosure requirements to help consumers understand the terms, benefits, costs, and risks of financial products and services, *id.* § 5532; *see also id.* § 5533. The CFPB also has rulemaking authority pursuant to 19 federal statutes that govern numerous consumer activities and services, including debt collection practices, debit card transfers, overdraft services, consumer leases, mortgage lending, credit card lending,

11

mortgage appraisals, real estate settlement practices, and credit reporting. *See* 12 U.S.C. §§ 5581(a)(1)(A), (b).[2]

26.    Since its inception in 2010, the CFPB has fulfilled its statutorily mandated duties by creating the requisite administrative apparatuses and enacting dozens of rules and regulations. The agency has published hundreds of fact sheets, studies, and technical assistance documents that are used by financial services providers, consumers, advocates, and researchers. And the agency has helped millions of consumers obtain relief, both through formal enforcement actions, and through informal dispute resolution mechanisms required by Congress.

27.    On average, the Bureau's statutorily-mandated complaint resolution system receives approximately 350,000 complaints per month. In January 2025, the number was closer to 500,000. Although some complaints are automatically sent to

---

[2] *See also* Alternative Mortgage Transaction Parity Act, 12 U.S.C. §§3801, et seq.; the Consumer Leasing Act of 197615 U.S.C. §§1667, et seq.; the Electronic Funds Transfer Act, 15 U.S.C. §§1693, et seq., except with respect to section 920; the Equal Credit Opportunity Act, 15 U.S.C. §§1691, et seq.; the Fair Credit Billing Act, 15 U.S.C. §§1666, et seq.; the Fair Credit Reporting Act, 15 U.S.C. §§1681, et seq., except with respect to sections 1681m(e) and 1681w; the Homeowners Protection Act of 1998, 12 U.S.C. §§4901, et seq.; the Fair Debt Collection Practices Act, 15 U.S.C. §§1692, et seq.; subsections (b) through (f) of section 43 of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1831t(c)-(f); sections 502 through 509 of the Gramm-Leach-Bliley Act, 15 U.S.C. §§6802-6809, except for section 6805 as it applies to section 6801(b); the Home Mortgage Disclosure Act of 1975, 12 U.S.C. §§2801, et seq.; the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. §1639; the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§2601, et seq.; the S.A.F.E. Mortgage Licensing Act of 2008, 12 U.S.C. §§5101, et seq.; the Truth in Lending Act (TILA), 15 U.S.C. §§1601, et seq.; the Truth in Savings Act, 12 U.S.C. §§4301, et seq.; section 626 of the Omnibus Appropriations Act, 2009, P.L. 111-8 §626; the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§1701, et seq.; and many provisions of the Mortgage Reform and Anti-Predatory Lending Act, Dodd-Frank Act Title XIV, Subtitles A, B, C, and E, and §§1471, 1472, 1475, and 1476).

companies, many have to be referred manually by a CFPB employee. CFPB employees also monitor the complaints to ensure that companies respond to consumers in a timely fashion and refer some complaints to the Bureau's enforcement division. And some complaints—including ones related to imminent actions like foreclosures—are investigated by the Bureau's Escalated Case Management Team. More than 1,000 of these complaints filed each year require attention from the Escalated Management.

28. Regardless of whether a complaint is sent to the Escalated Case Management Team, they are very often urgent. The majority relate to consumer credit reports, and most people do not become aware of an error on their reports until they are trying to secure a loan. Consumers also file complaints when they have been "debanked"—denied access to their accounts because of their past financial history— and face banks who are unwilling to help them restore their accounts. The CFPB is often the only resource available to help them regain access. Consumers also complain regularly about surprise fees and interest attached to payday loans. Consumers who need payday loans typically have little-to-no expendable income, and these surprise costs can mean missing the bus to work and therefore losing your job, skipping or rationing medications, or losing child-care.

29. The Dodd-Frank Act specifies that funding of the CFPB come from "the combined earnings of the Federal Reserve System." *See* 12 U.S.C. § 5497.

30. The Act directs that, each quarter, the Board of Governors of the Federal Reserve will transfer "the amount determined by the Director [of the Bureau] to be

reasonably necessary to carry out the authorities of the Bureau," subject to a statutory cap of 12% of the total operating expenses of the Federal Reserve (inflation adjusted). *Id.* § 5497(a)(1); *see id.* § 5497(a)(2)(A)–(B). In addition, the CFPB Director may request additional funds from Congress if necessary to carry out the authorities of the Bureau. *See id.* § 5497(e).

31.    For Fiscal Year 2025, "[t]he CFPB's projected budget estimate for its operations … [was] $810.6 million."[3]

32.    By letter to the Federal Reserve on October 8, 2024, then-CFPB Director Rohit Chopra requested a monetary transfer in the amount of $248,900,000, stating that he had "determined [it] is the amount necessary to carry out the authorities of the Bureau for FY2025 Q1."[4] Three days later, the Federal Reserve confirmed by letter that the requested funds had been transferred to the CFPB.[5]

33.    By letter to the Federal Reserve on December 19, 2024, then-Director Chopra requested a monetary transfer of $245,100,000 to the CFPB, stating that he had "determined [it] is the amount necessary to carry out the authorities of the

---

[3] Cong. Research Service, R48295, *The Consumer Financial Protection Bureau Budget: Background, Trends, and Policy Options*, at 6, https://crsreports.congress.gov/product/pdf/R/R48295/2#:~:text=The%20CFPB's%20 projected%20budget%20estimate,director%20or%20in%20CFPB's%20priorities.

[4] https://files.consumerfinance.gov/f/documents/cfpb_funds-transfer-request-fy-2025-q1.pdf.

[5] https://files.consumerfinance.gov/f/documents/cfpb_letter-from-frb-fy-2025-q1.pdf.

Bureau for FY 2025 Q2."[6] On January 2, 2025, the Federal Reserve confirmed by letter that the requested funds had been transferred to the CFPB.[7]

**Treasury Secretary Bessent named Acting Director of the CFPB and halts the CFPB's Work**

34.    On February 1, 2025, President Trump fired then-Director of the CFPB Rohit Chopra as Director of the CFPB. Pursuant to Dodd-Frank, the CFPB's then-Deputy Director, Zixta Martinez, then became Acting Director of the CFPB. *See* 12 U.S.C. § 5491(b)(5).

35.    Two days later, President Trump appointed Treasury Secretary Bessent as the Acting Director of the CFPB.

36.    On February 3, 2025, then-Acting Director Bessent sent an email, titled "Instructions from Acting Director," directing all CFPB staff and contractors to "immediately" suspend activities in six areas of work. Specifically, the February 3 email stated that unless expressly approved by Bessent, all CFPB workers were required:

- "[n]ot to approve or issue any proposed or final rules or formal or informal guidance";

- "[t]o suspend the effective dates of all final rules that have been issued or published but that have not yet become effective";

- "[n]ot to commence, take additional investigative activities related to, or settle enforcement actions";

---

[6] https://files.consumerfinance.gov/f/documents/cfpb-12-19-letter-from-cfpb-to-frb_2025-01.pdf.

[7] https://files.consumerfinance.gov/f/documents/cfpb_01-02-letter-from-frb-to-cfpb_2025-01.pdf.

- "[n]ot to issue public communications of any type, including publication of research papers";

- "[n]ot to approve or execute any material agreements, including related to employee matters or contractors"; and

- "[n]ot to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings."

*Id.* The February 3 email stated that Acting Director Bessent was issuing these directives "to promote consistency with the goals of the Administration." *Id.*

37.    By email to all CFPB staff and contractors on February 4, 2025, Acting Director Bessent "[u]pdate[d]" his February 3 directive halting another category of work. He instructed CFPB employees "[n]ot to initiate supervisory designation proceedings or designate any nondepository institution for supervision."

**Defendant Vought named Acting Director and halts CFPB's Work**

38.    On Friday, February 7, 2025, President Trump named Russell Vought, the Director of the Office of Management and Budget, as Acting Director of the CFPB.

39.    That same day, Elon Musk and other members of the so-called "Department of Government Efficiency" (DOGE) accessed CFPB's headquarters and computer systems.[8] Several hours later, Musk posted "CFPB RIP" with a tombstone emoji on his social-media site X.[9]

---

[8]    https://www.politico.com/news/2025/02/07/elon-musk-team-cfpb-00203119; https://www.forbes.com/sites/saradorn/2025/02/10/trump-vs-cfpb-russ-vought-orders-consumer-financial-protection-bureau-to-stop-work/.

[9] https://x.com/elonmusk/status/1887979940269666769.

40.     Also on February 7, the CFPB's official X account was deleted,[10] and the CFPB's website homepage was replaced with a banner stating, "404: Page not found."[11]

41.     On February 8, 2025, Acting Director Vought sent an email titled "Directives on Bureau Activities." The email stated that Vought was "committed to implementing the President's policies" and that "[t]o that end," he directed all CFPB staff and contractors to comply "immediately" with nine directives to cease work, unless expressly approved by Vought:

- "[n]ot approve or issue any proposed or final rules or formal or informal guidance";

- "[s]uspend the effective dates of all final rules that have been issued or published but that have not yet become effective";

- "[n]ot commence, take additional investigative activities related to, or settle enforcement actions";

- "[n]ot open any new investigation in any manner, and cease any pending investigations";

- "[n]ot issue public communications of any type, including publication of research papers and compliance bulletins";

- "[n]ot approve or execute any material agreements, including related to employee matters or contractors";

- "[n]ot make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings";

- "[c]ease all supervision and examination activity";

---

[10]     https://www.forbes.com/sites/saradorn/2025/02/08/cfpbs-x-account-goes-dark-as-russell-vought-takes-over-elon-musk-posts-cfpb-rip/.

[11]     https://www.forbes.com/sites/eriksherman/2025/02/09/consumer-financial-protection-bureau-adds-error-message-to-home-page/.

17

- "[c]ease all stakeholder engagement."

42.    Approximately one hour later, Acting Director Vought stated in a social media post on X that he "ha[d] notified the Federal Reserve that CFPB will not be taking its next draw of unappropriated funding because it is not 'reasonably necessary' to carry out its duties." [12]

43.    In the absence of taking a draw from the Federal Reserve, the Bureau must rely on its reserve fund.

44.    On information and belief, Defendant Vought intends to imminently return the funds in the CFPB's reserves to the Federal Reserve. Although Vought has stated that in his view, that money is not "necessary to fulfill the Bureau's mandate," without that money, the Bureau will be unable to fund its operations.

45.    On the evening of February 9, 2025, CFPB Chief Operating Officer Adam Martinez sent an email to all CFPB staff stating that the CFPB's headquarters would close the next day and instructing "[e]mployees and contractors … to work remotely unless instructed otherwise from our Acting Director or his designee." [13] No reason was given for the closure.

46.    On the morning of Monday, February 10, 2025, Vought sent an email with the subject line "Additional Directives on Bureau Activities," reiterating that the CFPB's "DC headquarters building is closed this week." The February 10 email

---

[12] https://x.com/russvought/status/1888423503537360986

[13]    https://www.nytimes.com/2025/02/09/us/russell-vought-consumer-bureau-protect-hq-close.html;  *see*  https://www.reuters.com/world/us/cfpbs-headquarters-be-closed-coming-week-email-says-2025-02-09/.

directed all CFPB staff "not [to] perform any work tasks" at all and that "employees should stand down from performing any work task." The email stated that "[i]f there are any urgent matters," CFPB staff should "alert [Vought] through Mark Paoletta," who is the Office of Management and Budget General Counsel and who was identified in the email as the CFPB's Chief Legal Officer, "to get approval in writing before performing any work task."

47.    Later that day, reporters speaking with President Trump asked him to confirm that "his goal was to have [the CFPB] totally eliminated." President Trump stated, "I would say, yeah, because we're trying to get rid of waste, fraud, and abuse."[14] President Trump further stated, "[W]e did the right thing. [The CFPB] was a very important thing to get rid of, and it was also a waste. I mean, number one, it was a bad group of people running it, but it was also a waste."[15] President Trump reportedly "praised his administration for shutting the CFPB and used the past tense to describe the [CFPB]."[16]

---

[14] https://x.com/joeygarrison/status/1889132023933022283?mx=2.

[15]    https://www.facebook.com/ANINEWS.IN/videos/shes-a-nasty-woman-trump-slams-senator-elizabeth-warren-after-her-cfpb-neutraliz/1227075188971091/; *see also* Alejandra Jaramillo, *Trump confirms goal to "totally eliminate" the Consumer Financial Protection bureau*, CNN Politics (Feb. 10, 2025), https://www.cnn.com/politics/live-news/trump-doge-presidency-news-02-10-25/index.html (quoting President Trump).

[16]   https://www.americanbanker.com/news/president-trump-confirms-his-goal-is-to-eliminate-the-cfpb

## *Defendants' Additional Actions to Shut Down the CFPB*

48.    By email on the evening of February 11, 2025, approximately 70 CFPB employees who were newly hired and subject to a two-year probationary period were terminated.[17] The email stated, "Unfortunately, the Agency finds that that [sic] you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs."[18]

49.    In the past few days, the CFPB has cancelled more than 150 vendor contracts. The canceled contracts reportedly include "102 vendor contracts for the CFPB's enforcement division, 33 contracts linked to the director's office, and 16 contracts for the agency's supervision unit."[19] The Bureau also cancelled nearly all contracts that underlie the consumer complaint function.

50.    The defendants have reportedly informed the General Services Administration that they are terminating the lease of the CFPB's headquarters office in Washington, D.C.

51.    The defendants are also preparing to conduct another mass firing, this time of over 95% of the Bureau's employees. That would make it impossible for the Bureau to fulfill any of its statutorily required functions.

---

[17]    https://news.bloomberglaw.com/banking-law/cfpb-fires-70-enforcement-lawyers-other-probationary-employees

[18]    https://news.bloomberglaw.com/banking-law/cfpb-fires-70-enforcement-lawyers-other-probationary-employees.

[19]    https://news.bloomberglaw.com/banking-law/cfpb-cancels-more-than-100-million-in-contracts-amid-doge-probe.

**Consequences of Defendants' Stop-Work Orders**

52.     By freezing the CFPB's work, the defendants have put an immediate halt to the CFPB's performance of its statutorily mandated functions.

53.     The defendants' orders to halt work at the CFPB have had devastating consequences. Among countless other consequences, halting CFPB work has suspended oversight of the biggest banks to ensure that they comply with the law; pending rulemakings, including a rulemaking to stop data brokers from selling sensitive personal data to scammers, stalkers, and spies;[20] and enforcement actions against institutions violating consumer financial protection laws.[21]

54.     Shuttering the agency has also severely disrupted the CFPB's consumer complaint operation: The hotline consumers call to submit complaints went offline, despite Congress's clear command that the CFPB "establish[] a single, toll-free telephone number" for use in collecting complaints. 12 U.S.C. § 5493(b)(3)(A). Although the Bureau may now have reinstated the contractors who operate the hotline, the operation remains severely diminished. The CFPB cancelled the contract for the contractors that processed mailed-in complaints and complaints referred to the CFPB by other federal agencies and Congress. Complaints submitted online can't

---

[20]     https://www.consumerfinance.gov/about-us/newsroom/cfpb-proposes-rule-to-stop-data-brokers-from-selling-sensitive-personal-data-to-scammers-stalkers-and-spies/

[21]     *See* Press Release, National Consumer Law Center, *Unlawful Shut Down of Consumer Agency Endangers Working Families, Honest Businesses, and the Economy* (Feb. 10, 2025), https://www.nclc.org/unlawful-shut-down-of-consumer-agency-endangers-working-families-honest-businesses-the-economy/ (identifying various impacted enforcement actions).

be sent to companies unless those companies are already in the CFPB's system. Particularly devastating is that the Escalated Case Management Team—which responds to extremely time sensitive complaints, like those involving foreclosures—is not working. And consumers who filed complaints related to other time-sensitive matters—like correcting a credit report so that they can obtain a loan, or regaining access to a bank account after being frozen out—can't rely on the CFPB to ensure they receive timely responses to their complaints, either.

55.    The shutdown has had a similar effect on the Student Loan Ombudsman's Office. The Office receives thousands of complaints a year, and its staff resolve hundreds of complaints each month. 2024 Annual Report of the CFPB Student Loan Ombudsman at 9.[22]

56.    The complaints concern inaccurate billing statements, yearslong processing delays, inability to reach lenders to lodge complaints directly, and missing refunds of hundreds to tens of thousands of dollars.

57.    The complaints are submitted through a telephone hotline, an electronic submission process and referrals from congressmembers and direct service organizations.  Complaints are screened by contractors and Bureau staff before being routed to lenders, who are required to respond within 15 days.

---

[22]    https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf.

58.    Because of the stop-work order, complaints are not being addressed by staff and not being routed to lenders, who sometimes resolve issues without the need for intervention from the CFPB.

59.    The Ombudsman's work has had profound impact on the borrowers it served. For instance, CFPB staff has successfully resolved complaints that involve schools withholding college transcripts and thereby preventing borrowers from pursuing employment. One borrower described the hold on her transcript as like a "hold on [her] life."

60.    Another borrower, had nearly $5,000 erroneously drawn from her account for a loan payment. She was given conflicting information and then told a refund could take 12 weeks. After lodging a complaint with the Ombudsman, she received a refund.

61.    Another borrower had loans cancelled and was due a $20,000 refund. After contacting the lender directly and waiting nearly two years, the borrower lodged a complaint with the CFPB. The lender issued a refund shortly after.

62.    Stories like this abound, and borrowers just like this will be left to the long delays, conflicting information, and denials of refunds that the Ombudsman's office, when functioning, has helped others avoid.

63.    These immediate consequences have already harmed each of the plaintiffs.

64.    The National Treasury Employees Union's more than 775 members at the CFPB face severe uncertainty and stress about their job security. Seventy CFPB

employees, many of whom were NTEU members, have already been fired. Those who have not yet been fired understandably fear for their jobs. Indeed, they have good reason to believe a mass layoff is imminent. And given the instructions to stop work, they lack clarity about their job status and their ability to comply with their usual work obligations.

65.    The National Consumer Law Center has already had multiple of its contracts with the CFPB cancelled. Those cancellations will cost NCLC thousands of dollars. The CFPB's subscription to NCLC's publication, for example, funds much of the organization's publishing work. CFPB employees have also withdrawn as panelists from trainings organized by NCLC. And NCLC relies extensively on data and reports published by the CFPB. Stopping the CFPB's work will deprive NCLC of this important information going forward.

66.    Pastor Steege has, over the years, had great difficulty in attempting to enroll in Public Service Loan Forgiveness. In late 2024, however, the pastor sought help from the CFPB. After an initial meeting with the Bureau in January 2025, Pastor Steege was hopeful that she might finally enroll in the program, have her loans forgiven, and, in fact, be returned $15,000 in overpayments. She scheduled a follow-up meeting with the Bureau for February 10, 2025. But the night before the meeting Pastor Steege learned that President Trump had taken steps to shut down the CFPB. Then, on the morning of the scheduled meeting, CFPB staff emailed Pastor Steege and informed her that, "due to new guidance CFPB employees recently received," the meeting was cancelled. No new meeting was scheduled, and Pastor

Steege has no reason to believe that the CFPB—with its worked indefinitely stopped—will ever be able to help her.

67.    The inability to seek loan forgiveness and a refund of $15,000 would be a devastating consequence standing alone. But it is even more dire for Pastor Steege. Because of her advanced cancer diagnosis, Pastor Steege has been told she has no more than six months to live. She hoped to have her loans forgiven so that she would not burden her surviving family with her debt, and so that they could use the $15,000 refund for basic needs after she passes. If the CFPB isn't able to help her, Pastor Steege will spend her final six months in great duress, worried that she is leaving her family with a financial burden and without the monetary help to which they are entitled. And if the loan is not forgiven while she is alive her family will be forced to pursue a death discharge that will not provide them with the $15,000 refund.

68.    The NAACP was actively working with the CFPB to protect NAACP members who live in Altadena, California. Those members have been targeted by predatory financial practices in the wake of the Los Angeles wildfires. The complete freeze on the CFPB's work has halted that collaboration and harmed both the NAACP members and the NAACP itself, which now must assist its members without the CFPB's assistance.

69.    The Virginia Poverty Law Center operates a Predatory Loan Helpline that consumers can call when they need help with unfair and predatory loans. The phone number is featured prominently on the Center's website. Because of the Center's limited staffing, even the CEO helps to answer the hotline.

25

70.    The Center routinely directs consumers who call the hotline to use the CFPB's consumer response complaint function. It even notes this resource on the Center's website.

71.    This process takes Center staff approximately 10 minutes and gets timely and helpful results. In September, for example, the Center received a complaint about an out-of-state lender that had been claiming that it was not subject to Virginia law. The Center helped the consumer submit a complaint to the CFPB, and it quickly resulted in a reduction of the interest rate on the loan from 118% to 36%, with a 50% reduction in payments. This is just one example of success the Center's client base has seen from referrals. There are many others.

72.    Before the CFPB's existence, the Center used to handle these complaints entirely itself. It consumed far more resources to replicate what the CFPB now does in minutes. Because the Center's staff is so limited, if it had to return to handling complaints itself, it would be unable to commit resources to other work.

73.    The Center also uses the CFPB's consumer response database to inform its work. If that database were not updated, or trustworthy, the Center would lose an important tool that it relies on to set its organizational priorities on what to advocate about and how to educate consumers.

74.    Plaintiff CFPB Employee Association's members include probationary employees who have already been fired, as well as current employees who rightly fear for their jobs.

26

## CAUSES OF ACTION

### Count One
(Non-statutory review of official and agency action)

75.    Plaintiffs have a non-statutory right of action to enjoing and declare unlawful official action that is ultra vires.

76.    The Constitution vests executive power in the President. U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

77.    The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

78.    Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. U.S. Const., art. I. The President and Executive Branch have no authority under the Constitution to amend statutes unilaterally.

79.    The CFPB was established as a federal agency by Congress by statute, the Dodd Frank Act, signed into law in 2010, and can be eliminated only by Congress.

80.    Defendants' actions to eliminate the CFPB exceed executive authority, usurp legislative authority conferred upon Congress by the Constitution, defendant Vought was not lawfully appointed, and his actions are ultra vires and should be enjoined.

**Count Two**
(Non-statutory review of official and agency action)

81.    The Constitution mandates that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2.

82.    The Director of the CFPB is an Officer of the United States.

83.    President Trump appointed Defendant Vought as acting Director without the advice and consent of the Senate.  Defendant Vought was neither nominated nor confirmed by the Senate to that position.

84.    President Trump purported to appoint Defendant Vought under the Federal Vacancies Reform Act, which allow for temporary appointments without the advice and consent of the Senate when the prior holder of a Senate-confirmed office "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a).

85.    But President Trump fired the last Senate-confirmed Director, Rohit Chopra. Chopra did not die, he did not resign, and he was not unable to perform the functions and duties of the office. He continued to perform them until the day he was fired, over a week into President Trump's term.

86.    The President's appointment of Defendant Vought as Acting Director of the CFPB is therefore unconstitutional and Defendant Vought has no power to direct the agency.

87.    Congress has provided that, when the Bureau is missing a director, the deputy director shall lead the agency. See 5 U.S.C. § 5491(b)(5). The deputy director, not Defendant Vought, therefore has the authority to exercise the Bureau's powers.

88.    In addition, Congress has charged the Secretary of Education, not the Director, with responsibility for designating the Private Education Loan Ombudsman. 12 U.S.C. § 5535(a). The authority to control who holds that office rests with the Secretary. By functionally removing the ombudsman from the office by prohibiting her from doing any work, Defendant Vought has exercised power of the Secretary without being confirmed by the Senate to do so.

89.    Because defendant Vought was not lawfully appointed, his actions are ultra vires and should be enjoined.

**Count Three**
(Administrative Procedure Act—706(2)(C))

90.    Under the APA, a court shall "hold unlawful and set aside agency action … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

91.    Defendants' actions and intended further actions to suspend or terminate CFPB's statutorily mandated activities—including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters—constitute final agency action under the APA.

92.     No defendant possesses the statutory authority to require CFPB to cease work on the activities it is statutorily required to perform. Defendants' actions exceed their statutory authority.

### Count Four
(Administrative Procedure Act—706(2)(A)

93.     The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

94.     Defendants' actions and intended further action to suspend or terminate CFPB's statutorily mandated activities and to return the funding that the CFPB needs to sustain its operations constitute final agency actions under the APA.

95.     Defendants' actions were taken without notice, reasoned explanation, or reasonable recourse.

96.     Defendants' actions were arbitrary, capricious, unconstitutional, and not in accordance with law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A)     Declare that the defendants' actions to dismantle the CFPB and their suspension of CFPB's statutorily mandated activities are unlawful;

(B)     Declare unlawful and set aside the defendants' actions and intended further actions to dismantle the CFPB, including issuance of stop-work instructions, cancellation of contracts, declining and returning funding, reductions in force, firing of employees, and termination of the lease for its headquarters, as arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

(C)   Issue an injunction barring Defendants Vought and CFPB from implementing or complying with the directions to cease work absent the authorization of Congress;

(D)   Order Defendants Vought and CFPB to resume immediately all activities that CFPB is required by statute to perform;

(E)   Issue a temporary restraining order and preliminary injunction directing Defendants Vought and CFPB to cease immediately actions to cease CFPB's operations;

(F)   Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

(G) Grant such other relief as the Court deems necessary, just, and proper.

Dated: February 13, 2025

/s/ Deepak Gupta
Deepak Gupta (DC Bar No. 495451)
Robert Friedman (D.C. Bar. 1046738)
Gabriel Chess (DC Bar No. 90019245)
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett*
Gupta Wessler LLP

Respectfully submitted,

/s/ Wendy Liu
Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Counsel for Plaintiffs

505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

\* motion for *pro hac vice*
admission forthcoming

*Counsel for Plaintiffs*

Julie M. Wilson
General Counsel
Paras N. Shah
Deputy General Counsel
Allison C. Giles
Assistant Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiff National Treasury*
*Employees Union*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL TREASURY EMPLOYEES UNION,** *et al.,* | |
| *Plaintiffs,* | No. 1:25-cv-00381-ABJ |
| v. | |
| **RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,** *et al.,* | |
| *Defendants.* | |

## DECLARATION OF ADAM MARTINEZ

1.     My name is Adam Martinez.  I am currently employed at the Consumer Financial Protection Bureau ("CFPB" or "the Bureau") serving as the Chief Operating Officer ("COO") and Acting Chief Human Capital Officer.  As the COO, I am responsible for leading the Operations Division in executing all operational functions including finance, procurement, human resources, information technology and development, facilities, security, records management, Freedom of Information Act ("FOIA"), and data governance.  I started serving as the COO on February 20, 2023, and have been with the federal government for 25 years.  The following is based on my personal knowledge or information provided to me in the course of performing my duties.

**Events Occurring After Changes in Bureau Leadership and Events Related to the CFPB Building Closure**

2.     On February 3, 2025, CFPB employees and contractors were notified by email that the Secretary of the Treasury had been named Acting Director of the CFPB, effective January 31, 2025.  The email also identified six areas where, "unless expressly approved by the Acting Director or required by law," Bureau employees were to refrain from taking further action "[i]n order to promote consistency with the goals of the Administration."  This email was sent in order to allow the new, incoming political leadership to assess the CFPB's current operations and evaluate CFPB's priorities in light of the new Administration.  A copy of that email is attached hereto as Exhibit A.

3.     Based on my 25 years of government experience, this is a common practice at the beginning of a new administration and/or during the transition of a new head of agency.  As it relates to operations, during these transitions I immediately prepare and expect for a freeze on

travel, speaking engagements, conference attendance, hiring/recruitment, human resource processing, contracts, and certain mission actions.

4.       While the Secretary of the Treasury was the Acting Director, his team engaged in the evaluation of CFPB's current D.C. Headquarters.  On February 4, 2025, Treasury's Deputy Assistant Secretary ("DAS") for Operations contacted CFPB's Chief Administrative Officer ("CAO") to coordinate a tour of the building that same evening for personnel of the General Services Administration ("GSA") and the Office of Personnel Management ("OPM").  In addition, on the same day the DAS requested the Office of the Comptroller of the Currency ("OCC") to provide him with a copy of the CFPB lease and occupancy agreement.

5.       The CFPB Headquarters Building has provided the potential for greater efficiency and cost savings over the past couple of years.  For example, in 2023 and 2024, the former CFPB Director under the last Administration instructed the Operations Division to explore options to sublease office space and parking to other financial regulators and/or federal agencies.  Since the pandemic, the building has largely remained unoccupied, so this would have provided an opportunity to share costs with other partners.  The CAO coordinated with the OCC to determine the process to sublease if the CFPB found an interested party.  Interest was identified from at least a half dozen agencies.

6.       Officials representing the Department of the Treasury notified CFPB officials on the evening of February 6, 2025, that two United States DOGE Service ("USDS") officials would need access to CFPB Headquarters located at 1700 G St. NW.

7.       A follow-up meeting was held at CFPB Headquarters on the morning of February 7, 2025, between CFPB Management and USDS Personnel.  During the meeting, a CFPB employee who was not an attendee at the meeting began taking pictures of attendees through a conference room window.  The attendees moved to an adjacent conference room with a covered window due to privacy and safety concerns, but the same employee entered that conference room and began to disrupt the meeting.  The employee questioned the personnel in the conference room, demanded to know who they were, began to take pictures and video of open laptops and attendees' faces around the conference table, and demanded that the attendees show her their identification cards.  A CFPB physical security specialist and approximately four security officers were called to the scene to mitigate the problem.  A copy of the Incident Report describing these events is attached hereto as Exhibit B.

8.       On the same day, CFPB employees began protesting outside of the CFPB Headquarters building.  The protest activities included following and questioning staff about who they were and at times making staff feel harassed.

9.       On the evening of February 7, 2025, the National Treasury Employees Union ("NTEU") local chapter president emailed the CFPB's Chief Information Officer ("CIO") and copied the CFPB Legal Team.  She stated that she was made aware of messages being sent to

employees that orders were being received from the "Whitehouse" directly that, in her view, contradict and circumvent CFPB policy and procedures. Further, the NTEU President reminded the CIO that the CFPB is an independent agency and stated that "Whitehouse officials" "are not your supervisor" and "have no authority to order you to carry out orders as a CFPB government employee; only the [Chief Operating Officer] and the Director have that authority." A copy of that email is attached hereto as Exhibit C.

10.     On February 7, 2025, shortly after receipt of the NTEU President's email to the CIO, the President named Russell Vought, the Office of Management and Budget ("OMB") Director, as the CFPB's Acting Director.

11.     On February 8, 2025, the Acting Director emailed CFPB employees stating his commitment to "implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources." The email also consisted of eight functions from which CFPB employees should refrain, absent approval "by the Acting Director or required by law." The email also invited employees to raise any questions that they may have "through your existing management for consideration by the Acting Director." This email was sent in order to allow the new Acting Director and political leadership to assess the CFPB's current operations and evaluate the CFPB's priorities in light of the new Administration. It is not unusual for these types of steps to be taken at an agency at the beginning of a new administration and during the transition period for new leadership. A copy of this email is attached hereto as Exhibit D.

12.     On February 9, 2025, I was advised by our new leadership that the Headquarters building would be closed the week of February 10, 2025, due to safety concerns, and employees and contractors would need to work remotely unless instructed otherwise from our Acting Director or his designee. This would provide an opportunity for employees needing access to the building to do so safely given the disruptions caused on February 7, 2025. As the Chief Operating Officer, I sent an email to CFPB employees advising them of the office building closure. A copy of my email is attached hereto as Exhibit E.

13.     On February 9, 2025, CFPB management became aware of additional, planned protests at CFPB Headquarters from 4:15 to 6:00 p.m. and included representatives from Indivisible, Progress Change Institute, MoveOn, and Americans for Financial Reform.

14.     On February 10, 2025, the Acting Director sent an email providing validation of the building closure and instructions regarding work tasks. A copy of the email is attached hereto as Exhibit F.

15.     On February 10, 2025, additional protests occurred at CFPB Headquarters. Those protests consisted of hundreds of people, making the opening of the building unsafe. CFPB Security Staff advised that, due to the protests, the building should remain closed, and as the Chief Operating Officer, I support the continued closure of the building due to ongoing security concerns.

16.     On February 12, 2025, staff protests occurred in front of the CFPB building at approximately 12:00 pm as reported by CFPB security personnel.

17.     The building closure should have limited impact to the Bureau and its employees. Approximately 900 employees currently primarily telework from home full time in the National Capital Region. An estimated 350 employees and contractors are currently assigned an office or cubicle in the building, but not all of them enter the building five days a week. The CFPB Headquarters building currently has a capacity of 1,221 seats and the annual operational costs are greater than $25.7 million.

18.     After considering the Bureau's priorities to run a more streamlined and efficient Bureau, current CFPB leadership determined that it did not need the footprint associated with its current office space and decided to cancel CFPB's Headquarters lease. As of the date of this declaration, the cancelation of the lease has not been fully executed. After the cancelation of the lease, CFPB will have thirty days to move out. CFPB leadership is evaluating and assessing CFPB's future office space needs. The Bureau, in consultation with USDS, will evaluate options for alternative office space once the Bureau has ascertained the amount of office space it will need to carry out its more streamlined operations. In the meantime, CFPB employees will continue to telework. The termination of CFPB's lease will not prevent the CFPB from performing the statutory functions described below, as employees have become accustomed to either working from home or remotely and the Bureau's informational technology supports it.

**The CFPB is Committed to Performing Statutory Obligations**

19.     Since the arrival of the Acting Director, the new leadership is engaging in ongoing decision-making to assess how to make the Bureau more efficient and accountable. Our leadership has worked to comply with statutorily required functions, and my operations team has been mindful of this as we advise on operational related issues.

20.     The closure of the CFPB's Headquarters pursuant to the February 9 and 10 emails has not prevented the CFPB from performing statutory functions as described in this declaration. As mentioned, the approximately 350 employees who have assigned cubicle or office space have the ability to work from home and not all of them came to the office five days a week before the office building closure as reflected in the February 9 and 10 emails. I or the Chief Legal Officer have approved access for employees that require onsite access to perform their jobs. Personnel that have been approved for access include newly appointed personnel, security personnel, facilities staff, information technology personnel, mailroom personnel, and cleaning contractors. For example, employees working in mail services have been permitted to access the building and have continued to process consumer complaints that are mailed in.

21.     Work requests have been approved to allow the CFPB to maintain operations required by statute. For example, the CIO was provided approval to onboard new political leadership with service desk support, perform security monitoring tasks for CFPB networks, and perform maintenance tasks needed to ensure the continuation of the Home Mortgage Disclosure

Act ("HMDA") application, Consumer Complaint Database, ServiceNow, and Microsoft365 platforms. Other approvals included maintaining the CFPB Call Centers and the processing of payments through the Civil Penalty Fund. While the Student Loan Ombudsman position is currently vacant, consumers have other options to receive support from the CFPB including utilizing the CFPB Consumer Complaint Center and/or the CFPB Ombudsman Office, which houses five employees. The CFPB Ombudsman Office is an independent, impartial, and confidential resource to help consumers, financial entities, consumer or trade groups, or anyone else interacting with the CFPB. These functions help ensure that the CFPB continues to engage in statutorily required work.

22.    Since the February 3 email, I have never had a work request be denied. The Bureau is committed to performing its statutory obligations, including those listed in 12 U.S.C. § 5493(b)(3)(A), entitled "Collecting and tracking complaints." The Bureau is maintaining a single, toll-free telephone number, a website, and a Consumer Complaint Database to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services. Operations related to the Consumer Complaint Database are continuing. Contracts needed for work related to the Consumer Complaint Database have remained intact and operational.

23.    Additionally, as required by the HMDA, the Bureau is providing information technology technical assistance to enable filers to submit their data and enabling the Federal Financial Institutions Examination Council to compile and publish information about applications for mortgage loans that is reported to the Bureau by mortgage lenders. 12 U.S.C. § 2809(a). In short, operations related to the CFPB's statutory requirements under HMDA are continuing. Contracts needed for work related to the HMDA have remained intact and operational.

**CFPB's Funding Structure and the Funding Request from Acting Director Vought**

24.    With respect to funding, the Bureau maintains two types of funds: (1) the Bureau of Consumer Financial Protection Fund ("Bureau Fund") and (2) the Civil Penalty Fund. The Federal Reserve funds the Bureau Fund through transfers administered by the Board of Governors of the Federal Reserve System, and this money is used for the Bureau's operations and expenses. Entirely separate from the Bureau Fund, the Civil Penalty Fund is funded by civil penalties imposed and collected by the Bureau—not the Federal Reserve. The Civil Penalty Fund is used to redress harmed consumers. Issuance of approved payments to affected consumers has continued to be processed.

25.    At the Bureau, new leadership is engaged in ongoing decision-making to assess how to make the Bureau more efficient and accountable, consistent with this Administration's goals of reforming the federal bureaucracy, reducing wasteful spending, and streamlining efficiencies in the federal government.

26.    Shortly after becoming Acting Director, Mr. Vought reviewed the sums available to the Bureau in its Bureau and Civil Penalty Funds. After considering the Bureau's total current

balance and the projected expenses for the upcoming quarter, Acting Director Vought determined that these currently available funds were sufficient for the Bureau to carry out its statutory mandates for the next fiscal quarter.

27.    In making that determination, Acting Director Vought considered the President's priorities of running a more streamlined and efficient Bureau, the public's interest in a streamlined and efficient Bureau, the impact of government spending on the federal deficit, the impact of anticipated efficiency initiatives at the Bureau, and the consumer interest. Based on his determination, Acting Director Vought sent Chairman Powell a letter requesting $0 for the Third Quarter of Fiscal Year 2025. A copy of that letter is attached as Exhibit G.

28.    The Bureau has made no attempts to transfer any of its Funds back to the Federal Reserve. Indeed, I am not aware of a mechanism to transfer Funds back to the Federal Reserve.

\*\*\*

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 24th day of February.

ADAM MARTINEZ    Digitally signed by ADAM MARTINEZ Date: 2025.02.24 17:45:53 -05'00'

Adam Martinez
Chief Operating Officer

# Exhibit A

| | |
|---|---|
| **From:** | CFPB_OfficeOfTheDirector |
| **To:** | _DL_CFPB_AllHands; _DL_CFPB_AllHands_Contractors |
| **Subject:** | Instructions from Acting Director |
| **Date:** | Monday, February 3, 2025 10:59:59 AM |

Colleagues,

Secretary of the Treasury Bessent has been named Acting Director of the CFPB, effective January 31, 2025. As Acting Director, Secretary Bessent is committed to appropriately stewarding the agency pending new leadership. In order to promote consistency with the goals of the Administration, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau are directed:

- Not to approve or issue any proposed or final rules or formal or informal guidance.
- To suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not to commence, take additional investigative activities related to, or settle enforcement actions.
- Not to issue public communications of any type, including publication of research papers.
- Not to approve or execute any material agreements, including related to employee matters or contractors.
- Not to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

# Exhibit B

February 21, 2025
Information Memo for the Chief Operating Officer

| **FROM** | ██████████, Director of Security, 202- ██████ |
|---|---|
| **THROUGH** | ██████████, Physical Security Specialist, 202- ██████ |
| **SUBJECT** | Employee Incident Report on Friday, February 7, 2025 |

| Select Applicable Information Type(s) | ☒Situational Awareness | ☐Request for Directional Feedback | ☐Reply to Inquiry from Director/FO | ☐ Draft Document Feedback Request |
|---|---|---|---|---|

<u>Issue</u>

On Friday, February 7, 2025, at approximately 11:09 am, ██████████, CFPB's Physical Security Specialist, received a call from Special Police Officer Lt. ██████ reporting a disruptive employee near Room B118. Upon arrival, Mr. ██████ observed Ms. ██████ in front of Room B118. When Mr. ██████ approached Ms. ██████, she appeared agitated and stated she had the right to know who the people in the room are and what they are doing. Mr. ██████ noticed Ms. ██████ was not displaying her PIV card in accordance with Bureau policy, and inquired if she was an employee and if he could see her PIV card. Ms. ██████ removed her PIV card from her pocket and showed it to Mr. ██████, then quickly put it back in her pocket. Mr. ██████ informed her that CFPB policy requires staff to display a PIV card while in CFPB space, but she did not comply. At that time ██████ from the Legal Division arrived and asked to speak with Ms. ██████. They proceed down the hallway to have a private conversation.

At that point, ██████, T&I Infrastructure Director, exited Room B118 and informed Mr. ██████ that it was he who notified security regarding her disruptive and harassing behavior. Mr. ██████ stated he was in a meeting in Room B116 with CFPB CIO ██████, along with DOGE staff ██████ and ██████, who were recently assigned to CFPB. While in the meeting in Room B116, Mr. ██████ noticed Ms. ██████ pushing a baby carriage past the room on several occasions with a telephone pointing towards the window apparently attempting to capture pictures or video of staff in the room. Mr. ██████ offered, and the team agreed, to move the meeting to Room B118 because the windows were covered. Mr. ██████ then stated that when he was exiting Room B118, Ms. ██████ confronted him in the hallway and was pointing her phone camera yelling at him about what he was doing. He requested Ms. ██████ to stop pointing the camera at him when she responded, 'don't touch me'. She then entered Room B118 and started recording and taking pictures of the computers and people in the room.

The incident was captured on CFPB security footage, Camera 13 at 11:04 am.

<u>Timing Considerations</u>

No timing considerations.

Information Memo Reviewer Sheet

| Subject/Document Title<br>Employee Incident Report | | |
|---|---|---|
| Name of Document Owner<br>██████████ | Office<br>Office of Administrative<br>Operations | Telephone Extension<br>202-██████ |
| Approved by<br>██████████ | | |
| Office<br>Office of Administrative<br>Operations | Name of Reviewer<br>██████████ | Date<br>2/21/2025 |
| Office<br>[Insert office] | Name of Reviewer<br>[Insert name of reviewer] | Date<br>[Insert date] |

2

# Exhibit C

| From: | Farman, Catherine (CFPB) |
|---|---|
| To: | Chilbert, Christopher (CFPB); Martinez, Adam (CFPB); Schafer, Jessica (CFPB); Scott, Adam (CFPB); Doguin, John Paul (CFPB); White, Sonya (CFPB); Belasco, Lisa (CFPB); Heiser, Nicole (CFPB); Rice, Kevin (CFPB); Smith, Jarid (CFPB); Noble, Erin (CFPB) |
| Subject: | Reminder you take orders from CFPB officials |
| Date: | Friday, February 7, 2025 6:37:32 PM |
| Importance: | High |

Chris,

I've been made aware of messages you're sending employees that you are receiving orders from the "Whitehouse" directly that contradict and circumvent CFPB policy and procedure. As a reminder the CFPB is an independent agency; DOGE officials and Whitehouse officials are not your supervisor and have no authority to order you to carry out orders as a CFPB government employee; only Adam Martinez and the Director have that authority.

If you are being asked and/or pressured by people other than your chain of command, ask your supervisor in writing to verify or clarify the request and cc CFPB Legal. Congress, CFPB Union and news reports have warned federal officials of well-documented pressure tactics from staff outside of independent agencies designed to manipulate government employees into circumventing law and standard operating procedure at their request and you should heed these warnings.

Thank you,

--

Catherine Farman (they/them, she/her/hers)
Web Developer | Technology & Innovation
President | CFPB Union NTEU 335
Mobile: ███████████
#Solidarity
consumerfinance.gov
nteu335.org

# Exhibit D

| | |
|---|---|
| **From:** | Vought, Russell |
| **To:** | _DL_CFPB_AllHands |
| **Subject:** | Directives on Bureau Activities |
| **Date:** | Saturday, February 8, 2025 8:50:28 PM |

Dear Colleagues,

I am honored that President Trump designated me as Acting Director of the Bureau on February 7, 2025.  As Acting Director, I am committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources. To that end, I am directing that, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau shall:

- Not approve or issue any proposed or final rules or formal or informal guidance.
- Suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not commence, take additional investigative activities related to, or settle enforcement actions.
- Not open any new investigation in any manner, and cease any pending investigations.
- Not issue public communications of any type, including publication of research papers and compliance bulletins.
- Not approve or execute any material agreements, including related to employee matters or contractors.
- Not make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.
- Cease all supervision and examination activity.
- Cease all stakeholder engagement.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Russell T. Vought

# Exhibit E

| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) |
| **To:** | _DL_CFPB_AllHands |
| **Subject:** | Please Read: DC Headquarters Building Operating Status (2/10-2/14) |
| **Date:** | Sunday, February 9, 2025 1:39:00 PM |

(This message is for DC Headquarters Staff and Contractors)

Dear Colleagues:

The DC Headquarters Building will be closed this week (2/10-2/14).  Employees and contractors are to work remotely unless instructed otherwise from our Acting Director or his designee.

Thank you.

Adam

Adam Martinez
Chief Operating Officer

# Exhibit F

**From:** Vought, Russell
**To:** _DL_CFPB_AllHands
**Subject:** Additional Directives on Bureau Activities
**Date:** Monday, February 10, 2025 8:30:43 AM

Good morning, CFPB staff,

As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is ████████████████. Otherwise, employees should stand down from performing any work task. Thank you for your attention on this matter.

Best,

Russ Vought

Acting Director

Bureau of Consumer Financial Protection

# Exhibit G


Consumer Financial
Protection Bureau

1700 G Street NW, Washington, D.C. 20552

February 8, 2025

The Honorable Jerome H. Powell
Chairman, Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, D.C. 20551

Dear Chairman Powell:

The Consumer Financial Protection Act requires the Board of Governors of the Federal Reserve System to transfer each quarter an "amount determined by the Director to be reasonably necessary" for the Bureau of Consumer Financial Protection to carry out its authorities under law. 12 U.S.C. 5497(a)(1). In determining this amount, the Director must "take into account such other sums made available to the Bureau from the preceding year" or quarter. *Id.*

This letter is to inform you that for the Third Quarter of Fiscal Year 2025, the Bureau is requesting $0.

During my review of the Bureau's finances, I have learned that the Bureau has a balance of $711,586,678.00 in the Bureau of Consumer Financial Protection Fund. By law, I must take account of this sum when determining the amount "reasonably necessary" for the Bureau to fulfill its statutory authorities. *Id.* I have determined that no additional funds are necessary to carry out the authorities of the Bureau for Fiscal Year 2025. The Bureau's current funds are more than sufficient—and are, in fact, excessive—to carry out its authorities in a manner that is consistent with the public interest.

In the past, the Bureau has at times opted to maintain a "reserve fund" for financial contingencies. But no such fund is required by statute or necessary to fulfill the Bureau's mandate. The Bureau's new leadership will run a substantially more streamlined and efficient bureau, cut this excessive fund, and do its part to reduce the federal deficit.

Sincerely,

/s/ Russell T. Vought
Russell T. Vought, Acting Director

cc:    Patrick J. McClanahan, Chief Operating Officer, Board of Governors of the Federal Reserve System

**consumerfinance.gov**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL TREASURY EMPLOYEES UNION,** *et al.,*<br><br> *Plaintiffs*,<br><br>v.<br><br>**RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,** *et al.*,<br><br> *Defendants*. | No. 1:25-cv-00381-ABJ |

### SUPPLEMENTAL DECLARATION OF ADAM MARTINEZ

1. My name is Adam Martinez.  I am currently employed at the Consumer Financial Protection Bureau ("CFPB" or "the Bureau") serving as its Chief Operating Officer ("COO") and Acting Chief Human Capital Officer.  I previously submitted a declaration in this matter dated February 24, 2025.  I make this declaration based upon my personal knowledge and information provided to me in the course of my official duties.

2. For purposes of this declaration, I have reviewed Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 40; all of the supplemental declarations attached to Plaintiffs' Motion for Leave to File Supplemental Attachments in Support of their Motion for a Preliminary Injunction, ECF No. 38; as well as the supplemental declarations attached to Plaintiffs' Notice of Corrected Attachments, ECF No. 41.  I provide this declaration to clarify and expand upon my previous testimony in light of these materials.

3. I have reviewed the declaration that Alex Doe submitted in this case.  In her testimony, A. Doe describes deliberative and predecisional events occurring during the week of February 10, 2025, including a statement where I referenced the "closure of the agency."  I have also reviewed the declaration that Blake Doe submitted in this case.  In his testimony, B. Doe also describes deliberative and predecisional events occurring during the week of February 10, 2025, including a statement where I referenced a "wind down mode."  A. Doe's testimony and B. Doe's testimony regarding my statements are not inaccurate.  Prior to Russell Vought's designation as Acting Director of CFPB, agency staff had received guidance from DOGE-associated personnel consistent with those statements, which I believed at the time to reflect the position of agency leadership, and continued to believe to reflect agency leadership's position for a brief time thereafter.

4.      In the short time since then, and by the date that I submitted my earlier declaration, a great deal has evolved at the CFPB.  On the evening of February 7, 2025, Russell Vought was named Acting Director of the agency.  Rather than a closure of the agency, Acting Director Vought's new leadership has focused on running a substantially more streamlined and efficient bureau, refocusing its priorities, and "right sizing" the agency.  But, from my perspective, a very fluid situation continued during the week of February 10, 2025, as new leadership started to take control.  Time was needed for new leadership to refocus the Bureau.  By the time of my earlier declaration, however, the situation was somewhat more stable.  And now, the Acting Director and Chief Legal Officer are taking time to assess, listen, and explore the state of the Bureau.  Based on that assessment, new leadership continues to believe that there are substantially more employees than appropriate for a "right-sized" CFPB.  But the new leadership, including the Chief Legal Officer, have taken a methodical approach to handling the Bureau's operations and responding to senior executives who have recommended or requested guidance to perform each of the CFPB's critical statutory responsibilities.  Moreover, I have personally engaged with several of my colleagues to guide them through navigating the change and seeking clarification where and when its needed.

5.      Notably, the President has nominated Jonathan McKernan to serve as a permanent Director of the CFPB.  Mr. McKernan testified before the Senate Banking, Housing, and Urban Affairs Committee on February 27.  I believe that having a Senate-confirmed permanent Director for the CFPB will further ensure that the Bureau carries out its statutory responsibilities.

6.      B. Doe's testimony refers to an email dated February 11, 2025, in which I stated that the agency's Chief Financial Officer (CFO) had been in communication with the Federal Reserve.  As stated in my original declaration, the Bureau has not attempted to transfer any of its funds back to the Federal Reserve.  Moreover, I am not aware of a mechanism to transfer funds back to the Federal Reserve.  That said, CFPB's CFO did receive an inquiry about whether "excess" funds from the Bureau Fund could be transferred back to the Federal Reserve. He shared that as far as he was aware, it could not, and that the only mechanism in statute to account for unobligated funds is to offset future requests but, pursuant to that inquiry, he would conduct research, including communicating with the Federal Reserve to determine if there was any authority or mechanism from the Federal Reserve's perspective that he was unaware of.  Based on that research, he determined that there indeed is no authority or mechanism to transfer excess funds back to the Federal Reserve, to transfer excess funds to the Federal Reserve's control, or to transfer excess funds to the control of any other entity.  The agency has therefore not attempted to do so. The Bureau only transfers funds for the payment of expenditures incurred in the normal course of Bureau activities pursuant to its statutory obligations.  In fact, pursuant to Dodd Frank, the Bureau Fund is a separate fund established in the Federal Reserve, and most of the CFPB funds (both the Bureau Fund and the Civil Penalty Fund) reside at the Federal Reserve. Routinely the Federal Reserve completes cash disbursements at the CFPB's request to Treasury-held CFPB accounts for CFPB operating expenses.

7.    I have reviewed the declaration that Drew Doe submitted in this case. D. Doe testifies that unnamed "Senior Executives" told staff that the CFPB would "not exist[.]" D. Doe Decl. ¶ 7. In addition to not identifying the individuals, D. Doe does not identify the date when he claims these statements were made. D. Doe does not testify that those statements were premised on directives from Acting Director Vought or the CFPB Chief Legal Officer and I understand those statements to be inconsistent with their directives. It is also inconsistent with the President nominating a permanent Director of CFPB.

8.    I have reviewed the declaration that Matthew Pfaff submitted in this case, which is dated February 26, 2025. On February 27, 2025, the CFPB Chief Legal Officer activated work related to compliance with the agency's critical statutory responsibilities in the area of the Office of Consumer Response. Thus, as of February 27, 2025, members of the Escalated Case Management team, for example, are working. These actions and others are inconsistent with D. Doe's testimony suggesting that the agency will eliminate all positions except for five positions identified in the Dodd-Frank Act. Again, I am not aware of the identity of the "multiple Senior Executives" referenced in D. Doe's testimony, and D. Doe does not testify that those statements were premised on directives from Acting Director Vought or the CFPB Chief Legal Officer. I understand the statement referenced in paragraph five of D. Doe's declaration regarding an "intention of the leadership" to reduce CFPB staff to "everyone but the five positions required by the Dodd-Frank Act" to be inconsistent with Acting Director Vought and the Chief Legal Officer's directives.

9.    It is correct that the CFPB Ombudsman Office may not replace or directly resolve work conducted by the Student Loan Ombudsman position. And as I have previously testified, that position is currently vacant. But consumers may always utilize the CFPB Ombudsman Office for support. For example, if a consumer attempts to contact the Student Loan Ombudsman and receives no response, the consumer may always contact the CFPB Ombudsman to point out the non-responsiveness of the office and seek support. Again, the CFPB Ombudsman Office helps ensure that the CFPB continues to engage with the public.

\*\*\*

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 2nd day of March, 2025.

_____
Adam Martinez
Chief Operating Officer