**ORAL ARGUMENT ON MOTION SCHEDULED FOR APRIL 9, 2025**
**No. 25-5091**

# In the United States Court of Appeals
# for the District of Columbia Circuit

---

NATIONAL TREASURY EMPLOYEES UNION, et al.,
*Plaintiffs-Appellees,*

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer
Financial Protection Bureau, et al.,
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-0381-ABJ (The Hon. Amy Berman Jackson)

---

## PLAINTIFFS-APPELLEES' OPPOSITION TO
## MOTION FOR STAY

---

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0336

JULIE WILSON
*General Counsel*
PARAS N. SHAH
*Deputy General Counsel*
ALLISON C. GILES
*Assistant Counsel*
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

DEEPAK GUPTA
ROBERT FRIEDMAN
GABRIEL CHESS
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

WENDY LIU
ADINA H. ROSENBAUM
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

April 3, 2025                          *Counsel for Plaintiffs-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### (A) Parties and Amici

National Treasury Employees Union – Plaintiff-Appellee

National Consumer Law Center – Plaintiff-Appellee

National Association for the Advancement of Colored People – Plaintiff-Appellee

Virginia Poverty Law Center – Plaintiff-Appellee

CFPB Employee Association – Plaintiff-Appellee

Ted Steege – Plaintiff-Appellee

Eva Steege – Plaintiff, terminated on March 28, 2025, upon suggestion of death (Dkt. 83) and grant of motion for substitution (Dkt. 85))

Russell T. Vought, in his official capacity as Acting Director of the Consumer Financial Protection Bureau – Defendant-Appellant

Consumer Financial Protection Bureau – Defendant-Appellant

Tzedek DC – Amicus curiae

State of New York – Amicus curiae

203 Members of Congress  – Amicus Curiae

New Jersey, District of Columbia, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin– Amici curiae

Janice Wolk Grenadier – Filed motion to intervene in district court, motion denied

### (B) Rulings Under Review

03/28/2025 Memorandum Opinion (Judge Amy Berman Jackson) – Dkt. 87.

03/28/2025 Order (Judge Amy Berman Jackson) – Dkt. 88.

## (C) Related Cases

This case was before the district court as case No. 1:25-cv-00381-ABJ. The defendants appealed the district court's preliminary injunction order, and that appeal is before this Court as No. 25-5091.

April 3, 2025

Respectfully submitted,
*/s/ Deepak Gupta*
DEEPAK GUPTA
*Counsel of Record*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

# TABLE OF CONTENTS

Certificate as to parties, rulings, and related cases ..................................................i

Introduction..............................................................................................................1

Statement.................................................................................................................4

Argument................................................................................................................11

    I.   The defendants have not made a strong showing that they are likely to succeed on appeal. ......................................................................................11

        A. The district court's injunction is tailored to its factual findings about the defendants' violation. ............................................................12

        B. The defendants' contrary arguments are meritless. ...............................16

    II.  The defendants have not satisfied the other stay factors.............................20

    III. The defendants are not entitled to a partial stay...........................................22

Conclusion.............................................................................................................22

## INTRODUCTION

This motion presents not a clash of legal principles but a clash of fact and fiction. Not once do the defendants try to reconcile their imagined reality with the district court's extensive factual findings, which were based on dozens of declarations, hundreds of pages of internal documents, and a two-day evidentiary hearing at which the testimony of the defendants' sole witness crumbled.

Chief Operating Officer Adam Martinez admitted under oath that key statements in his declarations were not true. His testimony, the court found, "bore no resemblance to the impression his declaration had been drafted to convey" and was "highly misleading, if not intentionally false." Op. 65-66. The problem wasn't just Martinez. The defendants' case was "so disingenuous that the Court [was] left with little confidence that the defense can be trusted to tell the truth about anything." *Id.*

Despite all this, the defendants' factual representations to this Court rest entirely on Martinez's discredited declarations—as if the proceedings below never occurred. They ignore the central finding of the court's 112-page decision: Acting Director Vought's "plan to shut the agency down entirely and do it fast" remains unchanged, merely paused by judicial intervention. Op. 2.

The record assembled in the district court documents in extensive detail Vought's systematic efforts to dismantle the CFPB. Within just one week of assuming

control, he implemented a comprehensive shutdown plan. He closed the headquarters and every other Bureau office, issued a sweeping stop-work order instructing all staff to "stand down," fired more than 200 employees, ordered the wholesale cancellation of nearly every Bureau contract, and placed virtually the entire agency on administrative leave while rushing to terminate the remaining 1,500 career staff.

Only this litigation prevented Vought from completing his plan. But preparation to complete the plan has continued. The "RIF team"—the team charged with implementing the mass terminations—continues to meet regularly. Op. 70-74, 84. And Martinez told colleagues that "within 30 days," the Bureau would be "wiped out." Op. 23.

Because there is no way to defend this conduct as lawful, the defendants try to rewrite history. Martinez submitted a declaration claiming that the Bureau was merely in transition and "committed to performing its statutory obligations." Dkt. 31-1 at 5. But, on cross-examination, he did an about-face: He admitted he had "no insight" into what statutory work was being done, conceded that statements in his declaration were untrue, and testified that "but for the Court's order, the agency would already have been gone." Op. 76, 92-93.

The defendants don't dispute that their actions likely violated the Constitution's separation of powers and the Administrative Procedure Act. Rather,

their sole argument is that the injunction should have been narrower. But each provision directly corresponds to a specific unlawful action that they took to dismantle the Bureau. The injunction prohibits data deletion to prevent irretrievable loss of agency records; rescinds the stop-work order to end the agency-wide paralysis; prohibits terminations except for cause to prevent the defendants from carrying out their planned mass firings; maintains consumer response operations to prevent the statutory complaint system from "collapse"; and unwinds wholesale contract cancellations to prevent permanent loss of services that "cannot just be turned back on." Op. 102.

This injunction does not dictate policy decisions. It merely prevents the defendants from carrying out their documented plan to eliminate the CFPB. The defendants fail to identify any "certain and great" harm that would occur during an expedited appeal. And their claim of "irreparably burdening" executive authority rings hollow when they voluntarily agreed to nearly all of the relief the district court ordered for over a month. Nor do the defendants contest that irreparable harm would result if they closed the agency. Instead, they simply repeat their discredited claim that "CFPB will remain open"—citing the same Martinez declaration the district court found "highly misleading, if not intentionally false," Op. 65; *see* Stay Opinion 3 (finding "cited statements ... not worthy of belief").

In reality, as the Supreme Court has recognized, "eliminat[ing] the CFPB" "would trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena." *Seila Law LLC v. CFPB*, 591 U.S. 197, 237-37 (2020). The injunction here does exactly what preliminary injunctions are designed to do: preserve the status quo until the court can rule on the merits. As the district court explained, "Once the agency is gone, there will be no opportunity to afford relief at a later point in the litigation." Op. 101.

For the reasons explained in the motion to strike, this Court should deny the stay motion for failure to comply with Rule 8. But, either way, it should deny a stay because the defendants cannot satisfy a single stay factor—let alone all of them.

## STATEMENT

***"Wind-down mode"—the "plan to shut the agency down entirely and do it fast."*** Russell Vought was appointed Acting Director of the CFPB on Friday, February 7. And within days, he brought the agency to the brink of closure: no offices, no contracts, no work, and—if this lawsuit hadn't been filed when it was—no employees. Op. 14-22. As the district court found, and the evidence demonstrated, the plan was to "completely wipe[] out" the agency. Op. 76. And as Martinez testified, that would have been "irreparable." *Id.*[1]

---

[1] Cites to Op. are the district court's preliminary injunction opinion, to Order are to the injunction order, to Stay Opinion are to the district court's opinion on the stay motion, and to Dkt. are to the district court docket.

***"Stand down from performing any work task."*** On February 10, the Monday after his appointment, Vought instructed all staff and contractors to "stand down from performing *any* work task"—no exceptions for statutorily mandated work. Op. 14. Based on this order, virtually all agency employees were placed on administrative leave. Op. 44-45. And the agency's work ground to a halt. Op. 85-88. "[E]mployees understood that no work meant no work." Op. 42. So too did the defendants. Op. 14 n.4. In fact, the agency set up a tip line—endorsed by Vought himself—to report employees working in "violation of Acting Director Russ Vought's stand down order." Op. 18.

***"The cancellation of all contracts."*** The day after Vought issued his stop-work order, he directed the Bureau to cancel virtually all of its contracts. Op. 17. Contrary to the defendants' assertion (at 7), the agency didn't cancel only "non-essential contracts." Vought's directive required the cancellation of *every* contract in Consumer Response, Enforcement, Supervision, External Affairs, and the Director's Office (among others)—even though Bureau staff had identified many of these contracts as critical to the Bureau's statutory duties. Op. 17, 32.

The Bureau's contracting officers were instructed to work overtime to "get these Termination Notifications out ASAP." Op. 17, 68. And because the whole point was to shut down the Bureau, the "termination letters did not include instructions to vendors to preserve their data or records." Op. 68

These termination notices stopped work and payment on the contracts. *See* Op. 55 (citing contract termination notice at Dkt. 60-1, Ex. D, ordering contractor to "stop work" and "incur[] no additional costs"). But they could be rescinded. Dkt. 38-4 at 3-4. So in advance of the preliminary injunction hearing, the defendants instructed the contracting officers to finalize the contract terminations as fast as possible—even ignoring requirements like getting the vendor's signature or consulting with legal—so that their termination could not be undone. *Id.*

***"We cannot wait until COB"—the rush to fire all staff.*** On February 11—the same day as the contract cancellations—the defendants fired all probationary employees, citing as a justification Vought's February 10 stop-work order. Op. 16, 44. Two days later, they fired all term-limited employees, offering the same justification. Op. 18, 44.

With these firings under way, a mass termination team—called the "RIF team"—was formed to fire everyone else. Op. 17, 75.  On February 13, two Vought deputies from the Department of Government Efficiency, following discussion with Vought, instructed the RIF team that more than 1,000 people must be fired the next day. Op. 17-18.

Within two hours, Martinez emailed the Office of Personnel Management to request an exemption from the notice requirement for reductions in force, again citing the stop-work order. Op. 18. In an attached memo, he outlined the agency's

6

two-phase plan for firing the rest of its employees. *Id.* Phase 1, which would take place the next day, would terminate approximately 1,200 employees by "eliminating whole divisions, offices, and units"—leaving little more than a "skeleton crew." Op. 18, 43, 69; Dkt. 67, Ex. JJ. Phase 2 would fire that skeleton crew, including Martinez himself. Op. 21.

But this lawsuit interrupted Vought's plan. The night before the Phase 1 termination notices were set to go out, news of Vought's plan leaked, and the plaintiffs moved for a temporary restraining order. Dkt. 10. The district court quickly scheduled a status conference for February 14 (the day the termination notices were supposed to be sent). Op. 19. When a member of the RIF team notified Martinez of the status conference, the defendants didn't pause their plans—they sped up. Op. 20. Terminations, they urged, could no longer "wait until COB." *Id.*

But they weren't fast enough. During the status conference, the defendants agreed to a consent order prohibiting the defendants from terminating any employees except for cause, deleting CFPB data, or transferring funds out of the CFPB (except for ordinary operating expenses). Dkt. 19. After the plaintiffs learned of the Bureau's rush to finalize contract terminations, the defendants also agreed to halt termination actions. Dkt. 41-2.

***"Little confidence that the defense can be trusted to tell the truth about anything."*** Unable to defend the lawfulness of closing an agency Congress

created, the defendants' opposition to the preliminary injunction motion took a different tack: It pretended that had never happened. The defendants ignored the February 10 stop-work order, relying instead on a prior email to claim that all Vought had done was "pause" activities that were not statutorily required. Dkt. 31, at 3, 25. They made no mention of cancelling the Bureau's contracts en masse or the effort to fire 1,200 employees that had taken place just days earlier. Instead, they claimed, the Bureau was operating as normal during a presidential transition, and its new leaders were "committed to having CFPB performing statutory obligations." *Id.* at 3; Dkt. 31-1, at 5. In making this claim, they relied on a declaration from Martinez. Dkt. 31-1.

But Martinez's declaration was quickly proven false. Multiple employees submitted declarations testifying that, in fact, the Bureau was—in Martinez's own words—in "wind-down" mode. Dkt. 38-2-38-8. They detailed the plan to cancel the Bureau's contracts and fire all of its employees. *Id.* And they explained how the stop-work order had halted critical work across the agency. *Id.* These declarations, the court found, "blew huge holes in [Martinez's] assertions." Op. 91.

Just before the preliminary-injunction hearing, Martinez submitted a supplemental declaration conceding that the testimony about the efforts to close the agency was "not inaccurate." Dkt. 47-1, at 1. No longer able to conceal the attempt to dismantle the CFPB, Martinez changed course, claiming that these events

8

occurred "during the week of February 10, 2025" based on "guidance from DOGE-associated personnel" "[p]rior to" Vought's appointment. *Id.* "In the short time since then, and by the date that [he] submitted [his] earlier declaration," he asserted, "a great deal ha[d] evolved." *Id.* at 2.

But these statements, too, were quickly proven false. At the evidentiary hearing, Martinez conceded that when he filed his declarations, he couldn't have known whether the agency was performing its statutory functions because his position gives him "no insight" into the offices responsible for performing statutorily required work. Op. 91-94. He simply based his assertions on whatever Chief Legal Officer Mark Paoletta told him. Op. 93. And those assertions, he admitted, were simply not true. *See, e.g.*, *id.* (conceding that when he filed his declaration, "most of the statutory functions were not up and running"); March 10 Tr. at 203.

The suggestion in Martinez's declaration that the attempt to close the agency "was all a misunderstanding" also could not withstand scrutiny. Op. 91. Unrefuted evidence, including, again, Martinez's own testimony, demonstrated that "current leadership was the engine behind the shutdown." *Id.* The shutdown started after Vought took over; Vought issued the stop-work order; Vought approved the tip line; Vought directed the cancellation of contracts; Vought cancelled the leases on CFPB buildings; and when the RIF team was having discussions with DOGE personnel,

those personnel were acting at Vought's direction and keeping Vought apprised. Op. 14-26, 91-97.

And while Martinez's declaration suggested that the attempt to shut down the agency was short-lived, the evidence—yet again including his own testimony—demonstrated otherwise. Op. 73. Well after the week of the 10th, the CFPB continued to be paralyzed—and its leadership continued to plan the agency's demise. *See* Op. 23, 73-84. The agency was "legitimately shutting down"—the defendants were just waiting for the district court's order to be lifted. Op. 23, 29, 74, 84. In fact, the RIF team still continues to meet, planning to execute mass terminations if and when the injunction is lifted. Op. 93-94.

The defendants pointed to a flurry of emails sent just before the preliminary-injunction hearing, "purporting to get things up and running again." Op. 89. But those emails, the court found, "could not be taken at face value." *Id*. For example, Paoletta wrote an email the day before the hearing purporting to be surprised that CFPB employees weren't working. Op. 84-85. But that email, the court explained, contained "a stunning mischaracterization of the February 10 [stop-work] order"—it suggested that the stop-work order did not actually stop work. *Id*. That description "cannot be squared with the plain language of the Vought directive, nor is it consistent with the manner in which the February 10 order was understood by the staff, implemented by the agency, or used to justify massive layoffs." Op. 85. And, in

any event, "employees found out that being reactivated on paper" in advance of a court hearing "did not mean they could actually do the work." Op. 89.

Ultimately, the court concluded that the defendants' "attempts to deny what was afoot are at odds with the undisputed facts in the record and the documents produced by both sides." Op. 47. Martinez's first declaration was "highly misleading, if not intentionally false." Op. 65. His live testimony "bore no resemblance to the impression his declaration had been drafted to convey." Op. 66. And the defendants' "eleventh hour attempt to suggest immediately before the hearing that the stop work order was not really a stop work order at all was so disingenuous that the Court [was] left with little confidence that the defense [could] be trusted to tell the truth about anything." *Id.*

In sum, the court found, "[t]he evidence reveals that: the defendants were in fact engaged in a concerted, expedited effort to shut the agency down entirely when the motion for injunctive relief was filed; while the effort to do so was stalled by the Court's intervention, the plan remains unchanged; and the defendants have absolutely no intention of operating the CFPB at all." *Id.*

## ARGUMENT

## I.  The defendants have not made a strong showing that they are likely to succeed on appeal.

The defendants have not made any showing—let alone the strong showing required for a stay—that they are likely to succeed on appeal. They do not even try

to dispute the district court's conclusion that the defendants' actions likely violated the separation of powers and the Administrative Procedure Act. Nor do they make any other argument that *any* of the preliminary injunction factors were not satisfied.

The defendants' sole likelihood-of-success argument is that the preliminary injunction should have been narrower. But the preliminary injunction is precisely tailored to restore the status quo by undoing the actions the defendants took to dismantle the Bureau—and prevents the defendants from trying again during the pendency of this case. That is exactly what a preliminary injunction is supposed to do. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022).

As the district court put it: "Absent an injunction freezing the status quo—preserving the agency's data, its operational capacity, and its workforce—there is a substantial risk that the defendants will complete the destruction of the agency completely in violation of law well before the Court can rule on the merits, and it will be impossible to rebuild." Op. 2.

## A.     The district court's injunction is tailored to its factual findings about the defendants' violation.

"Crafting a preliminary injunction is an exercise of discretion and judgment." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025). It is therefore reviewed for abuse of discretion. *Huisha-Huisha*, 27 F.4th at 726. The defendants cannot demonstrate that they are likely to succeed in showing that the district court abused its discretion by crafting an injunction that simply mirrors their illegal conduct—conduct that, the

court found, would immediately recur absent an injunction. Op. 107-08; *cf. Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969) ("[A] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed.").

**Data deletion** (**Paragraph 1**). The defendants have nothing to say about this provision. And with good reason. The court found, based on extensive evidence, that the defendants' actions to shut down the agency risked permanently and irretrievably losing or destroying CFPB data and records. Op. 68, 76-77, 90, 103-04.

**Indiscriminate mass firings** (**Paragraphs 2 & 3**). The defendants tried to fire virtually all of the CFPB's employees, and they "remain poised" to do so again. Op. 102. By prohibiting the defendants from executing their mass termination plan and ordering the reinstatement of those they already indiscriminately fired, the district court merely restored the status quo and prevented the defendants from taking what Martinez himself testified would be an "irreparable" step to destroy the agency. Op. 76.

**Work stoppage** (**Paragraphs 4 & 5**). The defendants ordered CFPB employees to "stand down from performing *any* work tasks," and placed virtually the entire staff on administrative leave. Op. 42, 44-45, 66. The district court did the only thing it could to restore the status quo and prevent the defendants from shutting down the agency by shutting down its employees: It rescinded the stop-work order,

prohibited the defendants from instituting a new one, and ordered that the defendants not circumvent this prohibition by taking from employees the tools they need to actually perform work. *See* Stay Opinion 4.

Contrary to the defendants' assertion (at 21), these provisions do not "require[] the continuation of all Bureau activities as of January 19, 2025." The injunction doesn't prohibit the defendants from stopping particular activities—or deciding what Bureau employees work on. It prohibits the defendants from stopping employees from working on anything at all.

**Consumer response (Paragraph 6).** The district court found that, absent the court's intervention, the defendants' actions would cause the statutorily required consumer-response system to "collapse." Op. 81, 102. Indeed, after just a couple weeks of Vought's stop-work order, 16,000 consumer complaints went unaddressed, 250 referrals from Congress went unanswered, and 75 requests for help with imminent foreclosures were ignored. Op. 82. The defendants do not dispute that disabling the consumer-response division was unlawful. The order merely prohibits them from doing it again.

**Contract terminations (Paragraph 7).** In their effort to close the CFPB, the defendants rushed to terminate nearly all of the agency's contracts. Op. 67-68. Their "shoot first [] ask questions later" approach led to chaos, risked permanent data loss, and continues to impair the Bureau's performance of its statutory functions.

14

*Id.* at 78, 90, 104. Accordingly, the court ordered the defendants to unwind the wholesale contract terminations, and prohibited them from "reinitiat[ing]" it. Order 3. But the injunction allows the defendants to issue a stop-work order on any contract they believe, "based on an individualized assessment," "is unnecessary for the agency to fulfill its statutory functions." *Id.* Thus, contrary to the defendants' assertions (at 17-18), the order allows them to halt a vendor's work and the CFPB's payment obligations. *See supra* 5. What it prohibits is "*finaliz[ing]* the termination of any contract," such that it cannot be reinstated at the end of the case. Order 3 (emphasis added); Stay Opinion 4.

**Certification of compliance (Paragraph 8).** The district court also included a generic requirement that the defendants inform the court of their compliance with the order within a week. Order 3. There is nothing unusual about a preliminary injunction requiring speedy compliance, and it was particularly necessary here because the parties' consent order protecting the agency's employees had expired. In addition, because the defendants had already agreed to most of the relief the district court granted, they'd already complied with most of the injunction. And, largely due to a different court's order, the defendants have also already reinstated the terminated employees. The defendants do not say why, given that they've already largely complied, the compliance deadline presents a problem.

### B.    The defendants' contrary arguments are meritless.

In arguing otherwise, the defendants rely on an account of the facts that the district court—and the defendants' own witness—rejected, and describe an order that the district court did not issue.

**1.** The defendants' primary argument is that the district court had nothing to worry about. After all, the defendants *said* that the "Bureau will remain open and continue to perform its statutory functions." Mot. Stay 1. But the defendants base their claim that the Bureau has a newfound commitment to performing its statutory functions on Martinez's declaration, which the district court found was "highly misleading" and Martinez himself disavowed. Op. 65, 92.

And when asked, the defendants could not even tell the court what the statutory functions they claimed to be complying with were. Op. 97-98. The court concluded that "[t]he defendants cannot expect the Court to be comforted by their recent announcement to employees that they should perform their statutory functions when they are simultaneously insisting" that they do not "know[] what [that] means." Op. 98-99.

Indeed, over and over again, the court found, the defendants sought to mislead it about their compliance with the law. The defendants' claims, the court concluded, are "highly misleading, if not intentionally false," "inconsistent with the agency's own contemporaneous records," and "disingenuous."  Op. 65, 86. The defendants do not

16

even try to argue that the district court's factual findings rejecting their made-for-court narrative were clearly erroneous. *Awad v. Obama*, 608 F.3d 1, 6 (D.C. Cir. 2010) ("factual findings" reviewed "for clear error"). Nor do they challenge the district court's credibility findings, which "are entitled to the greatest deference from this court on appeal." *United States v. Broadie*, 452 F.3d 875, 880 (D.C. Cir. 2006).

The court's finding that the defendants attempted to conceal their ongoing effort to close the agency only further supports the injunction. When tailoring injunctive relief, "breadth is warranted to prevent further violations where, as here, a proclivity for unlawful conduct has been shown." *United States v. Philip Morris*, 566 F.3d 1095, 1137 (D.C. Cir. 2009). And in assessing the risk of future violations, courts "consider[] [] the *bona fides* of the [defendants'] expressed intent to comply." *Jud. Watch v. Dep't of Homeland Sec.*, 895 F.3d 770, 783 (D.C. Cir. 2018).

The court found that the defendants' expressed intent to comply was a sham. Op. 97-99. Thus, anything narrower than the district court's order "would give tremendous impetus to the program of experimentation with disobedience of the law," whereby "the defendants work out a plan that was not specifically enjoined" and proceed with their original scheme. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).[2]

---

[2] Even in a counterfactual world, where the defendants weren't *currently* seeking to close the agency, voluntary cessation does not preclude injunctive relief so

**2.** Next, the defendants complain that the preliminary injunction should have "track[ed] any specific CFPB duties Congress made obligatory." Mot. 2. But the defendants "seem to forget" that they strenuously argued to the district court that such an injunction would be unlawful. *See* Stay Opinion 2; Op. 96; March 11 Tr. 121. And also, they contended, they would not even "know what [it] mean[s]." Op. 97-98. Litigants may not tell a district court that it may not enter an order and then turn around and tell this Court that the district court erred by not entering it.

Nor may they complain that the district court's order should have been narrower, when they refused to ever say how. *See J.D. v. Azar*, 925 F.3d 1291, 1335 (D.C. Cir. 2019).[3] "[T]he district court did not need to propose a range of conceivable policies to the government until the government found one to its liking." *Id.* District courts, faced with harmful, unlawful agency actions, may enjoin those actions. *See id.* They are "not require[d] ... to fashion narrower, ostensibly permissible policies from whole cloth." *Id.*

**3.** The defendants' final gambit (at 21) is to claim that the district court's order "require[s] the continuation of all Bureau activities as of January 19, 2025,"

---

long as "there exists some cognizable danger of recurrent violation." *Jud. Watch*, 895 F.3d at 783. The district court had no trouble concluding that if allowed to do so, the defendants' illegal effort to close the agency would immediately resume. Op. 2-3.

[3] The only suggestion the defendants ever made was that the court prohibit them from firing virtually everyone and shuttering Consumer Response "at once." Dkt. 31 at 40. Of course, that would still allow them to dismantle the agency in phases, just as they intended to before this lawsuit.

18

removing the defendants' discretion to set the agency's agenda. That's wrong. *First*, the defendants' "description of the Order is at odds with [its] terms." Stay Opinion 2. As explained above, it doesn't force the agency to keep paying for all its contracts; it requires the defendants not to irretrievably *finalize* their termination. It doesn't mandate that the agency continue the specific work it was doing before Vought began the shut-down; it prohibits the agency from stopping all work. And it doesn't require that the agency enable employees to use specific software; it requires the agency to give employees *some* tool through which they can work. Stay Opinion 4.

*Second*, the status quo ante is not January 19, 2025. It's February 10, 2025, when Vought issued the stop-work order. Stay Opinion 3-4. The district court did not find anything "problematic" with the actions taken by prior President Trump appointee Bessent, and did not enjoin them. *See id.*

And, *finally*, besides requiring the agency to ensure the functionality of consumer response—a statutorily mandated division—the district court did not order that the CFPB undertake any specific activities or pursue any specific agenda. Rather, the court explicitly recognized that it was up to the defendants to decide what enforcement actions to bring (or dismiss), what examinations to undertake, what rules to write—that is, it was up to the defendants to direct what activities the agency should undertake and what policies the agency should pursue. Op. 107. The

preliminary injunction does not order otherwise. It just ensures that whatever policies the defendants choose to pursue, there will be an agency to pursue them.

## II.    The defendants have not satisfied the other stay factors.

*Lack of irreparable harm to the defendants.* To justify a stay, the movant must show they will suffer irreparable harm that is "both certain and great" before the appeal is over. *KalshiEX v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024). But the defendants voluntarily *agreed* to the core relief in the preliminary injunction order *for six weeks* to avoid having to litigate on a more expedited basis. *See* Dkt. 19, 38-16, 65, 69, 71 (agreeing to prohibition on data deletion, contract terminations, and mass personnel terminations). The defendants do not explain how relief that was previously anodyne enough to remain in place for over a month has suddenly become so *irreparably* harmful that it cannot remain in place through an expedited appeal. Nor do the defendants identify any specific additional relief in the preliminary injunction that will cause them irreparable harm. Indeed, they have already reinstated the previously fired employees—in large part due to a court order in another case. *See* Dkt. 82. And they claim to not be implementing the stop-work order anyway. The defendants do not explain how they will be irreparably harmed by continuing to do what they have been doing for weeks.

In fact, the *only* irreparable harm the defendants claim is the generic assertion that the order "irreparably burdens the President's political accountability and

authority to 'take Care that the Laws be faithfully executed.'" Mot. Stay 23. But the defendants do not dispute the district court's conclusion that their actions were likely unlawful. Requiring the government not to take *unlawful* actions while an appeal is pending cannot possibly "irreparably burden" the President's authority to "take Care that the Laws be faithfully executed." *See New Jersey v. Trump*, --- F.4th ----, 2025 WL 759612, at *7 (1st Cir. 2025) (rejecting similar argument where the government did not argue "that it is likely to succeed in showing that [its actions were] lawful").

**Balance of the equities and the public interest.** The defendants don't dispute that dismantling the CFPB would seriously harm the plaintiffs and the public. Nor could they. After just a couple weeks of Vought's stop-work order, consumer response was on the verge of breaking down—thousands of consumers, including hundreds of people referred by Congress, were abandoned. Shuttering the agency would "be devastating" not only "for consumers," but for "small businesses, and the country's overall financial stability." Op. 110. It assists financial institutions in meeting their statutory obligations. Op. 76-77 & n.20. As the Supreme Court itself has recognized, "eliminat[ing] the CFPB" would "trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena." *Seila*, 591 U.S. at 237.

The defendants can't argue otherwise. So instead, they repeat their refrain that if given the power to close the agency—to terminate all their employees and

contracts and stop work—they won't use it. Mot. Stay 24. But, again, the district court found that wasn't true.

## III.   The defendants are not entitled to a partial stay.

The defendants' request (at 24–27) for a partial stay fails for the same reasons that their broader request fails. Each provision they ask this Court to stay was tailored by the district court to prevent the defendants from completing their dissolution of the CFPB. And, again, several of the provisions are ones they've previously agreed to. If those orders so "severely intrude[d] on the agency's day-to-day operations" that they "irreparably burden[ed] the" executive branch, it's hard to see how the defendants could have lived with them for the past nearly two months. *Contra* Mot. Stay 23–24. At the very least, this Court should not stay provisions that the defendants previously consented to.

## CONCLUSION

This Court should deny the stay.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
ROBERT FRIEDMAN
GABRIEL CHESS
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

22

*deepak@guptawessler.com*

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

WENDY LIU
ADINA H. ROSENBAUM
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

JULIE WILSON
*General Counsel*
PARAS N. SHAH
*Deputy General Counsel*
ALLISON C. GILES
*Assistant Counsel*
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

April 3, 2025                                    *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

I hereby certify that my word processing program, Microsoft Word, counted 5,200 words in the foregoing brief, exclusive of the portions excluded by Rule 32(f). The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface in 14-point Baskerville font.

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta