**[ORAL ARGUMENT SCHEDULED MAY 16, 2025]**

**Nos. 25-5091, 25-5132**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––––––––––––

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees,*

*v.*

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

––––––––––––––––––

On Appeal from the United States District Court
for the District of Columbia

––––––––––––––––––

**JOINT APPENDIX
VOLUME II**

––––––––––––––––––

DEEPAK GUPTA
ROBERT FRIEDMAN
GABRIEL CHESS
  *Gupta Wessler LLP*
  *2001 K Street NW*
  *Suite 850 North*
  *Washington, DC 20006*
  *(202) 888-1741*

JENNIFER D. BENNETT
  *Gupta Wessler LLP*
  *505 Montgomery Street*
  *San Francisco, CA 94111*
  *(415) 573-0336*

*Counsel for Plaintiffs*

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
CATHERINE PADHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7712*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5091*

*Counsel for Defendants*

*(additional counsel listed on inside cover)*

JULIE WILSON
  *General Counsel*

PARAS N. SHAH
  *Deputy General Counsel*

ALLISON C. GILES
  *Assistant Counsel*
  *National Treasury Employees Union*
  *800 K Street NW, Suite 1000*
  *Washington, DC 20001*
  *(202) 572-5500*

WENDY LIU
ADINA H. ROSENBAUM
  *Public Citizen Litigation Group*
  *1600 20th Street NW*
  *Washington, DC 20009*
  *(202) 588-1000*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

## VOLUME I

Docket Report ................................................................JA1

Amended Complaint (Dkt. 7)..............................................JA18

Kaspar Decl. (Dkt. 14-1) ..................................................JA50

Bross Decl. (Dkt. 14-3) ....................................................JA56

Meyer Decl. (Dkt. 14-4)....................................................JA60

Speer Decl. (Dkt. 14-5) ....................................................JA70

Dubois Decl. (Dkt. 14-6) ..................................................JA77

Second Meyer Decl. (Dkt. 18) ...........................................JA96

Order (Dkt. 19)..............................................................JA99

Feb. 10 Email (Dkt. 23-4) ...............................................JA101

Martinez Decl. Feb. 24 (Dkt. 31-1)  .................................JA102

Alex Doe Decl. (Dkt. 38-2) .............................................JA124

Blake Doe Decl. (Dkt. 38-3)  ...........................................JA127

Charlie Doe Decl. (Dkt. 38-4) .........................................JA129

Drew Doe Decl. (Dkt. 38-5) ...........................................JA134

Scott Decl. (Dkt. 38-6)  .................................................JA138

Pfaff Decl. (Dkt. 38-7) ..................................................JA142

Shearer Decl. (Dkt. 38-8) ...............................................JA155

Third Meyer Decl. (Dkt. 38-9)..........................................JA167

Barnard Decl. (Dkt. 38-10) ................................................................JA183

Salas Decl. (Dkt. 38-11) ..................................................................JA192

Halperin Decl. (Dkt. 38-12) .............................................................JA197

Frotman Decl. (Dkt. 38-13) ..............................................................JA203

West-Tillman Decl. (Dkt. 38-14) ......................................................JA217

Coll Decl. (Dkt. 38-15)....................................................................JA219

Diotalevi Decl. (Dkt. 41-1) ..............................................................JA223

Martinez Decl. March 2 (Dkt. 47-1) .................................................JA240

Second Pfaff Decl. (Dkt. 48-2)..........................................................JA243

Emory Doe Decl. (Dkt. 48-3) ...........................................................JA246

Francis Doe Decl. (Dkt. 48-4) ..........................................................JA248

Greer Doe Decl. (Dkt. 48-5)..............................................................JA251

CFPB Emails (Dkt. 56-1) .................................................................JA283

Communications Index (Dkt. 57-1) ...................................................JA399

Plaintiffs' Filed Communications (Dkt. 60-1) ....................................JA401

Plaintiffs' Supplemental Communications (Dkt. 66-1)...........................JA510

Plaintiffs' Supplemental Index (Dkt. 67) ...........................................JA570

Notice of Proposed Order (Dkt. 79)...................................................JA630

## VOLUME II

Preliminary Injunction Opinion (Dkt. 87) .................................................JA633

Preliminary Injunction Order (Dkt. 88) ....................................................JA745

Notice of Appeal (Dkt. 89) .......................................................................JA748

Stay Order (Dkt. 102) ...............................................................................JA750

Paoletta Decl. (Dkt. 109) ..........................................................................JA755

Order (Dkt. 113)........................................................................................JA892

Notice of Appeal (Dkt. 115) .....................................................................JA899

March 10 Transcript ..................................................................................JA900

March 11 Transcript ................................................................................JA1175

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RUSSELL VOUGHT *in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al.*, <br><br> Defendants. | Civil Action No. 25-0381 (ABJ) |

## <u>MEMORANDUM OPINION</u>

*"CFPB RIP"*
Elon Musk – February 7, 2025

*"The CFPB has been a woke and weaponized agency against disfavored industries and individuals for a long time. This must end."*
Russell Vought – February 8, 2025

*"That was a very important thing to get rid of."*
President Donald Trump – February 10, 2025

The motion for preliminary injunction to be decided boils down to one question: should the Court take action to preserve the the Consumer Financial Protection Bureau now, before the case concerning its fate has been resolved? That is an extraordinary step, and before it can step in, the Court must conclude that the plaintiffs are likely to succeed on their claims, that they would suffer irreparable harm in the meantime if the Court lets the lawsuit run its course, and that an injunction would be in the public interest.

The Court has made those findings, and the answer is an overwhelming yes: the Court can and must act.

The evidence presented in connection with the motion – the testimony of the agency's Chief Operating Officer and other witnesses, and the agency's own documents, produced by both sides – showed that Russell Vought, the Acting Director of the CFPB, ordered all employees to stop work on February 10, 2025. As of that date, the defendants were fully engaged in a hurried effort to dismantle and disable the agency entirely – firing all probationary and term-limited employees without cause, cutting off funding, terminating contracts, closing all of the offices, and implementing a reduction in force ("RIF") that would cover everyone else. These actions were taken in complete disregard for the decision Congress made 15 years ago, which was spurred by the devastating financial crisis of 2008 and embodied in the United States Code, that the agency must exist and that it must perform specific functions to protect the borrowing public. The elimination of the agency was interrupted only because plaintiffs sought and obtained the Court's intervention on the day the overwhelming majority of the employees were going to be fired.

That slowed, but did not deter, the defendants. The shut down activities continued for the next two weeks, and it wasn't until the Sunday afternoon before the Monday when the Court was scheduled to hold a hearing that agency officials turned around and announced to the surprised staff that they were supposed to have been performing their statutorily mandated duties all along.

The testimony and the contemporaneous documents suggest that those last minute communications were nothing more than window dressing, and that nothing has changed. The defendants are still engaged in an effort to implement a Presidential plan to shut the agency down entirely and to do it fast. Absent an injunction freezing the status quo – preserving the agency's data, its operational capacity, and its workforce – there is a substantial risk that the defendants will complete the destruction of the agency completely in violation of law well before the Court can rule on the merits, and it will be impossible to rebuild.

It may be that defendants decided to authorize the resumption of some work and the reactivation of some contracts in light of a belated, but genuine recognition that there were certain duties that had to be performed to comply with the law while the agency was still open. The material in the record and the chronology suggest, though, that the change of heart was more likely a charade for the Court's benefit. Either way, it's purely temporary; the Court's oversight is the only thing holding the defendants back. If the Court denies the motion for interim relief, the RIF

notices that have already been prepared will go out before the ink is dry on the Court's signature, the employees will be back on administrative leave for just thirty days before they are gone, and the defendants will pull the plug on the CFPB.

This is precisely the sort of situation preliminary injunctions were designed to address. If the defendants are not enjoined, they will eliminate the agency before the Court has the opportunity to decide whether the law permits them to do it, and as the defendants' own witness warned, the harm will be irreparable.

*    *    *

On February 9, 2025, Plaintiffs National Treasury Employees Union ("NTEU"), National Consumer Law Center ("NCLC"), National Association for the Advancement of Colored People ("NAACP"), Virginia Poverty Law Center, Rev. Eva Steege, and the CFPB Employee Association filed this action against the Acting Director of the CFPB, Russell Vought, and the CFPB itself. *See* Compl. [Dkt. # 1]. Plaintiffs challenge decisions made and actions taken by the defendants to carry out President Trump's vow to have the Consumer Financial Protection Bureau ("CFPB") "totally eliminated." *See* Am. Compl. ¶ 47, n.14, citing Joey Garrison (@joeygarrison), X (Feb. 10, 2025), https://x.com/joeygarrison/status/1889132023933022283?Mx=2.

Pending before the Court is plaintiffs' motion for a temporary restraining order, Pls.' Mot. for TRO [Dkt. # 10], which, with the parties' consent, was deemed to be a motion for preliminary injunction. *See* Order [Dkt. # 19]. This motion is fully briefed. Defs.' Opp. to Pls.' Mot. for Prelim. Inj. [Dkt. # 31] ("Defs.' Opp."); Pls.' Reply Mem. in Support of Pls.' Mot. [Dkt. # 40] ("Pls.' Reply"). The Court has also had the benefit of briefs filed by three amici curiae: twenty-two states and the District of Columbia, Br. of Amici Curiae States of N.Y., N.J., Ariz., Cal., Colo., Conn., Del., Haw., Ill., Me., Md., Mass., Mich., Minn., Nev., N.M., N.C., Or., R.I., Vt., Wash., Wis., and D.C. in support of Pls.' Mot. for a Prelim. Inj. [Dkt. # 24] ("States' Br."); non-profit Tzedek DC, Amicus Br. of Tzedek DC [Dkt. # 33]; and Br. of 203 Members of Congress

as Amici Curiae [Dkt. # 84] ("Members' Br.").  For the reasons set out in detail below, plaintiff's motion will be granted, and the Court will enter an order to preserve the status quo while the case moves forward on the merits.

## STATUTORY BACKGROUND

The Consumer Financial Protection Bureau was created in response to a severe economic crisis that gripped the nation.  In 2008, "the subprime mortgage market collapsed, precipitating a financial crisis that wiped out over $10 trillion in American household wealth and cost millions of Americans their jobs, their retirements, and their homes.  In the aftermath, . . . [t]hrough the Treasury Department, the administration encouraged Congress to establish an agency with a mandate to ensure that 'consumer protection regulations' in the financial sector 'are written fairly and enforced vigorously.'"  *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 205 (2020), quoting Dept. of Treasury, Financial Regulatory Reform:  A New Foundation 55 (2009).  Congress acted on these proposals, and as part of the Wall Street Reform and Consumer Protection Act, commonly referred to as the Dodd-Frank Act, Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010), it established the CFPB to serve as "an independent financial regulator within the Federal Reserve System."  *Seila L.,* 591 U.S. at 206.

The statute provides that the agency "shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws."  12 U.S.C. §5491(a); *see generally*, Title X, Dodd-Frank Act, also known as the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5491 et. seq.

> Congress tasked the CFPB with "implement[ing]" and "enforc[ing]" a large body of financial consumer protection laws to "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." . . . Congress transferred the administration of 18 existing federal statutes to the CFPB, including the Fair Credit

Reporting Act, the Fair Debt Collection Practices Act, and the Truth in Lending Act. . . . In addition, Congress enacted a new prohibition on "any unfair, deceptive, or abusive act or practice" by certain participants in the consumer-finance sector.

*Seila L.*, at 206, citing 12 U.S.C. §§ 5511(a), 5481(12), (14); *see also id.* § 5581.[1]

As a result of the consolidation of functions accomplished by the statute, the CFPB is now "the only federal agency authorized to supervise the nation's largest banks for their compliance with consumer financial protection laws.  It also supervises nonbanks of all sizes in certain market segments, like mortgage companies and payday lenders, as well as larger nonbank participants in other consumer financial market segments, like credit reporting agencies, digital payment apps, and debt collectors."  Members' Br. at 13.  "To date, the CFPB has returned more than $21 billion improperly taken from at least 205 million consumers, in addition to at least $5 billion in civil penalties made available to compensate consumers in cases where the business that took their money is insolvent."  *Id.* at 12.

The statute mandates that the CFPB maintain specific subject matter offices and units, produce specific periodic reports, and provide testimony and reports to Congress.

---

[1]    *See* Members' Br. at 2.  "The CFPB was born out of the most severe economic and financial crisis since the Great Depression.  Congress thoroughly investigated the root causes of the 2008 crisis and determined that regulatory failures were largely to blame.  Because responsibility for consumer financial protection was dispersed across federal agencies, consumers were, at best, a secondary consideration for regulators.  After an exhaustive legislative process, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 . . .. One of the greatest achievements of that bipartisan effort was to consolidate consumer financial protection in a single agency, the CFPB, that would be a watchdog for consumers, armed with the legal authority necessary to prevent another financial meltdown."  *Id.*

## I.  Required Offices and Positions

The CFPB is statutorily required to maintain:

- a Consumer Advisory Board to "advise and consult with the Bureau in the exercise of its functions . . . and to provide information on emerging practices in the consumer financial products or services industry," 12 U.S.C. § 5494(a);

- a unit that has "a single, toll-free telephone number, a website, and a database" to centralize the collection and monitoring of and the responses to consumer complaints about consumer financial products or services, 12 U.S.C. § 5493(b)(3)(A);

- "a unit whose functions shall include providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities," 12 U.S.C. § 5493(b)(2);

- "a unit whose functions shall include researching, analyzing, and reporting on" a number of specific issues, including "developments in markets for consumer financial products or services," "areas of risk to consumers," and "access to fair and affordable credit for traditionally underserved communities," 12 U.S.C. § 5493(b)(1);

- "the Office of Fair Lending and Equal Opportunity" which "shall . . .  provid[e] oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau;" coordinate fair lending efforts with other agencies and regulators; and work with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education, 12 U.S.C. § 5493(c)(1);

- an "Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions," 12 U.S.C. § 5493(d);

- an "Office of Service Member Affairs, which shall be responsible for developing and implementing initiatives for service members and their families," 12 U.S.C. § 5493(e); and

- an "Office of Financial Protection for Older Americans . . . to facilitate the financial literacy of individuals" 62-years-old and older "on protection from unfair, deceptive, and abusive practices and on current and future financial choices," 12 U.S.C. § 5493(g)(1).

JA638

The statute also requires the CFPB to have "a Private Education Loan Ombudsman . . . to provide timely assistance to borrowers of private education loans."  12 U.S.C. § 5535(a).  The Ombudsman must "receive, review, and attempt to resolve informally complaints from borrowers of loans . . . including, as appropriate attempt[ing] to resolve such complaints in collaboration with the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in private education loan programs."  *Id.* § 5535(c)(1).

## II.    Required Research and Reports

The statute requires the Bureau to produce research, reports, and information on specific topics, including credit rates and credit cards, *see* 15 U.S.C. §§ 1646(a), (b); *id.* § 1632(d)(3); market developments for consumer financial products or services and consumer access to those products, 12 U.S.C. § 5493(b)(1); depository institutions and aggregate lending patterns, *id.* § 2809(a); and emerging risks to consumers, *id.* § 5512(c)(3).  And it must make "[a]ll public data assets published by the Bureau" publicly available and freely available for download.  *Id.* § 5499.

The CFPB Director and offices within the Bureau are also required to report to Congress.  *See* 12 U.S.C. § 5493(b)(3)(C) (requiring the Director to report annually to Congress on the complaints received by the Bureau in the prior year regarding consumer financial products and services, including information and analysis about complaint numbers, complaint types, and, as applicable, information about resolution of complaints); *id.* § 5493(c)(2) (D) (requiring an annual report from the Office of Fair Lending and Equal Opportunity); *id.* § 5493(d)(4) (requiring an annual report from the Director on financial literacy activities and strategy to improve financial literacy of consumers); *id.* § 5535(d) (requiring an annual report from the Private Education Loan Ombudsman).  And the Director must report to the President and testify before Congress semi-annually.  *Id.* § 5496.

### III.    Rulemaking, Enforcement, and Supervision

In addition to these statutorily mandated activities, Congress gave the CFPB specific rulemaking, enforcement, and supervisory authority.  Congress granted the Bureau rulemaking authority, *see* 12 U.S.C. § 5512, specifically permitting it to promulgate regulations that identify "unfair, deceptive, or abusive" practices and establish disclosure requirements to aid consumers' understanding of financial products and services.  *See id.* § 5531(b); *id.* §§ 5532, 5533.  Congress also granted the Bureau enforcement authority, authorizing it to conduct investigations, hearings, and adjudication proceedings, and to initiate civil litigation and refer criminal matters to the U.S. Attorney General.  *Id.* §§ 5561–67.  And Congress granted the CFPB supervisory powers, *id.* §§ 5514–16, authorizing it to examine and require periodic reports from financial institutions, *id.* §§ 5514, 5515, including payday lenders, private education lenders, insured depository institutions, and credit unions with more than $10 billion in assets.  *Id.* § 5514(a)(1)(B), (D)–(E), (b)(1); *id.* § 5515(b)(1).

In addition, the Bureau is required by the statute to report on these authorized activities. *See, e.g.*, 12 U.S.C. § 5496(c) (requiring the Director's semi-annual report to Congress to include "(4) an analysis of complaints about consumer financial products or services that the Bureau has received and collected in its central database on complaints during the preceding year; (5) a list, with a brief statement of the issues, of the public supervisory and enforcement actions to which the Bureau was a party during the preceding year; (6) the actions taken regarding rules, (7) ) an assessment of significant actions by State attorneys general or State regulators relating to Federal consumer financial law;" and "(8) an analysis of the efforts of the Bureau to fulfill the fair lending mission of the Bureau").

## IV.    The CFPB's Funding

The CFPB does not rely on annual appropriations for its funding.  *Seila L.*, 591 U.S. at 207.

Rather, it "receives funding directly from the Federal Reserve, which is itself funded outside the

appropriations process through bank assessments."  *Id.* at 207–08, citing 12 U.S.C. §§ 5497(a)(1),

(2)(A)(iii), 2(B) ("Each year, the CFPB requests an amount that the Director deems 'reasonably

necessary to carry out' the agency's duties, and the Federal Reserve grants that request so long as

it does not exceed 12% of the total operating expenses of the Federal Reserve (inflation

adjusted).").  This arrangement was approved by the Supreme Court in *CFPB v. Community

Financial Services Association of America, Ltd.*, 601 U.S. 416 (2024).[2]

The Bureau's annual budget in recent years has exceeded 500 million dollars, *Seila L.*,

591 U.S. at 208, citing CFPB, Fiscal Year 2019:  Ann. Performance Plan and Rep., p. 7, and in its

first five years alone, it "obtained over $11 billion in relief for over 25 million consumers,

including a $1 billion penalty against a single bank in 2018."  *Id.* at 206, citing CFPB, Financial

Report of the Consumer Financial Protection Bureau, Fiscal Year 2015, p. 3.  The brief filed by

Members of Congress reports that the total is now more than $21 billion.  Members' Br. at 3, 12.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**Friday, January 31**        President Trump fires CFPB Director Rohit Chopra.  *See* Email
                              from CFPB Office of the Director (Feb. 3, 2025) [Dkt. # 23-1]
                              ("Feb. 3 Email").

---

2        Given that circumstance, it is not clear that the February 26, 2025 guidance from Russell
Vought, in his capacity as Director of OMB ("tax dollars are being siphoned off to fund
unproductive and unnecessary programs that benefit radical interest groups while hurting
hard-working citizens"), has much bearing on the CFPB.  *See* Mem. from Russell T. Vought,
Director, Off. of Mgmt. and Budget, and Charles Ezell, Acting Director, Off. of Pers. Mgmt., to
Heads of Exec. Dep'ts and Agencies (Feb. 26, 2025) [Dkt. # 70-2] at Page 1–7 of 7.

|  | Effective date of appointment of Secretary of Treasury Scott Bessent as CFPB Acting Director.  *See* Feb 3 Email. |
|---|---|
| **Monday, February 3** | CFPB Office of the Director email to DL_CFPB_AllHands; DL_CFPB_AllHands_Contractors |

Subject:  Instructions from Acting Director

Colleagues,

Secretary of the Treasury Bessent has been named Acting Director of the CFPB, effective January 31, 2025. As Acting Director, Secretary Bessent is committed to appropriately stewarding the agency pending new leadership.  In order to promote consistency with the goals of the Administration, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau are directed:

- Not to approve or issue any proposed or final rules or formal or informal guidance.
- To suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not to commence, take additional investigative activities related to, or settle enforcement actions.
- Not to issue public communications of any type, including publication of research papers.
- Not to approve or execute any material agreements, including related to employee matters or contractors.
- Not to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Feb. 3 Email.

| **Tuesday, February 4** | Acting Director Bessent emails all CFPB staff and contractors directing them "[n]ot to initiate supervisory designation proceedings or designate any nondepository institution for supervision." Am. Compl. ¶ 37. |
|---|---|
| **Thursday, February 6** | Officials from the Department of Treasury notify CFPB officials in the evening that two United States Department of Government Efficiency ("DOGE") Service officials would need access to CFPB's headquarters. First Decl. of Adam Martinez [Dkt. # 31-1] ("First Martinez Decl.") ¶ 6; Testimony of Adam Martinez, Tr. of Evidentiary Hr'g (Mar. 10, 2025) [Dkt. # 73] ("Mar. 10 Tr.") at 19. |
| | Members of DOGE, including Christopher Young, enter CFPB headquarters. Decl. of Daniel J. Kaspar, NTEU Director of Field Operations [Dkt. # 14-1] ("Kaspar Decl.") ¶ 6; Martinez Testimony, Mar. 10 Tr. at 20. |
| **Friday, February 7** | CFPB management and DOGE personnel Christopher Young, Jordan Wick, and Jeremy Lewin have a follow-up meeting. DOGE representatives gain access to all non-classified CFPB systems. Kaspar Decl. ¶ 6; First Martinez Decl. ¶ 7; Martinez Testimony, Mar. 10 Tr. at 21. |
| | Christopher Young of DOGE is officially detailed to CFPB. Martinez Testimony, Mar. 10 Tr. at 21, 137–38. DOGE staff are designated as senior advisors of CFPB. Martinez Testimony, Mar. 10 Tr. at 144. |
| | The "CFPB homepage at consumerfinance.gov – the launching pad for most American consumers' interactions with the CFPB – was changed to a '404 - Site Not Found' error message." Third Decl. of Erie Meyer, CFPB Chief Technologist [Dkt. # 38-9] ¶ 19. |
| | Elon Musk posts "CFPB RIP," accompanied by a tombstone emoji, to his personal X account. Kaspar Decl. ¶ 6; Am. Compl. ¶ 39, citing https://x.com/elonmusk/status/1887979940269666769. |
| | CFPB General Counsel and Senior Advisor to the Director Seth Frotman is terminated. Decl. of Seth Frotman [Dkt. # 38-13] ¶ 1; *see also* Martinez Testimony, Mar. 10 Tr. at 125 (testifying that Mark Paoletta joined the CFPB as Chief Legal Officer around this date). |
| | The President designates Director of the Office of Budget and Management Russell Vought as Acting Director that evening. First Martinez Decl. ¶¶ 9–10; Am. Compl. ¶ 38. |

**Saturday, February 8**       8:50 a.m.  Acting Director Vought sends email all CFPB employees.

From:  Vought, Russell
To: _DL_CFPB_AllHands
Subject:  Directives on Bureau Activities
Date:  Saturday, February 8, 2025 8:50:28 PM

Dear Colleagues,

I am honored that President Trump designated me as Acting Director of the Bureau on February 7, 2025. As Acting Director, I am committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources. To that end, I am directing that, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau shall:

- Not approve or issue any proposed or final rules or formal or informal guidance.
- Suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not commence, take additional investigative activities related to, or settle enforcement actions.
- Not open any new investigation in any manner, and cease any pending investigations.
- Not issue public communications of any type, including publication of research papers and compliance bulletins.
- Not approve or execute any material agreements, including related to employee matters or contractors.
- Not make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.
- Cease all supervision and examination activity.
- Cease all stakeholder engagement.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Russell T. Vought

*See* Email from Russell Vought (Feb. 8, 2025) [Dkt. # 23-2] ("Feb. 8 Email").

Vought sends a letter to Federal Reserve Chair Jerome Powell stating that the CFPB does not need funds for Third Quarter FY 2025.  Ex. G to First Martinez Decl. [Dkt. # 31-1] at Page 22 of 22.[3]

Vought posts on X: "The CFPB has been a woke & weaponized agency against disfavored industries and individuals for a long time. This must end." *See* @russvought, X (Feb. 8, 2025); Ex. F to Decl. of A. Roston & A. Scible [Dkt. # 38-17] ("Roston/Scible Decl.").

**Sunday, February 9**    Chief Operating Officer Adam Martinez emails all CFPB employees and contractors.

> To: _DL_CFPB_AllHands
> Subject:  Please Read:  DC Headquarters Building Operating Status (2/10-2/14)
> Date:  Sunday, February 9, 2025 1:39:00 PM
>
> (This message is for DC Headquarters Staff and Contractors)
>
> Dear Colleagues:
>
> The DC Headquarters Building will be closed this week (2/10-2/14). Employees and contractors are to work remotely unless instructed otherwise from our Acting Director or his designee.
>
> Thank you.
> Adam
> Adam Martinez
> Chief Operating Officer

---

[3]    Citations to filings with the court include the docket number of the filing, [Dkt. # __], pin cites to page or paragraph numbers appearing in the original documents, and where available, Bates numbers placed on a document by the parties at the bottom right corner.  For filings containing multiple documents in a single docket entry, the Court includes pin cites to the PDF page numbers at the top right of the document placed on the filing by the court's Electronic Case Filing system:  "at Page __ of __."

Email from Adam Martinez (Feb. 9, 2025) [Dkt. # 23-3] ("Feb. 9 Email").

Plaintiffs file the instant lawsuit. Compl. [Dkt. # 1].

**Monday, February 10**    8:30 a.m.    Vought sends email to all CFPB employees and contractors.

> To: DL CFPB AllHands
> Subject: Additional Directives on Bureau Activities
> Date: Monday, February 10, 2025 8:30:43 AM
>
> Good morning, CFPB staff,
>
> As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is [REDACTED]. Otherwise, employees should stand down from performing any work task. Thank you for your attention on this matter.
>
> Best,
> Russ Vought
> Acting Director
> Bureau of Consumer Financial Protection

Email of Feb. 10 [Dkt. # 23-4] ("Feb. 10 Email" or "stop work email").[4]

Adam Martinez meets with the Office of Personnel Management ("OPM") regarding the mechanics for a Reduction in Force ("RIF"). Martinez Testimony, Mar. 10 Tr. at 46, 126–27.

---

4    The exhibits introduced by the parties and counsel for both sides have referred to this email as the "stop work" order or email, and the Court will refer to it in the same manner in this opinion. *See* Pls.' TRO Mem. [Dkt. # 14] at 12; Defs.' Opp. at 34; Mar. 10 Tr. at 49, 56 (counsel for defendants referring to Acting Director Vought's "stop-work email" and "the stop-work order"); Defs.' Ex. 3 [Dkt. # 56-1] at page 5 of 116, CFPB_00005 (Chief Legal Officer Paoletta referring to the email as "the stop work order").

8:45 a.m. In response to the stop work email, CFPB Chief Information Officer Christopher Chilbert emails Adam Martinez to clarify the level of support to be provided in light of the order.

> I want to clarify the level of support we should be providing based on this email. I think the minimum is:
>
> > 1) Onboarding new political leadership and providing them with necessary service desk support to them
> >
> > 2) Performing security monitoring tasks for our networks
> >
> > 3) Supporting US DOGE members with requests
> >
> > 4) Perform any maintenance tasks needed to ensure that the HMDA application, Consumer Complaint Database operate, ServiceNow, and Microsoft365 platform (email/SharePoint) continue to operate.
> >
> > 5) Support any other requests from the Acting Director or new political leadership.
>
> I think this is the minimum, but I want to confirm before giving the team direction.

Defs.' Ex. 1 [Dkt. # 56-1] at Pages 1–2 of 116, CFPB_00001–2.[5]

8:54 a.m. Martinez responds to Chilbert and agrees: "That is all correct. The USDS Team [also referred to as DOGE] will let you or me know if any other work is needed." Defs.' Ex. 1 [Dkt. # 56-1] at Page 1 of 16, CFPB_00001.

11:58 a.m. Chilbert replies to Martinez, requesting authorization to create list of contractors necessary to support operational emergencies. Defs.' Ex. 1 [Dkt. # 56-1] at Page 1 of 116, CFPB_00001.

---

5    Defendants' exhibit list appears at [Dkt. # 70-3].

4:43 p.m. CFPB Assistant Director, Research Jason Brown tells Chief Legal Officer Mark Paoletta that the Office of Research has stopped work on publishing Average Prime Offer Rate (APOR). Defs.' Ex. 3 [Dkt. # 56-1] at Page 5 of 116, CFPB_00005.

7:15 p.m. Chief Legal Officer Paoletta replies to Brown: "The task of doing the work to publish the Average Prime Offer Rate (APOR) and publishing it are exempted from the stop work order." Defs.' Ex. 3 [Dkt. # 56-1] at Page 5 of 116, CFPB_00005.

President Trump tells a reporter that he intends to have the CFPB "totally eliminated" and "we did the right thing. The CFPB was a very important thing to get rid of, and it was also a waste. I mean, number one, it was a bad group of people running it, but it was also a waste." *See* Alejandra Jaramillo, *Trump confirms goal to "totally eliminate" the Consumer Financial Protection Bureau*, CNN (Feb. 10, 2025), Ex. G to Roston/Scible Decl. [Dkt. # 38-17].

**Tuesday, February 11**       Approximately 85 CFPB probationary employees are fired. Decl. of Peyton Diotalevi, NTEU National Counsel [Dkt. # 41-1] ("Diotalevi Decl.") ¶ 4; Kaspar Decl. ¶ 16; Martinez Testimony, Mar. 10 Tr. at 128; Testimony of Alex Doe, Tr. of Evidentiary Hr'g (Mar. 11, 2025) [Dkt. # 74] ("Mar. 11 Tr.") at 45; *see also* Template of Notification of Termination During Probationary Period, Pls.' Ex. C [Dkt. # 60-1] at Page 7 of 107.

10:27 a.m. CFPB Chief Financial Officer Jafner Gueye tells deputies to identify which "contracts directly support a statutory requirement, meaning that we would not be able to meet a statutory requirement without this contract." Pls.' Ex. F [Dkt. # 60-1] at Page 14–15 of 107.

11:10 a.m. Email from Consumer Response and Education identifying contracts that directly support its statutory requirements (attachment not provided). Pls.' Ex. F [Dkt. # 60-1] at Page 14 of 107.

12:36 p.m. Adam Martinez emails Chief Legal Officer Paoletta and James Bishop to introduce them to Chief Financial Officer Jafner Gueye: "1. At your convenience he will be ready to provide you a briefing on the Civil Penalty Fund including the contractor/vendor that serves as the Bureau's intermediary and the process for disbursements of funds to consumers. 2. Jafnar is currently in communications with the Federal Reserve regarding the Bureau's ability to return money to either Treasury or the Federal Reserve if needed." Pls.' Ex. E [Dkt. # 60-1] at Page 12 of 107.

12:47 p.m.  Email from Joshua Galicki to contracting officers with subject line "Urgent Action: Contract Termination and Continuation Notifications (Emails)" with instructions on how to issue contract termination notifications.  Galicki states, "We need to get these Termination Notifications out ASAP."  Pls.' Ex. A [Dkt. # 60-1] at Page 2 of 107; *see also* Decl. of Charlie Doe [Dkt. # 38-4] ("Charlie Doe Decl.") ¶¶ 5–6 (stating the Bureau issued "an urgent directive to the contracting department to cancel all of the agency's contracts. I am aware of only two exceptions to this initial directive:  the contract for storing litigation data and the database that houses employees' financial disclosure information").

4:32 p.m.  Chief Legal Officer Paoletta emails Chief Financial Officer Gueye on behalf of Acting Director Vought, "Subject: Cancellation of CFPB contracts," directing "the cancellation of all contracts in the following divisions:  Enforcement (102 contracts), Supervision (16 contracts), External Affairs (3 contracts), Consumer Response (20 contracts), Office of Director (33 contracts), and Legal Division (all except 2 contracts – FD Online Licenses and litigation data)" and the contract for concrete repairs.  Defs.' Ex. 4 [Dkt. # 56-1] at Page 6 of 116, CFPB_00006; *see also* Martinez Testimony, Mar. 10 Tr. at 162–64.

5:14 p.m.  Josha Galicki emails contracting officers advising them of the directive to terminate all Enforcement, Supervision, External Affairs, Consumer Response, and Office of Director contracts.  Pls.' Ex. B [Dkt. # 60-1] at Page 5 of 107.

**Wednesday, February 12**    6:51 p.m.  Adam Martinez emails Chief Financial Officer Gueye, Jordan Wick, Christopher Young, and OPM Deputy Associate Director, HR Strategy Jason Parman approving the Statement of Work for "RIF Consulting Services," under which CFPB is to pay OPM initial funding of $171,925.  Pls.' Ex. II [Dkt. # 66-1] at Page 3–4 of 60.

**Thursday, February 13**    Plaintiffs file an amended complaint and motion for temporary restraining order.  Am. Compl. [Dkt. # 7]; Mot. for TRO [Dkt. # 10].

3:30 p.m.  The RIF team, including Alex Doe, Adam Martinez, and others meet with Jordan Wick, Jeremy Lewin, and OPM officials. Alex Doe Testimony, Mar. 11 Tr. at 38.  Jeremy Lewin and Jordan Wick talk off screen with Acting Director Vought, and Wick tells the group that they want formal RIF notices to go out no later than February 14.  *Id.* at 41–44.

Approximately 130 CFPB term employees were fired. Diotalevi Decl. ¶ 4; Martinez Testimony, Mar. 10 Tr. at 128; Alex Doe Testimony, Mar. 11 Tr. at 45.

Post on X regarding tip line for the public to report "being pursued by CFPB enforcement or supervision staff, in violation of Acting Director Russ Vought's stand down order." Diotalevi Decl. ¶ 6; Pls.' Ex GG [Dkt. # 60-1] at Page 103 of 107.

Julie Barnard is terminated from her temporary excepted service appointment as a Markets & Policy Fellow. She is also the Student Loan Ombudsman. The stated reason for her termination is the February 11, 2025 Executive Order. Pls.' Ex. H [Dkt. # 60-1] at Page 19–20 of 107; Decl. of Julia Barnard [Dkt. # 38-10] ("Barnard Decl.") ¶ 2.

5:01 p.m. Adam Martinez emails Michael Mahoney of OPM attaching CFPB's "request for an exception to the RIF 90-day rule for competitive areas." Pls.' Ex. JJ [Dkt. # 66-1] at Page 7–8 of 60.

> This memorandum serves as the Consumer Financial Protection Bureau's (CFPB) request for an exception to the competitive area 90-day rule. . . . **The CFPB is responding to Executive Order Implementing The President's "Department of Government Efficiency" Workforce Optimization initiative – The White House dated February 11, 2025 and the CFPB Acting Director's work stoppage order dated February 10, 2025**.

Pls.' Ex. JJ [Dkt. # 66-1] at Page 9–11 of 60 (emphasis added); *see also* Martinez Testimony, Mar. 10 Tr. at 48–49 (confirming the two justifications).

RIF team receives the templates from OPM for firing the 1200 employees "at night on the 13th." Alex Doe Testimony, Mar. 11 Tr. at 46–47.

10:10 p.m. Jeremy Lewin emails Adam Martinez that "[w]e owe Acting Director Vought an update at 10am tomorrow." Pls.' Ex. JJ [Dkt. # 66-1] at Page 6 of 60.

10:12 p.m. Martinez, Lewin, and others are informed that OPM approved the exception request. Pls.' Ex. JJ [Dkt. # 66-1] at Page 6 of 60.

**Friday, February 14**

12:55 a.m.  Plaintiffs file their supporting memorandum and exhibits for the motion for a temporary restraining order.  Pls.' Mem. in Supp. for Mot. for TRO [Dkt. # 14] ("Pls.' TRO Mem.").

8:28 a.m.  Adam Martinez emails [REDACTED] advising that the request for an exception to the RIF ninety-day rule for competitive areas was approved.  Pls.' Ex. JJ [Dkt. # 66-1] at Page 6 of 60.

8:30 a.m.  RIF team including Adam Martinez meets to review OPM templates.  Alex Doe Testimony, Mar. 11 Tr. at 47.

10:00 a.m.  RIF team including Adam Martinez meets with OPM.  Alex Doe Testimony, Mar. 11 Tr. at 47.

11:08 a.m.  The Court sets a scheduling hearing for 2:00 p.m. that afternoon.  *See* ECF Notice of Hr'g (Feb. 14, 2025).

11:36 a.m.   [REDACTED] emails Jason Parman of OPM HR Strategy about the Exception Template:  "Attached are templates of Reduction in Force notifications with and without Severance Pay."  Pls.' Ex. MM [Dkt. # 66-1] at Page 21 of 60.

12:27 p.m.  CFPB's Office of Human Capital sends email:

> On Monday, February 10th CFPB's Acting Director issued guidance for Bureau staff to pause work tasks.  In accordance with the Acting Director's guidance employees should exercise administrative leave until otherwise instructed.  For staff who have been asked to work by the Acting Director, the Chief Legal Officer, or another designee (i.e. through their leadership chain, etc.) they should record that time as they normally would.  All time not in a working status should be reflected in webTA under the "Admin/Excused Absence" leave transaction category.

Pls.' Ex. J [Dkt. # 60-1] at Page 27 of 107.

12:38 p.m.  Adam Martinez emails [REDACTED], forwarding a 12:34 email he sent to Chris Young, Jeremy Lewin, Jordan Wick, copying Mark Paoletta and others:

> My team and I had a productive conversation with OPM this morning to work out any identified risks and answer follow-up questions regarding today's actions and notifications to staff.  OPM shared that

typically during the 30-day notice, employees work during this time to transfer any duties. Mark P. just happened to call me, and I was able to ask for clarification and expectations for the first phase of notifications.

We are going to place all staff on administrative leave for the 30-day notice period. This will provide the flexibility for our new leadership team to call back staff to fulfill closeout duties such as enforcement cases. If there are pockets of staff who we later determine do not need to be called back, we can immediately offboard them (i.e., terminate access) for the duration of the notice period. I will provide you all notice right before the letters go out, along with the final numbers. This will all be done this afternoon.

Pls.' Ex. KK [Dkt. # 66-1] at Page 13 of 60.

1:36 p.m. Adam Martinez receives email from [REDACTED] notifying him of the hearing on plaintiffs' motion for a temporary restraining order in this case:

Hi Adam, Wanted to make sure you were aware there is a hearing for a temporary restraining order or preliminary injunction related to today's activities scheduled for 2pm today. While we will continue preparing, it's just a consideration when deciding when to send out the notices.

Pls.' Ex. LL [Dkt. # 66-1] at Page 15 of 60; Alex Doe Testimony, Mar. 11 Tr. at 51.

Alex Doe was instructed that Adam "wanted me to reach out to OPM and tell them that they needed to provide the attachments right away and that we no longer had until close of business. . . . he wanted me to forward my email to him so he could reach out to some of their senior leadership and get those attachments quicker." Alex Doe Testimony, Mar. 11 Tr. at 52.

1:44 p.m. [REDACTED] sends email to OPM urgently requesting materials for RIFs: "Thanks for everything you're doing, but we need the last set of attachments now. We cannot wait until COB. We also need an answer on the attached question about the guidance. Apologies, but we have been instructed we do not have until COB." Pls.' Ex. MM [Dkt. # 66-1] at Page 17 of 60; Martinez Testimony,

Case 1:25-cv-00381-ABJ   Document 87   Filed 03/28/25   Page 21 of 112
USCA Case #25-5091   Document #2113074   Filed: 04/25/2025   Page 26 of 698

JA653

Mar. 10 Tr. at 135–36 (testifying that the people on this email are members of the RIF team and that this email was not a mistake).

2:00 p.m.   Court hearing begins.

2:27 p.m.   [REDACTED] sends email attaching list of employees to be fired. Pls.' Ex. NN [Dkt. # 66-1] at Page 24 of 60.

3:07 p.m.   OPM official emails Adam Martinez attaching the signed February 14, 2025 Letter from OPM Associate Director, Workforce Policy and Innovation Veronica Hinton approving the request for an exception to the sixty-day notice requirement for a RIF.

The Office of Personnel Management (OPM) approves, with one exception, the Consumer Financial Protection Bureau's (CFPB) February 13, 2025, request for OPM approval of an exception to the 60-day notice period provided given to employees selected for release through a reduction in force (RIF). **Your request indicates that a RIF is necessary due to the impact of the Executive Order (EO) titled, "Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative" (February 11, 2025), and the CFPB Acting Director's work stoppage order dated February 10, 2025.**

OPM approves your request in accordance with 5 CFR 351.801 (b).

Pls.' Ex. OO [Dkt. # 66-1] at Page 26, 28 of 60; *see also* Martinez Testimony, Mar. 10 Tr. at 48.

4:57 p.m.   Adam Martinez emails [REDACTED] confirming that "I'm dual hatted right now with Ops and OHC. I will be on the RIF list but in next group." Pls.' Ex. PP [Dkt. # 66-1] at Page 30 of 60.

5:04 p.m.   The Court enters the parties' Consent Order, reflecting the parties' agreement that plaintiffs' motion for a TRO will be deemed a motion for preliminary injunction and that the agreement would remain in place until the resolution of motion. The Order provides that defendants shall not: delete, destroy, remove, or impair any data, database, or other CFPB records; terminate any CFPB employee, except for cause related to the specific employee's performance or conduct; issue any notice of reduction-in-force to any CFPB employee; or transfer, relinquish, or return any money from the CFPB's reserve funds. Order. [Dkt. # 19]. **The Court sets a hearing on plaintiffs' motion for a preliminary injunction on Monday, March 3, 2025 at 10:00 a.m.** *Id.*

Alex Doe "reache[s] out to Adam's other senior advisor" at around 5:00 p.m. and advises that "RIFs [can] not occur until March 3rd." Alex Doe Testimony, Mar. 11 Tr. at 52–53.

7:00 p.m. to 10:00 p.m. "[E]mails go[ ] back and forth at 7:00, and all the way up to near 10 o'clock about these [RIF] notices and fields for them and what to code them under." Alex Doe Testimony, Mar. 11 Tr. at 54.

9:56 p.m. Email regarding materials for RIFs: "Hi you all. Here's the proposed coding for the separation actions. Can you please review and approve for me? . . . [W]e will need to key these over the weekend so they are there Tuesday morning." Pls.' Ex. QQ [Dkt. # 66-1 at Page 32 of 60.

1:21 p.m. Adam Martinez emails Regional Office Staff and Contractors that CFPB regional offices will remain closed the week of February 17–21. Pls.' Ex. K [Dkt. # 60-1] at Page 29 of 107.

|  |  |
|---|---|
| **Tuesday, February 18** | 8:15 a.m. Email from [REDACTED] to Adam Martinez and Christopher Chilbert requesting authorization to repair the website's homepage and stating that DOGE personnel "damaged the website by deleting the homepage." Pls.' Ex. L [Dkt. # 60-1] at Page 31 of 107; Decl. of Adam Scott [Dkt. # 38-6] ("Scott Decl.") ¶ 2. |
|  | 9:32 a.m. Christopher Chilbert responds that he does not have authorization to reactivate the website: "My understanding is that the decision to delete the homepage was made by Acting Director Vought, and it was not an error made by the members of the DOGE team." Pls.' Ex. L [Dkt. # 60-1] at Page 31 of 107; Scott Decl. ¶ 3. |
| **Wednesday, February 19** | 10:12 a.m. Mark Paoletta emails Adam Martinez and Jafner Gueye: "To follow up on my conversation with Adam just now, I am directing you to not terminate or suspend any contracts without specific authorization from Acting Director Vought or me." Defs.' Ex. 50 [Dkt. # 66-2] at Page 2 of 14, CFPB_00118. |
|  | The first RIF team meeting after Court's February 14 Consent Order is held, including Adam Martinez and OPM officials. Alex Doe Testimony, Mar. 11 Tr. at 54. Martinez is "more focused on the transfer of functions at that meeting . . . explaining that he had had conversations with new leadership and the chief legal officer about what the wind-down of an agency really meant, and that there were . . . functions that would need to transfer, and OPM was pressing us to identify where those would transfer and we did not yet have an answer." *Id.* at 55. "Q. Did he refer at this meeting to winding down the Agency? A. He did. Q. What did you understand that to mean? |

A. Closing of the Agency." *Id.* at 54–56. "And he used that phrase, 'the closure of the Agency'? A. He did." *Id.* at 57. Martinez said or implied the plan was on pause because of the order. *Id.* at 57–58.

7:19 p.m. Mark Paoletta emails Adam Martinez, Jafner Gueye, and Anthony Licata directing them to rescind contract termination notices. Defs.' Ex. 51 [Dkt. # 66-2] at Page 3 of 14, CFPB_00119.

President Trump announces in an interview that his administration has "virtually shut down the out of control CFPB." Lesley Stahl, *Why the Consumer Fin. Protection Bureau is being targeted by Trump, DOGE*, CBS News (Feb. 23, 2025), Ex. P to Roston/Scible Decl. [Dkt. # 38-17].

**Thursday, February 20**    An "internal meeting" is held "with some human capital colleagues that are not part of the RIF team . . . . And in that meeting, [Adam Martinez] was a lot more specific about what exactly the plan was for the Bureau." Alex Doe Testimony, Mar. 11 Tr. at 58.

"[Martinez] said there would no longer be a CFPB. He said that we were legitimately shutting down. He said that we would be wiped out within 30 days. He said that the White House had instructed us to cancel all of our committees and advisory boards and travel cards and purchase cards and to only keep any contracts that were necessary to effectuate the closure of the Agency within 30 days. . . . Adam said there would be no positions to compete for. Q. No positions to compete for, you understood that to mean because the entire divisions would be eliminated? A. Because the Agency would be eliminated. He was a lot more specific in that meeting that was just the CFPB." Alex Doe Testimony, Mar. 11 Tr. at 59.

"During meetings about the CFPB's shut-down that took place between Monday, February 18 and Tuesday, February 25, staff were told by Senior Executives that the CFPB would be eliminated except for the five statutorily mandated positions; that the CFPB would exist in name only; and that, once this Court's injunction was over, everything would need to be either removed from the building or destroyed. Staff were told by Senior Executives that the CFPB would no longer have an employee location and that data could not be stored at any CFPB location because there wouldn't be any locations left. Staff were told that no DHS, OIG, GAO, OMB, Internal Controls, Congressional, or other compliance would be necessary because the CFPB would 'not exist' and it would no longer be 'our problem.'" Decl. of Drew Doe [Dkt. # 38-5] ("Drew Doe Decl.") ¶ 7 .

"Senior Executives explained that the work stoppage on February 10 was characterized as a work stoppage to avoid the 10-day legal limit on administrative leave." Drew Decl. ¶ 8.

7:04 p.m. Jordan Wick emails Russell Vought and Mark Paoletta

Subject: More contracts to cut

Hi all, Please see attached for the next tranche of contracts for which we recommend immediate termination – they're composed of the following:
- Consumer Credit Information Surveys and Panels, which will no longer be used
- Various support services (user research and testing, financial mgmt., internal controls, and identity access software), all of which we can do without

These contracts represent $8.4M in obligated value. @Vought, Russell (CFPB), let us know if you approve cancelling these and then the rest of the team will proceed.

Defs.' Ex. 52 [Dkt. # 66-2] at Page 5 of 14, CFPB_00121.

**Friday, February 21**    A CFPB Realty Officer sends an email stating that the "CFPB's main focus" is "moving out of [its] large headquarters building" on "a very, very tight timeframe . . . (30 days)." The email also states that the Bureau will move out "of the regional offices with San Francisco being the first one." Diotalevi Decl. ¶ 15.

11:15 a.m. Deputy General Counsel Sonya White emails Adam Martinez. "Subject: Legal Assistance with Procurement Template for Contract Termination" "Josh reached for a legal review on the contract termination template. Confirming that LD is authorized to assist?" Defs.' Ex. 5 [Dkt. # 56-1] at Page 7 of 116, CFPB_00007.

11:30 a.m. Adam Martinez replies to Sonya White.

Hi Sonya – (+Mark P. and Dan for Situational Awareness) Legal Division is authorized to support all operational matters being exercised on behalf of our new leadership and our regulatory/statutorily requirements including:

Procurement/Contract Actions
Financial Management Actions
Human Capital Actions

                                 Labor Relations Actions
                                 Employee Relations Actions
Ethics Actions including vetting of new PAS/SCH Cs
Technology and Infrastructure Support
Administrative Operations Actions (Security, facilities, maintenance)
Data Governance/Administration
EEO Processing Counsel Support
Reasonable Accommodation Counsel Support

Mission related support should be coordinated directly through Mark or Dan.

Defs.' Ex. 5 [Dkt. # 56-1] at Page 7 of 116, CFPB_00007.

Twenty-two states and the District of Columbia file amicus brief in support of plaintiffs' motion for a preliminary injunction. States' Br.

**Monday, February 24**    Defendants file opposition to the motion for preliminary relief, attaching Declaration of Adam Martinez. Defs.' Opp. [Dkt. # 31]; First Martinez Decl.

**Tuesday, February 25**    8:53 a.m. Senior Litigation Counsel Rebecca Smullin sends email stating that her Consumer Sentinel Account, which has information subject to litigation holds, is being deactivated. Defs.' Ex. 8 [Dkt. # 56-1] at Page 14 of 116, CFPB_00014.

1:25 p.m. Liane Fiano in the Office of Communications emails LaShaun Warren and copies Adam Martinez and others. "I no longer have access to Sprinklr, which is where [our] social media backup records are maintained. We have hard copy exports for Director Chopra's account, but everything else lived within Sprinklr and on our public channel. As the public channels were removed unexpectedly, we may not be in compliance with our records retention requirements." Defs.' Ex. 7 [Dkt. # 56-1] at Page 12–13 of 116, CFPB_00012–13.

Tzedek DC files amicus brief in support of plaintiffs' motion for a preliminary injunction. Tzedek DC Amicus Br. [Dkt. # 33].

**Wednesday, February 26**    10:14 a.m. Email regarding discontinuation of Citrix Virtual Desktop: "The Citrix Virtual Desktop will be unavailable after Friday, February 28, 2025, at 11:59 PM EST." Pls.' Ex. M [Dkt. # 60-1] at Page 33 of 107. This is the program that allows

employees to securely log in to the CFPB system when they are not at a CFPB computer.  Diotalevi Decl. ¶ 20.

Russell Vought, in his capacity as OMB Director, issues memo: Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative.  *See* Mem. from Russell T. Vought, Director, Off. of Mgmt. and Budget, and Charles Ezell, Acting Director, Off. of Pers. Mgmt., to Heads of Exec. Dep'ts and Agencies (Feb. 26, 2025) [Dkt. # 70-2] at Page 1–7 of 7.

**Thursday, February 27**    OPM and RIF team meet.  "[W]e discussed some guidance that came out from Acting Director Vought, but in his OMB capacity. It was giving him guidance about RIFs for federal agencies." "[Adam] said he would discuss it further with acting leadership and that he would let us know – 'us' being the RIF team both at CFPB and at OPM – that he would let us know if the plan changed. And that has never – to this day has never happened." Alex Doe Testimony, Mar. 11 Tr. at 60–61.

11:25 a.m.  Email "Subject:  Pickup of Personal Belongings and Return of Equipment from the CFPB HQ: . . . We recognize that you have personal property, work materials. and federal records in your office or cubicle.  To prepare to vacate the building, the Operations team has packed up your personal belongings for pickup at 1700 G Street." Pls.' Ex. O [Dkt. # 60-1] at Page 37 of 107.

4:18 p.m.  Email from Adam Martinez to Research, Monitoring, and Regulation ("RMR")

> Subject:  Statutory/Legal Required Work
> Date:  Thursday, February 27, 2025 4:18:00 PM
> Attachments:  Directives on Bureau Activities.msg
>
> Hi RMR Colleagues – Good afternoon.
>
> Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.
>
> On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau. He did exclude areas approved by him or required by law. We want to ensure that you are aware that statutorily required work and/or work required by law are authorized.

Your teams are authorized to continue carrying out these responsibilities. Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director. Alternatively, you are always welcome to reach out to me if needed. I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam
Adam Martinez
Chief Operating Officer

Defs.' Ex. 16 [Dkt. # 56-1] at Page 34 of 116, CFPB_00034.

11:55 p.m.  Plaintiffs file reply and supplemental declarations disputing First Martinez Declaration.  Pls.' Reply [Dkt. # 40]; Pls.' Suppl. Decls. [Dkt. # 38].

As of February 27, "[n]o member of the Escalated Case Management [is] perform[ing] any work since at least the February 10th stop-work order."  Emory Doe Decl. [Dkt. # 48-3] ¶¶ 4–5.

RMR employees remain confused because Martinez's February 27 email does not reference the February 10 stop work email of Vought: "no work in my office has restarted."  Decl. of Greer Doe [Dkt. # 48-5] ("Greer Doe Decl.") ¶ 8.

| | |
|---|---|
| **Friday, February 28** | 8:54 a.m. Adam Martinez emails Gueye Jafnar and others, directing them to reinstate the ETK (Entellitrack) contract.  ETK is the database and workstream for EEO, reasonable accommodation, and anti-harassment/bullying cases, and are required to be proceed by law.<br>▪ This is in response to email highlighting "inability to access EEO complaints"<br>▪ "Some vendors that were asked to 'turn back on' operations were able to, others cannot be back on so easily."<br>▪ "we will not be able to run statutorily required reports" |

Defs.' Ex. 19 [Dkt. # 56-1] at Page 39–41 of 116, CFPB_00039–41.

10:18 a.m.   Deputy Associate Director and Acting Associate Director, Research, Monitoring, and Regulations Janis Pappalardo emails Adam Martinez, "In light of your e-mail and discussion yesterday, my understanding is that we can resume all regular work related to fulfilling statutory obligations, including regular management activities. Is that correct?" Defs.' Ex. 20 [Dkt. # 56-1] at Page at 44 of 116, CFPB_00044.

10:20 a.m. Martinez replies to Pappalardo that her understanding that "regular work related to fulfilling statutory obligations, including regular management activities" can be resumed is correct. Defs.' Ex. 20 [Dkt. # 56-1] at Page 44 of 116, CFPB_00044.

10:33 a.m.  Principal Deputy Assistant Director, Supervision Policy & Operations Cassandra Huggins emails Martinez, "To be clear, the Feb. 8 email directed us to cease all supervision and examination activity. Am I correct that directive still stands?" Defs.' Ex. 22 [Dkt. # 56-1] at Page 51 of 116, CFPB_00051.

10:49 a.m.  Text message telling Francis Doe to "stand down until further notice." Pls.' Ex. S [Dkt. # 60-1] at Page 50 of 107; *see* Decl. of Francis Doe [Dkt. # 48-4] ("Francis Doe Decl.") ¶¶ 6–9 (Francis Doe in RMR and two colleagues receives a direct text to their personal cell phones, stating: "In response to Adam Martinez's email, John [McNamara] has instructed us to stand down until further notice." After further emails, declarant emailed Mr. McNamara again, asking "To clarify, should I get started or wait for guidance?" Mr. McNamara responded that I should "[w]ait for guidance." Having not received any further guidance, I continue to remain unauthorized to perform any work. Despite Mr. Martinez's February 27 email, my understanding is that the stop-work order issued on February 10th remains in effect.").

10:58 a.m.  Adam Martinez responds to Huggins' 10:33 a.m. email: "That is correct. If there are any reports to congress per statute or anything like that, I'd recommend reaching out to Mark. Other divisions are raising questions about reports or other statutory requirements. I'm personally trying to be helpful to just ensure people know they can ask questions or seek clarification, even it's just on operational issues."  Defs.' Ex. 22 [Dkt. # 56-1] at Page 50–51 of 116, CFPB_00050–51.

5:11 p.m.  Assistant Director of Research Jason Brown emails Research staff, telling them to resume "statutory work" – "We

stopped most of our statutory work, I know, not because of the February 8 email, but because of the February 10 email. I clarified this point with the COO." Brown states that "the Research environment not functioning as before." Pls.' Ex. Q [Dkt. # 60-1] at Page 41 of 107.

203 Members of Congress file amicus brief in support of plaintiffs' motion for a preliminary injunction. Members' Br.

**Saturday, March 1**     1:59 p.m. Christopher Young sends Teams message to Adam Martinez asking if they are "prepared to implement the RIF" if the "judge lift[s] the TRO." Defs.' Teams Exchange Ex. [Dkt. # 70-1] at Page 1–2 of 2, CFPB_00131–32.

**Sunday, March 2**     Defendants file Supplemental Declaration of Adam Martinez. [Dkt. # 47-1] ("Second Martinez Decl.").

Plaintiffs file Second Declaration of Matthew Pfaff [Dkt. # 48-2] ("Second Pfaff Decl."); Declaration of Emory Doe [Dkt. # 48-3]; Decl. of Francis Doe [Dkt. # 48-4]; and Declaration of Greer Doe [Dkt. # 48-5].

3:33 p.m. Adam Martinez emails all CFPB employees and contractors on behalf of Chief Legal Officer Mark Paoletta.

> Subject: All Hands Message re: Work Required by Law
> Date: Sunday, March 2, 2025 3:33:06 PM
>
> Message from Mark Paoletta, Chief Legal Officer
>
> On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.
>
> On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood

this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

Defs.' Ex. 24 [Dkt. # 56-1] at Page 56 of 116, CFPB_00056.

| | |
|---|---|
| **Monday, March 3** | 8:45 a.m. Office of Supervision Examinations staff member Caitlyn Sellers emails supervision staff, instructing them to "continue to comply with the stop work order." Pls.' Ex. V [Dkt. # 60-1] at Page 58 of 107. |
| | 10:00 a.m. Court hears argument on plaintiffs' motion for a preliminary injunction. It sets an evidentiary hearing for Monday, March 10, 2025. *See* Minute Entry (Mar. 3, 2025). |
| | 10:02 a.m. [REDACTED] emails Adam Martinez. "Hi, Adam, Based on every email starting 2/10 the unambiguous guidance was to stop all work tasks, no stipulation of statute requirements was made. As of today, Consumer Complaint Database (CCDB) has not had been refreshed with new data since 02/22/2025 and displays an error banner . . . ." Pls.' Ex. Z [Dkt. # 60-1] at Page 73 of 107. |
| | 11:33 a.m. CFO Gueye reply to Nykea Bolton email: "In general we are very narrowly turning back contracts (or portions of contracts) that directly support statutory requirements. . . . Specifically can you outline for each contract what (statutorily required) action will not be able to be accomplished at all without the contract? I can't stress enough that this needs to be as specific as possible. We'll need to be prepared to have someone on the team |

defend this justification to external parties.  All PCards across the bureau have been cancelled.  We've been authorized to reopen one for the entire bureau with a very limited limit so we are triaging the requests as they come in.  I'm using the same criteria as above (i.e. directly being indispensable to meet a statutory requirement)." Defs.' Ex. 29 [Dkt. # 56-1] at Page 98–99 of 116, CFPB_00098–99.

11:39 a.m.  Chief Financial Officer Gueye replies to Chilbert email: "[W]e're getting a lot of requests to turn contracts back on. I will send out guidance shortly but for your awareness we are not turning back on every contract we've had. We're taking a very narrow approach: if without the contract the Bureau can't meet a statutory requirement then it will be considered for reactivation. Meaning that a contract enhancing our ability to meet a statutory requirement is not enough to get it back on.  It needs to be the only way the bureau can currently meet that requirement. Also as you're providing justifications please be prepared to have to defend those to external patties. We've been routinely asked to provide for names of the people providing the justification."  Defs.' Ex. 38 [Dkt. # 56-1] at Page 96 of 116, CFPB_00096; Martinez Testimony, Mar 10 Tr. at 85 (Martinez does not believe guidance has been sent out).

12:31 p.m.  Email providing term employee with notification of termination (approved on February 15) pursuant to "E.O. 14210 and the stop work email from Russ Vought."  Pls.' Ex. CC [Dkt. # 60-1] at Page 89–90 of 107.

3:52 p.m.   Regional Director, Midwest Region John Schroeder emails supervision examiners asking them to "refrain from all work activity other than ministerial tasks" pending further guidance, forwarding Paoletta's March 2 email.  Pls.' Ex. U [Dkt. # 60-1] at Page 55–56 of 107.

Email notifying supervision staff that Martinez and Paoletta's March 2 emails do not authorize them to carry out activities "required by law." Pls.' Ex. W [Dkt. # 60-1] at Page 63 of 107.

**Tuesday, March 4**      7:50 a.m.  Email providing probationary employee with Notification of Termination (approved on February 13) pursuant to "E.O. 14210 and the stop work email from Russ Vought."  Pls.' Ex. BB [Dkt. # 60-1] at Page 85–87 of 107.

8:38 a.m.  Chris Chilbert sends email to Chief Financial Officer Jafner Gueye and others request to pay for Google Analytics platform, without which CFPB "will lose all historical data."  Pls.' Ex. EE [Dkt. # 60-1] at Page 95 of 107.

8:45 a.m. Christopher Chilbert sends email to someone who has asked to fix the homepage: "I believe it is important to restore the home page as soon as possible, but that is not currently authorized." Pls.' Ex. DD [Dkt. # 60-1] at Page 92 of 107.

8:58 a.m. Gueye sends email advising that there is a problem with PCards, and that there is only one PCard exception, which has "a very limited total limit." Pls.' Ex. EE [Dkt. # 60-1] at Page 94 of 107.

OPM and RIF hold team meeting, with Martinez no longer attending. "On the 4th, it was mostly about a cost estimate for the final phase after the 1200, doing, you know, reduction in force on the rest of the positions." Alex Doe Testimony, Mar. 11 Tr. at 61–62.

White House issues statement that "President Trump ordered the" CFPB "to halt operations." The White House, "President Trump is Making Government Work for You Again," Pls.' Ex HH [Dkt. # 60-1] at Page 105–107 of 107.

| | |
|---|---|
| **Wednesday, March 5** | 7:27 a.m. Email advising of indefinite postponement of mandatory training. Pls.' Ex. SS [Dkt. # 66-1] at Page 37 of 60. |
| | 10:01 a.m. Email from Cassandra Huggins emails regional examiners directing them to prepare a report requested by Mark Paoletta on their supervision examination activity. Pls.' Ex. UU [Dkt. # 66-1] at Page 42 of 60. |
| **Thursday, March 6** | OPM and RIF hold another team meeting on work OPM needs the RIF team to do to help define competitive levels. Martinez is no longer attending meetings. Alex Doe Testimony, Mar. 11 Tr. at 63. |
| | 1:08 p.m. Email regarding reporting on supervision activity and return to administrative leave. Pls.' Ex. WW [Dkt. # 66-1] at Page 53 of 60. |
| | 6:17 p.m. Bruce McNitt emails John McNamara about the impact of contract cancellations on the Office of Markets. Pls.' Ex. XX [Dkt. # 66-1] at Page 55–56 of 60. |
| **Friday, March 7** | 10:07 a.m. Email from head of Office of Students team indicating that they are currently unable to perform required complaint-review function. Pls.' Ex. ZZ [Dkt. # 66-1] at Page 60 of 60. |
| **Monday, March 10** | The Court holds evidentiary hearing at which Adam Martinez testifies. *See* Minute Entry (Mar. 10, 2025); Mar. 10 Tr. |

**Tuesday, March 11**    The Court holds evidentiary hearing at which Adam Martinez concludes his testimony, and Alex Doe and Matthew Pfaff testify. *See* Minute Entry (Mar. 11, 2025); Mar. 11 Tr.

## ANALYSIS

## V.    THE COURT MAY EXERCISE SUBJECT MATTER JURISDICTION OVER THIS CASE.

"[E]very federal court has a 'special obligation to satisfy itself' of its own jurisdiction before addressing the merits of any dispute." *Dominguez v. UAL Corp.,* 666 F.3d 1359, 1362 (D.C. Cir. 2012), quoting *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986).  As an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies." *Allen v. Wright,* 468 U.S. 737, 750 (1984).

### A.    The Court has jurisdiction to decide Counts One, Three, and Four.

In Count One, plaintiffs have alleged both statutory and constitutional violations, and it is a fundamental proposition of constitutional law that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  Counts Three and Four are predicated on the APA.  These are the claims that will underlie this ruling,[6] and the Court has jurisdiction to hear them and to impose injunctive relief.

While the decisions in this case implemented Presidential directives, the President is not the defendant in this action:  plaintiffs sued Russell Vought, in his official capacity as Acting Director of the CFPB, and the agency itself.  In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the Supreme Court remedied the President's wrongful seizure of the nation's

---

[6]    Given that finding, and the fact that the relief to be granted will be predicated on those counts, the Court need not address the merits of Count Two, which asserts that the firing of the CFPB Director did not create a "vacancy" that could be filled under Federal Vacancies Reform Act, 5 U.S.C. §3345, and that therefore, the appointment of defendant Vought as Acting Director of the CFPB violated the Appointments Clause.  U.S. Const. art. II, § 2, cl. 2.

steel mills through an injunction to his subordinates, and that case continues to be cited for the proposition that "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v. David,* 448 F.2d 1067, 1072, n.12 (D.C. Cir. 1971).

In *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996), the D.C. Circuit reiterated the "bedrock principle that our system of government is founded on the rule of law."  And it explained that therefore:

> it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments.  In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.

*Id.* at 978 (internal citations and quotation marks omitted).

These principles apply to cases raising constitutional questions as well as statutory questions; "the court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself."  *Trudeau v. FTC,* 456 F.3d 178, 190, n.22 (D.C. Cir. 2006), quoting *Hubbard v. EPA,* 809 F.2d, 1 at 11, n.15 (1986). *See also id.* at 343 ("the 'APA's waiver of sovereign immunity applies to any suit whether under the APA or not'"), citing *Chamber of Com. v. Reich,* 74 F.3d 1322, 1328 (D.C. Cir. 1996).[7]

---

7       *See also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 491, n.2 (2010), in which the Supreme Court recognized its power to hear challenges to the constitutionality of governmental action on separation of powers principles, citing *Correctional Servs. Corp. v. Malesko,* 534 U.S. 61, 74 (2001) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell v. Hood,* 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . ."); and *Ex parte Young*, 209 U.S. 123, 149, 165, 167 (1908).

Count One alleges that the defendants' actions to dismantle and shut down the CFPB are unconstitutional because they exceed the executive's authority and usurp the legislature's authority: "[t]he CFPB was established as a federal agency by Congress by statute, the Dodd Frank Act, signed into law in 2010, and can be eliminated only by Congress." Am. Compl. ¶ 79.

This claim is likely to succeed as there is no mystery about what is going on as the President and his delegees, Elon Musk and Russell Vought, have made their actions and intentions clear.

On February 6, officials representing the Department of the Treasury notified the CFPB that individuals from United States DOGE Service would need access to the building that evening. First Martinez Decl. ¶ 6. A follow-up meeting was held on February 7. *Id.* ¶ 7. On that date, the President designated Russell Vought, Director of the Office of Management and Budget, to serve as the Acting Director of the CFPB, *id.* ¶ 10; Feb. 8 Email, and by that evening, Musk had already posted "CFPB RIP" and a tombstone emoji on his social media site X. Kaspar Decl. ¶ 6.

On February 8, Vought suspended rulemaking, investigative, public communication, and litigation activities, but also ordered that "effective immediately," all CFPB employees shall "cease all supervision and examination activity," and "cease all stakeholder engagement." Feb. 8 Email. By February 10, the day Vought ordered all employees to stop all work, President Trump acknowledged that his goal was to have the agency "totally eliminated," and he added that "we did the right thing. The CFPB was a very important thing to get rid of, and it was also a waste. I mean, number one, it was a bad group of people running it, but it was also a waste." *See* Am. Compl. ¶¶ 2, 47, n.14, citing @factpostnews, X (Feb. 10, 2025), https://x.com/joeygarrison/status/ 18891320239 33022283?Mx=2.

### 1.    The constitutional claims are not barred by *Dalton v. Spector*.

Defendants argue that this Court has no power to hear the constitutional claim that underlies Count One, as it is nothing more than a statutory claim, and they cite *Dalton v. Specter*, 511 U.S. 462, 472 (1994), for that principle.  But the holding in that case arose in a situation that is not at all analogous to the situation here.  In *Dalton,* the plaintiffs sought to enjoin the Secretary of Defense from closing the Philadelphia Naval Shipyard.  The President had made the decision to do so pursuant to the Defense Base Closure and Realignment Act of 1990, 10 U.S.C. § 2687.  As the opinion explains in detail, the Act established an "elaborate selection process" that concludes with a set of recommendations on the President's desk:   the Secretary issues recommendations for closure or realignment after he has given notice and an opportunity for public comment; the Secretary submits the recommendations to Congress and to the Defense Base Closure and Realignment Commission, an independent body whose members are appointed by the President and confirmed by the Senate; and the Commission conducts hearings, resulting in the transmittal of a report and recommendations to the President, who has the decision-making authority.  *Id.* at 464–65.  The Act then sets out a timetable for the President's approval or disapproval of the recommendations and the submission of any certification of approval to Congress.  *Id.*

The Court made quick work of the plaintiffs' claims challenging the actions of the Secretary and the Commission, finding that they could not be reviewed under the APA because they were not "final agency actions;" they were simply recommendations to the President, who had the ultimate decision-making authority.  *Id.* at 476.  The actions of the President could not be reviewed under the APA because the President is not an "agency" under that Act.  *Id.*

Thus, the question of jurisdiction in *Dalton* boiled down to the issue of whether the President exceeded his authority under the Act, and that, according to the Court, could not be characterized as a constitutional question.  First, it observed:

> Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution.  On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority.

*Id.* at 472, citing, *inter alia, Harmon v. Brucker,* 355 U.S. 579, 581 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' non-constitutional claim that respondent [Secretary of the Army] acted in excess of powers granted him by Congress ").[8]  The Court then distinguished the situation before it from what had been at issue in *Youngstown*:

> In *Youngstown,* the Government disclaimed any statutory authority for the President's seizure of steel mills.  The only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces.  Because no statutory authority was claimed, the case necessarily turned on whether the Constitution authorized the President's actions.  *Youngstown* thus involved the conceded *absence* of *any* statutory authority, not a claim that the President acted in excess of such authority.  The case cannot be read for the proposition that an action taken by the President in excess of his statutory authority necessarily violates the Constitution.

---

8    The Court also cited *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 691, n.11, (1949), which stated that sovereign immunity would not shield an executive officer from suit if the officer acted either unconstitutionally or beyond his statutory powers.  It commented that there was a difference:  "[i]f all executive actions in excess of statutory authority were *ipso facto* unconstitutional . . . there would have been little need in *Larson* for our specifying unconstitutional and ultra vires conduct as separate categories."  *Id.*  Count One alleges that the decision to close the agency is contrary to statute and the constitution; if the defendants do not defend on the grounds that the President was exercising his constitutional authority, the Court may not need to reach the constitutional question.

*Id*. at 473 (citations omitted) (emphasis in original).  Applying that reasoning, the Court found that the respondents' claim that the Secretary's action was inconsistent with the Act was at bottom a statutory claim.  It held that "[w]here a statute, such as the 1990 Act, commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."  *Id*. at 477.

That ruling does not serve as any sort of impediment here.  While the government disputes whether it is engaged in the elimination of the agency as a matter of fact, it is not suggesting that doing so would have been an exercise of discretion authorized by the statute in question as the Secretary's actions were in *Dalton*.  *See* Defs.' Opp. at 28–29.  Nor are plaintiffs solely alleging that defendants in this case exceeded any statutory authority accorded to the agency under the Dodd-Frank Act; their argument is that Acting Director Vought's actions to close the agency on behalf of the President violated both the separation of powers inherent in the Constitution and the statute that created the CPPB and assigned it mandatory duties.  *See* Am. Compl. ¶¶ 2, 9, 10, 76–80, and 92.

There are significant differences between the abrupt closure of a federal agency by the executive and the implementation of the multi-layered administrative, executive, and Congressional process that led to the closure of a shipyard.  Therefore, it is telling here that the *Dalton* Court took pains to emphasize that it was not repudiating *Marbury v. Madison* or the "nearly two centuries of constitutional adjudication" that followed; the "conclusion that judicial review is not available for respondents' claim follows from our interpretation of an Act of Congress, by which we and all federal courts are bound."  511 U.S. at 477.  Since there is no act of Congress that empowers the President to shut down the CFPB in his discretion, *Dalton* does not

apply, and the Court has jurisdiction to perform its traditional duty and consider both the statutory and constitutional claims.

**2.    The APA claims are properly predicated on discrete, final agency action.**

Defendants argue that the Court lacks jurisdiction to consider the APA claims because, as they characterize the complaint, plaintiffs are simply voicing a generalized grievance about agency policy or management, and such claims are not cognizable under *Lujan v. Defenders of Wildlife Federation*, 504 U.S. 555 (1992) and *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ("*SUWA*"). *See* Defs.' Opp. at 14–15 ("Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids.  They do not seek judicial review of a discrete agency action.  Rather, they seek wholesale judicial review of Defendants' management of the CFPB."); *id.* at 17 ("Plaintiffs are unlikely to succeed on their APA claims because they are sweeping programmatic challenges unavailable under the APA.").  Defendants also pluck one sentence from *Biden v. Texas,* 597 U.S. 785, 809 (2022), and repeat that "the APA does not permit review of an 'abstract decision.'"  Defs.' Opp. at 18, citing 597 U.S. at 809.  But they do not suggest that the holding of that case bears on this dispute in any other way.  *See* Defs.' Opp. at 18.

Defendants' repeated incantation of the words "programmatic" and "abstract" cannot change the character of what is actually going on, and there is at least one discrete order before the Court that is ripe for review.

Plaintiffs' claims under the Administrative Procedure Act are predicated on sections 706(2)(C) and 706(2)(A).  Am. Compl. ¶¶ 90, 93.  Section 706(2)(C) provides that "the reviewing court shall . . . hold unlawful and set aside agency action . . . found to be in excess of statutory jurisdiction, authority or limitations," and (2)(A) directs the reviewing court to hold unlawful and

set aside agency action found to be "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(C), (2)(A).

Congress specified what it meant by these terms. According to the definitions section of the statute, "agency action" includes "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. §551(13). The word "order" in that series is defined to mean "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." *Id.* § 551(6). There is no question that on February 10, 2025, Acting Director Vought ordered CFPB employees to stop work. But was that order "final" such that it would be a reviewable agency action? The statute further explains that when undertaking this review, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. *Id.* § 706 ("Scope of Review").

The test to be applied when a court is ensuring itself of its jurisdiction to review agency action was set out in *Bennet v. Spear,* 520 U.S. 154 (1997). "As a general matter, two conditions must be satisfied for agency action to be 'final': First the action must mark the 'consummation of the agency's decision-making process, . . . it must not be of a merely tentative of interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 177–78 (citations omitted).

The thrust of defendants' opposition to the pending motion is that Acting Director Vought's February 8 email was nothing more than the typical pause in regulatory and enforcement activities that would mark the arrival of any new administration.

> Incoming Presidents of both parties have routinely issued directives that
> pause policy-related decision-making to allow the reevaluation of those

> policies that were under consideration or under development but not
> finalized by the prior administration.  Consistent with this practice, on
> January 20, 2025, President Trump ordered agencies across the government
> to freeze regulatory actions so that new agency leadership may reevaluate
> policies and enforcement priorities.
>
> In line with these principles, on February 8, 2025, Russell Vought, Acting
> Director of the Consumer Financial Protection Bureau e-mailed all CFPB
> staff to direct that, unless "required by law" or "expressly approved by the
> Acting Director," staff were not to take substantive actions that might reflect
> policy decisions inconsistent with new leadership's views on the best way
> to meet the agency's statutory responsibilities.
>
> After this directive, Plaintiffs . . . filed the present motion.

Defs.' Opp. at 1; *see also* Defs.' Opp. at 28–29.

The problem for the defendants is that this explanation is largely irrelevant, and it is factually incorrect.  It is true that plaintiffs filed their initial complaint the day after the February 8 directive.  *See* Compl. [Dkt. #1].  But the February 13 motion for a temporary restraining order was *not* filed at that time; it came after the February 10 stop work order and the actions that followed in its wake.  *See* Mot. for TRO [Dkt. #10].  And the February 8 email is not the basis for plaintiffs' request for interim relief, nor will it be the subject of this order.  The Court's concern is February 10.

Defendants do posit that the February 10 "Vought 'stop work' email" does not satisfy the *Bennett* test either, but they do that by trying – unsuccessfully – to blur the obvious distinction between what happened on Vought's first day at the agency and what he did two days later, relying on the arguments advanced concerning the February 8 email in their brief.  *See* Defs.' Opp. at 18 ("[T]he e-mail marks the initiation, not the consummation, of the agency's decision-making process.  As described in more detail *infra* at 28–33, the Vought e-mail's directive to pause some agency activities reflects a decision by CFPB leadership that agency personnel should not advance the prior administration's policies until new leadership has an opportunity to reevaluate agency

priorities.  That decision is thus 'preliminary' in nature and 'not directly reviewable.'") (internal citation omitted).

The record shows that the February 10 stop work order marked the end of whatever decision-making process the Acting Director found to be necessary, and that it had immediate, concrete legal consequences.  While the February 8 "Directive on Bureau Activities" carved out activities "expressly approved by the Acting Director or required by law," the "Additional Directives" issued on February 10 superseded those instructions with a straightforward, unqualified statement:  "[p]lease do not perform any work tasks."  The order did include the information that if there were "urgent matters," employees could "alert" the Acting Director "through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task."  Feb. 10 Email.[9]  The email concluded by reiterating, "[o]therwise, employees should stand down from performing any work task."  *Id.*

The consequences were swift.  As of February 10, agency employees understood that no work meant no work.[10] *See* Martinez Testimony, Mar. 10 Tr. at 206.  On February 11 and 12, all eighty-five probationary employees were terminated.  *See, e.g.*, Alex Doe Testimony, Mar. 11 Tr. at 45.  On what grounds?  The Notification of Personnel Action issued by the Office of Personnel Management, headed by the very same Director, Russell Vought, cited only two sources of

---

9      As will be set out in more detail below, there were some requests for approval that were granted, but those generally involved operational needs – keeping the lights on and the computers running, or doing the work needed to effectuate the RIFs and contract terminations.

10      As of the day before, February 9, employees were informed that the CFPB headquarters building would be closed, and the President had already announced on January 20, 2025 that agencies in the executive branch "shall, as soon as practicable, take all necessary steps to terminate remote work arrangements and require employees to return to work in-person at their respective duty stations on a full-time basis."  Return to In-Person Work, https://www.whitehouse.gov/ presidential-actions/2025/01/return-to-in-person-work/.

authority: the Executive Order 14210 of February 11 and "the stop work email from Russ Vought Entitled 'Additional directives on Bureau Activities'" dated February 10. *See* Notices of Personnel Action, Pls.' Ex. BB [Dkt. # 60-1] at Page 86 of 107; Pls.' Ex. CC [Dkt. # 60-1] at Page 90 of 107. In short, the February 10 work stoppage order had an immediate impact on probationary employees' legal rights and obligations. *See id.* at Pages 87, 91 of 107 (second page of Notices explaining the contents of the first page and the employee's rights).

Also, on February 11, agency staff received direction to terminate contracts with outside vendors, affecting the contractors' rights and obligations, and a template for accomplishing this task was circulated. Pls.' Ex. B [Dkt. # 60-1] at 5 of 107; Template of Notification of Termination During Probationary Period, Pls.' Ex. C [Dkt. # 60-1] at Page 7 of 107.

On February 12, with the probationary and term employees out of the way, the CFBP entered into an agreement with OPM to receive "RIF Assistance." Pls.' Ex. II [Dkt. # 66-1] at Page 3 of 60. The objective was to fire approximately 1175 employees as soon as possible, leaving only a skeleton crew to oversee the functions associated with the RIF. Pls.' Ex. JJ [Dkt. # 66-1] at Page 10 of 60.

To do that, it was necessary to ask OPM to exempt the CFPB from the ninety-day notice period ordinarily required when an agency implements a RIF, which is supposed to give the discharged employees an opportunity to compete for the positions that remain. Since it had already been determined that there would be no open positions to fill, because the agency was shutting down completely, the agency submitted a request for an exception to the ninety-day period on February 13. Pls.' Ex. JJ [Dkt. # 66-1] at Pages 9–11 of 60.

What did the CFBP identify as the "circumstances" that would warrant giving notice less than 90 days before a proposed reduction? It wrote: "[t]he CFPB is responding to Executive Order

Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative . . . dated February 11, 2025 and the CFPB Acting Director's work stoppage order dated February 10, 2025." *Id.* at 11.

Unsurprisingly, the Office of Personnel Management approved the request the next day, again citing only two reasons: the Executive Order of February 11, and "the CFPB Acting Director's work stoppage order dated February 10, 2025." Pls.' Ex. OO [Dkt. # 66-1] at Page 28 of 60.

Given this set of exchanges between the two departments operating under Russell Vought's direct control, the defendants' suggestion that the document that both agencies referred to as a "work stoppage order" was merely interlocutory, and not a "final order" from which legal consequences flowed, is entirely unsustainable.

And the consequences kept on coming. On February 13, "term" employees, who were hired under a temporary/excepted appointment were terminated, and again, the Executive Order and "the stop work email from Russ Vought" were identified as the justifications. *See* Pls.' Ex. QQ [Dkt. # 66-1] at Page 32–33 of 60.

On February 14, the CFPB's Chief Operating Officer Adam Martinez was informed by OPM that employees typically work during the notice period, even if it has been truncated to thirty days, so he asked Mark Paoletta, Director Vought's legal advisor at both OPM and the CFPB, for "clarification and expectations." Pls.' Ex. KK [Dkt. # 66-1] at Page 13 of 60. After that conversation, Martinez communicated that all staff would be placed on administrative leave for the thirty-day notice period. *See id.* The Operations Manager of the CFPB Office of Human Capital then disseminated instructions that "employees should exercise administrative leave until

otherwise instructed" – why? – "[i]n accordance with the Acting Director's guidance" of February 10.  Pls.' Ex. J [Dkt. # 60-1] at Page 27 of 107.

Count Three specifically includes the issuance of the stop work directive as one of defendants' orders that constitutes final action under the APA.  Given the facts set forth above, the Court finds that the amended complaint presents at least one final, discrete agency action for the Court's review under the APA.

However, that is not the only focus of the complaint.  Defendants point to plaintiffs' iteration of the series of steps taken by agency leadership, including the February 10 work stoppage order, and plaintiffs' description of those circumstances as an unlawful effort "to dismantle an agency that Congress established," Am. Compl. ¶ 9, *see also, e.g.,* Am. Compl. ¶¶ 2, 4, 10, 80, 91, 92, 94, as an indication that the complaint amounts to nothing more than a "programmatic" challenge that does not pass muster under the APA given the Supreme Court's pronouncements in *Lujan* and *SUWA*.  Defs.' Opp. at 15–16.

But this lawsuit is not a challenge of any agency "program."  It does not challenge any exercise of the agency's discretionary authority to regulate activities within its purview or to enforce particular statutory provisions.  It is a challenge to the wholesale cessation of activities – the decision to shut down the agency completely – which is not within the executive's authority. Defendants can hardly complain that the focus of the action is too broad; it was the Acting Director who chose to paint with a broad brush, not plaintiffs.

Defendants quote *SUWA* for the proposition that "the purpose of the APA's discrete agency action requirement is: 'to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack

both expertise and information to resolve." Defs.' Opp. at 16, quoting *SUWA,* 542 U.S. at 66–67.[11]

None of those principles is at risk here. The decision to close an agency is not a theoretical or hypothetical concept – it's real. The agency is either open or it's not. It is either responding to calls from consumers or it's not. There is nothing abstract about firing employees, cutting off the funding stream, terminating contracts, or stopping all work; plaintiffs are not engaged in a "policy" disagreement with the agency, but a battle for its existence. Therefore, in the Court's view, even if the February 10 work stoppage order does not satisfy the requirements of a "final order," the

---

11    By introducing and editing the quoted language from the *SUWA* opinion in this manner, defendants leave out the circumstances that were being discussed in that case, which are easily distinguished from the case at hand. In *SUWA,* the petitioners were challenging an agency's "failure to act" under section 706(1) of the APA. 542 U.S. at 61–62. And while the Supreme Court made it clear that like the actions that can be set aside under section 706(2), an agency action that can be compelled under section 706(1) must be a discrete one, 542 U.S. at 63, it also went to some lengths to liken section 706(1) to a writ of mandamus and explain that "a claim under 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* action that it is *required to take.*" *Id.* at 64 (emphasis in original). *See also id.* at 65 ("The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not mandated by law. . . .") (emphasis in original).

"With these principles in mind," the Court then turned to one of the claims before it and found that the statute the petitioners were seeking to enforce in that claim left the agency with a great deal of discretion as to how to achieve the broad statutory objectives. *Id.* at 65–66. It was in that context that the Court made the quoted remarks about "[t]he principal purpose of the APA limitations we have discussed – and of the traditional limitations upon mandamus from with they were derived," and went on to express concern about the situation that would arise "if courts were empowered to enter general orders compelling compliance with broad statutory mandates[,]" and find that "the prospect of pervasive oversight by federal courts over the manner and pace of agency compliance *with such congressional directives* is not contemplated by the APA." *Id.* at 66–67 (emphasis added).

Here, plaintiffs are not invoking the APA to compel compliance with *any* statutory provision under section 706(1); while it will be prudent to ensure than any interim relief ordered is enforceable without the Court's taking on the problematic role of managing the agency's day-to-day operations, the cited section of *SUWA* does not bear on this Court's subject matter jurisdiction or the merits of plaintiff's APA claims.

APA claims in Counts Three and Four can be construed as challenging a final, concrete decision to shut down the agency entirely.[12]

The fact that the effort was temporarily stymied or slowed down by the Court's intervention and entry of a consent order to freeze the situation does not mean that the decision is not yet finalized or that it was ever abandoned.  As will be explained in more detail below, notwithstanding defendants' considerable efforts to paper over what they were assiduously trying to accomplish in one stroke before the Court ruled at the TRO hearing on February 14, their subsequent attempts to deny what was afoot are at odds with the undisputed facts in the record and the documents produced by both sides.  Indeed, only two days after the agency's Legal Officer – who like the police chief in *Casablanca* who was "shocked, shocked" to find gambling going on – professed to be surprised that some employees were not working, the White House posted a message on its "Work for You Again" webpage boasting:  "President Trump ordered the Consumer Financial Protection Bureau – the brainchild of Elizabeth Warren, which funneled cash to left-wing advocacy groups – to halt operations."  Pls.' Ex HH [Dkt. # 60-1] (underlining in original).  In

---

12     Count One could also be construed as being brought under section 706(2)(B) of the APA, which authorizes the reviewing court to set aside agency action "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

sum, the impending closure of the agency is also an action that can be a subject of review under the APA.[13]

### B.      There are plaintiffs with standing to bring this action.

"[T]o give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,'" which include standing, ripeness, mootness, and the political question doctrine. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), citing *Allen*, 468 U.S. at 750; *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (standing is a necessary "predicate to any exercise of our jurisdiction"). To establish Article III standing, a plaintiff must show that it has "suffered an injury in fact" that "is fairly traceable to the challenged action of the defendant," and it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000),

---

13      Defendants have directed the Court to the memorandum opinion and order issued in *Mayor and City Council of Baltimore v. Consumer Financial Protection Bureau,* Civ. No. MJM-25-458, 2025 WL 814500 (D. Md. Mar. 14, 2025). *See* Defs.' Notice of Suppl. Auth. [Dkt. # 78] (pointing out that "the court emphasized and explained that '[t]he distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to' the APA's 'conception of the separation of powers;'" and that "the *Baltimore* court rejected plaintiffs' assertion that they could 'challenge a disembodied and unrealized [purported] decision to drain the CFPB of its operating funds and reserves'").

The district court's thoughtful analysis in that case does not bear on the resolution of this one. The *Baltimore* lawsuit dealt solely with the funding of the agency, and in particular, Vought's February 8 letter to Jerome Powell and the fact that the CFO was communicating with the Federal Reserve later that week about the possibility of transferring funds back to the Federal Reserve. 2025 WL 814500 at *12–14. Whether those circumstances were sufficiently final to be amenable to judicial review does not aid in answering the questions addressed here: was the February 10 stop work order final, and has there been a reviewable decision to close the agency entirely? Moreover, the court in *Baltimore* based its factual conclusions on what was taking place on the declarations and documents before it; it did not have the benefit of the full evidentiary hearing held in this case, which cast some of those declarations and documents in a distinctly different light.

quoting *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted); *see also Banner Health v. Price*, 867 F.3d 1323, 1333–34 (D.C. Cir. 2017).

A plaintiff must show a personal interest in the dispute at all stages of litigation, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008), demonstrating standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. When seeking a preliminary injunction, a plaintiff must show standing with specific facts supported by affidavit or other evidence. *See Elec. Priv. Info. Ctr. v. United States Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (holding that in the context of a preliminary injunction, courts consider "whether the plaintiff has a substantial likelihood of standing – that is, whether the plaintiff is likely to be able to demonstrate standing at the summary judgment stage"), quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

While "plaintiffs must demonstrate standing for each claim that they press," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), it is not necessary that each plaintiff in a case show standing for each claim; a showing that one plaintiff has standing is sufficient. *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362 (D.C. Cir. 2003) ("[UAW] clearly has standing, and we need not consider whether the other plaintiffs do."), citing *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996). And plaintiffs need not await the harm to occur before they can sue or obtain relief: "a person exposed to a risk of future harm may pursue forward looking, injunctive relief to prevent the harm." *TransUnion LLC*, 594 U.S. at 436, citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414, n.5 (2013); *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

The six plaintiffs in this case include three member organizations – a union and an association that both represent CFPB employees, and a membership-based advocacy group; two

consumer advocacy groups; and the estate of an individual consumer who passed away during the pendency of this case. *See* Am. Compl. ¶¶ 13–18. The Court finds that some of them have presented specific facts supported by affidavit or other evidence to demonstrate that they have standing, and therefore, it need not address them all at this stage.

### 1.   Injury in fact

An injury in fact is an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, as opposed to merely conjectural or hypothetical. *Lujan*, 504 U.S. at 560. An injury is particularized if it affects the plaintiff in a personal and individual manner. *Id.* at 560 n.1.

### (a)   Member Organizations

The National Treasury Employees Union is a union that represents CFPB employees, Am. Compl. ¶ 13; *see* Kaspar Decl. ¶ 2, and the CFPB Employee Association is an association of current and former CFPB employees, including probationary employees who have already been fired. Am. Compl. ¶ 18; Decl. of Christina Coll [Dkt. # 38-15] ("Coll Decl.") ¶¶ 2–3. Defendants contend that plaintiff CFPB Employee Association has not established standing. Defs.' Opp. at 9–10.

A union or other member organization can assert organizational standing on its own behalf, associational standing on behalf of its members, or both. *Equal Rts. Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011), citing *Abigail All. For Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). An organization has standing on its own behalf if it satisfies the same standing test that applies to individuals: an actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision. *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). An

organization has associational standing if it can show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Bhd. of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1135 (D.C. Cir. 2005), quoting *United Food & Comm. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (internal quotation omitted).

Actions by a defendant that "make it more difficult for" an organization "to accomplish [its] primary mission . . . provide injury for purposes both of standing and irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("The United States Supreme Court has made plain that a 'concrete and demonstrable injury to [an] organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests' and thus suffices for standing."), quoting *Havens Realty Corp.*, 455 U.S. 363, 379 (1982) (holding that generalized grievances or an abstract concern with a subject that could be affected by the case does not confer standing, but a showing that alleged illegal action will increase the resources the group must devote to programs independent of the lawsuit challenging the action does).

The CFPB Employee Association has shown both organizational and associational standing. The association's membership is made up entirely of CFPB employees, "dedicated public servants," including probationary and term employees, and its purpose to advance CFPB employees and the mission of the agency. Coll Decl. [Dkt. # 38-15] ¶¶ 2–3. Given that the association's existence depends on the existence of an agency workforce, the actions by defendants to eliminate the CFPB would undoubtedly "make it more difficult for" the association "to

accomplish [its] primary mission." *League of Women Voters*, 838 F.3d at 9. This is enough to demonstrate an injury in fact to support organizational standing. *See id.*

Moreover, the CFPB Employee Association has demonstrated associational standing. Defendants terminated probationary and term CFPB employees en masse and without cause during the week of February 10 and is poised to fire the remaining employees. Alex Doe Testimony, Mar. 11 Tr. at 45; Alex Doe Decl. [Dkt. # 38-2] at 4.[14] Association members who have serious health issues or have family members with serious health issues face the risk of concrete and actual or immanent harm if they lose the health care coverage that comes with their jobs. *See* Coll Decl. ¶¶ 4–6 (identifying a fired term employee member, who recently learned that she could have a chronic auto-immune condition and planned to have further medical testing in late March or early April, expects that she will lose her CFPB health insurance during the critical stage of establishing a treatment plan with her doctor); *id.* ¶ 7 (another member who is still employed but at risk of termination is the insurance provider for the family; she has a spouse on full medical leave with an ongoing serious medical condition and termination would result the inability to provide the necessary medical care for them). These harms to its members are sufficient to demonstrate injury in fact for the CFPB Employee Association.

---

14    The parties have both addressed the potential significance of the district court decision in *Maryland v. U.S. Dept. of Agric.,* No. JKB-25-0748, 2025 WL 800216 (D. Md. Mar. 13, 2025), which ordered a number of federal agencies, including the CFPB, to reinstate probationary employees and prohibiting further reductions in force without notice. Pls.' Notice of Suppl. Auth. [Dkt. # 80]; Defs.' Response to Notice of Suppl. Auth. [Dkt. # 82] (attaching a declaration from Adam Martinez, identified now as the Acting Chief Human Capital Officer of the CFPB, which attests that the probationary employees have been reinstated). The Court appreciates the agency's compliance with a court order. But it does not find that the decision in a different case and a different district, challenging a much broader set of executive actions, on grounds different than those advanced here, being brought by the states as opposed to the organizations and individuals found to have standing here, should control the interim management of this case, particularly given the fact that the government has already appealed it, and the finality of it is uncertain.

Defendants argue that in seeking a preliminary injunction, a plaintiff-association must identify a particular member who has standing.  Defs.' Opp. at 37 n.11, citing *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 334 (D.D.C. 2021).

The Court is satisfied that the detailed descriptions of individual members' circumstances without their names are sufficient to show that at least one identified association member has suffered an injury in fact, particularly given the personal medical information involved.[15]

Plaintiff National Association for the Advancement of Colored People, which is also a membership organization, also has demonstrated the necessary injury in fact.  The NAACPS's "mission is to achieve equality, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color."  Decl. of Keisha D. Bross, Ex. 3 to Pls.' TRO Mem. [Dkt. # 14-3] ("Bross Decl.") ¶ 2.  This includes working to protect and educate its members on consumer financial protection issues, *see* Bross Decl. ¶¶ 3–7, and the organization has provided evidence that this work has been harmed as a result of defendants' actions.  The NAACP has been forced to cancel plans to provide CFPB resources at

---

15    NTEU's members also have a personal stake in this matter.  *See* Kaspar Decl. ¶ 18 (identifying an NTEU member whose spouse and child each received separate cancer diagnoses with thirty days of each other and who faces imminent harm from the potential loss of health care coverage and the inability to obtain life insurance coverage in the future); *id.* ¶ 22 (identifying one employee who was very close to completing ten years in government prior to termination and will likely lose eligibility for the Public Service Loan Forgiveness).  But it is not necessary to address defendants' arguments that the district court lacks jurisdiction to hear challenges to employment actions against members of NTEU, Defs.' Opp. at 11–14, or that those claims constitute improper "claim splitting" by the plaintiffs, *id.* at 7–9, at this time.  While the actions against employees that have been taken or threatened are among the facts alleged in the complaint, the Court need not decide now whether it can or should address their legality when the case proceeds on the merits; at this point, its focus is the closure of the agency as a whole.

the association's state-by-state conferences "to protect members in the respective state from financial harm," Bross Decl. ¶ 6, as well as an educational program offered with the CFPB for its members on "housing discrimination, CFPB financial protection, and how to protect financial rights." Bross Decl. ¶ 7. These are actual harms that impede the work of the organization and constitute an injury in fact. *League of Women Voters*, 838 F.3d at 9.

Furthermore, NAACP members have suffered an injury in fact. Juanita West-Tillman is an NAACP member who lost everything in the recent Altadena fire in California. Decl. of Juanita West-Tillman [Dkt. # 38-14] ("West-Tillman Decl.") ¶¶ 1–2. The CFPB had been providing direct assistance to NAACP members who were victims of the California fires, including connecting NAACP members with resources to help them get back on their feet, but this ended when the CFPB stopped work in early February. West-Tillman Decl. ¶ 4. West-Tillman has been the target of numerous financial scams and predatory schemes targeting fire victims, and she has "had a difficult time determining what assistance was legitimate and what was fraudulent." West-Tillman Decl. ¶ 3. She planned to take advantage of and rely on CFPB's assistance, but defendants' stop work order and other actions leave her and other NAACP members at risk of becoming victims of financial predators. *Id.* ¶¶ 3–4. This is not mere speculation; it is a concrete, actual harm to NAACP member West-Tillman.

### (b)    Consumer Advocacy Organizations

Plaintiffs National Consumer Law Center and Virginia Poverty Law Center have also presented sufficient evidence to show they have suffered an injury in fact. The National Consumer Law Center is both a customer of and a vendor to the Bureau. It researches, publishes, and conducts presentations and seminars on matters that affect low-income consumers, and it relies heavily on the CFPB's reports and consumer database for that work. *See* Decl. of Richard Dubois,

Ex. 6 to Pls.' TRO Mem. [Dkt. # 14-6] ("Dubois Decl.") ¶¶ 3–4, 10–13.[16]  Losing this data will

undermine a key part of its mission and work, *id.*, and this type of informational injury has long

been accepted as sufficient to confer standing.  *See Action All. of Senior Citizens of Greater Phila.*

*v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (organization suffered cognizable injury when

government cut off "generous flow of information" on which it relied); *Drs. for Am. v. Off. of Pers.*

*Mgmt.*, 2025 WL 452707, at *9 (D.D.C. Feb. 11, 2025) ("The denial of information these doctors

wish to use in their routine activities has inhibit[ed] . . . their daily operations and thereby caused

an injury both concrete and specific to the work in which they are engaged.") (internal quotation

marks omitted) (alternations in original).

Further, defendants' termination of most of CFPB's contracts, including its contract with

NCLC, is an injury in fact.  The Bureau terminated its subscription to NCLC's manual and

cancelled the three-part training series NCLC had been retained to provide to CFPB staff.  *See*

Dubois Decl. ¶¶ 7–8 ("The CFPB's contract is the largest single publications contract for NCLC

and significant[ly] assists in funding NCLC's publications work."); Feb. 11, 2025 Email from

CFPB Supervisory Contracting Officer Braden Sanner to NCLC, Pls.' Ex. D [Dkt. # 60-1] at Page

10 of 107 (directing NCLC "to stop work on the subject contract immediately").  NCLC's work

will increase as a result of defendants' actions:  in the absence of the CFPB, it will have to organize

more trainings and publish more materials; it will have to use more resources to support the legal

service providers that will have to handle the diverted consumer complaints; and it will have to

---

16    *See* 12 U.S.C. § 5493(b)(3)(A) (requiring the bureau to maintain a database of consumer
complaints and responses); 12 U.S.C. § 5499 (requiring all public data assets published by
the bureau to be made publicly available); *see also* 12 U.S.C. § 5493(b)(1), (3)(c), (d)(4); *id.*
§ 5496(c); 15 U.S.C. § 1646(a), (b); *id.* § 1632(d)(3); *id.* § 2809(a); and *id.* § 5512(c)(3) (requiring
reports from various units and the Director).

dramatically increase its advocacy in the states and redirect advocacy to multiple agencies and litigation that would otherwise not be necessary. Dubois Decl. ¶ 15. This is injury in fact.

The other consumer advocacy organization, the Virginia Poverty Law Center, works to "break down systemic barriers that keep low-income Virginians in the cycle of poverty." Decl. of James Speer, Ex. 5 to Pls.' TRO Mem. [Dkt. # 14-5] ("Speer Decl.") ¶ 2. It relies on CFPB's Consumer Response unit to assist it in providing aid to consumers who call VPLC's predatory lending helpline, and "[i]f the complaint system goes away entirely or becomes so unreliable that it cannot be depended upon, it will make fulfilling our consumer-protection mission much harder." *Id.* ¶¶ 9–10, 15–16, 24. This also constitutes injury in fact.

### (c)    Individual Consumer

Finally, at the time this action was filed, individual plaintiff Reverend Eva Steege was engaged in receiving assistance from the CFPB when defendants stopped the Bureau's work. At the time, Steege was 83-years old and a Pastor of the Evangelical Lutheran Church. *See* Decl. of Pastor Eva Steege, Ex. 2 to Pls.' TRO Mem. [Dkt. # 14-2] ("Steege Decl.") ¶ 1. She incurred student loans when pursuing higher education at the Lutheran Theological Seminary. *Id.* ¶ 2. When she submitted her February 13 declaration to the Court, Steege was in hospice care, and she was only expected to live for another six months. *Id.* ¶ 1–2. It was her hope to resolve the debt and spare her family that burden after she died. *Id.* ¶ 2. She had been trying to enroll in the Public Service Loan Forgiveness Program to no avail, and contacted the CFPB for help. *Id.* ¶¶ 2–3.

On January 23, 2025, Steege met with CFPB employees and the Student Loan Ombudsman, who explained that she qualified for not only loan forgiveness under the program, but also a $15,000 refund of overpayments. *Id.* ¶ 4. Steege was scheduled to have a follow-up

meeting on Monday, February 10, *id.*, but after Vought issued the stop work order, and defendants fired the Ombudsman, Pls.' Ex. H [Dkt. # 60-1] (Barnard termination notice); Decl. of Julia Barnard [Dkt. # 38-10] ("Barnard Decl.") ¶ 2, the CFPB cancelled the meeting.  Steege Decl. ¶ 7; Barnard Decl. ¶ 14.  Steege's fear of leaving her surviving family members saddled with her student loan debt came to pass on March 15, when she died.  *See* Suggestion of Death [Dkt. # 83]. Now that her husband, Ted Steege, has been substituted as a plaintiff in her stead, Min. Order (March 26, 2025) (granting motion to substitute), he has standing on his own behalf and on behalf of her estate to pursue her claim.[17]

### 2.    Causation and Redressability

"It is well established that '[c]ausation, or traceability, examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff.'"  *Grocery Mfrs. Ass'n v. EPA,* 693 F.3d 169, 176 (D.C. Cir. 2012) (alteration in original), quoting *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C. Cir. 1996); *see also Freedom Republicans, Inc. v. FEC,* 13 F.3d 412, 418 (D.C. Cir. 1994) ("fair traceability turns on the causal nexus between the agency action and the asserted injury").  Further, plaintiffs must demonstrate that it is "'likely,' as opposed to merely 'speculative,' that their injuries

---

17      Defendants argue that the PSLF program is administered by the Department of Education, *see* Defs.' Opp. at 22–23, 38, but this is of no moment.  The CFPB works hand-in-hand with the Department to assist consumers trying to enroll in the PSLF; "[m]any of the issues that borrowers like Pastor Steege face related to federal student loans are, in fact, related to the acts and practices of private student loan servicing companies."  Barnard Decl. ¶¶ 11–12; *see* 12 U.S.C. § 5535(c)(2) (providing that the student loan ombudsman works to "ensure coordination in providing assistance to and serving borrowers seeking to resolve complaints related to their private education or *Federal* student loans") (emphasis added).  And contrary to defendants' assertion, *see* Defs.' Opp. at 38, Steege showed that her efforts to apply own were unsuccessful, and her time was indeed running out.  Steege Decl. ¶¶ 1–3.  This is enough to establish injury in fact.

will be 'redressed by a favorable decision.'"  *Lujan,* 504 U.S. at 561, quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38 (1976).

Defendants do not dispute that plaintiffs' claimed injuries in fact are traceable to defendants' actions or that efforts to shut down the CFPB.  The challenged actions – including the stop work order from Vought, and the decision to shutter the Bureau, implemented by cancelling CFPB contracts, terminating term and probationary employees, and preparing to execute widespread RIFs – directly threaten the very existence of the CFPB Employee Association and have placed its terminated employee members and their families at risk.  They have caused the NAACP to cancel planned trainings and programs and halted direct support Bureau staff were giving to NAACP members trying to differentiate between legitimate financial support and unscrupulous criminals preying on who were victims of the Altadena fires.  They will cause both NCLC and VPLC to expend more resources on their missions, and they have left Pastor Steege's heirs at risk of inheriting unresolved student debt.  Nor do defendants dispute that a ruling from this Court in plaintiffs' favor would redress these injuries.

Accordingly, Court finds that several plaintiffs have demonstrated that they meet the requirements for Article III standing and that is has jurisdiction over this case.  *See TransUnion LLC*, 594 U.S. at 431; *UAW-Lab. Emp. & Training Corp.*, 325 F.3d at 362.

## VI.    A PRELIMINARY INJUNCTION IS NECESSARY TO PRESERVE THE STATUS QUO.

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011), quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Rule 65

authorizes a district court to issue interim relief to prevent irreparable injury and to preserve the status quo while the district court assesses the merits of a case. *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025), citing *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation.") (cleaned up). A district court "ha[s] authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition" until it can determine how to proceed, as "the law contemplates the possibility of a decision either way, and therefore must provide for it." *Id.* at *3, quoting *United States v. Shipp*, 203 U.S. 563, 573 (1906).

"The standard for obtaining either a TRO or a preliminary injunction is identical." *Id.*, citing *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011). When considering a motion for a preliminary injunction, the Court must consider whether the movant has met its burden of demonstrating that: (1) it "is likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) an injunction serves the public interest. *Winter*, 555 U.S. at 20.

For some time, the Court of Appeals adhered to a "sliding-scale" approach, where "a strong showing on one factor could make up for a weaker showing on another." *Sherley*, 644 F.3d at 392. However, in *Sherley*, the Court explained that because the Supreme Court's decision in *Winter* "seemed to treat the four factors as independent requirements," it had more recently "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-

standing requirement for a preliminary injunction.'" *Id.* at 393, quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).[18]

Whatever the status of the sliding scale analysis might be, the D.C. Circuit has clearly stated that a failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction. *See Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006). As another court in this district has observed, "absent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." *Navistar, Inc. v. EPA*, Civil Action No. 11-cv-449 (RLW), 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (alteration omitted), quoting *Hubbard v. United States*, 496 F. Supp. 2d 194, 198 (D.D.C. 2007).

Moreover, it remains the law in this Circuit that a movant must demonstrate irreparable harm, which has "always" been a "basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959).

The Court finds that a consideration of each of the factors supports the issuance of a preliminary injunction in this case. The testimony before the Court and the declarations and exhibits submitted by both sides have established that the requested relief is absolutely necessary

---

18      The Court of Appeals has not gone further to clarify whether the sliding scale approach is inconsistent with *Winter*, and the manner in which courts should weigh the four factors "remains an open question" in this Circuit. *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). *See also League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) ("Because appellants satisfy each of the four preliminary injunction factors, this case presents no occasion for the court to decide whether the 'sliding scale' approach remains valid after *Winter*."); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (reiterating that the Court has not yet decided the issue).

to preserve the status quo so that the CFPB will still be standing when the Court reaches the merits of this case.

**A.**　　**Likelihood of Success of the Merits**

　　**1.**　　**Plaintiffs are likely to succeed on their ultra vires and constitutional claims in Count One.**

As defendants' many citations to Article II of the United States Constitution imply, there is an Article I. And Article I, Section 1 provides: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States . . . ." U.S. Const. art. I, § 1.

Article I, Section 8 lists the powers of Congress, including "[t]o regulate Commerce . . . among the several States," and "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8. This power includes the authority to create new federal agencies and official positions. *See Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (under the Necessary and Proper Clause, "Congress may undoubtedly . . . create 'offices'"). As Chief Justice Marshall explained more than 200 years ago, the framers included this provision "in a constitution, intended to endure for ages to come . . . to be adapted to the many *crises* of human affairs." *M'Culloch v. State*, 17 U.S. 316, 415 (1819) (emphasis in original).

Under the Constitution, the President does not have legislative authority. Instead, Article II vests executive power in "a President of the United States of America," who "shall take Care that the Laws be faithfully executed." U.S. Const. art. II § 3 (the Take Care Clause). The Supreme Court has repeatedly emphasized the breadth of the President's discretion to determine how this should be done, but it has also drawn a clear demarcation between executing, or implementing, the laws and making them in the first place.

> In the framework of our Constitution, the President's power to see
> that the laws are faithfully executed refutes the idea that he is to be
> a lawmaker. The Constitution limits his functions in the lawmaking
> process to the recommending of laws he thinks wise and the vetoing
> of laws he thinks bad. And the Constitution is neither silent nor
> equivocal about who shall make laws which the President is to
> execute.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). After all, members of

Congress are democratically elected too.

Congress exercised its legislative power in 2010 in response to a genuine, devastating

financial crisis. It created the Consumer Financial Protection Bureau and gave it a job to do:

> There is established in the Federal Reserve System, an independent bureau
> to be known as the "Bureau of Consumer Financial Protection", which shall
> regulate the offering and provision of consumer financial products or
> services under the Federal consumer financial laws.

12 U.S.C. § 5491(a). The Dodd-Frank Act was quite specific about what that regulation would

entail, including: "establishing a single, toll-free telephone number, a website, and a database . . .

to facilitate the centralized collection of, monitoring of, and response to consumer complaints

regarding consumer financial products or services," 12 U.S.C. § 5493(b)(3)(A); designating a

Private Education Loan Ombudsman within the Bureau "to provide timely assistance to borrowers

of private education loans," *id.* § 5535(a); establishing an Office of Financial Protection for Older

Americans, *id.* § 5535(g)(3)(B), an Office of Service Member Affairs, *id.* § 5535(d)(2), and the

Office of Fair Lending and Equal Opportunity, *id.* § 5493(c); and researching, analyzing, and

reporting on market developments for consumer financial products and services and consumer

access to those products and services. *See* 15 U.S.C. §§ 1646(a), (b); *id.* § 1632(d)(3). In

accordance with the Constitution, these provisions mandating the existence of, and the functions

to be carried out by, the CFPB were enacted by the legislative branch and signed into law by the

President of the United States.

Plaintiffs allege in Count One that defendants were intent on executing the current President's plan to eliminate the agency and to do so in a hurry, in violation of the statutory imperatives of the Dodd-Frank Act and contrary to the constitutional limitations on executive authority and the Take Care Clause.[19]  Am. Compl. ¶¶ 75–80.

It is fundamental to the separation of powers embodied in the Constitution that "[t]he President's power . . . must stem from either an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.  Defendants do not even try to maintain that the Constitution or any statute accorded the President the authority to dismantle the agency.  Instead, in their February 24 opposition to the motion for preliminary injunction, they denied that it was happening at all, or that there was any imminent risk of its happening in the near future if the Court declined to act.

> [O]n February 8, 2025, Russell Vought, Acting Director of the Consumer Financial Protection Bureau ("CFPB"), e-mailed all CFPB staff to direct that, unless "required by law" or "expressly approved by the Acting Director," staff were not to take substantive actions that might reflect policy decisions inconsistent with new leadership's views on the best way to meet the agency's statutory responsibilities. As Acting Director Vought explained, he was "committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources."
>
> *　　　*　　　*

---

19    Plaintiffs characterize Count One as a claim seeking "non-statutory review of official and agency action," an effort to "enjoin[] and declare unlawful official action that is ultra vires." Am. Compl. ¶ 75.  As a "weapon in the arsenal for attacking federal administrative action," an *ultra vires* claim requires the Court to determine whether defendants "plainly act[ed] in excess of [their] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022), quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  The count complains that defendants overstepped both the constitutional and statutory limitations on their authority: paragraph 76 invokes the Take Care Clause in Article II of the Constitution; paragraph 79 of the amended complaint alleges that "[t]he CFPB was established as a federal agency by Congress by statute, the Dodd-Frank Act, signed into law in 2010, and can be eliminated only by Congress"; and paragraph 80 asserts that "[d]efendants' actions to eliminate the CFPB exceed executive authority, usurp legislative authority conferred upon Congress by the Constitution, defendant Vought was not lawfully appointed, and his actions are ultra vires and should be enjoined."

> Given . . . disruptive protests involving the CFPB's own staff, CFPB leadership has closed the CFPB Headquarters Building and tightened staff supervision, making sure that they are focused only on aspects of the mission that are, in fact, urgently required by law, as determined by the Chief Legal Officer.  Under this internal procedure, work requests have been approved to allow the CFPB to maintain its statutory obligations.
>
> Remarkably, the CFPB employee groups and other Plaintiffs now spin these actions and others as being part of a "coordinated campaign by the new administration to eliminate the" CFPB.  But President Trump has nominated Jonathan McKernan . . . to be the new CFPB Director, and the Senate Banking Committee will hold a hearing on his nomination this week – actions that are inconsistent with Plaintiffs' view of current events. Similarly, as Acting Director Vought noted in a letter to the Federal Reserve, the "Bureau's new leadership will run a substantially more streamlined and efficient bureau[.]"  The predicate to running a "more streamlined and efficient bureau" is that there will continue to be a CFPB.

 Defs.' Opp. at 1–2 (internal citations and footnote omitted) (alteration in original).  This rosy depiction of events, designed to assuage the Court, was accompanied by the February 24, 2025 Declaration of Adam Martinez, the Chief Operating Officer of the CFPB, First Martinez Decl., which was a carefully worded and highly selective account that was immediately contradicted by a second series of declarations and exhibits submitted by the plaintiffs.  The defendants' witness was then placed in the awkward position of submitting another declaration, in which he acknowledged the accuracy of the facts set forth by plaintiffs' declarants, including their accounts of his own statements, but he still voiced the assurance that the agency was complying with its statutory obligations.  *See* Second Martinez Decl.

The plaintiffs and the defendants have both provided the Court with numerous exhibits – communications within the CFPB and with OPM and other third parties, such as contractors – and there is no dispute as to their authenticity for purposes of this motion.  In short, there is no dispute as to the facts of what took place and what was said; the parties differ as to what it all means.

JA696

It is now clear to the Court that the omissions from the first declaration rendered it to be highly misleading, if not intentionally false. Defendants' initial effort to persuade the Court in their opposition that employees were hard at work on their statutory duties even after they were ordered to stand down on February 10 has been shown to be unreliable and inconsistent with the agency's own contemporaneous records, and the defendants' eleventh hour attempt to suggest immediately before the hearing that the stop work order was not really a stop work order at all was so disingenuous that the Court is left with little confidence that the defense can be trusted to tell the truth about anything.

After consideration of the record as a whole, then, including all of the declarations and exhibits submitted by both sides, and the testimony introduced by both sides at the hearing, the Court finds that it is likely that plaintiffs will succeed on the merits. The evidence reveals that: the defendants were in fact engaged in a concerted, expedited effort to shut the agency down entirely when the motion for injunctive relief was filed; while the effort to do so was stalled by the Court's intervention, the plan remains unchanged; and the defendants have absolutely no intention of operating the CFPB at all. While the President is free to propose legislation to Congress to accomplish this aim, the defendants are not free to eliminate an agency created by statute on their own, and certainly not before the Court has had an opportunity to rule on the merits of the plaintiffs' challenge.

**(a) The agency was in shut down mode as of February 10.**

In his first declaration, Adam Martinez characterized the February 3 email from the then Acting Director of the CFPB, Secretary of the Treasury Bessent, and the February 8 email from the current Acting Director, Russell Vought, as being consistent with typical practice during a Presidential transition. *See* First Martinez Decl. ¶¶ 2, 3, 11 ("It is not unusual for these types of

steps to be taken at an agency at the beginning of a new administration and during the transition period for new leadership."). He described the February 10 email as a communication providing both validation that the building was closed and "instructions regarding work tasks." *Id.* ¶ 14. He averred that "[s]ince the arrival of the Acting Director, the new leadership is engaging in ongoing decision-making to assess how to make the Bureau more efficient and accountable. Our leadership has worked to comply with statutorily required functions . . . . " *Id.* ¶19. The declaration noted that on Saturday, February 8, Vought's first day on the job, the new Acting Director wrote a letter to the Chair of the Federal Reserve Bank to say that the agency would not need any funds for the third quarter of 2025. *Id.* ¶ 27, citing Ex. G to First Martinez Decl. It recounted that the agency headquarters building was closed on February 9, *see* Feb. 9 Email, and Martinez asserted that "[t]he closure of the CFPB's Headquarters pursuant to the February 9 and 10 emails has not prevented the CFPB from performing statutory functions." First Martinez Decl. ¶ 20.

But the declaration makes no reference to the fact that Vought's February 10 email to all employees contained the directive, "[p]lease do not perform *any* work tasks." *See* Feb. 10 Email (emphasis added).

In fact, as Martinez acknowledged during his testimony, by February 10, the agency was barreling full speed ahead in an effort to dismantle the agency completely by the end of the week. At the hearing, primarily on cross-examination, Martinez described a succession of circumstances that bore no resemblance to the impression his declaration had been drafted to convey. The work stoppage order was issued on Monday the 10th, and according to Martinez, effective that day, "most employees were taking administrative leave;" in fact, they were "told to take it." Martinez Testimony, Mar. 10 Tr. at 52. *See also* Feb. 14 email from Human Capital Operations Manager with Updated Timekeeping Instructions, Pls.' Ex. J [Dkt. # 60-1] at Page 27 of 107; Pfaff

Testimony, Mar. 11 Tr. at 76 (testimony of Chief of Staff for the Office of Consumer Response: "We closed our laptop lids and walked away.").[20]

A meeting with OPM, the agency that was also under the control of Russell Vought, was convened that same day, to plan and execute a full-scale Reduction in Force. *See* Martinez Testimony, Mar. 10 Tr. at 128. At the meeting, Martinez explained to his team that the CFPB was going to fire "the vast majority of its employees," and that new leadership was asking that it be accomplished "as quickly as possible." *Id.* at 126–28. Agency employees who were still within their one-year probationary period were fired that Monday, and those still within their two-year probationary periods were fired by Tuesday the 11th. *Id.* at 45, 128. This affected approximately 75 to 85 people. Mar. 10 Tr. at 51; *see also* Diotalevi Decl. [Dkt. # 41-1] ¶ 4.

Also on February 11, Mark Paoletta, who had been identified in the February 10 email as the Chief Legal Officer of the CFPB, sent an email to Gueye Jafnar, the agency's Chief Financial Officer, Martinez, the Chief Operating Officer, and Jordan Wick, one of the DOGE employees who by then had been deputized as an employee of the CFPB, saying:

> On behalf of Acting Director Vought, I have reviewed CFPB contracts and authorize and direct the cancellation of all contracts in the following divisions: Enforcement (102 contracts), Supervision (16 contracts), Consumer Response (20 contracts), Office of Director (33 contracts), and Legal Division (all except 2 contracts . . .). Further, on behalf of the Acting Director, I direct the cancellation of the contract for concrete repairs.

---

20    The new leadership found out almost immediately that the agency's Office of Research was responsible for calculating the Average Prime Offer Rate ("APOR"), an essential piece of data for banks and mortgage lenders, and as of 7:15 p.m. on the evening of the 10th, Chief Legal Officer Mark Paoletta directed that the work to publish it would continue. *See* Defs.' Ex. 3 [Dkt. # 56-1] at Page 4–5 of 116, CFPB_00004–5. But this did not interrupt the effort to close the agency down in any way.

Defs.' Ex. 4 [Dkt. # 56-1] at Page 6 of 116, CFPB_0006.  *See also* Pls.' Ex. A [Dkt. # 60-1] (Feb. 11 "Urgent Action" email to contracting officers: "We need to get these Termination Notices out ASAP.").  The record reflects that notices of cancellation started going out that day.  *See, e.g.*, Pls.' Ex. D [Dkt. # 60-1] (Feb. 11 email to NCLC referencing the "blanket Stop Work Order" and notifying the organization to stop work on the contract immediately)  *See also* Charlie Doe Decl. ¶¶ 3–4 ("instructions to contracting officers did not reflect a change in policy direction, but rather a wholesale termination of the contracts needed to keep the CFPB running," and contracting officers were told to work overtime to do so despite the work stoppage).

While the CFO gave various offices the opportunity to identify those contracts that directly supported a statutory requirement, "meaning that we would not be able to meet a statutory requirement without [it]," Pls.' Ex. F [Dkt. # 60-1], some of those contracts were terminated anyway.  *See* Decl. of Matthew Pfaff ("First Pfaff Decl.") [Dkt. # 38-7] ¶ 27 ("I reviewed the list of contracts managed by Consumer Response and determined that five contracts directly supported a statutory requirement. All five contracts were nevertheless terminated for convenience . . . .").[21] And the termination letters did not include instructions to vendors to preserve their data or records. Mar. 10 Tr. at 174.

By Thursday the 13th, 130 employees with "not to exceed" fixed terms had been told to pack their bags.  *See* Diotalevi Decl. ¶ 14; Mar. 10 Tr. at 52.[22]  This included the employee who served in the statutorily mandated position of Student Loan Ombudsman.  Pls.' Ex. H.  Also by

---

21    Martinez testified on direct that there were some instances in which staff members were able to contact Paoletta and request permission to reactivate; he characterized those as "a couple of high-priority issues that would have been devastating had it stopped."  Mar. 10 Tr. at 77.

22    The workforce was also reduced as some employees accepted the "fork-in-the-road" early retirement option. Mar. 10 Tr. at 51.

February 13, the agency had established a tip line through which banks and other stakeholders in the community could report enforcement or supervision staff who were still asking them for information.  Diotalevi Decl. ¶ 6; Pls.' Ex GG [Dkt. # 60-1].[23]

On that Thursday, there was a lot of work to do to effectuate the RIF.  Alex Doe's Human Capital team had been directed to help with the effort.  The record contains her declaration, and she testified at the evidentiary hearing as well.  *See* Alex Doe Decl. [Dkt. # 38-2]; Mar. 11 Tr. at 33–67.  She recounted that at a meeting on Thursday the 13th, Martinez explained that the agency was in "wind-down mode," and its statutory functions were going to be transferred to other agencies.  Decl. of Blake Doe [Dkt. # 38-3] ¶ 3; Second Martinez Decl. ¶ 3 (confirming Blake Doe declaration as accurate); Mar. 11 Tr. at 39.  The plan was to terminate the agency's approximately 1200 employees by eliminating whole offices, divisions and units, and RIF notices were being prepared that day.  Mar. 11 Tr. at 40; Alex Doe Decl. ¶ 3.  Jeremy Lewin, another DOGE representative who had become a CFPB employee, told the group that they wanted the formal notices to go out by the 14th.  Mar. 11 Tr. at 41–42.  According to Alex Doe, and as confirmed by Martinez, the Bureau was to "reduce altogether" in a second step sixty to ninety days after that. *See* Mar. 10 Tr. at 129–30 (Martinez describes that account as "absolutely correct" based on the facts he had at the time).  *See also* Pls.' Ex. JJ [Dkt. # 66-1] ("CFPB Memo to Michael Mahoney, OPM") at Page 9–11 of 60 (identifying 1175 positions to be included in the first RIF).  At approximately 10:00 p.m. that evening, Jordan Wick reminded Martinez that Acting Director

---

23    That same day, the CFO was already in communication with the Federal Reserve regarding the Bureau's ability to return money to either Treasury or the Federal Reserve if necessary. *See* Pls.' Ex. E [Dkt. # 60-1].

Vought was expecting an update by 10:00 a.m. the next day.  Pls.' Ex. JJ [Dkt. # 66-1] at Page 6 of 60.

To achieve the desired level of speed, it was necessary to ask OPM for an exception from the usual ninety-day notice period, and to give the employees only thirty days, and that request was submitted on Thursday.  *See* CFPB Memo to Michael Mahoney, OPM, Pls.' Ex. JJ.  In that document, the CFPB identified Vought's stop work order as the extraordinary circumstance that would justify such haste.  *Id.* at Page 11 of 60.  Martinez was informed via email that evening that the request for the exception had been granted, and the formal approval was transmitted on February 14.  *See* Pls.' Ex. JJ.

On Friday morning, then, the team was awaiting the completion of the OPM documents that would be attached to the RIF notices.  The CFPB RIF team gathered at 8:30 a.m. to review templates provided by OPM, and along with Martinez, they met with OPM at 10:00 a.m.  Alex Doe Testimony, Mar 11 Tr. at 47.

Just after 12:00 a.m. that morning, though, the plaintiffs had filed an amended complaint coupled with a motion for a temporary restraining order.  Am. Compl.  By approximately 11:00 a.m., the Court had set a scheduling hearing for 2:00 p.m. that afternoon.  Martinez was notified by email of this development at approximately 1:36 p.m.; the sender noted, "[w]hile we will continue preparing, it's just a consideration when deciding when to send out notices."  Pls.' Ex. LL [Dkt. # 66-1].  And, indeed, it was a "consideration."  As Alex Doe reported, members of the termination team contacted OPM immediately and insisted that their counterparts speed up:

"Thanks for everything you're doing, but we need the last set of attachments now. **We cannot wait until COB**." Pls.' Ex. MM [Dkt. # 66-1] (emphasis added);[24] *see also* Mar. 11 Tr. at 52.

The hearing began as scheduled, and while the lawyers were addressing the Court or conferring with each other during a break that had been provided to see if they could work out a short-term solution themselves, the RIF efforts proceeded apace. At 2:27 p.m., a list of the employees to be fired was transmitted. Pls.' Ex. NN [Dkt. # 66-1].[25] But they didn't get it done in time.

By 5:00 p.m., the Court had docketed a consent order negotiated by the parties, which provided that until the Court ruled on plaintiffs' motion, which was to be deemed a motion for preliminary injunction, the defendants could not: delete, destroy, or impair any data, database or other CFPB record; terminate any CFPB employee, except for cause related to the specific employee's performance or conduct; issue any notice of reduction-in-force to any CFPB employee; or transfer, relinquish, or return any money from the CFPB's reserve funds. Order (Feb. 14, 2025) [Dkt. # 19]. Nonetheless, the CFBP RIF team and OMB continued to exchange documents and nail down the technical details as to how the necessary forms would be completed until approximately 10:00 pm. Alex Doe Testimony, Mar. 11 Tr. at 54; *see* Pls.' Ex. QQ [Dkt. # 66-1] ("[W]e will need to key these over the weekend so they are there Tuesday morning.").

---

24    *See* Martinez Testimony, Mar. 10 Tr. at 134–35 (Martinez confirms names redacted from the exhibit were members of the termination team).

25    Thirteen employees of the Office of Director/Office of Civil Rights were excepted from the proposed RIF because "[i]n a February 14, 2025, meeting with OPM staff CFPB clarified this competitive area should be removed from the request." Pls.' Ex. OO [Dkt. # 66-1] at 28 of 60.

Martinez, who had provided a sworn declaration attesting to his personal familiarity with the transition process for new administrations, had to acknowledge at the hearing that none of this was normal.

> THE COURT: . . . [A]t the beginning of your testimony we talked about the initial email from the secretary of Treasury being [a] pretty normal, kind of transitional kind of email. And the first email from the Acting Director Vought also, generally, pretty typical. Would you say that sending out an order that says "Do no work" is typical?
>
> THE WITNESS: No.
>
> THE COURT: Would you say that canceling all the contracts before the analysis as to whether these are duplicative, worthwhile, not worthwhile is typical?
>
> THE WITNESS: No.
>
> THE COURT: Would you say that firing all probationary employees and two-year employees from the get-go is typical?
>
> THE WITNESS: No.
>
> THE COURT: Would you say that trying to implement a RIF without notice before the new director is even put in place is typical?
>
> THE WITNESS: No.
>
> THE COURT: And would you say putting the rest of the employees on administrative leave with an order to do no work is typical?
>
> THE WITNESS: No.

Mar. 10 Tr. at 121–22. He also conceded on cross examination that while he had stated in his declaration that "new leadership" was working to comply with its statutory functions, "winding down an agency would not be consistent with statutory obligations," and that they were in fact winding down during the week of February 10. Mar. 10 Tr. at 126.

**(b)    The shutdown did not stop after the consent order was entered on February 14; the efforts continued as if nothing had changed.**

The record also establishes that even with the consent order in place, the effort continued over the next two weeks; the work stoppage remained in effect, and the shutdown was very much alive, although temporarily stalled by the Court.

Employees remained on administrative leave, and they were not performing their work duties. *See* Second Pfaff Decl. [Dkt. # 48-2] ¶ 4 ("None of the activities listed in my original declaration, including responding to escalated issues via the Escalated Case Management Team, are currently happening.").

On February 18, Martinez was informed by the CFPB Chief Information Officer that the unavailability of the agency's home page online was no accident.

> My understanding is that the decision to delete the home page was made by Acting Director Vought, and it was not an error made by the members of the DOGE team.

Pls.' Ex. L [Dkt. # 60-1].

Furthermore, during the week of February 17, the RIF was still being planned and discussed. Alex Doe, who had a poised and calm, but firm demeanor, and came across as extremely credible, testified that the RIF team met again on Wednesday, February 19. Mar. 11 Tr. at 54. Martinez was more focused on the transfer of functions at that meeting, "explaining that he had had conversations with new leadership and the chief legal officer about what the wind-down of an agency really meant, and that there were, you know, functions that would need to transfer, and OPM was pressing us to identify where those would transfer and we did not yet have an answer." Alex Doe Testimony, Mar. 11 Tr. at 55.

> MR. GUPTA [counsel for plaintiffs]: Did he refer at this meeting to winding down the Agency?

> DOE:  He did.
>
> MR. GUPTA:  What did you understand that to mean?
>
> DOE:  Closing of the Agency. . . .
>
> MR. GUPTA:  And he used that phrase, "the closure of the Agency"?
>
> DOE:  He did.

Mar. 11 Tr. at 56–57.

In the event there was any doubt about the intentions of the executive branch during this period, on February 19, the President reiterated in an interview with CBS News that his administration had "virtually shut down the out-of-control CFPB."  Ex. P to Roston/Scible Decl. [Dkt. # 38-17], Lesley Stahl, *Why the Consumer Fin. Protection Bureau is being targeted by Trump, DOGE*, CBS News (Feb. 23, 2025).

Martinez supplied more details to agency staff during a meeting on Thursday, February 20. Alex Doe testified:

> The next day we had an internal meeting with some human capital colleagues that are not part of the RIF team but we needed to loop them in . . . . And in that meeting, he was a lot more specific about what exactly the plan was for the Bureau. . . .
>
> Adam said there would no longer be a CFPB.  He said that we were legitimately shutting down.  He said that we would be wiped out within 30 days.  He said that the White House had instructed us to cancel all of our committees and advisory boards and travel cards and purchase cards and to only keep any contracts that were necessary to effectuate the closure of the Agency within 30 days. . . . Adam said there would be no positions to compete for.
>
> [MR. GUPTA]:  No positions to compete for, you understood that to mean because the entire divisions would be eliminated?

> [DOE]:  Because the Agency would be eliminated.  He was a lot more specific in that meeting that was just the CFPB.

Mar. 11 Tr. at 58–59. [26]

Just as Martinez's second declaration confirmed the accuracy of Alex Doe's, his testimony was consistent with hers as well.  He testified that there were meetings during the week of February 17 to talk about the RIF.  His understanding was that "the vast majority of the workforce [would] be terminated," and he was talking with the acting leadership, whom he identified as Paoletta and the DOGE personnel who had been designated as senior leaders of the CFPB, about who would inherit the agency's "administrative portfolio."  Mar. 10 Tr. at 142–44.  He agreed that he told his

---

[26]    The declaration of another employee details what CFPB staff were told in similar terms:

> During meetings about the CFPB's shut-down that took place between Monday, February 18 and Tuesday, February 25, staff were told by Senior Executives that the CFPB would be eliminated except for the five statutorily mandated positions; that the CFPB would exist in name only; and that, once this Court's injunction was over, everything would need to be either removed from the building or destroyed.  Staff were told by Senior Executives that the CFPB would no longer have an employee location and that data could not be stored at any CFPB location because there wouldn't be any locations left. Staff were told that no DHS, OIG, GAO, OMB, Internal Controls, Congressional, or other compliance would be necessary because the CFPB would "not exist" and it would no longer be "our problem."

Drew Doe Decl. [Dkt. # 38-5] ¶ 7; *id.* ¶ 10 ("One Senior Executive said that CFPB will become a 'room at Treasury, White House, or Federal Reserve with five men and a phone in it.'").

Martinez did not vouch for the accuracy of Drew Doe's account in his supplemental declaration as he did for the declarations of Alex Doe and Blake Doe.  But he did not dispute it either. He offered that he was not aware of the identity of the "senior officials' described and that D. Doe "does not testify that those statements were premised on directive from Acting Director Vought or the CFPB Chief Legal Officer."  The declaration also observed that D. Doe's suggestion that the agency was going to be reduced down to only five positions would be "inconsistent with Acting Director Vought and the Chief Legal Officer's directives." Supp. Decl. of Adam Martinez, [Dkt. # 47-1] ¶ 5.

colleagues at a meeting that week that entire divisions, offices and units were still going to be abolished, and that "the impediment to going forward was this Court's order on the 14th." Mar. 10 Tr. at 145–46.

Martinez confirmed that throughout that week, it was still the goal to dismantle the agency "as fast as possible." Mar. 10 Tr. at 149. Since the agency had received the requested approval from OPM to provide its employees with only thirty days' notice, he told his staff at the February 20 meeting that the whole agency would be completely wiped out in thirty days. Mar. 10 Tr. at 150. He conceded at the March 10 hearing that he had no information about the fate of the agency's statutory functions, Mar. 10 Tr. at 149–50, and that but for the Court's order, the agency would already have been gone: the process to release the headquarters had begun, and the five regional offices were being eliminated. Mar. 10 Tr. at 152–53. Martinez, who had been with the agency since its inception, seemed to genuinely care about its mission, and as he saw it, once the RIF was implemented, the situation would be irreparable; after the RIF, there would not be any jobs the employees could compete for. Mar. 10 Tr. at 153.

The paper record reflects a number of additional events occurring at a rapid-fire pace:

- On Thursday, February 20, Jordan Wick sent an email to Paoletta and Vought with the subject: "More contracts to cut." ("Please see attached for the next tranche of contracts for which we recommend immediate termination – they're composed of the following: . . . Consumer Credit Information Surveys and Panels, which will no longer be used . . . Various support services (user research and testing, financial mgmt., internal controls, and identity access software), all of which we can do without."). Defs.' Ex. 10 [Dkt. # 66-2], CFPB_00121.

- A February 21 email from a CFPB Realty officer stated that as of that date, the "CFPB's main focus was 'moving out of [its] large headquarters building' on a 'very very tight time frame . . . (30 days).'" Diotalevi Decl. ¶ 15. The Bureau was also moving out of its regional offices, beginning with San Francisco. *Id.*

- Also on February 21, the Chief Information Officer wrote to Martinez that the FDIC was asking about the status of the agency's statutorily required data collection under the Home Mortgage Disclosure Act, and stated "[w]e are doing our best effort to

support the data collection, but it is at risk due to several contracts being terminated. We've requested that three of them be turned on, at least temporarily." Defs.' Ex. 6 [Dkt. # 56-1] at Page 9 of 116, CFPB_0009.

■ Notwithstanding the fact that the building was closed, on February 26, employees were informed that they would lose their ability to work remotely in two days. *See* Pls.' Ex. M [Dkt. # 60-1] ("The Citrix Virtual Desktop will be unavailable after Friday, February 28, 2025, at 11:59 PM EST."). This is the program that enables employees to log in securely when they are not at a CFPB computer. Diotalevi Decl. ¶ 20.

■ And on Thursday, February 27, employees were told that it was time to pick up their belongings for good. *See* Pls.' Ex. O [Dkt. # 60-1] ("Subject: Pickup of Personal Belongings and Return of Equipment from the CFPB HQ . . . We recognize that you have personal property, work materials, and federal records in your office or cubicle. To prepare to vacate the building, the Operations team has packed up your personal belongings for pickup at 1700 G Street.").

■ By March 3, purchase cards were cut off. *See* Defs.' Ex. 29 [Dkt. # 56-1], CFPB_0098.

It was not until February 27, two weeks after the Court's order concerning the deletion of data, that the Chief Information Security Officer instructed agency staff to identify whether CFPB data or records were at risk of being deleted due to contract terminations, Feb. 27 Email, Defs.' Ex. 18 [Dkt. # 56-1] CFBP_00037, and a number of offices responded to express concerns about the loss of data needed for litigation or EEO compliance and uncertainty about whether it was too late to revive the contracts. *See, e.g.*, Feb. 28 Email, Defs.' Ex. 19 [Dkt. # 56-1] CFBP_00041; Mar. 10 Tr. at 179–81. The testimony also revealed that GSA's cut-off of purchase cards hampered the agency's ability to pay its bills and preserve historical data. *See* Mar. 10 Tr. at 183–84.

The defendants have highlighted a number of emails to suggest that after the blanket orders relating to work and contracts were issued on February 10 or 11, agency leadership circled back and took steps to approve certain activities or reactivate specific contracts related to statutorily mandated activities. The Court acknowledges that the new leadership relented in some circumstances when its employees insisted that the agency was legally required to complete some aspects of its work, *see, e.g.*, Feb. 27 email from Paoletta to Office of Fair Lending, Defs.' Ex. 13

[Dkt. # 56-1], CFPB_00029 (approving certain work, although the email contained the caveat, "[a]ny action or communication to an outside party should be sent to me and Daniel Shapiro for review and approval before being transmitted"), or when they discovered – after the notices to terminate contracts had already been sent – that certain contracts clearly supported statutory functions.  *See* Feb. 20 Email, Defs.' Ex. 51 [Dkt. # 66-2], CFPB_00120.

These appropriate steps by the new leadership are a matter of record, but the Court cannot find that they reflect that the ship changed course, or that the administration ever abandoned its plan to shut the CFPB down.  If anything, the scramble to revive legally required activities serves to underscore how complete the shutdown was as of February 10, and how little thought and attention was given to any particular contract or agency activity before it was eliminated. *See* Mar. 10 Tr. at 71–72 ("THE COURT:  So is it fair to say that there's thought going into it but only after, it's like shoot first and ask questions later?  MARTINEZ:  That's what it felt like.").

Also, a close examination of the materials in the record reveals that the approvals were narrow and grudging, and primarily related to operations – databases, phones, facilities, and human resources – but not the staffing or outward facing communications that had been in place to serve consumers directly.  In other words, when it was doing anything, the agency was largely doing what was statutorily mandated to manage *itself* internally:  responding to FOIA requests, maintaining records, complying with regimens governing employment and accommodating disabled employees.  *See, e.g.*, Feb. 21 Email from Martinez to Sonya White, Defs.' Ex. 5 [Dkt. # 56-1] CFPB_00007 ("Legal Division is authorized to support **all operational matters** being exercised on behalf of our new leadership and our regulatory/statutory requirements, including: Procurement/Contract Actions, Financial Management Actions, Human Capital Actions, Labor Relations Actions, Technology and Infrastructure Support, Administrative Operations Actions

(Security, Facilities, Maintenance), Data Governance/Administration, EEO Processing Counsel Support, Reasonable Accommodation Counsel Support," but "mission related support should be coordinated directly through Mark or Dan.") (emphasis added); *see also* Feb. 27 Email, Defs.' Ex. 26 [Dkt. # 56-1], CFPB_00062 (specifying that External Affairs team has been "1) reviewing contracts for termination, (2) terminating the advisory councils and (3) prepping and packing 1700 G Street due to the termination of the lease, a few other things:  unless otherwise directed, we will abide by the guidance issued and will continue to raise items that are statutorily mandated").

It is also notable that when the agency solicited information about contracts that needed to be revived to fulfill statutory directives, those communications were not particularly inviting. Employees were admonished that the agency was taking a "very narrow approach," and that "if you're providing justifications, please be prepared to defend those to external parties." *See, e.g.*, Mar. 3 Email, Defs.' Ex. 29 [Dkt. # 56-1] CFPB_00098–99  ("In general we are very narrowly turning back contracts (or portions of contracts) that directly support statutory requirements. . . Specifically can you outline for each contract what (statutorily required) action will not be able to be accomplished at all without the contract?  I can't stress enough that this needs to be as specific as possible.  We'll need to be prepared to have someone on the team defend this justification to external parties. All PCards across the bureau have been cancelled. We've been authorized to reopen one for the entire bureau with a very limited limit so we are triaging the requests as they come in.").  If that wasn't sufficiently chilling, the CFO added, "[w]e've been routinely asked to provide for names of the people providing the justification."  Mar. 3 Email, Defs.' Ex. 38 [Dkt. # 56-1] CFPB_00096.

Meanwhile, the effort to identify additional contracts to cancel remained underway.  Defs.' Ex. 52 [Dkt. # 66-2] CFPB_00121.  And while the Chief Financial Officer stated, "[w]e're getting

a lot of requests to turn contracts back on. I will send out guidance soon for your awareness,"
Mar. 3 Email, Defs.' Ex. 38 [Dkt. # 56-1] CFPB_00096, the Chief Operating Officer, Martinez,
testified that he did not believe that any such guidance had been provided. Mar. 10 Tr. at 85.[27]

In the weeks after February 14, while limited activities related to the shutdown continued
to move forward, and while the basic operational support needed as the agency tottered on its last
legs was being provided, most staff members were complying with the February 10 directive and
not performing their ordinary work to advance the mission of the agency. On Thursday,
February 26, plaintiffs submitted a declaration from Matthew Pfaff, the Chief of Staff of the Office
of Consumer Response, "the unit responsible for 'the centralized collection of, monitoring of, and
response to consumer complaints,' as well as sharing data, as required by 12 U.S.C.
§5493(b)(3)(A)-(D)."[28]  First Pfaff Decl. ¶ 1. He took issue with the representations in the first
Martinez declaration, and he reported that Consumer Response complied with the Acting
Director's February 10 direction that staff "not perform any work tasks."

> As a result of this compliance, the operations related to the Consumer
> Complaint Database are *not* continuing. And many of the contracts needed
> for work related to the Consumer Complaint database have *not* remained
> intact and operational.

---

[27]    It turned out that reactivating contracts was easier said than done. *See* Feb. 28 Email, Defs.'
Ex. [Dkt. # 56-1] CFBP_00040 ("Some vendors that were asked to 'turn back on' operations were
able to, others cannot be back on so easily.").

[28]    "When individuals or their representatives submit a complaint to the CFPB, the complaint
is submitted to and included in a case management system. This case management system allows
consumers, companies, and the CFPB to securely share information and engage in the complaint
process. This case management system is also how both the CFPB and companies can deliver
timely responses to consumers as required by law. Information from the case management system
populates other systems to meet data sharing requirements with federal and state agencies, as well
as with the public via the Consumer Complaint Database. People – both federal employees and
contractors – make this entire operation run successfully." First Pfaff Decl. ¶ 8.

*Id.* ¶ 9 (internal quotations omitted) (emphasis in original).  He averred that on February 13, he prepared a list of the teams within Consumer Response that "align to specific statutory obligations," and that as of the 27th, none of those teams had been activated to work.  "As a result, the complaint handling operation has experienced a significant disruption":

> Complaints referred by congressional offices, states, and most federal agencies are not being review and sent to companies. These complaints require federal staff to review and process.
>
> Complaints about companies that are not yet participating in the complaint program are not being addressed. These complaints require federal staff review and a manual invitation to participate in the program. . . .
>
> Incomplete complaints are not being processed or worked by anyone. These complaints require federal staff to conduct outreach to consumers for additional information. . . .
>
> Complaints are not being "monitored." Consumer Response has a team of subject matter experts who monitor complaints to ensure that consumers are receiving timely, accurate, and complete responses to their complaints. Subject matter experts also monitor complaints for emergent issues across market and at companies. This ongoing monitoring provides a necessary check on the complaint program to ensure that consumers receive meaningful responses. Without this work, company responses are likely declining in quality. . . .
>
> Escalated issues are not being addressed. Consumer Response's Escalated Case Management team responds to consumers who are facing imminent foreclosure, may be a risk to other or themselves, and other sensitive issues.
>
> Complaint systems, including the case management system and systems for sharing data, are not being maintained. Complaint systems require federal and contractor staff to monitor and respond to issues affecting system health. Automatically generated error notices indicate the system has already experienced problems. If these errors are not addressed, at some point, the system will break entirely. Additionally, companies that receive complaints through this system have received error notices that they are unable to export complaints out of the system, which will impede their ability to review and respond to complaints.
>
> Stakeholder support tickets are not being resolved. Consumer Response receives hundreds of support tickets every month from company, congressional, and government stakeholders. Support tickets range from companies trying to remedy potential privacy concerns to resetting

passwords. These tickets are not being reviewed and resolved, which is almost certainly frustrating the ability of stakeholders to complete their work. . . .

Complaints submitted by servicemembers and their families are not being monitored. It is my understanding that no one from the Office of Servicemember Affairs has been activated to work.

Student loan complaints are not being reviewed and informally resolved. The Student Loan Ombudsman role is vacant. Mr. Martinez seemingly suggests that the CFPB Ombudsman is an appropriate substitute.

Audits and quality controls have halted. Consumer Response maintains an audit function that ensures complaint processes and procedures are being followed, and vendors are appropriately interacting with members of the public.

Activities to monitor and safeguard the system to prevent bad actors from misusing it have stopped.

First Pfaff Decl. ¶¶ 12–13, 15, 17, 19–21, 23–26.

It was not until after that, on Thursday, February 27, that "the Chief Legal Officer activated work related to compliance with the agency's critical statutory responsibilities in the area of the Office of Consumer Response." Second Martinez Decl. ¶ 8. During the 17 days when that work had been prohibited, though, 16,000 unanswered complaints had accumulated. Pfaff Testimony, Mar. 11 Tr. at 74; *see also* Mar. 3 Email, Pls.' Ex Z [Dkt. # 60-1] at Page 73 of 107.

Late that afternoon, Adam Martinez circulated an email to the Office of Research, Monitoring, and Regulations concerning "Statutory/Regulatory Work," which hearkened back to Acting Director Vought's February 8 instructions and omitted any reference to the February 10 stop work:

Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau. He did exclude areas approved by him or required by law. We want to ensure that you are aware that statutorily required work and/or work required by law are authorized.

Your teams are authorized to continue carrying out these responsibilities. Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director. Alternatively, you are always welcome to reach out to me if needed. I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Feb. 27 Email, Pls.' Ex. P [Dkt. # 60-1] at Page 39 of 107; Defs.' Ex. 16 [Dkt. # 56-1] at Page 34 of 116, CFPB_00034.  Similar emails were sent to the Office of Supervision, and External Affairs. Defs.' Exs. 23 and 18 [Dkt. # 56-1] at Pages 55 and 37 of 116, CFPB_00055 and CFPB_00037.

Agency employees immediately recognized the communication as a change, *see, e.g.*, Feb 28 Email, Pls.' Ex. R [Dkt. # 60-1] at Page 44 of 107 (email stating "[t]he other offices in RMR have received notification from their management that Adam Martinez changed his guidance and we are now allowed to work on statutorily mandated work"), and they saw through the effort to pretend that the February 8 directions had never been superseded.  *See* Feb. 28 Email, Pls.' Ex. Q [Dkt. # 60-1] at Page 41 of 107 (email from Assistant Director of Research Jason Brown directing his staff to resume work, but emphasizing, "[w]e stopped most of our statutory work, I know, not because of the February 8 email, but because of the February 10 email.  I clarified this point with the COO"); *see also* Mar. 3 Email, Pls.' Ex. Z [Dkt. # 60-1] at Page 71 of 107 ("Based on every email starting 2/10, the unambiguous guidance was to stop all work tasks, no stipulation of statutory requirements was made. As of today, Consumer Complaint Database has not been refreshed with new data since 2/25/05.").  Martinez was promptly deluged with requests to start

working again.  Mar. 10 Tr. at 97; *see also* Feb. 28 Email, Defs.' Ex. 20 [Dkt. # 56-1] CFPB_00044 (seeking clarification that they "can *resume* all regular work related to fulfilling statutory obligations. . . .") (emphasis added).  And yet, shortly after some employees learned they had been reactivated, they received instructions to ignore the new guidance until further notice.  *See* Pls.' Ex. S [Dkt. # 60-1] ("In response to Adam Martinez's email, John has instructed us to stand down until further notice."); *see also* Francis Doe Decl. ¶ 6.

As the emails were circulating within the agency, no one had any illusions about the RIF waiting in the wings.  *See* Mar. 1 Teams Exchange [Dkt. # 70-1] at Page 1 of 2, CFPB 00131 (message from Chris Young to Martinez "just trying to get a sense of our status," and inquiring, "[s]hould the judge lift the TRO on March 3rd, are we prepared to implement the RIF?").

As Alex Doe testified on March 11, the RIF team met with OPM and Martinez again on the February 27th.

> [W]e discussed some guidance that came out from Acting Director Vought, but in his OMB capacity. It was giving him guidance about RIFs for federal agencies. . . .
>
> [Adam] said he would discuss it further with acting leadership and that he would let us know – "us" being the RIF team both at CFPB and at OPM – that he would let us know if the plan changed.
>
> And that has never – to this day has never happened.

Mar. 11 Tr. at 60.

### (c)    Paoletta's March 2 email suggesting that employees were supposed to be working all along has little evidentiary value.

As the March 1 email to Martinez reflects, agency leadership was well-aware that a hearing on the pending motion for preliminary injunction – which had been supported by declarations swearing that as of February 10, work had been stopped – was scheduled to take place Monday, March 3 at 10:00 am.  At 4:18 on the afternoon of Sunday, March 2, the agency's Chief Legal

Officer was moved to address "all hands" who were still on deck. Like Martinez, Paoletta invoked the February 8 email as if it was still the operative document. But his email also included a stunning mischaracterization of the February 10 order:

> On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.
>
> On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. **On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email.** These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.
>
> It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.
>
> Thank you for your attention to this matter

Mar. 2 Email, Defs.' Ex. 25 [Dkt. # 56-1] CFPB_00058 (emphasis added).

Paoletta's description of the February 10 order cannot be squared with the plain language of the Vought directive, nor is it consistent with the manner in which the February 10 order was understood by the staff, implemented by the agency, or used to justify massive layoffs.

- After being ordered to "stand down from performing any work task," the employees stood down.

- Probationary and term employees were fired in accordance with the February 10 order.

- The remaining agency employees were placed on administrative leave in accordance with the order.

- The agency called for the immediate cancellation of contracts because of the order.

- The agency justified the need for a shortened notice period before a RIF of just under 1200 employees by pointing to the order.

- Employees would remain on administrative leave for that thirty-day period in conformance with the order.

- The agency cancelled meetings with consumers in need of assistance, including Pastor Steege, because of the order.

The fact that Paoletta expounded upon the February 10 order for the first time almost three weeks after it was issued, and the fact that he suddenly did so on a weekend afternoon immediately before the Court was scheduled to hear the case, support an inference that the March 2 characterization was not what the order was intended to mean all along. Also, Paoletta's new spin on the order does not make sense: if the February 8 directive authorizing the performance of statutory duties was supposed to remain in force, there would have been no need to issue the February 10 email at all.

Furthermore, Paoletta insults the reader's intelligence when he feigns surprise that few employees were working. *See* Mar. 10 Tr. at 204 (Martinez testified that as of the date the email was sent, "honestly, I knew there was a good portion of the agency that was not working"). Furthermore, Martinez testified that the stop work order was never rescinded. Mar. 10 Tr. at 184.

Defendants' suggestion that the plaintiffs and agency staff simply misread or misunderstood the February 10 email is belied by the fact that when the CFPB, under the direction of its Acting Director, Russell Vought, provided Vought's OPM with the justification for accelerating a RIF of all but the employees needed to implement the RIF, it pointed to that very "work stoppage order." *See* Pls.' Ex. OO [Dkt. # 66-1] at Page 28 of 60. It is also belied by the

February 10 email sent to Martinez by the Chief Information Officer Christopher Chilbert, Feb. 10

Email, Defs.' Ex. 1 [Dkt. # 56-1] CFPB_0001, twenty minutes after Vought's email was received.

He identified the minimum level of support his office should be providing "based on this email,"

and it involved supporting DOGE and the new leadership, providing security monitoring for the

networks, and making sure that the agency's essential technology was operational. *Id.* at

CFPB_00002. The CIO even found it necessary to ask whether it would be "an acceptable work

task" to "identify a list of contractors who would be necessary to support operational emergencies."

*Id.* at CFPB_00001. *See also* Feb. 27 Email, Defs.' Ex. 21 [Dkt. # 56-1] CFPB_00047

(Enforcement Division staffer seeking confirmation that even though she had been directed to

work with contracting officers to ensure that data was being preserved, that work was authorized

by the Acting Director).

There are multiple other emails in the record that also reveal the employees' confusion and

their trepidation about asking to perform work tasks. *See, e.g.*, Feb. 27 Email, Defs.' Ex. 12 [Dkt.

# 56-1] CFPB_00026 (from a Senior Enforcement Attorney and Military Affairs Liaison: "I've

written previously on other issues; please do not take this email as insubordination. I request

permission to perform the following urgent work tasks . . . .).[29]

The defendants' attempt to intimidate the employees was on full display in the courtroom

when Pfaff, the head of the Office of Consumer Response, was subjected to a  cross examination

that insinuated that the shutdown of the statutorily  required consumer complaint system – the

heartbeat of the agency subscribed to by more than 70 stakeholders, Members of Congress, and

state regulators, and the only existing means within the federal government to resolve the over

350,000 consumer complaints per year – was *his* fault.  The witness handled this audacious attempt

to blame the closure of the most important office in the agency on him with aplomb:

> MR. HOLLAND (counsel for defendants):  In your first declaration, do you
> recall in paragraph 9 characterizing this email as directing staff not to
> perform any work tasks and to stand down from performing any work task?

---

29    *See also* Monday, Mar. 3, 10:02 a.m. email from Cassandra Huggins of Supervision
comparing Martinez's Feb. 27 email with Vought's Feb. 8 email and asking, "Please confirm that
the message you sent is not intended to authorize the reinstatement of supervision/examination
activity despite the fact that the Bureau is required by law to conduct these activities."  Defs.'
Ex. 33 [Dkt. # 56-1] at Page 82 of 116, CFPB_00082.  Martinez encourages Huggins to
communicate with Paoletta, but states, "you are correct that the email sent out yesterday does not
change the specific work stoppage in the bullet points issued on 8 February." *Id.*  After Paoletta
sends out the new instructions on Sunday afternoon, Huggins reaches out to him for clarification
as to whether Vought's Feb. 8 order prohibiting all supervision and examination activity remained
in force.  Defs.' Ex. 44 [Dkt. # 56-1] CFPB_00113.  Approximately two hours later, she informed
her concerned staff about the current status of her inquiries.  Defs.' Ex. 45 [Dkt. # 56-1] at Page
115 of 116, CFPB_00115; Pls.' Ex. W [Dkt. # 60-1] at Page 63 of 107 ("We have requested and
received clarification that their message was _not_ intended to authorize the reinstatement of
supervision/examination activity, . . . .") (emphasis in original).  Notwithstanding the rampant
confusion generated by his own email, Paoletta immediately took Huggins to task.  *See* Mar. 4,
4:51 p.m. Email, Pls.' Ex. FF [Dkt. # 60-1] at Pages 98–100 of 108 ("I am writing to raise
significant concerns regarding an internal agency communication you apparently sent yesterday
that directly contradicts an email from me . . . . [P]rovide your answer to me by 6 pm today.").
Huggins responded:  "I am attaching, as requested, the email that I sent to Supervision staff. I did
not provide this email to the media, and I do not know who did.  I did not intend to undermine the
new administration's ability to supervise agency staff- my only intention was to ensure that our
staff did not act against the direction in the February a email from Acting Director Vought to cease
all supervisory and examination activity." *Id.*

PFAFF:  Correct.

MR. HOLLAND:  But the email says more than that, doesn't it?

PFAFF:  The email says to get approval in writing before doing any work tasks. It also says, "Please alert me through Mark Paoletta if there are any urgent matters."

MR. HOLLAND:  "If there are urgent matters please alert me through Mark Paoletta," right?

PFAFF:  Yes.

MR. HOLLAND:  Despite that directive, you did not contact Mark Paoletta for consumer response approval to address all of the urgent and piling-up consumer complaints; isn't that right?

PFAFF:  I understood "urgent" to mean something out of the nonordinary course of business.

MR. HOLLAND:  You didn't think that, like, someone not being able to have their, like, imminent foreclosure complaint addressed was urgent?

PFAFF:  I consider it urgent, but I would – I would remind you that 1013 creates an obligation on the director to create the unit that over sees the handling of complaints.

Mar. 11 Tr. at 94.[30]

All in all, Paoletta's claim in the March 2 email that the stop work order was something other than a clear order to cease agency actions across the board proved to be unsustainable.  And the evidence showed that emails purporting to get things up and running again could not be taken on face value, either, as the employees found out that being reactivated on paper did not mean they could actually do the work.

THE COURT:    We've [got an] email from the head of Research, Monitoring, and Regulation on March 3rd, after they were all told on March

---

30    Counsel asked additional questions pointedly blaming the work stoppage on other employees instead of the Acting Director.  Mar. 11 Tr. at 95.

2nd not only should you be doing statutory-authorized, but you don't have to ask. He said we would do it, but we lost our people. We lost our contractors and we lost our data.

On February 27, after he said everybody do your statutory-authorized work, the Consumer Response Center said, yeah, but we need the people.

MARTINEZ: Right.

THE COURT: We can't do it without people. Office of Fair Lending said we can't do what we did do without talking to people, but we have to get permission to talk to people.

MARTINEZ: Right.

THE COURT: So, just saying statutory-authorized doesn't really answer the question, does it?

MARTINEZ: No.

Mar. 10 Tr. at 76–77. *See also* Mar. 3 Email, Pls.' Ex. Y [Dkt. # 60-1] (listing the challenges faced by Research, Monitoring, and Regulation in resuming its work, including *inter alia*, "[l]oss of personnel. The firing of much of our staff impacts our ability to complete assignments as planned. . . ;" "[l]oss of IT. Several contracts that have supported our work have been cancelled. . .;" [and] "[l]oss of data. Several of our data contracts have been cancelled. . . .").

> **(d)  The suggestion in the Chief Operating Officer's March 2 supplemental declaration that the situation had changed with the arrival of new "adults in the room" is not persuasive, since the agency has been managed by the same people all along. The agency is still at risk, and Martinez lacks personal knowledge of any facts to support his "hope" that it is not.**

There was additional drafting for the Court's consumption on Sunday, March 2. Since plaintiffs had filed supplemental declarations casting doubt on Martinez's first declaration with their February 27 reply, *see* Pls.' Suppl. Decls. [Dkt. # 38-1–17], defendants docketed a second declaration from Martinez in response at 4:33 p.m. *See* Second Martinez Decl. This time, the agency had Martinez admit that the accounts submitted by plaintiffs' declarants were "not

inaccurate," and he agreed that in fact, he had referred to the "closure of the agency" during the

week of February 10.  *Id.* ¶ 3.  But he attributed that information and those events to DOGE:

> Prior to Russell Vought's designation as Acting Director of CFPB, agency
> staff had received guidance from DOGE-associated personnel consistent
> with those statements, which I believed at the time to reflect the position of
> agency leadership, and continued to believe reflect agency leadership's
> position for a brief time thereafter.

*Id.* ¶ 3.  Martinez maintained that "new leadership," though, was taking a more methodical

approach, "taking time to assess, listen, and explore the state of the Bureau."  *Id.* ¶ 4.

The contradiction at the heart of these statements is apparent from the face of the

declaration, which also reminds the Court that Vought became Acting Director on February 7 –

*before* the actions that took place the week of February 10.  *Id.*  Yet the Chief Operating Officer

tried to maintain: "[r]ather than a closure of the agency, Acting Director Vought's new leadership

has focused on running a substantially more streamlined and efficient bureau, refocusing its

priorities, and 'right sizing' of the agency."  *Id.*

Martinez's suggestion that it was all a misunderstanding that got cleared up when new

leadership stepped in was undermined by exhibits showing that current leadership was the engine

behind the shutdown in the first place, and that Vought or Paoletta was involved in every step

along the way.  After the plaintiffs' second round of declarations blew huge holes in his assertions,

Martinez was forced to concede on the stand that when it came to anything other than the

operations under his purview, he did not have personal knowledge about what was actually going

on.

When asked about the statement in paragraph 22 of his first declaration that "operations

related to the consumer complaint database [were] continuing," he explained he was only talking

about operations – "what the minimum requirement was to ensure that the site didn't go down or

if the public could still access some form of complaint . . .[;] what was necessary to keep the

database going" and "to keep the lights on." Martinez Testimony, Mar. 10 Tr. at 196.

> THE COURT: So in that paragraph 22 of your first declaration where you talked about the Bureau's maintaining the toll-free number, the website, the database, operations related to the database are continuing, contracts needed for work related to the database have remained intact and operational, all you were intending to convey was the operations side? Again, not the programming.

> MARTINEZ: That is correct.

*Id.* at 197–98.

> THE COURT: Assuming it's open, is it fair to say that [the hotline] [is] only as good as the response to what people leave on the hotline? . . . [I]t's great that the hotline is always open, it needs to be opened, it's statutorily authorized and required. But how it's working is a question that's different from whether it's open.

> MARTINEZ: Correct. I don't have the inside knowledge to know who picks up the phone and who provides advice or what they do on the back end of that.

*Id.* at 91–92. After Martinez could not answer questions about not only Consumer Response, but

also the Research Division and the Office of Markets, *see id.* at 224–28, counsel for plaintiffs

asked, "So in general . . . just to be really clear, and that way I'll stop asking you specific questions,

all of the offices in the mission side of the organization, you don't have insight into what's

happening on the ground?"

> MARTINEZ: I have no insight. I usually don't have insight into those specific groups. Again, those groups have historically, over the last four years, reported to the chief of staff. That's an entirely different programmatic SME, subject matter expert, responsibility.

*Id.* at 228.

Martinez also explained on cross examination that when it came to his conversations with

Paoletta about reinstating contracts, his knowledge was limited to "a small number of technology

contracts[;]" "[t]he only contracts that I know that I reviewed were some that I reviewed

specifically with Mark Paoletta, who needed some guidance about operational contracts."  *Id.*

at 171–72.

Martinez was asked about the statement in paragraph 19 of his new declaration that "[o]ur

leadership has worked to comply with statutorily-required functions":

> MS. BENNETT:  So when you said that, your information . . . it's just based
> on what Mark Paoletta told you, right?
>
> MARTINEZ:  Yes, yes.
>
> MS. BENNETT:  It's not based on any insight into the mission side of the
> agency, right?
>
> MARTINEZ:  Not at all.
>
> MS. BENNETT:  Okay. And, in fact, at that time, if you know, most of the
> functions were not up and running, right?
>
> MARTINEZ:  That's what I know now.

*Id.* at 187–88.

The Court does not need to find, and it is not inclined to find, that Martinez intentionally

lied.  His second declaration and his sworn live testimony during the hearing acknowledged the

truth of what the plaintiffs' witnesses were saying, and once on the stand, he freely admitted what

he did not know.  At times, he appeared anguished by both the demise of the agency and by his

being cast in the role of agency spokesman; there were multiple painful pauses when you could

see the battle between his conflicting loyalties to his new employers and to the truth playing out

on his face, and he grimaced or turned red before he answered.  He had the demeanor of an abused

wife brought to court by her husband to drop the charges.

Moreover, Martinez's testimony established that he has no idea what the leadership of the

agency is planning beyond firing all of the employees.  He is well aware that even though there

was no RIF on February 14, the RIF team is still meeting.  *See id.* at 231–32.  And he agreed with

plaintiffs' counsel summary:  "[s]o you are saying . . . not that the plan to terminate the vast

majority of the employees is off the table, but that . . . they are taking into account the procedural

requirements in a way that they may not have before?"  MARTINEZ: "Yes."  *Id.* at 232.  When

asked if it was his testimony that Acting Director Vought and Paoletta "do not currently intend to

wind down the agency," he did not answer the question directly.

> MARTINEZ:  My understanding is that they have recognized that there are
> statutory requirements that need to be fulfilled within the agency, but I don't
> know how many people, I don't know what functions.  I have no knowledge
> of what their thinking is right now in terms of capacity or size of the agency.
> But, yes, my understanding is that they are committed to fulfilling the
> statutory requirements of the Agency.
>
> MS. BENNETT:  Okay. But you have no idea what that means to them,
> right?
>
> MARTINEZ:  I have no idea what that means.  I will find out once we're
> building out this report that needs to go to OMB with regards to the
> reduction in force across the federal government.  But I have no idea as of
> right now what they're thinking. . . .
>
> THE COURT:  And you don't know whether that means . . . they recognize
> that they will be fulfilled by the CFPB or if finding a home in some other
> agency does the trick?
>
> THE WITNESS:  Correct.
>
> THE COURT:  You don't know what they're thinking on that?
>
> THE WITNESS:  I have no idea.

*Id.* at 229–30.

Martinez did have a good understanding of the impact Paoletta's March 2 missive had on

the surprised agency employees.

> THE COURT:  . . . [T]hen it's 3:30 p.m. on the Sunday before the last
> hearing when [Paoletta] goes:  Do your statutorily-required work and you

don't have to ask anybody for permission first.  So up until that point they still had to ask for permission?

THE WITNESS:  That was my understanding of what people were doing, yes.

THE COURT:  And what happened after that – it went out Sunday, it looks like on Monday, while we were all here in court, a lot of the supervisors are saying, well, wait, what do you mean?  Do I have to ask permission?  Do I not have to ask permission? There was a little bit of confusion going on in the building. Is that fair to say?

THE WITNESS:  There was a lot of confusion in the building.

THE COURT:  Would you say there's still a lot of confusion in the building?

THE WITNESS:  I would say, from a lot of accounts, there's still a [lot] of confusion about what's going on.

\*        \*        \*

BY MR. ROSENBERG [counsel for defendants]:  Would you say that there's less confusion today than there was a couple week ago as to what functions –

THE WITNESS:  There's less confusion today.  I think there's hope.  I have hope for the future.  I think that people are – I think people want to go back to work and they want to do the work they were hired to do.

THE COURT:  So sitting here right now, you think there's still people not working?

THE WITNESS:  It would not surprise me if there were people still not working.

THE COURT:  I think I asked you this earlier:  You can't tell me how many people have come off administrative leave to do this statutorily-authorized work that everybody is committed to having them do.

THE WITNESS:  I cannot answer that, ma'am.

*Id.* at 66–68.

On re-direct examination the next morning, the witness returned to his theme of the salutary

effects of having adults in the room, but that did not amount to much after follow-up questioning.

> MARTINEZ: . . . If there's anything positive out of any of this, it's that we
> have a better understanding and an inventory of what the cause and effect
> could be in the future for turning off specific contracts and the devastation
> it could have on the Agency.  So we have a lot more information today than
> we had before that.  And all of this is happening through adults at the table
> that were able to interact with that understands how government is supposed
> to run and is savvy enough to know the consequences of not following
> normal government protocol, which, in my opinion, is the public, its
> accountability with the public, obviously with the court system, but
> Congress as well.

> THE COURT:  But I thought you told me yesterday that while this is not
> being done in as rushed a fashion . . . [t]he end game is to end up with no
> CFPB, and the very important functions, they will go somewhere else.

> MARTINEZ:  That was the week of the 10th.

> THE COURT:  Well, I thought the week of the 10th was just no CFPB. But
> I thought you're saying, they're still talking about how do we get rid of the
> employees – we're going to keep the contracts we need until this is done,
> but how do we get this down so that whatever has to be gone to some other
> agency can go, but we're not going to be here?

> MARTINEZ:  The week of the 10th, that was absolutely correct.  But the
> other question –

> THE COURT:  All right.  Well, yesterday I got the distinct impression that
> you were saying they're doing it in a much more methodical fashion, but
> that's the goal.

> MARTINEZ:  The goal, as I understand – I don't have what the end goal is
> for this team right now.

> THE COURT:  Okay. So you don't know. . . .

> MARTINEZ:  I don't know.  I don't know.  I – what I know is that we have
> OMB guidance that we've been directed to follow, and I don't know what
> they're going to mandate as part of that.  I just – I have absolutely no clue
> what the end result is for the Bureau.

*Id.* at 23–25.

At end of his testimony, then, all that was left of Martinez's ability to attest that the agency would continue to do its work was a "hope," and a hope grounded in little or no information.

> **(e)    The Court cannot stay its hand based on defendants' assurances that statutorily mandated work is being performed, because defendants now claim that they do not know what that means.**

In its opposition, and throughout the hearings on the motion, the defense was adamant that no injunction was needed since employees had repeatedly been instructed that they could, and should, perform statutory mandated duties, and that was what was happening.  At the conclusion of the evidentiary hearing, the Court asked if that was the case, why would the defendants object to the provision in plaintiffs' proposed interim order that the agency should not interfere with, prohibit, or suspend the employees' performance of those mandated duties?

> THE COURT:  I'm saying something about their claims makes me want to have interim relief, and you're telling me, "There is nothing to see here, Judge, because we are all in on statutorily required duties."  What is offensive about an order confirming that?
>
> MR. ROSENBERG:  There is ambiguity as to what the scope of those statutorily required duties are.

*Id.* at 115.  This took the Court by surprise, and counsel tried to backpedal a little bit.

> THE COURT:  So you're saying that every one of these emails is ambiguous that you've been showing me all day, and the order that was issued on February 27th and the order that was issued on March 2nd are ambiguous?
>
> MR. ROSENBERG:  No.

*Id.* at 116.  But then he reiterated, "[i]t's too broad to know.  It's vague." *Id.* at 117.

> THE COURT:  Does the director – acting director of the Consumer Financial Protection Bureau, today, know what the statutorily required duties are?  And did Mr. Paoletta know when he sent out the emails that you have asked me to rely on and to comfort me that the statutorily required duties are under control, does that have meaning for you or does that not have a meaning for you?

> MR. ROSENBERG: It has a meaning in the sense that the Agency's operations are broad.

*Id.* As counsel explained it, it was up to the employees to tell the leaders of the agency what its

duties were. *Id.*[31]

The frustrating exchange on this subject ended with the following:

> THE COURT: . . . [T]he fact that you all agreed to something that became a court order . . . had a direct and immediate effect on the dismantling of this agency, your own witness testified to that, your own documents demonstrate that. But the conversation hasn't ended. It's continued. So, the question is: What is the appropriate thing to order? And it seems to me that you're saying the term "statutory obligations" is too broad and not enforceable. . . . [Y]ou're also saying I don't have the authority to do it, but if I think I have the authority to do it under the unique circumstances of this case, are you telling me you don't know what they mean?
>
> MR. ROSENBERG: Yes.

*Id.* at 123–24.

With that, what little was left of the defendants' contention they were intent on doing what

the law required them to do collapsed like a balloon at the end of the Macy's Thanksgiving Day

Parade. The defendants cannot expect the Court to be comforted by their recent announcement to

employees that they should perform their statutory functions when they are simultaneously

---

31    *See also* Mar. 11 Tr. at 120:

> MR. ROSENBERG: . . . that's part of the problem . . . the statutory functions that plaintiffs have identified appear to be literally everything that the Agency does.
>
> THE COURT: . . . [Y]ou used the term more often than they did. This term is taken straight from the February 27 email . . . and then the March 2nd email, which was actually sent to someone saying . . . , "How can you dare defy my clear order?" . . . So somebody thought it was clear when they wrote it in an email. So somebody in your side knows what it means.

insisting that the term is so vague, no one – not even the Acting Director of the agency – knows what it means.

### 2.    The plaintiffs are likely to succeed on the merits of their APA claims.

The same evidence that underlies Count One also establishes a likelihood of success on the merits of the APA claims alleging at least one discrete, final action taken in violation of law and without a rational basis to support it:  the February 10 order.  The stop work order stopped all work, including statutorily mandated work, and the flurry of emails circulated on the eve of the hearing on the motion were little more than a transparent effort to pretend otherwise.  And as the documents and the witnesses' testimony revealed, there was little or no analysis undertaken before the employees were ordered to put their pencils down, before all of the agency's contracts were cancelled, *see, e.g.*, Martinez Testimony, Mar. 10 Tr. at 70–71, before the probationary employees

JA731

were fired, or before the effort to accomplish a complete reduction in force by the end of the week was initiated.[32]

More importantly, even if some employees did prevail on their management and obtain permission to perform some of their mandated duties on some of the days between February 8 and today, the implementation of the President's unlawful decision to close the agency has simply been slowed, not reversed.  As the defendants are chomping at the bit to wrap things up, it will take nothing less than a court order to maintain the status quo pending the resolution of this case.  As

---

[32]     It is important to note that, generally, the defendants did not assert in their opposition to the motion that any of this was the product of thoughtful analysis.  They did not suggest that DOGE or the new leadership had uncovered fraud or wasteful spending; instead, they tried to persuade the Court that agency was open for business and the employees had been encouraged and authorized to perform their statutory duties all along.

Counsel did try to tell the Court that when Vought made his decision to stop the flow of funding from the Federal Reserve on Saturday, February 8, his very first day on the job, he reviewed information provided by the Chief Financial Officer reflecting the funds available to the agency, and he made a decision, "given his expertise in budgetary matters and looking at the necessary documents," and "consistent with his view that he wanted to . . . make a more streamlined and efficient Bureau," that he had more than enough on hand for the next quarter. Tr. of Proceedings (Mar. 3, 2025) [Dkt. # 58] at 53–54.  Counsel advised the Court that "the materials [Vought] considered in making that decision" had been provided to the District Court in Maryland in opposition to a preliminary injunction motion there. *Id.* at 55.  A review of that docket revealed, though, that the Maryland court had been provided with a single piece of paper listing the amount of money in the Civil Penalty Fund, which is not available to be used for day-to-day operations, and the total of the obligated and unobligated funds on hand comprising the "Bureau Fund." *See Mayor & City Counsel of Balt. v. Consumer Fin. Prot. Bureau*, Civ. Action No. 25-00458-MJM [Dkt. # 29-1].  As of February 8, 2025, the Bureau Fund had a balance of $412,346,065.32 in unobligated funds, of which $220,000,000 was internally earmarked for a "reserve fund" for financial contingencies, which the Acting Director decided on day one to discontinue. *Id.*  The submission did not include any documents concerning expenses or potential contingencies that were relied upon in connection to Vought's decision that the reserve was superfluous and that the cash on hand was sufficient.  On Sunday, employees were informed that the building was closed, and on Monday, the first working day of Vought's tenure, the RIF meetings began and the stop work email was issued.  One could draw a reasonable inference that Vought's analysis that no additional funds were required was more likely based on his understanding when he assumed the position that soon, the agency would not be operating at all.

Martinez explained, "I now realize how much damage can be done . . . just within a couple of days." *Id*. at 74.

###    B.    Plaintiffs will suffer irreparable harm.

The second element to be established is that plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. at 20. The D.C. Circuit "has set a high standard for irreparable injury" – it "must be both certain and great; it must be actual and not theoretical" and it must be "beyond remediation." *Chaplaincy of Full Gospel Churches v. Eng.,* 454 F.3d 290, 297 (D.C. Cir. 2006), quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). It explains:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Id.* at 297–98 (emphasis in original), quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958).

Plaintiffs in this case will face irreparable harm without preliminary relief. The shutdown will take little more than a month, if that. The record reflects that the RIF notices giving employees thirty days' notice are ready and waiting. The decision to place employees on administrative leave during those thirty days has been made, with the understanding that they can be called back not to serve consumers, but "to fulfill close out duties." Pls.' Ex. KK. The CFPB building is already closed, arrangements to cancel the lease and move out in thirty days were made five weeks ago, and the technology to work remotely has been cancelled. Once the agency is gone, there will be no opportunity to afford relief at a later point in the litigation. There will be no opportunity to be

reinstated or rejoin a healthcare plan because there will be no jobs left to compete for after the RIF. There will be no hotline to call and no one to assist at the other end of the line.

Before the instant motion was filed, the agency was already in "wind-down mode," Martinez Testimony, Mar. 10 Tr. at 54, firing term and probationary employees and putting most of the other employees on administrative leave. Martinez Testimony, Mar. 10 Tr. at 128. They also terminated most of its contracts before walking back a "very narrow" set of those terminations in the face of this litigation. Defs.' Ex. 38 [Dkt. # 56-1] at Page 96 of 116, CFPB_00096. The record shows that reactivating work after just a few weeks of "stop work" has proven difficult; the Consumer Response function is experiencing "a large and unprecedented backlog" of more than 16,000 consumer complaints that will take weeks, if not months, to work through. First Pfaff Decl. ¶ 16; Pfaff Testimony, Mar. 11 Tr. at 90–92. As it stands in its "current state," defendants' challenged actions have the Bureau and its functions "hobbl[ing] along." Pfaff Testimony, Mar. 11 Tr. at 91.

Defendants remain poised to fire "most of [the] remaining staff, leaving a Bureau that [can't] actually perform any functions, or no Bureau at all." Alex Doe Decl. ¶ 3; *see* Pls.' Ex. OO [Dkt. # 66-1] (OPM approval of exception to the 60-day notice period for a RIF). If its contracts are finally terminated, the Consumer Response system will "collapse," as will other functions of the Bureau. Pfaff Testimony, Mar. 11 Tr. at 91. *See also* Drew Doe Decl. [Dkt. # 38-5] ¶ 6 (stating that "[t]he hasty termination of almost all of the Bureau's contracts resulted in systems and services being turned off"); Martinez Testimony, Mar. 10 Tr. at 194–96 (explaining that the contract terminations disrupted the CFPB's statutorily required Home Mortgage Disclosure Act work). And if those and other CFPB contracts are fully terminated, they cannot just be turned back on. *See* Charlie Doe Decl. ¶ 10. It will take "six months to a year or more" to enter new contracts. *Id.*

Allowing defendants to execute their plans without preliminary relief will cause irreparable harm to the Bureau, the plaintiffs in this case, and plaintiffs' members and constituents.

The NAACP, National Consumer Law Center, and Virginia Poverty Law Center will no longer be able to serve their members and constituents with consumer protection services and advocacy. VPLC routinely relies on the Consumer Response system to carry out is mission. *See* Speer Decl. ¶¶ 10, 15–16, 24. But the Vought stop work order and contract cancellations has put it in peril. *See* Pls.' Ex. Z (stating the CCDB has not had been refreshed with new data since February 22); Pfaff Testimony, Mar. 11 Tr. at 91. The VPLC's Chief Executive Officer avers that it would be "difficult if not impossible" for VPLC to replicate the Consumer Response complaint tool – "sending the complaint to the company, backed by a federal agency and with a deadline to respond, while also sending it to other state and federal agencies that may be able to help" – and would strain VPLC's limited resources. Speer Decl. ¶ 16.

Moreover, both VPLC and NCLC rely on CFPB data and reports to carry out their mission and face irreparable harm if that data disappears. VPLC uses CFPB information "about trends or widespread illegal activities that they have discovered through their consumer complaint process" to support its education work, which would be impossible to replicate without access to the consumer complaint database. Speer Decl. ¶ 23. NCLC uses CFPB data in its comprehensive digital treatise series, which "is intertwined with CFPB website materials" and "link extensively to CFPB materials on the CFPB's website." Dubois Decl. ¶ 9. It that data were allowed to disappear, "this material will go out of date and not be replaced by updated CFPB resources." *Id.* ¶¶ 9–10; *see also id.* ¶¶ 4–5.

Defendants' efforts to terminate the Bureau's contracts and other actions that risk destroying CFPB's data would harm these plaintiffs. *See* Pls.' Ex. EE [Dkt. # 60-1] at Page 95 of

107 (March 4, 2025 email warning "we will lose all historical data on our Google Analytics platform if we don't pay the bill"); Defs.' Ex. 6 [Dkt. # 56-1] at Page 9 of 116, CFPB_0009 (Feb. 21, 2025 email from Christopher Chilbert to Adam Martinez stating, "We are doing our best effort to support the data collection, but it is at risk due to several contracts being terminated."); Defs.' Ex. 18 (Feb. 27, 2025) [Dkt. # 56-1] at Page 37 of 116, CFPB_00037 (email directing recipients "to identify if CFPB data or records are at risk of being deleted due to contract cancellations"). And this harm is irreparable because, as one contracting officer explained, without the parties' March 3 agreement, "many of the CFPB's contracts would have been fully and irrevocably terminated by the end of this week" and "the Bureau has not taken any efforts to preserve CFPB data that is possessed by vendors whose contracts are terminated. Charlie Doe Decl. [Dkt. # 38-4] ¶¶ 10, 12.

Shutting down the CFPB would "unquestionably make it more difficult" for VPLC and NCLC to accomplish their primary missions, and this harm "provide[s] injury for purposes both of standing and irreparable harm." *League of Women Voters*, 838 F.3d at 9.

Further, plaintiffs' members face irreparable harm. NAACP member Junita West-Tillman has already suffered devastating losses from the Los Angeles wildfires. West-Tillman Decl. ¶ 2. Now she and other NAACP members are being targeted by mortgage scammers, and she has "had a difficult time determining what assistance was legitimate and what was fraudulent." *Id.* ¶ 3. Without the CFPB, which West-Tillman planned to reach out to for assistance, she and others like her face the "the financial scams that were rampant post-fire" on their own, Bross Decl. ¶ 3, and risk being "unable to recover money lost to financial predators." West-Tillman Decl. ¶ 4. Further, a CFPB Employee Association member who defendants terminated will not have health coverage if she remains terminated as she seeks to deal with a possible auto-immune condition, *see* Coll

Decl. ¶ 6, and another employee who is the insured member of her family and faces termination if defendants execute their planned RIF risks losing health coverage for her spouse who has an ongoing serious medical condition. *See id.* ¶ 7. These harms go beyond mere financial losses that can be paid for later. Association members and their family members with serious health conditions face "great" harm if those conditions are left untreated. *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297; *see Risteen v. Youth for Understanding*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) ("The loss of health insurance benefits – particularly for those who are unemployed – constitutes irreparable harm[.]").[33] These are irreparable harms to the organizational plaintiffs' members.

Finally, plaintiff Pastor Eva Steege has already suffered irreparable harm: she died on March 15 without resolving her student loans. *See* Suggestion of Death [Dkt. # 83]; Steege Decl. ¶ 9 ("If I do not receive public service loan forgiveness and the large refund that I am owed before my death, my family could be forced to pursue a death discharge that will not provide them with the refund that they are counting on so that they can use the money for basic needs after I pass."). The defense argument that Steege faces no irreparable harm "from allegedly not being able to immediately meet with CFPB staff," Defs.' Opp. at 38, ignored both her terminal illness and her statement that she had "attempted to submit the necessary forms and provide the required documentation multiple times but . . . encountered issues with miscommunication, conflicting

---

[33]    *See, e.g., Commc'ns. Workers of Am. District 1, AFL–CIO v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir. 1990) (the threat of termination of medical benefits to striking workers constitutes irreparable harm); *Whelan v. Colgan,* 602 F.2d 1060, 1062 (2d Cir. 1979) ("[T]he threatened termination of benefits such as medical coverage for workers and their families obviously raised the specter of irreparable injury.").

guidance, delays, and errors in processing." Steege Decl. ¶ 2.[34] It also ignored that "all prior

Ombudsmen serving during the Obama, Trump, and Biden Administrations dealt with federal

student loan issues regularly." Barnard Decl. ¶ 5. The irreparable harm that has already come to

pass for Pastor Eva Steege is enough to grant preliminary relief. *See Obergefell v. Kasich*, No.

13-CV-501, 2013 WL 3814262, at *7 (S.D. Ohio July 22, 2013) ("Dying with an incorrect death

certificate that prohibits Mr. Arthur from being buried with dignity constitutes irreparable harm.

. . . A later decision allowing an amendment to the death certificate cannot remediate the harm to

Mr. Arthur, as he will have passed away.").

### C.    The balance of the equities and the public interest weigh in favor of preliminary relief.

The remaining two requirements to be assessed before the issuance of a preliminary

injunction are whether the balance of equities tilts in the plaintiffs' favor and whether the

injunction would be in the public interest. *See Winter*, 555 U.S. at 20. Generally, when one party

is the government, these factors tend to merge and are considered together. *Nken v. Holder,* 556

U.S. 418, 435 (2009).

Defendants devote less than a page to this issue in their brief, and they have only identified

one public interest that is at stake: the public's interest in the democratically-elected President's

prerogative to pursue his policy objectives. *See* Opp. at 39–40 ("The public has an interest in

permitting the President to take decisive action when it comes to setting his policy priorities for

the CFPB."), citing *Heckler v. Chaney,* 470 U.S. 821, 831–32 (1985). *See also* May 3 Tr. at 111

---

34    The Court also notes that half of the staff of the Department of Education have recently
been terminated, which undermines defendants' argument. *See* U.S. Dep't of Ed. Press
Release, (Mar. 11, 2025) https://www.ed.gov/about/news/press-release/us-department-of-
education-initiates-reduction-force.

– 114.[35]  This is a significant interest in connection with any executive agency, and if the Court were being asked to enjoin a decision on how vigorously the CFPB will enforce particular provisions within the statute, or concerning whether agency resources should be allocated to facilitate more robust supervision of non-traditional, non-depository lenders, as opposed to more active monitoring of larger, depository banking institutions, it would bear heavily on the analysis.

But this case is not about how the executive exercises his discretion, and the defendants' citation of *Heckler* is misplaced. What happened in February was not merely a realignment of priorities. The Court has found after an evidentiary hearing and the review of an extensive record, that the plaintiffs are likely to establish that the defendants stopped all work, and that they took, and plan to take, additional concrete steps to dismantle and shut down the agency entirely, in violation of statutory mandates.  Plaintiffs are likely to prove that even if some statutorily required work resumed when the stop work order was relaxed, defendants have already made a decision to abandon their statutory obligations to the many members of the public who are consumers.  And it is likely to be shown that in doing so, the defendants overstepped their statutory and constitutional authority and usurped the power of the members of Congress, who were democratically elected by the people in every state in the union.  Finally, the Court has also found that defendants are poised to complete that process if the motion for an injunction is denied, and

---

35     While this was the only governmental or public interest identified, defense counsel declined to provide any further information as to what the administration's policy with respect to the CFPB might be, maintaining that whether there is a public interest in ensuring that the agency carries out its statutory duties to help people goes to the merits, not the public interest factor. Mar. 3 Tr. at 111–14.

that the closure of the agency will be swift, complete, and irreversible.  In those extraordinary

circumstances, an injunction advances the public interest.[36]

It is notable that when the Supreme Court found the Dodd-Frank Act's restrictions on the

removal of the Director to be unconstitutional, it insisted that those provisions were severable from

the rest of the statute, in part because eliminating the agency and sending its functions back to

whence they came would be entirely unworkable.

> Petitioner assumes that, if we eliminate the CFPB, regulatory and
> enforcement authority over the statutes it administers would simply revert
> back to the handful of independent agencies previously responsible for
> them.  But, as the Solicitor General and House of Representatives explain,
> that shift would trigger a major regulatory disruption and would leave
> appreciable damage to Congress's work in the consumer-finance
> arena.  One of the agencies whose regulatory authority was transferred to
> the CFPB no longer exists . . . (Office of Thrift Supervision).  The others do
> not have the staff or appropriations to absorb the CFPB's 1,500-employee,
> 500-million-dollar operations.  And none has the authority to administer the
> Dodd-Frank Act's new prohibition on unfair and deceptive practices in the
> consumer-finance sector.

*Seila L.*, 591 U.S. at 236–37 (citations omitted).

The amicus briefs filed by public officials and governmental entities include information

that bears on the balance of the equities and the public interest in an injunction.  While defense

counsel declined to weigh in on the public interest in the agency's mission, the amici did.  Like

---

36      While this case pits private parties against a governmental entity, it is relevant to the public
interest and balance of the equities analysis that it is likely that the challenged action exceeded the
executive's authority under the Constitution. *See Pursuing Am.'s Greatness v. Fed. Election
Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016), quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C.
Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest.").
*See also Centro Tepeyac v. Montgomery Cnty,* 722 F.3d 184 (4th Cir. 2013).  While that case arose
in a different context, that is, a state's alleged violation of the First Amendment, the court cited
"precedent that counsels that 'a state is in no way harmed by issuance of a preliminary injunction
which prevents the state from enforcing restrictions likely to be found unconstitutional.  If
anything, the system is improved by such an injunction.' . . . It also teaches that 'upholding
constitutional rights surely serves the public interest.'"  *Id.* at 191, quoting *Giovani Carandola,
Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002).

the Supreme Court, they highlight the singular role played by the CFPB and the costly vacuum that would be created by its absence.

The Court received a brief from 203 Members of Congress, a group that includes "members who sponsored Dodd-Frank, participated in drafting it, serve or served on committees with jurisdiction over the federal financial regulatory agencies and the banking industry, and currently serve in the leadership or served in the leadership when Dodd-Frank was passed." Members' Br. at 1 . Based on that experience:

> They are thus familiar with the essential role that the Consumer Financial Protection Bureau (CFPB or the Bureau) plays in Dodd-Frank's framework. Significantly, based on their experiences, amici know that Congress created the CFPB as a new agency with consolidated consumer financial protection authority and gave the Bureau extensive—and in many cases exclusive—mandatory responsibilities and obligations to regulate the very financial institutions whose conduct led to the 2008 financial crisis.

*Id.* They warn the Court:

> Defendants' stop-work order will have severe consequences for the American people. The CFPB has been a resounding success. It has delivered more than $21 billion back to consumers who have been defrauded by entities like large banks, loan servicers, debt collectors, and payday lenders, some of which were previously not subject to federal supervision. Among the many ways the CFPB has protected consumers, it has confronted the unlawful practices of some of the country's largest financial institutions in lawsuits and enforcement actions, provided certainty and guidance to financial institutions of all sizes, enforced protections against discrimination in consumer financial markets, and halted predatory targeting of servicemembers and their families.
>
> *                  *                  *
>
> If Defendants are successful in their attacks on the CFPB, they will have destroyed the framework Congress created for safeguarding the finances of millions of consumers. As a result, entire swaths of the market will go unprotected from the type of predatory conduct that caused the 2008 crisis because no other federal or state agency has the necessary authority to fill many of the regulatory gaps the Bureau's absence would leave.

Members' Br. at 3 and 4. *See also id.* at 13 ("A sudden halt to the CFPB's important—and mandatory—work would also be devastating for consumers, small businesses, and the country's overall financial stability. . . . [S]upervision would cease, leaving many financial institutions unmonitored and unchecked; and enforcement of many consumer financial protection laws would be limited, leaving millions of consumers with little recourse for the money they lose to unlawful financial practices.).

The Members of Congress also emphasize the importance of the statutorily mandated offices that support service members and seniors who are particularly vulnerable to predatory practices. *Id.* at 6, 18. They also emphasize the key role the agency plays in helping to manage and reduce managing lenders' legal risks, so that consumers can continue to have the access to the credit they need for such things as mortgages, credit cards, and auto loans. *Id.* at 16.

The brief filed by the twenty-two states and the District of Columbia warns of a distinct harm to the public interest given the particular role that states play in our federal system. They make it clear that they cannot fulfill the enormous role of monitoring lenders and responding to consumer complaints on their own.

> The loss of CFPB's partnership has concrete and far-reaching implications: from collaborating on supervisory examinations, to sharing of complaints and trend data, to providing training, to partnering on joint investigations and litigations, the CFPB has been a force multiplier for States' consumer-protection efforts. Absent a preliminary injunction to prevent the sudden loss of these significant contributions, the States will be unexpectedly stretched.

States' Br. at 12.

> While the CFPB has supervisory authority over approximately 200 of the largest financial institutions in the country, it shares supervisory authority with States and augments States' own supervisory efforts in a number of important ways. First, States rely on the CFPB to supervise compliance with federal consumer-protection laws by very large national banks, over which the CFPB has "exclusive authority," 12 U.S.C. § 5515(b)(1). Information

gleaned from this supervision is regularly shared with the States and can inform States' decisions on how to supervise and identify risk within the financial institutions under their direct supervision. Second, the CFPB and States each have supervisory authority over the largest state-chartered banks, nonbank entities offering consumer financial products such as nonbank mortgage lenders and payday lenders, and emerging markets such as digital payments. Because many States' decisions about how best to allocate resources have relied on the CFPB's role in these areas, the CFPB's sudden absence will create gaps in supervision that will be difficult to fill at all, let alone promptly. The resulting vacuum will uniquely burden States.

*Id.* at 13.

The states explain that there would be no substitute for the CFPB's statutorily mandated consumer complaint system and its intake process that identifies and prioritizes complaints involving imminent foreclosures, referring them to local counselors who can assist with timely resolution. *Id.* at 7–8. They also emphasize that the CFPB is the only federal regulator with supervisory authority over nonbank mortgage lenders. *Id.* at 7. These observations all point to the need to preserve the status quo while the case is decided.

Finally, when weighing this factor, the Court finds that a preliminary injunction that leaves the agency standing during the pendency of this case will not harm the only public interest identified by the defendants: the public interest in the President's exercise of his Article II powers to accomplish his policy objectives. *See* Defs.' Opp. at 38–40. That is because Article II explicitly requires him to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3. If the President finds the Consumer Financial Protection Act to be unsatisfactory, the administration will remain completely free to advance his agenda by proposing legislation that reconfigures the agency in a manner that is consistent with his policy preferences. It will then be up to Congress to weigh the advantages of any specific proposal aimed at streamlining the agency against the benefits of sustaining the CFPB, which has been fulfilling its mission to return billions of dollars to consumers at no cost to the taxpayers since 2010.

## CONCLUSION

In sum, the Court cannot look away or the CFPB will be dissolved and dismantled completely in approximately thirty days, well before this lawsuit has come to its conclusion. For all of the reasons set forth above, the Court will **GRANT** [Dkt. # 10] plaintiffs' motion and issue a preliminary injunction that maintains the agency's existence until this case has been resolved on the merits, reinstating and preserving the agency's contracts, work force, data, and operational capacity, and protecting and facilitating the employees' ability to perform statutorily required activities. The Court is aware of the modifications the plaintiffs have made to their proposed order, as well as the objections lodged by the defendants to previous iterations of the proposed order, and it is mindful that its order must be sufficiently specific to be enforceable, while also broad enough to afford the agency and its leadership the discretion they are accorded under the statute when carrying out their regulatory, enforcement, and supervisory responsibilities.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 28, 2025

JA744

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL TREASURY ) | |
| EMPLOYEES UNION, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 25-0381 (ABJ) |
| ) | |
| RUSSELL VOUGHT ) | |
| *in his official capacity as* ) | |
| *Acting Director of the* ) | |
| *Consumer Financial* ) | |
| *Protection Bureau*, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

<u>**ORDER**</u>

Plaintiffs' Motion for Temporary Restraining Order [Dkt. # 10] was converted with the parties' consent to a Motion for Preliminary Injunction on February 14, 2025. *See* Order [Dkt. # 19]. Upon consideration of the motion, defendants' opposition [Dkt. #31], plaintiffs' reply [Dkt. # 40], the parties' supplemental submissions, the arguments advanced and evidence introduced during the hearings conducted on March 3, 10, and 11, 2025, and the full record in this case, and for the reasons set forth in the accompanying Memorandum Opinion [Dkt. # 87], it is hereby **ORDERED** that the motion is **GRANTED**. In accordance with Fed. R. Civ. Proc. 65(a) and (d)(1) and (2)(A)–(C), defendant Vought and defendant Consumer Financial Protection Bureau ("CFPB") are enjoined as set forth below until further order of this Court. This order shall bind the defendants, their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, such as personnel from the Department of Government Efficiency ("DOGE") or the U.S. Digital Service.

It is hereby **ORDERED** that:

1. Defendants, shall maintain and shall not delete, destroy, remove, or impair any data or other CFPB records covered by the Federal Records Act (hereafter "agency data") except in accordance with the procedures described in 44 U.S.C. Chapter 33. This means that Defendants shall maintain and shall not delete, destroy, remove, or impair agency data from any database or information system controlled by, or stored on behalf of, the CFPB. The term "agency data" includes any data or CFPB records stored on the CFPB's premises, on physical media, on a cloud server, or otherwise. The defendants must take all necessary steps to ensure that its contractors do the same.

2. Defendants shall reinstate all probationary and term employees terminated between February 10, 2025 and the date of this order, including but not limited to, Julia Barnard, the Private Student Loan Ombudsman.

3. Defendants shall not terminate any CFPB employee, except for cause related to the individual employee's performance or conduct; and defendants shall not issue any notice of reduction-in-force to any CFPB employee.

4. Defendants shall not enforce the February 10, 2025 stop-work order or require employees to take administrative leave in furtherance of that order, and defendants shall not reinstitute or seek to achieve the outcome of a work stoppage, whether through a stop-work order, an order directing employees to take administrative leave, or any other means.

5. To ensure that employees can perform their statutorily mandated functions, the defendants must provide them with either fully-equipped office space, or permission to work remotely and laptop computers that are enabled to connect securely to the agency server through the Citrix Virtual Desktop or another similar program.

6. Defendants shall ensure that in accordance with 12 U.S.C. §5492(b)(3), the CFPB Office of Consumer Response continues to maintain a single, toll-free telephone number, a website, and a database for the centralized collection of consumer complaints

regarding consumer financial products and services, and that it continues to monitor and respond to those complaints, including by providing Elevated Case Management.

7. Defendants shall rescind all notices of contract termination issued on or after February 11, 2025, and they may not reinitiate the wholesale cancellation of contracts. This provision does not prohibit the defendants from ordering that work or services under specific contracts be halted based on an individualized assessment that the contract involved is unnecessary for the agency to fulfill its statutory functions. To ensure that this Court can award full relief at the end of the case, however, the defendants may not finalize the termination of any contract.

8. Defendants shall file a report with the Court by April 4, 2025 confirming that all individuals and entities that fall within Fed. R. Civ. Proc. 65(d)(2)(A), (B), and (C) have received actual notice of this Order, and that the defendants are in compliance with this Order.

9. The Court's temporary consent order issued on February 14, 2024 [Dkt. # 19] and the March 3, 2025 Minute Order issued in light of the parties' Notice of Agreement [Dkt. # 53] and Notice of Agreement (Corrected) [Dkt # 65], are hereby **VACATED.**

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  March 28, 2025

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>RUSSELL VOUGHT, *in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al.*,<br><br>  *Defendants*. | Case No. 1:25-cv-00381-ABJ |

## NOTICE OF APPEAL OF PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that the Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's March 28, 2025 Memorandum Opinion (ECF No. 87) and Order (ECF No. 88) granting Plaintiffs' motion for a preliminary injunction.

Dated: March 29, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG
(D.C. Bar No. 467513)
Special Counsel

LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

Phone:  202-514-3374
Fax:  202-616-8460
Email: brad.rosenberg@usdoj.gov

*Attorneys for Defendants*

JA749

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ | ) |
| NATIONAL TREASURY | ) |
| EMPLOYEES UNION, *et al.*, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) Civil Action No. 25-0381 (ABJ) |
| RUSSELL VOUGHT | ) |
| *in his official capacity as* | ) |
| *Acting Director of the* | ) |
| *Consumer Financial* | ) |
| *Protection Bureau, et al.*, | ) |
|  | ) |
| Defendants. | ) |
| _____ | ) |

## ORDER

On April 1, 2025, defendants filed a motion in this court [Dkt. #97] ("Defs.' Mot.") seeking a stay of the Court's March 28 preliminary injunction [Dkt. # 88] ("the Order") for the first time.

To the extent defendants seek a stay of the requirement in the Order that they inform the Court of their compliance with its terms by Friday, April 4, the motion is **GRANTED IN PART**; that obligation is hereby **STAYED**, with plaintiffs' consent, *see* Pls.' Mot. for Briefing Schedule [Dkt. # 92] at 2; Pls.' Opp. to Defs.' Mot. [Dkt. # 98] at 4–5, pending the outcome of the motion for emergency stay pending before the Court of Appeals.  The rest of the motion is **DENIED**, but without prejudice to a motion that proposes reasonable and appropriate modifications to the preliminary injunction that preserve its day-to-day managerial discretion.  The parties met and conferred in the past and agreed to terms that governed the period between the filing of plaintiffs' motion for a temporary restraining order ("TRO") and the ruling on the motion for preliminary injunction, and the Court encourages them to do so again.

The Court must consider four factors in connection with a motion to stay pending appeal: (1) whether the movant has made a strong showing that it is likely to succeed on the merits; (2) whether the movant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest

lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The Supreme Court has explained that the first two factors "are the most critical." *Id.*

Defendants say very little about most of this, and for all of the reasons set forth in the Memorandum Opinion, [Dkt. #87] ("Mem. Op."), the defendants cannot make the necessary showing. First, the Court found that the defendants' objections to its exercise of jurisdiction are unsupported, and after a detailed analysis of the testimony and agency records introduced by both sides, it found that plaintiffs are likely to succeed on the merits of their claims, including the claim that the defendants are in fact engaged in an effort to shut down the agency in violation of law notwithstanding their denials. *See* Mem. Op. at 61–101. This is not just a typical pause while the new administration considers and readjusts agency priorities.

Second, the defendants cannot point to any injury, much less any irreparable injury, that would flow from compliance with an injunction that requires that the agency continue to exist as Congress mandated and to perform its statutorily required duties, including in particular, the duties assigned to the Office of Consumer Response, while the merits of plaintiffs' claims are being litigated.

What is striking about the defendants' motion is that they pay very little attention to the merits of the case at all. They do not seem to dispute that they lack the ability to close the agency established by Congress on their own. Instead, the focus of the attack is the claimed breadth of the remedy. But their description of the Order is at odds with the terms of the Order, and their description of the ruling that prompted it is inaccurate as well.

Defendants assert in their motion and in the motion filed with the Circuit that "[t]he order does not track any specific CFPB duties Congress made obligatory." Defs.' Mot. at 2. But a key provision in the Order is directly tied to the statute and even cites the relevant provision: "Defendants shall ensure that in accordance with 12 U.S.C. § 5492(b)(3), the CFPB Office of Consumer Response continues to maintain a single, toll-free telephone number, a website, and a database for the centralized collection of consumer complaints regarding consumer financial products and services, and that it continues to monitor and respond to those complaints, including by providing Elevated Case Management." Order at 2–3. Moreover, the Order calls for the reinstallation of the Private Student Loan Ombudsman, a position specifically called for by the statute that has been vacant since February 13. Order at 2; *see* Mem. Op. at 18.

Defendants imply that all the Court needed to do was say: keep fulfilling your statutory duties pending the outcome of this case. *See* Defs.' Mot. at 1–2. But they seem to forget that when the plaintiffs proposed an order that simply required them not to interfere with the employees' performance of their statutory duties, the defendants objected to that order on the ground that it was too broad, too vague, and unenforceable. So the Court had to get specific.

JA751

Defendants announce that "[t]he Government has repeatedly explained that, absent congressional action, the Bureau will continue to perform mandatory statutory duties," Defs.' Mot. at 1, and that it was doing so when the Court issued its order. *See id*. at 2 ("The Government is likely to succeed in challenging the preliminary injunction[,] because the Bureau will continue to perform its statutory duties . . . ."). *See also id.* at 3 ("Defendants . . . continue to view this Court's intervention and supervision as unnecessary to preserve Defendant CFPB's existence and continued operation."). The defendants' insistence that they should be free to run the agency and implement the statutory requirements without court interference comes a little too late; the evidence the Court of Appeals has not yet seen shows that the defendants made the choice not to run the agency at all – to close it down and fire all of the employees – and that the Reduction in Force ("RIF") notices are ready to go if the injunction is lifted.

As the defendants put it, this Court "believed" that absent preliminary relief, the CFPB would be dismantled completely before the case came to its conclusion, but that "belief . . . is incorrect and based on outdated evidence since clarified by the current agency leadership." *Id*. at 4, citing Suppl. Decl. of Adam Martinez [Dkt. # 47-1].

Saying something does not make it so. Nor does saying it "repeatedly." Defs.' Mot. at 1, 3, 7, 8.

Apparently, the defendants have not read the entire Memorandum Opinion. It does not predicate the need for an injunction or base its ruling on a "belief." It does not predicate the need for an injunction on outdated evidence. It held two full days of evidentiary hearings involving three witnesses, including Mr. Martinez, and it reviewed every single document submitted by either side. It found that the cited statements in the declaration the defendants are relying on again were not worthy of belief.

Defendants repeat the theme they tried to advance in opposition to the TRO that "it is not uncommon for agency leadership to reevaluate . . . policy choices at the start of a new administration." Defs.' Mot. at 6. They accuse the Court of being unable to distinguish between a "temporary directive asking employees to briefly pause" during a transition and the "wholesale elimination of an agency." *Id.* But as recounted in detail in the Memorandum Opinion, the defendants have consistently attempted to blur the distinction between the initial transition emails issued by Acting Director Bessent on February 3 and by Acting Director Vought on February 8,

which the Court did not find to be problematic, and the stop work order issued on February 10, which is the focus of the Order.[1]

Defendants challenge the scope of the Order, asserting that the Court "imposed sweeping restrictions and affirmative requirements affecting administration of all routine Bureau operations, personnel decisions, and contract management." Defs.' Mot. at 2; *see also* Defs.' Mot. at 4 ("[A]gencies that remain fully 'open' possess broad discretion to allocate resources and make personnel decisions . . . ."). The Order in this case does prohibit the agency from sending out the notices that have already been prepared and approved by OPM for all agency employees except the few needed to effectuate the RIF and which would leave no open positions behind. But that is not a routine operation. As to routine workplace management, the Order includes explicit language authorizing the agency to take ordinary employment actions with respect to individual employees. And the Order fully permits the agency to turn off contracts if it determines they are not needed to support statutorily mandated functions. The requirement that they not be terminated entirely, though, is necessary to ensure that it will not take the initiation of a two-year procurement process to turn them back on if plaintiffs succeed in establishing that defendants' effort to eliminate the agency was unlawful.

Finally, the defendants take issue with what they describe as the Court's "inexplicabl[e]" decision to require the Bureau "to adopt specific information-technology policies." Defs.' Mot. at 6. This is also a blatant mischaracterization of the Order. The evidence showed that the defendants were engaged in negotiations to cancel the lease for its headquarters. The record reflects that there are government-wide policies against remote work. The record also reflects that shortly before the hearing on this motion, the agency cancelled the contract for the only technology available for remote work at the CFPB. Therefore, it was necessary, and hardly inexplicable, to require that if employees are going to work, they have to be provided with *either* office space or laptop computers equipped with software that can connect securely with the agency. But the Court did not dictate the particular technology to be selected; it said it could be the brand of virtual desktop that had recently been cancelled "or another similar program." Order at 2.

In short, the Order is hardly as onerous or unsupported as defendants would have this Court and the Court of Appeals believe. As noted above, though, the Court would be open to further

---

1    Defendants state that the Court "failed to meaningfully grapple" with the fact that employees "ignored the plain language of the email instructing them to seek approval for urgent and critical CFPB obligations." Defs.' Mot. at 7. But the Court specifically found that it is the defendants who are ignoring the plain text of the February 10 order and that their eleventh-hour attempt to recharacterize it as something else on the Sunday afternoon before the hearing was disingenuous and unpersuasive.

discussion about how it could or should be tailored, but it will not lift the order before those questions are resolved.

That is because, returning to the *Nken v. Holder* factors, staying the action would substantially injure the plaintiffs.  The defendants would be free to move swiftly to take the steps that would eliminate the agency in thirty days, which the Court has already found they are poised to do, and that would cause plaintiffs irreparable harm.  Indeed, during the hearing on the motion for preliminary injunction, defendants' only witness, the Chief Operating Officer of the CFPB, testified, "I now realize how much damage can be done . . . just within a couple of days."  Tr. of Evidentiary Hr'g (Mar. 10, 2025) [Dkt. #  73] at 74.  Given the devastating consequences that would ensue if a stay were entered and the defendants were relieved of their obligation to comply with the Order, the public interest lies decidedly against a stay.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  April 3, 2025

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-00381-ABJ |

## DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Mark Paoletta, declare as follows:

## I. Comprehensive Review of Agency's Functions By New Leadership

1. Since February, the Bureau's new leadership has been undertaking a review of the Bureau's activities and staffing. Over the course of this review, leadership has determined to take the Bureau in a new direction that would perform statutory duties, better align with Administration policy, and right-size the Bureau. Leadership has discovered many instances in which the Bureau's activities have pushed well beyond the limits of the law. For example, the Bureau has conducted many enforcement and supervision actions on the basis of mere statistical disparities without the slightest evidence of intentional discrimination. The Bureau has also engaged in intrusive and wasteful fishing expeditions against depository institutions and, increasingly, non-depository institutions. Additionally, the Bureau pushed into new areas beyond its jurisdiction such as peer-to-peer lending, rent-to-own, and discrimination as unfair practice. The Bureau engaged in supervisions with other federal agencies and supervision outside of the Bureau's authority, and also duplicative enforcement with State law enforcement and regulatory authorities.

2. Bureau leadership has directed the closure of many supervisions and examinations, and has also directed several enforcement actions to proceed, especially in the area of service member fraud.

3. For several weeks, the Bureau's leadership has been developing new enforcement and supervision priorities seeking to align the Bureau's practices with a much

more limited vision for enforcement and supervision activities, focused on protecting service members and veterans, and addressing actual tangible consumer harm and intentional discrimination. This review resulted in the Bureau's 2025 Supervision and Enforcement Priorities, released on April 16, 2025. These priorities capture the more restrained role described above.

4. Leadership has also been assessing how the agency can fulfill its statutory duties as a smaller, more efficient operation. In making this assessment, leadership discovered vast waste in the agency's size. Leadership recognized that all divisions, but especially enforcement, supervision, consumer response, operations, research, markets, and regulations, and the Director's office contained far more employees than are necessary to fulfill the Bureau's statutory duties and discretionary functions.

## II. Particularized Assessment

5. The D.C. Circuit's stay of the district court's opinion authorized the Bureau to issue a "notice of reduction in force to employees whom defendants have determined, after a particularized assessment, to be unnecessary to the performance of defendants' statutory duties."

6. I, along with two other CFPB attorneys, conducted a particularized assessment to determine which employees are unnecessary for the Bureau to perform its statutory duties.

7. As part of this assessment, I and the other attorneys went line by line through each competitive area to determine how many employees were necessary in each area.

8. The Consumer Response Education Division had 149 employees, further broken into Consumer Response, at 128, Consumer Response Education, at 8, and Financial Education, at 13. Considering that the Bureau retains dozens of contractors to field consumer complaints, I determined that this Division could be cut substantially, while still performing the Bureau's statutory duty "to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services." 12 U.S.C. § 5493. I determined that the escalated case management team could continue to fulfill its duties at a much lower level of employees. 12 U.S.C. § 5493(b)(3)(A). The Office of Financial Education is separately required by statute. § 5493(d). After consulting with agency operations personnel, I determined that the statutory functions of the Consumer Response Education Division could be performed with 16 in Consumer Response, 2 in Consumer Response Education, and 2 in Financial Education.

9. CFPB Centralized Services had 5 employees. This is not a statutorily required function and I was informed by agency personnel that it is unnecessary to the agency's functions. I therefore determined that 0 employees were necessary for this division.

10. The Director's Office contained 86 employees. Within the Director's Office, the Office of Minority and Women's Inclusion, § 5452, Office of Fair Lending and Equal Opportunity, § 5493 (which covers TILA and HDMA), and the Deputy Director, § 5491(b), are required by statute. I determined that the statutory functions of each of these offices could be performed by 1 person. Although not required by statute, I also retained 1 employee in the Office of Legislative Affairs and 1 employee in the Office of Civil Rights. I therefore determined that 5 employees would be sufficient for the Director's Office.

11. The Enforcement Division contained 248 employees. The Bureau is tasked by statute with performing some level of enforcement. In line with the Bureau's revised 2025 Supervision and Enforcement priorities, I determined that the Enforcement Division should be significantly reduced in line with the Bureau's new policy of focusing on tangible consumer harm and deferring to State enforcement actions. I therefore determined that 50 employees would be sufficient to allow the Bureau to perform its statutory enforcement functions.

12. The Supervision Division contained 487 employees. The Bureau is tasked by statute with performing some level of supervisory activity. In line with the Bureau's revised 2025 Supervision and Enforcement priorities, I determined that both the quantity and scope of supervision matters would be significantly reduced. I therefore determined that 50 employees would be sufficient to allow the Bureau to perform its statutory supervision functions. Bureau leadership also determined to reorganize Supervision to concentrate all personnel in the Southeastern region due to proximity to headquarters and relatively lower cost of living.

13. The External Affairs Division contained 41 employees. The only statutorily required component is the Community Affairs Unit. § 5493(b)(2). I determined that the statutory duties of this unit could be performed by 1 person. I also determined to retain 1 employee to engage in private sector engagement.

14. The Legal Division contained 87 employees. The Division is not required by statute. I determined that 27 employees—4 in General Law and Ethics, 8 in Law and Policy, 0 in the front office, 14 in litigation, and 1 in oversight—were sufficient to perform support functions for the Bureau.

15. The Operations Division contained 323 employees. It is not required by statute. In consultation with Bureau personnel, I determined that 30 employees were sufficient—5 in Administrative Operations, 0 in the CIO, 5 in Finance and Procurement, 5 in Human Capital, 1 in the front office, and 14 in Technology and Innovation—were sufficient to perform support functions for the Bureau.

Operations also ensures compliance with legal requirements like the Rehabilitation Act and Americans with Disabilities Act. I also determined these personnel levels to be sufficient for the preservation of data.

16. The Research Monitoring and Regulations Division consisted of 230 employees. Within RMR, the Office of Service Members Affairs, § 5493(e), Office of Financial Protection for Older Americans, § 5493(g), and Office of the Private Education Loan Ombudsman, § 5535, are statutorily required. I determined that the statutory duties of each could be performed by 1 person. The Research Unit is also required by statute. § 5493(b)(1). I determined that 3 employees are sufficient to perform the statutory duties of the Research Unit. Monitoring is also required by statute. § 5512(c). I determined that 4 employees were sufficient to perform this statutory duty.  I also determined that 10 employees for Regulations and 2 for the front office would be sufficient to perform these non-statutorily required functions. I thus determined that 22 employees would be sufficient for the RMR Division.

17. The Ombudsman's Office contained 4 employees. This position is required by statute. I determined that 1 employee could fulfill the statutory duties.

18. The Office of the Director's Financial Analysts contained 29 employees. This office is not required by statute. I therefore determined that 0 employees were sufficient.

## III. Conclusions of Particularized Assessment  Review

19. As the above indicates, the Bureau could have reduced beyond the levels it ultimately decided upon while still performing its statutory duties. The Bureau examined each and every statutory duty and determined the appropriate level of employees needed for each task. Bureau leadership determined that each statutory duty could be performed with significantly less personnel through a line-by-line assessment of each office, division, unit, subunit (some subunits are 1 person).

20. Bureau leadership determined that the level of employees retained were sufficient to perform the Bureau's statutory duties and the discretionary duties that leadership has determined to pursue.

21. An approximately 200 person agency allows the Bureau to fulfill its statutory duties and better aligns with the new leadership's priorities and management philosophy.

22. The employees who received RIF notices are still CFPB employees for 60 days. Leadership will continuously assess the Bureau's workforce needs and assess and adapt and make appropriate changes to ensure compliance with statutory duties and account for changing circumstances.

23. Attached are true and correct copies of the following documents:

- A copy of the Consumer Financial Protection Bureau 2025 Supervision and Enforcement Priorities Memorandum, dated April 16, 2025, which constitutes all letters, memoranda, or emails sent to CFPB staff from me and/or from Acting Director Russell Vought this week; a representative sample of a reduction in force notice that was issued on April 17, 2025, including attachments; a list of job titles of employees involved in the reduction in force; and a copy of a spreadsheet of Bureau divisions, offices, units, and subcomponents.   Pursuant to the Court's Minute Order, Defendants are filing the list of employees involved and their job titles under seal as well as submitting that document by e-mail to Ms. Rodriguez-Feleke.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Mark R. Paoletta
Chief Legal Officer

April 16, 2025

| **TO** | CFPB Staff |
|---|---|

| **FROM** | Mark R. Paoletta<br>Chief Legal Officer |
|---|---|

| **SUBJECT** | 2025 SUPERVISION AND ENFORCEMENT PRIORITIES |
|---|---|

This document sets out the Bureau's supervision and enforcement priorities. The Bureau will focus its enforcement and supervision resources on pressing threats to consumers, particularly service members and their families, and veterans. To focus on tangible harms to consumers, the Bureau will shift resources away from enforcement and supervision that can be done by the States. All prior enforcement and supervision priority documents are hereby rescinded.

1. To avoid the ever-increasing number of supervisory exams, which are multiplying the cost of running businesses and raising consumer prices, Supervision shall decrease the overall number of "events" by 50%. The focus should be on conciliation, correction, and remediation of harms subject to consumers' complaints. Supervision should focus on collaborative efforts with the supervised entities to resolve problems so that there are measurable benefits to consumers.

2. The Bureau's focus will shift back to depository institutions, as opposed to non-depository institutions. In 2012, 70% of the Bureau's supervision focused on banks and depository institutions and 30% on nonbanks. Now that proportion has completely flipped, with over 60% on nonbanks and less than 40% on banks and depository institutions. The Bureau must seek to return to the 2012 proportion and focus on the largest banks and depository institutions.

3. The Bureau will focus on actual fraud against consumers, where there are identifiable victims with material and measurable *consumer damages* as opposed to matters based on the Bureau's perception that consumers made "wrong" choices. The areas of priorities are:

   a. Mortgages (getting the highest priority).

     b.  FCRA/Reg V data furnishing violations.

     c.  FDCPA/Reg F relating to consumer contracts/debts.

     d.  Various fraudulent overcharges, fees, etc.

     e.  Inadequate controls to protect consumer information resulting in actual loss to consumers.

4. The Bureau will focus on redressing tangible harm by getting money back directly to consumers, rather than imposing penalties on companies in order to simply fill the Bureau's penalty fund.

5. The Bureau will focus on providing redress to service members and their families, and veterans.

6. The Bureau will respect Federalism:

     a.  The Bureau will deprioritize participation in multi-state exams unless *required* by statute (rather than merely permitted).

     b.  The Bureau will deprioritize supervision where States have and exercise ample regulatory and supervisory authority, unless required by statute (rather than merely permitted).

     c.  The Bureau will minimize duplicative enforcement, where State regulators or law enforcement authorities are currently engaged in or have concluded an investigation into the same matter.

7. The Bureau will respect other federal agencies' regulatory ambit:

     a.  The Bureau will eliminate duplicative supervision or supervision outside of the Bureau's authority (e.g., no supervision of M&A, just because regulated entities are involved, or attempt to insert itself into bankruptcy supervision).

     b.  To the extent feasible, the Bureau will coordinate exams' timing with other/primary federal regulators.

     c.  The Bureau will minimize duplicative enforcement, where another federal regulator is currently engaged in or has concluded enforcement.

8. The Bureau will not pursue supervision under novel legal theories, including of the Bureau's authority. It will focus on areas that are clearly within its statutory authority.

9. The Bureau will not engage in or facilitate unconstitutional racial classification or discrimination in its enforcement of fair lending law:

     a.  The Bureau will not engage in redlining or bias assessment supervisions or enforcement based solely on statistical evidence and/or stray remarks that may be susceptible to adverse inferences.

     b.  The Bureau will pursue only matters with proven actual intentional racial discrimination and actual identified victims. Such matters shall be brought to the leadership's attention and maximum penalties will be sought.

10. The Bureau will deprioritize the following:

    a. Loans or other initiatives for "justice involved" individuals (criminals).

    b. Medical debt.

    c. Peer-to-peer platforms and lending.

    d. Student loans.

    e. Remittances.

    f. Consumer data.

    g. Digital payments.

11. The Bureau's primary consumer enforcement tools are its disclosure statutes. The Bureau shall not engage in attempts to create price controls.

MEMORANDUM FOR:

FROM:                    Russell T. Vought
                         Acting Director of Consumer Financial Protection Bureau

DATE:                    April 17, 2025

SUBJECT:                 Specific Notice of Reduction in Force

I regret to inform you that you are affected by a reduction in force (RIF) action. This RIF action is necessary to restructure the Bureau's operations to better reflect the agency's priorities and mission.

This is your specific notice of RIF. In accordance with RIF procedures specified in Title 5, Code of Federal Regulations, Part 351, you are being released from your competitive level because your position is being eliminated. Consequently, you will be separated from Federal service effective June 16, 2025. In the event you are qualified and have assignment rights to a position that becomes available during the notice period, you will be informed via a specific, subsequent RIF notice. Should the circumstances of the RIF otherwise change, this notice may be withdrawn.

Please be advised that you will retain access to work systems, including email and internal platforms until 6:00 PM Eastern Time, on April 18, 2025. After that time system access will be discontinued, and you will be placed in an administrative leave status through your official separation date as outlined above.

It is recommended that you download a copy of your eOPF and performance records and send **only** personnel related documents to your personal email address. Employees **are strictly prohibited** from sending any Bureau work related documents, emails, information or data to their personal email address. **Employees are only authorized to email personal records outside of the Bureau.** Employees who send Bureau work related documents externally will be subject to disciplinary action up to and including removal from federal service.

Also, please ensure that your personal information is updated in HRConnect including your personal email address, personal phone number and home address. This information will be important as we continue to communicate with your during the RIF period.

**Retention Standing**

This action is being taken under the civil service RIF regulations and procedures. CFPB retains information used in connection with this action, including retention registers which list employees in retention standing order by civil service tenure group and subgroup, veterans' preference, performance ratings, and length of Federal service.

**Competitive Area:** SUPERVISION MIDWEST REGION
**Type of Service:** Competitive-Career

**Work Schedule:** Full-Time
**Position:** Examiner, CN-60, **Series** 0570
**Competitive Level:** A010
**Tenure Group and Subgroup:** Tenure Group 1
**Veterans' Preference:** None
**Last Three Performance Ratings:**

> Period Ending 9/30/2024: Rated Level 3. Fully Successful or equivalent. Pass level under pass/fail program
> Period Ending 9/30/2023: Rated Level 3. Fully Successful or equivalent. Pass level under pass/fail program
> Period Ending 9/30/2022: Rated Level 3. Fully Successful or equivalent. Pass level under pass/fail program

**Additional Years of Credit Based on Performance Ratings:** 20

**Adjusted RIF Service Computation Date (SCD):** ▨

NOTE: The adjusted RIF SCD includes all creditable military and civilian service and is adjusted with additional credit (up to a maximum of 20 years) for the performance ratings.

Please contact the Bureau of Fiscal Service (BFS) at 304-480-8000 option 4 or CFPBHROPs@fiscal.treasury.gov immediately if you believe any of the above information is incorrect. The Bureau is committed to correcting any incorrect employee information.

You may be eligible for a severance pay. For eligibility, please visit OPM's Severance Pay Fact Sheet.

**RIF Package**

Each employee impacted by RIF has access to documents that outline applicable benefits for which you may be eligible or entitled as appropriate. To access these documents, you may make an appointment with the Bureau of Fiscal Service (BFS) to obtain paper copies of the documents. You may make an appointment by contacting BFS at 304-480-8000 option 4 or CFPBHROPs@fiscal.treasury.gov. In addition, the websites to certain relevant external benefits provided by other entities are found immediately below.

For training benefits under the Workforce Improvement Act of 1998, please visit www.careeronestop.org.

For unemployment compensation benefits, please refer to the Department of Labor website at www.dol.gov.

For general transition assistance information, please refer to the OPM Employee's Guide to Career Transition or contact OHC at CFPB_OHC_General@cfpb.gov.

JA764

**Appeal and Grievance Rights**

<u>U.S. Merit Systems Protection Board (MSPB)</u>
If you believe your retention rights have not been applied correctly or have been violated, you may appeal this action to the MSPB. Your appeal must be in writing and may be filed any time after the effective date of the action being appealed until <u>no later than 30 calendar days</u> after the effective date. Failure to file an appeal within the time limit may result in dismissal of the appeal as untimely filed. More information on filing appeals is included in your RIF package. You may also access the MSPB website at www.mspb.gov for additional and further detailed information on the appeal process.

<u>Equal Employment Opportunity (EEO)</u>

If you believe this termination is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, pregnancy and/or reprisal for prior EEO activity, you may file a discrimination complaint with the Agency's Office of Civil Rights. To initiate the formal discrimination complaint process, you must first contact an EEO Counselor within forty-five (45) calendar days of the employment action or event you believe is discriminatory, harassing, or retaliatory. You may contact the Office of Civil Rights at CFPB_EEO@cfpb.gov or (202) 435-9EEO, 1-855-233-0362 or 202-435-9742 (TTY).

<u>Office of Special Counsel</u>

If you believe this action is being taken in retaliation for your making protected whistleblowing disclosures, you may also seek corrective action from the U.S. Office of Special Counsel (OSC). If you do so, your appeal may be limited to whether the Agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures, and you will not be able to challenge the decision on other bases in that action. To seek corrective action from the OSC, you may submit your complaint online. More information on or about filing a complaint with the OSC may be found at https://osc.gov/Pages/File-Complaint.aspx.  As an alternative, you may communicate in writing to the following address:

> Complaints Examining Unit
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505

**Conclusion**

This action is being taken in accordance with the applicable civil service RIF regulations. Included in your RIF package is a copy of the Office of Personnel Management (OPM) retention regulations, 5 C.F.R. Part 351. Further and detailed information about the RIF regulations may also be accessed on OPM website, Reductions in Force. You may make an appointment to review and obtain a copy of the RIF regulations and/or records pertaining to you by contacting the Bureau of Fiscal Service.

The Employee Assistance Program (EAP) is available free to you and in most cases your immediate family. EAP counselors are available 24 hours a day, 365 days per year at 1-800-222-0364 (TTY 1-888-262-7848) or http://www.foh4you.com/.

Because you are being separated through a RIF action, you are eligible for career transition and placement assistance. Specifically, you are eligible for the Bureau Reemployment Priority List (RPL), Career Transition Assistance Program (CTAP), and Interagency Career Transition Assistance Program (ICTAP). Your RIF package includes further information on these programs.

Please be advised that an early resignation may affect your eligibility for placement assistance and your appeal rights. It may also impact your ability to qualify for unemployment compensation and training benefits provided under WIA. You are encouraged to contact your State's Department of Labor and Employment for any questions regarding unemployment compensation. You are also encouraged to contact the Bureau of Fiscal Service (BFS) at 304-480-8000 option 4 or CFPBHROPs@fiscal.treasury.gov to determine how an early resignation may affect your benefits.

This RIF action does not reflect directly on your service, performance, or conduct. It is being taken solely for the reasons stated above. Leadership at the Bureau of Consumer Financial Protection are appreciative of your service.

Attachments (7)
1. MSPB Appeal Information
2. OPM Retention Regulations
3. Severance Pay Estimate
4. Unemployment Insurance
5. State Workforce Programs
6. Authorization for Release of Employment Information
7. CTAP, ICTAP and Reemployment Priority List (RPL) Program Information

# U.S. Merit Systems Protection Board
## Information Sheet No. 8
## e-Appeals

### *Purpose*

The purpose of this information sheet is to provide general guidance and background information. It does not represent an official statement approved by the Board itself, and is not intended to provide legal counsel or to be cited as legal authority. Instead, it is intended only to help the public become familiar with the MSPB and its procedures. In all instances, however, the Board's regulations and current case law control with respect to the matters discussed here.

### *What is e-Appeal?*

E-Appeal is a system which allows participants in Board proceedings to file and receive some or all of their pleadings to the Board electronically through the internet.

### *What type of pleadings can be filed or received through e-Appeal?*

Virtually every written submission that a party or representative may file can be sent through e-Appeal including submissions that set out claims, allegations, arguments, or evidence, motions, legal briefs, petitions, responses, and attachments.  Exceptions to this rule are set forth in 5 C.F.R. § 1201.14(c): requests to hear a case as a class action, service of subpoenas, filing a pleading with the Special Panel (after a disagreement between MSPB and EEOC), filing a pleading that contains Sensitive Security Information or classified information, and filing a request to participate as an amicus curiae or filing an amicus brief.

### *How does e-Appeal work?*

To start, a party or representative must register with the Board as an e-filer by following the simple instructions at the Board's e-Appeal website (https://e-appeal.mspb.gov/). After that, everything is done through the website. To file a document, you go to the Board's website and upload an electronic document or enter the text of your pleading. The website accepts documents in all popular electronic formats. The e-Appeal system will then send an e-mail message to all parties and their representatives who are registered as e-filers, with a link to the Repository at e-Appeal Online, where they can view and download the documents. At the Repository, you will also find an electronic "Docket Sheet" listing all of the documents issued by the Board to the parties, as well as all pleadings filed by the

parties, including those that are not available for viewing and downloading electronically. This will assure that you know what information is before the administrative judge when your appeal is decided.

### *Do I serve documents by e-mail?*

No. You may not use e-mail to serve pleadings. You just go to the Board's e-Appeal website to upload an electronic file or enter the text of your pleading online. The Board assures service of all documents on registered e-filers as explained in the response immediately above. The Board will not disclose an e-filer's e-mail address to the opposing party or to third parties.

### *If I register, must I file everything electronically?*

No. Although registration as an e-filer permits you to file electronically, you may file any pleading by non-electronic means, which include regular mail, fax, and personal or commercial delivery. Regardless of the means of filing a particular pleading as explained immediately above, the e filer will be allowed to submit supporting documentation as attachments, in both electronic and paper form. You can also withdraw from e-filing at any time. Also, if you are represented, you and your representative need not both be e-filers.

### *How hard is it to use e-Appeal?*

E-Appeal is easy to use. If you use the Internet to make airline reservations or to make purchases, you will not have much trouble learning to use e-Appeal.

### *What if I have other questions?*

Just go to the Board's e-Appeal website (https://e-appeal.mspb.gov/) for step-by-step help in getting started, a detailed FAQ (Frequently Asked Questions) section, and lots of other helpful information and links.

**OPM** U.S. Office of
Personnel Management

OPM.gov / Policy / Workforce Restructuring / Reductions in Force

# REDUCTIONS IN FORCE OVERVIEW

The U.S. Office of Personnel Management develops policy and provides guidance to Federal agencies regarding Reduction in Force (RIF). This page serves as a portal to assist you in locating pertinent information and content related to RIF in the Federal Government.

When an agency must abolish positions, the RIF regulations determine whether an employee keeps his or her present position, or whether the employee has a right to a different position. The regulatory requirements governing reduction in force are contained in Title 5, Code of Federal Regulations, Part 351. Federal agencies must follow the procedures contained in the Code of Federal Regulations when conducting a RIF. The law provides that OPM's RIF regulations must give effect to four factors in releasing employees:

1. tenure of employment (e.g., type of appointment);
2. veterans' preference;
3. length of service; and
4. performance ratings.

An agency is required to use the RIF procedures when an employee is faced with separation or downgrading for a reason such as reorganization, lack of work, shortage of funds, insufficient personnel ceiling, or the exercise of certain reemployment or restoration rights. A furlough of more than 30 calendar days, or of more than 22 discontinuous work days, is also a RIF action. (A furlough of 30 or fewer calendar days, or of 22 or fewer discontinuous work days, is an adverse action.)

This site provides general and detailed information and guidance on RIF procedures.

Click the Tabs for general information about:

# Summary of Reduction in Force

This summary covers the procedures in OPM's reduction in force regulations.

# The Employee Guide to Reduction in Force Benefits

The information presented in this guide is intended to provide an overview of benefits and entitlements if you are affected by RIF. The information is general in nature and cannot cover every situation. It may not be

applicable to every Federal employee. If you need more specific information, please contact your servicing human resources office.

# Summary of Transfer of Function

A transfer of function takes place when a function ceases in one competitive area, and moves to one or more other competitive areas that do not perform the function at the time of transfer. This summary covers the rights of non-temporary employees who have the right to move with their work to another organization if the alternative is separation or downgrading by RIF.

# Workforce Reshaping Operations Handbook and Appendices

The Workforce Reshaping Operations Handbook(PDF file) with Appendices(PDF file) assists Federal agencies that are reshaping by identifying mandatory procedures that agencies must follow and by suggesting related options that may reduce the likelihood of involuntary separations.

# SUMMARY OF REDUCTION IN FORCE UNDER OPM'S REGULATIONS

## On this Page

- Learning About the RIF Regulations
- Legal Basis for the RIF Regulations
- The Agency's Right to Make RIF Decisions
- Actions Covered by the RIF Regulations
- The Agency's Right to Reassign Employees
- Defining the Competitive Area
- Defining the Local Commuting Area
- Establishing Competitive Levels
- Establishing Retention Registers
- Determining Retention Standing-Tenure
- Determining Retention Standing-Veterans' Preference
- Determining Retention Standing-Veterans' Preference for Retired Members of the Armed Forces
- Determining Retention Standing-Total Creditable Service
- Determining Retention Standing-Performance
- Two Rounds of RIF Competition
- Sample Retention Register
- Release From the Competitive Level
- Sample Release From the Competitive Level
- Possible Right to Bump or Retreat to an Available Position
- Bumping Rights

- [Sample Bump Right to a Different Competitive Level](#)
- [Retreating Rights](#)
- [Sample Retreat Right to a Different Competitive Level](#)
- [Grade Intervals in Assignment Rights](#)
- [Offers of Assignment to Vacant Positions](#)
- [RIF Notices](#)
- [RIF Appeals and Grievances](#)
- [Additional Information from the Agency](#)

# Learning About the RIF Regulations

One of the most difficult situations in any worker's life is being laid off.

In the Federal Government, layoffs are called reduction in force (RIF) actions. When an agency must abolish positions, the RIF regulations determine whether an employee keeps his or her present position, or whether the employee has a right to a different position.

This summary discusses the procedures in the RIF regulations. With this summary, employees, managers, collective bargaining representatives, and others will have an overview of both the agency's and its employees' rights in a restructuring situation.

The appropriate human resource office in the agency can provide additional information on specific questions relating to RIF policies, options, and entitlements.

# Legal Basis for the RIF Regulations

The RIF regulations are derived from section 12 of the Veterans' Preference Act of 1944 and other statutes. These laws are codified in sections 3501 through 3503 of title 5, United States Code (5 U.S.C. 3501-3503). OPM implements these statutory requirements through regulations published in part 351 of title 5, Code of Federal Regulations (5 C.F.R. part 351).

The law provides that the RIF regulations must give effect to four retention factors:

1. Tenure of employment (i.e., type of appointment);
2. Veterans' preference;
3. Total creditable Federal civilian and uniformed service; and
4. Performance ratings.

This summary will cover each factor in more detail.

# The Agency's Right to Make RIF Decisions

Each agency has the right to decide what positions are abolished, whether a RIF is necessary, and when the RIF will take place. Once the agency makes these decisions, the retention regulations then determine which employee is actually reached for a RIF action.

# Actions Covered by the RIF Regulations

An agency must use the RIF regulations before separating or demoting an employee because of an organizational reason such as reorganization, including lack of work, shortage of funds, insufficient personnel ceiling, or the exercise of certain reemployment or restoration rights.  In fact, virtually all RIF actions are the result of a reorganization (e.g., the agency reorganizes as the result of a shortage of funds, lack of work, restructuring, etc.).

A furlough of more than 30 calendar days, or of more than 22 discontinuous workdays, is also a RIF action.  (A furlough of 30 or fewer calendar days, or of 22 or fewer discontinuous workdays, is an adverse action.)

An agency may not use the RIF regulations to separate or demote an employee for a personal reason, such as problems with the employee's performance or conduct.

# The Agency's Right to Reassign Employees

The abolishment of a position does not always require the use of RIF procedures.  The agency has the right to avoid a RIF action by simply reassigning an employee to a vacant position at the same grade or pay without regard to the employee's rights under the RIF regulations.  The vacant position may be in the same or in a different classification series, line of work, and/or geographic location.  The "Summary of Reassignment Under the Regulations" includes additional information on reassignment.

---

# Defining the Competitive Area

When preparing for a RIF, the agency defines the "***Competitive Area***" that establishes the geographical and organizational limits for RIF competition.

A competitive area may consist of all or part of an agency.  The minimum competitive area is an organization in a local commuting area that is separate from other agency organizations because of differences in operation, work function, staff, and personnel administration.  Separate personnel administration is the authority of managers to authorize personnel actions (i.e., establishing positions, abolishing positions, etc.), not just process personnel actions.  For example, a single personnel office may potentially process actions for multiple competitive areas.

At its option, an agency may establish a competitive area larger than the minimum standard.  The regulations do not define the maximum size of a competitive area (e.g., a competitive area may potentially be nationwide or even worldwide).

An Inspector General activity covered by the Inspector General Act of 1978 is always defined as a separate competitive area.

If an agency wants to redefine a competitive area within 90 days of the RIF effective date, the agency must obtain OPM's approval for the change.

JA772

# Defining the Local Commuting Area

While defining its competitive area, the agency also defines the appropriate "***Local Commuting Area(s)***" for the competitive area.

A local commuting area usually includes one population center in which employees live and reasonably travel back and forth to work.  The regulations do not define a mileage standard for local commuting area.  Instead, the agency must apply the regulations and determine what is reasonable for a specific geographic location.

# Establishing Competitive Levels

Within each competitive area, the agency groups interchangeable positions into "***Competitive Levels.***"

Each competitive level includes positions with the same grade, classification series, and official tour of duty (e.g., full-time, part-time, seasonal, or intermittent).  For example, otherwise identical full-time and seasonal positions are placed in separate competitive levels even when the agency conducts a RIF while the seasonal employee happens to be working a full-time tour of duty.

All positions in a competitive level have interchangeable qualifications, duties, and responsibilities.  The agency establishes a competitive level based on employees' official position descriptions, not on the employees' personal qualifications.

The agency establishes separate competitive levels for positions filled as part of a formally designated trainee or developmental program.  The agency also establishes separate competitive levels for positions filled on competitive service appointments, and for positions filled on excepted service appointments.

The agency places two similar positions (e.g., same grade, classification series, work schedule, etc.), in the same competitive level when the position descriptions for the two positions show that an employee in either one of the positions needs no more than 90 days to be able to perform the key tasks of the other position.

The agency does not include employees with competitive service temporary appointments in the competitive level because these employees serve at the will of the agency.  The agency includes excepted employees with temporary appointments of 1 year or less in the competitive level only after the employee completes more than 1 year of current continuous service under the same type of appointment.

# Establishing Retention Registers

After grouping interchangeable positions into competitive levels, the agency applies the four retention factors in establishing separate "***Retention Registers***" for each competitive level that may be involved in the RIF.  The terms "***Competitive Level***" and "***Retention Register***" generally have the same meaning.  "***Retention Register***" is the ranking of employees in the competitive level after the agency applies the four retention factors.

The agency lists the name of each employee on the retention register in the order of the employee's relative retention standing.  For example, the employee with the highest standing is at the top of the register, and the

employee with the lowest standing is at the bottom of the register.

# Determining Retention Standing-Tenure

Beginning with Group I, the agency ranks competitive service employees on a retention register in three groups according to their types of appointment:

*Group I* - Includes career employees who are not serving on probation.  A new supervisor or manager who is serving a probationary period that is required on initial appointment to that type of position is not considered to be serving on probation if the employee previously completed a probationary period.

*Group II* - Includes career-conditional employees, and career employees who are serving a probationary period because of a new appointment.

*Group III* - Includes employees serving under term and similar non-status appointments.

Retention registers for excepted positions use similar tenure groups.

# Determining Retention Standing-Veterans' Preference

The agency divides each of the three tenure groups into three subgroups based upon employees' entitlement to veterans' preference for RIF purposes:

1. Subgroup AD - Includes veterans who are eligible for RIF preference and who have a compensable service-connected disability of 30% or more
2. Subgroup A - Includes veterans eligible for RIF preference who are not eligible for subgroup AD (including eligible spouses, widowers or widowers, and mothers of veterans).
3. Subgroup B - Includes nonveterans and others not eligible for RIF preference in subgroups AD and A.

OPM's publication "Vet Guide" has additional information on eligibility for veterans' preference.  Vet Guide is available on the OPM website.

# Determining Retention Standing-Veterans' Preference for Retired Members of the Armed Forces

By law (i.e., the Dual Compensation Act of 1964, as presently codified in section 3501(a) of title 5, United States Code), a retired member of the Armed Forces is a veteran under the RIF regulations only if the employee meets one of the following three conditions:

1. The Armed Forces retirement (without regard to benefits from the Department of Veterans Affairs) is directly based upon a combat-incurred disability or injury; or
2. The Armed Forces retirement is based upon less than 20 years of active duty; or
3. The employee has been working for the Government since November 30, 1964, without a break in service of more than 30 days.

# Determining Retention Standing-Total Creditable Service

Within each subgroup, the agency ranks employees by their respective service dates. For example, the agency places the employee with the most service at the top of the subgroup, and places the employee with the least service at the bottom of the subgroup.

Retention service credit includes all creditable Federal civilian and military service.

A retired member of the Armed Forces with 20 or more years of military service who is not eligible for veterans' preference under the RIF regulations receives retention credit only for Armed Forces service during a war, or service performed in a campaign or expedition for which the individual received a badge.

# Determining Retention Standing-Performance

Employees receive extra retention service credit for performance based upon the average of their last three annual performance ratings of record received during the 4-year period prior to the date the agency either (1) issues specific RIF notices, or (2) at its option, freezes ratings before issuing RIF notices. If an employee received more than three ratings during the 4-year period, the agency uses the three most recent annual ratings of record.

Most employees receive performance ratings of record under one of eight possible summary rating patterns required by paragraph 5 C.F.R. 430.208(d) of the performance appraisal regulations (e.g., a two-level "Pass/Fail" pattern, a traditional five-level pattern, etc.)  The RIF regulations cover situations when all employees in the competitive area are covered by a single rating pattern (e.g., all employees are covered by a five-level pattern), as well as situations when employees in the competitive area are covered by more than one summary rating pattern (e.g., some employees are covered by a five level pattern, while other employees are covered by a two-level "Pass/Fail" pattern).

- ***Single Rating Pattern.***An agency has a single rating pattern when all employees in the competitive area received performance ratings of record under only one of the eight possible summary rating patterns.  For example, all of the employees in the competitive area have ratings of record only under a five-level pattern, or only under a two-level pattern, or under the same three-level pattern, etc.   The amount of extra retention service credit with a single rating pattern is:
    1. **20** additional years for each performance rating of "***Outstanding***" or equivalent (i.e., Level V);
    2. **16** additional years for each performance rating of "***Exceeds Fully Successful***" or equivalent (i.e., Level IV); and,
    3. **12** additional years for each performance rating of "***Fully Successful***" or equivalent (i.e., Level III).

The agency does not give any additional service credit for performance ratings below Fully Successful or equivalent (i.e., no additional retention service credit for a rating of record below Level 3).

For example, an employee with 3 years of Federal service has one Outstanding rating of record, (20), and two Exceeds Fully Successful (16) ratings of record. The employee would receive additional reduction in force service credit based upon the three actual ratings of record: 20 + 16 + 16 = 52, divided by 3 = 17.3, rounded up to 18 years of additional retention credit for performance.

The agency always rounds up a fraction (e.g., 17.3 years) to the next whole number (e.g., 18 years) for the final value of the employee's additional retention credit for performance.

- **Multiple Rating Patterns**. If an agency has employees in a competitive area who have performance ratings of record under more than one of the eight possible summary rating patterns, at its option the agency may provide different amounts of additional retention service credit for employees who have the same summary level, but are under different patterns.  The range of additional service credit is still limited from 12 to 20 years.

  For example, the agency may elect to provide employees who have a Level 3 (Fully Successful or equivalent) rating of record under a two-level Pass/Fail pattern with 18 years of additional retention service credit, while electing to continue providing employees who have a Level 4 (Exceeds Fully Successful or equivalent) rating of record under a five-level pattern with 16 years of additional retention service credit.

- **Less Than Three Ratings of Record**. If an employee received one or two, but not three ratings of record during the applicable 4-year period, the agency gives credit for performance on the basis of the actual rating(s) of record divided by the number of actual ratings received.

- **Modal Rating**.  If an employee did not receive any ratings of record during the applicable 4-year period, the agency gives retention credit on the basis of a single "**Modal Rating**" for the employee's summary level pattern.

  The modal rating is the summary rating level given most frequently to the summary rating pattern that applies to the employee's position.   For example, if Level 4 (Exceeds Fully Successful) is the most frequent rating of record for employees covered by a five-level pattern, Level 4 is the modal rating for an employee under that pattern who did not receive any ratings of record.

The agency determines the modal rating on the basis of its most recently completed available ratings.

The agency also decides whether to base the modal rating upon ratings finalized throughout the agency, or upon ratings finalized in a smaller agency organization (such as the competitive area).


# Two Rounds of RIF Competition

In "**First Round RIF Competition**," the agency applies the four retention factors to a competitive level to identify which employee has the lowest retention factor.  The agency may use RIF procedures to release the lowest-standing employee from the competitive level.

In "**Second Round RIF Competition**," the agency again applies the four retention factors, this time to determine whether a released employee has a bump or retreat right to a position in a different competitive level that is held by an employee with even lower retention standing.

# Sample Retention Register

This sample retention register, including additional credit for performance in the "RIF SCD," is a competitive level for GS-343-12 (Management Analyst) full-time employees holding competitive service appointments:

GS-343-12

| Group/Subgroup | Employee Name | SCD | RIF SCD |
|---|---|---|---|
| I-AD | Smith, Joseph O. | 04-02-73 | 04-02-57 |
| I-A | Brown, Nathanial T. | 11-14-66 | 11-14-50 |
| | Wilson, William A. | 07-31-65 | 07-31-53 |
| I-B | Downs, Christopher G. | 06-17-64 | 06-17-44 |
| | Wright, Mary S. | 03-28-94 | 03-28-74 |
| | Finn, Charles N. | 04-15-93 | 03-28-77 |
| | White, Beatrice L. | 08-22-95 | 08-22-79 |
| II-A | Robinson, John H. | 08-21-01 | 08-21-81 |
| II-B | Keane, Susan M. | 03-13-02 | 03-13-82 |

# Release From the Competitive Level

The agency releases employees from the retention register in the inverse order of their retention standing. For example, the agency begins with the employee who has the lowest standing in releasing employees from the competitive level as a reduction in force action.

The agency releases all employees in group III before releasing employees in group II, and releases all employees in group II before releasing employees in group I.

Then within subgroups, the agency releases all employees in subgroup B before releasing employees in subgroup A, and releases all employees in subgroup A before releasing employees in subgroup AD.

The agency must notify any employees reached for release out of this regular order (such as under a temporary or a continuing exception in order to retain an employee with special skills) of the reasons for the exception.

# Sample Release From the Competitive Level

This sample retention register is a competitive level for GS-343-12 full-time employees holding competitive service appointments:

GS-343-12

| Group/Subgroup | Employee Name | SCD | RIF SCD | Action |
|---|---|---|---|---|
| I-AD | Smith, Joseph O. | 04-02-73 | 04-02-57 | |
| I-A | Brown, Nathanial T. | 11-14-66 | 11-14-50 | |

| Group/Subgroup | Employee Name | SCD | RIF SCD | Action |
|---|---|---|---|---|
| | Wilson, William A. | 07-31-65 | 07-31-53 | Position abolished; displaces White |
| I-B | Downs, Christopher G. | 06-17-64 | 06-17-44 | |
| | Wright, Mary S. | 03-28-94 | 03-28-74 | |
| | Finn, Charles N. | 04-15-93 | 03-28-77 | Transfers to different agency |
| | White, Beatrice L. | 08-22-95 | 08-22-79 | Displaced by Wilson; lowest standing; released; retreats to GS-560-11 |
| II-A | Robinson, John H. | 08-21-01 | 08-21-81 | Position abolished; lowest standing; released; bumps to GS-346-9 |
| II-B | Keane, Susan M. | 03-13-02 | 03-13-82 | Position abolished; lowest standing; released; separated |

***Explanation*** - Based solely upon organizational needs, the agency abolished four positions, held by Wilson, Finn, Robinson and Keane.

Finn transferred to a different agency before the RIF effective date.

In the RIF, Robinson and Keane had the lowest retention standing, and are released from the competitive level.

In other RIF-related actions, Wilson (in tenure group and subgroup I-A) displaced White (in tenure group and subgroup I-B). White is released from the competitive level because of lowest retention standing. Wilson retains the same I-A status after entering into White's former position. Wilson's displacement of White is not a RIF action because Wilson was not released from the competitive level.

Unless White, Robinson, and Keane have bump or retreat rights to another position, the agency may separate each employee by RIF.

Keane has no assignment right to another position and separates by RIF. Robinson has a bump right to another position, while White has a retreat right. This summary will cover both the bump and the retreat actions in more detail.

# Possible Right to Bump or Retreat to an Available Position

An employee who the agency releases from a competitive level may have bump or retreat rights to a continuing position on a different competitive level held by another employee with lower retention standing.

A released competitive service employee in tenure groups I or II has Bump or Retreat rights to an "***Available Position***" in the same competitive area if the agency would otherwise separate or demote the released employee by RIF, and the released employee has a current performance rating of record equivalent to Minimally Successful (Level II) or higher.

***Available Position***. The existence of an "***available position***" does not oblige an agency to offer an employee a particular position. However, an available position does establish the employee's right to be offered a position at the same grade of the available position.

An "***Available Position***" must:

1. Last at least 3 months;
2. Not be a temporary time-limited position;
3. Be in the competitive service;
4. Be a position that the released employee qualifies for;
5. Have a pay rate that requires no reduction, or the least possible reduction, in the released employee's present grade (but not to a higher grade than the employee's present position.);
6. Have the same type of work schedule (full-time, part-time, seasonal, intermittent, on-call) as the released employee's present position;
7. Be within three grades or grade-intervals of the employee's present position ("***Grade-Intervals***" are discussed below); and
8. Be held by an employee:
9. In a lower retention subgroup who is subject to bump rights, or
    1. In the same subgroup, but with less service, and who holds a position which the employee formerly occupied on a permanent basis (or an essentially identical position) that is subject to retreat rights.

Promotion potential is not a consideration in filling a position under the RIF regulations. A RIF offer may have less, more, or the same promotion potential as the released employee's present position.

An employee with an excepted service appointment has no assignment rights under the RIF regulations. However, an agency may elect to provide its excepted employees with RIF assignment rights to other excepted positions under the same appointment authority.

To determine employees' potential qualifications to bump or retreat into another position, before the agency issues RIF notices the agency may ask employees to submit a qualifications update by a designated freeze date.

# Bumping Rights

**"Bumping"** means displacing an employee on a different competitive level who is in a lower tenure group, or in a lower subgroup within the released employee's own tenure group.

For example, an otherwise eligible subgroup I-A employee could potentially bump a lower-standing employee on a different competitive level in subgroup I-B, in tenure Group II, or in tenure Group III.  For another example, an otherwise eligible subgroup I-B employee could potentially bump a lower-standing employee in tenure Group II, or tenure Group III.

Although the released employee must be qualified for the position, the bump right may be to a position that the released employee never held.

At its option, the agency may consider employees' total service in determining an employee's bumping rights.  This option provides the first offer to the otherwise eligible released employee with the most service.

# Sample Bump Right to a Different Competitive Level

This sample retention register is a competitive level for GS-346-9 (Logistics Management) full-time employees holding competitive service appointments.   In this example, John Robinson (from the example in Section 18), who was released from the GS-343-12 competitive level by RIF, has a bump right to a position in the GS-343-9 competitive level because his II-A group and subgroup tenure is higher than the II-B tenure of Samuel Wills, and he is qualified for the position.  The agency then determines whether Samuel Wills has a bump or retreat right to another position on a different retention register.

This is the best offer available to John Robinson.  No higher-standing employee in RIF competition has a greater right than John Robinson to this GS-346-9 position:

GS-346-9

| Group/Subgroup | Employee Name | SCD | RIF SCD | Action |
|---|---|---|---|---|
| I-A | Lawrence, Patrick F. | 01-19-79 | 01-19-65 | |
| I-B | Jones, Bertha M. | 05-01-94 | 05-01-74 | |
| | Walsh, Charles N. | 08-13-93 | 08-13 77 | |
| | Hughes, Sheila C. | 11-22-96 | 11-22-80 | |
| II-B | Wills, Samuel H. | 06-13-01 | 06/13/81 | Bumped by Robinson from GS-343-12 retention register; lowest standing; released; separated |

After John Robinson bumps Samuel Wills, John Robinson retains the same II-A group and subgroup tenure from the former GS-343-12 position. After the displacement of Samuel Wills, the retention register for the GS-346-9 positions looks like this:

GS-346-9

| Group/Subgroup | Employee Name | SCD | RIF SCD |
|---|---|---|---|
| I-A | Lawrence, Patrick F. | 01-19-79 | 01-19-65 |
| I-B | Jones, Bertha M. | 05-01-94 | 05-01-74 |
| | Walsh, Charles N. | 08-13-93 | 08-13-77 |
| | Hughes, Sheila C. | 11-22-96 | 11-22-80 |
| II-A | Robinson, John H. | 08-21-01 | 08-21-81 |

# Retreating Rights

"**Retreating**" means displacing an employee on a different competitive level with less service within the released employee's own tenure group and subgroup.

JA780

The position may be up to five grades (or grade-intervals) lower than the position held by the released employee if he or she is a disabled veteran in Subgroup AD.

The position must also be the same position or essentially identical to a position held by the released employee in any Federal agency on a permanent basis.

An employee with a current annual performance rating of record of Minimally Successful (Level II) has retreat rights only to positions held by an employee with the same or a lower performance rating of record.

# Sample Retreat Right to a Different Competitive Level

This sample retention register is a competitive level for GS-560-11 full-time employees holding competitive service appointments.

Beatrice White (from the example in Section 18), who was released from the GS-343-12 competitive level by RIF, has the right to retreat to a position held by Charles Gabriel in the GS-560-11 competitive level. This is the best offer available to Beatrice White, who is qualified for the position. The agency then determines whether Charles Gabriel has a bump or retreat right to another position on a different retention register. No higher-standing employee has a right to this GS-560-11 position:

GS-560-11

| Group/Subgroup | Employee Name | SCD | RIF SCD | Action |
|---|---|---|---|---|
| I-AD | Malone, Michael M. | 01-19-79 | 01-19-65 | |
| I-B | Cook, Joseph G. | 05-01-94 | 05-01-74 | |
| | Gabriel, Charles N. | 08-13-93 | 08-13-81 | Displaced by White; lowest retention standing; released; separated |

After Beatrice White retreats to the position held by Charles Gabriel, the retention register for the GS-560-11 positions looks like this:

GS-560-11

| Group/Subgroup | Employee Name | SCD | RIF SCD |
|---|---|---|---|
| I-AD | Malone, Michael M. | 01-19-79 | 01-19-65 |
| I-B | Cook, Joseph G. | 05-01-94 | 05-01-74 |
| | White, Beatrice L. | 08-22-95 | 08/22/79 |

# Grade Intervals in Assignment Rights

The agency determines the grade limits of a released employee's assignment rights on the basis of the position the employee holds on the RIF effective date, regardless of how the employee progressed to the position.

For example, an employee released from a GS-11 position that progresses GS-5-7-9-11 has potential bump and retreat rights to available positions from GS-11 through GS-5. An employee released from a GS-9 position that progresses GS-5-6-7-8-9 has potential bump and retreat rights to available positions from GS-9 through GS-6.

The difference between successive grades in a one-grade occupation is a grade difference, and the difference between successive grades in a multi-grade occupation is a grade-interval difference.

# Offers of Assignment to Vacant Positions

An agency is not required to offer vacant positions in a reduction in force, but may choose to fill all, some, or none of the vacancies.

When an agency chooses to fill a vacancy with an employee reached for release from the competitive level by RIF, the agency must consider the relative retention standing of all the released employees. For example, the agency must offer a position to the released employee in the highest group and subgroup before offering a position to an employee in a lower group and subgroup. This is consistent with a bump offer to an occupied position.

The agency is not required to consider total service in offering positions to employees in the same group and subgroup unless the employee with the most service also formerly held the position on a permanent basis. This is consistent with a retreat offer of an occupied position.

The agency satisfies a released employee's right to RIF assignment rights if the agency offers the employee a vacant position at the grade to which the employee has bump or retreat rights.

An agency may choose to waive qualifications in offering an employee RIF assignment to a vacant position. However, the agency may not waive a minimum educational requirement. (An agency may never waive qualifications in offering assignment to an occupied position.)

An agency may make a RIF offer of a vacant position to a released employee only if the vacancy is in the same competitive area, and within three grades (or grade-intervals) of the employee's present position.

# RIF Notices

An agency must give an employee at least 60 days specific written notice before the employee is released from the competitive level by a RIF action.

If faced with an unforeseeable situation (e.g., a natural disaster), the agency may, with OPM approval, give the employee a specific RIF notice of less than 60 days, but at least 30 days, before the effective date of the RIF.

# RIF Appeals and Grievances

An employee who has been separated, downgraded, or furloughed for more than 30 days by RIF has the right to appeal the Merit Systems Protection Board (MSPB) if the employee believes that the agency did not properly

follow the RIF regulations.  The released employee must file the appeal during the 30-day period beginning the day after the effective date of the RIF action.

An employee in a bargaining unit covered by a negotiated grievance procedure that does not exclude RIF must use the negotiated grievance procedure.   The employee may not appeal the RIF action to the Board unless the employee alleges the action was based upon discrimination.  The collective bargaining agreement covers the time limits for filing a grievance under a negotiated grievance procedure.

# Additional Information from the Agency

The agency's human resources office can provide both employees and managers with additional information on the RIF regulations.  The office can also provide information on potential benefits, such as eligibility for:

1. Career transition assistance,
2. Separation incentives (if available),
3. Rehiring selection priority,
4. Severance pay,
5. Retirement,
6. Retraining,
7. Unemployment compensation, and
8. Relocation allowances.

# REDUCTION IN FORCE DOWNGRADING OR SEPARATION BENEFITS

**On this Page**

- Reduction in Force Downgrading or Separation Benefits
- Benefits for Downgraded Employees
- Benefits for Separated Employees
- Federal Employees Health Benefits Program (FEHBP)
- Federal Employees Group Life Insurance (FEGLI) Program
- Thrift Savings Plan (TSP)
- Retirement Benefits
- Reemployment and Retraining Programs
- USACAREERS
- Severance Pay Estimation Worksheets

If you are affected by reduction in force (RIF), you may have many questions about how your employee benefits will be affected. The information presented in this guide is intended to provide an overview of these benefits and entitlements. The information is general in nature and cannot cover every situation. It may not be applicable to every Federal employee. If you need more specific information, please contact your servicing human resources office.

# Benefits for Downgraded Employees

## Grade and Pay Retention

- If you are placed in a lower-graded position through RIF procedures, you will be entitled to retain the higher grade for two years if you completed at least 52 consecutive weeks at the higher grade. Also, if you are downgraded after receiving a specific RIF notice and taking a lower-graded position offered by management, you will be eligible for grade retention on the same basis as an employee who was actually downgraded by a RIF action.
- Your retained grade is considered to be the grade you held prior to RIF downgrading for most benefits purposes (including pay and pay administration, retirement, life insurance, eligibility for training, noncompetitive promotions, and within-grade increases). However, your retained grade for this RIF cannot be used as your retained grade for future RIF competition. For example, a GS-12 employee who is downgraded because of a RIF to a GS-9 position is still considered to be a GS-12 for most pay-related purposes, but would compete as a GS-9 in a later RIF.
- After grade retention expires, you will be eligible for indefinite pay retention. If you are downgraded because of a RIF but don't meet the 52-week eligibility for grade retention, you will also be eligible for indefinite pay retention. If your former rate of basic pay fits in the pay range for the lower-graded position, you will be placed in the lower pay range without a reduction in pay and pay retention will cease. If your former rate of basic pay is greater than the maximum rate of the pay range for the new position, your former rate will be continued as a retained rate (not to exceed 150 percent of the maximum rate for the grade in which you have been placed). You will then receive 50 percent of any adjustments (e.g., annual salary increases) in the maximum rate for the lower (reduced) grade until that maximum rate equals or exceeds your higher (retained) rate. At that point, pay retention will cease.
- If you are on a temporary or term appointment at the time of a RIF, grade and pay retention will not apply.

## Repromotion Consideration

- If you are downgraded because of RIF, your agency's internal placement plans may allow you to receive priority consideration for promotion to positions up to your former grade level. The specific policies and procedures for such consideration are established by each agency.

Part 536 of Title 5, Code of Federal Regulations, contains more information on grade and pay retention.

# Benefits for Separated Employees

## Severance Pay

- If you are about to be separated from a permanent position involuntarily and through no fault of your own, you will likely be eligible for severance pay. To be eligible, you must not have refused an offer of a position that is (1) in the same commuting area, (2) in the same agency, and (3) no more than two grades

JA784

below your current grade level. In addition, you must have been employed for at least 12 continuous months, and cannot be eligible for an immediate annuity from a federal civilian retirement system or from the uniformed services. Also, you must not be receiving workers' compensation benefits for wage loss due to an on-the-job injury.

# Computation of Severance Pay:

- Only civilian service is creditable for severance pay. You will be entitled to 1 week's basic pay for each year of civilian service up through 10 years, plus 2 weeks' basic pay for each year of creditable service beyond 10 years. In addition, an age adjustment allowance of 2.5 percent is added for each full quarter of a year you are over 40 years of age. The maximum amount of severance pay is one year's salary (52 weeks). (This is a lifetime limitation. Thus, any severance pay you may have received in the past is taken into account when applying the limit.) Severance payments will be equal to your weekly pay at the time of separation and will be paid out at regular pay period intervals (usually biweekly) until the severance pay is exhausted. The only deductions made from severance pay are taxes, social security (if applicable), and Medicare.
- Severance pay estimation sheets are located at the end of this guide. The actual calculation formula is somewhat more complicated and technical. The samples are intended to help compute the approximate amount of severance pay you might receive. To receive an actual computation, please contact your servicing human resources office.
- If you are reemployed in a permanent position with the Federal government or the District of Columbia, severance payments will be stopped immediately. If you are reemployed in the Federal government on a temporary appointment after a break of more than 3 calendar days, severance pay will be temporarily suspended. When your temporary appointment ends, the agency will restart the unexpired portion of your severance pay. If you accept a temporary appointment with the Federal government within 3 calendar days of separation and subsequently leave that temporary job on an involuntary basis (e.g., expiration of appointment), you are eligible for severance pay based on the separation from the temporary job. Severance pay would be recalculated based on your rate of pay when you separated from the temporary job. Employment in the private sector has no effect on your right to receive severance pay from the Federal government.

# Unemployment Compensation

- The Department of Labor administers the unemployment insurance program for Federal employees through State governments. States, including the District of Columbia, determine the eligibility for benefits and the amounts to be paid to unemployed individuals. The program provides a weekly income for a limited period of time. The laws of the State or jurisdiction determine the amount of benefits and length of time they will be received. If you were separated you should file a claim for benefits at your State Employment Service office or unemployment insurance claims office. These State offices also allow you to register for potential employment opportunities. You must present your social security card, official notice of separation or non-pay status (Standard Form 50), specific RIF notice letter, and unemployment insurance notice (Standard Form 8). For more information, visit the Department of Labor's website.

# Unused Annual Leave

- All civilian employees covered by annual leave laws are entitled to receive a lump sum payment for accrued annual leave when separated from the Federal Government.
- If you are close to retirement age, you may be able to use annual leave to qualify for retirement benefits in some cases. See the retirement section later in this guide for more information.

## Unused Sick Leave

- You will not be paid for unused sick leave. However, if you are separated from the Federal Government you are entitled to have your sick leave restored to your sick leave account if you are reemployed in the Federal Government. Also, unused sick leave will be added to your total service if you are eligible for an annuity under the Civil Service Retirement System (CSRS). Beginning October 28, 2009, if you are a Federal Employees Retirement System (FERS) employee eligible for an annuity, 50 percent of your unused sick leave will be added to your total service if you separate on or before December 31, 2013.  After December 31, 2013, 100 percent of your unused sick leave will be added.  FERS employees were not entitled to credit their unused sick leave to their total service before October 28, 2009.

# Federal Employees Health Benefits Program (FEHBP)

## Separated Employees Only:

- If you have been receiving health insurance but are not eligible for an immediate annuity, you can continue health insurance free for 31 days after separation. You can then elect to continue receiving benefits under FEHBP. However, continued coverage is not automatic. You must request it in writing within 60 days of separation (or within 60 days of receiving a notice from the agency that FEHB coverage is terminating). You must pay your share, the government's cost, and an additional 2 percent administrative fee. This totals 102 percent of the cost. This temporary extension of coverage can last for 18 months only. Your dependents can carry this coverage for up to 36 months. You can also convert to a private plan.
- If you are a Department of Defense employee who will be separated due to RIF, you can continue enrollment for 18 months following separation. During this time the enrollee pays both the employee and agency shares and any additional administrative costs.

# Federal Employees Group Life Insurance (FEGLI) Program

## Separated Employees Only:

- If you are separated, you will be covered by FEGLI without cost to you for 31 days. If you are separated and not eligible for an immediate annuity, you can convert all or part of the life insurance to an individual

policy without taking a medical examination. You can purchase the individual policy from any eligible insurance company. This will be a private transaction between you and the company. You will pay the entire premium of the conversion policy, and the conversion must be made within 31 days after the effective date of the separation.

# Thrift Savings Plan (TSP)

## Withdrawing Money:

- When you separate from Federal service for more than 31 days, you can choose to leave your money in your TSP account or you can withdraw the vested TSP account balance. If the account balance is under a certain amount (currently $3500 or less), the TSP Service Office will notify you and you will be paid the account balance in a single payment unless you request that it remain there or you select another withdrawal option.
    - For accounts over $3500, there are several options:
        - Leave the money in the TSP.
        - Transfer it entirely to an Individual Retirement Account (IRA) or other eligible retirement plan.
        - Purchase a life annuity immediately or at a later date.
        - Receive a single payment immediately or at a later date.
        - Receive a single payment and ask the TSP to transfer a portion of it to an IRA or other retirement plan.
        - Receive a series of equal monthly payments beginning immediately or at a later date.
        - Receive a series of equal monthly payments and ask the TSP to transfer each payment (or a portion of it) to an IRA or other eligible retirement plan if the series of payments is expected to last less than 10 years and is not based on your life expectancy.
- You will be taxed for any funds paid directly to you from TSP. If you separate before the year you reach age 55, you will be charged a 10 percent penalty for early TSP withdrawal. The booklet, "Withdrawing Your TSP Account After Leaving Federal Service," dated February 1998, outlines these options in detail. The TSP website provides the appropriate forms to exercise the withdrawal option.

# Retirement Benefits

Most Federal employees who were first hired before January 1, 1984, are covered by CSRS. Most employees first hired on or after January 1, 1984, are automatically covered by FERS.

## Refunds

- If you separate from Federal employment before completing a minimum of 5 years of creditable civilian service, you will not be eligible to receive optional or deferred annuity benefits under CSRS or FERS. If you receive a refund of retirement deductions under CSRS or FERS, you can, after reemployment with the Federal government, repay the refunded amount plus interest so that the period of service covered by the refund can be included in the computation of annuity benefits.  You do not have to take a refund of your

CSRS or FERS retirement contribution if you are separated from Federal service. Employees are paid interest on their FERS accounts, but they receive no interest on CSRS accounts that are more than 5 years old. You have already paid taxes on the retirement deductions that have been deducted from your paycheck. You must also pay taxes on the interest earned on the money in your retirement account.

# Deferred Annuity

- If you separate from the Federal service after completing at least 5 years of creditable civilian service, but before becoming eligible for an immediate annuity, you will be entitled to a deferred annuity at age 62 under either CSRS or FERS. If you are under FERS, you may be eligible for a deferred annuity before age 62 under certain conditions. If you are eligible for a deferred annuity, you can receive a refund of your retirement deductions in lieu of the annuity, provided that you are more than 31 days away from qualifying for an annuity when filing for the refund.

# Using Annual Leave to Reach Eligibility

- If you are scheduled to be separated by RIF, you can use your accumulated annual leave to remain on your agency's rolls past the RIF effective date if doing so would allow you to reach your first retirement eligibility date or FEHB carryover eligibility. You must have enough annual leave to cover the period from the RIF effective date to the first date you meet the minimum age and service criteria for CSRS or FERS retirement (as applicable). You must meet the other eligibility requirements for optional or discontinued service retirement as described below.
- The accumulated annual leave balance generally includes all annual leave in your account as of the RIF effective date, plus the annual leave earned while you are on leave between the RIF effective date and your first retirement eligibility date. If you wish to exercise this option, you should check with your human resources office for the necessary procedures.

# Immediate Annuity (CSRS)

- If you have been serving under CSRS for at least 1 of the last 2 years before your separation, you will be eligible for an immediate annuity if you meet the following minimum age and service requirements:

# Optional Retirement:

- Age 62 and 5 years creditable civilian service.
- Age 60 and 20 years total creditable service.
- Age 55 and 30 years total creditable service.

# Discontinued Service retirement:

- Age 50 and 20 years total creditable service.
- Any age and 25 years total creditable service.
- If you are under CSRS and you retire before age 55, your annuity will be reduced by 2 percent for each year you are under age 55 (1/6 of one percent for each month below age 55).

JA788

# Additional Discontinued Service Retirement Requirements:

Whether you are under CSRS or FERS, you will be eligible for discontinued service retirement if:

- You are reached for an involuntary action (such as job abolishment or reassignment to a position in a different commuting area).
- You have not received an offer of another position at or within two grades below your present position in the same local commuting area.

## Immediate Annuity (FERS)

- If you are under FERS, you will be eligible for an immediate annuity if you meet the following minimum age and service requirements:

## Optional Retirement:

- Age 62 and 5 years creditable civilian service.
- Age 60 and 20 years total creditable service.
- Minimum retirement age and 10 years total creditable service.
- If you are a FERS employee who was born before 1948, the minimum retirement age is 55. It gradually increases from 55 to 57 if you were born between 1948 and 1970. Also, your FERS annuity will be reduced by 5 percent for each year you are under age 62. You can avoid the age reduction entirely by choosing as the commencing date of your annuity either:
  - a date that is less than 1 full month before you reach age 62 if you have less than 20 years of service; or
  - the first day of any month after you have reached age 60, if you have at least 20 years of service.

## Discontinued Service Retirement:

- Age 50 and 20 years total creditable service.
- Any age and 25 years total creditable service.

If you are under FERS and retire on a discontinued service annuity under the age of 55, your annuity will not be reduced. If you have transferred to FERS and have service under CSRS, the CSRS portion of your annuity will be reduced by 2 percent per year if you are under age 55.

# Reemployment and Retraining Programs

## Reemployment Programs—

## Agency Career Transition Assistance Plans (CTAP)

JA789

- Agencies are required to provide assistance to help their surplus and displaced employees find new employment. Each agency will provide:
  - services to help their employees find new employment, either in the public or private sector, and
  - selection priority for competitive service vacancies within the agency.
- Agencies have developed Career Transition Assistance Plans with specific policies describing the assistance available to their employees. Questions regarding an agency's CTAP should be referred to the agency's human resources office.

# Priority Placement Program (PPP)

- The Priority Placement Program (PPP), also called the "Department of Defense Stopper List", is a program run solely by the Department of Defense (DoD) for its employees. It is the equivalent of a non-Defense agency's Career Transition Assistance Plan. Questions regarding the PPP should be referred to the nearest DoD human resources office or the DOD Civilian Assistance in Re-Employment (CARE) Office at (703) 696-1799.

# Reemployment Priority List (RPL)

- The RPL prevents employees from outside the agency from being employed ahead of agency employees who will be or have been separated by RIF. It provides separated employees with the first opportunity for positions within their former agency. Agencies must have a separate RPL for each commuting area from which eligible employees have been separated by RIF.

## Eligibility:

- You are eligible to apply for the RPL if:
  - You are serving under an appointment in the competitive service in tenure group I or II at the time of RIF separation;
  - You have not refused an offer of assignment to a position at the same grade or representative rate during RIF; and
  - You have a current rating of record of at least minimally successful.

## Consideration:

- You are entitled to be considered for positions for which you are available, providing all of the following conditions are met:
- You meet the qualification requirements for the position;
- The position is at no higher grade (or equivalent) and has no greater promotion potential than the position from which you were separated;
- The position has the same type of work schedule as the position from which you were separated; and
- The position is in the same commuting area as the position from which you were separated.

## Duration:

- You can remain on the RPL for 2 years.

# How to Apply:

- You can apply through your servicing human resources office beginning when you receive either a Certificate of Expected Separation or a RIF separation notice through the effective date of RIF separation.

## Interagency Career Transition Assistance Plan (ICTAP)

- The Interagency Career Transition Assistance Plan (ICTAP) is designed to help Federal employees who have lost their jobs due to downsizing find positions in other Federal agencies.

## How the ICTAP Works:

- When an agency is willing to go outside the agency to hire candidates, it must advertise its vacancies on OPM's automated government-wide employment information system, USAJOBS.
- USAJOBS provides easily accessible worldwide Federal employment information, updated every business day from a database of more than 12,000 worldwide job opportunities. USAJOBS is available to job seekers in a variety of formats (including computer or telephone), ensuring access for customers with differing physical and technological capabilities. It is convenient, user friendly, and available 24 hours a day, seven days a week.
- USAJOBS is available through:
  - Internet—You can find employment information at the USAJOBS website.
  - On the website, you can retrieve current job vacancies worldwide, find employment information fact sheets, obtain applications and forms, and apply for many jobs online. The USAJOBS website also has an Online Resume Builder feature you can use to create online resumes specifically designed for Federal jobs. You can print your USAJOBS resume and fax or mail it to employers, and save and edit it for future use. For many vacancies listed on the site, you can submit your USAJOBS resume directly to hiring agencies electronically.
  - When you see a vacancy for which you are qualified, you should develop the application package to show how you meet the specific qualification requirements of the position. Next, you should attach appropriate proof of eligibility for ICTAP, and apply directly to the location stated on the vacancy announcement. You must meet all the requirements stated on the vacancy announcement (e.g., closing date, area of consideration, etc.).
  - The agency will review your application material. If you meet all of the qualification requirements of a position that is in the local commuting area from which you were separated, and you are considered to be well-qualified for the job, the agency is required to select you over almost any other candidate(s) from outside the agency.
  - Questions regarding specific vacancies and well-qualified requirements can be addressed to the agency conducting the recruitment.

# USACAREERS

# ICTAP Eligibility Requirements

- You are eligible if you are:
- a current career or career-conditional competitive service employee at GS-15 or below in tenure group 1 or 2 and you have received a specific RIF separation notice or a notice of proposed removal because you declined a transfer of function or directed reassignment outside your commuting area.
- a former career or career-conditional competitive service employee at GS-15 or below in tenure group 1 or 2 and you:
  - were separated by RIF.
  - declined Directed Reassignment/Transfer of Function: You have been or are being separated because you declined a transfer of function or directed reassignment outside your commuting area.

# Length of ICTAP Eligibility

- You will be eligible for special selection priority in other agencies for 1 year after your separation date if you:
  - were separated by RIF.
  - declined directed reassignment/transfer of function.

# Proof of Eligibility

- You must attach the following proof of eligibility in order to exercise selection priority when applying for positions:
  - separated by RIF:
    - a copy of the Standard Form 50 (Notification of Personnel Action) showing that you were separated by RIF, or
    - a copy of the RIF separation notice.
  - declined directed reassignment/transfer of function:
    - a copy of the Standard Form 50 indicating that you were separated because you declined a transfer of function or directed reassignment outside your local commuting area, or
    - a copy of the notice of proposed removal for declining a transfer of function or directed reassignment.

# Retraining Opportunities

- Many states offer excellent opportunities for displaced employees to take various types of training through government funding to help them qualify for jobs. This may include the opportunity to train for a new career field.
- For information on training or retraining opportunities, contact your local State employment services department and ask about training/retraining possibilities under the Workforce Investment Act of 1998. The U.S. Department of Labor administers a dislocated worker program to assist laid off workers who are unlikely to return to their previous industry or occupation. The dislocated worker program authorizes a wide range of services to help individuals obtain meaningful re-employment. These services may include assessments of skills and interests, job development, counseling, job search assistance, career exploration,

and occupational skills retraining, like computer training. States and local grantees decide on the particular mix and availability of services. The program is funded by U.S. Department of Labor, Employment & Training Administration.

# Severance Pay Estimation Worksheets

The following are samples for use in estimating the amount of severance pay. The actual calculation formula is somewhat more complicated and technical. The samples are intended to allow you to figure the approximate amount of severance pay you may receive. The computation presumes that you were a full-time employee and that you have not previously received severance pay based on an earlier involuntary separation. OPM is not responsible for the accuracy of the results that this worksheet may give you. IF YOU WANT AN ACCURATE CALCULATION, PLEASE CONTACT YOUR HUMAN RESOURCES OFFICE.

**Severance Pay Estimation Worksheet**

line 1. Annual Rate of Basic Pay (at time of separation) = _____

line 2. Weekly Rate (divide line 1 by 2087 and then multiply result by 40) = _____
(Note: This weekly rate can also be derived by dividing the annual rate by 52.175.)

line 3. Years of Service (see A and B below)
A. If your length of service is LESS THAN 10 years, enter your length of service on line 3a.

B. If your length of service is MORE THAN 10 years:

(1) enter your length of service: _____

(2) subtract 10 from your length of service: -10 = _____

(3) multiply the result by 2: □ 2 = _____

(4) add 10 to the amount listed in 3): +10

(5) enter this total on line 3a. _____

line 3a. Adjusted Years of Service = _____

line 4. Basic Severance Pay (multiply amount on line 2 by the number on line 3a) = _____

line 5. Age Adjustment Factor (if your age is above 40, look
your age up on the "AGE TABLE AND FACTORS" chart
attached. Enter the "factor" number shown.)

Age = _____ years and _____ months. Factor = _____

line 6. Adjusted Severance Pay (multiply the amount in line 4 by the line 5 factor) = _____

line 7. Multiply the amount in line 2 by 52 weeks. = _____
This is the maximum amount of severance pay payable under the 1-year (52 weeks) limit.

line 8. If line 6 exceeds line 7, enter amount on line 7. Otherwise enter the line 6 amount. =
_____

This is the estimated amount of your total severance pay fund.

line 9. Multiply the amount in line 2 by 2. = _____
This is the estimated amount of your biweekly severance payment (before deductions).

line 10. Divide the amount in line 8 by the amount in line 9 and multiply the result by 2. = _____
This is the approximate number of weeks of severance payments you will receive
(assuming you are not reemployed by the government).

**Severance Pay Estimation Worksheet**

line 1. Annual Rate of Basic Pay (at time of separation) = $ 73,619

line 2. Weekly Rate (line 1 divided 2087 and then multiplied by 40) = $1,411
(Note: This weekly rate can also be derived by dividing the annual rate by 52.175.)

line 3. Years of Service (see A and B below)
A. If your length of service is LESS THAN 10 years, enter your length of service on line 3a.

B. If your length of service is MORE THAN 10 years:

(1) enter your length of service: 18

(2) subtract 10 from your length of service: -10 = 8

(3) multiply the result by 2: 8 x 2 = 16

(4) add 10 to the amount listed in 3): +10

(5) enter this total on line 3a. 26

line 3a. Adjusted Years of Service = 26

line 4. Basic Severance Pay (multiply amount on line 2 by the number on line 3a) = $ 36,686

line 5. Age Adjustment Factor (if your age is above 40, look
your age up on the "AGE TABLE AND FACTORS" chart
attached. Enter the "factor" number shown.)

Age = 52 years and 0 months. Factor = 2.2

line 6. Adjusted Severance Pay (multiply the amount in line 4 by the line 5 factor) = $ 80,709.20

line 7. Multiply the amount in line 2 by 52. = $73,372
This is the maximum amount of severance pay payable under the 1-year (52 weeks) limit.

line 8. If line 6 exceeds line 7, enter amount on line 7. Otherwise enter the line 6 amount. = $73,372
This is the estimated amount of your total severance pay fund.

line 9. Multiply the amount in line 2 by 2. = $ 2,822
This is the estimated amount of your biweekly severance payment (before deductions).

line 10. Divide the amount in line 8 by the amount in line 9 and multiply the result by 2. = 52 weeks
This is the approximate number of weeks of severance payments you will receive

(assuming you are not reemployed by the government).

## Severance

| Years | Months | Factor | Years | Months | Factor | Years | Months | Factor |
|-------|--------|--------|-------|--------|--------|-------|--------|--------|
| 40 | 3-5 | 1.025 | 48 | 6-8 | 1.850 | 56 | 9-11 | 2.675 |
| 40 | 6-8 | 1.050 | 48 | 9-11 | 1.875 | 57 | 0-2 | 2.700 |
| 40 | 9-11 | 1.075 | 49 | 0-2 | 1.900 | 57 | 3-5 | 2.725 |
| 41 | 0-2 | 1.100 | 49 | 3-5 | 1.925 | 57 | 6-8 | 2.750 |
| 41 | 3-5 | 1.125 | 49 | 6-8 | 1.950 | 57 | 9-11 | 2.775 |
| 41 | 6-8 | 1.150 | 49 | 9-11 | 1.975 | 58 | 0-2 | 2.800 |
| 41 | 9-11 | 1.175 | 50 | 0-2 | 2.000 | 58 | 3-5 | 2.825 |
| 42 | 0-2 | 1.200 | 50 | 3-5 | 2.025 | 58 | 6-8 | 2.850 |
| 42 | 3-5 | 1.225 | 50 | 6-8 | 2.050 | 58 | 9-11 | 2.875 |
| 42 | 6-8 | 1.250 | 50 | 9-11 | 2.075 | 59 | 0-2 | 2.900 |
| 42 | 9-11 | 1.275 | 51 | 0-2 | 2.100 | 59 | 3-5 | 2.925 |
| 43 | 0-2 | 1.300 | 51 | 3-5 | 2.125 | 59 | 6-8 | 2.950 |
| 43 | 3-5 | 1.325 | 51 | 6-8 | 2.150 | 59 | 9-11 | 2.975 |
| 43 | 6-8 | 1.350 | 51 | 9-11 | 2.175 | 60 | 0-2 | 3.000 |
| 43 | 9-11 | 1.375 | 52 | 0-2 | 2.200 | 60 | 3-5 | 3.025 |
| 44 | 0-2 | 1.400 | 52 | 3-5 | 2.225 | 60 | 6-8 | 3.050 |
| 44 | 3-5 | 1.425 | 52 | 6-8 | 2.250 | 60 | 9-11 | 3.075 |
| 44 | 6-8 | 1.450 | 52 | 9-11 | 2.275 | 61 | 0-2 | 3.100 |
| 44 | 9-11 | 1.475 | 53 | 0-2 | 2.300 | 61 | 3-5 | 3.125 |
| 45 | 0-2 | 1.500 | 53 | 3-5 | 2.325 | 61 | 6-8 | 3.150 |
| 45 | 3-5 | 1.525 | 53 | 6-8 | 2.350 | 61 | 9-11 | 3.175 |
| 45 | 6-8 | 1.550 | 53 | 9-11 | 2.375 | 62 | 0-2 | 3.200 |
| 45 | 9-11 | 1.575 | 54 | 0-2 | 2.400 | 62 | 3-5 | 3.225 |
| 46 | 0-2 | 1.600 | 54 | 3-5 | 2.425 | 62 | 6-8 | 3.250 |
| 46 | 3-5 | 1.625 | 54 | 6-8 | 2.450 | 62 | 9-11 | 3.275 |
| 46 | 6-8 | 1.650 | 54 | 9-11 | 2.475 | 63 | 0-2 | 3.300 |
| 46 | 9-11 | 1.675 | 55 | 0-2 | 2.50 | 63 | 3-5 | 3.325 |
| 47 | 0-2 | 1.700 | 55 | 3-5 | 2.525 | 63 | 6-8 | 3.350 |
| 47 | 3-5 | 1.725 | 55 | 6-8 | 2.550 | 63 | 9-11 | 3.375 |
| 47 | 6-8 | 1.750 | 55 | 9-11 | 2.575 | 64 | 0-2 | 3.400 |
| 47 | 9-11 | 1.775 | 56 | 0-2 | 2.600 | 64 | 3-5 | 3.425 |
| 48 | 0-2 | 1.800 | 56 | 3-5 | 2.625 | 64 | 6-8 | 3.450 |
| 48 | 3-5 | 1.825 | 56 | 6-8 | 2.650 | 64 | 9-11 | 3.475 |

# LEARNING ABOUT TRANSFER OF FUNCTION

**On this Page**

- Learning About Transfer of Function
- Legal Basis for Transfer of Function
- Transfer of Function Because of Organizational Change
- Transfer of Function Because the Competitive Area Relocates
- Interagency Transfer of Function
- Modifying Transfer of Function Rights
- Employee's Right to Transfer With a Function
- A Transfer of Function May Result in a RIF Action
- Transfer of Function Canvass Letters
- Adverse Action Separation for Declining a Geographic Transfer of Function
- Identifying Employees for Transfer
- Identification Method One
- Identification Method Two
- Volunteers for Transfer
- Transfer of Function Appeals
- Realignment Actions That Are Not a Transfer of Function
- Additional Information from the Agency

The transfer of function regulations require that under certain conditions nontemporary employees have the right to move with their work to another organization if the alternative is separation or downgrading by reduction in force.

This summary covers the procedures in the transfer of function regulations. With this summary, employees, managers, employee representatives, and others will have an overview of both the agency's and employees' rights in a transfer of function or similar situation involving the transfer of positions from one organization to another.

The appropriate human resources office can provide additional information on specific questions relating to transfer of function policies, options, and entitlements.

# Legal Basis for Transfer of Function

The transfer of function regulations are derived from section 3503 of title 5, United States Code. The regulations published in subpart C, part 351 of title 5, Code of Federal Regulations, implement the statute.

# Transfer of Function Because of Organizational Change

A transfer of function takes place when a function ceases in one competitive area, and moves to one or more other competitive areas that do not perform the function at the time of transfer.

"***Competitive Area***" is a reduction in force term. The agency establishes each of its competitive areas on the basis of organization and geography. The "***Summary of OPM's Reduction in Force Regulations***" includes additional information on competitive area.

OPM's transfer of function regulations apply only when, after transfer, the gaining competitive area uses Federal employees to perform the function. For example, a transfer of function does not take place when after transfer the gaining competitive area performs the work through contract employees, a reimbursable agreement with a different competitive area, or by members of the Armed Forces. The movement of work solely within a competitive area is a reorganization, and is not a transfer of function.

# Transfer of Function Because the Competitive Area Relocates

A transfer of function also takes place when the entire competitive area moves to a different local commuting area without any additional organizational change.

For example, a claims office in Baltimore, Maryland, is a stand-alone competitive area. A transfer of function takes place when the Baltimore claims office moves to Wilmington, Delaware (a different local commuting area), where the office continues as a separate stand-alone competitive area.

The "**Summary of OPM's Reduction in Force Regulations**" includes additional information on "**Local Commuting Area**." A local commuting area usually includes one population center in which employees live and reasonably travel back and forth to work. OPM's regulations do not define a mileage standard for local commuting area.

# Interagency Transfer of Function

A transfer of function may be intra- or interagency. The transfer of function regulations use the same procedures for both types of transfers.

An interagency transfer of a function and/or personnel requires specific statutory authorization. Without a specific legislative basis, an agency has no authority to permanently transfer a function and/or personnel to another agency.

An intra-agency transfer of function does not require statutory authority.

# Modifying Transfer of Function Rights

Congress has the authority to exempt intra- and interagency transfers of function from the transfer of function provisions. Congress may also modify the rights of employees involved in intra- or interagency transfers of function.

# Employee's Right to Transfer With a Function

An employee has no right to transfer with the function unless the alternative in the competitive area losing the function is separation or demotion by reduction in force.

An agency may always direct an employee's reassignment to another position (regardless of location) in lieu of transfer of function rights. The vacant position may be in the same or in a different classification series, line of work, and/or geographic location. The "Summary of Reassignment" includes additional information on reassignment.

# A Transfer of Function May Result in a RIF Action

If the transfer of function results in a surplus of employees in the gaining competitive area, before separation or demotion, with one exception covered in the next paragraph all employees who transfer with the function compete under the reduction in force regulations on equal terms with other employees in the gaining competitive area for available positions.

An employee whose position is transferred to the gaining competitive area for liquidation with a function that will not continue for more than 60 days does not compete under the reduction in force regulations for other positions in the gaining competitive area.

---

# Transfer of Function Canvass Letters

When a transfer of function will result in employees moving to a different local commuting area, the losing competitive area may use a "**Transfer of Function Canvass Letter**" to determine which employees wish to be considered for positions in a different local commuting area. A transfer of function canvass letter does not guarantee an employee a position at the new location, but simply asks the employee to state an interest in transferring with the function.

The losing competitive area may use the canvass letter as the basis to separate an employee who declines to transfer with the function to a different local commuting area.

An employee who chooses not to transfer with the function has no right to be in reduction in force competition for other positions in the losing competitive area. However, at its option the losing competitive area may include the employee in a concurrent reduction in force.

An employee who initially chooses to transfer with the function may later reconsider and decline to transfer to the new location. However, an employee who declines to transfer with the function may not later change the original declination to an acceptance of the offer to transfer with the function to the new location.

An employee is generally eligible for relocation expense allowances for a transfer of function that requires relocation to a different local commuting area. The General Services Administration (GSA) publishes its Federal Travel Regulation (FTR) in 41 CFR subpart F. The complete FTR and other relocation-related information are available on GSA's website. See "Additional Information from the Agency" below.

JA798

# Adverse Action Separation for Declining a Geographic Transfer of Function

The losing competitive area must use adverse action procedures to separate an employee who chooses not to transfer with the function to a different geographic location unless the losing competitive area at its option includes the employee in a concurrent reduction in force. If the employee chooses not to transfer with the function, the losing competitive area may not separate the employee any sooner than it transfers employees who choose to transfer to the gaining competitive area.

After receiving a separation notice, the employee becomes eligible for most of the benefits available to an employee who receives a notice of reduction in force separation (e.g., potentially eligible for intra- and interagency hiring priority, severance pay, discontinued service retirement, etc.). See "Additional Information from the Agency" below.

An employee does not have the option of declining transfer to a position in the employee's present local commuting area.

---

# Identifying Employees for Transfer

The losing competitive area identifies employees and positions for transfer with a function on the basis of each employee's official position. The regulations provide agencies with two procedures to identify employees for transfer with a function:

1. "**Identification Method One**"; and
2. "**Identification Method Two**."

# Identification Method One

Under Identification Method One, the losing competitive area identifies an employee with a transferring function if:

1. The employee performs the function during at least half of the employee's work time; or
2. Regardless of the amount of time that the employee performs the function, the function includes the duties controlling the employee's grade or rate of pay (i.e., the grade controlling duties transferring with the function fully support the employee's grade or rate of pay).

---

# Identification Method Two

The losing competitive area uses Identification Method Two only to identify positions and employees not covered by Identification Method One.

Under Identification Method Two, the losing competitive area identifies for transfer the number of employees it needs to perform the function.

To determine which employees are identified for transfer under Identification Method Two, the losing competitive area uses "**Retention Registers**" that list employees working on the function in the order of their respective reduction in force retention standing. The "Summary of OPM's Reduction in Force Regulations" includes additional information on retention registers.

Identification Method Two provides that the losing competitive area identifies employees with the lowest retention standing for transfer with the function. However, if this procedure would result in the employees' separation or demotion by reduction in force in the losing competitive area **of an employee with a higher retention standing**, the losing competitive area instead identifies employees with the highest retention standing for transfer.

# Volunteers for Transfer

At their option, the losing and the gaining competitive areas can agree that volunteers may transfer with the function, provided that no employee identified for transfer under Identification Methods One or Two is later separated or demoted solely because a volunteer transferred in place of a properly identified employee to the gaining competitive area.

# Transfer of Function Appeals

An employee may not file an appeal to the Merit Systems Protection Board based solely on a transfer of function issue. However, an employee who is reached for separation or demotion because of a reduction in force or an adverse action after declining transfer may raise transfer of function as in issue in that appeal.

The released employee must file the appeal no later than 30 days after the effective date of the reduction in force or adverse action. In some situations, an employee may not have the right to file an appeal to the Board because the negotiated grievance procedures contained in relevant collective bargaining agreement are the exclusive procedures for resolving any action that could otherwise be appealed to the Board (with some exceptions covered in the Board's regulations). The collective bargaining provides the time period for filing a grievance under the negotiated grievance procedures.

# Realignment Actions That Are Not a Transfer of Function

An employee has no right to transfer with a function if, at the time of transfer, the gaining competitive area performs the same type of work as the function that is transferring from the losing competitive area. Also, an employee has no right to transfer if the function does not cease in the losing competitive area at the time of transfer. In these situations, the employee has a right to compete in a reduction in force in the losing competitive area if the agency does not offer the employee another position at the same grade. The offered

position may be in the same or in a different local commuting area. The agency must use adverse action procedures to separate an employee who declines relocation (e.g., by reassignment, change of duty station, realignment, etc.) to a different local commuting area.

# Additional Information from the Agency

The agency's human resources office can provide both employees and managers with additional information on OPM's transfer of function regulations. The office can also provide information on potential benefits, such as eligibility for:

1. Career transition assistance
2. Separation incentives (if available)
3. Rehiring selection priority
4. Severance pay
5. Retirement
6. Retraining
7. Unemployment compensation
8. Relocation allowances

**OPM** | U.S. Office of
         Personnel Management

OPM.gov / Policy / Pay & Leave / Pay Administration

# FACT SHEET: SEVERANCE PAY ESTIMATION WORKSHEET

## Description

Severance pay is authorized under 5 U.S.C. 5595 and 5 CFR part 550, subpart G, for full-time and part-time employees who are involuntarily separated from Federal service and who meet other conditions of eligibility. (See Fact Sheet: Severance Pay for additional guidance.) This fact sheet provides a worksheet that can be used to calculate a severance pay estimate, an example of a severance pay calculation, and a table providing the age adjustment factors used in severance pay computations for employees more than 40 years old.

**Basic Severance Pay Allowance**

The basic severance pay allowance consists of—

- One week of pay at the rate of basic pay for the position held by the employee at the time of separation for each full year of creditable service through 10 years;
- Two weeks of pay at the rate of basic pay for the position held by the employee at the time of separation for each full year of creditable service beyond 10 years; and
- Twenty-five percent of the otherwise applicable amount for each full 3 months of creditable service beyond the final full year.

## Age Adjustment Allowance

The basic severance pay allowance is augmented by an age adjustment allowance consisting of 2.5 percent of the basic severance pay allowance for each full 3 months of age over 40 years.

## Rate of Basic Pay

"Rate of basic pay" means the rate of pay fixed by law or administrative action for the position held by the employee, including, as applicable, annual premium pay for standby duty, law enforcement availability pay, straight-time pay for regular overtime hours for firefighters, night differential for prevailing rate employees, locality payments, and special rate supplements. Rate of basic pay does not include additional pay of any other kind. (See the definition of "rate of basic pay" in 5 CFR 550.703.)

Note: The following worksheet is intended to allow an employee who is eligible for severance pay to calculate the approximate amount of severance pay he or she may receive. The actual calculation formula is somewhat more complicated and technical. The computation below presumes that the employee was full-time and has not previously received severance pay based on an earlier involuntary separation. The Office of Personnel

JA802

Management is not responsible for the accuracy of the estimate that this worksheet may provide. Employees should contact their agency's human resources office for information on their official severance pay entitlement.

# Severance Pay Estimation Worksheet

| STEP | DESCRIPTION |
| --- | --- |

Step 1  Annual Rate of Basic Pay (at time of separation) = _____

Weekly Rate (divide result of step 1 by 2,087 and then multiply by 40)

Step 2  (_____ / 2,087) x 40 = _____

(Note: This weekly rate can also be derived by dividing the annual rate by 52.175.)

Years of Service (use step 3A or step 3B below, as appropriate)

A. If your length of service is less than 10 years, enter your length of service: _____. Continue to step 4.

B. If your length of service is more than 10 years:

(1) enter your length of service: _____

Step 3  (2) subtract 10 from your length of service from line 1: _____ - 10 = _____

(3) multiply the result of line 2 by 2: _____ x 2 = _____

(4) add 10 to the result of line 3: _____ + 10 = _____

This is your adjusted years of service. Continue to step 4.

Basic Severance Pay (multiply result of step 2 by the result of step 3A or 3B, as appropriate)

Step 4  _____ x _____ = _____

Age Adjustment Factor (If your age is above 40, look up your age on the "Age Table and Factors" chart below. Enter the "factor" shown. If your age is below 40 years and 3 months, your "factor" is 1.)

Step 5  Age = _____ years and _____ months

Factor = _____

Adjusted Severance Pay (multiply the result of step 4 by the factor listed in step 5)

Step 6  _____ x _____ = _____

Step 7

Multiply the result of step 2 by 52 weeks.

_____ x 52 = _____

**STEP**                                          **DESCRIPTION**

This is the maximum amount of severance pay payable under the 1-year (52 weeks) limit.

If the result of step 6 exceeds the result of step 7, enter the result of step 7: _____

Step 8   Otherwise, enter the result of step 6: _____

This is the estimated amount of your total severance pay fund.

Multiply the result of step 2 by 2.

Step 9   _____ x 2 = _____

This is the estimated amount of your biweekly severance payment (before deductions).

Divide the result of step 8 by the result of step 9 and then multiply by 2.

Step 10   (_____ / _____) x 2 = _____

This is the approximate number of weeks of severance payments you will receive (assuming you are not reemployed by the Government).

# Severance Pay Calculation Example

**STEP**                                          **DESCRIPTION**

Step 1   Annual Rate of Basic Pay (at time of separation) = **$73,619**

Weekly Rate (divide result of step 1 by 2,087 and then multiply by 40)

Step 2   ($73,619 / 2,087) x 40 = **$1,411**

(Note: This weekly rate can also be derived by dividing the annual rate by 52.175.)

Step 3   Years of Service (use step 3A or step 3B below, as appropriate)

A. If your length of service is less than 10 years, enter your length of service: _____. Continue to step 4.

B. If your length of service is more than 10 years:

| STEP | DESCRIPTION |
|------|-------------|

(1) enter your length of service: **18**

(2) subtract 10 from your length of service from line 1: 18 - 10 = **8**

(3) multiply the result of line 2 by 2: 8 x 2 = **16**

(4) add 10 to the result of line 3: 16 + 10 = **26**

This is your adjusted years of service. Continue to step 4.

**Step 4**

Basic Severance Pay (multiply result of step 2 by the result of step 3A or 3B, as appropriate)

$1,411 x 26 = **$36,686**

**Step 5**

Age Adjustment Factor (If your age is above 40, look up your age on the "Age Table and Factors" chart below. Enter the "factor" shown. If your age is below 40 years and 3 months, your "factor" is 1.)

Age = 52 years and 0 months

Factor = **2.2**

**Step 6**

Adjusted Severance Pay (multiply the result of step 4 by the factor listed in step 5)

$36,686 x 2.2 = **$80,709.20**

**Step 7**

Multiply the result of step 2 by 52 weeks.

$1,411 x 52 = **$73,372**

This is the maximum amount of severance pay payable under the 1-year (52 weeks) limit.

**Step 8**

If the result of step 6 exceeds the result of step 7, enter the result of step 7: **$73,372**

Otherwise, enter the result of step 6: _____

This is the estimated amount of your total severance pay fund.

**Step 9**

Multiply the result of step 2 by 2.

$1,411 x 2 = **$2,822**

This is the estimated amount of your biweekly severance payment (before deductions).

**Step 10**

Divide the result of step 8 by the result of step 9 and then multiply by 2.

($73,372 / $2,822) x 2 = **52**

**JA805**

**STEP**                                          **DESCRIPTION**

This is the approximate number of weeks of severance payments you will receive (assuming you are not reemployed by the Government).

### Age Table and Factors

| Years | Months | Factor | Years | Months | Factor | Years | Months | Factor |
|-------|--------|--------|-------|--------|--------|-------|--------|--------|
| **40** | 3-5 | 1.025 | **48** | 6-8 | 1.850 | **56** | 9-11 | 2.675 |
| **40** | 6-8 | 1.050 | **48** | 9-11 | 1.875 | **57** | 0-2 | 2.700 |
| **40** | 9-11 | 1.075 | **49** | 0-2 | 1.900 | **57** | 3-5 | 2.725 |
| **41** | 0-2 | 1.100 | **49** | 3-5 | 1.925 | **57** | 6-8 | 2.750 |
| **41** | 3-5 | 1.125 | **49** | 6-8 | 1.950 | **57** | 9-11 | 2.775 |
| **41** | 6-8 | 1.150 | **49** | 9-11 | 1.975 | **58** | 0-2 | 2.800 |
| **41** | 9-11 | 1.175 | **50** | 0-2 | 2.000 | **58** | 3-5 | 2.825 |
| **42** | 0-2 | 1.200 | **50** | 3-5 | 2.025 | **58** | 6-8 | 2.850 |
| **42** | 3-5 | 1.225 | **50** | 6-8 | 2.050 | **58** | 9-11 | 2.875 |
| **42** | 6-8 | 1.250 | **50** | 9-11 | 2.075 | **59** | 0-2 | 2.900 |
| **42** | 9-11 | 1.275 | **51** | 0-2 | 2.100 | **59** | 3-5 | 2.925 |
| **43** | 0-2 | 1.300 | **51** | 3-5 | 2.125 | **59** | 6-8 | 2.950 |
| **43** | 3-5 | 1.325 | **51** | 6-8 | 2.150 | **59** | 9-11 | 2.975 |
| **43** | 6-8 | 1.350 | **51** | 9-11 | 2.175 | **60** | 0-2 | 3.000 |
| **43** | 9-11 | 1.375 | **52** | 0-2 | 2.200 | **60** | 3-5 | 3.025 |

**Age Table and Factors**

| Years | Months | Factor | Years | Months | Factor | Years | Months | Factor |
|---|---|---|---|---|---|---|---|---|
| 44 | 0-2 | 1.400 | 52 | 3-5 | 2.225 | 60 | 6-8 | 3.050 |
| 44 | 3-5 | 1.425 | 52 | 6-8 | 2.250 | 60 | 9-11 | 3.075 |
| 44 | 6-8 | 1.450 | 52 | 9-11 | 2.275 | 61 | 0-2 | 3.100 |
| 44 | 9-11 | 1.475 | 53 | 0-2 | 2.300 | 61 | 3-5 | 3.125 |
| 45 | 0-2 | 1.500 | 53 | 3-5 | 2.325 | 61 | 6-8 | 3.150 |
| 45 | 3-5 | 1.525 | 53 | 6-8 | 2.350 | 61 | 9-11 | 3.175 |
| 45 | 6-8 | 1.550 | 53 | 9-11 | 2.375 | 62 | 0-2 | 3.200 |
| 45 | 9-11 | 1.575 | 54 | 0-2 | 2.400 | 62 | 3-5 | 3.225 |
| 46 | 0-2 | 1.600 | 54 | 3-5 | 2.425 | 62 | 6-8 | 3.250 |
| 46 | 3-5 | 1.625 | 54 | 6-8 | 2.450 | 62 | 9-11 | 3.275 |
| 46 | 6-8 | 1.650 | 54 | 9-11 | 2.475 | 63 | 0-2 | 3.300 |
| 46 | 9-11 | 1.675 | 55 | 0-2 | 2.50 | 63 | 3-5 | 3.325 |
| 47 | 0-2 | 1.700 | 55 | 3-5 | 2.525 | 63 | 6-8 | 3.350 |
| 47 | 3-5 | 1.725 | 55 | 6-8 | 2.550 | 63 | 9-11 | 3.375 |
| 47 | 6-8 | 1.750 | 55 | 9-11 | 2.575 | 64 | 0-2 | 3.400 |
| 47 | 9-11 | 1.775 | 56 | 0-2 | 2.600 | 64 | 3-5 | 3.425 |
| 48 | 0-2 | 1.800 | 56 | 3-5 | 2.625 | 64 | 6-8 | 3.450 |

JA807

**Age Table and Factors**

**Years Months Factor Years Months Factor Years Months Factor**

| Years | Months | Factor | Years | Months | Factor | Years | Months | Factor |
|---|---|---|---|---|---|---|---|---|
| **48** | 3-5 | 1.825 | **56** | 6-8 | 2.650 | **64** | 9-11 | 3.475 |

# UNEMPLOYMENT INSURANCE

## WHAT IS UNEMPLOYMENT INSURANCE (UI)?

Unemployment Insurance is a joint state-federal program that provides cash benefits to eligible workers. Each state administers a separate UI program, but all states follow the same guidelines established by federal law.

Unemployment insurance payments (benefits) are intended to provide temporary financial assistance to unemployed workers who are unemployed through no fault of their own. Each state sets its own additional requirements for eligibility, benefit amounts, and length of time benefits can be paid.

> **UI Benefits are Administered by States**
>
> To find information about your state's program, including eligibility, benefits, and application information, visit our Unemployment Insurance Service Locator.

Generally, benefits are based on a percentage of your earnings over a recent 52-week period, and each state sets a maximum amount. Benefits are subject to federal and most state income taxes and must be reported on your income tax return. You may choose to have the tax withheld from your payment.

## AM I ELIGIBLE?

Each state sets its own guidelines for eligibility for UI benefits, but you usually qualify if you:

- **Are unemployed through no fault of your own.** In most states, this means you have to have separated from your last job due to a lack of available work.
- **Meet work and wage requirements.** You must meet your state's requirements for wages earned or time worked during an established period of time referred to as a "base period." (In most states, this is usually the first four out of the last five completed calendar quarters prior to the time that your claim is filed.)
- **Meet any additional state requirements.** Find details of your own state's program by using our Unemployment Insurance Service Locator.

## HOW DO I APPLY?

To receive UI benefits, you need to file a claim with the UI program in the state where you worked.

- You should contact your state's UI program as soon as possible after becoming unemployed. Find your state's program by using our Unemployment Insurance Service Locator and check with them to see if you should file a claim in person, by telephone, or online.
- Generally, you should file your claim with the state where you worked. If you worked in a state other than the one where you now live or if you worked in multiple states, the state UI agency where you now live can provide information about how to file your claim with other states.
- When you file a claim, you will be asked for certain information, such as addresses and dates of your former employment. To make sure your claim is not delayed, be sure to give complete and correct information.
- It generally takes two to three weeks after you file your claim to receive your first benefit check. Some states require a one-week waiting period; in other words, you would receive your first payment for the second week of your unemployment claim.

# HOW DO I STAY ELIGIBLE?

Generally states require the following in order to maintain weekly eligibility:

▸ File weekly or biweekly claims, usually by mail or phone.

▸ Be able to work, available to work, and activly seek work each week you claim benefits.

▸ Report any earnings from work you had during the week(s). States have different rules for how much money you can earn while receiving benefits.

▸ Report any job offers or job offers you decline during the week.

▸ If requested, report to your local UI claims office or American Job Center on the scheduled day and time. Benefits may be denied for those who do not attend.

▸ Some states require registration for work with the State Employment Service, so it can assist you in finding employment.

▸ Meet any other state eligibility requirements.

You will find help in your job search at your local American Job Center. They have a variety of services free of charge. Staff there can:

▸ Refer you to job openings in your area, or in other areas if you plan to relocate.

▸ Help with resume writing, interview practice, and other job search activities.

▸ Refer you to training programs.

▸ Some Centers offer testing and counseling to help you explore new careers.

▸ If you believe you have special needs or considerations, such as physical needs or other considerations, which may prevent you from getting a job, they can refer you to other agencies for help with those needs.

# WHAT IF I AM DENIED?

Each state UI Program makes its own decisions about workers' eligibility for benefits. There are many reasons for denying benefit payments; some of the most common are:

▸ Voluntarily leaving work without good cause. Benefit payments can be paid if you quit under certain circumstances depending on your state's laws.

▸ Being discharged for misconduct connected with work. Misconduct is an intentional or controllable act or failure to take action, which shows a deliberate disregard of the employer's interests.

▸ Not being able or available for work. You must be able, ready and willing to accept a suitable job.

▸ Not actively seeking work.

▸ Refusing an offer of suitable work.

▸ Knowingly making false statements to obtain benefit payments.

If you are disqualified or denied benefits, you have the right to file an appeal. Your employer may also appeal a determination if he/she does not agree with the state's determination regarding your eligibility. You must file your appeal within an established time frame.

# HOW LONG WILL MY BENEFITS LAST?

In general, benefits are based on a percentage of an individual's earnings over a recent 52-week period - up to a State maximum amount.

▶ Benefits can be paid for a maximum of 26 weeks in most States.

▶ Additional weeks of benefits called Extended Benefits may be available during times of high unemployment (Some States also provide additional benefits for specific purposes).

▶ Benefits are subject to Federal income taxes and must be reported on the individual's Federal income tax return. Or the individual may elect to have the tax withheld by the State Unemployment Insurance agency.

You can visit the Comparison of State UI Laws at https://oui.doleta.gov/unemploy/statelaws.asp#Statelaw for additional information about the maximum weeks of entitlement and other state specific UI laws.

**U.S. DEPARTMENT OF LABOR**

## Employment and Training Administration

## State Workforce Agencies

A "State workforce agency" refers to the lead state agency responsible for administering programs under chapter 2 or 3 of subtitle B of title I of the Workforce Innovation and Opportunity Act (WIOA) (29 U.S.C. 3161 et seq., 3171 et seq.). Enacted in 2014, WIOA is a significant legislative effort to enhance workforce development in the United States. Its goal is to improve the quality and coordination of employment, education, and training services for job seekers and employers. State workforce agencies are at the forefront of implementing WIOA, playing a pivotal role in creating a robust and responsive workforce development system.

### Alabama

Gay S. Vines
WOTC Unit
Alabama Department of Labor
649 Monroe St, Room 2813
Montgomery, AL 36131-0001
Phone: 334-309-9079
Fax: 334-309-9072
Email: wotc.alcc@alcc.alabama.gov
Alabama WOTC webpage

### Alaska

Teressa Parker
Alaska Department of Labor and Workforce Development
Division of Employment & Training Services
PO Box 115509
Juneau, AK 99811-5509
Phone: 907-465-5952
Fax: 907-931-6544
Email: dol.wotc@alaska.gov
Alaska WOTC webpage

### Arizona

Loi Dang
Arizona Department of Economic Security, WOTC Unit
1789 W. Jefferson Street
Mail drop 5271
Phoenix, AZ 85007

Phone: 520 576 8872
Email: ldang@azdes.gov
Arizona WOTC webpage

**Arkansas**

Kenneth Moore (ADWS)
Attn: WOTC Program
Arkansas Department of Workforce Services
PO Box 2981
Little Rock, AR 72203-2981
Phone: 501-682-2475 / 1-866-330-9459 (Toll Free)
Fax: 501-682-2576
Email: kenneth.moore@arkansas.gov
Arkansas WOTC webpage

**California**

Leslie Glover
Employment Development Department, Work Opportunity Tax Credit
2901 50th St
Sacramento, CA 95817
Phone: 1-866-593-0173
Fax: 916-227-5140
Email: WOTCSupport@edd.ca.gov
California WOTC webpage

**Colorado**

Kerri Owen
Colorado Department of Labor & Employment
WOTC Unit, Division of Employment Programs
633 17th St
Suite 700
Denver, CO 80202-3927
Phone: 303-318-8961
Fax: 303-318-8934
Email: kerri.owen@state.co.us
Colorado WOTC webpage

**Connecticut**

Anthony Coschigano
Operations Coordinator/Employment Services Operations
Connecticut Department of Labor
200 Folly Brook Blvd
Wethersfield, CT 06109
Phone: 860-263-6071
Fax: 860-263-6039

JA813

Email: Anthony.Coschigano@ct.gov
Connecticut WOTC webpage

**Delaware**

Sherese Brewington-Carr
Attn: WOTC Coordinator
Delaware Department of Labor
Division of Employment and Training
Work Opportunity Tax Credit Unit
4425 N Market St
3rd Floor
Wilmington, DE 19802
Phone: 302-761-8039
Fax: 302-761-6657
Email: Sherese.Brewington-C@delaware.gov
Delaware WOTC webpage

**District of Columbia**

Durrell Becton, MBA
Pronouns: He/Him/His
Program Analyst/WOTC Coordinator
Department of Employment Services
4058 Minnesota Avenue NE, Suite 3801, Washington, DC 20019
Office: 202.519.3203 | Mobile: 202.304.0846
Email: Durrell.Becton1@dc.gov
District of Columbia WOTC webpage

**Florida**

Eduardo Torres
WOTC State Coordinator
Bureau of One-Stop & Program Support
Florida Department of Commerce
Office: 850-921-3299
Email: WOTC@commerce.fl.gov
Florida WOTC webpage

**Georgia**

Gynda (Denise) Jordan
Georgia Department of Labor
148 Andrew Young International Blvd, NE
Suite 450 Sussex Place
Atlanta, GA 30303-1751
Phone: 404-232-3522
Fax: 404-232-3684

Email: Gynda.Jordan@gdol.ga.gov
Georgia WOTC webpage

**Hawaii**

Leila N. Shar
WOTC State Coordinator
Workforce Development Division, DLIR
Email: leila.n.shar@hawaii.gov
Phone: 808-586-9169
Hawaii WOTC Webpage

**Idaho**

Lapman (Simon) So
WOTC Coordinator
Idaho Department of Labor
317 W Main St
Boise, ID 83735
Phone: 208-332-3570 ext. 3153
Fax: 208-639-3254
Email: lapman.so@labor.idaho.gov
Idaho WOTC webpage

**Illinois**

Patricia Rusoff
Senior Public Service Administrator
Work Opportunity Tax Credit (WOTC) Unit
Illinois Department of Employment Security
115 S LaSalle Street, 16th Floor
Chicago, IL 60603
Phone: 217-558-1235
Fax: 312-793-1778
Email: Patricia.Rusoff2@illinois.gov
Illinois WOTC webpage

**Indiana**

Ashley Gatlin
Indiana Department of Workforce Development
WOTC Transition
10 N Senate Ave
SE308
Indianapolis, IN 46204
Phone: 317-671-2041
Fax: 317-233-2679
Email: agatlin@dwd.in.gov
Indiana WOTC webpage

**Iowa**

Bethany Ellingson
Iowa Workforce Development - WOTC Unit
1000 E Grand Avenue
Des Moines, IA 50319
563-382-0457 ext 32410 (Office)
563-387-0905 (Fax)
bethany.ellingson@iwd.iowa.gov
Iowa WOTC webpage

**Kansas**

Ashla Stowe, Program Manager
Work Opportunity Tax Credit Program
Kansas Department of Commerce
1000 SW Jackson St
Suite 100
Topeka, KS 66612-2115
Phone: 785-296-7435
Fax: 785-368-7108
Email: ashla.stowe@ks.gov
Kansas WOTC webpage

**Kentucky**

Amanda Inman
Kentucky Career Center
Office of Employer & Apprenticeship Services
Tax Credit Unit
500 Mero Street 443 CE
Frankfort, KY 40601
Office: 502-564-7456
Help Desk: 502-782-3465
Fax: 502-564-7459
Email: amanda.inman@ky.gov
Kentucky WOTC webpage

**Louisiana**

Kenny Lynch
Administrator, Targeted Populations/Employer Outreach
Office Of Workforce Development
Louisiana Workforce Commission
1001 N. 23rd Street, 3rd FL
Baton Rouge, LA 70802
Telephone: (225) 342-7679
Mobile: (225) 235-9699

Email: klynch@lwc.la.gov
Louisiana WOTC webpage

**Maine**

Veronica Roux, Clerk IV - Employment Services
Maine Department of Labor
55 State House Station
Augusta, ME 04333-0055
Office: 207-623-7977
Fax: 207-287-5933
Email: veronica.f.roux@maine.gov
Maine WOTC Webpage

**Maryland**

Jumamosi (Lovie) Johnson
WOTC Administrative Officer II
Work Opportunity Tax Credit Unit
Maryland Department of Labor
100 S. Charles Street, 210B
Baltimore, MD 21201
Phone: 410-767-2063
Fax: 410-767-2060
Email: Jumamosi.Johnson@maryland.gov
Maryland WOTC webpage

**Massachusetts**

Jack Sprince
MassHire/Department of Career Services
WOTC Unit
100 Cambridge Street, Suite 500
Boston, MA 02114
Phone: 617-626-5730 / 617-626-5353
Fax: 617-727-8671
Email: jackson.e.sprince@detma.org
Massachusetts WOTC webpage

**Michigan**

Shelly Khan
Michigan Unemployment Insurance Agency
WOTC Unit, Suite 12-400
3024 W Grand Blvd
Detroit, MI 48202
Phone: 313-456-2105 (WOTC Unit)
        1-800-482-2959 (WOTC Hotline)
Fax: 313-456-2132

Email: KhanS2@michigan.gov
Michigan WOTC webpage

**Minnesota**

Karen Marberry
Minnesota Department of Employment and Economic Development
WOTC Unit
180 E 5th Street, Suite 1200
St Paul, MN 55101
Phone: 651-259-7507 / 7521
1-888-234-5521 (Toll-Free)
Fax:651-297-7722
Email: karen.marberry@state.mn.us
Minnesota WOTC webpage

**Mississippi**

Constance Fuller
WOTC Unit
Mississippi Department of Employment Security
1235 Echelon Pkwy
PO Box 1699
Jackson, MS 39215-1699
Phone: 601-321-6079
Fax: 601-321-6506
Email: cfuller@mdes.ms.gov
Mississippi WOTC webpage

**Missouri**

Jennifer Cheshire
Missouri Department of Higher Education and Workforce Development
Harry S Truman Building, Room 870
301 W High St
PO Box 1087
Jefferson City, MO 65102-1087
Phone: 573-522-9581 / 1-800-877-8698 (Toll Free)
Fax: 573-751-9896
Email: jennifer.cheshire@dhewd.mo.gov
Missouri WOTC webpage

**Montana**

Rebecca Bradford O'Brien
Work Opportunity Tax Credit (WOTC) Program Manager
Montana Department of Labor & Industry
Workforce Services Division
Division Management Services

1315 E. Lockey
Helena, MT 59601
Phone: 406-444-6147
Fax 406-444-3037
Email: Rebecca.Bradford@mt.gov
Montana WOTC Webpage

**Nebraska**

Kelly Flanagan
Reemployment Services Administrator
Nebraska Department of Labor
550 South 16th Street
Lincoln, NE 68509
Phone: 402-499-4177
Email: Kelly.Flanagan@nebraska.gov
Nebraska WOTC webpage

**Nevada**

Chris Scaffidi
ATTN: WOTC Coordinator
Nevada Department of Employment, Training & Rehabilitation
500 E Third St
Carson City, NV 89713-0012
Phone: 775-684-0321
Fax: 775-687-6842
Email: wotcnv@detr.nv.gov
Nevada WOTC webpage

**New Hampshire**

Jacob Woodward
Program Specialist I
New Hampshire Employment Security
45 South Fruit Street
Concord, NH 03301-4857
Phone : 603-229-4452
Fax: 603-229-4321
Email: Jacob.R.Woodward@nhes.nh.gov
New Hampshire WOTC webpage

**New Jersey**

Christopher J. McKelvey
Supervisor - Office of Workforce Support Strategies
New Jersey Department of Labor and Workforce Development
PO Box 055
Trenton, NJ 08625

Office: 609.292.6574
Email: christopher.mckelvey@dol.nj.gov
New Jersey WOTC webpage

**New Mexico**

Juan J. Diaz
New Mexico Department of Workforce Solutions
Business Development & Outreach
Attention: WOTC Unit
401 Broadway NE
Albuquerque, NM 87102
Phone: 505-841-8444
Fax: 505-841-8880
Email: juan.diaz@dws.nm.gov
www.dws.state.nm.us/en-us/WOTC

**New York**

NYS Department of Labor
Attn: WOTC Unit
State Office Campus, Bldg 12, Rm 436
Albany, NY 12226
OR
FAX: 518-485-1359
OR
EMAIL: AskNYWOTC@labor.ny.gov

**North Carolina**

Annie T. Gomez
Work Opportunity Tax Credit Program Coordinator
North Carolina Department of Commerce
Division of Workforce Solutions
Attn: WOTC, Business Services
4316 Mail Service Center
Raleigh, NC 27699-4316
Phone: 984-236-4180
Fax: 919-662-4660
Email: Annie.Gomez@commerce.NC.gov
North Carolina WOTC webpage

**North Dakota**

Carmen R. Yantzer
State WOTC Coordinator
Workforce Programs
Job Service North Dakota
PO Box 5507

Bismarck, ND 58506-5507
Phone: 701-328-2997
Fax: 701-328-4894
Email: cayantzer@nd.gov
North Dakota WOTC webpage

**Ohio**

Betty Knutson
Ohio Department of Job & Family Services
Office of Workforce Development
P.O. Box 1618
Columbus, OH 43219
Phone: 614-595-4096
Fax: 614-644-7102
Email: Betty.Knutson@jfs.ohio.gov
OR WOTC_Contact@jfs.ohio.gov
Ohio WOTC webpage

**Oklahoma**

Roslyn Richards
Oklahoma Employment Security Commission
PO Box 52003
Oklahoma City, OK 73152-2003
Phone: 405-962-4627
Fax: 405-557-7105
Email: Roslyn.Richards@oesc.state.ok.us
Oklahoma WOTC webpage

**Oregon**

Celina Kirnberger
Oregon Employment Department
WOTC Unit, Room 201
875 Union St NE
Salem, OR 97311
Phone: 1-800-237-3710, option 3
Fax: 503-947-1524
Email: WOTC@employ.oregon.gov
Oregon WOTC webpage

**Pennsylvania**

Derrick A. Donnell
Special Projects Supervisor
PA Department of Labor and Industry
Bureau of Workforce Partnership Operations
651 Boas Street

12th Floor, Room 1200
Harrisburg, PA 17121
TEL: 717-772-3720
Email: ddonnell@pa.gov
Pennsylvania WOTC webpage

**Puerto Rico**

Ada M. Vega
Puerto Rico Department of Labor & Human Resources
Bureau of Employment Security
WOTC Unit, 4th Floor
PO Box 195540
San Juan, PR 00919-5540
Phone: 787-625-3137 ext. 2315 or 2316
Fax: 787-945-7473 or 787-945-7471
Email: advega@trabajo.pr.gov
Puerto Rico WOTC webpage

**Rhode Island**

Jean Luisi
Rhode Island Department of Labor and Training
1511 Pontiac Avenue, Bldg 73-2
Cranston, RI 02920
Phone: 401-462-8385
Email: Jean.Luisi@dlt.ri.gov
Fax: (401) 462-8722
Rhode Island WOTC webpage

**South Carolina**

Amy Hill
South Carolina Department of Employment and Workforce
ATTN: WOTC Unit, Room 515
1550 Gadsden St
Columbia, SC 29201
Phone: 803-737-3228
Email: ahill@dew.sc.gov
South Carolina WOTC webpage

**South Dakota**

Taunya J. Charlton
South Dakota Department of Labor
420 South Roosevelt Street
PO Box 4730
Aberdeen, SD 57401
Phone: 605-220-8383

Fax: 605-626-2228
Email: Taunya.Charlton@state.sd.us
South Dakota WOTC webpage

**Tennessee**

Justin Williams
WOTC Coordinator
Tennessee Department of Labor & Workforce Development
Attn: WOTC
220 French Landing Drive
Nashville, TN 37243
Phone: 844-216-8495
Fax: 615-532-1612
Email:  WOTC.info@tn.gov
Tennessee WOTC webpage

**Texas**

Russell Hunter, Manager
Work Opportunity Tax Credit
Board Support and Agency Administrated Programs
Texas Workforce Commission
101 East 15th St., Room 202T
Austin, TX 78778-0001
Phone: 737-270-8107
Texas WOTC webpage

**Utah**

Stacie Smith
Utah Department of Workforce Services
140 E 300 S
Salt Lake City, UT 84111
Phone: 385-272-7798
Fax: 801-596-2274
Email: stacielsmith@utah.gov
Utah WOTC webpage

**Vermont**

Gerard J. Miller IV
WOTC State Coordinator
Workforce Development Division
Vermont Department of Labor
5 Green Mountain Dr
Montpelier, VT 05601
Phone: (802) 828-4240

JA823

Email: Labor.WOTC@vermont.gov
Vermont WOTC webpage

**Virgin Islands**

Janelle J Murraine
Program Coordinator
Virgin Islands Department of Labor
2353 Kronprindsens Gade
St. Thomas, VI 00802
Tel: (340) 776-3700 ext 2007
janelle.murraine@dol.vi.gov
Virgin Island WOTC webpage

**Virginia**

Priscilla Skinner
WOTC State Coordinator
Virginia Employment Commission
6606 W. Broad Street
Suite 502, Room 507
Richmond, VA 23230
P. O. Box 26441
Richmond, VA 23261-6441
Phone: 804-786-4341
Fax: 804-225-3712
Email: priscilla.skinner@vec.virginia.gov
Virginia WOTC webpage

**Washington**

Stephen Henry
WOTC State Coordinator
Washington State Employment Security Department
WOTC Administrative Unit
PO Box 9046
Olympia, WA 98507-9046
Phone: 1-800-669-9271 (Toll Free)
Email: stephen.henry@esd.wa.gov
Office Group Email: ESDGPWOTC@ESD.WA.GOV
Washington WOTC Webpage

**West Virginia**

Josh Cox
WorkForce West Virginia
Building 3 Suite 400
1900 Kanawha Blvd E
Charleston, WV 25305

Phone: 304-352-3860
Fax: 304-558-6446
Email: WOTC@wv.gov
West Virginia WOTC webpage

**Wisconsin**

Jody Thomas
Wisconsin Department of Workforce Development
Federal Tax Credit Office, Room G-100
201 E Washington Ave
Madison, WI 53707-7972
Phone: 608-733-3931
Fax: 608-264-9682
Email: jody.thomas@dwd.wisconsin.gov
Wisconsin WOTC webpage

**Wyoming**

Michael Davis
State Veterans Coordinator/WOTC Program Manager
Department of Workforce Services
5221 Yellowstone Rd
Cheyenne, WY 82009
Phone: 307-777-3713
Fax : 307-777-5870
michael.davis@wyo.gov
Email: dws-wotc@wyo.gov
Wyoming WOTC webpage

## AUTHORIZATION FOR RELEASE OF INFORMATION

PRIVACY ACT STATEMENT

In compliance with the Privacy Act of 1974, the following information is provided: Basic authority to provide the requested information is contained in 5 U.S.C 552a. This form is furnished for the purpose of obtaining information about you and your activities in connection with **CFPB** concerning: (1) fitness for Federal and private sector employment, (2) clearance to perform contractual services for the Federal Government or private sector, or (3) any other legitimate law enforcement purpose within the scope of responsibilities exercised by the **CFPB**. Furnishing the requested information is voluntary.

AUTHORIZATION

I authorize **CFPB** by whom I have been employed or sought employment, any **CFPB** labor union of which I am or have been a member, and **BFS human resources/payroll department** to release my employment, past or present information, to include but not limited to employment applications, information pertaining to my wages, position, performance, date of employment, attendance, eligibility for rehire, and other related matters. To provide the requested employment information information to the any **other federal agencies, private sector employers human resources professionals**, official requesting this release. This release of information will be used only for official purposes by the CFPB and may be disclosed to third parties as necessary in accordance with applicable laws and regulations in fulfillment of official responsibilities.

I release any individual or organization from any and all liability for actual or alleged damages to me as a result of good faith compliance with this authorization.

Should you have questions on the validity or scope of this release, you may contact me as indicated below.


_____          _____

**(Print Name)**                                 **(Last 4 of SSN)**


_____          _____

**(Signature)**                                   **(Date)**


\*Your Social Security Number is needed to keep records accurate, because other people may have the same name. Executive Order 9397 also asks Federal agencies to use this number to help identify individuals in agency records.

JA826

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT

# The Employee's
# Guide to Career Transition
## (CTAP, ICTAP, RPL)



# Table of Contents

*Description*                                                                    *Page*

(1)    Introduction                                                          p. 3

(2)    Where Can I Go for More Information?                                   p. 4

(3)    Placement Priority--Reduction in Force or                             p. 5
       Out-of-Area Reassignment

       (A)  Selection Priority in Your Agency (CTAP)                         p. 5

       (B) Agency Reemployment Priority Lists (RPL)                          p. 13

       (C)  Selection Priority in Other Agencies (ICTAP)                     p. 15

(4)    Reemployment after Disability or Injury                               p. 22

       (A)  Reemployment after Recovery from Job-Related Injury              p. 22

       (B)  Reemployment after Termination of Disability Annuity             p. 23

       (C)  Former Military Reserve/National Guard                          p. 23
       Technicians Receiving Special Disability Annuity

(5)    Veterans In Certain Positions                                         p. 23

(6)    Career Transition Services                                           p. 24

(7)    Job Information                                                       p. 25

(8)    Glossary of Terms                                                     p. 26

# (1). Introduction

As the Federal Government continues to restructure and downsize, some employees may find themselves having to "transition" to new jobs--sometimes even to occupations in the private sector.  Making major career changes, perhaps for the first time in many years, can be a frightening and frustrating experience that raises many questions.

The Office of Personnel Management (OPM) recognizes the difficulties this kind of change can bring.  We developed this guide to inform and prepare you to take charge of your career.  Your transition is more likely to be successful if you see this as an opportunity to move to an exciting new job or career in the Federal government or the private sector.

**Background**

During the 1990's, transition and placement in the Federal government underwent a dramatic transformation.  In 1995, OPM issued regulations requiring Executive Branch agencies to provide career transition assistance to employees affected by downsizing or restructuring.  These agencies developed Career Transition Assistance Plans for their surplus and displaced employees.

**Agency Career Transition Assistance Plans (CTAPs)**

Agency plans must consist of three parts:

(1)  Agency Career Transition Services

Each agency provides career transition services to surplus employees, giving them skills and resources to help them find other employment.  These services might include skills assessment, resume preparation, counseling, or job search assistance.  Agencies must also develop policies on retraining their surplus employees.

(2)  Agency Special Selection Priority under the Career Transition Assistance Plan (CTAP)*

Agencies must give selection priority to their own well-qualified surplus employees who apply for vacancies in agency components in the local commuting area.  Agencies must notify their surplus or displaced employees when they plan to fill these jobs.  With a few exceptions, the agency must select those who apply and are eligible and well qualified before any other candidate from within or outside the agency.

(3)  Agency Reemployment Priority Lists (RPL)

Each agency must also maintain a Reemployment Priority List (RPL) for each local commuting area where it separates employees by reduction in force.  Employees can register for the RPL to tell their former agency that they want to return if the agency has vacancies. Employees can register for their agency's RPL as soon as they receive a reduction in force (RIF) separation notice.  Before the agency can select a candidate outside its workforce, it must first check the RPL for that location.  With a few exceptions, the agency must select a qualified employee from the RPL before hiring anyone from outside the agency.

**Interagency Career Transition Assistance Plan (ICTAP)**

OPM also changed the way displaced Federal workers receive priority for jobs in other agencies (besides the one they worked in before involuntary separation).  In 1996, OPM suspended the Interagency Placement Program (IPP) and replaced it with the Interagency Career Transition Assistance Plan (ICTAP).  The IPP was a centralized list of displaced employees referred by OPM to hiring agencies.  ICTAP is very different from the IPP and has placed more employees. ICTAP is not a list--instead, employees must apply for positions in the local commuting area and include proof that they were displaced.  ICTAP gives an eligible, well-qualified employee selection priority over almost any other applicant from outside the agency.  Under ICTAP, for example, a DOD employee with a RIF separation notice could apply for a competitive service vacancy in the local commuting area at the Department of Education.  In most cases, Education must select this well-qualified person for the position before choosing another applicant from outside the agency.

**\* *Note to DoD Employees:***  The Department of Defense (DoD) does not provide agency selection priority through CTAP.  Instead, DoD uses the Priority Placement Program (PPP) to help place its surplus employees.  DoD also provides career transition services to its employees to the extent possible.  Displaced DoD workers can also register for their local RPL, and request selection priority for jobs in non-DoD agencies using the ICTAP.

# (2). Where Can I Go for More Information?

The rest of this Guide explains CTAP, ICTAP and RPL and how they work.  Your human resources office should have information on your agency's specific services and programs, including agency career transition services, CTAP selection priority, and RPL.  Agency human resources representatives should also be able to answer your questions about ICTAP selection priority.

OPM's website at www.opm.gov provides access to information on various human resources

---

topics, including lists of Federal job opportunities worldwide.  You should also visit DOL's link to state employment and retraining services at: www.careeronestop.org.

OPM has information on worldwide Federal job opportunities available at www.usajobs.gov.

# (3). Placement Priority--Reduction in Force (RIF) or Out-of-Area Reassignment

## (A). Selection Priority in Your Agency (CTAP)

CTAP is designed to improve your chances of finding a new job in your agency through selection priority.  OPM's regulations establish the minimum requirements agencies must meet in providing their employees with transition services and selection priority for vacancies.  Each agency has a specific Career Transition Assistance Plan containing detailed information about the agency's transition policies.  Your human resources office should be able to explain the specifics for your agency.

***Note for Department of Defense (DoD) Employees:***  CTAP special selection priority does not apply to DoD employees.  DoD uses the Priority Placement Program (PPP) to help place its surplus employees.  You can get more information on the PPP from the DoD Civilian Transition Programs Office at (478) 926-3706 or from their web site at http://www.cpms.osd.mil/Subpage/Library.  DoD also provides career transition services to its employees to the extent possible.  In addition to the PPP, displaced DoD employees can register for their local RPL, and request selection priority for jobs in non-DoD agencies using the ICTAP.

***1. How do I get selection priority for vacancies in my agency?***

You must:

- be "surplus" or "displaced" (in other words, you must meet the definitions in either **2**. or **3.** below);

- have a current performance rating of at least "fully successful" (Level III) or equivalent;

---

OPM ·················································· · · · · · · · · · · · · · ·         Employee's Guide to Career Transition

5

**JA831**

- occupy a position in the same local commuting area of the vacancy;

- apply for a specific vacancy at or below your current grade level with no greater promotion potential than your current position;

- meet the application deadline in the announcement; and

- be found "well qualified" for the job.

## 2. What is a "surplus" employee?

You are "surplus" if you:

- are in the competitive service**;

- are in tenure group I (career) or tenure group II (career-conditional); **and**

- have an official notice from your agency saying that your position is no longer needed. This notice could be:

  > a "Certificate of Expected Separation" (CES);
  > an agency certification that you are in a surplus organization or occupation;
  > a notice that your position is being abolished; or
  > a letter saying you are eligible for discontinued service retirement.

** Agencies can extend the definition of a "surplus" employee to include employees in the excepted service if they are on Schedule A or B appointments without time limit and have received an appropriate notice (see above).  Selection priority for these employees is limited to other permanent Schedule A or B positions in the same agency and local commuting area. *Note:*  Excepted Service employees are not eligible for selection priority in other agencies under the Interagency Career Transition Assistance Plan.

## 3. What is a "displaced" employee?

You are "displaced" if you:

- are in the competitive service**;

- are in tenure group I (career) or tenure group II (career-conditional); **and**

---

OPM ·································································    Employee's Guide to Career Transition

JA832

- have an official notice from your agency saying you will be separated by reduction in force. This notice could be:

  - ➢ a specific reduction in force separation notice; or
  - ➢ a notice of proposed removal because you declined a directed reassignment or transfer of function out of the local commuting area.

** Agencies can extend the definition of a "displaced" employee to include employees in the excepted service if they are on Schedule A or B appointments without time limit and have received an appropriate notice (see above). Selection priority for these employees is limited to other permanent Schedule A or B positions in the same agency and local commuting area. ***Note:*** Excepted Service employees are not eligible for selection priority in other agencies under the Interagency Career Transition Assistance Plan.

### 4. *Who is not eligible for selection priority?*

You are generally not eligible for selection priority if you are:

- in the excepted service (unless your agency gives special selection priority to excepted employees);

- downgraded or reassigned due to reduction in force, but not separated;

- in a different local commuting area from the vacancy;

- in a temporary or term position in the competitive service;

- in an agency that is not in the Executive branch;

- in an agency that does not follow OPM hiring procedures (this includes Postal Service, legislative and judicial branch agencies); or

- in the Senior Executive Service (SES).

### 5. *I meet all the requirements for CTAP priority. How does this selection priority in my agency work?*

With few exceptions, if your agency plans to fill a vacancy in the local commuting area lasting more than 120 days, it must give CTAP eligibles the opportunity to apply. Agencies can advertise vacancies to surplus and displaced agency employees using OPM's USAJOBS, email, bulletin boards, etc. If you are interested in an advertised vacancy,

JA833

you must apply within the time frame given and attach proof of your CTAP eligibility (see below).

If the agency finds you well qualified for the vacancy, you have priority over other candidates from within or outside your agency.  If you are among two or more well-qualified CTAP eligibles, the agency may select any one of you.  Agencies may select candidates from other agency components only after giving priority to eligible CTAP candidates within the component.  An example of a component might be the National Park Service within the Department of the Interior.  Check with your human resources office to see how your agency defines "component."

**6.  *When does my eligibility begin?***

Your eligibility beings when you receive one of these notices or documents:

- a reduction in force (RIF) separation notice;

- a notice of proposed removal for declining a directed reassignment or transfer of function to another local commuting area;

- a Certificate of Expected Separation (CES); or

- your agency's certification that you are in a surplus organization or occupation (this could be a position abolishment letter, a notice of eligibility for discontinued service retirement, or similar notice).

Whichever notice or document you receive is your proof of eligibility for CTAP priority.

**7.  *When does my eligibility expire?***

Your eligibility expires when:

- your agency separates you by RIF;

- you resign, retire or otherwise separate from the agency;

- your agency separates you for declining a directed reassignment or transfer of function to another local commuting area;

- your agency cancels or rescinds the notice that made you eligible;

---

- you move to another position in the agency, time-limited or permanent, that is not affected by the RIF;

- you receive a career, career-conditional, or excepted service position without time limit in any agency; or

- you are no longer being separated by RIF.

## 8. *What are the steps in the process?*

*Step One: Application*

If you are eligible, you request CTAP selection priority by:

1. applying for a vacancy in your agency in the local commuting area; and

2. attaching proof of eligibility (for example:  your RIF separation notice, CES, surplus notification, or notice of proposed removal).  Make sure you attach any other documentation requested by the agency in the vacancy announcement.

*Step Two: Qualifications Review*

The agency reviews your application, comparing your background to the required qualifications, selective factors, knowledge, skills, abilities and competencies to determine if you are well qualified for the job.  The agency must define "well qualified" on vacancy announcements so you know the criteria they are using.

If your agency finds that you are not well qualified, they must conduct a second review of your application and tell you the results in writing.

*Step Three:  Selection*

If your agency finds you well qualified for the vacancy, in most cases they must select you before hiring another candidate from either inside or outside the agency.

If two or more well-qualified CTAP applicants request selection priority, the agency may choose among them.  Some agencies have a specific policy on selection order (for example, they may always select "displaced" employees before "surplus" employees).

If no well-qualified CTAP eligibles apply, the agency can fill the position through other means.

---

OPM ·················································································    **Employee's Guide to Career Transition**

*9. What does "vacancy" mean?*

Under CTAP, a vacancy is a competitive service position lasting 121 days or more. It is a "vacancy" if the agency plans to fill the position, even if they originally intended to do so without posting a competitive announcement.

*10. What is my "local commuting area"?*

Your local commuting area is based on the duty station of your position of record when you receive your notice. Agencies determine the local commuting area for jobs they announce. It is the geographic area usually considered a single area for employment purposes. It includes any population center and the surrounding localities where people live and routinely travel back and forth daily to their jobs. You can only get selection priority for vacancies announced in your local commuting area.

*11. What does "well qualified" mean?*

"Well qualified" means that you:

- meet the qualification standards and eligibility requirements for the position, including any medical qualifications, suitability, and minimum educational and experience requirements;

- meet all selective factors;

- either meet quality ranking factor levels at the level set by the agency, or are rated above minimally qualified in accordance with the agency's specific rating and ranking process;

- are physically qualified, with reasonable accommodation where appropriate, to perform the essential duties of the position;

- meet any special qualifying condition(s) for the position (such as the ability to speak a specific language or other selective factor); and

- are able to satisfactorily perform the duties of the position upon entry.

If your agency finds that you are not well qualified, they must conduct a second review of your application and tell you the results in writing.

*12. Can "well qualified" vary between positions or agencies?*

---

OPM ·······················································    **Employee's Guide to Career Transition**

JA836

Yes.  Each position has its own qualification requirements, selective factors, knowledge, skill, ability and competency requirements.  Since each job is different, you should relate your background and experience directly to the position.

### 13.  Can I get priority for higher-graded positions?

No.  Selection priority only applies to vacancies at your same (or a lower) grade, and with no higher promotion potential than your current position.

You can still apply for jobs at higher grades or those with greater promotion potential, but you won't receive selection priority when you compete for those jobs.

### 14.  What about lower-graded jobs?

If you are thinking about applying for lower-graded jobs, you should ask your agency about its pay-setting policies.  They could offer the job at a lower salary than you had before.  Don't apply for a job you won't accept, because turning down any permanent offer may end your selection priority.

### 15.  Is my priority limited to certain job series?

No. You can apply for any position, but you only get selection priority if you are well qualified for the job.

### 16.  I'm not sure whether I'm well qualified for a particular position.  How can I find out?

You can probably tell by reviewing the requirements in the vacancy announcement and comparing them to your credentials.  If you are having trouble, ask your human resources office or career transition center for help in determining your qualifications.

### 17.  What happens if I decline a job offer?  Do I lose my eligibility?

Your agency may end your selection priority if you apply for a permanent vacancy and are selected, but decline the offer.  Check your agency's policies for specifics.  If you decline a temporary or term position, you keep your selection priority for permanent positions until you separate or your eligibility ends for some other reason.

### 18.  I am full-time, but I might apply for a part-time job.  What happens if I accept?

Accepting another position--even part-time--ends your eligibility for agency selection priority.  As we said before, don't apply for a job you won't accept because turning down a

---

permanent position will end your selection priority.

**19. If I take a temporary or term job, will I lose my CTAP eligibility?**

Yes.  Accepting another position, even time-limited, means you are no longer faced with RIF separation, so you no longer get agency selection priority.

**20. What if I accept a position outside the Federal Government?  Am I still eligible for selection priority?**

Your eligibility for CTAP selection priority in your agency ends when you separate, whether you leave involuntarily (such as by RIF) or voluntarily (such as by resignation). However, if you separated involuntarily, you might still have selection priority in other agencies (see Section 3 (C) of the Guide).

**21. What if I move?  Am I eligible for selection priority for agency vacancies in a different geographic area?**

No, not unless your agency's policy expands the area for CTAP priority.  You can still apply for jobs in your new location, but you will not receive selection priority for those jobs.

**22. My agency says I wasn't well qualified for a job.  I disagree.  Where can I go with my complaint?**

Each agency should have a problem resolution coordinator to handle these types of situations.  Ask your human resources office for the person or office to hear your grievance or complaint.

**23. I am not eligible for CTAP selection priority.  Is there are other assistance available to me?**

See Section 6 of this Guide for information on services that may be available to surplus or displaced employees.  All employees, including those in the competitive, excepted, and Senior Executive Service (SES), are eligible for some type of career transition assistance or services.

SES employees are eligible for placement assistance through a special SES placement program.  If you are an SES employee facing RIF separation, check with your agency human resources office for information about this program.

Agencies that do not follow OPM hiring procedures (this includes Postal Service, legislative and judicial branch agencies) are not required to provide career transition services to their

JA838

employees, but many still do.  Consult your human resources office for details.

## (B). Agency Reemployment Priority Lists (RPL)

Agencies must maintain a Reemployment Priority List (RPL) for competitive service employees facing RIF separation, those who have already been RIF'd, and employees recovered from work-related (compensable) injuries.

### 24.  What is a Reemployment Priority List (RPL)?

The RPL is a list agencies use to give reemployment priority to any career and career-conditional competitive service employees they separated by RIF or due to compensable injury.  Under OPM regulations, each agency must establish an RPL for each local commuting area where competitive service employees have either been RIF'd or have recovered from work-related injury.

### 25.  Can I get hiring preference in other agencies by getting on the RPL?

No.  The RPL only provides hiring priority for jobs in your current/former agency in the same local commuting area.  It does not give you priority for jobs in any other agency.   The ICTAP (see section 3(C) below) gives you selection priority for jobs in other agencies.

### 26.  When am I eligible for the RPL?  When does my eligibility expire?

You can register for your agency's RPL when you receive either a specific reduction in force separation notice or a Certificate of Expected Separation (CES).  You must have a rating of least a "minimally successful" or equivalent (Level II) for your current performance rating.

You can also register if you separated more than one year ago due to a work-related injury, you have fully recovered, and your worker's compensation benefits have ended.

The registration deadline is 30 calendar days after RIF separation, or 30 calendar days after worker's compensation benefits terminate.

Career (tenure group I) employees get two years of rehiring priority starting from the date your name is put on the agency RPL.  Career-conditional (tenure group II) employees get one year of priority.

Your eligibility also ends if you:

- ask the agency to remove your name from the RPL;



- receive a career, career-conditional, or excepted service appointment without time limit in any agency;

- decline a permanent job offer at your current or former grade;

- decline an interview;

- don't respond to an offer or an availability inquiry, or fail to appear for a scheduled interview; or

- separate for some other reason (such as retirement or resignation) before the RIF date.

### 27.  How do I apply for the RPL?

Ask your agency for an RPL application form.  You should specify the grade(s), occupation(s), minimum hours of work per week you would accept, and whether you are interested in temporary and/or term jobs.

You can register for as many positions as you like.  Your agency human resources specialist should help you determine which positions you qualify for and answer any questions you have about the RPL application.

### 28.  Am I limited to certain series or grades?

You can list any position on your application, but you only get priority for jobs you qualify for at the same (or lower) grade with no higher promotion potential than your current (or last) position.

If you are thinking about listing lower-graded jobs, you should ask your agency about its pay-setting policies.  They could offer a job at a lower salary than you had before.  Don't list a job you don't think you would accept because turning down a permanent offer could limit or terminate your RPL consideration, depending on the grade level and type of offer.

### 29.  When does the agency have to consider me through the RPL?

You get priority when your agency fills competitive service jobs from outside its workforce. This includes temporary and term positions if you indicated interest in time-limited jobs on your RPL application.

---

OPM ·········································································     Employee's Guide to Career Transition

JA840

If you qualify for the vacant job, your agency may not fill the position by:

- a new appointment (unless they appoint a veteran with at least 10-point hiring preference);

- transferring someone from another Federal agency; or

- reinstating a former Federal employee (unless they appoint someone with restoration or reemployment rights).

### *30. Can the agency fill positions without having to choose someone from the RPL?*

Yes, agencies may fill positions without considering RPL registrants under certain circumstances.  These situations include:

- selecting someone from the agency's current workforce;

- no qualified RPL registrants are available at the grade level of the position being filled; or

- filling the position through a 30-day special needs appointment, an appointment for persons with disabilities, or another excepted appointment.

## (C).   Selection Priority in Other Agencies (ICTAP)

### *31. Who is eligible?*

To receive selection priority in other agencies through the Interagency Career Transition Assistance Plan (ICTAP), your current or last position must be/have been career (tenure group I) or career-conditional (tenure group II) in the competitive service, and you must fall under one of these categories:

- *RIF*--you have been (or are being) involuntarily separated from an Executive branch agency through reduction in force;

- *Transfer of Function/Directed Reassignment*--you have been (or are being) separated under adverse action procedures because you declined a transfer of function or directed reassignment to another local commuting area;

- *Injury Compensation*--you were separated due to work-related injury, your worker's compensation benefits have stopped because you recovered, and your former agency is

---

unable to place you through its RPL (see Section 3 B of this Guide);

- *Disability Annuitant*--you retired with a disability and your annuity has been /will be terminated because OPM considers you recovered;

- *RIF--Retired*--you received a RIF separation notice and elected either optional retirement on the RIF effective date, or discontinued service retirement on or before the RIF date;

- *Military/National Guard Technician*--you were a Military Reserve or National Guard Technician and now receive a special OPM disability retirement annuity.

### 32. I am in one of the categories you just described. How do I get selection priority for vacancies in other agencies?

You must:

- have a current performance rating of at least "fully successful" (Level III) or equivalent*** ;

- occupy (or have been separated from) a position in the same local commuting area of the vacancy;

- apply for a specific vacancy at or below the grade level you are being (or have been) separated from that does not have greater promotion potential than your last position;

- meet the application deadline; and

- be found "well qualified" for the job.

 ***Note:  This requirement does not apply if you qualify for ICTAP due to injury compensation or disability annuity.

### 33. Who is not eligible for selection priority?

You are generally not eligible for selection priority if you are:

- in the excepted service (unless you are covered under a separate law that gave you ICTAP eligibility);

- downgraded or reassigned involuntarily, but not separated;

---

- in a different local commuting area from the vacancy;

- in a temporary or term position in the competitive service;

- in an agency that is not in the Executive branch;

- in an agency that does not follow OPM hiring procedures (this includes Postal Service, legislative and judicial branch agencies); or

- in the Senior Executive Service (SES).

### 34. If I took a buyout, am I eligible for selection priority?

Voluntary separation incentives, or buyouts, are given to employees who volunteer to leave the Federal service. Placement assistance is for employees who are involuntarily separated. So, if you retired or resigned with a buyout, you are not entitled to placement assistance. You can apply and compete for Federal jobs, but you would not receive selection priority-- and you might have to pay back the full buyout amount if reemployed.

### 35. When does my eligibility begin?

Your eligibility begins when you receive one of the following documents:

- a reduction in force (RIF) separation notice;

- a notice of proposed removal for declining a directed reassignment or transfer of function to another local commuting area;

- an OPM notice that your disability annuity has been (or will be) terminated;

- certification from your former agency that it cannot place you after your recovery from a compensable injury; or

- certification from the National Guard Bureau or Military Department that you are eligible for a disability retirement and will receive the special OPM annuity.

Whatever notice you receive is your proof of eligibility for ICTAP priority.

### 36. When does my eligibility expire?

---

OPM ·······························································    Employee's Guide to Career Transition

Your ICTAP eligibility expires:

- one year after your RIF separation;

- one year after your agency separates you for declining a directed reassignment or transfer of function to another local commuting area;

- one year after your agency certifies that they cannot place you after your recovery from a compensable injury;

- one year after you are notified that your disability annuity has been or is being terminated;

- when you receive a career, career-conditional, or excepted service position without time limit in any agency;

- when your agency cancels or rescinds your RIF or removal notice;

- if you move to another position, time-limited or permanent, before the RIF date;

- if you separate by resignation or non-discontinued service retirement before the RIF effective date; or

- with a specific agency, if you decline a permanent offer from that agency.

### 37. What are the steps in the process?

When an agency plans to hire an outside candidate, they must post the vacancy on OPM's USAJOBS systems.  The announcement will contain all requirements well qualified candidates must possess--selective factors, qualifications, education, knowledge, skills, abilities, and competencies.  See the last section of this Guide for information on how to access USAJOBS.

*Step One: Application*

If you are eligible, you request ICTAP selection priority by:

1. applying for a vacancy in the local commuting area; and

2. attaching proof of eligibility (your RIF separation notice, notice of proposed removal for failure to relocate, notice of disability annuity termination, an SF-50--Notification of

---

Personnel Action--documenting RIF separation, agency certification of inability to place you through the RPL, etc.).  Make sure you attach any other documentation requested by the agency in the vacancy announcement.

*Step Two: Qualifications Review*

The agency reviews your application, comparing your background to the required qualifications, selective factors, knowledge, skills, abilities, and competencies to determine if you are well qualified for the job.  They must include their definition of "well qualified" on vacancy announcements so you know the criteria they are using.

If the agency finds that you are not well qualified, they must conduct a second review of your application and tell you the results in writing.

*Step Three:  Selection*

The agency must first select its own surplus or displaced employees under its Career Transition Assistance Plan (CTAP).  If there are no well-qualified CTAP eligibles, the agency may fill the job from within its current workforce or select an employee from its Reemployment Priority List (RPL).

After the agency clears its CTAP and RPL, they must consider ICTAP candidates before selecting most other outside candidates.  If the agency finds you well qualified for the vacancy, in most cases they must select you before hiring another applicant from outside the agency.

At any time during the recruitment process, the agency may choose not to fill the vacancy, or to select one of its own employees.

If two or more well-qualified ICTAP applicants request selection priority, the agency may choose among them.

If no well-qualified ICTAP eligibles apply, the agency is free to fill the position through other means.

### 38.  Do I get priority for every Federal job?

No, there are some exceptions.  Under ICTAP, you may request selection priority for vacancies that are:

- in the local commuting area;

---

- in any Executive Branch agency (Note: the Postal Service, courts, etc., are NOT Executive Branch agencies);

- at or below your current (or last) grade level, with no greater promotion potential than the position from which you were (or are being) separated;  and

- being filled from outside the agency's workforce.

### 39.  When can an agency fill a position without having to select an ICTAP eligible?

Well-qualified ICTAP eligibles have priority over most other candidates from outside the agency.  Agencies must give ICTAP eligibles priority before filling a competitive service position through competitive examining, noncompetitive appointment, transfer, or reinstatement.

There are situations where agencies can fill positions without selecting a well-qualified ICTAP eligible.  These exceptions include: vacancies lasting less than 121 days; reemployment of former agency employees with reemployment rights; employees moved due to formal reorganization or transfer of function; selection of internal agency employees; appointments of veterans with 10 point or greater hiring preference; and conversions of specific excepted appointments.

### 40.  What does "local commuting area" mean?

Local commuting area is defined in the CTAP section of this Guide (section 3 (A), Question 10).

### 41.  What does "well qualified" mean?

"Well qualified" is defined in the CTAP section of this Guide (section 3 (A), Question 11).

### 42.  Can I get priority for higher graded positions?

No.  Selection priority applies only to vacancies at your same (or lower) grade and with no greater promotion potential than your current or last position.

You can apply for jobs at higher grades or with greater promotion potential, but you won't receive selection priority when you compete for those jobs.

### 43.  What about lower-graded jobs?

---

OPM ························································································    Employee's Guide to Career Transition

20

JA846

If you are thinking about applying for lower-graded jobs, you should ask the agency about its pay-setting policies. They could offer the job at a lower salary than you had before. Don't apply for a job you won't accept, because turning down any permanent offer may end your right to selection priority, at least with that agency.

### 44. Is my priority limited to certain job series?

No. You can apply for any position, but you only get selection priority if you are well qualified for the job.

### 45. I'm full-time, but I might apply for a part-time job. What happens if I accept?

Accepting any permanent position--even part-time--ends your selection priority. As we said before, don't apply for a job you won't accept because turning down any permanent offer may end your selection priority with that agency.

### 46. If I take a temporary or term job, do I lose my selection priority?

It may depend on when you accept the position. If you receive a separation notice, but accept a temporary or term job before the involuntary separation occurs, your selection priority ends because you are no longer being involuntarily separated. However, if you accept a temporary or term job after your involuntary separation, you still have selection priority for permanent jobs. If you receive a career, career-conditional, or excepted appointment without time limit in any agency, your selection priority ends. Before accepting any employment offer, permanent or time-limited, you should check with a human resources specialist about the effect it would have on your eligibility.

### 47. What if I accept a position outside of the Federal Government? Am I still eligible for selection priority?

If you resign or retire before RIF or other involuntary separation, you lose your ICTAP eligibility. Otherwise, accepting employment outside the Federal Government after involuntary separation does not affect your ICTAP eligibility. You can continue to request ICTAP priority when applying for Federal jobs for one year after your separation, or until you accept a permanent Federal position, whichever comes first.

### 48. What if I move? Am I eligible for selection priority for Federal vacancies in a different geographic area?

No, ICTAP selection priority only applies in the local commuting area from which you were (or are being) separated. You can apply for jobs in your new location, but you will not receive selection priority for them.

---

**49.  I applied for a job, but the agency says I am not well qualified for it.  I disagree.  Where can I go with my complaint?**

Each agency should have a problem resolution coordinator to handle these types of situations.  Ask the human resources office for the person or office to hear your grievance or complaint.

**50.  I'm not eligible for ICTAP selection priority.  Is there are other assistance available to me?**

See Section 6 of this Guide for information on services that may be available to surplus or displaced employees.  All employees, including those in the competitive, excepted, and Senior Executive Service (SES), are eligible to receive some type of career transition assistance or services.

SES employees are eligible for placement assistance through a special SES placement program.  If you are an SES employee facing RIF separation, check with your agency human resources office for more information about this program.

Agencies that do not follow OPM hiring procedures (this includes Postal Service, legislative and judicial branch agencies) are not required to provide career transition services to their employees, but many still do.  Consult your human resources office for details.


# (4). Reemployment after Disability or Injury

## (A). Reemployment after Recovery from Job-Related Injury

Career or career-conditional competitive service employees who left the Government due to job-related illness or injury, were eligible for Workers' Compensation benefits (OWCP), and recovered within one year, are eligible for immediate restoration to their former agency.  You should contact your former agency's human resources office to request restoration.

If it has been more than one year since you left with OWCP benefits, you may be eligible for your former agency's Reemployment Priority List (RPL).  You must apply for the RPL within 30 days of the date your workers' compensation benefits end.  If your agency is unable to place you in your former job or local commuting area, you may be entitled to broader consideration for other jobs and/or locations.

For general information on the RPL, read section 3(B) of this Guide.

If your former agency is unable to place you through their RPL (for example, the types of jobs you are qualified to do no longer exist in the agency), you may be eligible for ICTAP selection priority.  This will allow you to request priority for jobs in other agencies in the local commuting area you were in when you separated.  You must ask your former agency to certify that they cannot place you through the RPL.  This certification is your proof of ICTAP eligibility and you must submit it with all job applications.  Your ICTAP eligibility ends one year from the date of the agency's certification.  You are not required to include your current or last performance appraisal.  For more information on ICTAP, see section 3(C) of this Guide.

## (B). Reemployment after Termination of Disability Annuity

Former employees who retired with a disability may lose their annuity if they exceed earnings limitations or have medically recovered.  If OPM's Retirement Office notifies you that your annuity has been or will be terminated, you should first check with your former agency to see if they can re-employ you.  You can also request ICTAP selection priority for jobs in agencies other than your former agency if you retired as a career or career-conditional employee in the competitive service.  Your ICTAP priority is limited to jobs in the local commuting area you were in when you separated.  Your annuity termination notice from OPM is your proof of ICTAP eligibility and you must submit a copy of it with all job applications.  Your ICTAP eligibility ends one year from the date of the notification.  You are not required to include your current or last performance appraisal.  For more information on ICTAP, including eligibility requirements, see section 3(C) of this Guide.

## (C). Former Military Reserve/National Guard Technicians Receiving Special Disability Annuity

Career or career-conditional competitive service employees receiving a special disability annuity from OPM as a former Military Reserve Technician or National Guard Technician are eligible for ICTAP selection priority.  This allows you to apply for jobs in other agencies besides your former agency in the local commuting area you were in when you separated.  The special disability annuity notice is your proof of ICTAP eligibility and you must submit a copy of it with all job applications.  Unlike other ICTAP eligibles, your selection priority does not have a one-year time limit.  You need not include the current or last performance appraisal required for other ICTAP candidates.  For more information on ICTAP, see section 3(C) of this Guide.

## (5). Veterans in Certain Positions

Preference eligible veterans displaced from "restricted" Federal positions due to "A-76 contracting out" (outsourcing under Office of Management and Budget Circular A-76



OPM                                                                                    Employee's Guide to Career Transition

JA849

procedures), may be eligible for selection priority under ICTAP.  "Restricted" positions include
Custodians, Elevator Operators, Guards, and Messengers.  Specific regulations covering these
veterans are in title 5, Code of Federal Regulations, Part 330, Subpart D.  The Code of Federal
Regulations is available through the Government Printing Office web site at
http://www.ecfr.gov.

This ICTAP eligibility lasts two years from the date of the separation.  All other ICTAP
provisions are the same.  For more information on ICTAP, read section 3(C) of this Guide.


# (6). Career Transition Services

### 51. What types of services are available to me to help me find another job?

Ask your agency what services it offers.  Depending on employees' needs and budget
constraints, agency services will vary.  Some examples of career transition services include:
skills assessment, resume and cover letter preparation, networking and interviewing
techniques, counseling, job search assistance, and retraining (if necessary).

### 52.  When am I eligible to use agency career transition services?  When does this eligibility expire?

Career transition services are available to surplus or displaced employees.  You can use these
services until separation.  Some agencies also provide services after separation.

### 53.  How will these services help me find another job, including employment in the private sector?

Career transition services can be valuable.  Agency services can help you develop or improve
your resume--the most widely used tool in both public and private sector employment.  They
can help you locate job opportunities through State and local government employment
information services.  Agencies can also help you practice interviewing techniques and
conduct skills assessments to help identify occupations best suited to your talents.

### 54.  Besides my agency, are there other services available to me?

You can visit DOL's link to state employment and retraining services at:
www.careeronestop.org.   This page provides a link to resources established
under the Workforce Investment Act of 1998 including re-training, career counseling, and other
local, state-run services available to you.

---

JA850

# (7). Job Information

### 55. *How do I find out about other Federal vacancies?*

Job seekers can find out about Federal career opportunities on USAJOBS at **www.USAJOBS.gov**

**USAJOBS** provides Federal employment information and access to current job opportunities across the world each day.  On the site, you can search and apply for jobs, create saved search notifications and check the status of your recently submitted job applications.  The USAJOBS Help Center provides information on Federal employment, unique hiring paths, and how to apply for Federal positions.  The USAJOBS Resume Builder will help you to create online resumes specifically designed for Federal jobs.

### 56. *How do I find out about vacancies in State and local Governments or the private sector?*

Your agency's career transition center will have information on local job information networks which can help you locate employment in your particular area.

For more information on training or retraining opportunities, contact your local State employment services department and ask about training/retraining possibilities under the Workforce Investment Act of 1998.  The U.S. Department of Labor administers a dislocated worker program to assist laid off workers who are unlikely to return to their previous industry or occupation.  The dislocated worker program authorizes a wide range of services to help individuals obtain meaningful re-employment.  These services may include assessments of skills and interests, job development, counseling, job search assistance, career exploration, and occupational skills retraining, like computer training. States and local substate grantees decide on the particular mix and availability of services. The program is funded by U.S. Department of Labor, Employment & Training Administration.  The web site address is  www.doleta.gov.

JA851

# (8). Glossary of Terms

*An agency that does not follow OPM hiring procedures*:  Any agency exempt from title 5, United States Code, the law covering certain government organizations and employees.  This includes legislative and judicial branch agencies as well as the Federal Aviation Administration, U.S. Postal Service, General Accounting Office, Tennessee Valley Authority, Federal Bureau of Investigation, Central Intelligence Agency, State Department's Foreign Service, Federal Reserve System-related agencies, and others.

*Agency component*:  The first major subdivision of the agency, separately organized and clearly distinguished from other components in work function and operation.  An example of a component might be the National Park Service within the Department of the Interior.  Each agency decides what is or is not a "component" within their particular agency organizational structure.

*Competitive Service*:  Executive branch positions covered by civil service merit system laws.  These jobs are normally filled through an open competitive civil service examination (but this does not necessarily mean taking a test). You should be able to tell from your Standard Form 50 (Notification of Personnel Action), block 34, if your position was/is in the competitive service.

*Displaced Employee*:  See question 3 (section 3(A)).

*Excepted Service*:  Civil service positions specifically excluded from the competitive service by law, executive order, or OPM action.  These jobs are usually not covered by the same hiring/appointment, pay, and classification rules as competitive service jobs.  Excepted service positions include attorneys, most security/intelligence positions, and most student appointments.

OPM ................................................................................    Employee's Guide to Career Transition

26

JA852

*Executive Branch*:  Agencies under the direct authority of the President of the United States. These include Cabinet level agencies such as the Departments of Defense, Justice, Transportation, Energy, Education, Health and Human Services, Agriculture, Interior, etc., and smaller agencies such as the Office of Personnel Management,  National Aeronautics and Space Administration, Small Business Administration, etc.  The Senate, House of Representatives and the Library of Congress are part of the Legislative Branch, and all U.S. courts are part of the Judicial Branch.

*Local Commuting Area*:  See question 10 (section 3(A)).

*Promotion Potential*:  Also sometimes called a "career ladder."  This is the highest grade or level of work established for a position.  A person selected for a GS-5 position with promotion potential to the GS-12 can be promoted to each intervening grade level from GS-5 to GS-12 as his/her knowledge and experience increases without competing with others.  The position description and job announcement should indicate the position's promotion potential, if any.

*Surplus Employee*:  See question 2 (section 3(A)).

*Ten point veterans' preference eligible*: Applicants can receive extra points (preference) in hiring if their armed forces service meets certain requirements.  Only veterans with a service-connected disability (and the widows, mothers or spouses of certain deceased or disabled veterans) are generally eligible for 10 point veterans' preference.

*Vacancy*:  See question 9 (section 3(A)).

*Well-Qualified*:  See question 11 (section 3(A)).

OPM ............................................................................................    **Employee's Guide to Career Transition**

27

JA853



**U.S. Office of Personnel Management**

Employee Services

1900 E Street, NW, Washington, DC 20415

**OPM**.GOV

ES/SWP-02803-03-17

JA854

**Position Title**
Government Information Specialist
Policy Analyst (Consumer Protection)
Examination Spec (Comp Tech Analyst)
Supervisory Examiner, Field Manager
Examiner
Investigator (Consumer Outreach)
Examiner
Facility Operations Specialist
Operations Specialist
Examiner
Attorney-Adviser
Examiner
Senior Advisor
HR Specialist (Performance Management)
Sct Chf, Disability & Access. Prgm
IT Specialist (APPSW)
Supervisory Administrative Officer
Supervisory Administrative Officer
Supervisory Administrative Officer
Information Tech Specialist (Information Security)
Commissioned Compliance Examiner
Program Manager
IT Specialist
Supvy HR Spec (Stff, Clss, Int Plcmnt)
Management and Program Analyst
Mgmt & Program Analyst (Info Systems)
Examiner
Examiner
Examiner
Examiner
Human Resource Specialist(Recruitment)
Examiner
Management & Program Analyst
Examiner
Examiner
Examiner
Examiner
Executive Assistant
Reasonable Accommodation Prog Manager
Supervisory Mgmt. and Program Analyst

JA855

Consumer Experience Program Manager
Operations Analyst
Supervision Policy Analyst
Examiner
Examiner
IT Specialist (INFOSEC)
Senior Business Consultant
Examiner
Management and Program Analyst
Administrative Officer
Operations Analyst
Examiner
Information Technology Specialist (DATAMGT)
Attorney Advisor
Staff Dir, Stakeholder Management
Examiner
Program Dir, (Supv Learning & Devel)
Supervision Qual Mgmt Prog Team Lead
Senior Advisor for Complaint Policy
Finance and Policy Analyst
Mgmt & Program Analyst (Info Systems)
Examiner
Examiner
Attorney-Adviser (General)
Examiner
Examiner
Sr Advisor to the CEE Dep Assc Dir.
Economist
IT Specialist (INET)
Paperwork Reduction Act Officer
Suprvsry IT Specialist (Info Security)
Examiner
Supervisory Examiner, Field Manager
Prgm Dir (Supervision Mgmt Strategy)
Attorney-Adviser (General)
Examiner
Supervisory Attorney Advisor
Examiner
Administrative Officer
Examiner
Examiner

Senior eLaw Litigation Support Specialist
Contracting Officer's Representative
Senior eLaw Litigation Support Specialist
Outreach and Engagement Associate
Commissioned Compliance Examiner
Examiner
Examiner
Commissioned Compliance Examiner
Supervisory Examiner
Senior Advisor (DEIA)
IT Project Manager
Consumer Financial Protection Analyst
Supervisory Examiner, Field Manager
Information Technology Specialist (Applications Software)
Examiner
Examiner
Training Specialist
Senior Investigator
Supervisory Examiner, Field Manager
Supervisory Manag. and Prog. Analyst
Commissioned Compliance Examiner
Examiner
Commissioned Compliance Examiner
Office Operations Assistant
Senior Quality Assurance Monitor
IT Specialist (Information Security)
Consumer Response Specialist
IT Specialist (NETWORK)
Operations Analyst
IT Specialist (INFOSEC)
IT Specialist (INFOSEC)
Human Resource Specialist(Recruitment)
Instructional Systems Designer
Consumer Response Specialist
Physical Security Specialist
Management and Program Analyst
Policy Analyst and Outreach Specialist
Travel Specialist
HR Specialist (Labor Relations)
Examiner
Examination Spec (Comp Tech Analyst)

Management and Program Analyst

Supervisory Public Affairs Specialist

Supervisory IT Specialist

Operations Program Analyst

Examiner

Public Affairs Specialist

Administrative Operations Assistant

Program Administration Lead

Examination Spec (Comp Tech Analyst)

Complaint Process QA Mgr

Quality Monitor (Stakeholder Services)

Management and Program Analyst

Attorney-Advisor (General)

Examiner

Supervisory Examiner, Field Manager

HR Specialist (Compensation)

Attorney-Advisor (General)

Attorney-Adviser

Deputy Assistant Director, Office of Procurement

Consumer Financial Protection Analyst

Consumer Financial Protection Analyst

Examiner

Commissioned Compliance Examiner

Attorney-Adviser (General)

Examiner

Examiner

Attorney-Adviser (General)

Examiner

Examiner

Examiner

Examiner

Examiner

Attorney-Advisor (General)

Management & Program Analyst (Examinations)

Attorney-Advisor (General)

Examiner

Supervisory Attorney Adviser

Attorney-Advisor (Senior EEO Advisor)

Contracting Officer's Representative

Policy Analyst

Deputy Chief Financial Officer

Supervisory Attorney-Adviser
Program Manager (Quality)
Attorney-Advisor (General)
Program Manager (Quality)
Information Technology Specialist (DATAMGT)
Examiner
Quality Monitor (Stakeholder Services)
Examiner
Sup Examiner, Asst. Regional Dir
Statistician
HR Specialist (Compensation)
Sup Examiner, Asst. Regional Dir
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Financial Analyst
Examiner
Commissioned Compliance Examiner
Operations Analyst
Attorney-Adviser
Administrative Specialist
Attorney-Adviser
Consumer Experience Program Manager
Supervisory Administrative Officer
Deputy Chief of Staff
Reg Implementation&Guidance Prog Anal
Outreach and Engagement Associate
Financial Analyst
Finance and Policy Analyst
Older Americans Project Support and Impact Specialist
Finance and Policy Analyst
Older Americans Policy Analyst
Finance and Policy Analyst
Attorney-Adviser
Finance and Policy Analyst
Deputy Executive Secretary
Supervisory Examiner, Field Manager
Supervisory Attorney-Adviser (General)
Attorney-Adviser
Quality Monitor (Stakeholder Services)
Business Product Manager
Executive Assistant

Examiner
Examiner
IT Specialist (INET)
Management and Program Analyst
Reasonable Accommodation Program Coord
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Deputy Chief Administrative Officer
Realty Officer
Supervisory Examiner, Field Manager
Management and Program Analyst
Policy Analyst
Travel Specialist
Strategic Planning Manager
Sup Mngmnt and Program Analyst
Associate Executive Secretariat
Travel Specialist
Operations Analyst
Consumer Financial Protection Analyst
Supervisory IT Specialist (Data MGT)
Senior Advisor
Management and Program Analyst
Consumer Educ & Engagement Prog Adv
Attorney - Adviser (General)
Consumer Financial Protection Analyst
Supervisory Examiner, Field Manager
Examiner
Supervisory Examiner
Administrative Operations Ass.
Operations Assistant
Supervisory IT Specialist
Economist
Attorney-Advisor (General)
Management and Program Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Acquisition Support Specialist
Program Analyst
Attorney-Adviser
Cnsmr Fin Prtctn Analyst (Regsrt)

Attorney-Advisor (General)
Economist
Attorney-Advisor (General)
Economist
Examiner
Economist
Economist
Examiner
Attorney-Advisor (General)
Outreach Specialist
Attorney-Advisor
Senior Program Manager (Markets)
Policy Analyst
Consumer Financial Protection Analyst
Administrative Operations Assistant
Economist
Senior Business Consultant
Attorney-Advisor (General)
Policy Analyst (Stakeholder Engage.)
Attorney-Advisor (General)
Attorney-Adviser
Attorney-Advisor (General)
Interdisciplinary Economist
Attorney-Adviser
Attorney-Advisor (General)
Attorney-Adviser
Financial Analyst
Attorney-Adviser
Supervisory Attorney-Adviser
Consumer Financial Protection Analyst
Attorney-Adviser
Supervisory Attorney-Adviser (General)
Attorney-Advisor (General)
Economist
Attorney-Adviser
Supervisory Attorney-Adviser
Attorney-Adviser
Interdisciplinary Economist
Cnsmr Fin Prtctn Analyst (Regsrt)
Economist
Consumer Financial Protection Analyst

Program Director for Operations
Economist
Attorney-Adviser
Consumer Financial Protection Analyst
HR Specialist (Labor Relations)
Senior Business Consultant
Attorney-Advisor (General)
Supervisory Examiner, Field Manager
Information Technology Specialist (INET)
Attorney-Advisor (General)
Supervisory Examiner
Attorney-Advisor (General)
Attorney-Advisor (General)
Multimedia and Visual Design Specialist
ITSPEC (INFOSEC)
IT Specialist (INET)
IT Specialist (INET)
Contracting Officer's Representative
Examiner
Examiner
Examiner
Examiner
Administrative Specialist
Examiner
Attorney-Advisor (General)
Training Specialist
Attorney-Advisor (General)
Supervisory Examiner, Field Manager
Attorney-Advisor (General)
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Attorney-Adviser (General)
IT Specialist (INET)
Senior Business Consultant
Program Manager for Strat Initiatives
Supervisory Examiner, Field Manager
Sup Mngmnt and Program Analyst
Strategic Ops & Product Mngmnt Advsr
Program Analyst
Program Analyst
IT  Specialist (APPSW)

Attorney-Adviser (General)
Attorney-Adviser (General)
Consumer Response Spec (Investigation)
Attorney-Adviser (General)
Attorney-Advisor (General)
Supervisory Examiner
Attorney-Advisor (General)
Contracting Officer's Representative
Attorney-Adviser (General)
Supervisory Examiner
Attorney Advsr (Enforcement Attorney)
IT Specialist (INET)
Supervisory Examiner, Field Manager
IT Specialist (INET)
Examiner
IT Specialist (INET)
Examiner
IT Specialist
Commissioned Compliance Examiner
IT Specialist
Commissioned Compliance Examiner
Information Technology Specialist (Applications Software)
IT  Specialist (INET)
Consumer Financial Protection Analyst
Attorney-Adviser
Supervisory Examiner, Field Manager
Sup Attorney-Adviser (Gen)
Sup Attorney-Adviser (Gen)
Sup Attorney-Adviser (Gen)
HR Specialist (Employee Benefits)
Sup Attorney-Adviser (Gen)
IT Specialist (APPSW)
Supervisory Attorney-Adviser (General)
Operations Support Assistant
Supervisory IT Specialist (APPSW)
Sup Attorney-Adviser (Gen)
IT Specialist (DATAMGT)
IT Specialist (APPSW)
Sup Attorney-Adviser (Gen)
Examiner
Sup Attorney-Adviser (Gen)

IT  Specialist (APPSW)
Policy Analyst
Regional Office Operations Analyst
Regional Office Operations Analyst
Regional Office Operations Analyst
Management and Program Analyst
Sup Learning & Dvlpmnt Prgrm Spec
Supervisory Visual Info Specialist
Supervisory, IT Specialist
IT Specialist (INFOSEC)
Outreach and Engagement Specialist
Supervisory IT Specialist (Internet)
Operations Analyst
Management & Program Analyst
IT Specialist
Human Resources Specialist (Human Resources Development)
Personnel Psychologist
IT Specialist (CUSTSPT)
Com Affairs Program Spec
Supervisory IT Specialist
Examiner
Examiner
Examiner
Supervisory IT Specialist
Examiner
IT Specialist (APPSW)
Examiner
Examiner
IT  Specialist (INFOSEC)
Supervisory IT Specialist
Commissioned Compliance Examiner
Examiner
Examiner
Examiner
Supervisory IT Specialist (INFOSEC)
IT Specialist (INFOSEC)
Examiner
Examiner
IT  Specialist (APPSW)
IT Specialist (Information Security)
IT Program Manager

IT Specialist (APPSW)

Examiner

Supervisory IT Specialist

Examiner

Examiner

IT Specialist (APPSW)

Examiner

IT Specialist (APPSW)

Supervisory Administrative Officer

Supervisory Administrative Officer

Supervisory IT Specialist

Supervisory Administrative Officer

Supervisory IT Specialist

Supervisory Administrative Officer

Examiner

Economist

Supervisory IT Specialist (INFOSEC)

Sen Human Resources Spec

Examiner

Operations Program Analyst

Senior Policy Analyst

Sr Outreach and Engagement Specialist

Examiner

Examiner

Operations Program Analyst

Public Affairs Specialist

Content Strategist

Content Associate

Staff Director, Digital Communications

Operations Specialist

Examiner

Deputy Associate Dir, External Affairs

Training Specialist

Public Affairs Specialist

Senior Policy Analyst

Operations Program Analyst

Program Analyst

Attorney-Adviser (General)

Supervisory Attorney-Advisor

Examiner

Examiner

Examiner
Operations Program Analyst
IT Specialist (INFOSEC)
IT Specialist (INFOSEC)
Community Affairs Outreach Specialist
Community Affairs Outreach Specialist
Examiner
Examiner
Paralegal Specialist
Mgmt. & Prog. Analyst (Enforcement)
IT Specialist (INFOSEC)
Management & Program Analyst
Management & Program Analyst
Examiner
Human Resources Specialist
HR Specialist (Student Programs)
Attorney-Adviser (General)
Attorney Advisor (Enforcement Attorney)
Consumer Financial Protection Analyst
Examiner
Examiner
Commissioned Compliance Examiner
Consumer Financial Protection Analyst
Attorney-Adviser (General)
IT Specialist (INFOSEC)
Sup Examiner, Asst. Regional Dir
Examiner
Training Specialist
Examiner
Examiner
Examiner
Sup Examiner, Asst. Regional Dir
Examiner
Administrative Specialist
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Sup Examiner, Asst. Regional Dir
Examiner
Commissioned Compliance Examiner
Supervisory IT Specialist (INFOSEC)

Examiner
Government Information Specialist
Interdisciplinary Economist
Attorney-Adviser
Operations Support Assistant
Attorney-Adviser
Program Analyst
Government Information Specialist
Examiner
Sup Examiner, Asst. Regional Dir
Examiner
Government Information Specialist
Examiner
Examiner
Attorney-Adviser
Commissioned Compliance Examiner
Examiner
Administrative Officer
IT Specialist (APPSW)
Acquisition Support Specialist
Records and Info Management Spec
IT Specialist (DATAMGT)
IT Specialist (DATAMGT)
Attorney-Advisor
Compliance Investigator
Records and Info Management Spec
Examiner
Supervisory Attorney-Adviser
Examiner
Supervisory Attorney Adviser
Examiner
Government Information Specialist
Cons Financial Protection Comp Analyst
Senior eLaw Litigation Support Specialist
Deputy Chief Information Officer
Examiner
Examiner
Talent Development Manager
Examiner
Management and Program Analyst
Examiner

Talent Management Program Manager
Commissioned Compliance Examiner
Chief, Int Communications Strategy
Sr Emp Comm & Change Mgmt Specialist
Public Affairs Specialist
Sup Examiner, Asst. Regional Dir
Senior Operations Analyst
Attorney-Adviser
Senior Operations Analyst
Consumer Financial Protection Analyst
Examiner
Supervisory Examiner, Field Manager
Commissioned Compliance Examiner
Examiner
Commissioned Compliance Examiner
Commissioned Compliance Examiner
IT Specialist (DATAMGT)
Examiner
IT Specialist (DATAMGT)
Commissioned Compliance Examiner
Program Analyst (Data Analytics)
IT Specialist
Examiner
IT Specialist (Data Management)
Supervisory Examiner, Field Manager
Sr Advsr to the Dpty Chf Oprting Offcr
Sr Advisor - Chief Operating Officer
Operations Specialist
Administrative Operations Assistant
Chief of Litigation Technology
Senior eLaw Litigation Support Specialist
Examiner
Examiner
Supervisory Examiner
HR Specialist (Emp Benf & WorkLife)
Human Resources Specialist (Benefits and Retirement)
Human Resources Specialist (Benefits and Retirement)
Examiner
Supervisory Examiner, Field Manager
Supervisory Examiner
Ombudsman Analyst

Deputy Ombudsman
Associate Ombudsman
Government Information Specialist
IT Specialist (OS)
Supervisory Government Info Specialist
Human Resources Specialist (Work/Life Programs)
IT Specialist
Examiner
Examiner
IT Specialist (INFOSEC)
Examiner
Examiner
Senior Financial Program Specialist
Examiner
Government Information Specialist
Paralegal Specialist
Examiner
Paralegal Specialist
Examiner
Examiner
Commissioned Compliance Examiner
Examiner
Examiner
Government Information Specialist
Paralegal Specialist
IT Project Manager
Attorney-Advisor
Attorney-Advisor
Examiner
Assistant Director, Community Affairs
Senior Advisor
Executive Assistant
Supervisory Examiner, Field Manager
Senior eLaw Litigation Support Specialist
Supervisory Examiner, Field Manager
Senior eLaw Litigation Support Specialist
Contract Specialist
Contract Specialist
Facilities Quality Assurance Specialist
Supervisory Investigator
Supervisory Investigator

Senior Investigator

Sup Examiner, Asst. Regional Dir

Senior Investigator

Sup Examiner, Asst. Regional Dir

Senior Investigator

Senior Investigator

Senior Investigator

Investigator (Consumer Outreach)

Auditor

Auditor

Senior Investigator

Investigator (Consumer Outreach)

Supervisory Examiner, Field Manager

Events Management Lead

Diversity & Inclusion Program Analyst

Diversity & Inclusion Program Analyst

Snr Diversity & Inclusion Pgrm Analyst

Diversity and Inclusion Program Analyst

Attorney-Adviser (General)

Information Technology Specialist (Applications Software)

Information Technology Specialist (Applications Software)

Senior Outreach & Engagement Spec.

Information Technology Specialist (Applications Software)

IT Specialist (APPSW)

IT Specialist (APPSW)

IT Specialist (APPSW)

IT Specialist (APPSW)

IT Specialist (APPSW)

IT Specialist (APPSW)

Engagement and Outreach Specialist

Information Technology Specialist (Applications Software)

Examiner

Sprvsr IT Spclst Plcy Plning Inf Scrty

Attorney-Adviser (EEO)

Attorney Advsr (Enforcement Attorney)

Attorney Advsr (Enforcement Attorney)

Attorney Advsr (Enforcement Attorney)

Attorney Advsr (Enforcement Attorney)

Consumer Response Investigations Team Lead

Dir of Strat, Arch, Governance, and Op

Supervisory Economist

Supervisory Economist
Contract Specialist
Contract Specialist
IT Specialist
IT Specialist
Program Analyst
Supvy HR Specialist (Labor Relations)
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Sr Program Manager (Complaint Policy)
Financial Education Content Specialist
Supervisory Manag and Program Analyst
Financial Well-Being Program Specialist
Staff Director
Financial Ed Program Mgr (Pub & Dis)
Sr. PM for CCO & Stakeholder Services
Senior Financial Education Content Specialist
Senior Policy Analyst, Consumer Resp
Senior Advisor, EEO Data and Programs
Supervisory IT Specialist (DATAMGMT)
Supervisory Government Info Specialist
Attorney-Adviser (General)
Events Management Specialist
Senior Product Mgmt Specialist
Supervisory Attorney Advisor
Supervisory Attorney Advisor
Project Manager
Paralegal Specialist
CFP  Analyst (Regulations)
Management and Program Analyst
Attorney-Adviser (General)
Attorney-Adviser (General)
Economist
Economist
Economist
Economist
Economist
Events Management Specialist

Paralegal Specialist
Supervisory Economist
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Administrative Officer
Examiner
Examiner
Examiner
Examiner
Commissioned Compliance Examiner
Administrative Operations Assistant
Stakeholder Support Team Lead
Examiner
Supervisory Administrative Officer
Examiner
Management and Program Analyst
Management and Program Analyst
Supervisory Examiner, Field Manager
Project Delivery Manager
Operations Analyst
Supervisory Budget Analyst
Consumer Financial Protection Analyst
Consumer Financial Protection Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Executive Assistant
Events Management Specialist
Management and Program Analyst
Management and Program Analyst
Management and Program Analyst
Data Quality Analyst

Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Attorney-Adviser (General)
Deputy Assistant Director, OMWI
Management and Program Analyst
Director, Travel and Relocation
Senior Reporting Analyst
Paralegal Specialist
Business Process Analyst
Senior Advisor to the Assoc Dir, RMR
Director Regional Examining
Director Regional Examining
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Examiner
Data Management Business Architect
Senior Congressional Liaison
Attorney-Adviser
Attorney-Adviser
HR Specialist (Staffing Spec)

HR Specialist (Staffing Spec)
Attorney Advisor (Enforcement Attorney)
Attorney Advisor (Enforcement Attorney)
Attorney Advisor (Enforcement Attorney)
Attorney Advisor (Enforcement Attorney)
Attorney Advisor (Enforcement Attorney)
Attorney Advisor (Enforcement Attorney)
Attorney Advisor (Enforcement Attorney)
Compliance Analyst
Interdisciplinary Research Psychologist
Attorney-Advisor
Attorney-Advisor
Attorney-Advisor
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Adviser
Attorney-Advisor
Attorney-Advisor
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Economist
Economist
Interdisciplinary Social Scientist
Paralegal Specialist
Paralegal Specialist

Paralegal Specialist
CFP Analyst (Enforcement)
Attorney-Adviser (General)
Attorney-Advisor
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Advisor
Attorney-Advisor
Attorney-Advisor
Attorney-Advisor
Attorney-Advisor
Attorney Advisor(Enforcement Attorney)
Interdisciplinary Economist
Interdisciplinary Economist
Consumer Fin. Protn. Analyst (Enforce)
Consumer Fin. Protn. Analyst (Enforce)
Consumer Fin. Protn. Analyst (Enforce)
Consumer Fin. Protn. Analyst (Enforce)
Supervisory Economist
Paralegal Specialist
Paralegal Specialist
Management and Program Analyst
Management and Program Analyst
Economist
Economist
Senior Customer Experience Strategist
Senior Customer Experience Strategist
Senior Company Monitoring Analyst
Senior Advisor
Senior Advisor
Senior Advisor
Attorney-Advisor
Attorney-Advisor (General)
Senior Program Manager
Senior Content & Comm Analyst
Attorney-Advisor
Attorney-Advisor (General)
Attorney-Advisor (General)
Attorney-Advisor (General)
Attorney Advisor
Economist

JA875

Operations Analyst
Economist
Economist
Senior Advisor to the CHCO
Supervisory HR Spec (Compensation)
Supvy HR Spec (Class Rec & Int Plmt)
Attorney Advisor(Enforcement Attorney)
Attorney-Adviser
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Supervisory Examiner, Field Manager
Con Resp Qual Assurance Anal (Invest)
Con Resp Qual Assurance Anal (Invest)
Con Resp Qual Assurance Anal (Invest)
Con Resp Qual Assurance Anal (Invest)
Con Resp Qual Assurance Anal (Invest)
Economist
Attorney-Advisor
Human Resources Specialist (Staffing)
Supervisory Examiner, Field Manager
Consumer Response Program Manager
Supervisory IT Specialist (DATAMGT)
Consumer Response Specialist (Investigations)
Supervisory IT Specialist (DATAMGT)
EEO Spec (Investigator)
Equal Employment Opp Specialist
IT Specialist (DATAMGT)
IT Specialist (DATAMGT)
HR Specialist (Staffing)
Program Analyst
Content and Communications Analyst
Management and Program Analyst
Consumer Response Spec (Investigation)
IT Specialist (PLCYPLN)
Commissioned Compliance Examiner
Consumer Response Spec (Sr Comp Anlst)
Financial Analyst
Supervisory IT Specialist DATAMGT)
Senior Program Manager (Markets)
Senior Program Manager (Markets)

ACQUISITION PROGRAM ANALYST
Supervisory Examiner, Field Manager
Artificial Intelligence Prog. Manager
Supervisory IT Specialist (DATAMGT)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Consumer Response Spec (Sr Comp Anlst)
Attorney-Adviser
Diversity and Inclusion Program Analyst
Examiner
Attorney-Adviser (General)
Attorney-Adviser (General)
Examiner
Attorney-Adviser (General)
Attorney-Adviser (General)
Examiner
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Examiner
Attorney-Adviser (General)
Examiner
Examiner
Attorney-Adviser (General)
Examiner
Examiner
Attorney-Adviser (General)
Examiner
Attorney-Adviser (General)
Examiner
Attorney-Adviser (General)
Attorney-Adviser (General)
Commissioned Compliance Examiner
Attorney-Adviser (General)

JA877

Examiner
Attorney-Adviser (General)
Examiner
Attorney-Adviser (General)
Examiner
Attorney-Adviser (General)
Examiner
Attorney-Adviser (General)
Program Manager
Attorney-Adviser (General)
Attorney-Adviser (General)
HR Specialist (Employee Relations)
Supervisory Attorney-Adviser
Supervisory Attorney-Adviser
Supervisory Attorney-Adviser
Executive Assistant
Senior Program Manager (Markets)
Supervisory Attorney-Adviser
Senior Advisor (Markets)
Sec Chief, Cnsmr Crdt, Pmts & Dep
Attorney-Advisor (General)
Financial Analyst
Senior Advisor
Senior Advisor
Senior Program Manager (Markets)
Principal Asst Director, Consumer Ed
Examiner
Senior RAMPS Analyst
Attorney-Adviser (General)
Attorney-Adviser (General)
HR Specialist (Employee Relations)
Attorney-Adviser (General)
IT Specialist (DATAMGMT)
IT Specialist (DATAMGMT)
Attorney-Adviser (General)
IT Specialist
IT Specialist (Enterprise Architecture)
Mgmt & Program Analyst (Info Systems)
Mgmt & Program Analyst (Info Systems)
Mgmt & Program Analyst (Info Systems)
Mgmt & Program Analyst (Info Systems)

Attorney-Adviser (General)
Mgmt & Program Analyst (Info Systems)
Senior Product Manager
Senior Older Americans Policy Analyst
Older Americans Sr Policy Analyst
Sen Content & Comms Analyst (Internal)
Consumer Response Manager
Consum Ed & Engag Acquis Prog Manag
Consumer Response Manager
Consumer Response Manager
Consumer Response Manager
Consumer Response Manager
Commissioned Compliance Examiner
Examiner
Digital Content Specialist
Examiner
Examiner
IT Specialist (Enterprise Architecture)
Research and Analysis Program Manager
IT Specialist (Policy & Planning)
Administrative Specialist (Docket Mgr)
Supervisory Administrative Officer
Project Delivery Manager
Complaint Sharing and Analysis Program Manager (Complaint Analytics)
Complaint Process Monitoring Manager
Business Manager
Business Manager
Youth Financial Education Program Analyst
Analysis and Operations Manager
Financial Education Program Analyst
Financial Education Program Analyst
Financial Education Program Analyst
Paralegal Specialist
Consumer Response Manager
Paralegal Specialist
Paralegal Specialist
Senior Program Manager
Sen Adv to Sec Chief of Investigations
Examiner
Financial Analyst
Sup Program Analyst (Procure&Budget)

Economist
Economist
Economist
Program Manager
CFP Analyst (Registrations)
Industry Engmt. & Relationship Spec.
Outreach and Policy Advisor
HR Spec. (Policy and Accountability)
Industry Engmt. & Relationship Spec.
Examiner
Examiner
Examiner
Older Americans Policy Analyst
Examiner
Dpty Ast Drctr Offc for Oldr Americans
Attorney - Adviser (General)
Sup Attorney-Adviser (Gen)
Supervisory IT Specialist (PLCYPLN)
Interdisciplinary Economist
Management and Program Analyst
Senior Program Manager (Markets)
Senior Program Manager (Markets)
Supervisory Operations Analyst
Senior Program Manager (Markets)
Policy Analyst (Stakeholder Engage.)
Senior Program Manager (Markets)
Management and Program Analyst
Deputy Assistant Director
Management and Program Analyst
Management and Program Analyst
Attorney-Advisor
Innovation Program Manager
Content Strategist & Communications Specialist
Management and Program Analyst
Personnel Security Specialist
Consumer Reponse Process Analyst
Personnel Security Specialist
Physical Security Specialist
Sec Chief, Cnsmr Crdt, Pmts & Dep
Supervisory Attorney-Adviser
Supervisory Manag and Program Analyst

Attorney-Adviser

Senior Program Manager

Attorney-Adviser

Senior Policy Analyst

Supervisory Attorney-Advisor (General)

Attorney-Adviser

Chf Comm Ofr & Ast Dir Off of Pub Affr

Outreach and Engagement Specialist

Attorney-Adviser

Attorney-Adviser

Executive Assistant

Attorney-Adviser

Supervisory Administrative Officer

Attorney-Adviser

Sr Advsr (Stkh Engmt and Relatsh Mgmt)

Attorney-Adviser

Senior Advisor

Attorney-Adviser

Supervisory Contract Specialist

Attorney-Adviser

Attorney-Adviser (General)

Attorney-Adviser (General)

Attorney-Advisor

Supervisory Examiner, Field Manager

Attorney-Advisor

Attorney-Adviser (General)

Program Director (Supervision Systems)

Attorney-Adviser (General)

Attorney-Advisor

Consumer Financial Protection Analyst

Prgm Director (Examination Oversight)

Lead Consumer Financial Protection Analyst

Attorney-Adviser

Attorney-Adviser

Supervisory Contract Specialist

Attorney-Adviser

Senior Contract Program Analyst

Senior Advisor

Attorney-Adviser

Attorney-Adviser

Attorney-Adviser

Program Analyst
Contract Specialist
Contract Specialist
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Finance and Policy Analyst
Human Resources Specialist
Attorney-Advisor
Human Resources Specialist
Attorney-Advisor (General)
Senior Policy Analyst
Attorney-Adviser
Asst Dir, Ofc Fin Inst & Bus Liaison
Attorney-Adviser
Senior Advisor
Attorney-Adviser
IT Specialist (INFOSEC)
Attorney-Adviser
IT Specialist (INFOSEC)
Attorney-Adviser
IT Specialist (INFOSEC)
Attorney-Advisor (General)
Attorney-Adviser
Attorney-Advisor (General)
Attorney-Advisor (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Supvy HR Spec (Employee Relations)
Data Quality and Reporting Manager
Supervisory Attorney Advisor
Deputy General Counsel
Cons Resp Man (Plcy, Pro and Bus Proc)
Supervisory Attorney Advisor
Project Delivery Analyst
Complaint Analytics Analyst

Product Program Specialist
Supervisory Attorney Adviser
Attorney-Adviser
Attorney-Adviser (General)
Attorney Advisor (Enforcement Attorney)
Supervisory Attorney Advisor
Data Reporting Program Manager
Portfolio Planning Manager
Supervisory Examiner, Field Manager
Supervisory Manag and Program Analyst
Section Chief of Stakeholder Services
Contact Center Program Manager
Contact Center Program Manager
Consumer Response Program Manager
Consumer Response Spec (Investigation)
Operations Specialist
Management and Program Analyst
Risk Monitoring Program Manager
IT Specialist (DATAMGT)
Asst Director, Office of Innovation
IT Specialist
Training Coordinator
Research Program Manager
Operations Analyst
Attorney-Adviser (General)
Supervisory Attorney Adviser
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser
Executive Assistant
Senior Procurement Analyst
Supervisory Attorney-Adviser
Program Dir, (Supv Learning & Devel)
Supervisory Attorney Adviser
Supervisory Contracting Officer's Rep
Supervisory Attorney Adviser
Examiner
Supervisory Contract Specialist
Supervisory Attorney Adviser
Senior Advisor
Supervisory Attorney Adviser

Supervisory Attorney Adviser

Deputy Chief Operating Officer

Superviosry Attorney-Adviser

Supervisory Attorney Adviser

Supervisory Attorney-Adviser

Examiner

Administrative Operations Assistant

Supervisory Attorney Adviser

Snr Advisor, Advsy Brd & Cncl Section

Attorney-Adviser

Supervisory Attorney-Advisor (General)

Examiner

Supervisory Attorney-Advisor (General)

Consumer Financial Protection Analyst

Examiner

Examiner

Examiner

Executive Assistant

Examiner

Information Technology Specialist

Examiner

Examiner

Consumer Financial Protection Analyst

Project Delivery Analyst

Physical Security Specialist

IT Specialist (APPSW)

IT Specialist (APPSW)

Attorney-Adviser (General)

IT Specailist (Customer Support)

IT Specialist

Attorney-Advisor (General)

Data Scientist

Complaint Process Monitoring Spec.

Supervisory Attorney-Adviser

Financial Analyst

Attorney-Advisor (General)

Consumer Financial Protection Analyst

Economist (Interdisciplinary Research Analyst)

Supervisory Economist

Interdisciplinary Economist

Attorney Advisor(Enforcement Attorney)

Interdisciplinary Economist
Economist
Economist
Interdisciplinary Statistician
IT Specialist (INET)
Examiner
Economist
Attorney-Advisor (General)
Attorney-Advisor (General)
IT Specialist (DATAMGT)
Economist
Management and Program Analyst
Examiner
Attorney-Adviser (General)
Management & Program Analyst
IT Specialist (APPSW)
Examiner
Examiner
Examiner
Examiner
IT Specialist (DATAMGT)
Management and Program Analyst
Senior Program Manager (Markets)
Attorney Advsr (Enforcement Attorney)
Attorney Advisor(Enforcement Attorney)
Examiner
Economist
Economist
Financial Analyst
Financial Analyst
Com Affairs Program Spec
Operations Analyst
Examiner
IT Specialist
Consumer Financial Protection Analyst
Economist
Attorney-Adviser (General)
Attorney Advisor (Enforcement Attorney)
Attorney-Adviser (General)
Attorney-Adviser (General)
IT Specialist

Associate Ombudsman
Attorney-Advisor
Mgmt. & Prog. Analyst (Enforcement)
Attorney-Advisor (General)
Examiner
Senior Learning Specialist
Data Scientist
Attorney-Adviser (General)
Attorney-Adviser (General)
Attorney-Adviser (General)
Data Scientist
Data Scientist
Data Scientist
IT Specialist (DATAMGT)
Attorney Advisor(Enforcement Attorney)
Attorney Advisor(Enforcement Attorney)
Attorney Advisor(Enforcement Attorney)
Attorney Advsr (Enforcement Attorney)
Interdisciplinary Economist
Supervisory IT Specialist
Financial Analyst
Attorney Advisor (Enforcement Attorney)
Senior Program Manager (Markets)
Management & Program Analyst
Financial Analyst (Fellow)
Paralegal Specialist
Small Bus. Lndng Vendor Outreach Coord
Business Process Analyst
Financial Analyst (Fellow)
IT Specialist (APPSW)
IT Specialist (Policy and Planning)
Paralegal Specialist
Paralegal Specialist
Economist
IT Specialist (Policy and Planning)
Financial Analyst (Fellow)
Financial Analyst (Fellow)
Financial and Program Analyst (Fellow)
Financial Analyst (Fellow)
Financial Analyst (Fellow)
Financial Analyst (Fellow)

Financial Analyst (Fellow)
Financial Analyst (Fellow)
Markets & Policy Fellow (Analyst)
Financial Analyst (Fellow)
Consultant (Compensation Advisor)
Financial Analyst (Fellow)
Financial Analyst (Fellow)
Statistician
Economist
Economist
Attorney-Advisor (General)
IT Specialist (Policy and Planning)
IT Specialist (Policy and Planning)
Financial Analyst (Fellow)
Financial and Program Analyst (Fellow)
Attorney-Advisor (General)
Financial Analyst
Engagement & Policy Fellow (Pgrm Mgr)
Engagement & Policy Fellow (Pgrm Mgr)
Engagement & Policy Fellow (Pgrm Mgr)
Senior Research Fellow
Senior Research Fellow
Financial and Program Analyst (Fellow)
Financial and Program Analyst (Fellow)
Financial and Program Analyst (Fellow)
Financial and Program Analyst (Fellow)
Financial and Program Analyst (Fellow)
Financial and Program Analyst (Fellow)
Paralegal Specialist
Mathematician
Sm Bus Lending Data Coll Bus Prod Lead
IT Specialist (INFOSEC)
HR Spcec (Stfng/Recruitmt & Class.)
IT Specialist (Policy and Planning)
IT Specialist (Policy and Planning)
Administrative Specialist
Financial and Program Analyst (Fellow)
Financial and Program Analyst (Fellow)
Attorney-Advisor (General)
IT Specialist (Policy and Planning)
Markets & Policy Fellow (Prog Manager)

Management and Program Analyst
Senior Markets & Policy Fellow
Senior Engagement & Policy Fellow
Senior Engagement & Policy Fellow
Economist
Senior Engagement & Policy Fellow
Economist
Financial Analyst (Fellow)
Financial and Program Analyst (Fellow)
IT Specialist (Policy and Planning)
Economist
Engagement and Strategy Program Mgr
Markets & Policy Fellow (Prog Manager)
Markets & Policy Fellow (Prog Manager)
Senior Engagement & Policy Fellow
OFLEO Policy Advisor
Economist
Financial Analyst (Fellow)
Financial Analyst (Fellow)
Engagement & Policy Fellow (Analyst)
Financial Analyst (Fellow)
Financial and Program Analyst (Fellow)
Financial Analyst (Fellow)
Financial Analyst (Fellow)
Financial Analyst (Fellow)
Financial Analyst (Fellow)
Financial Analyst (Fellow)
Economist
Senior Engagement & Policy Fellow
Student Trainee (Program Assistant)
IT Specialist (Policy and Planning)
Student Trainee (Program Assistant)
Student Trainee (Admin & Ofc Support)
Emp Comm & Change Mgmt Specialist
IT Specialist (DATAMGT)
Examiner
Supervisory Economist
Data Scientist
Paralegal Specialist
Data Scientist
Attorney-Advisor

Examiner

Financial and Program Analyst (Fellow)

Financial Analyst (Fellow)

Financial Analyst (Fellow)

Financial and Program Analyst (Fellow)

Student Trainee (Program Assistant)

Supervisory Attorney Adviser

Attorney-Advisor (General)

Supervisory Attorney-Adviser

Supervisory Attorney-Adviser

Supervisory Attorney-Advisor (General)

Sup Attorney-Adviser (Gen)

Supervisory Attorney-Adviser (General)

Attorney-Adviser (General)

Financial Analyst

**Retain/Release Scenario**

**Onboard Count - PP6 FY25**

| Division/Office | Sum of Number to Retain | Sum of Number to Release | Division/Office | Sum of Number on PD |
|---|---|---|---|---|
| **CFPB CENTRALIZED SERVICES** | **0** | **5** | **CFPB CENTRALIZED SERVICES** | **5** |
| **CFPB CENTRALIZED SERVICES-HUMAN CAPITAL** | **0** | **5** | **CFPB CENTRALIZED SERVICES-HUMAN CAPITAL** | **5** |
| **CONSUMER RESPONSE EDUCATION DIV** | **20** | **129** | **CONSUMER RESPONSE EDUCATION DIV** | **149** |
| **CONSUMER RESPONSE** | **16** | **112** | **CONSUMER RESPONSE** | 128 |
| **CONSUMER RESPONSE EDUCATION DIV** | **2** | **6** | **CONSUMER RESPONSE EDUCATION DIV** | 8 |
| **FINANCIAL EDUCATION** | **2** | **11** | **FINANCIAL EDUCATION** | 13 |
| **DIRECTOR** | **5** | **81** | **DIRECTOR** | **86** |
| **Legislative Affairs** | **1** | **2** | **Legislative Affairs** | 3 |
| **Off of Policy Planning & Strategy** | **0** | **16** | **Off of Policy Planning & Strategy** | 16 |
| **Office of Civil Rights** | **1** | **8** | **Office of Civil Rights** | 9 |
| **Office of Fair Lending and Equal Opp** | **1** | **13** | **Office of Fair Lending and Equal Opp** | 14 |
| **Office of Minority and Women Incl** | **1** | **13** | **Office of Minority and Women Incl** | 14 |
| **OFFICE OF THE DIRECTOR** | **1** | **29** | **OFFICE OF THE DIRECTOR** | 30 |
| **DIVISION OF ENFORCEMENT** | **50** | **198** | **DIVISION OF ENFORCEMENT** | **248** |
| **DIVISION OF ENFORCEMENT** | **50** | **198** | **DIVISION OF ENFORCEMENT** | 248 |
| **DIVISION OF SUPERVISION** | **50** | **437** | **DIVISION OF SUPERVISION** | **487** |
| **DIVISION OF SUPERVISION** | **0** | **2** | **DIVISION OF SUPERVISION** | 2 |
| **OFFICE OF SUPV POLICY AND OPS** | **1** | **108** | **OFFICE OF SUPV POLICY AND OPS** | 109 |
| **SUPERVISION EXAMINATIONS** | **1** | **0** | **SUPERVISION EXAMINATIONS** | 1 |
| **SUPERVISION MIDWEST REGION** | **0** | **89** | **SUPERVISION MIDWEST REGION** | 89 |
| **SUPERVISION NORTHEAST REGION** | **0** | **95** | **SUPERVISION NORTHEAST REGION** | 95 |
| **SUPERVISION SOUTHEAST REGION** | **48** | **61** | **SUPERVISION SOUTHEAST REGION** | 109 |
| **SUPERVISION WEST REGION** | **0** | **82** | **SUPERVISION WEST REGION** | 82 |
| **EXTERNAL AFFAIRS DIVISION** | **2** | **39** | **EXTERNAL AFFAIRS DIVISION** | **41** |
| **COMMUNICATIONS** | **0** | **11** | **COMMUNICATIONS** | 11 |
| **EXTERNAL AFFAIRS DIVISION** | **0** | **13** | **EXTERNAL AFFAIRS DIVISION** | 13 |
| **INTERGOVERNMENTAL AFFAIRS** | **0** | **5** | **INTERGOVERNMENTAL AFFAIRS** | 5 |

| | | | | |
|---|---|---|---|---|
| **PRIVATE SECTOR ENGAGEMENT** | **1** | **4** | **PRIVATE SECTOR ENGAGEMENT** | 5 |
| **PUBLIC ENGAGEMENT** | **1** | **6** | **PUBLIC ENGAGEMENT** | 7 |
| **LEGAL DIVISION** | **27** | **60** | **LEGAL DIVISION** | **87** |
| **GENERAL LAW AND ETHICS** | **4** | **25** | **GENERAL LAW AND ETHICS** | 29 |
| **LAW AND POLICY** | **8** | **22** | **LAW AND POLICY** | 30 |
| **LEGAL DIVISION** | **0** | **12** | **LEGAL DIVISION** | 12 |
| **LITIGATION** | **14** | **0** | **LITIGATION** | 14 |
| **OVERSIGHT** | **1** | **1** | **OVERSIGHT** | 2 |
| **OPERATIONS DIVISION** | **30** | **293** | **OPERATIONS DIVISION** | **323** |
| **ADMINISTRATIVE OPERATIONS** | **5** | **28** | **ADMINISTRATIVE OPERATIONS** | 33 |
| **CHIEF DATA OFFICER** | **0** | **10** | **CHIEF DATA OFFICER** | 10 |
| **FINANCE AND PROCUREMENT** | **5** | **48** | **FINANCE AND PROCUREMENT** | 53 |
| **HUMAN CAPITAL** | **5** | **56** | **HUMAN CAPITAL** | 61 |
| **OPERATIONS DIVISION** | **1** | **8** | **OPERATIONS DIVISION** | 9 |
| **TECHNOLOGY AND INNOVATION** | **14** | **143** | **TECHNOLOGY AND INNOVATION** | 157 |
| **OTHER PROGRAMS** | **1** | **33** | **OTHER PROGRAMS** | **34** |
| **DIRECTOR'S FINANCIAL ANALYSTS** | **0** | **29** | **DIRECTOR'S FINANCIAL ANALYSTS** | 29 |
| **OMBUDSMAN** | **1** | **4** | **OMBUDSMAN** | 5 |
| **RESEARCH MONITORING AND REGULATIONS DIV** | **22** | **208** | **RESEARCH MONITORING AND REGULATIONS DIV** | 230 |
| **Competition and Innovation** | **0** | **9** | **Competition and Innovation** | 9 |
| **CONSUMER POPULATIONS** | **3** | **42** | **CONSUMER POPULATIONS** | 45 |
| **MARKETS** | **4** | **36** | **MARKETS** | 40 |
| **REGULATIONS** | **10** | **56** | **REGULATIONS** | 66 |
| **RESEARCH** | **3** | **55** | **RESEARCH** | 58 |
| **RESEARCH MONITORING AND REGULATIONS DIV** | **2** | **10** | **RESEARCH MONITORING AND REGULATIONS DIV** | 12 |
| Grand Total | **207** | **1483** | Grand Total | **1690** |

JA891

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-0381 (ABJ) |
| RUSSELL VOUGHT *in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al.*, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**ORDER**

On March 28, 2025, after two days of evidentiary hearings and full briefing by the parties, the Court found that defendants were in fact engaged in an unlawful effort to dismantle and eliminate the Consumer Financial Protection Bureau that had been created by Congress. *See* Mem. Op. [Dkt. # 87]. Based on its findings that the plaintiffs are likely to succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in their favor, and an injunction serves the public interest, the Court granted plaintiffs' motion for preliminary injunction and issued an order designed to preserve the status quo. The Court stated, "[i]f the defendants are not enjoined, they will eliminate the agency before the Court has the opportunity to decide whether the law permits them to do it, and as the defendants' own witness warned, the harm will be irreparable." Mem. Op. at 3.

Among other things, the injunction required that:

1. Defendants shall maintain and . . . not delete, destroy, remove, or impair any data or other CFPB records covered by the Federal Records Act (hereafter 'agency data') except in accordance with the procedures described in 44 U.S.C. Chapter 33;

2. Defendants shall reinstate all probationary and term employees terminated between February 10, 2025 and the date of this order, including but not limited to . . . the Private Student Loan Ombudsman;

3. Defendants shall not terminate any CFPB employee, except for cause related to the individual employee's performance or conduct, and defendants shall not issue any notice of reduction-in-force to any CFPB employee;

4. Defendants shall not enforce the February 10, 2025 stop-work order or require employees to take administrative leave in furtherance of that order, and defendants shall not reinstitute or seek to achieve the outcome of a work stoppage, whether through a stop-work order, an order directing employees to take administrative leave, or any other means; and . . .

6. Defendants shall ensure that in accordance with 12 U.S.C. § 5492(b)(3), the CFPB Office of Consumer Response continues to maintain a single, toll-free telephone number, a website, and a database for the centralized collection of consumer complaints regarding consumer financial products and services, and that it continues to monitor and respond to those complaints, including by providing Elevated Case Management.

Prelim. Inj. [Dkt. # 88] at 1–2.

On April 1, defendants moved to stay the Order pending appeal, Mot. to Stay [Dkt. # 97], which the Court granted in part and denied in part on April 3. Order [Dkt. # 102]. It reiterated that in issuing the preliminary injunction, "after a detailed analysis of the testimony and agency records introduced by both sides, it found that plaintiffs are likely to succeed on the merits of their claims, including the claim that the defendants are in fact engaged in an effort to shut down the agency in violation of law notwithstanding their denials." *Id.* at 2. Given its prior findings, the Court was skeptical of the defendants' assurances that they would carry out the agency's statutory mission, and it found that a stay would substantially injure the plaintiffs and would be contrary to the public interest. "The defendants would be free to move swiftly to take the steps that would eliminate the agency . . . which the Court already found they are poised to do." *Id.* at 5. However, with the plaintiffs' consent, it stayed the provision in paragraph 8 of the Order that required the agency to report on its compliance with the injunction by April 4. *Id.* at 1.

In the meantime, defendants had filed a substantially similar emergency motion with the D.C. Circuit seeking a stay pending appeal. *NTEU v. Vought*, Case No. 25-5091 (D.C. Cir.), Emergency Mot. for an Admin. Stay and Stay Pending Appeal and Supp. Mem. [Dkt. # 210841] ("Defs.' Mot."). In a short per curiam order issued on the evening of Friday, April 11, the Court

of Appeals granted the motion in part and denied it in part. *See id.*, Order [Dkt. # 2110720] ("Cir. Order"). After considering the defendants' representations that the Bureau would continue to perform its mandatory statutory duties, *see e.g.*, Defs.' Mot. at 1, 2, & 3, and that it was engaged in nothing more than a typical reevaluation of policy priorities at the start of a new administration rather than the wholesale elimination of an agency, *see id.* at 6, it ordered:

> Provision two (2) is stayed insofar as it requires defendants to reinstate employees whom defendants have determined, after an individualized assessment, to be unnecessary to the performance of defendants' statutory duties.

> Provision three (3) is stayed insofar as it prohibits defendants from terminating or issuing a notice of reduction in force to employees whom defendants have determined, after a particularized assessment, to be unnecessary to the performance of defendants' statutory duties.

> The court understands provision four (4) to allow work stoppages that defendants have determined, after a particularized assessment, would not interfere with the performance of defendants' statutory duties. On that understanding, provision four (4) remains in effect.

Cir. Order at 1–2. The Court also stayed provision eight (8), which had been stayed by this Court as well, and it set a schedule for the briefing of defendants' appeal of the preliminary injunction with a hearing more than a month away. *Id.* at 2. It then announced:

> All other provisions of the preliminary injunction remain in full effect pending further order of the court.

*Id.*

That was on Friday evening. And within three to four business days, the agency took the feared swift and decisive action to RIF more than eighty percent of its workforce: to terminate more than 1400 of its employees, even more than the total who were on the chopping block on February 14.

At 6:02 p.m. on Thursday April 17, 2025, plaintiffs filed an emergency motion for an order to show cause as to why defendants had not violated the preliminary injunction. Mot. for Order to Show Cause [Dkt. # 105]. The motion stated that earlier that day, defendants sent reduction-in-force notices to the vast majority of CFPB employees and that all affected employees would be entirely cut off from computer access at 6:00 p.m. on Friday, April 18, 2025. *Id.* at 1. The Court scheduled a hearing for Friday at 11:00 a.m., and it called for the production of certain materials. *See* Minute Order (Apr. 17, 2025).

In response to the Court's order, defendants filed a list of the 1408 employees subject to the RIF.  Notice of Sealed Filing [Dkt. # 108]. They also supplied the Court with a copy of the memorandum sent to CFPB employees from Mark R. Paoletta, Chief Legal Officer of the CFPB, entitled "2025 Supervision and Enforcement Priorities," on Wednesday, April 16, 2025, and a representative memorandum from defendant Russell Vought to an employee concerning "Specific Notice of Reduction in Force," that was dated April 17, 2025.  Attachments to Paoletta Decl. [Dkt. # 109].  Defendants also filed a declaration from Paoletta averring that along with two unnamed CFPB attorneys, on some unspecified date, he "conducted a particularized assessment to determine which employees are unnecessary for the Bureau to perform its statutory duties."  Paoletta Decl. [Dkt. # 109] at 2.  The declaration does not describe any consultation with the heads of the various offices involved.

On April 18, plaintiffs filed six declarations of their own, which paint a dramatically different picture.  *See* Notice of Decls. [Dkt. # 106]; Decl. of Jason Brown, [Dkt. # 110]; Decl. of Josh Friedman [Dkt. # 110-1]; 2d Decl. of Alex Doe [Dkt. # 111].  Matthew Pfaff, Chief of Staff for the Office of Consumer Response, states that no managers in Consumer Response were consulted by agency leadership about the level of staff needed to perform the office's statutory duties (which are now explicitly incorporated in the Order) or how the RIF would affect its ability to respond to the thousands of consumer complaints and inquiries from banks that it receives.  3d Decl. of Matthew Pfaff [Dkt. # 106-1] ¶¶ 3, 7.  The RIF will reduce the statutorily mandated Office from approximately 135 employees to eight, none of whom are the ones who carry out the day-to-day tasks involved in fulfilling its obligations.  *Id.* ¶ 5.

Jason Brown, the head of the statutorily mandated Office of Research, states that only he and two other senior leaders will remain after the RIF, and that none of them were consulted about how these terminations would impact the office's ability to fulfill its statutory duties.  *See* Decl. of Jason Brown [Dkt. # 110] ¶¶ 3–4.  Josh Friedman, an Air Force veteran and employee of the Bureau's Office of Servicemember Affairs, another office called for by Congress, states that he and all or nearly all employees of that office "ha[ve] been RIFd" and that the office "will not be able to perform its statutory duties" without adequate, experienced staff.  Decl. of Josh Friedman [Dkt. # 110-1] ¶¶ 3, 5.

Finally, Alex Doe, who was formerly on the Bureau's RIF team until she testified before this Court, was advised by other team members that this RIF is even larger than the one that had

been planned for February 14, and that someone named Gavin Kliger of DOGE managed the RIF in lengthy, contentious meetings with the team this week.  2d Decl. of Alex Doe ¶¶ 3, 5–6.  She stated that "[t]eam members raised the concern with Adam Martinez [the CFPB Chief Operating Officer who oversees the Office of Human Capital] that there was a court order requiring that they do a particularized assessment, but they were told all that mattered was the numbers. The direction to ignore the concern came from Mark Paoletta, who said the numbers-based RIF should move forward, and that leadership would assume the risk." *Id.* ¶ 7.

The Court held a hearing this morning at which plaintiffs made an oral motion that the Court enforce its Order, and the motion for an order to show cause was deemed to be a motion to enforce.  Counsel for the defendants professed to have little knowledge of what had transpired at the agency or who was involved.  It became clear to the Court that given the starkly different pictures being presented by declarations alone, it is necessary to conduct an evidentiary hearing before the Court can determine whether the agency is complying with or flouting the Order.  Both parties asked for time to be able to prepare, and a schedule was established with the consent of both sides:  plaintiffs may issue requests for production of documents to defendants by Friday, April 18; defendants' response to the motion to enforce is due by Tuesday, April 22; plaintiffs' reply is due by Thursday, April 24; and a hearing is set for Monday, April 9:30 a.m.[1]

It also became clear that it is incumbent upon the Court once again to preserve the status quo in the meantime, and the Court ruled on the record that the announced RIF of the 1408 employees listed in Dkt. 108 may NOT be implemented or effectuated, and that employees' access to work systems, including email and internal platforms, may NOT be discontinued at 6:00 pm today.  The defense voiced no objection to this directive.

Given the scope and speed of the agency's action, the apparent lack of consultation with the heads of the statutorily mandated agency components involved, and the troubling description of the RIF meetings set forth in plaintiffs' declarations, the Court has significant grounds for concern that the defendants are not in compliance with its Order as it was refined by the Court of Appeals.  While the Chief Legal Counsel has intoned the phrase "particularized assessment," there is reason to believe that the defendants simply spent the days immediately following the Circuit's

---

[1]    The Court proposed to hold the hearing on Wednesday, April 23, but both parties asked for more time.

relaxation of the Order dressing their RIF in new clothes, and that they are thumbing their nose at both this Court and the Court of Appeals.

The material submitted to date provides cause to believe that a RIF that will decimate the agency and render it unable to comply with its statutory duties is underway, and that it will be completed before this Court can determine whether it comports with the Order of March 27, as stayed in part by the Circuit's Order of April 11. Under those circumstances, the Court must act, and it has the power to act.

"It is well established that the District Court is without jurisdiction to alter a judgment of its own while an appeal therefrom is ongoing. But it is equally clear that the vitality of that judgment is undiminished by pendency of the appeal. Unless a stay is granted either by the court rendering the judgment or by the court to which the appeal is taken, the judgment remains operative. To be sure, for as long as the appellate court retains its mandate it maintains its jurisdiction over the case, and thus the power to alter the mandate. But non-issuance of the mandate by the appellate court has no impact on the trial court's powers to enforce its unstayed judgment since the latter court has retained that power throughout the pendency of the appeal." *Deering Milliken, Inc. v. FTC,* 647 F.2d 1124, 1128–29 (D.C. Cir. 1978) (footnotes omitted). *See Maness v. Myers,* 419 U.S. 449, 458–59 (1975) ("[It is a] basic proposition that all orders and judgments of courts must be complied with promptly. . . . The orderly and expeditious administration of justice by the courts requires that an order issued by a court with jurisdiction over the subject matter must be obeyed by the parties until it is reversed by orderly and proper proceedings.").

Once again, the Court is confronted with evidence that gives rise to concerns that there will be no agency standing by the time it gets to consider the merits, by the time the Court of Appeals rules on the legality of the preliminary injunction, or even by the time it holds a hearing on the motion to enforce the Order. As the D.C. Circuit has recently reiterated, Rule 65 authorizes a district court to issue interim relief to prevent irreparable injury and to preserve the status quo while the district court assesses the merits of a case. *Dellinger v. Bessent,* No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025), citing *Cobell v. Kempthorne,* 455 F.3d 301, 314 (D.C. Cir. 2006) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation.") (cleaned up). A district court "ha[s] authority, from the necessity of the case, to make orders to preserve the existing conditions and the subject of the petition" until it

can determine how to proceed, as "the law contemplates the possibility of a decision either way, and therefore must provide for it." *Id.* at *3, quoting *United States v. Shipp*, 203 U.S. 563, 573 (1906). Those principles surely apply when the Court is faced with what appears to be a violation of a preliminary injunction that has already been reviewed and refined by the Court of Appeals and that remains in force, and the Court finds it necessary to enjoin the planned RIF to preserve the existing conditions and the subject of plaintiffs' motion until it can determine how to proceed.

Therefore, as stated on the record at today's hearing, the defendants are ordered as follows:

1) **the Reduction in Force announced by Acting Director Vought on or about April 17, 2025 is SUSPENDED and it may NOT be implemented, effectuated, or completed in any way until this Court has ruled on plaintiffs' motion to enforce the preliminary injunction, and**

2) **the defendants are PROHIBITED from discontinuing any employee's access to work systems, including email and internal platforms until this Court has ruled on plaintiffs' motion.**

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  April 18, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

NATIONAL TREASURY EMPLOYEES
UNION, *et al.*,

                *Plaintiffs*,

     v.

RUSSELL VOUGHT, *in his official
capacity as Acting Director of the Consumer
Financial Protection Bureau, et al.*,

                *Defendants*.

</td><td>

Case No. 1:25-cv-00381-ABJ

</td></tr>
</table>

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of

Appeals for the District of Columbia Circuit from this Court's April 18, 2025 Order (ECF No.

113).

Dated: April 18, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

BRAD P. ROSENBERG
Special Counsel

*/s/ Liam C. Holland*
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone:  202-514-4964
Fax:  202-616-8460
Email: liam.c.holland@usdoj.gov

*Attorneys for Defendants*

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3    National Treasury Employees    )
      Union, et al.,                 ) Civil Action
 4                                   ) No. 25-cv-381
                      Plaintiffs,    )
 5                                   ) EVIDENTIARY HEARING
      vs.                            ) Day 1
 6                                   )
      Russell Vought, et al.,        ) Washington, DC
 7                                   ) March 10, 2025
                      Defendants.    ) Time:  10:18 a.m.
 8    _____

 9               TRANSCRIPT OF EVIDENTIARY HEARING
                         HELD BEFORE
10        THE HONORABLE JUDGE AMY BERMAN JACKSON
                 UNITED STATES DISTRICT JUDGE
11    _____

12                    A P P E A R A N C E S

13    For Plaintiff:    Deepak Gupta
                        Robert D. Friedman
14                      GUPTA WESSLER LLP
                        2001 K Street, NW
15                      Suite 850 North
                        Washington, DC 20006
16                      (202) 888-1741
                        Email:  Deepak@guptawessler.com
17                      Email:  Robert@guptawessler.com

18                      Jennifer D. Bennett
                        GUPTA WESSLER LLP
19                      505 Montgomery Street
                        San Francisco, CA  94111
20                      (415) 573-0335
                        Email:  Jennifer@guptawessler.com
21
                        Allison Marcy Zieve
22                      Wendy Liu
                        PUBLIC CITIZEN LITIGATION GROUP
23                      1600 20th Street, NW
                        Washington, DC 20009
24                      (202) 588-1000
                        Email:  Azieve@citizen.org
25                      Email:  Wliu@citizen.org
```

2

```
 1    For Defendant:         Brad P. Rosenberg
                             U.S. DEPARTMENT OF JUSTICE
 2                           1100 L Street, NW
                             Washington, DC 20005
 3                           (202) 514-3374
                             Email:  Brad.rosenberg@usdoj.gov
 4    _____

 5    Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                             Official Court Reporter
 6                           United States Courthouse, Room 6523
                             333 Constitution Avenue, NW
 7                           Washington, DC  20001
                             (202) 354-3267
 8
                                   *   *   *
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    * * * * * * *P R O C E E D I N G S* * * * * * *

2    THE COURTROOM DEPUTY:  We are on the record with

3    civil case 25-381, *National Treasury Employees Union, et al.*

4    *versus Russell Vought, et al.*

5    Counsel, starting with the plaintiff, please approach

6    and state your appearance for the record.

7    MR. GUPTA:  Good morning, Your Honor, Deepak Gupta,

8    of Gupta Wessler, on behalf of the plaintiffs, the National

9    Treasury Employees Union, National Consumer Law Center, NAACP,

10   the Virginia Poverty Law Center, Pastor Eva Steege, and the

11   CFPB Employees Association.  I'm joined by my colleague

12   Jennifer Bennett, also of Gupta Wessler, and at counsel table

13   my colleagues Robert Friedman, Gabriel Chess, and Thomas

14   Scott-Railton, our co-counsel, Allison Zieve and Wendy Liu of

15   Public Citizen Litigation Group, and Julie Wilson, Paras Shah,

16   and Payton Diotalevi of the National Treasury Employees

17   Association -- Union.

18   THE COURT:  Okay.  You have more names than people at

19   the table, so I guess you're including the front row back

20   there.

21   MR. GUPTA:  One lawyer is back there, yes.

22   THE COURT:  All right.

23   MR. ROSENBERG:  Good morning, Your Honor, Brad

24   Rosenberg for the Department of Justice, Civil Division,

25   Federal Programs Branch, on behalf of the United States.

4

1    Joining me at counsel table is Liam Holland, also of the

2    Federal Programs Branch.

3         THE COURT:  Good morning, everybody.  I want to note

4    for the record that the public phone line is open.  Anyone who

5    is listening to this proceeding through that mechanism is

6    welcome to listen, however, you are instructed that you do not

7    have authority to record these proceedings and you do not have

8    the authority to broadcast them to other people while you're

9    listening to it yourself, or to record it and rebroadcast it

10   later.

11        I did hear argument, lengthy argument, from both

12   sides last week.  I think I have a full understanding of the

13   parties' positions.  However, before, during and after the

14   hearing I received information in support of conflicting

15   visions of what's actually going on on the ground.  And,

16   therefore, I continued the hearing on the preliminary

17   injunction until today for the presentation of live testimony.

18        I've received hundreds of pages of emails and

19   declarations, some submitted as of last Friday.  So before I

20   ask any questions of the lawyers, I think the thing to do is to

21   go ahead and hear from the witnesses first.

22        The plaintiffs have the burden of proving the need

23   for the preliminary injunction, so I'm going to have the

24   plaintiff call their witnesses first.  Of particular interest

25   to me is the state of the Office of Consumer Response.  I have

1    some interest also in the student loans and the disaster

2    response, the examinations necessary for the reporting

3    functions.  I'm not as interested in what's going on in

4    enforcement at this stage.

5         I will hear from the defendants' declarant as well,

6    and if the plaintiffs have someone that they think is necessary

7    to rebut what he says, you'll have that opportunity.

8         I want to tell everyone in this courtroom that this

9    is a public proceeding and you're absolutely entitled to be

10   here and see what goes on in a courtroom.  But anyone who

11   reacts audibly to the testimony will be excused from the

12   courtroom.  The witnesses from both sides are here and they

13   need to be treated with civility and without intimidation, so

14   we're not going to be letting them know what we think of what

15   they're saying while we're in the room.

16        All right.  Mr. Gupta, you can proceed.

17        MR. GUPTA:  Your Honor, we discussed the sequence

18   with the government beforehand and we came to an agreed-upon

19   proposal that I wanted to present to you.  And you can correct

20   me if I get anything wrong.

21        THE COURT:  Okay.  I know we're friends.  So --

22        MR. GUPTA:  So we anticipated you might say that, you

23   know, the plaintiffs go first because its our burden.  We then

24   proposed that we would call Mr. Martinez, the government

25   understandably would prefer that they get to do a direct

1    examination of him first and a cross.  We agreed to that and so

2    the proposal that we have jointly is that --

3                THE COURT:  They're going to call Mr.  Martinez

4    first?

5                MR. GUPTA:  They get to call Mr. Martinez first, we

6    would cross him, they reserve the right to redirect.  And then

7    depending on how that testimony goes -- certainly, we have

8    Mr. Pfaff here available.  We also have two Doe declarants

9    available and they're, understandably, reluctant to testify

10   because of fear of retaliation, but they're available and ready

11   to do so.  And so we would -- we would make a determination

12   after Mr. Martinez's testimony.

13               Did I get that all right?

14               MR. ROSENBERG:  Yes.

15               THE COURT:  With the understanding that you have the

16   burden of proof, the government can go first and call its

17   witness and do a direct.  And then you'll do a cross and then

18   they'll do a redirect.

19               MR. ROSENBERG:  That is correct, Your Honor.

20               THE COURT:  Okay.  All right.  That's fine.

21               MR. ROSENBERG:  The one additional element of our

22   agreement is that we ask that any of plaintiffs' witnesses be

23   sequestered so they not hear Mr. Martinez.

24               THE COURT:  I believe they are in a witness room.

25               MR. GUPTA:  That's been done as well.

```
 1               THE COURT:  All right.  So you can call Mr. Martinez.

 2               MR. ROSENBERG:  We'll go get him.

 3               THE COURT:  All right.

 4               MR. ROSENBERG:  In the meantime, Your Honor, we have

 5     a couple of binders of the exhibits for Mr. Martinez, we have a

 6     set for you and your clerks and for plaintiffs' counsel.  So

 7     permission to approach?  We would use those binders as part of

 8     the examination.

 9               THE COURT:  You're not going to put them on the

10     screen?

11               MR. ROSENBERG:  I am a Luddite, so I think it would

12     be more efficient.  Plus, we've been working, obviously, to

13     prepare the binders we have, we're just not in a position to do

14     it electronically.

15               THE COURT:  All right.  I guess I'll take a binder.

16               MR. ROSENBERG:  There's something to be said for the

17     tangible feel of paper.

18               THE COURT:  I will say, even if people don't have

19     their exhibits on their laptop ready to show on the court

20     system, we have an Elmo where you can just put it down and turn

21     it on and we can all see it.

22               All right.  Mr. Rosenbeg, you can proceed.

23               MR. ROSENBERG:  One more note on the binders.  Each

24     binder has a cover sheet.  One binder consists of the filings

25     of the various internal documents that we've provided, the
```

1    other binder consists of plaintiffs' documents.  I will note

2    that the cover sheet is a little bit of a misnomer because our

3    binder also includes Mr. Martinez's declaration.  So it's a

4    little bit broader than what is on the cover sheet.  But,

5    everything that is in the binder is something that has been

6    publicly filed on the docket in this court.

7              THE COURT:  Okay.

8              MR. ROSENBERG:  And then last question, I think this

9    is just a logistical question.  Because the exhibits that we're

10   relying upon -- or anticipate relying upon, you know, and there

11   may be an issue that will come up during the examination today,

12   but other -- which we'll address it at an appropriate time.

13   But since these documents have all already been filed on the

14   public docket, we do not anticipate a need to separately move

15   them into evidence, since they're all already before the Court.

16             THE COURT:  That's fine.  I'm not planning to have

17   people move things in evidence.

18             MR. GUPTA:  We agree.

19             THE COURT:  And I also think -- is he going to have a

20   binder, so you don't have to walk around the courtroom and say

21   I'm handing you this, I'm handing you that?

22             MR. ROSENBERG:  Everyone has a binders.  You have a

23   set of binders, the witness has a set of binders, your law

24   clerks have a set of binders.

25             THE COURT:  Apparently you did not bring enough

```
 1   binders.  We've got two courtrooms full of people.  But, okay.
 2            MR. ROSENBERG:  Old school.
 3            The defense calls Mr. Martinez.
 4                      ADAM MARTINEZ,
 5   was called as a witness and, having been first duly sworn, was
 6   examined and testified as follows:
 7   BY MR. ROSENBERG:
 8   Q.  Good morning.  Can you please state your full name for the
 9   record?
10   A.  Yes.  It's Adam Martinez.
11   Q.  And, Mr. Martinez --
12            THE COURT:  Mr. Martinez, let me just tell you one
13   thing.  If you can move that microphone kind of closer to your
14   mouth, because the chair doesn't move, but it does.
15            THE WITNESS:  Is that better?
16            THE COURT:  All right.  Thank you.
17            THE WITNESS:  Wonderful.
18   BY MR. ROSENBERG:
19   Q.  Mr. Martinez, can you tell us where you went to college?
20   A.  I went to the College of Santa Fe, in Santa Fe, New Mexico.
21   Q.  When did you graduate from college?
22   A.  I graduated in 1999.
23   Q.  Can you just give us an overview of your post-college
24   career, at a high level, until your first interaction with
25   CFPB?
```

1    A.  Sure.  While I was in college I actually worked for my

2    member of Congress, handling constituent services in the

3    district office.  Shortly thereafter, when I graduated, I moved

4    to Washington, D.C., worked for two separate trade associations

5    for a short period of time, and then I was hired to work at the

6    House Ways and Means Committee with Congress.  I was there from

7    starting in about 2001 through 2007, and then I was hired for a

8    position at the Department of Treasury, specifically, serving

9    as a senior advisor to the Director of the Community

10   Development Financial Institutions Fund.  That is an office

11   within the Office of Domestic Finance.

12           It was during that time that the financial crisis

13   occurred, so it was a really interesting and wonderful

14   opportunity to be able to be part of the Treasury stand-up

15   team, to stand-up the CFPB.

16   Q.  And what do you mean to stand up the CFPB?

17   A.  So it was a very contentious time.  The regulators were not

18   generally happy about what was occurring because they were

19   losing quite a bit of jurisdiction from their portfolios, so

20   there didn't seem to be a lot of enthusiasm to stand up the

21   Bureau, so it was given the Department of Treasury's Treasury

22   Secretary with the authority to stand the Bureau up, build an

23   infrastructure and then allow them to be part of their own

24   independent Bureau status.

25   Q.  And can you describe for us what work you did as part of

1    the stand-up process?

2    A.  Yeah, it was fascinating.  I do have a background in human

3    capital, so I worked very closely with all of the regulators,

4    counterparts, liaisons to detail, in some cases actually hire

5    people into the CFPB during that time.

6    Q.  And I may ask you just to slow down a tiny, tiny bit to

7    make sure the court reporter can keep up with you.

8    A.  I'm sorry.  Yes.  Thank you.

9    Q.  I'm just curious, Elizabeth Warren -- my vague recollection

10   is that Elizabeth Warren was involved in the creation of the

11   CFPB.  Did you work with her at all as part of the stand-up

12   process?

13   A.  I did.  It was an incredible experience.  I was there for

14   three months.  She was an incredible leader to work with.  I --

15   there's a lot of things I learned from her.  But, yeah, she was

16   there on a daily basis, working directly with the employees.

17   Q.  Now, after -- was the stand-up process for which you were

18   involved about three months long?

19   A.  It was three months long.  My specific job was to work in

20   their human capital office, or a small version of a human

21   capital office, to get the initial detailees and transferees

22   into the CFPB, build out a payroll system and operational

23   infrastructure until -- the staff was originally under, like,

24   Treasury's payroll system, so we built an entirely new payroll

25   system that we transferred them into.

1    Q.  After that three-month process with which you were

2    involved, what did you do next?

3              THE COURT:  Can you tell us what year that was?  I

4    know when the statute was passed, but I'm not sure if you're

5    talking about before the statute was passed, after it was

6    passed.

7              THE WITNESS:  It was after it passed.  I was on the

8    ground, I believe, in December of 2010.  There were about 34,

9    35 of us from the Department of Treasury, and by the time I

10   left, it was February, I believe, of 2011, and there were

11   hundreds of people at that point on board, couple hundred.

12             THE COURT:  Go ahead.

13   BY MR. ROSENBERG:

14   Q.  What did you do next?

15   A.  After CFPB, I actually returned back to Treasury, I have a

16   love for the department.  I became an operations manager at the

17   same organization, the CDFI Fund, and then worked as a program

18   manager for their flagship grant program and their Native

19   American grant program.

20   Q.  And after that?

21   A.  After working for domestic finance, the CDFI Fund, I was

22   recruited into the HR director position for Treasury

23   headquarters.

24             THE COURT:  Let me interrupt you for one second.

25   I've been informed that while we do have authorization to

1    operate the public line when it's just a legal proceeding and

2    we're hearing argument in a civil case, that we don't have

3    authorization to do it if there are live witnesses testifying.

4    So before I turned it off, I didn't want everybody to think our

5    system was down and there's something wrong with the phone.

6    But the testimony is not going to be broadcast through the

7    line.

8            You can proceed.

9    BY MR. ROSENBERG:

10   Q.  Obviously you returned to CFPB at some point.  But maybe

11   you can just give us an overview of the other tasks that you

12   had at Treasury?

13   A.  Sure, I'll do that quickly, with enough time for the

14   reporter to do her job.

15           So after serving as HR director for Treasury

16   headquarters, I was recruited to serve as the chief management

17   officer of the Export/Import Bank of the United States, which

18   is another independent organization.  I was there for

19   approximately three years.  And then the chief operating

20   officer position became available at the CFPB and it was always

21   my goal to go back.  I enjoyed my experience there, and I

22   looked forward to it.

23   Q.  When did you become the chief operating officer of CFPB?

24   A.  It would have been in February of 2023.

25   Q.  And what is the role of the chief operating officer at

1     CFPB?

2     A.   The -- it was very similar to my experience at EXIM Bank.

3     My position there is to support the administrative or

4     operational infrastructure of the organization, so finance,

5     procurement, human capital, data governance, FOIA, records

6     management, security, facilities, those types of positions

7     report to me.

8     Q.   Now, when you started as chief operating officer in 2023,

9     that was, obviously, in the timeline under the prior

10    administration, who was director of CFPB at that time?

11    A.   It was Rohit Chopra.

12    Q.   And what was Mr. Chopra's management style like?

13    A.   Fortunately, with me, personally, he was -- he trusted me

14    and my position.  He was very hands-off.  However, the Bureau

15    historically -- and it's not just him, but the Bureau

16    historically has a very top-down approach.  So the head of

17    Agency -- it's very centric around the head of Agency, they

18    make the decisions.  I was in a unique position where I did not

19    make decisions as the chief operating officer under him, but,

20    nonetheless, he was the head of Agency, so he had that right.

21    Q.   You mention a top-down approach.  I'm just curious, at that

22    time, about how many employees did CFPB have?

23    A.   There were over 1700.

24    Q.   Relatively small agency?

25    A.   I would say for government agencies, yes, medium size,

1    perhaps.

2    Q.  Certainly smaller than Treasury?

3    A.  Much smaller than Treasury, yes.

4    Q.  When did Mr. Chopra's time as director of CFPB come to an

5    end?

6    A.  It was approximately Saturday, the 1st of February.

7    Q.  And what happened next, after he ceased to be the director

8    the CFPB?

9    A.  We -- it was -- we anticipated it because -- I mean, I was

10   personally surprised that it didn't happen sooner.  But, on the

11   morning of the 1st, we received an email from the director

12   letting us know that his time had come to an end.  And he had

13   notified, I believe, the White House at that point.  So, that's

14   how I learned.

15   Q.  Is that when -- you said this was the 1st.  Is that when

16   Acting Secretary Bessent, or Bessent, became acting director?

17   A.  No.  My recollection is we probably went about 24 to 48

18   hours without, like, a named leader.  I believe it was Monday,

19   after that weekend, that our deputy director sent an email out

20   essentially saying she would be acting director during that

21   time.  And then shortly after she sent that email, then we

22   received a separate email from Secretary Bessent, letting us

23   know that he had been named the acting director effective,

24   actually, which was a little odd, effective the 31st, which was

25   that Friday.

1    Q.  Retroactive?

2    A.  Retroactive, correct.

3    Q.  So, Mr. Martinez, there are two binders in front of you,

4    one of which says CFPB Internal Emails, CFPB Enforcement Action

5    Filings, CFPB Department of Education MOU, ECF No. 56.

6    A.  Okay.

7    Q.  I will note that the volume of materials that's in this

8    binder is a little bit larger than what the face of the binder

9    says.  And, in fact, we're going to turn to one of the

10   documents that's not explicitly referenced on the face of the

11   binder.

12        I'm going to ask you to turn to tab No. 56.  And I'll

13   just speed this along a little bit.  You'll see this is the

14   first declaration you submitted in this case.

15   A.  Yes.

16   Q.  And so I'm going to ask you to turn -- at the top of each

17   of the pages in this document is a running header that contains

18   the case number, you know, the docket number here, it's 31-1,

19   and then a page number, it will say page X of Y.

20   A.  Sure.

21   Q.  I'm going to ask you to turn to page 9.  So it will say

22   page 9 of 22 of document number 31-1.  Do you see that?

23   A.  Yes.  Yes.

24   Q.  Okay.  Is that the email to which you referred just now?

25   A.  This is the email that was sent out on February 3rd, yes.

1    Q.  That email is the one that names acting -- that names the

2    Treasury secretary as the acting director of CFPB?

3    A.  That is correct.

4    Q.  Let me back up for a second.  This was your first

5    transition from one administration to another at CFPB?

6    A.  No -- oh, at CFPB, yes.

7    Q.  But you actually anticipated what I was going to ask.  It

8    wasn't your first transition from one administration?

9    A.  No, no.

10   Q.  And that's because, if my memory serves me correctly, you

11   started working in the executive branch in 2007.

12   A.  That is correct.

13   Q.  And worked in the executive branch since then?

14   A.  I have.

15   Q.  Okay.  Based on your experience in the executive branch,

16   largely at the Department of Treasury or its components, does

17   this email strike you as odd in any way in the context of a

18   presidential transition?

19   A.  It does not.  I mean, this specific email from Secretary

20   Bessent wasn't, to me, surprising or unusual.

21          THE COURT:  Can you just tell me -- it wasn't your

22   first one, you've been in the executive branch since 2007 --

23   the presidential transitions that are the basis for your

24   experience when you talk about what's my experience?

25          THE WITNESS:  Yes, ma'am.  Well, one example is --

1    well, I was there during the Bush to Obama transition, I was

2    there from the Obama to Trump transition, and then the Trump

3    transition to the Biden transition, and then now the Biden

4    transition to the Trump transition.

5            THE COURT:  Okay.  Thank you.

6            THE WITNESS:  Sure.

7    BY MR. ROSENBERG:

8    Q.  Just to, you know, maybe build out on the Judge's question

9    for a moment, what type of changes have you seen at Treasury,

10   or any other components, during these types of transitions that

11   makes you believe that this email is not unusual?

12   A.  There's been a couple of experiences that -- the first

13   experience I had at the Department of Treasury, and one of the

14   reasons I was recruited into that specific position at the CDFI

15   Fund, and most people probably would not know this, but back in

16   the 2000s -- the CDFI Fund is a grant and financial assistance

17   program.  And it was President Bush at that time, was

18   contemplating actually transitioning that organization into the

19   Department of Commerce, along with other federal grant

20   programs.

21            As a result of that, there were a lot of people that

22   left the organization.  So it was pretty decimated at that

23   point, so I was hired specifically to work with the new

24   appointed director, to essentially bring the agency back to

25   life and try to build some operational infrastructure into the

1    organization.

2    Q.  I'm just curious, are there any other examples that you can

3    think of?

4    A.  Yeah.

5         THE COURT:  I don't really think that the February

6    3rd email from -- concerning Secretary Bessent is the issue in

7    this hearing.  I mean --

8         MR. ROSENBERG:  I'll move on.

9         THE COURT:  You can talk about it as much as you

10    want, but I don't think that's what we need to talk about.

11         MR. ROSENBERG:  I'll move on.  And if there are any

12    points where the Court wants like to provide guidance on the

13    testimony that it wants to hear, please let me know.

14         THE COURT:  All right.  Thanks.

15    BY MR. ROSENBERG:

16    Q.  On that note, let's change topics then.

17         Are you familiar with the United States DOGE service?

18    A.  I am now.

19    Q.  What was your first interaction with DOGE?

20    A.  My first interaction with DOGE was the evening of February

21    6, which I believe was a Thursday.

22    Q.  And can you describe that for us?

23    A.  We received an email from the Secretary Treasury's staff to

24    let us know that several of the DOGE personnel were headed to

25    our building and we needed to let them in.

```
 1    Q.  And --

 2              THE COURT:  That night?

 3              THE WITNESS:  That night.  The email came

 4    approximately 5:45 and they were there at about 6:15, 6:30 that

 5    evening.

 6    BY MR. ROSENBERG:

 7    Q.  If you recall, who is the "they" to which you are

 8    referring?

 9    A.  We were anticipating two IT engineers to show up.  There

10    was actually -- the two IT engineers ended up not showing up,

11    but who did show up was Christopher Young, with DOGE.

12    Q.  And at that time, what was your understanding --

13              THE COURT:  All by himself?  So it is not a "they,"

14    it was a "he"?

15              THE WITNESS:  It was just he, yes, ma'am.

16              THE COURT:  What was his title?

17              THE WITNESS:  He didn't have a title.  Based on my

18    interaction with him and what I was able to pull from him, it

19    was very clear that he was like a project manager or a project

20    lead that was there -- assigned to be on that specific

21    assignment, to lead the IT engineers that were to follow.

22    BY MR. ROSENBERG:

23    Q.  Since we're on that topic, let me ask, Mr. Young, is he

24    considered to be a CFPB employee?

25    A.  He has been detailed to the CFPB.  He is an employee, I
```

 1    believe, of Office of Personnel Management.

 2    Q.  And --

 3              THE COURT:  When was he detailed to the CFPB?

 4              THE WITNESS:  He was detailed officially on the 7th

 5    to the CFPB.  So our introduction was the evening of the 6th

 6    and then on the 7th the DOGE staff showed up and we worked with

 7    them to try to figure out who they were and why they were

 8    there.

 9    BY MR. ROSENBERG:

10    Q.  And is that --

11              THE COURT:  Who showed up on the 7th?

12              THE WITNESS:  Initially it was Chris Young, Jordan

13    Wick, and Jeremy Lewin showed up that morning and then by the

14    afternoon there were three additional DOGE employees that

15    showed up.

16              THE COURT:  And what did they do?

17              THE WITNESS:  The discussion that we had with DOGE

18    Friday morning, the 7th, was a similar conversation that we had

19    with Chris Young on Thursday evening.  And the point of the

20    discussion was to talk about what their engagement was and what

21    they would be doing at the Bureau.

22              THE COURT:  And what did they say they were going to

23    be doing?

24              THE WITNESS:  I will say this loosely, I felt as

25    though the information they were requesting, which was

1    primarily operational data, they wanted access to our human

2    capital system, procurement system, travel system, and our

3    finance system.  They also wanted a copy of our org chart.  And

4    I -- based on my discussion with them, they were very

5    interested in the inner operations of the organization.  And I

6    almost felt like it was an engagement that I've had with prior,

7    like, inspector generals office.  So it seemed like an audit

8    almost of our operational functions.

9              THE COURT:  Did they undertake the audit on the 7th?

10             THE WITNESS:  They started on the evening of the 7th,

11   yes.  It was one individual on that team that was given access

12   to those systems they requested.  I had staff working with that

13   individual to show them quickly how to utilize the system

14   through Microsoft Teams.  It was a virtual session.  One of my

15   employees worked until 4 o'clock the next morning with the DOGE

16   personnel to provide that technical assistance.

17             THE COURT:  So when was this audit completed, as far

18   as you know?

19             THE WITNESS:  I believe it's still -- well,

20   there's -- they're still present.  They're still detailed to

21   the Bureau.  I feel -- from my recollection is, is that the

22   audit was quickly wrapped up.  It wouldn't have been the week

23   of the 10th, but it would have been the following week.

24             Once the director of OMB, who is our acting director,

25   and his chief legal officer became more engaged in the inner

```
1    workings of our operations, there was definitely a change in

2    posture that was very clear to me.  Somewhat differing

3    opinions, differing approaches.  DOGE came in with a very hard

4    fist, so to speak.  I felt as though, when the OMB director's

5    team came in, I felt like the adults were around the table at

6    that point.

7                THE COURT:  Well, I thought Mr. Vought came in on the

8    8th?

9                THE WITNESS:  He did.

10               THE COURT:  So who was in charge at that point?

11               THE WITNESS:  Presumably he was in charge during that

12   point.  However, many of the -- so the evening of the 7th,

13   Director Vought sends email communications to the staff,

14   letting our team know that those employees were acting,

15   essentially, on his behalf and were detailed to the Bureau and

16   had access to our systems.  So --

17               THE COURT:  And so the conversations that you had

18   with them, that you talk about in your declaration, during the

19   week of the 10th, where you got the impression that they were

20   shutting things down because that's what they told you, he'd

21   already said they work for me?

22               THE WITNESS:  Yes.

23               THE COURT:  Okay.

24   BY MR. ROSENBERG:

25   Q.  Let me back up for just a moment, so the record is clear.
```

1    You referred to this being something like an audit?

2    A.  Yeah.

3    Q.  When I think of an audit, I think of an accountant's audit.

4    Was this a formal audit?  Was is it a process?  Was it

5    something else?

6    A.  Well, it felt like a formal audit, in the sense that

7    they -- I had the impression that they knew exactly what they

8    wanted to do, how they wanted to do it.  They asked for very

9    specific access to our systems and we provided that to them.

10   Q.  You mentioned, I think, that they requested access to

11   systems -- I think you may have said, like, sort of on the

12   operational side, or operations.

13   A.  Right.

14   Q.  Did they express any interest in the programmatic functions

15   of the CFPB?

16   A.  That's actually a great question.  Thank you.  The --

17   during the time in which DOGE -- I would say within the first

18   24 to 48 hours that DOGE was on site there did not appear to be

19   an interest in any of what I would call the mission critical

20   systems, the programmatic side of the house.  The reason I was

21   dealing with them directly at that point was it was my systems

22   that I was responsible for that they wanted access to.  We did

23   let them know, several times, and our chief information officer

24   let them know as well, that if at any point during the

25   engagement that they wanted access to any of our mission's

 1    specific systems, that that was going to be a whole different

 2    discussion, probably with our legal counsel and others.

 3    Q.  And one more clarifying point just to make sure we're all

 4    on the same page.  You're referring to DOGE --

 5    A.  Right.

 6    Q.  -- perhaps because I asked the initial question about DOGE.

 7    But you also mentioned that within a day, at least for

 8    Mr. Young, they were considered to be CFPB employees.  Is there

 9    anything that documents that?

10    A.  Yes.  On the evening of the 7th, before they requested

11    access to our, like, our SharePoint site, our web page, other

12    systems under the purview of our chief information officer,

13    before we even allowed them access to those systems, we

14    received an email from Director Vought, letting the agency know

15    that the DOGE employees were being granted access from him.

16    And he also provided an e-signature copy of a memorandum of

17    understanding that evening.  It was that information that we

18    used to -- the CIO used to provide access to them.

19            THE COURT:  I'm not going to ask you the follow-up

20    question to this, I just want to understand the scope of your

21    knowledge.  You certainly know which systems there are that are

22    essential to your side of the house, the operations side of the

23    house, correct?

24            THE WITNESS:  Yes.

25            THE COURT:  Do you know -- you talked about there's a

1    programmatic side of the house and there are mission-critical

2    systems for the programmatic side of the house?

3              THE WITNESS:  Yes.

4              THE COURT:  Do you know what they are?

5              THE WITNESS:  I generally know what they do and why

6    we use them.  But I've never accessed those systems.  I've not

7    had a need to access those systems.

8              THE COURT:  So who knows the programmatic side of the

9    house?  Who is the person with knowledge about that?

10             THE WITNESS:  So, the -- it would be the associate or

11   my peers who run their specific programs for the Bureau.

12             THE COURT:  So each program head knows what is

13   mission critical for their program?

14             THE WITNESS:  Correct.

15             THE COURT:  There's not a person like you who is over

16   all the program heads, other than the director themselves?

17             THE WITNESS:  The chief of staff played that role.

18   That position was a political appointment position and that

19   person did leave the same day that Director Chopra left.

20             THE COURT:  Okay.  Go ahead.

21   BY MR. ROSENBERG:

22   Q.  Let's go back to the February 7th meeting.  Is that the

23   same meeting that you discussed in your declaration that raised

24   security concerns?

25   A.  Yes.  There were a couple things that occurred -- well,

 1    there was a couple of things that occurred that day, most -- so

 2    I'm very sensitive to security issues just in general, having

 3    worked on the Hill for Congress, but also in a Secret Service

 4    environment, and also having worked in national security, you

 5    become very, very focused on security-specific issues.

 6         When I was talking to Chris Young on Thursday evening

 7    by himself, he was telling me he thought that potentially the

 8    reason that the DOGE boys were late was because they were

 9    having to order car service because they were being essentially

10    stalked, tailed, followed, harassed.  So that was the first

11    indication that something was off and odd.

12         The next morning we had some of our career staff

13    members that were giving reports that they had been followed in

14    the building by other employees, they were asking to see their

15    PIV cards, they were wondering if they were with DOGE.  They

16    responded that they were not.  However, when DOGE finally

17    arrived at our building, we were in a conference room in the

18    basement that we had allocated for them to use during their

19    engagement and it was during that discussion that we started --

20    that we started to see employees circling the hallway of the

21    basement.

22         The DOGE folks pointed out and said, Are you aware

23    that somebody is pushing a baby stroller down the hallway and

24    taking pictures of us through the window?  And we were, like,

25    no, we weren't aware of that.  So somebody on our career staff

1    team said I think we need to move to the next conference room

2    over, where the window was covered.

3          So we moved over into that space.  And then I had

4    stayed behind to check an email in the conference room next

5    door and then all of a sudden I heard just the sheer chaos that

6    was going on next door.  And from what I could tell from where

7    I was sitting and standing, one of our employees,

8    unfortunately, walked directly into the conference room,

9    started to question everybody around the table, both our career

10   staff, the DOGE staff, started to demand to take -- to see

11   their IDs.

12         They showed their IDs, she started taking pictures.

13   They were concerned that they were live streaming.  She was

14   taking pictures of their laptops.  And at one point she got

15   face to face with one of our staff members in our technology

16   shop and said who are you?  Show me your ID.  Why are you here?

17   And his response back to her was, like, well, who are you?

18   Like, why are you asking me this question?

19         So it was very contentious.  Four security guards

20   were called down to see what was happening.  The employee did

21   leave.  I understand she left the building and then it was

22   shortly thereafter that we could hear the protesting taking

23   place outside of the building.

24   Q.  I'm going to ask you to turn -- we're still on tab No. 56.

25   So we're still looking at the attachments to your declaration.

```
 1    I'm going to ask you to turn to document 31-1, page 18 of 22.

 2    A.  You said tab?

 3    Q.  Still the same tab, tab 56 in the binder of CFPB's

 4    documents, page 18 of 22.

 5    A.  Oh, 18.  Got it.  Yes.

 6    Q.  Do you recognize this email?

 7    A.  I do.

 8    Q.  What is it?

 9    A.  This was the email I sent to the workforce after being

10    instructed to do so by Director Vought's staff.

11            THE COURT:  By who?

12            THE WITNESS:  Director Vought's staff, our acting

13    director.

14            THE COURT:  Okay.

15    BY MR. ROSENBERG:

16    Q.  When she asked whom, is there anyone specific?

17    A.  I couldn't recall.  It was either -- it was either the

18    chief legal officer or it was Chris Young.

19    Q.  Why was -- you ultimately sent out the email to close the

20    building?

21    A.  I did send the email, yeah.

22            THE COURT:  I think at the last hearing I said,

23    again, that my interest isn't why the building was closed.

24            MR. ROSENBERG:  Okay.  I'll move on.

25    BY MR. ROSENBERG:
```

1    Q.  I would like you to turn, same tab, 56, page 16.  Just to

2    move this along, I think we all sort of recognize this

3    document.  This is the email from Acting Director Vought, sent

4    on Saturday, February 8th, noting that President Trump

5    designated him as acting director the prior day, February 7th.

6    And like the Bessent email, this email contains a series of

7    bullets as to what agency employees should or should not do.

8    It's a little bit different -- let me ask you this:  Is it a

9    little bit different in scope than Bessent's email?

10   A.  This was a lot more specific.  I recall the last two bullet

11   points.

12   Q.  How so?

13   A.  Because in this specific directive the employees were being

14   asked to cease all supervision and examination activity and to

15   cease all stakeholder engagement.

16   Q.  I asked you for your reaction to Acting Director Bessent's

17   email.  Do you have any reaction to this email in terms of

18   whether it's out of the ordinary?

19   A.  Well, I mean, there's a couple of different ways to look at

20   it.  I -- my take on the situation with this specific, like,

21   email, was that it appeared, though, that under Vought, I would

22   presume that they felt as though the agency needed further

23   clarification.  So, I would imagine, based upon my

24   understanding of the agency, there were some things that

25   stopped when Bessent sent his email out originally, and then

1    certain activities continued throughout the week and this

2    essentially made it much more clear.

3            THE COURT:  What does "stakeholder engagement" mean

4    to you?

5            THE WITNESS:  Stakeholder engagement, to me, would be

6    our interaction with our constituents or consumers or trade

7    associations or interest groups, financial institutions.

8            THE COURT:  And have you ever seen something like

9    that in the transitions with which you have experience?

10           THE WITNESS:  At Treasury I've seen similar.  This,

11   obviously, is a very unique situation.  But I have seen pauses

12   on stakeholder engagement specifically at the Department of

13   Treasury.  Generally, because, like, Treasury itself is

14   somewhat different than the Bureau, is a very policy

15   oriented -- I worked at headquarters, so headquarters is very

16   policy oriented.  So typically there is some stoppage or --

17   there's a lot more caution about sending employees out to speak

18   with the public or interest groups before the employees have an

19   idea what the administration expects out of their policy.

20           THE COURT:  Go ahead.

21   BY MR. ROSENBERG:

22   Q.  I'm going to ask you to turn now -- we're still on tab 56,

23   but I'm going to ask you to turn to document 31-1, page 20 of

24   22.

25   A.  You said 20 out of 22?

1    Q.  Yes.  Just to be clear, this is the Monday, February 10th

2    email from Acting Director Vought?

3    A.  Correct.

4    Q.  Do you recognize this document?

5    A.  I do recognize it.

6    Q.  Okay.  What is your understanding, if you have one, of what

7    this document -- what this email was attempting to accomplish?

8    A.  The way that I read it was different than I've now

9    understood that my colleagues read it.  But what the --

10             THE COURT:  His question was -- we can all read it,

11   he wants to know if you know, from your personal knowledge,

12   what it was intended to accomplish?

13             THE WITNESS:  No.

14             THE COURT:  Okay.

15   BY MR. ROSENBERG:

16   Q.  The email does note, and correct me if I'm wrong, but if

17   there are any urgent matters, please alert the acting director

18   through Mark Paoletta, the chief legal officer, to get approval

19   in writing before performing any work task.  Is that correct?

20   A.  Correct.

21             THE COURT:  That was only urgent matters, otherwise

22   employees should stand down from performing any work task.  It

23   says that, too?

24             THE WITNESS:  Yes.

25   BY MR. ROSENBERG:

1    Q.  I'm going to go back to DOGE for a second.  And when I'm

2    referring to DOGE, it's a matter of convenience because I think

3    your testimony is at this point in time individuals affiliated

4    with DOGE were in fact with CFPB -- functionally CFPB

5    employees, is that fair?

6    A.  Yes.

7    Q.  Did individuals affiliated with DOGE ask about CFPB

8    finances?

9    A.  Yes.

10    Q.  Can you tell us about that?

11    A.  Yes.

12            THE COURT:  Would there be some document that shows

13    when these people were added or designated to be CFPB

14    employees?

15            THE WITNESS:  That would be the Director Vought's --

16    or, Acting Director Vought's email that he sent out the evening

17    of the 7th which specifically called out the names of the

18    individuals, and then it was a memorandum of understanding that

19    had been signed between himself and the DOGE representative.

20            THE COURT:  To the effect that?

21            THE WITNESS:  That they were allowed to have access

22    to our systems and --

23            THE COURT:  That's different than saying they're CFPB

24    employees now?  They're just getting access?

25            THE WITNESS:  Correct.  As -- we have detailees,

1    obviously, from across government and it's not abnormal to get

2    the MOU up front, to let the agency know that these individuals

3    are going to be detailed in.  And then what occurred, which

4    typically occurs, is the subsequent paperwork that follows that

5    structures the engagement with the other agencies.

6            THE COURT:  Go ahead.

7    BY MR. ROSENBERG:

8    Q.  I think I had asked, you know, what -- basically, tell us

9    what happened initially when individuals affiliated with DOGE

10   asked about CFPB finances?

11   A.  Yes.  The chief legal officer at DOGE asked specifically

12   what the status was of our finances.  And he specifically

13   wanted to know how much money we had in our accounts.  So I

14   immediately reached out to our chief financial officer to pull

15   the account information.

16           We have three accounts specifically for the Bureau

17   established, which could cause a little bit of confusion

18   because we're not just like a one-line item organization.

19   Q.  What did you mean by that?

20   A.  It means that we have three specific funds.  We have the

21   fund that is used to pay our financial costs for our operations

22   of the agency.  So that would be all of our contracts,

23   personnel, anything associated with the work that's done.  We

24   then have the civil penalty fund, which is a fund that's

25   established after a financial institution is directed to pay

1    what I would call restitution to affected consumers, and then

2    the agency makes a decision at that point with returning some

3    of that money back to consumers, which they have.  And then the

4    third fund is a reserve fund that was established.

5    Q.  Let's talk about that reserve fund for a moment.  And just

6    to move this along, I'm going to ask you to turn to page 22.

7    We're still looking at the attachments to your declaration, so

8    this is document 31-1, in tab 56, page 22.

9    A.  You said 31?

10   Q.  No, tab 56, same tab.

11   A.  Got it.

12   Q.  Document 31-1 at the top, page 22.

13        Do you recognize this letter?

14   A.  I do recognize the letter.

15   Q.  This is the letter from Acting Director Vought to Jerome

16   Powell, Chairman of the Board of Governors of the Federal

17   Reserve System.

18        Just to understand the context very briefly, the -- my

19   understanding at least, and you can correct me if I'm wrong, is

20   that CFPB sends letters such as this one on a quarterly basis

21   to the Federal Reserve regarding its funding, is that correct?

22   A.  That is the protocol, correct.  This letter or similar

23   letter goes to the chairman, yes.

24   Q.  CFPB gets its funding from the Federal Reserve?

25   A.  Correct.

1    Q.  It doesn't get appropriations from Congress?

2    A.  We're not an appropriations agency, that is correct.

3              THE COURT:  So that means it's not taxpayer money?

4              THE WITNESS:  Correct.

5    BY MR. ROSENBERG:

6    Q.  And I'll just summarize.  I mean, in -- why don't you

7    summarize the gist of this letter for us, based on your

8    understanding?

9    A.  The gist of this specific letter -- again, I'm not

10   surprised that this occurred.  I'm not surprised that the

11   director requested zero transfer from the Fed.

12   Q.  I was going to ask, when you said this occurred, the "this"

13   you referred to is what you just said now, which is requesting

14   zero dollars from the Fed?

15   A.  The exact same scenario played out under the first Trump

16   administration when Acting Director Mulvaney also sent a

17   similar letter to the Fed requesting zero transfer for that

18   quarter.

19   Q.  The letter refers to $711 million in the Bureau of Consumer

20   Financial Protection fund, but I think you testified that there

21   are various funds?

22   A.  Correct.

23   Q.  And you've mentioned a reserve fund.  What is the reserve

24   fund?

25   A.  So the reserve fund was somewhat controversial under

```
 1    Director Mulvaney as well.  Again, not surprised that this
 2    played out the way that it did.  The reserve fund --
 3              THE COURT:  I'm going to ask you to just answer his
 4    questions.  And he'll ask you if he wants your opinion.
 5              THE WITNESS:  Okay.  Thank you.
 6              THE COURT:  All right.
 7    BY MR. ROSENBERG:
 8    Q.  I actually may have forgotten what my question was.  I
 9    think it was:  What is the reserve fund?
10              THE COURT:  I don't think you got there.  What is it?
11    A.  The reserve fund?
12    BY MR. ROSENBERG:
13    Q.  Yes.
14    A.  I call it a rainy day fund, a continuity fund.  The
15    director is allowed to build up that fund.  It was built up
16    since I arrived, in 2023, for a couple of different purposes.
17    Q.  So let me ask you then, what were the purposes for which
18    the reserve fund was built up?
19    A.  At the time, in 2023, we built it up for two purposes.  One
20    was there were specific potential items that the Agency
21    potentially could incur over time and that funding would be
22    available in the reserve fund to cover those costs.  The second
23    reason, that is very clear to me why it was being placed in the
24    reserve fund, was we were undergoing the Supreme Court ruling,
25    whether or not our agency should be appropriated or not
```

 1    appropriated.

 2    Q.  And for the record, is that -- does this name ring a bell:

 3    *Consumer Financial Protection Bureau versus Community Financial*

 4    *Services Association of America*?

 5    A.  That's correct.

 6    Q.  Now, you're not a lawyer?

 7    A.  No.

 8    Q.  But -- well, I thank goodness for small things.

 9        What is your -- but you seem to have an understanding of

10    what the issue was in that case.  Can you explain --

11        THE COURT:  Are we kind of getting a little of far

12    afield for where we need to be right now?

13        MR. ROSENBERG:  I don't think so, Your Honor, because

14    I think there's an issue that's been raised in this litigation

15    about -- we're going to go to in a minute -- an attempt to

16    return funds to the Federal Reserve and the amount of money

17    that is in the Bureau's reserve fund.  And what I anticipate

18    that the witness will show is that there was actually a very

19    large amount of money in the reserve fund and so it was not at

20    all unusual for the acting director to send a letter to the

21    Federal Reserve not requesting additional funds.

22        If this is not an issue that is of concern to the

23    Court, I'm happy to move on.

24        THE COURT:  I think just for purposes -- it may be an

25    issue for the merits.  I think for the purposes of the

1   preliminary injunction, we're really talking about whether

2   there's an ongoing effort to have the agency move forward and

3   its mission, or whether there's an ongoing effort to dismantle

4   it.  Now, I understand that you're saying that they're saying

5   this is part of the effort to dismantle it, so we can touch on

6   it a little.

7        My question to you is:  Does the 711 figure include

8   the civil penalty fund?

9        THE WITNESS:  No.

10       THE COURT:  Okay.

11  BY MR. ROSENBERG:

12  Q.  Let me ask you this --

13       THE COURT:  Do you know what the operating costs were

14  per month?

15       THE WITNESS:  I don't recall the operating costs per

16  month for that period.

17       THE COURT:  Were you asked to provide that

18  information between the 7th -- the evening of the 6th, when the

19  DOGE people arrived, and the morning of the 8th, when this --

20  on the 8th, when this letter goes out, we don't need any more

21  money?

22       THE WITNESS:  The reserve fund was significant enough

23  to carry us for another quarter.

24       THE COURT:  All right.

25  BY MR. ROSENBERG:

1    Q.  Just to be clear on this, CFPB has a chief financial

2    officer?

3    A.  Yes.

4    Q.  That's not you?

5    A.  No.

6    Q.  But the chief financial officer does report to you?

7    A.  He does.

8    Q.  Okay.  And that's Mr. Guy?

9    A.  Yes, and he advised, as well, that in my discussions with

10   him, at that time, that we had sufficient funds to carry out

11   our expenditures or even zeroing out.

12            MR. ROSENBERG:  I'll also just note for the Court

13   that CFPB is currently under at least a temporary order

14   regarding the transfer of funds, and that's where this is going

15   and that's what I wish to address next.

16            THE COURT:  Well, there's an order from another Court

17   that I don't have any authority to go behind.  So that's one of

18   the reasons I asked you the question.  I think there's a

19   certain amount that's before that Court and there's a certain

20   amount that's before me.

21            MR. ROSENBERG:  That is correct.  That seems to be

22   the nature of our practice of having multiple lawsuits to

23   defend.  But that lawsuit is focused almost exclusively on this

24   issue.  And I think I can wrap this up pretty quickly.

25            THE COURT:  Okay.

1    BY MR. ROSENBERG:

2    Q.  Are you aware of any discussions regarding returning CFPB

3    funds to the Federal Reserve?

4    A.  Yes.

5    Q.  Can you tell us about those discussions?

6    A.  Yes.  The chief legal officer asked whether or not there

7    was a process or if it was even an option to return money back

8    to the Federal Reserve Board.  Again, I immediately contacted

9    our chief financial officer to ask him what he was aware of.

10   He immediately said I am not an attorney, but I seriously doubt

11   that is possible, let me reach out to the Federal Reserve

12   board, which he did, spoke to his counterparts there.  There

13   was no mechanism to return money back to the Federal Reserve.

14   Q.  We're going to -- relatively exciting moment here.  We're

15   going to switch binders for one second.

16        So if you close up that first binder and then open up

17   the plaintiffs' binder.  It's tab E.  They've marked it as

18   Exhibit E.  And it should say at the top 60-1, page 12 of 107.

19   A.  Okay.

20   Q.  Take a moment.  Do you recognize this document?

21   A.  Yes.

22   Q.  It's an email from you to various other individuals?

23   A.  Correct.

24   Q.  By the way, I'll note that among the individuals in this,

25   there is a CC recipient of this document, Christopher Young,

1    who you discussed earlier?

2    A.  Yes.

3    Q.  And it appears that he has, at least as of February 11th, a

4    CFPB email address?

5    A.  He does.

6    Q.  And that would be where it says Young, Christopher,

7    parenthetical, CFPB?

8            THE COURT:  These are two-sided now in this binder,

9    is that how this works?

10           MR. ROSENBERG:  We try to save paper where we can.

11           THE COURT:  The other one wasn't like that, so I'm

12   just trying to figure out if I'm looking at the right thing.

13   Behind tab A is a piece of paper that says Exhibit E, and then

14   you're talking about the email on the reverse of that, correct?

15   Just now, that's what you're asking him about?

16           MR. ROSENBERG:  It is the email, it says page 12 of

17   107.

18           THE COURT:  Okay.  All right.

19   BY MR. ROSENBERG:

20   Q.  Why did you send this email?

21   A.  Well, I sent it for two reasons.  One was I had received

22   the question to our CFO about the ability to return money back

23   to the Federal Reserve.  And the way that our funds work is

24   highly, highly unusual and it's very difficult to explain.

25   But, my recollection is on Tuesday, February the 11th, I

1    received a subsequent phone call from Mark Paoletta, our chief

2    legal officer, and Mr. Bishop, inquiring about the way that

3    our -- the Fed system transfer works, and then also they'd

4    specifically asked about the how the civil penalty fund works.

5            So I was not comfortable getting into that level of

6    detail, so this was intended for me to introduce them to the

7    CFO to have that discussion.

8    Q.  And I think we can wrap it up here, what was the CFO's

9    conclusion?

10   A.  Well, the conclusion with regards to the Federal Reserve

11   transfer back, that it was not possible.

12   Q.  And he also spoke with the Federal Reserve about that?

13   A.  He did.

14   Q.  Okay.  And do you have an understanding as to whether the

15   Federal Reserve shared that conclusion?

16   A.  They did.  They did.

17           THE COURT:  At the outset, did the DOGE people

18   understand that the civil penalty fund isn't available to fund

19   operations in any way?

20           THE WITNESS:  It didn't come up with DOGE

21   specifically.  It doesn't come up until Dan Bishop, who is an

22   advisor to Director Mulvaney, started to ask questions about

23   the civil penalty fund and what it was, you know, how did it

24   work, where was the money, whether it had stopped or not.  It

25   did not stop.  We have an obligation to continue with that.

```
 1              THE COURT:  All right.  You meant Director Vought?  I

 2    think you said Mulvaney.  I just want to make sure we're

 3    talking about the present --

 4              THE WITNESS:  I'm sorry.  I apologize for that.

 5    BY MR. ROSENBERG:

 6    Q.  Since these events occurred, has there been any attempt to

 7    transfer funds back to the Federal Reserve?

 8    A.  No.  No.

 9    Q.  Or to any other organization, other than in the Bureau's

10    ordinary course of business?

11    A.  It is virtually impossible to do that, as we've learned.

12    The money -- the money can't even be sent back to the

13    Department of Treasury.  The only reason that some of the money

14    sits at the Department of Treasury is we pull funds from the

15    Federal Reserve Bank of New York into the Treasury account to

16    pay our bills.  It's like a checking account.  We move it from

17    the savings account to the checking account.

18              MR. ROSENBERG:  Ready to change topics, unless the

19    Court has any further questions?

20              THE COURT:  No, no.

21    BY MR. ROSENBERG:

22    Q.  Let's discuss RIFs and employment decisions.  What is a

23    RIF?

24    A.  It's a reduction in force.

25    Q.  What does that mean?
```

1   A.  Generally, reduction in force in government only -- it

2   rarely occurs.  It only occurs when there is excess staff that

3   is no longer needed for the Agency.  It's also been used in the

4   past if an Agency is not appropriated by Congress, there has to

5   be cuts made somewhere.  So essentially the process is, is that

6   you begin RIF procedures, if it's necessary.

7   Q.  Is a RIF different from an employee termination?

8   A.  It is different.  And -- yes, it is different.

9   Q.  Were any CFPB employees terminated the week of February

10  10th?

11  A.  They absolutely were, yes.

12  Q.  Can you give us the overview of the categories of employees

13  that were terminated?

14  A.  There were several categories that were terminated.  All of

15  this came at the direction of our new leadership.  The first

16  category we received a -- or, we were told to terminate were

17  those on probationary period.  Those would be career employees

18  who serve a one-year mandatory probationary period.  We also,

19  at the same time, terminated the trial-period attorneys, for

20  those employees that have to serve two years of probationary,

21  typically, accepted service, attorneys in our case.

22          There was as third category -- or, second category

23  really of employees that were serving in a not-to-exceed

24  position.  So a term appointment that was set to expire,

25  probably, within one to two years.

1    Q.  When were you first made aware of the possibility of RIFs?

2    I'm talking RIFs and not terminations.

3    A.  I remember that very well, actually.  That -- I was told on

4    Monday, the 10th of February, that I was expected to attend a

5    meeting at the Office of Personnel Management, with their

6    staff.  I was to meet with their policy staff and also a shared

7    service staff.  The shared service is an entity that supports

8    federal agencies while working along with their policy folks.

9    Q.  And as a result of that meeting, did you prepare -- did you

10   begin the RIF process?

11   A.  Well, the meeting was to talk about -- I mean, there have

12   not been RIFs in government in a long time, and so my sense was

13   try to understand exactly what the mechanics were.  You know,

14   what we needed to do.  So they provided specific guidance with

15   regards to how RIFs take place.  And the first start of it is

16   to develop your competitive areas within organization.

17           THE COURT:  Wasn't a subject of the discussion

18   whether typically they're supposed to involve notice, correct?

19           THE WITNESS:  That's correct.

20           THE COURT:  And there has to be some sort of

21   extraordinary circumstance that requires a RIF without even

22   notice?

23           THE WITNESS:  That is correct.

24           THE COURT:  And one of the things you were there to

25   justify was doing it without notice, right?

1          THE WITNESS:  It was -- it was a reduced timeframe

2     notice.

3          THE COURT:  Was there any notice?

4          THE WITNESS:  Well, it didn't happen.  But the

5     approval that -- typically it's a 60-day window that you

6     provide employees with advance notice of the intent to run the

7     RIF.  I was instructed to work with OPM to reduce that

8     timeframe from 60 days to 30 days.

9          THE COURT:  And what were the extraordinary

10    circumstances that warranted that?

11         THE WITNESS:  There were two specific items that we

12    referenced.  One was the executive order that the President had

13    signed on workforce reshaping, and then the specific item was

14    the work stoppage that occurred.

15         THE COURT:  So it was the February 10 email that said

16    you can't work but then became the emergency that justified the

17    RIF?

18         THE WITNESS:  Absolutely.  Yes.

19         THE COURT:  Okay.

20    BY MR. ROSENBERG:

21    Q.  Just to clarify, it was one of two justifications that you

22    provided to OPM, is that correct?

23    A.  That is correct.

24    Q.  The other one being the President's executive order?

25    A.  Yes.

1    Q.  Just for clarity sake -- and this may assist the Court --

2    I'm going to ask you -- we're still on plaintiffs' binder -- to

3    turn to tab OO.  Double O.  I'm going to ask you to turn to the

4    last page in that tab, which is document 66-1, page 28 of 60.

5    A.  Um-hum.

6    Q.  Do you recognize this document?

7    A.  I do.

8    Q.  What is it?

9    A.  This is the official approval from OPM's policy division,

10    granting the exception from the 60-day to 30-day rule for

11    running a RIF.

12    Q.  Does that document reference the two justifications that

13    you just identified for the Court?

14    A.  Yes.

15    Q.  I'm going to ask you to turn to tab JJ in plaintiffs'

16    binder.  I'm going to ask you, this is document 66-1, starting

17    on page 5 of 60 and running all the way until page 11 of 60.

18    A.  Um-hum.

19    Q.  I'm going to direct your attention to pages 9 through 11 of

20    that document.  This is a letter, or a memo, CFPB letterhead up

21    top, that's to Michael J Mahoney, Office of Personal

22    Management, from you?

23    A.  Correct.

24    Q.  Regarding the establishment of competitive areas.

25         And I'll just note that at the very end there's

1    paragraph 6, it says:  Discussion of circumstances that led to

2    the proposed changes less than 90 days before a proposed

3    reduction.  And in that paragraph you also identified those two

4    justifications?

5    A.  That is correct.

6    Q.  Now, why did you identify those two justifications?

7    A.  That is the information that we had available at the time.

8    Q.  Do you have any understanding as to whether Acting Director

9    Vought intended his stop-work email to serve as a justification

10   for a RIF?

11              MS. BENNETT:  Objection.

12              THE COURT:  If you have an objection, you stand up

13   and say, "Objection," and then you say the basis for your

14   objection in, like, two words.  You don't get to ask the

15   witness a question.  And then I can rule on the objection.

16              MS. BENNETT:  Objection, personal knowledge.

17              THE COURT:  All right.  Do you know what -- he's

18   Director Vought, not secretary?

19              THE WITNESS:  Director.

20              THE COURT:  Okay.  Do you know whether he thought

21   that was a justification for them coming back to his agency and

22   asking --

23              THE WITNESS:  I have no recollection.

24              THE COURT:  All right.  These are the justifications

25   they offered.  I think we've got that down.

1    BY MR. ROSENBERG:

2    Q.   These are the justifications you provided?

3    A.   Yes.

4    Q.   Is that because you have to provide a justification of some

5    sort?

6    A.   We do, absolutely.

7    Q.   The President's executive order is a publicly available

8    document?

9    A.   Yes.

10   Q.   And everyone at CFPB received Acting Director Vought's

11   email?

12   A.   Yes.

13   Q.   Okay.  Did the RIF notices ever go out?

14   A.   No.

15   Q.   Did you ever receive final authorization to send out RIF

16   notices?

17   A.   No.

18   Q.   Do you have an understanding as to how many employees,

19   approximately, would have been subject to the RIF notice, had

20   it gone out?

21   A.   It was different than what was submitted to OPM and there

22   is a reason for that.  But if the RIF had taken place, it would

23   have been approximately 7- to 900 employees.

24           THE COURT:  Did you say 720?

25           THE WITNESS:  700 to 900.

 1    BY MR. ROSENBERG:

 2    Q.  And why was it -- you said it was different than what was

 3    in the documentation.  Can you explain why it was different?

 4    A.  Yeah, correct.  We have to reconcile the numbers because

 5    when -- initially when I submitted this to OPM for 1175

 6    positions, we later had to take out those employees that had

 7    been terminated based off a probationary trial period, and also

 8    the employees that had been terminated for not-to-exceed.

 9          And then there was a third category, which we've not

10    discussed, but there were a significant number of people that

11    actually applied for and were granted the deferred resignation

12    program.

13    Q.  That's sometimes called the fork in the road?

14    A.  The fork in the road, yes.

15          THE COURT:  When was that offered in this chronology

16    we've been talking about?

17          THE WITNESS:  It was offered before any engagement

18    from DOGE.

19          THE COURT:  So before you talked about the RIF, you

20    talked about employees who were in fact terminated.  So, how

21    many probationary employees were terminated, the one-year ones?

22          THE WITNESS:  I don't know -- I know the one-year to

23    two-year was approximately 75 to 85 employees.

24          THE COURT:  So the combination of probationary

25    employees and trial period is 75, did you say?

1    THE WITNESS:  Correct, um-hum.

2    THE COURT:  And how many not-to-exceed term type

3    employees were terminated?

4    THE WITNESS:  There were approximately 130 employees

5    on a not-to-exceed.

6    THE COURT:  So after the stop-work email, how many

7    employees were placed on administrative leave?

8    THE WITNESS:  I could not -- that would -- I would

9    make an assumption of how many employees.  I would say that

10    most -- I would say effective the 10th of February most

11    employees were taking administrative leave.

12    THE COURT:  You say taking it like they made a

13    choice.  Were they told to take it?

14    THE WITNESS:  They were told to take it.

15    THE COURT:  But you don't know how many people were

16    told to take it?

17    THE WITNESS:  I don't.

18    THE COURT:  Do you know how many people aren't taking

19    it anymore?

20    THE WITNESS:  I don't know the specific numbers,

21    ma'am.

22    THE COURT:  Okay.  You can ask your next question.

23    BY MR. ROSENBERG:

24    Q.  Let's go back to the setup of CFPB.  I think you testified

25    that you worked with Elizabeth Warren when CFPB was set up.  Do

1    you have an understanding from that time period as to how many

2    employees were anticipated to work at CFPB?

3    A.  At the time in which I was on detail, having worked in

4    human capital and looking at the staffing plans, it was

5    never -- my understanding, it was never supposed to be above

6    1,000 people.  And I've had subsequent discussions with former

7    colleagues at that time, you know, we've said, well, this is a

8    large organization.  It's become very large.

9    Q.  Is there any other reason why you may believe that the CFPB

10   was never intended to have more than approximately 1,000

11   employees?

12   A.  The concern was -- I mean, while we're not an appropriated

13   agency, we do have a cap for how much money can be transferred

14   from the Federal Reserve to the CFPB.  So based upon, at that

15   time, the calculations of the funding that we would have

16   available was approximately 1,000 people.

17   Q.  Now, at the time that you were evaluating potential RIFs,

18   was this also the time period where you may have provided

19   statements referring to wind-down mode or closure of the

20   agency?

21   A.  Oh, yes.  Yeah.

22   Q.  Can you shed some light on that?

23   A.  I -- yes.  There were a couple of ways of looking at it.

24   Even explaining it to my staff in human capital was concerning.

25   And I was having a hard time processing what was happening, and

1    then trying to explain to them what was happening was

2    difficult.  And my reference with regards to wind-down was that

3    the way that we have to look at this, because not everybody was

4    going to be RIF in that phase -- again, they didn't use

5    "phase," I'm using the word "phase."  Not everybody was going

6    to be RIF in that phase.  Those are specific groups that were

7    identified by the new leadership to be placed on the RIF list.

8            So what I told my team was I don't know what's going

9    to end up being left and the only way I can explain what we're

10   doing right now is winding things down to some number that I

11   don't know what we're aiming towards.

12   Q.  I hate to ask you this way, but --

13           THE COURT:  Well, you said, in your declaration --

14   you admitted that at that time you talked about closure of the

15   agency and wind-down mode.

16           THE WITNESS:  Correct.

17           THE COURT:  Now, whether that turned out to be

18   correct, you said that.

19           THE WITNESS:  I did.

20           THE COURT:  And you said that based on your meetings

21   with the DOGE people?

22           THE WITNESS:  That is correct.

23           THE COURT:  They led you to understand that's what

24   they were there to do?

25           THE WITNESS:  They led me to believe that,

 1    absolutely.  Yes.

 2            THE COURT:  So you weren't saying wind down, resizing

 3    after you spoke with them.  That's not what you were saying.

 4    You're saying it now, but that's not what you were saying then.

 5            THE WITNESS:  Let me clarify one piece of it.  My

 6    understanding directly from the DOGE folks was that there would

 7    still be statutory-required individuals representing the CFPB.

 8    I didn't know how many and I didn't know how many people would

 9    support those individuals.

10            THE COURT:  How do you close the Agency and do

11    statutory-required work?

12            THE WITNESS:  Well, there's -- what I understood from

13    them was there was a possibility to, one, have a small

14    presence.  I don't know where they would be, that was not

15    discussed.  Or, the second part of that was potentially some of

16    the statutory-required work could go to other FIRREAs or

17    regulators that had done the work before.

18            THE COURT:  So that would require -- how would that

19    happen?  How would things that you're statutorily required to

20    do get assigned to some other agency?  What's involved there?

21            THE WITNESS:  That I don't know.

22            THE COURT:  Does it involve Congress saying that?

23            THE WITNESS:  I would anticipate that Congress would

24    have a lot to say about that.

25            THE COURT:  So when did your impression of what was

1    happening change and why?

2            THE WITNESS:  I would say for that week, from the

3    10th through the 14th, was all focused on this action.  The

4    following week, as more people arrived on detail from the

5    Office of Management and Budget, it became increasingly clear

6    that there was, in my opinion, misalignment between the DOGE

7    people and the OMB people.

8            THE COURT:  Well, who sent out the stop-work order?

9            THE WITNESS:  That was Director Vought.

10           THE COURT:  Okay.  Keep going.

11   BY MR. ROSENBERG:

12   Q.  And just to be clear on the chronology, approximately how

13   many days after he was announced as acting director did Acting

14   Director Vought send out the stop-work order?

15   A.  Two days.

16           THE COURT:  Has it been rescinded?

17           THE WITNESS:  It's been -- he has not rescinded that

18   email, although the chief legal officer who represents him has

19   gone back and told people that they need to be doing their

20   statutorily-required work.

21           THE COURT:  That was the February 27 email that went

22   out?

23           THE WITNESS:  That was one of them, yes.

24           THE COURT:  Has he further refined what that means?

25   That means this unit, this unit, this unit, this employee, this

1    employee, this employee?

2          THE WITNESS:  Not the employee specific, but what

3    occurred was the heads -- my peers, the heads of those specific

4    programmatic areas, as they began to make recommendations to

5    the chief legal officer as to what programs they ran that were

6    statutorily required -- and I only know this because I was

7    copied on several of those emails.  But they went to the chief

8    legal officer, requested approval to begin -- reinstate that

9    work, direct their staff to do the work.  And most of that,

10   that I'm aware of, was approved.

11         THE COURT:  Well, I've been treated to many of those

12   emails, so it would be helpful to me if you would identify the

13   people you are referring to as the heads of the statutory-

14   authorized areas --

15         THE WITNESS:  Sure.

16         THE COURT:  -- who are your peers.

17         THE WITNESS:  Sure.  One of the first offices that

18   actually did what I thought was a really fantastic job of

19   laying out their information was the Office of Consumer

20   Response in Education.  They have a really -- it's one of my

21   favorite organizations within the Bureau because of the type of

22   work that they do, but their leadership is also incredibly

23   strong.  So they put forward a list of statutorily-required

24   work and positions that were needed to continue that work.  So

25   I know that that was done.  And they have been all pulled back

1    into doing what they need to do in their jobs.

2        The second office that I'm aware of is the Office of

3    Research, Markets, and Regulation.  They also took a similar

4    approach.  They included all of their statutory-required work.

5    I believe all of that has been approved to continue.  There is

6    some -- a lack of clarity, I would say, with the supervision

7    team, the examination team that goes out and examines the

8    financial institutions.

9        There has been some back and forth between the chief

10    legal officer and their management to determine, other than the

11    examination work, what other statutory work is required by law

12    to continue.  And I believe he has requested their cases, who

13    is on their cases -- you know, who they're regulating, what is

14    the status of the regulation, what are some of the things that

15    he needs to consider on that.

16        My understanding, as well, is that the chief legal

17    officer, along with other OMB detailees have been working

18    directly with the office of enforcement to determine which

19    cases should remain litigated, through the litigation process,

20    and then also I understand, from what I've read publicly, is

21    that some of those cases have been pulled back from the core

22    system.

23        The Consumer Affairs division, most of their work --

24    again, the head of that organization also submitted a request

25    to the chief legal officer and all of it was approved based on

```
1    their recommendation, except for moving forward with one of the

2    FCRA required committees in statute.

3             THE COURT:  Some of the emails, there's some

4    information going back saying if you request this, you may have

5    to be approved by outside parties.  Who is that?

6             THE WITNESS:  Outside parties presumably would be the

7    acting dir -- I don't know.  I actually don't know, ma'am.

8             THE COURT:  So when they say you have to get

9    approval -- we're going to have to get approval from outside

10   parties, you don't know what that means?

11            THE WITNESS:  No.  I just know that I had the

12   discretion to approve operational matters to keep the engines

13   running within the organization.  Everybody else I encouraged

14   that they needed to go to Mark Paoletta, the chief legal.  I

15   don't have that authority.

16            THE COURT:  So you don't know, when people were told

17   we're going to have to get the approval of outside parties, you

18   also don't know who they're referring to when they said and

19   they want to know the names of who is requesting?  So you don't

20   know who is asking for names?

21            THE WITNESS:  No, no.

22            THE COURT:  So what about the hotline that was set up

23   where people could call if they thought somebody else was

24   working when they weren't supposed to be working and report

25   them?  Now that there's so many people that are supposed to be
```

```
 1          working, is that still up and running?
 2                    THE WITNESS:  I was not aware of that until this
 3          case.
 4                    THE COURT:  So you don't know if it's still up and
 5          running?
 6                    THE WITNESS:  I was not aware of that hotline until
 7          this case.  I was surprised that that occurred.
 8                    THE COURT:  Okay.
 9                    THE WITNESS:  And I don't know who authorized -- I
10          have no background on that whatsoever.
11                    THE COURT:  Okay.  All right.
12                    MR. ROSENBERG:  So, Your Honor, there was one last
13          issue on RIF that I wanted to address with the witness and then
14          I was actually going to go to the final two topics, which is
15          where the Court went just now, concerns contracts and, you
16          know, the activities of the agency.  And I don't know if the
17          Court wants me to skip ahead to that topic and then circle
18          back?
19                    THE COURT:  If you have two questions on RIFs, you
20          can ask two questions on RIFs.
21                    MR. ROSENBERG:  It's more than two, and it's
22          important.
23                    THE COURT:  Ask whatever you think needs to be asked
24          to establish the record that you're trying to establish.
25                    MR. ROSENBERG:  Okay.
```

1          THE COURT:  But I don't think you have to ask him

2     what somebody else meant by something they wrote.  He doesn't

3     know.  Okay.  Go ahead.

4          MR. ROSENBERG:  Understood.

5     BY MR. ROSENBERG:

6     Q.  Have circumstances changed since the week of February 10th

7     regarding potential for RIFs?

8     A.  Yes.

9     Q.  How so?

10    A.  We had a cooling off period, then there was guidance issued

11    by Director Vought to all federal agencies with a roadmap for

12    agencies to consider in running RIFs across government.

13    Q.  And when you say Acting Director Vought, you're referring

14    to Director Vought in his capacity as the head of the Office of

15    Management and Budget?

16    A.  That is correct.

17    Q.  I actually have a document that's not in the binder, but I

18    have copies for everyone.  It's the OMB memo to which the

19    witness is referring.

20          MR. ROSENBERG:  Permission to approach?

21          THE COURT:  Yes.  And you don't have to ask anymore,

22    just --

23          MR. ROSENBERG:  I think I have given it to everyone,

24    but if not, someone can raise their hands.

25    BY MR. ROSENBERG:

1    Q.  Is this the memo to which you referred just now?

2    A.  I don't have the memo, but based on what I saw, you --

3    Q.  It's right here (indicating).

4    A.  Oh, I'm sorry.  Thank you.

5           Yes, this is the memo that went out from Director

6    Vought.

7    Q.  In his capacity as the head of --

8    A.  OMB.

9    Q.  -- OMB.  Because he's dual-hatted?

10   A.  Yes.  And it's a collaborative memo that went out on behalf

11   of both OMB and OPM, which is not uncommon.

12   Q.  Do you have an understanding as to what would happen at

13   CFPB if this Court were to lift its temporary order regarding

14   the reduction in force or termination of employees in light of

15   this memo?

16   A.  My instructions right now is that we are to follow what

17   Director Vought has ordered for the rest of government and

18   intends that we apply it to the Bureau.

19   Q.  And I'll ask you to turn to page 2 of the memo.

20          Do you see where -- I'm going to read this to you.

21   Toward the top of page 2, under No. 5, it says:  Pursuant to

22   the President's direction, Agency should focus on the maximum

23   elimination of functions that are not statutorily mandated

24   while driving the highest quality, most efficient delivery of

25   their statutorily-required functions?

1    A.  Correct.

2    Q.  Do you have an understanding as to whether CFPB is

3    analyzing that in the context of complying with this memo?

4    A.  I understand that Director Vought and his staff are

5    evaluating the work of the Bureau to come up with that

6    decision.  I also understand that we have possibly an incoming

7    director coming in very soon, who I'm sure will have feedback

8    and opinions on this.

9    Q.  When you say in-coming director, that would be a Senate

10   confirmed?

11   A.  Senate-confirmed position.

12   Q.  Do you see -- one more passage here, about the middle of

13   the page.  Agency should review their statutory authority and

14   ensure that their plans and actions are consistent with such

15   authority.

16   A.  Yes.

17   Q.  CFPB conducting that analysis?

18   A.  Yes.

19   Q.  Are you aware of any discussion to the contrary?

20   A.  No.

21   Q.  Has anyone from -- has anyone affiliated with DOGE

22   indicated or asked you a question regarding RIFs following

23   this -- the issuance of this memorandum?

24   A.  Yes.

25           MR. ROSENBERG:  Okay.  I have one more document, this

```
1    is -- this is an internal text message.  We did not become

2    aware of it until after Friday's filing.  But with the Court's

3    permission, after this hearing we can file this on the public

4    docket.

5             THE COURT:  All right.

6    BY MR. ROSENBERG:

7    Q.  Take a moment to look at that text message.  And to speed

8    this along, I'll represent this is a text message from

9    Christopher Young, with a CFPB account, asking you, says:  Good

10   afternoon.  Just trying to get a sense of our current status.

11   Should the Judge lift the TRO on March 3rd, are we prepared to

12   implement the RIF?  Do you see that?

13   A.  Yes.

14   Q.  And you responded.  Can you read your response, please?

15   A.  Hi, Chris.  Good afternoon.  A discussion with Mark P. --

16   Paoletta -- is needed.  Our new team have been assessing over

17   the past several weeks and new guidance was issued a week ago

18   from OMB regarding how agencies should be approaching workforce

19   reshaping.

20   Q.  What is your understanding --

21             THE COURT:  As far as this says, he thought the only

22   thing in his way was the TRO, which actually was a consent

23   order, is that correct?

24             THE WITNESS:  Yes.

25             THE COURT:  Do you want to ask another question?
```

```
 1          MR. ROSENBERG:  No, I -- I was only going -- the last

 2     question I had on this is:

 3     BY MR. ROSENBERG:

 4     Q.  Sitting here today, what is your understanding as to how

 5     CFPB intends to proceed with regard to any potential future

 6     RIFs?

 7     A.  My understanding and my direction -- and this is something

 8     I've been working with my direct staff in human capital on the

 9     last ten days, I would say, is that we need to put together

10     processes and a proposal for what -- not with regards to who

11     gets RIF'd or what parts of the origination, but a process in

12     place based upon the requirements of the OMB order and

13     instructions.

14          There's also -- just to note, there is absolutely no

15     way we will be able to meet the deadline that's in this

16     memorandum.  That is something I also shared with our team.  We

17     won't be able to meet that because I don't know -- I need

18     information from our leadership to tell me where we're headed.

19          THE COURT:  Has anybody asked the people to tell you

20     exactly what they think their statutory duties are and what

21     they need to support them?  Has everybody received that from

22     the top down?  You said it's a top down organization and I keep

23     seeing the people at the top saying to the people at the

24     bottom, you need to tell us.  So has everybody been told,

25     across the board, you tell me exactly who is needed, you tell
```

1    me exactly which contracts are needed?

2          THE WITNESS:  Contracts, yes.  Mission programmatic,

3    I don't know.

4          THE COURT:  Okay.  And on February 27th is the first

5    time after February 10th we get the Paoletta email telling

6    everybody actually -- it said no work, but that didn't meet

7    statutory-authorized, so he reverts back to the language from

8    February 8th, that's correct?

9          THE WITNESS:  Correct.

10         THE COURT:  But then it's 3:30 p.m. on the Sunday

11   before the last hearing when he goes:  Do your statutorily-

12   required work and you don't have to ask anybody for permission

13   first.  So up until that point they still had to ask for

14   permission?

15         THE WITNESS:  That was my understanding of what

16   people were doing, yes.

17         THE COURT:  And what happened after that -- it went

18   out Sunday, it looks like on Monday, while we were all here in

19   court, a lot of the supervisors are saying, well, wait, what do

20   you mean?  Do I have to ask permission?  Do I not have to ask

21   permission?  There was a little bit of confusion going on in

22   the building.  Is that fair to say?

23         THE WITNESS:  There was a lot of confusion in the

24   building.

25         THE COURT:  Would you say there's still a lot of

```
 1    confusion in the building?

 2              THE WITNESS:  I would say, from a lot of accounts,

 3    there's still a local of confusion about what's going on.

 4              THE COURT:  So is there any plan for somebody to

 5    clearly call everybody together and say do your work?

 6              THE WITNESS:  I don't know.

 7              THE COURT:  Next question.

 8              MR. ROSENBERG:  I'm just curious, I'm going to ask a

 9    question to which I don't know the answer.

10              THE COURT:  Risky.

11              MR. ROSENBERG:  Risky, but I'm willing to roll the

12    dice.

13    BY MR. ROSENBERG:

14    Q.  Would you say that there's less confusion today than there

15    was a couple week ago as to what functions --

16    A.  There's less confusion today.  I think there's hope.  I

17    have hope for the future.  I think that people are -- I think

18    people want to go back to work and they want to do the work

19    they were hired to do.

20              THE COURT:  So sitting here right now, you think

21    there's still people not working?

22              THE WITNESS:  It would not surprise me if there were

23    people still not working.

24              THE COURT:  I think I asked you this earlier:  You

25    can't tell me how many people have come off administrative
```

1    leave to do this statutorily-authorized work that everybody is

2    committed to having them do.

3                THE WITNESS:  I cannot answer that, ma'am.

4                THE COURT:  Okay.

5    BY MR. ROSENBERG:

6    Q.  We're going to walk through, though, some of those emails.

7                I don't know, let me ask the witness:  We've been going

8    at this for an hour and a half, are you okay?

9    A.  I'm okay.

10               MR. ROSENBERG:  Is the Court okay proceeding?

11               THE COURT:  I'm fine.

12               MR. ROSENBERG:  Okay.  Great.  I think we should

13   turn, then, to the topic that the Court is most interested in,

14   and I'll just preview that we're going to --

15               THE COURT:  At 11 o'clock, after an hour and a half.

16   Okay.  Yes.

17               MR. ROSENBERG:  Like to end at a high note.

18               THE COURT:  Let's turn to it.

19   BY MR. ROSENBERG:

20   Q.  There's actually two topics.  We're going to walk through

21   some of the contracting issues and then we're going to walk

22   through the people who are working in statutorily required

23   areas.

24               So let's start with contracts.  Did DOGE-affiliated

25   folks within CFPB look at CFPB contracts?

```
 1    A.  They did.

 2    Q.  Was this the first time that CFPB evaluated the number of

 3    contracts that it had?

 4    A.  No.

 5    Q.  Can you tell us, were you involved in a previous analysis

 6    in some way, shape, or form of a number of contracts?

 7    A.  There were a handful of analysis that I conducted when I

 8    started again in 2023.  It was during the Supreme Court case,

 9    we didn't know if we were headed towards being appropriated or

10    not.  It was a desire to look at all of the contracts.  I was

11    directed, along with our general counsel and some of my

12    employees, to look at every single contract to determine if

13    they were necessary for the agency to continue, or could they

14    potentially be cut?

15         And then the second most notable time was we, over

16    the past year, have gone pretty close to hitting our cap in

17    terms -- our budget cap of how much money we can transfer from

18    the Fed.  So with that in mind, the director was very concerned

19    about contracts and instructed my staff and I to try to pinch

20    pennies as much as possible.

21    Q.  When you say the director, you mean Director --

22    A.  Director Chopra.

23    Q.  -- Chopra from the last administration?

24    A.  Yes.  Correct.

25         THE COURT:  When you talk about you're doing it,
```

1     you're still talking about operations, or was somebody doing it

2     on the programmatic side, too?

3            THE WITNESS:  They were doing it on the programmatic

4     side as well.  Again, top-down approach.  There wasn't a lot in

5     the past of formulating a budget with a consensus process.  The

6     past 18 months, I would say, to two years, there's been more

7     of -- more engagement from the programmatic and operational

8     components to have the opportunity to go through their

9     contracts to determine if they were still needed.

10           The other thing the director did, if I may, is he had

11    our CFO do a -- a data called "all the staff," inviting them to

12    identify any contracts or cost savings that they could identify

13    to try to reduce costs to the Agency.

14           THE COURT:  When the order was issued in this case to

15    terminate them all, what date did that happen and who did that

16    come from?

17           THE WITNESS:  That was the week of the 10th.  It was

18    during the same exact time that the RIF process was in place.

19           THE COURT:  Did you do an analysis like you're

20    talking about here?  Did you provide anybody with that

21    analysis?

22           THE WITNESS:  The staff did not.  The staff did not.

23    There was a small data culling on a subset of contracts that

24    were identified by the General Services Administration to us,

25    saying you need to look at these consulting contracts to

 1    determine if they are still needed or not and make your case

 2    for that.  The CFO did go out to the heads of those

 3    organizations and ask them for a justification on it.  But, the

 4    big piece of what DOGE did was the whole population of

 5    contracts that they had pulled.

 6            THE COURT:  And so as a follow up to these emails oh,

 7    you're supposed to do what's statutory authorized, with a what

 8    they have to do is put the contracts back.

 9            THE WITNESS:  Yes.

10            THE COURT:  And is that an easy thing to do?

11            THE WITNESS:  It was easier -- the time made it

12    easier to do that.  The contracts that were run through our

13    normal procurement shop requires a 30 day notification to

14    contractors of the agencies intent to terminate the contracts.

15    So my understanding is, as the acting director and his staff

16    started to get a lot more engaged in the organization and

17    identified potential gaps in having contracts to fulfil the

18    statutory requirements, they started to pull back.  And those

19    lists were going to the CFOs team to contract the contractor

20    and say we're not going to cancel the contract.

21            THE COURT:  So is it fair to say that there's thought

22    going into it but only after, it's like shoot first and ask

23    questions later.

24            THE WITNESS:  That's what it felt like.

25    BY MR. ROSENBERG:

1    Q.  Let's talk about the reinstatement of these contracts,

2    since we're on that topic.  I think you may need to switch

3    binders, back to the government's binder.  In other words, the

4    binder containing the documents provided by CFPB.  And I'm

5    going to ask you to turn to tab 49.

6         And just for the record, this has a Bates number at the

7    bottom right-hand corner, CPFB_00117.  It's an email from you

8    to Jafnar Gueye, the chief financial officer, and a few other

9    folks.

10   A.  Correct.

11   Q.  You wrote this email?

12   A.  I did.

13   Q.  And the email refers to a conversation that you had with

14   Mark P.  Is that Paoletta --

15   A.  Mark Paoletta, um-hum.

16   Q.  -- chief legal officer?

17        Is it fair to say that at this point in time he is

18   functionally running the agency?

19   A.  Yeah, I would consider Mark Paoletta to be our chief of

20   staff or staff director for the organization at this point.

21   Q.  Mr. Vought's email, I think, referred to him -- any

22   questions, to contact Mr. Paoletta through -- or, contact him

23   through Mr. Paoletta?

24   A.  Yeah.

25   Q.  There's reference to a master list of contracts, the status

1    of each, and a description regarding their support of

2    statutory/regulatory mandates, as well as a reference to a

3    master spreadsheet.  Can you tell us about those?

4            THE COURT:  Can you get me back to which document

5    you're looking at again?

6            MR. ROSENBERG:  Sure.  It's in our binder, tab 49.

7    And it's the document with the Bates number CFPB_00117.

8            THE COURT:  All right.  So as of February 18th,

9    contracts are either work-hold or terminated?

10           THE WITNESS:  Yes.

11           THE COURT:  And as of today, do you know what percent

12   of the contracts have left one of those two statuses?

13           THE WITNESS:  Most of them have been reinstated.  The

14   majority of the contracts have been reinstated, although the

15   chief financial officer has been also taking this seriously, to

16   also not irresponsibly turning everything on that we don't

17   need, to try to save money in that case.  But, yes.

18           THE COURT:  Well, in fact, he sent out a reminder

19   that if you think your contracts need to be reactivated, you

20   have to be prepared to not only provide succinct justifications

21   to him, but to justify them to outside partners.  You were

22   copied on that, too, weren't you?

23           THE WITNESS:  I was.

24           THE COURT:  Did you know what that meant?

25           THE WITNESS:  Yeah, I -- the chief financial officer

 1   who, I appreciate, comes from other agencies that go through an

 2   appropriated process.  So, in that appropriated process it's

 3   very common to go through their contracts to determine if

 4   you're not appropriated, what can you give up so that you don't

 5   have to run a RIF or do something crazy.

 6            I don't know who the other people are, but that --

 7            THE COURT:  That was my question.  No one is

 8   suggesting that there's anything wrong with evaluating your

 9   contracts.

10            THE WITNESS:  I don't know the other people.

11            THE COURT:  The plaintiffs' concern is that you

12   started evaluating after you cancelled them, as opposed to

13   before.

14            THE WITNESS:  Correct.

15            THE COURT:  Then my question was:  Well, who's being

16   involved in the evaluation, besides the people that you're

17   telling me are in charge?  And you don't know that answer?

18            THE WITNESS:  Correct.

19            THE COURT:  Go ahead.

20   BY MR. ROSENBERG:

21   Q.  But you referred to, I think, in your testimony earlier, a

22   process whereby the new Bureau leadership -- and if I'm

23   mischaracterizing this in any way, let me know -- but, starting

24   to get its arms around the Bureau's statutory responsibilities

25   and what was needed to fulfil those?

```
 1    A.  Yes.

 2    Q.  Does this email, in your opinion, reflect that process?

 3    A.  Yes.

 4    Q.  All right.  Turn to the next tab, which is tab No. 50.

 5    There's a document with a Bates number in the lower right-hand

 6    corner, CFPB_00118?

 7    A.  Yes.

 8    Q.  This is an email from Mr. Paoletta to you and the chief

 9    financial officer, one other individual, the next day.

10    A.  Yes.

11    Q.  He says:  To follow up on my conversation with Adam just

12    now, I am directing you to not terminate or suspend any

13    contracts without specific authorization from Acting Director

14    Vought or me.  Please let me know if you have any questions.

15         What is the conversation to which he's referring?

16    A.  The conversation I had with Mark was a bit of what I

17    perceived as frustration on his end about some of the contracts

18    that were going to be terminated or cut off and not having the

19    ability to access those contracts to meet some of the statutory

20    requirements that he was reviewing at the time and understood

21    why there was a necessity for the contract.

22              THE COURT:  Who is the "he" in that sentence?

23              THE WITNESS:  Mr. Paoletta, Mark Paoletta.

24    BY MR. ROSENBERG:

25    Q.  I think we're discussing a timeline, but, this is only
```

1    approximately a week or so after the initial termination of

2    some of these contracts?

3    A.  Yes.

4    Q.  Since this email was sent on February 19th, are you aware

5    of whether any contracts that are necessary to perform

6    statutory functions have been terminated?

7    A.  I'm not aware of contracts being terminated after this.  I

8    think --

9             THE COURT:  After this?  What is "this"?

10            THE WITNESS:  After the 19th.  February 19th email

11    from Mr. Paoletta.

12            MR. ROSENBERG:  Let me see if I can summarize.

13            THE COURT:  We've gotten email from the head of

14    Research, Monitoring, and Regulation on March 3rd, after they

15    were all told on March 2nd not only should you be doing

16    statutory-authorized, but you don't have to ask.  He said we

17    would do it, but we lost our people.  We lost our contractors

18    and we lot our data.

19            On February 27, after he said everybody do your

20    statutory-authorized work, the Consumer Response Center said,

21    yeah, but we need the people.

22            THE WITNESS:  Right.

23            THE COURT:  We can't do it without people.  Office of

24    Fair Lending said we can't do what we did do without talking to

25    people, but we have to get permission to talk to people.

```
 1              THE WITNESS:  Right.
 2              THE COURT:  So, just saying statutory-authorized
 3     doesn't really answer the question, does it?
 4              THE WITNESS:  No.
 5     BY MR. ROSENBERG:
 6     Q.  Some of the documents to which Judge Jackson referred are
 7     documents we're going to ask you about.
 8     A.  Yeah.
 9     Q.  I think you said that there was some confusion over what
10     was authorized and what was not.  But, over -- Mr. Paoletta did
11     send an email that if there were any questions, people should
12     contact him, is that correct?
13     A.  Yeah, that's correct.
14     Q.  And indeed, Acting Director Vought's February 10th email, I
15     believe, directed that if individuals had any questions
16     regarding urgent matters, that they should contact
17     Mr. Paoletta, is that correct?
18     A.  And some staff at the staff level did, they did reach out
19     to him.
20     Q.  Relatively quickly, what was the timeline, if you can
21     recall?
22     A.  There were a couple of high-priority issues that would have
23     been devastating had it stopped.  And in one case the manager
24     went to Mark and said we have a problem here.  Mark looked --
25     assessed the situation and said please do not stop work on
```

1    this, please continue moving forward with this.  In fact, asked

2    the employer to confirm that he had received the email so that

3    it would continue.

4         THE COURT:  When did he get there?

5         THE WITNESS:  Mark?

6         THE COURT:  Yes.

7         THE WITNESS:  Mark was appointed the same weekend as

8    the DOGE.  It would have been on the 10th -- 6, 7, 8 -- 9th.

9    9th and 10th of February.

10    BY MR. ROSENBERG:

11    Q.  Do you know if -- what the status of Mr. Paoletta's

12    computer access was at CFPB when he first started?

13    A.  My recollection is that all of the OMB staff were provided

14    and provisioned laptops and email addresses immediately upon

15    entrance.

16    Q.  And like acting Director Vought, is Mr. Paoletta dual-

17    headed?

18    A.  He is.  He is.

19    Q.  What is his other job function, if you know?

20    A.  The work that I have personally been working with him on is

21    not legal work per se, it's advisory management responsibility,

22    such as a senior advisor or a chief of staff role.  You know,

23    he's been providing management guidance to me, but I also

24    understand that he is the full-time OMB general counsel, if I'm

25    not mistaken.

1    Q.  Okay.  I would like to turn to tab No. 51, which is a

2    document CFPB_00119.  That's an email.  I would like you to

3    look at the bottom of this email chain.  It's from Anthony

4    Licata to you and various other people, and then there's a

5    series of responses to that email chain.

6        But to summarize, Mr. Licata's email says:  Mark

7    Paoletta directs that the termination notifications issued for

8    the contracts identified in the spreadsheet be rescinded or

9    withdrawn and if any have already been so terminated, that such

10   contracts be reinstated.

11       Then there's a follow-up from Mr. Paoletta:  Please

12   rescind these termination notices.  I do not believe they have

13   gone into effect and want to make sure there is no

14   interruption.

15       And then Mr. Gueye, the chief financial officer,

16   responds:  We've sent continuance notices to all vendors on the

17   list and are waiting for confirmation.

18       What is your understanding of what prompted this email

19   chain?  And do you have an understanding of the result of it?

20   A.  Yeah.  So, at the very beginning Director Vought's tenure

21   with us, there were only a couple of people that were on the

22   team.  Anthony Licata was one that was brought in specifically

23   to help do some analysis of statutory-required work.  And as he

24   started to look at the contracts and work directly with our

25   CFO, he assessed it and determined that some of those contracts

```
 1   should not be turned off.
 2   Q.  And is it your understanding that contracts pursuant to
 3   this email exchange have been reinstated?
 4   A.  Yes.
 5   Q.  Okay.  One second please.  One moment.
 6        I would like you to turn --
 7        THE COURT:  Is there any consultation with the heads
 8   of each of the programmatic areas?
 9        THE WITNESS:  Yeah.  In fact, a lot of them were
10   identified by the heads of those organizations to say if we
11   have to -- if we are expected to do the statutory work, these
12   are the contracts that we must have to do it.  That's how I
13   think -- that engagement is, I believe, is what started to
14   really change the way that things were moving forward in the
15   new way.
16        THE COURT:  So, when the parties negotiated we're
17   going to leave the contracts in place, why are you insisting
18   that that only last until Monday, as opposed to when this
19   preliminary injunction gets resolved?  Or until such time as
20   there's a new director and the agency's statutory duties are
21   restricted by Congress?  Why Monday?
22        THE WITNESS:  I can't answer that.
23        THE COURT:  Okay.  I might ask you all later.
24        MR. ROSENBERG:  I figured as much.
25        THE COURT:  All right.
```

 1    BY MR. ROSENBERG:

 2    Q.  Are you aware that plaintiffs have raised an issue in this

 3    litigation regarding the preservation of data associated with

 4    contractors?

 5    A.  Yes.

 6    Q.  Do Bureau contracts generally include provisions for the

 7    preservation or return of data?

 8    A.  If they go through our official procurement system, which

 9    is really the only way to purchase at the Bureau, there are

10    terms and conditions that require that the contractor return

11    data that's owned by the government.

12    Q.  I would like you to turn tab 18 in the CFPB binder.

13    There's a Bates number -- at the top it will say pages 36 to 38

14    [sic], the Bates numbers will be CFPB_36 through 38.  I don't

15    think -- take a moment to look at this email chain.

16         I'll just ask:  Is it fair to say that this email chain

17    concerns the authorization of work to ensure that data is

18    preserved?

19    A.  Yes.

20    Q.  And at the top of this email, it's from Christopher

21    Chilbert.  Who is Christopher Chilbert?

22    A.  He's our chief information officer.

23    Q.  So he would have knowledge of issues surrounding the

24    preservation of data for the Bureau?

25    A.  He would.  I mean, he doesn't own the IT systems and store

```
 1    the data, but he certainly maintains them for the agency.

 2    Q.  And he says at the top of this email:  Yes, retrieving

 3    Bureau data and records from contractors in accordance with the

 4    terms and conditions of the contracts is authorized work.  We

 5    need to ensure that it is preserved.

 6    A.  Correct.

 7    Q.  Did I read that correctly?

 8    A.  That is correct.

 9    Q.  Do you have any reason to believe that data has not been

10    preserved?

11    A.  I don't know.

12    Q.  Do you have any reason to doubt Mr. Chilbert's assertion

13    that --

14              THE COURT:  He doesn't know.  Chilbert is the one who

15    knows, he wrote something.  He doesn't know.

16              MR. ROSENBERG:  Okay.

17    BY MR. ROSENBERG:

18    Q.  If someone were to approach you to identify a contract that

19    needed to be reinstated in order to perform statutorily

20    required obligations or functions, do you think it would be

21    approved?

22    A.  Yes.  And on some of them I directed and approved myself.

23    I was willing to do that.

24    Q.  Okay.

25              THE COURT:  And some, you tell people you have to
```

1    talk to your supervisor and some you say you have to talk to

2    Mark?

3            THE WITNESS:  Right.  And those that I sent back to

4    Mark were heavily missioned, again programmatic related.  I

5    don't know what their intent was with that.  But if, you know,

6    there was, like, a disability intake system, and I'm, like,

7    that's -- it would be a big problem if we did not turn that

8    back on.

9            THE COURT:  Okay.

10   BY MR. ROSENBERG:

11   Q.  Just to follow up on the Judge's point, that's because

12   individual circumstances may vary depending on what the ask is,

13   is that fair?

14   A.  Correct.

15   Q.  And so when you refer to referring mission-focused requests

16   to Mark, is that because you believe that the CFPB as an agency

17   has discretion within its statutory bounds to identify how it's

18   going to execute its mission?

19   A.  Yes.

20   Q.  And is that, for lack of a better term --

21           THE COURT:  Okay, let's -- we're not going to

22   cross-examine him with your theory.  You asked him, if somebody

23   brought him a contract, would he approve it?  And I just wanted

24   to get into what kinds of contracts he has that authority and

25   what he doesn't.  That's --

1              MR. ROSENBERG:  Fair, fair.

2              THE COURT:  Okay.  He's a fact witness, he's not a

3      law witness.

4      BY MR. ROSENBERG:

5      Q.  Are you aware of any requests to reinstate mission critical

6      contracts that have been denied?

7      A.  No.

8      Q.  I think you testified earlier about a distinction

9      between -- let me ask it this way:  There are contracts that

10     support statutorily-required functions?

11     A.  Um-hum.

12     Q.  Is it necessarily the case that all contracts that support

13     statutorily-required functions are in fact necessary for the

14     Bureau to carry out those statutory functions?

15     A.  That's an interesting question and the answer is no because

16     even over the last 18 months, we've gone through budget

17     scenarios where there's been a lot of discussion about whether

18     or not some of the contractors, for example, were doing work

19     that staff at the agency should be doing.  So, again, I can't

20     answer that question because I don't do the analysis and that.

21     But, no, it's not the first time it's been questioned.

22     Q.  I'm going to ask you to go to tab 38 in the CFPB binder.

23     And it is Bates No. CFPB_00096 to 00097.  Note that this email

24     chain starts with the March 2nd email from Mr. Paoletta.  And I

25     promise we will get to this email shortly, the substance of it.

1       But for purposes of this discussion, in response to

2  Mr. Paoletta's email, Mr. Chilbert refers to restarting some

3  tasks that are stopped, and some of our T&I capacities reduced.

4  What is T&I?

5  A.  Technology and innovation.

6  Q.  If there are capacities that -- capabilities that need to

7  be restored, please let me know as soon as possible what

8  specifically is needed and for what purpose.

9       And in response to that, Mr. Gueye, who is the chief

10  financial officer, responds, and he says that the Bureau --

11  that he'll be sending out guidance shortly, that the Bureau is

12  not turning back on every contract we've had.  We're taking a

13  very narrow approach.  If the contract -- if without the

14  contract the Bureau can't meet a statutory requirement, then it

15  will be considered for reactivation.  Meaning that a contract

16  enhancing our ability to meet a statutory requirement is not

17  enough to get it back on.  It needs to be the only way the

18  Bureau can currently meet that requirement.

19       THE COURT:  Right.  He just recognized that

20  distinction in your last question.

21       MR. ROSENBERG:  Right.  Okay.

22       THE COURT:  Has the further guidance been issued?

23       THE WITNESS:  I don't believe it has.

24  BY MR. ROSENBERG:

25  Q.  Are you aware of an example of a type of contract that

 1    might be -- well, let me ask it this way:  Would you
 2    characterize these as nice-to-have contacts?
 3            THE COURT:  I think he explained the difference
 4    between -- we've been here a really, really long time and this
 5    is very painstaking.  And this is not a deposition, it's a
 6    hearing.  There's a factfinder here who is reading the very
 7    pieces of paper that you're reading.  So I don't think you have
 8    to ask obvious questions that sum up the question you just
 9    asked.  I'm getting the implication of the questions that you
10    asked.
11            MR. ROSENBERG:  Appreciate that, Your Honor.  And I'm
12    ready to move on to the last topic.
13            THE COURT:  All right.  I think that we're getting
14    close to the point where we're going to need to break to give
15    people who work here lunch.  So, how long do you think you have
16    left for this direct examination?
17            MR. ROSENBERG:  Probably about 20 minutes, maybe 30,
18    tops.
19            THE COURT:  I think 30 is too long.  I'll let you go
20    for ten more and then over lunch you can reduce what you have
21    left.
22            MR. ROSENBERG:  Okay.
23            THE COURT:  All right.
24    BY MR. ROSENBERG:
25    Q.  So let's go back to Mr. Vought's February 10th email.  I

87

```
1    would like you to turn to tab 1.  The bottom of this chain --
2    this is Bates No. CFPB_00001 to 2.  The bottom of the chain is
3    Mr. Vought's February 10th email.  Do you see that?
4    A.  Yes.
5              THE COURT:  Tell me which document you're in again.
6              MR. ROSENBERG:  This is tab No. 1 in the CFPB binder.
7              THE COURT:  All right.
8    BY MR. ROSENBERG:
9    Q.  Now, if you look further up on that chain on the same day,
10   does somebody reach out to you to ask whether it's acceptable
11   to perform certain categories of work --
12   A.  Yes.
13   Q.  -- that's immediate?
14         And he refers to performing maintenance tasks to ensure
15   the HMDA application, consumer complaint database, ServiceNow,
16   and Microsoft 365 platform continue to operate.  Did those
17   tasks continue to operate, notwithstanding Acting Secretary
18   Vought's email?
19   A.  They did.
20   Q.  Turn to tab 2.  This is an email from -- it's Bates No
21   00003.  It's an email from Christopher Johnson?
22              THE COURT:  Tab one is about operational stuff?
23              THE WITNESS:  It is.  I take that back.  Yes, but --
24              THE COURT:  I mean, operational emergencies.  The
25   computers have to work, the bathrooms have to work, the locks
```

 1   on the doors have to work.

 2           THE WITNESS:  I do want to point out that the HMDA

 3   application and the consumer complaint database are mission

 4   critical.  They are statutorily required.

 5           THE COURT:  Right.  You have to have the database and

 6   you have to have the hotline.

 7           THE WITNESS:  Yes.

 8           THE COURT:  You have to have people to answer it

 9   though, right?

10           THE WITNESS:  Yeah.  And in one of the contracts we

11   have, the contract that did remain, there are people external

12   from the agency that do pick up those phone calls.

13           THE COURT:  Are they the ones who do the response?

14           THE WITNESS:  In some cases, yes.

15           THE COURT:  Go ahead.

16   BY MR. ROSENBERG:

17   Q.  Tab No. 2.  This is an email from Christopher Johnson, who

18   is the associate director, Division of Consumer Response and

19   Education.  I believe you discussed him earlier today?

20   A.  Um-hum.

21   Q.  The first two discussions with you that the work stoppage

22   will not apply to the Bureau's consumer resource center, can

23   you describe -- I think that's actually what Judge Jackson was

24   just asking you about.  Can you describe those conversations?

25   A.  Yeah.  Yes.  I was very, very concerned about the consumer

1    response center going down.  Again, having been a constituent

2    services person, I understand the reliance on that.  I was also

3    concerned about the potential backlash that could occur

4    government-wide if those systems came down.  So, I actually

5    coordinated a discussion between Mr. Johnson and the DOGE folks

6    to help them understand why his program was so important.

7    Q.  And, again, this is the very same day as Acting Director

8    Vought's email?

9    A.  Yes.

10    Q.  Okay.  By the way, what is APOR?  It's referred to in the

11    email.

12    A.  Sure.  As I understand -- I've never seen it, but as I

13    understand, the APOR is established by our organization through

14    our research team and helps determine the housing market in the

15    U.S.  So if that goes down, people cannot get loans, is what I

16    understand.

17    Q.  Okay.  Can you turn to tab 9, please.

18            THE COURT:  Can we go back to tab 2, for a second?

19            Do you know, from your own personal knowledge -- I

20    understand that the infrastructure, the contract necessary to

21    operate the consumer hotline, the ability to leave complaints,

22    was something that you understood the importance of and you

23    made sure that it's working, but do you know what the situation

24    is in terms of whether it's operating in terms of getting back

25    to consumers?  Elevating things to the emergency case managing

1    team, resolving the things that they're calling to complain

2    about, what the timing, what the turnaround is, what the

3    backlog is compared to before February 10?  Is that in your

4    bailiwick?

5              THE WITNESS:  It is not, although our chief

6    information officer last week did email me specifically about

7    the consumer complaint center.  I think his team was very

8    curious to see what the impact was with regards to our website.

9    There was a lot of controversy about a 404 page on our website,

10   giving the appearance that it was down.  So Chris Chilbert, our

11   CIO, and their team actually did some analysis to determine

12   what the effect was on that.  And what they found --

13             THE COURT:  They found even though your website was

14   down, people could still get to the hotline.  My question is:

15   Once they get to the hotline, are you getting to them?  And do

16   you know about that?

17             THE WITNESS:  The contract employees did have access

18   to the consumers and had the access, as I understand, to

19   communicate with some of the financial institutions.  What

20   didn't exist, that was then later reinstated, were the

21   employees who needed to -- where cases needed to be elevated to

22   somebody, to take it to a different level.

23             THE COURT:  When did that get reinstated?

24             THE WITNESS:  I don't recall the specific date.  I

25   would say within the last week.

```
 1      BY MR. ROSENBERG:

 2      Q.  Actually, let's jump ahead to tab -- because this is

 3      directly relevant to your question -- tab 53, which is the

 4      analysis of the email that you just referred to, which is the

 5      analysis of the impact of the 404 on the website.  And at the

 6      bottom of that email chain, does it -- Mr. Johnson sends an

 7      email.  Is he referring to complaints submitted via the hotline

 8      or complaints submitted via the website?

 9      A.  The website.

10      Q.  Okay.  Just wanted to be clear.

11              THE COURT:  So that's different.  All right.  So we

12      don't know what that has to do with the hotline?

13              THE WITNESS:  The hotline is always open.  I don't

14      know what the numbers were with regards to the hotline, but

15      that is like the last resort for consumers.  If the website

16      goes down, which we don't ever want it to go down, then the

17      hotline would be the final resort.

18              MR. ROSENBERG:  Okay.

19              THE COURT:  Assuming it's open, is it fair to say

20      that it's only as good as the response to what people leave on

21      the hotline?

22              THE WITNESS:  The hot --

23              THE COURT:  It's important to be able to leave your

24      complaint.

25              THE WITNESS:  Yes.
```

 1          THE COURT:  I have a long-term complaint.  I'm

 2   getting charged this fee every month, what is it?  Or, I'm

 3   about to be put out on the street if I don't pay my mortgage.

 4   My house just burned down.  The more emergent ones.  So it's

 5   great that the hotline is always open, it needs to be opened,

 6   it's statutorily authorized and required.  But how it's working

 7   is a question that's different than whether it's open.

 8          THE WITNESS:  Correct.  I don't have the inside

 9   knowledge to know who picks up the phone and who provides

10   advice or what they do on the back end of that.

11          THE COURT:  Okay.

12   BY MR. ROSENBERG:

13   Q.  Can you turn to tab 9, please.  I'll try to move this

14   along.

15       This is an email, again, from Christopher Johnson,

16   referring to a memo that is at tab 10 to Jordan Wick and Jeremy

17   Lewin.  And I don't think we need to go into the details of

18   this, other than the memo.  Does the memo outline the number of

19   employees that Mr. Johnson believed were necessary to perform

20   statutory functions?

21   A.  Yes.

22   Q.  Okay.  And then he follows up sometime later with an email

23   to Mr. Paoletta identifying the needs to -- for Consumer

24   Response and Education section to carry out its statutory

25   functions.  Did Mr. Paoletta approve that?

```
 1    A.  He did.

 2    Q.  Okay.

 3            THE COURT:  And Johnson is the head of the Consumer

 4    Response?

 5            THE WITNESS:  And Education, yes, ma'am.

 6            THE COURT:  Okay.

 7    BY MR. ROSENBERG:

 8    Q.  Turn to tab 13, please.

 9            THE COURT:  Wait.  That's different, the education,

10    than the consumer response team that we're talking about that

11    deals with the hotline, or is this --

12            THE WITNESS:  It's the same group, but it's two

13    functions.

14            THE COURT:  He's the head of it?

15            THE WITNESS:  Um-hum.

16            THE COURT:  Okay.

17    BY MR. ROSENBERG:

18    Q.  Turn to tab 13, please.  Email from Frank Vespa-Papaleo --

19    A.  Um-hum.

20    Q.  -- to Mark Paoletta.  He is the head -- the assistant

21    director of the Office of Fair Lending.  What does the Office

22    of Fair Lending do?

23    A.  They protect the consumer from -- ensuring that they have a

24    level playing field, that they have the ability to get credit

25    and it's fair.
```

1    Q.  And just to move this along, is this another approval of a

2    request to perform statutory-required functions?

3    A.  It is.

4    Q.  Tab 14.  CFPB_00031.  It's a request regarding FOIA.  Was

5    FOIA processing approved?

6    A.  Yes.

7             MR. ROSENBERG:  Imagine that would be a relief to

8    this Court, in light of FOIA its docket.

9             THE COURT:  Very favorite thing.

10   BY MR. ROSENBERG:

11   Q.  Tab No. 16.  This one is a little bit different.  This is

12   an email from you to RMR colleagues on February 27th.  Let's

13   take a moment to look at this email, then I'm just going to ask

14   you to explain why you sent this email out.

15   A.  Amongst some of the chaos that was going on, it was very

16   clear to me that people either were not comfortable or they

17   were not reaching out directly to Mark Paoletta for guidance or

18   to make recommendations.  So this was my personal attempt to

19   try to get folks to do it.  I didn't -- as being the operations

20   officer, this is not my normal -- I don't handle these types of

21   issues, but I knew from an operational perspective, some of

22   these folks needed support, they needed to be told you really

23   can move forward and ask for support.  I attempted to do that.

24            THE COURT:  Can we go back to the email at tab 13

25   from Mr. Paoletta stating you are authorized to perform

1    statutory functions?  There's another sentence after that that

2    says:  Any action or communication to an outside party should

3    be sent to me and Daniel Shapiro for review and approval before

4    being transmitted.  Would you say that the functions that he

5    lists below involve interaction with outside parties?

6              THE WITNESS:  Yes.

7              THE COURT:  You can ask your next question.

8    BY MR. ROSENBERG:

9    Q.  Okay.  Tab 17 is a similar email to the one you just -- the

10   one that you discussed at tab No. 16, an email to LaShaun

11   Warren.

12   A.  Yes.

13   Q.  Who is LaShaun Warren?

14   A.  She's our acting associate director for community affairs.

15   Q.  Okay.  In this are you --

16   A.  Or, external affairs.

17   Q.  Similar reasons for sending this email out as the email

18   behind tab 16?

19   A.  Yes.  Yeah.

20   Q.  Can you turn to tab 26, please.  This is CFPB_59 through

21   -64?

22   A.  Yes.

23   Q.  And this is an email involving -- it actually is a

24   follow-up on the email you sent out in which Ms. Warren

25   identifies many areas for which she would like authority or

1    approval to proceed.  Just to simplify this, does Mr. Paoletta

2    approve that, with the exception of -- I think this is the --

3    when he referred to the FACA, the Federal Advisory Committee

4    Act, there was an exception to item No. 1.  Was everything else

5    approved?

6    A.  It was.

7    Q.  Can you turn to tab 20.  This is an email chain involving

8    Janis Pappalardo, the deputy associate director and acting

9    associate director for Research, Monitoring, and Regulations.

10    What does she do?

11    A.  Jan?

12    Q.  Yeah.

13    A.  She is -- right now she is our acting associate director

14    for our research arm, markets arm that does market monitoring,

15    and also our regulation team.

16    Q.  And she says to you:  In light of your email and discussion

17    yesterday, my understanding is that we can resume all regular

18    work related to fulfilling statutory obligations, including our

19    regular management activities.  And you responded:  That's

20    correct?

21    A.  That is my understanding, yes.

22    Q.  Can you turn to tab 24, please.  This is an email that I

23    alluded to earlier at CFPB_00056.  It is an email from --

24    technically from you, but it is a message from Mark Paoletta,

25    the chief legal officer.  I think the email speaks for itself.

1    So let me just ask this:  Do you have an understanding as to

2    why Mr. Paoletta sent this email?

3    A.  I'm pretty certain that he understood that there was --

4           MS. BENNETT:  Objection.  Personal knowledge.

5           THE COURT:  Do you know why he sent it out?

6           THE WITNESS:  He sent it out because there was

7    confusion about the statutory work.

8           THE COURT:  Right.  Because after the 27th, where he

9    said you should do all statutory-authorized duties, everybody

10   is asking:  Does that mean me, does that mean me, does that

11   mean me?  And, so, at 3 p.m. on the day before our hearing, he

12   said you don't even have to ask.  That's what this is, right?

13          THE WITNESS:  I don't know if that's what his

14   thinking was.

15          THE COURT:  I didn't say that's what he was thinking,

16   that's what it says.

17          THE WITNESS:  It does.

18   BY MR. ROSENBERG:

19   Q.  Do you know whether Mr. Paoletta was receiving a lot of

20   requests for authorization?

21   A.  At this point in period he was.

22          THE COURT:  And you were, too?  You were basically

23   deluged with them.

24          THE WITNESS:  I was.

25   BY MR. ROSENBERG:

1    Q.  Let's talk about that deluge.  Let's look at tab No 25.

2    And I'll just walk through this quickly.  Is this an approval

3    email that follows up on Mr. Paoletta's email for RMR and

4    markets?

5    A.  Yes.

6    Q.  Tab 30.

7          THE COURT:  Does this -- after the March 2nd email,

8    where it's underscored that statutorily required duties should

9    be performed, didn't even have to ask for permission, that's

10   your job.  Who decided whether an employee could then come back

11   from administrative leave and do that work?  Did they have to

12   ask their supervisors?

13         THE WITNESS:  It would be the supervisor who would

14   have directed the work.

15         THE COURT:  Okay.  And did the supervisors have the

16   authority to bring people back from administrative leave?  Is

17   that what this means?

18         THE WITNESS:  I would take it as yes, that's what it

19   means.

20         THE COURT:  Do you know?

21         THE WITNESS:  I don't know if that's what occurred.

22         THE COURT:  Do you know if that's what it means?

23         THE WITNESS:  No.  But that's the process I followed

24   for my own staff.

25         THE COURT:  Okay.

1          MR. ROSENBERG:  We have an email on this, Your Honor.

2          THE COURT:  I'm sorry?

3          MR. ROSENBERG:  We have an email on this very issue.

4          THE COURT:  Great.

5     BY MR. ROSENBERG:

6     Q.  Turn to tab 32, please.  This is the document starting with

7     Bates No. 00079.  And, again, I'll just walk you through.  This

8     email chain starts with the March 2nd email from Mr. Paoletta.

9     And then Christopher Johnson responds, thanking him for

10    providing clarity about the work, and says:  Consistent with

11    your direction, we're going to, you know, conduct various

12    activities.

13         Mr. Paoletta says thanks for reaching out.  Yes, please

14    reactivate staff to support your work and reach out to

15    stakeholders.  And then the -- what I point the Court to and

16    you to is Mr. Johnson's Monday, March 3rd email at 5:59 a.m. --

17    gets up early -- email to the CRE team.  Do you have an

18    understanding what the CRE team is?

19    A.  Yes.

20    Q.  What is it?

21    A.  Consumer, Response, and Education.

22    Q.  Noting that the reactivation of all CRE team members

23    full-time has taken place, has been approved.  Does that help

24    you to answer the question that the Judge asked you about --

25         THE COURT:  Well, that says what it says.  You

1    answered the question.  I don't need him to answer the question

2    now.  I mean, I take your point.  It's an important email, but

3    I don't know if you need to ask him if it's an important email.

4            MR. ROSENBERG:  I wasn't asking him if it was an

5    important email.

6            THE COURT:  All right.  So with resect to the

7    Consumer Response Center you're familiar with, we have this,

8    indicating the exact question I was asking.  Were the employees

9    reactivated?  Are you aware of similar ones for other

10   functions?

11           THE WITNESS:  I know that Jan Pappalardo sent a

12   similar email out to her team.  She shared that with me, that

13   she was going to do that.

14           THE COURT:  And what team is that?

15           THE WITNESS:  That would be research, markets,

16   regulation.

17           THE COURT:  Okay.

18   BY MR. ROSENBERG:

19   Q.  And I think we have an email on that one as well.  So if we

20   could turn to tab 43.  Give you and the Court a moment to take

21   a look at that.

22           And, again, this starts with an email from Mr. Paoletta,

23   it leads to an email chain in which Ms. Pappalardo explains how

24   work will be implemented.  And Mr. Paoletta says:  Please

25   proceed with your proposed implementation strategies.  Is that

1    the exchange that you were thinking of when you testified just

2    now?

3    A.  It's one of them, yes.  I had a separate conversation with

4    her because she was trying to form, you know, how to

5    communicate all of this with her specific team.  You know, how

6    to cascade it down to all staff.  So she came back -- that

7    happened first, and then she came back and clarified a few

8    things with Mark Paoletta.

9            THE COURT:  When you're having separate conversations

10    with people, do they tend to be by email or by phone or by

11    text.

12            THE WITNESS:  By email.

13            THE COURT:  Did you communicate with anybody by text?

14            THE WITNESS:  No.

15    BY MR. ROSENBERG:

16    Q.  In this context at least?

17    A.  No.

18    Q.  We know that you had one text exchange previously --

19    A.  Yes.

20    Q.  -- with Mr. Young.

21    A.  Oh, yeah.  I mean, I do use Teams, yes.

22    Q.  Okay.  Can you turn to tab 35, please.

23            THE COURT:  All right.  I think we are past the point

24    where I said we were going to break for everyone's convenience.

25    So we're going to do that.  And you can resume your direct when

1    we get back.

2            Just given how much time it's going to take for

3    everyone to leave the room and return, we'll start again at 2.

4            (Recess.)

5            THE COURT:  All right.  You can resume your direct

6    examination of the witness.

7            MR. ROSENBERG:  Thank you.

8    BY MR. ROSENBERG:

9    Q.  Welcome back.  I would like to circle back on two very

10   brief topics that you discussed earlier today and then I think

11   we can go to a conclusion on the resumption of activities.

12           First, I ask you to take a look at tab 56 in the CFPB

13   binder.  And this is going to be page 16.  And just so you

14   know, this is the email from Acting Director Vought on

15   Saturday, February 8th.

16           I'm going to ask you just one specific question because

17   I'm not sure whether I heard I correctly, so I want some

18   potential clarification.  One of the bullets says that CFPB

19   employees are to cease all stakeholder engagement.  Do you

20   review that as applying to consumers themselves?

21   A.  No.

22   Q.  All right.

23           THE COURT:  Well, the first time when we asked who

24   stakeholders were, you added them in the list.  So what has

25   occurred over lunch that took him out of the list?

1    THE WITNESS:  It's not -- not about consumers

2    specifically.  When I heard the question the first time, when I

3    think of stakeholder engagement, I think of folks that handle,

4    like, some of our external affairs work, where we're taking

5    policy views or regulatory views on the Agency itself.

6    THE COURT:  So stakeholders would include all the

7    other things you mentioned; banks and lenders and all the

8    organizations that you interact with as part of your daily job?

9    THE WITNESS:  Correct.

10    THE COURT:  But not consumers?

11    THE WITNESS:  Consumers I put in a whole different

12    bucket of categories.  Like, that is public facing, taxpayers,

13    public individuals that we are -- should be providing services

14    to.

15    THE COURT:  Did anybody tell you that's what that

16    meant?  Or that's just how you're reading it as you think about

17    it?

18    THE WITNESS:  That's how I'm reading it because, like

19    I said earlier in my testimony, having been working as a

20    constituent liaison in a congressional office, I know the

21    importance of what some of these agencies do to fulfil that

22    service.

23    THE COURT:  I'm not sure that there's a doubt about

24    whether you know.  That's not really what the questions have

25    all been about.

1           You can ask your next questions.

2    BY MR. ROSENBERG:

3    Q.  I want to be -- let me be very clear about this:  Did we

4    discuss this topic at lunch?

5    A.  No.

6           THE COURT:  I didn't mean you had been cued on the

7    answer.  I just wondered why you included consumers the first

8    time and took it out after.

9    BY MR. ROSENBERG:

10   Q.  One other question regarding your prior testimony.  This is

11   perhaps an admission on my part, but when you were discussing

12   RIFs, was the Office of Consumer Response and Education part of

13   the anticipated RIFs during that week of February 10th,

14   February 14th?

15   A.  No, no.

16   Q.  No.  Okay.  Then let's pick up where we left off.

17          I would like to ask you turn to tab 35.  And this is

18   another email in response to Mr. Paoletta's email of March 2nd

19   regarding the CFPB ombudsman's office.  And this email

20   indicates that the CFPB ombudsman's office team will work in

21   conjunction with the statute.  Do you have an understanding as

22   to whether the CFPB ombudsman's office is operational once

23   again?

24   A.  It is operational.

25   Q.  Now, your declaration discussed the student loan ombudsman.

1    Is that position still vacant?

2    A.  It is vacant.

3    Q.  To fill that position, what would be required?

4    A.  The director would need to identify a person, submit that

5    request to the Department of Treasury.  And I understand the

6    Treasury secretary has to make the designation.

7    Q.  All right.  Let's talk about supervision.  Can you turn to

8    tab 22, please.

9        Take a look at that email and then I have a couple of

10   questions.  And just for the record, this is tab 22 in the CFPB

11   binder, CFPB_00050 to 00052.

12       Okay.  Let me start this way:  Was there confusion over

13   whether supervision could resume their statutorily required

14   activities?

15   A.  I believe there was confusion around the type of work that

16   was required by statute that could or could not be performed.

17   Q.  And in this email chain, starting at the bottom, there's an

18   email from you to Cassandra Huggins and Calvin Hagins, on

19   February 27th, 2025.  This email appears similar in some

20   respects to the other two emails that you sent out.  But I'll

21   also note that it's missing some other information that was in

22   your other emails.

23   A.  Yeah.

24   Q.  Can you tell us what makes this email a little bit

25   different?

1    A.  I think the bullet points in the email that went out from

2    Director Vought on, I believe, the 10th -- or, I'm sorry, the

3    8th, was very clear about the type of work they should not be

4    doing.

5    Q.  How did you interpret that?

6    A.  I interpreted it as though they should not be forward

7    facing, working directly, examining financial institution.

8    Because, again, I was not clear if there were other types of

9    congressional reports or other work they should be recommending

10   to Mark Paoletta about what they would be able to continue.

11   Q.  They reach out to you via email on Friday, February 28th,

12   saying:  Adam, to be clear the February 8th email directed us

13   to cease all supervision and examination activity.  Am I

14   correct that directive still stands?

15        And you answer:  That is correct.  And then you say --

16   then you recommend reaching out to Mark -- I assume that's Mark

17   Paoletta --

18   A.  Correct.

19   Q.  -- regarding reports to Congress per statute or anything

20   like that.  And then you note that other people are raising

21   questions about reports or other statutory requirements.

22        When you say, "That is correct," what did you mean by

23   that?

24   A.  I meant what I said earlier, which is that in the

25   initial -- the email that the acting director sent out on the

1    8th stopped certain work and my belief at that time was it was

2    clear that we should not be doing examination work.

3    Q.  Now let's turn to tab 44.  This is Bates number CFPB_00111

4    to 00 --

5          THE COURT:  Whether it was included in February 8th,

6    it certainly was included February 10th, that was all work?

7          THE WITNESS:  That was all work.

8    BY MR. ROSENBERG:

9    Q.  Tab No. 44, at CFPB_00111 through 00114.  This is starting

10   at the bottom of this chain.  Yet another chain that was

11   prompted by Mr. Paoletta's March 2nd email.  And then

12   Ms. Huggins responds --

13         THE COURT:  The one at the bottom is the one you

14   showed us just before, isn't it?  The one from Mr. Martinez

15   here.  It's not the same one that you just showed us, when he's

16   explaining it to her.  This is the one that went to everybody?

17         MR. ROSENBERG:  Yes.  The email -- if the Court is

18   referring to the email on page 114, that's the -- it's from

19   Mr. Martinez.

20         THE COURT:  That's the one that went to everybody.

21         MR. ROSENBERG:  It went to everybody.

22         THE COURT:  The one we just saw was sent out the same

23   day, where it clarified if you have questions about certain

24   things, you need to talk to Mark.  That's what we just saw in

25   tab 22.  Did that come out in between?

1       MR. ROSENBERG:  That was a few days earlier.  So the

2    email that the witness just testified about from tab 22 was

3    sent out on February 27th.  And that prompts -- there's going

4    to be a series of email chains here, but that prompts one email

5    chain, and then the email chain in tab 44 starts with --

6           THE COURT:  On March 2nd.

7           MR. ROSENBERG:  On March 2nd.  It's from

8    Mr. Martinez, but it's really Mr. Paoletta.  Mr. Martinez is

9    sending the email out on his behalf.

10          THE COURT:  Okay.

11   BY MR. ROSENBERG:

12   Q.  And just to, again, speed this along a little bit, Miss

13   Huggins responds to Mr. Paoletta's email to everyone, on Monday

14   March 3rd in the morning, asking a question about the work

15   stoppage in the February 8th email.  Do you see that?

16   A.  Yes.

17   Q.  Like I said, that was sent at 10:33.  Now I'm going to ask

18   you to turn to tab 45.

19          And this is an email -- again, it's a different -- it's

20   a branch of a different chain, but it starts with the,

21   basically, the all-hands message from Mr. Paoletta on March 2nd

22   and that email is then forwarded on March 3rd, at 12:13 p.m.,

23   to DL_CFPB_Supervision_All, and it says, you know, supervision

24   staff.  So is that -- goes to supervision staff.  And that

25   email discusses Ms. Huggins's view as to what's been authorized

 1    or not authorized.

 2         Now, the first question for you is:  That email was sent

 3    at 12:13 p.m. on Monday, March 3rd.  But if you look back at

 4    tab 44, when Ms. Huggins asks Mr. Paoletta for clarification,

 5    that was Monday, March 3rd, at 10:33 a.m.   In your experience

 6    in working at the CFPB, is it reasonable to expect a response

 7    on a substantive email of the type that Ms. Huggins sent on

 8    Monday, March 3rd, at 10:33 a.m., in less than two hours?

 9    A.  Not this type of email.

10    Q.  Now let's go back to tab 44.  There's an email from

11    Mr. Paoletta responding to Ms. Huggins's March 3rd email

12    seeking clarification.  Actually, hold on one second.

13         Let's go back to tab 45 for a moment.  Ms. Huggins's

14    email to the supervision staff.  And she says, in bold, that

15    she received -- there's been some confusion regarding the

16    message we received from Adam Martinez/Mark Paoletta on March

17    2nd.  We have requested and received clarification that their

18    message was not intended to authorize the reinstatement of

19    supervision/examination activity, even though the Bureau is

20    required by law to carry out those activities.  Right?

21    A.  (Nods head.)

22    Q.  Are you aware of Mr. Paoletta otherwise -- and this is a

23    yes or no question -- but are you aware of Mr. Paoletta

24    otherwise responding to Ms. Huggins between the time that she

25    asked for advice on the morning -- at 10:33 in the morning on

1    March 3rd and the time she indicated she received guidance from

2    you and Mr. Paoletta less than two hours later?

3              THE COURT:  She wrote Mr. Martinez at 10 a.m. and

4    asked him:  Are we still supposed to do supervision

5    examination?  He said yes, but you can get clarification from

6    Mark, right?  That happened.

7              MR. ROSENBERG:  That was a week prior.

8              THE COURT:  And then she sends the email to him

9    asking for clarification.

10             MR. ROSENBERG:  Yes.  And I'll cut to the point.

11             THE COURT:  Good.

12             MR. ROSENBERG:  She asks him for clarification.  She

13   asks him for clarification in her email -- and this is in tab

14   No. 44 -- on Monday, March 3rd, at 10:33 a.m.  And then, less

15   than two hours later, she tells her staff that she's received

16   clarification regarding Mark's March 2nd email, that they're

17   not intended to authorize the reinstatement of supervision or

18   examination activity.  And the point is just to be blunt?

19             MS. BENNETT:  Objection, Your Honor.  He's just

20   testifying and reading emails.

21             THE COURT:  Right.  Well, he's telling me what he's

22   doing here, which I think is helpful.  It's not a question.

23   He's talking to me.  You can finish your thought.

24             MS. BENNETT:  I apologize.

25             MR. ROSENBERG:  The point is simply she didn't give

 1    Mr. Paoletta an opportunity to respond.  She sent out an email

 2    to staff purporting --

 3              THE COURT:  You don't think that Mr. Martinez

 4    responded?

 5              MR. ROSENBERG:  He did a week prior and in his

 6    response he indicated that she should check with Mr. Paoletta.

 7              THE COURT:  It wasn't a week prior, it was March 3rd.

 8              MR. ROSENBERG:  I think the confusion may be that

 9    Mr. Paoletta's email is coming from Mr. Martinez's email

10    account.  So there was an email that we discussed at the

11    beginning, from Mr. Martinez, I believe it was on February

12    27th.  This was the email in tab 22.

13              THE COURT:  Right.  That comes out on the 27th.

14              MR. ROSENBERG:  Yes.

15              THE COURT:  But then she asks a question on the 28th,

16    and he responds, "That's correct," and she says, "That's

17    helpful," but then this conversation keeps going.  So that's

18    all on the 28th.  All right.  And February -- March 2nd is just

19    a long time after that.

20              MR. ROSENBERG:  And then Mr. Paoletta sends out his

21    all-hands email.

22              THE COURT:  Okay.

23              MR. ROSENBERG:  So she responds to that and seeks the

24    guidance from Mr. Paoletta that Mr. Martinez had recommended

25    that she seek.

1          THE COURT:  Right.

2          MR. ROSENBERG:  And when she seeks that guidance from

3     Mr. Paoletta, she does so at 10:33 a.m. on March 3rd.  She asks

4     him a question and says, at the bottom of that email, she says:

5     Please confirm the message you sent is not intended to

6     authorize the reinstatement of supervision examination activity

7     and the activities that support this function, despite the fact

8     that the Bureau is required by law to conduct these activities.

9          THE COURT:  Okay.  But you think that only includes

10    the conversation that she had -- the email with Paoletta.  You

11    don't think that's a broader -- that also embraces what she

12    asks Mr. Martinez?

13         MR. ROSENBERG:  It may very well embrace what she

14    asked Mr. Martinez.

15         THE COURT:  Okay.  So she jumps the gun, she tells

16    everybody:  I asked for clarification.  She asks for

17    clarification, she tells them that she didn't get it.

18              All right.  Ask your next question.

19         MR. ROSENBERG:  Including ask for clarification from

20    Mr. Paoletta.

21    BY MR. ROSENBERG:

22    Q.  So I think we're near the end of this process here.  So go

23    back to tab 44.  And this is an email from Mr. Paoletta the

24    next day, on Tuesday, March 4th, 2025?

25              THE COURT:  And he's furious with her for

```
1    countermanding his directive, as he sees it.
2              MR. ROSENBERG:  I think that's a fair
3    characterization.
4              THE COURT:  All right.
5    BY MR. ROSENBERG:
6    Q.  And he asks her to prepare -- he makes clear that
7    supervision division is to carry out its activities,
8    statutorily-required activities, and asks her for various
9    reports.
10             So, with that, let me ask this:  Are you aware of
11   whether the supervisory staff has in fact started to prepare
12   those reports?
13   A.  Only based off of her acknowledge of the receipt of the
14   email in stating that she would have her staff work on that.
15   Q.  Do you have an understanding of what the status of the
16   supervisory staff currently is?
17   A.  No.
18             THE COURT:  Is that the one where they were all told
19   they could come off administrative leave to write the report,
20   saying this is what our statutory activities are, and then they
21   had to go back on?  Am I thinking about another series of
22   emails or am I correct about that?
23             MR. ROSENBERG:  I don't know if you're correct about
24   that.  If the Court wants to point me to that.
25             THE COURT:  I don't know where it is in the binder.
```

1          MR. ROSENBERG:  And I'm not trying -- to be clear,

2     I'm not trying to push back, I just don't know --

3          THE COURT:  I'm sure if it's a plaintiffs' exhibit,

4     they'll bring it up, but there was a discussion about that

5     which suggested that they were, at the beginning of this

6     conversation and the end of the conversation, still on leave.

7          MR. ROSENBERG:  All right.  I think we've --

8          THE COURT:  To be fair, I think the supervision

9     enforcement area is the most complicated area with respect to

10    this dispute because to engage in the supervision and

11    monitoring, you have to do an examination.  Now, if you do an

12    examination, you find something that you think violates the

13    statute, you have to make a discretionary agency enforcement

14    decision about whether I'm going to go after that bad actor or

15    not, and that's plainly -- it's statutorily authorized, that

16    there shall be an office of enforcement, but what they do with

17    their enforcement authority, I think everybody agrees is

18    discretionary.

19         But they also have reporting requirements about what

20    they found based on their monitoring and supervision and

21    examination.  So how do you comply with those requirements

22    without doing the examination?

23         So a lot depends on how much precision you use when

24    you ask the question, is that statutorily authorized, because

25    there are things that they do that they have to do and there

1   are things that they do that they don't have to do.  Is that a

2   fair characterization of this particular branch?  Which is why

3   I think there's so much confusion arising out of it.

4           MR. ROSENBERG:  I think that's fair.  I think we're

5   delving a little bit to argument here as -- I'm not going to

6   call "my friends," but as opposing counsel has indicated with

7   her prior objection.  I think it is also fair to infer from

8   these emails that to the extent there was confusion, that

9   people had the opportunity to seek clarification.

10          Now, maybe the Court or plaintiffs might quarrel with

11  that particular management style, but ultimately we don't think

12  that that is an issue that is teed up by the allegations and

13  legal theories of plaintiffs' complaint.  And on the facts,

14  yes, I think it's fair to infer that Mr. Paoletta was upset, as

15  he noted in his email, among other things, Ms. Huggins's

16  directive to her staff for which Mr. Paoletta did not have a

17  meaningful opportunity to respond, was leaked to the press.

18  And it characterized --

19          THE COURT:  We're not going to figure out who did

20  that here, that's not part of this.  She was -- we have the

21  emails about that question and that's just -- we're not going

22  there.

23          MR. ROSENBERG:  I'm not suggesting that we would be

24  able to figure that out.

25          THE COURT:  No, we're not.

```
 1              Okay.  Ask your next question.

 2     BY MR. ROSENBERG:

 3     Q.  What is the current status of CFPB's website?

 4     A.  As far as I am aware, it's up and running.

 5     Q.  404 error has been fixed?

 6     A.  Yes.

 7     Q.  Hold on just one moment.

 8          (Pause.)

 9          All right.  I'm going to ask you to turn -- I think this

10     will be the last one -- to tab No. 55.  And this is in the CFPB

11     binder.  It's Bates number CFPB_00130.  Do you recognize this

12     document?

13     A.  Yes.

14     Q.  What is it?

15     A.  It's the org structure for the Bureau.

16     Q.  Is the current structure of the Bureau accurately reflected

17     in this document, to the best of your knowledge?

18     A.  Yes.

19     Q.  Some of the names on this may be outdated?

20     A.  Correct.

21     Q.  People have left, for example?

22     A.  Correct.

23     Q.  Okay.  What I would like to do is I would like to go

24     through some of the -- since we've had a lot of testimony about

25     a lot of emails and I think the Court is interested in what is
```

1    up and running at the agency, I would like to go through org

2    chart and let us see if we can summarize what's up and running

3    and, you know, maybe there's some areas that still need work.

4    Okay?

5         So, let's start with -- I see at the top -- I'm not

6    going to go through every single box on this, but just the ones

7    that are relevant.  But if there's something that I don't ask

8    about that you think is important, please let us know.

9         I see deputy director for Fair Lending.  That's -- I

10   think we had testimony from you about that earlier regarding an

11   email from Frank Vespa-Papaleo?

12   A.  Correct.

13   Q.  Okay.  Is that office now up and running, to your

14   knowledge?

15   A.  Yes.

16   Q.  Okay.  See on the main -- there's sort of a long list of

17   organizations, you know, subunits across the middle of the

18   chart.  Research, monitoring, and regulations?

19   A.  Yes.

20   Q.  Is that -- to your knowledge, is that section in the --

21   basically, subsections under it, are they up and running?  And

22   if not, are there any gaps that you're aware of?

23   A.  I'm aware that they're running.  And it's been validated

24   between the head of this organization and Mark Paoletta.

25             THE COURT:  Every single one of them?  I mean,

1    "regulations" doesn't sound like something that --

2              THE WITNESS:  They've been in discussions with the

3    regulations team.

4              THE COURT:  They're doing stuff, too?

5              THE WITNESS:  I mean, yeah.

6    BY MR. ROSENBERG:

7    Q.  Again, this is to the best of your knowledge, so if there's

8    something you think is a gap, I encourage you to let us know.

9    A.  Yep.

10   Q.  And please take your time.  If you need a minute to look

11   through different functions and if there are functions -- I'll

12   just say, if there are functions that you're not sure about,

13   let us know that as well.  Okay?

14   A.  (Nods head.)

15             THE COURT:  All right.  Well, what I've been told

16   adamantly is that statutorily-required activities are up and

17   running.  And you're asking about every one of these lines on

18   the organizational chart.  It's not -- I'm pretty sure it's not

19   your position that every one of these boxes falls into the

20   statutorily-required activities?

21             MR. ROSENBERG:  That is correct.

22             THE COURT:  All right.

23   BY MR. ROSENBERG:

24   Q.  External affairs is probably not statutorily required, but

25   I think we saw an email about that.  Is that up and running?

1    A.   The functions that are statutorily required that were taken

2    to Mark Paoletta, yes, those have resumed.

3    Q.   Consumer Response and Education?

4    A.   Based off of my testimony this morning, yes.

5    Q.   I think you just testified regarding supervision that's --

6    how would you characterize -- to the extent you can, how would

7    you characterize the current status of supervision?

8    A.   No current stakeholder engagement with financial

9    institutions, but it appears to be as though there are --

10   there's reporting that's been requested for Mark Paoletta from

11   that division, in terms of their case file or files.

12            THE COURT:  Reporting of?  Tell me everything you

13   were working on?

14            THE WITNESS:  Correct.

15            THE COURT:  So they're not actively doing any

16   examinations?

17            THE WITNESS:  That is my understanding.

18   BY MR. ROSENBERG:

19   Q.   We haven't spoken much about enforcement because it's in

20   many respects outside the scope of this litigation and it's --

21   I think Judge Jackson characterized the legal requirements of

22   enforcement as being within the Agency's discretion.  But,

23   nonetheless, do you have any understanding as to what the

24   current status is with Enforcement?

25   A.   There's a review being done of the current caseload for

1    Enforcement.  And in what I understand from our website and

2    other material, there have been some cases that have been

3    pulled back from the court system and then others have

4    remained.

5    Q.  And when you say that, some cases pulled back, does that

6    mean some cases have been dismissed?

7    A.  Correct.

8    Q.  And there are cases that are being pursued?

9    A.  Correct.

10            THE COURT:  Mr. Rosenbeg, if he says something that's

11   really clear, please don't repeat it.  We just have to move

12   this on.

13            MR. ROSENBERG:  I'm almost done.

14            THE COURT:  I can't have this hearing all week.

15   BY MR. ROSENBERG:

16   Q.  Legal?

17   A.  Yes, they -- yes.  They have been instructed to work.

18   Q.  Operations?

19   A.  Yeah.  Most of my staff, we're not fully -- we're not

20   statutorily required, but we do support the mission as the

21   mission is right now.  So as things start moving ahead and they

22   need more assistance from my workforce, then we will have more

23   people engaged.

24   Q.  Last question:  In light of all your testimony today, how

25   would you describe the current status of CFPB's operations?

1    A.  I don't want to say normal, but we're operating.

2         MR. ROSENBERG:  Thank you.  Nothing further at this

3    time, other than to note that we, with the Court's permission

4    we will file a notice of filing with the text message and the

5    OMB memo after this hearing, so they can be part of the record.

6         THE COURT:  Before the cross-examination starts, the

7    last question was whether something was normal.  And at the

8    beginning of your testimony we talked about the initial email

9    from the secretary of Treasury being pretty normal, kind of

10   transitional kind of email.  And the first email from the

11   Acting Director Vought also, generally, pretty typical.

12        Would you say that sending out an order that says "Do

13   no work" is typical?

14        THE WITNESS:  No.

15        THE COURT:  Would you say that canceling all the

16   contracts before the analysis as to whether these are

17   duplicative, worthwhile, not worthwhile is typical?

18        THE WITNESS:  No.

19        THE COURT:  Would you say that firing all

20   probationary employees and two-year employees from the get-go

21   is typical?

22        THE WITNESS:  No.

23        THE COURT:  Would you say that trying to implement a

24   RIF without notice before the new director is even put in place

25   is typical?

1          THE WITNESS:  No.

2          THE COURT:  And would you say putting the rest of the

3    employees on administrative leave with an order to do no work

4    is typical?

5          THE WITNESS:  No.

6          THE COURT:  All right.  Your witness.

7          MS. BENNETT:  We can just use the same binders we've

8    been using for simplicity.  I have Bates numbers references

9    instead of exhibit references, but they're marked on the

10   bottom.

11         THE WITNESS:  Okay.

12         THE COURT:  I would just say that what you just did,

13   which is go to tab whatever in your binder and page whatever of

14   the PDF in the binder did not create a record because you can

15   call anything by its name, Exhibit D, Exhibit F.  It got really

16   more about the binder.  And if you're going to talk about the

17   Bates numbers, they're not in the record at all.

18         MS. BENNETT:  Those are in the record.  We're going

19   to use the Bates numbers.

20         THE COURT:  At the bottom of the page.  But when you

21   docketed things, they were like Exhibit X and XO and Exhibit S.

22   If anyone is going to read this transcript and know what you're

23   talking about, those are the names of the documents.  That's

24   why we label them A and B and C, so they can be A and B and C

25   forever.  It would help if you use your same nomenclature so

1     that if someone wants to go back and know what you're talking

2     about, they'll be able to find it.  Do you understand what I'm

3     talking about?

4               MR. ROSENBERG:  Yes.  Can I speak to that?

5               THE COURT:  I think you largely went with the tab

6     number.

7               MS. BENNETT:  To be clear, I'm going to use the

8     numbering systems for both sets of exhibits that are on file.

9     So the government submitted exhibits with Bates numbers.  I'll

10    use the Bates numbers for theirs.  We submitted exhibits with

11    exhibit letters and I'll use the letters for ours.  So anybody

12    who has the transcript afterwards can just go to the record and

13    see which document.

14               THE COURT:  Okay.

15               MR. ROSENBERG:  Can I -- and just to speak to the

16    Court's concern, I mean, we did pull these documents together

17    very, very quickly and it was a substantial volume of

18    documents.  So we weren't able -- didn't have time to put

19    specific exhibit labels on these documents, but they are all on

20    the Court's CM-ECF system.

21               THE COURT:  No, I know I have them and I know when

22    you open them up they usually said like Exhibit F or Exhibit

23    something, so I knew it was Exhibit F to somebody's

24    declaration.  I'm just saying as a trial advocacy pointer, that

25    this record will be somewhat difficult to follow for anyone who

1    is going to have to review it.  Perhaps no one will have the

2    pleasure.  We'll see.

3              All right.  Go ahead.

4                        CROSS-EXAMINATION

5    BY MS. BENNETT:

6    Q.  Good afternoon, Mr. Martinez.  I'm Jennifer Bennett.  I'm

7    an attorney for the plaintiffs here.

8              So, I just want to clarify some of your testimony,

9    because you've already submitted testimony twice in this case

10   before, right?  So once was on February 24th, you submitted a

11   declaration, and that was in support of the defendant's

12   opposition to a preliminary injunction, right?

13   A.  Um-hum.

14   Q.  And then you submitted a supplemental declaration on March

15   2nd, right?  And that was the day before the first part of this

16   hearing on the preliminary injunction?

17   A.  (Nods head.)

18   Q.  The declaration you submitted on February 24th, that was

19   submitted -- you swore that that declaration was true and

20   correct, right?

21   A.  Yes.

22   Q.  Okay.  And it was under penalty of perjury?

23   A.  Yes.

24   Q.  And same thing with your March 2nd declaration.  You swore

25   under penalty of perjury that that was true and correct?

1    A.  Yes.

2    Q.  So let's start, I just want to make sure I understand what

3    your testimony is today about -- let's start with the idea of

4    winding down the agency, closing the agency, right?

5         So in your first declaration, the one submitted on

6    February 24th, you testified that since the arrival of the

7    acting director, the new leadership is assessing how to make

8    the Bureau more efficient, right?

9    A.  Yes.

10   Q.  And so by new leadership you meant Russ Vought?

11   A.  Correct.

12   Q.  Who was appointed on February 7th?

13   A.  Yes.

14   Q.  And Mark Paoletta, who I think you testified joined around

15   the same time, the 7th or the 8th right?  He's the chief legal

16   officer?

17   A.  He is.

18   Q.  And you testified, I think, that he's also kind of serving

19   in a chief of staff kind of role now, effectively?

20   A.  Correct.  I mean my communications with Mark has not been

21   with -- as a legal matter.

22   Q.  Okay.  Understood.

23   A.  Yeah.

24   Q.  And then, in addition to assessing how to make the Bureau

25   more efficient, I think you testified in your declaration on

```
 1    February 24th that the new leadership was working to comply

 2    with the Bureau's statutory functions, right?

 3    A.  Yes.

 4    Q.  Okay.  And then you also testified that your operations

 5    team had been mindful of those.  By which, I think, correct me

 6    if I'm wrong, you meant your operations team was also being

 7    mindful of the statutory obligations, right?

 8    A.  That's correct.

 9    Q.  And winding down an agency would not be consistent with

10    statutory obligations, would it?

11    A.  It would not.

12    Q.  Okay.  In that first declaration you didn't mention

13    anything about an attempt to wind down the agency, right?

14    A.  That is correct.

15    Q.  But by your testimony now, it had already happened by then?

16            MR. ROSENBERG:  Objection.  Vague as to what the --

17    it already happened refers to.

18            MS. BENNETT:  I'm sorry.  Fair enough.

19    BY MS. BENNETT:

20    Q.  There had been an attempt to wind down the agency, or at

21    least you thought there was an attempt to wind down the agency,

22    right?

23    A.  The week of February 10th, yes.

24    Q.  That's before your declaration?  Before your declaration

25    on --
```

```
1    A.  It was a couple weeks before, yes.

2    Q.  And you're aware that following your declaration, which

3    didn't mention this at all, multiple federal employees

4    submitted declarations attesting to this attempt that you, I

5    think, recognized to shut down the agency?

6    A.  Sure.

7    Q.  Okay.  And one of those employees is pseudonymous, but

8    their declaration is under the name of Alex Doe, right?

9    A.  (Nods head.)

10   Q.  And in your second declaration, the one on March 2nd, you

11   say that Alex Doe's testimony regarding your statements is,

12   quote, not inaccurate?

13   A.  It was not inaccurate.

14   Q.  By that you mean it was accurate?

15   A.  The documentation that was provided to you that was

16   pre-decisional, that we didn't take action on the week of the

17   10th, the accounts that she provided or he provided were

18   accurate.

19   Q.  Okay.  And the same is true, another employee, Blake Doe,

20   testified similarly.  And, again, in your declaration you said

21   that Blake Doe's statements are, quote, not inaccurate, right?

22   A.  No, they were true.

23   Q.  Okay.  And so I just want to go through, you know, what the

24   plan was then.

25           So there was, as I understand it, there was a meeting
```

USCA Case #25-5091     Document #2113074      Filed: 04/25/2025     Page 400 of 698

1   with OPM to discuss large-scale termination of employees, yes?

2   A.  Yes.

3   Q.  And that happened on the 13th?

4   A.  It actually happened on the 10th of February.

5   Q.  It happened on the 10th?

6   A.  It did.

7   Q.  And then there was another meeting.  So then on the 10th

8   and then on the 11th the probationary employees were fired?

9   A.  Yes.

10  Q.  And then on the 13th the term employees were fired?

11  A.  Yes.

12  Q.  That same day there was another meeting with OPM --

13  A.  Yes, ma'am.

14  Q.  -- to discuss firing the rest of the employees, right?

15  A.  RIFing employees, yes.

16  Q.  And at that meeting you explained that the CFPB was going

17  to terminate the vast majority of employees, yes?

18  A.  That's correct.

19  Q.  It was going to do so as quickly as possible, yes?

20  A.  That is correct.

21  Q.  That's because new leadership was asking you to do it as

22  quickly as possible, right?

23  A.  That is correct.

24  Q.  And then you said that first the Bureau was going to

25  terminate -- I think the record says 1200, I hear your

```
 1    testimony saying that included some of the already fired

 2    people.  But, a very -- together, roughly 1200 people --

 3    A.  Correct.

 4    Q.  -- yes?

 5        And it was going to do so by eliminating whole divisions

 6    and offices of the Bureau, right?

 7    A.  That is true.

 8    Q.  Okay.  And then you said the second step of this was, one

 9    step, we're going to fire, say, 1200 people, the next step is

10    we're going to, quote, reduce altogether, is that right?

11        MR. ROSENBERG:  Objection.  Misleading.  Confusion

12    between firing and pro-reductions in force.

13        THE COURT:  Reduction-in-force people don't work

14    there anymore, correct?

15        MR. ROSENBERG:  Yes.

16        THE COURT:  Okay.  You can ask your question.

17    BY MS. BENNETT:

18    Q.  So I just to clarify, at this meeting on the 13th, you

19    described essentially a two-step plan?

20    A.  Um-hum.

21    Q.  One was we're going to fire about 1200 people.  That had

22    already started taking place.  And then the second step was

23    we're going to reduce -- the Bureau is going to reduce

24    altogether, yes?

25    A.  Based upon the facts I had at the time, yes, that is
```

1    absolutely correct.

2    Q.  Okay.  And there's a memo in the record that basically

3    memorializes this plan, and that's at Plaintiffs' Exhibit JJ.

4    It's the first page of that.  And you don't have to turn to it

5    necessarily.  You're welcome to, but --

6    A.  Yeah.

7    Q.  And that memorandum was sent by you, right?

8    A.  Yes.

9    Q.  To OPM?

10   A.  That is correct.

11   Q.  On February 13th?

12   A.  That sounds correct.

13   Q.  Okay.  So that's almost a week after Acting Director Vought

14   was appointed, right?  Six days?

15   A.  Yes.  Sorry.

16   Q.  And the memo identifies entire divisions, offices, and

17   units that are going to be eliminated, right?

18   A.  That is correct.

19   Q.  One of those was Supervision?

20   A.  Yes.

21   Q.  And you understand Supervision to be statutorily required?

22   A.  Yes.

23   Q.  Another one Enforcement?

24   A.  Yes.

25   Q.  And you understand Enforcement as a division or a function

```
 1   to be statutorily required?

 2   A.  Yes.

 3   Q.  Okay.  Another was the Office of Fair Lending?

 4   A.  Yes.

 5   Q.  And that's statutorily required?

 6   A.  Yes.

 7   Q.  Division of Research, statutory, yes?

 8   A.  Yes.

 9   Q.  That's statutorily required?

10   A.  Yes.

11   Q.  I won't go through.  There are many others, right?

12   A.  Yeah, of course.  My front office was on that list.  I was

13   on that list.

14   Q.  And, actually, you were on that list and somebody asked you

15   about that, right?

16   A.  Correct.

17   Q.  And you said, "I will be terminated in the second round"?

18   A.  My staff was concerned about not having -- I was okay being

19   terminated as the chief operating officer, but my staff was

20   concerned about not having a leader to help them through

21   whatever next step was possible or needed.

22   Q.  Right.  You were needed to be able to close the agency?

23   A.  Exactly.  Right.  But I was prepared, I -- yeah.

24   Q.  And that memo -- just to confirm, that memo outlines the

25   first line of cuts and then it says there will be a second
```

1    round of divisions, offices, and units that will be cut, right?

2    A.  Yes.

3    Q.  And that second round, it says, will include Operations.

4    That's your office?

5    A.  Right.

6    Q.  Research, Monitoring, and Regulations, right?

7    A.  Correct.

8    Q.  And the Division of Consumer Response, right?

9    A.  Correct.  Yes, but --

10   Q.  Just yes or no.

11   A.  Go ahead.

12   Q.  And that memo requested permission from OPM for an

13   exemption from the rules regarding RIFs or large scale

14   termination so you could move faster, right?

15   A.  Yes.

16   Q.  Again, that's all at the direction of new leadership,

17   right?

18   A.  That is correct.

19   Q.  Okay.  And you were planning to -- the direction of new

20   leadership was all of these people in the first round, the

21   1200, had to be terminated by Friday, February 14th, right?

22   A.  That's correct.

23   Q.  Okay.  And the reason for that is because there was a

24   hearing in this case on Friday, February 14th, right?

25            MR. ROSENBERG:  Objection.  Facts not in evidence.

1          THE COURT:  Do you know why February 14th?

2          THE WITNESS:  No, I do not know.

3    BY MS. BENNETT:

4    Q.  So you wouldn't have said anywhere had the TRO not been

5    executed when it was on Friday, we would have terminated all

6    these people?  You wouldn't have said that then because you

7    don't know it?

8    A.  If I had known, I would have been freaked out.  I would

9    have said something.  I would have probably challenged it.  I

10   was unaware --

11         THE COURT:  I think that's different.  Had I known

12   that the order would be issued on the 14th is different than

13   saying I asked for the 14th because I thought that there was

14   going to be a hearing that day.  The hearing was scheduled

15   immediately after a motion for a TRO was filed.

16         MS. BENNETT:  Right.

17   BY MS. BENNETT:

18   Q.  And so, can I ask you, though, there's -- can I ask you to

19   turn to plaintiffs' Exhibit LL.  And that's an email chain

20   between you and members of the team that was executing --

21   A.  Yes, yes.

22   Q.  And so you get an email and that email is at 1:30 -- I'm

23   sorry, 1:36, right?

24   A.  Correct.

25   Q.  So you get an email at 1:36 and it's from, presumably, a

1    member of this large-scale termination team?

2    A.  Yes.  Yes.

3    Q.  And this email says -- wanted to make sure you are aware

4    that --

5    A.  Right.

6    Q.  -- there's a hearing on a temporary restraining order.

7    A.  Right.

8    Q.  You respond "Thank you" three minutes later, yes?

9    A.  Yep.

10   Q.  And then about ten minutes later -- if you could turn to

11   Exhibit MM.

12        So that's an email, I think, from a member of this

13   termination team that says, "We cannot wait until COB," right?

14   A.  Right.

15   Q.  Did I read that correctly?

16   A.  Um-hum.

17   Q.  So we have an email sent to you that says there's this

18   hearing that's about to start?

19   A.  Um-hum.

20   Q.  You immediately respond "Thank you," right?

21   A.  (Nods head.)

22   Q.  Then a few minutes later the team decides they can't wait

23   until the end of the day to execute these terminations, right?

24        MR. ROSENBERG:  Objection.  The individuals on their

25   email chain all appear to be blacked out.  So to the extent

1    we're referring to the team, it assumes facts not in evidence

2    as to who is on the team, who is sending these emails, and what

3    they mean by them.

4         THE COURT:  Do you know who those emails were from?

5         THE WITNESS:  I do.

6         THE COURT:  Okay.  Were they members of the

7    termination team?

8         THE WITNESS:  They were.

9         THE COURT:  Okay.  Next question.

10   BY MS. BENNETT:

11   Q.  Okay.  So just to clarify the chain of events that happened

12   here, you got an email from a member of the termination team

13   saying the hearing is happening at 2 p.m., right?

14   A.  Right.

15   Q.  You immediately respond "Thank you," right?

16   A.  Yep.

17   Q.  And then that person emails the team at OPM, I think --

18   A.  Um-hum.

19   Q.  -- that says we can't wait until the close of business,

20   right?

21   A.  They were looking -- yes.

22   Q.  And the thing they couldn't wait until the close of

23   business on was to get the documents they needed to be able to

24   execute these terminations, right?

25   A.  That is correct.

1    Q.  Okay.  And as I understood your second declaration -- and

2    now I'm thinking I misunderstood it.  I understood your second

3    declaration to suggest that essentially this was all a mistake,

4    right?

5    A.  It was not a mistake.

6    Q.  It was not a mistake?

7    A.  No.

8    Q.  So these terminations were directed by new leadership?

9          MR. ROSENBERG:  Objection.  Also vague, repeated

10   references to new leadership.  It could be unclear if who

11   plaintiffs' counsel is referring to as new leadership are the

12   same individuals as the witness believes constitute new

13   leadership.

14         THE COURT:  All right.  Well, we've seen documents

15   indicating who the new leadership was, but if you want to

16   clarify that, go ahead.

17   BY MS. BENNETT:

18   Q.  I asked you at the beginning of the cross-examination who,

19   in your view, was new leadership, right?

20   A.  Yes.

21   Q.  You said Acting Director Vought, yes?

22   A.  At the week of the 10th of February, there were two tracks

23   going on at the same time, that's what's a little bit

24   confusing.

25   Q.  Are you saying that when you say "new leadership," you say

1    sometimes you mean actual new leadership, but other times you

2    mean other people?

3    A.  Well, I use new leadership together.  But I'm not -- I

4    didn't get the impression that people were on the same page

5    about what exactly was going on.

6            THE COURT:  Was Mr. Vought the leader the day he sent

7    out the email on February 8th?

8            THE WITNESS:  He was ultimately the leader, yes.

9            THE COURT:  Was he the leader that day?

10            THE WITNESS:  Yes.

11            THE COURT:  Was he the leader on February 10th when

12    he sent out the memo saying don't work?

13            THE WITNESS:  Yes.

14            THE COURT:  So who are the people directing you

15    since -- you got involved in OPM and the RIFs, correct?

16            THE WITNESS:  I did.

17            THE COURT:  At whose direction?

18            THE WITNESS:  DOGE.

19            THE COURT:  Okay.  At that point had DOGE become

20    Christopher Young of the CFPB because he was designated?

21            THE WITNESS:  He did.

22            THE COURT:  Who would have to designate him then?

23            THE WITNESS:  The acting director.

24            THE COURT:  So Vought designated the DOGE people to

25    be CFPB people?

1          THE WITNESS:  That is correct.

2          THE COURT:  They got to tell you to go do this thing

3     with OPM?

4          THE WITNESS:  Yes.

5          THE COURT:  Okay.

6     BY MS. BENNETT:

7     Q.  Okay.  So could you turn to plaintiffs' Exhibit JJ at 1.

8     So that's an email on February 13th?

9     A.  Correct.

10    Q.  Right.  And that's before these terminations were supposed

11    to happen, right?

12    A.  That's correct.

13    Q.  Okay.  And it's from Jeremy Lewin, right?

14    A.  Yes.

15    Q.  And he's a -- I think you identified him as a member of

16    DOGE, yes?

17    A.  That's correct.

18    Q.  And that email says we owe acting Director Vought an update

19    at 10 a.m. tomorrow, right?

20    A.  Yes.

21    Q.  So they were keeping Acting Director Vought apprised?

22    A.  Yes.

23    Q.  Is it your testimony that Acting Director Vought knew but

24    didn't do anything?

25    A.  I would presume that he knew.

1  Q.  Okay.  And then at Plaintiffs' Exhibit -- can you turn to

2  Plaintiffs' Exhibit KK?

3  A.  Um-hum.

4  Q.  And that's an email from you to what I recognize to be the

5  people you've identified as people who work for DOGE, right?

6  A.  Correct.

7  Q.  And that email says, "Mark P. just happened to call me."

8  That's Mark Paoletta?

9  A.  That is correct.

10  Q.  "Mark P. just happened to call me and I was able to ask for

11  clarification and expectations for this first phase of

12  notifications," yes?

13  A.  That is correct.

14  Q.  So Mark Paoletta, whom you've identified as sort of new

15  leadership on the director side, right?

16  A.  That's correct.

17  Q.  Was in the loop about this too, right?

18  A.  Yes.

19          THE COURT:  I'm sorry.  That was KK not K?  Never

20  mind.  Now I can find it.

21  BY MS. BENNETT:

22  Q.  And in that February 13th meeting, right, Jeremy Lewin, one

23  of the DOGE members --

24  A.  Yes.

25  Q.  -- was talking to Director Vought during the meeting,

1    right?

2    A.  I don't recall having a conversation that ever transpired

3    between -- that included both of those individuals.

4    Q.  So he wasn't sort of coming in and off screen to get

5    direction from Russ, as he would put it?

6    A.  Not that I'm aware of.

7    Q.  Okay.  And you wouldn't ever have said we're being directed

8    by the director to fulfil all these requirements as fast as

9    possible?

10   A.  I have received no communications from Acting Director

11   Vought.

12   Q.  Okay.  So you were receiving communications from Mark

13   Paoletta, who's functioning as chief of staff, right --

14   A.  Correct.

15   Q.  -- and DOGE?

16   A.  That is correct.

17   Q.  And do you have -- there's no reason to believe that Mark

18   Paoletta was sort of off on a limb, right?

19   A.  That is correct.

20   Q.  And that's especially true given from these emails.  It's

21   clear that Vought was being kept updated, right?

22   A.  Presume -- well, I don't know.  I don't know.

23   Q.  You don't know?

24   A.  I don't know.

25   Q.  But the emails -- you have no reason to doubt the email

1    that we just read, right?

2              MR. ROSENBERG:  Objection.

3              THE COURT:  If you don't know, he doesn't know.

4              THE WITNESS:  I don't know.

5              THE COURT:  Same rules for him we had on direct.  If

6    he doesn't know, he doesn't know.

7    BY MS. BENNETT:

8    Q.  Okay.  So you have testified that your confusion was the

9    week of the 10th, right?

10   A.  Sometime, yeah.

11   Q.  How about the following week?  It seems it was cleared up?

12   A.  I don't want to say it was cleared up.

13   Q.  Um-hum.

14   A.  It was becoming -- it was moving slower.  It was moving at

15   a much more -- I don't want to say manageable pace, but we had

16   adults at the table that we were able to talk to through some

17   of these issues, which I think started to really -- there was a

18   pivotal change that next week when things started to change.

19   Q.  It was moving -- you're aware that the Court issued an

20   order on February 14th, as agreed by -- with the government

21   that prohibited mass terminations?

22   A.  Yes.

23   Q.  Right?

24   A.  Yeah.

25   Q.  Okay.  So, and you're saying after that the plan to

```
1   terminate people en masse was moving a little bit more

2   methodically, yes?

3   A.  I was re --

4          MR. ROSENBERG:  Objection.  Mischaracterizes prior

5   testimony.

6          THE COURT:  That was a little argumentative.  Put that

7   into two questions.

8          MS. BENNETT:  Sure.

9   MS. BENNETT:

10  Q.  So your testimony is after the week after this court order,

11  things started to change, yes?

12  A.  They did.

13  Q.  Okay.

14  A.  Based off of the timing, yes.

15  Q.  Okay.  And were you in a meeting on February 19th to talk

16  about these?  Large-scale terminations?

17  A.  I don't recall what the email would have -- I mean, it's

18  possible.

19  Q.  Were you in meetings the week of -- between the -- I guess

20  it would be the week of the 17th, so the following week, that

21  continued to talk about these terminations?

22  A.  Lease terminations?

23  Q.  That continued to talk about the possibility of or the plan

24  to terminate the vast majority of the Bureau's employees?

25  A.  Oh, I -- to continue a RIF process --
```

1    Q.  Yes.  Yes.

2    A.  -- regardless.  Yeah, of course.  Yeah, right.

3    Q.  And as part of these meetings, you stated that, quote, we

4    know the vast majority of the workforce will be terminated,

5    right?

6    A.  That was my understanding.

7    Q.  Okay.  And that's the week after the 10th?

8    A.  Yep.

9    Q.  And that could have been the 19th?

10   A.  I have no idea when.

11   Q.  Fair enough.  And you also said that you'd been speaking

12   with acting leadership about who's going to inherit the CFPB

13   administrative portfolios once the agency is closed, right?

14   A.  That's absolutely correct.

15   Q.  By administrative portfolios, you mean HR, any records,

16   FOIA?

17   A.  Like a merger and acquisitions, somebody has to inherit

18   what you have left.

19   Q.  Right.  Merger and acquisition, that's what you were

20   discussing.  And that's the week -- the following week?  That's

21   not the week of the 10th, right?

22   A.  It was not the week --

23            MR. ROSENBERG:  Objection.

24            THE COURT:  Just to make sure we don't have any

25   confusion, when you said you were speaking with leadership

1    about that, who are you talking about?

2            THE WITNESS:  Those discussions were continued with

3    DOGE at that time.

4            MS. BENNETT:  So now --

5            THE COURT:  Mr. Paoletta is not involved?

6            THE WITNESS:  Mr. Paoletta was involved, yes.  There

7    were several different discussions that we had, but not

8    specifically about how to execute the RIF.  I think they needed

9    more time to think through what he needed to do.

10            THE COURT:  I'm talking about you said you were

11    speaking with leadership, about who would inherit the

12    administrative responsibilities of this agency.

13            THE WITNESS:  Yeah, I did mention that's Mark

14    Paoletta.  And I also mentioned that to DOGE because that was

15    my concern, that also --

16            THE COURT:  I don't understand.  Why are you using

17    the word "leadership" to refer to DOGE unless you were told

18    that DOGE is now your leadership?

19            THE WITNESS:  They were designated as senior

20    advisors.

21            THE COURT:  Senior leaders of the CFPB?

22            THE WITNESS:  Correct.

23            THE COURT:  Okay.

24    BY MS. BENNETT:

25    Q.  And you -- in a that -- in these discussions you've used

1    the phrase "acting leadership."  You were discussing this with

2    acting leadership, right?

3    A.  Yes.

4    Q.  And acting leadership would presumably be Mark Paoletta or

5    Vought because those were active leadership, right?

6    A.  That's correct.

7    Q.  So these discussions were with Vought and Paoletta and not

8    just DOGE?

9    A.  I never had any discussions with Russ Vought.

10   Q.  Okay.  So they were with Paoletta --

11   A.  Correct.

12   Q.  -- and DOGE?

13   A.  That is correct.

14   Q.  Understood.  And did you say, sort of, the week after the

15   court order -- just for timing, the week after the court order,

16   did you say, still, you know, we need that entire divisions,

17   offices, and units are going to be abolished?

18   A.  Yes.

19   Q.  Okay.  And you said that plan was approved, yes?

20   A.  The competitive area plan that was developed the prior week

21   was approved, yes.

22   Q.  Understood.  And then you said the problem now is that our

23   union filed a temporary restraining order, right?

24   A.  Sure.  Yeah.

25   Q.  So the problem with -- the impediment to going forward was

 1    this Court's order on the 14th?

 2    A.  Yep.

 3    Q.  Okay.  And then you said that in some ways the delay was a

 4    blessing because it gave you more time to figure out how to

 5    accomplish this wide-scale termination, right?

 6    A.  Absolutely.  Yes.

 7    Q.  Did you mention during this week that there was something

 8    like a single point of failure with the plan to wind down or

 9    close the agency?

10    A.  I know I had discussions about the fact that we needed to

11    identify single points of failure --

12    Q.  Understood.

13    A.  -- if a RIF were to occur.

14          THE COURT:  I'm not familiar with that term.

15          THE WITNESS:  Single point of failure?  Whether

16    something is dependent upon one individual or one group, and if

17    that group is eliminated, then you've eliminated all of the

18    knowledge.

19          THE COURT:  Okay.

20    BY MS. BENNETT:

21    Q.  Would you identify as at least one of those single point of

22    failures, that Dodd-Frank -- the Dodd-Frank Act identifies some

23    statutorily required offices?

24    A.  Are you asking me to list out?

25    Q.  No.  I apologize.  When you were discussing a single point

1    of failure, did you ever say one of the single points of

2    failure, or the single point of failure here, is that the

3    statute requires specific offices to exist?

4    A.  As I testified this morning, my biggest concern, which

5    would have generated a lot of controversy, was the Consumer

6    Response and Education function for the organization.  That is,

7    like, the most public-facing organization that members of

8    Congress use.

9         Anytime the system goes down with that system, we get

10   complaints.  There are people who complain about that, yes.

11   Q.  Right.  And so you said while there are specific people the

12   statute requires --

13   A.  Yes.  Oh, yes.

14   Q.  -- and you said but it doesn't require those people to have

15   any employees, right?

16   A.  That was what I understood.

17   Q.  Okay.  And then you also said and anything else we can just

18   transfer to other agencies, right?

19   A.  That was what I understood was a possibility that could

20   happen, and that's what I testified on this morning.

21   Q.  Okay.  Do you have a meeting later in the week, again, to

22   talk about the current status of closing down the agency,

23   winding down the agency?

24   A.  I mean, there were many discussions I had -- I don't know

25   which specific discussion.  I mean are we talking about OPM?

USCA Case #25-5091     Document #2113074     Filed: 04/25/2025     Page 420 of 698

1    Are we talking about, like, my internal staff that was

2    responsible for moving some of -- I don't know what --

3    Q.  With OPM, for example?

4    A.  Yeah.  We've continued to have discussions.  We entered

5    into a memorandum of understanding with Office of Personnel

6    Management to advise about how these RIFs take place.

7    Q.  Got it.  And so did you -- so this is the week after the

8    10th.  Did you say that there was a desire to expedite

9    everything as quickly as possible last week until the TRO was

10   implemented?

11   A.  Based upon the timing, yes.  Starting on the 10th, there

12   was -- yes.

13   Q.  Yeah.

14   A.  I'm struggling this a little bit because you keep talking

15   about the TRO.  And I understand why you're making the

16   connection with that.  I think the DOGE would have been equally

17   as happy if we had terminated people on Wednesday and not

18   Friday.  I got the impression there was no specific timeframe.

19   They would have been happy if we could have fired them on

20   Monday or Tuesday, along with the other probationary period.

21           So I didn't get the impression that this was

22   specifically about the TRO.  There was a desire to unload staff

23   from the agency.

24           THE COURT:  I think her point was that the first week

25   that we talked about, the 10th through the 14th, that desire

 1    was very much in existence.  So when you said there was a goal

 2    to do it as fast as possible --

 3              THE WITNESS:  Yes.

 4              THE COURT:  -- that was true that week?

 5              THE WITNESS:  Yes.

 6              THE COURT:  And what you're saying is it was true the

 7    following week too?

 8              THE WITNESS:  It was true, but it was moving at a

 9    slower pace.

10              THE COURT:  Okay.  But the desire was still there to

11    do it as fast as possible?

12              THE WITNESS:  Based on my understanding, yes.

13              THE COURT:  Okay.

14    BY MS. BENNETT:

15    Q.  So you conveyed things like there really isn't going to be

16    a CFPB now, right?

17    A.  I mean, when you're RIFing that number of people and

18    functions, yes.  And, yes.  And I testified this morning as

19    well that, if I may, is that I wasn't clear about, again, who

20    was going to inherit functions.  That was not discussed.  And

21    it's not just like -- obviously, my equities was focused around

22    operational functions because that affected my team the most.

23    But, also, I did have questions about the functions of the

24    programmatic part of the house that I just did not have any

25    clarity into at all.

USCA Case #25-5091      Document #2113074      Filed: 04/25/2025      Page 422 of 698

1    Q.  Because you didn't know if you were -- if the CFPB is

2    shutting down, you didn't know what was going to happen to

3    those functions, right?

4    A.  That is correct.

5    Q.  Understood.

6         THE COURT:  And nobody was asking you about what you

7    thought about it either?

8         THE WITNESS:  No.  No.

9    BY MS. BENNETT:

10   Q.  And you said the whole agency is being completely wiped out

11   within 30 days, yes?

12   A.  Well, yes, because we received the approval for a 30-day

13   notice instead of a 60.

14   Q.  Yeah.  And then you described -- and again, talking about

15   around February 20th, you described the state of the Bureau on

16   that date, right?

17   A.  When?

18   Q.  There was a meeting -- did you have a meeting with OPM and

19   part of that included a description of the state of the Bureau

20   on that date?

21   A.  Yes.

22   Q.  So at this February 20th meeting with OPM you're describing

23   the state of the Bureau.  And you say the White House has

24   instructed the CFPB to immediately, this week, shut down all of

25   our committees and advisory boards, yes?

1    A.  Yes.  Yes.  Yes.

2    Q.  You say we don't have contracts anymore, yes?

3    A.  Well, can we go back to the committees part?  So I'm

4    assuming you're referencing the FACA committees or FACA

5    counsel.

6    Q.  I am asking if you said that.  Did you say that the White

7    House has instructed the CFPB to shut down all of their

8    committees and advisory boards?

9    A.  The General Services Administration made that call.  They

10   instructed us, through Christopher Young, to terminate the --

11   there were four FACA councils committees that were stood up by

12   the Bureau, one of them was statutorily required.  And I went

13   back and said, no, we won't do that.  We have to keep that.

14   But the other ones were discretionary, based off of their

15   charter language.

16   Q.  So the White House had instructed you to shut down these

17   committees and advisory boards.  Did you also say we don't have

18   contracts anymore?

19   A.  Certain contracts, yes.

20   Q.  And you said we don't have purchase cards anymore?

21   A.  General Services Administration ordered our agency to

22   terminate all purchase cards and travel cards for the agency.

23   Q.  Okay.  So you said --

24   A.  That did not come through Vought or Chris Young or anyone

25   else.

USCA Case #25-5091     Document #2113074     Filed: 04/25/2025     Page 424 of 698

1  Q.  I apologize for the interruption.

2       So you said we don't have contracts anymore, we don't

3  have purchase cards anymore, and we don't have travel cards

4  anymore, yes?

5  A.  That is correct.

6  Q.  You said the termination has already started for releasing

7  the headquarters?

8  A.  Yes.

9  Q.  The letters have already come off the building?

10  A.  Yes.

11  Q.  The five regional offices are in the process of being

12  eliminated?

13  A.  Yes.

14  Q.  There's a stop order across-the-board for all work

15  associated with the Bureau?

16  A.  Based off of what we've discussed today, yes.

17  Q.  That absent the TRO -- by which I think you mean the

18  agreed-upon order that we were talking about before -- that

19  absent the TRO, the majority of the CFPD's employees would have

20  been terminated?

21  A.  Prior to?

22  Q.  Yes.

23  A.  The majority, yes.

24  Q.  And you said that was just phase one, yes?

25  A.  Yes.  Yes.

1   Q.  And phase two would have been terminating the rest, yes?

2   A.  I don't know what the rest would be.  I know that there

3   would have been terminations, I just don't know what.

4   Q.  And you said that you had told Jafnar Gueye -- is that how

5   he pronounces it?

6   A.  Gueye, yeah.

7   Q.  Jafnar Gueye, who is the chief financial officer, yes?  And

8   you said that you had told him the actions that were taken over

9   the last week, I am not sure how its even repairable, yes?

10  A.  Yes.

11  Q.  And you told him I think we're in a situation where it's

12  totally unrepairable, yes?

13  A.  That's how I felt at the time, yes.

14  Q.  And you said whatever ends up being required for -- to

15  happen with the terminated employees, the reality is there

16  aren't going to be any jobs to compete for, yes?

17  A.  That is a true statement.

18  Q.  And this was February 20th.  That's four days before you

19  submitted your first declaration in this case, right?

20  A.  Correct.

21  Q.  And you didn't mention any of this in your declaration?

22  A.  I did not.

23  Q.  And you said that the new executive order -- today you said

24  that the new executive order on RIFs has made this a more fluid

25  situation, yes?

1    A.  Yes.

2    Q.  Okay.  And you said that's because that executive order

3    referred to statutes and what's required by statutes, right?

4    A.  Amongst other things, yes.

5    Q.  And the prior executive order, though, that you cited also

6    referred to legal requirements, right?

7    A.  I don't recall the specifics.  But, yeah, sounds right.

8    Q.  Okay.  I think we have copies of that somewhere.  Just

9    going to --

10           MS. BENNETT:  May I approach?

11           THE COURT:  Yes.  Yes.  You don't have to ask.

12           MS. BENNETT:  I apologize.  We don't have enough

13   copies, but I will give you one later.

14   BY MS. BENNETT:

15   Q.  So this is the executive order that you cited, along with

16   the stop-work order and the terminations that occurred and the

17   terminations that were planned, right?

18   A.  Correct.

19   Q.  And page 2, at the bottom of that executive order, little

20   c.  Do you see that?

21   A.  Yes.

22   Q.  That talks about reductions in force, right?

23   A.  Yes, um-hum.

24   Q.  And it says that they have to be consistent with applicable

25   law, right?

1    A.  Correct.

2    Q.  And it says -- it talks about offices that perform

3    functions not mandated by statute, right?

4    A.  Correct.

5    Q.  So this essentially has, with respect to statutes,

6    basically the same requirements as the -- that are outlined in

7    the new executive order, right?

8              MR. ROSENBERG:  Objection.  Misleading.  Calls for

9    legal conclusion.  Assumes facts not in evidence.

10              THE COURT:  You can answer the question.

11    A.  Can you repeat the question?  I apologize.

12    BY MS. BENNETT:

13    Q.  Sure.  So I think on direct you talked about the new

14    executive order calling out statutorily authorized functions,

15    right?

16    A.  Correct.

17    Q.  And that's true of the old one too, right?

18    A.  Yes.

19              MR. ROSENBERG:  Objection.  Mischaracterizes prior

20    testimony.  I think his testimony was the OPM memo and not a

21    new executive order.

22              MS. BENNETT:  Understood.  Thank you for the

23    clarification.

24              So I'm going to try one more time.

25              THE COURT:  Rephrase your question then.

USCA Case #25-5091    Document #2113074    Filed: 04/25/2025    Page 428 of 698

 1          MS. BENNETT:  Yes.

 2   BY MS. BENNETT:

 3   Q.  So you testified that the situation became more fluid

 4   after -- thank you for the correction -- after the OPM/OMB

 5   memorandum came out?

 6   A.  Yes.

 7   Q.  And that memorandum talked about statutorily-authorized

 8   functions, right?

 9   A.  Amongst other things.

10   Q.  And this executive order, the one you relied on for the

11   prior terminations, also talks about offices that perform

12   statutorily-authorized functions, right?

13   A.  Correct.

14   Q.  Okay.  Thank you.

15          And did you have a meeting after this -- after the new

16   memorandum that we were just talking about, the OMB/OPM

17   memorandum came out, did you have a meeting after that with OPM

18   about terminations?

19   A.  We had discussions, coordination meetings with OPM about

20   what we needed from them.  But I had multiple discussions with

21   my human capital staff about the OPM memo, yes.

22   Q.  In those discussions after this memo came out, did you tell

23   them --

24          THE COURT:  You're saying "this memo."

25   BY MS. BENNETT:

1    Q.  After the February 26th memorandum between OPM and OMB and

2    in those discusses you had with your team, did you tell them

3    that you would let them know if this changed anything?

4         MR. ROSENBERG:  Objection.  Assumes facts not in

5    evidence.  Confusing statement.

6         THE COURT:  I don't think so.  We've established the

7    meeting.  We've established that the meeting -- she was talking

8    about a meeting after the memorandum that you introduced in

9    evidence.  And so your question is:  At that meeting --

10   BY MS. BENNETT:

11   Q.  At that meeting did you tell your staff:  If plans have

12   changed, I'll let you know?

13   A.  Yeah, sounds right.

14   Q.  And did you ever let any of your staff know that plans have

15   changed?

16   A.  I actually had subsequent meetings with my staff to walk

17   them through following the OMB guidance and coming up with a

18   proposal on how to proactively guide our leadership.  There was

19   a lot of pushback from my staff, wanting to know what the end

20   state of the agency was, and I didn't have that information.  I

21   still don't have that information.  So what I advised my staff

22   was to do their best to try to document a roadmap to try to

23   come up with recommendations so that I could take to leadership

24   or they could take to leadership.

25        I also said that we need to make -- somehow manage

1    upward in that process.  If I am not at the agency any longer,

2    I want my staff to be successful, and being successful means

3    they need to manage upward with these individuals.  So --

4    Q.  So I heard you say -- and correct me if I'm wrong -- that

5    acting leadership, so Russ Vought, Mark Paoletta, has not told

6    you that there's any different end state, right?

7    A.  They have not mentioned about different end state.  But

8    Mark Paoletta advised me that we should be following the OPM

9    guidance issued that was issued by Director Vought.

10   Q.  Understood.  And because you're not sure what the end state

11   is, they haven't said, for example, we no longer plan to

12   conduct large-scale terminations, right?

13   A.  No.  There has been no discussions like that at all.  I

14   mean, again, I could speculate that we could have possibly a

15   new director coming in with a different vision, I don't know.

16   There's a lot of factors out there that I just am not aware of.

17   Q.  Got it?

18             THE COURT:  Has anybody told you that the end state

19   is not what you thought it was for a considerable period of

20   time, which is basically no agency, but, you know, parcel out

21   what's left?

22             THE WITNESS:  Yeah.  I mean, during the weeks from,

23   like, the 14th to, like, the 24th, 28th, Mark Paoletta

24   mentioned to me multiple times that -- how we need staff.  And,

25   I mean, there was even a question raised, I know that was part

1    of this suit as well, about the real estate of the building.

2    And Mark was kind of like, well, how many days do we have?  I

3    told him, and he said, Where is the staff going to go?

4         So there were, again, like not -- I can't just solely

5    rely off of specific details, other than sometimes I have to

6    formulate some basis to pivot at the last minute and make last-

7    minute recommendations.

8    BY MS. BENNETT:

9    Q.  So switching gears, your second declaration -- so the one

10   filed on March 2nd -- that declaration says that the new

11   leadership, including the chief legal officer, have taken a

12   methodical approach to handling the Bureau's operations, right?

13   A.  They were at that point, yes.

14   Q.  Okay.  And you stand by that testimony, that new leadership

15   have taken a methodical approach?

16   A.  Absolutely.  I -- yes.

17   Q.  And you said Acting Director Vought was appointed on

18   February 7th, right?

19   A.  February 7th, yes.

20   Q.  The evening of the 7th, right?

21   A.  Yes.

22   Q.  And on February 8th he had already sent a letter to the

23   Federal Reserve chair, Jerome Powell, saying that it was

24   unnecessary for the CFPB to draw funds from the Fed for that

25   year, right?

1    A.  My understanding, he referenced that because we had a

2    reserve fund with sufficient funding for that quarter that

3    could have been used, so we didn't have to ask for more funds.

4    Q.  And earlier -- but earlier today you testified that in

5    prior years -- recent years, the Bureau was coming close to its

6    budgetary cap, right?

7    A.  Correct.

8    Q.  So it was coming close to its budgetary cap, yet within 24

9    hours the new acting director said we're not going to need

10   money, yes?

11        MR. ROSENBERG:  Objection.  Misleading.  I believe

12   the witness's testimony regarding budgetary cap referred to the

13   amount that could be drawn down from the Federal Reserve, not

14   the amount of operating funds that the agency had.

15        THE COURT:  All right.  That's what she said.

16        MS. BENNETT:  Yeah.

17   BY MS. BENNETT:

18   Q.  So just to --

19   A.  So what's the question?  I'm sorry.

20   Q.  Just to sum -- I think --

21        THE COURT:  Juxtaposing the determination on March

22   8th that we don't need to draw more funds because we have this

23   big reserve.  But it's your testimony that under the prior

24   director there were many points where there were concerns and

25   need to review contracts to see if there was fat that needed to

1    be trimmed or duplication that needed to go because they were

2    at the cap of what they could get.

3              THE WITNESS:  Right.

4              THE COURT:  So now what's your question?

5    BY MS. BENNETT:

6    Q.  So given that situation, the acting director was, in your

7    view, methodical in taking less than 24 hours to make that

8    request?

9    A.  The reserve fund can be used however the director or head

10   of agency sees fit for funding.  And while the money was

11   allocated as what I'm calling a rainy day fund, my assumption

12   and understanding from the memo was that there was sufficient

13   money, including the reserve fund, to pay for the expenses for

14   the Bureau for that quarter without having to draw down.  And

15   again, as I said this morning, this was very similar to what

16   Director Mulvaney did when he was head of agency.

17   Q.  Okay.  And let's turn to the contracts.  You're aware that

18   on February 11th Acting Director Vought directed the

19   cancellation of all contracts supporting several divisions of

20   the Bureau, right?

21   A.  I have not seen a Director Vought email to that effect, but

22   there was an email from Mark Paoletta.

23   Q.  Okay.  Let's turn to the defendant's exhibits, Bates

24   stamped 6.

25   A.  Is it tab 6?

1    Q.  Bates stamp.  So on the bottom right of the pages there's a

2    number, that's CFPB, underscore, some number.  So we're looking

3    at CFPB_00006.

4              THE COURT:  No tab?

5              MR. ROSENBERG:  Tab 4.

6              THE COURT:  Oh, you don't know what tab they're in?

7              MS. BENNETT:  I'm just trying to use the numbers that

8    are already in the record so that you can match them up.  But I

9    can do both, if you like.

10             THE COURT:  It's hard for us to turn to something

11   unless -- are the numbers -- are the Bates numbers sequential

12   in your binder?

13             MS. BENNETT:  Yes.

14             THE COURT:  They're newly Bates stamped?  So they're

15   not the original Bates stamps?

16             MR. ROSENBERG:  The Bates numbers actually track the

17   ECF page numbers at the top of each of the documents.  So for

18   example, if you look at what's in tab 4, it's Bates No.

19   CFPB_0006, that's also at page 6 of ECF number 56-1.  So they

20   largely track -- they track that because each page number was

21   numbered sequentially when it was filed.

22   BY MS. BENNETT:

23   Q.  Okay.  So we are at tab 4, Bates No. CFPB_6, yes?

24   A.  Yes.

25   Q.  And that's an email from Mark Paoletta, right?

```
 1    A.  Right.

 2    Q.  And you're CC'd on this email?

 3    A.  Right.

 4    Q.  And that email says on behalf of Acting Director Vought --

 5    A.  Yes.

 6    Q.  -- right.

 7         So that email was sent on behalf of Acting Director

 8    Vought?

 9    A.  Correct.

10    Q.  And it directs the cancellation of all contracts in several

11    divisions, right?

12    A.  Yes.

13    Q.  And all contracts in Enforcement?

14    A.  I don't know if that was all the contracts.  But, yeah.  I

15    mean, that's the contracts.

16    Q.  He says, "I have reviewed CFPB contracts and authorize and

17    direct the cancellation of all contracts in the following

18    divisions."

19    A.  Yes.

20    Q.  Did I read that correctly?

21    A.  Yes.

22    Q.  And the following divisions are Enforcement?

23    A.  Um-hum.

24    Q.  To all contracts in Enforcement, yes?

25    A.  Yes.
```

1    Q.   Supervision?

2    A.   Yes.

3    Q.   External Affairs?

4    A.   Yes.

5    Q.   Consumer Response?

6    A.   Yes.

7    Q.   The Office of Director?

8    A.   Yes.

9    Q.   And all but two in the legal division?

10   A.   Correct, yes.

11   Q.   Okay.  And contracting officers, not only were they

12   directed to terminate all of these contracts wholesale, they

13   were directed to do it ASAP, right?

14   A.   Yes.

15   Q.   Okay.  And some of the contracts that were terminated had

16   already been identified as crucial to performing statutory

17   obligations, right?

18   A.   I don't know.  It's possible.

19   Q.   Okay.  Let's turn to Exhibit F in the plaintiffs' binder.

20        So that's an email from the chief financial officer,

21   right?

22   A.   Correct.

23   Q.   Asking all of the deputies to identify statutorily-required

24   contracts, right?

25   A.   Yes.

USCA Case #25-5091     Document #2113074          Filed: 04/25/2025     Page 437 of 698

1    Q.  And that went out before the wholesale termination, right?

2    A.  Yes.

3    Q.  Okay.  And then to go back to the government's binder.

4    With apologies.  If we go to tab 2, which is Bates stamped

5    CFPB_ 00003.

6    A.  Yes.

7    Q.  That's an email from Christopher Johnson, right?

8    A.  Yes.

9    Q.  And he's the deputy or the associate director in charge of

10   Consumer Response and Education, right?

11   A.  That's correct.

12   Q.  And he identifies several contracts that are critical to

13   the consumer complaint database, right?

14   A.  Yes.

15   Q.  The Deloitte contract, right?  The Mosaic contract?

16   A.  Yes.

17   Q.  An antivirus contract, right?

18   A.  Yes.

19   Q.  Address Doctor, right?

20   A.  Yes.

21   Q.  Provar?

22   A.  Yep.

23   Q.  And all of these contracts were cancelled, right?

24   A.  I don't recall if they were cancelled or not.  I'm sorry.

25   Q.  Okay.  And just to be clear --

1          THE COURT:  What's the document on which his are

2    listed?

3          MS. BENNETT:  Sure.  So the documents -- you mean the

4    email listing the required contracts?

5          THE COURT:  Yes.

6          MS. BENNETT:  That's Bates stamp CFPB_3.

7          THE COURT:  I just want to go back.  This email that

8    went out on February 12th, February 11th, we were talking about

9    what's reasonable to get a complete response.  It went out at

10   10:27 a.m. and they were supposed to respond by noon,

11   identifying all of their contracts and directly report

12   statutory requirements, right?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.  Were they all able to get that in

15   on time?

16         THE WITNESS:  They did.

17         THE COURT:  Okay.

18   BY MS. BENNETT:

19   Q.  And just so the record is clear, the email from Christopher

20   Johnson, the consumer response and enforcement lead,

21   identifying the contracts that were necessary for the consumer

22   complaint database, that was sent on February 10th, right?

23   A.  Yes.

24   Q.  And so that's the day before --

25   A.  Um-hum.

1    Q.  -- the wholesale termination of consumer response

2    contracts, right?

3    A.  Yes.

4    Q.  Which was on the 11th.

5    A.  (Nods head.)

6    Q.  Can you turn to Exhibit -- the defendant's -- it's tab 50,

7    it's Bates stamp CFPB_118.

8    A.  I think I totally got myself out of sync.  I think you're

9    going to have to walk me through which document.  I apologize.

10   Q.  No problem.  I think that's the right binder.  I think

11   we're going -- here (indicating).

12   A.  Got it.  Thank you.

13   Q.  No problem.

14        So, actually, just going back one page, so to 49

15   CFPB_117.  So this is an email from you to the chief financial

16   officer and the chief information officer, right?

17   A.  Yes.

18   Q.  And it says you spoke with Mark P. -- that's Mark Paoletta,

19   right?

20   A.  That's correct.

21   Q.  -- regarding contracts that support statutorily-authorized

22   work, or required work, right?

23   A.  Correct.

24   Q.  So that's several days after there was a hearing in this

25   case, yes?

 1    A.   Yeah.   Yes.

 2    Q.   The hearing in this case, the first hearing was a status

 3    conference, was February 14th, right?

 4    A.   I wasn't aware of the specific -- I -- yes.  I have not

 5    been keeping track.

 6               THE COURT:  Can you just tell me what document you're

 7    on?

 8               MS. BENNETT:  I'm on tab 49, CFPB_117.

 9    BY MS. BENNETT:

10    Q.   So it's only after -- you're aware that sometime before

11    February 18th this lawsuit was filed?

12    A.   Yes.

13    Q.   Sometime before the 19th, right?

14    A.   Yes, of course.  Right.

15    Q.   So this email on February 18th about a spreadsheet

16    regarding contracts that support statutorily required work,

17    this email was sent after the lawsuit was filed, right?

18    A.   Yes.

19    Q.   And, in fact, it was sent after all of the contracts that

20    we were discussing before had already been terminated, right?

21    A.   The letters of intent to contractors were sent, yes.

22    Q.   Okay.  And by letters of intent, do you mean an order to

23    stop work, right?

24    A.   Either stop work or intend to cancel the contract, and the

25    contract has 30 days.

1   Q.  Understood.  So the way it works is you send a notice of a

2   termination or notice of intent, right?

3   A.  Correct.

4   Q.  And upon receiving that notice, the contractors stop work,

5   right?

6   A.  In some cases, yes.

7   Q.  Okay.  So this email that we're looking at now is after

8   those had already all gone out?

9   A.  Yes.

10  Q.  Okay.  So after those had gone out, then you sent an email

11  saying that there's a list that identifies statutorily-required

12  contracts, right?

13  A.  Yes, um-hum.

14  Q.  Okay.  And then let's turn the page to tab 50, which is

15  CFPB_118.  And that's an email from Mark Paoletta to you,

16  right?

17  A.  Yes.

18  Q.  And the chief financial officer?

19  A.  Yes.

20  Q.  And that's sent on February 19th, right?

21  A.  Yes.

22  Q.  And that email says, "I am directing you to not terminate

23  or suspend any contracts without specific authorization from

24  Acting Director Vought or me," right?

25  A.  Yes.

1   Q.  So that email saying don't terminate or suspend any

2   contracts without authorization was sent out after all of the

3   notices of termination had already been issued, right?

4   A.  Yes.

5   Q.  And then let's turn to the next tab, which is 50.  And it's

6   Bates No. CFPB_119.  It's just -- just the next page.  And you

7   discussed this on direct, I won't rehash it.  But this is an

8   email chain about rescinding notices of termination for certain

9   contracts, right?

10  A.  Yes.

11        THE COURT:  You said the next tab, but we're already

12  in 50, and then you said 50 again.  So where are we now?

13        THE WITNESS:  51.

14        MS. BENNETT:  We're at 51.  I apologize.  And it's

15  CFPB_119.

16        THE COURT:  You may have to slow down just a teeny

17  bit because we all got lulled into a different pace this

18  morning.  And I do appreciate the speed at which you talk and

19  move between questions, but I think your talking has to slow

20  down enough so somebody can type it.

21        MS. BENNETT:  Fair enough.  Sorry about that.

22  BY MS. BENNETT:

23  Q.  So we are on tab 51, Bates No. CFPB_119.  And this is the

24  chain that you discussed on direct about reinstating certain

25  notices, certain contracts, right?

1   A.  Right.

2   Q.  And that was a very small number of contracts that were

3   reinstated, right?

4   A.  I don't recall the number.

5   Q.  Okay.  Perhaps I can refresh your memory.

6   A.  Sure.

7   Q.  Just take a look at that.  You don't read it out loud.

8   A.  Sure.

9           MR. ROSENBERG:  Do you have a copy?

10          MS. BENNETT:  Yeah.  (Hands document to counsel.)

11          MR. ROSENBERG:  Thanks.

12  BY MS. BENNETT:

13  Q.  So it's a small number of contracts, right?

14  A.  Of technology contracts, right.

15  Q.  So you were reinstating a small -- this email chain refers

16  to the reinstatement of a small number of technology contracts,

17  right?

18  A.  Yes.

19  Q.  Okay.  And you said as of now most contracts have been

20  reinstated?

21  A.  They have.

22  Q.  Are you sure about that?

23  A.  That was -- that's my understanding.

24  Q.  Okay.  And that's your understanding from personal

25  knowledge of the list of contracts?

```
 1   A.  No.  No.  Not from looking at the contracts, no.  It's

 2   based off of conversations I've had with our CFO on our team.

 3   Q.  I see.  So you haven't actually looked -- there is this

 4   master spreadsheet of contracts, right?

 5   A.  I have not looked.

 6   Q.  You have not looked at it?

 7   A.  No, I have not --

 8   Q.  Understood.

 9   A.  -- looked --

10         MR. ROSENBERG:  Can the witness finish his answer?

11   There's a lot of crosstalk.

12         THE COURT:  All three of you need to be careful about

13   that.  All right.

14   A.  I have not looked at all of the contract listings.  The

15   only contracts that I know that I reviewed were some that I

16   reviewed specifically with Mark Paoletta, who needed some

17   guidance about operational contracts.

18   BY MS. BENNETT:

19   Q.  Okay.  So your personal knowledge is really limited to ops

20   contracts or technology contracts, right?

21   A.  That is correct.

22   Q.  Okay.  And could you turn, please, to tab 38, which is

23   Bates No. CFPB_96.

24   A.  96, correct.

25   Q.  Yes.  And I just want to clarify, you discussed this on
```

```
 1    direct, but this says that there's going to be more guidance

 2    about contracts, right?

 3    A.   Um-hum.

 4    Q.   And there has not yet been any guidance, right?

 5    A.   There has not been.

 6    Q.   And the contracts that were cancelled on February 11th,

 7    when we talked about that initial email canceling all the

 8    contracts in certain divisions, those contracts were cancelled

 9    without any effort to preserve the records or data that might

10    have been -- that those vendors might have had, right?

11              MR. ROSENBERG:  Objection.  Vague and misleading.

12              THE COURT:  Now, look.  You're not the witness.

13    She's asking him and he can answer; no, that's not true.  But

14    you can't object because you don't think that's a fair

15    question.  She's asking a question and it had a question mark

16    at the end.  I understand it's a leading question because it's

17    cross-examination, but objection, what she said isn't true is

18    not an objection.  Do you understand?  I don't think -- you can

19    object to the form of a question, you can object to a lack of

20    foundation.  You objected to lots of things, but that one

21    basically you were saying that's not right.  What she's saying,

22    that's not right.  And that's not -- that's for him to say,

23    isn't it?

24              MR. ROSENBERG:  I don't have the transcript.  I think

25    that there was a -- probably would have reframed the objection
```

 1    as a lack of foundation.  But I will withdraw.

 2              THE COURT:  All right.  Well, let's -- you know,

 3    obviously, if you know.  If you don't know, you have to answer

 4    this question, "I don't know."  Okay.  Now ask the question.

 5    BY MS. BENNETT:

 6    Q.  Okay.  So when the contracts were cancelled or the notice

 7    of termination were sent on February 11th, there's no

 8    affirmative effort to preserve the data or the records that

 9    those vendors had, right?

10    A.  Not in instructions when the termination letters went out.

11    But again, each contracting officer and contracting officer

12    representative who manages the contracts are responsible for

13    fulfilling what the terms and conditions of the contract is.

14              So if there's data saying, on the contract, based

15    upon the work that was performed by the contractor, then I

16    would expect that the SMEs, like the core, would be pulling

17    that data back.  And we did subsequently get questions from

18    staff asking whether or not we had lost the data or what was

19    the process and we walked them through what the terms and

20    conditions were in their contract.

21    Q.  Okay.  Can I ask you to turn in the plaintiffs' binder to

22    Exhibit A.  And at the bottom of the first page of that exhibit

23    there's a heading that says, "Required email notification

24    wording," right?

25    A.  Um-hum.

USCA Case #25-5091    Document #2113074    Filed: 04/25/2025    Page 447 of 698

1    Q.  And it says, "The contracts that require a termination

2    notification, send the following email," yes?

3    A.  Yes.

4    Q.  And would you just read that -- not aloud, but to yourself.

5    Can you please review just that paragraph that constitutes the

6    email that they were supposed to send?

7         (Pause.)

8         Do you see where I am?

9    A.  Yeah.

10   Q.  Okay.

11        (Pause.)

12   A.  Okay.

13   Q.  And there's nothing in that form termination notice that

14   talks about preserving data, right?

15   A.  No, there's nothing.

16   Q.  Or preserving records, right?

17   A.  No.

18   Q.  Did you instruct the contracting officers to send an

19   additional email, in addition to this template?

20   A.  I didn't instruct the COs to do anything.

21   Q.  Okay.  And you said in the beginning of your direct, right,

22   one of your areas of responsibility is data, right?

23   A.  Yes.

24   Q.  And records management?

25   A.  Yes.

1    Q.  Okay.  And you issued no directive to the contracting

2    officers?

3    A.  Not in this case, no.

4    Q.  Okay.  Let's turn to -- make sure I have the right tab.  So

5    this is tab 7 in the defendant's binder.

6    A.  Yes.

7    Q.  And this is an email chain.  We start -- it starts from the

8    back, so it starts from Bates stamp CFPB_13 and goes through

9    CFPB 11.

10   A.  Yep.

11   Q.  And this email chain is from, initially, from the staff

12   director of Digital Communications, right?

13   A.  Yes.

14   Q.  And you're CC'd on it, right?

15   A.  That's correct.

16   Q.  And what it says is that the public channels of the CFPB

17   were unexpectedly removed, right?

18   A.  Yes.

19   Q.  Then it says -- or, before that it says, "Sprinklr," which

20   is -- it says, "Sprinklr, which is where our social media

21   backup records are maintained," right?

22   A.  Correct.

23   Q.  And it says that the staff director of Digital

24   Communications no longer has access to that, right?

25   A.  That is correct, because it had been cancelled, yes.

1  Q.  That contract had been cancelled?

2  A.  Yes.

3  Q.  So the Sprinklr contract, the contract for preserving

4  social media records had been cancelled, right?

5  A.  Yep.

6  Q.  And the social media itself had been unexpectedly removed,

7  right?

8  A.  Yes.

9  Q.  Okay.  And I'll just note this email chain starts on

10  February 25th, 2025, right?

11  A.  Correct.

12  Q.  And I'll represent to you that the Court's order, which

13  included data deletion, was issued on February 14th, 2025.  Do

14  you have any reason to quarrel with that?

15  A.  My concentration was to try to help figure out what the

16  Sprinklr system was, how it was purchased.  Wasn't clear if it

17  was purchased through procurement process, purchase card, why

18  we had it, whether they had consulted with my records team on

19  the data.  That was very unclear to me.  So I was trying to get

20  additional questions from this individual to ascertain exactly

21  what was going on.

22  Q.  So 11 days after an order prohibiting data deletion there

23  was a back and forth where data had been unexpectedly deleted

24  and it wasn't clear, because the contract had been cancelled,

25  whether it could be recovered, right?

USCA Case #25-5091      Document #2113074      Filed: 04/25/2025      Page 450 of 698

 1  A.  I mean, the way you stated it, yes.

 2  Q.  Okay.

 3  A.  Yep.

 4  Q.  And then can you turn to Bates stamp CFPB_15, which is tab

 5  8.  It's just the beginning of the thread.  It's just the next

 6  tab.  And this is an email -- initially the first email in this

 7  chain is February 25th, 2025, right?

 8  A.  Um-hum.

 9  Q.  And that is an enforcement -- sent from an enforcement

10  attorney, right?

11  A.  Yes.

12  Q.  And that email gets forwarded to you, right?

13  A.  Yes.

14  Q.  And the email says that this attorney has some software,

15  right?

16  A.  Yes.

17  Q.  That was preserving data, consumer data, right?

18  A.  Yeah.  I'm assuming it's consumer data.

19  Q.  And that data was under a litigation hold, right?

20  A.  I don't recall the specifics of the case, but I clearly see

21  that it was data preservation.

22  Q.  Sorry?  I missed the last part.

23  A.  No, I was confirming that I know that it's a data

24  preservation-specific issue, but I don't recall what the

25  specifics of it were.

1    Q.  Sure.  So on the bottom of CFPB_14 -- that's the first page

2    in this tab -- it says, "I am flagging this time-sensitive

3    account issue because my Sentinel account is connected to

4    several holds that I placed on searches of Sentinel data

5    related to Bureau matters for which Bureau litigation holds are

6    in place," right?

7    A.  Yes, yes.

8    Q.  That's litigation holds?

9    A.  Got it.  Yes.

10   Q.  So, again, this is February 25th, which is 11 days after

11   the data deletion order, right?

12   A.  Yes.

13   Q.  And there's an enforcement attorney saying we have a

14   problem because I can't get into my account --

15   A.  Yes.

16   Q.  -- to ensure that these litigation holds --

17   A.  Yeah, right.

18   Q.  Yeah.  And then you testified on direct that there was an

19   email that went out about records preservation and data

20   preservation, right?

21   A.  I don't recall.

22   Q.  Sure.

23   A.  Can you help me?

24   Q.  Let me ask you to turn to tab 18.  And -- in the second

25   page of that tab is CFPB_37.

USCA Case #25-5091    Document #2113074    Filed: 04/25/2025    Page 452 of 698

```
 1    A.  Yes.
 2    Q.  So, that's an email sent by the chief information security
 3    officer, right?
 4    A.  Yes.
 5    Q.  And that email, I believe, went out widely in the Bureau,
 6    is that right?
 7    A.  That appears to be the case, yes.
 8    Q.  Okay.  And it says to work with your CORs.  Those are
 9    contracting officer representatives, right?
10    A.  Correct.
11    Q.  And PoC?
12    A.  Yes.
13    Q.  Points of contact?
14    A.  Points of contact.
15    Q.  "To identify if CFPB data or records are at risk of being
16    deleted due to contract cancellations, memorandum/agreement
17    terminations, or other causes," right?
18    A.  Yes.
19    Q.  And that email goes out on February 27th, 2025, right?
20    A.  Yes.
21    Q.  That's almost two weeks after the February 14th data
22    deletion order?
23    A.  Yes.
24    Q.  And if you could turn to the next tab, which is 19.  This
25    is CFPB Bates stamps 39 through 43.
```

1    A.   Um-hum.

2    Q.   And that's an email chain that was triggered by the email

3    we just talked about from the chief information security

4    officer, right?

5    A.   Yep.

6    Q.   And this email says that the contract for the software --

7    for Entellitrak was cancelled, right?

8    A.   That is correct.

9    Q.   And that's the software that, among other things, is where

10   EEO, equal employment, data and complaints are stored, right?

11   A.   Multiple purposes, yes.

12   Q.   Okay.  And the employee asked you about the risk of

13   deletion -- advised you there was a risk of data deletion,

14   right?

15   A.   Right.

16   Q.   And you responded, "I would advise that we should reinstate

17   the ETK" -- the Entellitrak -- "contract if it is still

18   available in the short term," right?

19   A.   Yes.

20   Q.   So you didn't know if it was still available, right?

21   A.   I did not know.

22   Q.   And you were advising to reinstate it in the short term,

23   right?

24   A.   Yes.

25   Q.   And then the next sentence is, "ETK" -- Entellitrak, the

1    software -- "will help us prevent further litigation and/or

2    settlements as a result of the database being down," right?

3    A.  In these specific EEO cases, reasonable accommodation, or

4    anti-harassment type, yes.

5    Q.  So this email chain was on the 28th, right?

6    A.  Yes.

7    Q.  So that's two weeks after the date of the deletion order,

8    right?

9    A.  Yes.

10   Q.  Okay.  And then if I can ask you to turn to Exhibit EE in

11   the plaintiffs's binder.

12        And this is an email chain from March 3rd, 2025, right?

13   The 3rd and the 4th.  I apologize.

14   A.  Yes, yeah.

15   Q.  And the 3rd and the 4th of 2025, that's last Monday and

16   Tuesday, right?

17   A.  Yes.

18   Q.  And so last week -- and this email chain starts from the

19   director of data and analytics, right?

20   A.  Yes.

21   Q.  And the director of data and analytics makes a request to

22   pay a bill on software that stored their office's data, right?

23   A.  That appears to be the case, yes.

24   Q.  And the director states without payment the office would

25   lose all of its historical data, right?

1   A.  Based on the email, yes.

2   Q.  And then the following day, March 4th, 2025, the chief

3   financial officer responds, right?

4   A.  Yes.

5   Q.  And the chief financial officer says -- asks a number of

6   questions, right?

7   A.  Yes.

8   Q.  The chief financial officer doesn't say go ahead and

9   reinstate this contractor, pay this bill, right?

10  A.  He did not.  And there was a reason for that, yes.

11  Q.  Okay.  And the reason for that is that he had several

12  questions that needed to be answered, right?

13  A.  It wasn't just a matter of the questions, but it was a

14  matter of fact that GSA had turned our cards off so we

15  physically could not use them.  And we understood the bar to be

16  very high when going back to GSA to request them to reinstate

17  purchase cards for the agency.

18  Q.  I see.  So the -- tell me if I have this right:  GSA told

19  the agency to terminate all of the purchase cards?

20  A.  Very clearly, yes.

21  Q.  And those are the cards that employees have to pay for

22  small purchases, yes?

23  A.  Under a certain threshold.

24  Q.  Under certain -- okay.  And --

25  A.  Yeah.

1    Q.  -- so this employee says we're going to lose all of our

2    historical data if we don't make this payment, right?

3    A.  Yes, yes.

4    Q.  And there's no answer about how to ensure that doesn't

5    happen, right?

6    A.  That is correct.

7    Q.  Okay.  I'm going to ask to change gears again.  And let's

8    talk about the stop-work order.

9        So we have the February 10th email, right?

10   A.  Yes.

11   Q.  And Acting Director Vought was appointed, says employees

12   should stand down from performing work tasks, right?

13   A.  Yes.

14   Q.  Okay.  That has not been rescinded, has it?

15   A.  No.

16   Q.  And I believe you testified on direct this is a unique

17   situation, right?

18   A.  It is unique.

19   Q.  You're not aware of any other example where this has

20   happened, right?

21   A.  Not in my career, no.

22   Q.  Okay.  I just want to talk about what happened after the

23   stop-work order was issued.

24       So that stop-work order was in effect when you submitted

25   your declaration on February 24th, the first declaration?

1    A.  Yes.

2    Q.  And you said in that declaration that CFPB leadership has

3    worked to comply with statutorily-required functions, right?

4    A.  That's what they -- yes, that's what they told me.

5    Q.  And that's what they told you.  The leadership was telling

6    you that it was working with --

7    A.  That intent was to follow statutory requirements.

8    Q.  And you testified that the CFPB had maintained operations

9    when you --

10           THE COURT:  When you say that, are you talking about

11   the Vought/Paoletta or the whole other team that you've been

12   talking about as a leadership team, including the DOGE people

13   who have now been deputized?  Who told you the intention prior

14   to your declarations on --

15           THE WITNESS:  It was Mark Paoletta, because the

16   timing -- there were about two weeks from when, like, DOGE

17   started to my declaration being, you know, filled out and

18   signed.  And it was towards the latter part that it was very

19   clear that I think there was -- I got the perception there was

20   concerns about not following statutory requirements.  Is --

21   yeah.

22   BY MS. BENNETT:

23   Q.  So there were concerns about not following statutory

24   requirements?

25   A.  Yes.

USCA Case #25-5091     Document #2113074          Filed: 04/25/2025     Page 458 of 698

1    Q.  That's what you're testifying.  Okay.  But, in fact, at the

2    time that your declaration was submitted, most statutory

3    functions were not up and running at the Bureau, right?

4    A.  I didn't know what was being -- necessarily what was being

5    implemented.  I mean, I'm not, again, part of the mission side

6    of the house.  What I understood from the chief legal officer

7    and his team was that they were going to follow the statutory

8    requirements for the agency.

9    Q.  I see.  So you were -- when you say in your declaration --

10   you say it in several different ways, I think -- that the

11   Bureau is fulfilling its statutory functions --

12   A.  That was the direction that we had received.

13          MR. ROSENBERG:  Objection.  That's misleading.  I

14   don't think he says in his declaration the Bureau was

15   fulfilling statutory functions.  He used different language.

16   BY MS. BENNETT:

17   Q.  So the Bureau, in your view, on February 24th, you didn't

18   know whether it was actually fulfilling its statutory

19   functions, right?

20   A.  There was some work that was -- that had continued, yes.  I

21   mean, they were looking at enforcement cases and -- yeah.  I

22   mean, there was some work being done.

23   Q.  So when you -- in your declaration --

24          THE COURT:  You said, in paragraph 20, the closure of

25   the headquarters has not prevented them --

1          THE WITNESS:  Correct.

2          THE COURT:  -- from performing statutory functions.

3    And they had the ability to work from home.

4    A.  Um-hum.

5    BY MS. BENNETT:

6    Q.  Fair to say that the impression that your declaration gives

7    is that statutory functions are ongoing, right?

8          MR. ROSENBERG:  Objection.

9          THE COURT:  All right.  Its either in there or it's

10   not.  But did you -- you don't have a sentence in here where he

11   said they are in fact performing the statutory functions?

12         MS. BENNETT:  So I'll just -- we'll just go directly

13   to the declaration.

14         THE COURT:  Here it is, paragraph 19.  Since the

15   arrival of the Acting Director, the new leadership is engaging

16   in ongoing decisionmaking to assess how to make the Bureau more

17   effective and accountable.  Our leadership has worked to comply

18   with statutorily-required functions and my operations team has

19   been mindful of this as we advise on operational-related

20   issues.  Is that the sentence you want to ask him about?

21         MS. BENNETT:  Yeah.

22         THE COURT:  All right /ask him a question.

23         MS. BENNETT:  So when you said that, your information

24   was coming -- it's just based, on what Mark Paoletta told you,

25   right?

 1    A.  Yes, yes.

 2    Q.  It's not based on any insight into the mission side of the

 3    agency, right?

 4    A.  Not at all.

 5    Q.  Okay.  And, in fact, at that time, if you know, most of the

 6    functions were not up and running, right?

 7    A.  That's what I know now.

 8    Q.  You know now that when you submitted your declaration on

 9    February 24th, most of the functions were not up and running,

10    right?

11    A.  Most of the functions.

12    Q.  So supervision, not up and running?

13    A.  I was not aware of what -- I was only aware of what was in

14    the bullet point.  Again, I'm not mission programmatic.

15    Q.  Sure.

16    A.  So I have no control over that.  I also don't know what

17    engagement was taking place behind the scenes between those

18    entities and Mark Paoletta and the leadership.

19            THE COURT:  I think we've established he didn't know.

20    So you can ask your next question, as opposed to more about

21    what he didn't know.

22            MS. BENNETT:  Sure.

23    BY MS. BENNETT:

24    Q.  You didn't know about the mission side of the agency?

25    A.  No.

1    Q.  We can move on from there.

2         You did mention specifically the Student Loan Ombudsman.

3    That's paragraph 21 of your declaration.  And you recognize

4    that the position was vacant, right?

5    A.  Yes.

6    Q.  And that's because the ombudsman was terminated --

7    A.  Yes.

8    Q.  -- as part of the --

9    A.  Yes, yes.

10   Q.  And your declaration says that there are other options to

11   receive support from the CFPB, right?

12   A.  That is absolutely correct.

13   Q.  And one of those other options that you mentioned was the

14   general CFPD ombudsman office?

15   A.  Correct.

16   Q.  But that ombudsman office was not working at the time you

17   submitted your declaration, right?

18   A.  I was not aware of that.

19   Q.  You're aware of that now?

20   A.  I'm aware of that now, yes.

21   Q.  So now you know when you submitted your declaration on

22   February 24th, the office that you said people should go to was

23   actually not working because the stop-work order?

24   A.  Now I know, yes.

25   Q.  And the other place you said people could go was the CFPB

```
 1    Consumer Complaint Center, right?
 2    A.  Yes.
 3    Q.  And there was no human employees processing complaints at
 4    that time because of the stop-work order, right?
 5    A.  I can't say that.  I don't know.  We have contractors in
 6    other states that run some of those facilities, so I can't tell
 7    you what the status was, if they were live or if it was by
 8    phone.
 9    Q.  I see.  So on February 24th, when you submitted your
10    declaration suggesting the complaint center as an alternative,
11    you didn't know at the time whether they were up -- whether
12    that was a viable alternative or not?
13    A.  That's correct.  But I also wanted to clarify, if I may,
14    that my intent with that statement, which the media and
15    everyone has had a field day with and has questioned what -- a
16    little bit of my integrity and what I know, was never to
17    suggest that going to those two additional resources was a
18    replacement for the student loan ombudsman.
19            My -- if somebody is going to ask me a question about
20    what is my alternative, it's to file a complaint with the
21    agency ombudsman office, which is what they are supposed to be
22    doing, or you go to the Consumer Response Center and file a
23    complaint, if they're able to manage that.  But it was not
24    intended to be a replacement to the student loan payment
25    program, which people seem to think that's what I was referring
```

1    to.

2            THE COURT:  All right.  I just want to clear the air

3    for one second.  I'm not interested at all -- and I'm not

4    reading and I wouldn't pay attention to it if somebody sent it

5    to me -- what the media is saying that's going on at the CFPB.

6    That's why we're here.  And I don't think anybody is suggesting

7    that you acted in bad faith or deliberately lied.  But I think

8    they're probing some of the broad statements to see whether you

9    actually knew the facts to support the inference that they tend

10   to give.  And it's hard not to feel that's a personal attack.

11   I don't think it's meant as a personal attack.

12           I think you've come across to everyone as a person

13   who cares about the mission of this agency, cares about his

14   job, cares about consumers.  The question is, is what's

15   happening the picture that's painted in some e-mails, or is

16   what's happening more like the picture in some other emails?

17   And the only person who has to figure that out at this moment

18   is me, and not the press.

19           THE WITNESS:  Yes, ma'am.

20           THE COURT:  Okay.  Go ahead.

21           MS. BENNETT:  Thank you.

22   BY MS. BENNETT:

23   Q.  And with that understanding, I want to just briefly touch

24   on the Home Mortgage Disclosure Act as another function that

25   you called out specifically in that declaration.  And just to

1    make sure my understanding is correct, that statute requires

2    financial institutions to disclose information about their

3    mortgage lending, right?

4    A.  Yes.

5    Q.  And the deadline for that was March 1st, right?

6    A.  Correct.

7    Q.  And the declaration says -- and this is at paragraph 23.

8    The declaration says, "Operations related to the CFPB statutory

9    requirements under HMDA, the Home Mortgage Disclosure Act, are

10   continuing."  And it also says that contracts needed for work

11   related to the HMDA have remained intact and operational.

12   A.  Correct.

13   Q.  And that informational came to you from Mark Paoletta?

14   A.  That it was intact?

15   Q.  Yes.

16   A.  No.  I actually -- this dates back to the evening of the

17   7th, when DOGE was in our building.  We were in a conference

18   room with our chief information officer, myself, and several

19   people in our T&I division, and they were looking at the

20   website.  And we had our oversight attorney in the room as well

21   at that time.  And we were advising them to be really careful,

22   to be careful about what came off the website that would

23   prevent the public from not being able to access.  The Consumer

24   Response Center was one of them, HMDA was the other one,

25   because we knew we had a statutory requirement to do that.

1      So it never stopped.  It was available.  We put

2  additional resources when they were asked by staff.  The CIO

3  came to me and asked me if he could put additional people on

4  that work because they were getting a specific number of help

5  desk tickets.  And I said absolutely, you need to get them to

6  respond to the public so they could successfully enter their

7  data.

8  Q.  Understood.  Well, let me check if I understand.  So you

9  identified very early on HMDA, Home Mortgage Disclosure Act,

10  that that -- because of the upcoming deadline and the

11  importance to financial institutions, that that was very

12  important that it --

13  A.  Yes.

14  Q.  -- kept going.  And your testimony is that it did keep

15  going?

16  A.  It did keep going.  It may not have been at the level of

17  preference, but it didn't stop.  Like, institutions were still

18  able to file their information into the system.

19  Q.  I see.  So by "keep going," you mean just did not stop?

20  A.  Correct.

21  Q.  You could technically do it?

22  A.  We didn't take it down.  We didn't cancel contract.

23  Q.  You didn't cancel contracts?

24  A.  Not for HMDA, not for that specific work.

25  Q.  Okay.  Could you turn to tab 6 of the defendant's binder?

 1   That's Bates stamp CFPB_9.

 2            THE COURT:  All right, we need to take a break.  I'm

 3   sorry.  We came back from lunch, so my brain wasn't even

 4   thinking about what time it is.

 5            We'll take a break, just a ten-minute break, and then

 6   we'll resume.

 7            After we come back, it would be helpful if you give

 8   me some idea of how much more time you think you're going to

 9   take with this witness, whether you're still planning to call

10   other witnesses.  That will be useful information to have.

11            MS. BENNETT:  We will confer in the break.

12            (Recess.)

13            THE COURT:  Let's try to go until about 5, or at

14   least where you get to a reasonable stopping point, which could

15   conceivably be the end of your questions, before we talk about

16   timing for doing more.

17            MS. BENNETT:  Okay.

18   BY MS. BENNETT:

19   Q.  So I think where we left off, we were talking about HMDA?

20   A.  Yes.

21   Q.  Home Mortgage Disclosure Act?

22   A.  Yes, ma'am.

23   Q.  You said that you had urged them not to cancel any

24   contracts related to that, right?  Or that they hadn't

25   cancelled any contracts related to that?

USCA Case #25-5091    Document #2113074    Filed: 04/25/2025    Page 467 of 698

1    A.   The focus was to keep it available to the public, to be

2    able to file their reports.  So I don't know what contracts

3    specifically would require that, but that was the intent.

4    Q.   And so can you turn to Bates stamp CFPB_9.

5         I think I switched my binder with yours.

6    A.   No worries.  Got it.  Thank you.

7    Q.   So that's tab 6, Bates stamp CFPB_9.

8    A.   Yes.

9    Q.   That's an email from Christopher Chilbert who's the chief

10   information officer, right?

11   A.   Yes.

12   Q.   To you, on February 21st, 2025, right?

13   A.   Correct.

14   Q.   And that email says -- it's about HMDA data, right?  And

15   it's about an inquiry from the FDIC about the status, right?

16   A.   Yes.  Right.

17   Q.   And Mr. Chilbert says, at the top of this page, "We're

18   doing our best effort to support the data collection, but it is

19   at risk due to several contracts being terminated," right?

20   A.   Yes.

21   Q.   So even HMDA data, the thing that you potentially most

22   strongly urged them to maintain --

23   A.   Yeah.

24   Q.   -- the contracts were cancelled?

25   A.   Yes.  I don't know if they were cancelled, but he was

1    concerned that they had stopped.

2    Q.  Understood.  And then let's talk about consumer complaints,

3    because that's the other division that you called out in your

4    first declaration as being operational.  And you testified in

5    that declaration -- this is paragraph 22 of that declaration --

6    that operations related to the consumer complaint database are

7    continuing, right?

8    A.  Some of it was, yes.

9    Q.  Some of it was?

10   A.  Yes.

11   Q.  So you testified just generally operations are continuing?

12   A.  Yeah, minimal amount required that we -- because I know

13   that we specifically talked to Chris Johnson early on about

14   what the minimum requirement was to ensure that the site didn't

15   go down or if the public could still access some form of

16   complaint or have access to complaints.

17   Q.  Understood.  So you talked to Chris Johnson, who is the

18   head of Consumer Response and Enforcement about what was

19   necessary to keep the database going, yes?

20   A.  To keep the lights on, yes.

21   Q.  Okay.  And we have already gone through that, identified

22   several things, right?

23   A.  Um-hum.

24   Q.  All of those things were terminated, at least initially,

25   right?

1    A.  Quite a few were, yes.

2    Q.  Okay.  And one of those things was the consumer call center

3    initially, right?

4    A.  I believe so.

5    Q.  Another one of those things was an antivirus software,

6    right?

7    A.  Yes.

8    Q.  And that antivirus software is essential for attachments to

9    be sent back and forth from consumers and companies?

10   A.  Yes.  Yes.

11   Q.  And when that was cancelled, a number of complaints were

12   not able to go through, right?

13   A.  My understanding, for a short period of time, yes.

14   Q.  Okay.  And that's even the automatic database, right?

15   A.  Yes.  Yes.

16   Q.  So there were problems even with the automatic sending and

17   receiving of complaints because of the termination of

18   contracts, right?

19   A.  During that -- during that period of time, yes, that's what

20   I understand.

21   Q.  And there wasn't any human processing of complaints during

22   that time, right?

23   A.  I don't know.

24   Q.  You don't know.  Okay.

25           THE COURT:  So in that paragraph 22 of your first

1    declaration where you talked about the Bureau's maintaining the

2    toll-free number, the website, the database, operations related

3    to the database are continuing, contracts needed for work

4    related to the database have remained intact and operational,

5    all you were intending to convey was the operation side?

6    Again, not the programming?

7                THE WITNESS:  That is correct.  That is correct,

8    yeah.

9                THE COURT:  Okay.

10   BY MS. BENNETT:

11   Q.  And while we're on the subject of consumer response, can I

12   just briefly ask you about the escalated case management team?

13   A.  Um-hum.

14   Q.  So in your March 2nd declaration -- that's the supplemental

15   declaration you submitted before the hearing?

16   A.  Yeah, right.

17   Q.  That declaration says that the escalated case management

18   team started -- was working as of February 27th, right?

19   A.  On or about.  I don't have it in front of me, I'm sorry.

20   Q.  Sure.  I'll -- I believe that is tab 56 in the defendant's

21   binder.

22                THE COURT:  I think 56 is the first one.

23   BY MS. BENNETT:

24   Q.  I apologize.  It's tab 57.  And it's paragraph 8 of that

25   declaration, which is ECF page 3.

1          So that paragraph says:  On February 27th, 2025, the

2    CFPB chief legal officer activated work related to compliance

3    with the agency's critical statutory responsibilities in the

4    area of the Office of Consumer Response.  Did I read that

5    correctly?

6    A.  That was my understanding.

7    Q.  Okay.  So, it was -- wasn't until the 27th that the chief

8    legal officer activated work, right?

9    A.  That sounds correct.

10   Q.  And then it says as of February 27th, 2025, members of the

11   escalated case management team, for example, are working,

12   right?

13   A.  I believe that was the case, yes.

14   Q.  And do you today believe it was the case that on February

15   27, 2025, members of the escalated case management team were

16   working?

17   A.  I would have to go back and build a timeline on that.  I

18   don't know offhand.

19   Q.  How -- what information did you have that they were

20   working?

21   A.  The information on this was based upon the discussions I

22   had with our chief legal officer, in addition to emailings

23   that -- and again, I don't know what the timeline was -- the

24   emails that went from Chris Johnson to Mark Paoletta

25   recommending additional work to start up again.

1   Q.  Okay.  So you didn't have firsthand knowledge of whether

2   they were working when you wrote this declaration?

3   A.  I did not.  It was my understanding.

4   Q.  Understood.  And then let's look at those emails that I

5   believe you're talking about.  So the first one is tab 9 of the

6   defendant's binder, it's CFPB_16, is the Bates stamp, and it

7   goes through CFPB_16 through CFPB_19.

8   A.  Yep.  Yes.

9   Q.  And that email asks for -- Chris Johnson introduces

10  himself, right?

11  A.  Correct.

12  Q.  So at that time Mark Paoletta did not know who the head of

13  Consumer Response and Education was?

14  A.  I don't know.

15  Q.  Okay.  And he explains what the division of Consumer

16  Response and Education does, right?

17  A.  Yes.

18  Q.  Okay.  And he's reaching out on the 26th about requests to

19  start some work, right?

20  A.  Correct.

21  Q.  And that request, which is on CFPB_17, is -- has three

22  parts.  One is about contracting, right?

23  A.  Yes.

24  Q.  The second is assessment, right?

25  A.  Yes.

1   Q.  So the request is the work I want to do is assess what's

2   going on in consumer response, right?

3   A.  Yes.

4   Q.  It's not I am activating people to actually do work in

5   consumer response, right?

6   A.  Yes.

7   Q.  Okay.  And because he says there's going to be -- you see

8   at the bottom of CFPB_17, he says there's going to be two

9   phases, one is assessment.  That's what I'm requesting

10  permission to do first, right?

11  A.  Yes.

12  Q.  Sorry.  I think for the court reporter you have to answer

13  out loud.

14  A.  Yes.  Yes.

15  Q.  And the second is after he does that assessment, he says

16  I'm going to prepare a recommendation and share it, right?

17  A.  Yes.

18  Q.  Okay.  So on the 26th he's asking for permission just to do

19  an assessment, right?

20  A.  Yes.  Yes.

21  Q.  And he gets that permission on February 27th, right?

22  A.  Um-hum.

23  Q.  Okay.  So as of that email, nobody is actually working in

24  the escalated case management team, as far as you know?

25  A.  I don't know.

1    Q.  Okay.  And then if you could turn to Bates stamp 65, which

2    I will tell you the tab for.  It's tab 27 in the defendant's

3    binder.

4    A.  Yes.

5    Q.  So this is an email from Chris Johnson to you, right?

6    A.  Yes.

7    Q.  It's on March 2nd, 2025 --

8    A.  Yes.

9    Q.  -- right?

10        And it CCs Mark Paoletta, right?

11   A.  Yes.

12   Q.  And it says what we're doing is assessing the complaint

13   handling process, right?

14   A.  Yes.

15   Q.  And then the permission to start work is given on March

16   2nd, 2025, right?

17   A.  Yes.

18   Q.  And then if you could turn to page Bates stamp 73, which is

19   tab 30 in the same binder, so CFPB_73.

20   A.  Yes.

21   Q.  This is an email between you and Christopher Johnson,

22   right?

23   A.  Christopher Johnson, yes.

24   Q.  I believe I'm directing you to the wrong tab.  Apologies.

25   Can you go to tab 32, which is CFPB_79?

```
 1    A.  Yes.

 2    Q.  So this is an email from Christopher Johnson to -- the

 3    first email to the entire consumer response team, right?

 4    A.  Right.

 5    Q.  It's sent on March 3rd, 2025, right?

 6    A.  Yes.

 7    Q.  At 6 a.m.?

 8    A.  Yes.

 9    Q.  And that is the email that activates them to do work,

10    right?

11    A.  Based on the timeline, yes.

12    Q.  Okay.  So on February 27th, 2025, the escalated case

13    management team, based on these emails, was not yet working?

14    A.  Now I know.

15    Q.  So now you know that.  And they started working last week?

16    A.  Right.

17    Q.  I want to turn back briefly to the stop-work order.  And

18    the day before the hearing last week -- so the hearing last

19    week was on March 3rd, 2025, right?  Last Monday?

20    A.  Yes.

21    Q.  I will represent to you that the hearing --

22    A.  Yes.

23    Q.  -- was on marched 3rd, 2025.

24            THE COURT:  I can't even remember that.

25    BY MS. BENNETT:
```

1    Q.  Yeah, I'll represent that to you.  The day before would

2    have been March 2nd, 2025, right?

3    A.  Yes.

4    Q.  It was a Sunday?

5    A.  Yes.

6    Q.  And Mark Paoletta sends an email to all staff, right, on

7    that day?

8    A.  Yes.

9    Q.  And what he says is -- this is at, by the way, CFPB Bates

10   stamp 56, if you want to look at it.

11       What he says is it's come to his attention that some

12   employees have not been performing statutorily required work,

13   right?

14   A.  Um-hum.  Yes.

15   Q.  And you believe, were under the impression that almost no

16   employees were working, right?

17   A.  I didn't know -- I didn't know how many people -- honestly,

18   I knew there was a good portion of the agency that was not

19   performing.

20   Q.  Okay.  And so a big portion of the agency was not

21   performing, which means either some -- a big portion of the

22   agency was doing nothing and the person performing the chief of

23   staff role just didn't notice, right?

24   A.  Yes.

25   Q.  Okay.  And then he says, "Let me be clear, employees should

1    be performing work that is required by law and do not need to

2    seek prior approval to do so," right?

3    A.  Yes.

4    Q.  And is that your understanding -- that's not your

5    understanding of what the order was before this email, right?

6    A.  No.

7    Q.  Your understanding was nobody should be performing work,

8    right?

9    A.  As an executive and as the COO of the agency, it's hard for

10   me to answer that question because I looked at the order and I

11   went and sought clarification from Mark Paoletta about what my

12   stuff should or should not be doing.  So I worked that out

13   separately with Mark.  I don't know who reached out to Mark

14   throughout that process.  I know that he was working with

15   enforcement on some issues.  I believe they were having

16   separate possible discussions with regulations.  But I don't

17   know what his daily interaction was with the mission part of

18   the house.

19          THE COURT:  It's your understanding that the stop

20   work was what it said?

21          THE WITNESS:  Yes.

22          THE COURT:  It was across the board and you had to

23   talk to him?

24          THE WITNESS:  I did.

25          THE COURT:  So different career people?

```
 1                  THE WITNESS:  Yes.

 2     BY MS. BENNETT:

 3     Q.  I think you testified to this earlier, you in fact

 4     characterized the stop-work order as a stop order

 5     across-the-board, for all work associated with the agency,

 6     right?

 7     A.  No.

 8     Q.  You never said that?

 9     A.  Not everything, no.  I don't believe I did.  I hope not.

10     Q.  And there was an office of human capital that issued a

11     directive on February 14th regarding administrative leave,

12     right?

13     A.  Yes.

14     Q.  And that directive is at Exhibit J of the plaintiffs'

15     binder, if you would like to take a look at it.

16          That directive says, "In accordance with the acting

17     director's guidance, employees should exercise administrative

18     leave until otherwise instructed," right?

19     A.  Yes.

20     Q.  Okay.  Nothing about statutorily required work, right?

21     A.  No.

22     Q.  And in the February 10th stop-work order there was also

23     nothing about statutorily required work there either, right?

24     A.  In the -- not that I recall.  No, it was on the 8th, I

25     believe, that -- yeah.
```

1    Q.  So we have it clear, the 8th talked about had this proviso

2    about work required by law, but the 8th, in that email, also

3    said you can't do any supervision or examination, right?

4    A.  At the end it did say that.

5    Q.  Okay.  And is your understanding that supervision and

6    examination are required by law?

7    A.  I understood that supervision was required by law.  I'm not

8    sure about enforcement.

9    Q.  Okay.  So on 8th there is this email that says -- has some

10   proviso that says "authorized by law," but also has bullet

11   points prohibiting work that is required by law?

12   A.  Right.

13   Q.  Not authorized by law, required by law.  Right?  So you

14   have this contradictory email and then on the 10th there's no

15   proviso, right?  It just says all employees are directed to

16   stop work?

17   A.  Right.

18        THE COURT:  I would say that fact has probably been

19   established.

20        MS. BENNETT:  Fair enough.

21   MS. BENNETT:

22   Q.  As we discussed, that's how it was understood in the

23   administrative leave email, it directs all employees to take

24   administrative leave, right?

25   A.  Yes.  And this email -- yes.

1    Q.  Okay.  And you're aware that the CFPB set up a tip line to

2    report people?

3    A.  I was not aware of that.

4    Q.  You're aware of that now, but --

5    A.  As part of the case, I became aware of it.

6    Q.  Understood.  And are you aware that when asked about this

7    tip line, asked whether the CFPB had set up this tip line,

8    Acting Director Vought responded, "Yes, we have"?

9    A.  I don't know what he -- I don't know what method he used

10   to -- I don't use social media.  I understand that that

11   possibly came from social media.  I'm trying really hard not to

12   pay attention to social media right now.

13   Q.  I see.  So you're also not aware that it's still up?

14   A.  I'm not aware of anything having to do -- I don't even know

15   who -- I don't even know who in the agency those calls go to,

16   if that's the case.  That has never been discussed in my

17   presence.

18   Q.  Okay.  And just a couple more questions on this.

19        The documents that were used to -- that were given to

20   the terminated probationary and term employees had one of the

21   reasons that was given for those terminations was the stop-work

22   order, right?

23   A.  Yes.

24   Q.  And so it wasn't just a stop-work order, it was such an

25   order that it meant that people were fired, right?

1    A.  Yes.  Yes.

2    Q.  Okay.  And fair to say that around the 27th there was a

3    flurry of emails requesting -- suddenly requesting permission

4    to do work, right?

5    A.  Yes.  Yes.

6    Q.  And some of those were started by you, right?

7    A.  It was.

8    Q.  It was started by you?

9    A.  Some of it was, yes.  Yeah.  I was concerned.

10   Q.  Okay.  So you were concerned that people weren't getting

11   authorization and so you generated this set of requests?

12   A.  Again, I didn't know who was going to Mark Paoletta

13   directly.  There were a couple of executives that chose to copy

14   me on their email to Mark, which helped me, actually.  It

15   helped me when they went to the CFO to ask for a procurement

16   issue, or to the CIO.  So it helped me to be able to confirm to

17   my staff that those things had been approved, or what the

18   status was.  But I didn't know what everybody was having, I

19   don't know what their communications were directly with Mark

20   Paoletta.

21   Q.  So if there was testimony that previous to this flurry of

22   emails people had asked Mr. Paoletta for guidance and hadn't

23   heard back, you wouldn't know whether that's correct or not?

24   A.  Unless he copied me on the email.

25   Q.  Unless they copied you, okay.

1   A.   In fact, when they copied me on the email, typically if he

2   didn't respond, I did respond somehow.

3   Q.   Okay.  And the stop-work order though just directed people

4   to contact Mr. Paoletta, right?

5   A.   Yes.

6   Q.   Okay.

7   A.   People chose to also include me in some of those emails as

8   well, which I tried to be helpful.

9   Q.   Okay.

10          THE COURT:  Going back to your question that began

11   with the flurry of emails.  What was the date when you kind of

12   started the flurry, the question?

13          MS. BENNETT:  I think it's the 27th.

14          THE COURT:  Okay.  That's just a flurry, that I

15   recall.  I wasn't sure if you were referring to that one.  I

16   just wanted to make sure which one you were referring to.

17          Okay.  Keep going.

18   BY MS. BENNETT:

19   Q.   So there's this flurry of emails that culminates, I think,

20   with -- maybe not culminates, but the email from Mr. Paoletta

21   on Sunday, the 2nd, is after this flurry of emails, right?

22   A.   Yes.

23   Q.   So -- and there was a hearing on March 3rd here, I will

24   represent, so there's -- so all of these emails, all of these

25   requests for authorization to work that were granted are in,

1    say, the five days before there was about to be a hearing in

2    this case, right?

3    A.  Based on your timeline, yes.

4    Q.  Okay.  And even after these emails went out, you testified

5    there's still a lot of confusion, right?

6    A.  Um-hum.

7    Q.  So I'm going to ask you to turn -- and one of the things

8    you went back with the defendants on was supervision.  So I'm

9    going to try to clarify what happened there.

10   A.  Sure.

11   Q.  So if you could turn to tab 22.  And this is CFPB Bates

12   stamps 50 through 52.

13        If you turn to 51.  This is an email from -- in the

14   middle of the page there's an email from Cassandra Huggins,

15   right?

16   A.  Yes.

17   Q.  And that's the principal deputy assistant director

18   responsible for supervision, yeah?

19   A.  Yes.

20   Q.  And to you?

21   A.  Yes.

22   Q.  And it's February 28th, 2025?

23   A.  Correct.

24   Q.  And Cassandra Huggins is asking you, "To be clear, the

25   February 8th email directed us to cease all supervision and

1    examination activity.  Am I correct that directive still

2    stands?"

3    A.  That was my understanding, yes.

4    Q.  And you answer, "That is correct," right?

5    A.  That is correct.

6    Q.  So after -- so there's a flurry of emails on the 27th.  On

7    the 28th Cassandra Huggins asks you, is the direction to stop

8    all supervision still in effect?  And you say yes, right?

9    A.  Yes.

10   Q.  Okay.

11   A.  And, again, I was basing that off of the email that went

12   all the way back to February 8th.

13   Q.  Understood.  So then I'm going to ask you to turn to tab 33

14   in the defendant's binder, which is Bates stamp CFPB_82.  And

15   this is another email chain between you and the same person,

16   Cassandra Huggins, right?

17   A.  Yes.  Yep.

18   Q.  Who, again, is the principal deputy in charge of

19   supervision, right?

20   A.  Yes.

21   Q.  And this email chain is on March 3rd, 2025, right?

22   A.  Yes.

23   Q.  So this email chain takes place after Mr. Paoletta sent out

24   his email on March 2nd, 2025, right?

25   A.  Yes.

1    Q.  Okay.  And, again, after having received that email,

2    Cassandra Huggins, the deputy in charge of supervision, reaches

3    out to you for more clarification, right?

4    A.  Yes.  Yes.

5    Q.  And the clarification that they request is whether

6    Supervision should remain on administrative leave, right?

7    A.  Yes.

8    Q.  And whether -- again, whether the prohibition on

9    supervision and examination is still in effect, right?

10   A.  Yes.

11   Q.  And you respond, your first sentence is -- I think we

12   talked about this on direct.  Your first sentence is, "I would

13   highly encourage you to communicate with Mark P. regarding

14   expectations?

15   A.  Yes.

16   Q.  Your second sentence is, "However, you are correct that the

17   email sent out yesterday does not change the specific work

18   stoppage in the bullet points issued on 8 February," right?

19   A.  That was my understanding, yes.

20   Q.  So then when Cassandra Huggins sends out an email to her

21   team a few hours later that says their understanding is that

22   the work stoppage still applies, that was based on your email

23   to them at the time?

24   A.  Yes.  However, I didn't realize that she had separately

25   reach out to Mark Paoletta for advice and did not receive a

1    response before she sent that email.

2    Q.  Right.  So she's emailed -- she sent an email to you,

3    right?

4    A.  Yes.

5    Q.  You said, I think it's correct, that the work stoppage is

6    in effect, but contact Mark P.?

7    A.  Yes.

8    Q.  Then she sent an email to Mr. Paoletta, right?

9    A.  Yes.

10   Q.  But in the meantime, she said until I hear back, the work

11   stoppage is in effect, right?

12   A.  That's correct, yeah.

13   Q.  And even now, supervision is not actually doing any

14   supervision or examinations, right?

15   A.  That is my understanding.

16   Q.  Only thing they're authorized to do by Mr. Paoletta is

17   provide him a report, right?

18   A.   I thought his email was very clear.

19   Q.  You thought his email was very clear --

20   A.  Of what his expectations were with regards to providing him

21   with reports of what cases they had opened and who they were

22   with and wanted a status update on that.  I mean, I would

23   presume when somebody is asking me that question, it's to

24   assess, to see exactly what the population is within your

25   portfolio and then you make a decision based on that.  Again, I

 1   don't know what's in the thinking of this administration, but
 2   presumably he could order them back to do certain work, I don't
 3   know.
 4   Q.  Okay.  And just to -- so the record is clear, this email
 5   from Mr. Paoletta is at tab 44 of the defendants' binder.  It's
 6   Bates stamp CFPB_11 through CFPB_14 and this is the email that
 7   we've been talking about that says I want a report from you,
 8   right?
 9   A.  Yes.
10   Q.  Okay.  I just want to spend a little bit of time -- so
11   supervision is not operating, except to provide this report to
12   Mark Paoletta, as far as you know?
13   A.  This is the last status update that I am aware of.
14   Q.  Okay.  There is one more -- just for the record, there's
15   one more status update that is in the exhibits, it's
16   plaintiffs' binder, Exhibit WW.  And this is an email from an
17   examiner at the CFPB, right?  That's somebody who does
18   examinations?
19   A.  There's a lot of redactions.  But, yes, it appears to be an
20   examiner within that office.
21   Q.  Sure.  So the signature block says "Examiner," right?
22   A.  Yes.
23   Q.  And it's a recap of a meeting that occurred on March 6,
24   2025, right?
25   A.  Yes.

1   Q.  And what that recap says is exactly the thing that you just

2   told me, right?

3   A.  Yes.

4   Q.  Which is after we are done with providing the information

5   for the report Casey requested yesterday, and that report is

6   the report Mr. Paoletta asked of her, right?

7   A.  Yes.

8   Q.  So it says, "After we're done with providing the

9   information for the report Mr. Paoletta requested, we're to go

10  back on administrative leave," right?

11  A.  Yes.

12  Q.  So, supervision, what's happening is they're providing a

13  report and they're otherwise on administrative leave?

14  A.  Yes.

15  Q.  As far as you know?

16  A.  As far as I know, yes.

17  Q.  Let's talk about what happened with some of the offices

18  that were actually authorized to do some work.  So the Office

19  of Civil Rights, they were authorized back to work sometime

20  between the 27th and the 3rd?

21  A.  I authorized it, yes.

22  Q.  You authorized them?

23  A.  I did.

24  Q.  And they returned to CFPB Bates stamp 41.  That is at tab

25  19.

```
1    A.  Yes.

2    Q.  We've already talked about this chain, but the email in the

3    middle of CFPB_41, so the -- you authorize back to work the

4    Office of Civil Rights on the 27th or 28th?

5    A.  Yeah.

6    Q.  And then they respond, "I want to make sure we're flagging

7    that Entellitrak is our system of record for EEO cases, and we

8    cannot do our work without it," right?

9    A.  Yes.

10   Q.  So the problem is they were ordered back to work, but they

11   don't have the system they used to track their cases --

12   A.  Yes.

13   Q.  -- because that contract was cancelled?

14   A.  Yes.

15   Q.  If we could go to CFPB Bates stamp 9, which is at tab 6.

16   I'm sorry, 99, which I believe is at tab 39.  And this is an

17   email from the section chief of the Disability and

18   Accessibility Programs section, right?

19   A.  Yes.

20   Q.  And it's to the chief financial officer, right --

21   A.  Yes.

22   Q.  -- and to you?

23   A.  Yes.

24   Q.  And it's sent on March 3rd, 2025, right?

25   A.  Yes.
```

1    Q.  And it explains that the Disability and Accessibility

2    Programs Service office has been technically activated, right?

3    A.  Yes.

4    Q.  But it can't do its work because the contracts required to

5    provided reasonable accommodations were cancelled, right?

6    A.  The work on the contract?

7    Q.  The contracts.  So it said --

8    A.  Oh, yes, yes.  Which was a separate contract, yes.

9    Q.  So it says, just so we're clear, "To meet the demands of

10   the statutes governing our work, we must have the resources of

11   our contracts that were recently terminated," right?

12   A.  Yes.

13   Q.  Then they outline what those are?

14   A.  Yeah.

15   Q.  So, "I have a attached the reasonable accommodations,"

16   right?

17   A.  Yes.

18   Q.  "And 508 contracts," right?

19   A.  Yes.

20   Q.  508 is also a disability accessibility?

21   A.  It's for reading on a website or a form.

22   Q.  Okay.  And then it also says, "We would need our instance

23   of the Entellitrak system."  That's the system you were

24   previously talking about that manages a whole bunch of HR data?

25   A.  It's a case management.

```
 1    Q.  It's a case management system?

 2    A.  It is.

 3    Q.  So then it says, "We also would need our instance of the

 4    Entellitrak system" -- the case management system --

 5    "reinstated"?

 6    A.  Yes.

 7    Q.  "As we are legally required to keep and maintain a system

 8    of record for reasonable accommodations," right?

 9    A.  Yes.

10    Q.  So, in other words, they were put back to work, but they

11    didn't have the contracts in place needed to actually do their

12    work, right?

13    A.  Until they raised the concern that they didn't have those

14    tools.

15    Q.  And when they raised that concern -- if you turn back a

16    page, to CFPB_98 -- they raised that concern on Monday, March

17    3rd.  And there's a response by Jafnar Gueye, who is the chief

18    financial officer, right?

19    A.  Correct.

20    Q.  And it says Entellitrak either is going to be or has been

21    turned back on?

22    A.  Um-hum.

23    Q.  Then it says, "We are very narrowly turning back contracts,

24    or portions of contracts," right?

25    A.  Right.
```

1    Q.  And it say, "If without the contract the Bureau would fail

2    to meet those requirements, then we would turn it back on"?

3    A.  That's what he said.

4    Q.  But, it says if the Bureau can meet the statutory

5    requirement even if minimally without it, they're not going to

6    turn it back on, right?

7    A.  According to him, yes.

8    Q.  Yep.  And I just actually want to be clear, it says yes.

9    That's all I need from that.

10       So people are being activated to work, they can't work

11   because the contracts haven't been -- are cancelled, right?

12   And then they're not being told, oh, of course we're going to

13   turn those right back on, right?

14   A.  Correct.

15   Q.  They're getting questions --

16   A.  Correct.

17   Q.  -- and suggestions that it's going to be very narrow,

18   right?

19   A.  Correct.

20   Q.  Okay.

21   A.  But I also don't expect my procurement staff to know all of

22   the mission or programmatic details of every one of these

23   contracts.  So that's why Jafnar is relying on the officers to

24   help justify why these are important.  So I appreciate the fact

25   that Nykea stated what she stated to him, and we have been

1    trying to work with them to make the accommodation.

2    Q.  So the chief financial officer -- so all of these contracts

3    were turned off, right?

4    A.  (No response.)

5    Q.  They sent notices of termination?

6    A.  Yes.  Thank you.

7    Q.  And the office responsible for figuring that out, your

8    office, right, or at least you oversee procurement?

9    A.  Yes, right.

10   Q.  So your office, responsible for figuring that out, doesn't

11   have the knowledge required to figure out which ones need to be

12   turned back on, right?

13   A.  Not with all of the contracts, with this one specifically

14   as it related to reasonable accommodation, EEO compliance,

15   anti-harassment, anti-bullying, these are people that work very

16   closely with my team and my staff.  They do not report to me,

17   but I'd like to think that this kind of work should not stop

18   because that just creates a whole different level of problems

19   for the Agency.  I mean, these are, again, legally-required

20   functions for people to accommodate them.

21   Q.  Okay.  And while we're on the subject of contract --

22            THE COURT:  Just to be clear, when we're talking

23   about these disability and accessibility, this is so that

24   internally your employees are having their disabilities

25   accommodated?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  It's not about consumers.

3          THE WITNESS:  That's correct.

4          THE COURT:  They have access to your complaint

5     system.  This is about how you manage yourself?

6          THE WITNESS:  Yes.

7          THE COURT:  And those requirements flow from the

8     statutes creating CFPB, or flow from the statutes that govern

9     all federal agencies?

10         THE WITNESS:  EEOC.

11    BY MS. BENNETT:

12    Q.  In that we talked about the 508 contract being cancelled?

13    A.  Yes.

14    Q.  That contract, though, was agency-wide, right?  Or at least

15    there was a 508 contract for consumer response too, right?

16    A.  I don't know.

17    Q.  Okay.  So you're not aware whether there was a contract

18    that allowed consumers with disabilities to be able to access

19    the consumer complaint database, right?

20    A.  I don't know.  The only thing -- again, narrowly looking at

21    it, I'm aware of the operational legal requirements for the

22    agency to comply with both external and internal stakeholders

23    as it relates to 508, which is managed by our Office of

24    Minority and Women Inclusion.

25    Q.  Okay.  So you don't know whether the 508 contract for

```
 1    consumer response was cancelled?

 2    A.  I have no idea if they have a separate contract for 508.

 3    Q.  Just very briefly while we're on the subject of contracts,

 4    can you turn to Exhibit X in the plaintiffs' binder.

 5         And that, again, is -- I believe was an email from the

 6    chief financial officer, right?

 7    A.  It appears to be, yes.

 8    Q.  It emphasizes we're taking a very narrow approach, right?

 9    And it says, "If without the contract the Bureau can't meet a

10    statutory requirement, then it will be considered for

11    reactivation," right?

12    A.  Yes.

13    Q.  That's what it says?

14    A.  Yes.  Yes.

15    Q.  And it also says you have to be -- "Please be prepared to

16    have to defend the justifications to external parties," right?

17    A.  Yes.  But can I explain about --

18    Q.  I think you'll probably get a chance to explain when

19    defendants get back up.

20         Okay.  So we've talked about the Office of Civil Rights,

21    we've talked about the Disability and Accessibility Programs

22    section.  Let's talk about the Office of Research.  What's

23    going on in the Office of Research since it was turned back on?

24         If you don't mind turning to Exhibit Y of the

25    plaintiffs' binder.  And this is an email from Jason Brown,
```

1    right?

2    A.  Yes.

3    Q.  And who is Jason Brown?

4    A.  He is head of our -- I believe he's the assistant director

5    for Research.

6    Q.  So it's an email from the assistant director of Research

7    to, it looks like, the Research Division, right?

8    A.  Yes.

9    Q.  And it's sent on March 4th, 2025, right?  It's at the top.

10   A.  March 3rd, yes.

11   Q.  Sent on March 3rd of 2025?

12   A.  Right.

13   Q.  And it outlines several ways in which -- several challenges

14   that they are confronting with getting back to work, right?

15   A.  Yes.  I haven't read the whole thing, but, yes, it

16   sounds -- looks correct.

17          THE COURT:  Tell me the page number.

18          MS. BENNETT:  This is Exhibit Y in the plaintiffs'

19   binder and it's the first and second page of that exhibit.

20   It's only a two-page exhibit.

21   BY MS. BENNETT:

22   Q.  And it says -- I'm starting at the bottom of that page.

23   Jason Brown says, "As we are resuming our work, we are

24   confronting a few challenges," right?

25   A.  Um-hum.

1    Q.  And he lists them?

2    A.  Yes.

3    Q.  One is loss of personnel?

4    A.  Yes.

5    Q.  He says, "The firing of much of our staff impacts our

6    ability to complete assignments as planned," right?

7    A.  Yes.

8    Q.  And he also says, "We are trying to make sure we have

9    access to the files of the staff who have left," right?

10    A.  Yes.

11    Q.  So they both -- people were fired that they needed to do

12    their -- complete their work, right?

13          MR. ROSENBERG:  Objection.  Potential lack of

14    foundation.  The email is from Jason Brown, to DL_CFPB_OR.

15    Maybe a missed it, have we established that Mr. Martinez has

16    received this email?

17          THE WITNESS:  I've never seen this email before.

18          MS. BENNETT:  We would be happy to -- I thought we

19    were --

20          THE COURT:  Have we shown people emails that they

21    didn't write or send?

22          MS. BENNETT:  Yes, yes.

23          MR. ROSENBERG:  I believe all of the emails that I

24    showed Mr. Martinez were e-mails that he either sent or

25    received, either directly or indirectly.

```
 1              THE COURT:  What question were you going to ask about
 2      this?  Did you have any interplay into this communication or
 3      know anything about the problem that he's reporting?
 4              THE WITNESS:  No.
 5              THE COURT:  Okay.
 6      BY MS. BENNETT:
 7      Q.  Do you have any reason to doubt the head of research's
 8      assessment of the problems that they're suffering in getting
 9      back to work?
10      A.  No.
11      Q.  Okay.  And you previously opined on the status --
12              THE COURT:  All the emails and declarations that you
13      introduced and all the ones they introduced are still part of
14      the record.
15              MS. BENNETT:  Great.
16              THE COURT:  So they don't all have to come through
17      his mouth.
18      BY MS. BENNETT:
19      Q.  Let's talk about consumer response.  You're aware that
20      there's a backlog of thousands of complaints, right?
21      A.  Generally.
22      Q.  Generally.  So you're not aware of the current status of
23      Consumer Response, right?
24      A.  I don't know all of the specific details about Consumer
25      Response.
```

```
1    Q.  Okay.  So you don't know whether it's fully operational
2    right now or not?
3    A.  No.
4    Q.  Okay.  And --
5    A.  Well, fully operational versus a backlog?  I mean, there --
6            THE COURT:  Look, you're either a witness who can
7    testify to the status of this organization or you can't.  So if
8    you are, then she's going to ask you questions about it.  If
9    you aren't, she isn't.
10           THE WITNESS:  Yes, ma'am.
11           THE COURT:  So are you?
12           THE WITNESS:  I will hold back.  Thank you.
13           THE COURT:  Okay.
14   BY MS. BENNETT:
15   Q.  So you can testify to supervision based just on the emails
16   we went back and forth on, right?
17   A.  Yes.
18   Q.  And Research, you can't testify to the current status,
19   right?
20   A.  No.
21   Q.  And same with Consumer Response, right?
22   A.  Well, let me back up, though, because my testimony this
23   morning, when I was questioned about this, I was able to
24   reference the specific emails that I was copied on to Mark
25   Paoletta and what he subsequently approved.  So, I -- again, I
```

1    know what was approved, but I don't know the specifics of who

2    is performing work in those divisions.

3    Q.  I see.  So you know -- if you were CCed on an email, you

4    know what the email said?

5    A.  Yes.

6    Q.  But you don't know the current status of what's actually

7    happening on the ground in --

8    A.  I would have no way of knowing that.

9    Q.  Got it.  And how about Markets?  The Office of Markets?

10   A.  I have no idea.  Other than the email that I referenced

11   this morning, that I looked at and was asked about.

12   Q.  Okay.  So in general, in the mission side of the

13   organization -- just to be really clear, and that way I'll stop

14   asking you specific questions, all of the offices in the

15   mission side of the organization, you don't have insight into

16   what's actually happening on the ground?

17   A.  I have no insight.  I usually don't have insight into those

18   specific groups.  Again, those groups have historically, over

19   the last four years, reported to the chief of staff.  That's an

20   entirely different programmatic SME, subject matter expert,

21   responsibility.

22   Q.  And I just want to -- actually have just two more things to

23   ask you about.

24            THE COURT:  More topics or two more questions?

25            MS. BENNETT:  Two more topics, although they both

```
 1    will be very short.  One is just one question.
 2              THE COURT:  Ask the one-question topic.
 3    BY MS. BENNETT:
 4    Q.  So the one question topic is:  I just want to clear up, you
 5    said on direct that you don't message about work, right?  You
 6    don't send text messages about work?
 7    A.  When I think of text messages, I think of using my iPhone
 8    and sending text messages.
 9    Q.  I said it was one question, but it might be three
10    questions.
11        The previous exhibit that the defendants showed you was
12    a Teams message?
13    A.  That was a Teams message.
14    Q.  You do use Teams messages for work, right?
15    A.  Yes.
16    Q.  And as far as you're aware, none of your Teams messages are
17    in this record, right?
18    A.  That is the only one I'm aware of.
19              MS. BENNETT:  Okay.  And then I have one last topic,
20    which would have probably four questions.
21              THE COURT:  All right.  Go ahead, try.
22    BY MS. BENNETT:
23    Q.  So the last thing I just want to ask you about is:  I think
24    your testimony is, but I'm not entirely sure, that current
25    leadership -- and by that I mean Acting Director Vought and
```

1    Mark Paoletta -- do not currently intend to wind down the

2    Agency, is that right?

3    A.  My understanding is that they have recognized that there

4    are statutory requirements that need to be fulfilled within the

5    agency, but I don't know how many people, I don't know what

6    functions.  I have no knowledge of what their thinking is right

7    now in terms of capacity or size of the agency.  But, yes, my

8    understanding is that they are committed to fulfilling the

9    statutory requirements of the Agency.

10   Q.  Okay.  But you have no idea what that means to them, right?

11   A.  I have no idea what that means.  I will find out once we're

12   building out this report that needs to go to OMB with regards

13   to the reduction in force across the federal government.  But I

14   have no idea as of right now what they're thinking.

15   Q.  Okay.

16          THE COURT:  And you don't know whether that means

17   they want -- they recognize that they will be fulfilled by the

18   CFPB or if finding a home in some other agency does the trick?

19          THE WITNESS:  Correct.

20          THE COURT:  You don't know what they're thinking on

21   that?

22          THE WITNESS:  I have no idea.

23          THE COURT:  Okay.

24   BY MS. BENNETT:

25   Q.  Okay.  And the evidence we do have is they've cancelled the

```
 1    leases on all the buildings, right?

 2    A.  Yes.

 3    Q.  There's an executive -- return-to-work executive order,

 4    right?

 5    A.  Yes.

 6    Q.  So they've cancelled all of the physical offices, but there

 7    is an executive order that employees that still work for the

 8    government have to go to a physical office, right?

 9    A.  Yes.

10    Q.  Okay.  And we know that the virtual desktop is not

11    available, right?

12    A.  To a smaller population of individuals.

13    Q.  Okay.  So that's Exhibit M of the plaintiffs' exhibits.

14         We know that at least as of last week human resources

15    still had an auto response discussing employees' recent or

16    impending separation, right?

17    A.  Yes.

18    Q.  That's Exhibit N.

19         And we know that all mandatory training -- mandatory

20    training -- has been cancelled, right?

21    A.  Yes.

22    Q.  That's Exhibit SS of the plaintiffs'.

23         And, so, one last question is:  Is the mass termination

24    team still meeting?  The -- I think what you called the RIF

25    team?
```

```
 1    A.  Yes.

 2    Q.  The RIF team is still meeting, right?

 3    A.  They're meeting regularly together as a team to come up

 4    with what questions and guidance they need from the leadership

 5    to develop the material that's due to OMB.

 6    Q.  Okay.  So as far as you know, nothing -- you don't know

 7    that anything has changed as the -- per the RIF plans?

 8    A.  Well, for the RIF plan related to the 14th, that's, like,

 9    off the table.  Our guidance is to go through the organized

10    process that OMB has put into place.  And there's several

11    things that call into question where agencies need to take

12    budgets, statutory requirements, collective bargaining

13    agreements.  There's a whole host of things that is very

14    orderly that I intend to follow based upon my conversations

15    with leadership.

16    Q.  I see.  So you are saying that -- not that the plan to

17    terminate the vast majority of the employees is off the table,

18    but that the -- they are taking into account the procedural

19    requirements in a way that they may not have before?

20    A.  Yes.

21         MS. BENNETT:  Okay.  Thank you.  No further

22    questions.

23         Oh, actually, can I just really quickly --

24         No further questions.

25         THE COURT:  All right.  It's always the better
```

```
 1    answer.
 2            Okay.  So we need to talk about scheduling.  I
 3    presume that you have some very, very targeted and
 4    nonrepetitive redirect that you would like to ask?  That's it
 5    on that page?
 6            MR. ROSENBERG:  Pretty much.
 7            THE COURT:  All right.  I still don't think we can do
 8    it this afternoon.  But you're not going to add any questions
 9    to that overnight.  You're allowed to delete them, however.
10    Because I did -- I actually did read along with everything you
11    showed him, so you don't have to show him everything you've
12    already showed him.  But I'm going to allow you to do redirect
13    because you're entitled to redirect, but not today.
14            And do you have any other witnesses the government
15    intends to call?
16            MR. ROSENBERG:  The government does not have any
17    other witnesses.
18            THE COURT:  Okay.  Now, having conferred, possibly,
19    among yourselves, are you planning to call any of your
20    witnesses?
21            MR. GUPTA:  Yes.
22            THE COURT:  Okay.  Approximately how many?
23            MR. GUPTA:  Two.
24            THE COURT:  Two?
25            MR. GUPTA:  Two.  And it will be very short.
```

USCA Case #25-5091    Document #2113074    Filed: 04/25/2025    Page 506 of 698

1          THE COURT:  And they'll be cross-examined, which is

2    appropriate and fair.  Okay.  So we have probably either a

3    morning or afternoon, it sounds like, of testimony, maybe a

4    little less, which is kind of where I thought we were headed

5    this month.  Silly me.  So we need to figure out when we can do

6    that.

7          I understand the parties were excited about tomorrow.

8    And I have a conflict in the morning tomorrow that I cannot

9    change, and it's not even going to be over until about 11,

10   11:30ish.  So I think we're talking about resuming in the

11   afternoon.

12         And I don't have anything else in court, anything

13   scheduled on my calendar for tomorrow afternoon?

14         THE COURTROOM DEPUTY:  No, ma'am.

15         THE COURT:  So we can resume tomorrow afternoon.

16   Does that work for you, Mr. Rosenbeg?

17         MR. ROSENBERG:  That does, Your Honor.

18         THE COURT:  What about you?

19         MS. BENNETT:  Yes, Your Honor.

20         MR. GUPTA:  Yes.

21         THE COURT:  Why don't we start at -- why don't we say

22   1:30 tomorrow afternoon.  Does that work?

23         You're done -- oh, no, you're not done.  I'm sorry.

24         THE WITNESS:  No.

25         THE COURT:  You'll be back.  If they tell you to be

```
1   back, you'll be back.  That's the way it is.  So we'll start

2   again at 1:30, in the hope that we won't be sitting here at

3   5 p.m. again.

4               MR. ROSENBERG:  Two housekeeping matters.  Plaintiffs

5   have indicated they plan to call two witnesses.  We would ask

6   them to identify those witnesses to us so we know who will be

7   testifying on plaintiffs' behalf.

8               THE COURT:  Well, that's -- I thought you already

9   knew who was here, but --

10              MR. GUPTA:  Matt Pfaff.

11              THE COURT:  You committed to having him all along.

12              MR. GUPTA:  Right.  We've identified him last week.

13  It's Matt Pfaff.  And then the other one is a person who

14  submitted a pseudonymous declaration.

15              THE COURT:  So you haven't determined yet whether

16  they're going to testify?

17              MR. GUPTA:  We haven't had a chance to speak with the

18  witness.

19              THE COURT:  All right.  Okay.

20              MR. ROSENBERG:  What is the pseudonymous name?

21              THE COURT:  You can give the pseudonymous name so

22  they can at lease prepare their cross.

23              MR. GUPTA:  It's Alex Doe.

24              THE COURT:  So now you know who you're looking for.

25              MR. ROSENBERG:  The second question is more of a
```

1    logistical question regarding the exhibits.  We, if this Court

2    will allow it, are prepared to re-file our exhibits by adding

3    exhibit numbers that correspond to the tabs in the binder, so

4    that to the extent that will help the Court with the clarity of

5    the record.  The exact same documents we already have to submit

6    and the two documents that we introduced today for the first

7    time, the OMB memo and the text message.

8         THE COURT:  So these weren't numbered as attachments

9    to the declarations with which they were submitted and the

10   notices with which they were submitted already as something?

11        MR. ROSENBERG:  So the documents -- most of the

12   documents in the CFPB binder are the emails that we submitted,

13   you know, in the two tranches, the first one on Tuesday and the

14   second one on Friday.  They were sequentially numbered with

15   Bates numbers.  Unfortunately, we didn't have time to add

16   exhibit numbers to those documents at that time.

17        The binder also includes the two Martinez

18   declarations which were also previously filed with the court

19   under separate exhibit tabs.  And what we would propose to do

20   is simply superimpose an exhibit number on each page of the

21   document that corresponds with the tab in the binder, so that

22   when we refer, for example, to tab 42, there will be a number

23   42 on each of those pages of the document, as well as the Bates

24   number to which we've all been referring.  I suppose the ECF

25   number at the top will get, like, superimposed.

1          THE COURT:  You're welcome to do that.  It just even

2     slows up further our trying to write an opinion based on it

3     because now the numbering system that we have been using, which

4     is your system, now we need to go through all our notes and

5     make sure we're talking about the same document.  But probably

6     for clarity sake it's a good thing to do, so you're welcome to

7     do it.

8          MR. ROSENBERG:  I only want to do it if the Court

9     believes it would be helpful.

10          THE COURT:  I think it would be a nice idea to have a

11     record of what you have moved in with individual exhibit

12     numbers.  So, go right ahead.  I'm not going to order you to do

13     it, just if you want to do it, do it.

14          MR. ROSENBERG:  One other -- since the Court referred

15     to ordering individual exhibit numbers, I believe we had an

16     agreement, since all of these exhibits were already on the

17     docket and were available for the Court, there was no need to

18     separately move in --

19          THE COURT:  Correct.  This is not a trial where we're

20     deciding what goes back to the jury room.  Everything you've

21     already given me was supported by a declaration as something

22     and they're in the record, in support of or in opposition to

23     the pending motion for preliminary injunction.  They're not in

24     the record for any other purpose.  You have to start all over

25     again, if there are depositions or summary judgment or all that

1    sort of thing, you'll have to call them something else.

2         But if you would like a clear record of what

3    transpired at this hearing, you are welcome to file these and

4    then they will have a name, and maybe use that name for them in

5    the future.  But, you're numbers, they are letters of the

6    alphabet.  And I don't think they have any more letters left,

7    unless we go with triple letters, which we're not going to do.

8         I think we know what we're doing about exhibits.

9         And I'm not going to ask you for an answer right now,

10   but I need you to consider the following thing:  You asked me,

11   when we were last here:  Oh, when are you going to decide this

12   by?  And I resisted telling you because I had not yet even had

13   this hearing or received everything that was submitted after

14   the hearing, which was substantial, and now this hearing isn't

15   even over.

16        I was prepared, before I took the bench, to say to

17   you, Can you continue what you've agreed to until Friday?  I

18   think it's the 21st, which was only four business days after

19   your agreement which ends on the 17th.  Now that I know -- I've

20   been in here all day and I didn't have the opportunity to write

21   and I don't have tomorrow afternoon to write -- I'm incapable

22   of telling you I could be done by that date.

23        But, I would be interested in knowing, tomorrow, if

24   the parties -- understanding that I'm trying to work with that

25   kind of expedition and so I would be targeting the following

1    week -- can agree to extend their agreement so it's parallel to

2    what's already binding you until I rule on the preliminary

3    injunction, with the understanding that I'm going to do

4    everything I can, assuming that this hearing ever ends, to get

5    it done by the week of -- whatever that week is -- the 24th.

6    Because the rest of my docket needs attention in between, and

7    certainly after whatever I do.

8          But I think we're now engaged in not just a legal

9    exercise, but a fact-finding exercise.  And you've both taken a

10    lot of time and a lot of effort to identify the documents that

11    you wanted me to look at and to consider it in connection with

12    his testimony and your argument, and you want me to do that

13    thoroughly and you want me to reach the right answer.  You

14    don't want me to rush it.  And that's in everybody's benefit.

15          So I would encourage you to think about having that

16    be an orderly and thoughtful process, while expedited, compared

17    to the typical summary judgment process, which gets balanced

18    against everything else you have on your docket.

19          So, think about that.  I would encourage you to be

20    open to that.  And I will see everybody tomorrow at 1:30.

21                   *  *  *

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3       I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                        Dated this 12th day of March, 2025

8

9

10                    _____

11                    Janice E. Dickman, CRR, CMR, CCR
                      Official Court Reporter
12                    Room 6523
                      333 Constitution Avenue, N.W.
13                    Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$711** [1] - 36:19

**/**

**/ask** [1] - 187:22

**0**

**00** [1] - 107:4
**00003** [2] - 87:21, 165:5
**00052** [1] - 105:11
**00079** [1] - 99:7
**00097** [1] - 84:23
**00114** [1] - 107:9

**1**

**1** [4] - 87:1, 87:6, 96:4, 138:7
**1,000** [3] - 53:6, 53:10, 53:16
**10** [5] - 47:15, 90:3, 92:16, 110:3, 138:19
**100** [1] - 129:21
**107** [2] - 41:18, 42:17
**10:27** [1] - 166:10
**10:33** [6] - 108:17, 109:5, 109:8, 109:25, 110:14, 112:3
**10th** [35] - 22:23, 23:19, 32:1, 45:10, 46:4, 52:10, 56:3, 61:6, 66:5, 70:17, 77:14, 78:8, 78:9, 86:25, 87:3, 104:13, 106:2, 107:6, 126:23, 127:17, 128:4, 128:5, 128:7, 136:22, 137:11, 141:9, 143:7, 143:21, 148:8, 148:11, 148:25, 166:22, 184:9, 206:22, 207:14
**11** [7] - 48:17, 48:19, 68:15, 176:9, 177:22, 179:10, 234:9
**114** [1] - 107:18
**1175** [1] - 51:5
**11:30ish** [1] - 234:10
**11th** [8] - 42:3, 42:25, 128:8, 161:18, 166:8, 167:4, 173:6, 174:7
**12** [2] - 41:18, 42:16
**1200** [4] - 128:25, 129:2, 129:9, 132:21
**12:13** [2] - 108:22, 109:3
**12th** [1] - 166:8
**13** [3] - 93:8, 93:18,

94:24
**130** [1] - 52:4
**13th** [6] - 128:3, 128:10, 129:18, 130:11, 138:8, 139:22
**14** [1] - 94:4
**14th** [16] - 56:3, 104:14, 132:21, 132:24, 133:1, 133:12, 133:13, 141:20, 146:1, 148:25, 158:23, 168:3, 177:13, 180:21, 206:11, 232:8
**16** [5] - 30:1, 94:11, 95:10, 95:18, 102:13
**17** [1] - 95:9
**1700** [1] - 14:23
**17th** [2] - 142:20, 238:19
**18** [7] - 29:1, 29:4, 29:5, 70:6, 81:12, 84:16, 179:24
**18th** [3] - 73:8, 168:11, 168:15
**19** [3] - 180:24, 187:14, 216:25
**1999** [1] - 9:22
**19th** [7] - 76:4, 76:10, 142:15, 143:9, 168:13, 169:20
**1:30** [4] - 133:22, 234:22, 235:2, 239:20
**1:36** [2] - 133:23, 133:25
**1st** [4] - 15:6, 15:11, 15:15, 192:5

**2**

**2** [10] - 62:19, 62:21, 87:2, 87:20, 88:17, 89:18, 102:3, 135:13, 154:19, 165:4
**20** [5] - 31:23, 31:25, 86:17, 96:7, 186:24
**2000s** [1] - 18:16
**2001** [1] - 10:7
**2007** [3] - 10:7, 17:11, 17:22
**2010** [1] - 12:8
**2011** [1] - 12:10
**2023** [5] - 13:24, 14:8, 37:16, 37:19, 69:8
**2025** [27] - 105:19, 112:24, 177:10, 177:13, 178:7, 180:19, 182:12, 182:15, 183:2, 195:12, 199:1, 199:10, 199:15, 202:7, 202:16, 203:5, 203:12, 203:19,

203:23, 204:2, 211:22, 212:21, 212:24, 215:24, 217:24, 224:9, 224:11
**20th** [3] - 150:15, 150:22, 153:18
**21** [1] - 189:3
**21st** [2] - 195:12, 238:18
**22** [16] - 16:22, 29:1, 29:4, 31:24, 31:25, 35:6, 35:8, 35:12, 105:8, 105:10, 107:25, 108:2, 111:12, 196:5, 197:25, 211:11
**23** [1] - 192:7
**24** [5] - 15:17, 24:18, 96:22, 160:8, 161:7
**24th** [11] - 124:10, 124:18, 125:6, 126:1, 158:23, 184:25, 186:17, 188:9, 189:22, 190:9, 239:5
**25** [1] - 98:1
**25-381** [1] - 3:3
**25th** [3] - 177:10, 178:7, 179:10
**26** [1] - 95:20
**26th** [2] - 157:1, 200:18, 201:18
**27** [4] - 56:21, 76:19, 199:15, 202:2
**27th** [19] - 66:4, 94:12, 97:8, 105:19, 108:3, 111:12, 111:13, 180:19, 198:18, 199:1, 199:7, 199:10, 201:21, 203:12, 209:2, 210:13, 212:6, 216:20, 217:4
**28** [1] - 48:4
**28th** [8] - 106:11, 111:15, 111:18, 158:23, 182:5, 211:22, 212:7, 217:4
**2nd** [22] - 76:15, 84:24, 98:7, 99:8, 104:18, 107:11, 108:6, 108:7, 108:21, 109:17, 110:16, 111:18, 124:15, 124:24, 127:10, 159:10, 198:14, 202:7, 202:16, 204:2, 210:21, 212:24

**3**

**3** [2] - 97:11, 198:25
**30** [8] - 47:8, 71:13, 86:17, 86:19, 98:6, 150:11, 168:25, 202:19

**30-day** [2] - 48:10, 150:12
**31** [1] - 35:9
**31-1** [6] - 16:18, 16:22, 29:1, 31:23, 35:8, 35:12
**31st** [1] - 15:24
**32** [2] - 99:6, 202:25
**33** [1] - 212:13
**34** [1] - 12:8
**35** [3] - 12:9, 101:22, 104:17
**36** [1] - 81:13
**365** [1] - 87:16
**38** [4] - 81:13, 81:14, 84:22, 172:22
**39** [2] - 180:25, 217:16
**3:30** [1] - 66:10
**3rd** [28] - 16:25, 19:6, 64:11, 76:14, 99:16, 108:14, 108:22, 109:3, 109:5, 109:8, 109:11, 110:1, 110:14, 111:7, 112:3, 182:12, 182:13, 182:15, 203:5, 203:19, 203:23, 210:23, 212:21, 216:20, 217:24, 219:17, 224:10, 224:11

**4**

**4** [4] - 22:15, 162:5, 162:18, 162:23
**404** [3] - 90:9, 91:5, 116:5
**41** [1] - 216:24
**42** [2] - 236:22, 236:23
**43** [2] - 100:20, 180:25
**44** [8] - 107:3, 107:9, 108:5, 109:4, 109:10, 110:14, 112:23, 215:5
**45** [2] - 108:18, 109:13
**48** [2] - 15:17, 24:18
**49** [4] - 72:5, 73:6, 167:14, 168:8
**4th** [5] - 112:24, 182:13, 182:15, 183:2, 224:9

**5**

**5** [4] - 48:17, 62:21, 194:13, 235:3
**50** [7] - 75:4, 167:6, 169:14, 170:5, 170:12, 211:12
**508** [7] - 218:18, 218:20, 222:12, 222:15, 222:23,

222:25, 223:2
**51** [5] - 79:1, 170:13, 170:14, 170:23, 211:13
**52** [1] - 211:12
**53** [1] - 91:3
**55** [1] - 116:10
**56** [12] - 16:5, 16:12, 28:24, 29:3, 30:1, 31:22, 35:8, 35:10, 102:12, 198:20, 198:22, 204:10
**56-1** [1] - 162:19
**57** [1] - 198:24
**5:45** [1] - 20:4
**5:59** [1] - 99:16

## 6

**6** [11] - 19:21, 49:1, 78:8, 161:24, 161:25, 162:19, 193:25, 195:7, 203:7, 215:23, 217:15
**60** [5] - 47:8, 48:4, 48:17, 150:13
**60-1** [1] - 41:18
**60-day** [2] - 47:5, 48:10
**64** [1] - 95:21
**65** [1] - 202:1
**66-1** [2] - 48:4, 48:16
**6:15** [1] - 20:4
**6:30** [1] - 20:4
**6th** [2] - 21:5, 39:18

## 7

**7** [3] - 50:23, 78:8, 176:5
**700** [1] - 50:25
**711** [1] - 39:7
**720** [1] - 50:24
**73** [1] - 202:18
**75** [2] - 51:23, 51:25
**7th** [18] - 21:4, 21:6, 21:11, 21:18, 22:9, 22:10, 23:12, 25:10, 26:22, 30:5, 33:17, 39:18, 125:12, 125:15, 159:18, 159:19, 159:20, 192:17

## 8

**8** [4] - 78:8, 178:5, 198:24, 213:18
**85** [1] - 51:23
**8th** [21] - 23:8, 30:4, 39:19, 39:20, 66:8, 102:15, 106:3, 106:12, 107:1, 107:5, 108:15,

125:15, 137:7, 159:22, 160:22, 206:24, 207:1, 207:2, 207:9, 211:25, 212:12

## 9

**9** [7] - 16:21, 16:22, 48:19, 89:17, 92:13, 200:5, 217:15
**90** [1] - 49:2
**900** [2] - 50:23, 50:25
**96** [1] - 172:24
**99** [1] - 217:16
**9th** [1] - 78:8, 78:9

## A

**a.m** [9] - 99:16, 109:5, 109:8, 110:3, 110:14, 112:3, 138:19, 166:10, 203:7
**ability** [7] - 42:22, 75:19, 85:16, 89:21, 93:24, 187:3, 225:6
**able** [22] - 10:14, 20:18, 65:15, 65:17, 91:23, 106:10, 115:24, 123:2, 123:18, 131:22, 135:23, 139:10, 141:16, 166:14, 190:23, 192:23, 193:18, 195:2, 197:12, 209:16, 222:18, 227:23
**abnormal** [1] - 34:1
**abolished** [1] - 145:17
**absent** [2] - 152:17, 152:19
**Absolutely** [1] - 47:18
**absolutely** [1] - 5:9, 45:11, 50:6, 55:1, 65:14, 130:1, 143:14, 146:6, 159:16, 189:12, 193:5
**acceptable** [1] - 87:10
**accepted** [1] - 45:21
**access** [25] - 22:1, 22:11, 23:16, 24:9, 24:10, 24:22, 24:25, 25:11, 25:13, 25:15, 25:18, 26:7, 33:21, 33:24, 75:19, 78:12, 90:17, 90:18, 176:24, 192:23, 196:15, 196:16, 222:4, 222:18, 225:9
**accessed** [1] - 26:6
**Accessibility** [3] - 217:18, 218:1, 223:21
**accessibility** [2] -

218:20, 221:23
**accommodate** [1] - 221:20
**accommodated** [1] - 221:25
**accommodation** [3] - 182:3, 221:1, 221:14
**accommodations** [3] - 218:5, 218:15, 219:8
**accomplish** [3] - 32:7, 32:12, 146:5
**accordance** [2] - 82:3, 206:16
**according** [1] - 220:7
**account** [11] - 34:15, 44:15, 44:16, 44:17, 64:9, 111:10, 179:3, 179:14, 232:18
**accountable** [1] - 187:17
**accountant's** [1] - 24:3
**accounts** [4] - 34:13, 34:16, 67:2, 127:17
**accurate** [2] - 127:14, 127:18
**accurately** [1] - 116:16
**acknowledge** [1] - 113:13
**acquisition** [1] - 143:19
**acquisitions** [1] - 143:17
**across-the-board** [2] - 152:14, 206:5
**Act** [6] - 96:4, 146:22, 191:24, 192:9, 193:9, 194:21
**acted** [1] - 191:7
**Acting** [31] - 15:16, 30:3, 30:16, 32:2, 33:16, 35:15, 36:16, 49:8, 50:10, 56:13, 61:13, 75:13, 77:14, 87:17, 89:7, 102:14, 121:11, 130:13, 136:21, 138:21, 138:23, 140:10, 159:17, 161:18, 163:4, 163:7, 169:24, 184:11, 187:15, 208:8, 229:25
**acting** [30] - 15:16, 15:20, 15:23, 17:1, 17:2, 22:24, 23:14, 29:12, 30:5, 32:17, 38:20, 56:13, 59:7, 71:15, 78:16, 95:14, 96:8, 96:13, 106:25, 125:7, 137:23, 138:18, 143:12, 145:1, 145:2,

145:4, 158:5, 160:9, 161:6, 206:16
**action** [3] - 56:3, 95:2, 127:16
**Action** [1] - 16:4
**actions** [2] - 63:14, 153:8
**activated** [4] - 199:2, 199:8, 218:2, 220:10
**activates** [1] - 203:9
**activating** [1] - 201:4
**active** [1] - 145:5
**actively** [1] - 119:15
**activities** [14] - 31:1, 60:16, 96:19, 99:12, 102:11, 105:14, 109:20, 112:7, 112:8, 113:7, 113:8, 113:20, 118:16, 118:20
**activity** [6] - 30:14, 106:13, 109:19, 110:18, 112:6, 212:1
**actor** [1] - 114:14
**actual** [1] - 137:1
**ADAM** [1] - 9:4
**Adam** [4] - 9:10, 75:11, 106:12, 109:16
**adamantly** [1] - 118:16
**add** [2] - 233:8, 236:15
**added** [2] - 33:13, 102:24
**adding** [1] - 236:2
**addition** [3] - 125:24, 175:19, 199:22
**additional** [9] - 6:21, 21:14, 38:21, 175:19, 177:20, 190:17, 193:2, 193:3, 199:25
**address** [5] - 8:12, 40:15, 42:4, 60:13, 165:19
**addresses** [1] - 78:14
**administration** [7] - 14:10, 17:5, 17:8, 31:19, 36:16, 69:23, 215:1
**Administration** [3] - 70:24, 151:9, 151:21
**administrative** [18] - 14:3, 52:7, 52:11, 67:25, 98:11, 98:16, 113:19, 122:3, 143:13, 143:15, 144:12, 206:11, 206:17, 207:23, 207:24, 213:6, 216:10, 216:13
**admission** [1] - 104:11
**admitted** [1] - 54:14
**adults** [2] - 23:5,

141:16
**advance** [1] - 47:6
**advice** [3] - 92:10, 109:25, 213:25
**advise** [3] - 148:6, 181:16, 187:19
**advised** [4] - 40:9, 157:21, 158:8, 181:13
**advising** [2] - 181:22, 192:21
**advisor** [3] - 10:9, 43:22, 78:22
**advisors** [1] - 144:20
**Advisory** [1] - 96:3
**advisory** [4] - 78:21, 150:25, 151:8, 151:17
**advocacy** [1] - 123:24
**affairs** [4] - 95:14, 95:16, 103:4, 118:24
**Affairs** [2] - 58:23, 164:3
**affected** [2] - 35:1, 149:22
**affiliated** [5] - 33:3, 33:7, 34:9, 63:21, 68:24
**afield** [1] - 38:12
**afternoon** [11] - 21:14, 64:10, 64:15, 124:6, 233:8, 234:3, 234:11, 234:13, 234:15, 234:22, 238:21
**afterwards** [1] - 123:12
**agencies** [12] - 14:25, 34:5, 46:8, 61:11, 61:12, 64:18, 71:14, 74:1, 103:21, 147:18, 222:9, 232:11
**Agency** [13] - 14:17, 14:20, 37:20, 45:3, 45:4, 55:10, 62:22, 70:13, 103:5, 221:19, 230:2, 230:9
**agency** [68] - 14:24, 18:24, 25:14, 30:7, 30:22, 30:24, 34:2, 34:22, 35:2, 36:2, 37:25, 39:2, 49:21, 53:13, 53:20, 54:15, 55:20, 60:16, 63:13, 69:13, 72:18, 82:1, 83:16, 84:19, 88:12, 114:13, 117:1, 125:4, 126:9, 126:13, 126:20, 126:21, 127:5, 131:22, 143:13, 144:12, 146:9, 147:22, 147:23, 148:23, 150:10, 151:21, 151:22,

157:20, 158:1, 158:20, 160:14, 161:10, 161:16, 183:17, 183:19, 186:8, 188:3, 188:24, 190:21, 191:13, 204:18, 204:20, 204:22, 205:9, 206:5, 208:15, 222:14, 222:22, 230:5, 230:7, 230:18
**agency's** [2] - 80:20, 199:3
**Agency's** [1] - 119:22
**agency-wide** [1] - 222:14
**ago** [2] - 64:17, 67:15
**agree** [2] - 8:18, 239:1
**agreed** [5] - 5:18, 6:1, 141:20, 152:18, 238:17
**agreed-upon** [2] - 5:18, 152:18
**agreement** [4] - 6:22, 237:16, 238:19, 239:1
**agreements** [1] - 232:13
**agrees** [1] - 114:17
**ahead** [18] - 4:21, 12:12, 26:20, 31:20, 34:6, 60:17, 61:3, 74:19, 88:15, 91:2, 120:21, 124:3, 132:11, 136:16, 183:8, 191:20, 229:21, 237:12
**aiming** [1] - 54:11
**air** [1] - 191:2
**al** [2] - 3:3, 3:4
**alert** [1] - 32:17
**Alex** [1] - 127:8, 127:11, 235:23
**all-hands** [2] - 108:21, 111:21
**allegations** [1] - 115:12
**Allison** [1] - 3:14
**allocated** [2] - 27:18, 161:11
**allow** [3] - 10:23, 233:12, 236:2
**allowed** [5] - 25:13, 33:21, 37:15, 222:18, 233:9
**alluded** [1] - 96:23
**almost** [7] - 22:6, 22:8, 40:23, 120:13, 130:13, 180:21, 204:15
**aloud** [1] - 175:4
**alphabet** [1] - 238:6
**alternative** [1] - 190:10, 190:12, 190:20
**altogether** [2] -

129:10, 129:24
**America** [1] - 38:4
**American** [1] - 12:19
**amount** [7] - 38:16, 38:19, 40:19, 40:20, 160:13, 160:14, 196:12
**analysis** [11] - 63:17, 69:5, 69:7, 70:19, 70:21, 79:23, 84:20, 90:11, 91:4, 91:5, 121:16
**analytics** [2] - 182:19, 182:21
**analyzing** [1] - 63:3
**announced** [1] - 56:13
**answer** [24] - 37:3, 67:9, 68:3, 74:17, 77:3, 80:22, 84:15, 84:20, 88:8, 99:24, 100:1, 104:7, 106:15, 155:10, 172:10, 173:13, 174:3, 184:4, 201:12, 205:10, 212:4, 233:1, 238:9, 239:13
**answered** [2] - 100:1, 183:12
**Anthony** [2] - 79:3, 79:22
**anti** [3] - 182:4, 221:15
**anti-bullying** [1] - 221:15
**anti-harassment** [2] - 182:4, 221:15
**anticipate** [4] - 8:10, 8:14, 38:17, 55:23
**anticipated** [5] - 5:22, 15:9, 17:7, 53:2, 104:13
**anticipating** [1] - 20:9
**antivirus** [3] - 165:17, 197:5, 197:8
**anytime** [1] - 147:9
**apologies** [1] - 165:4
**Apologies** [1] - 202:24
**apologize** [10] - 44:4, 110:24, 146:25, 152:1, 154:12, 155:11, 167:9, 170:14, 182:13, 198:24
**APOR** [2] - 89:10, 89:13
**appear** [2] - 24:18, 134:25
**appearance** [2] - 3:6, 90:10
**appeared** [1] - 30:21
**applicable** [1] - 154:24
**application** [2] - 87:15, 88:3
**applied** [1] - 51:11
**applies** [1] - 213:22

**apply** [2] - 62:18, 88:22
**applying** [1] - 102:20
**appointed** [6] - 18:24, 78:7, 125:12, 130:14, 159:17, 184:11
**appointment** [2] - 26:18, 45:24
**appreciate** [4] - 74:1, 86:11, 170:18, 220:24
**apprised** [1] - 138:21
**approach** [13] - 3:5, 7:7, 14:16, 14:21, 58:4, 61:20, 70:4, 82:18, 85:13, 154:10, 159:12, 159:15, 223:8
**approaches** [1] - 23:3
**approaching** [1] - 64:18
**appropriate** [2] - 8:12, 234:2
**appropriated** [8] - 37:25, 38:1, 45:4, 53:12, 69:9, 74:2, 74:4
**appropriations** [2] - 36:1, 36:2
**approval** [13] - 32:18, 47:5, 48:9, 57:8, 59:9, 59:17, 94:1, 95:3, 96:1, 98:2, 150:12, 205:2
**approve** [4] - 59:12, 83:23, 92:25, 96:2
**approved** [14] - 57:10, 58:5, 58:25, 59:5, 82:21, 82:22, 94:5, 96:5, 99:23, 145:19, 145:21, 209:17, 227:25, 228:1
**area** [4] - 114:9, 145:20, 199:4
**areas** [9] - 46:16, 48:24, 57:4, 57:14, 68:23, 80:8, 95:25, 117:3, 175:22
**argument** [5] - 4:11, 13:2, 115:5, 239:12
**argumentive** [1] - 142:6
**arising** [1] - 115:3
**arm** [2] - 96:14
**arms** [1] - 74:24
**arrival** [2] - 125:6, 187:15
**arrived** [4] - 27:17, 37:16, 39:19, 56:4
**ASAP** [1] - 164:13
**ascertain** [1] - 177:20
**assertion** [1] - 82:12
**assess** [3] - 187:16, 201:1, 214:24

**assessed** [2] - 77:25, 79:25
**assessing** [4] - 64:16, 125:7, 125:24, 202:12
**assessment** [5] - 200:24, 201:9, 201:15, 201:19, 226:8
**assigned** [2] - 20:20, 55:20
**assignment** [1] - 20:21
**assignments** [1] - 225:6
**assist** [1] - 48:1
**assistance** [3] - 18:16, 22:16, 120:22
**assistant** [4] - 93:20, 211:17, 224:4, 224:6
**associate** [7] - 26:10, 88:18, 95:14, 96:8, 96:9, 96:13, 165:9
**associated** [4] - 34:23, 81:3, 152:15, 206:5
**Association** [3] - 3:11, 3:17, 38:4
**associations** [2] - 10:4, 3:7
**assume** [1] - 106:16
**assumes** [3] - 135:1, 155:9, 157:4
**assuming** [4] - 91:19, 151:4, 178:18, 239:4
**assumption** [2] - 52:9, 161:11
**attached** [1] - 218:15
**attachments** [4] - 28:25, 35:7, 197:8, 236:8
**attack** [2] - 191:10, 191:11
**attempt** [7] - 38:15, 44:6, 94:18, 126:13, 126:20, 126:21, 127:4
**attempted** [1] - 94:23
**attempting** [1] - 32:7
**attend** [1] - 46:4
**attention** [5] - 48:19, 191:4, 204:11, 208:12, 239:6
**attesting** [1] - 127:4
**attorney** [6] - 41:10, 124:7, 178:10, 178:14, 179:13, 192:20
**attorneys** [2] - 45:19, 45:21
**audibly** [1] - 5:11
**audit** [9] - 22:7, 22:9, 22:17, 22:22, 24:1, 24:3, 24:4, 24:6
**authority** [11] - 4:7,

4:8, 10:22, 40:17, 59:15, 63:13, 63:15, 83:24, 95:25, 98:16, 114:17
**authorization** [10] - 12:25, 13:3, 50:15, 75:13, 81:17, 97:20, 169:23, 170:2, 209:11, 210:25
**authorize** [5] - 109:18, 110:17, 112:6, 163:16, 217:3
**authorized** [28] - 57:14, 60:9, 66:7, 68:1, 71:7, 76:16, 76:20, 77:2, 77:10, 82:4, 92:6, 94:25, 97:9, 108:25, 109:1, 114:15, 114:24, 155:14, 156:7, 156:12, 167:21, 207:10, 207:13, 214:16, 216:18, 216:19, 216:21, 216:22
**auto** [1] - 231:15
**automatic** [2] - 197:14, 197:16
**available** [15] - 6:8, 6:9, 6:10, 13:20, 37:22, 43:18, 49:7, 50:7, 53:16, 181:18, 181:20, 193:1, 195:1, 231:11, 237:17
**aware** [51] - 27:22, 27:25, 41:2, 41:9, 46:1, 57:10, 58:2, 60:2, 60:6, 63:19, 64:2, 76:4, 76:7, 81:2, 84:5, 85:25, 100:9, 109:22, 109:23, 113:10, 116:4, 117:22, 117:23, 127:2, 134:3, 140:6, 141:19, 158:16, 161:17, 168:4, 168:10, 184:19, 188:13, 189:18, 189:19, 189:20, 208:1, 208:3, 208:4, 208:5, 208:6, 208:13, 208:14, 215:13, 222:17, 222:21, 226:19, 226:22, 229:16, 229:18

---

## B

**baby** [1] - 27:23
**background** [2] - 11:2, 60:10
**backlash** [1] - 89:3
**backlog** [3] - 90:3, 226:20, 227:5
**backup** [1] - 176:21

**bad** [2] - 114:14, 191:7
**bailiwick** [1] - 90:4
**balanced** [1] - 239:17
**Bank** [3] - 13:17, 14:2, 44:15
**banks** [1] - 103:7
**bar** [1] - 183:15
**bargaining** [1] - 232:12
**based** [34] - 17:15, 20:17, 22:4, 30:23, 36:7, 51:7, 53:14, 54:20, 58:25, 62:2, 65:12, 113:13, 114:20, 119:4, 129:25, 142:14, 148:11, 149:12, 151:14, 152:16, 172:2, 174:14, 183:1, 187:24, 188:2, 199:21, 203:11, 203:13, 211:3, 213:22, 214:25, 227:15, 232:14, 237:2
**basement** [2] - 27:18, 27:21
**basing** [1] - 212:11
**basis** [5] - 11:16, 17:23, 35:20, 49:13, 159:6
**Bates** [47] - 72:6, 73:7, 75:5, 81:13, 81:14, 84:23, 87:2, 87:20, 99:7, 107:3, 116:11, 122:8, 122:17, 122:19, 123:9, 123:10, 161:23, 162:1, 162:11, 162:14, 162:15, 162:16, 162:18, 162:23, 165:4, 166:6, 167:7, 170:6, 170:23, 172:23, 176:8, 178:4, 180:25, 194:1, 195:4, 195:7, 200:6, 202:1, 202:18, 204:9, 211:11, 212:14, 215:6, 216:24, 217:15, 236:15, 236:23
**bathrooms** [1] - 87:25
**became** [8] - 12:16, 13:20, 15:16, 22:25, 47:16, 56:5, 156:3, 208:5
**become** [5] - 13:23, 27:5, 53:8, 64:1, 137:19
**becoming** [1] - 141:14
**beforehand** [1] - 5:18
**began** [2] - 57:4, 210:10
**begin** [3] - 45:6, 46:10, 57:8
**beginning** [7] - 79:20,

111:11, 114:5, 121:8, 136:18, 175:21, 178:5
**behalf** [8] - 3:8, 3:25, 23:15, 62:10, 108:9, 163:4, 163:7, 235:7
**behind** [5] - 28:4, 40:17, 42:13, 95:18, 188:17
**belief** [1] - 107:1
**believes** [2] - 136:12, 237:9
**bell** [1] - 38:2
**below** [1] - 95:5
**bench** [1] - 238:16
**benefit** [1] - 239:14
**BENNETT** [92] - 49:11, 49:16, 97:4, 110:19, 110:24, 122:7, 122:18, 123:7, 124:5, 126:18, 126:19, 129:17, 133:3, 133:16, 133:17, 135:10, 136:17, 138:6, 139:21, 141:7, 142:8, 142:9, 144:4, 144:24, 146:20, 149:14, 150:9, 154:10, 154:12, 154:14, 155:12, 155:22, 156:1, 156:2, 156:25, 157:10, 159:8, 160:16, 160:17, 161:5, 162:7, 162:13, 162:22, 166:3, 166:6, 166:18, 168:8, 168:9, 170:14, 170:21, 170:22, 171:10, 171:12, 172:18, 174:5, 185:22, 186:16, 187:5, 187:12, 187:21, 187:23, 188:22, 188:23, 191:21, 191:22, 194:11, 194:17, 194:18, 198:10, 198:23, 203:25, 206:2, 207:20, 207:21, 210:13, 210:18, 222:11, 224:18, 224:21, 225:18, 225:22, 226:6, 226:15, 226:18, 227:14, 228:25, 229:3, 229:19, 229:22, 230:24, 232:21, 234:19
**Bennett** [2] - 3:12, 124:6
**Bessent** [7] - 15:16, 15:22, 17:20, 19:6, 30:6, 30:25
**Bessent's** [2] - 30:9, 30:16
**best** [4] - 116:17,

118:7, 157:22, 195:18
**better** [3] - 9:15, 83:20, 232:25
**between** [21] - 33:19, 39:18, 56:6, 58:9, 84:9, 86:4, 89:5, 107:25, 109:24, 117:24, 129:12, 133:20, 140:3, 142:19, 157:1, 170:19, 188:17, 202:21, 212:15, 216:20, 239:6
**Biden** [2] - 18:3
**big** [5] - 71:4, 83:7, 160:23, 204:20, 204:21
**biggest** [1] - 147:4
**bill** [2] - 182:22, 183:9
**bills** [1] - 44:16
**binder** [54] - 7:15, 7:24, 8:1, 8:3, 8:5, 8:20, 16:8, 16:11, 29:3, 41:16, 41:17, 42:8, 48:2, 48:16, 61:17, 72:3, 72:4, 73:6, 81:12, 84:22, 87:6, 102:13, 105:11, 113:25, 116:11, 122:13, 122:14, 122:16, 162:12, 164:19, 165:3, 167:10, 174:21, 176:5, 182:11, 193:25, 195:5, 198:21, 200:6, 202:3, 202:19, 206:15, 212:14, 215:5, 215:16, 223:4, 223:25, 224:19, 236:3, 236:12, 236:17, 236:21
**binders** [13] - 7:5, 7:7, 7:13, 7:23, 8:22, 8:23, 8:24, 9:1, 16:3, 41:15, 72:3, 122:7
**binding** [1] - 239:2
**bishop** [1] - 43:2
**Bishop** [1] - 43:21
**bit** [21] - 8:2, 8:4, 10:19, 11:6, 16:8, 16:13, 30:8, 30:9, 34:17, 66:21, 75:16, 94:11, 105:24, 108:12, 115:5, 136:23, 142:1, 148:14, 170:17, 190:16, 215:10
**blacked** [1] - 134:25
**Blake** [2] - 127:19, 127:21
**blessing** [1] - 146:4
**block** [1] - 215:21
**blunt** [1] - 110:18
**board** [6] - 12:11, 41:12, 65:25, 152:14, 205:22, 206:5

**Board** [2] - 35:16, 41:8
**boards** [3] - 150:25, 151:8, 151:17
**bold** [1] - 109:14
**bottom** [18] - 65:24, 72:7, 79:3, 87:1, 87:2, 91:6, 105:17, 107:10, 107:13, 112:4, 122:10, 122:20, 154:19, 162:1, 174:22, 179:1, 201:8, 224:22
**bounds** [1] - 83:17
**box** [1] - 117:6
**boxes** [1] - 118:19
**boys** [1] - 27:8
**Brad** [1] - 3:23
**brain** [1] - 194:3
**branch** [6] - 17:11, 17:13, 17:15, 17:22, 108:20, 115:2
**Branch** [2] - 3:25, 4:2
**break** [6] - 86:14, 101:24, 194:2, 194:5, 194:11
**brief** [1] - 102:10
**briefly** [5] - 35:18, 191:23, 198:12, 203:17, 223:3
**bring** [4] - 8:25, 18:24, 98:16, 114:4
**broad** [1] - 191:8
**broadcast** [2] - 4:8, 13:6
**broader** [2] - 8:4, 112:11
**brought** [2] - 79:22, 83:23
**Brown** [4] - 223:25, 224:3, 224:23, 225:14
**bucket** [1] - 103:12
**budget** [3] - 69:17, 70:5, 84:16
**Budget** [2] - 56:5, 61:15
**budgetary** [3] - 160:6, 160:8, 160:12
**budgets** [1] - 232:12
**build** [1] - 10:22, 11:22, 18:8, 18:25, 37:15, 199:17
**building** [14] - 19:25, 27:14, 27:17, 28:21, 28:23, 29:20, 29:23, 66:22, 66:24, 67:1, 152:9, 159:1, 192:17, 230:12
**buildings** [1] - 231:1
**built** [4] - 14:24, 37:15, 37:18, 37:19
**bullet** [5] - 30:10,

106:1, 188:14, 207:10, 213:18
**bullets** [2] - 30:7, 102:18
**bullying** [1] - 221:15
**bunch** [1] - 218:24
**burden** [3] - 4:22, 5:23, 6:16
**Bureau** [54] - 10:21, 10:22, 10:24, 14:14, 14:15, 21:21, 22:21, 23:15, 26:11, 31:14, 34:16, 36:19, 38:3, 57:21, 62:18, 63:5, 74:22, 81:6, 81:9, 81:24, 82:3, 84:14, 85:10, 85:11, 85:14, 85:18, 109:19, 112:8, 116:15, 116:16, 125:8, 125:24, 128:24, 129:6, 129:23, 150:15, 150:19, 150:23, 151:12, 152:15, 160:5, 161:14, 161:20, 179:5, 180:5, 186:3, 186:11, 186:14, 186:17, 187:16, 220:1, 220:4, 223:9
**Bureau's** [8] - 38:17, 44:9, 74:24, 88:22, 126:2, 142:24, 159:12, 198:1
**burned** [1] - 92:4
**Bush** [2] - 18:1, 18:17
**business** [4] - 44:10, 135:19, 135:23, 238:18
**BY** [121] - 9:7, 9:18, 12:13, 13:9, 18:7, 19:15, 20:6, 20:22, 21:9, 23:24, 26:21, 29:15, 29:25, 31:21, 32:15, 32:25, 34:7, 36:5, 37:7, 37:12, 39:11, 39:25, 41:1, 42:19, 44:5, 44:21, 47:20, 50:1, 51:1, 52:23, 56:11, 61:5, 61:25, 64:6, 65:3, 67:13, 68:5, 68:19, 71:25, 74:20, 75:24, 77:5, 78:10, 81:1, 82:17, 83:10, 84:4, 85:24, 86:24, 87:8, 88:16, 91:1, 92:12, 93:7, 93:17, 94:10, 95:8, 97:18, 97:25, 99:5, 100:18, 101:15, 102:8, 104:2, 104:9, 107:8, 108:11, 112:21, 113:5, 116:2, 118:6,

118:23, 119:18, 120:15, 124:5, 126:19, 129:17, 133:3, 133:17, 135:10, 136:17, 138:6, 139:21, 141:7, 144:24, 146:20, 149:14, 150:9, 154:14, 155:12, 156:2, 156:25, 157:10, 159:8, 160:17, 161:5, 162:22, 166:18, 170:22, 171:12, 172:18, 174:5, 185:22, 186:16, 187:5, 188:23, 191:22, 194:18, 198:10, 198:23, 203:25, 206:2, 210:18, 222:11, 224:21, 226:6, 226:18, 227:14, 229:3, 229:22, 230:24

## C

**calculations** [1] - 53:15
**calendar** [1] - 234:13
**Calvin** [1] - 105:18
**cancel** [5] - 71:20, 168:24, 193:22, 193:23, 194:23
**canceling** [2] - 121:15, 173:7
**cancellation** [3] - 161:19, 163:10, 163:17
**cancellations** [1] - 180:16
**cancelled** [23] - 74:12, 165:23, 165:24, 173:6, 173:8, 174:6, 176:25, 177:1, 177:4, 177:24, 181:7, 194:25, 195:24, 195:25, 197:11, 217:13, 218:5, 220:11, 222:12, 223:1, 230:25, 231:6, 231:20
**cannot** [5] - 68:3, 89:15, 134:13, 217:8, 234:8
**cap** [7] - 53:13, 69:16, 69:17, 160:6, 160:8, 160:12, 161:2
**capabilities** [1] - 85:6
**capacities** [2] - 85:3, 85:6
**capacity** [3] - 61:14, 62:7, 230:7
**capital** [10] - 11:3, 11:20, 11:21, 14:5, 22:2, 53:4, 53:24, 65:8, 156:21, 206:10
**car** [1] - 27:9

**card** [1] - 177:17
**cards** [10] - 27:15, 151:20, 151:22, 152:3, 183:14, 183:17, 183:19, 183:21
**career** [7] - 9:24, 27:12, 27:25, 28:9, 45:17, 184:21, 205:25
**careful** [3] - 172:12, 192:21, 192:22
**cares** [3] - 191:13, 191:14
**carry** [6] - 39:23, 40:10, 84:14, 92:24, 109:20, 113:7
**cascade** [1] - 101:6
**case** [39] - 3:3, 13:2, 16:14, 16:18, 38:10, 45:21, 60:3, 60:7, 69:8, 70:14, 71:1, 73:17, 77:23, 84:12, 89:25, 119:11, 124:9, 132:24, 153:19, 167:25, 168:2, 176:3, 178:20, 180:7, 182:23, 198:12, 198:17, 199:11, 199:13, 199:14, 199:15, 201:24, 203:12, 208:5, 208:16, 211:2, 218:25, 219:1, 219:4
**caseload** [1] - 119:25
**cases** [17] - 11:4, 58:12, 58:13, 58:19, 58:21, 88:14, 90:21, 120:2, 120:5, 120:6, 120:8, 169:6, 182:3, 186:21, 214:21, 217:7, 217:11
**Casey** [1] - 216:5
**Cassandra** [7] - 105:18, 211:14, 211:24, 212:7, 212:16, 213:2, 213:20
**categories** [4] - 45:12, 45:14, 87:11, 103:12
**category** [4] - 45:16, 45:22, 51:9
**causes** [1] - 180:17
**caution** [1] - 31:17
**CC** [1] - 41:25
**CC'd** [2] - 163:2, 176:14
**CCed** [1] - 228:3
**CCs** [1] - 202:10
**CDFI** [4] - 12:17, 12:21, 18:14, 18:16
**cease** [5] - 30:14, 30:15, 102:19, 106:13, 211:25

**ceased** [1] - 15:7
**Center** [7] - 3:9, 3:10, 76:20, 100:7, 190:1, 190:22, 192:24
**center** [5] - 88:22, 89:1, 90:7, 190:10, 197:2
**centric** [1] - 14:17
**certain** [15] - 31:1, 40:19, 87:11, 97:3, 107:1, 107:23, 151:19, 170:8, 170:24, 170:25, 173:8, 183:23, 183:24, 215:2
**certainly** [6] - 6:7, 15:2, 25:21, 82:1, 107:6, 239:7
**CFO** [7] - 42:22, 43:7, 70:11, 71:2, 79:25, 172:2, 209:15
**CFO's** [1] - 43:8
**CFOs** [1] - 71:19
**CFPB** [106] - 3:11, 9:25, 10:15, 10:16, 11:5, 11:11, 11:22, 12:15, 13:10, 13:20, 13:23, 14:1, 14:10, 14:22, 15:4, 15:8, 16:4, 16:5, 17:2, 17:5, 17:6, 20:24, 20:25, 21:3, 21:5, 24:15, 25:8, 33:4, 33:7, 33:13, 33:23, 34:10, 35:20, 35:24, 40:1, 40:13, 41:2, 42:4, 42:7, 45:9, 48:20, 50:10, 52:24, 52:25, 53:2, 53:9, 53:14, 55:7, 62:13, 63:2, 63:17, 64:9, 65:5, 68:25, 69:2, 72:4, 78:12, 81:12, 83:16, 84:22, 87:6, 102:12, 102:18, 104:19, 104:20, 104:22, 105:10, 109:6, 116:10, 128:16, 137:20, 137:25, 143:12, 144:21, 149:16, 150:1, 150:24, 151:7, 159:24, 162:2, 163:16, 165:5, 176:9, 176:16, 180:15, 180:25, 185:2, 185:8, 189:11, 189:25, 191:5, 192:8, 199:2, 204:9, 208:1, 208:7, 211:11, 215:17, 216:24, 217:15, 222:8, 230:18, 236:12
**CFPB's** [3] - 29:3, 116:3, 120:25

**CFPB_00001** [1] - 87:2
**CFPB_00006** [1] - 162:3
**CFPB_00031** [1] - 94:4
**CFPB_00050** [1] - 105:11
**CFPB_00056** [1] - 96:23
**CFPB_0006** [1] - 162:19
**CFPB_00096** [1] - 84:23
**CFPB_00111** [2] - 107:3, 107:9
**CFPB_00117** [1] - 73:7
**CFPB_00118** [1] - 75:6
**CFPB_00119** [1] - 79:2
**CFPB_00130** [1] - 116:11
**CFPB_11** [1] - 215:6
**CFPB_117** [2] - 167:15, 168:8
**CFPB_118** [2] - 167:7, 169:15
**CFPB_119** [3] - 170:6, 170:15, 170:23
**CFPB_13** [1] - 176:8
**CFPB_14** [2] - 179:1, 215:6
**CFPB_15** [1] - 178:4
**CFPB_16** [2] - 200:6, 200:7
**CFPB_17** [2] - 200:21, 201:8
**CFPB_19** [1] - 200:7
**CFPB_3** [1] - 166:6
**CFPB_36** [1] - 81:14
**CFPB_37** [1] - 179:25
**CFPB_41** [1] - 217:3
**CFPB_59** [1] - 95:20
**CFPB_6** [1] - 162:23
**CFPB_73** [1] - 202:19
**CFPB_79** [1] - 202:25
**CFPB_82** [1] - 212:14
**CFPB_9** [3] - 194:1, 195:4, 195:7
**CFPB_96** [1] - 172:23
**CFPB_98** [1] - 219:16
**CFPD** [1] - 189:14
**CFPD's** [1] - 152:19
**chain** [37] - 79:3, 79:5, 79:19, 81:15, 81:16, 84:24, 87:1, 87:2, 87:9, 91:6, 96:7, 99:8, 100:23, 105:17, 107:10, 108:5, 108:20, 133:19, 134:25, 135:11, 170:8, 170:24, 171:15, 176:7, 176:11, 177:9, 178:7, 181:2,

182:5, 182:12, 182:18, 212:15, 212:21, 212:23, 217:2
**chains** [1] - 108:4
**chair** [2] - 9:14, 159:23
**Chairman** [1] - 35:16
**chairman** [1] - 35:23
**challenged** [1] - 133:9
**challenges** [2] - 224:13, 224:24
**chance** [2] - 223:18, 235:17
**change** [11] - 19:16, 23:1, 44:18, 56:1, 80:14, 141:18, 142:11, 184:7, 213:17, 234:9
**changed** [5] - 61:6, 157:3, 157:12, 157:15, 232:7
**changes** [2] - 18:9, 49:2
**channels** [1] - 176:16
**chaos** [2] - 28:5, 94:15
**characterization** [2] - 113:3, 115:2
**characterize** [3] - 86:2, 119:6, 119:7
**characterized** [3] - 115:18, 119:21, 206:4
**charge** [6] - 23:10, 23:11, 74:17, 165:9, 212:18, 213:2
**charged** [1] - 92:2
**chart** [4] - 22:3, 117:2, 117:18, 118:18
**charter** [1] - 151:15
**check** [3] - 28:4, 111:6, 193:8
**checking** [2] - 44:16, 44:17
**Chess** [1] - 3:13
**chief** [66] - 13:16, 13:19, 13:23, 13:25, 14:8, 14:19, 22:25, 24:23, 25:12, 26:17, 29:18, 32:18, 34:11, 34:14, 40:1, 40:6, 41:6, 41:9, 43:1, 56:18, 57:5, 57:7, 58:9, 58:16, 58:25, 59:14, 72:8, 72:16, 72:19, 73:15, 73:25, 75:8, 78:22, 79:15, 81:22, 85:9, 90:5, 96:25, 125:15, 125:19, 131:19, 140:13, 153:7, 159:11, 164:20, 167:15, 167:16, 169:18, 180:2, 181:3, 183:2, 183:5, 183:8, 186:6, 192:18,

195:9, 199:2, 199:7, 199:22, 204:22, 217:17, 217:20, 219:17, 221:2, 223:6, 228:19

**Chilbert** [7] - 81:21, 82:14, 85:2, 90:10, 195:9, 195:17

**Chilbert's** [1] - 82:12

**choice** [1] - 52:13

**Chopra** [4] - 14:11, 26:19, 69:22, 69:23

**Chopra's** [2] - 14:12, 15:4

**chose** [2] - 209:13, 210:7

**Chris** [12] - 21:12, 21:19, 27:6, 29:18, 64:15, 90:10, 151:24, 196:13, 196:17, 199:24, 200:9, 202:5

**Christopher** [18] - 20:11, 41:25, 42:6, 64:9, 81:20, 81:21, 87:21, 88:17, 92:15, 99:9, 137:20, 151:10, 165:7, 166:19, 195:9, 202:21, 202:23, 203:2

**chronology** [2] - 51:15, 56:12

**CIO** [4] - 25:18, 90:11, 193:2, 209:16

**circle** [2] - 60:17, 102:9

**circling** [1] - 27:20

**circumstance** [1] - 46:21

**circumstances** [4] - 47:10, 49:1, 61:6, 83:12

**cited** [2] - 154:5, 154:15

**Citizen** [1] - 3:15

**Civil** [4] - 3:24, 216:19, 217:4, 223:20

**civil** [7] - 3:3, 13:2, 34:24, 39:8, 43:4, 43:18, 43:23

**civility** [1] - 5:13

**clarification** [19] - 30:23, 102:18, 109:4, 109:12, 109:17, 110:5, 110:9, 110:12, 110:13, 110:16, 112:16, 112:17, 112:19, 115:9, 139:11, 155:23, 205:11, 213:3, 213:5

**clarified** [2] - 101:7, 107:23

**clarify** [9] - 47:21,

55:5, 124:8, 129:18, 135:11, 136:16, 172:25, 190:13, 211:9

**clarifying** [1] - 25:3

**clarity** [6] - 48:1, 58:6, 99:10, 149:25, 236:4, 237:6

**clear** [40] - 20:19, 23:2, 23:25, 31:2, 32:1, 37:23, 40:1, 56:5, 56:12, 91:10, 94:16, 104:3, 106:3, 106:8, 106:12, 107:2, 113:6, 114:1, 120:11, 123:7, 140:21, 149:19, 165:25, 166:19, 177:16, 177:24, 185:19, 191:2, 204:25, 207:1, 211:24, 214:18, 214:19, 215:4, 218:9, 220:8, 221:22, 228:13, 229:4, 238:2

**cleared** [2] - 141:11, 141:12

**clearly** [3] - 67:5, 178:20, 183:20

**clerks** [2] - 7:6, 8:24

**close** [11] - 29:19, 41:16, 55:10, 69:16, 86:14, 131:22, 135:19, 135:22, 146:9, 160:5, 160:8

**closed** [2] - 29:23, 143:13

**closely** [2] - 11:3, 221:16

**closer** [1] - 9:13

**closing** [2] - 125:4, 147:22

**closure** [3] - 53:19, 54:14, 186:24

**CM** [1] - 123:20

**CM-ECF** [1] - 123:20

**co** [1] - 3:14

**co-counsel** [1] - 3:14

**COB** [1] - 134:13

**collaborative** [1] - 62:10

**colleague** [1] - 3:11

**colleagues** [4] - 3:13, 32:9, 53:7, 94:12

**collection** [1] - 195:18

**collective** [1] - 232:12

**college** [4] - 9:19, 9:21, 9:23, 10:1

**College** [1] - 9:20

**combination** [1] - 51:24

**comfortable** [2] - 43:5, 94:16

**coming** [10] - 49:21, 63:7, 63:9, 111:9, 140:4, 157:17, 158:15, 160:5, 160:8, 187:24

**Commerce** [1] - 18:19

**committed** [4] - 68:2, 230:8, 235:11

**Committee** [2] - 10:6, 96:3

**committees** [7] - 59:2, 150:25, 151:3, 151:4, 151:8, 151:11, 151:17

**common** [1] - 74:3

**communicate** [4] - 90:19, 101:5, 101:13, 213:13

**communication** [2] - 95:2, 226:2

**Communications** [2] - 176:12, 176:24

**communications** [5] - 23:13, 125:20, 140:10, 140:12, 209:19

**Community** [2] - 10:9, 38:3

**community** [1] - 95:14

**companies** [1] - 197:9

**compared** [2] - 90:3, 239:16

**compete** [1] - 153:16

**competitive** [2] - 46:16, 48:24, 145:20

**complain** [2] - 90:1, 147:10

**Complaint** [1] - 190:1

**complaint** [16] - 87:15, 88:3, 90:7, 91:24, 92:1, 115:13, 165:13, 166:22, 190:10, 190:20, 190:23, 196:6, 196:16, 202:12, 222:4, 222:19

**complaints** [12] - 89:21, 91:7, 91:8, 147:10, 181:10, 190:3, 196:2, 196:16, 197:11, 197:17, 197:21, 226:20

**complete** [3] - 166:9, 225:6, 225:12

**completed** [1] - 22:17

**completely** [1] - 150:10

**compliance** [2] - 199:2, 221:14

**complicated** [1] - 114:9

**comply** [5] - 114:21, 126:1, 185:3, 187:17, 222:22

**complying** [1] - 63:3

**components** [3] - 17:16, 18:10, 70:8

**computer** [1] - 78:12

**computers** [1] - 87:25

**conceivably** [1] - 194:15

**concentration** [1] - 177:15

**concern** [9] - 38:22, 53:12, 74:11, 123:16, 144:15, 147:4, 219:13, 219:15, 219:16

**concerned** [9] - 28:13, 69:18, 88:25, 89:3, 131:18, 131:20, 196:1, 209:9, 209:10

**concerning** [2] - 19:6, 53:24

**concerns** [6] - 26:24, 60:15, 81:17, 160:24, 180:20, 185:23

**conclusion** [5] - 43:9, 43:10, 43:15, 102:11, 155:9

**conditions** [4] - 81:10, 82:4, 174:13, 174:20

**conduct** [3] - 99:11, 112:8, 158:12

**conducted** [1] - 69:7

**conducting** [1] - 63:17

**confer** [1] - 194:11

**conference** [6] - 27:17, 28:1, 28:4, 28:8, 168:3, 192:17

**conferred** [1] - 233:18

**confirm** [4] - 78:2, 112:5, 131:24, 209:16

**confirmation** [1] - 79:17

**confirmed** [2] - 63:10, 63:11

**confirming** [1] - 178:23

**conflict** [1] - 234:8

**conflicting** [1] - 4:14

**confronting** [2] - 224:14, 224:24

**confusing** [2] - 136:24, 157:5

**confusion** [19] - 34:17, 66:21, 66:23, 67:1, 67:3, 67:14, 67:16, 77:9, 97:7, 105:12, 105:15, 109:15, 111:8, 115:3, 115:8, 129:11, 141:8, 143:25, 211:5

**Congress** [10] - 10:2, 10:6, 27:3, 36:1, 45:4, 55:22, 55:23, 80:21,

106:19, 147:8
**congressional** [2] - 103:20, 106:9
**conjunction** [1] - 104:21
**connected** [1] - 179:3
**connection** [2] - 148:16, 239:11
**consensus** [1] - 70:5
**consent** [1] - 64:22
**consider** [5] - 58:15, 61:12, 72:19, 238:10, 239:11
**considerable** [1] - 158:19
**considered** [4] - 20:24, 25:8, 85:15, 223:10
**consistent** [4] - 63:14, 99:10, 126:9, 154:24
**consists** [2] - 7:24, 8:1
**constituent** [3] - 10:2, 89:1, 103:20
**constituents** [1] - 31:6
**constitute** [1] - 136:12
**constitutes** [1] - 175:5
**consultation** [1] - 80:7
**consulted** [1] - 177:18
**consulting** [1] - 70:25
**Consumer** [24] - 3:9, 4:25, 36:19, 57:19, 58:23, 76:20, 88:18, 92:23, 93:3, 100:7, 104:12, 132:8, 147:5, 165:10, 190:1, 190:22, 192:23, 196:18, 199:4, 200:13, 200:15, 226:23, 226:24, 227:21
**consumer** [29] - 38:3, 87:15, 88:3, 88:22, 88:25, 89:21, 90:7, 93:10, 93:23, 99:21, 119:3, 164:5, 165:13, 166:20, 166:21, 167:1, 178:17, 178:18, 196:2, 196:6, 197:2, 198:11, 201:2, 201:5, 203:3, 222:15, 222:19, 223:1, 226:19
**consumers** [15] - 31:6, 35:1, 35:3, 89:25, 90:18, 91:15, 102:20, 103:1, 103:10, 103:11, 104:7, 191:14, 197:9, 222:2, 222:18
**contact** [8] - 72:22, 77:12, 77:16, 180:13, 180:14, 210:4, 214:6
**contacted** [1] - 41:8
**contacts** [1] - 86:2

**containing** [1] - 72:4
**contains** [2] - 16:17, 30:6
**contemplating** [1] - 18:18
**contentious** [2] - 10:17, 28:19
**context** [4] - 17:17, 35:18, 63:3, 101:16
**continuance** [1] - 79:16
**continue** [12] - 43:25, 57:24, 58:5, 58:12, 69:13, 78:1, 78:3, 87:16, 87:17, 106:10, 142:25, 238:17
**continued** [7] - 4:16, 31:1, 142:21, 142:23, 144:2, 148:4, 186:20
**continuing** [4] - 192:10, 196:7, 196:11, 198:3
**continuity** [1] - 37:14
**contract** [43] - 69:12, 71:19, 71:20, 75:21, 82:18, 83:23, 85:12, 85:13, 85:14, 85:15, 85:25, 88:11, 89:20, 90:17, 165:15, 165:17, 168:24, 168:25, 172:14, 174:13, 174:14, 174:20, 177:1, 177:3, 177:24, 180:16, 181:6, 181:17, 193:22, 217:13, 218:6, 218:8, 220:1, 221:21, 222:12, 222:14, 222:15, 222:17, 222:25, 223:2, 223:9
**contracting** [8] - 68:21, 164:11, 174:11, 175:18, 176:1, 180:9, 200:22
**contractor** [4] - 71:19, 81:10, 174:15, 183:9
**contractors** [8] - 71:14, 76:17, 81:4, 82:3, 84:18, 168:21, 169:4, 190:5
**contracts** [119] - 34:22, 60:15, 66:1, 66:2, 68:24, 68:25, 69:3, 69:6, 69:10, 69:19, 70:9, 70:12, 70:23, 70:25, 71:5, 71:8, 71:12, 71:14, 71:17, 72:1, 72:25, 73:9, 73:12, 73:14, 73:19, 74:3, 74:9, 75:13, 75:17, 75:19,

76:2, 76:5, 76:7, 79:8, 79:10, 79:24, 79:25, 80:2, 80:12, 80:17, 81:6, 82:4, 83:24, 84:6, 84:9, 84:12, 88:10, 121:16, 151:2, 151:18, 151:19, 152:2, 160:25, 161:17, 161:19, 163:10, 163:13, 163:14, 163:15, 163:16, 163:17, 163:24, 164:12, 164:15, 164:24, 165:12, 165:23, 166:4, 166:11, 166:21, 167:2, 167:21, 168:16, 168:19, 169:12, 169:23, 170:2, 170:9, 170:25, 171:2, 171:13, 171:14, 171:16, 171:19, 171:25, 172:1, 172:4, 172:15, 172:17, 172:20, 173:2, 173:6, 173:8, 174:6, 174:12, 175:1, 192:10, 193:23, 194:24, 194:25, 195:2, 195:19, 195:24, 197:18, 198:3, 218:4, 218:7, 218:11, 218:18, 219:11, 219:23, 219:24, 220:11, 220:23, 221:2, 221:13, 223:3
**contradictory** [1] - 207:14
**contrary** [1] - 63:19
**control** [1] - 188:16
**controversial** [1] - 36:25
**controversy** [2] - 90:9, 147:5
**convenience** [2] - 33:2, 101:24
**conversation** [11] - 21:18, 72:13, 75:11, 75:15, 75:16, 101:3, 111:17, 112:10, 114:6, 140:2
**conversations** [5] - 23:17, 88:24, 101:9, 172:2, 232:14
**convey** [1] - 198:5
**conveyed** [1] - 149:15
**COO** [1] - 205:9
**cooling** [1] - 61:10
**coordinated** [1] - 89:5
**coordination** [1] - 156:19
**copied** [6] - 57:7, 73:22, 209:24, 209:25,

210:1, 227:24
**copies** [3] - 61:18, 154:8, 154:13
**copy** [4] - 22:3, 25:16, 171:9, 209:13
**core** [2] - 58:21, 174:16
**corner** [2] - 72:7, 75:6
**Correct** [1] - 69:24
**correct** [162] - 5:19, 6:19, 16:2, 17:3, 17:12, 25:23, 26:14, 32:3, 32:16, 32:19, 32:20, 33:25, 35:19, 35:21, 35:22, 35:25, 36:2, 36:4, 36:22, 38:5, 40:21, 41:23, 42:14, 46:18, 46:19, 46:23, 47:22, 47:23, 48:23, 49:5, 51:4, 52:1, 54:16, 54:18, 54:22, 61:16, 63:1, 64:23, 66:8, 66:9, 72:10, 74:14, 74:18, 77:12, 77:13, 77:17, 82:6, 82:8, 83:14, 92:8, 96:20, 103:9, 106:14, 106:15, 106:18, 106:22, 111:16, 113:22, 113:23, 116:20, 116:22, 117:12, 118:21, 119:14, 120:7, 120:9, 124:20, 124:25, 125:11, 125:20, 126:5, 126:8, 126:14, 128:18, 128:20, 128:23, 129:3, 129:14, 130:1, 130:10, 130:12, 130:18, 131:16, 132:7, 132:9, 132:18, 132:22, 133:24, 135:25, 137:15, 138:1, 138:9, 138:12, 138:17, 139:6, 139:9, 139:13, 139:16, 140:14, 140:16, 140:19, 143:14, 144:22, 145:6, 145:11, 145:13, 150:4, 152:5, 153:20, 154:18, 155:1, 155:4, 155:16, 156:13, 158:4, 160:7, 163:9, 164:10, 164:22, 165:11, 167:20, 167:23, 169:3, 172:21, 172:24, 176:15, 176:22, 176:25, 177:11, 180:10, 181:8, 184:6, 187:1, 189:12, 189:15, 190:13, 192:1, 192:6, 192:12, 193:20,

195:13, 198:7, 199:9, 200:11, 200:20, 209:23, 211:23, 212:1, 212:4, 212:5, 213:16, 214:5, 214:12, 219:19, 220:14, 220:16, 220:19, 222:3, 224:16, 230:19, 237:19

**correction** [1] - 156:4

**correctly** [6] - 17:10, 82:7, 102:17, 134:15, 163:20, 199:5

**correspond** [1] - 236:3

**corresponds** [1] - 236:21

**CORs** [1] - 180:8

**COs** [1] - 175:20

**cost** [1] - 70:12

**costs** [5] - 34:21, 37:22, 39:13, 39:15, 70:13

**councils** [1] - 151:11

**counsel** [12] - 3:5, 3:12, 3:14, 4:1, 7:6, 25:2, 69:11, 78:24, 115:6, 136:11, 151:5, 171:10

**countermanding** [1] - 113:1

**counterparts** [2] - 11:4, 41:12

**couple** [15] - 7:5, 12:11, 18:12, 26:25, 27:1, 30:19, 37:16, 53:23, 67:15, 77:22, 79:21, 105:9, 127:1, 208:18, 209:13

**course** [5] - 44:10, 131:12, 143:2, 168:14, 220:12

**COURT** [394] - 3:18, 3:22, 4:3, 5:21, 6:3, 6:15, 6:20, 6:24, 7:1, 7:3, 7:9, 7:15, 7:18, 8:7, 8:16, 8:19, 8:25, 9:12, 9:16, 12:3, 12:12, 12:24, 17:21, 18:5, 19:5, 19:9, 19:14, 20:2, 20:13, 20:16, 21:3, 21:11, 21:16, 21:22, 22:9, 22:17, 23:7, 23:10, 23:17, 23:23, 25:19, 25:25, 26:4, 26:8, 26:12, 26:15, 26:20, 29:11, 29:14, 29:22, 31:3, 31:8, 31:20, 32:10, 32:14, 32:21, 33:12, 33:20, 33:23, 34:6, 36:3, 37:3,

37:6, 37:10, 38:11, 38:24, 39:10, 39:13, 39:17, 39:24, 40:16, 40:25, 42:8, 42:11, 42:18, 43:17, 44:1, 44:20, 46:17, 46:20, 46:24, 47:3, 47:9, 47:15, 47:19, 49:12, 49:17, 49:20, 49:24, 50:24, 51:15, 51:19, 51:24, 52:2, 52:6, 52:12, 52:15, 52:18, 52:22, 54:13, 54:17, 54:20, 54:23, 55:2, 55:10, 55:18, 55:22, 55:25, 56:8, 56:10, 56:16, 56:21, 56:24, 57:11, 57:16, 59:3, 59:8, 59:16, 59:22, 60:4, 60:8, 60:11, 60:19, 60:23, 61:1, 61:21, 64:5, 64:21, 64:25, 65:19, 66:4, 66:10, 66:17, 66:25, 67:4, 67:7, 67:10, 67:20, 67:24, 68:4, 68:11, 68:15, 68:18, 69:25, 70:14, 70:19, 71:6, 71:10, 71:21, 73:4, 73:8, 73:11, 73:18, 73:24, 74:7, 74:11, 74:15, 74:19, 75:22, 76:9, 76:13, 76:23, 77:2, 78:4, 78:6, 80:7, 80:16, 80:23, 80:25, 82:14, 82:25, 83:9, 83:21, 84:2, 85:19, 85:22, 86:3, 86:13, 86:19, 86:23, 87:5, 87:7, 87:22, 87:24, 88:5, 88:8, 88:13, 88:15, 89:18, 90:13, 90:23, 91:11, 91:19, 91:23, 92:1, 92:11, 93:3, 93:6, 93:9, 93:14, 93:16, 94:9, 94:24, 95:7, 95:5, 97:8, 97:15, 97:22, 98:7, 98:15, 98:20, 98:22, 98:25, 99:2, 99:4, 99:25, 100:6, 100:14, 100:17, 101:9, 101:13, 101:23, 102:5, 102:23, 103:6, 103:10, 103:15, 103:23, 104:6, 107:5, 107:13, 107:20, 107:22, 108:6, 108:10, 110:3, 110:8, 110:11, 110:21, 111:3, 111:7, 111:13, 111:15, 111:22, 112:1, 112:9,

112:15, 112:25, 113:4, 113:18, 113:25, 114:3, 114:8, 115:19, 115:25, 117:25, 118:4, 118:15, 118:22, 119:12, 119:15, 120:10, 120:14, 121:6, 121:15, 121:19, 121:23, 122:2, 122:6, 122:12, 122:20, 123:5, 123:14, 123:21, 129:13, 129:16, 133:1, 133:11, 135:4, 135:6, 135:9, 136:14, 137:6, 137:9, 137:11, 137:14, 137:17, 137:19, 137:22, 137:24, 138:2, 138:5, 139:19, 141:3, 141:5, 142:6, 143:24, 144:5, 144:10, 144:16, 144:21, 144:23, 146:14, 146:19, 148:24, 149:4, 149:6, 149:10, 149:13, 150:6, 154:11, 155:10, 155:25, 156:24, 157:6, 158:18, 160:15, 160:21, 161:4, 162:4, 162:6, 162:10, 162:14, 166:1, 166:5, 166:7, 166:14, 166:17, 168:6, 170:11, 170:16, 172:12, 173:12, 174:2, 185:10, 186:24, 187:2, 187:9, 187:14, 187:22, 188:19, 191:2, 191:20, 194:2, 194:13, 197:25, 198:9, 198:22, 203:24, 205:19, 205:22, 205:25, 207:18, 210:10, 210:14, 221:22, 222:2, 222:4, 222:7, 224:17, 225:20, 226:1, 226:5, 226:12, 226:16, 227:6, 227:11, 227:13, 228:24, 229:2, 229:21, 230:16, 230:20, 230:23, 232:25, 233:7, 233:18, 233:22, 233:24, 234:1, 234:15, 234:18, 234:21, 234:25, 235:8, 235:11, 235:15, 235:19, 235:21, 235:24, 236:8, 237:1, 237:10, 237:19

**court** [11] - 7:19, 8:6, 11:7, 66:19, 120:3, 142:10, 145:15, 201:12, 234:12, 236:18

**Court** [29] - 8:15, 19:12, 37:24, 38:23,

40:12, 40:16, 40:19, 44:19, 48:1, 48:13, 60:15, 60:17, 62:13, 68:10, 68:13, 69:8, 94:8, 99:15, 100:20, 107:17, 113:24, 115:10, 116:25, 141:19, 236:1, 236:4, 237:8, 237:14, 237:17

**Court's** [6] - 64:2, 121:3, 123:16, 123:20, 146:1, 177:12

**COURTROOM** [2] - 3:2, 234:14

**courtroom** [4] - 5:8, 5:10, 5:12, 8:20

**courtrooms** [1] - 9:1

**cover** [4] - 7:24, 8:2, 8:4, 37:22

**covered** [1] - 28:2

**CPFB_00117** [1] - 72:7

**crazy** [1] - 74:5

**CRE** [3] - 99:17, 99:18, 99:22

**create** [1] - 122:14

**creates** [1] - 221:18

**creating** [1] - 222:8

**creation** [1] - 11:10

**credit** [1] - 93:24

**crisis** [1] - 10:12

**critical** [7] - 24:19, 26:1, 26:13, 84:5, 88:4, 165:12, 199:3

**CROSS** [1] - 124:4

**cross** [9] - 6:1, 6:6, 6:17, 83:22, 121:6, 136:18, 173:17, 234:1, 235:22

**cross-examination** [3] - 121:6, 136:18, 173:17

**CROSS-EXAMINATION** [1] - 124:4

**cross-examine** [1] - 83:22

**cross-examined** [1] - 234:1

**crosstalk** [1] - 172:11

**crucial** [1] - 164:16

**cued** [1] - 104:6

**culling** [1] - 70:23

**culminates** [2] - 210:19, 210:20

**curious** [5] - 11:9, 14:21, 19:2, 67:8, 90:8

**current** [13] - 64:10, 116:3, 116:16, 119:7, 119:8, 119:24, 119:25, 120:25, 147:22, 226:22, 227:18, 228:6,

229:24

**cut** [4] - 69:14, 75:18, 110:10, 132:1

**cuts** [2] - 45:5, 131:25

# D

**D.C** [1] - 10:4

**daily** [3] - 11:16, 103:8, 205:17

**Dan** [1] - 43:21

**Daniel** [1] - 95:3

**data** [47] - 14:5, 22:1, 70:11, 70:23, 76:18, 81:3, 81:7, 81:11, 81:17, 81:24, 82:1, 82:3, 82:9, 173:9, 174:8, 174:14, 174:17, 174:18, 175:14, 175:22, 177:13, 177:19, 177:22, 177:23, 178:17, 178:18, 178:19, 178:21, 178:23, 179:4, 179:11, 179:19, 180:15, 180:21, 181:10, 181:13, 182:19, 182:21, 182:22, 182:25, 184:2, 193:7, 195:14, 195:18, 195:21, 218:24

**database** [13] - 87:15, 88:3, 88:5, 165:13, 166:22, 182:2, 196:6, 196:19, 197:14, 198:2, 198:3, 198:4, 222:19

**date** [7] - 70:15, 90:24, 150:16, 150:20, 182:7, 210:11, 238:22

**dates** [1] - 192:16

**days** [17] - 47:8, 49:2, 56:13, 56:15, 65:9, 108:1, 130:14, 150:11, 153:18, 159:2, 167:24, 168:25, 177:22, 179:10, 211:1, 238:18

**deadline** [3] - 65:15, 192:5, 193:10

**dealing** [1] - 24:21

**deals** [1] - 93:11

**December** [1] - 12:8

**decide** [1] - 238:11

**decided** [1] - 98:10

**decides** [1] - 134:22

**deciding** [1] - 237:20

**decimated** [1] - 18:22

**decision** [4] - 35:2, 63:6, 114:14, 214:25

**decisional** [1] - 127:16

**decisionmaking** [1] -

187:16

**decisions** [3] - 14:18, 14:19, 44:22

**declarant** [1] - 5:5

**declarants** [1] - 6:8

**declaration** [59] - 8:3, 16:14, 23:18, 26:23, 28:25, 35:7, 54:13, 104:25, 123:24, 124:11, 124:14, 124:18, 124:19, 124:24, 125:5, 125:25, 126:12, 126:24, 127:2, 127:8, 127:10, 127:20, 136:1, 136:3, 153:19, 153:21, 159:9, 159:10, 184:25, 185:2, 185:17, 186:2, 186:9, 186:14, 186:23, 187:6, 187:13, 188:8, 189:3, 189:10, 189:17, 189:21, 190:10, 191:25, 192:7, 192:8, 196:4, 196:5, 198:1, 198:14, 198:15, 198:17, 198:25, 200:2, 235:14, 237:21

**declarations** [6] - 4:19, 127:4, 185:14, 226:12, 236:9, 236:18

**Deepak** [1] - 3:7

**defend** [2] - 40:23, 223:16

**defendant's** [9] - 124:11, 161:23, 167:6, 176:5, 193:25, 198:20, 200:6, 202:2, 212:14

**defendants** [3] - 211:8, 223:19, 229:11

**defendants'** [2] - 5:5, 215:5

**defense** [1] - 9:3

**deferred** [1] - 51:11

**definitely** [1] - 23:1

**delay** [1] - 146:3

**delete** [1] - 233:9

**deleted** [2] - 177:23, 180:16

**deletion** [7] - 177:13, 177:22, 179:11, 180:22, 181:13, 182:7

**deliberately** [1] - 191:7

**delivery** [1] - 62:24

**Deloitte** [1] - 165:15

**deluge** [1] - 98:1

**deluged** [1] - 97:23

**delving** [1] - 115:5

**demand** [1] - 28:10

**demands** [1] - 218:9

**denied** [1] - 84:6

**Department** [12] - 3:24, 10:8, 10:21, 12:9, 16:5, 17:16, 18:13, 18:19, 31:12, 44:13, 44:14, 105:5

**department** [1] - 12:16

**dependent** [1] - 146:10

**deposition** [1] - 86:5

**depositions** [1] - 237:25

**deputies** [1] - 164:23

**deputized** [1] - 185:13

**DEPUTY** [2] - 3:2, 234:14

**deputy** [7] - 15:19, 96:8, 117:9, 165:9, 211:17, 212:18, 213:2

**describe** [5] - 10:25, 19:22, 88:23, 88:24, 120:25

**described** [3] - 129:19, 150:14, 150:15

**describing** [1] - 150:22

**description** [2] - 73:1, 150:19

**designate** [1] - 137:22

**designated** [5] - 30:5, 33:13, 137:20, 137:24, 144:19

**designation** [1] - 105:6

**desire** [5] - 69:10, 148:8, 148:22, 148:25, 149:10

**desk** [1] - 193:5

**desktop** [1] - 231:10

**despite** [1] - 112:7

**detail** [4] - 11:4, 43:6, 53:3, 56:4

**detailed** [6] - 20:25, 21:3, 21:4, 22:20, 23:15, 34:3

**detailees** [3] - 11:21, 33:25, 58:17

**details** [4] - 92:17, 159:5, 220:22, 226:24

**determination** [2] - 6:11, 160:21

**determine** [8] - 58:10, 58:18, 69:12, 70:9, 71:1, 74:3, 89:14, 90:11

**determined** [2] - 79:25, 235:15

**devastating** [1] - 77:23

**develop** [2] - 46:16, 232:5

**developed** [1] - 145:20

**Development** [1] - 10:10

**dice** [1] - 67:12

**difference** [1] - 86:3

**different** [36] - 25:1, 30:8, 30:9, 30:19, 31:14, 32:8, 33:23, 37:16, 45:7, 45:8, 50:21, 51:2, 51:3, 90:22, 91:11, 92:7, 93:9, 94:11, 103:11, 105:25, 108:19, 108:20, 118:11, 133:11, 133:12, 144:7, 158:6, 158:7, 158:15, 170:17, 186:10, 186:15, 205:25, 221:18, 228:20

**differing** [2] - 23:2, 23:3

**difficult** [3] - 42:24, 54:2, 123:25

**Digital** [2] - 176:12, 176:23

**Diotalevi** [1] - 3:16

**dir** [1] - 59:7

**direct** [19] - 5:25, 6:17, 48:19, 57:9, 65:8, 86:16, 101:25, 102:5, 141:5, 155:13, 163:17, 170:7, 170:24, 173:1, 175:21, 179:18, 184:16, 213:12, 229:5

**directed** [14] - 34:25, 69:11, 77:15, 82:22, 98:14, 106:12, 136:8, 140:7, 161:18, 164:12, 164:13, 207:15, 210:3, 211:25

**directing** [4] - 75:12, 137:14, 169:22, 202:24

**direction** [10] - 45:15, 62:22, 65:7, 99:11, 132:16, 132:19, 137:17, 140:5, 186:12, 212:7

**directive** [9] - 30:13, 106:14, 113:1, 115:16, 176:1, 206:11, 206:14, 206:16, 212:1

**directly** [14] - 11:16, 24:21, 28:8, 55:6, 58:18, 79:24, 91:3, 94:17, 106:7, 166:11, 187:12, 209:13, 209:19, 225:25

**director** [60] - 12:22, 13:15, 14:10, 15:4,

15:7, 15:11, 15:16, 15:19, 15:20, 15:23, 17:2, 18:24, 22:24, 26:16, 29:13, 30:5, 32:17, 36:11, 37:15, 38:20, 49:19, 56:13, 63:7, 63:9, 69:18, 69:21, 69:22, 70:10, 71:15, 72:20, 80:20, 88:18, 93:21, 95:14, 96:8, 96:9, 96:13, 105:4, 106:25, 117:9, 121:24, 125:7, 137:23, 139:15, 140:8, 158:15, 160:9, 160:24, 161:6, 161:9, 165:9, 176:12, 176:23, 182:19, 182:21, 182:24, 211:17, 224:4, 224:6

**Director** [56] - 10:9, 23:13, 25:14, 26:19, 29:10, 29:12, 30:3, 30:16, 32:2, 33:15, 33:16, 35:15, 36:16, 37:1, 43:22, 44:1, 49:8, 49:18, 50:10, 56:9, 56:14, 61:11, 61:13, 61:14, 62:5, 62:17, 63:4, 69:21, 75:13, 77:14, 78:16, 79:20, 89:7, 102:14, 106:2, 121:11, 130:13, 136:21, 138:18, 138:21, 138:23, 139:25, 140:10, 158:9, 159:17, 161:16, 161:18, 161:21, 163:4, 163:7, 164:7, 169:24, 184:11, 187:15, 208:8, 229:25

**director's** [2] - 23:4, 206:17

**directs** [3] - 79:7, 163:10, 207:23

**disabilities** [2] - 221:24, 222:18

**disability** [3] - 83:6, 218:20, 221:23

**Disability** [3] - 217:17, 218:1, 223:21

**disaster** [1] - 5:1

**disclose** [1] - 192:2

**Disclosure** [4] - 191:24, 192:9, 193:9, 194:21

**discretion** [3] - 59:12, 83:17, 119:22

**discretionary** [3] - 114:13, 114:18, 151:14

**discuss** [4] - 44:22,

104:4, 128:1, 128:14

**discussed** [17] - 5:17, 26:23, 42:1, 51:10, 55:15, 88:19, 95:10, 102:10, 104:25, 111:10, 149:20, 152:16, 170:7, 170:24, 172:25, 207:22, 208:16

**discusses** [2] - 108:25, 157:2

**discussing** [7] - 75:25, 104:11, 143:20, 145:1, 146:25, 168:20, 231:15

**discussion** [15] - 21:17, 21:20, 22:4, 25:2, 27:19, 43:7, 46:17, 63:19, 64:15, 84:17, 85:1, 89:5, 96:16, 114:4, 147:25

**Discussion** [1] - 49:1

**discussions** [20] - 40:9, 41:2, 41:5, 53:6, 88:21, 118:2, 144:2, 144:7, 144:25, 145:7, 145:9, 146:10, 147:24, 148:4, 156:19, 156:20, 156:22, 158:13, 199:21, 205:16

**dismantle** [2] - 39:3, 39:5

**dismissed** [1] - 120:6

**dispute** [1] - 114:10

**distinction** [2] - 84:8, 85:20

**district** [1] - 10:3

**division** [10] - 48:9, 58:23, 113:7, 119:11, 130:25, 131:7, 164:9, 192:19, 196:3, 200:15

**Division** [4] - 3:24, 88:18, 132:8, 224:7

**divisions** [10] - 129:5, 130:16, 132:1, 145:16, 161:19, 163:11, 163:18, 163:22, 173:8, 228:2

**DL_CFPB_OR** [1] - 225:14

**DL_CFPB_ Supervision_All** [1] - 108:23

**docket** [8] - 8:6, 8:14, 16:18, 64:4, 94:8, 237:17, 239:6, 239:18

**docketed** [1] - 122:21

**Doctor** [1] - 165:19

**document** [37] - 16:17, 16:22, 29:1, 30:3, 31:23, 32:4, 32:7,

33:12, 35:8, 35:12, 41:20, 41:25, 48:4, 48:6, 48:12, 48:16, 48:20, 50:8, 61:17, 63:25, 73:4, 73:7, 75:5, 79:2, 87:5, 99:6, 116:12, 116:17, 123:13, 157:22, 166:1, 167:9, 168:6, 171:10, 236:21, 236:23, 237:5

**documentation** [2] - 51:3, 127:15

**documents** [24] - 7:25, 8:1, 8:13, 16:10, 25:9, 29:4, 72:4, 77:6, 77:7, 122:23, 123:16, 123:18, 123:19, 135:23, 136:14, 162:17, 166:3, 208:19, 236:5, 236:6, 236:11, 236:12, 236:16, 239:10

**Dodd** [2] - 146:22

**Dodd-Frank** [2] - 146:22

**Doe** [4] - 6:8, 127:8, 127:19, 235:23

**Doe's** [2] - 127:11, 127:21

**DOGE** [56] - 19:17, 19:19, 19:20, 19:24, 20:11, 21:6, 21:14, 21:17, 22:15, 23:3, 24:17, 24:18, 25:4, 25:6, 25:15, 27:8, 27:15, 27:16, 27:22, 28:10, 33:1, 33:2, 33:4, 33:7, 33:19, 34:9, 34:11, 39:19, 43:17, 43:20, 51:18, 54:21, 55:6, 56:6, 63:21, 68:24, 71:4, 78:8, 89:5, 137:18, 137:19, 137:24, 138:16, 139:5, 139:23, 140:15, 144:3, 144:14, 144:17, 144:18, 145:8, 145:12, 148:16, 185:12, 185:16, 192:17

**DOGE-affiliated** [1] - 68:24

**dollars** [1] - 36:14

**domestic** [1] - 12:21

**Domestic** [1] - 10:11

**done** [13] - 6:25, 34:23, 55:17, 57:25, 119:25, 120:13, 186:22, 216:4, 216:8, 234:23, 238:22, 239:5

**door** [2] - 28:5, 28:6

**doors** [1] - 88:1

**double** [1] - 48:3

**doubt** [5] - 41:10, 82:12, 103:23, 140:25, 226:7

**down** [50] - 7:20, 11:6, 13:5, 14:16, 14:21, 23:20, 27:23, 28:20, 32:22, 49:25, 53:19, 54:2, 54:10, 54:15, 55:2, 65:22, 70:4, 89:1, 89:4, 89:15, 90:10, 90:14, 91:16, 92:4, 101:6, 125:4, 126:9, 126:13, 126:20, 126:21, 127:5, 146:8, 147:9, 147:22, 147:23, 150:2, 150:24, 151:7, 151:16, 160:13, 161:14, 170:16, 170:20, 182:2, 184:12, 193:22, 196:15, 230:1

**draw** [3] - 159:24, 160:22, 161:14

**drawn** [1] - 160:13

**driving** [1] - 62:24

**dual** [2] - 62:9, 78:16

**dual-hatted** [1] - 62:9

**due** [3] - 180:16, 195:19, 232:5

**duly** [1] - 9:5

**duplication** [1] - 161:1

**duplicative** [1] - 121:17

**during** [22] - 4:13, 8:11, 10:12, 11:5, 15:20, 18:1, 18:10, 23:11, 23:18, 24:17, 24:24, 27:18, 27:19, 69:8, 70:18, 104:13, 139:25, 146:7, 158:22, 197:19, 197:21

**duties** [4] - 65:20, 80:20, 97:9, 98:8

# E

**e-mails** [3] - 191:15, 225:24

**e-signature** [1] - 25:16

**early** [3] - 99:17, 193:9, 196:13

**easier** [2] - 71:11, 71:12

**easy** [1] - 71:10

**ECF** [6] - 16:5, 123:20, 162:17, 162:19, 198:25, 236:24

**education** [1] - 93:9

**Education** [12] - 16:5, 57:20, 88:19, 92:24,

93:5, 99:21, 104:12, 119:3, 147:6, 165:10, 200:13, 200:16

**EE** [1] - 182:10

**EEO** [4] - 181:10, 182:3, 217:7, 221:14

**EEOC** [1] - 222:10

**effect** [9] - 33:20, 79:13, 90:12, 161:21, 184:24, 212:8, 213:9, 214:6, 214:11

**effective** [4] - 15:23, 15:24, 52:10, 187:17

**effectively** [1] - 125:19

**efficient** [4] - 7:12, 62:24, 125:8, 125:25

**effort** [7] - 39:2, 39:3, 39:5, 173:9, 174:8, 195:18, 239:10

**either** [14] - 29:17, 73:9, 94:16, 150:7, 168:24, 187:9, 204:21, 206:23, 219:20, 225:24, 225:25, 227:6, 234:2

**electronically** [1] - 7:14

**element** [1] - 6:21

**elevated** [1] - 90:21

**elevating** [1] - 89:25

**eliminated** [4] - 130:17, 146:17, 152:12

**eliminating** [1] - 129:5

**elimination** [1] - 62:23

**Elizabeth** [3] - 11:9, 11:10, 52:25

**Elmo** [1] - 7:20

**email** [283] - 15:11, 15:19, 15:21, 15:22, 16:24, 16:25, 17:1, 17:17, 17:19, 18:11, 19:6, 19:23, 20:3, 23:13, 25:14, 28:4, 29:6, 29:9, 29:19, 29:21, 30:3, 30:6, 30:9, 30:17, 30:21, 30:25, 32:2, 32:7, 32:16, 33:16, 41:22, 42:4, 42:14, 42:16, 42:20, 47:15, 49:9, 50:11, 52:6, 56:18, 56:21, 66:5, 72:7, 72:11, 72:13, 72:21, 75:2, 75:8, 76:4, 76:10, 76:13, 77:11, 77:14, 78:2, 78:14, 79:2, 79:3, 79:5, 79:6, 79:18, 80:3, 81:15, 81:16, 81:20, 82:2, 84:23, 84:24, 84:25, 85:2, 86:25,

87:3, 87:18, 87:20, 87:21, 88:17, 89:8, 89:11, 90:6, 91:4, 91:6, 91:7, 92:15, 92:22, 93:18, 94:12, 94:13, 94:14, 94:24, 95:9, 95:10, 95:17, 95:23, 95:24, 96:7, 96:16, 96:22, 96:23, 96:25, 97:2, 98:3, 98:7, 99:1, 99:3, 99:8, 99:16, 99:17, 100:2, 100:3, 100:5, 100:12, 100:19, 100:22, 100:23, 101:10, 101:12, 102:14, 104:18, 104:19, 105:9, 105:17, 105:18, 105:19, 105:24, 106:1, 106:11, 106:12, 106:25, 107:11, 107:17, 107:18, 108:2, 108:4, 108:5, 108:19, 108:13, 108:15, 108:19, 108:22, 108:25, 109:2, 109:7, 109:9, 109:10, 109:11, 109:14, 110:8, 110:13, 110:16, 111:1, 111:9, 111:10, 111:12, 111:21, 112:4, 112:10, 112:23, 113:14, 115:15, 117:11, 118:25, 121:8, 121:10, 133:19, 133:22, 133:25, 134:3, 134:12, 134:17, 134:25, 135:12, 137:7, 138:8, 138:18, 139:4, 139:7, 140:25, 142:17, 161:21, 161:22, 162:25, 163:2, 163:4, 163:7, 164:20, 165:7, 166:4, 166:7, 166:19, 167:15, 168:15, 168:17, 169:7, 169:10, 169:15, 169:22, 170:1, 170:8, 171:15, 173:7, 174:23, 175:2, 175:6, 175:19, 176:7, 176:11, 177:9, 178:6, 178:12, 178:14, 179:19, 180:2, 180:5, 180:19, 181:2, 181:6, 182:5, 182:12, 182:18, 183:1, 184:9, 195:9, 195:14, 200:9, 201:23, 202:5, 202:21, 203:2, 203:3, 203:9, 204:6, 205:5, 207:2, 207:9, 207:14, 207:23, 207:25, 209:14, 209:24, 210:1, 210:20,

211:13, 211:14, 211:25, 212:11, 212:15, 212:21, 212:23, 212:24, 213:1, 213:17, 213:20, 213:22, 214:1, 214:2, 214:8, 214:18, 214:19, 215:4, 215:6, 215:16, 217:2, 217:17, 223:5, 223:25, 224:6, 225:14, 225:16, 225:17, 228:3, 228:4, 228:10

**emailed** [1] - 214:2

**emailings** [1] - 199:22

**emails** [37] - 4:18, 57:7, 57:12, 59:3, 68:6, 71:6, 105:20, 105:22, 110:20, 113:22, 115:8, 115:21, 116:25, 135:2, 135:4, 135:17, 140:20, 140:25, 191:16, 199:24, 200:4, 203:13, 209:3, 209:22, 210:7, 210:11, 210:19, 210:21, 210:24, 211:4, 212:6, 220:20, 225:23, 226:12, 227:15, 227:24, 236:12

**Emails** [1] - 16:4

**embrace** [1] - 112:13

**embraces** [1] - 112:11

**emergencies** [1] - 87:24

**emergency** [2] - 47:16, 89:25

**emergent** [1] - 92:4

**emphasizes** [1] - 223:8

**employee** [12] - 20:24, 20:25, 28:20, 45:7, 56:25, 57:1, 57:2, 98:10, 127:19, 181:12, 184:1

**Employees** [4] - 3:3, 3:9, 3:11, 3:16

**employees** [74] - 11:16, 14:22, 21:14, 22:15, 23:14, 25:8, 25:15, 27:14, 27:20, 28:7, 30:7, 30:13, 31:17, 31:18, 32:22, 33:5, 33:14, 33:24, 45:9, 45:12, 45:17, 45:20, 45:23, 47:6, 50:18, 50:23, 51:6, 51:8, 51:20, 51:21, 51:23, 51:25, 52:3, 52:4, 52:7, 52:9, 52:11, 53:2, 53:11, 62:14, 69:12, 90:17, 90:21,

92:19, 100:8, 102:19, 121:20, 122:3, 127:3, 127:7, 128:1, 128:8, 128:10, 128:14, 128:15, 128:17, 142:24, 147:15, 152:19, 153:15, 183:21, 184:11, 190:3, 204:12, 204:16, 204:25, 206:17, 207:15, 207:23, 208:20, 221:24, 231:7, 232:17

**employees'** [1] - 231:15

**employer** [1] - 78:2

**employment** [2] - 44:22, 181:10

**en** [1] - 142:1

**encourage** [4] - 118:8, 213:13, 239:15, 239:19

**encouraged** [1] - 59:13

**end** [18] - 15:5, 15:12, 48:25, 54:9, 68:17, 75:17, 92:10, 112:22, 114:6, 134:23, 157:19, 158:6, 158:7, 158:10, 158:18, 173:16, 194:15, 207:4

**ended** [1] - 20:10

**ends** [3] - 153:14, 238:19, 239:4

**Enforcement** [9] - 16:4, 119:24, 120:1, 130:23, 130:25, 163:13, 163:22, 163:24, 196:18

**enforcement** [15] - 5:4, 58:18, 114:9, 114:13, 114:16, 114:17, 119:19, 119:22, 166:20, 178:9, 179:13, 186:21, 205:15, 207:8

**engage** [1] - 114:10

**engaged** [4] - 22:25, 71:16, 120:23, 239:8

**engagement** [16] - 21:20, 22:6, 24:25, 27:19, 30:15, 31:3, 31:5, 31:12, 34:5, 51:17, 70:7, 80:13, 102:19, 103:3, 119:8, 188:17

**engaging** [1] - 187:15

**engineers** [3] - 20:9, 20:10, 20:21

**engines** [1] - 59:12

**enhancing** [1] - 85:16

**enjoyed** [1] - 13:21
**ensure** [7] - 63:14, 81:17, 82:5, 87:14, 179:16, 184:4, 196:14
**ensuring** [1] - 93:23
**Entellitrak** [7] - 181:7, 181:17, 181:25, 217:7, 218:23, 219:4, 219:20
**enter** [1] - 193:6
**entered** [1] - 148:4
**enthusiasm** [1] - 10:20
**entire** [3] - 130:16, 145:16, 203:3
**entirely** [3] - 11:24, 228:20, 229:24
**entities** [1] - 188:18
**entitled** [2] - 5:9, 233:13
**entity** [1] - 46:7
**entrance** [1] - 78:15
**environment** [1] - 27:4
**equal** [1] - 181:10
**equally** [1] - 148:16
**equities** [1] - 149:21
**error** [1] - 116:5
**escalated** [6] - 198:12, 198:17, 199:11, 199:15, 201:24, 203:12
**especially** [1] - 140:20
**essential** [2] - 25:22, 197:8
**essentially** [9] - 15:20, 18:24, 23:15, 27:9, 31:2, 45:5, 129:19, 136:3, 155:5
**establish** [2] - 60:24
**established** [9] - 34:17, 34:25, 35:4, 89:13, 157:6, 157:7, 188:19, 207:19, 225:15
**establishment** [1] - 48:24
**estate** [1] - 159:1
**et** [2] - 3:3, 3:4
**ETK** [2] - 181:17, 181:25
**Eva** [1] - 3:10
**evaluated** [1] - 69:2
**evaluating** [4] - 53:17, 63:5, 74:8, 74:12
**evaluation** [1] - 74:16
**evening** [1] - 19:20, 20:5, 21:5, 21:19, 22:10, 23:12, 25:10, 25:17, 27:6, 33:16, 39:18, 159:20, 192:16
**events** [2] - 44:6, 135:11
**evidence** [8] - 8:15,

8:17, 132:25, 135:1, 155:9, 157:5, 157:9, 230:25
**exact** [4] - 36:15, 70:18, 100:8, 236:5
**exactly** [10] - 24:7, 46:13, 65:20, 65:25, 66:1, 131:23, 137:5, 177:20, 214:24, 216:1
**examination** [24] - 6:1, 7:8, 8:11, 30:14, 58:7, 58:11, 86:16, 102:6, 106:13, 107:2, 110:5, 110:18, 112:6, 114:11, 114:12, 114:21, 114:22, 121:6, 136:18, 173:17, 207:3, 207:6, 212:1, 213:9
**EXAMINATION** [1] - 124:4
**examinations** [4] - 5:2, 119:16, 214:14, 215:18
**examine** [1] - 83:22
**examined** [2] - 9:6, 234:1
**examiner** [2] - 215:17, 215:20
**Examiner** [1] - 215:21
**examines** [1] - 58:7
**examining** [1] - 106:7
**example** [10] - 17:25, 84:18, 85:25, 116:21, 148:3, 158:11, 162:18, 184:19, 199:11, 236:22
**examples** [1] - 19:2
**exceed** [4] - 45:23, 51:8, 52:2, 52:5
**except** [2] - 59:1, 215:11
**exception** [3] - 48:10, 96:2, 96:4
**excess** [1] - 45:2
**exchange** [3] - 80:3, 101:1, 101:18
**excited** [1] - 234:7
**exciting** [1] - 41:14
**exclusively** [1] - 40:23
**excused** [1] - 5:11
**execute** [4] - 83:18, 134:23, 135:24, 144:8
**executed** [1] - 133:5
**executing** [1] - 133:20
**executive** [21] - 17:11, 17:13, 17:15, 17:22, 47:12, 47:24, 50:7, 153:23, 153:24, 154:2, 154:5, 154:15, 154:19, 155:7, 155:14, 155:21, 156:10, 205:9, 231:3,

231:7
**executives** [1] - 209:13
**exemption** [1] - 132:13
**exercise** [3] - 206:17, 239:9
**Exhibit** [27] - 41:18, 42:13, 122:15, 122:21, 123:22, 123:23, 130:3, 133:19, 134:11, 138:7, 139:1, 139:2, 164:19, 167:6, 174:22, 182:10, 206:14, 215:16, 223:4, 223:24, 224:18, 231:13, 231:18, 231:22
**exhibit** [14] - 114:3, 122:9, 123:11, 123:19, 174:22, 224:19, 224:20, 229:11, 236:3, 236:16, 236:19, 236:20, 237:11, 237:15
**exhibits** [13] - 7:5, 7:19, 8:9, 123:8, 123:9, 123:10, 161:23, 215:15, 231:13, 236:1, 236:2, 237:16, 238:8
**EXIM** [1] - 14:2
**exist** [2] - 90:20, 147:3
**existence** [1] - 149:1
**expect** [3] - 109:6, 174:16, 220:21
**expectations** [3] - 139:11, 213:14, 214:20
**expected** [2] - 46:4, 80:11
**expects** [1] - 31:19
**expedite** [1] - 148:8
**expedited** [1] - 239:16
**expedition** [1] - 238:25
**expenditures** [1] - 40:11
**expenses** [1] - 161:13
**experience** [9] - 11:13, 13:21, 14:2, 17:15, 17:24, 18:13, 31:9, 109:5
**experiences** [1] - 18:12
**expert** [1] - 228:20
**expire** [1] - 45:24
**explain** [8] - 38:10, 42:24, 51:3, 54:1, 54:9, 94:14, 223:17, 223:18
**explained** [2] - 86:3, 128:16
**explaining** [2] - 53:24, 107:16
**explains** [3] - 100:23,

200:15, 218:1
**explicitly** [1] - 16:10
**Export/Import** [1] - 13:17
**express** [1] - 24:14
**extend** [1] - 239:1
**extent** [4] - 115:8, 119:6, 134:25, 236:4
**external** [7] - 88:11, 95:16, 103:4, 118:24, 164:3, 222:22, 223:16
**extraordinary** [2] - 46:21, 47:9

**F**

**FACA** [4] - 96:3, 151:4, 151:11
**face** [4] - 16:8, 16:10, 28:15
**facilities** [2] - 14:6, 190:6
**facing** [3] - 103:12, 106:7, 147:7
**fact** [21] - 16:9, 33:4, 51:20, 73:18, 78:1, 80:9, 84:2, 84:13, 112:7, 113:11, 146:10, 168:19, 183:14, 186:1, 187:11, 188:5, 206:3, 207:18, 210:1, 220:24, 239:9
**fact-finding** [1] - 239:9
**factfinder** [1] - 86:6
**factors** [1] - 158:16
**facts** [7] - 115:13, 129:25, 132:25, 135:1, 155:9, 157:4, 191:9
**fail** [1] - 220:1
**failure** [6] - 146:8, 146:11, 146:15, 147:1, 147:2
**failures** [1] - 146:22
**Fair** [6] - 76:24, 93:21, 93:22, 117:9, 131:3, 187:6
**fair** [23] - 33:5, 66:22, 71:21, 72:17, 81:16, 83:13, 84:1, 91:19, 93:25, 113:2, 114:8, 115:2, 115:4, 115:7, 115:14, 126:18, 143:11, 170:21, 173:14, 207:20, 209:2, 234:2
**faith** [1] - 191:7
**falls** [1] - 118:19
**familiar** [3] - 19:17, 100:7, 146:14
**fantastic** [1] - 57:18

**far** [10] - 22:17, 38:11, 64:21, 116:4, 201:24, 215:12, 216:15, 216:16, 229:16, 232:6
**fascinating** [1] - 11:2
**fast** [3] - 140:8, 149:2, 149:11
**faster** [1] - 132:14
**fat** [1] - 160:25
**favorite** [2] - 57:21, 94:9
**FCRA** [1] - 59:2
**FDIC** [1] - 195:15
**Fe** [2] - 9:20
**fear** [1] - 6:10
**February** [103] - 12:10, 13:24, 15:6, 16:25, 19:5, 19:20, 26:22, 30:4, 30:5, 32:1, 42:3, 42:25, 45:9, 46:4, 47:15, 52:10, 56:21, 61:6, 66:4, 66:5, 66:8, 73:8, 76:4, 76:10, 76:19, 77:14, 78:9, 86:25, 87:3, 90:3, 94:12, 102:15, 104:13, 104:14, 105:19, 106:11, 106:12, 107:5, 107:6, 108:3, 108:15, 111:11, 111:18, 124:10, 124:18, 125:6, 125:12, 126:1, 126:23, 128:4, 130:11, 132:21, 132:24, 133:1, 136:22, 137:7, 137:11, 138:8, 139:22, 141:20, 142:15, 150:15, 150:22, 153:18, 157:1, 159:18, 159:19, 159:22, 161:18, 166:8, 166:22, 168:3, 168:11, 168:15, 169:20, 173:6, 174:7, 177:10, 177:13, 178:7, 179:10, 180:19, 180:21, 184:9, 184:25, 186:17, 188:9, 189:22, 190:9, 195:12, 198:18, 199:1, 199:10, 199:14, 201:21, 203:12, 206:11, 206:22, 211:22, 211:25, 212:12, 213:18
**Fed** [6] - 36:11, 36:14, 36:17, 43:3, 69:18, 159:24
**Federal** [21] - 3:25, 4:2, 35:16, 35:21, 35:24, 38:16, 38:21, 41:3, 41:8, 41:11, 41:13, 42:23, 43:10,

43:12, 43:15, 44:7, 44:15, 53:14, 96:3, 159:23, 160:13
**federal** [6] - 18:19, 46:8, 61:11, 127:3, 222:9, 230:13
**fee** [1] - 92:2
**feedback** [1] - 63:7
**felt** [8] - 21:24, 22:6, 23:4, 23:5, 24:6, 30:22, 71:24, 153:13
**few** [7] - 72:8, 101:7, 108:1, 134:22, 197:1, 213:21, 224:24
**field** [2] - 93:24, 190:15
**figure** [10] - 21:7, 39:7, 42:12, 115:19, 115:24, 146:4, 177:15, 191:17, 221:11, 234:5
**figured** [1] - 80:24
**figuring** [2] - 221:7, 221:10
**file** [10] - 64:3, 119:11, 121:4, 123:8, 190:20, 190:22, 193:18, 195:2, 236:2, 238:3
**filed** [9] - 8:6, 8:13, 133:15, 145:23, 159:10, 162:21, 168:11, 168:17, 236:18
**files** [2] - 119:11, 225:9
**filing** [2] - 64:2, 121:4
**filings** [1] - 7:24
**Filings** [1] - 16:5
**fill** [1] - 105:3
**filled** [1] - 185:17
**final** [3] - 50:15, 60:14, 91:17
**finally** [1] - 27:16
**Finance** [1] - 10:11
**finance** [3] - 12:21, 14:4, 22:3
**finances** [3] - 33:8, 34:10, 34:12
**Financial** [4] - 10:10, 36:20, 38:3
**financial** [32] - 10:12, 18:16, 31:7, 34:14, 34:21, 34:25, 40:1, 40:6, 41:9, 58:8, 72:8, 73:15, 73:25, 75:9, 79:15, 85:10, 90:19, 106:7, 119:8, 153:7, 164:20, 167:15, 169:18, 183:3, 183:5, 183:8, 192:2, 193:11, 217:20, 219:18, 221:2, 223:6

**fine** [3] - 6:20, 8:16, 68:11
**finish** [2] - 110:23, 172:10
**fire** [2] - 129:9, 129:21
**fired** [6] - 128:8, 128:10, 129:1, 148:19, 208:25, 225:11
**firing** [4] - 121:19, 128:14, 129:12, 225:5
**FIRREAs** [1] - 55:16
**first** [64] - 4:21, 4:24, 5:23, 6:1, 6:4, 6:5, 6:16, 9:5, 9:24, 16:14, 17:4, 17:8, 17:22, 18:12, 19:19, 19:20, 24:17, 27:10, 36:15, 41:16, 45:15, 46:1, 46:15, 57:17, 66:4, 66:13, 69:2, 71:22, 78:12, 84:21, 88:21, 101:7, 102:12, 102:23, 103:2, 104:7, 109:2, 121:10, 124:15, 125:5, 126:12, 128:24, 130:4, 131:25, 132:20, 139:11, 148:24, 153:19, 168:2, 174:22, 178:6, 179:1, 184:25, 196:4, 197:25, 198:22, 200:5, 201:10, 203:3, 213:11, 213:12, 224:19, 236:6, 236:13
**firsthand** [1] - 200:1
**fist** [1] - 23:4
**fit** [1] - 161:10
**five** [2] - 152:11, 211:1
**fixed** [1] - 116:5
**flagging** [2] - 179:2, 217:6
**flagship** [1] - 12:18
**flow** [2] - 222:7, 222:8
**fluid** [2] - 153:24, 156:3
**flurry** [8] - 209:3, 209:21, 210:11, 210:12, 210:14, 210:19, 210:21, 212:6
**focus** [2] - 62:22, 195:1
**focused** [5] - 27:5, 40:23, 56:3, 83:15, 149:21
**FOIA** [5] - 14:5, 94:4, 94:5, 94:8, 143:16
**folks** [9] - 27:22, 46:8, 55:6, 68:25, 72:9, 89:5, 94:19, 94:22, 103:3
**follow** [12] - 20:21, 25:19, 62:16, 71:6,

75:11, 79:11, 83:11, 95:24, 123:25, 185:7, 186:7, 232:14
**follow-up** [3] - 25:19, 79:11, 95:24
**followed** [3] - 27:10, 27:13, 98:23
**following** [18] - 22:23, 56:4, 63:22, 127:2, 141:11, 142:20, 143:20, 149:7, 157:17, 158:8, 163:17, 163:22, 175:2, 183:2, 185:20, 185:23, 238:10, 238:25
**follows** [4] - 9:6, 34:4, 92:22, 98:3
**force** [7] - 44:24, 45:1, 62:14, 129:12, 129:13, 154:22, 230:13
**forever** [1] - 122:25
**forgotten** [1] - 37:8
**fork** [2] - 51:13, 51:14
**form** [6] - 69:6, 101:4, 173:19, 175:13, 196:15, 218:21
**formal** [2] - 24:4, 24:6
**former** [1] - 53:6
**formulate** [1] - 159:6
**formulating** [1] - 70:5
**forth** [4] - 58:9, 177:23, 197:9, 227:16
**fortunately** [1] - 14:13
**forward** [9] - 13:22, 39:2, 57:23, 59:1, 78:1, 80:14, 94:23, 106:6, 145:25
**forwarded** [2] - 108:22, 178:12
**foundation** [3] - 173:20, 174:1, 225:14
**four** [6] - 28:19, 151:11, 153:18, 228:19, 229:20, 238:18
**Frank** [4] - 93:18, 117:11, 146:22
**freaked** [1] - 133:8
**free** [1] - 198:2
**Friday** [10] - 4:19, 15:25, 21:18, 106:11, 132:21, 132:24, 133:5, 148:18, 236:14, 238:17
**Friday's** [1] - 64:2
**Friedman** [1] - 3:13
**friends** [2] - 5:21, 115:6
**front** [5] - 3:19, 16:3, 34:2, 131:12, 198:19
**frustration** [1] - 75:17
**fulfil** [4] - 71:17, 74:25, 103:21, 140:8

**fulfilled** [2] - 230:4, 230:17
**fulfilling** [6] - 96:18, 174:13, 186:11, 186:15, 186:18, 230:8
**full** [5] - 4:12, 9:1, 9:8, 78:24, 99:23
**full-time** [2] - 78:24, 99:23
**fully** [3] - 120:19, 227:1, 227:5
**function** [5] - 78:19, 112:7, 130:25, 147:6, 191:24
**functionally** [2] - 33:4, 72:18
**functioning** [1] - 140:13
**functions** [46] - 5:3, 22:8, 24:14, 62:23, 62:25, 67:15, 76:6, 82:20, 84:10, 84:13, 84:14, 92:20, 92:25, 93:13, 94:2, 95:1, 95:4, 100:10, 118:11, 118:12, 119:1, 126:2, 149:18, 149:20, 149:22, 149:23, 150:3, 155:3, 155:14, 156:8, 156:12, 185:3, 186:3, 186:11, 186:15, 186:19, 187:2, 187:7, 187:11, 187:18, 188:6, 188:9, 188:11, 221:20, 230:6
**Fund** [5] - 10:10, 12:17, 12:21, 18:15, 18:16
**fund** [31] - 34:21, 34:24, 35:4, 35:5, 36:20, 36:23, 36:24, 36:25, 37:2, 37:9, 37:11, 37:14, 37:15, 37:18, 37:22, 37:24, 38:17, 38:19, 39:8, 39:22, 43:4, 43:18, 43:23, 160:2, 161:9, 161:11, 161:13
**funding** [6] - 35:21, 35:24, 37:21, 53:15, 160:2, 161:10
**funds** [14] - 34:20, 36:21, 38:16, 38:21, 40:10, 40:14, 41:3, 42:23, 44:7, 44:14, 159:24, 160:3, 160:14, 160:22
**furious** [1] - 112:25
**future** [3] - 65:5, 67:17, 238:5

**G**

**Gabriel** [1] - 3:13
**gap** [1] - 118:8
**gaps** [2] - 71:17, 117:22
**gears** [2] - 159:9, 184:7
**general** [6] - 27:2, 69:11, 78:24, 151:21, 189:14, 228:12
**General** [2] - 70:24, 151:9
**generally** [9] - 10:18, 26:5, 31:13, 45:1, 81:6, 121:11, 196:11, 226:21, 226:22
**generals** [1] - 22:7
**generated** [2] - 147:5, 209:11
**get-go** [1] - 121:20
**gist** [2] - 36:7, 36:9
**given** [10] - 10:21, 22:11, 61:23, 102:2, 140:20, 161:6, 202:15, 208:19, 208:21, 237:21
**goal** [2] - 13:21, 149:1
**goodness** [1] - 38:8
**govern** [1] - 222:8
**governance** [1] - 14:5
**governing** [1] - 218:10
**government** [17] - 5:18, 5:24, 6:16, 14:25, 34:1, 45:1, 46:12, 61:12, 62:17, 81:11, 89:4, 123:9, 141:20, 230:13, 231:8, 233:14, 233:16
**government's** [2] - 72:3, 165:3
**government-wide** [1] - 89:4
**Governors** [1] - 35:16
**graduate** [1] - 9:21
**graduated** [2] - 9:22, 10:3
**grant** [4] - 12:18, 12:19, 18:16, 18:19
**granted** [3] - 25:15, 51:11, 210:25
**granting** [1] - 48:10
**great** [5] - 24:16, 68:12, 92:5, 99:4, 226:15
**ground** [4] - 4:15, 12:8, 228:7, 228:16
**group** [3] - 93:12, 146:16, 146:17
**Group** [1] - 3:15
**groups** [5] - 31:7,

31:18, 54:6, 228:18
**GSA** [3] - 183:14, 183:16, 183:18
**guards** [1] - 28:19
**guess** [3] - 3:19, 7:15, 142:19
**Gueye** [7] - 72:8, 79:15, 85:9, 153:4, 153:6, 153:7, 219:17
**guidance** [20] - 19:12, 46:14, 61:10, 64:17, 78:23, 85:11, 85:22, 94:17, 110:1, 111:24, 112:2, 157:17, 158:9, 172:17, 173:1, 173:4, 206:17, 209:22, 232:4, 232:9
**guide** [1] - 157:18
**gun** [1] - 112:15
**GUPTA** [15] - 3:7, 3:21, 5:17, 5:22, 6:5, 6:25, 8:18, 233:21, 233:23, 233:25, 234:20, 235:10, 235:12, 235:17, 235:23
**Gupta** [4] - 3:7, 3:8, 3:12, 5:16
**guy** [1] - 40:8

**H**

**Hagins** [1] - 105:18
**half** [2] - 68:8, 68:15
**hallway** [2] - 27:20, 27:23
**hand** [2] - 72:7, 75:5
**handful** [1] - 69:7
**handing** [2] - 8:21
**handle** [2] - 94:20, 103:3
**handling** [3] - 10:2, 159:12, 202:13
**hands** [5] - 14:14, 61:24, 108:21, 111:21, 171:10
**hands-off** [1] - 14:14
**happy** [5] - 10:18, 38:23, 148:17, 148:19, 225:18
**harassed** [1] - 27:10
**harassment** [2] - 182:4, 221:15
**hard** [6] - 23:3, 53:25, 162:10, 191:10, 205:9, 208:11
**hate** [1] - 54:12
**hatted** [1] - 62:9
**head** [24] - 14:16, 14:17, 14:20, 26:12, 58:24, 61:14, 62:7,

76:13, 93:3, 93:14, 93:20, 109:21, 117:24, 118:14, 124:17, 127:9, 134:21, 161:9, 161:16, 167:5, 196:18, 200:12, 224:4, 226:7
**headed** [5] - 19:24, 65:18, 69:9, 78:17, 234:4
**header** [1] - 16:17
**heading** [1] - 174:23
**headquarters** [6] - 12:23, 13:16, 31:15, 152:7, 186:25
**heads** [7] - 26:16, 57:3, 57:13, 71:2, 80:7, 80:10
**hear** [8] - 4:11, 4:21, 5:5, 6:23, 19:13, 28:22, 128:25, 214:10
**heard** [5] - 28:5, 102:17, 103:2, 158:4, 209:23
**hearing** [32] - 4:14, 4:16, 13:2, 19:7, 29:22, 64:3, 66:11, 86:6, 97:11, 120:14, 121:5, 124:16, 132:24, 133:14, 134:6, 134:18, 135:13, 167:24, 168:2, 198:15, 203:18, 203:21, 210:23, 211:1, 238:3, 238:13, 238:14, 239:4
**heavily** [1] - 83:4
**help** [11] - 79:23, 89:6, 99:23, 122:25, 131:20, 177:15, 179:23, 182:1, 193:4, 220:24, 236:4
**helped** [3] - 209:14, 209:15, 209:16
**helpful** [6] - 57:12, 110:22, 111:17, 194:7, 210:8, 237:9
**helps** [1] - 89:14
**hi** [1] - 64:15
**high** [4] - 9:24, 68:17, 77:22, 183:16
**high-priority** [1] - 77:22
**highest** [1] - 62:24
**highly** [3] - 42:24, 213:13
**Hill** [1] - 27:3
**himself** [4] - 20:13, 27:7, 33:19, 200:10
**hire** [1] - 11:4
**hired** [4] - 10:5, 10:7, 18:23, 67:19
**historical** [2] - 182:25,

184:2
**historically** [3] -
14:15, 14:16, 228:18
**hitting** [1] - 69:16
**HMDA** [10] - 87:15,
88:2, 192:9, 192:11,
192:24, 193:9, 193:24,
194:19, 195:14, 195:21
**hold** [5] - 73:9, 109:12,
116:7, 178:19, 227:12
**holds** [4] - 179:4,
179:5, 179:8, 179:16
**Holland** [1] - 4:1
**Home** [3] - 191:24,
192:9, 193:9
**home** [3] - 187:3,
194:21, 230:18
**honestly** [1] - 204:17
**Honor** [12] - 3:7, 3:23,
5:17, 6:19, 7:4, 38:13,
60:12, 86:11, 99:1,
110:19, 234:17, 234:19
**hope** [4] - 67:16,
67:17, 206:9, 235:2
**host** [1] - 232:13
**hot** [1] - 91:22
**hotline** [14] - 59:22,
60:6, 88:6, 89:21,
90:14, 90:15, 91:7,
91:12, 91:13, 91:14,
91:17, 91:21, 92:5,
93:11
**hour** [2] - 68:8, 68:15
**hours** [8] - 15:18,
24:18, 109:8, 110:2,
110:15, 160:9, 161:7,
213:21
**house** [10] - 24:20,
25:22, 25:23, 26:1,
26:2, 26:9, 92:4,
149:24, 186:6, 205:18
**House** [5] - 10:6,
15:13, 150:23, 151:7,
151:16
**housekeeping** [1] -
235:4
**housing** [1] - 89:14
**HR** [4] - 12:22, 13:15,
143:15, 218:24
**Huggins** [12] - 105:18,
107:12, 108:13, 109:4,
109:7, 109:24, 211:14,
211:24, 212:7, 212:16,
213:2, 213:20
**Huggins's** [4] -
108:25, 109:11,
109:13, 115:15
**hum** [31] - 48:5, 48:18,
52:1, 72:15, 84:11,
88:20, 93:15, 93:19,

124:13, 129:20,
134:16, 134:19,
135:18, 139:3, 141:13,
154:23, 163:23,
166:25, 169:13, 173:3,
174:25, 178:8, 181:1,
187:4, 196:23, 198:13,
201:22, 204:14, 211:6,
219:22, 224:25
**human** [13] - 11:2,
11:20, 14:5, 22:1, 53:4,
53:24, 65:8, 156:21,
190:3, 197:21, 206:10,
231:14
**hundred** [1] - 12:11
**hundreds** [2] - 4:18,
12:11

## I

**ID** [1] - 28:16
**idea** [11] - 31:19,
125:3, 143:10, 194:8,
223:2, 228:10, 230:10,
230:11, 230:14,
230:22, 237:10
**identified** [14] - 48:13,
49:3, 54:7, 70:24,
71:17, 79:8, 80:10,
138:15, 139:5, 139:14,
164:16, 193:9, 196:21,
235:12
**identifies** [5] - 95:25,
130:16, 146:22,
165:12, 169:11
**identify** [13] - 49:6,
57:12, 70:12, 82:18,
83:17, 105:4, 146:11,
146:21, 164:23,
180:15, 235:6, 239:10
**identifying** [3] - 92:23,
166:11, 166:21
**IDs** [2] - 28:11, 28:12
**imagine** [2] - 30:23,
94:7
**immediate** [1] - 87:13
**immediately** [8] -
34:14, 41:8, 41:10,
78:14, 133:15, 134:20,
135:15, 150:24
**impact** [2] - 90:8, 91:5
**impacts** [1] - 225:5
**impediment** [1] -
145:25
**impending** [1] -
231:16
**implement** [2] - 64:12,
121:23
**implementation** [1] -
100:25

**implemented** [3] -
100:24, 148:10, 186:5
**implication** [1] - 86:9
**importance** [2] -
89:22, 103:21, 193:11
**important** [9] - 60:22,
89:6, 91:23, 100:2,
100:3, 100:5, 117:8,
193:12, 220:24
**impossible** [1] - 44:11
**impression** [8] -
23:19, 24:7, 55:25,
137:4, 148:18, 148:21,
187:6, 204:15
**in-coming** [1] - 63:9
**inaccurate** [3] -
127:12, 127:13, 127:21
**incapable** [1] - 238:21
**include** [5] - 39:7,
81:6, 103:6, 132:3,
210:7
**included** [8] - 58:4,
104:7, 107:5, 107:6,
129:1, 140:3, 150:19,
177:13
**includes** [3] - 8:3,
112:9, 236:17
**including** [6] - 3:19,
96:18, 112:19, 159:11,
161:13, 185:12
**Inclusion** [1] - 222:24
**incoming** [1] - 63:6
**increasingly** [1] - 56:5
**incredible** [2] - 11:13,
11:14
**incredibly** [1] - 57:22
**incur** [1] - 37:21
**indeed** [1] - 77:14
**independent** [2] -
10:24, 13:18
**indicated** [5] - 63:22,
110:1, 111:6, 115:6,
235:5
**indicates** [1] - 104:20
**indicating** [2] - 100:8,
136:15
**indicating)** [2] - 62:3,
167:11
**indication** [1] - 27:11
**indirectly** [1] - 225:25
**individual** [8] - 22:11,
22:13, 75:9, 83:12,
146:16, 177:20,
237:11, 237:15
**individuals** [16] - 33:3,
33:7, 33:18, 34:2, 34:9,
41:22, 41:24, 55:7,
55:9, 77:15, 103:13,
134:24, 136:12, 140:3,
158:3, 231:12

**infer** [2] - 115:7,
115:14
**inference** [1] - 191:9
**information** [29] -
4:14, 21:25, 24:23,
25:12, 25:17, 34:15,
39:18, 49:7, 57:19,
59:4, 65:18, 81:22,
90:6, 105:21, 157:20,
157:21, 167:16, 180:2,
181:3, 187:23, 192:2,
192:18, 193:18,
194:10, 195:10,
199:19, 199:21, 216:4,
216:9
**informational** [1] -
192:13
**informed** [1] - 12:25
**infrastructure** [5] -
10:23, 11:23, 14:4,
18:25, 89:20
**inherit** [4] - 143:12,
143:17, 144:11, 149:20
**initial** [6] - 11:21, 25:6,
76:1, 106:25, 121:8,
173:7
**injunction** [8] - 4:17,
4:23, 39:1, 80:19,
124:12, 124:16,
237:23, 239:3
**inner** [2] - 22:5, 22:25
**innovation** [1] - 85:5
**inquiring** [1] - 43:2
**inquiry** [1] - 195:15
**inside** [1] - 92:8
**insight** [4] - 188:2,
228:15, 228:17
**insisting** [1] - 80:17
**inspector** [1] - 22:7
**instance** [2] - 218:22,
219:3
**instead** [2] - 122:9,
150:13
**institution** [2] - 34:25,
106:7
**Institutions** [1] - 10:10
**institutions** [7] - 31:7,
58:8, 90:19, 119:9,
192:2, 193:11, 193:17
**instruct** [2] - 175:18,
175:20
**instructed** [10] - 4:6,
29:10, 47:7, 69:19,
120:17, 150:24, 151:7,
151:10, 151:16, 206:18
**instructions** [3] -
62:16, 65:13, 174:10
**intact** [3] - 192:11,
192:14, 198:4
**intake** [1] - 83:6

integrity [1] - 190:16
intend [3] - 168:24, 230:1, 232:14
intended [8] - 32:12, 43:6, 49:9, 53:10, 109:18, 110:17, 112:5, 190:24
intending [1] - 198:5
intends [3] - 62:18, 65:5, 233:15
intent [9] - 47:6, 71:14, 83:5, 168:21, 168:22, 169:2, 185:7, 190:14, 195:3
intention [1] - 185:13
interact [1] - 103:8
interaction [7] - 9:24, 19:19, 19:20, 20:18, 31:6, 95:5, 205:17
interest [7] - 4:24, 5:1, 24:14, 24:19, 29:23, 31:7, 31:18
interested [6] - 5:3, 22:5, 68:13, 116:25, 191:3, 238:23
interesting [2] - 10:13, 84:15
internal [4] - 7:25, 64:1, 148:1, 222:22
Internal [1] - 16:4
internally [1] - 221:24
interplay [1] - 226:2
interpret [1] - 106:5
interpreted [1] - 106:6
interrupt [1] - 12:24
interruption [2] - 79:14, 152:1
intimidation [1] - 5:13
introduce [1] - 43:6
introduced [4] - 157:8, 226:13, 236:6
introduces [1] - 200:9
introduction [1] - 21:5
inviting [1] - 70:11
involve [3] - 46:18, 55:22, 95:5
involved [9] - 11:10, 11:18, 12:2, 55:20, 69:5, 74:16, 137:15, 144:5, 144:6
involving [2] - 95:23, 96:7
iPhone [1] - 229:7
irresponsibly [1] - 73:16
issuance [1] - 63:23
issue [14] - 8:11, 19:6, 38:10, 38:14, 38:22, 38:25, 40:24, 60:13, 81:2, 99:3, 115:12,

178:24, 179:3, 209:16
issued [15] - 61:10, 64:17, 70:14, 79:7, 85:22, 133:12, 141:19, 158:9, 170:3, 176:1, 177:13, 184:23, 206:10, 213:18
issues [9] - 27:2, 27:5, 68:21, 77:22, 81:23, 94:21, 141:17, 187:20, 205:15
IT [4] - 20:9, 20:10, 20:21, 81:25
item [3] - 34:18, 47:13, 96:4
items [2] - 37:20, 47:11
itself [4] - 31:13, 96:25, 103:5, 177:6

## J

Jackson [3] - 77:6, 88:23, 119:21
Jafnar [5] - 72:8, 153:4, 153:7, 219:17, 220:23
Jan [2] - 96:11, 100:11
Janis [1] - 96:8
Jason [4] - 223:25, 224:3, 224:23, 225:14
Jennifer [2] - 3:12, 124:6
Jeremy [4] - 21:13, 92:16, 138:13, 139:22
Jerome [2] - 35:15, 159:23
JJ [3] - 48:15, 130:3, 138:7
job [7] - 11:19, 13:14, 57:18, 78:19, 98:10, 103:8, 191:14
jobs [2] - 58:1, 153:16
Johnson [18] - 87:21, 88:17, 89:5, 91:6, 92:15, 92:19, 93:3, 99:9, 165:7, 166:20, 196:13, 196:17, 199:24, 200:9, 202:5, 202:21, 202:23, 203:2
Johnson's [1] - 99:16
joined [2] - 3:11, 125:14
joining [1] - 4:1
jointly [1] - 6:2
Jordan [2] - 21:12, 92:16
Judge [5] - 64:11, 77:6, 88:23, 99:24, 119:21

Judge's [2] - 18:8, 83:11
judgment [2] - 237:25, 239:17
Julie [1] - 3:15
jump [1] - 91:2
jumps [1] - 112:15
jurisdiction [1] - 10:19
jury [1] - 237:20
Justice [1] - 3:24
justification [4] - 49:9, 49:21, 50:4, 71:3
justifications [8] - 47:21, 48:12, 49:4, 49:6, 49:24, 50:2, 73:20, 223:16
justified [1] - 47:16
justify [3] - 46:25, 73:21, 220:24
juxtaposing [1] - 160:21

## K

keep [14] - 11:7, 56:10, 59:12, 65:22, 148:14, 151:13, 193:14, 193:16, 193:19, 195:1, 196:19, 196:20, 210:17, 219:7
keeping [2] - 138:21, 168:5
keeps [1] - 111:17
kept [2] - 140:21, 193:14
kind [11] - 9:13, 38:11, 121:9, 121:10, 125:18, 125:19, 159:2, 210:11, 221:17, 234:4, 238:25
kinds [1] - 83:24
KK [2] - 139:2, 139:19
knowing [2] - 228:8, 238:23
knowledge [18] - 25:21, 26:9, 32:11, 49:16, 81:23, 89:19, 92:9, 97:4, 116:17, 117:14, 117:20, 118:7, 146:18, 171:25, 172:19, 200:1, 221:11, 230:6
known [2] - 133:8, 133:11
knows [3] - 26:13, 26:12, 82:15

## L

label [1] - 122:24
labels [1] - 123:19

lack [5] - 58:6, 83:20, 173:19, 174:1, 225:13
language [3] - 66:7, 151:15, 186:15
laptop [1] - 7:19
laptops [2] - 28:14, 78:14
large [8] - 38:19, 53:8, 128:1, 132:13, 134:1, 142:16, 158:12
large-scale [4] - 128:1, 134:1, 142:16, 158:12
largely [3] - 17:16, 123:5, 162:20
larger [1] - 16:8
LaShaun [2] - 95:10, 95:13
last [40] - 4:12, 4:19, 8:8, 29:22, 30:10, 48:4, 60:12, 65:1, 65:9, 66:11, 69:23, 80:18, 84:16, 85:20, 86:12, 90:6, 90:25, 91:15, 116:10, 120:24, 121:7, 148:9, 153:9, 159:6, 178:22, 182:15, 182:18, 203:15, 203:18, 203:19, 215:13, 228:19, 229:19, 229:23, 231:14, 231:23, 235:12, 238:11
late [1] - 27:8
latter [1] - 185:18
Law [2] - 3:9, 3:10
law [14] - 8:23, 58:11, 84:3, 109:20, 112:8, 154:25, 205:1, 207:2, 207:6, 207:7, 207:10, 207:11, 207:13
lawsuit [1] - 40:23, 168:11, 168:17
lawsuits [1] - 40:22
lawyer [2] - 3:21, 38:6
lawyers [1] - 4:20
laying [1] - 57:19
lead [7] - 11:14, 15:18, 131:20, 137:6, 137:8, 137:9, 137:11
leaders [1] - 144:21
leadership [45] - 45:15, 54:7, 57:22, 65:18, 74:22, 125:7, 125:10, 126:1, 128:21, 132:16, 132:20, 136:8, 136:10, 136:11, 136:13, 136:15,

136:19, 136:25, 137:1, 137:3, 139:15, 143:12, 143:25, 144:11, 144:17, 144:18, 145:1, 145:2, 145:4, 145:5, 157:18, 157:23, 157:24, 158:5, 159:11, 159:14, 185:2, 185:5, 185:12, 187:15, 187:17, 188:18, 229:25, 232:4, 232:15

**leading** [1] - 173:16

**leads** [1] - 100:23

**leaked** [1] - 115:17

**learned** [3] - 11:15, 15:14, 44:11

**lease** [2] - 142:22, 235:22

**leases** [1] - 231:1

**least** [12] - 25:7, 35:19, 40:13, 42:3, 101:16, 126:21, 146:21, 194:14, 196:24, 221:8, 222:14, 231:14

**leave** [22] - 26:19, 28:21, 52:7, 52:11, 68:1, 80:17, 89:21, 91:20, 91:23, 98:11, 98:16, 102:3, 113:19, 114:6, 122:3, 206:11, 206:18, 207:23, 207:24, 213:6, 216:10, 216:13

**led** [3] - 49:1, 54:23, 54:25

**left** [15] - 12:10, 18:22, 26:19, 28:21, 54:9, 73:12, 86:16, 86:21, 104:16, 116:21, 143:18, 158:21, 194:19, 225:9, 238:6

**legal** [33] - 13:1, 22:25, 25:2, 29:18, 32:18, 34:11, 41:6, 43:2, 56:18, 57:5, 57:8, 58:10, 58:16, 58:25, 59:14, 72:16, 78:21, 96:25, 115:13, 119:21, 120:16, 125:15, 125:21, 154:6, 155:9, 159:11, 164:9, 186:6, 199:2, 199:8, 199:22, 222:21, 239:8

**legally** [2] - 219:7, 221:19

**legally-required** [1] - 221:19

**lenders** [1] - 103:7

**lending** [1] - 192:3

**Lending** [5] - 76:24,

93:21, 93:22, 117:9, 131:3

**lengthy** [1] - 4:11

**less** [8] - 49:2, 67:14, 67:16, 109:8, 110:2, 110:14, 161:7, 234:4

**letter** [13] - 35:13, 35:14, 35:15, 35:22, 35:23, 36:7, 36:9, 36:17, 36:19, 38:20, 39:20, 48:20, 159:22

**letterhead** [1] - 48:20

**letters** [10] - 35:20, 123:11, 152:9, 168:21, 168:22, 174:10, 238:5, 238:6, 238:7

**letting** [5] - 5:14, 15:12, 15:22, 23:14, 25:14

**level** [7] - 9:24, 43:5, 77:18, 90:22, 93:24, 193:16, 221:18

**Lewin** [4] - 21:13, 92:17, 138:13, 139:22

**liaison** [1] - 103:20

**liaisons** [1] - 11:4

**Liam** [1] - 4:1

**Licata** [2] - 79:4, 79:22

**Licata's** [1] - 79:6

**lied** [1] - 191:7

**life** [1] - 18:25

**lift** [2] - 62:13, 64:11

**light** [5] - 53:22, 62:14, 94:8, 96:16, 120:24

**lights** [1] - 196:20

**limb** [1] - 140:18

**limited** [1] - 172:19

**line** [8] - 4:4, 13:1, 13:7, 34:18, 131:25, 208:1, 208:7

**lines** [1] - 118:17

**list** [13] - 54:7, 57:23, 72:25, 79:17, 102:24, 102:25, 117:16, 131:12, 131:13, 131:14, 146:24, 169:11, 171:25

**listed** [1] - 166:2

**listen** [1] - 4:6

**listening** [2] - 4:5, 4:9

**listing** [1] - 166:4

**listings** [1] - 172:14

**lists** [3] - 71:19, 95:5, 225:1

**litigated** [1] - 58:19

**litigation** [9] - 38:14, 58:19, 81:3, 119:20, 178:19, 179:5, 179:8, 179:16, 182:1

**Litigation** [1] - 3:15

**Liu** - 3:14

**live** [4] - 4:17, 13:3, 28:13, 190:7

**LL** [1] - 133:19

**Loan** [1] - 189:2

**loan** [3] - 104:25, 190:18, 190:24

**loans** [2] - 5:1, 89:15

**local** [1] - 67:3

**locks** [1] - 87:25

**logistical** [2] - 8:9, 236:1

**long-term** [1] - 92:1

**look** [26] - 30:19, 54:3, 64:7, 68:25, 69:10, 69:12, 70:25, 79:3, 79:24, 81:15, 87:9, 94:13, 98:1, 100:21, 102:12, 105:9, 109:3, 118:10, 162:18, 171:7, 173:12, 200:4, 204:10, 206:15, 227:6, 239:11

**looked** [9] - 13:22, 77:24, 172:3, 172:5, 172:6, 172:9, 172:14, 205:10, 228:11

**looking** [14] - 28:25, 35:7, 42:12, 53:4, 53:23, 73:5, 135:21, 162:2, 169:7, 172:1, 186:21, 192:19, 222:20, 235:24

**looks** [3] - 66:18, 224:7, 224:16

**loop** [1] - 139:17

**loosely** [1] - 21:24

**lose** [2] - 182:25, 184:1

**losing** [1] - 10:19

**loss** [1] - 225:3

**lost** [3] - 76:17, 174:18

**loud** [2] - 171:7, 201:13

**love** [1] - 12:16

**lower** [1] - 75:5

**Luddite** [1] - 7:11

**lulled** [1] - 170:17

**lunch** [5] - 86:15, 86:20, 102:25, 104:4, 194:3

## M

**ma'am** [12] - 17:25, 20:15, 52:21, 59:7, 68:3, 93:5, 128:13, 191:19, 194:22, 222:1, 227:10, 234:14

**Mahoney** [1] - 48:21

**mails** [2] - 191:15,

225:24

**main** [1] - 117:16

**maintain** [2] - 195:22, 219:7

**maintained** [2] - 176:21, 185:8

**maintaining** [1] - 198:1

**maintains** [1] - 82:1

**maintenance** [1] - 87:14

**majority** [7] - 73:14, 128:17, 142:24, 143:4, 152:19, 152:23, 232:17

**manage** [4] - 157:25, 158:3, 190:23, 222:5

**manageable** [1] - 141:15

**managed** [1] - 222:23

**Management** [6] - 21:1, 46:5, 48:22, 56:5, 61:15, 148:6

**management** [18] - 13:16, 14:6, 14:12, 58:10, 78:21, 78:23, 96:19, 115:11, 175:24, 198:12, 198:17, 199:11, 199:15, 201:24, 203:13, 218:25, 219:1, 219:4

**manager** [4] - 12:16, 12:18, 20:19, 77:23

**manages** [2] - 174:12, 218:24

**managing** [1] - 89:25

**mandated** [2] - 62:23, 155:3

**mandates** [1] - 73:2

**mandatory** [3] - 45:18, 231:19

**March** [49] - 64:11, 76:14, 76:15, 84:24, 98:7, 99:8, 99:16, 104:18, 107:11, 108:6, 108:7, 108:14, 108:21, 108:22, 109:3, 109:5, 109:8, 109:11, 109:16, 110:1, 110:14, 110:16, 111:7, 111:18, 112:3, 112:24, 124:14, 124:24, 127:10, 159:10, 160:21, 182:12, 183:2, 192:5, 198:14, 202:7, 202:15, 203:5, 203:19, 204:2, 210:23, 212:21, 212:24, 215:23, 217:24, 219:16, 224:9, 224:10, 224:11

**marched** [1] - 203:23

**mark** [3] - 78:7, 79:6, 173:15

**Mark** [67] - 32:18, 43:1, 59:14, 64:15, 72:14, 72:15, 72:19, 75:16, 75:23, 77:24, 78:5, 83:2, 83:4, 83:16, 93:20, 94:17, 96:24, 101:8, 106:10, 106:16, 107:24, 110:6, 117:24, 119:2, 119:10, 125:14, 125:20, 139:7, 139:8, 139:10, 139:14, 140:12, 140:17, 144:13, 145:4, 158:5, 158:8, 158:23, 159:2, 161:22, 162:25, 167:18, 169:15, 172:16, 185:15, 187:24, 188:18, 192:13, 199:24, 200:12, 202:10, 204:6, 205:11, 205:13, 209:12, 209:14, 209:19, 213:13, 213:25, 214:6, 215:12, 227:24, 230:1

**Mark's** [1] - 110:16

**marked** [2] - 41:17, 122:9

**market** [2] - 89:14, 96:14

**markets** [3] - 96:14, 98:4, 100:15

**Markets** [3] - 58:3, 228:9

**MARTINEZ** [1] - 9:4

**Martinez** [26] - 5:24, 6:3, 6:5, 6:23, 7:1, 7:5, 9:3, 9:10, 9:11, 9:12, 9:19, 16:3, 107:14, 107:19, 108:8, 110:3, 111:3, 111:11, 111:24, 112:12, 112:14, 124:6, 225:15, 225:24, 236:17

**Martinez's** [3] - 6:12, 8:3, 111:9

**Martinez/Mark** [1] - 109:16

**mass** [2] - 141:21, 231:23

**masse** [1] - 142:1

**master** [3] - 72:25, 73:3, 172:4

**match** [1] - 162:8

**material** [2] - 120:2, 232:5

**materials** [1] - 16:7

**Matt** [2] - 235:10, 235:13

**matter** [5] - 33:2, 125:21, 183:13, 183:14, 228:20

**matters** [6] - 32:17, 32:21, 59:12, 77:16, 179:5, 235:4

**maximum** [1] - 62:22

**mean** [52] - 10:16, 15:9, 17:19, 19:7, 30:19, 31:3, 34:19, 36:6, 44:25, 46:11, 53:12, 66:20, 69:21, 81:25, 87:24, 97:10, 97:11, 100:2, 101:21, 104:6, 106:22, 117:25, 118:5, 120:6, 123:16, 125:20, 127:14, 135:3, 137:1, 137:2, 142:17, 143:15, 147:24, 147:25, 149:17, 152:17, 158:14, 158:22, 158:25, 163:15, 166:3, 168:22, 178:1, 186:5, 186:21, 186:22, 193:19, 214:22, 221:19, 227:5, 229:25

**meaning** [1] - 85:15

**meaningful** [1] - 115:17

**Means** [1] - 10:6

**means** [13] - 34:20, 36:3, 56:24, 56:25, 59:10, 98:17, 98:19, 98:22, 158:2, 204:21, 230:10, 230:11, 230:16

**meant** [9] - 44:1, 61:2, 73:24, 103:16, 106:24, 125:10, 126:6, 191:11, 208:25

**meantime** [2] - 7:4, 214:10

**mechanics** [1] - 46:13

**mechanism** [2] - 4:5, 41:13

**media** [8] - 176:20, 177:4, 177:6, 190:14, 191:5, 208:10, 208:11, 208:12

**medium** [1] - 14:25

**meet** [12] - 46:6, 65:15, 65:17, 66:6, 75:19, 85:14, 85:16, 85:18, 218:9, 220:2, 220:4, 223:9

**meeting** [28] - 26:22, 26:23, 46:5, 46:9, 46:11, 127:25, 128:7, 128:12, 128:16, 129:18, 139:22,

139:25, 142:15, 147:21, 150:18, 150:22, 156:15, 156:17, 157:7, 157:8, 157:9, 157:11, 215:23, 231:24, 232:2, 232:3

**meetings** [5] - 54:20, 142:19, 143:3, 156:19, 157:16

**member** [5] - 10:2, 134:1, 134:12, 135:12, 138:15

**members** [9] - 27:13, 28:15, 99:22, 133:20, 135:6, 139:23, 147:7, 199:10, 199:15

**memo** [25] - 48:20, 61:18, 62:1, 62:2, 62:5, 62:10, 62:15, 62:19, 63:3, 92:16, 92:18, 121:5, 130:2, 130:16, 131:24, 132:12, 137:12, 155:20, 156:21, 156:22, 156:24, 161:12, 236:7

**memorandum** [12] - 25:16, 33:18, 63:23, 65:16, 130:7, 148:5, 156:5, 156:7, 156:16, 156:17, 157:1, 157:8

**memorandum/ agreement** [1] - 180:16

**memorializes** [1] - 130:3

**memory** [2] - 17:10, 171:5

**mention** [7] - 14:21, 126:12, 127:3, 144:13, 146:7, 153:21, 189:2

**mentioned** [8] - 24:10, 25:7, 36:23, 103:7, 144:14, 158:7, 158:24, 189:13

**merger** [1] - 143:17

**Merger** [1] - 143:19

**merits** [1] - 38:25

**message** [13] - 64:1, 64:7, 64:8, 96:24, 108:21, 109:16, 109:18, 112:5, 121:4, 229:5, 229:12, 229:13, 236:7

**messages** [5] - 229:6, 229:7, 229:8, 229:14, 229:16

**method** [1] - 208:9

**methodical** [3] - 159:12, 159:15, 161:7

**methodically** [1] - 142:2

**Mexico** [1] - 9:20

**Michael** [1] - 48:21

**microphone** [1] - 9:13

**Microsoft** [2] - 22:14, 87:16

**middle** [4] - 63:12, 117:17, 211:14, 217:3

**might** [7] - 5:22, 80:23, 86:1, 115:10, 173:9, 173:10, 229:9

**million** [1] - 36:19

**mind** [3] - 69:18, 139:20, 223:24

**mindful** [3] - 126:5, 126:7, 187:19

**minimal** [1] - 196:12

**minimally** [1] - 220:5

**minimum** [1] - 196:14

**Minority** [1] - 222:24

**minute** [5] - 38:15, 118:10, 159:6, 159:7, 194:5

**minutes** [4] - 86:17, 134:8, 134:10, 134:22

**misalignment** [1] - 56:6

**mischaracterizes** [2] - 142:4, 155:19

**mischaracterizing** [1] - 74:23

**misleading** [5] - 129:11, 155:8, 160:11, 173:11, 186:13

**misnomer** [1] - 8:2

**Miss** [1] - 108:12

**missed** [2] - 178:22, 225:15

**missing** [1] - 105:21

**mission** [20] - 24:19, 26:1, 26:13, 39:3, 66:2, 83:15, 83:18, 84:5, 88:3, 120:20, 120:21, 186:5, 188:2, 188:14, 188:24, 191:13, 205:17, 220:22, 228:12, 228:15

**mission's** [1] - 24:25

**mission-critical** [1] - 26:1

**mission-focused** [1] - 83:15

**missioned** [1] - 83:4

**mistake** [3] - 136:3, 136:5, 136:6

**mistaken** [1] - 78:25

**misunderstood** [1] - 136:2

**MM** [1] - 134:11

**mode** [2] - 53:19, 54:15

**moment** [13] - 18:9, 23:25, 35:5, 41:14, 41:20, 64:7, 80:5, 81:15, 94:13, 100:20, 109:13, 116:7, 191:17

**Monday** [16] - 15:18, 32:1, 46:4, 66:18, 80:18, 80:21, 99:16, 108:13, 109:3, 109:5, 109:8, 110:14, 148:20, 182:15, 203:19, 219:16

**money** [19] - 34:13, 35:3, 36:3, 38:16, 38:19, 39:21, 41:7, 41:13, 42:22, 43:24, 44:12, 44:13, 53:13, 69:17, 73:17, 160:10, 161:10, 161:13

**Monitoring** [3] - 76:14, 96:9, 132:6

**monitoring** [4] - 96:14, 114:11, 114:20, 117:18

**month** [5] - 12:1, 39:14, 39:16, 92:2, 234:5

**months** [5] - 11:14, 11:18, 11:19, 70:6, 84:16

**morning** [23] - 3:7, 3:23, 4:3, 9:8, 15:11, 21:13, 21:18, 22:15, 27:12, 39:19, 108:14, 109:25, 119:4, 147:4, 147:20, 149:18, 161:15, 170:18, 227:23, 228:11, 234:3, 234:8

**Mortgage** [4] - 191:24, 192:9, 193:9, 194:21

**mortgage** [2] - 92:3, 192:3

**Mosaic** [1] - 165:15

**most** [20] - 18:15, 27:1, 52:10, 57:9, 58:23, 62:24, 68:13, 69:15, 114:9, 120:19, 147:7, 149:22, 171:19, 186:2, 188:5, 188:9, 188:11, 195:21, 236:11

**Most** [1] - 73:13

**motion** [2] - 133:15, 237:23

**MOU** [2] - 16:5, 34:2

**mouth** [2] - 9:14, 226:17

**move** [22] - 8:14, 8:17, 9:13, 9:14, 19:8, 19:11, 28:1, 29:24, 30:2, 35:6, 38:23, 39:2, 44:16,

86:12, 92:13, 94:1, 94:23, 120:11, 132:14, 170:19, 189:1, 237:18

**moved** [3] - 10:3, 28:3, 237:11

**moving** [10] - 59:1, 78:1, 80:14, 120:21, 141:14, 141:19, 142:1, 148:2, 149:8

**MR** [198] - 3:7, 3:21, 3:23, 5:17, 5:22, 6:5, 6:14, 6:19, 6:21, 6:25, 7:2, 7:4, 7:11, 7:16, 7:23, 8:8, 8:18, 8:22, 9:2, 9:7, 9:18, 12:13, 13:9, 18:7, 19:8, 19:11, 19:15, 20:6, 20:22, 21:9, 23:24, 26:21, 29:15, 29:24, 29:25, 31:21, 32:15, 32:25, 34:7, 36:5, 37:7, 37:12, 38:13, 39:11, 39:25, 40:12, 40:21, 41:1, 42:10, 42:16, 42:19, 44:5, 44:18, 44:21, 47:20, 50:1, 51:1, 52:23, 56:11, 60:12, 60:21, 60:25, 61:4, 61:5, 61:23, 61:25, 63:25, 64:6, 65:1, 65:3, 67:8, 67:11, 67:13, 68:5, 68:10, 68:12, 68:17, 68:19, 71:25, 73:6, 74:20, 75:24, 76:12, 77:5, 78:10, 80:24, 81:1, 82:16, 82:17, 83:10, 84:1, 84:4, 85:21, 85:24, 86:11, 86:17, 86:22, 86:24, 87:6, 87:8, 88:16, 91:1, 91:18, 92:12, 93:7, 93:17, 94:7, 94:10, 95:8, 97:18, 97:25, 99:1, 99:3, 99:5, 100:4, 100:18, 101:15, 102:7, 102:8, 104:2, 104:9, 107:8, 107:17, 107:21, 108:1, 108:7, 108:11, 110:7, 110:10, 110:12, 110:25, 111:5, 111:8, 111:14, 111:20, 111:23, 112:2, 112:13, 112:19, 112:21, 113:2, 113:5, 113:23, 114:1, 114:7, 115:4, 115:23, 116:2, 118:6, 118:21, 118:23, 119:18, 120:13, 120:15, 121:2, 123:4, 123:15, 126:16, 129:11, 129:15,

132:25, 134:24, 136:9, 141:2, 142:4, 143:23, 155:8, 155:19, 157:4, 160:11, 162:5, 162:16, 171:9, 171:11, 172:10, 173:11, 173:24, 186:13, 187:8, 225:13, 225:23, 233:6, 233:16, 233:21, 233:23, 233:25, 234:17, 234:20, 235:4, 235:10, 235:12, 235:17, 235:20, 235:23, 235:25, 236:11, 237:8, 237:14

**MS** [92] - 49:11, 49:16, 97:4, 110:19, 110:24, 122:7, 122:18, 123:7, 124:5, 126:18, 126:19, 129:17, 133:3, 133:16, 133:17, 135:10, 136:17, 138:6, 139:21, 141:7, 142:8, 142:9, 144:4, 144:24, 146:20, 149:14, 150:9, 154:10, 154:12, 154:14, 155:12, 155:22, 156:1, 156:2, 156:25, 157:10, 159:8, 160:16, 160:17, 161:5, 162:7, 162:13, 162:22, 166:3, 166:6, 166:18, 168:8, 168:9, 170:14, 170:21, 170:22, 171:10, 171:12, 172:18, 174:5, 185:22, 186:16, 187:5, 187:12, 187:21, 187:23, 188:22, 188:23, 191:21, 191:22, 194:11, 194:17, 194:18, 198:10, 198:23, 203:25, 206:2, 207:20, 207:21, 210:13, 210:18, 222:11, 224:18, 224:21, 225:18, 225:22, 226:6, 226:15, 226:18, 227:14, 228:25, 229:3, 229:19, 229:22, 230:24, 232:21, 234:19

**multiple** [5] - 40:22, 127:3, 156:20, 158:24, 181:11

**Mulvaney** [5] - 36:16, 37:1, 43:22, 44:2, 161:16

**must** [2] - 80:12, 218:10

## N

**NAACP** [1] - 3:9

**name** [8] - 9:8, 38:2, 122:15, 127:8, 235:20, 235:21, 238:4

**named** [2] - 15:18, 15:23

**names** [8] - 3:18, 17:1, 33:17, 59:19, 59:20, 116:19, 122:23

**narrow** [3] - 85:13, 220:17, 223:8

**narrowly** [2] - 219:23, 222:20

**national** [1] - 27:4

**National** [4] - 3:3, 3:8, 3:9, 3:16

**Native** [1] - 12:18

**nature** [1] - 40:22

**near** [1] - 112:22

**necessarily** [3] - 84:12, 130:5, 186:4

**necessary** [10] - 5:2, 5:6, 45:6, 69:13, 76:5, 84:13, 89:20, 92:19, 166:21, 196:19

**necessity** [1] - 75:21

**need** [53] - 4:22, 5:13, 8:14, 19:10, 26:7, 28:1, 38:12, 39:20, 56:19, 58:1, 65:9, 65:17, 65:21, 65:24, 70:25, 72:2, 73:17, 73:19, 76:21, 82:5, 85:6, 86:14, 92:17, 100:1, 100:3, 105:4, 107:24, 117:3, 118:10, 120:22, 145:16, 157:25, 158:3, 158:24, 160:9, 160:22, 160:25, 172:12, 193:5, 194:2, 205:1, 218:22, 219:3, 220:9, 221:11, 230:4, 232:4, 232:11, 233:2, 234:5, 237:4, 237:17, 238:10

**needed** [33] - 19:25, 30:22, 45:3, 46:14, 57:24, 59:14, 64:16, 65:25, 66:1, 70:9, 71:1, 74:25, 82:19, 85:8, 90:21, 94:22, 131:21, 131:22, 135:23, 144:8, 144:9, 146:10, 156:20, 160:25, 161:1, 172:16, 183:12, 192:10, 198:3, 219:11, 225:11

**needs** [7] - 58:15, 60:23, 85:17, 92:5, 92:23, 230:12, 239:6

**negotiated** [1] - 80:16
**never** [12] - 26:6, 53:5, 53:10, 89:12, 139:19, 145:9, 190:16, 193:1, 206:8, 208:16, 225:17
**New** [2] - 9:20, 44:15
**new** [37] - 11:24, 18:23, 45:15, 54:7, 64:16, 64:17, 74:22, 80:15, 80:20, 121:24, 125:7, 125:10, 126:1, 128:21, 132:16, 132:19, 136:8, 136:10, 136:11, 136:12, 136:15, 136:19, 136:25, 137:1, 137:3, 139:14, 153:23, 153:24, 155:7, 155:13, 155:21, 156:15, 158:15, 159:10, 159:14, 160:9, 187:15
**newly** [1] - 162:14
**next** [29] - 12:2, 12:14, 15:7, 22:15, 27:12, 28:1, 28:4, 28:6, 40:15, 52:22, 67:7, 75:4, 75:9, 95:7, 104:1, 112:18, 112:24, 116:1, 129:9, 131:21, 135:9, 141:18, 170:5, 170:6, 170:11, 178:5, 180:24, 181:25, 188:20
**nice** [2] - 86:2, 237:10
**nice-to-have** [1] - 86:2
**night** [2] - 20:2, 20:3
**nobody** [3] - 150:6, 201:23, 205:7
**nomenclature** [1] - 122:25
**none** [1] - 229:16
**nonetheless** [2] - 14:20, 119:23
**nonrepetitive** [1] - 233:4
**noon** [1] - 166:10
**normal** [5] - 71:13, 94:20, 121:1, 121:7, 121:9
**not-to-exceed** [4] - 45:23, 51:8, 52:2, 52:5
**notable** [1] - 69:15
**note** [16] - 4:3, 7:23, 8:1, 16:7, 19:16, 32:16, 40:12, 41:24, 48:25, 65:14, 68:17, 84:23, 105:21, 106:20, 121:3, 177:9
**noted** [1] - 115:15
**notes** [1] - 237:4
**nothing** [7] - 121:2,

175:13, 175:15, 204:22, 206:20, 206:23, 232:6
**notice** [16] - 46:18, 46:22, 46:25, 47:2, 47:3, 47:6, 50:19, 121:4, 121:24, 150:13, 169:1, 169:2, 169:4, 174:6, 175:13, 204:23
**notices** [9] - 50:13, 50:16, 79:12, 79:16, 170:3, 170:8, 170:25, 221:5, 236:10
**notification** [3] - 71:13, 174:23, 175:2
**notifications** [2] - 79:7, 139:12
**notified** [1] - 15:13
**noting** [2] - 30:4, 99:22
**notwithstanding** [1] - 87:17
**number** [34] - 16:18, 16:19, 16:22, 51:10, 54:10, 69:2, 69:6, 72:6, 73:7, 75:5, 81:13, 92:18, 107:3, 116:11, 123:6, 149:17, 162:2, 162:19, 162:20, 171:2, 171:4, 171:13, 171:16, 183:5, 193:4, 197:11, 198:2, 224:17, 236:20, 236:22, 236:24, 236:25
**numbered** [3] - 162:21, 236:8, 236:14
**numbering** [2] - 123:8, 237:3
**numbers** [20] - 51:4, 52:20, 81:14, 91:14, 122:8, 122:17, 122:19, 123:9, 123:10, 162:7, 162:11, 162:16, 162:17, 236:3, 236:15, 236:16, 237:12, 237:15, 238:5
**Nykea** [1] - 220:25

**O**

**o'clock** [2] - 22:15, 68:15
**Obama** [2] - 18:1, 18:2
**object** [3] - 173:14, 173:19
**objected** [1] - 173:20
**objection** [27] - 49:11, 49:12, 49:14, 49:15, 49:16, 97:4, 110:19, 115:7, 126:16, 129:11, 132:25, 134:24, 136:9,

141:2, 142:4, 143:23, 155:8, 155:19, 157:4, 160:11, 173:11, 173:17, 173:18, 173:25, 186:13, 187:8, 225:13
**Objection** [1] - 49:13
**obligation** [1] - 43:25
**obligations** [5] - 82:20, 96:18, 126:7, 126:10, 164:17
**obvious** [1] - 86:8
**obviously** [7] - 7:12, 13:10, 14:9, 31:11, 34:1, 149:21, 174:3
**occur** [2] - 89:3, 146:13
**occurred** [14] - 10:13, 26:25, 27:1, 34:3, 36:10, 36:12, 44:6, 47:14, 57:3, 60:7, 98:21, 102:25, 154:16, 215:23
**occurring** [1] - 10:18
**occurs** [3] - 34:4, 45:2
**odd** [3] - 15:24, 17:17, 27:11
**offered** [3] - 49:25, 51:15, 51:17
**offhand** [1] - 199:18
**Office** [23] - 4:25, 10:11, 21:1, 46:5, 48:21, 56:5, 57:19, 58:2, 61:14, 93:21, 104:12, 131:3, 148:5, 164:7, 199:4, 216:18, 217:4, 222:23, 223:20, 223:22, 223:23, 228:9
**office** [28] - 10:3, 10:10, 11:20, 11:21, 22:7, 58:2, 58:18, 76:23, 103:20, 104:19, 104:20, 104:22, 114:16, 117:13, 131:12, 132:4, 182:24, 189:14, 189:16, 189:22, 190:21, 206:10, 215:20, 218:2, 221:7, 221:8, 221:10, 231:8
**office's** [1] - 182:22
**officer** [61] - 13:17, 13:20, 13:23, 13:25, 14:8, 14:19, 22:25, 24:23, 25:12, 29:18, 32:18, 34:11, 34:14, 40:2, 40:6, 41:6, 41:9, 43:2, 56:18, 57:5, 57:8, 58:10, 58:17, 58:25, 72:8, 72:16, 73:15,

73:25, 75:9, 79:15, 81:22, 85:10, 90:6, 94:20, 96:25, 125:16, 131:19, 153:7, 159:11, 164:20, 167:16, 169:18, 174:11, 180:3, 180:9, 181:4, 183:3, 183:5, 183:8, 186:6, 192:18, 195:10, 199:2, 199:8, 199:22, 217:20, 219:18, 221:2, 223:6
**officers** [4] - 164:11, 175:18, 176:2, 220:23
**offices** [13] - 57:17, 129:6, 130:16, 132:1, 145:17, 146:23, 147:3, 152:11, 155:2, 156:11, 216:17, 228:14, 231:6
**official** [2] - 48:9, 81:8
**officially** [1] - 21:4
**old** [2] - 9:2, 155:17
**OMB** [19] - 22:24, 23:4, 56:7, 58:17, 61:18, 62:8, 62:9, 62:11, 64:18, 65:12, 78:13, 78:24, 121:5, 157:1, 157:17, 230:12, 232:5, 232:10, 236:7
**OMB/OPM** [1] - 156:16
**ombudsman** [6] - 104:25, 189:6, 189:14, 189:16, 190:18, 190:21
**Ombudsman** [1] - 189:2
**ombudsman's** [3] - 104:19, 104:20, 104:22
**once** [6] - 22:24, 90:15, 104:22, 124:10, 143:13, 230:11
**one** [133] - 3:21, 6:21, 7:23, 7:24, 9:12, 12:24, 16:4, 16:9, 17:1, 17:5, 17:8, 17:22, 17:25, 18:13, 22:11, 22:14, 25:3, 28:7, 28:14, 28:15, 32:6, 34:18, 35:20, 37:19, 40:17, 41:15, 42:11, 42:21, 45:18, 45:25, 46:24, 47:12, 47:21, 47:24, 51:21, 51:22, 55:5, 55:13, 56:23, 57:17, 59:20, 59:1, 60:12, 63:12, 63:25, 73:12, 74:7, 75:9, 77:23, 79:22, 80:5, 82:14, 87:22, 88:10, 94:11, 95:9, 95:10, 100:19, 101:3, 101:18, 102:16, 102:18, 104:10,

107:13, 107:14, 107:15, 107:16, 107:20, 107:22, 108:4, 109:12, 113:18, 116:7, 116:10, 117:25, 118:17, 118:19, 124:1, 125:5, 127:7, 127:10, 129:8, 129:21, 130:19, 130:23, 139:22, 146:16, 146:21, 147:1, 151:12, 152:24, 154:13, 155:17, 155:24, 156:10, 159:9, 167:14, 173:20, 175:22, 189:13, 191:3, 192:24, 197:2, 197:5, 198:22, 200:5, 200:22, 201:9, 208:20, 210:15, 210:16, 211:7, 215:14, 215:15, 220:22, 221:13, 225:3, 229:1, 229:2, 229:4, 229:9, 229:18, 229:19, 231:23, 235:13, 236:13, 236:14, 237:14

**one-line** [1] - 34:18
**one-question** [1] - 229:2
**one-year** [3] - 45:18, 51:21, 51:22
**ones** [8] - 51:21, 88:13, 92:4, 100:9, 117:6, 151:14, 221:11, 226:13
**ongoing** [4] - 39:2, 39:3, 187:7, 187:16
**OO** [1] - 48:3
**open** [8] - 4:4, 41:16, 91:13, 91:19, 92:5, 92:7, 123:22, 239:20
**opened** [2] - 92:5, 214:21
**operate** [4] - 13:1, 87:16, 87:17, 89:21
**operating** [12] - 13:19, 13:23, 13:25, 14:8, 14:19, 39:13, 39:15, 89:24, 121:1, 131:19, 160:14, 215:11
**operation** [1] - 198:5
**operational** [22] - 11:22, 14:4, 18:25, 22:1, 22:8, 24:12, 59:12, 70:7, 87:22, 87:24, 94:21, 104:22, 104:24, 149:22, 172:17, 187:19, 192:11, 196:4, 198:4, 222:21, 227:1, 227:5
**operational-related**

[1] - 187:19
**operations** [19] - 12:16, 22:5, 23:1, 24:12, 25:22, 34:21, 43:19, 70:1, 94:19, 120:18, 120:25, 126:4, 126:6, 159:12, 185:8, 187:18, 196:6, 196:11, 198:2
**Operations** [2] - 132:3, 192:8
**opined** [1] - 226:11
**opinion** [4] - 37:4, 56:6, 75:2, 237:2
**opinions** [2] - 23:3, 63:8
**OPM** [22] - 47:7, 47:22, 50:21, 51:5, 62:11, 128:1, 128:12, 130:9, 132:12, 135:17, 137:15, 138:3, 147:25, 148:3, 150:18, 150:22, 155:20, 156:17, 156:19, 156:21, 157:1, 158:8
**OPM's** [1] - 48:9
**OPM/OMB** [1] - 156:4
**opportunity** [7] - 5:7, 10:14, 70:8, 111:1, 115:9, 115:17, 238:20
**opposed** [3] - 74:12, 80:18, 188:20
**opposing** [1] - 115:6
**opposition** [2] - 124:12, 237:22
**ops** [1] - 172:19
**option** [1] - 41:7
**options** [2] - 189:10, 189:13
**order** [61] - 27:9, 40:13, 40:16, 47:12, 47:24, 50:7, 56:8, 56:14, 62:13, 64:23, 65:12, 70:14, 82:19, 121:12, 122:3, 133:12, 134:6, 141:20, 142:10, 145:15, 145:23, 146:1, 152:14, 152:18, 153:23, 153:24, 154:2, 154:5, 154:15, 154:16, 154:19, 155:7, 155:14, 155:21, 156:10, 168:22, 177:12, 177:22, 179:11, 180:22, 182:7, 184:8, 184:23, 184:24, 189:23, 190:4, 203:17, 205:5, 205:10, 206:4, 206:22, 208:22, 208:24, 208:25, 210:3,

215:2, 231:3, 231:7, 237:12
**ordered** [3] - 62:17, 151:21, 217:10
**ordering** [1] - 237:15
**orderly** [2] - 232:14, 239:16
**ordinary** [2] - 30:18, 44:10
**org** [3] - 22:3, 116:15, 117:1
**organization** [23] - 12:17, 13:18, 14:4, 18:18, 18:22, 19:1, 22:5, 34:18, 44:9, 46:16, 53:8, 58:24, 59:13, 65:22, 71:16, 72:20, 89:13, 117:24, 147:6, 147:7, 227:7, 228:13, 228:15
**organizational** [1] - 118:18
**organizations** [5] - 57:21, 71:3, 80:10, 103:8, 117:17
**organized** [1] - 232:9
**oriented** [2] - 31:15, 31:16
**original** [1] - 162:15
**originally** [2] - 11:23, 30:25
**origination** [1] - 65:11
**otherwise** [5] - 32:21, 109:22, 109:24, 206:18, 216:13
**outdated** [1] - 116:19
**outline** [2] - 92:18, 218:13
**outlined** [1] - 155:6
**outlines** [2] - 131:24, 224:13
**outset** [1] - 43:17
**outside** [9] - 28:23, 59:5, 59:6, 59:9, 59:17, 73:21, 95:2, 95:5, 119:20
**overnight** [1] - 233:9
**oversee** [1] - 221:8
**oversight** [1] - 192:20
**overview** [3] - 9:23, 13:11, 45:12
**owe** [1] - 138:18
**own** [4] - 10:23, 81:25, 89:19, 98:24
**owned** [1] - 81:11

---

**P**

**p.m** [6] - 66:10, 97:11, 108:22, 109:3, 135:13,

235:3
**pace** [3] - 141:15, 149:9, 170:17
**page** [50] - 16:19, 16:21, 16:22, 25:4, 25:11, 29:1, 29:4, 30:1, 31:23, 35:6, 35:8, 35:12, 41:18, 42:16, 48:4, 48:17, 62:19, 62:21, 63:13, 90:9, 102:13, 107:18, 122:13, 122:20, 130:4, 137:4, 154:19, 162:17, 162:19, 162:20, 167:14, 169:14, 170:6, 174:22, 179:1, 179:25, 195:17, 198:25, 202:18, 211:14, 219:16, 224:17, 224:19, 224:20, 224:22, 233:5, 236:20
**pages** [6] - 4:18, 16:17, 48:19, 81:13, 162:1, 236:23
**painstaking** [1] - 86:5
**painted** [1] - 191:15
**Paoletta** [100] - 32:18, 43:1, 59:14, 64:16, 66:5, 72:14, 72:15, 72:19, 72:22, 72:23, 75:8, 75:23, 76:11, 77:10, 77:17, 78:16, 79:7, 79:11, 84:24, 92:23, 92:25, 93:20, 94:17, 94:25, 96:1, 96:24, 97:2, 97:19, 99:8, 99:13, 100:22, 100:24, 101:8, 106:10, 106:17, 108:8, 108:21, 109:4, 109:11, 109:16, 109:22, 109:23, 110:2, 111:1, 111:6, 111:20, 111:24, 112:3, 112:10, 112:20, 112:23, 115:14, 115:16, 117:24, 119:2, 119:10, 125:14, 139:8, 139:14, 140:13, 140:18, 144:5, 144:6, 144:14, 145:4, 145:7, 145:10, 158:5, 158:8, 158:23, 161:22, 162:25, 167:18, 169:15, 172:16, 185:15, 187:24, 188:18, 192:13, 199:24, 200:12, 202:10, 204:6, 205:11, 209:12, 209:20, 209:22, 210:4, 210:20, 212:23, 213:25, 214:8,

214:16, 215:5, 215:12,
216:6, 216:9, 227:25,
230:1

**Paoletta's** [7] - 78:11,
85:2, 98:3, 104:18,
107:11, 108:13, 111:9

**Papaleo** [2] - 93:18,
117:11

**paper** [4] - 7:17,
42:10, 42:13, 86:7

**paperwork** [1] - 34:4

**Pappalardo** [3] - 96:8,
100:11, 100:23

**paragraph** [11] - 49:1,
49:3, 175:5, 186:24,
187:14, 189:3, 192:7,
196:5, 197:25, 198:24,
199:1

**parallel** [1] - 239:1

**Paras** [1] - 3:15

**parcel** [1] - 158:20

**parenthetical** [1] -
42:7

**part** [25] - 7:7, 10:14,
10:23, 10:25, 11:11,
39:5, 55:15, 103:8,
104:11, 104:12,
115:20, 121:5, 124:15,
143:3, 149:24, 150:19,
151:3, 158:25, 178:22,
185:18, 186:5, 189:8,
205:17, 208:5, 226:13

**particular** [3] - 4:24,
115:2, 115:11

**parties** [9] - 59:5,
59:6, 59:10, 59:17,
80:16, 95:5, 223:16,
234:7, 238:24

**parties'** [1] - 4:13

**partners** [1] - 73:21

**parts** [2] - 65:11,
200:22

**party** [1] - 95:2

**passage** [1] - 63:12

**passed** [4] - 12:4,
12:5, 12:6, 12:7

**past** [6] - 45:4, 64:17,
69:16, 70:5, 70:6,
101:23

**Pastor** [1] - 3:10

**pause** [3] - 116:8,
175:7, 175:11

**pauses** [1] - 31:11

**pay** [10] - 34:21, 34:25,
44:16, 92:3, 161:13,
182:22, 183:9, 183:21,
191:4, 208:12

**payment** [3] - 182:24,
184:2, 190:24

**payroll** [3] - 11:22,

11:24

**Payton** [1] - 3:16

**PDF** [1] - 122:14

**peers** [3] - 26:11, 57:3,
57:16

**penalty** [7] - 34:24,
39:8, 43:4, 43:18,
43:23, 124:22, 124:25

**pending** [1] - 237:23

**pennies** [1] - 69:20

**people** [103] - 3:18,
4:8, 7:18, 8:17, 9:1,
11:5, 12:11, 18:15,
18:21, 33:13, 39:19,
43:17, 51:10, 52:15,
52:18, 53:6, 53:16,
54:21, 55:8, 56:4, 56:7,
56:19, 57:13, 59:16,
59:23, 59:25, 65:19,
65:23, 66:16, 67:17,
67:18, 67:21, 67:23,
67:25, 68:22, 74:6,
74:10, 74:16, 76:17,
76:21, 76:23, 76:25,
77:11, 79:4, 79:21,
82:25, 86:15, 88:8,
88:11, 89:15, 90:14,
91:20, 94:16, 98:16,
101:10, 106:20, 115:9,
116:21, 120:23, 129:2,
129:9, 129:13, 129:21,
132:20, 133:6, 137:2,
137:4, 137:14, 137:24,
137:25, 139:5, 142:1,
147:10, 147:11,
147:14, 148:17,
149:17, 185:12,
189:22, 189:25,
190:25, 192:19, 193:3,
201:4, 204:17, 205:25,
208:2, 208:25, 209:10,
209:22, 210:3, 210:7,
220:10, 221:15,
221:20, 225:11,
225:20, 230:5

**per** [5] - 39:14, 39:15,
78:21, 106:19, 232:7

**perceived** [1] - 75:17

**percent** [1] - 73:11

**perception** [1] -
185:19

**perform** [8] - 76:5,
82:19, 87:11, 92:19,
94:2, 94:25, 155:2,
156:11

**performed** [3] - 98:9,
105:16, 174:15

**performing** [14] -
32:19, 32:22, 87:14,
164:16, 184:12, 187:2,

187:11, 204:12,
204:19, 204:21,
204:22, 205:1, 205:7,
228:2

**perhaps** [5] - 15:1,
25:6, 104:11, 124:1,
171:5

**period** [15] - 10:5,
39:16, 45:17, 45:18,
45:19, 51:7, 51:25,
53:1, 53:18, 61:10,
97:21, 148:20, 158:19,
197:13, 197:19

**perjury** [2] - 124:22,
124:25

**Permission** [1] - 61:20

**permission** [15] - 7:7,
64:3, 66:12, 66:14,
66:20, 66:21, 76:25,
98:9, 121:3, 132:12,
201:10, 201:18,
201:21, 202:15, 209:3

**person** [11] - 26:9,
26:15, 26:19, 89:2,
105:4, 135:17, 191:12,
191:17, 204:22,
212:15, 235:13

**Personal** [2] - 48:21,
97:4

**personal** [8] - 32:11,
49:16, 89:19, 94:18,
171:24, 172:19,
191:10, 191:11

**personally** [3] - 14:13,
15:10, 78:20

**personnel** [4] - 19:24,
22:16, 34:23, 225:3

**Personnel** [3] - 21:1,
46:5, 148:5

**perspective** [1] -
94:21

**Pfaff** [3] - 6:8, 235:10,
235:13

**phase** [7] - 54:4, 54:5,
54:6, 139:11, 152:24,
153:1

**phases** [1] - 201:9

**phone** [7] - 4:4, 13:5,
43:1, 88:12, 92:9,
101:10, 190:8

**phrase** [1] - 145:1

**physical** [2] - 231:6,
231:8

**physically** [1] - 183:15

**pick** [2] - 88:12,
104:16

**picks** [1] - 92:9

**picture** [2] - 191:15,
191:16

**pictures** [3] - 27:24,

28:12, 28:14

**piece** [3] - 42:13, 55:5,
71:4

**pieces** [1] - 86:7

**pinch** [1] - 69:19

**PIV** [1] - 27:15

**pivot** [1] - 159:6

**pivotal** [1] - 141:18

**place** [16] - 28:23,
46:15, 50:22, 65:12,
70:18, 80:17, 99:23,
121:24, 129:22, 148:6,
179:6, 188:17, 189:25,
212:23, 219:11, 232:10

**placed** [4] - 37:23,
52:7, 54:7, 179:4

**plainly** [1] - 114:15

**plaintiff** [2] - 3:5, 4:24

**plaintiffs** [8] - 3:8,
4:22, 5:6, 5:23, 81:2,
115:10, 124:7, 235:4

**plaintiffs'** [22] - 6:22,
7:6, 8:1, 41:17, 48:2,
48:15, 74:11, 114:3,
115:13, 133:19,
136:11, 138:7, 164:19,
174:21, 206:14,
215:16, 223:4, 223:25,
224:18, 231:13,
231:22, 235:7

**Plaintiffs'** [3] - 130:3,
139:1, 139:2

**plaintiffs's** [1] -
182:11

**plan** [13] - 67:4,
127:24, 129:19, 130:3,
141:25, 142:23,
145:19, 145:20, 146:8,
158:11, 232:8, 232:16,
235:5

**planned** [2] - 154:17,
225:6

**planning** [4] - 8:16,
132:19, 194:9, 233:19

**plans** [5] - 53:4, 63:14,
157:11, 157:14, 232:7

**platform** [1] - 87:16

**played** [3] - 26:17,
36:15, 37:2

**playing** [1] - 93:24

**pleasure** [1] - 124:2

**plus** [1] - 7:12

**PoC** [1] - 180:11

**point** [38] - 12:11,
13:10, 15:13, 18:23,
21:19, 23:6, 23:10,
23:12, 24:21, 24:24,
25:3, 28:14, 33:3, 35:2,
66:13, 72:17, 72:20,
83:11, 86:14, 88:2,

97:21, 99:15, 100:2,
101:23, 110:10,
110:18, 110:25,
113:24, 137:19, 146:8,
146:15, 146:21,
146:25, 147:2, 148:24,
159:13, 188:14, 194:14
**pointed** [1] - 27:22
**pointer** [1] - 123:24
**points** [10] - 19:12,
30:11, 106:1, 146:11,
147:1, 160:24, 180:13,
180:14, 207:11, 213:18
**policy** [7] - 31:14,
31:16, 31:19, 46:6,
46:8, 48:9, 103:5
**political** [1] - 26:18
**population** [3] - 71:4,
214:24, 231:12
**portfolio** [1] - 214:25
**portfolios** [3] - 10:19,
143:13, 143:15
**portion** [3] - 204:18,
204:20, 204:21
**portions** [1] - 219:24
**position** [16] - 7:13,
10:8, 12:22, 13:20,
14:3, 14:14, 14:18,
18:14, 26:18, 45:24,
63:11, 105:1, 105:3,
118:19, 189:4
**positions** [4] - 4:13,
14:6, 51:6, 57:24
**possibility** [4] - 46:1,
55:13, 142:23, 147:19
**possible** [14] - 41:11,
43:11, 69:20, 85:7,
128:19, 128:22,
131:21, 140:9, 142:18,
148:9, 149:2, 149:11,
164:18, 205:16
**possibly** [4] - 63:6,
158:14, 208:11, 233:18
**post** [1] - 9:23
**post-college** [1] - 9:23
**posture** [1] - 23:2
**potential** [8] - 37:20,
53:17, 61:7, 65:5,
71:17, 89:3, 102:18,
225:13
**potentially** [5] - 27:7,
37:21, 55:15, 69:14,
195:21
**Poverty** [1] - 3:10
**Powell** [2] - 35:16,
159:23
**practice** [1] - 40:22
**pre** [1] - 127:16
**pre-decisional** [1] -
127:16

**precision** [1] - 114:23
**prefer** [1] - 5:25
**preference** [1] -
193:17
**preliminary** [8] - 4:16,
4:23, 39:1, 80:19,
124:12, 124:16,
237:23, 239:2
**prepare** [6] - 7:13,
46:9, 113:6, 113:11,
201:16, 235:22
**prepared** [6] - 64:11,
73:20, 131:23, 223:15,
236:2, 238:16
**presence** [2] - 55:14,
208:17
**present** [3] - 5:19,
22:20, 44:3
**presentation** [1] - 4:17
**preservation** [7] -
81:3, 81:7, 81:24,
178:21, 178:24,
179:19, 179:20
**preservation-
specific** [1] - 178:24
**preserve** [2] - 173:9,
174:8
**preserved** [3] - 81:18,
82:5, 82:10
**preserving** [4] -
175:14, 175:16, 177:3,
178:17
**President** [3] - 18:17,
30:4, 47:12
**President's** [3] -
47:24, 50:7, 62:22
**presidential** [2] -
17:18, 17:23
**press** [2] - 115:17,
191:18
**presumably** [5] -
23:11, 59:6, 133:25,
145:4, 215:2
**presume** [5] - 30:22,
138:25, 140:22,
214:23, 233:3
**pretty** [8] - 18:22,
40:24, 69:16, 97:3,
118:18, 121:9, 121:11,
233:6
**prevent** [2] - 182:1,
192:23
**prevented** [1] - 186:25
**preview** [1] - 68:14
**previous** [3] - 69:5,
209:21, 229:11
**previously** [4] -
101:18, 218:24,
226:11, 236:18
**primarily** [1] - 22:1

**principal** [2] - 211:17,
212:18
**priority** [1] - 77:22
**pro** [1] - 129:12
**pro-reductions** [1] -
129:12
**proactively** [1] -
157:18
**probationary** [10] -
45:17, 45:18, 45:20,
51:7, 51:21, 51:24,
121:20, 128:8, 148:20,
208:20
**probing** [1] - 191:8
**problem** [9] - 77:24,
83:7, 145:22, 145:25,
167:10, 167:13,
179:14, 217:10, 226:3
**problems** [3] - 197:16,
221:18, 226:8
**procedural** [1] -
232:18
**procedures** [1] - 45:6
**proceed** [6] - 5:16,
7:22, 13:8, 65:5, 96:1,
100:25
**proceeding** [4] - 4:5,
5:9, 13:1, 68:10
**proceedings** [1] - 4:7
**process** [28] - 11:1,
11:12, 11:17, 12:1,
24:4, 41:7, 45:5, 46:10,
58:19, 65:11, 70:5,
70:18, 74:2, 74:22,
75:2, 98:23, 112:22,
142:25, 152:11, 158:1,
174:19, 177:17,
202:13, 205:14,
232:10, 239:16, 239:17
**processes** [1] - 65:10
**processing** [4] -
53:25, 94:5, 190:3,
197:21
**procurement** [8] -
14:5, 22:2, 71:13, 81:8,
177:17, 209:15,
220:21, 221:8
**program** [10] - 12:17,
12:18, 12:19, 18:17,
26:12, 26:13, 26:16,
51:12, 89:6, 190:25
**programmatic** [16] -
24:14, 24:20, 26:1,
26:2, 26:8, 57:4, 66:2,
70:2, 70:3, 70:7, 80:8,
83:4, 149:24, 188:14,
220:22, 228:20
**programming** [1] -
198:6
**programs** [3] - 18:20,

26:11, 57:5
**Programs** [5] - 3:25,
4:2, 217:18, 218:2,
223:21
**prohibited** [1] - 141:21
**prohibiting** [2] -
177:22, 207:11
**prohibition** [1] - 213:8
**project** [2] - 20:19
**promise** [1] - 84:25
**prompted** [2] - 79:18,
107:11
**prompts** [2] - 108:3,
108:4
**pronounces** [1] -
153:5
**proof** [1] - 6:16
**proposal** [4] - 5:19,
6:2, 65:10, 157:18
**propose** [1] - 236:19
**proposed** [4] - 5:24,
49:2, 100:25
**protect** [1] - 93:23
**Protection** [2] - 36:20,
38:3
**protesting** [1] - 28:22
**protocol** [1] - 35:22
**Provar** [1] - 165:21
**provide** [10] - 19:12,
22:16, 25:18, 39:17,
47:6, 50:4, 70:20,
73:20, 214:17, 215:11
**provided** [13] - 7:25,
24:9, 25:16, 46:14,
47:22, 50:2, 53:18,
72:4, 78:13, 127:15,
127:17, 218:5
**provides** [1] - 92:9
**providing** [7] - 78:23,
99:10, 103:13, 214:20,
216:4, 216:8, 216:12
**proving** [1] - 4:22
**provisioned** [1] -
78:14
**provisions** [1] - 81:6
**proviso** [3] - 207:1,
207:10, 207:15
**pseudonymous** [4] -
127:7, 235:14, 235:20,
235:21
**public** [14] - 4:4, 5:9,
8:14, 13:1, 31:18, 64:3,
103:12, 103:13, 147:7,
176:16, 192:23, 193:6,
195:1, 196:15
**Public** [1] - 3:15
**public-facing** [1] -
147:7
**publicly** [3] - 8:6, 50:7,
58:20

**pull** [5] - 20:18, 34:14, 44:14, 71:18, 123:16
**pulled** [5] - 57:25, 58:21, 71:5, 120:3, 120:5
**pulling** [1] - 174:16
**purchase** [7] - 81:9, 151:20, 151:22, 152:3, 177:17, 183:17, 183:19
**purchased** [2] - 177:16, 177:17
**purchases** [1] - 183:22
**purporting** [1] - 111:2
**purpose** [2] - 85:8, 237:24
**purposes** [7] - 37:16, 37:17, 37:19, 38:24, 38:25, 85:1, 181:11
**pursuant** [2] - 62:21, 80:2
**pursued** [1] - 120:8
**purview** [1] - 25:12
**push** [1] - 114:2
**pushback** [1] - 157:19
**pushing** [1] - 27:23
**put** [15] - 7:9, 7:20, 57:23, 65:9, 71:8, 92:3, 103:11, 121:24, 123:18, 140:5, 142:6, 193:1, 193:3, 219:10, 232:10
**putting** [1] - 122:2

## Q

**quality** [1] - 62:24
**quarrel** [2] - 115:10, 177:14
**quarter** [4] - 36:18, 39:23, 160:2, 161:14
**quarterly** [1] - 35:20
**questioned** [3] - 84:21, 190:15, 227:23
**questions** [38] - 4:20, 37:4, 43:22, 44:19, 60:19, 60:20, 71:23, 72:22, 75:14, 77:11, 77:15, 86:8, 86:9, 103:24, 104:1, 105:10, 106:21, 107:23, 142:7, 149:23, 170:19, 174:17, 177:20, 183:6, 183:12, 183:13, 194:15, 208:18, 220:15, 227:8, 228:14, 228:24, 229:10, 229:20, 232:4, 232:22, 232:24, 233:8
**quickly** [11] - 13:13,

22:13, 22:22, 40:24, 77:20, 98:2, 123:17, 128:19, 128:22, 148:9, 232:23
**quite** [2] - 10:19, 197:1
**quote** [4] - 127:12, 127:21, 129:10, 143:3

## R

**Railton** [1] - 3:14
**rainy** [2] - 37:14, 161:11
**raise** [1] - 61:24
**raised** [7] - 26:23, 38:14, 81:2, 158:25, 219:13, 219:15, 219:16
**raising** [1] - 106:20
**ran** [1] - 57:5
**rarely** [1] - 45:2
**re** [2] - 142:3, 236:2
**re-file** [1] - 236:2
**reach** [4] - 41:11, 77:18, 87:10, 99:14, 106:11, 213:25, 239:13
**reached** [2] - 34:14, 205:13
**reaches** [1] - 213:2
**reaching** [4] - 94:17, 99:13, 106:16, 200:18
**reaction** [2] - 30:16, 30:17
**reactivate** [1] - 99:14
**reactivated** [2] - 73:19, 100:9
**reactivation** [3] - 85:15, 99:22, 223:11
**reacts** [1] - 5:11
**read** [16] - 32:8, 32:9, 32:10, 58:20, 62:20, 64:14, 82:7, 122:22, 134:15, 141:1, 163:20, 171:7, 175:4, 199:4, 224:15, 233:10
**reading** [7] - 86:6, 86:7, 103:16, 103:18, 110:20, 191:4, 218:21
**ready** [4] - 6:10, 7:19, 44:18, 86:12
**real** [1] - 159:1
**reality** [1] - 153:15
**realize** [1] - 213:24
**really** [23] - 10:13, 19:5, 39:1, 45:23, 57:18, 57:20, 77:3, 80:14, 81:9, 86:4, 94:22, 103:24, 108:8, 120:11, 122:15, 141:17, 149:15, 172:19, 192:21,

208:11, 228:13, 232:23
**reason** [15] - 24:20, 27:8, 37:23, 44:13, 50:22, 53:9, 82:9, 82:12, 132:23, 140:17, 140:25, 177:14, 183:10, 183:11, 226:7
**reasonable** [8] - 109:6, 166:9, 182:3, 194:14, 218:5, 218:15, 219:8, 221:14
**reasons** [5] - 18:14, 40:18, 42:21, 95:17, 208:21
**rebroadcast** [1] - 4:9
**rebut** [1] - 5:7
**recap** [2] - 215:23, 216:1
**receipt** [1] - 113:13
**receive** [3] - 50:15, 189:11, 213:25
**received** [24] - 4:14, 4:18, 15:11, 15:22, 19:23, 25:14, 42:21, 43:1, 45:16, 50:10, 65:21, 78:2, 109:15, 109:16, 109:17, 110:1, 110:15, 140:10, 150:12, 186:12, 213:1, 225:16, 225:25, 238:13
**receiving** [4] - 97:19, 140:12, 169:4, 197:17
**recent** [2] - 160:5, 231:15
**recently** [1] - 218:11
**recess** [2] - 102:4, 194:12
**recipient** [1] - 41:25
**recognize** [12] - 29:6, 30:2, 32:4, 32:5, 35:13, 35:14, 41:20, 48:6, 116:11, 139:4, 189:3, 230:17
**recognized** [3] - 85:19, 127:5, 230:3
**recollection** [6] - 11:9, 15:17, 22:21, 42:25, 49:23, 78:13
**recommend** [1] - 106:16
**recommendation** [2] - 59:1, 201:16
**recommendations** [4] - 57:4, 94:18, 157:23, 159:7
**recommended** [1] - 111:24
**recommending** [2] - 106:9, 199:25
**reconcile** [1] - 51:4

**record** [32] - 3:2, 3:6, 4:4, 4:7, 4:9, 9:9, 23:25, 38:2, 60:24, 72:6, 105:10, 121:5, 122:14, 122:17, 122:18, 123:12, 123:25, 128:25, 130:2, 162:8, 166:19, 215:4, 215:14, 217:7, 219:8, 226:14, 229:17, 236:5, 237:11, 237:22, 237:24, 238:2
**records** [12] - 14:5, 82:3, 143:15, 173:9, 174:8, 175:16, 175:24, 176:21, 177:4, 177:18, 179:19, 180:15
**recovered** [1] - 177:25
**recruited** [3] - 12:22, 13:16, 18:14
**redactions** [1] - 215:19
**redirect** [5] - 6:6, 6:18, 233:4, 233:12, 233:13
**reduce** [6] - 47:7, 70:13, 86:20, 129:10, 129:23
**reduced** [2] - 47:1, 85:3
**reduction** [5] - 44:24, 45:1, 49:3, 62:14, 230:13
**Reduction** [1] - 129:13
**Reduction-in-force** [1] - 129:13
**reductions** [2] - 129:12, 154:22
**refer** [3] - 83:15, 144:17, 236:22
**reference** [5] - 48:12, 54:2, 72:25, 73:2, 227:24
**referenced** [4] - 16:10, 47:12, 160:1, 228:10
**references** [3] - 122:8, 122:9, 136:10
**referencing** [1] - 151:4
**referred** [14] - 16:24, 24:1, 36:13, 62:1, 72:21, 74:21, 77:6, 89:10, 91:4, 96:3, 154:3, 154:6, 160:12, 237:14
**referring** [19] - 20:8, 25:4, 33:2, 53:19, 57:13, 59:18, 61:13, 61:19, 75:15, 83:15, 91:7, 92:16, 107:18, 135:1, 136:11, 190:25, 210:15, 210:16, 236:24

refers [6] - 36:19, 72:13, 85:2, 87:14, 126:17, 171:15
refined [1] - 56:24
reflect [1] - 75:2
reflected [1] - 116:16
reframed [1] - 173:25
refresh [1] - 171:5
regard [1] - 65:5
regarding [27] - 35:21, 40:14, 41:2, 48:24, 61:7, 62:13, 63:22, 64:18, 73:1, 77:16, 81:3, 94:4, 104:10, 104:19, 106:19, 109:15, 110:16, 117:10, 119:5, 127:11, 132:13, 160:12, 167:21, 168:16, 206:11, 213:13, 236:1
regardless [1] - 143:2
regards [8] - 43:10, 46:15, 54:2, 65:10, 90:8, 91:14, 214:20, 230:12
regional [1] - 152:11
regular [2] - 96:17, 96:19
regularly [1] - 232:3
regulating [1] - 58:13
Regulation [2] - 58:3, 76:14
regulation [3] - 58:14, 96:15, 100:16
Regulations [2] - 96:9, 132:6
regulations [4] - 117:18, 118:1, 118:3, 205:16
regulators [3] - 10:17, 11:3, 55:17
regulatory [1] - 103:5
rehash [1] - 170:7
reinstate [6] - 57:8, 84:5, 181:16, 181:22, 183:9, 183:16
reinstated [10] - 73:13, 73:14, 79:10, 80:3, 82:19, 90:20, 90:23, 171:3, 171:20, 219:5
reinstatement [5] - 72:1, 109:18, 110:17, 112:6, 171:16
reinstating [2] - 170:24, 171:15
related [14] - 83:4, 96:18, 179:5, 187:19, 192:8, 192:11, 194:24, 194:25, 196:6, 198:2, 198:4, 199:2, 221:14,
232:8
relates [1] - 222:23
relatively [1] - 14:24, 41:14, 77:20
releasing [1] - 152:6
relevant [2] - 91:3, 117:7
reliance [1] - 89:2
relied [1] - 156:10
relief [1] - 94:7
reluctant [1] - 6:9
rely [1] - 159:5
relying [3] - 8:10, 220:23
remain [3] - 58:19, 88:11, 213:6
remained [3] - 120:4, 192:11, 198:4
remember [1] - 46:3, 203:24
reminder [1] - 73:18
removed [2] - 176:17, 177:6
repairable [1] - 153:9
repeat [2] - 120:11, 155:11
repeated [1] - 136:9
rephrase [1] - 155:25
replacement [2] - 190:18, 190:24
report [16] - 14:7, 40:6, 59:24, 113:19, 166:11, 208:2, 214:17, 215:7, 215:11, 216:5, 216:6, 216:9, 216:13, 221:16, 230:12
reported [1] - 228:19
reporter [3] - 11:7, 13:14, 201:12
reporting [5] - 5:2, 114:19, 119:10, 119:12, 226:3
reports [8] - 27:13, 106:9, 106:19, 106:21, 113:9, 113:12, 195:2, 214:21
represent [5] - 64:8, 177:12, 203:21, 204:1, 210:24
representative [2] - 33:19, 174:12
representatives [1] - 180:9
representing [1] - 55:7
represents [1] - 56:18
request [11] - 58:24, 59:4, 94:2, 94:4, 105:5, 161:8, 182:21, 183:16, 200:21, 201:1, 213:5

requested [11] - 22:12, 24:10, 25:10, 36:11, 57:8, 58:12, 109:17, 119:10, 132:12, 216:5, 216:9
requesting [8] - 21:25, 36:13, 36:17, 38:21, 59:19, 201:9, 209:3
requests [6] - 83:15, 84:5, 97:20, 200:18, 209:11, 210:25
require [5] - 55:18, 81:10, 147:14, 175:1, 195:3
Required [1] - 174:23
required [61] - 55:7, 55:11, 55:16, 55:19, 56:20, 57:6, 57:23, 58:4, 58:11, 59:2, 62:25, 66:12, 68:22, 79:23, 82:20, 84:10, 84:13, 88:4, 92:6, 94:2, 98:8, 105:3, 105:13, 105:16, 109:20, 112:8, 113:8, 118:16, 118:20, 118:24, 119:1, 120:20, 130:21, 131:1, 131:5, 131:9, 146:23, 151:12, 153:14, 154:3, 164:23, 166:4, 167:22, 168:16, 169:11, 185:3, 187:18, 196:12, 204:12, 205:1, 206:20, 206:23, 207:2, 207:6, 207:7, 207:11, 207:13, 218:4, 219:7, 221:11, 221:19
requirement [7] - 85:14, 85:16, 85:18, 192:25, 196:14, 220:5, 223:10
requirements [23] - 65:12, 71:18, 75:20, 106:21, 114:19, 114:21, 119:21, 140:8, 154:6, 155:6, 166:12, 185:7, 185:20, 185:24, 186:8, 192:9, 220:2, 222:7, 222:21, 230:4, 230:9, 232:12, 232:19
requires [5] - 46:21, 71:13, 147:3, 147:12, 192:1
rescind [1] - 79:12
rescinded [4] - 56:16, 56:17, 79:8, 184:14
rescinding [1] - 170:8
Research [10] - 58:3, 76:14, 96:9, 131:7, 223:22, 223:23, 224:5, 224:6, 224:7, 227:18

research [5] - 89:14, 96:14, 100:15, 117:18, 132:6
research's [1] - 226:7
resect [1] - 100:6
reserve [19] - 6:6, 35:4, 35:5, 36:23, 36:25, 37:2, 37:9, 37:11, 37:18, 37:22, 37:24, 38:17, 38:19, 39:22, 160:2, 160:23, 161:9, 161:13
Reserve [18] - 35:17, 35:21, 35:24, 38:16, 38:21, 41:3, 41:8, 41:11, 41:13, 42:23, 43:10, 43:12, 43:15, 44:7, 44:15, 53:14, 159:23, 160:13
reshaping [2] - 47:13, 64:19
resignation [1] - 51:11
resisted [1] - 238:12
resizing [1] - 55:2
resolved [1] - 80:19
resolving [1] - 90:1
resort [2] - 91:15, 91:17
resource [1] - 88:22
resources [4] - 190:17, 193:2, 218:10, 231:14
respect [2] - 114:9, 155:5
respects [2] - 105:20, 119:20
respond [11] - 111:1, 115:17, 134:8, 134:20, 135:15, 166:10, 193:6, 210:2, 213:11, 217:6
responded [6] - 27:16, 64:14, 96:19, 111:4, 181:16, 208:8
responding [2] - 109:11, 109:24
responds [8] - 79:16, 85:10, 99:9, 107:12, 108:13, 111:16, 111:23, 183:3
Response [23] - 4:25, 57:20, 76:20, 88:18, 92:24, 93:4, 99:21, 100:7, 104:12, 119:3, 132:8, 147:6, 164:5, 165:10, 190:22, 192:24, 196:18, 199:4, 200:13, 200:16, 226:23, 226:25, 227:21
response [26] - 5:2, 28:17, 64:14, 85:1,

85:9, 88:13, 89:1, 91:20, 93:10, 104:18, 109:6, 111:6, 166:9, 166:20, 167:1, 198:11, 201:2, 201:5, 203:3, 214:1, 219:17, 221:4, 222:15, 223:1, 226:19, 231:15

**responses** [1] - 79:5
**responsibilities** [3] - 74:24, 144:12, 199:3
**responsibility** [3] - 78:21, 175:22, 228:21
**responsible** [6] - 24:22, 148:2, 174:12, 211:18, 221:7, 221:10
**rest** [6] - 62:17, 122:2, 128:14, 153:1, 153:2, 239:6
**restarting** [1] - 85:2
**restitution** [1] - 35:1
**restored** [1] - 85:7
**restraining** [2] - 134:6, 145:23
**restricted** [1] - 80:21
**result** [4] - 18:21, 46:9, 79:19, 182:2
**resume** [1] - 96:17, 101:25, 102:5, 105:13, 194:6, 234:15
**resumed** [1] - 119:2
**resuming** [2] - 224:23, 234:10
**resumption** [1] - 102:11
**retaliation** [1] - 6:10
**retrieving** [1] - 82:2
**retroactive** [2] - 16:1, 16:2
**return** [8] - 38:16, 41:7, 41:13, 42:22, 81:7, 81:10, 102:3, 231:3
**return-to-work** [1] - 231:3
**returned** [3] - 12:15, 13:10, 216:24
**returning** [2] - 35:2, 41:2
**reverse** [1] - 42:14
**reverts** [1] - 66:7
**review** [7] - 63:13, 95:3, 102:20, 119:25, 124:1, 160:25, 175:5
**reviewed** [3] - 163:16, 172:15, 172:16
**reviewing** [1] - 75:20
**RIF** [29] - 44:23, 45:6, 45:7, 46:10, 46:21, 47:7, 47:17, 48:11,

49:10, 50:13, 50:15, 50:19, 50:22, 51:19, 54:4, 54:6, 54:7, 60:13, 64:12, 70:18, 74:5, 121:24, 142:25, 144:8, 146:13, 231:24, 232:2, 232:7, 232:8
**RIF'd** [1] - 65:11
**RIFing** [2] - 128:15, 149:17
**RIFs** [18] - 44:22, 46:1, 46:2, 46:12, 46:15, 53:17, 60:19, 60:20, 61:7, 61:12, 63:22, 65:6, 104:12, 104:13, 132:13, 137:15, 148:6, 153:24
**right-hand** [2] - 72:7, 75:5
**Rights** [3] - 216:19, 217:4, 223:20
**ring** [1] - 38:2
**risk** [4] - 180:15, 181:12, 181:13, 195:19
**risky** [2] - 67:10, 67:11
**RMR** [2] - 94:12, 98:3
**road** [2] - 51:13, 51:14
**roadmap** [2] - 61:11, 157:22
**Robert** [1] - 3:13
**Rohit** [1] - 14:11
**role** [5] - 13:25, 26:17, 78:22, 125:19, 204:23
**roll** [1] - 67:11
**room** [10] - 5:15, 6:24, 27:17, 28:1, 28:4, 28:8, 102:3, 192:18, 192:20, 237:20
**Rosenberg** [3] - 7:22, 120:10, 234:16
**ROSENBERG** [183] - 3:23, 6:14, 6:19, 6:21, 7:2, 7:4, 7:11, 7:16, 7:23, 8:8, 8:22, 9:2, 9:7, 9:18, 12:13, 13:9, 18:7, 19:8, 19:11, 19:15, 20:6, 20:22, 21:9, 23:24, 26:21, 29:15, 29:24, 29:25, 31:21, 32:15, 32:25, 34:7, 36:5, 37:7, 37:12, 38:13, 39:11, 39:25, 40:12, 40:21, 41:1, 42:10, 42:16, 42:19, 44:5, 44:18, 44:21, 47:20, 50:1, 51:1, 52:23, 56:11, 60:12, 60:21, 60:25, 61:4, 61:5, 61:20, 61:23, 61:25, 63:25, 64:6,

65:1, 65:3, 67:8, 67:11, 68:5, 68:10, 68:12, 68:17, 68:19, 71:25, 73:6, 74:20, 75:24, 76:12, 77:5, 78:10, 80:24, 81:1, 82:16, 82:17, 83:10, 84:1, 84:4, 85:21, 85:24, 86:11, 86:17, 86:22, 86:24, 87:6, 87:8, 88:16, 91:1, 91:18, 92:12, 93:7, 93:17, 94:7, 94:10, 95:8, 97:18, 97:25, 99:1, 99:3, 99:5, 100:4, 100:18, 101:15, 102:7, 102:8, 104:2, 104:9, 107:8, 107:17, 107:21, 108:1, 108:7, 108:11, 110:7, 110:10, 110:12, 110:25, 111:5, 111:8, 111:14, 111:20, 111:23, 112:2, 112:13, 112:19, 112:21, 113:2, 113:5, 113:23, 114:1, 114:7, 115:4, 115:23, 116:2, 118:6, 118:21, 118:23, 119:18, 120:13, 120:15, 121:2, 123:4, 123:15, 126:16, 129:11, 129:15, 132:25, 134:24, 136:9, 141:2, 142:4, 143:23, 155:8, 155:19, 157:4, 160:11, 162:5, 162:16, 171:9, 171:11, 172:10, 173:11, 173:24, 186:13, 187:8, 225:13, 225:23, 233:6, 233:16, 234:17, 235:4, 235:20, 235:25, 236:11, 237:8, 237:14
**rOSENBERG** [1] - 67:13
**Rosenberg** [1] - 3:24
**roughly** [1] - 129:2
**round** [4] - 131:17, 132:1, 132:3, 132:20
**row** [1] - 3:19
**rule** [3] - 48:10, 49:15, 239:2
**rules** [2] - 132:13, 141:5
**ruling** [1] - 37:24
**run** [5] - 26:11, 47:6, 71:12, 74:5, 190:6
**running** [20] - 16:17, 48:11, 48:17, 59:13, 60:1, 60:5, 61:12, 72:18, 116:4, 117:1,

117:2, 117:13, 117:21, 117:23, 118:17, 118:25, 186:3, 188:6, 188:9, 188:12
**rush** [1] - 239:14
**Russ** [4] - 125:10, 140:5, 145:9, 158:5
**Russell** [1] - 3:4

## S

**sake** [2] - 48:1, 237:6
**Santa** [2] - 9:20
**Saturday** [3] - 15:6, 30:4, 102:15
**save** [2] - 42:10, 73:17
**savings** [2] - 44:17, 70:12
**saw** [4] - 62:2, 107:22, 107:24, 118:25
**scale** [6] - 128:1, 132:13, 134:1, 142:16, 146:5, 158:12
**scenario** [1] - 36:15
**scenarios** [1] - 84:17
**scenes** [1] - 188:17
**scheduled** [2] - 133:14, 234:13
**scheduling** [1] - 233:2
**school** [1] - 9:2
**scope** [3] - 25:20, 30:9, 119:20
**Scott** [1] - 3:14
**Scott-Railton** [1] - 3:14
**screen** [2] - 7:10, 140:4
**se** [1] - 78:21
**searches** [1] - 179:4
**second** [29] - 12:24, 17:4, 33:1, 37:22, 41:15, 45:22, 55:15, 58:2, 69:15, 80:5, 89:18, 109:12, 127:10, 129:8, 129:22, 131:17, 131:25, 132:3, 136:1, 136:2, 159:9, 179:24, 191:3, 200:24, 201:15, 213:16, 224:19, 235:25, 236:14
**Secret** [1] - 27:3
**Secretary** [7] - 10:22, 15:16, 15:22, 17:19, 19:6, 19:23, 87:17
**secretary** [4] - 17:2, 49:18, 105:6, 121:9
**section** [5] - 92:24, 117:20, 217:17, 217:18, 223:22
**security** [8] - 14:6,

26:24, 27:2, 27:4, 27:5, 28:19, 180:2, 181:3

**security-specific** [1] - 27:5

**see** [37] - 5:10, 7:21, 16:13, 16:22, 27:14, 27:20, 28:10, 28:20, 62:20, 63:12, 64:12, 76:12, 87:3, 90:8, 108:15, 117:2, 117:5, 117:9, 117:16, 123:13, 124:2, 154:20, 160:25, 172:3, 175:8, 178:20, 183:18, 186:9, 190:9, 191:8, 193:19, 201:7, 208:13, 214:24, 228:3, 232:16, 239:20

**seeing** [1] - 65:23

**seek** [3] - 111:25, 115:9, 205:2

**seeking** [1] - 109:12

**seeks** [2] - 111:23, 112:2

**seem** [3] - 10:20, 38:9, 190:25

**sees** [2] - 113:1, 161:10

**Senate** [1] - 63:9

**senate** [1] - 63:11

**senate-confirmed** [1] - 63:11

**send** [12] - 29:21, 38:20, 42:20, 50:15, 56:14, 77:11, 169:1, 175:2, 175:6, 175:18, 225:21, 229:6

**sending** [8] - 31:17, 85:11, 95:17, 108:9, 121:12, 135:2, 197:16, 229:8

**sends** [7] - 23:13, 35:20, 91:6, 110:8, 111:20, 204:6, 213:20

**senior** [4] - 10:9, 78:22, 144:19, 144:21

**sense** [3] - 24:6, 46:12, 64:10

**sensitive** [2] - 27:2, 179:2

**sent** [61] - 15:19, 15:21, 16:25, 29:9, 29:19, 30:3, 30:25, 33:16, 36:16, 42:21, 44:12, 56:8, 73:18, 76:4, 79:16, 83:3, 94:14, 95:3, 95:24, 97:2, 97:5, 97:6, 100:11, 105:20, 106:25, 107:22, 108:3, 108:17, 109:2, 109:7,

111:1, 112:5, 130:7, 134:17, 137:6, 137:12, 159:22, 163:7, 166:22, 168:17, 168:19, 168:21, 169:10, 169:20, 170:2, 174:7, 178:9, 180:2, 191:4, 197:9, 203:5, 212:23, 213:17, 214:1, 214:2, 214:8, 217:24, 221:5, 224:9, 224:11, 225:24

**sentence** [8] - 75:22, 95:1, 181:25, 187:10, 187:20, 213:11, 213:12, 213:16

**Sentinel** [2] - 179:3, 179:4

**separate** [8] - 10:4, 15:22, 101:3, 101:9, 205:16, 218:8, 223:2, 236:19

**separately** [4] - 8:14, 205:13, 213:24, 237:18

**separation** [1] - 231:16

**sequence** [1] - 5:17

**sequential** [1] - 162:11

**sequentially** [2] - 162:21, 236:14

**sequestered** [1] - 6:23

**series** [4] - 30:6, 79:5, 108:4, 113:21

**seriously** [2] - 41:10, 73:15

**serve** [4] - 13:16, 45:18, 45:20, 49:9

**serves** [1] - 17:10

**Service** [2] - 27:3, 218:2

**service** [6] - 19:17, 27:9, 45:21, 46:7, 103:22

**ServiceNow** [1] - 87:15

**services** [3] - 10:2, 89:2, 103:13

**Services** [4] - 38:4, 70:24, 151:9, 151:21

**serving** [4] - 10:8, 13:15, 45:23, 125:18

**session** [1] - 22:14

**set** [10] - 7:6, 8:23, 8:24, 45:24, 52:25, 59:22, 208:1, 208:7, 209:11

**sets** [1] - 123:8

**settlements** [1] - 182:2

**setup** [1] - 52:24

**several** [19] - 19:24, 24:23, 45:14, 57:7, 64:17, 144:7, 161:19, 163:10, 165:12, 167:24, 179:4, 183:11, 186:10, 192:18, 195:19, 196:22, 224:13, 232:10

**Shah** [1] - 3:15

**shall** [1] - 114:16

**shape** [1] - 69:6

**Shapiro** [1] - 95:3

**share** [1] - 201:16

**shared** [5] - 43:15, 46:6, 46:7, 65:16, 100:12

**SharePoint** [1] - 25:11

**shed** [1] - 53:22

**sheer** [1] - 28:5

**sheet** [3] - 7:24, 8:2, 8:4

**shoot** [1] - 71:22

**shop** [2] - 28:16, 71:13

**short** [6] - 10:5, 181:18, 181:22, 197:13, 229:1, 233:25

**shortly** [5] - 10:3, 15:21, 28:22, 84:25, 85:11

**show** [7] - 7:19, 20:9, 20:11, 22:13, 28:16, 38:18, 233:11

**showed** [11] - 21:6, 21:11, 21:13, 21:15, 28:12, 107:14, 107:15, 225:24, 229:11, 233:11, 233:12

**showing** [1] - 20:10

**shown** [1] - 225:20

**shows** [1] - 33:12

**shut** [4] - 127:5, 150:24, 151:7, 151:16

**shutting** [2] - 23:20, 150:2

**sic** [1] - 81:14

**side** [16] - 24:12, 24:20, 25:22, 26:1, 26:2, 26:8, 70:2, 70:4, 139:15, 186:5, 188:2, 188:24, 198:5, 228:12, 228:15

**sided** [1] - 42:8

**sides** [2] - 4:12, 5:12

**signature** [2] - 25:16, 215:21

**signed** [3] - 33:19, 47:13, 185:18

**significant** [2] - 39:22, 51:10

**silly** [1] - 234:5

**similar** [12] - 14:2, 21:18, 31:10, 35:22, 36:17, 58:3, 95:9, 95:17, 100:9, 100:12, 105:19, 161:15

**similarly** [1] - 127:20

**simplicity** [1] - 122:8

**simplify** [1] - 96:1

**simply** [2] - 110:25, 236:20

**single** [10] - 69:12, 117:6, 117:25, 146:8, 146:11, 146:15, 146:21, 146:25, 147:1, 147:2

**site** [3] - 24:18, 25:11, 196:14

**sits** [1] - 44:14

**sitting** [4] - 28:7, 65:4, 67:20, 235:2

**situation** [9] - 30:20, 31:11, 77:25, 89:23, 153:11, 153:25, 156:3, 161:6, 184:17

**six** [1] - 130:14

**size** [2] - 14:25, 230:7

**skip** [1] - 60:17

**slow** [3] - 11:6, 170:16, 170:19

**slower** [2] - 141:14, 149:9

**slows** [1] - 237:2

**small** [10] - 11:20, 14:24, 38:8, 55:13, 70:23, 171:2, 171:13, 171:15, 171:16, 183:22

**smaller** [3] - 15:2, 15:3, 231:12

**SME** [1] - 228:20

**SMEs** [1] - 174:16

**social** [6] - 176:20, 177:4, 177:6, 208:10, 208:11, 208:12

**software** [7] - 178:14, 181:6, 181:9, 182:1, 182:22, 197:5, 197:8

**solely** [1] - 159:4

**someone** [4] - 5:6, 61:24, 82:18, 123:1

**sometime** [5] - 92:22, 141:10, 168:10, 168:13, 216:19

**sometimes** [3] - 51:13, 137:1, 159:5

**somewhat** [4] - 23:2, 31:14, 36:25, 123:25

**somewhere** [2] - 45:5, 154:8

**soon** [2] - 63:7, 85:7

**sooner** [1] - 15:10

**sorry** [18] - 11:8, 44:4, 62:4, 99:2, 106:2, 126:18, 130:15, 133:23, 139:19, 160:19, 165:24, 170:21, 178:22, 194:3, 198:19, 201:12, 217:16, 234:23
**sort** [10] - 24:11, 30:2, 46:20, 50:5, 117:16, 139:14, 140:4, 140:18, 145:14, 238:1
**sought** [1] - 205:11
**sound** [1] - 118:1
**sounds** [6] - 130:12, 154:7, 157:13, 199:9, 224:16, 234:3
**space** [1] - 28:3
**speaking** [3] - 143:11, 143:25, 144:11
**speaks** [1] - 96:25
**specific** [43] - 11:19, 17:19, 18:14, 20:20, 24:9, 25:1, 26:11, 27:5, 29:16, 30:10, 30:13, 30:20, 34:20, 36:9, 37:20, 46:14, 47:11, 47:13, 52:20, 54:6, 57:2, 57:3, 75:13, 90:24, 101:5, 102:16, 123:19, 147:3, 147:11, 147:25, 148:18, 159:5, 168:4, 169:23, 178:24, 182:3, 193:4, 193:24, 213:17, 226:24, 227:24, 228:14, 228:18
**specifically** [21] - 10:8, 18:23, 31:12, 33:17, 34:11, 34:12, 34:16, 43:4, 43:21, 79:22, 85:8, 90:6, 103:2, 144:8, 148:22, 172:16, 189:2, 191:25, 195:3, 196:13, 221:13
**specifics** [4] - 154:7, 178:20, 178:25, 228:1
**speculate** [1] - 158:14
**speed** [4] - 16:13, 64:7, 108:12, 170:18
**spend** [1] - 215:10
**spoken** [1] - 119:19
**spreadsheet** [4] - 73:3, 79:8, 168:15, 172:4
**Sprinklr** [4] - 176:19, 176:20, 177:3, 177:16
**SS** [1] - 231:22
**staff** [73] - 11:23, 19:23, 21:6, 22:12, 23:13, 26:17, 27:12,

27:25, 28:10, 28:15, 29:10, 29:12, 45:2, 46:6, 46:7, 53:24, 57:9, 63:4, 65:8, 69:19, 70:11, 70:22, 71:15, 72:20, 77:18, 78:13, 78:22, 84:19, 98:24, 99:14, 101:6, 108:24, 109:14, 110:15, 111:2, 113:11, 113:14, 113:16, 115:16, 120:19, 125:19, 131:18, 131:19, 140:13, 148:1, 148:22, 156:21, 157:11, 157:14, 157:16, 157:19, 157:21, 158:2, 158:24, 159:3, 174:18, 176:11, 176:23, 193:2, 204:6, 204:23, 209:17, 220:21, 221:16, 225:5, 225:9, 228:19
**staffing** [1] - 53:4
**stage** [1] - 5:4
**stakeholder** [7] - 30:15, 31:3, 31:5, 31:12, 102:19, 103:3, 119:8
**stakeholders** [4] - 99:15, 102:24, 103:6, 222:22
**stalked** [1] - 27:10
**stamp** [16] - 162:1, 166:6, 167:7, 176:8, 178:4, 194:1, 195:4, 195:7, 200:6, 202:1, 202:18, 204:10, 212:14, 215:6, 216:24, 217:15
**stamped** [3] - 161:24, 162:14, 165:4
**stamps** [3] - 162:15, 180:25, 211:12
**stand** [12] - 10:14, 10:15, 10:16, 10:20, 10:22, 11:1, 11:11, 11:17, 32:22, 49:12, 159:14, 184:12
**stand-up** [5] - 10:14, 10:15, 11:1, 11:11, 11:17
**standing** [1] - 28:7
**stands** [2] - 106:14, 212:2
**start** [16] - 46:15, 68:24, 102:3, 105:12, 117:5, 120:21, 125:2, 125:3, 134:18, 176:7, 199:25, 200:19, 202:15, 234:21, 235:1,

237:24
**started** [28] - 14:8, 17:11, 22:10, 27:19, 27:20, 28:9, 28:10, 28:12, 43:22, 69:8, 71:16, 71:18, 74:12, 78:12, 79:24, 80:13, 113:11, 129:22, 141:17, 141:18, 142:11, 152:6, 185:17, 198:18, 203:15, 209:6, 209:8, 210:12
**starting** [9] - 3:5, 10:7, 48:16, 74:23, 99:6, 105:17, 107:9, 148:11, 224:22
**starts** [10] - 84:24, 99:8, 100:22, 108:5, 108:20, 121:6, 176:7, 176:8, 177:9, 182:18
**state** [11] - 3:6, 4:25, 9:8, 150:15, 150:19, 150:23, 157:20, 158:6, 158:7, 158:10, 158:18
**statement** [3] - 153:17, 157:5, 190:14
**statements** [4] - 53:19, 127:11, 127:21, 191:8
**states** [2] - 182:24, 190:6
**States** [3] - 3:25, 13:17, 19:17
**stating** [2] - 94:25, 113:14
**status** [24] - 10:24, 34:12, 58:14, 64:10, 72:25, 78:11, 113:15, 116:3, 119:7, 119:24, 120:25, 147:22, 168:2, 190:7, 195:15, 209:18, 214:22, 215:13, 215:15, 226:11, 226:22, 227:7, 227:18, 228:6
**statuses** [1] - 73:12
**statute** [11] - 12:4, 12:5, 59:2, 104:21, 105:16, 106:19, 114:13, 147:3, 147:12, 155:3, 192:1
**statutes** [6] - 154:3, 155:5, 218:10, 222:8
**statutorily** [42] - 55:19, 56:20, 57:6, 57:23, 62:23, 62:25, 66:11, 68:1, 68:22, 82:19, 84:10, 84:13, 88:4, 92:6, 98:8, 105:13, 113:8, 114:15,

114:24, 118:16, 118:20, 118:24, 119:1, 120:20, 130:21, 131:1, 131:5, 131:9, 146:23, 151:12, 155:14, 156:7, 156:12, 164:23, 167:21, 168:16, 169:11, 185:3, 187:18, 204:12, 206:20, 206:23
**statutorily-authorized** [4] - 68:1, 156:7, 156:12, 167:21
**statutorily-required** [12] - 56:20, 57:23, 62:25, 84:10, 84:13, 113:8, 118:16, 118:20, 164:23, 169:11, 185:3, 187:18
**statutory** [58] - 55:7, 55:11, 55:16, 57:13, 58:4, 58:11, 63:13, 65:20, 66:7, 71:7, 71:18, 74:24, 75:19, 76:6, 76:16, 76:20, 77:2, 79:23, 80:11, 80:20, 83:17, 84:14, 85:14, 85:16, 92:20, 92:24, 94:2, 95:1, 96:18, 97:7, 97:9, 106:21, 113:20, 126:2, 126:7, 126:10, 131:7, 164:16, 166:12, 185:7, 185:20, 185:23, 186:2, 186:7, 186:11, 186:15, 186:18, 187:2, 187:7, 187:11, 192:8, 192:25, 199:3, 220:4, 223:10, 230:4, 230:9, 232:12
**statutory-authorized** [5] - 66:7, 76:16, 76:20, 77:2, 97:9
**statutory-required** [6] - 55:7, 55:11, 55:16, 58:4, 79:23, 94:2
**statutory/regulatory** [1] - 73:2
**stayed** [1] - 28:4
**Steege** [1] - 3:10
**step** [6] - 129:8, 129:9, 129:19, 129:22, 131:21
**still** [46] - 22:19, 22:20, 28:24, 28:25, 29:3, 31:22, 35:7, 48:2, 55:7, 60:1, 60:4, 66:13, 66:25, 67:3, 67:21, 67:23, 70:1, 70:9, 71:1, 90:14, 105:1, 106:14, 110:4, 114:6, 117:3, 145:16, 149:10, 157:21, 181:17,

181:20, 193:17, 194:9, 196:15, 208:13, 211:5, 212:1, 212:8, 213:9, 213:22, 226:13, 231:7, 231:15, 231:24, 232:2, 233:7

**stood** [1] - 151:11

**stop** [30] - 43:25, 49:9, 52:6, 56:8, 56:14, 77:25, 152:14, 154:16, 168:23, 168:24, 169:4, 184:8, 184:23, 184:24, 189:23, 190:4, 193:17, 193:19, 203:17, 205:19, 206:4, 206:22, 207:16, 208:21, 208:24, 210:3, 212:7, 221:17, 228:13

**stop-work** [16] - 49:9, 52:6, 56:8, 56:14, 154:16, 184:8, 184:23, 184:24, 189:23, 190:4, 203:17, 206:4, 206:22, 208:21, 208:24, 210:3

**stoppage** [8] - 31:16, 47:14, 88:21, 108:15, 213:18, 213:22, 214:5, 214:11

**stopped** [7] - 30:25, 43:24, 77:23, 85:3, 107:1, 193:1, 196:1

**stopping** [1] - 194:14

**store** [1] - 81:25

**stored** [2] - 181:10, 182:22

**strategies** [1] - 100:25

**streaming** [1] - 28:13

**street** [1] - 92:3

**strike** [1] - 17:17

**stroller** [1] - 27:23

**strong** [1] - 57:23

**strongly** [1] - 195:22

**structure** [2] - 116:15, 116:16

**structures** [1] - 34:5

**struggling** [1] - 148:14

**Student** [1] - 189:2

**student** [4] - 5:1, 104:25, 190:18, 190:24

**stuff** [3] - 87:22, 118:4, 205:12

**style** [2] - 14:12, 115:11

**subject** [6] - 46:17, 50:19, 198:11, 221:21, 223:3, 228:20

**submit** [2] - 105:4, 236:5

**submitted** [29] - 4:19, 16:14, 50:21, 51:5,

58:24, 91:7, 91:8, 123:9, 123:10, 124:9, 124:10, 124:14, 124:18, 124:19, 125:5, 127:4, 153:19, 184:24, 186:2, 188:8, 189:17, 189:21, 190:9, 198:15, 235:14, 236:9, 236:10, 236:12, 238:13

**subsections** [1] - 117:21

**subsequent** [4] - 34:4, 43:1, 53:6, 157:16

**subsequently** [2] - 174:17, 227:25

**subset** [1] - 70:23

**substance** [1] - 84:25

**substantial** [2] - 123:17, 238:14

**substantive** [1] - 109:7

**subunits** [1] - 117:17

**successful** [2] - 158:2

**successfully** [1] - 193:6

**succinct** [1] - 73:20

**sudden** [1] - 28:5

**suddenly** [1] - 209:3

**suffering** [1] - 226:8

**sufficient** [3] - 40:10, 160:2, 161:12

**suggest** [2] - 136:3, 190:17

**suggested** [1] - 114:5

**suggesting** [4] - 74:8, 115:23, 190:10, 191:6

**suggestions** [1] - 220:17

**suit** [1] - 159:1

**sum** [2] - 86:8, 160:20

**summarize** [5] - 36:6, 36:7, 76:12, 79:6, 117:2

**summary** [2] - 237:25, 239:17

**Sunday** [4] - 66:10, 66:18, 204:4, 210:21

**superimpose** [1] - 236:20

**superimposed** [1] - 236:25

**supervision** [34] - 30:14, 58:6, 105:7, 105:13, 106:13, 108:23, 108:24, 109:14, 110:4, 110:17, 112:6, 113:7, 114:8, 114:10, 114:20, 119:5, 119:7, 164:1, 188:12, 207:3, 207:5, 207:7,

211:8, 211:18, 211:25, 212:8, 212:19, 213:2, 213:9, 214:13, 214:14, 215:11, 216:12, 227:15

**Supervision** [3] - 130:19, 130:21, 213:6

**supervision/ examination** [1] - 109:19

**supervisor** [2] - 83:1, 98:13

**supervisors** [3] - 66:19, 98:12, 98:15

**supervisory** [2] - 113:11, 113:16

**supplemental** [2] - 124:14, 198:14

**support** [19] - 4:14, 14:3, 55:9, 65:21, 73:1, 84:10, 84:12, 94:22, 94:23, 99:14, 112:7, 120:20, 124:11, 167:21, 168:16, 189:11, 191:9, 195:18, 237:22

**supported** [1] - 237:21

**supporting** [1] - 161:19

**supports** [1] - 46:7

**suppose** [1] - 236:24

**supposed** [10] - 46:18, 53:5, 59:24, 59:25, 71:7, 110:4, 138:10, 166:10, 175:6, 190:21

**Supreme** [2] - 37:24, 69:8

**surprise** [1] - 67:22

**surprised** [5] - 15:10, 36:10, 37:1, 60:7

**surprising** [1] - 17:20

**surrounding** [1] - 81:23

**suspend** [3] - 75:12, 169:23, 170:1

**switch** [2] - 41:15, 72:2

**switched** [1] - 195:5

**switching** [1] - 159:9

**swore** [2] - 124:19, 124:24

**sworn** [1] - 9:5

**sync** [1] - 167:8

**system** [31] - 7:20, 11:22, 11:24, 11:25, 13:5, 22:2, 22:3, 22:13, 43:3, 58:22, 81:8, 83:6, 120:3, 123:20, 147:9, 177:16, 193:18, 217:7, 217:11, 218:23, 219:1, 219:4, 219:7, 222:5,

237:3, 237:4

**System** [1] - 35:17

**systems** [17] - 22:12, 23:16, 24:9, 24:11, 24:20, 24:21, 25:1, 25:12, 25:13, 25:21, 26:2, 26:6, 26:7, 33:22, 81:25, 89:4, 123:8

## T

**T&I** [3] - 85:3, 85:4, 192:19

**tab** [108] - 16:12, 28:24, 29:2, 29:3, 30:1, 31:22, 35:8, 35:10, 41:17, 42:13, 48:3, 48:4, 48:15, 72:5, 73:6, 75:4, 79:1, 81:12, 84:22, 87:1, 87:6, 87:20, 87:22, 88:17, 89:17, 89:18, 91:2, 91:3, 92:13, 92:16, 93:8, 93:18, 94:4, 94:11, 94:24, 95:9, 95:10, 95:18, 95:20, 96:7, 96:22, 98:1, 98:6, 99:6, 100:20, 101:22, 102:12, 104:17, 105:8, 105:10, 107:3, 107:9, 107:25, 108:2, 108:5, 108:18, 109:4, 109:10, 109:13, 110:13, 111:12, 112:23, 116:10, 122:13, 123:5, 161:25, 162:4, 162:5, 162:6, 162:18, 162:23, 165:4, 167:6, 168:8, 169:14, 170:5, 170:11, 170:23, 172:22, 176:4, 176:5, 178:4, 178:6, 179:2, 179:24, 179:25, 180:24, 193:25, 195:7, 198:20, 198:24, 200:5, 202:2, 202:19, 202:24, 202:25, 211:11, 212:13, 215:5, 216:24, 217:15, 217:16, 236:21, 236:22

**table** [8] - 3:12, 3:19, 4:1, 23:5, 28:9, 141:16, 232:9, 232:17

**tabs** [2] - 236:3, 236:19

**tailed** [1] - 27:10

**talks** [4] - 154:22, 155:2, 156:11, 175:14

**tangible** [1] - 7:17

**targeted** [1] - 233:3

**targeting** [1] - 238:25

**task** [2] - 32:19, 32:22
**tasks** [5] - 13:11, 85:3, 87:14, 87:17, 184:12
**taxpayer** [1] - 36:3
**taxpayers** [1] - 103:12
**team** [58] - 10:15, 22:11, 23:5, 23:14, 28:1, 54:8, 58:7, 64:16, 65:16, 71:19, 79:22, 89:14, 90:1, 90:7, 90:11, 93:10, 96:15, 99:17, 99:18, 99:22, 100:12, 100:14, 101:5, 104:20, 118:3, 126:5, 126:6, 133:20, 134:1, 134:13, 134:22, 135:1, 135:2, 135:7, 135:12, 135:17, 149:22, 157:2, 172:2, 177:18, 185:11, 185:12, 186:7, 187:18, 198:12, 198:18, 199:11, 199:15, 201:24, 203:3, 203:13, 213:21, 221:16, 231:24, 231:25, 232:2, 232:3
**Teams** [6] - 22:14, 101:21, 229:12, 229:13, 229:14, 229:16
**technical** [1] - 22:16
**technically** [3] - 96:24, 193:21, 218:2
**technology** [5] - 28:15, 85:5, 171:14, 171:16, 172:20
**teed** [1] - 115:12
**teeny** [1] - 170:16
**template** [1] - 175:19
**temporary** [4] - 40:13, 62:13, 134:6, 145:23
**ten** [4] - 65:9, 86:20, 134:10, 194:5
**ten-minute** [1] - 194:5
**tend** [2] - 101:10, 191:9
**tenure** [1] - 79:20
**term** [9] - 45:24, 52:2, 83:20, 92:1, 128:10, 146:14, 181:18, 181:22, 208:20
**terminate** [15] - 45:16, 70:15, 71:14, 75:12, 128:17, 128:25, 142:1, 142:24, 151:10, 151:22, 164:12, 169:22, 170:1, 183:19, 232:17
**terminated** [29] - 45:9, 45:13, 45:14, 45:19, 51:7, 51:8, 51:20,

51:21, 52:3, 73:9, 75:18, 76:6, 76:7, 79:9, 131:17, 131:19, 132:21, 133:5, 143:4, 148:17, 152:20, 153:15, 164:15, 168:20, 189:6, 195:19, 196:24, 208:20, 218:11
**terminating** [1] - 153:1
**termination** [25] - 45:7, 62:14, 76:1, 79:7, 79:12, 128:1, 132:14, 134:1, 134:13, 135:7, 135:12, 146:5, 152:6, 165:1, 167:1, 169:2, 170:3, 170:8, 174:7, 174:10, 175:1, 175:13, 197:17, 221:5, 231:23
**terminations** [17] - 46:2, 134:23, 135:24, 136:8, 138:10, 141:21, 142:16, 142:21, 142:22, 153:3, 154:16, 154:17, 156:11, 156:18, 158:12, 180:17, 208:21
**terms** [10] - 30:17, 69:17, 81:10, 82:4, 89:24, 119:11, 174:13, 174:19, 230:7
**testified** [26] - 9:6, 36:20, 52:24, 84:8, 101:1, 108:2, 119:5, 125:6, 125:14, 125:18, 125:25, 126:4, 127:20, 141:8, 147:4, 147:20, 149:18, 156:3, 160:4, 179:18, 184:16, 185:8, 196:4, 196:11, 206:3, 211:4
**testify** [5] - 6:9, 227:7, 227:15, 227:18, 235:16
**testifying** [4] - 13:3, 110:20, 186:1, 235:7
**testimony** [35] - 4:17, 5:11, 6:7, 6:12, 13:6, 19:13, 33:3, 74:21, 103:19, 104:10, 116:24, 117:10, 119:4, 120:24, 121:8, 124:8, 124:9, 125:3, 126:15, 127:11, 129:1, 138:23, 142:5, 142:10, 155:20, 159:14, 160:12, 160:23, 193:14, 209:21, 227:22, 229:24, 234:3, 239:12
**text** [11] - 64:1, 64:7, 64:8, 101:11, 101:13, 101:18, 121:4, 229:6,

229:7, 229:8, 236:7
**thanking** [1] - 99:9
**THE** [595] - 3:2, 3:18, 3:22, 4:3, 5:21, 6:3, 6:15, 6:20, 6:24, 7:1, 7:3, 7:9, 7:15, 7:18, 8:7, 8:16, 8:19, 8:25, 9:12, 9:15, 9:16, 9:17, 12:3, 12:7, 12:12, 12:24, 17:21, 17:25, 18:5, 18:6, 19:5, 19:9, 19:14, 20:2, 20:3, 20:13, 20:15, 20:16, 20:17, 21:3, 21:4, 21:11, 21:12, 21:16, 21:17, 21:22, 21:24, 22:9, 22:10, 22:17, 22:19, 23:7, 23:9, 23:10, 23:11, 23:17, 23:22, 23:23, 25:19, 25:24, 25:25, 26:3, 26:4, 26:5, 26:8, 26:10, 26:12, 26:14, 26:15, 26:17, 26:20, 29:11, 29:12, 29:14, 29:22, 31:3, 31:5, 31:8, 31:10, 31:20, 32:10, 32:13, 32:14, 32:21, 32:24, 33:12, 33:15, 33:20, 33:21, 33:23, 33:25, 34:6, 36:3, 36:4, 37:3, 37:5, 37:6, 37:10, 38:11, 38:24, 39:9, 39:10, 39:13, 39:15, 39:17, 39:22, 39:24, 40:16, 40:25, 42:8, 42:11, 42:18, 43:17, 43:20, 44:1, 44:4, 44:20, 46:17, 46:19, 46:20, 46:23, 46:24, 47:1, 47:3, 47:4, 47:9, 47:11, 47:15, 47:18, 47:19, 49:12, 49:17, 49:19, 49:20, 49:23, 49:24, 50:24, 50:25, 51:15, 51:17, 51:19, 51:22, 51:24, 52:1, 52:2, 52:4, 52:6, 52:8, 52:12, 52:14, 52:15, 52:17, 52:18, 52:20, 52:22, 54:13, 54:16, 54:17, 54:19, 54:20, 54:22, 54:23, 54:25, 55:2, 55:5, 55:10, 55:12, 55:18, 55:21, 55:22, 55:23, 55:25, 56:2, 56:8, 56:9, 56:10, 56:16, 56:17, 56:21, 56:23, 56:24, 57:2, 57:11, 57:15, 57:16, 57:17, 59:3, 59:6, 59:8,

59:11, 59:16, 59:21, 59:22, 60:2, 60:4, 60:6, 60:8, 60:9, 60:11, 60:19, 60:23, 61:1, 61:21, 64:5, 64:21, 64:24, 64:25, 65:19, 66:2, 66:4, 66:9, 66:10, 66:15, 66:17, 66:23, 66:25, 67:2, 67:4, 67:6, 67:7, 67:10, 67:20, 67:22, 67:24, 68:3, 68:4, 68:11, 68:15, 68:18, 69:25, 70:3, 70:14, 70:17, 70:19, 70:22, 71:6, 71:9, 71:10, 71:11, 71:21, 71:24, 73:4, 73:8, 73:10, 73:11, 73:13, 73:18, 73:23, 73:24, 73:25, 74:7, 74:10, 74:11, 74:14, 74:15, 74:18, 74:19, 75:22, 75:23, 76:9, 76:10, 76:13, 76:22, 76:23, 77:1, 77:2, 77:4, 78:4, 78:5, 78:6, 78:7, 80:7, 80:9, 80:16, 80:22, 80:23, 80:25, 82:14, 82:25, 83:3, 83:9, 83:21, 84:2, 85:19, 85:22, 85:23, 86:3, 86:13, 86:19, 86:23, 87:5, 87:7, 87:22, 87:23, 87:24, 88:2, 88:5, 88:7, 88:8, 88:10, 88:13, 88:14, 88:15, 89:18, 90:5, 90:13, 90:17, 90:23, 90:24, 91:11, 91:13, 91:19, 91:22, 91:23, 91:25, 92:1, 92:8, 92:11, 93:3, 93:5, 93:6, 93:9, 93:12, 93:14, 93:15, 93:16, 94:9, 94:24, 95:6, 95:7, 95:5, 97:6, 97:8, 97:13, 97:15, 97:17, 97:22, 97:24, 98:7, 98:13, 98:15, 98:18, 98:20, 98:21, 98:22, 98:23, 98:25, 99:2, 99:4, 99:25, 100:6, 100:11, 100:14, 100:15, 100:17, 100:9, 101:12, 101:13, 101:14, 101:23, 102:5, 102:23, 103:1, 103:6, 103:9, 103:10, 103:11, 103:15, 103:18, 103:23, 104:6, 107:5, 107:7, 107:13, 107:20, 107:22, 108:6, 108:10,

110:3, 110:8, 110:11, 110:21, 111:3, 111:7, 111:13, 111:15, 111:22, 112:1, 112:9, 112:15, 112:25, 113:4, 113:18, 113:25, 114:3, 114:8, 115:19, 115:25, 117:25, 118:2, 118:4, 118:5, 118:15, 118:22, 119:12, 119:14, 119:15, 119:17, 120:10, 120:14, 121:6, 121:14, 121:15, 121:18, 121:19, 121:22, 121:23, 122:1, 122:2, 122:5, 122:6, 122:11, 122:12, 122:20, 123:5, 123:14, 123:21, 129:13, 129:16, 133:1, 133:2, 133:11, 135:4, 135:5, 135:6, 135:8, 135:9, 136:14, 137:6, 137:8, 137:9, 137:10, 137:11, 137:13, 137:14, 137:16, 137:17, 137:18, 137:19, 137:21, 137:22, 137:23, 137:24, 138:1, 138:2, 138:4, 138:5, 139:19, 141:3, 141:4, 141:5, 142:6, 143:24, 144:2, 144:5, 144:6, 144:10, 144:13, 144:16, 144:19, 144:21, 144:22, 144:23, 146:14, 146:15, 146:19, 148:24, 149:3, 149:4, 149:5, 149:6, 149:8, 149:10, 149:12, 149:13, 150:6, 150:8, 154:11, 155:10, 155:25, 156:24, 157:6, 158:18, 158:22, 160:15, 160:21, 161:3, 161:4, 162:4, 162:6, 162:10, 162:14, 166:1, 166:5, 166:7, 166:13, 166:14, 166:16, 166:17, 168:6, 170:11, 170:13, 170:16, 172:12, 173:12, 174:2, 185:10, 185:15, 186:24, 187:1, 187:2, 187:9, 187:14, 187:22, 188:19, 191:2, 191:19, 191:20, 194:2, 194:13, 197:25, 198:7, 198:9, 198:22, 203:24, 205:19, 205:21,

205:22, 205:24, 205:25, 206:1, 207:18, 210:10, 210:14, 221:22, 222:1, 222:2, 222:3, 222:4, 222:6, 222:7, 222:10, 224:17, 225:17, 225:20, 226:1, 226:4, 226:5, 226:12, 226:16, 227:6, 227:10, 227:11, 227:12, 227:13, 228:24, 229:2, 229:21, 230:16, 230:19, 230:20, 230:22, 230:23, 232:25, 233:7, 233:18, 233:22, 233:24, 234:1, 234:14, 234:15, 234:18, 234:21, 234:24, 234:25, 235:8, 235:11, 235:15, 235:19, 235:21, 235:24, 236:8, 237:1, 237:10, 237:19

**theirs** [1] - 123:10
**themselves** [2] - 26:16, 102:20
**theories** [1] - 115:13
**theory** [1] - 83:22
**thereafter** [2] - 10:3, 28:22
**therefore** [1] - 4:16
**they've** [4] - 41:17, 118:2, 230:25, 231:6
**thinking** [10] - 97:14, 97:15, 101:1, 113:21, 136:2, 194:4, 215:1, 230:6, 230:14, 230:20
**third** [3] - 35:4, 45:22, 51:9
**Thomas** [1] - 3:13
**thoroughly** [1] - 239:13
**thoughtful** [1] - 239:16
**thousands** [1] - 226:20
**thread** [1] - 178:5
**three** [12] - 11:14, 11:18, 11:19, 12:1, 13:19, 21:14, 34:16, 34:20, 134:8, 172:12, 200:21, 229:9
**three-month** [1] - 12:1
**threshold** [1] - 183:23
**throughout** [2] - 31:1, 205:14
**Thursday** [3] - 19:21, 21:19, 27:6
**tickets** [1] - 193:5
**time-sensitive** [1] -

179:2
**timeframe** [3] - 47:1, 47:8, 148:18
**timeline** [7] - 14:9, 75:25, 77:20, 199:17, 199:23, 203:11, 211:3
**timing** [6] - 90:2, 142:14, 145:15, 148:11, 185:16, 194:16
**tiny** [2] - 11:6
**tip** [3] - 208:1, 208:7
**title** [2] - 20:16, 20:17
**today** [16] - 4:17, 8:11, 65:4, 67:14, 67:16, 73:11, 88:19, 102:10, 120:24, 125:3, 152:16, 153:23, 160:4, 199:14, 233:13, 236:6
**together** [6] - 65:9, 67:5, 123:16, 129:2, 137:3, 232:3
**toll** [1] - 198:2
**toll-free** [1] - 198:2
**tomorrow** [9] - 138:19, 234:7, 234:8, 234:13, 234:15, 234:22, 238:21, 238:23, 239:20
**took** [4] - 58:3, 102:25, 104:8, 238:16
**tools** [1] - 219:14
**top** [19] - 14:16, 14:21, 16:16, 35:12, 41:18, 48:21, 62:21, 65:22, 65:23, 70:4, 81:13, 81:20, 82:2, 117:5, 162:17, 195:17, 224:9, 236:25
**top-down** [3] - 14:16, 14:21, 70:4
**topic** [9] - 20:23, 60:17, 68:13, 72:2, 86:12, 104:4, 229:2, 229:4, 229:19
**topics** [7] - 19:16, 44:18, 60:14, 68:20, 102:10, 228:24, 228:25
**tops** [1] - 86:18
**totally** [2] - 153:12, 167:8
**touch** [2] - 39:5, 191:23
**toward** [1] - 62:21
**towards** [3] - 54:11, 69:9, 185:18
**track** [5] - 162:16, 162:20, 168:5, 217:11
**tracks** [1] - 136:22
**trade** [2] - 10:4, 31:6
**training** [2] - 231:19, 231:20

**tranches** [1] - 236:13
**transcript** [3] - 122:22, 123:12, 173:24
**transfer** [8] - 36:11, 36:17, 40:14, 43:3, 43:11, 44:7, 69:17, 147:18
**transferees** [1] - 11:21
**transferred** [2] - 11:25, 53:13
**transition** [9] - 17:5, 17:8, 17:18, 18:1, 18:2, 18:3, 18:4
**transitional** [1] - 121:10
**transitioning** [1] - 18:18
**transitions** [3] - 17:23, 18:10, 31:9
**transmitted** [1] - 95:4
**transpired** [2] - 140:2, 238:3
**travel** [3] - 22:2, 151:22, 152:3
**Treasury** [26] - 3:3, 3:9, 3:16, 10:8, 10:14, 10:21, 12:9, 12:15, 12:22, 13:12, 13:15, 15:2, 15:3, 17:2, 17:16, 18:9, 18:13, 31:10, 31:13, 44:13, 44:14, 44:15, 105:5, 105:6, 121:9
**Treasury's** [3] - 10:21, 11:24, 19:23
**treated** [2] - 5:13, 57:11
**trial** [5] - 45:19, 51:7, 51:25, 123:24, 237:19
**trial-period** [1] - 45:19
**trick** [1] - 230:18
**tried** [1] - 210:8
**triggered** [1] - 181:2
**trimmed** [1] - 161:1
**triple** [1] - 238:7
**TRO** [9] - 64:11, 64:22, 133:4, 133:15, 148:9, 148:15, 148:22, 152:17, 152:19
**true** [13] - 124:19, 124:25, 127:19, 127:22, 129:7, 140:20, 149:4, 149:6, 149:8, 153:17, 155:17, 173:13, 173:17
**Trump** [5] - 18:2, 18:4, 30:4, 36:15
**trusted** [1] - 14:13
**try** [16] - 18:25, 21:7, 42:10, 46:13, 69:19,

70:13, 73:17, 92:13, 94:19, 155:24, 157:22, 177:15, 194:13, 211:9, 229:21
**trying** [15] - 42:12, 54:1, 60:24, 64:10, 101:4, 114:1, 114:2, 121:23, 162:7, 177:19, 208:11, 221:1, 225:8, 237:2, 238:24
**Tuesday** [5] - 42:25, 112:24, 148:20, 182:16, 236:13
**turn** [73] - 7:20, 16:9, 16:12, 16:16, 16:21, 28:24, 29:1, 30:1, 31:22, 31:23, 35:6, 48:3, 48:15, 62:19, 68:13, 68:18, 72:5, 75:4, 79:1, 80:6, 81:12, 83:7, 87:1, 87:20, 89:17, 92:13, 93:8, 93:18, 95:20, 96:7, 96:22, 99:6, 100:20, 101:22, 104:17, 105:7, 107:3, 108:18, 116:9, 130:4, 133:19, 134:10, 138:7, 139:1, 161:17, 161:23, 162:10, 164:19, 167:6, 169:14, 170:5, 172:22, 174:21, 176:4, 178:4, 179:24, 180:24, 182:10, 193:25, 195:4, 202:1, 202:18, 203:17, 211:7, 211:11, 211:13, 212:13, 219:15, 220:2, 220:6, 220:13, 223:4
**turnaround** [1] - 90:2
**turned** [8] - 13:4, 54:17, 80:1, 183:14, 219:21, 221:3, 221:12, 223:23
**turning** [4] - 73:16, 85:12, 219:23, 223:24
**twice** [1] - 124:9
**two** [57] - 6:8, 9:1, 10:4, 16:3, 20:9, 20:10, 30:10, 37:19, 42:8, 42:21, 45:20, 45:25, 47:11, 47:21, 48:12, 49:3, 49:6, 49:14, 51:23, 56:15, 60:14, 60:19, 60:20, 60:21, 68:20, 70:6, 73:12, 88:21, 93:12, 102:9, 105:20, 109:8, 110:2, 110:15, 121:20, 129:19, 136:22, 142:7, 153:1, 164:9, 180:21,

182:7, 185:16, 190:17, 201:8, 224:20, 228:22, 228:24, 228:25, 233:23, 233:24, 233:25, 235:4, 235:5, 236:6, 236:13, 236:17
**two-page** [1] - 224:20
**two-sided** [1] - 42:8
**two-step** [1] - 129:19
**two-year** [2] - 51:23, 121:20
**type** [10] - 18:9, 52:2, 57:21, 85:25, 105:15, 106:3, 109:7, 109:9, 170:20, 182:4
**types** [4] - 14:6, 18:10, 94:20, 106:8
**typical** [7] - 121:11, 121:13, 121:17, 121:21, 121:25, 122:4, 239:17
**typically** [6] - 31:16, 34:4, 45:21, 46:18, 47:5, 210:1

## U

**U.S** [1] - 89:15
**ultimately** [3] - 29:19, 115:11, 137:8
**um-hum** [31] - 48:5, 48:18, 52:1, 72:15, 84:11, 88:20, 93:15, 93:19, 124:13, 129:20, 134:16, 134:19, 135:18, 139:3, 141:13, 154:23, 163:23, 166:25, 169:13, 173:3, 174:25, 178:8, 181:1, 187:4, 196:23, 198:13, 201:22, 204:14, 211:6, 219:22, 224:25
**unaware** [1] - 133:10
**unclear** [2] - 136:10, 177:19
**uncommon** [1] - 62:11
**under** [20] - 11:23, 14:9, 14:19, 25:12, 30:21, 36:15, 36:25, 40:13, 62:21, 117:21, 124:22, 124:25, 127:8, 160:23, 178:19, 183:23, 183:24, 192:9, 204:15, 236:19
**undergoing** [1] - 37:24
**underscore** [1] - 162:2
**underscored** [1] - 98:8
**understandably** [2] -

5:25, 6:9
**understood** [28] - 32:9, 55:12, 61:4, 75:20, 89:22, 97:3, 125:22, 136:1, 136:2, 145:14, 145:22, 146:12, 147:16, 147:19, 150:5, 155:22, 169:1, 172:8, 183:15, 186:6, 193:8, 196:2, 196:17, 200:4, 207:7, 207:22, 208:6, 212:13
**Understood** [1] - 158:10
**undertake** [1] - 22:9
**unexpectedly** [3] - 176:17, 177:6, 177:23
**unfortunately** [2] - 28:8, 236:15
**union** [1] - 145:23
**Union** [3] - 3:3, 3:9, 3:17
**unique** [4] - 14:18, 31:11, 184:16, 184:18
**unit** [3] - 56:25
**United** [3] - 3:25, 13:17, 19:17
**units** [3] - 130:17, 132:1, 145:17
**unless** [6] - 44:18, 144:17, 162:11, 209:24, 209:25, 238:7
**unload** [1] - 148:22
**unnecessary** [1] - 159:24
**unrepairable** [1] - 153:12
**unusual** [4] - 17:20, 18:11, 38:20, 42:24
**up** [87] - 8:11, 10:14, 10:15, 10:16, 10:20, 10:22, 11:1, 11:7, 11:11, 11:17, 17:4, 20:9, 20:10, 20:11, 21:6, 21:11, 21:13, 21:15, 22:22, 23:25, 25:19, 34:2, 37:15, 37:18, 37:19, 40:24, 41:16, 43:8, 43:20, 43:21, 48:20, 49:12, 52:25, 54:9, 59:22, 60:1, 60:4, 63:5, 66:13, 71:6, 74:4, 75:11, 79:11, 83:11, 86:8, 87:9, 88:12, 92:9, 92:22, 95:24, 98:3, 99:17, 104:16, 114:4, 115:12, 116:4, 117:1, 117:2, 117:13, 117:21, 118:16, 118:25,

123:22, 141:11, 141:12, 151:11, 153:14, 157:17, 157:23, 162:8, 186:3, 188:6, 188:9, 188:12, 190:11, 199:25, 208:1, 208:7, 208:13, 223:19, 227:22, 229:4, 232:3, 237:2
**upcoming** [1] - 193:10
**update** [4] - 138:18, 214:22, 215:13, 215:15
**updated** [1] - 140:21
**upset** [1] - 115:14
**upward** [1] - 158:1, 158:3
**urged** [2] - 194:23, 195:22
**urgent** [3] - 32:17, 32:21, 77:16
**useful** [1] - 194:10
**utilize** [1] - 22:13

## V

**vacant** [3] - 105:1, 105:2, 189:4
**vague** [4] - 11:9, 126:16, 136:9, 173:11
**validated** [1] - 117:23
**various** [6] - 7:25, 36:21, 41:22, 79:4, 99:11, 113:8
**vary** [1] - 83:12
**vast** [4] - 128:17, 142:24, 143:4, 232:17
**vendors** [3] - 79:16, 173:10, 174:9
**version** [1] - 11:20
**versus** [3] - 3:4, 38:3, 227:5
**Vespa** [2] - 93:18, 117:11
**Vespa-Papaleo** [2] - 93:18, 117:11
**via** [3] - 91:7, 91:8, 106:11
**viable** [1] - 190:12
**view** [4] - 108:25, 136:19, 161:7, 186:17
**views** [2] - 103:5
**violates** [1] - 114:12
**Virginia** [1] - 3:10
**virtual** [2] - 22:14, 231:10
**virtually** [1] - 44:11
**vision** [1] - 158:15
**visions** [1] - 4:15
**volume** [2] - 16:7, 123:17

**Vought** [50] - 3:4, 23:7, 23:13, 25:14, 30:3, 30:21, 32:2, 35:15, 44:1, 49:9, 49:18, 56:9, 56:14, 61:11, 61:13, 61:14, 62:6, 62:17, 63:4, 75:14, 78:16, 102:14, 106:2, 121:11, 125:10, 130:13, 136:21, 137:6, 137:24, 138:18, 138:21, 138:23, 139:25, 140:11, 140:21, 145:5, 145:7, 145:9, 151:24, 158:5, 158:9, 159:17, 161:18, 161:21, 163:4, 163:8, 169:24, 184:11, 208:8, 229:25

**Vought's** [12] - 29:10, 29:12, 33:15, 33:16, 50:10, 72:21, 77:14, 79:20, 86:25, 87:3, 87:18, 89:8

**Vought/Paoletta** [1] - 185:11

**W**

**wait** [6] - 66:19, 93:9, 134:13, 134:22, 135:19, 135:22

**waiting** [1] - 79:17

**walk** [8] - 8:20, 68:6, 68:20, 68:21, 98:2, 99:7, 157:16, 167:9

**walked** [2] - 28:8, 174:19

**wants** [7] - 19:12, 19:13, 32:11, 37:4, 60:17, 113:24, 123:1

**warranted** [1] - 47:10

**Warren** [6] - 11:9, 11:10, 52:25, 95:11, 95:13, 95:24

**Washington** [1] - 10:4

**ways** [5] - 30:19, 53:23, 146:3, 186:10, 224:13

**Ways** [1] - 10:6

**web** [1] - 25:11

**website** [13] - 90:8, 90:9, 90:13, 91:5, 91:8, 91:9, 91:15, 116:3, 120:1, 192:20, 192:22, 198:2, 218:21

**Wednesday** [1] - 148:17

**week** [57] - 4:12, 22:22, 22:23, 23:19, 31:1, 45:9, 56:2, 56:4, 61:6, 64:17, 67:15, 70:17, 76:1, 90:6, 90:25, 104:13, 110:7, 111:5, 111:7, 120:14, 126:23, 127:16, 130:13, 136:22, 141:9, 141:11, 141:18, 142:10, 142:19, 142:20, 143:7, 143:20, 143:21, 143:22, 145:14, 145:15, 145:20, 146:7, 147:21, 148:7, 148:9, 148:24, 149:4, 149:7, 150:24, 153:9, 182:18, 203:15, 203:18, 203:19, 231:14, 235:12, 239:1, 239:5

**weekend** [2] - 15:19, 78:7

**weeks** [6] - 64:17, 127:1, 158:22, 180:21, 182:7, 185:16

**welcome** [6] - 4:6, 102:9, 130:5, 237:1, 237:6, 238:3

**Wendy** [1] - 3:14

**Wessler** [2] - 3:8, 3:12

**whatsoever** [1] - 60:10

**whereby** [1] - 74:22

**White** [4] - 15:13, 150:23, 151:6, 151:16

**whole** [10] - 25:1, 71:4, 103:11, 129:5, 150:10, 185:11, 218:24, 221:18, 224:15, 232:13

**wholesale** [3] - 164:12, 165:1, 167:1

**Wick** [2] - 21:13, 92:16

**wide** [3] - 89:4, 146:5, 222:14

**wide-scale** [1] - 146:5

**widely** [1] - 180:5

**willing** [2] - 67:11, 82:23

**Wilson** [1] - 3:15

**wind** [9] - 53:19, 54:2, 54:15, 55:2, 126:13, 126:20, 126:21, 146:8, 230:1

**wind-down** [3] - 53:19, 54:2, 54:15

**winding** [4] - 54:10, 125:4, 126:9, 147:23

**window** [3] - 27:24, 28:2, 47:5

**wiped** [1] - 150:10

**wish** [1] - 40:15

**withdraw** [1] - 174:1

**withdrawn** [1] - 79:9

**WITNESS** [199] - 9:15, 9:17, 12:7, 17:25, 18:6, 20:3, 20:15, 20:17, 21:4, 21:12, 21:17, 21:24, 22:10, 22:19, 23:9, 23:11, 23:22, 25:24, 26:3, 26:5, 26:10, 26:14, 26:17, 29:12, 31:5, 31:10, 32:13, 32:24, 33:15, 33:21, 33:25, 36:4, 37:5, 39:9, 39:15, 39:22, 43:20, 44:4, 46:19, 46:23, 47:1, 47:4, 47:11, 47:18, 49:19, 49:23, 50:25, 51:17, 51:22, 52:1, 52:4, 52:8, 52:14, 52:17, 52:20, 54:16, 54:19, 54:22, 54:25, 55:5, 55:12, 55:21, 55:23, 56:2, 56:9, 56:17, 56:23, 57:2, 57:15, 57:17, 59:6, 59:11, 59:21, 60:2, 60:6, 60:9, 64:24, 66:2, 66:9, 66:15, 66:23, 67:2, 67:6, 67:22, 68:3, 70:3, 70:17, 70:22, 71:9, 71:11, 71:24, 73:10, 73:13, 73:23, 73:25, 74:10, 74:14, 74:18, 75:23, 76:10, 76:22, 77:1, 77:4, 78:5, 78:7, 80:9, 80:22, 83:3, 85:23, 87:23, 88:2, 88:7, 88:10, 88:14, 90:5, 90:17, 90:24, 91:13, 91:22, 91:25, 92:8, 93:5, 93:12, 93:15, 95:6, 97:6, 97:13, 97:17, 97:24, 98:13, 98:18, 98:21, 98:23, 100:11, 100:15, 101:12, 101:14, 103:1, 103:9, 103:11, 103:18, 107:7, 118:2, 118:5, 119:14, 119:17, 121:14, 121:18, 121:22, 122:1, 122:5, 122:11, 133:2, 135:5, 135:8, 137:8, 137:10, 137:13, 137:16, 137:18, 137:21, 137:23, 138:1, 138:4, 141:4, 144:2, 144:6, 144:13, 144:19, 144:22, 146:15, 149:3, 149:5, 149:8, 149:12, 150:8, 158:22, 161:3, 166:13, 166:16, 170:13, 185:15, 187:1, 191:19, 198:7, 205:21, 205:24, 206:1, 222:1, 222:3, 222:6, 222:10, 225:17, 226:4, 227:10, 227:12, 230:19, 230:22, 234:24

**witness** [20] - 6:17, 6:24, 8:23, 9:5, 38:18, 49:15, 60:13, 61:19, 68:7, 84:2, 84:3, 102:6, 108:2, 122:6, 136:12, 172:10, 173:12, 194:9, 227:6, 235:18

**witness's** [1] - 160:12

**witnesses** [11] - 4:21, 4:24, 5:12, 6:22, 13:3, 194:10, 233:14, 233:17, 233:20, 235:5, 235:6

**Women** [1] - 222:24

**wondered** [1] - 104:7

**wonderful** [1] - 10:13

**Wonderful** [1] - 9:17

**wondering** [1] - 27:15

**word** [2] - 54:5, 144:17

**wording** [1] - 174:24

**words** [3] - 49:14, 72:3, 219:10

**work-hold** [1] - 73:9

**workforce** [5] - 29:9, 47:13, 64:18, 120:22, 143:4

**workings** [1] - 23:1

**works** [4] - 42:9, 43:3, 43:4, 169:1

**worries** [1] - 195:6

**worthwhile** [2] - 121:17

**wrap** [2] - 40:24, 43:8

**wrapped** [1] - 22:22

**write** [5] - 113:19, 225:21, 237:2, 238:20, 238:21

**writing** [1] - 32:19

**wrote** [5] - 61:2, 72:11, 82:15, 110:3, 200:2

**WW** [1] - 215:16

**X**

**XO** [1] - 122:21

**Y**

**year** [8] - 12:3, 45:18, 51:21, 51:22, 51:23, 69:16, 121:20, 159:25

**years** [7] - 13:19, 45:20, 45:25, 70:6, 160:5, 228:19
  **yesterday** [3] - 96:17, 213:17, 216:5
  **York** [1] - 44:15
  **Young** [11] - 20:11, 21:12, 21:19, 27:6, 29:18, 41:25, 42:6, 64:9, 137:20, 151:10, 151:24
  **young** [3] - 20:23, 25:8, 101:20
  **yourself** [3] - 4:9, 175:4, 222:5
  **yourselves** [1] - 233:19

## Z

**zero** [3] - 36:11, 36:14, 36:17
  **zeroing** [1] - 40:11
  **Zieve** [1] - 3:14

```
 1               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3     National Treasury Employees    )
       Union, et al.,                 ) Civil Action
 4                                     ) No. 25-cv-381
                       Plaintiffs,    )
 5                                     ) EVIDENTIARY HEARING
       vs.                            )
 6                                     ) Washington, DC
       Russell Vought, et al.,        ) March 11, 2025
 7                                     ) Time:  10:18 a.m.
                       Defendants.    )
 8     _____

 9              TRANSCRIPT OF EVIDENTIARY HEARING
                          HELD BEFORE
10       THE HONORABLE JUDGE AMY BERMAN JACKSON
                 UNITED STATES DISTRICT JUDGE
11     _____

12                   A P P E A R A N C E S

13     For Plaintiff:    Deepak Gupta
                         Robert D. Friedman
14                       GUPTA WESSLER LLP
                         2001 K Street, NW
15                       Suite 850 North
                         Washington, DC 20006
16                       (202) 888-1741
                         Email:  Deepak@guptawessler.com
17                       Email:  Robert@guptawessler.com

18                       Jennifer D. Bennett
                         GUPTA WESSLER LLP
19                       505 Montgomery Street
                         San Francisco, CA  94111
20                       (415) 573-0335
                         Email:  Jennifer@guptawessler.com
21
                         Allison Marcy Zieve
22                       Wendy Liu
                         PUBLIC CITIZEN LITIGATION GROUP
23                       1600 20th Street, NW
                         Washington, DC 20009
24                       (202) 588-1000
                         Email:  Azieve@citizen.org
25                       Email:  Wliu@citizen.org
```

```
1    For Defendant:        Brad P. Rosenberg
                           U.S. DEPARTMENT OF JUSTICE
2                          1100 L Street, NW
                           Washington, DC 20005
3                          (202) 514-3374
                           Email:  Brad.rosenberg@usdoj.gov
4    _____

5    Court Reporter:       Janice E. Dickman, RMR, CRR, CRC
                           Official Court Reporter
6                          United States Courthouse, Room 6523
                           333 Constitution Avenue, NW
7                          Washington, DC  20001
                           (202) 354-3267
8
                                  *   *   *
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2              THE COURTROOM DEPUTY:  We are on the record with

3       Civil Case 25-381, National Treasury Employees Union, et al.,

4       versus Russell Vought, et al.

5              Counsel, starting with plaintiff, please state your

6       appearance for the record.

7              MR. GUPTA:  Good afternoon, Your Honor.  Deepak Gupta

8       for the plaintiffs.  At counsel table are Jennifer Bennett,

9       Gabriel Chess, and Robert Friedman of Gupta Wessler, and Alison

10      Zieve and Wendy Liu for Public Citizen Litigation Group.

11             THE COURT:  All right.  Good afternoon.

12             MR. ROSENBERG:  Good afternoon, Your Honor.  Brad

13      Rosenberg from the Department of Justice Civil Division,

14      Federal Programs Branch, on behalf of the United States.  And

15      with me at counsel's table is Liam Holland, also with the

16      Federal Programs Branch.

17             THE COURT:  All right, everybody.  We are going to

18      complete the testimony of Mr. Martinez.  I believe we are up to

19      the punchy redirect, which will not need to repeat the direct

20      because we have a court reporter, and I was taking notes, too.

21      And then we will -- the plaintiffs are going to put on

22      Mr. Pfaff, yes?  Is that still the plan?

23             MS. BENNETT:  (Nods head.)

24             THE COURT:  Who I want to hear about the current

25      status of the consumer response.

4

```
 1              And, then, are you still planning to call someone

 2      that provided a Doe declaration or was the substance of that

 3      declaration covered in your cross-examination of Mr. Martinez?

 4              MR. GUPTA:  That is still our plan, Your Honor, to

 5      call them.

 6              THE COURT:  Okay.  All right.  My goal is to finish

 7      this up this afternoon.  So I don't see why we can't do that.

 8              So, Mr. Martinez, you can return to the witness

 9      stand, you're still under oath.

10              And, Mr. Rosenberg, please proceed.

11                          REDIRECT EXAMINATION

12      BY MR. ROSENBERG:

13      Q.  Welcome back.

14      A.  Thank you.

15      Q.  Yesterday you provided testimony about various committees,

16      advisory committees at CFPB.  And I believe you were asked

17      about the status of those committees and indicated that you

18      wanted to provide a more fulsome answer, and opposing counsel

19      indicated you would have a opportunity to do so.  Do you recall

20      that exchange?

21      A.  I do, I do.

22      Q.  Please go ahead with the answer that you were going to

23      provide.

24              THE COURT:  Can we have the question first?  And then

25      his answer.
```

1     BY MR. ROSENBERG:

2     Q.  What was the answer that you were going to provide?

3               THE COURT:  What is the question that you're asking

4     him to answer?

5               MR. ROSENBERG:  I don't have a transcript from

6     yesterday, but my recollection is that he was asked about the

7     status of various advisory committees and similar organizations

8     such as advisory boards at CFPB, including the elimination or

9     termination of some of those advisory committees and advisory

10    boards.

11              THE COURT:  All right.  Go ahead.

12              THE WITNESS:  Thank you.  My clarification on that

13    specific question was that we received a request for all four

14    FACA councils to be canceled, and those came directly from the

15    General Services Administration as a mandate to cancel those.

16    We did push back with one that was specifically statutorily

17    required.  The other three we did comply with because in the --

18    in the -- in the actual charters, it was clear that they were

19    discretionary councils.  But that did not come directly from

20    the CFPB leadership, that came directly from GSA.

21              THE COURT:  I don't understand what GSA has to do

22    with committees.  I understand what it might have to do with

23    buildings.

24              THE WITNESS:  The General Services Administration

25    actually manages the FACA program for the US.

1          THE COURT:  Do you want to tell me what that stands

2     for?

3          THE WITNESS:  I actually don't know.

4          THE COURT:  Okay.  All right.  Do you?

5          MR. ROSENBERG:  I think he said FACA, were you

6     referring to the Federal Advisory Committee Act?

7          THE WITNESS:  Yes.  Thank you.

8     BY MR. ROSENBERG:

9     Q.  You mentioned there was one committee that was statutorily

10    required.  Do you recall which one that was?

11    A.  That was the advisory board.  That's in statute.

12    Q.  Last question on this topic.  What do they do?

13    A.  They advise the head of Agency and the CFPB on

14    CFPB-specific issues.

15    Q.  Okay.  I'm going to ask you to turn to the binder that

16    contains the defendant's exhibits.

17          THE COURT:  Have they met to advise anybody about

18    anything?

19          THE WITNESS:  Not currently.  Or recently.

20          MR. ROSENBERG:  And for the record, this is the

21    binder of defendant's exhibits, which has the numbered tabs.

22    We did file earlier today an exhibit list that describes the

23    exhibits by both description -- both by description, Bates

24    number, and ECF number.

25          THE COURT:  Great.

```
 1    BY MR. ROSENBERG:
 2    Q.  I'm going to ask you to turn to tab 4, please.  And just to
 3    be clear, this is CFPB_00006.
 4    A.  Yes.
 5    Q.  Do you recall being asked about this document during your
 6    cross-examination yesterday?
 7    A.  Yes.
 8    Q.  Do you have an understanding as to how the contracts that
 9    are described in this document were identified for termination?
10    A.  My recollection is these specific contracts were identified
11    by the DOGE folks, and they provided the instruction to have
12    these terminated.
13    Q.  Okay.  And this email came from Mr. Paoletta on
14    February 11th?
15    A.  That is correct.
16    Q.  Do you recall --
17              THE COURT:  He's not a DOGE folk.
18              THE WITNESS:  No.
19    BY MR. ROSENBERG:
20    Q.  Do you recall when Mr. Paoletta started working at CFPB?
21    A.  I did not have any interaction with him until approximately
22    Monday, the 10th.
23    Q.  Do you have any understanding as to Mr. Paoletta's
24    understanding of the scope of CFPB operations at the time that
25    this email was issued?
```

```
 1    A.  No.
 2              THE COURT:  You don't know what his understanding
 3    was; is what you're saying?
 4              THE WITNESS:  Correct.  Yes, ma'am.
 5    BY MR. ROSENBERG:
 6    Q.  And Mr. Paoletta started reinstating many of these
 7    contracts shortly thereafter?
 8    A.  He did.
 9    Q.  Do you have an understanding as to why Mr. Paoletta started
10    reinstating many of these contracts shortly thereafter?
11              THE COURT:  What does "shortly thereafter" mean?
12              THE WITNESS:  Shortly thereafter would have -- would
13    have been within days of the 11th.
14              THE COURT:  So there were some that were reinstated
15    within days of the 11th?
16              THE WITNESS:  I recall, yes, or there was at least an
17    order to halt and give some assurance that they were not going
18    to be closed or terminated.
19    BY MR. ROSENBERG:
20    Q.  I'd like you to turn to tab No. 39.
21          Do you recall providing testimony yesterday about this
22    document?
23    A.  Yes.
24    Q.  It was during your cross-examination, if I recall
25    correctly; is that right?
```

1    A.   That's correct.

2    Q.   Okay.  Per this email, the IntelliTrack contract was

3    reinstated; is that your understanding of what happened?

4    A.   It was.

5    Q.   And in the email, the chief financial officer asks for a

6    justification to turn contracts back on based on what is

7    statutorily required.  In other words -- and what can't be

8    accomplished without the underlying contract.  Do you

9    understand the chief financial officer's email to be reflecting

10   that?

11   A.   Yes.

12   Q.   And do you understand that the IntelliTrack contract did

13   not involve something that is consumer facing?

14   A.   That is correct.

15   Q.   And I believe you provided testimony during your

16   cross-examination yesterday that the CFO has not yet provided

17   guidance on contracts that are necessary to carry out a

18   statutory function.  In other words, you can't carry it out

19   without the contract, versus those that might relate to a

20   statutory function but aren't necessary.  Do you recall that

21   testimony?

22   A.   I do.

23   Q.   Do you have an understanding as to why the chief financial

24   officer is conducting that analysis?

25   A.   Because -- because not all contracts should be turned on --

 1   back on.  There -- there may be some discretionary contracts

 2   that have been identified over the past couple of years that we

 3   may not turn back on.

 4   Q.  Do you know whether the chief financial officer is a --

 5   conducting a similar case-by-case analysis for other contracts?

 6   A.  Yes.

 7   Q.  And is that analysis separate from the contracts that

 8   Mr. Paoletta has already reinstated?

 9   A.  Yes.

10   Q.  One last question on contracts.  You were asked various

11   questions about specific individual contracts and the data that

12   third-party contractors may possess?

13   A.  Yes.

14   Q.  What is your scope of knowledge regarding data held by

15   third-party contractors to CFPB?

16   A.  If they follow the normal procurement process, there are

17   terms and conditions in those contracts that require that the

18   vendor return data back to the government who owns it.

19   Q.  I would like to change topics to work that's taking place

20   at CFPB.  Do you recall being asked during your

21   cross-examination yesterday about what plaintiffs refer to as

22   the acting director's stop-work order and whether it has been

23   rescinded?

24   A.  Yes.

25   Q.  And that -- what plaintiffs refer to as the stop-work order

1    is the email the acting director sent on Monday, February 10th?

2    A.  Yes.

3    Q.  That email did contain exceptions for urgent matters; is

4    that your understanding?

5    A.  My understanding was that our executive or staff could

6    reach out to either Acting Director Vought or Mark Paoletta if

7    they had questions.

8    Q.  Was the February 10th email from the acting director

9    sent -- directing people to contact Mark Paoletta regarding

10   urgent matters sent only to CFPB managers, or was it sent to

11   all CFPB employees?

12   A.  All employees.

13   Q.  And do you know whether people did, in fact, start to reach

14   out to Acting Director Paoletta right away regarding urgent

15   matters?

16   A.  There were -- I recall -- I mean, I was one of them, yes.

17   I definitely reached out for clarification, given our

18   operational infrastructure needs.  But I recall there was at

19   least one or two others that reached out initially.

20   Q.  Was Jason Brown regarding the average prime offer rates --

21   A.  That was one of the ones, absolutely, that he reached out

22   on.

23   Q.  And Christopher Johnson, who is the head of office of

24   consumers --

25            MS. BENNETT:  Objection.  Leading.

```
 1                THE COURT:  Well, let him finish the question.
 2   BY MR. ROSENBERG:
 3   Q.  Christopher Johnson, who is the head of the Office of
 4   Consumer Response, did he contact you that same day about
 5   contracts in support of CFPB's consumer resources center?
 6   A.  He did.
 7   Q.  Did you make sure that the resource center remained
 8   operational?
 9   A.  Based on the minimal requirements that he provided, yes.
10                THE COURT:  What does that mean?
11                THE WITNESS:  Keeping the lights on, ensuring that
12   the system didn't go down, the system would maintain its status
13   quo, that it didn't come off the website, there were --
14                THE COURT:  So system was physically operational?
15                THE WITNESS:  Correct.
16                THE COURT:  That doesn't have anything to do with
17   stopping work, does it?
18                THE WITNESS:  No.
19                THE COURT:  Okay.
20   BY MR. ROSENBERG:
21   Q.  Is that what Mr. Johnson asked for in that initial request?
22   A.  I don't -- I -- I would have to look.  I'm sorry, I would
23   need to look at the email.
24   Q.  Give me one moment.
25                All right.  I would like to ask you to turn to tab
```

```
 1    No. 2.  And this is CFPB_00003.
 2    A.  Yes.
 3    Q.  And this is an email from Mr. Johnson to you, among many
 4    others, on Monday, February 10th?
 5    A.  That's correct.
 6    Q.  That's the same day that the acting director sent his
 7    email?
 8    A.  That's correct.
 9    Q.  Okay.  Does this document refresh your recollection as to
10    the scope of Mr. Johnson's request?
11    A.  It does.
12    Q.  Okay.  And was that request approved?
13    A.  It was.
14    Q.  And did he have subsequent requests regarding operations?
15    A.  He did.  He -- later on he did.  He did reach out directly
16    to Mark Paoletta.
17    Q.  Right.
18         And over time, those subsequent requests were approved,
19    correct?
20    A.  Yes.
21    Q.  And, in fact, Mr. Johnson didn't introduce himself to
22    Mr. Paoletta until, I believe, it was February 26th?  Does that
23    seem right to you?
24    A.  That sounds correct.
25    Q.  Well, let's take a look at tab No. 9.
```

1      THE COURT:  And was the building closed during that

2  period of time?

3      THE WITNESS:  The building was closed.

4  BY MR. ROSENBERG:

5  Q.  Tab No. 9, which is CFPB_00016 through 00019.

6  A.  Yes.

7  Q.  I would like you to take a look at the -- on the first

8  page, which is CFPB_00016, there's an email from Mr. Johnson to

9  Mr. Paoletta on Wednesday, February 26th, at 11:01 a.m.  Can

10  you take a look at that first paragraph?

11  A.  Yes.

12  Q.  So based on that, reading that paragraph, is it your

13  understanding that that was the first time that Mr. Johnson

14  reached out directly to Mr. Paoletta?

15  A.  Directly to Mr. Paoletta, yes.

16  Q.  Okay.  And his request was approved in that email exchange

17  as well?

18  A.  It was.

19  Q.  Are you aware of Mr. Paoletta ever denying a work request?

20  A.  I don't recall Mr. Paoletta denying requests, but I recall

21  Mr. Paoletta letting employees know that he needed to get back

22  to them.

23  Q.  And you sent an email out on February 27th.  Do you recall

24  your testimony about that yesterday?

25  A.  Well, multiple emails, yes.

```
1    Q.  Yeah.

2         And the emails to which I'm referring, to be clear, are

3    emails directing people to -- let me pull it up -- directing

4    people to ensure that they're carrying out their functions; is

5    that fair?

6    A.  Yes.

7    Q.  And then, subsequently thereafter, Mr. Paoletta sent out

8    his email on March 2nd, and that's in tab No. 24.  So I'm going

9    to ask you to turn to that.

10        Do you have an understanding, based on Mr. Paoletta's

11   email, as to why he sent out this email?

12             THE COURT:  Did you have personal knowledge as to why

13   he sent out this email?

14             THE WITNESS:  Yes.

15             THE COURT:  How do you have that personal knowledge?

16             THE WITNESS:  I spoke -- I had a conversation with

17   him about it.

18             THE COURT:  Okay.  What did you ask?  How did that

19   come up?  What did you do?

20             THE WITNESS:  It came up because when I -- what was

21   very, very clear to me was that people were not reaching out to

22   Mark Paoletta for questions about statutory work, and that's

23   what prompted my emails to my peers to say, "You may want to

24   reach out to Mark."

25             There was something clearly wrong.  So, I tried to
```

```
 1    help folks get them to reach out to Mark.  And when I had a

 2    subsequent conversation with Mark, Mark became very clear at

 3    that point that work had literally stopped in many of these

 4    areas.

 5              THE COURT:  I'm sorry.  Mark made it clear or you

 6    made it clear?

 7              THE WITNESS:  I made it clear to Mark that it was

 8    very, very clear that people had stopped work.

 9              THE COURT:  And you say it was clear to you that

10    people weren't reaching out to him, that's because people were

11    reaching out to you, they knew.

12              THE WITNESS:  They were -- they were either reaching

13    out to me or they were coping me on those emails.

14              THE COURT:  Okay.  All right.  Ask your next

15    question.

16    BY MR. ROSENBERG:

17    Q.  Actually, I want to follow up on that because you

18    said that -- or you inferred that Mr. -- that people were not

19    reaching out to Mr. Paoletta.  Do you have any understanding as

20    to whether prior to this conversation Mr. Paoletta believed

21    that people were reaching out to him as appropriate?

22    A.  He didn't indicate whether people were reaching out to him

23    directly.  But I -- he was only aware of the -- my

24    recollection, he was only aware of the emails that I was copied

25    on.
```

1    Q.  Was he surprised when you told him that people were not

2    reaching out to him?

3    A.  I -- yeah.  Yes.  I literally said, "Mark, People stopped

4    working."

5    Q.  And he was surprised by that?

6    A.  He genuinely seemed surprised about that.

7    Q.  And Mr. Paoletta's March 2nd email, still on tab 24, refers

8    to both the acting director's February 8, 2025, email and the

9    February 10, 2025, email?

10   A.  Correct.

11   Q.  Now, you testified, I believe, yesterday, that Acting

12   Director Vought's February 10th email has not been rescinded.

13   Do you recall that testimony?

14   A.  Yeah, yes.

15   Q.  When providing that testimony, did you take into account

16   Mr. Paoletta's March 2nd email, which referenced Acting

17   Director Vought's email?

18   A.  I did not take this email into account; that is correct.

19           THE COURT:  Does the email rescind the 2-10 email?

20           THE WITNESS:  It clarifies.  It --

21           THE COURT:  Okay.  I mean, I think -- it's -- they

22   say what they say, and you're asking him how to read it or her

23   asking him how to read it.  It says what it says.  And we'll

24   have to figure out what it says.

25   BY MR. ROSENBERG:

```
 1   Q.  Let me just ask one follow up on this.

 2        When you refer to "rescind," were you thinking of a

 3   recision in a formal manner, coming from the actor director

 4   himself?

 5   A.  Yes.

 6   Q.  How many emails has the acting director sent out after

 7   February 10th to all hands at CFPB?

 8   A.  After the 10th, I don't recall seeing any emails.

 9   Q.  Now, if either you or Mr. Paoletta authorized the

10   resumption of work, who was ultimately responsible for ensuring

11   that the work is actually resumed?

12   A.  That would be the head of Agency.

13   Q.  What do you mean "the head of Agency"?

14   A.  That would be the acting director.

15   Q.  Do the managers or division heads or assistant directors

16   have responsibility to ensure that their offices are operating

17   pursuant to the guidance that they receive?

18   A.  Of course.

19   Q.  Okay.  So let's turn to tab 32.

20        THE COURT:  32, did you say?

21        MR. ROSENBERG:  32.  CFPB_00079 through -81.

22   BY MR. ROSENBERG:

23   Q.  Do you recall providing testimony yesterday about this

24   document?

25   A.  Yes.
```

1    Q.  Okay.  And I'll direct you to the middle paragraph.  I

2    think we know who Christopher Johnson is.  He is the associate

3    director of the Division of Consumer Response and Education.

4    And this is an email from to DL_CFPB_CRE_All.  Is that to

5    basically all CRE employees?

6    A.  All of his employees, yes.

7    Q.  Okay.  And does this email operationalize the guidance that

8    he received from Mr. Paoletta regarding the resumption of

9    activities?

10   A.  To the staff, yes.

11   Q.  Is that typical for CFPB operations, for the heads of

12   components or sections to ensure that the components or

13   sections for which they're responsible are actually operating?

14   A.  That would be normal, yes.

15   Q.  Now, yesterday you provided testimony that many of CFPB's

16   operations have resumed.  Do you still stand by that testimony?

17   A.  Operations, in terms of, like, the work that my team does

18   or --

19   Q.  The operations across different functions of the Agency.

20   A.  Oh.  Both programmatic and operationally?

21   Q.  Yes.

22   A.  Yes, yes.

23   Q.  And yesterday you also testified about your state of mind

24   during the week of February 10th to the 14th.  Do you recall

25   that?

1    A.  Yes.

2    Q.  And I forget, because I don't have the transcript, the

3    exact language that you used, but it was a -- I think you may

4    have said or referred to the difficulty that the Agency would

5    face in reassuming its operations or, you know, an end state.

6    Am I recall that testimony correctly?

7    A.  Yes.

8    Q.  But you also testified yesterday that you have hope for the

9    Agency.  What's changed?

10   A.  A lot has changed.  A lot has changed.  It was very

11   frightening that first week.  It was not anything that I had

12   seen before.  It's not something I would expected to have seen

13   before in government.  It just simply was not normal, and the

14   rapidness of the way that it was occurring was overwhelming.

15       And I now realize how much damage can be done with --

16   just within a couple of days to an organization.  And my

17   concern was, was that some of what we were directed to do by

18   DOGE was potentially irreparable from the operational

19   perspective.  I mean, you -- you can't just -- there was -- it

20   was -- it was like rapid fire, it was -- I have referred to

21   this, and this is probably not -- I know yesterday I used the

22   word "mergers and acquisitions," but when I've studied human

23   capital, you often talk about hostile takeovers, and that's

24   what it felt like in that first week.

25   Q.  You've interacted --

21

1            THE COURT:  Well, you describe it as a hostile

2    takeover, but didn't you also testify that those DOGE people

3    were installed.

4            THE WITNESS:  They were.

5            THE COURT:  Now, as people running the CFPB by not an

6    outside force, but by Acting Director Vought.

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.

9    BY MR. ROSENBERG:

10   Q.  Now, during the -- that -- from that time period to today,

11   have you interacted a great deal with Mark Paoletta?

12   A.  I've interacted mostly with Mark Paoletta.

13   Q.  Do you have an understanding as to his knowledge of the

14   Agency's functions when he first became the chief legal officer

15   versus his knowledge of the Agency's functions today?

16   A.  I would say it's very different.

17   Q.  How?

18   A.  At the very beginning, I believe -- my impression was that

19   he was trusting the DOGE folks that work in-house.  Once he

20   became more aware of our statutory requirements, he became more

21   aware of the operations of the organization, once he was

22   spending more time on our portfolio, he started to ask a lot of

23   questions.

24   Q.  Now, you referred to -- I want to go back to the hope

25   because you discussed, I think, the -- where you believe the

1    Agency was during that week of February 10th to 14th.  Seems

2    like you're in a different place now.  So I'm wondering, is --

3    in terms of the repairability of CFPB's operations, is CFPB

4    making an attempt to repair those operations?

5    A.  Yes.  I would say through the -- I mean, there's a couple

6    of things.  One is the RIF did not occur, fortunately.  And

7    then we received guidance from OMB on providing a roadmap to

8    the rest of the government on how to restructure or reshape the

9    federal workforce through their guidance.  That, to me, seemed

10   likely much more appropriate way to handle a change through

11   change management.

12          And I was advised by Mark to follow the guidance that

13   his boss, through OMB, had issued to the workforce.  That to

14   me, signified personally that we would have the ability to work

15   with our management, to determine what the needs were to get

16   some of the work done -- get the statutory-required work done

17   for the Agency, but I was also concerned that we also had not

18   followed collective bargaining rights for our union.  And this

19   process allows us to do that.  It also provides us the

20   opportunity to consider incentive programs for employees to

21   leave the Agency, if they choose to do that on their own; early

22   buyouts, if they choose to go that avenue.  It just provides a

23   more normalized, under the circumstances, approach.

24          THE COURT:  To reducing the number of people that

25   work there?

1           THE WITNESS:  Correct.  And it was, obviously,

2   helpful, as I pointed out yesterday, to see that the

3   requirement requires that we look at statutory requirements, we

4   look at the workforce itself, we look at the budget itself.

5   Those are all the things I would typically expect to see in any

6   type -- any type of government organization or reorganization.

7           The other thing that's happened that we've talked a

8   lot about the last couple of days is around the contracts being

9   reinstated.  I know it's not perfect, and it's incredibly

10  sloppy, the way that it occurred and how we're getting

11  contracts turned on.  If there's anything positive out of any

12  of this, it's that we have a better understanding and an

13  inventory of what the cause and effect could be in the future

14  for turning off specific contracts and the devastation it could

15  have on the Agency.  So we have a lot more information today

16  than we had before that.

17          And all of this is happening through adults at the

18  table that were able to interact with that understands how

19  government is supposed to run and is savvy enough to know the

20  consequences of not following normal government protocol,

21  which, in my opinion, is the public, its accountability with

22  the public, obviously with the court system, but Congress as

23  well.

24          THE COURT:  But I thought you told me yesterday that

25  while this is not being done in as rushed a fashion, it's not

1    being done in as -- an ill-informed fashion, but there are

2    grownups looking at things and figuring out how do you do this

3    in a logical, appropriate way.  The end game is to end up with

4    no CFPB, and the very important functions, they will go

5    somewhere else.

6            THE WITNESS:  That was the week of the 10th.

7            THE COURT:  Well, I thought the week of the 10th was

8    just no CFPB.  But I thought you're saying, they're still

9    talking about how do we get rid of the employees -- we're going

10    to keep the contracts we need until this is done, but how do we

11    get this down so that whatever has to be gone to some other

12    agency can go, but we're not going to be here?

13            THE WITNESS:  The week of the 10th, that was

14    absolutely correct.  But the other question --

15            THE COURT:  All right.  Well, yesterday I got the

16    distinct impression that you were saying they're doing it in a

17    much more methodical fashion, but that's the goal.

18            THE WITNESS:  The goal, as I understand -- I don't

19    have what the end goal is for this team right now.

20            THE COURT:  Okay.  So you don't know.

21            THE WITNESS:  I don't know.

22            THE COURT:  Okay.

23            THE WITNESS:  I don't know.  I don't know.  I -- what

24    I know is that we have OMB guidance that we've been directed to

25    follow, and I don't know what they're going to mandate as part

1   of that.  I just -- I have absolutely no clue what the end

2   result is for the Bureau.

3   BY MR. ROSENBERG:

4   Q.  Do you have any understanding as to whether there are

5   ongoing discussions about that topic?

6   A.  Not with me.

7   Q.  But is your -- and this is, I think, the last question.

8   Based on the tasks that you've -- that you've been performing

9   regarding the resumption of Bureau activities, resumption of

10  contracts, and attempts to comply with the OMB, OPM memo, do

11  you believe that current leadership at CFPB is committed to

12  fulfilling the Agency statutory functions?

13  A.  That is my understanding.  That is my understanding.  I

14  don't know how, but that is my understanding.  It's not been

15  discussed with me how they're going to do that.  But that --

16  that is what I understand.

17  Q.  They might go to Congress, for example?

18  A.  Yeah.  They could.  And we have a -- as I mentioned

19  yesterday, we have a new director coming in very soon who may

20  have an entirely --

21          THE COURT:  There's been no ongoing discussions with

22  you?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  Okay.  He doesn't know.  I'm not saying

25  that you can't prove that, but you can't prove it through him.

1          MR. ROSENBERG:  And I'll just note that it's the

2     plaintiffs' burden of proof.

3          THE COURT:  Okay.  Well, you asked the question.

4          MR. ROSENBERG:  But I think -- I think I'm done.  So

5     I would like to thank you very much for your time.

6          THE COURT:  Okay.  All right.  You're looking like

7     you're planning to get up.

8          MS. BENNETT:  Can we do short recross?

9          THE COURT:  Very short.  I mean, I think you did a

10    very lengthily and thorough cross.  So you don't need to ask

11    him anything you already asked him, even if you think it

12    undermines what he said today.  So direct yourself just to what

13    their redirect was.

14                    RECROSS-EXAMINATION

15    BY MS. BENNETT:

16    Q.  So I just want to ask you a couple of questions about the

17    contracts.

18    A.  Yes.

19    Q.  Can you turn to Bates stamp in the CFPB binder 7 -- pages 7

20    and 8.  This is tab 5.

21    A.  Yes.

22    Q.  And this is an email from you to Sonya White, yes?

23    A.  Yes.

24    Q.  It's a deputy general counsel?

25    A.  Yes.

1    Q.  And Mark Paoletta is CCed on this email?

2    A.  Yes.

3    Q.  And you're activating the legal division to do a handful of

4    operational matters, yes?

5    A.  Yes.

6    Q.  And it's sent on February 21, 2025, yes?

7    A.  That is correct.

8    Q.  And one of the things they're being activated to do is

9    procurement contract actions?

10   A.  Yes.

11   Q.  Okay.  And below that, this chain was started with an email

12   from Sonya White, who again is the deputy general counsel,

13   right?

14   A.  Yes.

15   Q.  To you?

16   A.  Yes.

17   Q.  And the contract action they're being asked to get

18   permission to work on is a contract termination template,

19   right?

20   A.  That's what she asked, yes.

21   Q.  Okay.  And then can you turn to Bates stamp 40, please.

22   That is tab 19.  It's, again, CFPB Bates stamp 40.  And this is

23   an email from Vanessa Del Torro.

24   A.  Yes.

25   Q.  Who is a contracting officer?

1   A.  Um-hum.

2   Q.  And it was sent on February 28, 2025?

3   A.  Yes.

4   Q.  And you're aware, that's after we entered an agreement to

5   pause any contract termination actions, at least until -- I

6   think it was for a week at that time?  Yes?

7   A.  Based on your timeline yesterday, yes.

8   Q.  Okay.  And you're not on this email, right?  But it was

9   forwarded to you.  If you look up to the next email in the

10  chain, you're on this chain, so you've seen this email?

11  A.  It was.

12  Q.  Okay.

13  A.  It was.

14  Q.  And what this email says is, "We stopped doing the

15  modification to terminate," right?

16  A.  Yes.

17  Q.  So they were in the process of finalizing contract

18  terminations and they stopped the finalization process?

19  A.  It was in the 30 -- 30-day window, yeah.

20  Q.  Yes, okay.

21      So after we have the agreement, they stopped the

22  modification.  And then it says, "We have mostly sent out the

23  stop-work termination notices," right?

24  A.  Yes.

25  Q.  And it doesn't say anything about how many have been

 1    rescinded or anything like that, right?

 2    A.  No.

 3    Q.  And then it says, "Some vendors that were asked to turn

 4    back on operations were able to, but others cannot be turned on

 5    so easily," right?

 6    A.  Yes.

 7    Q.  And the reason is, I think from your knowledge, as

 8    overseeing procurement, one reason is that contractors, when

 9    you send a stop-work notice or a notice of termination, they

10    reassign their contractors to something else, right?

11    A.  Absolutely.

12    Q.  Or reassign the systems to something else, yes?  For

13    example, they might stop maintaining the software that they

14    were using?

15    A.  Stop maintaining the software would be accurate, yes.

16    Q.  Okay.  And then it also says, "Because we sent stop-work or

17    termination notices as directed by those above us, that also

18    means that the vendor does not necessarily have to comply,"

19    right?

20    A.  They could pull out, yes.

21    Q.  Okay.  So if the contracts were -- if those final

22    termination modifications were entered, there would be no way

23    to get that contract back, right, once it gets finally

24    terminated?

25              MR. ROSENBERG:  Objection.  Calls for speculation.

```
 1              THE COURT:  If he knows.

 2    BY MS. BENNETT:

 3    Q.  Do you know, as the person who oversees procurement,

 4    whether once a contract termination is finalized whether it has

 5    to go through the procurement process again before getting

 6    turned back on?

 7    A.  It would have to be re-competed again, yes.

 8    Q.  Understood, okay.

 9         Then just maybe, I think, two more questions.  If you

10    could turn to CFPB 3, which is tab 2 of the defendant's binder.

11    I think we've talked about this email a lot back and forth.  I

12    just want to confirm one question.  This request from Chris

13    Johnson that you're CCed on, you're aware that all of the

14    contracts that he requested stay on were actually sent

15    termination notices, right?

16    A.  That's what I understand.

17    Q.  Okay.  And then on CFPB 19, which I will give you the tab

18    for as soon as I find it.  So tab 9.  You're there before me.

19         So, you talked -- on redirect, you were talking about

20    the top of this email chain at CFPB 16, right, which is an

21    exchange on the 27th of February?

22    A.  Yes, um-hum.

23    Q.  Let's go to the end of that chain, so that's CFPB 19.  And

24    this is an email that you're CCed on, right?

25    A.  Yes.
```

1    Q.  From Christopher Johnson?

2    A.  Yes.

3    Q.  And he's, again, the associate director of consumer

4    response and education, right?

5    A.  Yes.

6    Q.  And this email identified teams and functions that he

7    thought were aligned to the division statutory mandates, right?

8    A.  Yes.

9    Q.  And he sends this email on February 13, 2025, right?

10   A.  To a different -- different group of people, yes.

11   Q.  You're CCed on it, right?

12   A.  Yes.

13   Q.  And so are you aware of anybody getting back to him before

14   the 27th?

15   A.  I'm not aware of any conversation -- I understand -- I

16   recall the conversation -- I was the one that connected Chris

17   Johnson with these two individuals to have a discussion to talk

18   about his program needs.

19   Q.  Okay.  So you're not aware of what happened in the interim,

20   all you're aware of is you got -- you were CCed on an email

21   requesting authorization for an identified population of

22   people, right?

23   A.  Population --

24   Q.  Sorry.  That was a terrible question.

25        What you know is on February 13th, you're CCed on an

```
 1    email from Chris Johnson saying, "This is the group of people I
 2    think we need to do statutorily authorized work"?
 3    A.   Um-hum.
 4    Q.   And the next thing you're aware of is on the 27th, Mark
 5    Paoletta says, "Yes," in this.
 6    A.   (No response.)
 7    Q.   Yes?  I think you have to audibly answer for the court
 8    reporter.
 9    A.   I didn't know if he was going to object or -- or have a
10    question.
11    Q.   Oh.  Got it.
12    A.   Yes, that is correct.
13    Q.   Okay.  And that's in this flurry of February 27th emails?
14    A.   That is correct.
15    Q.   Okay.  And I just want one more thing -- to make one more
16    thing clear, which is, you're not aware of whether Mark
17    Paoletta was getting requests that he ignored in the interim,
18    are you?
19    A.   Unless -- no.  No.  Unless I was copied on the email or
20    somebody said something, no, I'm not aware of what people
21    reached directly out to him, yeah.
22    Q.   Yeah.
23         So you just don't know?
24    A.   I don't know.
25    Q.   Okay.  No further questions.  Thank you very much.
```

```
 1   A.  Thank you.

 2              THE COURT:  All right.  Thank you very much.

 3              THE WITNESS:  Thank you, Judge.

 4              THE COURT:  You may step down.  You are excused.

 5              The government has no additional witnesses to call;

 6   is that correct?

 7              MR. ROSENBERG:  No additional witnesses, Your Honor.

 8              THE COURT:  All right.  Plaintiffs can call their

 9   witness.

10              MS. BENNETT:  We would like to call Alex Doe first,

11   if that's all right.

12              THE COURT:  You can call whoever you want to call.

13              MS. BENNETT:  Great.  We would like to call Alex Doe.

14   I will go to the witness room.

15              (Pause.)

16                         ALEX DOE,

17   was called as a witness and, having been first duly sworn, was

18   examined and testified as follows:

19                    DIRECT EXAMINATION

20   BY MR. GUPTA:

21   Q.  Good afternoon.  Thank you for being here.

22              THE COURT:  Before you begin, I just want to let you

23   know that you need to direct that microphone close to you

24   because your chair doesn't move, but it does.  And then try to

25   speak into it.  Thank you.
```

```
 1                    THE WITNESS:  Thank you.

 2    BY MR. GUPTA:

 3    Q.  Did you previously provide testimony to this Court in the

 4    form of a declaration?

 5    A.  I did.

 6    Q.  And you did that under a pseudonym, correct?

 7    A.  I did.

 8    Q.  And can you explain to the Court why you provided that

 9    testimony under a pseudonym?

10    A.  Even whistleblower protections, I feared identification and

11    retaliation by the Bureau.

12    Q.  And the Bureau is the Consumer Financial Protection Bureau?

13    A.  That's correct.

14    Q.  And is that where you work?

15    A.  It is.

16    Q.  Can you please tell the Court what your position is at the

17    Bureau?

18    A.  I'm a senior advisor in the Office of Human Capital, and I

19    report directly to Mr. Martinez.

20    Q.  You report directly to Mr. Martinez, and do you report to

21    anyone else?

22    A.  No.

23    Q.  Can you tell the Court briefly what your educational

24    background is and how long you've worked in government and in

25    the CFPB?
```

1    A.  I graduated law school in 2011.  And then 2012, I work for

2    a state agency doing consumer protection.  I did that for about

3    three years before moving to federal consumer protection.  I've

4    been a federal employee for ten years, and five of that has

5    been with the Bureau.

6    Q.  And who is currently in charge of the Bureau?

7    A.  Acting Director Vought.

8    Q.  And when did he become in charge of the Bureau?

9    A.  February 7th.

10   Q.  Okay.  I would like to skip forward -- so that was late on

11   the evening of February 7th?

12   A.  That's correct.

13   Q.  Skip to the first working day of the Bureau, so that was

14   Monday, February 10th.  What happened that day?

15   A.  I logged on, and there was an email from Acting Director

16   Vought telling us to stop all work tasks.  I usually have a

17   standing meeting at 9 a.m. with human capital leads and Adam

18   Martinez, and that meeting had been canceled.  And so we just

19   awaited further instructions.

20   Q.  And did you get further instructions?  Were you assigned

21   any particular work tasks despite the work stoppage?

22   A.  I was.  On the 11th, we fired the probationary employees,

23   and I was asked to review some templates that would be going

24   out to them because there were those in human capital that were

25   concerned about some of the language in the templates that we

 1    were provided.

 2    Q.  So can you explain what you mean by that?  What were the

 3    concerns about the templates?

 4    A.  There was wording around kind of indicating they were being

 5    let go because of performance, and we had nothing that said

 6    that they had poor performance.  And so there were those in

 7    human capital that were very concerned about that language, and

 8    so we reviewed and discussed that.

 9    Q.  And was there justification provided, either in the

10    templates or the notices to go out to the employees, what the

11    justification was for firing all of these employees?

12    A.  I don't believe it was ultimately included in the letters

13    they received, but we did discuss the justification, and it was

14    the executive order on improving government efficiency and

15    Acting Director Vought stop-work order.

16    Q.  Was it your understanding that the templates -- I'm sorry,

17    the notices that they ultimately received later included those

18    justifications?

19    A.  I don't believe so.  I think we used that -- we had to code

20    it internally to explain why they were let go, and I believe it

21    was there, but that they would also later get something called

22    an SF-50.  That just takes time to create, and it would have

23    been included on that document that they'd received.

24    Q.  What's an SF-50?

25    A.  A notice of personnel action.

1    Q.  Okay.  So that document included those justifications, and

2    you said that included the justification based on the

3    February 10th stop-work order Acting Director Vought's email?

4    A.  It did.

5    Q.  Did anyone explain to you why the February 10th stop-work

6    email was a justification for firing all of these people?

7    A.  No.

8    Q.  So what happened after that?  Were you assigned any

9    additional response --

10            THE COURT:  Can you just identify for me which

11    executive order you're talking about that was the other piece

12    of the justification?

13            THE WITNESS:  I forget the full name, but I believe

14    it was on February 11th there was one about increasing

15    government efficiency.

16            THE COURT:  Okay.

17    BY MR. GUPTA:

18    Q.  And so after that, after the -- you reviewed these

19    templates and the probationary employees were terminated, were

20    you given additional responsibilities?

21    A.  I was.  On February 12th I was informed that I would be a

22    project lead for the CFPB team that would be doing the

23    reduction in force for the Bureau and that I would be working

24    with OPM, that there would be a team from both agencies, and I

25    was asked to review an agreement between the Bureau and OPM

1    before Adam signed it to set up that RIF team.

2    Q.  So in other words, you were asked to lead the RIF team?

3    A.  I was.

4    Q.  And that was on February 12th?

5    A.  That was.

6    Q.  And what did leading the RIF team consist of?  What were

7    you asked to do?  You mentioned reviewing a memorandum of

8    understanding?

9    A.  I didn't really know what it would involve.  I just

10   reviewed what services they would be assisting us with because

11   we really had no experience with a reduction in force at the

12   Bureau.  And so I found out more the next day when we met with

13   OPM on what that would look like.

14   Q.  And so that was the first meeting of the RIF team?

15   A.  Was on February 13th.

16   Q.  February 13th.

17       And do you remember when that was?

18   A.  It was in the afternoon, around 3:30.

19   Q.  Who was present at that first meeting of the RIF team?

20   A.  There were four of us from human capital, including myself

21   and Mr. Martinez.  There were several people from OPM, and

22   there were two people from the DOGE team.

23   Q.  So when you say "two people from the DOGE team," what does

24   that mean?  Who were they?

25   A.  Jordan Wick and Jeremy Lewin.

1    Q.  And were they -- had they been detailed to the Consumer

2    Financial Protection Bureau?

3    A.  That was my understanding.  I didn't recognize Jordan Wick,

4    and he was showing up as CFPB on Teams.  So on Teams if you

5    hover over someone, it tells you their position, and he was

6    listed as a DOGE engineer.

7    Q.  So he had a CFPB email address?

8    A.  Um-hum.

9    Q.  And what about Jeremy Lewin?

10   A.  It was my understanding that he was detailed to us as well.

11   That came out later in the meeting.

12   Q.  So at this meeting, who led the meeting?  Who spoke?

13   A.  OPM did initial introductions of who they were.  They had

14   people from various positions, including, like, policy there.

15   And then most of the talking after that was done by Adam

16   Martinez.

17   Q.  And can you recall what Adam Martinez said at this meeting?

18   A.  He explained the plan for the Bureau.  He said that it

19   would be partial transfer of functions, and the rest would be

20   elimination.  And that meeting was very much focused on the

21   elimination.

22   Q.  Transfer of functions, did you have an understanding based

23   on his description of what that meant?

24   A.  Not the specific ones, but that we do have some statutorily

25   required functions, and I understood that to mean those.

```
 1   Q.  So you understood that those functions that are assigned by
 2   Congress to the Bureau would be transferred to other agencies?
 3   A.  That they had to go somewhere.
 4   Q.  And you said that the -- what other -- I don't want to put
 5   words in your mouth, so I want to be really clear about what he
 6   said.  Did he say anything about offices and divisions of the
 7   Bureau?
 8   A.  I can't remember if it was at that meeting or the next one,
 9   but he did talk about eliminating entire offices, divisions,
10   and units, yes.
11   Q.  Eliminating entire offices, divisions, and units?
12   A.  Um-hum.
13   Q.  And was there any reason given for this, for this action?
14   A.  Again --
15          MR. ROSENBERG:  Objection.  Hearsay.
16          THE COURT:  Well, she's saying what happened at the
17   meeting.  I believe all of that information was also being
18   elicited from the prior witness, what did Mr. Paoletta tell
19   you?  What did Mr. Vought tell you?  What did the DOGE people
20   tell you?  I think while it may be hearsay, there's no jury
21   here and I can assess that when I assess the weight to be given
22   to the testimony.  But I'm not going to exclude it, as I didn't
23   exclude it with the prior witness either.
24          Go ahead.
25   BY MR. GUPTA:
```

1    Q.  I'm just asking you, just to be clear, you know, to the

2    best of your recollection, what was said in that meeting?  I'm

3    not asking you to speculate on anything.

4    A.  Oh, no, this is my memory of the meeting.

5    Q.  Right.  And so the justification provided for this action

6    was what?

7    A.  It was, again, the executive order.  We started just saying

8    "the executive order," but, I'm referencing the same one each

9    time.  And Director Vought -- or, Acting Director Vought's

10   stop-work order.

11   Q.  Was there any discussion of the timing of a plan for a

12   reduction in force or the -- or how it would be sequenced?

13   A.  Yes.  Adam said that the immediate impact would be 1200

14   employees.  And then we would reduce altogether after that,

15   within 60 to 90 days.  He said the immediate -- I'm sorry, he

16   described it as immediate impact.  There was discussion about

17   how to RIF those employees.  OPM, again, giving us the policy,

18   and they were the experts, gave us two different ways that we

19   could notice those employees.  You could either let those 1200

20   know in informal notice, where you let them know that their

21   areas had been identified for a reduction in force, or you

22   could give a formal notice, where you gave them what is

23   typically 60 days notice that they would be laid off.

24          Jordan and Jeremy -- and Jeremy, they shared a

25   screen, they shared Jordan's screen.  And Jeremy would pop off

1    and on that screen, and he said he was talking to Russ.  The

2    three of them discussed it and very quickly informed us that

3    they would like formal notices to go out no later than

4    February 14th.

5    Q.  I just want to be clear, because you've used some first

6    names.  You said Jeremy was talking to Russ.  You're talking

7    about Jeremy Lewin.  And who did you understand Russ to be?

8    A.  Russ Vought.

9    Q.  So Jeremy was speaking to Russ Vought during this meeting?

10   A.  He was.

11          MR. ROSENBERG:  Objection.  This is now being --

12          THE COURT:  Jeremy represented that he was talking to

13   Mr. Vought?

14          THE WITNESS:  He did.

15          THE COURT:  Was it, like, a Teams or set up where you

16   can see people's faces, or was he messaging someone?

17          THE WITNESS:  I couldn't see Russell Vought, but it

18   was Teams.  And Jeremy kept leaving the screen, but he informed

19   all of us that he was talking to Russ.

20          THE COURT:  Okay.  All right.  So that's what he

21   said.

22          Go ahead.

23   BY MR. GUPTA:

24   Q.  What are competitive areas?  What does that mean?

25   A.  That's how you group employees during a reduction in force.

1    So it's dividing them out to groups.

2    Q.  And you do that because the idea is people should be able

3    to compete for positions and be able to keep -- maybe hold onto

4    their positions in a reduction in force; is that the idea?

5    A.  That they may be entitled to compete for a position, if

6    there are any positions left.

7    Q.  And was it your understanding that this plan would involve

8    people being able to compete for those positions and hold on to

9    the positions?

10   A.  No.  It was clearly explained to us that for these 1200,

11   because we were eliminating -- in fact, this is where this came

12   up, because we were eliminating entire offices, divisions, and

13   units, and we would not even leave a single employee, that

14   there would be no competition because there would be no jobs to

15   compete for.

16   Q.  And what if -- how would it work if there were individual

17   employees, if particular people had been left in those offices?

18   A.  We were informed that if there was a single position left

19   in any of those groups that were identified, that it would be a

20   much lengthier process and we would not be able to complete it

21   by the 14th.

22   Q.  So the only way to accomplish it on that timeline was to

23   eliminate entire offices?

24   A.  Divisions or, yes, groups of competitive areas, yes.

25   Q.  You mentioned doing it by the 14th, so I just wanted to be

44

1    clear about this.  Who brought that up?  Who said it had to be

2    done by the 14th?  And did anyone say why?

3    A.  Jordan Wick was the one that said it after they had

4    discussed it.  And there was no reason given, just that that

5    was as quick as we could do it.  They wanted to give 30 days'

6    notice instead of 60, and just to do it as quick as possible.

7    Q.  So your understanding from this meeting was that Jordan was

8    communicating with Acting Director Vought, wanted these

9    terminations, these mass terminations to occur by the next day,

10   Friday 14th?

11   A.  Yes.  We had to seek exceptions to make that happen, so

12   that was my understanding.

13   Q.  Was there any discussion in this meeting of getting

14   permission from Congress first before eliminating whole offices

15   that were created by Congress?

16   A.  Not at all.

17   Q.  Was there any discussion of getting permission from

18   Congress first before transferring functions from the Bureau

19   that had been assigned by Congress?

20   A.  Congress never came up.

21            MR. ROSENBERG:  Objection.  Lack of foundation.

22            THE COURT:  He asked if there was any discussion at

23   the meeting, she's at the meeting.  He didn't ask if it was

24   necessary, he just asked it was discussed.

25            MR. ROSENBERG:  I thought the question was:  Was

1    there discussion --

2              MR. GUPTA:  I'll rephrase the question.  At this --

3              THE COURT:  I thought he said "was there," so I

4    assume we're talking about the meeting.

5              THE WITNESS:  That was my understanding.

6    BY MR. GUPTA:

7    Q.  At that meeting, was there any discussion?

8    A.  None.

9              THE COURT:  Let me ask you a question.  You said 1200

10   people, you used that number a lot.  How many people had

11   been -- when you did the probation employees in the days

12   before, how many employees was that?

13             THE WITNESS:  There were 85 probationary, and then on

14   the 13th we also did term and it was about 130 of those.

15             THE COURT:  So if you add those to the 1200, how many

16   would have been left?

17             THE WITNESS:  I believe we started with 1700, about

18   300 people.

19             THE COURT:  All right.  Thanks.

20   BY MR. GUPTA:

21   Q.  In your -- based on your understanding of this meeting, was

22   this a discussion about -- a deliberating about how to do this

23   or whether to do this?  Was it predecisional deliberative, or

24   were you being asked to implement this plan?

25   A.  We were being asked to implement this the next day.

1    Q.  Okay.  Is it possible that Adam Martinez was confused about

2    whether Acting Director Vought wanted these RIFs to occur

3    immediately?

4    A.  No.

5    Q.  How do you know that?

6    A.  He asked us for -- or, he asked OPM for templates so that

7    we could do this the next day.  We were provided those

8    templates, and he instructed us to do the work to provide those

9    notices to employees the next day.

10   Q.  So you were put in charge of this team.  The first meeting

11   is the afternoon of the 13th, and you were asked to get this

12   all done by the next day?

13   A.  That's correct.

14   Q.  And was there a time given?

15   A.  Initially, it was just the next day.  It was a lot of

16   information to gather.  Our initial understanding was, as long

17   as it was done by midnight.  At some point it was communicated

18   close of business.  And then that changed further later.

19   Q.  Okay.  I want to turn now to that next day.  Friday,

20   February the 14th, and try to ask you about a chronology of

21   that day.

22   A.  Okay.

23   Q.  What's the first thing that you can remember occurring that

24   day?

25   A.  We received the templates rather late at night on the 13th.

1   OPM did have them, but they needed to review them because they

2   had never given that type of exceptions that we received

3   before.  So we got together at 8:30 in the morning to review

4   those templates, and we had a lot of questions.  So we

5   scheduled a meeting with OPM for 10 o'clock that morning.

6   Q.  Who is "we"?

7   A.  The RIF team.  So members of human capital, but only at the

8   Bureau, and Adam Martinez was there as well.

9   Q.  Okay.  So this was an internal meeting just at the Bureau

10  with you, Adam Martinez, and the team?

11  A.  Yes.

12  Q.  And then did you subsequently have discussions with OPM?

13  A.  We did.

14  Q.  And when did that happen?

15  A.  10 a.m.

16  Q.  And do you recall what was discussed at that meeting?

17  A.  Yes.  I did a lot of the talking at that meeting.  I had

18  questions about the templates.  There was a section of the

19  template that said -- and these are templates that employees

20  would receive, letting them know that they were subject to

21  reduction in force and would be laid off in 30 days.  And there

22  was a section that said that we had created a retention

23  register.  And it had a lot of fields that would be -- that

24  would be populated with information individual to each

25  employee.  It was a lot of information to gather.  We had not

1    yet started gathering it and we had not created retention

2    registers.  So I raised a concern about that and asked if we

3    could remove that section from the template.

4    Q.  Okay.  Can you just explain what a retention register is,

5    for those who don't know much about federal employment?

6    A.  It gives the employee information about, kind of, where

7    they fell among things, if they were able to compete for a job,

8    if there were jobs left.  So it would give them information,

9    like their service, how long they -- their tenure is, and just

10   other pieces of information like that.  If they got any extra

11   credit, basically, for good performance appraisals.  There were

12   eight or so fields.

13   Q.  So none of that was done?

14   A.  None of that was done, and we hadn't created the retention

15   personnel.

16   Q.  And your concern was the template said it was done, but it

17   wasn't?

18   A.  Correct.

19   Q.  Did Adam Martinez, at this meeting, elaborate at all on the

20   plan that he had described the previous day?  Did you learn

21   anything more about the plan and what it would entail?

22   A.  He pulled up a memo to be sent to OMB, and it listed out

23   the specific offices, divisions, and units that would be

24   subject to termination.  And it had the numbers by each one of

25   them.  He had to do that, I think, to request the exception to

1    establish those competitive areas without there being a 90-day

2    period.  And so he pulled that up, and that was the first time

3    I saw that.

4    Q.  That was the first time you saw that memo.  And that was

5    dated the previous day?

6    A.  13th.  Yeah, I believe it was the 13th or 14th.

7          MR. GUPTA:  That's the -- let the record show that's

8    the memo marked as Plaintiffs' Exhibit JJ.  And the memo from

9    Adam Martinez to OPM dated February 13th.

10          THE WITNESS:  Um-hum.

11   BY MR. GUPTA:

12   Q.  So this is the first time you were seeing this document,

13   even though you were the team leader assigned to accomplish

14   these RIFs?

15   A.  Um-hum.

16   Q.  Do you recall your reaction to the memo what you noticed

17   what you saw it?

18   A.  Yeah.  I think it's important to understand in my reaction

19   that it had been explained to us that these -- there could not

20   be a single job left in any of these areas for us to do the

21   work we were doing on the 14th.  So I was shocked to see the

22   Office of Supervision, Enforcement, the Office of Civil Rights,

23   that Adam was letting go of his own ops for an office, and just

24   seeing it black and white, the numbers of people that were

25   being fired was -- it was shocking and it was upsetting.

1    Q.  So was it your understanding that that meant the

2    elimination of entire offices that were created by Congress,

3    like the Office of Enforcement or the Office of Supervision?

4    A.  Yes.

5    Q.  The memo itself, didn't it say that this is entire

6    divisions, offices, and units?

7    A.  That was the only way to get that exception.

8    Q.  And what was the justification provided in that memo, if

9    you recall?

10   A.  Again, the executive order and Acting Director Vought's

11   stop-work order.

12   Q.  And, again, at this meeting, was there any discussion or

13   explanation from Adam or from anyone else of how the email from

14   February 10th directing people to stop work could be a

15   justification for firing and, indeed, abolishing whole units of

16   the Agency?

17   A.  None.

18          THE COURT:  And when you said it's the only way for

19   the exception, you mean the exception to the ordinary notice

20   provisions?

21          THE WITNESS:  I believe that one was attached to the

22   90-day competitive area exception, that's why he had to create

23   that memo.

24   BY MR. GUPTA:

25   Q.  And OPM, did they say whether they had ever provided an

```
 1   exception like this before?

 2   A.  The day before they said that they had not, that this was

 3   the first.

 4   Q.  So this was not normal?

 5   A.  It was not.

 6   Q.  Okay.  So that meeting was, I think you said, it was at

 7   10 a.m. on Friday the 14th?

 8   A.  Um-hum.

 9   Q.  Did you become aware of an effort to change the timeline --

10   I think you alluded to this earlier -- to get these notices out

11   faster?

12   A.  Yes.  Staff was stressed and trying to pull this

13   information together as quickly as possible.  And, so, around

14   1:30, when I was aware of the hearing from this Court at

15   2 o'clock, I sent an email to Adam, letting him know that we

16   would continue working but that we may want to consider what

17   the Court would do that day when we were, you know, considering

18   the timing of sending out these notices.  I thought we might

19   slow down if we're going to be told we couldn't do it anyway.

20   And the opposite occurred.

21   Q.  Okay.  So you sent this email at 1:00, 1:30, thereabouts --

22   A.  Around 1:30.

23   Q.  -- informing him of the hearing, and you were aware that

24   the hearing was going to be -- you didn't know about this

25   courtroom, but you knew it was going to be at 2 p.m.?
```

52

```
 1    A.   At 2 p.m.

 2    Q.   And you knew that the lawsuit involved this question about

 3    whether or not the Bureau could go ahead and do this?

 4    A.   I did.

 5    Q.   And the response you got was to speed things up?

 6    A.   The response I got is to -- we were still waiting on some

 7    attachments that were referenced in the notices we were

 8    provided from OPM.  And so 10 to 15 minutes after, Adam thanked

 9    me for my email.  And I was instructed through his other senior

10    advisor that he, being Adam, wanted me to reach out to OPM and

11    tell them that they needed to provide the attachments right

12    away and that we no longer had until close of business.  And

13    that after I had done, so he wanted me to forward my email to

14    him so he could reach out to some of their senior leadership

15    and get those attachments quicker.

16    Q.   And did you then instruct the team, "We don't have until

17    the close of business today"?

18    A.   I did.

19    Q.   And you did that by email?

20    A.   I did.

21    Q.   Okay.  Now I want to just talk about the chronology of --

22    you know, did you know when the Court issued its order, when

23    this Court issued its order?

24    A.   A colleague informed me and sent me a copy of the order

25    around 5 o'clock.
```

1   Q.  So it was, in fact, 5:03 p.m., I can represent to you, is

2   when the order from this Court issued.

3          What did you do when you found out that there had been a

4   court order?

5   A.  I reached out to Adam's other senior advisor and I told her

6   RIFs could not occur until March 3rd.

7   Q.  And that's because you had read the order and it said

8   March 3rd?

9   A.  Yes.

10  Q.  And what was the response?

11  A.  That Adam had not yet heard from Mark Paoletta, and that he

12  insisted that we kept going.

13  Q.  And did you say, "We can't do that because of the court

14  order"?

15  A.  I did.  I said, "These cannot go out today, and I hope Mark

16  Paoletta knows how to read an order."

17  Q.  And did -- was there a response to that?

18  A.  She said, "We still might have to send them out today, DOGE

19  is pressuring Adam for the time that we can still send them

20  out."

21  Q.  And who was going to actually send these notices out?  Who

22  was going to be the person who was going to hit send button if

23  they were going to go out?

24  A.  If they were like the other two notices, it was someone on

25  the other senior director's team, from their systems.  It was

1    not his decision, but he does the coding, he's the one that

2    presses the button.

3    Q.  Did you ever -- as the head of the RIF team, did you get

4    direction from Adam Martinez or from Mark Paoletta or from Russ

5    Vought after that order came out at 5:03 on Friday to stand

6    down and to stop?

7    A.  No.  I told the other senior advisor while we were

8    communicating that I hoped that Adam, if he was going to tell

9    staff to violate a court order, that he had it in writing from

10   the DOGE team because I did not believe they would speak up for

11   him later, and I logged off.

12   Q.  And you meant the DOGE team that was working at CFPB, that

13   had been detailed to CFPB, operating under Acting Director

14   Vought?

15   A.  Correct.

16   Q.  And so did people, in fact, keep working on these notices?

17   A.  They did.  When I logged on later, I saw emails going back

18   and forth at 7:00, and all the way up to near 10 o'clock about

19   these notices and fields for them and what to code them under.

20   Q.  Was it unusual for staff like that to be working up until

21   10 p.m. on a Friday on notices like this?

22   A.  Very.

23   Q.  So when did the RIF team next meet after the Court order?

24   A.  On the 19th of February.

25   Q.  And who was there at that meeting, if you recall?

1    A.  The -- it was just OPM, and I think a smaller group, and

2    then the CFPB RIF team again, including myself and Adam

3    Martinez.

4    Q.  And nobody from DOGE, right?  Now it's just Adam

5    Martinez --

6    A.  I didn't see DOGE in any of their meetings.

7    Q.  Who leads this meeting?

8    A.  Adam, again, did most of the talking.  He was more focused

9    on the transfer of functions at that meeting.  And he was

10   explaining to them -- he was comparing us to the Office of

11   Thrift Supervision and explaining that he had had conversations

12   with new leadership and the chief legal officer about what the

13   wind-down of an agency really meant, and that there were, you

14   know, functions that would need to transfer, and OPM was

15   pressing us to identify where those would transfer and we did

16   not yet have an answer.

17   Q.  You mentioned the Office of Thrift Supervision, what does

18   that have to do with anything?

19   A.  That office was closed when the Bureau was created through

20   the Dodd-Frank.  And so when that agency closed, there were

21   legacy functions that had to go places.  Adam informed us that

22   a lot of those went to OCC, and so he was just using that as a

23   comparison of what needs to happen with the wind-down of an

24   agency.

25   Q.  So in other words, that was an agency that was abolished by

```
1    Congress?

2    A.  By law.

3    Q.  And the discussion here was what happened when Congress

4    abolished an agency, and the plan was to do the same thing?

5    And was there any discussion in this meeting about going to

6    Congress?

7             THE COURT:  I think that was your summary of what

8    happened.  You weren't there.  So why don't you just ask your

9    question.

10   BY MR. GUPTA:

11   Q.  Was there any discussion, again, about going to Congress

12   first, before implementing this plan?

13   A.  No.  The only comparison was that things would need to

14   transfer.

15   Q.  You referenced that there were -- Adam referred to the new

16   administration.  So is your understanding that he was getting

17   direction for this plan from the acting director?

18   A.  He said new leadership, so I was very clear that he was

19   talking about Acting Director Vought.  He also mentioned the

20   chief legal officer.

21   Q.  Did he refer at this meeting to winding down the Agency?

22   A.  He did.

23   Q.  What did you understand that to mean?

24   A.  Closing of the Agency.  He also referred to the positions

25   that we would need to keep to effectuate the closure of the
```

1    Agency, but he said that those positions didn't -- those people

2    would also lose their jobs as well.

3    Q.  And he used that phrase, "the closure of the Agency"?

4    A.  He did.

5    Q.  Was there any discussion at this meeting of the court's

6    order?  Because as I understand your testimony, this was the

7    first meeting of the RIF team after the Court had issued an

8    order.

9    A.  Yeah.  The meeting was more focused on what would happen,

10   you know, after the 1200.  So at the end of the meeting, he did

11   let our partners at OPM know that there was a problem and that

12   the union had filed a temporary restraining order that

13   prevented the 1200, but he was kind of just giving an update.

14   But I remember his describing that as a problem.

15   Q.  So he referred to the court's order as a problem.  Did he

16   say anything else about it?

17   A.  I don't remember if he said this or it was implied, but

18   that was -- that was on pause, so we were focusing on what

19   happened after.

20   Q.  On pause?

21   A.  (Nods head.)

22   Q.  Okay.  He said the plan was on pause as a result of the

23   order?

24            MR. ROSENBERG:  Objection.  Leading.

25            THE COURT:  She said that.

```
 1    BY MR. GUPTA:

 2    Q.  I'm just asking what your testimony was.

 3    A.  If he didn't say -- if he did not say it, it was implied

 4    that we would focus on the later phases because that one was on

 5    hold.

 6    Q.  So your declaration describes the RIF meeting on the week

 7    of the 10th, it describes this meeting in substance, but you've

 8    provided some additional details for us today.  Why is it that

 9    those details were not in your declaration?

10    A.  I was hoping to avoid identification.  But I want to come

11    forward as a whistleblower, and I think there's things that I

12    can share now under my own name that are important because I

13    think what they were doing was illegal and wrong.

14    Q.  Was there an additional meeting after this meeting at which

15    Adam Martinez was present where he discussed with you this

16    plan?

17    A.  Yes.  The next day we had an internal meeting with some

18    human capital colleagues that are not part of the RIF team but

19    we needed to loop them in, they had a need to know some of this

20    information so they could give us some guidance.  And in that

21    meeting, he was a lot more specific about what exactly the plan

22    was for the Bureau.

23    Q.  Can you elaborate on those specifics, to the best of your

24    recollection?

25    A.  He said that acting leadership wanted us to move as quickly
```

1 as possible, that there would -- Adam said there would no

2 longer be a CFPB.  He said that we were legitimately shutting

3 down.  He said that we would be wiped out within 30 days.  He

4 said that the White House had instructed us to cancel all of

5 our committees and advisory boards and travel cards and

6 purchase cards and to only keep any contracts that were

7 necessary to effectuate the closure of the Agency within

8 30 days.

9    He informed them, because they were not part of these

10 OPM meetings, that without the temporary restraining order, we

11 would have laid off 1,000 people that previous Friday, and that

12 we would be eliminating another 700 positions.  The people in

13 that meeting were not RIF experts, nor were really any of us.

14 So they said they did have one question, that they had heard

15 about retention registers for competing for positions.  And so

16 they asked us about those, and Adam said there would be no

17 positions to compete for.

18 Q.  No positions to compete for, you understood that to mean

19 because the entire divisions would be eliminated?

20 A.  Because the Agency would be eliminated.  He was a lot more

21 specific in that meeting that was just the CFPB.  He said that

22 OPM struggled to understand that we were completely closing.

23 Q.  So this is February 20th.  This is not the week of the

24 10th?

25 A.  (Shakes head.)

```
1    Q.  The plan had not changed?

2    A.  The plan had not changed.

3    Q.  Were there additional meetings of the RIF team?

4    A.  We met again on the 27th with the joint CFPB/OPM/RIF team.

5    And we discussed some guidance that came out from Acting

6    Director Vought, but in his OMB capacity.  It was giving him

7    guidance about RIFs for federal agencies.

8            THE COURT:  Can I interrupt you a second?  Because

9    I've lost the dates.

10           THE WITNESS:  Sure.

11           THE COURT:  We had the Friday where the hearing was

12   and getting the RIFs out, and that was February 14th.

13           THE WITNESS:  Um-hum.

14           THE COURT:  Then you said the next meeting was the

15   RIF team with OPM and no DOGE people.  Was that the Monday

16   after the 14th?

17           THE WITNESS:  It was -- it was a holiday, it was the

18   19th.

19           THE COURT:  Okay.

20   BY MR. GUPTA:

21   Q.  That was on the 19th, and then you said this other

22   meeting --

23           THE COURT:  Was the 20th.

24           MR. GUPTA:  Was the 20th.

25           THE COURT:  Okay.
```

 1    BY MR. GUPTA:

 2    Q.  And then the following meeting, I think you said, was on

 3    February 27th?

 4    A.  It was.

 5    Q.  And you referred to OPM/OMB memorandum.  And that is the

 6    memorandum that was issued jointly by those two agencies on

 7    February 26th; is that right?

 8    A.  That's correct.

 9    Q.  Okay.  And so you were saying that Adam was discussing that

10    memorandum?

11    A.  He was discussing that memorandum.  He said he would

12    discuss it further with acting leadership and that he would let

13    us know -- "us" being the RIF team both at CFPB and at OPM --

14    that he would let us know if the plan changed.  And that has

15    never -- to this day has never happened.

16    Q.  So he told you that if the memorandum resulted in any

17    change of the plan, he would let you, as the team leader, know?

18    A.  Yes.

19    Q.  And he has not done so?

20    A.  Correct.

21    Q.  Okay.  Next -- were there any additional meetings of the

22    RIF team?

23    A.  Yes.  But Adam stopped attending.

24    Q.  Adam didn't attend, okay.

25         But when did those meetings occur?

1   A.  We had one Tuesday and Thursday of last week.  I believe

2   that's the 4th and the 6th of March.

3   Q.  March 4th and March 6th, so we're now several weeks away

4   from the acting director taking over the Agency?

5   A.  Correct.

6   Q.  What was the discussion about at the March 4th -- Tuesday,

7   March 4th meeting?

8            THE COURT:  Were those just internal, or were those

9   OPM people, too?

10           THE WITNESS:  Those were with OPM.

11           THE COURT:  Okay.  He asked you what was discussed.

12           THE WITNESS:  On the 4th, it was mostly about a cost

13   estimate for the final phase after the 1200, doing, you know,

14   reduction in force on the rest of the positions.  So it was

15   mostly about a cost estimate.  We talked a little bit about

16   policy because we were -- we were confused in that defining

17   competitive areas for those remaining groups of people.  It

18   talks about local competing areas and we were confused on how

19   to do that since we'll no longer have offices.  So we asked the

20   policy group how that worked, and they said it hadn't happened

21   before so they didn't know.

22   BY MR. GUPTA:

23   Q.  When you say "cost estimates," you mean the cost for OPM to

24   provide services to CFPB to dismantle themselves?

25   A.  Correct.  We were paying them to help up lay ourselves off.

1    Q.  This is about the final phase, so this after the 1200?

2    This is about the last phase?

3    A.  Yes.  From OPM's perspective, they helped with Phase 1, the

4    1200; and Phase 2, this was a -- the meeting was called Phase 2

5    and it was a cost estimate for that.

6    Q.  So this was last Tuesday?

7    A.  Yes.

8    Q.  And to your knowledge, as the head of the RIF team, the

9    plan had not changed?

10   A.  Correct.

11   Q.  Okay.  Let's talk about the meeting last Thursday.  So

12   that's March 6th.  Do you recall who was at that meeting?

13   A.  The CFPB RIF team, but not Adam, and a few members from

14   OPM.

15   Q.  And do you recall what the discussion was about at that

16   meeting?

17   A.  It was about some work they needed us to do to help define

18   something called competitive levels.  I'm still learning about

19   RIFs.  I can't explain that very well, but they -- it was,

20   again, for this last phase we needed to define competitive

21   areas and competitive levels, and this was about the

22   competitive level codes.

23   Q.  So as you understood it, as of last Thursday, the plan was

24   still to abolished entire offices created by Congress?

25   A.  Correct.

```
 1                    MR. ROSENBERG:  Objection.  Lack of foundation.
 2    BY MR. GUPTA:
 3    Q.  The plan had not changed, to your knowledge, as of last
 4    Thursday?
 5    A.  No one has told me that the plan has changed.
 6    Q.  I just want to be clear.  Has there been, to knowledge, any
 7    change in the reduction in force plan since Thursday, February
 8    13th or Friday, February 14th?
 9    A.  Nobody has shared that.
10    Q.  Has anyone said, "We can't do this without going to
11    Congress"?
12    A.  No.
13    Q.  Has anyone said, "We can't do this because it's illegal"?
14    Anyone from leadership.
15    A.  No one in leadership has.
16    Q.  But the procedures have changed, you're crossing the Ts and
17    dotting the Is; would that be fair to say?  You've had time to
18    do that with OPM?
19    A.  We've had time to ask more questions and try to do --
20    Q.  So as far as you're aware, as the designated team leader
21    for the RIF team, is the plan still to eliminate the Bureau
22    once the court order is lifted?
23    A.  That's my understanding.  I haven't been told anything
24    different.
25                    THE COURT:  Do you have any other duties besides
```

1    being on the RIF team at this point?

2             THE WITNESS:  I also work, not directly, but with the

3    benefits retirement and work life team.  And so with some --

4    giving them some guidance so that they can counsel employees.

5    And they've been very confused about what they're allowed to do

6    and not allowed to do with the stop-work order.  And so I've

7    been helping to provide some of that guidance.

8             THE COURT:  Okay.

9    BY MR. GUPTA:

10   Q.  You mentioned at the beginning of your testimony that you

11   were afraid of retaliation.  Why, despite that, have you

12   decided to come forward and testify in court today?

13   A.  Because I think it's important, and this is the right thing

14   to do.

15   Q.  Thank you.  Thank you very much.

16             THE COURT:  All right.  Cross-examination.

17             I need one second to write a note on an unrelated

18   matter.

19             (Pause.)

20             THE COURT:  All right.  I'm sorry.

21             MR. ROSENBERG:  I do have a housekeeping question.

22             THE COURT:  Okay.

23             MR. ROSENBERG:  Yesterday, when the parties were

24   discussing the calling of pseudonymous witnesses, the Court

25   indicated that they would testify and provide, you know, their

 1    name.  I don't --

 2              THE COURT:  I don't think I said that.  But, okay.

 3              MR. ROSENBERG:  But I just wanted to ask how the

 4    Court wanted to proceed.  We're not necessarily asking for that

 5    now.  And I don't know --

 6              THE COURT:  Well, if it's not an issue now, then I

 7    would just proceed by asking the witness questions without

 8    using their name.  I'm certain that people at counsel table are

 9    aware of who this person is, but I don't think it needs to be

10    on the public record at this moment.

11              MR. ROSENBERG:  Fair enough.

12                         CROSS-EXAMINATION

13    BY MR. ROSENBERG:

14    Q.  Thank you for testifying.  I have just a few questions for

15    you.

16         You spoke about the preparation of RIF notices, but

17    those notices never actually went out, did they?

18    A.  Correct.

19    Q.  Okay.  And you discussed various meetings that you've

20    participated in as part of the RIF team.  Have you participated

21    in meetings with senior CFPB officials such as Mr. Paoletta or

22    Mr. Vought?

23    A.  That hasn't been necessary.

24    Q.  So you have not?

25    A.  Correct.

```
1    Q.  Okay.  You referred to the fact that Mr. Martinez stopped
2    participating in your meetings on or about February 27th; is
3    that correct?
4    A.  That was the last one he attended.  He did not attend the
5    meetings with OPM.
6    Q.  And was February 28th the date that you submitted a
7    declaration in this case?
8    A.  It was.
9    Q.  Okay.  And that declaration went through some length to
10   describe the actions of Mr. Martinez?
11   A.  It did.
12   Q.  Okay.  And it was publicly filed on this Court's docket; is
13   that correct?
14   A.  Yes.
15            MR. ROSENBERG:  I said I would be short.
16            THE COURT:  Is that it?
17            MR. ROSENBERG:  Thank you for your time.
18            THE COURT:  All righty.  Any redirect?
19            MR. GUPTA:  No.
20            THE COURT:  Okay.  This witness can be excused.
21   We'll take a brief, ten-minute break before the calling of the
22   next witness.  Thank you, everybody.
23            (Recess.)
24            THE COURT:  This is a happy group.  Every time I come
25   in, everybody is bustling around.
```

```
 1              All right.  Call your next witness.
 2              MR. FRIEDMAN:  The plaintiffs will call Matthew Pfaff
 3    next.
 4                        MATTHEW PFAFF,
 5    was called as a witness and, having been first duly sworn, was
 6    examined and testified as follows:
 7              THE COURT:  I'm just going to tell you about that
 8    microphone.  Now you've met it.
 9              THE WITNESS:  Got me.
10              THE COURT:  You need to try to lean into it because
11    your chair won't move.
12              THE WITNESS:  Got it.  All right.
13              THE COURT:  Thank you.
14                      DIRECT EXAMINATION
15    BY MR. FRIEDMAN:
16    Q.  Good afternoon.
17    A.  Good afternoon.
18    Q.  Can you state your name for the record, please?
19    A.  Matthew Pfaff, or Pfaff.  My family hasn't figured it out.
20    Q.  And where do you work?
21    A.  I work at the Consumer Financial Protection Bureau.
22    Q.  When did you begin working at the Bureau?
23    A.  I began working there October 2013.
24    Q.  What is your current position at the Bureau?
25    A.  I'm currently the chief of staff for the Office of Consumer
```

```
 1    Response.
 2    Q.  When did you begin that, as chief of staff?
 3    A.  I began that role in February 2021.
 4    Q.  What are your prior positions at the Bureau?
 5    A.  Prior to that I worked in our investigations section, most
 6    recently as a program manager, an adviser before that, and an
 7    investigator before that.
 8    Q.  Were all those positions within the Office of Consumer
 9    Response?
10    A.  Yes.
11    Q.  What does your current job entail?
12    A.  As the chief of staff, my responsibility is to ensure that
13    our office meets our statutory obligations.  I advise a number
14    of leaders in the office about initiatives, and I also
15    coordinate across the Bureau with various functions.
16    Q.  Who do you report to?
17    A.  I report to Darian Dorsey.  She's currently the deputy
18    associate director for Consumer Response and Education, and she
19    reports to Christopher Johnson.
20    Q.  Do you also work directly with Mr. Johnson?
21    A.  I do.
22    Q.  Just briefly, what does consumer response do?
23    A.  Consumer response does a few things.  We answer questions,
24    so we run a contact center that responds to questions from the
25    public.  We handle complaints.  We get about 350,000 complaints
```

1    every month and up.  And so we get to work to get those to

2    companies and to other regulators for a response.  And then we

3    analyze and share data, which includes the investigation and

4    monitoring of complaints coming into -- to the Bureau.

5    Q.  What are the benefits to consumers of the services that

6    your office provides?

7    A.  I'll start with the top line number, I think we've returned

8    more than $300 million to American consumers.  Last year about

9    half of complaints were closed with nonmonetary relief, meaning

10   consumers got updates to credit reports, or discontinuation of

11   calls from debt collectors.  The complaint process has stopped

12   imminent foreclosures, it's gotten consumers' loans canceled.

13   It's done a lot of good for the public.

14   Q.  What role do Bureau employees within the Office of Consumer

15   Response play in the complaint process?

16   A.  Our office is organized by various functions.  So starting

17   at the beginning, our product section is -- are the folks who

18   are building the technology to accept complaints and to share

19   that data.  Our stakeholders services section is getting

20   complaints where they need to go, it's managing our hotline.

21   They --

22            THE COURT:  What was the name of that section?  I'm

23   sorry.

24            THE WITNESS:  Stakeholder services.

25            THE COURT:  Stakeholder.

1           THE WITNESS:  Stakeholder services.

2           THE COURT:  So the term "stakeholder" includes

3    consumers?

4           THE WITNESS:  Yes.  To the extent that consumers are

5    sending in -- the primary stakeholders in that section are

6    company, portal users, government portal users, congressional

7    portal users.  So anyone that's interacting with the complaint

8    process, they're -- they're assisting them.

9           Next we have our investigation section, which is

10   responsible for investigating and monitoring complaints.  And

11   within that section is the escalated case management team.

12          We have a data and governing section, which is

13   responsible for providing our official counts of complaints.

14   They also do some project management, respond to information

15   requests from the public.

16          And then finally, we have our quality section, which

17   is responsible for -- it's essentially an audit function.

18   BY MR. FRIEDMAN:

19   Q.  Do employees in the Bureau, outside of Consumer Response,

20   support the office's work?

21   A.  Oh, yes.  We -- we work in close concert with many of our

22   offices.  So, our technology and innovation colleagues have us

23   build the systems that -- that run this entire operation.  We

24   work closely with our privacy colleagues to respond to

25   suspected privacy breaches.  We work closely with our

1      procurement partners who help us bring vendors in to work on

2      the system.  We also work closely with our colleagues in our

3      RMR division, they help us identify market participants to

4      invite them to the portal.  There's also offices within that

5      division that monitor complaints, or Office of Servicemember

6      Affairs, Office of Older Americans, Office of Students and

7      Young Consumers.

8           And we work closely with our regs and legal

9      colleagues to make sure that our system is legal.  We work

10     closely with the private ombudsman to -- who has a variety of

11     responsibilities with complaints.

12          And then, finally, we work very closely with our

13     colleagues in supervision and enforcement.  That partnership

14     has been particularly productive.  They help us bring companies

15     in to participate on the complaint portal, and they also have

16     been a really effective partner in helping consumers get

17     meaningful responses to complaints, when we've seen companies

18     that are not really playing ball, they've been a really

19     close -- close partner that's made the system successful.

20          THE COURT:  What does it mean for a company to

21     participate in the portal?

22          THE WITNESS:  So in order for a company to respond to

23     a consumer they have to first register with us to be able to

24     receive their complaints.  And then we will send the complaints

25     to the company, the company will then, once their in receipt of

1    a complaint, they will -- they typically have -- they have

2    15 days to provide an initial response to the consumer, and

3    then 60 days to provide a final response.

4            And so we have more than 7500 companies that have

5    registered with this portal.  And for them to participate, by

6    that I mean they're providing responses to consumers.

7            THE COURT:  And so that's to enable them to work it

8    among themselves --

9            THE WITNESS:  Exactly.

10           THE COURT:  -- without further involvement of people

11   in your organization?

12           THE WITNESS:  Correct.  There's -- we do have

13   processes that allow us to intervene, but we received more than

14   3 million complaints last year.  And so a lot of this is

15   happening as part of just how the process is designed.

16           THE COURT:  Thank you.

17   BY MR. FRIEDMAN:

18   Q.  We just talked about the support that Bureau employees

19   played.  Does your office also receive support from

20   contractors?

21   A.  We do.  We have --

22           THE COURT:  Can you also get more close to the

23   microphone, thank you.

24   BY MR. FRIEDMAN:

25   Q.  Can you provide an overview of the support that you receive

```
 1    from contractors?
 2    A.   Sure.  We have multiple contractors who support us.  I'll
 3    start with the largest contract, it's a contract that we have
 4    for our consumer -- our contact center.  This contract is
 5    providing the agents who will pick up the calls to the 1-800
 6    number.
 7           We have a contract with Deloitte, that supports us in
 8    the development of the software that accepts complaints and
 9    helps us get them to companies and other regulators.
10           We have a contract with Ernst & Young, which is a
11    data-sharing contract.  So we sues that vehicle to get
12    complaints, again, share complaints with federal and state
13    agencies.
14           And then we also have a contract with a group called
15    North Ridge, which provides an audit function, independent
16    audit function for our office.
17           THE COURT:  The 1-800 number, that includes human
18    personnel that answer the phone?
19           THE WITNESS:  Correct.  We have -- I think it's about
20    120 agents.  So when you call the 1-800 number, they will pick
21    up, they will give you information about consumer financial
22    products and services, they'll accept a complaint over the
23    phone, they'll give you a status update on your complaint.
24    But, yeah, it's real people.
25           THE COURT:  Do they reach out to any of the
```

1      stakeholders and try to resolve the complaint, or is that a

2      function --

3               THE WITNESS:  That's -- that's in our shop.

4      That's -- that's all federal staff.

5               THE COURT:  All right.  Thank you.

6      BY MR. FRIEDMAN:

7      Q.  Does your office also receive contracts support that

8      doesn't involve the provision of labor?

9      A.  Yes.  We have a number of contracts that are both housed in

10     our unit and outside of the unit.  That provides -- like,

11     subscription-based software.  So we have a contract that does

12     address verification, so when a consumer comes and puts their

13     address on the complaint form, it will check to ensure that

14     that address is accurate.

15               We have a -- with our colleagues in our technology

16     and innovation shop, we have a virus scanning software, so when

17     a consumer submits an attachment, it will run the virus scan to

18     make sure there's no malicious malware there.

19     Q.  Let's shift gears now.  Who is in charge of the CFPB right

20     now?

21     A.  The current acting director, it is Russell Vought.

22     Q.  When did he take over?

23     A.  I believe it was a Friday, February 7th.

24     Q.  The next day, on February 8th, did he issue a directive to

25     employees?

1    A.  He did.  He sent an email that extended a list of

2    prohibitions that the then-acting secretary -- I'm sorry,

3    Acting Director Bessent had sent previously in the week prior.

4    And he also added a few -- few additional prohibitions.

5    Q.  Before that February 8th directive, was the Office of

6    Computer Response working?

7    A.  Yes.

8    Q.  And then the next day, February 9th, was a Sunday, correct?

9    A.  Correct.

10   Q.  Did Acting Director Vought issue another order on

11   February 10th, the next Monday that followed?

12   A.  Yes, he did.  He issued a stop-work order.

13   Q.  On that day, was a request made for consumer response to

14   continue working in any facet?

15   A.  It was a -- it was a conversation that was eventually

16   memorialized in a email that said our contact center would

17   continue operations.

18   Q.  What happened after that for the contact center?

19   A.  That contract was canceled the next day.

20   Q.  After the February 10th email directing people to stop

21   work, what did CFPB employees within the Office of Consumer

22   Response do?

23   A.  We closed our laptop lids and walked away.

24   Q.  So after the stop-work order, was anybody monitoring

25   consumer complaints?

```
 1   A.  No.
 2   Q.  After the stop-work order, was anybody investigating
 3   consumer complaints?
 4   A.  No.
 5   Q.  After the stop-work order, way anyone handling referrals
 6   from other agencies?
 7   A.  No.
 8   Q.  After the stop-work order, was anybody handling referrals
 9   from Congress?
10   A.  No.
11   Q.  After the stop-work order, was anybody within the Bureau
12   working on any consumer complaints that required human
13   intervention to get to the company that was the subject of the
14   complaint?
15   A.  No.
16   Q.  The week of February the 10th, were you asked to analyze
17   the Office of Consumer Response's contracts?
18   A.  I was.
19   Q.  How did that assignment come about?
20   A.  On Monday, February 10th, I received a request from
21   Mr. Johnson to review contracts that were assigned to our
22   office.  This assignment -- I met with Mr. Johnson and
23   Ms. Dorsey later that evening.  Jordan Wick, who I believe is a
24   member of the DOGE who was assigned to the CFPB, he had
25   conducted a preliminary analysis, and we were to go in and --
```

1    and review those contracts and offer our assessment.

2    Q.  I'm going to ask you to turn to the government's binder,

3    which has numbered tabs.  And if you can turn to tab 2.  Do you

4    see this is an email from Christopher -- sorry.  This is

5    CFPB 3.  This is an email from Christopher Johnson.  And you

6    are one of the recipients on the CC line.  And the larger of

7    the paragraphs identifies a number of contracts.  Do you see

8    that?

9    A.  Yes.

10   Q.  Okay.  And that's dated February 10th?

11   A.  Yep.  At 1:55 p.m.

12   Q.  Do you know if these are the same contracts or some of the

13   same contracts that DOGE had identified at the same time as you

14   were performing your analysis?

15   A.  Yeah.  These -- these contracts, many of -- many of them

16   were on the list that I looked at this -- that evening.

17   Q.  And your analysis assignment came the next day?

18   A.  I'm sorry?

19   Q.  Your assignment to analyze the contracts came the next day;

20   is that correct?

21   A.  I received the request from -- to analyze the contracts on

22   that same day, on February 10th.  And then the -- we received a

23   parallel request from the CFPB chief financial -- chief

24   financial officer to do the same thing the next morning.

25   Q.  How many contracts did you identify as part of that

1    analysis as necessary to complete statutorily required work?

2    A.  We identified five.

3    Q.  How many of those contracts were subsequently canceled?

4    A.  All five.

5    Q.  That same week, were you also asked to write a memo on the

6    Office of Consumer Response's staffing?

7    A.  I was.

8    Q.  How did that assignment come about?

9    A.  On Thursday, February 13th, I was contacted by Mr. Johnson,

10   who requested my assistance in drafting a memo about divisional

11   staffing.  This memo was going to be used to -- for put on a

12   RIF, reduction in force.

13   Q.  What was the due date of that memo?

14   A.  The original due date -- I received the request around

15   2 p.m., the original due date was the same day at 6 p.m., but

16   Jordan Wick, and I believe the other gentleman, his name was

17   Jeremy, again, associated with the DOGE, began asking for

18   updates approximately 60 to 90 minutes later.

19   Q.  Can you turn to tab 10 in the same binder that we were just

20   looking at?

21   A.  Yes.

22   Q.  This starts at CFPB 20.  Is this the memo that you wrote?

23   A.  This is.

24   Q.  Do you see at the bottom, there's a highlighted two

25   sentences?

1    A.  Yes.

2              THE COURT:  Just tell me where you are in the binder

3    again.

4              MR. FRIEDMAN:  Oh, tab 10, CFPB 20.

5    BY MR. FRIEDMAN:

6    Q.  Second sentence states, "The functional areas listed below

7    align to statutory responsibility is total of approximately 80

8    to 85."

9         What did you mean by the term "align"?

10   A.  I think the best way to explain that is to walk through a

11   few examples.

12             So, the statute requires that we have a toll-free

13   number, and we have people on staff that manage that toll-free

14   number.  The statute requires us to monitor and investigate

15   complaints.  We have staff in our office that monitor and

16   investigate complaints.

17   Q.  What did the teams that are not in this memo do?

18   A.  The teams not in this memo provide a variety of support

19   services for our office, so they include project managers, they

20   include consumer experience, designers, they include people who

21   fulfil FOIA requests, they -- that sort of thing.  All

22   providing support to all of the sections within our office.

23   Q.  And when you say support services, do they provide services

24   for statutorily required work?

25   A.  They do.

1  Q.  Does anybody within the Office of Consumer Response work on

2  matters that are not statutorily required?

3  A.  No.  Everyone is working on statutorily required work.

4  Q.  So why were those other teams not put in your memo?

5  A.  Couple reasons.  Number one, I was -- I was rushing through

6  this memo, I had about -- in total, I spent two hours with this

7  memo, and so I wasn't working for an org chart.  I was racing

8  through the assignment.

9           And then secondly, the prevailing sentiment at the

10  time was that any -- any action that could be perceived as a --

11  as obstructionist or resistance, would just be met with

12  negative consequences for members of the DOGE.

13  Q.  And did Mr. Johnson say anything to you about what he felt

14  could be included in the memo?

15  A.  Yeah.  Mr. Johnson and I had a conversation before I began

16  writing about the teams that we would include, and he agreed

17  with -- he agreed with me that we needed to, you know, have

18  this number south of 150, 155, just, you know, because of --

19  because of the assignment and because of who it was going to.

20  Q.  And when you say 150 to 155, you mean south of the total

21  number of people in the office?

22  A.  Correct.

23  Q.  Did anybody else assist in the contents of the memo?

24           THE COURT:  I'm sorry, when you say keep the number

25  down to less than 150 to 155 people, or 150 to 155 people less

```
 1    than the total number of people you usually have?

 2              THE WITNESS:  So --

 3              THE COURT:  I'm confused now with the way you summed

 4    it up.

 5              THE WITNESS:  I'm sorry.  So we have a -- we have a

 6    little bit less than 150.  We have about 144 people currently

 7    on staff.  The intention was to have that number south of that

 8    number.

 9              THE COURT:  Okay.

10    BY MR. FRIEDMAN:

11    Q.  I just want to make sure the record is clear.  By the

12    "number south of that number," you mean the number that counts

13    as statutorily aligned?

14    A.  Correct.  Sorry.  The numbers that are listed in this memo

15    would be below 150 to 155.

16    Q.  Did anybody else contribute to the contents of this memo

17    besides you?

18    A.  Mr. Johnson, he provided both the numbers that are

19    throughout the memo.  So throughout the memo there's sentences

20    that say, "The current head count for this area is blank."  He

21    also authored the final paragraph for management and

22    operations.

23    Q.  Do you agree with the head count numbers that he provided?

24    A.  I do not.

25    Q.  Why not?
```

1    A.  Again, we were working quickly, so we were counting those

2    people in our heads, and by looking at org charts that were on

3    teams, which are known to be problematic, that was also the

4    week that the OPM fork-in-the-road offer expired, people were

5    talking about retirement the night before probationary

6    employees had been terminated, we knew that terms were likely

7    to go that evening.  So we just weren't working from an

8    accurate count.

9           And then secondly, having reflected on this more, I

10   would conclude that everyone in the office is working on a

11   statutorily required function.

12   Q.  Can you provide an example of one of the head counts that

13   you disagree with?

14   A.  Investigations lists the current head count for this area

15   as 30.  And the number is closer to 40.

16   Q.  What happened to the draft after you sent it to

17   Mr. Johnson?

18   A.  I sent it to Mr. Johnson, he made some edits, little nits.

19   And, again, writing that final paragraph.  And then he sent it

20   on to Mr. Martinez and members of -- Jordan and Jeremy, of the

21   DOGE.

22   Q.  Have you heard anything back from anybody about the

23   analysis in this memo?

24   A.  I have not.

25   Q.  When did the Office of Consumer Response return to work?

1    A.  Monday, March 3rd.  At 6 a.m. Mr. Johnson sent out a email

2    activating staff.

3    Q.  Was anyone in the Office of Consumer Response authorized to

4    work before that point?

5    A.  The prior week, on February 27th, there was a limited

6    number of employees who were activated to do a couple of

7    different discrete tasks.  So there were a few employees who

8    were activated to deal with some vendor issues.  There were

9    employees activated to conduct an assessment of system

10    backlogs.  And then there was also a few employees activated

11    for purposes of commencing work on our annual report to

12    Congress, which I was one of those people.

13    Q.  Was there anything else beyond that, February 27th

14    authorization?

15    A.  No.

16    Q.  What is the escalated case management team?

17    A.  The -- the escalated case management team sits in our

18    investigations section, and they respond to both escalated

19    consumer issues, they do deep dive investigations, and they

20    also work on a portfolio of mortgage complaints where the

21    consumer has indicated that they're subject to imminent

22    foreclosure.

23    Q.  Have you reviewed the declaration of Adam Martinez in this

24    case?

25    A.  I have.

1  Q.  In Mr. Martinez's second declaration at paragraph 8 he

2  states, "As of February 27, 2025, members of the escalated case

3  management team, for example, are working."

4      Was the escalated case management team working as of

5  February 27, 2025?

6  A.  No.

7  Q.  How do you know?

8  A.  Mr. Johnson would have, first, told me; but secondly, one

9  of the members of the team reached out following that

10 declaration saying that they were not working.

11 Q.  You're saying Mr. Johnson would have told you.  Did you ask

12 Mr. Johnson whether they were working?

13 A.  Yeah.  He -- he told me they weren't working.

14 Q.  In Mr. Martinez's first declaration he wrote, "Contracts

15 needed for work related to the consumer complaint database have

16 remained intact and operational."

17     Between February 10th and March 3rd, did a single

18 contract owned by consumer response remain intact throughout

19 that period?

20 A.  No.

21 Q.  So I want to take you to the week of March 3rd.  How did

22 you learn that the Office of Consumer Response was going back

23 to work?

24 A.  I received an email from Mr. Johnson.

25 Q.  Can you turn to tab 32 in the blinder that we were looking

1    at?

2         Is this the -- is this an email that is -- not the very

3    first, but the second, March 3rd, 5:59 a.m., from Mr. Johnson,

4    is that the email --

5    A.   That's right.

6    Q.   -- that I alerted you to?

7         And then if you can turn to the next page, page 80,

8    there's another email from Mr. Johnson to Mr. Martinez in the

9    to line, but it begins with "Hi, Mark."  Do you see that?

10   A.   I do.

11   Q.   And the second paragraph begins, "Consistent with your

12   direction and in light of our statutory obligations to conduct

13   financial education programs --" he cites the statute -- "and

14   to collect, investigate, and respond to consumer complaints --"

15   he cites the statute -- he says, "the Division of Consumer

16   Response and Education will take steps to reactivate all staff

17   full-time."

18        At that time, did all staff include the people that were

19   not on the teams identified in your memo?

20   A.   Yes.  This activated everyone, both listed on the memo and

21   not listed on the memo.

22   Q.   Can you describe what it was like when you went back to

23   work on March 3rd?

24   A.   Chaotic is generous.  People had been out of -- out of work

25   for three weeks.  There was a lot of confusion about what was

1    happening.  We also had a variety of challenges that had

2    developed over the prior coming -- the prior weeks, that we

3    needed to address.

4    Q.  Had all the contracts that the Office of Consumer Response

5    used prior to the stop-work order been reinstated?

6    A.  Not all of them, no.

7    Q.  Were any of the contracts that had not been reinstated

8    among the five that you identified as necessary for the

9    office's work?

10   A.  I'm sorry.  Can you repeat that?

11   Q.  Were any of the contracts that had not been reinstated

12   among the five that you had previously identified as necessary

13   for the office's work?

14   A.  Yes.

15   Q.  Can you describe -- give an example of one?

16   A.  Sure.  We have a contract with Ernst & Young, it's our

17   data-sharing contract.  And this contract is -- works on the

18   technology that shares complaints between us and other federal

19   and state regulators.

20   Q.  And without that contract, are you able to share complaints

21   with those other regulators in the same way?

22   A.  No.  No.  Without that contract we've -- these systems

23   invariably develop bugs.  And so beginning last week, we

24   identified -- several of my colleagues identified a bug that's

25   preventing the user from accessing attachments.  And so both

1    internal users can't access this as well as other users of the

2    portal, including federal and state agencies.

3    Q.  Is sharing information with those federal and state

4    agencies something that happens on a weekly basis?

5    A.  It's daily.

6    Q.  Were there any contracts that were turned on but are not

7    back to normal?

8    A.  Yeah.  We have a contract with Deloitte that supports the

9    development of our case management system.  This is a system

10   that's built in a sales force environment, so it requires sales

11   force coders and developers to -- to work insides of it.  When

12   the Deloitte contract was canceled, the staff assigned to that

13   contract had been moved on to other projects because these are

14   people that are typically in demand.  That contract has since

15   been activated, but we are still working with the vendor to

16   identify people who can -- who can work on it.

17   Q.  So, currently, the contract is on, but you have nobody

18   staffing it from Deloitte; is that --

19   A.  That's right.

20   Q.  And you mentioned that they -- the people who -- if

21   staffed, would work on it, would be working on the case

22   management system.  Is the case management system important to

23   the Office of Consumer Response?

24   A.  Very.

25   Q.  Can you explain how?

1    A.  It's -- the case management system is -- you can think of

2    it as the central artery of the office.  It's the system that

3    allows us to take in complaints, get complaints into companies,

4    it's the system that manages consumers' access as well as

5    company access.  So, it is essential for getting consumers

6    timely responses to complaints.

7    Q.  Was there an assessment of the impact of the stop-work

8    order on the Office of Consumer Response done the week of

9    March 3rd?

10   A.  There was.  This -- this is the assessment that began on

11   February 27th.  And on February -- I'm sorry, on March -- on

12   Tuesday, March 4th, there was a briefing about impacts.  And so

13   from that assessment we know that more than 16,000 complaints

14   were awaiting manual review and routing to companies or

15   regulators.  We know that about 500 support tickets came in

16   from company users -- you know, government users to -- to --

17   that needed responding to.  We knew that about 250

18   congressional cases or updates about those cases had been

19   received but not had -- but not been worked.  We also know that

20   about 75 complaints came in that were -- that indicated that

21   they were subject to an immanent foreclosure, and those had not

22   been touched.

23   Q.  In your 11 years at the Office of Consumer Response, had

24   you experienced a backlog like that before?

25   A.  No.

1    Q.  Did you learn anything about how complaints posted to the

2    public database during the stop-work order?

3    A.  The complaints posted to the public database experienced

4    issues as well, and we're currently working through those.

5    Q.  Can you elaborate on whether it was a small number of

6    complaints that didn't make it or a large number?

7    A.  It's thousands of complaints that didn't make it into the

8    database.

9    Q.  Have you learned anything else about the impact of Director

10   Vought's February 10th order on the office's work?

11   A.  Let's see.  Other than -- specific -- about the office --

12   Q.  I'll try it a different way.

13   A.  Sure.

14   Q.  Did you learn anything about the pace of company's response

15   time to consumer complaints?

16   A.  Yes.  The time -- the time that companies take to respond

17   to complaints has increased.

18   Q.  How long will it take the Office of Consumer Response to

19   work through its backlog?

20   A.  Weeks, if not months.

21   Q.  Has the effect of the stop-work order on other offices

22   within the Bureau impacted the Office of Consumer Response?

23   A.  Yes.

24   Q.  Can you explain how?

25   A.  We rely on a variety of other offices to conduct our work.

1   And, so, you know, having -- having the work stop -- stoppage

2   has been difficult.  And so -- would you like me to go through

3   those offices or --

4   Q.  Can you explain the impact on -- it's okay.  We can just

5   move forward.

6        Based on your 11 years of experience in the Office of

7   Consumer Response, what would happen if the current state of

8   affairs continued?

9   A.  If the current state of affairs continued with the

10  contracts that we have, we'll hobble along, but we won't be

11  able to offer services at the level of quality or performance

12  standards that we have in the past.

13  Q.  And based on your 11 years of experience at the Office of

14  Consumer Response, what would happen if the contracts were

15  finally terminated?

16  A.  Oh, the system will collapse.

17            MR. FRIEDMAN:  No further questions.

18            THE COURT:  All right.  Cross-examination?

19                      CROSS-EXAMINATION

20  BY MR. HOLLAND:

21  Q.  Thank you for testifying today, Mr. Pfaff.

22  A.  Thank you.

23  Q.  Get organized here.

24        You testified that you're the chief of staff for the

25  Office of Consumer Response, the CFPB; is that right?

1    A.  That's right.

2    Q.  You also testified that as chief of staff, you're

3    responsible for leading the Office of Consumer Response efforts

4    to meet its statutory obligations; is that right?

5    A.  That's right.

6    Q.  It's true that between approximately February 10, 2025,

7    and, you know, February 26th or March 3rd, whatever the date

8    is, consumer response staff were not working; is that right?

9    A.  That's correct.

10   Q.  And it's true that because staff were not working, the

11   complaint handling operating system experienced a significant

12   disruption; isn't that right?

13   A.  That's right.

14   Q.  Many complaints, by thousands of consumers, not being

15   processed during that period, right?

16   A.  That's correct.

17   Q.  In fact, your estimate is that more than 10,000 complaints

18   were awaiting federal staff review, or at least as of

19   February 26th; isn't that right?

20   A.  More than 16,000.

21   Q.  More than 16,000.

22       And some of those involved people who, as you testified,

23   right, had an imminent foreclosure, which is -- right?

24   A.  Correct.

25   Q.  And folks were not responding to them, right?

```
 1    A.  The complaints that were in the manual queues, they were

 2    not being worked.

 3    Q.  The 16,000 complaint backlog, that's a large backlog, isn't

 4    it?

 5    A.  Correct.

 6    Q.  It's unprecedented, isn't it?

 7    A.  Unprecedented in my memory, yes.

 8    Q.  So you would agree, then, that each consumer complaint must

 9    be addressed with some urgency to prevent that type of large

10    and unprecedented backlog from building up, right?

11    A.  Yes.

12    Q.  I think you have a binder with -- in front of you, can you

13    turn to tab 56?

14         And that tab has a couple of exhibits in it, and I want

15    you to turn to Exhibit F, which is at -- the top it says, "ECF

16    page No. 20."

17    A.  20 out of 22, correct?

18    Q.  Correct.

19    A.  Okay.

20    Q.  And you've seen this before?

21    A.  Yes.

22    Q.  All right.  This is the email dated February 10th from

23    Acting Director Vought to all staff that you referred to as a

24    stop-work order; is that right?

25    A.  Correct.
```

1  Q.  Okay.  And you submitted the declaration -- two

2  declarations in this case, right?

3  A.  I did.

4  Q.  In your first declaration, do you recall in paragraph 9

5  characterizing this email as directing staff not to perform any

6  work tasks and to stand down from performing any work task?

7  A.  Correct.

8  Q.  But the email says more than that, doesn't it?

9  A.  The email says to get approval in writing before doing any

10  work tasks.  It also says, "Please alert me through Mark

11  Paoletta if there are any urgent matters."

12  Q.  "If there are urgent matters please alert me through Mark

13  Paoletta," right?

14  A.  Yes.

15  Q.  Despite that directive, you did not contact Mark Paoletta

16  for consumer response approval to address all of the urgent and

17  piling-up consumer complaints; isn't that right?

18  A.  I understood "urgent" to mean something out of the

19  nonordinary course of business.

20  Q.  You didn't think that, like, someone not being able to have

21  their, like, imminent foreclosure complaint addressed was

22  urgent?

23  A.  I consider it urgent, but I would -- I would remind you

24  that 1013 creates an obligation on the director to create the

25  unit that over sees the handling of complaints.  I assume the

```
 1    director, if --
 2    Q.  You thought it was urgent, right, but you didn't respond to
 3    this email?
 4            THE COURT:  All right.  I think you're just arguing
 5    with him at this point.
 6    BY MR. HOLLAND:
 7    Q.  Were you aware that Chris Johnson, the associate director
 8    of consumer response, did not email Mark Paoletta requesting
 9    authorization to address those consumer complaints at all until
10    at least February 26th at 11 a.m.?
11    A.  I've seen that email, yes.
12            THE COURT:  Would you have known whether there was
13    one in there about a foreclosure without working and going
14    through all the complaints?
15            THE WITNESS:  No.  We would have to write a report.
16    BY MR. HOLLAND:
17    Q.  So it's pretty infrequent that folks contact the Office of
18    Consumer Response about imminent foreclosures?
19    A.  We received 75 complaints about imminent foreclosures
20    during the three-week period.
21    Q.  Right.
22            So this would be pretty typical, right?
23    A.  I'm sorry?
24    Q.  It would be typical that you would receive approximately 75
25    complaints about imminent foreclosures during any three-week
```

1    period, wouldn't it?

2    A.  It's subject to market fluctuations and what's happening.

3    Q.  There would be at least one every three-week period,

4    wouldn't there?

5    A.  I would imagine some.

6    Q.  Right.

7        So you had some idea that if everyone stopped work, and

8    urgent issues with respect to consumers would not actually be

9    addressed, right?

10   A.  Again, you know, as a employee of the Bureau, we are

11   decided -- we have to decide between, you know, a stop-work

12   order and defining what urgent tasks are.

13   Q.  I think -- okay.  Can you turn to tab 27 in the binder?

14   A.  Sure.

15   Q.  Well, actually, I'm sorry, can we first turn to tab 9?  I'm

16   sorry.

17   A.  Tab 9.  Yes.

18   Q.  So, have you seen this, like, email chain before?  I know

19   you're not on it.

20   A.  I've seen it, yes.

21   Q.  And this is the one you reference before when I asked a

22   question about Mr. Johnson first reaching out to Mr. Paoletta;

23   is that right?

24   A.  I'm sorry.  What was that in reference to?

25   Q.  I'll just ask you.  I mean, you know, as this email

1    indicates, the first time that Mr. Johnson even sent an email

2    of any kind to Mr. Paoletta was actually on February 26th; is

3    that right?

4    A.   That's the only email that -- I'm not in Mr. Johnson's

5    email in box, so I don't know if there were other

6    correspondence here.

7    Q.   From your review, he's introducing himself in the first --

8    A.   Sure, yes.

9    Q.   Okay.  And so, is any -- was any aspect of Mr. Johnson's

10   request on that date denied?

11   A.   No.  No.  Mr. --

12   Q.   How quickly did Mr. Paoletta agree to all of Mr. Johnson's

13   requests for work authorization?

14   A.   Looks like it's a difference of -- Mr. Johnson sent it on a

15   Wednesday night, and Mr. Paoletta responded the next morning.

16   Q.   And you're aware that Mr. Johnson has, like, several roles

17   in the administration, he's not only working as the chief legal

18   officer of CFPB?

19   A.   Mr. Johnson is not the chief legal officer.

20   Q.   I'm sorry, I misspoke.  I meant to say Mr. Paoletta.

21   A.   That's what I've heard, yes.

22   Q.   At the -- like, the bottom of this email chain on page

23   CFPB 19, that's the email that you were talking about on your

24   direct examination; is that right?  Or let me rephrase that.

25        Does that email address the memo that you had worked on,

1    on February 13th?

2    A.  Correct.

3    Q.  And that was not sent to Mark Paoletta on that date; is

4    that right?

5    A.  It was not sent to Mr. Paoletta, no.

6    Q.  Okay.  And were you aware that during that week the entire

7    Office of Consumer Response was left out of whatever RIF

8    planning was going on?

9    A.  I -- I was not aware, no.

10              THE COURT:  Are we?

11              MR. HOLLAND:  Yes, Your Honor.  We've had a lots of

12   testimony.  In fact, if you would like to open up to

13   Plaintiffs' Exhibit JJ, it's in the other binder.

14   BY MR. HOLLAND:

15   Q.  If you move towards the end of that, there's a memo from

16   Adam Martinez to Michael Mahoney?

17   A.  I'm sorry.  You said JJ?

18   Q.  It should be JJ.  I pulled it out myself, so I know.

19              THE COURT:  Well, if he doesn't know you can point me

20   to it later.

21              MR. HOLLAND:  Okay.  I'm just responding to him.  It

22   is, Your Honor, in this memo that has been discussed several

23   times in which there is no Office of Consumer Response in the

24   RIF memo, of, like, nobody was being taken out of that

25   particular office.

 1    BY MR. HOLLAND:

 2    Q.  I'll just -- you've spoken about a few contracts issue now

 3    that people finally have come back to work, little issues here

 4    and there with certain contracts.  I assume you're now raising

 5    those issues with management so they can be addressed; is that

 6    right?

 7    A.  We're responding to those issues.

 8    Q.  Thank you so much.

 9          THE COURT:  Any redirect?

10          MR. FRIEDMAN:  Yeah, just briefly.

11                    REDIRECT EXAMINATION

12    BY MR. FRIEDMAN:

13    Q.  Can you turn -- or if you still have it open to Exhibit JJ?

14    A.  Yes.

15    Q.  You see there's a number, No. 1 there?  Oh, sorry.  It's --

16    there's a memo, that has -- begins to Michael J. Mahoney?

17    A.  Yes.

18    Q.  Okay.  And do you see there's a No. 1 there?  And there's a

19    question and then an answer paragraph?

20    A.  Yes.

21    Q.  Okay.  Now, do you see the second sentence says,

22    "Additional competitive areas will be identified in the next

23    round of divisions, offices, and/or units, including the

24    Division of Operations, Division of Research Monitoring and

25    Regulations, and Division of Consumer Response"?

1          Is the Division of Consumer Response the same as the
2     Office of Consumer Response?
3     A.  Yes.  The -- the formal name is the Division of Consumer
4     Response and Education.
5               MR. FRIEDMAN:  No furthers questions.
6               THE COURT:  All right.  Thank you very much.  The
7     witness can step down.
8               THE WITNESS:  Thank you.
9               THE COURT:  All right.  Is that the end of the
10    witnesses the plaintiff seeks to introduce today?
11              MS. BENNETT:  Yes, Your Honor.
12              THE COURT:  All right.  Now, I've heard the
13    testimony.  I need to review the documents in connection with
14    the testimony.  I wanted to ask a few questions about the state
15    of everyone's positions at this moment.  I had asked at the
16    last hearing for the plaintiffs to take a hard look at the
17    proposed order that they wanted me to introduce, that they
18    wanted me to execute, and one of the main objections that had
19    been raised on the defense side of the courtroom was that they
20    thought your original proposed order was broad and it would put
21    me in the position of monitoring the Agency and constant series
22    of contempt proceedings and evidentiary proceedings of the yes,
23    you are/no, you aren't variety that we've experienced this
24    week.
25              And I had stressed that the -- whatever injunction I

1    issued had to be clear and enforceable so that parties would

2    know when they're violating it, when they're not violating it.

3    So, I wanted to know what the thinking is between the

4    substitution of a very different type of order, saying, "You

5    must have this function, you must have that function, and keep

6    the data, don't fire the employees, don't cancel the

7    contracts."  And this one, which says basically it's still got

8    the, "No delete data, don't fire anybody, reinstate the

9    probationary people, don't give away the money" -- which

10   another judge has already ordered them anyway -- "don't enforce

11   the stop-work order.  Rescind any contract, any contract

12   terminations that enables the statutorily-authorized functions,

13   and basically don't get in the way of the statutory-authorized

14   functions."

15         So, explain to me why you want me to do this as

16   opposed to what you were asking me to do before.

17         MS. BENNETT:  So, the order before, and I apologize,

18   I don't have the text in front of me, but the order before said

19   just don't take any action to interfere with or impair the

20   operations of the CFPB, generally, including a few things.  And

21   so we narrowed it to the statutory authorized functions to make

22   it a more narrowly tailored order.

23         THE COURT:  You also called out specific offices.

24   So, you're not interested in doing that any more?

25         MS. BENNETT:  I think, especially the testimony we've

 1    heard, and I think it became very clear to us that these

 2    offices are interconnected, and identifying -- limiting it to

 3    specific offices would not give sufficient relief, even in the

 4    interim.

 5         You know, we have heard that there's an ongoing

 6    effort to fire everyone in every office, including specific

 7    statutorily identified offices.  And so we didn't want the call

 8    out of a few offices to limit the relief necessary on an interm

 9    basis, but we also recognize that saying, you know, "You have

10    to resume everything at the CFPB," was too broad.

11         THE COURT:  All right.  So any injunctive order has

12    to be predicated on a finding of likelihood of success on the

13    merits of one of your counts.

14         Count 1 talks about an Agency action being *ultra

15    vires*, and then one of the two APA counts essentially echoes

16    the same thing by saying there's a final Agency action which is

17    contrary to law.  There's another one that says final Agency

18    action, which is arbitrary and capricious.

19         So specifically now, what Agency action are you

20    asking me to deem to be unlawful, either under Count 1 or the

21    APA counts?

22         MS. BENNETT:  Sure.  So under Count 1, I think the

23    labeling is confusing.  We would be happy to fix it, but it's

24    really a separation of powers count.  And so the stop-work

25    order saying that the Agency can do -- essentially shutting

1   down the functioning of the Agency is a violation of the

2   separation of powers, at least as -- with regard to the

3   statutorily authorized functions.

4          Similarly, the firing --

5          THE COURT:  Before you get to whether it's a

6   constitutional --

7          MS. BENNETT:  Sure.

8          THE COURT:  -- violation, aren't you also saying it's

9   a violation of the provisions in the U.S. Code that

10  establishes --

11         MS. BENNETT:  Yes.

12         THE COURT:  So you don't even have to get in the

13  battle between the Congress and the President.

14         MS. BENNETT:  Yes, right.

15         THE COURT:  You're not suing the President, correct?

16         MS. BENNETT:  Right.  So that stop-work order, we

17  think is a violation of the statute, it's a violation of

18  separation of powers.  It's also arbitrary and capricious.

19  It's very clear that there was no analysis that went into the

20  scope of that order, who's work did what.  And to the extent

21  there was analysis, it was disregard.  So we think it's both

22  contrary to the constitution, contrary to law, and arbitrary

23  and capricious.

24         The same is true with the wholesale termination of

25  contracts.  The same is true with the decision to fire the

1     probationary employees en masse, the term employees en masse,

2     and everybody else en masse.  And the same is true with the

3     decision that we're going to wind down or close the Agency.

4           THE COURT:  Well, you've pointed to a document that

5     reflects -- whether it's a final decision or a decision -- a

6     decision to get rid of all the probationary and term employees,

7     to send out notices terminating the contracts and to stop work.

8           The upshot of all that and the intent of all that,

9     according to -- I believe your position and I believe you think

10    you've proved this through the witnesses you've put on -- is to

11    dismantle and eliminate the Agency completely.  But is there a

12    decision to do that in the record that you're challenging, or

13    are you challenging these other decisions and saying the reason

14    injunctive relief is needed is because of the intent behind

15    them and if we don't have interim relief, there would be no way

16    to fix it if that's what happened in the meantime?

17          MS. BENNETT:  I think both are true.  So I think you

18    could draw from the testimony today that there was a decision

19    to wind down or close the Agency, but I don't think for

20    preliminary relief you need to decide that.  I think the

21    decisions to terminate the contracts, fire the employees and

22    stop work are sufficient to themselves cause irreparable harm

23    if they're not preliminarily enjoined.  And we've heard a lot

24    of testimony, including from Mr. Martinez, that if you stop all

25    the contracts, that's irreparable, that the decisions to fire

1   the employees were causing harm.  And if they do get fired,

2   there won't be positions for them to come back to.  So that's

3   irreparable.

4        And the same thing from the stop-work order, we've

5   heard that even trying, you know, to wrestle up some work that

6   happens before the hearing last week, people weren't able to do

7   that work and there was a whole bunch of problems that were

8   caused by the -- you know, even just a three-week stop of the

9   Agency not working.

10        And so we don't -- I don't think you need to get to

11   the question, the ultimate question of what they were trying to

12   do with that.  I think those decisions themselves are

13   sufficient to justify preliminary relief.

14        THE COURT:  Well, given the arguments about the

15   collective barring agreement and the existence of the Merit

16   System Protection Board, et cetera, do I have jurisdiction to

17   review the decision to fire anyone or is that also just

18   something that's demonstrative of the underlying goal of the

19   other decisions?

20        MS. BENNETT:  I think both.  And I'm just going to

21   grab my notes on that, if you don't mind.

22        THE COURT:  Okay.

23        MS. BENNETT:  So, I do think you have jurisdiction,

24   and what the Supreme Court's recent decision in *Axon* tells us

25   is the question is whether the particular claims brought are of

1    the type Congress intended to be reviewed within the statutory

2    structure.  So that's the MSPB, and I think they're also saying

3    the FLRA, the union grievance process.

4           And this case is quite similar to *Axon*, actually, in

5    that the ordinary statutory review scheme does not apply to

6    extraordinary claims like this.  That's what the Supreme Court

7    said in *Axon*.  Look, they said, there's a separation of powers

8    problem here, it's an extraordinary situation.  And we're not

9    going to assume that when Congress created an administrative

10   process for ordinary fights between employees and their

11   employers that it applies to this extraordinary claim.

12          And I think if you go through the *Thunder Basin*

13   factors, you get to the same place.  You know these are

14   statutory schemes that don't have any explicit mention of

15   jurisdiction stripping, so we're looking at what is implied in

16   the statute.  There's nothing that says there's no

17   jurisdiction.  And the factors all point to not -- Congress not

18   intending to strip this Court of jurisdiction in this kind of

19   extraordinary case.

20          So the first factor is whether all meaningful review

21   will be foreclosed.  I think, you know, it is clear here

22   that -- and I think the testimony of Mr. Martinez shows that

23   there might be no Agency to be reinstated to, if everybody gets

24   fired.  I think this is to your point, the firing is towards a

25   goal of dismantling the Agency.  And the intent was that there

1    be nothing left, and so, you know, the employees could not get

2    relief before the MSPB or the FLRA because there won't be jobs

3    to come back to.

4        I also so want to point out that the government is in

5    several courts and before Congress stating that these

6    tribunals, the MSPB and FLRA, are unconstitutional because of

7    the for-cause removal statutes.  And I'm not aware of any

8    situation ever where the government has argued that people

9    should be channeled to a tribunal that they say is

10   unconstitutional, that they say any decision that comes from

11   that tribunal will be unconstitutional.  I'm not aware of a

12   court ever ordering that relief.

13       And the other reason is, as you mentioned, you know,

14   the employees aren't the only plaintiffs here.  And to get

15   relief, we've heard that you, consumers, the NCLC, cannot give

16   relief to its consumers if there are no employees at the CFPB.

17   You know, Pastor Steege, if there's no student loan ombudsman,

18   cannot go to the student loan ombudsman office, et cetera.

19       THE COURT:  Okay.  Let me ask you, the other issue

20   they're saying, I know you've already addressed voluntary

21   cessation and whether that's a defense here.  And I think

22   everybody has briefed that.  And I know their position, I know

23   your position.  But their position is also that the trigger for

24   the APA is finality.  And clearly, we know that the RIF got

25   stopped in its tracks.  It still seems to be being planned, but

1   where is the thing that's final?

2           I think with your -- with respect to the stop-work

3   order, you're saying, "It never got rescinded, they're just

4   giving little exceptions here and there, and it's still in

5   place."  They're saying, "But we've granted every exception

6   everybody has asked for," so we have to figure that out.

7           But what's your answer to the finality question?

8   Which is a little bit different than the mootness question.

9           MS. BENNETT:  Sure.  So two answers to that.  The

10  first is, you know, all of the evidence we have heard is that

11  there was a final decision to do this that was interrupted by a

12  court order.  And so I'm not aware of any case that says if you

13  have a final decision but the Court enjoins it before you can

14  effectuate that decision, it's somehow no longer a final

15  decision.

16          And the second answer is, you know, to the extent the

17  APA doesn't apply, it is still a violation of the separation of

18  powers, and there is no final decision necessary to find that

19  the action is a violation of the separation of powers and needs

20  to be enjoined for that reason.

21          THE COURT:  And are the plaintiffs -- I understand

22  that you've identified them and explained why you believe that

23  they have standing because they will suffer an injury in fact

24  due to these actions, if they go through.  Did they have

25  standing to raise the constitutional question, the separation

1    of powers issue?

2         MS. BENNETT:  Yes.  So the question in standing is

3    injury.  Are they injured?  And they've certainly been injured

4    by these actions.  And the Supreme Court's decision in *Duke*

5    *Power* and the Supreme Court's recent decisions in the

6    appointments clause cases -- and I could get citations for both

7    of those -- has made very clear, if you have an injury from an

8    agency's action, it doesn't have to be -- there doesn't have to

9    be any nexus between the reason the agency's action was illegal

10   to have standing to challenge it.  You can challenge an agency

11   action that injures you even if, you know, the reason is

12   irrelevant.

13        So, for example, I think *Collins v. Yellen* is the

14   most recent case on this.  And that was an appointments cause

15   challenge.  And what the Court said is as long the action

16   injured you, you don't have to have been injured because the

17   action was unconstitutional, the action could have injured you

18   for some other reason.  But, that's enough for standing.

19        THE COURT:  Okay.  I think I've asked you the

20   questions I wanted to ask you.

21        MS. BENNETT:  Okay.  And we would be very happy to

22   provide any citations or very short briefing that you would

23   like on a short timeline.

24        THE COURT:  Right.  Well, my concern with -- I mean,

25   I think you all have briefed most of these issues before, or

1    you've mentioned these cases in argument.  And if I ask for

2    briefing, then I'm going to want to get it and read it, and

3    that just delays when you get your answer, which doesn't seem

4    to be what anybody is looking for here.

5            MS. BENNETT:  Understood.  But even if you want just

6    citations to the cases, we would be happy to provide them.

7            THE COURT:  I appreciate that.  I think *Collins v.*

8    *Yellen* I can find.

9            MS. BENNETT:  Okay.  And the other case that's really

10   clear on this is *Duke Power*, and I can't remember who was on

11   the other side of *Duke Power*, but it's a Supreme Court case.

12           THE COURT:  All right.  Thank you.

13           MS. BENNETT:  Sure.

14           THE COURT:  All right.  I have a few questions for

15   the government.

16           Are there any particular objections with respect to

17   this order that are different from your objections to the other

18   order?  I mean, I understand the general objections to

19   irreparable harm, standing, jurisdiction, all of that.  But, if

20   I found that there was something that warranted relief to

21   preserve the Agency until the merits were reached, are there

22   aspects of this that are particularly odious from your

23   perspective?

24           MR. ROSENBERG:  Yes.

25           THE COURT:  The whole thing?

1          MR. ROSENBERG:  I can walk through --

2          THE COURT:  Besides -- okay.

3          MR. ROSENBERG:  I'm happy to walk through them.  So

4    I'm looking at the current proposed order, which is -- I

5    believe it's ECF 606.

6          THE COURT:  And to be fair, the first paragraph is

7    essentially similar to what the agreed-upon paragraph was in

8    the TRO.  And you may still not be agreeing but I don't

9    think --

10         MR. ROSENBERG:  And I will object on that paragraph.

11   I mean, we agreed in order to provide this Court with an

12   opportunity to resolve the preliminary injunction.  We know

13   that the Court is working on that decision.  But one of the

14   issues that has arisen concerns these contracts, and there's

15   been testimony about contractors and contractor data.  But,

16   there hasn't been testimony about, you know, if you have a

17   contract, is the data actually CFPB data?  Might there be

18   another copy of that data some place else?  Is the data on

19   those contracts that might be held by those third-party

20   contractor subject to the Federal Records Act.

21         So we object to the data preservation issue because

22   it does raise longer term some operational challenges for the

23   CFPB.

24         Now, we've agreed to pause or freeze the suspension

25   of those contracts, and I'm prepared to speak to that issue as

1   well.  But at least on that first paragraph, we think that

2   there does need to be, if the Court were to issue a preliminary

3   injunction, more specificity as to what the data is.

4        It's also unclear, after these two days of testimony,

5   whether any data that might be held by contractors or any data

6   that the Agency has more generally, are necessary to resolve or

7   preserve the claims of these plaintiffs.  Because when the

8   Court enters an injunction, the extraordinary relief of a

9   preliminary injunction, it has to enter the narrowest form

10  injunctive relief necessary to preserve the status quo.

11       And the plaintiffs here are a serious of different

12  organizations, you know, some unions, some consumer advocacy

13  groups.  But it's unclear, for example, whether, I don't know,

14  the preservation of EEOC-related data is necessary in order to

15  resolve the claims that the plaintiffs have here.  So that

16  would be our objection to paragraph No. 1.

17       For paragraph No. 2, regarding the termination of

18  CFPB employees, you've heard testimony that CFPB intends to

19  comply with the OMB, OPM memo.  That process is one that's

20  ongoing.  And it's the government's position that that memo has

21  functionally superseded any actions that were previously going

22  to take place.

23       Does a preliminary injunction that says that

24  defendants shall not terminate any CFPB employee except for

25  cause and defendant shall not issue a notice of reduction in

1  force to any CFPB employee preclude the Agency from complying

2  with that OMB/OPM memo?  It's in the middle of that process,

3  it's predecisional, if you want to call it that, at this point.

4  And yet, this proposed preliminary injunction would preclude

5  the Agency from even engaging in or ultimately fulfilling that

6  process, which if it were to do so, would be very different

7  from what was contemplated the week of February 10th.

8           THE COURT:  Well, I don't think we know that.

9           MR. ROSENBERG:  But the injunction that plaintiffs

10  would have the Court issue would prevent the Agency from even

11  being able to participate in a different process.  And I don't

12  believe that there's been any testimony from plaintiffs' side

13  or any argument from plaintiffs' side challenge the Agency's

14  ability to engage in that process.  Nor could there be because

15  the process has only just begun.

16           So that's part of the challenge here, that this is an

17  amorphous case where -- I'm not going to say my good friends --

18  but opposing counsel even indicated when they got up here just

19  a few moments ago that it's a little bit less than clear what

20  they're seeking.  And if it's less than clear what they're

21  seeking and if it's less than clear what their claims are

22  about, then this Court needs to be very careful in crafting a

23  preliminary injunction that provides clarity for the CFPB.

24           THE COURT:  Well, I think it's a little hard to blame

25  the lack of specificity on the plaintiffs when the orders that

1    were issued that sent them to court were blanket orders, all

2    contracts, all employees, all provisionary employees.  So you

3    can't turn around and put the onus on them, "Well, how come you

4    aren't more specific?"  They were dealing with something that

5    since then you're saying is changing, and I have to determine

6    if it's changing enough to have eliminated anything that I need

7    to do or not.  But, I think the fact that they came in with

8    broad requests parallels the broad nature of the initial

9    orders.

10         Do you agree that paragraph 4, that's something

11    you're already obligated to do by the Court in Maryland?

12         MR. ROSENBERG:  The Court in Maryland has not yet

13    issued a decision on the preliminary injunction.  It's extended

14    it's time window to, you know, basically issue the equivalent

15    of a temporary restraining order with a time limit.  I don't

16    know whether that court is waiting on this Court to decide or

17    vice versa.  But there's no final decision from that Court.  We

18    are under a temporary order.

19         THE COURT:  But we had something like that in our

20    original TRO, anyway, before I really knew much about what was

21    going on in Maryland, I think, in the order that the two sides

22    hammered out together, probably because you knew you were

23    already obligated to do that; is that fair to say?

24         MR. ROSENBERG:  On No. 4, I would just say the

25    testimony shows that CFPB can't do what's in No. 4 in any

1    event.  So I mean, I think there's a legal problem with that.

2            THE COURT:  That was my original question, I got a

3    very long answer to that.  Okay.

4            All right.  Well, now that you've told me repeatedly

5    and pointed to a lot of documents that have words to this

6    effect, that it is absolutely the position of the Agency that,

7    at least while it's still in existence, it's going to perform

8    its statutorily required duties, that's who we're measuring

9    employees against, that's what we're measuring the contracts

10   against, that's what -- those are the requests that we're

11   asking for and that we're granting on a regular basis.  If

12   that's true, then what is the problem with memorializing that?

13           MR. ROSENBERG:  Couple of problems.  Number one,

14   going back to the point of the amorphous nature of plaintiffs's

15   claims.

16           THE COURT:  Well, now I'm not talking anything

17   amorphous about clear claims.

18           MR. ROSENBERG:  Okay.

19           THE COURT:  I'm saying something about their claims

20   makes me want to have interim relief, and you're telling me,

21   "There is nothing to see here, Judge, because we are all in on

22   statutorily required duties."  What is offensive about an order

23   confirming that?

24           MR. ROSENBERG:  There is ambiguity as to what the

25   scope of those statutorily required duties are.  I think we

1    heard it just now from Mr. Pfaff --

2              THE COURT:  So you're saying that every one of these

3    emails is ambiguous that you've been showing me all day, and

4    the order that was issued on February 27th and the order that

5    was issued on March 2nd are ambiguous?

6              MR. ROSENBERG:  No.

7              THE COURT:  Okay.

8              MR. ROSENBERG:  You heard if now from Mr. Pfaff when

9    he testified, he felt that there were urgent matters, yet he

10   did not bring those matters to Mr. Paoletta's attention.  He

11   also submitted --

12             THE COURT:  That's urgent matters.  That's not

13   statutorily required.  Don't change --

14             MR. ROSENBERG:  He also submitted a memo that

15   apparently was intentionally incorrect because that memo

16   identified a certain number of statutorily required employees.

17   And then on the stand today he said, "Well, it's actually much

18   larger than that, it's broader than that."  So --

19             THE COURT:  Okay.  So there's a document in the

20   record at this point that I believe the plaintiffs created at

21   Docket 48-5, which is a lengthy chart of statutory duties.  Do

22   you disagree with that chart?

23             MR. ROSENBERG:  I have not had an opportunity to

24   review that chart, but I will point to one area where when

25   plaintiffs were asked to narrow their proposed preliminary

1    injunction, they actually made it broader.  So if you look at

2    paragraph 6 --

3             THE COURT:  I just want to know --

4             MR. ROSENBERG:  It's too broad to know.  It's vague.

5             THE COURT:  Does the director -- acting director of

6    the Consumer Finance Protection Bureau, today, know what the

7    statutorily required duties are?  And did Mr. Paoletta know

8    when he sent out the emails that you have asked me to rely on

9    and to comfort me that the statutorily required duties are

10   under control, does that have meaning for you or does that not

11   have a meaning for you?

12            MR. ROSENBERG:  It has a meaning in the sense that

13   the Agency's operations are broad.  And when individuals have

14   identified statutory duties, they have been approved by

15   Mr. Paoletta.  Now --

16            THE COURT:  So it's up to the employees to identify

17   them up and not for the director to identify them down?

18            MR. ROSENBERG:  Under the current operation of the

19   Bureau, that is the way that it's been functioning.  And that

20   provides an opportunity for the Bureau and its leadership to

21   identify -- to have employees raise those concerns, which

22   they've been asked to do, invited to do, and then they can

23   evaluate those concerns.  The problem is --

24            THE COURT:  They've been invited to do it because

25   they've been told to stop doing all work, and then you decided

```
 1    to add an exception for statutorily required work, but you've
 2    asked them to identify what that is.
 3              MR. ROSENBERG:  Because those employees are the most
 4    familiar with the operation of the Bureau.  Remember, this is
 5    new acting leadership at the Bureau that's only been there for
 6    a couple of weeks.  And that was part of the reason why I asked
 7    Mr. Martinez about Mr. Paoletta's full knowledge and
 8    understanding of the Bureau.  That knowledge and understanding
 9    has grown over time, and that has affected they type of
10    approvals that have taken place.
11              The problem with looking at -- there are actually two
12    paragraph 6s in plaintiffs' proposed order, the current version
13    of it.  But looking at the second paragraph 6, it says,
14    "Defendant shall not impair, suspend, or terminate the Bureau's
15    ability to perform its statutorily required functions or to
16    comply with its statutory obligations."
17              That may lead to a circumstance where plaintiffs have
18    one view of what their statutory functions are, CFPB leadership
19    may have a different view, and this Court may have a third view
20    because we haven't identified specifically what those
21    statutorily required functions are.  And that creates a risk of
22    contempt for the Agency because they're not being put on clear
23    notice as to what's required.  Instead of making their proposed
24    order narrower, they made it broader, and it's a real risk.
25              THE COURT:  I thought you might say that.  And I
```

1    personally would not be interested in having daily contempt

2    proceedings.  But how do we solve that problem?  Let's say I

3    want to issue an order.  Do I order you to give me a list of

4    statutorily required functions and tell me what -- all the

5    orders that you're telling me I should rely on in knowing that

6    everything is happening at this Agency that's supposed to

7    happen is really happening?  Should I ask you to draft a list

8    or should I ask you to tell me if there's anything on the

9    plaintiffs' list that you say is not statutorily authorized?

10          One issue of have for both of you is where -- and I

11    think I raised this the other day, but I haven't asked for your

12    answer today -- is where examinations fall in this requirement.

13    I understand that a certain level of supervision and

14    enforcement falls within the Agency may, Agency may.  They have

15    to have the offices for those offices to do what they do within

16    the discretion of the politically appointed leadership, I

17    understand that.

18          But some of the things those same organizations do is

19    to report their results of examinations to Congress, to the

20    President, various places, which enables, I guess, Congress or

21    the President to oversee whether they like -- they think the

22    enforcement division is being aggressive enough or too

23    aggressive or whatever.

24          So how do you do your reporting without doing

25    examinations?  Would you agree that examination function is

1    required?

2              MR. ROSENBERG:  Under that circumstance, it may be.

3    But, if the question is preparing a report for Congress,

4    Congress isn't a plaintiff in this case, so it's unclear how an

5    injunction from this Court would remedy a harm there.  I mean,

6    that's part of the problem.  Is that -- and the statutory

7    functions that plaintiffs have identified appear to be

8    literally everything that the Agency does.  They want -- they

9    can take --

10             THE COURT:  Isn't that what that means?  I mean, you

11   used the term more often than they did.  This term is taken

12   straight from the February 27 email and then the February --

13   and then the March 2nd email, which was actually sent to

14   someone saying, you know, "How can you dare defy my clear

15   order?"

16             MR. ROSENBERG:  If that --

17             THE COURT:  So somebody thought it was clear when

18   they wrote it in an email.  So somebody in your side knows what

19   it means.  And isn't it the same?  I don't know.  If it's not

20   the same as what plaintiffs thinks it means, then it sounds

21   like both of you need to tell me what it means because you like

22   the term as much as they do.  They've adopted it from you.

23             MR. ROSENBERG:  But what CFPB has been doing is

24   that --

25             THE COURT:  Your co-counsel is dying to say

1    something, so why don't you check in with him.

2              MR. ROSENBERG:  Let me finish the point.  As I

3    said --

4              THE COURT:  Okay.  Not that you weren't going to say

5    something good, but I wanted to make sure he got whatever he

6    was trying to get out, out.

7              MR. ROSENBERG:  You can come on up.

8              MR. HOLLAND:  I don't want to steal your thunder.

9              MR. ROSENBERG:  No.  I mean, it's -- go ahead.

10             MR. HOLLAND:  Can I just say, Your Honor, I mean,

11   this is -- the problem with this case, like, if you read *Norton*

12   and the block quotes we put in our brief from the Supreme Court

13   on these issues.  Is that the plaintiffs can't bring a claim

14   for everything the Agency is doing.  I really encourage you to

15   go back and read the block quotes from *Norton v. Southern Utah*

16   *Alliance Foundation*, or whatever it's called.  But, like, the

17   point is, right, Your Honor, Congress tasked the Agency, not

18   this Court, with going through and figuring out a process for

19   identifying how it's going to comply with each one of it's

20   statutory obligations.  That's --

21             THE COURT:  I do not want to manage this agency.  But

22   the problem they are presenting is that if I determine that

23   what's happening is that they're trying to shut it down.  And

24   if I determine that the shutdown violates the statute, and

25   that's not the way executives shut down agencies, they go --

1    just everything the congressman said in their amicus brief,

2    that they sit down and they engage in a process of saying, "We

3    don't like the CFPB, we're going to break it up."  The same way

4    they created Homeland Security or they're going to have to if

5    they decide to get rid of education, they can't just do it at

6    the White House.  They're going to have to do it on the Hill.

7    They have friendly houses of Congress on the Hill.

8         You know, whether this is popular, this Agency and

9    its work, which doesn't cost the taxpayers anything but brings

10   billions to them, whether that's popular to the constituents of

11   the members of Congress, and whether they want to fight for it

12   or not fight for it or whether they're equally happy to have

13   this work done under the umbrella of an existing agency in the

14   interest of streamlining the federal government is not a matter

15   for me to determine.

16        My only concern is until that gets determined, then

17   who gets to decide, whether it's the President or Congress.

18   If, at the end of the day, I decide or the Circuit decides or

19   the Supreme Court decides that it's only Congress, and they say

20   it's only Congress, if it's already been gotten rid of below,

21   it's too late.

22        That's what I'm trying to figure out.  What do we

23   need to say if that, I determine, is what's going on.

24        MR. HOLLAND:  I think your order is confusing the,

25   like, if I decide something and the merits is wrong, therefore

1    there's something I can do.  When, in fact, the merits are for

2    claims for wholesale supervision.  The Supreme Court has been

3    very clear that Congress devised how a court addresses this.

4    It's for a plaintiff with an -- who is injured by, like, an

5    individualized failure to act with respect to an

6    individualized, for example, consumer complaint, they can bring

7    an action under 7061.

8            THE COURT:  They aren't those people.

9            MR. HOLLAND:  That's a problem.

10           THE COURT:  They are facing the inability to be

11   served at all.  This case may or may not fit into the *Norton*

12   framework.  I will look at it.  I'm not saying I'm not going to

13   look at it.  I'm just trying to figuring out.

14           I think there are plenty of case law that talk about

15   preserving the status quo.  And your status quo is statutory

16   stuff is going on, not to worry.  And they're saying, "Not

17   really because we don't actually have the people and we don't

18   actually have the contracts.  And, so, we need some assurance."

19           Obviously the fact that you all agreed to something

20   that became a court order before had a direct and immediate

21   effect on the dismantling of this agency, your own witness

22   testified to that, your own documents demonstrate that.  But

23   the conversation hasn't ended.  It's continued.  So, the

24   question is:  What is the appropriate thing to order?  And it

25   seems to me that you're saying the term "statutory obligations"

1     is too broad and not enforceable.  And I would like to not --

2     and you're also saying I don't have the authority to do it, but

3     if I think I have the authority to do it under the unique

4     circumstances of this case, are you telling me you don't know

5     what they mean?

6               MR. ROSENBERG:  Yes.

7               THE COURT:  Okay.

8               MR. ROSENBERG:  I think there are some more

9     objections.

10              THE COURT:  All right.

11              MR. ROSENBERG:  Paragraph 5.

12              THE COURT:  Well, that's just poorly written.

13              MR. ROSENBERG:  Yes.  We can agree on that.

14              THE COURT:  What else?

15              MR. ROSENBERG:  But beyond that -- I mean, this goes

16    to -- this goes to the Vought email that plaintiffs have

17    characterized as a stop-work order.

18              THE COURT:  It is a stop-work order.

19              MR. ROSENBERG:  With exceptions.  With exceptions.

20              THE COURT:  It doesn't have an exception.  It says

21    "If you have an urgent matter, you can reach out to me."  That

22    doesn't say there's an exception for urgent matters.  You can

23    read it how you want to read it, but I think the way you've

24    been trying to read it is not true to the language.

25              MR. ROSENBERG:  Okay.  You are the factfinder here.

1    So, but what I would nonetheless say is, in some ways they are

2    two sides of the same coin.  So the reason that those emails

3    were issued in part, if not entirely, was to get operational

4    control of the Agency.  After those emails were issued,

5    testimony shows that people requested exceptions, and they were

6    granted.

7         Now, the other way one could do it, is instead of

8    saying, "No, unless I tell you yes," there could be a

9    presumption that it's yes, unless I tell you no.

10        Would paragraph 5, as written, that says, "Do not

11   enforce the order that CFPB employees and contractors stop work

12   at or for the CFPB," set that aside, it seems to be what

13   plaintiffs are requesting there, does CFPB still have the

14   discretion to make individual decisions to tell employees not

15   to do something?  Or is that something for plaintiffs, who

16   represent CFPB employees, to decide, instead of having CFPB

17   management decide.  Or to put it more bluntly, is that -- would

18   the CFPB employees, who are in court here, have this Court

19   decide what functions can continue rather than have the Agency

20   leadership itself decide?

21        And in that regard, paragraph No. 5 is confusing.

22        You know, regarding paragraph 6 and the freeze on the

23   termination of contracts, one of the issues -- and we realize

24   that the Court may disagree with this, but one of the issues

25   that we do firmly believe is that there's bloat in CFPB's

1    contracts, and that there's testimony that that goes back to

2    the prior administration.  And one of the things that CFPB is

3    trying to do is to reduce its costs, which is well within the

4    mainstream of, you know, what an agency can do.

5         And we've discussed a lot of different contacts.

6    There are various snippets based on the record that we have,

7    and it was a record that was pulled together very quickly, in a

8    matter of days, but, you know, both sides worked to pull that

9    together for the Court.  But would this require CFPB to

10   maintain all of its contracts?  It has to maintain not only the

11   contract --

12        THE COURT:  Well, the think I've been asking you to

13   work on for two weeks was which are the ones that they think

14   are essential?  I think you've shown me documents where each

15   organization is saying that, and some have been turned back on,

16   some have not been turned back on.  Some have been turned back

17   on in name only because they can't actually perform.  But, that

18   was what I thought you all were going to discuss.  You reached

19   an agreement, which is broad and has this kind of language and

20   doesn't specify contracts, and said it's going to expire next

21   Monday, when we might still be here talking.

22        So, I don't have a problem with a more narrowly

23   targeted version of that, but I don't have the expertise to

24   draft it.  So, you know, I think every time that you all put

25   your heads together in this case, there's been more clarity,

1    and something that becomes more easily enforceable, and maybe

2    something that both sides can live with.  Because I am

3    concerned that there is a disconnect between the language in

4    the, "Oh, absolutely, do your statutorily required duties,

5    that's what we want you to do," and what's actually happening

6    and what's actually going on behind the scenes and what's

7    actually being planned.

8            We're still having RIF team meetings that result, at

9    the end of the day, with nobody left.  And that may be

10    something that is allowed to happen, but I don't think it's

11    something that's allowed to happen the way it's happening.  I

12    don't think it's up to the President and Mr. Vought, or even

13    the President and the new director of the CFPB.

14            So, I want to preserve an agency that could be

15    revived, if necessary.  That doesn't mean it has to be the

16    agency that it was on January 31st.  But it has to be something

17    like what it is now or maybe even a little bit better than it

18    is now, that can limp along -- well, I think hobble was the

19    word that Mr. Pfaff used -- until we get to the merits.  I

20    don't think we can have nothing, is where I'm leaning to right

21    now.  I have not decided.  I'm thinking out loud here.

22            But I think a lot of evidence has been introduced

23    that supports a conclusion that the same people who are sitting

24    in a room and talking about RIFing are still sitting in a room

25    and talking about RIFing.  So -- and that the process for

1      restarting contracts hasn't been as smooth as advertised.

2              So I still have to think about whether I can issue

3      such an order on the record that I have now, with the

4      plaintiffs that I have now.  Given standing, given whether we

5      have final order, given whether I see a statutory violation,

6      given the *Norton* case, given all the cases that have been

7      provided to me.

8              And I'm not making fun of you, I want you to

9      understand that.  I really will look at what you think is

10     important.

11             So I have to do all those things.  And the reason I

12     don't like to tell you when I'm going to finish is because I

13     cannot tell you that -- if I'm going to come out at the end of

14     the day persuaded by one side or the other.  I am concerned

15     about the factual situation.  This was a very illuminating two

16     days.

17             And, so, the question I asked at the end of yesterday

18     was:  Are you willing to live with what you did agree to

19     between now and the ruling on the preliminary injunction?

20             MR. ROSENBERG:  We are willing to maintain the freeze

21     on the termination of contracts, you know, using the same

22     language that we had before, which is a carve out for the

23     lease, through March 28th.  Which is the end of the week that

24     you indicated you would, you know --

25             THE COURT:  All right.

1          MR. ROSENBERG:  -- endeavor to issue a decision.

2          THE COURT:  Aim for, yes.

3          MR. ROSENBERG:  With one clarification, it's our

4     understanding that if the Court issues a preliminary

5     injunction -- and to be clear, we don't think it should -- but

6     if it does, that would supersede.

7          THE COURT:  It would vacate -- okay.  Well, I would

8     like it if you all put it in writing and docket that, that

9     would be a helpful thing.

10         And I would also encourage you to think about, if

11    there are ways to draft an order -- that you don't want me to

12    issue at all -- that you find more easily understandable and

13    enforceable and that you think meets what I'm sort of referring

14    to as your minimum daily requirements.  What is -- what do I

15    have to order, as opposed to what would you like me to order.

16    And I think if you can actually agree on those things, that

17    would be great.  If you have dueling proposals for how to

18    improve what's on the table, that would be great, too.

19         So I'm not going to give you a date for that.  But I

20    think to the extent I have information like that by the end of

21    this week, that would be terrific.  And if you improve on it in

22    agreement with each other between now and when you get an order

23    from me, I'm never going to say it's too late to agree to

24    something.

25         All right.  Is there anything else anybody needs to

1    say at this moment?

2              MS. BENNETT:  No, your.

3              THE COURT:  Okay.  All right.  Thank you very much,

4    everybody.

5                              *   *   *

6

7

8

9

10              CERTIFICATE OF OFFICIAL COURT REPORTER

11

12        I, JANICE DICKMAN, do hereby certify that the above and

13    foregoing constitutes a true and accurate transcript of my

14    stenographic notes and is a full, true and complete transcript

15    of the proceedings to the best of my ability.

16                        Dated this 11th day of March, 2025

17

18

19              _____

20              Janice E. Dickman, CRR, CMR, CCR
                Official Court Reporter
21              Room 6523
                333 Constitution Avenue, N.W.
22              Washington, D.C.  20001

23

24

25

## $

**$300** [1] - 70:8

## 0

**00019** [1] - 14:5

## 1

**1** [7] - 63:3, 99:15, 99:18, 102:14, 102:20, 102:22, 112:16
**1,000** [1] - 59:11
**1-800** [3] - 74:5, 74:17, 74:20
**10** [10] - 17:9, 47:5, 47:15, 51:7, 52:8, 54:18, 54:21, 79:19, 80:4, 92:6
**10,000** [1] - 92:17
**1013** [1] - 94:24
**10th** [28] - 7:22, 11:1, 11:8, 13:4, 17:12, 18:7, 18:8, 19:24, 22:1, 24:6, 24:7, 24:13, 35:14, 37:3, 37:5, 50:14, 58:7, 59:24, 76:11, 76:20, 77:16, 77:20, 78:10, 78:22, 85:17, 90:10, 93:22, 113:7
**11** [4] - 89:23, 91:6, 91:13, 95:10
**11:01** [1] - 14:9
**11th** [5] - 7:14, 8:13, 8:15, 35:22, 37:14
**120** [1] - 74:20
**1200** [10] - 41:13, 41:19, 43:10, 45:9, 45:15, 57:10, 57:13, 62:13, 63:1, 63:4
**12th** [2] - 37:21, 38:4
**13** [1] - 31:9
**130** [1] - 45:14
**13th** [12] - 31:25, 38:15, 38:16, 45:14, 46:11, 46:25, 49:6, 49:9, 64:8, 79:9, 98:1
**144** [1] - 82:6
**14th** [14] - 19:24, 22:1, 42:4, 43:21, 43:25, 44:2, 44:10, 46:20, 49:6, 49:21, 51:7, 60:12, 60:16, 64:8
**15** [2] - 52:8, 73:2
**150** [6] - 81:18, 81:20, 81:25, 82:6, 82:15
**155** [5] - 81:18, 81:20, 81:25, 82:15
**16** [1] - 30:20

**16,000** [4] - 89:13, 92:20, 92:21, 93:3
**1700** [1] - 45:17
**19** [4] - 27:22, 30:17, 30:23, 97:23
**19th** [3] - 54:24, 60:18, 60:21
**1:00** [1] - 51:21
**1:30** [3] - 51:14, 51:21, 51:22
**1:55** [1] - 78:11

## 2

**2** [10] - 13:1, 30:10, 51:15, 51:25, 52:1, 63:4, 78:3, 79:15, 112:17
**2-10** [1] - 17:19
**20** [4] - 79:22, 80:4, 93:16, 93:17
**2011** [1] - 35:1
**2012** [1] - 35:1
**2013** [1] - 68:23
**2021** [1] - 69:3
**2025** [8] - 17:8, 17:9, 27:6, 28:2, 31:9, 85:2, 85:5, 92:6
**20th** [3] - 59:23, 60:23, 60:24
**21** [1] - 27:6
**22** [1] - 93:17
**24** [2] - 15:8, 17:7
**25-381** [1] - 3:3
**250** [1] - 89:17
**26th** [7] - 13:22, 14:9, 61:7, 92:7, 92:19, 95:10, 97:2
**27** [4] - 85:2, 85:5, 96:13, 120:12
**27th** [12] - 14:23, 30:21, 31:14, 32:4, 32:13, 60:4, 61:3, 67:2, 84:5, 84:13, 89:11, 116:4
**28** [1] - 28:2
**28th** [2] - 67:6, 128:23
**2nd** [5] - 15:8, 17:7, 17:16, 116:5, 120:13

## 3

**3** [3] - 30:10, 73:14, 78:5
**30** [6] - 28:19, 44:5, 47:21, 59:3, 59:8, 83:15
**30-day** [1] - 28:19
**300** [1] - 45:18
**31st** [1] - 127:16

**32** [4] - 18:19, 18:20, 18:21, 85:25
**350,000** [1] - 69:25
**39** [1] - 8:20
**3:30** [1] - 38:18
**3rd** [9] - 53:6, 53:8, 84:1, 85:17, 85:21, 86:3, 86:23, 89:9, 92:7

## 4

**4** [4] - 7:2, 114:10, 114:24, 114:25
**40** [3] - 27:21, 27:22, 83:15
**48-5** [1] - 116:21
**4th** [6] - 62:2, 62:3, 62:6, 62:7, 62:12, 89:12

## 5

**5** [5] - 26:20, 52:25, 124:11, 125:10, 125:21
**500** [1] - 89:15
**56** [1] - 93:13
**5:03** [2] - 53:1, 54:5
**5:59** [1] - 86:3

## 6

**6** [5] - 79:15, 84:1, 117:2, 118:13, 125:22
**60** [5] - 41:15, 41:23, 44:6, 73:3, 79:18
**606** [1] - 111:5
**6s** [1] - 118:12
**6th** [2] - 62:2, 62:3, 63:12

## 7

**7** [2] - 26:19
**700** [1] - 59:12
**7061** [1] - 123:7
**75** [3] - 89:20, 95:19, 95:24
**7500** [1] - 73:4
**7:00** [1] - 54:18
**7th** [3] - 35:9, 35:11, 75:23

## 8

**8** [3] - 17:8, 26:20, 85:1
**80** [2] - 80:7, 86:7
**81** [1] - 18:21
**85** [2] - 45:13, 80:8
**8:30** [1] - 47:3

**8th** [2] - 75:24, 76:5

## 9

**9** [7] - 13:25, 14:5, 30:18, 35:17, 94:4, 96:15, 96:17
**90** [2] - 41:15, 79:18
**90-day** [2] - 49:1, 50:22
**9th** [2] - 76:8

## A

**a.m** [7] - 14:9, 35:17, 47:15, 51:7, 84:1, 86:3, 95:10
**ability** [3] - 22:14, 113:14, 118:15
**able** [13] - 23:18, 29:4, 43:2, 43:3, 43:8, 43:20, 48:7, 72:23, 87:20, 91:11, 94:20, 105:6, 113:11
**abolished** [3] - 55:25, 56:4, 63:24
**abolishing** [1] - 50:15
**absolutely** [6] - 11:21, 24:14, 25:1, 29:11, 115:6, 127:4
**accept** [2] - 70:18, 74:22
**accepts** [1] - 74:8
**access** [3] - 88:1, 89:4, 89:5
**accessing** [1] - 87:25
**accomplish** [2] - 43:22, 49:13
**accomplished** [1] - 9:8
**according** [1] - 104:9
**account** [2] - 17:15, 17:18
**accountability** [1] - 23:21
**accurate** [3] - 29:15, 75:14, 83:8
**acquisitions** [1] - 20:22
**act** [1] - 123:5
**Act** [2] - 6:6, 111:20
**acting** [16] - 10:22, 11:1, 11:8, 13:6, 17:8, 18:6, 18:14, 35:7, 56:17, 58:25, 61:12, 62:4, 75:21, 76:2, 117:5, 118:5
**Acting** [18] - 11:6, 11:14, 17:11, 17:16, 21:6, 35:15, 36:15,

37:3, 41:9, 44:8, 46:2, 50:10, 54:13, 56:19, 60:5, 76:3, 76:10, 93:23

**action** [18] - 27:17, 36:25, 40:13, 41:5, 81:10, 101:19, 102:14, 102:16, 102:18, 102:19, 108:19, 109:8, 109:9, 109:11, 109:15, 109:17, 123:7

**actions** [6] - 27:9, 28:5, 67:10, 108:24, 109:4, 112:21

**activated** [7] - 27:8, 84:6, 84:8, 84:9, 84:10, 86:20, 88:15

**activating** [2] - 27:3, 84:2

**activities** [2] - 19:9, 25:9

**actor** [1] - 18:3

**actual** [1] - 5:18

**Adam** [33] - 35:17, 38:1, 39:15, 39:17, 41:13, 46:1, 47:8, 47:10, 48:19, 49:9, 49:23, 50:13, 51:15, 52:8, 52:10, 53:11, 53:19, 54:4, 54:8, 55:2, 55:4, 55:8, 55:21, 56:15, 58:15, 59:1, 59:16, 61:9, 61:23, 61:24, 63:13, 84:23, 98:16

**Adam's** [1] - 53:5

**add** [2] - 45:15, 118:1

**added** [1] - 76:4

**additional** [9] - 33:5, 33:7, 37:9, 37:20, 58:8, 58:14, 60:3, 61:21, 76:4

**Additional** [1] - 99:22

**address** [8] - 39:7, 75:12, 75:13, 75:14, 87:3, 94:16, 95:9, 97:25

**addressed** [5] - 93:9, 94:21, 96:9, 99:5, 107:20

**addresses** [1] - 123:3

**Administration** [2] - 5:15, 5:24

**administration** [3] - 56:16, 97:17, 126:2

**administrative** [1] - 106:9

**adopted** [1] - 120:22

**adults** [1] - 23:17

**advertised** [1] - 128:1

**advise** [3] - 6:13, 6:17, 69:13

**advised** [1] - 22:12

**adviser** [1] - 69:6

**advisor** [4] - 34:18, 52:10, 53:5, 54:7

**advisory** [7] - 4:16, 5:7, 5:8, 5:9, 6:11, 59:5

**Advisory** [1] - 6:6

**advocacy** [1] - 112:12

**affairs** [2] - 91:8, 91:9

**Affairs** [1] - 72:6

**affected** [1] - 118:9

**afraid** [1] - 65:11

**afternoon** [9] - 3:7, 3:11, 3:12, 4:7, 33:21, 38:18, 46:11, 68:16, 68:17

**agencies** [9] - 37:24, 40:2, 60:7, 61:6, 74:13, 77:6, 88:2, 88:4, 121:25

**agency** [14] - 24:12, 35:2, 55:13, 55:20, 55:24, 55:25, 56:4, 109:10, 121:21, 122:13, 123:21, 126:4, 127:14, 127:16

**Agency** [48] - 6:13, 18:12, 18:13, 19:19, 20:4, 20:9, 22:1, 22:17, 22:21, 23:15, 25:12, 50:16, 56:21, 56:24, 57:1, 57:3, 59:7, 59:20, 62:4, 100:21, 102:14, 102:16, 102:17, 102:19, 102:25, 103:1, 104:3, 104:11, 104:19, 105:9, 106:23, 106:25, 110:21, 112:6, 113:1, 113:5, 113:10, 115:6, 118:22, 119:6, 119:14, 120:8, 121:14, 121:17, 122:8, 125:4, 125:19

**agency's** [2] - 109:8, 109:9

**Agency's** [4] - 21:14, 21:15, 113:13, 117:13

**agents** [2] - 74:5, 74:20

**aggressive** [2] - 119:22, 119:23

**ago** [1] - 113:19

**agree** [9] - 82:23, 93:8, 97:12, 114:10, 119:25, 124:13, 128:18, 129:16, 129:23

**agreed** [6] - 81:16, 81:17, 111:7, 111:11, 111:24, 123:19

**agreed-upon** [1] - 111:7

**agreeing** [1] - 111:8

**agreement** [6] - 28:4, 28:21, 37:25, 105:15, 126:19, 129:22

**ahead** [6] - 4:22, 5:11, 40:24, 42:22, 52:3, 121:9

**aim** [1] - 129:2

**al** [2] - 3:3, 3:4

**alert** [2] - 94:10, 94:12

**alerted** [1] - 86:6

**Alex** [2] - 33:10, 33:13

**ALEX** [1] - 33:16

**align** [2] - 80:7, 80:9

**aligned** [2] - 31:7, 82:13

**Alison** [1] - 3:9

**Alliance** [1] - 121:16

**allow** [1] - 73:13

**allowed** [4] - 65:5, 65:6, 127:10, 127:11

**allows** [2] - 22:19, 89:3

**alluded** [1] - 51:10

**altogether** [1] - 41:14

**ambiguity** [1] - 115:24

**ambiguous** [2] - 116:3, 116:5

**American** [1] - 70:8

**Americans** [1] - 72:6

**amicus** [1] - 122:1

**amorphous** [3] - 113:17, 115:14, 115:17

**analysis** [10] - 9:24, 10:5, 10:7, 77:25, 78:14, 78:17, 79:1, 83:23, 103:19, 103:21

**analyze** [4] - 70:3, 77:16, 78:19, 78:21

**annual** [1] - 84:11

**answer** [15] - 4:18, 4:22, 4:25, 5:2, 5:4, 32:7, 55:16, 69:23, 74:18, 99:19, 108:7, 108:16, 110:3, 115:3, 119:12

**answers** [1] - 108:9

**anyway** [3] - 51:19, 101:10, 114:20

**APA** [4] - 102:15, 102:21, 107:24, 108:17

**apologize** [1] - 101:17

**appear** [1] - 120:7

**appearance** [1] - 3:6

**applies** [1] - 106:11

**apply** [2] - 106:5, 108:17

**appointed** [1] - 119:16

**appointments** [2] - 109:6, 109:14

**appraisals** [1] - 48:11

**appreciate** [1] - 110:7

**approach** [1] - 22:23

**appropriate** [4] - 16:21, 22:10, 24:3, 123:24

**approval** [2] - 94:9, 94:16

**approvals** [1] - 118:10

**approved** [4] - 13:12, 13:18, 14:16, 117:14

**arbitrary** [3] - 102:18, 103:18, 103:22

**are/no** [1] - 100:23

**area** [4] - 50:22, 82:20, 83:14, 116:24

**areas** [11] - 16:4, 41:21, 42:24, 43:24, 49:1, 49:20, 62:17, 62:18, 63:21, 80:6, 99:22

**argued** [1] - 107:8

**arguing** [1] - 95:4

**argument** [2] - 110:1, 113:13

**arguments** [1] - 105:14

**arisen** [1] - 111:14

**artery** [1] - 89:2

**aside** [1] - 125:12

**aspect** [1] - 97:9

**aspects** [1] - 110:22

**assess** [2] - 40:21

**assessment** [5] - 78:1, 84:9, 89:7, 89:10, 89:13

**assigned** [8] - 35:20, 37:8, 40:1, 44:19, 49:13, 77:21, 77:24, 88:12

**assignment** [7] - 77:19, 77:22, 78:17, 78:19, 79:8, 81:8, 81:19

**assist** [1] - 81:23

**assistance** [1] - 79:10

**assistant** [1] - 18:15

**assisting** [2] - 38:10, 71:8

**associate** [4] - 19:2, 31:3, 69:18, 95:7

**associated** [1] - 79:17

**assume** [4] - 45:4, 94:25, 99:4, 106:9

**assurance** [2] - 8:17, 123:18

**attached** [1] - 50:21

**attachment** [1] - 75:17

**attachments** [4] - 52:7, 52:11, 52:15, 87:25

**attempt** [1] - 22:4

**attempts** [1] - 25:10

**attend** [2] - 61:24, 67:4

**attended** [1] - 67:4

**attending** [1] - 61:23

**attention** [1] - 116:10

**audibly** [1] - 32:7

**audit** [3] - 71:17, 74:15, 74:16

**authored** [1] - 82:21

**authority** [2] - 124:2, 124:3

**authorization** [4] - 31:21, 84:14, 95:9, 97:13

**authorized** [8] - 18:9, 32:2, 84:3, 101:12, 101:13, 101:21, 103:3, 119:9

**avenue** [1] - 22:22

**average** [1] - 11:20

**avoid** [1] - 58:10

**awaited** [1] - 35:19

**awaiting** [2] - 89:14, 92:18

**aware** [26] - 14:19, 16:23, 16:24, 21:20, 21:21, 28:4, 30:13, 31:13, 31:15, 31:19, 31:20, 32:4, 32:16, 32:20, 51:9, 51:14, 51:23, 64:20, 66:9, 95:7, 97:16, 98:6, 98:9, 107:7, 107:11, 108:12

**Axon** [3] - 105:24, 106:4, 106:7

## B

**background** [1] - 34:24

**backlog** [5] - 89:24, 90:19, 93:3, 93:10

**backlogs** [1] - 84:10

**ball** [1] - 72:18

**bargaining** [1] - 22:18

**barring** [1] - 105:15

**based** [13] - 9:6, 12:9, 14:12, 15:10, 25:8, 28:7, 37:2, 39:22, 45:21, 75:11, 91:6, 91:13, 126:6

**Basin** [1] - 106:12

**basis** [3] - 88:4, 102:9, 115:11

**Bates** [4] - 6:23,

26:19, 27:21, 27:22

**battle** [1] - 103:13

**became** [6] - 16:2, 21:14, 21:20, 102:1, 123:20

**become** [2] - 35:8, 51:9

**becomes** [1] - 127:1

**began** [5] - 68:23, 69:3, 79:17, 81:15, 89:10

**begin** [3] - 33:22, 68:22, 69:2

**beginning** [4] - 21:18, 65:10, 70:17, 87:23

**begins** [3] - 86:9, 86:11, 99:16

**begun** [1] - 113:15

**behalf** [1] - 3:14

**behind** [2] - 104:14, 127:6

**below** [4] - 27:11, 80:6, 82:15, 122:20

**benefits** [2] - 65:3, 70:5

**BENNETT** [24] - 3:23, 11:25, 26:8, 26:15, 30:2, 33:10, 33:13, 100:11, 101:17, 101:25, 102:22, 103:7, 103:11, 103:14, 103:16, 104:17, 105:20, 105:23, 108:9, 109:2, 109:21, 110:5, 110:9, 110:13

**Bennett** [1] - 3:8

**Bessent** [1] - 76:3

**best** [3] - 41:2, 58:23, 80:10

**better** [2] - 23:12, 127:17

**between** [12] - 37:25, 85:17, 87:18, 92:6, 96:11, 101:3, 103:13, 106:10, 109:9, 127:3, 128:19, 129:22

**beyond** [2] - 84:13, 124:15

**billions** [1] - 122:10

**binder** [10] - 6:15, 6:21, 26:19, 30:10, 78:2, 79:19, 80:2, 93:12, 96:13, 98:13

**bit** [5] - 62:15, 82:6, 108:8, 113:19, 127:17

**black** [1] - 49:24

**blame** [1] - 113:24

**blank** [1] - 82:20

**blanket** [1] - 114:1

**blinder** [1] - 85:25

**bloat** [1] - 125:25

**block** [2] - 121:12, 121:15

**bluntly** [1] - 125:17

**Board** [1] - 105:16

**board** [1] - 6:11

**boards** [3] - 5:8, 5:10, 59:5

**boss** [1] - 22:13

**bottom** [2] - 79:24, 97:22

**box** [1] - 97:5

**Brad** [1] - 3:12

**Branch** [2] - 3:14, 3:16

**breaches** [1] - 71:25

**break** [2] - 67:21, 122:3

**brief** [3] - 67:21, 121:12, 122:1

**briefed** [2] - 107:22, 109:25

**briefing** [3] - 89:12, 109:22, 110:2

**briefly** [3] - 34:23, 69:22, 99:10

**bring** [5] - 72:1, 72:14, 116:10, 121:13, 123:6

**brings** [1] - 122:9

**broad** [8] - 100:20, 102:10, 114:8, 117:4, 117:13, 124:1, 126:19

**broader** [3] - 116:18, 117:1, 118:24

**brought** [2] - 44:1, 105:25

**Brown** [1] - 11:20

**budget** [1] - 23:4

**bug** [1] - 87:24

**bugs** [1] - 87:23

**build** [1] - 71:23

**building** [4] - 14:1, 14:3, 70:18, 93:10

**buildings** [1] - 5:23

**built** [1] - 88:10

**bunch** [1] - 105:7

**burden** [1] - 26:2

**Bureau** [42] - 25:2, 25:9, 34:11, 34:12, 34:17, 35:5, 35:6, 35:8, 35:13, 37:23, 37:25, 38:12, 39:2, 39:18, 40:2, 40:7, 44:18, 47:8, 47:9, 52:3, 55:19, 58:22, 64:21, 68:21, 68:22, 68:24, 69:4, 69:15, 70:4, 70:14, 71:19, 73:18, 77:11, 90:22, 96:10, 117:6, 117:19, 117:20, 118:4, 118:5, 118:8

**Bureau's** [1] - 118:14

**business** [4] - 46:18, 52:12, 52:17, 94:19

**bustling** [1] - 67:25

**button** [2] - 53:22, 54:2

**buyouts** [1] - 22:22

**BY** [47] - 4:12, 5:1, 6:8, 7:1, 7:19, 8:5, 8:19, 12:2, 12:20, 14:4, 16:16, 17:25, 18:22, 21:9, 25:3, 26:15, 30:2, 33:20, 34:2, 37:17, 40:25, 42:23, 45:6, 45:20, 49:11, 50:24, 56:10, 58:1, 60:20, 61:1, 62:22, 64:2, 65:9, 66:13, 68:15, 71:18, 73:17, 73:24, 75:6, 80:5, 82:10, 91:20, 95:6, 95:16, 98:14, 99:1, 99:12

## C

**cancel** [3] - 5:15, 59:4, 101:6

**canceled** [6] - 5:14, 35:18, 70:12, 76:19, 79:3, 88:12

**cannot** [5] - 29:4, 53:15, 107:15, 107:18, 128:13

**capacity** [1] - 60:6

**Capital** [1] - 34:18

**capital** [7] - 20:23, 35:17, 35:24, 36:7, 38:20, 47:7, 58:18

**capricious** [3] - 102:18, 103:18, 103:23

**cards** [2] - 59:5, 59:6

**careful** [1] - 113:22

**carry** [2] - 9:17, 9:18

**carrying** [1] - 15:4

**carve** [1] - 128:22

**case** [28] - 10:5, 67:7, 71:11, 84:16, 84:17, 84:24, 85:2, 85:4, 88:9, 88:21, 88:22, 89:1, 94:2, 106:4, 106:19, 108:12, 109:14, 110:9, 110:11, 113:17, 120:4, 121:11, 123:11, 123:14, 124:4, 126:25, 128:6

**Case** [1] - 3:3

**case-by-case** [1] - 10:5

**cases** [6] - 89:18, 109:6, 110:1, 110:6,

128:6
**caused** [1] - 105:8
**causing** [1] - 105:1
**CC** [1] - 78:6
**CCed** [6] - 27:1, 30:13, 30:24, 31:11, 31:20, 31:25
**center** [6] - 12:5, 12:7, 69:24, 74:4, 76:16, 76:18
**central** [1] - 89:2
**certain** [4] - 66:8, 99:4, 116:16, 119:13
**certainly** [1] - 109:3
**cessation** [1] - 107:21
**cetera** [2] - 105:16, 107:18
**CFO** [1] - 9:16
**CFPB** [70] - 4:16, 5:8, 5:20, 6:13, 6:14, 7:20, 7:24, 10:15, 10:20, 11:10, 11:11, 18:7, 19:11, 21:5, 22:3, 24:4, 24:8, 25:11, 26:19, 27:22, 30:10, 30:17, 30:20, 30:23, 34:25, 37:22, 39:4, 39:7, 54:12, 54:13, 55:2, 59:2, 59:21, 61:13, 62:24, 63:13, 66:21, 75:19, 76:21, 77:24, 78:5, 78:23, 79:22, 80:4, 91:25, 97:18, 97:23, 101:20, 102:10, 107:16, 111:17, 111:23, 112:18, 112:24, 113:1, 113:23, 114:25, 118:18, 120:23, 122:3, 125:11, 125:12, 125:13, 125:16, 125:18, 126:2, 126:9, 127:13
**CFPB's** [4] - 12:5, 19:15, 22:3, 125:25
**CFPB-specific** [1] - 6:14
**CFPB/OPM/RIF** [1] - 60:4
**CFPB_00003** [1] - 13:1
**CFPB_00006** [1] - 7:3
**CFPB_00016** [2] - 14:5, 14:8
**CFPB_00079** [1] - 18:21
**chain** [7] - 27:11, 28:10, 30:20, 30:23, 96:18, 97:22
**chair** [2] - 33:24, 68:11
**challenge** [5] - 109:10, 109:15, 113:13, 113:16

**challenges** [2] - 87:1, 111:22
**challenging** [2] - 104:12, 104:13
**change** [7] - 10:19, 22:10, 22:11, 51:9, 61:17, 64:7, 116:13
**changed** [11] - 20:9, 20:10, 46:18, 60:1, 60:2, 61:14, 63:9, 64:3, 64:5, 64:16
**changing** [2] - 114:5, 114:6
**channeled** [1] - 107:9
**chaotic** [1] - 86:24
**characterized** [1] - 124:17
**characterizing** [1] - 94:5
**charge** [4] - 35:6, 35:8, 46:10, 75:19
**chart** [4] - 81:7, 116:21, 116:22, 116:24
**charters** [1] - 5:18
**charts** [1] - 83:2
**check** [2] - 75:13, 121:1
**Chess** [1] - 3:9
**chief** [16] - 9:5, 9:9, 9:23, 10:4, 21:14, 55:12, 56:20, 68:25, 69:2, 69:12, 78:23, 91:24, 92:2, 97:17, 97:19
**choose** [2] - 22:21, 22:22
**Chris** [4] - 30:12, 31:16, 32:1, 95:7
**Christopher** [7] - 11:23, 12:3, 19:2, 31:1, 69:19, 78:4, 78:5
**chronology** [2] - 46:20, 52:21
**Circuit** [1] - 122:18
**circumstance** [2] - 118:17, 120:2
**circumstances** [2] - 22:23, 124:4
**citations** [3] - 109:6, 109:22, 110:6
**cites** [2] - 86:13, 86:15
**Citizen** [1] - 3:10
**Civil** [3] - 3:3, 3:13, 49:22
**claim** [2] - 106:11, 121:13
**claims** [9] - 105:25, 106:6, 112:7, 112:15, 113:21, 115:15, 115:17, 115:19, 123:2

**clarification** [3] - 5:12, 11:17, 129:3
**clarifies** [1] - 17:20
**clarity** [2] - 113:23, 126:25
**clause** [1] - 109:6
**clear** [33] - 5:18, 7:3, 15:2, 15:21, 16:2, 16:5, 16:6, 16:7, 16:8, 16:9, 32:16, 40:5, 41:1, 42:5, 44:1, 56:18, 64:6, 82:11, 101:1, 102:1, 103:19, 106:21, 109:7, 110:10, 113:19, 113:20, 113:21, 115:17, 118:22, 120:14, 120:17, 123:3, 129:5
**clearly** [3] - 15:25, 43:10, 107:24
**close** [10] - 33:23, 46:18, 52:12, 52:17, 71:21, 72:19, 73:22, 104:3, 104:19
**closed** [7] - 8:18, 14:1, 14:3, 55:19, 55:20, 70:9, 76:23
**closely** [6] - 71:24, 71:25, 72:2, 72:8, 72:10, 72:12
**closer** [1] - 83:15
**closing** [2] - 56:24, 59:22
**closure** [3] - 56:25, 57:3, 59:7
**clue** [1] - 25:1
**co** [1] - 120:25
**co-counsel** [1] - 120:25
**Code** [1] - 103:9
**code** [2] - 36:19, 54:19
**coders** [1] - 88:11
**codes** [1] - 63:22
**coding** [1] - 54:1
**coin** [1] - 125:2
**collapse** [1] - 91:16
**colleague** [1] - 52:24
**colleagues** [8] - 58:18, 71:22, 71:24, 72:2, 72:9, 72:13, 75:15, 87:24
**collect** [1] - 86:14
**collective** [2] - 22:18, 105:15
**collectors** [1] - 70:11
**Collins** [2] - 109:13, 110:7
**comfort** [1] - 117:9
**coming** [4] - 18:3, 25:19, 70:4, 87:2

**commencing** [1] - 84:11
**committed** [1] - 25:11
**Committee** [1] - 6:6
**committee** [1] - 6:9
**committees** [7] - 4:15, 4:16, 4:17, 5:7, 5:9, 5:22, 59:5
**communicated** [1] - 46:17
**communicating** [2] - 44:8, 54:8
**companies** [8] - 70:2, 72:14, 72:17, 73:4, 74:9, 89:3, 89:14, 90:16
**company** [8] - 71:6, 72:20, 72:22, 72:25, 77:13, 89:5, 89:16
**company's** [1] - 90:14
**comparing** [1] - 55:10
**comparison** [2] - 55:23, 56:13
**compete** [7] - 43:3, 43:5, 43:8, 43:15, 48:7, 59:17, 59:18
**competed** [1] - 30:7
**competing** [2] - 59:15, 62:18
**competition** [1] - 43:14
**competitive** [10] - 42:24, 43:24, 49:1, 50:22, 62:17, 63:18, 63:20, 63:21, 63:22, 99:22
**complaint** [16] - 70:11, 70:15, 71:7, 72:15, 73:1, 74:22, 74:23, 75:1, 75:13, 77:14, 85:15, 92:11, 93:3, 93:8, 94:21, 123:6
**complaints** [46] - 69:25, 70:4, 70:9, 70:18, 70:20, 71:10, 71:13, 72:5, 72:11, 72:17, 72:24, 73:14, 74:8, 74:12, 76:25, 77:3, 77:12, 80:15, 80:16, 84:20, 86:14, 87:18, 87:20, 89:3, 89:6, 89:13, 89:20, 90:1, 90:3, 90:6, 90:7, 90:15, 90:17, 92:14, 92:17, 93:1, 94:17, 94:25, 95:9, 95:14, 95:19, 95:25
**complete** [3] - 3:18, 43:20, 79:1
**completely** [2] - 59:22,

104:11
**comply** [6] - 5:17, 25:10, 29:18, 112:19, 118:16, 121:19
**complying** [1] - 113:1
**components** [2] - 19:12
**Computer** [1] - 76:6
**concern** [5] - 20:17, 48:2, 48:16, 109:24, 122:16
**concerned** [5] - 22:17, 35:25, 36:7, 127:3, 128:14
**concerns** [4] - 36:3, 111:14, 117:21, 117:23
**concert** [1] - 71:21
**conclude** [1] - 83:10
**conclusion** [1] - 127:23
**conditions** [1] - 10:17
**conduct** [3] - 84:9, 86:12, 90:25
**conducted** [1] - 77:25
**conducting** [2] - 9:24, 10:5
**confirm** [1] - 30:12
**confirming** [1] - 115:23
**confused** [5] - 46:1, 62:16, 62:18, 65:5, 82:3
**confusing** [3] - 102:23, 122:24, 125:21
**confusion** [1] - 86:25
**Congress** [33] - 23:22, 25:17, 40:2, 44:14, 44:15, 44:18, 44:19, 44:20, 50:2, 56:1, 56:3, 56:6, 56:11, 63:24, 64:11, 77:9, 84:12, 103:13, 106:1, 106:9, 106:17, 107:5, 119:19, 119:20, 120:3, 120:4, 121:17, 122:7, 122:11, 122:17, 122:19, 122:20, 123:3
**congressional** [2] - 71:6, 89:18
**congressman** [1] - 122:1
**connected** [1] - 31:16
**connection** [1] - 100:13
**consequences** [2] - 23:20, 81:12
**consider** [3] - 22:20, 51:16, 94:23
**considering** [1] - 51:17

**consist** [1] - 38:6
**Consistent** [1] - 86:11
**constant** [1] - 100:21
**constituents** [1] - 122:10
**constitution** [1] - 103:22
**constitutional** [2] - 103:6, 108:25
**consumer** [33] - 3:25, 9:13, 12:5, 31:3, 35:2, 35:3, 69:22, 69:23, 72:23, 73:2, 74:4, 74:21, 75:12, 75:17, 76:13, 76:25, 77:3, 77:12, 80:20, 84:19, 84:21, 85:15, 85:18, 86:14, 90:15, 92:8, 93:8, 94:16, 94:17, 95:8, 95:9, 112:12, 123:6
**Consumer** [36] - 12:4, 19:3, 34:12, 39:1, 68:21, 68:25, 69:8, 69:18, 70:14, 71:19, 76:21, 77:17, 79:6, 81:1, 83:25, 84:3, 85:22, 86:15, 87:4, 88:23, 89:8, 89:23, 90:18, 90:22, 91:7, 91:14, 91:25, 92:3, 95:18, 98:7, 98:23, 99:25, 100:1, 100:2, 100:3, 117:6
**Consumers** [1] - 72:7
**consumers** [13] - 11:24, 70:5, 70:8, 70:10, 71:3, 71:4, 72:16, 73:6, 89:5, 92:14, 96:8, 107:15, 107:16
**consumers'** [2] - 70:12, 89:4
**contact** [8] - 11:9, 12:4, 69:24, 74:4, 76:16, 76:18, 94:15, 95:17
**contacted** [1] - 79:9
**contacts** [1] - 126:5
**contain** [1] - 11:3
**contains** [1] - 6:16
**contemplated** [1] - 113:7
**contempt** [3] - 100:22, 118:22, 119:1
**contents** [2] - 81:23, 82:16
**continue** [4] - 51:16, 76:14, 76:17, 125:19
**continued** [3] - 91:8,

91:9, 123:23
**contract** [35] - 9:2, 9:8, 9:12, 9:19, 27:9, 27:17, 27:18, 28:5, 28:17, 29:23, 30:4, 74:3, 74:4, 74:7, 74:10, 74:11, 74:14, 75:11, 76:19, 85:18, 87:16, 87:17, 87:20, 87:22, 88:8, 88:12, 88:13, 88:14, 88:17, 101:11, 111:17, 126:11
**contracting** [1] - 27:25
**contractor** [2] - 111:15, 111:20
**contractors** [10] - 10:12, 10:15, 29:8, 29:10, 73:20, 74:1, 74:2, 111:15, 112:5, 125:11
**Contracts** [1] - 85:14
**contracts** [61] - 7:8, 7:10, 8:7, 8:10, 9:6, 9:17, 9:25, 10:1, 10:5, 10:7, 10:10, 10:11, 10:17, 12:5, 23:8, 23:11, 23:14, 24:10, 25:10, 26:17, 29:21, 30:14, 59:6, 75:7, 75:9, 77:17, 77:21, 78:1, 78:7, 78:12, 78:13, 78:15, 78:19, 78:21, 78:25, 79:3, 87:4, 87:7, 87:11, 88:6, 91:10, 91:14, 99:2, 99:4, 101:7, 103:25, 104:7, 104:21, 104:25, 111:14, 111:19, 111:25, 114:2, 115:9, 123:18, 125:23, 126:1, 126:10, 126:20, 128:1, 128:21
**contrary** [3] - 102:17, 103:22
**contribute** [1] - 82:16
**control** [2] - 117:10, 125:4
**conversation** [8] - 15:16, 16:2, 16:20, 31:15, 31:16, 76:15, 81:15, 123:23
**conversations** [1] - 55:11
**coordinate** [1] - 69:15
**copied** [2] - 16:24, 32:19
**coping** [1] - 16:13
**copy** [2] - 52:24, 111:18
**correct** [50] - 7:15, 8:4,

9:1, 9:14, 12:15, 13:5, 13:8, 13:19, 13:24, 17:10, 17:18, 23:1, 24:14, 27:7, 32:12, 32:14, 33:6, 34:6, 34:13, 35:12, 46:13, 48:18, 54:15, 61:8, 61:20, 62:5, 62:25, 63:10, 63:25, 66:18, 66:25, 67:3, 67:13, 73:12, 74:19, 76:8, 76:9, 78:20, 81:22, 82:14, 92:9, 92:16, 92:24, 93:5, 93:17, 93:18, 93:25, 94:7, 98:2, 103:15
**correctly** [2] - 8:25, 20:6
**correspondence** [1] - 97:6
**cost** [6] - 62:12, 62:15, 62:23, 63:5, 122:9
**costs** [1] - 126:3
**councils** [2] - 5:14, 5:19
**counsel** [9] - 3:5, 3:8, 4:18, 26:24, 27:12, 65:4, 66:8, 113:18, 120:25
**counsel's** [1] - 3:15
**count** [5] - 82:20, 82:23, 83:8, 83:14, 102:24
**Count** [3] - 102:14, 102:20, 102:22
**counting** [1] - 83:1
**counts** [6] - 71:13, 82:12, 83:12, 102:13, 102:15, 102:21
**couple** [10] - 10:2, 20:16, 22:5, 23:8, 26:16, 81:5, 84:6, 93:14, 115:13, 118:6
**course** [2] - 18:18, 94:19
**Court** [38] - 34:3, 34:8, 34:16, 34:23, 51:14, 51:17, 52:22, 52:23, 53:2, 54:23, 57:7, 65:24, 66:4, 106:6, 106:18, 108:13, 109:15, 110:11, 111:11, 111:13, 112:2, 112:8, 113:10, 113:22, 114:11, 114:12, 114:16, 114:17, 118:19, 120:5, 121:12, 121:18, 122:19, 123:2, 125:18, 125:24, 126:9, 129:4

**court** [15] - 3:20, 23:22, 32:7, 53:4, 53:13, 54:9, 64:22, 65:12, 107:12, 108:12, 114:1, 114:16, 123:3, 123:20, 125:18

**COURT** [162] - 3:11, 3:17, 3:24, 4:6, 4:24, 5:3, 5:11, 5:21, 6:1, 6:4, 6:17, 6:25, 7:17, 8:2, 8:11, 8:14, 12:1, 12:10, 12:14, 12:16, 12:19, 14:1, 15:12, 15:15, 15:18, 16:5, 16:9, 16:14, 17:19, 17:21, 18:20, 21:1, 21:5, 21:8, 22:24, 23:24, 24:7, 24:15, 24:20, 24:22, 25:21, 25:24, 26:3, 26:6, 26:9, 30:1, 33:2, 33:4, 33:8, 33:12, 33:22, 37:10, 37:16, 40:16, 42:12, 42:15, 42:20, 44:22, 45:3, 45:9, 45:15, 45:19, 50:18, 56:7, 57:25, 60:8, 60:11, 60:14, 60:19, 60:23, 60:25, 62:8, 62:11, 64:25, 65:8, 65:16, 65:20, 65:22, 66:2, 66:6, 67:16, 67:18, 67:20, 67:24, 68:7, 68:10, 68:13, 70:22, 70:25, 71:2, 72:20, 73:7, 73:10, 73:16, 73:22, 74:17, 74:25, 75:5, 80:2, 81:24, 82:3, 82:9, 91:18, 95:4, 95:12, 98:10, 98:19, 99:9, 100:6, 100:9, 100:12, 101:23, 102:11, 103:5, 103:8, 103:12, 103:15, 104:4, 105:14, 105:22, 107:19, 108:21, 109:19, 109:24, 110:7, 110:12, 110:14, 110:25, 111:2, 111:6, 113:8, 113:24, 114:19, 115:2, 115:16, 115:19, 116:2, 116:7, 116:12, 116:19, 117:3, 117:5, 117:16, 117:24, 118:25, 120:10, 120:17, 120:25, 121:4, 121:21, 123:8, 123:10, 124:7, 124:10, 124:12, 124:14, 124:18, 124:20, 126:12, 128:25, 129:2, 129:7

**court's** [2] - 57:5, 57:15

**Court's** [4] - 67:12, 105:24, 109:4, 109:5

**COURTROOM** [1] - 3:2

**courtroom** [2] - 51:25, 100:19

**courts** [1] - 107:5

**covered** [1] - 4:3

**crafting** [1] - 113:22

**CRE** [1] - 19:5

**create** [3] - 36:22, 50:22, 94:24

**created** [10] - 44:15, 47:22, 48:1, 48:14, 50:2, 55:19, 63:24, 106:9, 116:20, 122:4

**creates** [2] - 94:24, 118:21

**credit** [2] - 48:11, 70:10

**CROSS** [2] - 66:12, 91:19

**cross** [8] - 4:3, 7:6, 8:24, 9:16, 10:21, 26:10, 65:16, 91:18

**CROSS-EXAMINATION** [2] - 66:12, 91:19

**cross-examination** [7] - 4:3, 7:6, 8:24, 9:16, 10:21, 65:16, 91:18

**crossing** [1] - 64:10

**current** [12] - 3:24, 25:11, 68:24, 69:11, 75:21, 82:20, 83:14, 91:7, 91:9, 111:4, 117:18, 118:12

**D**

**daily** [3] - 88:5, 119:1, 129:14

**damage** [1] - 20:15

**dare** [1] - 120:14

**Darian** [1] - 69:17

**data** [20] - 10:11, 10:14, 10:18, 70:3, 70:19, 71:12, 74:11, 87:17, 101:6, 101:8, 111:15, 111:17, 111:18, 111:21, 112:3, 112:5, 112:14

**data-sharing** [2] - 74:11, 87:17

**database** [4] - 85:15, 90:2, 90:3, 90:8

**date** [8] - 67:6, 79:13, 79:14, 79:15, 92:7,

97:10, 98:3, 129:19

**dated** [4] - 49:5, 49:9, 78:10, 93:22

**dates** [1] - 60:9

**days** [15] - 8:13, 8:15, 20:16, 23:8, 41:15, 41:23, 45:11, 47:21, 59:3, 59:8, 73:2, 73:3, 112:4, 126:8, 128:16

**days'** [1] - 44:5

**deal** [2] - 21:11, 84:8

**dealing** [1] - 114:4

**debt** [1] - 70:11

**decide** [11] - 96:11, 104:20, 114:16, 122:5, 122:17, 122:18, 122:25, 125:16, 125:17, 125:19, 125:20

**decided** [4] - 65:12, 96:11, 117:25, 127:21

**decides** [2] - 122:18, 122:19

**decision** [21] - 54:1, 103:25, 104:3, 104:5, 104:6, 104:12, 104:18, 105:17, 105:24, 107:10, 108:11, 108:13, 108:14, 108:15, 108:18, 109:4, 111:13, 114:13, 114:17, 129:17

**decisions** [7] - 104:13, 104:21, 104:25, 105:12, 105:19, 109:5, 125:14

**declaration** [13] - 4:2, 4:3, 34:4, 58:6, 58:9, 67:7, 67:9, 84:23, 85:1, 85:10, 85:14, 94:1, 94:4

**declarations** [1] - 94:2

**deem** [1] - 102:20

**deep** [1] - 84:19

**Deepak** [1] - 3:7

**Defendant** [1] - 118:14

**defendant** [1] - 112:25

**defendant's** [3] - 6:16, 6:21, 30:10

**defendants** [1] - 112:24

**defense** [2] - 100:19, 107:21

**define** [2] - 63:17, 63:20

**defining** [2] - 62:16, 96:12

**definitely** [1] - 11:17

**defy** [1] - 120:14

**Del** [1] - 27:23

**delays** [1] - 110:3

**delete** [1] - 101:8

**deliberating** [1] - 45:22

**deliberative** [1] - 45:23

**Deloitte** [4] - 74:7, 88:8, 88:12, 88:18

**demand** [1] - 88:14

**demonstrate** [1] - 123:22

**demonstrative** [1] - 105:18

**denied** [1] - 97:10

**denying** [2] - 14:19, 14:20

**Department** [1] - 3:13

**deputy** [3] - 26:24, 27:12, 69:17

**DEPUTY** [1] - 3:2

**describe** [4] - 21:1, 67:10, 86:22, 87:15

**described** [3] - 7:9, 41:16, 48:20

**describes** [3] - 6:22, 58:6, 58:7

**describing** [1] - 57:14

**description** [3] - 6:23, 39:23

**designated** [1] - 64:20

**designed** [1] - 73:15

**designers** [1] - 80:20

**despite** [3] - 35:21, 65:11, 94:15

**detailed** [3] - 39:1, 39:10, 54:13

**details** [2] - 58:8, 58:9

**determine** [6] - 22:15, 114:5, 121:22, 121:24, 122:15, 122:23

**determined** [1] - 122:16

**devastation** [1] - 23:14

**develop** [1] - 87:23

**developed** [1] - 87:2

**developers** [1] - 88:11

**development** [2] - 74:8, 88:9

**devised** [1] - 123:3

**difference** [1] - 97:14

**different** [17] - 19:19, 21:16, 22:2, 31:10, 41:18, 64:24, 84:7, 90:12, 101:4, 108:8, 110:17, 112:11, 113:6, 113:11, 118:19, 126:5

**difficult** [1] - 91:2

**difficulty** [1] - 20:4

**direct** [6] - 3:19, 19:1, 26:12, 33:23, 97:24,

123:20
**DIRECT** [2] - 33:19, 68:14
**directed** [3] - 20:17, 24:24, 29:17
**directing** [6] - 11:9, 15:3, 50:14, 76:20, 94:5
**direction** [3] - 54:4, 56:17, 86:12
**directive** [3] - 75:24, 76:5, 94:15
**directly** [12] - 5:14, 5:19, 5:20, 13:15, 14:14, 14:15, 16:23, 32:21, 34:19, 34:20, 65:2, 69:20
**director** [20] - 11:1, 11:8, 13:6, 18:3, 18:6, 18:14, 19:3, 25:19, 31:3, 56:17, 62:4, 69:18, 75:21, 94:24, 95:1, 95:7, 117:5, 117:17, 127:13
**Director** [21] - 11:6, 11:14, 17:12, 17:17, 21:6, 35:7, 35:15, 36:15, 37:3, 41:9, 44:8, 46:2, 50:10, 54:13, 56:19, 60:6, 76:3, 76:10, 90:9, 93:23
**director's** [3] - 10:22, 17:8, 53:25
**directors** [1] - 18:15
**disagree** [3] - 83:13, 116:22, 125:24
**disconnect** [1] - 127:3
**discontinuation** [1] - 70:10
**discrete** [1] - 84:7
**discretion** [2] - 119:16, 125:14
**discretionary** [2] - 5:19, 10:1
**discuss** [3] - 36:13, 61:12, 126:18
**discussed** [13] - 21:25, 25:15, 36:8, 42:2, 44:4, 44:24, 47:16, 58:15, 60:5, 62:11, 66:19, 98:22, 126:5
**discussing** [3] - 61:9, 61:11, 65:24
**discussion** [16] - 31:17, 41:11, 41:16, 44:13, 44:17, 44:22, 45:1, 45:7, 45:22, 50:12, 56:3, 56:5, 56:11, 57:5, 62:6,

63:15
**discussions** [3] - 25:5, 25:21, 47:12
**dismantle** [2] - 62:24, 104:11
**dismantling** [2] - 106:25, 123:21
**disregard** [1] - 103:21
**disruption** [1] - 92:12
**distinct** [1] - 24:16
**dive** [1] - 84:19
**dividing** [1] - 43:1
**division** [6] - 18:15, 27:3, 31:7, 72:3, 72:5, 119:22
**Division** [8] - 3:13, 19:3, 86:15, 99:24, 99:25, 100:1, 100:3
**divisional** [1] - 79:10
**divisions** [9] - 40:6, 40:9, 40:11, 43:12, 43:24, 48:23, 50:6, 59:19, 99:23
**DL_CFPB_CRE_All** [1] - 19:4
**Docket** [1] - 116:21
**docket** [2] - 67:12, 129:8
**document** [10] - 7:5, 7:9, 8:22, 13:9, 18:24, 36:23, 37:1, 49:12, 104:4, 116:19
**documents** [4] - 100:13, 115:5, 123:22, 126:14
**Dodd** [1] - 55:20
**Dodd-Frank** [1] - 55:20
**DOE** [1] - 33:16
**Doe** [3] - 4:2, 33:10, 33:13
**DOGE** [20] - 7:11, 7:17, 20:18, 21:2, 21:19, 38:22, 38:23, 39:6, 40:19, 53:18, 54:10, 54:12, 55:4, 55:6, 60:15, 77:24, 78:13, 79:17, 81:12, 83:21
**done** [19] - 20:15, 22:16, 23:25, 24:1, 24:10, 26:4, 39:15, 44:2, 46:12, 46:17, 48:13, 48:14, 48:16, 52:13, 61:19, 70:13, 89:8, 122:13
**Dorsey** [2] - 69:17, 77:23
**dotting** [1] - 64:17
**down** [19] - 12:12,

24:11, 33:4, 51:19, 54:6, 55:13, 55:23, 56:21, 59:3, 81:25, 94:6, 100:7, 103:1, 104:3, 104:19, 117:17, 121:23, 121:25, 122:2
**draft** [4] - 83:16, 119:7, 126:24, 129:11
**drafting** [1] - 79:10
**draw** [1] - 104:18
**due** [4] - 79:13, 79:14, 79:15, 108:24
**dueling** [1] - 129:17
**Duke** [3] - 109:4, 110:10, 110:11
**duly** [2] - 33:17, 68:5
**during** [15] - 7:5, 8:24, 9:15, 10:20, 14:1, 19:24, 21:10, 22:1, 42:9, 42:25, 90:2, 92:15, 95:20, 95:25, 98:6
**duties** [9] - 64:25, 115:8, 115:22, 115:25, 116:21, 117:7, 117:9, 117:14, 127:4
**dying** [1] - 120:25

## E

**early** [1] - 22:21
**easily** [3] - 29:5, 127:1, 129:12
**ECF** [3] - 6:24, 93:15, 111:5
**echoes** [1] - 102:15
**edits** [1] - 83:18
**Education** [4] - 19:3, 69:18, 86:16, 100:4
**education** [3] - 31:4, 86:13, 122:5
**educational** [1] - 34:23
**EEOC** [1] - 112:14
**EEOC-related** [1] - 112:14
**effect** [4] - 23:13, 90:21, 115:6, 123:21
**effective** [1] - 72:16
**effectuate** [3] - 56:25, 59:7, 108:14
**efficiency** [2] - 36:14, 37:15
**effort** [2] - 51:9, 102:6
**efforts** [1] - 92:3
**eight** [1] - 48:12
**either** [7] - 11:6, 16:12, 18:9, 36:9, 40:23, 41:19, 102:20
**elaborate** [3] - 48:19,

58:23, 90:5
**elicited** [1] - 40:18
**eliminate** [3] - 43:23, 64:21, 104:11
**eliminated** [3] - 59:19, 59:20, 114:6
**eliminating** [6] - 40:9, 40:11, 43:11, 43:12, 44:14, 59:12
**elimination** [4] - 5:8, 39:20, 39:21, 50:2
**email** [84] - 7:13, 7:25, 9:2, 9:5, 9:9, 11:1, 11:3, 11:8, 12:23, 13:3, 13:7, 14:8, 14:16, 14:23, 15:8, 15:11, 15:13, 17:7, 17:8, 17:9, 17:12, 17:16, 17:17, 17:18, 17:19, 19:4, 19:7, 26:22, 27:1, 27:23, 28:8, 28:9, 28:10, 28:14, 30:11, 30:20, 30:24, 31:6, 31:9, 31:20, 32:1, 32:19, 35:15, 37:3, 37:6, 39:7, 50:13, 51:15, 51:21, 52:9, 52:13, 52:19, 76:1, 76:16, 76:20, 78:4, 78:5, 84:1, 85:24, 86:2, 86:4, 86:8, 93:22, 94:5, 94:8, 94:9, 95:3, 95:8, 95:11, 96:18, 96:25, 97:1, 97:4, 97:5, 97:22, 97:23, 97:25, 120:12, 120:13, 120:18, 124:16
**emails** [14] - 14:25, 15:2, 15:3, 15:23, 16:13, 16:24, 18:6, 18:8, 32:13, 54:17, 116:3, 117:8, 125:2, 125:4
**employee** [7] - 35:4, 43:13, 47:25, 48:6, 96:10, 112:24, 113:1
**employees** [53] - 11:11, 11:12, 14:21, 19:5, 19:6, 22:20, 24:9, 35:22, 36:10, 36:11, 37:19, 41:14, 41:17, 41:19, 42:25, 43:17, 45:11, 45:12, 46:9, 47:19, 65:4, 70:14, 71:19, 73:18, 75:25, 76:21, 83:6, 84:6, 84:7, 84:9, 84:10, 101:6, 104:1, 104:6, 104:21, 105:1, 106:10, 107:1, 107:14, 107:16, 112:18, 114:2, 115:9,

116:16, 117:16, 117:21, 118:3, 125:11, 125:14, 125:16, 125:18
**Employees** [1] - 3:3
**employers** [1] - 106:11
**employment** [1] - 48:5
**en** [3] - 104:1, 104:2
**enable** [1] - 73:7
**enables** [2] - 101:12, 119:20
**encourage** [2] - 121:14, 129:10
**end** [15] - 20:5, 24:3, 24:19, 25:1, 30:23, 57:10, 98:15, 100:9, 122:18, 127:9, 128:13, 128:17, 128:23, 129:20
**endeavor** [1] - 129:1
**ended** [1] - 123:23
**enforce** [2] - 101:10, 125:11
**enforceable** [4] - 101:1, 124:1, 127:1, 129:13
**enforcement** [3] - 72:13, 119:14, 119:22
**Enforcement** [2] - 49:22, 50:3
**engage** [2] - 113:14, 122:2
**engaging** [1] - 113:5
**engineer** [1] - 39:6
**enjoined** [2] - 104:23, 108:20
**enjoins** [1] - 108:13
**ensure** [5] - 15:4, 18:16, 19:12, 69:12, 75:13
**ensuring** [2] - 12:11, 18:10
**entail** [2] - 48:21, 69:11
**enter** [1] - 112:9
**entered** [2] - 28:4, 29:22
**enters** [1] - 112:8
**entire** [10] - 40:9, 40:11, 43:12, 43:23, 50:2, 50:5, 59:19, 63:24, 71:23, 98:6
**entirely** [2] - 25:20, 125:3
**entitled** [1] - 43:5
**environment** [1] - 88:10
**equally** [1] - 122:12
**equivalent** [1] - 114:14
**Ernst** [2] - 74:10,

87:16
**escalated** [6] - 71:11, 84:16, 84:17, 84:18, 85:2, 85:4
**especially** [1] - 101:25
**essential** [2] - 89:5, 126:14
**essentially** [4] - 71:17, 102:15, 102:25, 111:7
**establish** [1] - 49:1
**establishes** [1] - 103:10
**estimate** [4] - 62:13, 62:15, 63:5, 92:17
**estimates** [1] - 62:23
**et** [4] - 3:3, 3:4, 105:16, 107:18
**evaluate** [1] - 117:23
**evening** [4] - 35:11, 77:23, 78:16, 83:7
**event** [1] - 115:1
**eventually** [1] - 76:15
**evidence** [2] - 108:10, 127:22
**evidentiary** [1] - 100:22
**exact** [1] - 20:3
**exactly** [2] - 58:21, 73:9
**examination** [9] - 4:3, 7:6, 8:24, 9:16, 10:21, 65:16, 91:18, 97:24, 119:25
**EXAMINATION** [7] - 4:11, 26:14, 33:19, 66:12, 68:14, 91:19, 99:11
**examinations** [3] - 119:12, 119:19, 119:25
**examined** [2] - 33:18, 68:6
**example** [8] - 25:17, 29:13, 83:12, 85:3, 87:15, 109:13, 112:13, 123:6
**examples** [1] - 80:11
**except** [1] - 112:24
**exception** [10] - 48:25, 50:7, 50:19, 50:22, 51:1, 108:5, 118:1, 124:20, 124:22
**exceptions** [7] - 11:3, 44:11, 47:2, 108:4, 124:19, 125:5
**exchange** [3] - 4:20, 14:16, 30:21
**exclude** [2] - 40:22, 40:23
**excused** [2] - 33:4, 67:20

**execute** [1] - 100:18
**executive** [6] - 11:5, 36:14, 37:11, 41:7, 41:8, 50:10
**executives** [1] - 121:25
**exhibit** [1] - 6:22
**Exhibit** [4] - 49:8, 93:15, 98:13, 99:13
**exhibits** [4] - 6:16, 6:21, 6:23, 93:14
**existence** [2] - 105:15, 115:7
**existing** [1] - 122:13
**expect** [1] - 23:5
**expected** [1] - 20:12
**experience** [4] - 38:11, 80:20, 91:6, 91:13
**experienced** [4] - 89:24, 90:3, 92:11, 100:23
**expertise** [1] - 126:23
**experts** [2] - 41:18, 59:13
**expire** [1] - 126:20
**expired** [1] - 83:4
**explain** [11] - 34:8, 36:2, 36:20, 37:5, 48:4, 63:19, 80:10, 88:25, 90:24, 91:4, 101:15
**explained** [4] - 39:18, 43:10, 49:19, 108:22
**explaining** [2] - 55:10, 55:11
**explanation** [1] - 50:13
**explicit** [1] - 106:14
**extended** [2] - 76:1, 114:13
**extent** [4] - 71:4, 103:20, 108:16, 129:20
**extra** [1] - 48:10
**extraordinary** [5] - 106:6, 106:8, 106:11, 106:19, 112:8

**F**

**FACA** [3] - 5:14, 5:25, 6:5
**face** [1] - 20:5
**faces** [1] - 42:16
**facet** [1] - 76:14
**facing** [2] - 9:13, 123:10
**fact** [12] - 11:13, 13:21, 43:11, 53:1, 54:16, 67:1, 92:17, 98:12, 108:23, 114:7,

123:1, 123:19
**factfinder** [1] - 124:25
**factor** [1] - 106:20
**factors** [2] - 106:13, 106:17
**factual** [1] - 128:15
**failure** [1] - 123:5
**fair** [5] - 15:5, 64:17, 66:11, 111:6, 114:23
**fall** [1] - 119:12
**falls** [1] - 119:14
**familiar** [1] - 118:4
**family** [1] - 68:19
**far** [1] - 64:20
**fashion** [3] - 23:25, 24:1, 24:17
**faster** [1] - 51:11
**feared** [1] - 34:10
**February** [73] - 7:14, 11:1, 11:8, 13:4, 13:22, 14:9, 14:23, 17:8, 17:9, 17:12, 18:7, 19:24, 22:1, 27:6, 28:2, 30:21, 31:9, 31:25, 32:13, 35:9, 35:11, 35:14, 37:3, 37:5, 37:14, 37:21, 38:4, 38:15, 38:16, 42:4, 46:20, 49:9, 50:14, 54:24, 59:23, 60:12, 61:3, 61:7, 64:7, 64:8, 67:2, 67:6, 69:3, 75:23, 75:24, 76:5, 76:8, 76:11, 76:20, 77:16, 77:20, 78:10, 78:22, 79:9, 84:5, 84:13, 85:2, 85:5, 85:17, 89:11, 90:10, 92:6, 92:7, 92:19, 93:22, 95:10, 97:2, 98:1, 113:7, 116:4, 120:12
**federal** [12] - 22:9, 35:3, 35:4, 48:5, 60:7, 74:12, 75:4, 87:18, 88:2, 88:3, 92:18, 122:14
**Federal** [4] - 3:14, 3:16, 6:6, 111:20
**fell** [1] - 48:7
**felt** [3] - 20:24, 81:13, 116:9
**few** [14] - 63:13, 66:14, 69:23, 76:4, 80:11, 84:7, 84:10, 99:2, 100:14, 101:20, 102:8, 110:14, 113:19
**fields** [3] - 47:23, 48:12, 54:19
**fight** [2] - 122:11, 122:12

**fights** [1] - 106:10
**figure** [3] - 17:24, 108:6, 122:22
**figured** [1] - 68:19
**figuring** [3] - 24:2, 121:18, 123:13
**file** [1] - 6:22
**filed** [2] - 57:12, 67:12
**final** [16] - 29:21, 62:13, 63:1, 73:3, 82:21, 83:19, 102:16, 102:17, 104:5, 108:1, 108:11, 108:13, 108:14, 108:18, 114:17, 128:5
**finality** [2] - 107:24, 108:7
**finalization** [1] - 28:18
**finalized** [1] - 30:4
**finalizing** [1] - 28:17
**finally** [5] - 29:23, 71:16, 72:12, 91:15, 99:3
**Finance** [1] - 117:6
**Financial** [3] - 34:12, 39:2, 68:21
**financial** [8] - 9:5, 9:9, 9:23, 10:4, 74:21, 78:23, 78:24, 86:13
**finish** [4] - 4:6, 12:1, 121:2, 128:12
**fire** [8] - 20:20, 101:6, 101:8, 102:6, 103:25, 104:21, 104:25, 105:17
**fired** [4] - 35:22, 49:25, 105:1, 106:24
**firing** [5] - 36:11, 37:6, 50:15, 103:4, 106:24
**firmly** [1] - 125:25
**first** [37] - 4:24, 14:7, 14:10, 14:13, 20:11, 20:24, 21:14, 33:10, 33:17, 35:13, 38:14, 38:19, 42:5, 44:14, 44:18, 46:10, 46:23, 49:2, 49:4, 49:12, 51:3, 56:12, 57:7, 68:5, 72:23, 85:8, 85:14, 86:3, 94:4, 96:15, 96:22, 97:1, 97:7, 106:20, 108:10, 111:6, 112:1
**fit** [1] - 123:11
**five** [5] - 35:4, 79:2, 79:4, 87:8, 87:12
**fix** [2] - 102:23, 104:16
**FLRA** [3] - 106:3, 107:2, 107:6
**fluctuations** [1] - 96:2
**flurry** [1] - 32:13

**focus** [1] - 58:4
**focused** [3] - 39:20, 55:8, 57:9
**focusing** [1] - 57:18
**FOIA** [1] - 80:21
**folk** [1] - 7:17
**folks** [6] - 7:11, 16:1, 21:19, 70:17, 92:25, 95:17
**follow** [5] - 10:16, 16:17, 18:1, 22:12, 24:25
**followed** [2] - 22:18, 76:11
**following** [3] - 23:20, 61:2, 85:9
**follows** [2] - 33:18, 68:6
**for-cause** [1] - 107:7
**force** [14] - 21:6, 37:23, 38:11, 41:12, 41:21, 42:25, 43:4, 47:21, 62:14, 64:7, 79:12, 88:10, 88:11, 113:1
**foreclosed** [1] - 106:21
**foreclosure** [5] - 84:22, 89:21, 92:23, 94:21, 95:13
**foreclosures** [4] - 70:12, 95:18, 95:19, 95:25
**forget** [2] - 20:2, 37:13
**fork** [1] - 83:4
**fork-in-the-road** [1] - 83:4
**form** [3] - 34:4, 75:13, 112:9
**formal** [4] - 18:3, 41:22, 42:3, 100:3
**forth** [2] - 30:11, 54:18
**fortunately** [1] - 22:6
**forward** [5] - 35:10, 52:13, 58:11, 65:12, 91:5
**forwarded** [1] - 28:9
**foundation** [2] - 44:21, 64:1
**Foundation** [1] - 121:16
**four** [2] - 5:13, 38:20
**framework** [1] - 123:12
**Frank** [1] - 55:20
**free** [2] - 80:12, 80:13
**freeze** [3] - 111:24, 125:22, 128:20
**Friday** [9] - 44:10, 46:19, 51:7, 54:5,

54:21, 59:11, 60:11, 64:8, 75:23
**FRIEDMAN** [13] - 68:2, 68:15, 71:18, 73:17, 73:24, 75:6, 80:4, 80:5, 82:10, 91:17, 99:10, 99:12, 100:5
**Friedman** [1] - 3:9
**friendly** [1] - 122:7
**friends** [1] - 113:17
**frightening** [1] - 20:11
**front** [2] - 93:12, 101:18
**fulfil** [1] - 80:21
**fulfilling** [2] - 25:12, 113:5
**full** [3] - 37:13, 86:17, 118:7
**full-time** [1] - 86:17
**fulsome** [1] - 4:18
**fun** [1] - 128:8
**function** [10] - 9:18, 9:20, 71:17, 74:15, 74:16, 75:2, 83:11, 101:5, 119:25
**functional** [1] - 80:6
**functionally** [1] - 112:21
**functioning** [2] - 103:1, 117:19
**functions** [27] - 15:4, 19:19, 21:14, 21:15, 24:4, 25:12, 31:6, 39:19, 39:22, 39:25, 40:1, 44:18, 55:9, 55:14, 55:21, 69:15, 70:16, 101:12, 101:14, 101:21, 103:3, 118:15, 118:18, 118:21, 119:4, 120:7, 125:19
**furthers** [1] - 100:5
**future** [1] - 23:13

**G**

**Gabriel** [1] - 3:9
**game** [1] - 24:3
**gather** [2] - 46:16, 47:25
**gathering** [1] - 48:1
**gears** [1] - 75:19
**general** [3] - 26:24, 27:12, 110:18
**General** [2] - 5:15, 5:24
**generally** [2] - 101:20, 112:6
**generous** [1] - 86:24
**gentleman** [1] - 79:16
**genuinely** [1] - 17:6

**given** [13] - 11:17, 37:20, 40:13, 40:21, 44:4, 46:14, 47:2, 105:14, 128:4, 128:5, 128:6
**goal** [6] - 4:6, 24:17, 24:18, 24:19, 105:18, 106:25
**governing** [1] - 71:12
**government** [16] - 10:18, 20:13, 22:8, 23:6, 23:19, 23:20, 33:5, 34:24, 36:14, 37:15, 71:6, 89:16, 107:4, 107:8, 110:15, 122:14
**government's** [2] - 78:2, 112:20
**grab** [1] - 105:21
**graduated** [1] - 35:1
**granted** [2] - 108:5, 125:6
**granting** [1] - 115:11
**great** [5] - 6:25, 21:11, 33:13, 129:17, 129:18
**grievance** [1] - 106:3
**group** [7] - 31:10, 32:1, 42:25, 55:1, 62:20, 67:24, 74:14
**Group** [1] - 3:10
**groups** [5] - 43:1, 43:19, 43:24, 62:17, 112:13
**grown** [1] - 118:9
**grownups** [1] - 24:2
**GSA** [2] - 5:20, 5:21
**guess** [1] - 119:20
**guidance** [12] - 9:17, 18:17, 19:7, 22:7, 22:9, 22:12, 24:24, 58:20, 60:5, 60:7, 65:4, 65:7
**GUPTA** [22] - 3:7, 4:4, 33:20, 34:2, 37:17, 40:25, 42:23, 45:2, 45:6, 45:20, 49:7, 49:11, 50:24, 56:10, 58:1, 60:20, 60:24, 61:1, 62:22, 64:2, 65:9, 67:19
**Gupta** [2] - 3:7, 3:9

**H**

**half** [1] - 70:9
**halt** [1] - 8:17
**hammered** [1] - 114:22
**handful** [1] - 27:3
**handle** [2] - 22:10, 69:25

**handling** [4] - 77:5, 77:8, 92:11, 94:25
**hands** [1] - 18:7
**happy** [6] - 67:24, 102:23, 109:21, 110:6, 111:3, 122:12
**hard** [2] - 100:16, 113:24
**harm** [4] - 104:22, 105:1, 110:19, 120:5
**head** [14] - 3:23, 6:13, 11:23, 12:3, 18:12, 18:13, 54:3, 57:21, 59:25, 63:8, 82:20, 82:23, 83:12, 83:14
**heads** [4] - 18:15, 19:11, 83:2, 126:25
**hear** [1] - 3:24
**heard** [14] - 53:11, 59:14, 83:22, 97:21, 100:12, 102:1, 102:5, 104:23, 105:5, 107:15, 108:10, 112:18, 116:1, 116:8
**hearing** [6] - 51:14, 51:23, 51:24, 60:11, 100:16, 105:6
**hearsay** [2] - 40:15, 40:20
**held** [3] - 10:14, 111:19, 112:5
**help** [6] - 16:1, 62:25, 63:17, 72:1, 72:3, 72:14
**helped** [1] - 63:3
**helpful** [2] - 23:2, 129:9
**helping** [2] - 65:7, 72:16
**helps** [1] - 74:9
**Hi** [1] - 86:9
**highlighted** [1] - 79:24
**Hill** [2] - 122:6, 122:7
**himself** [3] - 13:21, 18:4, 97:7
**hit** [1] - 53:22
**hobble** [2] - 91:10, 127:18
**hold** [3] - 43:3, 43:8, 58:5
**holiday** [1] - 60:17
**Holland** [1] - 3:15
**HOLLAND** [11] - 91:20, 95:6, 95:16, 98:11, 98:14, 98:21, 99:1, 121:8, 121:10, 122:24, 123:9
**Homeland** [1] - 122:4
**Honor** [9] - 3:7, 3:12, 4:4, 33:7, 98:11, 98:22,

100:11, 121:10, 121:17
**hope** [3] - 20:8, 21:24, 53:15
**hoped** [1] - 54:8
**hoping** [1] - 58:10
**hostile** [2] - 20:23, 21:1
**hotline** [1] - 70:20
**hours** [1] - 81:6
**House** [2] - 59:4, 122:6
**house** [1] - 21:19
**housed** [1] - 75:9
**housekeeping** [1] - 65:21
**houses** [1] - 122:7
**hover** [1] - 39:5
**hum** [9] - 28:1, 30:22, 32:3, 39:8, 40:12, 49:10, 49:15, 51:8, 60:13
**Human** [1] - 34:18
**human** [9] - 20:22, 35:17, 35:24, 36:7, 38:20, 47:7, 58:18, 74:17, 77:12

# I

**idea** [3] - 43:2, 43:4, 96:7
**identification** [2] - 34:10, 58:10
**identified** [21] - 7:9, 7:10, 10:2, 31:6, 31:21, 41:21, 43:19, 78:13, 79:2, 86:19, 87:8, 87:12, 87:24, 99:22, 102:7, 108:22, 116:16, 117:14, 118:20, 120:7
**identifies** [1] - 78:7
**identify** [9] - 37:10, 55:15, 72:3, 78:25, 88:16, 117:16, 117:17, 117:21, 118:2
**identifying** [2] - 102:2, 121:19
**ignored** [1] - 32:17
**ill** [1] - 24:1
**ill-informed** [1] - 24:1
**illegal** [3] - 58:13, 64:13, 109:9
**illuminating** [1] - 128:15
**imagine** [1] - 96:5
**immanent** [1] - 89:21
**immediate** [4] - 41:13, 41:15, 41:16, 123:20
**immediately** [1] - 46:3
**imminent** [7] - 70:12,

84:21, 92:23, 94:21, 95:18, 95:19, 95:25
**impact** [5] - 41:13, 41:16, 89:7, 90:9, 91:4
**impacted** [1] - 90:22
**impacts** [1] - 89:12
**impair** [2] - 101:19, 118:14
**implement** [2] - 45:24, 45:25
**implementing** [1] - 56:12
**implied** [3] - 57:17, 58:3, 106:15
**important** [6] - 24:4, 49:18, 58:12, 65:13, 88:22, 128:10
**impression** [2] - 21:18, 24:16
**improve** [2] - 129:18, 129:21
**improving** [1] - 36:14
**in-house** [1] - 21:19
**inability** [1] - 123:10
**incentive** [1] - 22:20
**include** [5] - 80:19, 80:20, 81:16, 86:18
**included** [6] - 36:12, 36:17, 36:23, 37:1, 37:2, 81:14
**includes** [3] - 70:3, 71:2, 74:17
**including** [9] - 5:8, 38:20, 39:14, 55:2, 88:2, 99:23, 101:20, 102:6, 104:24
**incorrect** [1] - 116:15
**increased** [1] - 90:17
**increasing** [1] - 37:14
**incredibly** [1] - 23:9
**indeed** [1] - 50:15
**independent** [1] - 74:15
**indicate** [1] - 16:22
**indicated** [7] - 4:17, 4:19, 65:25, 84:21, 89:20, 113:18, 128:24
**indicates** [1] - 97:1
**indicating** [1] - 36:4
**individual** [4] - 10:11, 43:16, 47:24, 125:14
**individualized** [2] - 123:5, 123:6
**individuals** [2] - 31:17, 117:13
**inferred** [1] - 16:18
**informal** [1] - 41:20
**information** [14] - 23:15, 40:17, 46:16, 47:24, 47:25, 48:6,

48:8, 48:10, 51:13, 58:20, 71:14, 74:21, 88:3, 129:20
**informed** [8] - 24:1, 37:21, 42:2, 42:18, 43:18, 52:24, 55:21, 59:9
**informing** [1] - 51:23
**infrastructure** [1] - 11:18
**infrequent** [1] - 95:17
**initial** [5] - 12:21, 39:13, 46:16, 73:2, 114:8
**initiatives** [1] - 69:14
**injunction** [14] - 100:25, 111:12, 112:3, 112:8, 112:9, 112:23, 113:4, 113:9, 113:23, 114:13, 117:1, 120:5, 128:19, 129:5
**injunctive** [3] - 102:11, 104:14, 112:10
**injured** [6] - 109:3, 109:16, 109:17, 123:4
**injures** [1] - 109:11
**injury** [3] - 108:23, 109:3, 109:7
**innovation** [2] - 71:22, 75:16
**insides** [1] - 88:11
**insisted** [1] - 53:12
**installed** [1] - 21:3
**instead** [4] - 44:6, 118:23, 125:7, 125:16
**instruct** [1] - 52:16
**instructed** [3] - 46:8, 52:9, 59:4
**instruction** [1] - 7:11
**instructions** [2] - 35:19, 35:20
**intact** [2] - 85:16, 85:18
**IntelliTrack** [2] - 9:2, 9:12
**intended** [1] - 106:1
**intending** [1] - 106:18
**intends** [1] - 112:18
**intent** [3] - 104:8, 104:14, 106:25
**intention** [1] - 82:7
**intentionally** [1] - 116:15
**interact** [1] - 23:18
**interacted** [3] - 20:25, 21:11, 21:12
**interacting** [1] - 71:7
**interaction** [1] - 7:21
**interconnected** [1] - 102:2

**interest** [1] - 122:14
**interested** [2] - 101:24, 119:1
**interfere** [1] - 101:19
**interim** [5] - 31:19, 32:17, 102:4, 104:15, 115:20
**interm** [1] - 102:8
**internal** [4] - 47:9, 58:17, 62:8, 88:1
**internally** [1] - 36:20
**interrupt** [1] - 60:8
**interrupted** [1] - 108:11
**intervene** [1] - 73:13
**intervention** [1] - 77:13
**introduce** [3] - 13:21, 100:10, 100:17
**introduced** [1] - 127:22
**introducing** [1] - 97:7
**introductions** [1] - 39:13
**invariably** [1] - 87:23
**inventory** [1] - 23:13
**investigate** [3] - 80:14, 80:16, 86:14
**investigating** [2] - 71:10, 77:2
**investigation** [2] - 70:3, 71:9
**investigations** [4] - 69:5, 83:14, 84:18, 84:19
**investigator** [1] - 69:7
**invite** [1] - 72:4
**invited** [2] - 117:22, 117:24
**involve** [4] - 9:13, 38:9, 43:7, 75:8
**involved** [2] - 52:2, 92:22
**involvement** [1] - 73:10
**irrelevant** [1] - 109:12
**irreparable** [5] - 20:18, 104:22, 104:25, 105:3, 110:19
**issue** [17] - 66:6, 75:24, 76:10, 99:2, 107:19, 109:1, 111:21, 111:25, 112:2, 112:25, 113:10, 114:14, 119:3, 119:10, 128:2, 129:1, 129:12
**issued** [15] - 7:25, 22:13, 52:22, 52:23, 53:2, 57:7, 61:6, 76:12, 101:1, 114:1, 114:13,

116:4, 116:5, 125:3, 125:4
**issues** [14] - 6:14, 84:8, 84:19, 90:4, 96:8, 99:3, 99:5, 99:7, 109:25, 111:14, 121:13, 125:23, 125:24, 129:4
**itself** [4] - 23:4, 50:5, 125:20

**J**

**January** [1] - 127:16
**Jason** [1] - 11:20
**Jennifer** [1] - 3:8
**Jeremy** [12] - 38:25, 39:9, 41:24, 41:25, 42:6, 42:7, 42:9, 42:12, 42:18, 79:17, 83:20
**JJ** [5] - 49:8, 98:13, 98:17, 98:18, 99:13
**job** [3] - 48:7, 49:20, 69:11
**jobs** [4] - 43:14, 48:8, 57:2, 107:2
**Johnson** [36] - 11:23, 12:3, 12:21, 13:3, 13:21, 14:8, 14:13, 19:2, 30:13, 31:1, 31:17, 32:1, 69:19, 69:20, 77:21, 77:22, 78:5, 79:9, 81:13, 81:15, 82:18, 83:17, 83:18, 84:1, 85:8, 85:11, 85:12, 85:24, 86:3, 86:8, 95:7, 96:22, 97:1, 97:14, 97:16, 97:19
**Johnson's** [4] - 13:10, 97:4, 97:9, 97:12
**joint** [1] - 60:4
**jointly** [1] - 61:6
**Jordan** [8] - 38:25, 39:3, 41:24, 44:3, 44:7, 77:23, 79:16, 83:20
**Jordan's** [1] - 41:25
**judge** [1] - 101:10
**Judge** [2] - 33:3, 115:21
**jurisdiction** [6] - 105:16, 105:23, 106:15, 106:17, 106:18, 110:19
**jury** [1] - 40:20
**Justice** [1] - 3:13
**justification** [10] - 9:6, 36:9, 36:11, 36:13, 37:2, 37:6, 37:12, 41:5, 50:8, 50:15

**justifications** [2] - 36:18, 37:1
**justify** [1] - 105:13

**K**

**keep** [7] - 24:10, 43:3, 54:16, 56:25, 59:6, 81:24, 101:5
**keeping** [1] - 12:11
**kept** [2] - 42:18, 53:12
**kind** [6] - 36:4, 48:6, 57:13, 97:2, 106:18, 126:19
**knowing** [1] - 119:5
**knowledge** [1] - 10:14, 15:12, 15:15, 21:13, 21:15, 29:7, 63:8, 64:3, 64:6, 118:7, 118:8
**known** [2] - 83:3, 95:12
**knows** [3] - 30:1, 53:16, 120:18

**L**

**labeling** [1] - 102:23
**labor** [1] - 75:8
**lack** [3] - 44:21, 64:1, 113:25
**laid** [3] - 41:23, 47:21, 59:11
**language** [7] - 20:3, 35:25, 36:7, 124:24, 126:19, 127:3, 128:22
**laptop** [1] - 76:23
**large** [3] - 90:6, 93:3, 93:9
**larger** [2] - 78:6, 116:18
**largest** [1] - 74:3
**last** [17] - 6:12, 10:10, 23:8, 25:7, 62:1, 63:2, 63:6, 63:11, 63:20, 63:23, 64:3, 67:4, 70:8, 73:14, 87:23, 100:16, 105:6
**late** [4] - 35:10, 46:25, 122:21, 129:23
**law** [5] - 35:1, 56:2, 102:17, 103:22, 123:14
**lawsuit** [1] - 52:2
**lay** [1] - 62:25
**lead** [3] - 37:22, 38:2, 118:17
**leader** [2] - 49:13, 61:17, 64:20
**leaders** [1] - 69:14
**leadership** [14] - 5:20,

25:11, 52:14, 55:12, 56:18, 58:25, 61:12, 64:14, 64:15, 117:20, 118:5, 118:18, 119:16, 125:20
**leading** [4] - 11:25, 38:6, 57:24, 92:3
**leads** [2] - 35:17, 55:7
**lean** [1] - 68:10
**leaning** [1] - 127:20
**learn** [4] - 48:20, 85:22, 90:1, 90:14
**learned** [1] - 90:9
**learning** [1] - 63:18
**lease** [1] - 128:23
**least** [9] - 8:16, 11:19, 28:5, 92:18, 95:10, 96:3, 103:2, 112:1, 115:7
**leave** [2] - 22:21, 43:13
**leaving** [1] - 42:18
**led** [1] - 39:12
**left** [9] - 43:6, 43:17, 43:18, 45:16, 48:8, 49:20, 98:7, 107:1, 127:9
**legacy** [1] - 55:21
**legal** [9] - 21:14, 27:3, 55:12, 56:20, 72:8, 72:9, 97:17, 97:19, 115:1
**legitimately** [1] - 59:2
**length** [1] - 67:9
**lengthier** [1] - 43:20
**lengthily** [1] - 26:10
**lengthy** [1] - 116:21
**less** [6] - 81:25, 82:6, 113:19, 113:20, 113:21
**letters** [1] - 36:12
**letting** [4] - 14:21, 47:20, 49:23, 51:15
**level** [3] - 63:22, 91:11, 119:13
**levels** [2] - 63:18, 63:21
**Lewin** [3] - 38:25, 39:9, 42:7
**Liam** [1] - 3:15
**lids** [1] - 76:23
**life** [1] - 65:3
**lifted** [1] - 64:22
**light** [1] - 86:12
**lights** [1] - 12:11
**likelihood** [1] - 102:12
**likely** [2] - 22:10, 83:6
**limit** [2] - 102:8, 114:15
**limited** [1] - 84:5
**limiting** [1] - 102:2

**limp** [1] - 127:18
**line** [3] - 70:7, 78:6, 86:9
**list** [6] - 6:22, 76:1, 78:16, 119:3, 119:7, 119:9
**listed** [6] - 39:6, 48:22, 80:6, 82:14, 86:20, 86:21
**lists** [1] - 83:14
**literally** [3] - 16:3, 17:3, 120:8
**Litigation** [1] - 3:10
**Liu** [1] - 3:10
**live** [2] - 127:2, 128:18
**loan** [2] - 107:17, 107:18
**loans** [1] - 70:12
**local** [1] - 62:18
**logged** [3] - 35:15, 54:11, 54:17
**logical** [1] - 24:3
**look** [16] - 12:22, 12:23, 13:25, 14:7, 14:10, 23:3, 23:4, 28:9, 38:13, 100:16, 106:7, 117:1, 123:12, 123:13, 128:9
**looked** [1] - 78:16
**looking** [10] - 24:2, 26:6, 79:20, 83:2, 85:25, 106:15, 110:4, 111:4, 118:11, 118:13
**looks** [1] - 97:14
**loop** [1] - 58:19
**lose** [1] - 57:2
**lost** [1] - 60:9
**loud** [1] - 127:21

**M**

**ma'am** [2] - 8:4, 25:23
**Mahoney** [2] - 98:16, 99:16
**main** [1] - 100:18
**mainstream** [1] - 126:4
**maintain** [4] - 12:12, 126:10, 128:20
**maintaining** [2] - 29:13, 29:15
**malicious** [1] - 75:18
**malware** [1] - 75:18
**manage** [2] - 80:13, 121:21
**management** [15] - 22:11, 22:15, 71:11, 71:14, 82:21, 84:16, 84:17, 85:3, 85:4, 88:9, 88:22, 89:1, 99:5,
125:17
**manager** [1] - 69:6
**managers** [3] - 11:10, 18:15, 80:19
**manages** [2] - 5:25, 89:4
**managing** [1] - 70:20
**mandate** [2] - 5:15, 24:25
**mandates** [1] - 31:7
**manner** [1] - 18:3
**manual** [2] - 89:14, 93:1
**March** [23] - 15:8, 17:7, 17:16, 53:6, 53:8, 62:2, 62:3, 62:6, 62:7, 63:12, 84:1, 85:17, 85:21, 86:3, 86:23, 89:9, 89:11, 89:12, 92:7, 116:5, 120:13, 128:23
**Mark** [26] - 11:6, 11:9, 13:16, 15:22, 15:24, 16:1, 16:2, 16:5, 16:7, 17:3, 21:11, 21:12, 22:12, 27:1, 32:4, 32:16, 53:11, 53:15, 54:4, 86:9, 94:10, 94:12, 94:15, 95:8, 98:3
**marked** [1] - 49:8
**market** [2] - 72:3, 96:2
**Martinez** [2] - 3:18, 4:3, 4:8, 34:19, 34:20, 35:18, 38:21, 39:16, 39:17, 46:1, 47:8, 47:10, 48:19, 49:9, 54:4, 55:3, 55:5, 58:15, 67:1, 67:10, 83:20, 84:23, 86:8, 98:16, 104:24, 106:22, 118:7
**Martinez's** [2] - 85:1, 85:14
**Maryland** [3] - 114:11, 114:12, 114:21
**mass** [1] - 44:9
**masse** [3] - 104:1, 104:2
**matter** [4] - 65:18, 122:14, 124:21, 126:8
**matters** [11] - 11:3, 11:10, 11:15, 27:4, 81:2, 94:11, 94:12, 116:9, 116:10, 116:12, 124:22
**Matthew** [2] - 68:2, 68:19
**MATTHEW** [1] - 68:4
**mean** [34] - 8:11, 11:16, 12:10, 17:21,
18:13, 20:19, 22:5, 26:9, 36:2, 38:24, 39:25, 42:24, 50:19, 56:23, 59:18, 62:23, 72:20, 73:6, 80:9, 81:20, 82:12, 94:18, 96:25, 109:24, 110:18, 111:11, 115:1, 120:5, 120:10, 121:9, 121:10, 124:5, 124:15, 127:15
**meaning** [4] - 70:9, 117:10, 117:11, 117:12
**meaningful** [2] - 72:17, 106:20
**means** [5] - 29:18, 120:10, 120:19, 120:20, 120:21
**meant** [5] - 39:23, 50:1, 54:12, 55:13, 97:20
**meantime** [1] - 104:16
**measuring** [2] - 115:8, 115:9
**meet** [2] - 54:23, 92:4
**meeting** [54] - 35:17, 35:18, 38:14, 38:19, 39:11, 39:12, 39:17, 39:20, 40:8, 40:17, 41:2, 41:4, 42:9, 44:7, 44:13, 44:23, 45:4, 45:7, 45:21, 46:10, 47:5, 47:9, 47:16, 47:17, 48:19, 50:12, 51:6, 54:25, 55:7, 55:9, 56:5, 56:21, 57:5, 57:7, 57:9, 57:10, 58:6, 58:7, 58:14, 58:17, 58:21, 59:13, 59:21, 60:14, 60:22, 61:2, 62:7, 63:4, 63:11, 63:12, 63:16
**meetings** [10] - 55:6, 59:10, 60:3, 61:21, 61:25, 66:19, 66:21, 67:2, 67:5, 127:8
**meets** [2] - 69:13, 129:13
**member** [1] - 77:24
**members** [7] - 47:7, 63:13, 81:12, 83:20, 85:2, 85:9, 122:11
**memo** [39] - 25:10, 48:22, 49:4, 49:8, 49:16, 50:5, 50:8, 50:23, 79:5, 79:10, 79:11, 79:13, 79:22, 80:17, 80:18, 81:4, 81:6, 81:7, 81:14, 81:23, 82:14, 82:16, 82:19, 83:23, 86:19, 86:20, 86:21, 97:25,
98:15, 98:22, 98:24, 99:16, 112:19, 112:20, 113:2, 116:14, 116:15
**memorandum** [6] - 38:7, 61:5, 61:6, 61:10, 61:11, 61:16
**memorialized** [1] - 76:16
**memorializing** [1] - 115:12
**memory** [2] - 41:4, 93:7
**mention** [1] - 106:14
**mentioned** [10] - 6:9, 25:18, 38:7, 43:25, 55:17, 56:19, 65:10, 88:20, 107:13, 110:1
**mergers** [1] - 20:22
**Merit** [1] - 105:15
**merits** [5] - 102:13, 110:21, 122:25, 123:1, 127:19
**messaging** [1] - 42:16
**met** [6] - 6:17, 38:12, 60:4, 68:8, 77:22, 81:11
**methodical** [1] - 24:17
**Michael** [2] - 98:16, 99:16
**microphone** [3] - 33:23, 68:8, 73:23
**middle** [2] - 19:1, 113:2
**midnight** [1] - 46:17
**might** [12] - 5:22, 9:19, 25:17, 29:13, 51:18, 53:18, 106:23, 111:17, 111:19, 112:5, 118:25, 126:21
**million** [2] - 70:8, 73:14
**mind** [2] - 19:23, 105:21
**minimal** [1] - 12:9
**minimum** [1] - 129:14
**minute** [1] - 67:21
**minutes** [2] - 52:8, 79:18
**misspoke** [1] - 97:20
**modification** [2] - 28:15, 28:22
**modifications** [1] - 29:22
**moment** [3] - 12:24, 66:10, 100:15
**moments** [1] - 113:19
**Monday** [9] - 7:22, 11:1, 13:4, 35:14, 60:15, 76:11, 77:20, 84:1, 126:21

143

**money** [1] - 101:9
**monitor** [3] - 72:5, 80:14, 80:15
**Monitoring** [1] - 99:24
**monitoring** [4] - 70:4, 71:10, 76:24, 100:21
**month** [1] - 70:1
**months** [1] - 90:20
**mootness** [1] - 108:8
**morning** [4] - 47:3, 47:5, 78:24, 97:15
**mortgage** [1] - 84:20
**most** [6] - 39:15, 55:8, 69:5, 109:14, 109:25, 118:3
**mostly** [4] - 21:12, 28:22, 62:12, 62:15
**mouth** [1] - 40:5
**move** [5] - 33:24, 58:25, 68:11, 91:5, 98:15
**moved** [1] - 88:13
**moving** [1] - 35:3
**MR** [117] - 3:7, 3:12, 4:4, 4:12, 5:1, 5:5, 6:5, 6:8, 6:20, 7:1, 7:19, 8:5, 8:19, 12:2, 12:20, 14:4, 16:16, 17:25, 18:21, 18:22, 21:9, 25:3, 26:1, 26:4, 29:25, 33:7, 33:20, 34:2, 37:17, 40:15, 40:25, 42:11, 42:23, 44:21, 44:25, 45:2, 45:6, 45:20, 49:7, 49:11, 50:24, 56:10, 57:24, 58:1, 60:20, 60:24, 61:1, 62:22, 64:1, 64:2, 65:9, 65:21, 65:23, 66:3, 66:11, 66:13, 67:15, 67:17, 67:19, 68:2, 68:15, 71:18, 73:17, 73:24, 75:6, 80:4, 80:5, 82:10, 91:17, 91:20, 95:6, 95:16, 98:11, 98:14, 98:21, 99:1, 99:10, 99:12, 100:5, 110:24, 111:1, 111:3, 111:10, 113:9, 114:12, 114:24, 115:13, 115:18, 115:24, 116:6, 116:8, 116:14, 116:23, 117:4, 117:12, 117:18, 118:3, 120:2, 120:16, 120:23, 121:2, 121:7, 121:8, 121:9, 121:10, 122:24, 123:9, 124:6, 124:8, 124:11, 124:13, 124:15, 124:19,

124:25, 128:20, 129:1, 129:3
**MS** [24] - 3:23, 11:25, 26:8, 26:15, 30:2, 33:10, 33:13, 100:11, 101:17, 101:25, 102:22, 103:7, 103:11, 103:14, 103:16, 104:17, 105:20, 105:23, 108:9, 109:2, 109:21, 110:5, 110:9, 110:13
**MSPB** [3] - 106:2, 107:2, 107:6
**multiple** [2] - 14:25, 74:2
**must** [3] - 93:8, 101:5

## N

**name** [9] - 37:13, 58:12, 66:1, 66:8, 68:18, 70:22, 79:16, 100:3, 126:17
**names** [1] - 42:6
**narrow** [1] - 116:25
**narrowed** [1] - 101:21
**narrower** [1] - 118:24
**narrowest** [1] - 112:9
**narrowly** [2] - 101:22, 126:22
**National** [1] - 3:3
**nature** [2] - 114:8, 115:14
**NCLC** [1] - 107:15
**near** [1] - 54:18
**necessarily** [2] - 29:18, 66:4
**necessary** [14] - 9:17, 9:20, 44:24, 59:7, 66:23, 79:1, 87:8, 87:12, 102:8, 108:18, 112:6, 112:10, 112:14, 127:15
**need** [21] - 3:19, 12:23, 24:10, 26:10, 32:2, 33:23, 55:14, 56:13, 56:25, 58:19, 65:17, 68:10, 70:20, 100:13, 104:20, 105:10, 112:2, 114:6, 120:21, 122:23, 123:18
**needed** [11] - 14:21, 47:1, 52:11, 58:19, 63:17, 63:20, 81:17, 85:15, 87:3, 89:17, 104:14
**needs** [8] - 11:18, 22:15, 31:18, 55:23, 66:9, 108:19, 113:22,

129:25
**negative** [1] - 81:12
**never** [7] - 44:20, 47:2, 61:15, 66:17, 108:3, 129:23
**new** [6] - 25:19, 55:12, 56:15, 56:18, 118:5, 127:13
**next** [31] - 16:14, 28:9, 32:4, 38:12, 40:8, 44:9, 45:25, 46:7, 46:9, 46:12, 46:15, 46:19, 54:23, 58:17, 60:14, 61:21, 67:22, 68:1, 68:3, 71:9, 75:24, 76:8, 76:11, 76:19, 78:17, 78:19, 78:24, 86:7, 97:15, 99:22, 126:20
**nexus** [1] - 109:9
**night** [3] - 46:25, 83:5, 97:15
**nits** [1] - 83:18
**nobody** [5] - 55:4, 64:9, 88:17, 98:24, 127:9
**none** [4] - 45:8, 48:13, 48:14, 50:17
**nonetheless** [1] - 125:1
**nonmonetary** [1] - 70:9
**nonordinary** [1] - 94:19
**normal** [6] - 10:16, 19:14, 20:13, 23:20, 51:4, 88:7
**normalized** [1] - 22:23
**North** [1] - 74:15
**Norton** [4] - 121:11, 121:15, 123:11, 128:6
**note** [2] - 26:1, 65:17
**notes** [2] - 3:20, 105:21
**nothing** [5] - 36:5, 106:16, 107:1, 115:21, 127:20
**notice** [11] - 29:9, 36:25, 41:19, 41:20, 41:22, 41:23, 44:6, 50:19, 112:25, 118:23
**noticed** [1] - 49:16
**notices** [18] - 28:23, 29:17, 30:15, 36:10, 36:17, 42:3, 46:9, 51:10, 51:18, 52:7, 53:21, 53:24, 54:16, 54:19, 54:21, 66:16, 66:17, 104:7
**number** [30] - 6:24, 22:24, 45:10, 69:13,

70:7, 74:6, 74:17, 74:20, 75:9, 78:7, 80:13, 80:14, 81:5, 81:18, 81:21, 81:24, 82:1, 82:7, 82:8, 82:12, 83:15, 84:6, 90:5, 90:6, 99:15, 115:13, 116:16
**numbered** [2] - 6:21, 78:3
**numbers** [5] - 48:24, 49:24, 82:14, 82:18, 82:23

## O

**o'clock** [4] - 47:5, 51:15, 52:25, 54:18
**oath** [1] - 4:9
**object** [3] - 32:9, 111:10, 111:21
**objection** [8] - 11:25, 29:25, 40:15, 42:11, 44:21, 57:24, 64:1, 112:16
**objections** [5] - 100:18, 110:16, 110:17, 110:18, 124:9
**obligated** [2] - 114:11, 114:23
**obligation** [1] - 94:24
**obligations** [6] - 69:13, 86:12, 92:4, 118:16, 121:20, 123:25
**obstructionist** [1] - 81:11
**obviously** [3] - 23:1, 23:22, 123:19
**OCC** [1] - 55:22
**occur** [5] - 22:6, 44:9, 46:2, 53:6, 61:25
**occurred** [2] - 23:10, 51:20
**occurring** [2] - 20:14, 46:23
**October** [1] - 68:23
**odious** [1] - 110:22
**offensive** [1] - 115:22
**offer** [4] - 11:20, 78:1, 83:4, 91:11
**office** [21] - 11:23, 49:23, 55:19, 69:13, 69:14, 70:6, 70:16, 73:19, 74:16, 75:7, 77:22, 80:15, 80:19, 80:22, 81:21, 83:10, 89:2, 90:11, 98:25, 102:6, 107:18
**Office** [36] - 12:3, 34:18, 49:22, 50:3, 55:10, 55:17, 68:25,

69:8, 70:14, 72:5, 72:6, 76:5, 76:21, 77:17, 79:6, 81:1, 83:25, 84:3, 85:22, 87:4, 88:23, 89:8, 89:23, 90:18, 90:22, 91:6, 91:13, 91:25, 92:3, 95:17, 98:7, 98:23, 100:2

**office's** [4] - 71:20, 87:9, 87:13, 90:10

**officer** [10] - 9:5, 9:24, 10:4, 21:14, 27:25, 55:12, 56:20, 78:24, 97:18, 97:19

**officer's** [1] - 9:9

**offices** [26] - 18:16, 40:6, 40:9, 40:11, 43:12, 43:17, 43:23, 44:14, 48:23, 50:2, 50:6, 62:19, 63:24, 71:22, 72:4, 90:21, 90:25, 91:3, 99:23, 101:23, 102:2, 102:3, 102:7, 102:8, 119:15

**official** [1] - 71:13

**officials** [1] - 66:21

**often** [2] - 20:23, 120:11

**Older** [1] - 72:6

**OMB** [7] - 22:7, 22:13, 24:24, 25:10, 48:22, 60:6, 112:19

**OMB/OPM** [1] - 113:2

**ombudsman** [3] - 72:10, 107:17, 107:18

**once** [6] - 21:19, 21:21, 29:23, 30:4, 64:22, 72:25

**one** [58] - 5:16, 6:9, 6:10, 10:10, 11:16, 11:19, 11:21, 12:24, 18:1, 22:6, 27:8, 29:8, 30:12, 31:16, 32:15, 37:14, 40:8, 41:8, 44:3, 48:24, 50:21, 54:1, 58:4, 59:14, 62:1, 64:5, 64:15, 65:17, 67:4, 78:6, 81:5, 83:12, 84:12, 85:8, 87:15, 95:13, 96:3, 96:21, 100:18, 101:7, 102:13, 102:15, 102:17, 111:13, 112:19, 115:13, 116:2, 116:24, 118:18, 119:10, 121:19, 125:7, 125:23, 125:24, 126:2, 128:14, 129:3

**ones** [3] - 11:21, 39:14, 126:13

**ongoing** [4] - 25:5, 25:21, 102:5, 112:20

**onus** [1] - 114:3

**open** [2] - 98:12, 99:13

**operating** [4] - 18:16, 19:13, 54:13, 92:11

**operation** [3] - 71:23, 117:18, 118:4

**operational** [8] - 11:18, 12:8, 12:14, 20:18, 27:4, 85:16, 111:22, 125:3

**operationalize** [1] - 19:7

**operationally** [1] - 19:20

**Operations** [1] - 99:24

**operations** [15] - 7:24, 13:14, 19:11, 19:16, 19:17, 19:19, 20:5, 21:21, 22:3, 22:24, 29:4, 76:17, 82:22, 101:20, 117:13

**opinion** [1] - 23:21

**OPM** [30] - 25:10, 37:24, 37:25, 38:13, 38:21, 39:13, 41:17, 46:6, 47:1, 47:5, 47:12, 49:9, 50:25, 52:8, 52:10, 55:1, 55:14, 57:11, 59:10, 59:22, 60:15, 61:13, 62:9, 62:10, 62:23, 63:14, 64:18, 67:5, 83:4, 112:19

**OPM's** [1] - 63:3

**OPM/OMB** [1] - 61:5

**opportunity** [4] - 4:19, 22:20, 111:12, 116:23, 117:20

**opposed** [2] - 101:16, 129:15

**opposing** [2] - 4:18, 113:18

**opposite** [1] - 51:20

**ops** [1] - 49:23

**order** [88] - 8:17, 10:22, 10:25, 36:14, 36:15, 37:3, 37:11, 41:7, 41:8, 41:10, 50:10, 50:11, 52:22, 52:23, 52:24, 53:2, 53:4, 53:7, 53:14, 53:16, 54:5, 54:9, 54:23, 57:6, 57:8, 57:12, 57:15, 57:23, 59:10, 64:22, 65:6, 72:22, 76:10, 76:12, 76:24, 77:2, 77:5, 77:8, 77:11, 87:5, 89:8, 90:2,

90:10, 90:21, 93:24, 96:12, 100:17, 100:20, 101:4, 101:11, 101:17, 101:18, 101:22, 102:11, 102:25, 103:16, 103:20, 105:4, 108:3, 108:12, 110:17, 110:18, 111:4, 111:11, 112:14, 114:15, 114:18, 114:21, 115:22, 116:4, 118:12, 118:24, 119:3, 120:15, 122:24, 123:20, 123:24, 124:17, 124:18, 125:11, 128:3, 128:5, 129:11, 129:15, 129:22

**ordered** [1] - 101:10

**ordering** [1] - 107:12

**orders** [4] - 113:25, 114:1, 114:9, 119:5

**ordinary** [3] - 50:19, 106:5, 106:10

**org** [2] - 81:7, 83:2

**organization** [5] - 20:16, 21:21, 23:6, 73:11, 126:15

**organizations** [3] - 5:7, 112:12, 119:18

**organized** [2] - 70:16, 91:23

**original** [5] - 79:14, 79:15, 100:20, 114:20, 115:2

**ourselves** [1] - 62:25

**outside** [3] - 21:6, 71:19, 75:10

**oversee** [1] - 119:21

**overseeing** [1] - 29:8

**oversees** [1] - 30:3

**overview** [1] - 73:25

**overwhelming** [1] - 20:14

**own** [5] - 22:21, 49:23, 58:12, 123:21, 123:22

**owned** [1] - 85:18

**owns** [1] - 10:18

---

**P**

**p.m** [7] - 51:25, 52:1, 53:1, 54:21, 78:11, 79:15

**pace** [1] - 90:14

**page** [5] - 14:8, 86:7, 93:16, 97:22

**pages** [1] - 26:19

**Paoletta** [45] - 7:13, 7:20, 8:6, 8:9, 10:8, 11:6, 11:9, 11:14,

13:16, 13:22, 14:9, 14:14, 14:15, 14:19, 14:20, 14:21, 15:7, 15:22, 16:19, 16:20, 18:9, 19:8, 21:11, 21:12, 27:1, 32:5, 32:17, 40:18, 53:11, 53:16, 54:4, 66:21, 94:11, 94:13, 94:15, 95:8, 96:22, 97:2, 97:12, 97:15, 97:20, 98:3, 98:5, 117:7, 117:15

**Paoletta's** [6] - 7:23, 15:10, 17:7, 17:16, 116:10, 118:7

**paragraph** [23] - 14:10, 14:12, 19:1, 82:21, 83:19, 85:1, 86:11, 94:4, 99:19, 111:6, 111:7, 111:10, 112:1, 112:16, 112:17, 114:10, 117:2, 118:12, 118:13, 124:11, 125:10, 125:21, 125:22

**paragraphs** [1] - 78:7

**parallel** [1] - 78:23

**parallels** [1] - 114:8

**part** [10] - 24:25, 58:18, 59:9, 66:20, 73:15, 78:25, 113:16, 118:6, 120:6, 125:3

**partial** [1] - 39:19

**participants** [1] - 72:3

**participate** [4] - 72:15, 72:21, 73:5, 113:11

**participated** [2] - 66:20

**participating** [1] - 67:2

**particular** [5] - 35:21, 43:17, 98:25, 105:25, 110:16

**particularly** [2] - 72:14, 110:22

**parties** [2] - 65:23, 101:1

**partner** [2] - 72:16, 72:19

**partners** [2] - 57:11, 72:1

**partnership** [1] - 72:13

**party** [3] - 10:12, 10:15, 111:19

**past** [2] - 10:2, 91:12

**Pastor** [1] - 107:17

**pause** [7] - 28:5, 33:15, 57:18, 57:20, 57:22, 65:19, 111:24

**paying** [1] - 62:25

**peers** [1] - 15:23
**people** [68] - 11:9, 11:13, 15:3, 15:4, 15:21, 16:8, 16:10, 16:18, 16:21, 16:22, 17:1, 21:2, 21:5, 22:24, 31:10, 31:22, 32:1, 32:20, 37:6, 38:21, 38:22, 38:23, 39:14, 40:19, 43:2, 43:8, 43:17, 45:10, 45:18, 49:24, 50:14, 54:16, 57:1, 59:11, 59:12, 60:15, 62:9, 62:17, 66:8, 73:10, 74:24, 76:20, 80:13, 80:20, 81:21, 81:25, 82:1, 82:6, 83:2, 83:4, 84:12, 86:18, 86:24, 88:14, 88:16, 88:20, 92:22, 99:3, 101:9, 105:6, 107:8, 123:8, 123:17, 125:5, 127:23
**People** [1] - 17:3
**people's** [1] - 42:16
**per** [1] - 9:2
**perceived** [1] - 81:10
**perfect** [1] - 23:9
**perform** [4] - 94:5, 115:7, 118:15, 126:17
**performance** [4] - 36:5, 36:6, 48:11, 91:11
**performing** [3] - 25:8, 78:14, 94:6
**period** [8] - 14:2, 21:10, 49:2, 85:19, 92:15, 95:20, 96:1, 96:3
**permission** [3] - 27:18, 44:14, 44:17
**person** [3] - 30:3, 53:22, 66:9
**personal** [2] - 15:12, 15:15
**personally** [2] - 22:14, 119:1
**personnel** [3] - 36:25, 48:15, 74:18
**perspective** [3] - 20:19, 63:3, 110:23
**persuaded** [1] - 128:14
**Pfaff** [8] - 3:22, 68:2, 68:19, 91:21, 116:1, 116:8, 127:19
**PFAFF** [1] - 68:4
**phase** [4] - 62:13, 63:1, 63:2, 63:20
**Phase** [3] - 63:3, 63:4

**phases** [1] - 58:4
**phone** [2] - 74:18, 74:23
**phrase** [1] - 57:3
**physically** [1] - 12:14
**pick** [2] - 74:5, 74:20
**piece** [1] - 37:11
**pieces** [1] - 48:10
**piling** [1] - 94:17
**piling-up** [1] - 94:17
**place** [7] - 10:19, 22:2, 106:13, 108:5, 111:18, 112:22, 118:10
**places** [2] - 55:21, 119:20
**plaintiff** [4] - 3:5, 100:10, 120:4, 123:4
**plaintiffs** [24] - 3:8, 3:21, 10:21, 10:25, 33:8, 68:2, 100:16, 107:14, 108:21, 112:7, 112:11, 112:15, 113:9, 113:25, 116:20, 116:25, 118:17, 120:7, 120:20, 121:13, 124:16, 125:13, 125:15, 128:4
**plaintiffs'** [5] - 26:2, 113:12, 113:13, 118:12, 119:9
**Plaintiffs'** [2] - 49:8, 98:13
**plaintiffs's** [1] - 115:14
**plan** [24] - 3:22, 4:4, 39:18, 41:11, 43:7, 45:24, 48:20, 48:21, 56:4, 56:12, 56:17, 57:22, 58:16, 58:21, 60:1, 60:2, 61:14, 61:17, 63:9, 63:23, 64:3, 64:5, 64:7, 64:21
**planned** [2] - 107:25, 127:7
**planning** [3] - 4:1, 26:7, 98:8
**play** [1] - 70:15
**played** [1] - 73:19
**playing** [1] - 72:18
**plenty** [1] - 123:14
**point** [15] - 16:3, 46:17, 65:1, 84:4, 95:5, 98:19, 106:17, 106:24, 107:4, 113:3, 115:14, 116:20, 116:24, 121:2, 121:17
**pointed** [3] - 23:2, 104:4, 115:5
**policy** [4] - 39:14, 41:17, 62:16, 62:20

**politically** [1] - 119:16
**poor** [1] - 36:6
**poorly** [1] - 124:12
**pop** [1] - 41:25
**popular** [2] - 122:8, 122:10
**populated** [1] - 47:24
**population** [2] - 31:21, 31:23
**portal** [8] - 71:6, 71:7, 72:4, 72:15, 72:21, 73:5, 88:2
**portfolio** [2] - 21:22, 84:20
**position** [12] - 34:16, 39:5, 43:5, 43:18, 68:24, 100:21, 104:9, 107:22, 107:23, 112:20, 115:6
**positions** [17] - 39:14, 43:3, 43:4, 43:6, 43:8, 43:9, 56:24, 57:1, 59:12, 59:15, 59:17, 59:18, 62:14, 69:4, 69:8, 100:15, 105:2
**positive** [1] - 23:11
**possess** [1] - 10:12
**possible** [4] - 44:6, 46:1, 51:13, 59:1
**posted** [2] - 90:1, 90:3
**potentially** [1] - 20:18
**Power** [3] - 109:5, 110:10, 110:11
**powers** [7] - 102:24, 103:2, 103:18, 106:7, 108:18, 108:19, 109:1
**preclude** [2] - 113:1, 113:4
**predecisional** [2] - 45:23, 113:3
**predicated** [1] - 102:12
**preliminarily** [1] - 104:23
**preliminary** [13] - 77:25, 104:20, 105:13, 111:12, 112:2, 112:9, 112:23, 113:4, 113:23, 114:13, 116:25, 128:19, 129:4
**preparation** [1] - 66:16
**prepared** [1] - 111:25
**preparing** [1] - 120:3
**present** [2] - 38:19, 58:15
**presenting** [1] - 121:22
**preservation** [2] - 111:21, 112:14

**preserve** [4] - 110:21, 112:7, 112:10, 127:14
**preserving** [1] - 123:15
**President** [7] - 103:13, 103:15, 119:20, 119:21, 122:17, 127:12, 127:13
**presses** [1] - 54:2
**pressing** [1] - 55:15
**pressuring** [1] - 53:19
**presumption** [1] - 125:9
**pretty** [2] - 95:17, 95:22
**prevailing** [1] - 81:9
**prevent** [2] - 93:9, 113:10
**prevented** [1] - 57:13
**preventing** [1] - 87:25
**previous** [3] - 48:20, 49:5, 59:11
**previously** [4] - 34:3, 76:3, 87:12, 112:21
**primary** [1] - 71:5
**prime** [1] - 11:20
**privacy** [2] - 71:24, 71:25
**private** [1] - 72:10
**probation** [1] - 45:11
**probationary** [7] - 35:22, 37:19, 45:13, 83:5, 101:9, 104:1, 104:6
**problem** [14] - 57:11, 57:14, 57:15, 106:8, 115:1, 115:12, 117:23, 118:11, 119:2, 120:6, 121:11, 121:22, 123:9, 126:22
**problematic** [1] - 83:3
**problems** [2] - 105:7, 115:13
**procedures** [1] - 64:16
**proceed** [3] - 4:10, 66:4, 66:7
**proceedings** [3] - 100:22, 119:2
**process** [21] - 10:16, 22:19, 28:17, 28:18, 30:5, 43:20, 70:11, 70:15, 71:8, 73:15, 106:3, 106:10, 112:19, 113:2, 113:6, 113:11, 113:14, 113:15, 121:18, 122:2, 127:25
**processed** [1] - 92:15
**processes** [1] - 73:13
**procurement** [6] - 10:16, 27:9, 29:8, 30:3,

30:5, 72:1
**product** [1] - 70:17
**productive** [1] - 72:14
**products** [1] - 74:22
**program** [3] - 5:25, 31:18, 69:6
**programmatic** [1] - 19:20
**programs** [2] - 22:20, 86:13
**Programs** [2] - 3:14, 3:16
**prohibitions** [2] - 76:2, 76:4
**project** [3] - 37:22, 71:14, 80:19
**projects** [1] - 88:13
**prompted** [1] - 15:23
**proof** [1] - 26:2
**proposals** [1] - 129:17
**proposed** [7] - 100:17, 100:20, 111:4, 113:4, 116:25, 118:12, 118:23
**Protection** [5] - 34:12, 39:2, 68:21, 105:16, 117:6
**protection** [2] - 35:2, 35:3
**protections** [1] - 34:10
**protocol** [1] - 23:20
**prove** [2] - 25:25
**proved** [1] - 104:10
**provide** [18] - 4:18, 4:23, 5:2, 34:3, 46:8, 52:11, 62:24, 65:7, 65:25, 73:2, 73:3, 73:25, 80:18, 80:23, 83:12, 109:22, 110:6, 111:11
**provided** [19] - 4:2, 4:15, 7:11, 9:15, 9:16, 12:9, 19:15, 34:8, 36:1, 36:9, 41:5, 46:7, 50:8, 50:25, 52:8, 58:8, 82:18, 82:23, 128:7
**provides** [7] - 22:19, 22:22, 70:6, 74:15, 75:10, 113:23, 117:20
**providing** [8] - 8:21, 17:15, 18:23, 22:7, 71:13, 73:6, 74:5, 80:22
**provision** [1] - 75:8
**provisionary** [1] - 114:2
**provisions** [2] - 50:20, 103:9
**pseudonym** [2] - 34:6, 34:9
**pseudonymous** [1] -

65:24
**public** [8] - 23:21, 23:22, 66:10, 69:25, 70:13, 71:15, 90:2, 90:3
**Public** [1] - 3:10
**publicly** [1] - 67:12
**pull** [4] - 15:3, 29:20, 51:12, 126:8
**pulled** [4] - 48:22, 49:2, 98:18, 126:7
**punchy** [1] - 3:19
**purchase** [1] - 59:6
**purposes** [1] - 84:11
**pursuant** [1] - 18:17
**push** [1] - 5:16
**put** [13] - 3:21, 40:4, 46:10, 79:11, 81:4, 100:20, 104:10, 114:3, 118:22, 121:12, 125:17, 126:24, 129:8
**puts** [1] - 75:12

# Q

**quality** [2] - 71:16, 91:11
**questions** [19] - 10:11, 11:7, 15:22, 21:23, 26:16, 30:9, 32:25, 47:4, 47:18, 64:19, 66:7, 66:14, 69:23, 69:24, 91:17, 100:5, 100:14, 109:20, 110:14
**queues** [1] - 93:1
**quick** [2] - 44:5, 44:6
**quicker** [1] - 52:15
**quickly** [6] - 42:2, 51:13, 58:25, 83:1, 97:12, 126:7
**quite** [1] - 106:4
**quo** [4] - 12:13, 112:10, 123:15
**quotes** [2] - 121:12, 121:15

# R

**racing** [1] - 81:7
**raise** [3] - 108:25, 111:22, 117:21
**raised** [3] - 48:2, 100:19, 119:11
**raising** [1] - 99:4
**rapid** [1] - 20:20
**rapidness** [1] - 20:14
**rates** [1] - 11:20
**rather** [2] - 46:25, 125:19
**re** [1] - 30:7

**re-competed** [1] - 30:7
**reach** [9] - 11:6, 11:13, 13:15, 15:24, 16:1, 52:10, 52:14, 74:25, 124:21
**reached** [9] - 11:17, 11:19, 11:21, 14:14, 32:21, 53:5, 85:9, 110:21, 126:18
**reaching** [9] - 15:21, 16:10, 16:11, 16:12, 16:19, 16:21, 16:22, 17:2, 96:22
**reaction** [2] - 49:16, 49:18
**reactivate** [1] - 86:16
**read** [10] - 17:22, 17:23, 53:7, 53:16, 110:2, 121:11, 121:15, 124:23, 124:24
**reading** [1] - 14:12
**real** [2] - 74:24, 118:24
**realize** [2] - 20:15, 125:23
**really** [15] - 38:9, 38:11, 40:5, 55:13, 59:13, 72:16, 72:18, 102:24, 110:9, 114:20, 119:7, 121:14, 123:17, 128:9
**reason** [13] - 29:7, 29:8, 40:13, 44:4, 104:13, 107:13, 108:20, 109:9, 109:11, 109:18, 118:6, 125:2, 128:11
**reasons** [1] - 81:5
**reassign** [2] - 29:10, 29:12
**reassuming** [1] - 20:5
**receipt** [1] - 72:25
**receive** [7] - 18:17, 47:20, 72:24, 73:19, 73:25, 75:7, 95:24
**received** [16] - 5:13, 19:8, 22:7, 36:13, 36:17, 36:23, 46:25, 47:2, 73:13, 77:20, 78:21, 78:22, 79:14, 85:24, 89:19, 95:19
**recent** [3] - 105:24, 109:5, 109:14
**recently** [2] - 6:19, 69:6
**recess** [1] - 67:23
**recipients** [1] - 78:6
**recision** [1] - 18:3
**recognize** [2] - 39:3, 102:9
**recollection** [6] - 5:6,

7:10, 13:9, 16:24, 41:2, 58:24
**record** [12] - 3:2, 3:6, 6:20, 49:7, 66:10, 68:18, 82:11, 104:12, 116:20, 126:6, 126:7, 128:3
**Records** [1] - 111:20
**recross** [1] - 26:8
**RECROSS** [1] - 26:14
**RECROSS-EXAMINATION** [1] - 26:14
**redirect** [5] - 3:19, 26:13, 30:19, 67:18, 99:9
**REDIRECT** [2] - 4:11, 99:11
**reduce** [2] - 41:14, 126:3
**reducing** [1] - 22:24
**reduction** [11] - 37:23, 38:11, 41:12, 41:21, 42:25, 43:4, 47:21, 62:14, 64:7, 79:12, 112:25
**refer** [4] - 10:21, 10:25, 18:2, 56:21
**reference** [2] - 96:21, 96:24
**referenced** [3] - 17:16, 52:7, 56:15
**referencing** [1] - 41:8
**referrals** [2] - 77:5, 77:8
**referred** [9] - 20:4, 20:20, 21:24, 56:15, 56:24, 57:15, 61:5, 67:1, 93:23
**referring** [3] - 6:6, 15:2, 129:13
**refers** [1] - 17:7
**reflected** [1] - 83:9
**reflecting** [1] - 9:9
**reflects** [1] - 104:5
**refresh** [1] - 13:9
**regard** [2] - 103:2, 125:21
**regarding** [9] - 10:14, 11:9, 11:14, 11:20, 13:14, 19:8, 25:9, 112:17, 125:22
**register** [3] - 47:23, 48:4, 72:23
**registered** [1] - 73:5
**registers** [2] - 48:2, 59:15
**regs** [1] - 72:8
**regular** [1] - 115:11
**Regulations** [1] -

99:25
**regulators** [5] - 70:2, 74:9, 87:19, 87:21, 89:15
**reinstate** [1] - 101:8
**reinstated** [8] - 8:14, 9:3, 10:8, 23:9, 87:5, 87:7, 87:11, 106:23
**reinstating** [2] - 8:6, 8:10
**relate** [1] - 9:19
**related** [2] - 85:15, 112:14
**relief** [15] - 70:9, 102:3, 102:8, 104:14, 104:15, 104:20, 105:13, 107:2, 107:12, 107:15, 107:16, 110:20, 112:8, 112:10, 115:20
**rely** [1] - 90:25, 117:8, 119:5
**remain** [1] - 85:18
**remained** [2] - 12:7, 85:16
**remaining** [1] - 62:17
**remedy** [1] - 120:5
**remember** [7] - 38:17, 40:8, 46:23, 57:14, 57:17, 110:10, 118:4
**remind** [1] - 94:23
**removal** [1] - 107:7
**remove** [1] - 48:3
**reorganization** [1] - 23:6
**repair** [1] - 22:4
**repairability** [1] - 22:3
**repeat** [2] - 3:19, 87:10
**repeatedly** [1] - 115:4
**rephrase** [2] - 45:2, 97:24
**report** [9] - 34:19, 34:20, 69:16, 69:17, 84:11, 95:15, 119:19, 120:3
**reporter** [2] - 3:20, 32:8
**reporting** [1] - 119:24
**reports** [2] - 69:19, 70:10
**represent** [2] - 53:1, 125:16
**represented** [1] - 42:12
**request** [14] - 5:13, 12:21, 13:10, 13:12, 14:16, 14:19, 30:12, 48:25, 76:13, 77:20, 78:21, 78:23, 79:14,

97:10
**requested** [3] - 30:14, 79:10, 125:5
**requesting** [3] - 31:21, 95:8, 125:13
**requests** [9] - 13:14, 13:18, 14:20, 32:17, 71:15, 80:21, 97:13, 114:8, 115:10
**require** [2] - 10:17, 126:9
**required** [25] - 5:17, 6:10, 9:7, 22:16, 39:25, 77:12, 79:1, 80:24, 81:2, 81:3, 83:11, 115:8, 115:22, 115:25, 116:13, 116:16, 117:7, 117:9, 118:1, 118:15, 118:21, 118:23, 119:4, 120:1, 127:4
**requirement** [2] - 23:3, 119:12
**requirements** [4] - 12:9, 21:20, 23:3, 129:14
**requires** [4] - 23:3, 80:12, 80:14, 88:10
**rescind** [3] - 17:19, 18:2, 101:11
**rescinded** [4] - 10:23, 17:12, 29:1, 108:3
**Research** [1] - 99:24
**reshape** [1] - 22:8
**resistance** [1] - 81:13
**resolve** [4] - 75:1, 111:12, 112:6, 112:15
**resource** [1] - 12:7
**resources** [1] - 12:5
**respect** [2] - 96:8, 108:2, 110:16, 123:5
**respond** [7] - 71:14, 71:24, 72:22, 84:18, 86:14, 90:16, 95:2
**responded** [1] - 97:15
**responding** [4] - 89:17, 92:25, 98:21, 99:7
**responds** [1] - 69:24
**response** [19] - 3:25, 31:4, 32:6, 37:9, 52:5, 52:6, 53:10, 53:17, 69:22, 69:23, 70:2, 73:2, 73:3, 76:13, 85:18, 90:14, 92:8, 94:16, 95:8
**Response** [31] - 12:4, 19:3, 69:1, 69:9, 69:18, 70:15, 71:19, 76:6, 76:22, 81:1, 83:25, 84:3, 85:22, 86:16,

87:4, 88:23, 89:8, 89:23, 90:18, 90:22, 91:7, 91:14, 91:25, 92:3, 95:18, 98:7, 98:23, 99:25, 100:1, 100:2, 100:4
**Response's** [2] - 77:17, 79:6
**responses** [3] - 72:17, 73:6, 89:6
**responsibilities** [2] - 37:20, 72:11
**responsibility** [3] - 18:16, 69:12, 80:7
**responsible** [6] - 18:10, 19:13, 71:10, 71:13, 71:17, 92:3
**rest** [3] - 22:8, 39:19, 62:14
**restarting** [1] - 128:1
**restraining** [3] - 57:12, 59:10, 114:15
**restructure** [1] - 22:8
**result** [3] - 25:2, 57:22, 128:8
**resulted** [1] - 61:16
**results** [1] - 119:19
**resume** [1] - 102:10
**resumed** [2] - 18:11, 19:16
**resumption** [4] - 18:10, 19:8, 25:9
**retaliation** [2] - 34:11, 65:11
**retention** [5] - 47:22, 48:1, 48:4, 48:14, 59:15
**retirement** [2] - 65:3, 83:5
**return** [3] - 4:8, 10:18, 83:25
**returned** [1] - 70:7
**review** [14] - 35:23, 37:25, 47:1, 47:3, 77:21, 78:1, 89:14, 92:18, 97:7, 100:13, 105:17, 106:5, 106:20, 116:24
**reviewed** [5] - 36:8, 37:18, 38:10, 84:23, 106:1
**reviewing** [1] - 38:7
**revived** [1] - 127:15
**rid** [4] - 24:9, 104:6, 122:5, 122:20
**Ridge** [1] - 74:15
**RIF** [30] - 22:6, 38:1, 38:2, 38:6, 38:14, 38:19, 41:17, 47:7, 54:3, 54:23, 55:2, 57:7,

58:6, 58:18, 59:13, 60:3, 60:15, 61:13, 61:22, 63:8, 63:13, 64:21, 65:1, 66:16, 66:20, 79:12, 98:7, 98:24, 107:24, 127:8
**RIFing** [2] - 127:24, 127:25
**RIFs** [6] - 46:2, 49:14, 53:6, 60:7, 60:12, 63:19
**rights** [1] - 22:18
**Rights** [1] - 49:22
**righty** [1] - 67:18
**risk** [2] - 118:21, 118:24
**RMR** [1] - 72:3
**road** [1] - 83:4
**roadmap** [1] - 22:7
**Robert** [1] - 3:9
**role** [2] - 69:3, 70:14
**roles** [1] - 97:16
**room** [1] - 33:14, 127:24
**ROSENBERG** [71] - 3:12, 4:12, 5:1, 5:5, 6:5, 6:8, 6:20, 7:1, 7:19, 8:5, 8:19, 12:2, 12:20, 14:4, 16:16, 17:25, 18:21, 18:22, 21:9, 25:3, 26:1, 26:4, 29:25, 33:7, 40:15, 42:11, 44:21, 44:25, 57:24, 64:1, 65:21, 65:23, 66:3, 66:11, 66:13, 67:15, 67:17, 110:24, 111:1, 111:3, 111:10, 113:9, 114:12, 114:24, 115:13, 115:18, 115:24, 116:6, 116:8, 116:14, 116:23, 117:4, 117:12, 117:18, 118:3, 120:2, 120:16, 120:23, 121:2, 121:7, 121:9, 124:6, 124:8, 124:11, 124:13, 124:15, 124:19, 124:25, 128:20, 129:1, 129:3
**Rosenberg** [2] - 3:13, 4:10
**round** [1] - 99:23
**routing** [1] - 89:14
**ruling** [1] - 128:19
**run** [4] - 23:19, 69:24, 71:23, 75:17
**running** [1] - 21:5
**rushed** [1] - 23:25
**rushing** [1] - 81:5
**Russ** [7] - 42:1, 42:6,

42:7, 42:8, 42:9, 42:19, 54:4
**Russell** [3] - 3:4, 42:17, 75:21

## S

**sales** [2] - 88:10
**savvy** [1] - 23:19
**saw** [4] - 49:3, 49:4, 49:17, 54:17
**scan** [1] - 75:17
**scanning** [1] - 75:16
**scenes** [1] - 127:6
**scheduled** [1] - 47:5
**scheme** [1] - 106:5
**schemes** [1] - 106:14
**school** [1] - 35:1
**scope** [5] - 7:24, 10:14, 13:10, 103:20, 115:25
**screen** [4] - 41:25, 42:1, 42:18
**second** [9] - 60:8, 65:17, 80:6, 85:1, 86:3, 86:11, 99:21, 108:16, 118:13
**secondly** [2] - 81:9, 83:9, 85:8
**secretary** [1] - 76:2
**section** [13] - 47:18, 47:22, 48:3, 69:5, 70:17, 70:19, 70:22, 71:5, 71:9, 71:11, 71:12, 71:16, 84:18
**sections** [3] - 19:12, 19:13, 80:22
**Security** [1] - 122:4
**see** [17] - 4:7, 23:2, 23:5, 42:16, 42:17, 49:21, 55:6, 78:4, 78:7, 79:24, 86:9, 90:11, 99:15, 99:18, 99:21, 115:21, 128:5
**seeing** [3] - 18:8, 49:12, 49:24
**seek** [1] - 44:11
**seeking** [2] - 113:20, 113:21
**seeks** [1] - 100:10
**seem** [2] - 13:23, 110:3
**sees** [1] - 94:25
**send** [7] - 29:9, 53:18, 53:19, 53:21, 53:22, 72:24, 104:7
**sending** [2] - 51:18, 71:5
**sends** [1] - 31:9
**senior** [7] - 34:18,

52:9, 52:14, 53:5, 53:25, 54:7, 66:21
**sense** [1] - 117:12
**sent** [32] - 11:1, 11:9, 11:10, 13:6, 14:23, 15:7, 15:11, 15:13, 18:6, 27:6, 28:2, 28:22, 29:16, 30:14, 48:22, 51:15, 51:21, 52:24, 76:1, 76:3, 83:16, 83:18, 83:19, 84:1, 97:1, 97:14, 98:3, 98:5, 114:1, 117:8, 120:13
**sentence** [2] - 80:6, 99:21
**sentences** [2] - 79:25, 82:19
**sentiment** [1] - 81:9
**separate** [1] - 10:7
**separation** [7] - 102:24, 103:2, 103:18, 106:7, 108:17, 108:19, 108:25
**sequenced** [1] - 41:12
**series** [1] - 100:21
**serious** [1] - 112:11
**served** [1] - 123:11
**service** [1] - 48:9
**Servicemember** [1] - 72:5
**services** [11] - 38:10, 62:24, 70:5, 70:19, 70:24, 71:1, 74:22, 80:19, 80:23, 91:11
**Services** [2] - 5:15, 5:24
**set** [3] - 38:1, 42:15, 125:12
**several** [6] - 38:21, 62:3, 87:24, 97:16, 98:22, 107:5
**SF-50** [2] - 36:22, 36:24
**Shakes** [1] - 59:25
**shall** [3] - 112:24, 112:25, 118:14
**share** [5] - 58:12, 70:3, 70:18, 74:12, 87:20
**shared** [3] - 41:24, 41:25, 64:9
**shares** [1] - 87:18
**sharing** [3] - 74:11, 87:17, 88:3
**shift** [1] - 75:19
**shocked** [1] - 49:21
**shocking** [1] - 49:25
**shop** [2] - 75:3, 75:16
**short** [5] - 26:8, 26:9, 67:15, 109:22, 109:23
**shortly** [4] - 8:7, 8:10,

8:11, 8:12
**show** [1] - 49:7
**showing** [2] - 39:4, 116:3
**shown** [1] - 126:14
**shows** [3] - 106:22, 114:25, 125:5
**shut** [2] - 121:23, 121:25
**shutdown** [1] - 121:24
**shutting** [2] - 59:2, 102:25
**side** [6] - 100:19, 110:11, 113:12, 113:13, 120:18, 128:14
**sides** [4] - 114:21, 125:2, 126:8, 127:2
**signed** [1] - 38:1
**significant** [1] - 92:11
**signified** [1] - 22:14
**similar** [4] - 5:7, 10:5, 106:4, 111:7
**similarly** [1] - 103:4
**simply** [1] - 20:13
**single** [4] - 43:13, 43:18, 49:20, 85:17
**sit** [1] - 122:2
**sits** [1] - 84:17
**sitting** [2] - 127:23, 127:24
**situation** [3] - 106:8, 107:8, 128:15
**skip** [2] - 35:10, 35:13
**sloppy** [1] - 23:10
**slow** [1] - 51:19
**small** [1] - 90:5
**smaller** [1] - 55:1
**smooth** [1] - 128:1
**snippets** [1] - 126:6
**software** [5] - 29:13, 29:15, 74:8, 75:11, 75:16
**solve** [1] - 119:2
**someone** [6] - 4:1, 39:5, 42:16, 53:24, 94:20, 120:14
**somewhere** [2] - 24:5, 40:3
**Sonya** [2] - 26:22, 27:12
**soon** [2] - 25:19, 30:18
**sorry** [22] - 12:22, 16:5, 31:24, 36:16, 41:15, 65:20, 70:23, 76:2, 78:4, 78:18, 81:24, 82:5, 82:14, 87:10, 89:11, 95:23, 96:15, 96:16, 96:24, 97:20, 98:17, 99:15
**sort** [2] - 80:21,

129:13
**sounds** [2] - 13:24, 120:20
**south** [4] - 81:18, 81:20, 82:7, 82:12
**southern** [1] - 121:15
**speaking** [1] - 42:9
**specific** [14] - 5:13, 6:14, 7:10, 10:11, 23:14, 39:24, 48:23, 58:21, 59:21, 90:11, 101:23, 102:3, 102:6, 114:4
**specifically** [3] - 5:16, 102:19, 118:20
**specificity** [2] - 112:3, 113:25
**specifics** [1] - 58:23
**specify** [1] - 126:20
**speculate** [1] - 41:3
**speculation** [1] - 29:25
**speed** [1] - 52:5
**spending** [1] - 21:22
**spent** [1] - 81:6
**spoken** [1] - 99:2
**staff** [23] - 11:5, 19:10, 51:12, 54:9, 54:20, 68:25, 69:2, 69:12, 75:4, 80:13, 80:15, 82:7, 84:2, 86:16, 86:18, 88:12, 91:24, 92:2, 92:8, 92:10, 92:18, 93:23, 94:5
**staffed** [1] - 88:21
**staffing** [3] - 79:6, 79:11, 88:18
**stakeholder** [4] - 70:24, 70:25, 71:1, 71:2
**stakeholders** [3] - 70:19, 71:5, 75:1
**stamp** [3] - 26:19, 27:21, 27:22
**stand** [5] - 4:9, 19:16, 54:5, 94:6, 116:17
**standards** [1] - 91:12
**standing** [8] - 35:17, 108:23, 108:25, 109:2, 109:10, 109:18, 110:19, 128:4
**stands** [1] - 6:1
**start** [3] - 11:13, 70:7, 74:3
**started** [8] - 7:20, 8:6, 8:9, 21:22, 27:11, 41:7, 45:17, 48:1
**starting** [2] - 3:5, 70:16
**starts** [1] - 79:22

**state** [12] - 3:5, 19:23, 20:5, 35:2, 68:18, 74:12, 87:19, 88:2, 88:3, 91:7, 91:9, 100:14
**states** [2] - 80:6, 85:2
**States** [1] - 3:14
**stating** [1] - 107:5
**status** [8] - 3:25, 4:17, 5:7, 12:12, 74:23, 112:10, 123:15
**statute** [8] - 6:11, 80:12, 80:14, 86:13, 86:15, 103:17, 106:16, 121:24
**statutes** [1] - 107:7
**statutorily** [27] - 5:16, 6:9, 9:7, 32:2, 39:24, 79:1, 80:24, 81:2, 81:3, 82:13, 83:11, 101:12, 102:7, 103:3, 115:8, 115:22, 115:25, 116:13, 116:16, 117:7, 117:9, 118:1, 118:15, 118:21, 119:4, 119:9, 127:4
**statutorily-authorized** [1] - 101:12
**statutory** [26] - 9:18, 9:20, 15:22, 21:20, 22:16, 23:3, 25:12, 31:7, 69:13, 80:7, 86:12, 92:4, 101:13, 101:21, 106:1, 106:5, 106:14, 116:21, 117:14, 118:16, 118:18, 120:6, 121:20, 123:15, 123:25, 128:5
**statutory-authorized** [1] - 101:13
**statutory-required** [1] - 22:16
**stay** [1] - 30:14
**steal** [1] - 121:8
**Steege** [1] - 107:17
**step** [2] - 33:4, 100:7
**steps** [1] - 86:16
**still** [26] - 3:22, 4:1, 4:4, 4:9, 17:7, 19:16, 24:8, 52:6, 53:18, 53:19, 63:18, 63:24, 64:21, 88:15, 99:13, 101:7, 107:25, 108:4, 108:17, 111:8, 115:7, 125:13, 126:21, 127:8, 127:24, 128:2
**stop** [43] - 10:22, 10:25, 28:23, 29:9, 29:13, 29:15, 29:16, 35:16, 36:15, 37:3,

37:5, 41:10, 50:11, 50:14, 54:6, 65:6, 76:12, 76:20, 76:24, 77:2, 77:5, 77:8, 77:11, 87:5, 89:7, 90:2, 90:21, 91:1, 93:24, 96:11, 101:11, 102:24, 103:16, 104:7, 104:22, 104:24, 105:4, 105:8, 108:2, 117:25, 124:17, 124:18, 125:11
**stop-work** [30] - 10:22, 10:25, 28:23, 29:9, 29:16, 36:15, 37:3, 37:5, 41:10, 50:11, 65:6, 76:12, 76:24, 77:2, 77:5, 77:8, 77:11, 87:5, 89:7, 90:2, 90:21, 93:24, 96:11, 101:11, 102:24, 103:16, 105:4, 108:2, 124:17, 124:18
**stoppage** [2] - 35:21, 91:1
**stopped** [11] - 16:3, 16:8, 17:3, 28:14, 28:18, 28:21, 61:23, 67:1, 70:11, 96:7, 107:25
**stopping** [1] - 12:17
**straight** [1] - 120:12
**streamlining** [1] - 122:14
**stressed** [2] - 51:12, 100:25
**strip** [1] - 106:18
**stripping** [1] - 106:15
**structure** [1] - 106:2
**struggled** [1] - 59:22
**student** [2] - 107:17, 107:18
**Students** [1] - 72:6
**studied** [1] - 20:22
**stuff** [1] - 123:16
**subject** [7] - 47:20, 48:24, 77:13, 84:21, 89:21, 96:2, 111:20
**submits** [1] - 75:17
**submitted** [4] - 67:6, 94:1, 116:11, 116:14
**subscription** [1] - 75:11
**subscription-based** [1] - 75:11
**subsequent** [3] - 13:14, 13:18, 16:2
**subsequently** [3] - 15:7, 47:12, 79:3
**substance** [2] - 4:2, 58:7
**substitution** [1] -

101:4
**success** [1] - 102:12
**successful** [1] - 72:19
**sues** [1] - 74:11
**suffer** [1] - 108:23
**sufficient** [3] - 102:3, 104:22, 105:13
**suing** [1] - 103:15
**summary** [1] - 56:7
**summed** [1] - 82:3
**Sunday** [1] - 76:8
**supersede** [1] - 129:6
**superseded** [1] - 112:21
**supervision** [3] - 72:13, 119:13, 123:2
**Supervision** [4] - 49:22, 50:3, 55:11, 55:17
**support** [11] - 12:5, 71:20, 73:18, 73:19, 73:25, 74:2, 75:7, 80:18, 80:22, 80:23, 89:15
**supports** [3] - 74:7, 88:8, 127:23
**supposed** [2] - 23:19, 119:6
**Supreme** [8] - 105:24, 106:6, 109:4, 109:5, 110:11, 121:12, 122:19, 123:2
**surprised** [3] - 17:1, 17:5, 17:6
**suspected** [1] - 71:25
**suspend** [1] - 118:14
**suspension** [1] - 111:24
**sworn** [2] - 33:17, 68:5
**system** [17] - 12:12, 12:14, 23:22, 72:2, 72:9, 72:19, 84:9, 88:9, 88:22, 89:1, 89:2, 89:4, 91:16, 92:11
**System** [1] - 105:16
**systems** [4] - 29:12, 53:25, 71:23, 87:22

**T**

**tab** [22] - 7:2, 8:20, 12:25, 13:25, 14:5, 15:8, 17:7, 18:19, 26:20, 27:22, 30:10, 30:17, 30:18, 78:3, 79:19, 80:4, 85:25, 93:13, 93:14, 96:13, 96:15, 96:17
**table** [5] - 3:8, 3:15, 23:18, 66:8, 129:18

**tabs** [2] - 6:21, 78:3
**tailored** [1] - 101:22
**takeover** [1] - 21:2
**takeovers** [1] - 20:23
**talks** [2] - 62:18, 102:14
**targeted** [1] - 126:23
**task** [1] - 94:6
**tasked** [1] - 121:17
**tasks** [7] - 25:8, 35:16, 35:21, 84:7, 94:6, 94:10, 96:12
**taxpayers** [1] - 122:9
**team** [44] - 19:17, 24:19, 37:22, 37:24, 38:1, 38:2, 38:6, 38:14, 38:19, 38:22, 38:23, 46:10, 47:7, 47:10, 49:13, 52:16, 53:25, 54:3, 54:10, 54:12, 54:23, 55:2, 57:7, 58:18, 60:3, 60:4, 60:15, 61:13, 61:17, 61:22, 63:8, 63:13, 64:20, 64:21, 65:1, 65:3, 66:20, 71:11, 84:16, 84:17, 85:3, 85:4, 85:9, 127:8
**Teams** [4] - 39:4, 42:15, 42:18
**teams** [7] - 31:6, 80:17, 80:18, 81:4, 81:16, 83:3, 86:19
**technology** [4] - 70:18, 71:22, 75:15, 87:18
**template** [4] - 27:18, 47:19, 48:3, 48:16
**templates** [12] - 35:23, 35:25, 36:3, 36:10, 36:16, 37:19, 46:6, 46:8, 46:25, 47:4, 47:18, 47:19
**temporary** [4] - 57:12, 59:10, 114:15, 114:18
**ten** [2] - 35:4, 67:21
**ten-minute** [1] - 67:21
**tenure** [1] - 48:9
**term** [10] - 45:14, 71:2, 80:9, 104:1, 104:6, 111:22, 120:11, 120:22, 123:25
**terminate** [4] - 28:15, 104:21, 112:24, 118:14
**terminated** [6] - 7:12, 8:18, 29:24, 37:19, 83:6, 91:15
**terminating** [1] - 104:7
**termination** [15] - 5:9, 7:9, 27:18, 28:5, 28:23,

29:9, 29:17, 29:22, 30:4, 30:15, 48:24, 103:24, 112:17, 125:23, 128:21

**terminations** [4] - 28:18, 44:9, 101:12

**terms** [4] - 10:17, 19:17, 22:3, 83:6

**terrible** [1] - 31:24

**terrific** [1] - 129:21

**testified** [10] - 17:11, 19:23, 20:8, 33:18, 68:6, 91:24, 92:2, 92:22, 116:9, 123:22

**testify** [3] - 21:2, 65:12, 65:25

**testifying** [2] - 66:14, 91:21

**testimony** [33] - 3:18, 4:15, 8:21, 9:15, 9:21, 14:24, 17:13, 17:15, 18:23, 19:15, 19:16, 20:6, 34:3, 34:9, 40:22, 57:6, 58:2, 65:10, 98:12, 100:13, 100:14, 101:25, 104:18, 104:24, 106:22, 111:15, 111:16, 112:4, 112:18, 113:12, 114:25, 125:5, 126:1

**text** [1] - 101:18

**thanked** [1] - 52:8

**THE** [221] - 3:2, 3:11, 3:17, 3:24, 4:6, 4:24, 5:3, 5:11, 5:12, 5:21, 5:24, 6:1, 6:3, 6:4, 6:7, 6:17, 6:19, 6:25, 7:17, 7:18, 8:2, 8:4, 8:11, 8:12, 8:14, 8:16, 12:1, 12:10, 12:11, 12:14, 12:15, 12:16, 12:18, 12:19, 14:1, 14:3, 15:12, 15:14, 15:15, 15:16, 15:18, 15:20, 16:5, 16:7, 16:9, 16:12, 16:14, 17:19, 17:20, 17:21, 18:20, 21:1, 21:4, 21:5, 21:7, 21:8, 22:24, 23:1, 23:24, 24:6, 24:7, 24:13, 24:15, 24:18, 24:20, 24:21, 24:22, 24:23, 25:21, 25:23, 25:24, 26:3, 26:6, 26:9, 30:1, 33:2, 33:3, 33:4, 33:8, 33:12, 33:22, 34:1, 37:10, 37:13, 37:16, 40:16, 42:12, 42:14, 42:15, 42:17, 42:20, 44:22, 45:3, 45:5, 45:9,

45:13, 45:15, 45:17, 45:19, 49:10, 50:18, 50:21, 56:7, 57:25, 60:8, 60:10, 60:11, 60:13, 60:14, 60:17, 60:19, 60:23, 60:25, 62:8, 62:10, 62:11, 62:12, 64:25, 65:2, 65:8, 65:16, 65:20, 65:22, 66:2, 66:6, 67:16, 67:18, 67:20, 67:24, 68:7, 68:9, 68:10, 68:12, 68:13, 70:22, 70:24, 70:25, 71:1, 71:2, 71:4, 72:20, 72:22, 73:7, 73:9, 73:10, 73:12, 73:16, 73:22, 74:17, 74:19, 74:25, 75:3, 75:5, 80:2, 81:24, 82:2, 82:3, 82:5, 82:9, 91:18, 95:4, 95:12, 95:15, 98:10, 98:19, 99:9, 100:6, 100:8, 100:9, 100:12, 101:23, 102:11, 103:5, 103:8, 103:12, 103:15, 104:4, 105:14, 105:22, 107:19, 108:21, 109:19, 109:24, 110:7, 110:12, 110:14, 110:25, 111:2, 111:6, 113:8, 113:24, 114:19, 115:2, 115:16, 115:19, 116:2, 116:7, 116:12, 116:19, 117:3, 117:5, 117:16, 117:24, 118:25, 120:10, 120:17, 120:25, 121:4, 121:21, 123:8, 123:10, 124:7, 124:10, 124:12, 124:14, 124:18, 124:20, 126:12, 128:25, 129:2, 129:7

**themselves** [4] - 62:24, 73:8, 104:22, 105:12

**then-acting** [1] - 76:2

**thereabouts** [1] - 51:21

**thereafter** [5] - 8:7, 8:10, 8:11, 8:12, 15:7

**therefore** [1] - 122:25

**they've** [7] - 65:5, 72:18, 109:3, 117:22, 117:24, 117:25, 120:22

**thinking** [3] - 18:2, 101:3, 127:21

**thinks** [1] - 120:20

**third** [4] - 10:12, 10:15, 111:19, 118:19

**third-party** [3] - 10:12, 10:15, 111:19

**thorough** [1] - 26:10

**thousands** [2] - 90:7, 92:14

**three** [8] - 5:17, 35:3, 42:2, 86:25, 95:20, 95:25, 96:3, 105:8

**three-week** [4] - 95:20, 95:25, 96:3, 105:8

**Thrift** [2] - 55:11, 55:17

**throughout** [3] - 82:19, 85:18

**thunder** [1] - 121:8

**Thunder** [1] - 106:12

**Thursday** [6] - 62:1, 63:11, 63:23, 64:4, 64:7, 79:9

**tickets** [1] - 89:15

**timeline** [4] - 28:7, 43:22, 51:9, 109:23

**timely** [1] - 89:6

**timing** [2] - 41:11, 51:18

**today** [16] - 6:22, 21:10, 21:15, 23:15, 26:12, 52:17, 53:15, 53:18, 58:8, 65:12, 91:21, 100:10, 104:18, 116:17, 117:6, 119:12

**together** [6] - 47:3, 51:13, 114:22, 126:7, 126:9, 126:25

**toll** [2] - 80:12, 80:13

**toll-free** [2] - 80:12, 80:13

**top** [3] - 30:20, 70:7, 93:15

**topic** [2] - 6:12, 25:5

**topics** [1] - 10:19

**Torro** [1] - 27:23

**total** [4] - 80:7, 81:6, 81:20, 82:1

**touched** [1] - 89:22

**towards** [2] - 98:15, 106:24

**tracks** [1] - 107:25

**transcript** [2] - 5:5, 20:2

**transfer** [6] - 39:19, 39:22, 55:9, 55:14, 55:15, 56:14

**transferred** [1] - 40:2

**transferring** [1] - 44:18

**travel** [1] - 59:5

**Treasury** [1] - 3:3

**tribunal** [2] - 107:9,

107:11

**tribunals** [1] - 107:6

**tried** [1] - 15:25

**trigger** [1] - 107:23

**TRO** [2] - 111:8, 114:20

**true** [8] - 92:6, 92:10, 103:24, 103:25, 104:2, 104:17, 115:12, 124:24

**trusting** [1] - 21:19

**try** [6] - 33:24, 46:20, 64:19, 68:10, 75:1, 90:12

**trying** [9] - 51:12, 105:5, 105:11, 121:6, 121:23, 122:22, 123:13, 124:24, 126:3

**Ts** [1] - 64:16

**Tuesday** [4] - 62:1, 62:6, 63:6, 89:12

**turn** [24] - 6:15, 7:2, 8:20, 9:6, 10:3, 12:25, 15:9, 18:19, 26:19, 27:21, 29:3, 30:10, 46:19, 78:2, 78:3, 79:19, 85:25, 86:7, 93:13, 93:15, 96:13, 96:15, 99:13, 114:3

**turned** [8] - 9:25, 23:11, 29:4, 30:6, 88:6, 126:15, 126:16

**turning** [1] - 23:14

**two** [18] - 11:19, 30:9, 31:17, 38:22, 38:23, 41:18, 53:24, 61:6, 79:24, 81:6, 94:1, 102:15, 108:9, 112:4, 114:21, 118:11, 125:2, 126:13, 128:15

**type** [7] - 23:6, 47:2, 93:9, 101:4, 106:1, 118:9

**typical** [3] - 19:11, 95:22, 95:24

**typically** [2] - 23:5, 41:23, 73:1, 88:14

## U

**U.S** [1] - 103:9

**ultimate** [1] - 105:11

**ultimately** [4] - 18:10, 36:12, 36:17, 113:5

**ultra** [1] - 102:14

**um-hum** [9] - 28:1, 30:22, 32:3, 39:8, 40:12, 49:10, 49:15, 51:8, 60:13

**umbrella** [1] - 122:13

**unclear** [3] - 112:4,

112:13, 120:4

**unconstitutional** [4] - 107:6, 107:10, 107:11, 109:17

**under** [16] - 4:9, 22:23, 34:6, 34:9, 54:13, 54:19, 58:12, 102:20, 102:22, 114:18, 117:10, 117:18, 120:2, 122:13, 123:7, 124:3

**underlying** [2] - 9:8, 105:18

**undermines** [1] - 26:12

**understandable** [1] - 129:12

**understood** [7] - 30:8, 39:25, 40:1, 59:18, 63:23, 94:18, 110:5

**Union** [1] - 3:3

**union** [3] - 22:18, 57:12, 106:3

**unions** [1] - 112:12

**unique** [1] - 124:3

**unit** [3] - 75:10, 94:25

**United** [1] - 3:14

**units** [7] - 40:10, 40:11, 43:13, 48:23, 50:6, 50:15, 99:23

**unlawful** [1] - 102:20

**unless** [4] - 32:19, 125:8, 125:9

**unprecedented** [3] - 93:6, 93:7, 93:10

**unrelated** [1] - 65:17

**unusual** [1] - 54:20

**up** [37] - 3:18, 4:7, 15:3, 15:19, 15:20, 16:17, 18:1, 24:3, 26:7, 28:9, 38:1, 39:4, 42:15, 43:12, 44:1, 44:20, 48:22, 49:2, 52:5, 54:10, 54:18, 54:20, 62:25, 70:1, 74:5, 74:21, 82:4, 93:10, 94:17, 98:12, 105:5, 113:18, 117:16, 117:17, 121:7, 122:3, 127:12

**update** [2] - 57:13, 74:23

**updates** [3] - 70:10, 79:18, 89:18

**upsetting** [1] - 49:25

**upshot** [1] - 104:8

**urgency** [1] - 93:9

**urgent** [16] - 11:3, 11:10, 11:14, 94:11, 94:12, 94:16, 94:18, 94:22, 94:23, 95:2,

96:8, 96:12, 116:9, 116:12, 124:21, 124:22

**US** [1] - 5:25

**user** [1] - 87:25

**users** [7] - 71:6, 71:7, 88:1, 89:16

**Utah** [1] - 121:15

---

**V**

---

**vacate** [1] - 129:7

**vague** [1] - 117:4

**Vanessa** [1] - 27:23

**variety** [5] - 72:10, 80:18, 87:1, 90:25, 100:23

**various** [9] - 4:15, 5:7, 10:10, 39:14, 66:19, 69:15, 70:16, 119:20, 126:6

**vehicle** [1] - 74:11

**vendor** [4] - 10:18, 29:18, 84:8, 88:15

**vendors** [2] - 29:3, 72:1

**verification** [1] - 75:12

**versa** [1] - 114:17

**version** [2] - 118:12, 126:23

**versus** [3] - 3:4, 9:19, 21:15

**vice** [1] - 114:17

**view** [3] - 118:18, 118:19

**violate** [1] - 54:9

**violates** [1] - 121:24

**violating** [2] - 101:2

**violation** [8] - 103:1, 103:8, 103:9, 103:17, 108:17, 108:19, 128:5

**vires** [1] - 102:15

**virus** [2] - 75:16, 75:17

**voluntary** [1] - 107:20

**Vought** [24] - 3:4, 11:6, 21:6, 35:7, 35:16, 36:15, 40:19, 41:9, 42:8, 42:9, 42:13, 42:17, 44:8, 46:2, 54:5, 54:14, 56:19, 60:6, 66:22, 75:21, 76:10, 93:23, 124:16, 127:12

**Vought's** [6] - 17:12, 17:17, 37:3, 41:9, 50:10, 90:10

---

**W**

---

**waiting** [2] - 52:6, 114:16

**walk** [3] - 80:10,

111:1, 111:3

**walked** [1] - 76:23

**warranted** [1] - 110:20

**ways** [3] - 41:18, 125:1, 129:11

**website** [1] - 12:13

**Wednesday** [2] - 14:9, 97:15

**week** [29] - 19:24, 20:11, 20:24, 22:1, 24:6, 24:7, 24:13, 28:6, 58:6, 59:23, 62:1, 76:3, 77:16, 79:5, 83:4, 84:5, 85:21, 87:23, 89:8, 95:20, 95:25, 96:3, 98:6, 100:24, 105:6, 105:8, 113:7, 128:23, 129:21

**weekly** [1] - 88:4

**weeks** [6] - 62:3, 86:25, 87:2, 90:20, 118:6, 126:13

**weight** [1] - 40:21

**welcome** [1] - 4:13

**Wendy** [1] - 3:10

**Wessler** [1] - 3:9

**whistleblower** [2] - 34:10, 58:11

**White** [4] - 26:22, 27:12, 59:4, 122:6

**white** [1] - 49:24

**whole** [4] - 44:14, 50:15, 105:7, 110:25

**wholesale** [2] - 103:24, 123:2

**Wick** [5] - 38:25, 39:3, 44:3, 77:23, 79:16

**willing** [2] - 128:18, 128:20

**wind** [4] - 55:13, 55:23, 104:3, 104:19

**wind-down** [2] - 55:13, 55:23

**winding** [1] - 56:21

**window** [2] - 28:19, 114:14

**wiped** [1] - 59:3

**WITNESS** [58] - 5:12, 5:24, 6:3, 6:7, 6:19, 7:18, 8:4, 8:12, 8:16, 12:11, 12:15, 12:18, 14:3, 15:14, 15:16, 15:20, 16:7, 16:12, 17:20, 21:4, 21:7, 23:1, 24:6, 24:13, 24:18, 24:21, 24:23, 25:23, 33:3, 34:1, 37:13, 42:14, 42:17, 45:5, 45:13, 45:17, 49:10, 50:21, 60:10, 60:13,

60:17, 62:10, 62:12, 65:2, 68:9, 68:12, 70:24, 71:1, 71:4, 72:22, 73:9, 73:12, 74:19, 75:3, 82:2, 82:5, 95:15, 100:8

**witness** [13] - 4:8, 33:9, 33:14, 33:17, 40:18, 40:23, 66:7, 67:20, 67:22, 68:1, 68:5, 100:7, 123:21

**witnesses** [5] - 33:5, 33:7, 65:24, 100:10, 104:10

**wondering** [1] - 22:2

**word** [2] - 20:22, 127:19

**wording** [1] - 36:4

**words** [6] - 9:7, 9:18, 38:2, 40:5, 55:25, 115:5

**workforce** [3] - 22:9, 22:13, 23:4

**works** [1] - 87:17

**worry** [1] - 123:16

**wrestle** [1] - 105:5

**write** [3] - 65:17, 79:5, 95:15

**writing** [5] - 54:9, 81:16, 83:19, 94:9, 129:8

**written** [2] - 124:12, 125:10

**wrote** [3] - 79:22, 85:14, 120:18

---

**Y**

---

**year** [2] - 70:8, 73:14

**years** [6] - 10:2, 35:3, 35:4, 89:23, 91:6, 91:13

**Yellen** [2] - 109:13, 110:8

**yesterday** [20] - 4:15, 5:6, 7:6, 8:21, 9:16, 10:21, 14:24, 17:11, 18:23, 19:15, 19:23, 20:8, 20:21, 23:2, 23:24, 24:15, 25:19, 28:7, 65:23, 128:17

**Young** [3] - 72:7, 74:10, 87:16

**yourself** [1] - 26:12

---

**Z**

---

**Zieve** [1] - 3:10