**[ORAL ARGUMENT SCHEDULED MAY 16, 2025]**

**Nos. 25-5091, 25-5132**

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees,*

*v.*

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**CORRECTED JOINT APPENDIX
VOLUME I**

———————————

DEEPAK GUPTA
ROBERT FRIEDMAN
GABRIEL CHESS
  *Gupta Wessler LLP*
  *2001 K Street NW*
  *Suite 850 North*
  *Washington, DC 20006*
  *(202) 888-1741*

JENNIFER D. BENNETT
  *Gupta Wessler LLP*
  *505 Montgomery Street*
  *San Francisco, CA 94111*
  *(415) 573-0336*

*Counsel for Plaintiffs*

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
CATHERINE PADHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7712*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5091*

*Counsel for Defendants*

*(additional counsel listed on inside cover)*

JULIE WILSON
  *General Counsel*

PARAS N. SHAH
  *Deputy General Counsel*

ALLISON C. GILES
  *Assistant Counsel*
  *National Treasury Employees Union*
  *800 K Street NW, Suite 1000*
  *Washington, DC 20001*
  *(202) 572-5500*

WENDY LIU
ADINA H. ROSENBAUM
  *Public Citizen Litigation Group*
  *1600 20th Street NW*
  *Washington, DC 20009*
  *(202) 588-1000*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

## VOLUME I

Docket Report ..................................................................................JA1

Amended Complaint (Dkt. 7)............................................................JA18

Kaspar Decl. (Dkt. 14-1) ................................................................JA50

Bross Decl. (Dkt. 14-3) ..................................................................JA56

Meyer Decl. (Dkt. 14-4)..................................................................JA60

Speer Decl. (Dkt. 14-5) ..................................................................JA70

Dubois Decl. (Dkt. 14-6) ...............................................................JA77

Second Meyer Decl. (Dkt. 18) ........................................................JA96

Order (Dkt. 19)...............................................................................JA99

Feb. 10 Email (Dkt. 23-4) ...............................................................JA101

Martinez Decl. Feb. 24 (Dkt. 31-1)  .............................................JA102

Alex Doe Decl. (Dkt. 38-2) ............................................................JA124

Blake Doe Decl. (Dkt. 38-3)  .........................................................JA127

Charlie Doe Decl. (Dkt. 38-4) ........................................................JA129

Drew Doe Decl. (Dkt. 38-5) ...........................................................JA134

Scott Decl. (Dkt. 38-6)  .................................................................JA138

Pfaff Decl. (Dkt. 38-7) ...................................................................JA142

Shearer Decl. (Dkt. 38-8) ...............................................................JA155

Third Meyer Decl. (Dkt. 38-9)........................................................JA167

Barnard Decl. (Dkt. 38-10) ............................................................................JA183

Salas Decl. (Dkt. 38-11) ...............................................................................JA192

Halperin Decl. (Dkt. 38-12) ........................................................................JA197

Frotman Decl. (Dkt. 38-13) .........................................................................JA203

West-Tillman Decl. (Dkt. 38-14) .................................................................JA217

Coll Decl. (Dkt. 38-15) ................................................................................JA219

Diotalevi Decl. (Dkt. 41-1) ..........................................................................JA223

Martinez Decl. March 2 (Dkt. 47-1) ............................................................JA240

Second Pfaff Decl. (Dkt. 48-2) .....................................................................JA243

Emory Doe Decl. (Dkt. 48-3) .......................................................................JA246

Francis Doe Decl. (Dkt. 48-4) ......................................................................JA248

Greer Doe Decl. (Dkt. 48-5) .........................................................................JA251

CFPB Emails (Dkt. 56-1) .............................................................................JA283

Communications Index (Dkt. 57-1) ..............................................................JA399

Plaintiffs' Filed Communications (Dkt. 60-1) .............................................JA401

Plaintiffs' Supplemental Communications (Dkt. 66-1)...............................JA510

Plaintiffs' Supplemental Index (Dkt. 67) ....................................................JA570

Notice of Proposed Order (Dkt. 79).............................................................JA630

## VOLUME II

Preliminary Injunction Opinion (Dkt. 87) ...................................................JA633

Preliminary Injunction Order (Dkt. 88) .....................................................JA745

Notice of Appeal (Dkt. 89) ........................................................................JA748

Stay Order (Dkt. 102) ................................................................................JA750

Paoletta Decl. (Dkt. 109) ...........................................................................JA755

Order (Dkt. 113)........................................................................................JA892

Notice of Appeal (Dkt. 115) ......................................................................JA899

March 10 Transcript ..................................................................................JA900

March 11 Transcript ................................................................................JA1175

## U.S. District Court
### District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:25–cv–00381–ABJ

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION v. VOUGHT | Date Filed: 02/09/2025 |
| Assigned to: Judge Amy Berman Jackson | Jury Demand: None |
| Case in other court: USCA, 25–05091 | Nature of Suit: 899 Administrative |
| USCA, 25–05132 | Procedure Act/Review or Appeal of |
| Cause: 28:2201 Declaratory Judgment | Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

| Date Filed | # | Docket Text |
|---|---|---|
| 02/09/2025 | 1 | COMPLAINT against RUSSELL VOUGHT ( Filing fee $ 405 receipt number ADCDC–11467139) filed by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons)(Wilson, Julie) (Entered: 02/09/2025) |
| 02/10/2025 | 2 | NOTICE of Appearance by Allison Conrey Giles on behalf of NATIONAL TREASURY EMPLOYEES UNION (Giles, Allison) (Entered: 02/10/2025) |
| 02/10/2025 | 3 | NOTICE of Appearance by Paras N. Shah on behalf of NATIONAL TREASURY EMPLOYEES UNION (Shah, Paras) (Entered: 02/10/2025) |
| 02/10/2025 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL TREASURY EMPLOYEES UNION (Wilson, Julie) (Entered: 02/10/2025) |
| 02/10/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 1 COMPLAINT against RUSSELL VOUGHT filed by NATIONAL TREASURY EMPLOYEES UNION. (Wilson, Julie).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/17/2025. (znmw) Modified on 2/12/2025 (zhcn). (Entered: 02/10/2025) |
| 02/10/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 2 NOTICE of Appearance by Allison Conrey Giles on behalf of NATIONAL TREASURY EMPLOYEES UNION (Giles, Allison).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/17/2025. (znmw) Modified on 2/10/2025 (zhcn). (Entered: 02/10/2025) |
| 02/12/2025 | | Case Assigned to Judge Amy Berman Jackson. (znmw) (Entered: 02/12/2025) |
| 02/12/2025 | 5 | SUMMONS (3) Issued Electronically as to RUSSELL VOUGHT, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 02/12/2025) |

| 02/13/2025 | 6 | NOTICE of Appearance by Deepak Gupta on behalf of All Plaintiffs (Gupta, Deepak) (Entered: 02/13/2025) |
|---|---|---|
| 02/13/2025 | 7 | AMENDED COMPLAINT against All Defendants filed by NATIONAL TREASURY EMPLOYEES UNION.(Gupta, Deepak) (Entered: 02/13/2025) |
| 02/13/2025 | 8 | REQUEST FOR SUMMONS TO ISSUE filed by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, CFPB EMPLOYEE ASSOCIATION, VIRGINIA POVERTY LAW CENTER, NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, EVA STEEGE. Related document: 7 Amended Complaint filed by NATIONAL TREASURY EMPLOYEES UNION. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons)(Gupta, Deepak) (Entered: 02/13/2025) |
| 02/13/2025 | 9 | NOTICE of Appearance by Wendy Liu on behalf of All Plaintiffs (Liu, Wendy) (Entered: 02/13/2025) |
| 02/13/2025 | 10 | MOTION for Temporary Restraining Order *and for Administrative Stay* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (Attachments: # 1 Text of Proposed Order for Temporary Restraining Order, # 2 Text of Proposed Order for Administrative Stay)(Gupta, Deepak). Added MOTION to Stay on 2/14/2025 (zdp). (Entered: 02/13/2025) |
| 02/13/2025 | 11 | NOTICE of Appearance by Allison Marcy Zieve on behalf of All Plaintiffs (Zieve, Allison) (Entered: 02/13/2025) |
| 02/13/2025 | 12 | NOTICE of Appearance by Robert D. Friedman on behalf of All Plaintiffs (Friedman, Robert) (Entered: 02/13/2025) |
| 02/14/2025 | 13 | NOTICE of Appearance by Adam R. Pulver on behalf of All Plaintiffs (Pulver, Adam) (Entered: 02/14/2025) |
| 02/14/2025 | 14 | SUPPLEMENTAL MEMORANDUM to re 10 MOTION for Temporary Restraining Order by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (Attachments: # 1 Exhibit 1: Index and Kaspar Declaration, # 2 Exhibit 2: Steege Declaration, # 3 Exhibit 3: Bross Declaration, # 4 Exhibit 4: Meyer Declaration, # 5 Exhibit 5: Speer Declaration, # 6 Exhibit 6: Dubois Declaration, # 7 Exhibit 7: Rheingold Declaration, # 8 Exhibit 8: Blumenthal Declaration, # 9 Exhibit 9: Halperin Declaration)(Gupta, Deepak) Modified docket text on 2/14/2025 (zdp). (Entered: 02/14/2025) |
| 02/14/2025 | 15 | NOTICE by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION re 10 Motion for TRO, (Gupta, Deepak) (Entered: 02/14/2025) |
| 02/14/2025 | 16 | SUMMONS (4) Issued as to CONSUMER FINANCIAL PROTECTION BUREAU, RUSSELL VOUGHT, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zdp) (Entered: 02/14/2025) |
| 02/14/2025 | 17 | NOTICE of Appearance by Brad P. Rosenberg on behalf of All Defendants (Rosenberg, Brad) (Entered: 02/14/2025) |
| 02/14/2025 | | NOTICE of Hearing: Scheduling Conference set for 2/14/2025 at 2:00 PM in Courtroom 25A– In Person before Judge Amy Berman Jackson. The hearing will proceed in person for the parties and by telephone for members of the public. Toll Free Number 833–990–9400. Meeting ID: 208322628. (zdrf) (Entered: 02/14/2025) |
| 02/14/2025 | 18 | DECLARATION of *Erie Meyer* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION re 14 MOTION |

| | | |
|---|---|---|
| | | for Temporary Restraining Order *and Administrative Stay*. (Gupta, Deepak) (Entered: 02/14/2025) |
| 02/14/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 12 NOTICE of Appearance by Robert D. Friedman on behalf of All Plaintiffs (Friedman, Robert).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/21/2025. (zapb) Modified on 2/18/2025 (zhcn). (Entered: 02/14/2025) |
| 02/14/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 9 NOTICE of Appearance by Wendy Liu on behalf of All Plaintiffs (Liu, Wendy).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/21/2025. (zapb) Modified on 2/18/2025 (zhcn). (Entered: 02/14/2025) |
| 02/14/2025 | | Minute Entry for Scheduling Conference proceedings held on 2/14/2025 before Judge Amy Berman Jackson. Order forthcoming via Chambers. (Court Reporter Janice Dickman.) (zdrf) (Entered: 02/14/2025) |
| 02/14/2025 | 19 | ORDER. In light of the agreement of the parties at today's scheduling conference and the underlying record, the accompanying order will remain in place until the resolution of plaintiffs' 10 motion for temporary restraining order, which, with the parties' consent, will be deemed to be a motion for preliminary injunction. The Order provides that defendants shall not: delete, destroy, remove, or impair any data, database or other CFPB records; terminate any CFPB employee, except for cause related to the specific employee's performance or conduct; issue any notice of reduction–in–force to any CFPB employee; or transfer, relinquish, or return any money from the CFPB's reserve funds. A hearing on plaintiffs' motion is SET for March 3, 2025 at 10:00 in Courtroom 25A. Members of the public can access the hearing via toll free number 833–990–9400. Meeting ID 208322628. See Order for further details. Signed by Judge Amy Berman Jackson on 2/14/2025. (lcabj2) (Entered: 02/14/2025) |
| 02/18/2025 | 20 | NOTICE of Proposed Order by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION (Attachments: # 1 Text of Proposed Order(Gupta, Deepak) (Entered: 02/18/2025) |
| 02/20/2025 | | MINUTE ORDER. Defendants are ORDERED to file with the Court by 9:30 A.M., Friday, February 21, 2025 copies of (a) the February 3, 2025 email sent by the then–Acting Director Scott Bessent, titled "Instruction from Acting Director," referenced in plaintiffs' memorandum 14 at page 9; (b) the February 8, 2025 bureau–wide email sent by Acting Director Russell Vought referenced in plaintiffs' memorandum at page 10; (c) the February 9, 2025 email sent by CFPB Chief Operating Officer Adam Martinez to all CFPB staff, referenced in the amended complaint 7 at paragraph 45; and (d) the February 10, 2025 email sent by Acting Director Vought, titled "Additional Directives on Bureau Activities," referenced in the amended complaint at paragraph 46. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/20/25. (DMK) (Entered: 02/20/2025) |

| 02/20/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Jennifer D. Bennett, Filing fee $ 100, receipt number ADCDC–11493768. Fee Status: Fee Paid. by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (Attachments: # 1 Declaration, # 2 Exhibit (Certificate of Good Standing), # 3 Text of Proposed Order)(Friedman, Robert) (Entered: 02/20/2025) |
|---|---|---|
| 02/21/2025 | 23 | NOTICE *OF FILING (AMENDED)* by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU re Order,,,, Set Deadlines,,, (Attachments: # 1 Feb. 3, 2025 email, "Instructions from Acting Director", # 2 Feb. 8, 2025 email, "Directives on Bureau Activities", # 3 Feb. 9, 2025 email, "Please Read: DC Headquarters Building Operating Status (2/10–2/14)", # 4 Feb. 10, 2025 email, "Additional Directives on Bureau Activities" (redaction added))(Rosenberg, Brad) (Entered: 02/21/2025) |
| 02/21/2025 | | MINUTE ORDER granting 21 Motion for Leave of Jennifer D. Bennett to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Amy Berman Jackson on 2/21/25. (DMK) (Entered: 02/21/2025) |
| 02/21/2025 | 24 | AMICUS BRIEF *In Support of Plaintiffs' Motion for a Prelimination Injunction* by The State of New York, the State of New Jersey, the District of Columbia, and the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Mich. (Oser, Andrea) (Entered: 02/21/2025) |
| 02/21/2025 | 25 | NOTICE of Appearance by Noah Hy Brozinsky on behalf of Tzedek DC (Brozinsky, Noah) (Entered: 02/21/2025) |
| 02/21/2025 | 26 | NOTICE of Appearance by William Bullock Pittard, IV on behalf of Tzedek DC (Pittard, William) (Entered: 02/21/2025) |
| 02/21/2025 | 27 | Unopposed MOTION for Leave to File *Amicus Brief* by Tzedek DC. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order Proposed Order)(Brozinsky, Noah) (Entered: 02/21/2025) |
| 02/21/2025 | 28 | NOTICE of Appearance by Ariel B. Levinson–Waldman on behalf of Tzedek DC (Levinson–Waldman, Ariel) (Entered: 02/21/2025) |
| 02/24/2025 | 29 | NOTICE of Appearance by Jennifer Bennett on behalf of All Plaintiffs (Bennett, Jennifer) (Entered: 02/24/2025) |
| 02/24/2025 | 30 | NOTICE of Appearance by Liam Holland on behalf of RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU (Holland, Liam) (Entered: 02/24/2025) |
| 02/24/2025 | 31 | Memorandum in opposition to re 10 Motion for TRO,, Motion to Stay, *Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction* filed by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. (Attachments: # 1 Exhibit 1 (Martinez Decl. & Exhibits), # 2 Exhibit 2 (CFPB and NTEA CBA))(Holland, Liam) (Entered: 02/24/2025) |
| 02/25/2025 | | MINUTE ORDER granting 27 Tzedek DC's unopposed motion for leave to file amicus brief. The Clerk of Court is directed to file [27–1] Tzedek DC's Amicus Brief in Support of Plaintiffs' Motion for a Preliminary Injunction on the docket. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/25/25. (DMK) (Entered: 02/25/2025) |
| 02/25/2025 | 32 | Unopposed MOTION for Leave to File Excess Pages *For Reply Memorandum* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (Gupta, Deepak) (Entered: 02/25/2025) |

| 02/25/2025 | 33 | AMICUS BRIEF by TZEDEK DC. (zdp) (Entered: 02/26/2025) |
|---|---|---|
| 02/26/2025 | | MINUTE ORDER granting 32 Plaintiffs' Unopposed Motion to Exceed Page Limitation for Reply Memorandum. Plaintiffs' reply brief in further support of their motion for preliminary injunction may include ten pages in excess of the page limit set by the Local Civil Rules. Plaintiffs should avoid repeating arguments already advanced in their initial submission. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/26/25. (DMK) (Entered: 02/26/2025) |
| 02/27/2025 | 34 | MOTION for Leave to Appear *at the Preliminary Injunction Hearing as Amicus Curiae on behalf of the Amici States* by The State of New York. (Reigstad, Christian) (Entered: 02/27/2025) |
| 02/27/2025 | 35 | NOTICE *Regarding MOTION for Leave to Appear at the Preliminary Injunction Hearing as Amicus Curiae on behalf of the Amici States* by The State of New York (Reigstad, Christian) (Entered: 02/27/2025) |
| 02/27/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Andrew J. Huber, Filing fee $ 100, receipt number ADCDC–11509576. Fee Status: Fee Paid. by Tzedek DC. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Levinson–Waldman, Ariel) (Entered: 02/27/2025) |
| 02/27/2025 | | MINUTE ORDER granting 34 motion of amici, the States, to participate in oral argument. Counsel for New York will be allowed to speak on behalf of the States briefly –– no more than 10 minutes –– on the irreparable harm and public interest factors to be applied to the motion for a preliminary injunction, and to address any alleged important factual misrepresentations in the defendants' submissions. However, the States are further directed to submit a supplemental filing explaining the relevance of the complained–of harm to the States, as opposed to the public at large, given that the States are not a party to this action. The supplemental filing is due by Friday, February 28, 2025. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/27/25. (DMK) (Entered: 02/27/2025) |
| 02/27/2025 | 37 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on February 14, 2025; Page Numbers: 1–24. Date of Issuance:February 27, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/20/2025. Redacted Transcript Deadline set for 3/30/2025. Release of Transcript Restriction set for 5/28/2025.(Dickman, Janice) (Entered: 02/27/2025) |
| 02/27/2025 | 38 | MOTION for Leave to File *Supplemental Declarations* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (Attachments: # 1 Exhibit Index of Declarations, # 2 Declaration of Alex Doe, # 3 Declaration of Blake Doe, # 4 Declaration of Charlie Doe, # 5 Declaration of Drew Doe, # 6 Declaration of Adam Scott, # 7 Declaration of Matthew Pfaff, # 8 Declaration of Brian Shearer, # 9 Declaration of Erie Meyer, # 10 Declaration of Julia Barnard, # 11 Declaration of Lorelei Salas, # 12 Declaration of Eric Halperin, # 13 Declaration of Seth Frotman, # 14 Declaration of Juanita West–Tillman, # 15 Declaration of Christina Coll, # 16 Declaration of Deepak Gupta, # 17 Declaration of A. Roston and A. Scible)(Gupta, Deepak) (Entered: 02/27/2025) |

| 02/27/2025 | 39 | NOTICE of Proposed Order by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION re 38 MOTION for Leave to File *Supplemental Declarations* (Gupta, Deepak) (Entered: 02/27/2025) |
|---|---|---|
| 02/27/2025 | 40 | REPLY to opposition to motion re 10 Motion for TRO,, Motion to Stay, filed by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (Gupta, Deepak) (Entered: 02/27/2025) |
| 02/28/2025 | 41 | NOTICE *of Corrected Attachments* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION re 38 Motion for Leave to File,,, (Attachments: # 1 Declaration of Peyton Diotalevi, # 2 Declaration of Deepak Gupta (Corrected))(Gupta, Deepak) (Entered: 02/28/2025) |
| 02/28/2025 | 42 | NOTICE of Appearance by Christopher Michael D'Angelo on behalf of The State of New York (D'Angelo, Christopher) (Entered: 02/28/2025) |
| 02/28/2025 | 43 | NOTICE of Appearance by Lucia Goin on behalf of 203 Members of Congress (Goin, Lucia) (Entered: 02/28/2025) |
| 02/28/2025 | 44 | MOTION for Leave to File *Amicus Brief* by 203 Members of Congress. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Goin, Lucia) (Entered: 02/28/2025) |
| 02/28/2025 | | MINUTE ORDER granting 38 plaintiffs' motion to file supplemental declarations in support of their motion for a preliminary injunction. The Clerk of Court is directed to file on the docket [38–1] through [38–17]. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/28/25. (DMK) (Entered: 02/28/2025) |
| 02/28/2025 | | MINUTE ORDER granting 36 Motion for Leave of Andrew J. Hube to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Amy Berman Jackson on 2/28/25. (DMK) (Entered: 02/28/2025) |
| 02/28/2025 | | MINUTE ORDER granting 44 Motion for Leave to File Amicus Brief. The Clerk of Court is directed to file on the docket [44–1] the Brief of 203 Members of Congress as Amici Curiae in Support of Plaintiffs' Motion for a Preliminary Injunction. SO ORDERED. Signed by Judge Amy Berman Jackson on 2/28/25. (DMK) (Entered: 02/28/2025) |
| 02/28/2025 | 45 | NOTICE of Appearance by Andrew James Huber on behalf of Tzedek DC (Huber, Andrew) (Entered: 02/28/2025) |
| 02/28/2025 | 46 | SUPPLEMENTAL MEMORANDUM re Order on Motion for Leave to Appear,,, by The State of New York, the State of New Jersey, the District of Columbia, and the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Mich. (Reigstad, Christian) Modified docket text on 3/7/2025 (zdp). (Entered: 02/28/2025) |
| 02/28/2025 | 84 | AMICUS BRIEF by 203 MEMBERS OF CONGRESS. (zdp) (Entered: 03/26/2025) |
| 03/02/2025 | 47 | Consent MOTION for Leave to File *Supplemental Declaration of Adam Martinez* by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. (Attachments: # 1 Declaration (Supplemental) of Adam Martinez, # 2 Text of Proposed Order)(Rosenberg, Brad) (Entered: 03/02/2025) |
| 03/02/2025 | 48 | Consent MOTION for Leave to File *Supplemental Declarations* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB |

| | | |
|---|---|---|
| | | EMPLOYEE ASSOCIATION. (Attachments: # 1 Exhibit Index, # 2 Declaration of Matthew Pfaff, # 3 Declaration of Emory Doe, # 4 Declaration of Francis Doe, # 5 Declaration of Greer Doe, # 6 Text of Proposed Order)(Gupta, Deepak) (Entered: 03/02/2025) |
| 03/03/2025 | | MINUTE ORDER granting 47 Defendants' Motion for Leave to File Supplemental Declaration and 48 Plaintiffs' Motion for Leave to File Supplemental Declarations. The Clerk of Court is directed to file on the docket [47–1] Defendants' Supplemental Declaration and [48–1] through [48–5] Plaintiffs' Exhibit Index and Supplemental Declarations. The parties may not file any additional declarations until further order of the Court. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/3/25. (DMK) (Entered: 03/03/2025) |
| 03/03/2025 | 49 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/15/2025. Answer due for ALL FEDERAL DEFENDANTS by 4/16/2025. (Gupta, Deepak) (Entered: 03/03/2025) |
| 03/03/2025 | 50 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RUSSELL VOUGHT served on 2/14/2025 (Friedman, Robert) (Entered: 03/03/2025) |
| 03/03/2025 | 51 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CONSUMER FINANCIAL PROTECTION BUREAU served on 2/14/2025 (Friedman, Robert) (Entered: 03/03/2025) |
| 03/03/2025 | 52 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 2/20/2025. (Friedman, Robert) (Entered: 03/03/2025) |
| 03/03/2025 | | Minute Entry for Preliminary Injunction proceedings held on 3/3/2025 before Judge Amy Berman Jackson. Arguments heard and taken under advisement. Evidentiary Hearing set for 3/10/2025 at 10:00 AM in Courtroom 25A– In Person before Judge Amy Berman Jackson. (Court Reporter Janice Dickman.) (zdrf) (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER. As ordered at the motions hearing held on this date, plaintiffs must file a revised proposed preliminary injunction order by Wednesday, March 5, 2025, and an evidentiary hearing is set for Monday, March 10, 2025 at 10:00 AM, at which the government's declarant, Adam Martinez, and any of plaintiffs' declarants, who must have personal knowledge of the facts they are being called to assert, that plaintiffs choose to call to dispute Martinez's assertions. According to its terms, the consent order 19 agreed to by the parties on February 14, 2025 remains in effect until the motion for a preliminary injunction is decided. The parties advised the Court that they reached a separate agreement that expires on the date of the hearing concerning the cancellation of CFPB contracts. The parties are ordered to confer and advise the Court today whether they can agree to extend this agreement or an agreed narrowed version until the Court rules on the preliminary injunction motion, and if they can agree, the parties must file by Friday, March 7 at 5:00 PM a proposed consent agreement on that subject. If they cannot agree, the parties must provide the Court today with a copy of the existing agreement. Since the agreement was supposed to extend through the preliminary injunction hearing, if defendants do not agree that by its terms it extends through the continuation of the hearing on March 10, they must explain why not, and the plaintiffs must provide the Court with the language of any order they would be seeking to cover that period of time. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/3/25. (DMK) (Entered: 03/03/2025) |
| 03/03/2025 | 53 | ENTERED IN ERROR.....NOTICE *OF AGREEMENT* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION (Friedman, Robert) Modified on 3/6/2025 (zdp). (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER. In light of the parties' notice 53 , it is ORDERED that the agreement described in the notice that "[t]he Consumer Financial Protection Bureau ('CFPB') has frozen and will continue to freeze any and all termination actions regarding its contracts," with the understanding that the parties are not agreed as to its applicability to the lease for the agency headquarters, is extended through next Monday, March 10, 2025. SO ORDERED. Signed by Judge Amy Berman Jackson on |

| | | |
|---|---|---|
| | | 3/3/25. (DMK) (Entered: 03/03/2025) |
| 03/03/2025 | 59 | MOTION to Intervene by JANICE WOLK GRENADIER. "Leave to File Granted" Signe by Judge Amy B. Jackson on 3/3/2025 (zdp) (Entered: 03/05/2025) |
| 03/04/2025 | | MINUTE ORDER. As ordered at the hearing of March 3, 2025, the parties must file by today, March 4, 2025, all internal emails or text messages relied upon by the declarants or the parties in connection with the status or ongoing operations of the CFBP. SO ORDERED. Signed by Judge Amy Berman Jackson on 03/04/2025. (DMK) (Entered: 03/04/2025) |
| 03/04/2025 | 54 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Erik Goodman, Filing fee $ 100, receipt number ADCDC–11518215. Fee Status: Fee Paid. by Tzedek DC. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Levinson–Waldman, Ariel) (Entered: 03/04/2025) |
| 03/04/2025 | 55 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Marissa Ditkowsky, Filing fee $ 100, receipt number ADCDC–11519355. Fee Status: Fee Paid. by Tzedek DC. (Attachments: # 1 Declaration, # 2 Exhibit Certificates of Good Standing, # 3 Text of Proposed Order)(Levinson–Waldman, Ariel) (Entered: 03/04/2025) |
| 03/04/2025 | 56 | NOTICE of Filing by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU re Order, (Attachments: # 1 Internal CFPB E–mails, # 2 CFPB Enforcement Action Filings, # 3 CFPB–Dept of Ed MOU)(Holland, Liam) (Entered: 03/04/2025) |
| 03/04/2025 | 57 | NOTICE of Filing of Communications by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION (Attachments: # 1 Exhibit Index, # 2 Exhibit Emails, Text Messages, and Other Communications)(Gupta, Deepak) (Entered: 03/04/2025) |
| 03/05/2025 | 58 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on March 3, 2025; Page Numbers: 1–123. Date of Issuance: March 5, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 3/26/2025. Redacted Transcript Deadline set for 4/5/2025. Release of Transcript Restriction set for 6/3/2025.(Dickman, Janice) (Entered: 03/05/2025) |
| 03/05/2025 | | MINUTE ORDER granting 54 55 Motions for Leave of Erik Goodman and Marissa Ditkowsky to Appear Pro Hac Vice only upon condition that the lawyers admitted, or at least one member of the lawyers' firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Amy Berman Jackson on 03/05/2025. (DMK) (Entered: 03/05/2025) |
| 03/05/2025 | | MINUTE ORDER denying 59 Motion to Intervene. Movant has not made a showing that she satisfies the requirements to intervene as of right under Fed. R. Civ. Proc. 24(a) because: (1) she is not given an unconditional right to intervene by any federal statute, and (2) she does not claim an interest relating to any property of transaction that is the subject of the action and is not so situated that disposing of the action may |

| | | |
|---|---|---|
| | | as a practical matter impair or impede her ability to protect that interest. Movant has also not shown that the Court should exercise its discretion to grant permissive intervention under Rule 24(b)(1), since: (A) she is not given a conditional right to intervene by any federal statute, and (B) she does not have a claim or defense that shares a common question of law or fact with the main action. Also, movant's wide–ranging complaints about the actions of multiple federal and state agencies and judges, as well as numerous private actors, do not bear on this action. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/5/2025. (DMK) (Entered: 03/05/2025) |
| 03/05/2025 | 60 | ERRATA *AND CORRECTED VERSION* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION re 57 Notice (Other),. (Attachments: # 1 Exhibit Corrected Communications)(Gupta, Deepak) (Entered: 03/05/2025) |
| 03/05/2025 | 61 | NOTICE of Appearance by Marissa Ariel Ditkowsky on behalf of Tzedek DC (Ditkowsky, Marissa) (Entered: 03/05/2025) |
| 03/05/2025 | 62 | NOTICE of Proposed Order *for Preliminary Injunction* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION re Order,,,,,, (Gupta, Deepak) (Entered: 03/05/2025) |
| 03/05/2025 | 63 | NOTICE OF SUPPLEMENTAL AUTHORITY by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION (Gupta, Deepak) (Entered: 03/05/2025) |
| 03/06/2025 | | NOTICE OF ERROR regarding 53 Notice (Other). The following error(s) need correction: Invalid attorney signature– signature on document must match PACER login. Please refile. (zdp) (Entered: 03/06/2025) |
| 03/06/2025 | 64 | NOTICE of Appearance– Pro Bono by Erik Goodman on behalf of Tzedek DC (Goodman, Erik) (Entered: 03/06/2025) |
| 03/06/2025 | 65 | NOTICE *of Agreement (Corrected)* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION re 53 Notice (Other), Notice of Error (Gupta, Deepak) (Entered: 03/06/2025) |
| 03/07/2025 | 66 | Joint MOTION for Leave to File *Supplemental Emails and Communications* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (Attachments: # 1 Exhibit 1: Plaintiffs' Supplemental Communications, # 2 Exhibit 2: Defendants' Supplemental Communications, # 3 Text of Proposed Order)(Gupta, Deepak) (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER: As noted in the minute entry dated March 3, 2025, the parties shall appear in person for an evidentiary hearing on March 10, 2025 at 10:00 AM in Courtroom 25A. Members of the public can access the hearing via Toll Free Number 833–990–9400; Meeting ID 208322628. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/7/2025. (zdrf) (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER granting 66 the parties' Joint Motion for Leave to File Supplemental Emails and Communications. The Clerk of Court is directed to file on the docket [66–1] Plaintiffs' Supplemental Communications and [66–2] Defendants' Supplemental Communications. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/7/2025. (DMK) (Entered: 03/07/2025) |
| 03/07/2025 | 67 | PLAINTIFF SUPPLEMENTAL INDEX to re 57 Notice (Other), filed by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED |

| | | |
|---|---|---|
| | | PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (zdp) (Entered: 03/07/2025) |
| 03/07/2025 | 68 | DEFENDANT SUPPLEMENTAL INDEX to re 57 Notice (Other), filed by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (zdp) (Entered: 03/07/2025) |
| 03/07/2025 | 69 | NOTICE *OF AGREEMENT CONCERNING CONTRACT TERMINATIONS (JOINT)* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION re Order,,,,,, (Gupta, Deepak) (Entered: 03/07/2025) |
| 03/10/2025 | | Minute Entry for proceedings held 3/10/2025 before Judge Amy Berman Jackson. Evidentiary Hearing began and continued to 3/11/2025 at 1:30 PM in Courtroom 25A– In Person before Judge Amy Berman Jackson. Defense Witness: Adam Martinez. (Court Reporter Janice Dickman.) (zdrf) (Entered: 03/10/2025) |
| 03/11/2025 | 70 | NOTICE *OF FILING OF EXHIBIT LIST AND RELATED DOCUMENTS* by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU (Attachments: # 1 Exhibit Teams Exchange, # 2 Exhibit OMB–OPM Memorandum, # 3 Exhibit List)(Rosenberg, Brad) (Entered: 03/11/2025) |
| 03/11/2025 | | Minute Entry for proceedings held 3/11/2025 before Judge Amy Berman Jackson. Evidentiary Hearing resumed and concluded. Matter taken under advisement. Defense Witness: Adam Martinez; Plaintiff Witnesses: Alex Doe and Mathew Pfaff. (Court Reporter Janice Dickman) (zdrf) (Entered: 03/11/2025) |
| 03/12/2025 | 71 | NOTICE *Joint Notice of Agreement Concerning Contract Terminations* by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU (Holland, Liam) (Entered: 03/12/2025) |
| 03/13/2025 | 72 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Sarah Hollender, Filing fee $ 100, receipt number ADCDC–11538714. Fee Status: Fee Paid. by TZEDEK DC. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Levinson–Waldman, Ariel) (Entered: 03/13/2025) |
| 03/13/2025 | | MINUTE ORDER granting 72 Motion for Leave of Sarah Hollender to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Amy Berman Jackson on 3/13/25. (DMK) (Entered: 03/13/2025) |
| 03/14/2025 | 73 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on March 10, 2025; Page Numbers: 1–275. Date of Issuance: March 14, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form  For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.  **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.  Redaction Request due 4/4/2025. Redacted Transcript Deadline set for 4/14/2025. Release of Transcript Restriction set for 6/12/2025.(Dickman, Janice) (Entered: |

| | | |
|---|---|---|
| | | 03/14/2025) |
| 03/14/2025 | 74 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on March 11, 2025; Page Numbers: 1–155. Date of Issuance: March 14, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/4/2025. Redacted Transcript Deadline set for 4/14/2025. Release of Transcript Restriction set for 6/12/2025.(Dickman, Janice) (Entered: 03/14/2025) |
| 03/17/2025 | 75 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Hannah M. Kieschnick, Filing fee $ 100, receipt number ADCDC–11546045. Fee Status: Fee Paid. by 203 MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit H. Kieschnick – Declaration, # 2 Exhibit H. Kieschnick – Certificate of Good Standing, # 3 Text of Proposed Order)(Goin, Lucia) (Attachment 1 replaced on 3/18/2025) (znmw). (Entered: 03/17/2025) |
| 03/17/2025 | 76 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Shelby Leighton, Filing fee $ 100, receipt number ADCDC–11546086. Fee Status: Fee Paid. by 203 MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit S. Leighton – Declaration, # 2 Exhibit S. Leighton – Certificate of Good Service, # 3 Text of Proposed Order)(Goin, Lucia) (Entered: 03/17/2025) |
| 03/17/2025 | 77 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Douglas R. Jensen, Filing fee $ 100, receipt number ADCDC–11546127. Fee Status: Fee Paid. by 203 MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit D. Jensen – Declaration, # 2 Exhibit D. Jensen – Certificate of Good Standing, # 3 Text of Proposed Order)(Goin, Lucia) (Entered: 03/17/2025) |
| 03/17/2025 | 78 | NOTICE OF SUPPLEMENTAL AUTHORITY by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU (Holland, Liam) (Entered: 03/17/2025) |
| 03/19/2025 | 79 | NOTICE of Proposed Order by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 03/19/2025) |
| 03/20/2025 | | MINUTE ORDER denying without prejudice 76 Motion for Leave to Appear Pro Hac Vice for failure to provide the information required in a motion to proceed pro have vice under Local Rule, specifically with respect to LCvR 83.2(e)(2)(6). Signed by Judge Amy Berman Jackson on 3/20/25. (DMK) (Entered: 03/20/2025) |
| 03/20/2025 | | MINUTE ORDER granting 75 77 Motions for Leave of Hannah M. Kieschnick and Douglas R. Jensen to Appear Pro Hac Vice only upon condition that the lawyers admitted, or at least one member of the lawyers' firms, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Amy Berman Jackson on 3/20/25. (DMK) (Entered: 03/20/2025) |

| 03/20/2025 | 80 | NOTICE OF SUPPLEMENTAL AUTHORITY by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION (Attachments: # 1 Exhibit Does 1–26 v. Musk, # 2 Exhibit Maryland v. United States Department of Agriculture)(Gupta, Deepak) (Entered: 03/20/2025) |
|---|---|---|
| 03/21/2025 | 81 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Shelby Leighton, Fee Status: No Fee Paid. by 203 MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Goin, Lucia) (Entered: 03/21/2025) |
| 03/24/2025 | | MINUTE ORDER granting 81 Motion for Leave of Shelby Leighton to Appear Pro Hac Vice only upon condition that the lawyer admitted, or at least one member of the lawyer's firm, undergo CM/ECF training, obtain a CM/ECF username and password, and agree to file papers electronically. No court papers will be mailed to any lawyer. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Amy Berman Jackson on 3/24/25. (DMK) (Entered: 03/24/2025) |
| 03/24/2025 | 82 | RESPONSE re 63 NOTICE OF SUPPLEMENTAL AUTHORITY, 80 NOTICE OF SUPPLEMENTAL AUTHORITY, filed by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. (Attachments: # 1 TRO, Mayland v. USDA, Civil No. JKB–25–0748 (D. MD. Mar. 13, 2025), # 2 Declaration of Adam Martinez Re: Compliance with Maryland TRO)(Holland, Liam) (Entered: 03/24/2025) |
| 03/25/2025 | 83 | SUGGESTION OF DEATH Upon the Record as to Eva Steege *and Motion for Substitution of Ted Steege* by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (Attachments: # 1 Declaration of Ted Steege, # 2 Declaration of Julia Barnard (Second), # 3 Text of Proposed Order)(Gupta, Deepak) Modified on 3/27/2025 (zdp). (Entered: 03/25/2025) |
| 03/25/2025 | 85 | MOTION to Substitute by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION. (See docket entry 83 to view document) (zdp) Modified on 3/28/2025 (zdp). (Entered: 03/27/2025) |
| 03/26/2025 | | MINUTE ORDER. Upon consideration of plaintiffs' motion for substitution 83 , it is ORDERED that the motion is GRANTED and that Ted Steege is substituted for Eva Steege as a plaintiff in this matter pursuant to Federal Rule of Civil Procedure 25(a)(1). The caption of the case shall be amended to reflect this substitution, and the Clerk of Court is directed to reflect this substitution on the docket. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/26/25. (DMK) (Entered: 03/26/2025) |
| 03/27/2025 | 86 | NOTICE OF SUPPLEMENTAL AUTHORITY by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, VIRGINIA POVERTY LAW CENTER, EVA STEEGE, CFPB EMPLOYEE ASSOCIATION (Attachments: # 1 Exhibit A: AFGE v. OPM Opinion)(Gupta, Deepak) (Entered: 03/27/2025) |
| 03/28/2025 | 87 | MEMORANDUM OPINION. Signed by Judge Amy Berman Jackson on 3/28/2025. (DMK) Document replaced to correct formatting and numbering errors. No changes were made to the text of the opinion. (Document 87 replaced on 3/29/2025) (zdrf). Modified on 3/29/2025 (zdrf). (Entered: 03/28/2025) |
| 03/28/2025 | 88 | ORDER. For the reasons set forth in the accompanying Memorandum Opinion 87 , Plaintiffs' Motion for a Temporary Restraining Order 10 , which was converted with the parties' consent to a Motion for Preliminary Injunction on February 14, 2025, see Order 19 , is GRANTED. See Order for details. Signed by Judge Amy Berman Jackson on 3/28/2025. (DMK) (Entered: 03/28/2025) |
| 03/28/2025 | | MINUTE ORDER. Plaintiff is directed to inform the Court by March 31, 2025 why it is no longer seeking the restriction in the February 14 consent order prohibiting defendants from transferring or relinquishing money from the Reserve Fund other than |

| | | |
|---|---|---|
| | | to satisfy ordinary operating obligations, and whether the interim order should include a restriction on using or disbursing money in the Civil Penalty Fund for anything other than reimbursing consumers. Defendants are directed to inform the Court by the same date of the status of the headquarters building lease, and they may inform the Court of their position on the questions posed to the plaintiffs. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/28/2025. (DMK) (Entered: 03/28/2025) |
| 03/29/2025 | 89 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 88 Order on Motion for TRO, 87 Memorandum & Opinion, by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. Fee Status: No Fee Paid. Parties have been notified. (Rosenberg, Brad) (Entered: 03/29/2025) |
| 03/29/2025 | 90 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 89 Notice of Appeal to DC Circuit Court. (zjd) (Entered: 03/29/2025) |
| 03/31/2025 | | USCA Case Number 25−5091 for 89 Notice of Appeal to DC Circuit Court filed by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. (zdp) (Entered: 03/31/2025) |
| 03/31/2025 | 91 | NOTICE of Appearance by Hannah Meredith Kieschnick on behalf of 203 MEMBERS OF CONGRESS (Kieschnick, Hannah) (Main Document 91 replaced on 4/1/2025) (zdp). (Entered: 03/31/2025) |
| 03/31/2025 | 92 | MOTION for Briefing Schedule by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, TED STEEGE, VIRGINIA POVERTY LAW CENTER, CFPB EMPLOYEE ASSOCIATION (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) Modified event on 4/2/2025 (zdp). (Entered: 03/31/2025) |
| 03/31/2025 | | MINUTE ORDER in response to 92 plaintiffs' filing: To the extent clarification is required, as of the time of the docketing of this order, defendants have not filed a motion for a stay pending appeal in this court in accordance with Federal Rule of Appellate Procedure 8(a)(1). It follows that the Court has not yet granted or denied such a motion. In the absence of any motion on its docket, the Court sees no reason to establish a briefing schedule or to toll compliance with any aspect of its March 28 Order at this time. SO ORDERED. Signed by Judge Amy Berman Jackson on 3/31/2025. (DMK) (Entered: 03/31/2025) |
| 03/31/2025 | 93 | NOTICE of Appearance by Sarah Hollender on behalf of TZEDEK DC (Hollender, Sarah) (Entered: 03/31/2025) |
| 03/31/2025 | 94 | RESPONSE re 3/28/2025 Minute Order by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, TED STEEGE, VIRGINIA POVERTY LAW CENTER, CFPB EMPLOYEE ASSOCIATION re Order,, (Gupta, Deepak) Modified docket text on 4/1/2025 (zdp). (Entered: 03/31/2025) |
| 03/31/2025 | 95 | NOTICE *IN RESPONSE TO MINUTE ORDER REGARDING THE STATUS OF CFPB'S HEADQUARTERS LEASE* by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU re Order,, (Rosenberg, Brad) (Entered: 03/31/2025) |
| 04/01/2025 | 96 | NOTICE of Appearance by Adina H. Rosenbaum on behalf of All Plaintiffs (Rosenbaum, Adina) (Entered: 04/01/2025) |
| 04/01/2025 | 97 | MOTION to Stay re 88 Order on Motion for TRO, *Defendants' Renewed Request for a Stay Pending Appeal* by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. (Attachments: # 1 Text of Proposed Order)(Holland, Liam) (Entered: 04/01/2025) |
| 04/01/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 96 NOTICE of Appearance by Adina H. Rosenbaum on behalf of All Plaintiffs (Rosenbaum, Adina). |

| | | |
|---|---|---|
| | | Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal. <br><br> Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/8/2025. (zhcn) 4/2/2025 (zapb). (Entered: 04/02/2025) |
| 04/02/2025 | | MINUTE ORDER. Any opposition to 97 defendants' motion for a stay pending appeal is due by 12:00 noon today, April 2, 2025. SO ORDERED. Signed by Judge Amy Berman Jackson on 4/2/25. (DMK) (Entered: 04/02/2025) |
| 04/02/2025 | 98 | Memorandum in opposition to re 97 Motion to Stay filed by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, TED STEEGE, VIRGINIA POVERTY LAW CENTER, CFPB EMPLOYEE ASSOCIATION. (Gupta, Deepak) (Entered: 04/02/2025) |
| 04/02/2025 | 99 | NOTICE of Proposed Order by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, TED STEEGE, VIRGINIA POVERTY LAW CENTER, CFPB EMPLOYEE ASSOCIATION re 98 Memorandum in Opposition, (Gupta, Deepak) (Entered: 04/02/2025) |
| 04/02/2025 | | MINUTE ORDER. The parties are directed to inform the Court of their positions on whether this Court has jurisdiction to consider 97 defendants' motion to stay the preliminary injunction, given the pendency of the earlier motion to stay that defendants filed with the D.C. Circuit, and the fact that the Circuit –– upon consideration of not only defendants' motion but also plaintiffs' motion to strike the stay motion on the grounds that the defense should have moved in this Court first –– has set a briefing schedule and oral argument on that motion. SO ORDERED. Signed by Judge Amy Berman Jackson on 4/2/25. (DMK) (Entered: 04/02/2025) |
| 04/02/2025 | 100 | RESPONSE TO ORDER OF THE COURT re Order,, filed by NATIONAL TREASURY EMPLOYEES UNION, NATIONAL CONSUMER LAW CENTER, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, TED STEEGE, VIRGINIA POVERTY LAW CENTER, CFPB EMPLOYEE ASSOCIATION. (Gupta, Deepak) (Entered: 04/02/2025) |
| 04/03/2025 | 101 | RESPONSE TO ORDER OF THE COURT re Order,, filed by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. (Holland, Liam) (Entered: 04/03/2025) |
| 04/03/2025 | 102 | ORDER granting in part and denying in part 97 Motion to Stay. See order for details. Signed by Judge Amy Berman Jackson on 4/3/25. (DMK) (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER denying as moot 92 Plaintiffs' Motion for Briefing Schedule. Signed by Judge Amy Berman Jackson on 4/3/25. (DMK) (Entered: 04/03/2025) |
| 04/15/2025 | 103 | MOTION to Stay *Proceedings Pending Final Resolution of the Expedited Appeal of this Court's Preliminary Injunction Order*, MOTION for Extension of Time to File Answer *(in the alternative) until 30 days after Defendants' Motion to Stay Proceedings is denied* by CONSUMER FINANCIAL PROTECTION BUREAU, RUSSELL VOUGHT. (Attachments: # 1 Exhibit 1––Order Expediting Appeal, NTEU v. Vought, No. 25–5091 (D.C. Cir. Apr. 11, 2025), # 2 Text of Proposed Order)(Holland, Liam) (Entered: 04/15/2025) |
| 04/15/2025 | 104 | MEMORANDUM re 103 MOTION to Stay *Proceedings Pending Final Resolution of the Expedited Appeal of this Court's Preliminary Injunction Order* MOTION for Extension of Time to File Answer *(in the alternative) until 30 days after Defendants' Motion to Stay Proceedings is denied* by CONSUMER FINANCIAL PROTECTION BUREAU, RUSSELL VOUGHT. (Holland, Liam) (Entered: 04/15/2025) |

| 04/17/2025 | 105 | Emergency MOTION for Order to Show Cause by CFPB EMPLOYEE ASSOCIATION, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL CONSUMER LAW CENTER, NATIONAL TREASURY EMPLOYEES UNION, TED STEEGE, VIRGINIA POVERTY LAW CENTER. (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 04/17/2025) |
|---|---|---|
| 04/17/2025 | | MINUTE ORDER. In light of 105 plaintiffs' motion for an order to show cause as to why defendants have not violated the preliminary injunction in this case, the Court will conduct a hearing on Friday, April 18, 2025 at 11:00 AM in Courtroom 25A. It is ORDERED that defendants must have a person with personal knowledge of the scope of the Reduction in Force ("RIF") and the decision to implement it, such as the CFPB Chief Operating Officer or the Operations Manager or Chief of the Office of Human Capital, present at the hearing. It is FURTHER ORDERED that by 10:00 AM Friday, April 18, defendants must file with the Court: copies of any letters, memoranda, or emails sent to CFPB staff from Chief Legal Officer Mark Paoletta and/or Acting Director Russell Vought this week; representative samples of any RIF or layoff notices that have been issued or will be issued on April 18; and a list of all of the employees involved and their job titles. The list of employees must be filed under seal to avoid the publication of personal information with a redacted version filed on the public docket; an unredacted copy should be emailed to the Court's Deputy Clerk. SO ORDERED. Signed by Judge Amy Berman Jackson on 4/17/25. (DMK) (Entered: 04/17/2025) |
| 04/18/2025 | 106 | NOTICE of Declarations by CFPB EMPLOYEE ASSOCIATION, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL CONSUMER LAW CENTER, NATIONAL TREASURY EMPLOYEES UNION, TED STEEGE, VIRGINIA POVERTY LAW CENTER re 105 Motion for Order to Show Cause, (Attachments: # 1 Declaration of Jennifer Bennett, # 2 Declaration of Matthew Pfaff (Third), # 3 Declaration of Emory Doe (Second))(Gupta, Deepak) (Entered: 04/18/2025) |
| 04/18/2025 | 107 | NOTICE of Appearance by Charles E.T. Roberts on behalf of All Defendants (Roberts, Charles) (Entered: 04/18/2025) |
| 04/18/2025 | 108 | SEALED DOCUMENT filed by CONSUMER FINANCIAL PROTECTION BUREAU, RUSSELL VOUGHT re Order,,,,,, Set Hearings,,,,, (This document is SEALED and only available to authorized persons.) (Attachments: # 1 a list of all of the employees involved in the RIF and their job titles)(Holland, Liam) (Entered: 04/18/2025) |
| 04/18/2025 | 109 | DECLARATION of Mark Paoletta by CONSUMER FINANCIAL PROTECTION BUREAU, RUSSELL VOUGHT re Order,,,,,, Set Hearings,,,,,. (Holland, Liam) (Entered: 04/18/2025) |
| 04/18/2025 | 110 | DECLARATION by CFPB EMPLOYEE ASSOCIATION, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL CONSUMER LAW CENTER, NATIONAL TREASURY EMPLOYEES UNION, TED STEEGE, VIRGINIA POVERTY LAW CENTER. (Attachments: # 1 Declaration)(Gupta, Deepak) (Entered: 04/18/2025) |
| 04/18/2025 | 111 | DECLARATION of Alex Doe by CFPB EMPLOYEE ASSOCIATION, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL CONSUMER LAW CENTER, NATIONAL TREASURY EMPLOYEES UNION, TED STEEGE, TZEDEK DC, VIRGINIA POVERTY LAW CENTER re 105 Emergency MOTION for Order to Show Cause . (Bennett, Jennifer) (Entered: 04/18/2025) |
| 04/18/2025 | | Minute Entry for proceedings held before Judge Amy Berman Jackson: Show Cause Hearing held on 4/18/2025. Evidentiary Hearing set for 4/28/2025 at 9:30 AM in Courtroom 25 (In Person) before Judge Amy Berman Jackson. Order forthcoming via chambers on the issues discussed on the record and for further proceedings. (Court Reporter Jan Dickman.) (zakb) (Entered: 04/18/2025) |
| 04/18/2025 | 112 | TRANSCRIPT OF PROCEEDINGS before Judge Amy Berman Jackson held on April 18, 2025; Page Numbers: 1–23. Date of Issuance: April 18, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form |

tscan #25-5091    Document #2114200    Filed: 05/05/2025    Page 21 of 637

| | | |
|---|---|---|
| | | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/9/2025. Redacted Transcript Deadline set for 5/19/2025. Release of Transcript Restriction set for 7/17/2025.(Dickman, Janice) (Entered: 04/18/2025) |
| 04/18/2025 | 113 | ORDER. As stated on the record at the hearing held on this date, defendants are ordered as follows: the Reduction in Force announced by Acting Director Vought on or about April 17, 2025 is SUSPENDED and it may NOT be implemented, effectuated, or completed in any way until this Court has ruled on plaintiffs' motion to enforce the preliminary injunction, and the defendants are PROHIBITED from discontinuing any employee's access to work systems, including email and internal platforms until this Court has ruled on plaintiffs' motion. Plaintiffs may issue requests for production of documents to defendants by Friday, April 18; defendants' response to the motion to enforce is due by Tuesday, April 22; plaintiffs' reply is due by Thursday, April 24; and a hearing is set for Monday, April 9:30 a.m. See Order for details. Signed by Judge Amy Berman Jackson on 4/18/25. (DMK) (Entered: 04/18/2025) |
| 04/18/2025 | 114 | MOTION to set a deadline for defendants' production by CFPB EMPLOYEE ASSOCIATION, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL CONSUMER LAW CENTER, NATIONAL TREASURY EMPLOYEES UNION, TED STEEGE, VIRGINIA POVERTY LAW CENTER. (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 04/18/2025) |
| 04/18/2025 | 115 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 113 Order,,, by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. Fee Status: No Fee Paid. Parties have been notified. (Holland, Liam) (Entered: 04/18/2025) |
| 04/18/2025 | 116 | MOTION to Clarify re 113 Order,,, by CFPB EMPLOYEE ASSOCIATION, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL CONSUMER LAW CENTER, NATIONAL TREASURY EMPLOYEES UNION, TED STEEGE, VIRGINIA POVERTY LAW CENTER. (Gupta, Deepak) (Entered: 04/18/2025) |
| 04/19/2025 | 117 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 115 Notice of Appeal to DC Circuit Court. (zjd) (Entered: 04/19/2025) |
| 04/19/2025 | | MINUTE ORDER granting 114 motion to set a deadline for defendants' production. It is ORDERED that defendants must produce all documents responsive to the plaintiffs' request for production of documents by 12:00 p.m. ET on Tuesday, April 22, 2025. Signed by Judge Amy Berman Jackson on 4/19/2025. (DMK) (Entered: 04/19/2025) |
| 04/19/2025 | | MINUTE ORDER granting 116 plaintiffs' motion to clarify 113 the April 18, 2025 order. Given the preliminary showing made by plaintiffs that they are likely to establish that the defendants have not conducted a particularized assessment that the more than 1400 employees subject to the RIF are unnecessary to the agency's performance of its statutory duties; that, with the RIF, the agency will be unable to operate the Office of Consumer Response as required by statute and the preliminary injunction order; and that the planned RIF is in violation of this Court's order as stayed in part; and in light of the findings embodied in the preliminary injunction order that dismantling the agency would be contrary to law and would cause the plaintiffs irreparable harm, the Court temporarily enjoined the RIF pursuant to Federal Rule of Civil Procedure 65 and its inherent authority to enforce its own orders. This is a |

| | | |
|---|---|---|
| | | non–final, interim order to enable the Court to determine –– on the schedule requested by the parties and based on sworn testimony and contemporaneous records –– whether the RIF is compliant with the existing injunction or not. The order –– to which defendants raised no objection at the hearing –– will remain in place for no more than 14 days, "unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." Fed. R. Civ. Pro. 65(b)(2). It is further clarified that the April 18 order prohibits defendants from discontinuing an employee's access to work systems as part of the enjoined RIF, but the provisions in the March preliminary injunction order that enable the agency to make individual employment decisions in the ordinary course of business remain unchanged. SO ORDERED. Signed by Judge Amy Berman Jackson on 4/19/2025. (DMK) (Entered: 04/19/2025) |
| 04/19/2025 | | USCA Case Number 25–5132 for 115 Notice of Appeal to DC Circuit Court filed by RUSSELL VOUGHT, CONSUMER FINANCIAL PROTECTION BUREAU. (mg) (Entered: 04/21/2025) |
| 04/21/2025 | | MINUTE ORDER. The defendants are advised that Mark Paoletta must be present at the April 28, 2025 evidentiary hearing and available to testify concerning the matters in his declaration 109 . Defendants must also ensure that Gavin Kliger and Adam Martinez are present and available to testify. The plaintiffs must have at least one member of the CFPB RIF team with personal knowledge of the events described in the declaration 111 of Alex Doe present and available to testify; the witness may utilize a pseudonym on the record. Neither party is limited to these witnesses, however. The parties must docket any exhibits they intend to introduce or utilize during the testimony of the witnesses by 12:00 noon on Saturday, April 26, 2025. SO ORDERED. Signed by Judge Amy Berman Jackson on 4/21/25. (DMK) (Entered: 04/21/2025) |
| 04/22/2025 | 118 | Joint MOTION for Order *under Federal Rule of Evidence 502(d)* by CONSUMER FINANCIAL PROTECTION BUREAU, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order)(Holland, Liam) (Entered: 04/22/2025) |
| 04/22/2025 | 119 | ORDER granting 118 joint motion for order under Federal Rule of Evidence 502(d). See order for details. Signed by Judge Amy Berman Jackson on 4/22/25. (DMK) (Entered: 04/22/2025) |
| 04/22/2025 | 120 | Joint MOTION for Protective Order by CONSUMER FINANCIAL PROTECTION BUREAU, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order)(Holland, Liam) (Entered: 04/22/2025) |
| 04/22/2025 | 121 | RESPONSE re 105 Emergency MOTION for Order to Show Cause *Defendants' Response to Plaintiffs' Motion to Enforce* filed by CONSUMER FINANCIAL PROTECTION BUREAU, RUSSELL VOUGHT. (Holland, Liam) (Entered: 04/22/2025) |
| 04/23/2025 | 122 | PROTECTIVE ORDER. See stipulated order for details. Signed by Judge Amy Berman Jackson on 4/23/25. (DMK) (Entered: 04/23/2025) |
| 04/23/2025 | 123 | Unopposed MOTION for Extension of Time to File Response/Reply as to 105 Emergency MOTION for Order to Show Cause *and to Enforce* by CFPB EMPLOYEE ASSOCIATION, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NATIONAL CONSUMER LAW CENTER, NATIONAL TREASURY EMPLOYEES UNION, TED STEEGE, VIRGINIA POVERTY LAW CENTER. (Attachments: # 1 Text of Proposed Order)(Gupta, Deepak) (Entered: 04/23/2025) |
| 04/23/2025 | | MINUTE ORDER granting 123 unopposed motion for extension of time. Plaintiffs' reply in support of their motion to enforce is due Friday, April 25, 2025. SO ORDERED. Signed by Judge Amy Berman Jackson on 4/23/25. (DMK) (Entered: 04/23/2025) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION,
    800 K Street, NW
    Washington, DC 20001,

NATIONAL CONSUMER LAW
CENTER,
    7 Winthrop Square
    Boston, MA 02110

NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF
COLORED PEOPLE,
    4805 Mt. Hope Drive,
    Baltimore, MD 21215

VIRGINIA POVERTY LAW
CENTER,
    919 East Main Street
    Richmond, VA 23219,

PASTOR EVA STEEGE,
    address omitted per LCvR 5.1,

CFPB EMPLOYEE
ASSOCIATION,
    1015 15th Street, NW
    Washington, DC 20005,

    *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official
capacity as Acting Director of the
Consumer Financial Protection
Bureau,
    1700 G Street NW
    Washington, DC 20552, and

Civil Action No. 25-cv-381-ABJ

**FIRST AMENDED COMPLAINT**

**TEMPORARY RESTRAINING
ORDER REQUESTED**

CONSUMER FINANCIAL
PROTECTION BUREAU,
1700 G Street NW
Washington, DC 20552,

            *Defendants*.

## INTRODUCTION

1.      In the aftermath of the 2008 financial crisis, Congress established the Consumer Financial Protection Bureau and charged it with supervising and regulating financial institutions across the country as well as assisting consumers harmed by those institutions. That mandate to the Executive Branch has led to the recovery of billions of dollars for average Americans and, as Congress required, produced a more "fair, transparent, and competitive" market for financial products and services. 12 U.S.C. § 5511. Congress established the CFPB through the exercise of its constitutional power to regulate commerce, and Congress has the ability to eliminate the CFPB through that same power. Congress has not done so.

2.       In defiance of Congress's role in our constitutional system and the separation of powers, President Trump has resolved to "totally eliminate[]" the CFPB.

3.      To carry out that plan, he fired the CFPB's director and illegally installed Russell Vought as the acting director on February 7. That same day, Elon Musk posted on his social media account "CFPB RIP."

4.      With a series of escalating actions beginning on February 8, Vought took drastic steps to make that promise a reality. First, he instructed CFPB staff and contractors to "immediately" stop all work that involved promulgating rules and

guidance, investigations, public communications, supervision of covered entities contracting, and litigation. He then informed the Federal Reserve that the CFPB would not take any additional funding for its operations in the next quarter. The next day, Vought directed staff "not [to] perform any work tasks" at all—including tasks mandated by statute. He also directed staff not to come into the office. Just one day later, February 10, Vought announced that the CFPB's Washington, DC headquarters was closed—and has since taken steps to cancel the lease on the building.

5.    Vought didn't stop there. The next day, February 11, he cancelled $100 million of contracts with companies that enabled the CFPB to do all aspects of its work, from processing consumer complaints to litigation to supervision. That same day, he took the dramatic step of firing, in indiscriminatory fashion, 70 probationary employees. To add insult to injury, he communicated the news via a mail-merged form email that didn't bother to personally address the fired employees who viewed the email on their phones.

6.    On February 12, the Bureau's statutorily mandated consumer complaint went dark, cutting off one of the Bureau's most direct links with consumers in dire financial straits. The Bureau's Consumer Response function is now functioning at diminished capacity at best, threatening a vital lifeline that collects hundreds of thousands of consumer complaints a month.

7.    Vought is not expected to stop there. On information and belief, Vought intends to return the CFPB's operating reserves to the Federal Reserve. Given that

he has already informed the Federal Reserve that the CFPB will not take any additional funding, that would eliminate its entire budget. And Vought has planned another mass layoff that may occur imminently—as early as today or tomorrow.

8.    American consumers are already suffering the consequences. Plaintiff Pastor Eva Steege—an 83 year old Lutheran pastor whose doctors have told her she has less than six months to live—can no longer discharge her student loan debt before she dies because the CFPB cancelled its meeting with her and the Bureau's statutorily mandated Student Loan Ombudsman's office has been forced to shut its doors. Meanwhile, military servicemembers and their families who are owed refund payments based on a consent order between a predatory car title lender and the CFPB are not getting those refunds because the payments must first be approved by CFPB employees—who, of course, cannot work.

9.    Neither the President nor the head of the CFPB has the power to dismantle an agency that Congress established. By suspending the statutorily mandated activities of the CFPB, Trump and Vought's shutdown of the CFPB runs afoul of core constitutional separation of powers principles, Congress's express statutory directive, and the Administrative Procedure Act.

10.    Trump and Vought's actions to disable the CFPB have already caused mass confusion and imposed significant and irreparable harm on consumers across the country. Absent immediate relief, the defendants will continue to upend the lives of countless civil servants. Consumers who were relying on the CFPB to help resolve urgent financial disputes—disputes that, absent the CFPB's intervention, can lead to

4

foreclosure or the inability to get a loan or rent an apartment—have been abandoned.

Even litigation that was already pending against financial institutions that scammed

consumers and exploited ordinary Americans has come to a halt, and the agency is

not conducting any new enforcement actions. All supervision of financial institutions

has been cancelled. With each day that the agency remains shut down, the financial

institutions that seek to prey on consumers are emboldened—harming their law-

abiding competitors and the consumers who fall victim to them.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

because this action arises under the laws of the United States, namely, the United

States Constitution and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702,

706.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A)

because the defendants are officers and agencies of the United States.

## PARTIES

13.     Plaintiff National Treasury Employees Union is the exclusive

bargaining representative of employees at 37 federal departments and agencies, more

than 1,000 of whom work at the CFPB. About sixty probationary employees who were

fired were represented by NTEU.

14.     Plaintiff National Consumer Law Center uses the tools of advocacy,

education, and litigation to fight for economic justice for low-income and other

vulnerable people who have been abused, deceived, discriminated against, or left

behind in our economy. NCLC interacts with and relies on the CFPB in many ways: the Bureau purchases NCLC's publications and hires NCLC to conduct trainings for CFPB employees; NCLC's treatises and reports rely heavily, and link to, the CFPB's reports and data; and NCLC uses the CFPB's complaint database to draft reports.

15.    Plaintiff National Association for the Advancement of Colored People is the oldest and largest civil rights organization in the United States. Its mission is to achieve equality, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. The NAACP was actively working with the CFPB to address predatory practices targeted at its members in the wake of the Los Angeles wildfires.

16.    Plaintiff Virginia Poverty Law Center is a 501(c)(3) nonprofit organization that since 1978 has worked to break down systemic barriers that keep low-income Virginians in the cycle of poverty through advocacy, education, litigation, and direct counseling and referral services. It routinely relies on the CFPB's consumer response function, consumer complaint database, and CFPB research and publications to serve its client base.

17.    Plaintiff Rev. Eva Steege is an 83-year-old retired pastor of the Evangelical Lutheran Church in America. Pastor Steege took on student loans to pursue higher education at a seminary, to fulfill her calling as a pastor. Because of her advanced chronic obstructive pulmonary disease, Pastor Steege has been told that she has no longer than six months to live. She is entitled to discharge her loans under

the Public Service Loan Forgiveness Program, and the CFPB was helping her do so. Pastor Seege wants to ensure that she discharges her debt before she dies, so that she will not burden her surviving family, and because she could pass on to her family as much as $15,000 of overpayments. Pastor Steege had a meeting scheduled with the Bureau this week that was suddenly cancelled because of the CFPB's unlawful closure. Absent the CFPB's assistance, it is unlikely that she will be able to discharge her debt and get her overpayments returned before she passes away.

18.    Plaintiff CFPB Employee Association is a membership organization of dedicated public servants committed to advocating for the interests of the Consumer Financial Protection Bureau. Its members include current and former employees of the CFPB, including probationary employees who were recently terminated.

19.    Defendant Russell Vought is the Acting Director of the Consumer Financial Protection Bureau. He is sued in his official capacity.

20.    Defendant Consumer Financial Protection Bureau is an agency of the United States.

## BACKGROUND

**Statutory Creation of the CFPB**

21.    In July 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), Pub. L. No. 111-203, 124 Stat. 1376, 1376 (2010), "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to

7

protect the American taxpayer by ending bailouts, [and] to protect consumers from abusive financial services practices." *Id.*

22.    Title X of the Dodd-Frank Act, titled the Consumer Financial Protection Act of 2010 (CFP Act), established the CFPB as an "independent bureau" within the Federal Reserve System. 12 U.S.C. § 5491(a). Congress tasked the CFPB with "implement[ing]" and "enforc[ing]" a large body of financial consumer protection laws to "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." *Id.* § 5511(a). Congress required the CFPB's "principal office" to be located in Washington, D.C. *Id.* § 5491(a).

23.    The CFPB is headed by a single Director, who is appointed by the President with the advice and consent of the Senate. 12 U.S.C. § 5491(b)(1)–(2). Congress required that the Bureau's Deputy Director, who is "appointed by the Director," shall "serve as acting Director in the absence or unavailability of the Director." *Id.* § 5491(b)(5).

24.    The CFP Act charges the CFPB with numerous mandatory duties to protect consumers and taxpayers. including duties related to the supervision of financial institutions, research and education, enforcement, and rulemaking. *See generally* P.L. 111-203, Title X, §§ 1001–1100H. Among other things, Congress required the CFPB to perform the following activities:

    a.    ***Obligations to Monitor and Respond to Consumer Complaints.*** The CFP Act requires the CFPB to "collect[]," "monitor[]," and

"respon[d] to consumer complaints regarding consumer financial products or services." *Id.* § 5493(b)(3)(A). The CFPB is further required to "establish … reasonable procedures to provide a timely response to consumers" for complaints or inquiries. *Id.* § 5534. Those complaints can and do "help consumers get resolution to the problems they encounter."[1]

      b.    ***Research, Reporting, and Information Obligations.*** The Act imposes on the CFPB numerous research, reporting, and information obligations. For example, the CFPB is required to "research[], analyz[e], and report[]" on market developments for consumer financial products or services and consumer understanding of and access to financial products. *Id.* § 5493(b)(1). In addition, it is required to publish and disseminate information about credit rates and credit cards. *See* 15 U.S.C. §§ 1646(a), (b); *id.* § 1632(d)(3). And the CFPB must "provide staff and data processing resources" to the Federal Financial Institutions Examination Council, 12 U.S.C. § 2809(c), and to compile information on depository institutions and aggregate lending patterns, *id.* § 2809(a).

      c.    ***Obligations to establish specific offices.*** Congress further required the CFPB to establish offices that perform specified tasks or aid specific groups of consumers. For example, the CFP Act requires that a Private Education Loan Ombudsman "provide timely assistance to borrowers of

---

[1] CFPB, *Four million complaints: More than just a milestone* (Sep. 29, 2023), https://www.consumerfinance.gov/about-us/blog/four-million-complaints-more-than-just-a-milestone/.

private education loans." *Id.* § 5535(a). Among other things, the Ombudsman is required to "compile and analyze data on borrower complaints regarding private education loans" and, in accordance with regulations, "receive, review, and attempt to resolve informally complaints" from loan borrowers. *Id.* §§ (c)(1)(3).

In addition, the statute requires the CFPB to establish an Office of Financial Protection for Older Americans that "shall … monitor certifications or designations of financial advisors who advise seniors and alert the Commission and State regulators of certifications or designations that are identified as unfair, deceptive, or abusive" and "conduct research … to educate and counsel seniors about personal finance management." *Id.* §§ (g)(3)(B), (D).

The Act also requires the establishment of several other offices, including the Office of Service Members Affairs, which "shall be responsible for developing and implementing initiatives for service members and their families," *id.* § (e)(1); the Office of Financial Education, which is mandated to "implement a strategy to improve the financial literacy of consumers" through various "activities including providing opportunities for consumers to access" services, information, and assistance," *id.* § (d)(2); and the Office of Fair Lending and Equal Opportunity, which provides oversight and enforcement of various federal laws and "work[s] with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education," *id.* § 5493(c).

d. ***Supervision***. The Dodd-Frank Act gives the CFPB broad supervisory authority to examine financial institutions for compliance with federal consumer financial laws. 12 U.S.C. §§ 5514, 5515. For example, the CFPB "shall require reports and conduct examinations on a periodic basis" of payday lenders and private education lenders. *Id.* § 5514(b)(1). In addition, for insured depository institutions and credit unions with more than $10 billion in assets, the CFPB "shall have exclusive authority to require reports and conduct examinations on a periodic basis" to "assess[] compliance" with federal law, "obtain information" about the activities, systems and procedures of the entity, and "detect[] and assess[] risks to consumers and to markets for consumer financial products and services." 12 U.S.C. § 5515(b)(1).

25.    The Act also confers rulemaking authority on the CFPB. *See* 12 U.S.C. § 5512(b). The CFPB has the authority to prescribe rules identifying acts or practices that are "unfair, deceptive, or abusive," *id.* § 5531(b), and rules imposing disclosure requirements to help consumers understand the terms, benefits, costs, and risks of financial products and services, *id.* § 5532; *see also id.* § 5533. The CFPB also has rulemaking authority pursuant to 19 federal statutes that govern numerous consumer activities and services, including debt collection practices, debit card transfers, overdraft services, consumer leases, mortgage lending, credit card lending,

mortgage appraisals, real estate settlement practices, and credit reporting. *See* 12 U.S.C. §§ 5581(a)(1)(A), (b).[2]

26.    Since its inception in 2010, the CFPB has fulfilled its statutorily mandated duties by creating the requisite administrative apparatuses and enacting dozens of rules and regulations. The agency has published hundreds of fact sheets, studies, and technical assistance documents that are used by financial services providers, consumers, advocates, and researchers. And the agency has helped millions of consumers obtain relief, both through formal enforcement actions, and through informal dispute resolution mechanisms required by Congress.

27.    On average, the Bureau's statutorily-mandated complaint resolution system receives approximately 350,000 complaints per month. In January 2025, the number was closer to 500,000. Although some complaints are automatically sent to

---

[2] *See also* Alternative Mortgage Transaction Parity Act, 12 U.S.C. §§3801, et seq.; the Consumer Leasing Act of 197615 U.S.C. §§1667, et seq.; the Electronic Funds Transfer Act, 15 U.S.C. §§1693, et seq., except with respect to section 920; the Equal Credit Opportunity Act, 15 U.S.C. §§1691, et seq.; the Fair Credit Billing Act, 15 U.S.C. §§1666, et seq.; the Fair Credit Reporting Act, 15 U.S.C. §§1681, et seq., except with respect to sections 1681m(e) and 1681w; the Homeowners Protection Act of 1998, 12 U.S.C. §§4901, et seq.; the Fair Debt Collection Practices Act, 15 U.S.C. §§1692, et seq.; subsections (b) through (f) of section 43 of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1831t(c)-(f); sections 502 through 509 of the Gramm-Leach-Bliley Act, 15 U.S.C. §§6802-6809, except for section 6805 as it applies to section 6801(b); the Home Mortgage Disclosure Act of 1975, 12 U.S.C. §§2801, et seq.; the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. §1639; the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§2601, et seq.; the S.A.F.E. Mortgage Licensing Act of 2008, 12 U.S.C. §§5101, et seq.; the Truth in Lending Act (TILA), 15 U.S.C. §§1601, et seq.; the Truth in Savings Act, 12 U.S.C. §§4301, et seq.; section 626 of the Omnibus Appropriations Act, 2009, P.L. 111-8 §626; the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§1701, et seq.; and many provisions of the Mortgage Reform and Anti-Predatory Lending Act, Dodd-Frank Act Title XIV, Subtitles A, B, C, and E, and §§1471, 1472, 1475, and 1476).

companies, many have to be referred manually by a CFPB employee. CFPB employees also monitor the complaints to ensure that companies respond to consumers in a timely fashion and refer some complaints to the Bureau's enforcement division. And some complaints—including ones related to imminent actions like foreclosures—are investigated by the Bureau's Escalated Case Management Team. More than 1,000 of these complaints filed each year require attention from the Escalated Management.

28.    Regardless of whether a complaint is sent to the Escalated Case Management Team, they are very often urgent. The majority relate to consumer credit reports, and most people do not become aware of an error on their reports until they are trying to secure a loan. Consumers also file complaints when they have been "debanked"—denied access to their accounts because of their past financial history—and face banks who are unwilling to help them restore their accounts. The CFPB is often the only resource available to help them regain access. Consumers also complain regularly about surprise fees and interest attached to payday loans. Consumers who need payday loans typically have little-to-no expendable income, and these surprise costs can mean missing the bus to work and therefore losing your job, skipping or rationing medications, or losing child-care.

29.    The Dodd-Frank Act specifies that funding of the CFPB come from "the combined earnings of the Federal Reserve System." *See* 12 U.S.C. § 5497.

30.    The Act directs that, each quarter, the Board of Governors of the Federal Reserve will transfer "the amount determined by the Director [of the Bureau] to be

reasonably necessary to carry out the authorities of the Bureau," subject to a statutory cap of 12% of the total operating expenses of the Federal Reserve (inflation adjusted). *Id.* § 5497(a)(1); *see id.* § 5497(a)(2)(A)–(B). In addition, the CFPB Director may request additional funds from Congress if necessary to carry out the authorities of the Bureau. *See id.* § 5497(e).

31.    For Fiscal Year 2025, "[t]he CFPB's projected budget estimate for its operations … [was] $810.6 million."[3]

32.    By letter to the Federal Reserve on October 8, 2024, then-CFPB Director Rohit Chopra requested a monetary transfer in the amount of $248,900,000, stating that he had "determined [it] is the amount necessary to carry out the authorities of the Bureau for FY2025 Q1."[4] Three days later, the Federal Reserve confirmed by letter that the requested funds had been transferred to the CFPB.[5]

33.    By letter to the Federal Reserve on December 19, 2024, then-Director Chopra requested a monetary transfer of $245,100,000 to the CFPB, stating that he had "determined [it] is the amount necessary to carry out the authorities of the

---

[3] Cong. Research Service, R48295, *The Consumer Financial Protection Bureau Budget: Background, Trends, and Policy Options*, at 6, https://crsreports.congress.gov/product/pdf/R/R48295/2#:~:text=The%20CFPB's%20 projected%20budget%20estimate,director%20or%20in%20CFPB's%20priorities.

[4] https://files.consumerfinance.gov/f/documents/cfpb_funds-transfer-request-fy-2025-q1.pdf.

[5] https://files.consumerfinance.gov/f/documents/cfpb_letter-from-frb-fy-2025-q1.pdf.

(Page 36 of Total)

Bureau for FY 2025 Q2."[6] On January 2, 2025, the Federal Reserve confirmed by letter that the requested funds had been transferred to the CFPB.[7]

**Treasury Secretary Bessent named Acting Director of the CFPB and halts the CFPB's Work**

34.    On February 1, 2025, President Trump fired then-Director of the CFPB Rohit Chopra as Director of the CFPB. Pursuant to Dodd-Frank, the CFPB's then-Deputy Director, Zixta Martinez, then became Acting Director of the CFPB. *See* 12 U.S.C. § 5491(b)(5).

35.    Two days later, President Trump appointed Treasury Secretary Bessent as the Acting Director of the CFPB.

36.    On February 3, 2025, then-Acting Director Bessent sent an email, titled "Instructions from Acting Director," directing all CFPB staff and contractors to "immediately" suspend activities in six areas of work. Specifically, the February 3 email stated that unless expressly approved by Bessent, all CFPB workers were required:

- "[n]ot to approve or issue any proposed or final rules or formal or informal guidance";

- "[t]o suspend the effective dates of all final rules that have been issued or published but that have not yet become effective";

- "[n]ot to commence, take additional investigative activities related to, or settle enforcement actions";

---

[6] https://files.consumerfinance.gov/f/documents/cfpb-12-19-letter-from-cfpb-to-frb_2025-01.pdf.

[7] https://files.consumerfinance.gov/f/documents/cfpb_01-02-letter-from-frb-to-cfpb_2025-01.pdf.

(Page 37 of Total)

- "[n]ot to issue public communications of any type, including publication of research papers";

- "[n]ot to approve or execute any material agreements, including related to employee matters or contractors"; and

- "[n]ot to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings."

*Id.* The February 3 email stated that Acting Director Bessent was issuing these directives "to promote consistency with the goals of the Administration." *Id.*

37.    By email to all CFPB staff and contractors on February 4, 2025, Acting Director Bessent "[u]pdate[d]" his February 3 directive halting another category of work. He instructed CFPB employees "[n]ot to initiate supervisory designation proceedings or designate any nondepository institution for supervision."

**Defendant Vought named Acting Director and halts CFPB's Work**

38.    On Friday, February 7, 2025, President Trump named Russell Vought, the Director of the Office of Management and Budget, as Acting Director of the CFPB.

39.    That same day, Elon Musk and other members of the so-called "Department of Government Efficiency" (DOGE) accessed CFPB's headquarters and computer systems.[8] Several hours later, Musk posted "CFPB RIP" with a tombstone emoji on his social-media site X.[9]

---

[8]    https://www.politico.com/news/2025/02/07/elon-musk-team-cfpb-00203119; https://www.forbes.com/sites/saradorn/2025/02/10/trump-vs-cfpb-russ-vought-orders-consumer-financial-protection-bureau-to-stop-work/.

[9] https://x.com/elonmusk/status/1887979940269666769.

16

40.     Also on February 7, the CFPB's official X account was deleted,[10] and the CFPB's website homepage was replaced with a banner stating, "404: Page not found."[11]

41.     On February 8, 2025, Acting Director Vought sent an email titled "Directives on Bureau Activities." The email stated that Vought was "committed to implementing the President's policies" and that "[t]o that end," he directed all CFPB staff and contractors to comply "immediately" with nine directives to cease work, unless expressly approved by Vought:

- "[n]ot approve or issue any proposed or final rules or formal or informal guidance";

- "[s]uspend the effective dates of all final rules that have been issued or published but that have not yet become effective";

- "[n]ot commence, take additional investigative activities related to, or settle enforcement actions";

- "[n]ot open any new investigation in any manner, and cease any pending investigations";

- "[n]ot issue public communications of any type, including publication of research papers and compliance bulletins";

- "[n]ot approve or execute any material agreements, including related to employee matters or contractors";

- "[n]ot make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings";

- "[c]ease all supervision and examination activity";

---

[10]     https://www.forbes.com/sites/saradorn/2025/02/08/cfpbs-x-account-goes-dark-as-russell-vought-takes-over-elon-musk-posts-cfpb-rip/.

[11]     https://www.forbes.com/sites/eriksherman/2025/02/09/consumer-financial-protection-bureau-adds-error-message-to-home-page/.

JA34

- "[c]ease all stakeholder engagement."

42.    Approximately one hour later, Acting Director Vought stated in a social media post on X that he "ha[d] notified the Federal Reserve that CFPB will not be taking its next draw of unappropriated funding because it is not 'reasonably necessary' to carry out its duties." [12]

43.    In the absence of taking a draw from the Federal Reserve, the Bureau must rely on its reserve fund.

44.    On information and belief, Defendant Vought intends to imminently return the funds in the CFPB's reserves to the Federal Reserve. Although Vought has stated that in his view, that money is not "necessary to fulfill the Bureau's mandate," without that money, the Bureau will be unable to fund its operations.

45.    On the evening of February 9, 2025, CFPB Chief Operating Officer Adam Martinez sent an email to all CFPB staff stating that the CFPB's headquarters would close the next day and instructing "[e]mployees and contractors … to work remotely unless instructed otherwise from our Acting Director or his designee."[13] No reason was given for the closure.

46.    On the morning of Monday, February 10, 2025, Vought sent an email with the subject line "Additional Directives on Bureau Activities," reiterating that the CFPB's "DC headquarters building is closed this week." The February 10 email

---

[12] https://x.com/russvought/status/1888423503537360986

[13]    https://www.nytimes.com/2025/02/09/us/russell-vought-consumer-bureau-protect-hq-close.html;  *see*  https://www.reuters.com/world/us/cfpbs-headquarters-be-closed-coming-week-email-says-2025-02-09/.

directed all CFPB staff "not [to] perform any work tasks" at all and that "employees should stand down from performing any work task." The email stated that "[i]f there are any urgent matters," CFPB staff should "alert [Vought] through Mark Paoletta," who is the Office of Management and Budget General Counsel and who was identified in the email as the CFPB's Chief Legal Officer, "to get approval in writing before performing any work task."

47.    Later that day, reporters speaking with President Trump asked him to confirm that "his goal was to have [the CFPB] totally eliminated." President Trump stated, "I would say, yeah, because we're trying to get rid of waste, fraud, and abuse."[14] President Trump further stated, "[W]e did the right thing. [The CFPB] was a very important thing to get rid of, and it was also a waste. I mean, number one, it was a bad group of people running it, but it was also a waste."[15] President Trump reportedly "praised his administration for shutting the CFPB and used the past tense to describe the [CFPB]."[16]

---

[14] https://x.com/joeygarrison/status/1889132023933022283?mx=2.

[15] https://www.facebook.com/ANINEWS.IN/videos/shes-a-nasty-woman-trump-slams-senator-elizabeth-warren-after-her-cfpb-neutraliz/1227075188971091/; *see also* Alejandra Jaramillo, *Trump confirms goal to "totally eliminate" the Consumer Financial Protection bureau*, CNN Politics (Feb. 10, 2025), https://www.cnn.com/politics/live-news/trump-doge-presidency-news-02-10-25/index.html (quoting President Trump).

[16] https://www.americanbanker.com/news/president-trump-confirms-his-goal-is-to-eliminate-the-cfpb

*Defendants' Additional Actions to Shut Down the CFPB*

48.    By email on the evening of February 11, 2025, approximately 70 CFPB employees who were newly hired and subject to a two-year probationary period were terminated.[17] The email stated, "Unfortunately, the Agency finds that that [sic] you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs."[18]

49.    In the past few days, the CFPB has cancelled more than 150 vendor contracts. The canceled contracts reportedly include "102 vendor contracts for the CFPB's enforcement division, 33 contracts linked to the director's office, and 16 contracts for the agency's supervision unit."[19] The Bureau also cancelled nearly all contracts that underlie the consumer complaint function.

50.    The defendants have reportedly informed the General Services Administration that they are terminating the lease of the CFPB's headquarters office in Washington, D.C.

51.    The defendants are also preparing to conduct another mass firing, this time of over 95% of the Bureau's employees. That would make it impossible for the Bureau to fulfill any of its statutorily required functions.

---

[17]    https://news.bloomberglaw.com/banking-law/cfpb-fires-70-enforcement-lawyers-other-probationary-employees

[18]    https://news.bloomberglaw.com/banking-law/cfpb-fires-70-enforcement-lawyers-other-probationary-employees.

[19]    https://news.bloomberglaw.com/banking-law/cfpb-cancels-more-than-100-million-in-contracts-amid-doge-probe.

**Consequences of Defendants' Stop-Work Orders**

52.    By freezing the CFPB's work, the defendants have put an immediate halt to the CFPB's performance of its statutorily mandated functions.

53.    The defendants' orders to halt work at the CFPB have had devastating consequences. Among countless other consequences, halting CFPB work has suspended oversight of the biggest banks to ensure that they comply with the law; pending rulemakings, including a rulemaking to stop data brokers from selling sensitive personal data to scammers, stalkers, and spies;[20] and enforcement actions against institutions violating consumer financial protection laws.[21]

54.    Shuttering the agency has also severely disrupted the CFPB's consumer complaint operation: The hotline consumers call to submit complaints went offline, despite Congress's clear command that the CFPB "establish[] a single, toll-free telephone number" for use in collecting complaints. 12 U.S.C. § 5493(b)(3)(A). Although the Bureau may now have reinstated the contractors who operate the hotline, the operation remains severely diminished. The CFPB cancelled the contract for the contractors that processed mailed-in complaints and complaints referred to the CFPB by other federal agencies and Congress. Complaints submitted online can't

---

[20]    https://www.consumerfinance.gov/about-us/newsroom/cfpb-proposes-rule-to-stop-data-brokers-from-selling-sensitive-personal-data-to-scammers-stalkers-and-spies/

[21]    *See* Press Release, National Consumer Law Center, *Unlawful Shut Down of Consumer Agency Endangers Working Families, Honest Businesses, and the Economy* (Feb. 10, 2025), https://www.nclc.org/unlawful-shut-down-of-consumer-agency-endangers-working-families-honest-businesses-the-economy/ (identifying various impacted enforcement actions).

be sent to companies unless those companies are already in the CFPB's system. Particularly devastating is that the Escalated Case Management Team—which responds to extremely time sensitive complaints, like those involving foreclosures— is not working. And consumers who filed complaints related to other time-sensitive matters—like correcting a credit report so that they can obtain a loan, or regaining access to a bank account after being frozen out—can't rely on the CFPB to ensure they receive timely responses to their complaints, either.

55.    The shutdown has had a similar effect on the Student Loan Ombudsman's Office. The Office receives thousands of complaints a year, and its staff resolve hundreds of complaints each month. 2024 Annual Report of the CFPB Student Loan Ombudsman at 9.[22]

56.    The complaints concern inaccurate billing statements, yearslong processing delays, inability to reach lenders to lodge complaints directly, and missing refunds of hundreds to tens of thousands of dollars.

57.    The complaints are submitted through a telephone hotline, an electronic submission process and referrals from congressmembers and direct service organizations.  Complaints are screened by contractors and Bureau staff before being routed to lenders, who are required to respond within 15 days.

---

[22]    https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf.

58.    Because of the stop-work order, complaints are not being addressed by staff and not being routed to lenders, who sometimes resolve issues without the need for intervention from the CFPB.

59.    The Ombudsman's work has had profound impact on the borrowers it served. For instance, CFPB staff has successfully resolved complaints that involve schools withholding college transcripts and thereby preventing borrowers from pursuing employment. One borrower described the hold on her transcript as like a "hold on [her] life."

60.    Another borrower, had nearly $5,000 erroneously drawn from her account for a loan payment. She was given conflicting information and then told a refund could take 12 weeks. After lodging a complaint with the Ombudsman, she received a refund.

61.    Another borrower had loans cancelled and was due a $20,000 refund. After contacting the lender directly and waiting nearly two years, the borrower lodged a complaint with the CFPB. The lender issued a refund shortly after.

62.    Stories like this abound, and borrowers just like this will be left to the long delays, conflicting information, and denials of refunds that the Ombudsman's office, when functioning, has helped others avoid.

63.    These immediate consequences have already harmed each of the plaintiffs.

64.    The National Treasury Employees Union's more than 775 members at the CFPB face severe uncertainty and stress about their job security. Seventy CFPB

employees, many of whom were NTEU members, have already been fired. Those who have not yet been fired understandably fear for their jobs. Indeed, they have good reason to believe a mass layoff is imminent. And given the instructions to stop work, they lack clarity about their job status and their ability to comply with their usual work obligations.

65.    The National Consumer Law Center has already had multiple of its contracts with the CFPB cancelled. Those cancellations will cost NCLC thousands of dollars. The CFPB's subscription to NCLC's publication, for example, funds much of the organization's publishing work. CFPB employees have also withdrawn as panelists from trainings organized by NCLC. And NCLC relies extensively on data and reports published by the CFPB. Stopping the CFPB's work will deprive NCLC of this important information going forward.

66.    Pastor Steege has, over the years, had great difficulty in attempting to enroll in Public Service Loan Forgiveness. In late 2024, however, the pastor sought help from the CFPB. After an initial meeting with the Bureau in January 2025, Pastor Steege was hopeful that she might finally enroll in the program, have her loans forgiven, and, in fact, be returned $15,000 in overpayments. She scheduled a follow-up meeting with the Bureau for February 10, 2025. But the night before the meeting Pastor Steege learned that President Trump had taken steps to shut down the CFPB. Then, on the morning of the scheduled meeting, CFPB staff emailed Pastor Steege and informed her that, "due to new guidance CFPB employees recently received," the meeting was cancelled. No new meeting was scheduled, and Pastor

Steege has no reason to believe that the CFPB—with its worked indefinitely stopped—will ever be able to help her.

67.    The inability to seek loan forgiveness and a refund of $15,000 would be a devastating consequence standing alone. But it is even more dire for Pastor Steege. Because of her advanced cancer diagnosis, Pastor Steege has been told she has no more than six months to live. She hoped to have her loans forgiven so that she would not burden her surviving family with her debt, and so that they could use the $15,000 refund for basic needs after she passes. If the CFPB isn't able to help her, Pastor Steege will spend her final six months in great duress, worried that she is leaving her family with a financial burden and without the monetary help to which they are entitled. And if the loan is not forgiven while she is alive her family will be forced to pursue a death discharge that will not provide them with the $15,000 refund.

68.    The NAACP was actively working with the CFPB to protect NAACP members who live in Altadena, California. Those members have been targeted by predatory financial practices in the wake of the Los Angeles wildfires. The complete freeze on the CFPB's work has halted that collaboration and harmed both the NAACP members and the NAACP itself, which now must assist its members without the CFPB's assistance.

69.    The Virginia Poverty Law Center operates a Predatory Loan Helpline that consumers can call when they need help with unfair and predatory loans. The phone number is featured prominently on the Center's website. Because of the Center's limited staffing, even the CEO helps to answer the hotline.

70.    The Center routinely directs consumers who call the hotline to use the CFPB's consumer response complaint function. It even notes this resource on the Center's website.

71.    This process takes Center staff approximately 10 minutes and gets timely and helpful results. In September, for example, the Center received a complaint about an out-of-state lender that had been claiming that it was not subject to Virginia law. The Center helped the consumer submit a complaint to the CFPB, and it quickly resulted in a reduction of the interest rate on the loan from 118% to 36%, with a 50% reduction in payments.  This is just one example of success the Center's client base has seen from referrals. There are many others.

72.    Before the CFPB's existence, the Center used to handle these complaints entirely itself.  It consumed far more resources to replicate what the CFPB now does in minutes. Because the Center's staff is so limited, if it had to return to handling complaints itself, it would be unable to commit resources to other work.

73.    The Center also uses the CFPB's consumer response database to inform its work.  If that database were not updated, or trustworthy, the Center would lose an important tool that it relies on to set its organizational priorities on what to advocate about and how to educate consumers.

74.    Plaintiff CFPB Employee Association's members include probationary employees who have already been fired, as well as current employees who rightly fear for their jobs.

## CAUSES OF ACTION

### Count One
(Non-statutory review of official and agency action)

75.    Plaintiffs have a non-statutory right of action to enjoing and declare unlawful official action that is ultra vires.

76.    The Constitution vests executive power in the President. U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

77.    The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

78.    Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. U.S. Const., art. I. The President and Executive Branch have no authority under the Constitution to amend statutes unilaterally.

79.    The CFPB was established as a federal agency by Congress by statute, the Dodd Frank Act, signed into law in 2010, and can be eliminated only by Congress.

80.    Defendants' actions to eliminate the CFPB exceed executive authority, usurp legislative authority conferred upon Congress by the Constitution, defendant Vought was not lawfully appointed, and his actions are ultra vires and should be enjoined.

27

**Count Two**
(Non-statutory review of official and agency action)

81.    The Constitution mandates that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2.

82.    The Director of the CFPB is an Officer of the United States.

83.    President Trump appointed Defendant Vought as acting Director without the advice and consent of the Senate.  Defendant Vought was neither nominated nor confirmed by the Senate to that position.

84.    President Trump purported to appoint Defendant Vought under the Federal Vacancies Reform Act, which allow for temporary appointments without the advice and consent of the Senate when the prior holder of a Senate-confirmed office "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a).

85.    But President Trump fired the last Senate-confirmed Director, Rohit Chopra. Chopra did not die, he did not resign, and he was not unable to perform the functions and duties of the office. He continued to perform them until the day he was fired, over a week into President Trump's term.

86.    The President's appointment of Defendant Vought as Acting Director of the CFPB is therefore unconstitutional and Defendant Vought has no power to direct the agency.

87.     Congress has provided that, when the Bureau is missing a director, the deputy director shall lead the agency. See 5 U.S.C. § 5491(b)(5). The deputy director, not Defendant Vought, therefore has the authority to exercise the Bureau's powers.

88.     In addition, Congress has charged the Secretary of Education, not the Director, with responsibility for designating the Private Education Loan Ombudsman. 12 U.S.C. § 5535(a). The authority to control who holds that office rests with the Secretary. By functionally removing the ombudsman from the office by prohibiting her from doing any work, Defendant Vought has exercised power of the Secretary without being confirmed by the Senate to do so.

89.     Because defendant Vought was not lawfully appointed, his actions are ultra vires and should be enjoined.

## Count Three
### (Administrative Procedure Act—706(2)(C))

90.     Under the APA, a court shall "hold unlawful and set aside agency action … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

91.     Defendants' actions and intended further actions to suspend or terminate CFPB's statutorily mandated activities—including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters—constitute final agency action under the APA.

92.    No defendant possesses the statutory authority to require CFPB to cease work on the activities it is statutorily required to perform. Defendants' actions exceed their statutory authority.

## Count Four
(Administrative Procedure Act—706(2)(A)

93.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

94.    Defendants' actions and intended further action to suspend or terminate CFPB's statutorily mandated activities and to return the funding that the CFPB needs to sustain its operations constitute final agency actions under the APA.

95.    Defendants' actions were taken without notice, reasoned explanation, or reasonable recourse.

96.    Defendants' actions were arbitrary, capricious, unconstitutional, and not in accordance with law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A)    Declare that the defendants' actions to dismantle the CFPB and their suspension of CFPB's statutorily mandated activities are unlawful;

(B)    Declare unlawful and set aside the defendants' actions and intended further actions to dismantle the CFPB, including issuance of stop-work instructions, cancellation of contracts, declining and returning funding, reductions in force, firing of employees, and termination of the lease for its headquarters, as arbitrary,

30

capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

(C)   Issue an injunction barring Defendants Vought and CFPB from implementing or complying with the directions to cease work absent the authorization of Congress;

(D)   Order Defendants Vought and CFPB to resume immediately all activities that CFPB is required by statute to perform;

(E)   Issue a temporary restraining order and preliminary injunction directing Defendants Vought and CFPB to cease immediately actions to cease CFPB's operations;

(F)   Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

(G) Grant such other relief as the Court deems necessary, just, and proper.

Dated: February 13, 2025

*/s/ Deepak Gupta*
Deepak Gupta (DC Bar No. 495451)
Robert Friedman (D.C. Bar. 1046738)
Gabriel Chess (DC Bar No. 90019245)
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett*
Gupta Wessler LLP

Respectfully submitted,

*/s/ Wendy Liu*
Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

\* motion for *pro hac vice*
admission forthcoming

*Counsel for Plaintiffs*

Julie M. Wilson
General Counsel
Paras N. Shah
Deputy General Counsel
Allison C. Giles
Assistant Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiff National Treasury
Employees Union*

32

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
*Plaintiffs*,

v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

*Defendants*.

Case No. 25-cv-381-ABJ

## DECLARATION OF DANIEL J. KASPAR

I, Daniel J. Kaspar, declare as follows:

1.  I am the Director of Field Operations and Organizing at the National Treasury Employees Union (NTEU). I have worked at NTEU since 2011.

2.  NTEU represents approximately 160,000 bargaining-unit employees across 37 federal departments and agencies. More than 775 of our members work at the Consumer Financial Protection Bureau (CFPB). NTEU's mission is to ensure that all federal employees are treated with dignity and respect, and to fight for their fair pay, benefits and working conditions.

3.  As Director of Field Operations, I am responsible for overseeing NTEU's eight field offices across the country. Each field office employs one National Counsel and approximately five to seven field representatives. Every chapter (local) is assigned to a field office and field representative. NTEU field representatives serve as chapters' and members' first line of contact with NTEU on a day-to-day basis.

4.  By virtue of my job duties, I am familiar with the details of NTEU's relationships with its chapters, chapter leaders, members, and bargaining-unit employees.

5.  Our members at the CFPB have faced rapidly increasing uncertainty about their ability to retain, let alone perform, their jobs. On February 3, 2025, the CFPB's Office of the Director emailed the Bureau's entire staff notifying them that they were not allowed to perform several basic and core agency functions "unless expressly approved by the Acting Director."

6.  Members of the Department of Government Efficiency (DOGE) entered the CFPB on February 6, 2025, and, by the next day, had gained access to all non-classified CFPB systems. Some of these systems contain CFPB employees' personal identifying information.

Bargaining-unit employees reasonably fear that DOGE team members or their presumptive leader, Elon Musk, will leak employees' personal information to the public, leading to harassment. That fear is founded, in significant part, on Musk's proclivity to using his social media site to denigrate the Bureau. On February 7, 2025, for example, he posted "CFPB RIP" accompanied by a tombstone emoji to his personal X account.

7. On February 8, 2025—without any communication with NTEU—the CFPB's just-appointed Acting Director, Russell Vought, ordered CFPB staff "to 'cease all supervision and examination activity," "cease all stakeholder engagement,' pause all pending investigations, not issue any public communications and pause 'enforcement actions.'" These are the core functions of the Bureau and nearly every bargaining-unit employee performs work in support of one or more of these functions.

8. On February 9, 2025—again without any pre- or post-implementation notice or consultation with the union—all staff were informed that the CFPB's Washington, D.C. headquarters would be closed from February 10 until February 14. Employees were left uncertain because they were not directed to work but also had not been put on any type of leave.

9. The next day, February 10, Acting Director Vought halted the CFPB's work entirely, writing in a message to staff: "Employees should not come into the office. Please do not perform any work tasks." "[U]rgent matters" could be handled *only* with the approval of the Bureau's Chief Legal Officer. "Otherwise," the email continues, "employees should stand down from performing any work task."

10. This stop-work order has caused enormous confusion and stress among the bargaining unit and, specifically, NTEU's members. Staff inside the Bureau did not know how to implement the order. Some managers told staff that the directive broadly covers all activities, including individual meetings and training. Another supervisor told an employee that they were not allowed to check work emails. Several CFPB employees were told to shut off their laptops and not to work at all.

11. There has also been mass confusion about how the stop-work order affects employees' ability to comply with their obligations under existing laws, rules and policies. For example, employees do not know whether, or how, to comply with imminent financial disclosure deadlines or if they should seek approval for participating in the kinds of outside activities they are normally allowed to do on behalf of the Bureau.

12. CFPB attorneys are particularly concerned that they will violate their ethical obligations because they are not allowed to take *any* action under the stop-work order unless they get specific permission. For example, they worry that the stop-work order will cause them to fail to obey court orders that require them to make appearances or file papers.

13. The stop-work order has also interfered with the CFPB's internal harassment and bullying policies. Complaints that were filed under those policies have not been allowed to proceed. Employees have no way of knowing if those grievances—which often involve very sensitive matters—will ever be processed.

2

14. Particularly given the confusion surrounding the stop-work orders, our members are afraid of retaliation for even accidentally doing something that might later be considered a violation. The CFPB has set up a Twitter account urging companies to report CFPB employees who have purportedly violated the stop-work order. Employees are afraid that companies will report employees not only for purportedly working, but out of retaliation for having previously done their job of supervision or enforcement.

15. One day after the stop-work order, on February 11, the CFPB's acting chief human capital officer sent an email to approximately 70 CFPB employees telling them that they were fired.

16. NTEU's members are profoundly affected by the CFPB's closure. The overwhelming majority of the 70 fired employees were NTEU members. These members relied on their continued employment at the CFPB for their livelihood and are now suddenly unemployed.

17. Members who are terminated will lose their health insurance and ability to pay for medicine and health care. One probationary employee has serious health conditions that are kept in remission by expensive medications and is already facing an $8,000 out of pocket bill for medication to keep them alive. If this employee does not receive treatment according to the prescribed schedule, their disease will recur, and they may develop antibodies that would mean they could never use their lifesaving medication again. Other probationary employees need their health insurance for chronic medical conditions and preventative testing for high-risk conditions, for recovery from surgeries they recently had, or for immediate fertility procedures (which, if delayed, diminishes the employees' health and chance of fertility).

18. Many members will also lose health insurance coverage for their entire families. One employee reports that both their spouse and their child received cancer diagnoses of differing types within the last 30 days, and without medical benefits they will not be able to continue with treatments or obtain necessary surgeries, which could ultimately result in their deaths. Those recent diagnoses will also prevent them from being eligible for future coverage for life insurance which had been established under the employee's employment with CFPB, and possibly prevent them from obtaining other medical coverage.

19. Members have relocated to Washington, D.C. from lower cost-of-living areas to take positions at the CFPB, and they now have leases and mortgages they have no way of paying. Employees report being unable to afford housing in their current neighborhoods where their children go to school, necessitating a move where they will need to remove their children from their current schools, communities and friends. Another employee purchased their first home in September 2024 and will not be able to pay their mortgage without their job. Employees report that they will have no choice but to take on high-interest debt, to sell their homes at a loss, or to default on financial obligations.

20. Members will face reputational harm to their careers because they were terminated from federal employment, which harms their ability to obtain new jobs in the private sector. Employees have already been told by private sector recruiters that there is a "stigma"

3

around their terminations, because the terminations were labeled "for cause." "For cause" terminations generally must be disclosed in response to questions in job application, interview, or background check processes, and they are materially damaging to employees' job prospects.

21. One terminated employee is seven months pregnant, and thus her chance of getting new employment in the next several months is severely hindered. The employee submitted her request for maternity leave with the CFPB before her termination. Without new employment, her family will not be able to afford their mortgage. Additionally, she is risking recovery time and bonding time with her new infant because soon after giving birth, she will need to start looking for new employment.

22. Multiple members at the CFPB were eligible for Public Service Loan Forgiveness (PSLF), and because they have lost their federal employment, they may not be able to complete the required 10 years of public service to have their student loans forgiven. One employee reports that they were very close to completing ten years in government prior to their termination, and because they may not find another qualifying public service job, they will lose a major financial benefit upon which they were relying, even though they faithfully completed the terms of the program. Even if they can secure another public service job, any months they are out of work will set back their progress in making qualifying payments.

23. Another employee reports that they were planning to take the California bar in July 2025. As a result of the "for cause" termination, they now must disclose that they were dismissed for cause to the California bar.

24. Pursuant to the CFPB's ethical requirements, one employee recently divested stock holdings that were intended to secure their retirement. They cannot regain those positions. Because of their loss in income, they will need to use those proceeds as they search for another position and will not be able to take advantage of the certificate of divestiture program, which means they will lose a portion of these forced-sale proceeds to tax obligations.

25. Bargaining-unit employees who were not fired on February 11 remain in a precarious position. Several NTEU members report being told by managers that a mass layoff of the Bureau's employees will soon be announced. As I write this declaration, it appears this mass firing has begun, with termination letters starting to go out on the evening of February 13, 2025. My understanding is that the Bureau could ultimately be shrunk down to as few as five people. Members also report being told that the CFPB headquarters building lease in Washington, D.C. has not been renewed. NTEU's records show that 1,050 employees are assigned to the headquarters office. Those employees will face the same severe consequences as individuals who have already been fired.

26. In addition to the extraordinary harm inflicted on NTEU's members by the CFPB's closure, there is direct harm to the Union. The CFPB bargaining unit is 1,054. Within the bargaining unit, 776 are dues-paying NTEU members. That number continues to increase daily as employees fear for their jobs.

4

27. Reductions to the CFPB's workforce will decrease the Union's dues revenue. NTEU collected $569,456 in dues from CFPB members in fiscal year 2024. Even if former CFPB employees remain in the Union after their termination, their dues rates will be significantly reduced.

28. Based on my experience and discussions with unions who have been through similar challenges, I expect that a substantial portion of NTEU's CFPB members will not remain in the Union after being fired, regardless of NTEU's efforts, offers of assistance and encouragement.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, D.C. on February 13, 2025.

Daniel J. Kaspar

5

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

       *Plaintiffs*,

   v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

       *Defendants*.

Case No. 25-cv-381-ABJ

## DECLARATION OF KEISHA D. BROSS

I, Keisha D. Bross, declare as follows:

1.   I am the Director of Opportunity, Race, and Justice at the National Association for the Advancement of Colored People ("NAACP"). The statements made in this declaration are based on my personal knowledge and information available to me through my duties at the NAACP.

2.   The NAACP is the oldest and largest civil rights organization in the United States. Its mission is to achieve equality, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color.

3.   The NAACP was actively working with the Consumer Financial Protection Bureau ("CFPB"), particularly CFPB's Natural Disaster Team, to address predatory practices for NAACP members who were victims of the Los Angeles wildfires in Altadena, California in 2025. The NAACP reached out to the Natural Disaster Team because NAACP members who were victims of the fires were being further victimized by the financial scams that were rampant post-fire. The NAACP was working with the CFPB employees to help individual members who had been harmed. The CFPB was helping the NAACP educate its members to avoid post-fire financial fraud.

1

And the CFPB was helping NAACP members affected by the wildfires make connections to other resource groups across California. All of these efforts were ongoing when the CFPB was shut down. The CFPB stopped helping individual fire victims. For example, although the CFPB communicated that it would send to the NAACP educational materials, it did not do so because of the shutdown.

4.   Furthermore, a member of the Natural Disaster Team was planning to fly to Los Angeles to help hundreds of fire victims in-person, but could not do so because of the stop-work order, which instructed CFPB staff to stop performing their work duties.

5.   Many victims of the Los Angeles fires were entitled to mortgage forbearance. The CFPB was helping to ensure that mortgage companies provided the forbearance they are required to provide. But absent that enforcement, the NAACP is seeing its members struggle with mortgage companies that refuse to provide forbearance or tack on unnecessary fees.

6.   The impact of the CFPB's shutdown on the NAACP and its members is not limited to the recent fires. Shortly, before the shutdown, in 2025, the NAACP met with the CFPB to plan a state-by-state approach for helping NAACP members across the country. The NAACP members state conferences throughout the country. The NAACP had been working with the CFPB on a plan to provide resources to each state conference to protect members in the respective state from financial harm. This is especially important for older members, who are particularly vulnerable to financial fraud. Because of the stop-work order, the NAACP has been unable to move forward on the plan to work in conjunction with the CFPB to help protect these members.

7.   Before the shutdown, the NAACP regularly collaborated with the CFPB to educate NAACP members in other ways as well. In 2024, for example, the NAACP partnered with the CFPB to hold three education calls for NAACP members across the country. The calls were focused on housing discrimination, CFPB financial protection, and how to protect financial rights.

CFPB Director Rohit Chopra attended one of the calls and answered direct questions from our members. The NAACP anticipated continuing a similar collaboration this year, but the CFPB's shutdown has prevented us from doing so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2025, in Baltimore, MD.

/s/ _____

Keisha D. Bross

3

JA59

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
            *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official
capacity as Acting Director of the
Consumer Financial Protection
Bureau, *et al.*,

            *Defendants*.

Case No. 25-cv-381-ABJ

## DECLARATION OF ERIE MEYER

I, Erie Meyer, declare the following under penalty of perjury:

1.      I served as the Chief Technologist and Senior Advisor to the Director at the Consumer Financial Protection Bureau from October 2021 until February 7, 2025, when I resigned. Prior to my most recent position, I served as a founding member of the Technology and Innovation Unit at the Bureau from March 2011 to September 2013. Based on that work, I have personal knowledge of numerous aspects of the Bureau's work.

2.      That includes how the Bureau's Consumer Response and Education Division works. As a Senior Advisor, my portfolio included the work of Consumer Response.

3.      Consumer Response was established to provide consumers with a way to lodge complaints that the Bureau then monitors and ensures receive a timely and appropriate response from the company that is the subject of the

1

complaint. The Bureau also posts for public consumption a database of complaints. Both Bureau staff and contractors perform different aspects of this work.

4.    The Bureau receives consumer complaints about everything from credit reporting to debt collection to imminent foreclosures.

5.    For example, consumers often file credit reporting complaints when they are seeking a car or home loan, and false credit reporting is preventing them from getting that loan. These complaints are frequently very time-sensitive because the consumer's home purchase will fall through if they cannot get a mortgage in time or because they urgently need a car to get to work or drive their kids to school, which they cannot get without a car loan.

6.    The majority of complaints about debt collection are about attempts to collect debt not owed. Medical debt, for example, can be riddled with errors, involve many parties (the medical provider, the insurance, the debt collector, a credit reporting agency, etc.), and consumers often report getting the runaround in nailing down the facts between those parties. Again, debt collection complaints can be quite time-sensitive because absent resolution, they can      result in negative credit reporting, which impedes consumers' ability to rent an apartment, get a mortgage, or buy a car.

7.    Most complaints about mortgages are focused on trouble during the payment process, specifically successfully submitting payment. There

2

have been outages, security issues, and other system problems at mortgage servicing companies that have left consumers in a lurch. If the problem is not resolved in time with the help of a complaint, the consumer can receive negative information on their credit reports for something beyond their control. Those credit report errors are extremely hard to prove without the documentation that comes from a timely complaint submitted when the system error occurred.

8.    Additionally, consumers who are filing complaints about foreclosures typically have worked with their servicer and come to a dead end. This is a last effort to get to the bottom of what is going on with their mortgage and save their home. Those complaints being delayed or stuck can devastate a family who is forced to leave a home they should not be forced to leave.

9.    Consumer Response accepts complaints online, by phone, by mail, by referral from other agencies (including OCC, FDIC, NCUA, and the White House), and by referral from members of Congress.

10.    It is common for members of Congress to refer complaints to Consumer Response, and this happens daily when constituents call congressmembers seeking help with consumer financial issues. There is no other mechanism in place for Congressmembers to seek help from the Bureau for constituents.

3

11.    Consumer Response receives on average approximately 350,000 complaints per month. That number is sometimes higher:  In January 2025, it was approximately 500,000.

12.    When a complaint is filed, it is sent to the company about whom the complaint was lodged. That company is generally required to respond within 15 days. And it must report its response to the CFPB.

13.    Although many complaints are sent automatically to companies, many require the intervention of CFPB staff or contractors. For example, if a complaint is filed about a company that is already listed in the CFPB's consumer complaint system, the complaint can be automatically routed to the company for a response.  But if the company is not yet listed, a CFPB employee must onboard     the company to the Consumer Response system before the complaint can be processed. Similarly, if a consumer mistypes the name of a company or inputs the company's name in a way that does not match the company's name in the system, a CFPB employee or contractor must process the complaint.

14.    If a consumer files a complaint but does not have an email address, a contractor     must communicate with the consumer via postal mail.

15.    Additionally, there is no automated processing for complaints lodged through the Bureau's hotline, made by referral, or sent in through the

4

mail. A CFPB employee or contractor is required to process each of these complaints.

16.    Only CFPB employees can make determinations on which companies to onboard to the system. Contractors work on how to route referrals or more complex complaints. This means that even with a work stoppage of a few days, thousands of consumers are stuck in limbo. Not only will they not get help or answers on their complaints; other law enforcement agencies that depend on information from the CFPB's database will not have access to that information.

17.    In addition to the CFPB employees and contractors that process complaints, CFPB employees also help ensure that complaints get a response —and facilitate    resolution of many complaints. For example, there is a team of CFPB employees that monitors whether companies provide timely responses and can contact the companies if they don't. There is an Escalated Case Management Team that helps consumers who, for example, are subject to imminent foreclosure and, more generally, helps facilitate complaint resolution when a company fails to respond or when its response is inadequate. The Escalated Case Management Team    handles roughly    a thousand complaints a year.

18.    Consumer Response also monitors the complaint database and brings companies to the attention of the enforcement division for potential investigation.

5

19.    Filing a complaint with the CFPB is often successful in resolving consumers' issues. Indeed, the Bureau frequently gets reports that filing a complaint with the CFPB was the only thing that successfully stopped false credit reporting or halted an erroneous foreclosure, despite the consumer having previously tried themselves to solve the problem directly with the company.

20.    When the Consumer Response department is operating, consumers receive a response in 15 days or less in 98 percent of complaints sent to the company.

21.    Consumer complaints are often urgent to the consumer, regardless of whether they go to the Escalated Case Management Team.

22.    For example, the majority of complaints filed relate to consumer credit reports, and most people do not become aware of an error on their reports—and thus lodge a complaint—until they are trying to secure a loan.

23.    Another example is consumers who lose access to their accounts via "debanking"—when a consumer is denied access to their account —and face banks unwilling to work with them to restore the accounts or address what happened. Consumer Response is often the only resource available for them to get more information or re-access their accounts.    Consumers otherwise have no access to their accounts and no information about what went wrong.

6

24.    Consumers who complain about payday loans are primarily reporting that there are fees or interest they didn't expect. Consumers who use payday loans typically do not have other options available to them, and are experiencing severe liquidity issues. Unexpected charges, and not being able to submit a complaint, for a person in this situation can mean not having enough bus fare to make it to work on time and losing a job, skipping or rationing medications that are dangerous to skip or ration, or losing a badly-needed childcare slot due to insufficient funds.

25.    In the past week, Russel Vought directed Bureau staff to stop all work. I understand that not only have all Bureau employees been ordered to stop working, but all contracts for the companies that provide the infrastructure and the additional workforce   needed to staff Consumer Response were cancelled.

26.    That means that the Escalated Case Management team is not working—and therefore nobody is helping consumers with imminent foreclosures or to facilitate other time-sensitive complaint resolution when the company does not adequately respond. Complaints submitted online about companies that are not already in the system or where the company name inputted by the consumer does not match the one in the system are not being processed at all. Nobody is reviewing the mail to process mailed-in complaints or referrals, no one is processing referrals from agencies or Congress, and no one is sending mail to complainants without email

addresses. By now, there are likely thousands of complaints that have gone unprocessed. In addition, no one is monitoring company response times to the complaints that continue to be forwarded automatically online, ensuring that companies respond at all to those complaints, or bringing companies to the attention of the enforcement division.

27.    The hotline normally available for people to lodge complaints from 8:00 a.m. to 8:00 p.m. was down for the first time since we launched the CFPB without anyone able to work on the continuity of operations plan that this mission essential function requires. And this happened on a day it should have been open and was no longer accepting complaints. Although I understand that there is some possibility that this contract—and only this contract—has been un-terminated, that limited restoration would still leave Consumer Response non-functional.

28.    Even the automated complaint forwarding is likely to break down soon. CFPB employees that manage the data pipeline for automated forwarding have been ordered to stop work. Contractors are responsible for continuously managing the functionality of the online system that consumers use and that takes on more than a million    complaints a year. I understand that that contract, too, was cancelled. Without regular maintenance of that system, it will cease to function and crash.

29.    When I reviewed the complaints database the evening of February 13, the most recent complaint posted is from January 29. That is a change

8

from earlier today when the database showed complaints from February. This means that the system is already experiencing a significant error and likely breaking down.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2025

_____

/s/ _____

Erie Meyer

9

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
                    *Plaintiffs*,

v.

RUSSELL VOUGHT, in his official
capacity as Acting Director of the
Consumer Financial Protection Bureau,
                    *Defendants*.

Case No. 25-cv-381-ABJ

---

## DECLARATION OF JAMES SPEER

I, James Speer, declare as follows:

    1.    I am the Chief Executive Officer of the Virginia Poverty Law Center (VPLC). I am also a consumer rights attorney. The statements made in this declaration are based on my personal knowledge and information available to me through my duties at VPLC.

    2.    VPLC is a 501(c)(3) nonprofit organization that since 1978 has worked to break down systemic barriers that keep low-income Virginians in the cycle of poverty through advocacy, education, litigation, and direct counseling and referral services.

    3.    At VPLC, we organize our work into three centers, one of which is the Center for Economic Justice. The Center seeks to ensure that consumers' rights—and in particular the rights of those living in low-income households—are respected and protected when those consumers shop for and use necessary products and services from credit unions, banks, loan companies, rental companies, and many others.

    4.    VPLC's work on consumer issues is central to our mission and takes a number of forms.

5.    One part of our consumer work is advocating for fairer laws in the state legislature. During the last General Assembly session, for example, we were able to stop legislation that unfairly limited Virginians' access to unemployment benefits.

6.    We also do everything we can to get legal information about consumer issues to those who need it most. For example, we conduct regular training workshops on consumer-related issues for attorneys who are new to the legal aid network or who are doing pro bono work for legal aid clients.

7.    We also partner with credit unions and credit-counseling agencies to provide information and training directly to diverse groups, including low-income men and women, the elderly, and youth in foster care. We train them on financial literacy and developing strong financial practices such as learning how to save and to avoid predatory loans.

8.    VPLC takes other steps too to help people to deal with problems like those arising from predatory loans or debt collection. For example, we field phone calls and other inquiries from consumers nearly every day seeking help with these issues. Where we can offer guidance or point them to relevant information, we do so. Where appropriate, we help connect them with legal representation.

9.    For many years, VPLC has operated a Predatory Loan Helpline that consumers can call when they run into problems with unfair and predatory loans. The phone number is featured prominently on our website. I frequently answer the helpline myself.

10.    We routinely direct people calling the helpline or who otherwise contact us to file a complaint about their issue with the Consumer Financial Protection Bureau. We

2

even provide a link to the CFPB's website on the "consumer advocacy" page of our website, and tell consumers they can go there to file complaints. When needed, we will help them to file the complaint.

11.    Especially compared to other options like fighting directly with the debt collector or lender, or going to litigation, filing a complaint with CFPB is easy. It costs nothing and can usually be completed in less than 10 minutes.

12.    Filing a complaint with CFPB can get real and immediate results too. To give one example: Last September, I got a call from a woman with a car title loan made by a predatory lender that allegedly was partnering with a Utah bank and therefore felt they could ignore Virginia state law. I advised her to file a complaint with CFPB. CFPB shared the complaint with the lender and the FDIC. The lander denied any wrongdoing but lowered her interest rate from 118% to 36% and cut her payments in half and saved her car from repossession.

13.    One reason we tell folks to file CFPB complaints is that they can file once and it will be shared with the appropriate state attorney general's office and any other relevant federal agency to avoid having to file multiple complaints for the same issue with all the pertinent entities. Also, filing a complaint routes the complaint to the company and forces it to acknowledge and respond.

14.    In short, being able to refer people to the CPFB complaint system and help them file complaints that can get them real results is a very important tool we have in our work directly counseling people on consumer issues. These complaints don't just go into

3

JA73

the circular file—they are an important way we can help people get solutions that put them in a better situation than they were before.

15.     My understanding is that the CFPB's complaint system and hotline were entirely down for the entire day yesterday as a result of the cancellation of the CFPB's contract with the vendor.  If the complaint system goes away entirely or becomes so unreliable that it cannot be depended upon, it will make fulfilling our consumer-protection mission much harder. I can remember answering our helpline before CFPB and the complaint database even existed. Handling the same types of consumer complaints then consumed far more resources of my limited staff than it does today because there was no option then to quickly and easily file a complaint that we could count on to reach the right people.

16.     Going back to those days would require VPLC to devote more time, and ultimately money, just to be able to deliver the same help we can now. Especially compared to big banks and other financial companies, we have limited resources, and any time spent making up for the loss of the CFPB complaint tool would be time not spent on other work. To replicate what the complaint tool does—sending the complaint to the company, backed by a federal agency and with a deadline to respond, while also sending it to other state and federal agencies that may be able to help—would be difficult if not impossible and would strain our already limited resources.

17.     The same goes for if the complaint system were to be compromised in some way where we couldn't trust that people's information would remain safe. It's generally necessary when submitting a complaint to provide information so the company can identify

4

you and your accounts. This can include private personal information and things like account numbers.

19.    I could not in good conscience tell people to send their private personal and financial information to a system that others could then use to exploit them. A lot of the callers to our Predatory Loan Helpline called about fraudulent debt collection. We soon discovered that the internet lenders were selling their information and then the fraudsters used it to appear to be collecting a loan they had actually made. This is the same type of information that is in the CFPB database that could be exploited if not protected.

20.    We use the complaint system to help people in others way too. CFPB gives people the option to make public redacted versions of their complaints, which you can access on the CFPB's website. When someone comes in with an issue, that online database allows us to look up the same issue and even the same company to see whether the problem is widespread. That information helps us not only to assist the person with their own complaint, it helps us to understand bigger picture issues so we can focus our other consumer-protection efforts, like on advocacy and education, where they're needed most.

21.    While the FTC and state attorneys general accept consumer complaints, they don't offer any similar way for the public to see what has been submitted. In other words, if the CFPB complaint system went away or became compromised or manipulated in some way we could no longer trust, there would be no way to substitute for that lost information.

22.    I have read reports about so-called "DOGE" staffers at CFPB. I do not trust that these people know or care to follow the law or that they will do anything to protect the communities we serve from being taken advantage of.

23.    An important part of our work is education. That includes both education of other legal aid staff around the state, other nonprofits and agencies that advocate for consumers, and the public. Whenever we receive information from the CFPB about trends or widespread illegal activities that they have discovered through their consumer complaint process, we share that information with our network and the public. It would be extremely time-consuming and likely impossible for us to get this information and recognize these dangers if we did not have access to the consumer complaint database.

24. CFPB has become such an integral part of the advocacy and education work we do. Without the CFPB complaint system and the educational tools we would likely be forced to hire additional staff or divert another staff member's time to provide our current level of consumer service.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2025, in Richmond, VA.

*/s/ James Speer*
_____
James Speer

6

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br><br>             *Plaintiffs*,<br><br>  v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br><br><br>          *Defendants*. | Case No. 25-cv-381-ABJ |

**DECLARATION OF RICHARD DUBOIS**

I, Richard Dubois, declare:

1.       I am the Executive Director at the National Consumer Law Center (NCLC), and have held this position since 2016. Prior to becoming the Executive Director, I served as the Deputy Director and Director of Development and Project Planning, as well as a staff attorney at NCLC. I have been with the organization for 27 years. I have personal knowledge of the matters set forth herein and could and would testify competently about them if called upon to do so. This Declaration identifies and describes the harm that the recent shut down of the Consumer Financial Protection Bureau (CFPB) has had and will have on the work, operations, and budget of NCLC.

2.       NCLC is a non-partisan, nonprofit organization governed by a volunteer national board of directors that has included a past president of the American Bar Association, a former

Arizona Solicitor General, as well as bar association representatives and clients for low-income communities.

3.      Since 1969, NCLC has used its expertise in consumer law and energy policy to work for consumer justice and economic security for low-income and other disadvantaged people in the United States. NCLC's expertise includes policy analysis and advocacy; consumer law and energy publications; litigation; expert witness services; and training and advice for advocates. NCLC works with nonprofit and legal services organizations, private attorneys, policymakers, and federal and state government and courts across the nation to stop exploitative practices, help financially stressed families build and retain wealth, and advance economic fairness. NCLC publishes a 21-book series of manuals on all major aspects of consumer law, which it updates regularly. It also conducts multiple training sessions nationally on consumer law for attorneys, paralegals, and other counselors.

4.      Since the CFPB was created, NCLC has relied on its work to further its mission. As described in more detail below, NCLC depends on the research, reports, consumer complaint database, trainings, and staff at the CFPB as essential resources to support NCLC's core work.

5.      These resources support NCLC's financial well-being and ability to operate, including by ensuring that NCLC's paid publications and trainings are well-informed and backed by expertise and data. The resources provided by the CFPB also enable NCLC to produce quality advice, support, and free materials that enable NCLC to obtain financial support from foundations and donors.

6.      On February 8, 2025, newly appointed CFPB Acting Director Russell Vought ordered all work at the CFPB to cease, including issuing a directive to CFPB staff not to issue public communications of any type, including publication of research papers and compliance bulletins, not to approve or execute any material agreements, including relating to contractors

and to cease all stakeholder engagement. A true and correct copy of the email from Acting

Director Vought, obtained from Philip Melanchthlon Wegmann (@PhilipWegmann), X,

https://perma.cc/4KLT-C9M6, is attached as Exhibit 1. On February 11, 2025, President Trump

confirmed his goal of eliminating the CFPB. Kate Berry, *President Trump confirms his goal is to*

*eliminate the CFPB*, Am. Banker, Feb. 11, 2025, https://perma.cc/FYB5-QNHS (video at 1:26).

7.      The impact of Acting Director Vought's directives on NCLC was immediate. On

February 11, 2025, NCLC received a Stop Work Order relating to its contract with the CFPB for

subscription to NCLC's publications. A true and correct copy of the February 11, 2025, Stop Work

Order is attached as Exhibit 2. On February 12, 2025, NCLC received a second mail with a

subject line, "Termination for Convenience of the Government," from the Bureau of Fiscal

Service on behalf of the CFPB, notifying NCLC that the CFPB "…hereby terminates in its

entirety the subject contract, **effective 02/12/2025**," and instructing NCLC to take various

actions. A true and correct copy of the "Termination for Convenience of the Government,"

email is attached as Exhibit 3 (emphasis in original).  The CFPB has been a subscriber to

NCLC's manuals for more than a decade. The CFPB's contract is the largest single publications

contract for NCLC and significant assists in funding NCLC's publications work.

8.      This week, the CFPB canceled a training contract with NCLC. NCLC entered

into a contract with the CFPB on January 30, 2025, under which the CFPB would pay NCLC

$10,000 for a three-part training series for CFPB staff, which was scheduled to begin on

Wednesday, February 12, 2025, and end on June 18, 2025. A true and correct copy of the contract

letter dated January 30, 2025 is attached as Exhibit 4. The CFPB canceled the training on

Monday, February 10, 2025, after NCLC staff already spent time organizing and preparing a

presentation for the training. The CFPB has paid $2,760 of the total contract price, which NCLC

may have to refund if the training series is canceled entirely, and NCLC will lose the balance of

3

the contract funds it was set to receive if the remainder of the training is canceled. Other trainings also have been impacted. For example, a NCLC staff member organized a training for the Practicing Law Institute to take place on March 13 and 14, 2025, which included CFPB staff members as panelists. She and others now need to substitute themselves in for the absent CFPB the panelists, and spend time to prepare to do these presentations.

9.    NCLC's comprehensive digital treatise series is intertwined with CFPB website materials. All of NCLC's treatises link extensively to CFPB materials on the CFPB's website.  If the CFPB's website is scrubbed or ceases to exist, NCLC's staff will need to spend considerable time and effort replacing all of these links.  NCLC will either have to link to archive.org or download all the material from that website and host it as companion material. Over time, much of this material will go out of date and not be replaced by updated CFPB resources.

10.    NCLC relies heavily on CFPB publicly available resources and data to support its work, including writing NCLC's reports and manuals, and developing advocacy initiatives. These resources include periodic CFPB reports, its consumer complaint database and the materials to which the CFPB provides access online, including its regulations and their commentary. This work is core to NCLC's mission and a significant amount of NCLC's fundraising efforts go to support this work.

11.    By way of example, with respect to NCLC's manuals, NCLC uses the CFPB's annual Fair Debt Collection Practices (FDCPA) report and the CFPB's bi-annual report on the credit card market (which the CFPB is required to publish pursuant to the CARD Act of 2009 and is next due to be published in 2025) for its FDCPA and other manuals. NCLC relies on the CFPB's Supervisory Highlights for NCLC's Consumer Banking & Payments Law manual, among others. The CFPB periodically implements the inflation adjustment for certain dollar

4

figures in TILA (i.e., for the scope of consumer credit covered) and other statutes, and NCLC includes those adjustments in its manuals.

12.    NCLC also relies on the CFPB's publicly available complaint database to draft its reports. Some examples of NCLC's reports that have used the complaint database include, "Digital Denials," (2023) available at, https://perma.cc/7DLL-QHWT, "Unfair Debts With No Way Out: Consumers Share Their Experiences With Rental Debt Collectors" (2022), available at https://perma.cc/Y7D9-52YN, and "Automated Injustice Redux," (2019), available at https://perma.cc/5WHE-63FT.

13.    NCLC also uses the complaint database to develop training materials for its conferences. For example, for NCLC's most recent national Consumer Rights Litigation Conference held in October 2024, NCLC staff used the complaint database to provide examples of mortgage servicer abuses for one of its panels. This is just one example. NCLC staff frequently uses the complaint database for this reason, in presentations, seminars and in providing guidance to other advocates that rely on NCLC's work.

14.    If Acting Director Vought's stop work orders to CFPB staff continue and/or the CFPB is permanently shuttered, NCLC will lose access to essential resources upon which it has relied to do its core work. NCLC will not be able to inform those who rely on it on current trends in consumer issues and, as a result, its work supporting other advocates and, ultimately, supporting consumers will be detrimentally impacted.

15.    In addition to what NCLC has lost and stands to lose, NCLC's work will increase in the absence of the CFPB, including by organizing more trainings and publishing more written materials such as issue briefs. Without the CFPB engaging in oversight and enforcement and administering its consumer complaint function, the private bar and legal services community will see a dramatic increase in need from consumers, which will lead to a strain on its one-on-one

5

JA82

intake and support of these legal service providers. NCLC will have to engage in dramatically

increased advocacy in the states to fill the gaps left by elimination of federal consumer protection

resources, and redirect our other advocacy to multiple agencies and litigation that would

otherwise not be necessary.

      I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

February 13, 2025                    <u>s/Richard Dubois</u>
                                         Richard Dubois, Executive Director
                                         National Consumer Law Center

# Exhibit 1

Dear Colleagues,                              **Exhibit 1**

I am honored that President Trump designated me as Acting Director of the Bureau on February 7, 2025. As Acting Director, I am committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources. To that end, I am directing that, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau shall:

- Not approve or issue any proposed or final rules or formal or informal guidance.
- Suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not commence, take additional investigative activities related to, or settle enforcement actions.
- Not open any new investigation in any manner, and cease any pending investigations.
- Not issue public communications of any type, including publication of research papers and compliance bulletins.

- Not approve or execute any material agreements, including related to employee matters or contractors.
- Not make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.
- Cease all supervision and examination activity.
- Cease all stakeholder engagement.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Russell T. Vought

# Exhibit 2



Katie Eelman <keelman@nclc.org>

---

# Stop Work Notice - Contract 20343021C00006

---

**Braden K. Sanner** <braden.sanner@fiscal.treasury.gov>                    Tue, Feb 11, 2025 at 10:27 PM
To: "keelman@nclc.org" <keelman@nclc.org>
Cc: "Jawad.Syedain@cfpb.gov" <Jawad.Syedain@cfpb.gov>, Kathy Sanders <Kathy.Sanders@cfpb.gov>

Good Evening,

You might have received a blanket Stop Work Order from the Consumer Financial Protection Bureau (CFPB), Office of Finance and Procurement yesterday, 02/10/2025.  Please note that this is your official notice, in accordance with FAR 52.242-15, with instruction to stop work on the subject contract immediately, incurring no additional costs, until otherwise instructed by the Contracting Officer.  Fiscal Service Procurement will follow up if there are any additional changes in direction. This notice is effective immediately, 02/11/2025.

Please confirm receipt of this email as soon as possible.

**Braden K. Sanner**

Supervisory Contracting Officer

Bureau of the Fiscal Service

braden.sanner@fiscal.treasury.gov

304-480-7858

# Exhibit 3

# Fwd: Termination for Convenience of the Government – Contract 20343021C00006

1 message

---

**Katie Eelman** <keelman@nclc.org>                                                          Wed, Feb 12, 2025 at 4:17 PM
To: RapidResponse@nclc.org

FYI on the below.

Can someone let me know if I should respond to confirm receipt?

Thanks!

---------- Forwarded message ---------
From: **Mark A. Board** <Mark.Board@fiscal.treasury.gov>
Date: Wed, Feb 12, 2025 at 3:19 PM
Subject: Termination for Convenience of the Government – Contract 20343021C00006
To: keelman@nclc.org <keelman@nclc.org>
Cc: Syedain, Jawad (CFPB) <Jawad.Syedain@cfpb.gov>, Sanders, Kathy (CFPB) <Kathy.Sanders@cfpb.gov>, Braden K. Sanner <braden.sanner@fiscal.treasury.gov>


Good Afternoon,

On 02/11/2025, you were notified to stop work. Pursuant to FAR clause 52.212-4(l), Fiscal Service Procurement on the behalf of the Consumer Financial Protection Bureau (CFPB) hereby terminates in its entirety the subject contract, **effective 02/12/2025**.  As such, you are directed to immediately stop all work under the subject contract, terminate all subcontracts, and place no further orders.  You are also directed to provide by electronic means similar instructions to all subcontractors and suppliers.  You are required to keep detailed, individual records of your steps taken and expenditures, if any, you intend to claim as a result of the CFPB terminating this contract.  We request that you provide within 30 days the entirety of the termination settlement proposal(s), if any, you will be submitting for the subject contract.

Finally, it is necessary that you immediately confirm receipt of this termination for convenience notice via an electronic mail (e-mail) response to me, the Contracting Officer for the subject contract.



Thanks,

Mark Board
Lead Contracting Officer
Bureau of the Fiscal Service
Office of Shared Services/DPS
Office:  (304)-480-8356

Katie Edman (she/her/hers)
**Publishing Operations Manager**
National Consumer Law Center®
7 Winthrop Square, Boston, MA 02110
901.231.5681 | www.nclc.org/library

# Exhibit 4



NATIONAL HEADQUARTERS
7 Winthrop Square, Boston, MA 02110
(617) 542-8010

WASHINGTON OFFICE
Spanogle Institute for Consumer Advocacy
1001 Connecticut Avenue, NW, Suite 510
Washington, DC 20036
(202) 452-6252

NCLC.ORG

January 30, 2025

Theresa Burton
Resource Management Officer · Consumer Financial Protection Bureau
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20553
Theresa.Burton@cfpb.org

Re: Cost Proposal for Spring Training

Dear Theresa:

The National Consumer Law Center (NCLC) agrees to develop and deliver a series of three 90-minute consumer law webinars for the Consumer Financial Protection Bureau (CFPB) in the Spring of 2025. The training will cover the following topics on the designated dates and times:

- *Is it a loan? Strategies for challenging alternative financing products*: February 12, 2025 from 1:00-2:30pm EST
- *Junk Fees in Auto Sales and Finance*: April 16, 2025 from 1:00-2:30pm EST
- *The New Payday Loans and other Usury Evasion Developments*: June 18, 2025 from 1:00-2:30pm EST

The training agenda will include background and current developments on the issue and relevant law and provide time for a question and answer discussion with the attendees. The presenters will prepare powerpoint slide material that incorporates references and links to all major relevant developments so participants will be able to keep this material as a resource. They will also continue to research ongoing developments in the particular subject area to share with attendees. The final agenda for each program session will be finalized in consultation with the CFPB Enforcement Training Coordinator.

*Personnel*: Each training session will be presented by at least one NCLC attorney who is an expert in the particular topic. For some sessions, we will engage consumer rights attorneys outside of NCLC who specialize in the subject area to co-present.

*Cost*: The proposed cost for the training series is as follows:

Each 90-minute training session will include having presenters log in at least 15 minutes beforehand and staying to either answer additional questions or debrief for about 15 minutes after for a total of 2-hours for each actual session. There will also be preparation time for a comprehensive powerpoint presentation with additional materials where relevant. Each advocate, other than those who work for the CFPB or FTC, will be billed at $230 per hour for 2025.

The breakdown of costs for the training series is as follows:

- Is it a Loan? Strategies for Challenging Alternative Financing Products

  We propose having 3 main speakers plus Lauren Saunders, Associate Director of NCLC, who will be the organizer and moderator. NCLC will invoice for 3 attorneys for a total of 6 hours for the actual presentation. $230 x 6= $1,380

  We estimate 8 total hours of preparation time: $230 x 8 = $1,840

  The total for this session would be $3,220

- Junk Fees in Auto Sales and Finance

  We propose 2 speakers, including John Van Alst, Senior attorney at NCLC. That would be a total of 4 hours for the presentation. $230 x 4= $920

  We estimate 8 total hours of preparation time: $230 x 8 = $1,840

  The total for this session would be $2,760

- The New Payday Loans and other Usury Evasion Developments.

  We propose 2 speakers, including Lauren Saunders. That would be a total of 4 hours for the presentation. $230 x 4= $920

  We estimate 6 total hours of preparation time: $230 x 6 = $1,380

  The total for this session would be $2,300

Andrea Bopp Stark, senior attorney at NCLC, will help organize, coordinate, make arrangements with outside speakers, and attend each session to help moderate, monitor the chat and Q&A, troubleshoot issues or help with anything else. We estimate that would be a total of 7.5 hours x $230 = $1725

TOTAL COST: $ 10,000 (rounded down from $10,005)

Payment: NCLC will invoice as follows:

$3,500 upon execution of this contract

 $3,500 when a final agenda with topics and speakers has been determined,

Page 100 of 637

Filed: 05/05/2025

Document #2114200

USCA Case #25-5091

$3,000 is upon completion of the final session on June 18, 2025.

NCLC will provide a full refund for any work that is not performed.

We are very pleased to have the opportunity to work with you and provide training for the CFPB. Please let me know when you would like to discuss this proposal. Thank you!

Agreed to:

Richard Dubois, Executive Director, National Consumer Law Center

Date: 1-29-2025

Theresa Burton
Resource Management Officer · Consumer Financial Protection Bureau

Date:    January 30, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

        *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

        *Defendants*.

Case No. 25-cv-381-ABJ

**SECOND DECLARATION OF ERIE MEYER**

I, Erie Meyer, declare as follows:

1.  My name is Erie Meyer.

2.  I served as the Chief Technologist and Senior Advisor to the Director at the Consumer Financial Protection Bureau until February 7, 2025.

3.  I am preparing this declaration to ensure that the Court is aware of the imminent risk that twelve years' of critical CFPB records, which belong to the public, will be irretrievably lost and cause serious and sweeping damage unless the Court takes action to preserve the status quo in the face of efforts to dismantle the CFPB.

4.  I have direct knowledge of the CFPB's data management practices and the vital role that its data plays in protecting consumers and ensuring fairness in the financial system.

5.  The CFPB manages a wide range of sensitive data critical to the enforcement of federal consumer protection laws. This data includes, but is not limited to, supervisory and examination records of financial institutions, enforcement action data, consumer complaints, personal consumer information, and market research records. The CFPB's databases hold information regarding the

activities of large financial institutions, including details about compliance, enforcement actions, consumer experiences, and financial products.

6.   Public reporting and reports that I have received from within the Bureau reliably indicate that databases holding the CFPB's data will soon be deleted.

7.   If that happens, it would result in the immediate and irrevocable loss of data essential to the agency's core mission. I believe this loss would have catastrophic effects, including:

- ***Incapacitation of the Bureau's Public Facing Obligations***: The loss of this data will make the Consumer Response database unavailable and/or unreliable, severely hamper—if not entirely take down—the Bureau's website, and likely result in the loss of mandatory public reporting the Bureau has previously done.

- ***Loss of Consumer Protection Information***: A significant portion of the CFPB's data comprises sensitive consumer information, including personally identifiable information (PII). The loss of such data would severely disrupt the Bureau's ability to investigate and take enforcement actions against violations of consumer protection laws. In addition, it would leave consumers without critical recourse in the event of financial harm caused by institutions under the Bureau's jurisdiction.

- ***Financial System Instability***: The deletion of data that tracks the financial behavior of institutions, including compliance and enforcement records, would impair the Bureau's ability to identify risks and respond to emerging threats within the financial system. This could destabilize markets, allow bad actors to exploit weaknesses in financial institutions, and undermine public trust in the financial system.

- ***Competitive Disadvantages and Market Manipulation***: If such data were deleted, there would be no way to ensure that it was not accessed or misused by

2

unauthorized parties. For example, tech companies moving into financial services could gain an illegal competitive advantage by accessing sensitive consumer financial data or enforcement records, and the audit logs of that activity could be deleted. This could result in unfair competition and undermine market integrity.

8.  The deletion of these records, particularly without proper safeguards in place, would have lasting and serious consequences. Not only would it harm consumers and financial institutions, but it would also undermine the integrity of federal financial laws. In the absence of this data, it would be nearly impossible for the CFPB to fulfill its statutory obligations to protect consumers from fraudulent practices and ensure fair treatment in financial markets.

9.  Based on my experience and expertise, I believe that the deletion of the CFPB's databases and contracts would cause irreversible damage, not only to the Bureau's mission but also to consumer protection and the financial system as a whole. Any such action would severely impair the Bureau's ability to safeguard the public interest.

10.  Over the past 24 hours, I have learned from many well informed Bureau officials that leadership intends to fire massive numbers of Bureau staff today and into the weekend, threatening the decimation of the Bureau. These firings are troubling in themselves but they will also make it even more difficult to ensure the preservation of the Bureau's data. The loss of the Bureau's staff further threatens the Bureau's existence.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, D.C. on February 14, 2025.

_____
Eric Meyer

3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
NATIONAL TREASURY                         )
EMPLOYEES UNION, *et al.*,                 )
                                          )
                 Plaintiffs,              )
                                          )
         v.                               )
                                          )        Civil Action No. 25-0381 (ABJ)
                                          )
RUSSELL VOUGHT                            )
*in his official capacity as*             )
*Acting Director of the*                  )
*Consumer Financial*                      )
*Protection Bureau*, *et al.*,             )
                                          )
                 Defendants.              )
_____)

## ORDER

In light of the agreement of the parties at the scheduling conference held on today's date, February 14, 2025, and the underlying record, it is hereby ORDERED that until the resolution of plaintiffs' motion for temporary restraining order [Dkt. # 10], which, with the parties' consent, will be deemed to be a motion for preliminary injunction, the following orders shall remain in place:

It is ORDERED that Defendants, including their officers, agents, servants, employees, and attorneys, (hereafter collectively, "Defendants") shall not delete, destroy, remove, or impair any data or other CFPB records covered by the Federal Records Act (hereinafter "agency data") except in accordance with the procedures described in 33 U.S.C. § 44.  This means that defendants shall not delete or remove agency data from any database or information system controlled by, or stored on behalf of, the Consumer Financial Protection Bureau (CFPB), and the term "agency data"

includes any data or CFPB records stored on the CFPB's premises, on physical media, on a cloud server, or otherwise.

It is further ORDERED that Defendants shall not terminate any CFPB employee, except for cause related to the specific employee's performance or conduct; nor shall Defendants issue any notice of reduction-in-force to any CFPB employee.

And, it is further ORDERED that Defendants shall not: (i) transfer money from the CFPB's reserve funds, other than to satisfy the ordinary operating obligations of the CFPB; (ii) relinquish control or ownership of the CFPB's reserve funds, nor grant control or ownership of the CFPB's reserve funds to any other entity; (iii) return any money from the CFPB's reserve funds to the Federal Reserve or the Department of Treasury; or (iv) otherwise take steps to reduce the amount of money available to the CFPB below the amount available as of 4:00 pm on February 14, 2025, other than to satisfy the ordinary operating obligations of the CFPB.

Plaintiffs' motion for a temporary restraining order is hereby deemed to be a motion for a preliminary injunction. Defendants must file any opposition to plaintiffs' motion on or before February 24, 2025, and plaintiffs' reply must be filed on or before February 27, 2025.

The Court will hold a hearing on plaintiffs' motion on March 3, 2025 at 10:00 AM

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATED: February 14, 2025

**From:**      Vought, Russell
**To:**        _DL_CFPB_AllHands
**Subject:**   Additional Directives on Bureau Activities
**Date:**      Monday, February 10, 2025 8:30:43 AM

Good morning, CFPB staff,

As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is ███████████████████. Otherwise, employees should stand down from performing any work task. Thank you for your attention on this matter.

Best,

Russ Vought

Acting Director

Bureau of Consumer Financial Protection

# Exhibit 1

JA102

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL TREASURY EMPLOYEES UNION,** *et al.,* | |
| *Plaintiffs,* | No. 1:25-cv-00381-ABJ |
| v. | |
| **RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,** *et al.,* | |
| *Defendants.* | |

**DECLARATION OF ADAM MARTINEZ**

1.      My name is Adam Martinez.  I am currently employed at the Consumer Financial Protection Bureau ("CFPB" or "the Bureau") serving as the Chief Operating Officer ("COO") and Acting Chief Human Capital Officer.  As the COO, I am responsible for leading the Operations Division in executing all operational functions including finance, procurement, human resources, information technology and development, facilities, security, records management, Freedom of Information Act ("FOIA"), and data governance.  I started serving as the COO on February 20, 2023, and have been with the federal government for 25 years.  The following is based on my personal knowledge or information provided to me in the course of performing my duties.

**Events Occurring After Changes in Bureau Leadership and Events Related to the CFPB Building Closure**

2.      On February 3, 2025, CFPB employees and contractors were notified by email that the Secretary of the Treasury had been named Acting Director of the CFPB, effective January 31, 2025.  The email also identified six areas where, "unless expressly approved by the Acting Director or required by law," Bureau employees were to refrain from taking further action "[i]n order to promote consistency with the goals of the Administration."  This email was sent in order to allow the new, incoming political leadership to assess the CFPB's current operations and evaluate CFPB's priorities in light of the new Administration.  A copy of that email is attached hereto as Exhibit A.

3.      Based on my 25 years of government experience, this is a common practice at the beginning of a new administration and/or during the transition of a new head of agency.  As it relates to operations, during these transitions I immediately prepare and expect for a freeze on

travel, speaking engagements, conference attendance, hiring/recruitment, human resource processing, contracts, and certain mission actions.

4.    While the Secretary of the Treasury was the Acting Director, his team engaged in the evaluation of CFPB's current D.C. Headquarters.  On February 4, 2025, Treasury's Deputy Assistant Secretary ("DAS") for Operations contacted CFPB's Chief Administrative Officer ("CAO") to coordinate a tour of the building that same evening for personnel of the General Services Administration ("GSA") and the Office of Personnel Management ("OPM").  In addition, on the same day the DAS requested the Office of the Comptroller of the Currency ("OCC") to provide him with a copy of the CFPB lease and occupancy agreement.

5.    The CFPB Headquarters Building has provided the potential for greater efficiency and cost savings over the past couple of years.  For example, in 2023 and 2024, the former CFPB Director under the last Administration instructed the Operations Division to explore options to sublease office space and parking to other financial regulators and/or federal agencies.  Since the pandemic, the building has largely remained unoccupied, so this would have provided an opportunity to share costs with other partners.  The CAO coordinated with the OCC to determine the process to sublease if the CFPB found an interested party.  Interest was identified from at least a half dozen agencies.

6.    Officials representing the Department of the Treasury notified CFPB officials on the evening of February 6, 2025, that two United States DOGE Service ("USDS") officials would need access to CFPB Headquarters located at 1700 G St. NW.

7.    A follow-up meeting was held at CFPB Headquarters on the morning of February 7, 2025, between CFPB Management and USDS Personnel.  During the meeting, a CFPB employee who was not an attendee at the meeting began taking pictures of attendees through a conference room window.  The attendees moved to an adjacent conference room with a covered window due to privacy and safety concerns, but the same employee entered that conference room and began to disrupt the meeting.  The employee questioned the personnel in the conference room, demanded to know who they were, began to take pictures and video of open laptops and attendees' faces around the conference table, and demanded that the attendees show her their identification cards.  A CFPB physical security specialist and approximately four security officers were called to the scene to mitigate the problem.  A copy of the Incident Report describing these events is attached hereto as Exhibit B.

8.    On the same day, CFPB employees began protesting outside of the CFPB Headquarters building.  The protest activities included following and questioning staff about who they were and at times making staff feel harassed.

9.    On the evening of February 7, 2025, the National Treasury Employees Union ("NTEU") local chapter president emailed the CFPB's Chief Information Officer ("CIO") and copied the CFPB Legal Team.  She stated that she was made aware of messages being sent to

employees that orders were being received from the "Whitehouse" directly that, in her view, contradict and circumvent CFPB policy and procedures.  Further, the NTEU President reminded the CIO that the CFPB is an independent agency and stated that "Whitehouse officials" "are not your supervisor" and "have no authority to order you to carry out orders as a CFPB government employee; only the [Chief Operating Officer] and the Director have that authority."  A copy of that email is attached hereto as Exhibit C.

10.    On February 7, 2025, shortly after receipt of the NTEU President's email to the CIO, the President named Russell Vought, the Office of Management and Budget ("OMB") Director, as the CFPB's Acting Director.

11.    On February 8, 2025, the Acting Director emailed CFPB employees stating his commitment to "implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources."  The email also consisted of eight functions from which CFPB employees should refrain, absent approval "by the Acting Director or required by law."  The email also invited employees to raise any questions that they may have "through your existing management for consideration by the Acting Director."  This email was sent in order to allow the new Acting Director and political leadership to assess the CFPB's current operations and evaluate the CFPB's priorities in light of the new Administration.  It is not unusual for these types of steps to be taken at an agency at the beginning of a new administration and during the transition period for new leadership.  A copy of this email is attached hereto as Exhibit D.

12.    On February 9, 2025, I was advised by our new leadership that the Headquarters building would be closed the week of February 10, 2025, due to safety concerns, and employees and contractors would need to work remotely unless instructed otherwise from our Acting Director or his designee.  This would provide an opportunity for employees needing access to the building to do so safely given the disruptions caused on February 7, 2025.  As the Chief Operating Officer, I sent an email to CFPB employees advising them of the office building closure.  A copy of my email is attached hereto as Exhibit E.

13.    On February 9, 2025, CFPB management became aware of additional, planned protests at CFPB Headquarters from 4:15 to 6:00 p.m. and included representatives from Indivisible, Progress Change Institute, MoveOn, and Americans for Financial Reform.

14.    On February 10, 2025, the Acting Director sent an email providing validation of the building closure and instructions regarding work tasks.  A copy of the email is attached hereto as Exhibit F.

15.    On February 10, 2025, additional protests occurred at CFPB Headquarters.  Those protests consisted of hundreds of people, making the opening of the building unsafe.  CFPB Security Staff advised that, due to the protests, the building should remain closed, and as the Chief Operating Officer, I support the continued closure of the building due to ongoing security concerns.

16.    On February 12, 2025, staff protests occurred in front of the CFPB building at approximately 12:00 pm as reported by CFPB security personnel.

17.    The building closure should have limited impact to the Bureau and its employees. Approximately 900 employees currently primarily telework from home full time in the National Capital Region. An estimated 350 employees and contractors are currently assigned an office or cubicle in the building, but not all of them enter the building five days a week.  The CFPB Headquarters building currently has a capacity of 1,221 seats and the annual operational costs are greater than $25.7 million.

18.    After considering the Bureau's priorities to run a more streamlined and efficient Bureau, current CFPB leadership determined that it did not need the footprint associated with its current office space and decided to cancel CFPB's Headquarters lease.  As of the date of this declaration, the cancelation of the lease has not been fully executed.  After the cancelation of the lease, CFPB will have thirty days to move out.  CFPB leadership is evaluating and assessing CFPB's future office space needs.  The Bureau, in consultation with USDS, will evaluate options for alternative office space once the Bureau has ascertained the amount of office space it will need to carry out its more streamlined operations.  In the meantime, CFPB employees will continue to telework. The termination of CFPB's lease will not prevent the CFPB from performing the statutory functions described below, as employees have become accustomed to either working from home or remotely and the Bureau's informational technology supports it.

**The CFPB is Committed to Performing Statutory Obligations**

19.    Since the arrival of the Acting Director, the new leadership is engaging in ongoing decision-making to assess how to make the Bureau more efficient and accountable.  Our leadership has worked to comply with statutorily required functions, and my operations team has been mindful of this as we advise on operational related issues.

20.    The closure of the CFPB's Headquarters pursuant to the February 9 and 10 emails has not prevented the CFPB from performing statutory functions as described in this declaration. As mentioned, the approximately 350 employees who have assigned cubicle or office space have the ability to work from home and not all of them came to the office five days a week before the office building closure as reflected in the February 9 and 10 emails.  I or the Chief Legal Officer have approved access for employees that require onsite access to perform their jobs.  Personnel that have been approved for access include newly appointed personnel, security personnel, facilities staff, information technology personnel, mailroom personnel, and cleaning contractors. For example, employees working in mail services have been permitted to access the building and have continued to process consumer complaints that are mailed in.

21.    Work requests have been approved to allow the CFPB to maintain operations required by statute.  For example, the CIO was provided approval to onboard new political leadership with service desk support, perform security monitoring tasks for CFPB networks, and perform maintenance tasks needed to ensure the continuation of the Home Mortgage Disclosure

Act ("HMDA") application, Consumer Complaint Database, ServiceNow, and Microsoft365 platforms. Other approvals included maintaining the CFPB Call Centers and the processing of payments through the Civil Penalty Fund. While the Student Loan Ombudsman position is currently vacant, consumers have other options to receive support from the CFPB including utilizing the CFPB Consumer Complaint Center and/or the CFPB Ombudsman Office, which houses five employees. The CFPB Ombudsman Office is an independent, impartial, and confidential resource to help consumers, financial entities, consumer or trade groups, or anyone else interacting with the CFPB. These functions help ensure that the CFPB continues to engage in statutorily required work.

22.     Since the February 3 email, I have never had a work request be denied. The Bureau is committed to performing its statutory obligations, including those listed in 12 U.S.C. § 5493(b)(3)(A), entitled "Collecting and tracking complaints." The Bureau is maintaining a single, toll-free telephone number, a website, and a Consumer Complaint Database to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services. Operations related to the Consumer Complaint Database are continuing. Contracts needed for work related to the Consumer Complaint Database have remained intact and operational.

23.     Additionally, as required by the HMDA, the Bureau is providing information technology technical assistance to enable filers to submit their data and enabling the Federal Financial Institutions Examination Council to compile and publish information about applications for mortgage loans that is reported to the Bureau by mortgage lenders. 12 U.S.C. § 2809(a). In short, operations related to the CFPB's statutory requirements under HMDA are continuing. Contracts needed for work related to the HMDA have remained intact and operational.

**CFPB's Funding Structure and the Funding Request from Acting Director Vought**

24.     With respect to funding, the Bureau maintains two types of funds: (1) the Bureau of Consumer Financial Protection Fund ("Bureau Fund") and (2) the Civil Penalty Fund. The Federal Reserve funds the Bureau Fund through transfers administered by the Board of Governors of the Federal Reserve System, and this money is used for the Bureau's operations and expenses. Entirely separate from the Bureau Fund, the Civil Penalty Fund is funded by civil penalties imposed and collected by the Bureau—not the Federal Reserve. The Civil Penalty Fund is used to redress harmed consumers. Issuance of approved payments to affected consumers has continued to be processed.

25.     At the Bureau, new leadership is engaged in ongoing decision-making to assess how to make the Bureau more efficient and accountable, consistent with this Administration's goals of reforming the federal bureaucracy, reducing wasteful spending, and streamlining efficiencies in the federal government.

26.     Shortly after becoming Acting Director, Mr. Vought reviewed the sums available to the Bureau in its Bureau and Civil Penalty Funds. After considering the Bureau's total current

balance and the projected expenses for the upcoming quarter, Acting Director Vought determined that these currently available funds were sufficient for the Bureau to carry out its statutory mandates for the next fiscal quarter.

27.     In making that determination, Acting Director Vought considered the President's priorities of running a more streamlined and efficient Bureau, the public's interest in a streamlined and efficient Bureau, the impact of government spending on the federal deficit, the impact of anticipated efficiency initiatives at the Bureau, and the consumer interest.   Based on his determination, Acting Director Vought sent Chairman Powell a letter requesting $0 for the Third Quarter of Fiscal Year 2025.  A copy of that letter is attached as Exhibit G.

28.     The Bureau has made no attempts to transfer any of its Funds back to the Federal Reserve.   Indeed, I am not aware of a mechanism to transfer Funds back to the Federal Reserve.


***

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 24th day of February.

ADAM MARTINEZ   Digitally signed by ADAM MARTINEZ
Date: 2025.02.24 17:45:53 -05'00'

Adam Martinez
Chief Operating Officer

# Exhibit A

| From: | CFPB_OfficeOfTheDirector |
|---|---|
| To: | _DL_CFPB_AllHands; _DL_CFPB_AllHands_Contractors |
| Subject: | Instructions from Acting Director |
| Date: | Monday, February 3, 2025 10:59:59 AM |

Colleagues,

Secretary of the Treasury Bessent has been named Acting Director of the CFPB, effective January 31, 2025. As Acting Director, Secretary Bessent is committed to appropriately stewarding the agency pending new leadership. In order to promote consistency with the goals of the Administration, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau are directed:

- Not to approve or issue any proposed or final rules or formal or informal guidance.
- To suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not to commence, take additional investigative activities related to, or settle enforcement actions.
- Not to issue public communications of any type, including publication of research papers.
- Not to approve or execute any material agreements, including related to employee matters or contractors.
- Not to make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

# Exhibit B

February 21, 2025
Information Memo for the Chief Operating Officer

| **FROM** | ██████████, Director of Security, 202-████ |
|---|---|
| **THROUGH** | ██████████, Physical Security Specialist, 202-████ |
| **SUBJECT** | Employee Incident Report on Friday, February 7, 2025 |

| Select Applicable Information Type(s) | ☒Situational Awareness | ☐Request for Directional Feedback | ☐Reply to Inquiry from Director/FO | ☐ Draft Document Feedback Request |
|---|---|---|---|---|

<u>Issue</u>

On Friday, February 7, 2025, at approximately 11:09 am, ████████████, CFPB's Physical Security Specialist, received a call from Special Police Officer Lt. ████████ reporting a disruptive employee near Room B118. Upon arrival, Mr. ████████ observed Ms. ████████ in front of Room B118. When Mr. ████████ approached Ms. ████████, she appeared agitated and stated she had the right to know who the people in the room are and what they are doing. Mr. ████████ noticed Ms. ████████ was not displaying her PIV card in accordance with Bureau policy, and inquired if she was an employee and if he could see her PIV card. Ms. ████████ removed her PIV card from her pocket and showed it to Mr. ████████, then quickly put it back in her pocket. Mr. ████████ informed her that CFPB policy requires staff to display a PIV card while in CFPB space, but she did not comply. At that time ████████████ from the Legal Division arrived and asked to speak with Ms. ████████. They proceed down the hallway to have a private conversation.

At that point, ████████████, T&I Infrastructure Director, exited Room B118 and informed Mr. ████████ that it was he who notified security regarding her disruptive and harassing behavior. Mr. ████████ stated he was in a meeting in Room B116 with CFPB CIO ████████████, along with DOGE staff ████████████ and ████████████, who were recently assigned to CFPB. While in the meeting in Room B116, Mr. ████████ noticed Ms. ████████ pushing a baby carriage past the room on several occasions with a telephone pointing towards the window apparently attempting to capture pictures or video of staff in the room. Mr. ████████ offered, and the team agreed, to move the meeting to Room B118 because the windows were covered. Mr. ████████ then stated that when he was exiting Room B118, Ms. ████████ confronted him in the hallway and was pointing her phone camera yelling at him about what he was doing. He requested Ms. ████████ to stop pointing the camera at him when she responded, 'don't touch me'. She then entered Room B118 and started recording and taking pictures of the computers and people in the room.

The incident was captured on CFPB security footage, Camera 13 at 11:04 am.

<u>Timing Considerations</u>

No timing considerations.

Information Memo Reviewer Sheet

| Subject/Document Title Employee Incident Report | | |
|---|---|---|
| Name of Document Owner ██████████ | Office Office of Administrative Operations | Telephone Extension 202-██████ |
| Approved by ██████████ | | |
| Office Office of Administrative Operations | Name of Reviewer ██████████ | Date 2/21/2025 |
| Office [Insert office] | Name of Reviewer [Insert name of reviewer] | Date [Insert date] |

2

JA113

# Exhibit C

| From: | Farman, Catherine (CFPB) |
|---|---|
| To: | Chilbert, Christopher (CFPB); Martinez, Adam (CFPB); Schafer, Jessica (CFPB); Scott, Adam (CFPB); Doguin, John Paul (CFPB); White, Sonya (CFPB); Belasco, Lisa (CFPB); Heiser, Nicole (CFPB); Rice, Kevin (CFPB); Smith, Jarid (CFPB); Noble, Erin (CFPB) |
| Subject: | Reminder you take orders from CFPB officials |
| Date: | Friday, February 7, 2025 6:37:32 PM |
| Importance: | High |

Chris,

I've been made aware of messages you're sending employees that you are receiving orders from the "Whitehouse" directly that contradict and circumvent CFPB policy and procedure. As a reminder the CFPB is an independent agency; DOGE officials and Whitehouse officials are not your supervisor and have no authority to order you to carry out orders as a CFPB government employee; only Adam Martinez and the Director have that authority.

If you are being asked and/or pressured by people other than your chain of command, ask your supervisor in writing to verify or clarify the request and cc CFPB Legal. Congress, CFPB Union and news reports have warned federal officials of well-documented pressure tactics from staff outside of independent agencies designed to manipulate government employees into circumventing law and standard operating procedure at their request and you should heed these warnings.

Thank you,

--

**Catherine Farman (they/them, she/her/hers)**
**Web Developer | Technology & Innovation**
**President | CFPB Union NTEU 335**
**Mobile:** ▮▮▮▮▮▮▮▮▮▮
**#Solidarity**
consumerfinance.gov
nteu335.org

# Exhibit D

| From: | Vought, Russell |
|---|---|
| To: | _DL_CFPB_AllHands |
| Subject: | Directives on Bureau Activities |
| Date: | Saturday, February 8, 2025 8:50:28 PM |

Dear Colleagues,

I am honored that President Trump designated me as Acting Director of the Bureau on February 7, 2025.  As Acting Director, I am committed to implementing the President's policies, consistent with the law, and acting as a faithful steward of the Bureau's resources. To that end, I am directing that, effective immediately, unless expressly approved by the Acting Director or required by law, all employees, contractors, and other personnel of the Bureau shall:

- Not approve or issue any proposed or final rules or formal or informal guidance.
- Suspend the effective dates of all final rules that have been issued or published but that have not yet become effective.
- Not commence, take additional investigative activities related to, or settle enforcement actions.
- Not open any new investigation in any manner, and cease any pending investigations.
- Not issue public communications of any type, including publication of research papers and compliance bulletins.
- Not approve or execute any material agreements, including related to employee matters or contractors.
- Not make or approve filings or appearances by the Bureau in any litigation, other than to seek a pause in proceedings.
- Cease all supervision and examination activity.
- Cease all stakeholder engagement.

If you have any questions, please raise issues through your existing management for consideration by the Acting Director.

Thank you.

Russell T. Vought

# Exhibit E

| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) |
| **To:** | _DL_CFPB_AllHands |
| **Subject:** | Please Read: DC Headquarters Building Operating Status (2/10-2/14) |
| **Date:** | Sunday, February 9, 2025 1:39:00 PM |

**(This message is for DC Headquarters Staff and Contractors)**

**Dear Colleagues:**

**The DC Headquarters Building will be closed this week (2/10-2/14).  Employees and contractors are to work remotely unless instructed otherwise from our Acting Director or his designee.**

**Thank you.**

**Adam**

**Adam Martinez**
**Chief Operating Officer**

# Exhibit F

| From: | Vought, Russell |
|---|---|
| **To:** | _DL_CFPB_AllHands |
| **Subject:** | Additional Directives on Bureau Activities |
| **Date:** | Monday, February 10, 2025 8:30:43 AM |

Good morning, CFPB staff,

As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is ███████████████████. Otherwise, employees should stand down from performing any work task. Thank you for your attention on this matter.

Best,

Russ Vought

Acting Director

Bureau of Consumer Financial Protection

# Exhibit G

February 8, 2025

The Honorable Jerome H. Powell
Chairman, Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, D.C. 20551

Dear Chairman Powell:

The Consumer Financial Protection Act requires the Board of Governors of the Federal Reserve
System to transfer each quarter an "amount determined by the Director to be reasonably necessary" for
the Bureau of Consumer Financial Protection to carry out its authorities under law. 12 U.S.C.
5497(a)(1).  In determining this amount, the Director must "take into account such other sums made
available to the Bureau from the preceding year" or quarter.  *Id.*

This letter is to inform you that for the Third Quarter of Fiscal Year 2025, the Bureau is requesting $0.

During my review of the Bureau's finances, I have learned that the Bureau has a balance of
$711,586,678.00 in the Bureau of Consumer Financial Protection Fund.  By law, I must take account
of this sum when determining the amount "reasonably necessary" for the Bureau to fulfill its statutory
authorities.  *Id.*  I have determined that no additional funds are necessary to carry out the authorities of
the Bureau for Fiscal Year 2025.  The Bureau's current funds are more than sufficient—and are, in
fact, excessive—to carry out its authorities in a manner that is consistent with the public interest.

In the past, the Bureau has at times opted to maintain a "reserve fund" for financial contingencies.  But
no such fund is required by statute or necessary to fulfill the Bureau's mandate.  The Bureau's new
leadership will run a substantially more streamlined and efficient bureau, cut this excessive fund, and
do its part to reduce the federal deficit.

Sincerely,

/s/ Russell T. Vought
Russell T. Vought, Acting Director

cc:    Patrick J. McClanahan, Chief Operating Officer, Board of Governors of the Federal Reserve
       System

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br>                          *Plaintiffs*,<br><br>    v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br><br>                          *Defendants*. | Case No. 25-cv-0381-ABJ |

**DECLARATION OF ALEX DOE**

I, Alex Doe, declare as follows:

1.      I am a federal employee who attended meetings between the Office of Personnel Management and the CFPB. The statements made in this declaration are based on my personal knowledge.

2.      I am submitting this declaration pseudonymously because I fear retaliation. But if the Court would like to know my name or job position, I would be willing to provide it ex parte and under seal.

3.      Around February 13th, my team was directed to assist with terminating the vast majority of CFPB employees as quickly as possible. The termination was to proceed in phases, to be completed in rapid succession. First, the Bureau fired all probationary and term employees. Next, the Bureau would fire approximately 1,200 additional employees, by eliminating whole offices, divisions, and units. Finally, the Bureau would "reduce altogether" within 60-90 days by terminating most of its remaining staff, leaving a Bureau that could not actually perform any functions, or no Bureau at all.

1

JA124

4.      The CFPB sought to effectuate the second step of this large-scale termination—the firing of more than 1,000 employees—within 36 hours. Doing so required bypassing several ordinary procedures, safeguards, and rules. Jordan Wick, a DOGE employee, specifically stated that DOGE wanted formal termination notices to be sent by February 14th. The Bureau intended to comply and fire the vast majority of remaining employees on February 14th. The only reason it did not do so is because of this Court's order temporarily prohibiting it from doing so.

5.      We met again after the Court's order. Adam Martinez stated that he asked the CFPB's leadership whether they had been thinking about what agency would inherit the CFPB's administrative portfolios—human resources, FOIA, records management, and data systems—once the CFPB itself was no longer operating. There are statutory requirements to maintain those systems even once an agency no longer exists. The only experience the CFPB had with this was in 2010-2011, when the Dodd-Frank Act dissolved the Office of Thrift Supervision. In that case, Adam explained, the administrative functions were transferred to the Office of the Comptroller of the Currency. And OCC retained the files and records previously held by the Office of Thrift Supervision, along with the funding and staff to support legacy administrative functions like FOIA and record management. Mr. Martinez stated that he did not yet know what agency would perform a similar role for the CFPB or whether the Bureau itself would technically continue to exist with a small staff to perform those functions.

6.      Later in the meeting, Mr. Martinez was asked if an agency or department had been identified to perform those legacy administrative functions. He answered that that is exactly what he had just asked the CFPB's Chief Legal Officer and new leadership that morning because he didn't know if DOGE had thought about that. He stated that there are a lot of administrative

functions still left to do after the "wind down" of an agency but CFPB did not yet know who would handle those, and he didn't know if DOGE did.

7.    Mr. Martinez stated that during phase 2 of the three-phase termination process (the phase when the CFPB would lay off the vast majority of its employees), the CFPB would keep the specific positions necessary to carry out the "closure of the agency." But that many of those employees would then eventually be fired themselves.

8.    During at least one of the meetings in which both I and Mr. Martinez were present, Mr. Martinez referenced Acting Director Vought's "stop work" order.

9.    I have worked in federal government for many years, and I have never seen most of an agency's workforce be placed on administrative leave after a change in administration. Nor have I received an email requiring an agency's employees to stop all work tasks.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 26, 2025, in Washington, D.C.

/s/ *Alex Doe*
Alex Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

             *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

             *Defendants*.

Case No. 25-cv-0381-ABJ

**DECLARATION OF BLAKE DOE**

I, Blake Doe, declare as follows:

1.      I am a federal employee who was present at a February 13, 2025 meeting about "winding down" the CFPB. The statements made in this declaration are based on my personal knowledge.

2.      I am submitting this declaration pseudonymously because I fear retaliation. But if the Court would like to know my name or job position, I would be willing to provide it ex parte and under seal.

3.      On February 13th, 2025, I was present at a meeting, at which CFPB Chief Operating Officer Adam Martinez explained that the CFPB was in "wind down mode." He then laid out the plan for how that "wind down" would occur. Term employees would be fired that day. The agency was preparing Reduction in Force notices for most other employees, who would be terminated soon after. Mr. Martinez said that the CFPB's statutorily-required functions would be transferred to other agencies.

4.      I have read Mr. Martinez's declaration filed in this lawsuit. That declaration states that consumers who would be served by the CFPB Student Loan Ombudsman can seek help from

the CFPB's general Ombudsman Office, now that the Student Loan Ombudsman has been terminated. ECF 31-1 ¶ 21. That is not possible, however, because the employees of the general Ombudsman Office have been ordered not to perform any work.

    *5.*    Mr. Martinez's declaration also states that the "Bureau has made no attempts to transfer any of its Funds back to the Federal Reserve." ECF 31-1 ¶ 28. But I have seen an email dated February 11, 2025, in which Mr. Martinez stated that Chief Financial Officer Jafnar Gueye was in communications with the Federal Reserve about how to return money to either the Federal Reserve or the Treasury.


    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on February 26, 2025, in Washington, D.C.

                                          /s/ *Blake Doe*
                                          Blake Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

            *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

            *Defendants*.

Case No. 25-cv-0381-ABJ

## DECLARATION OF CHARLIE DOE

I, Charlie Doe, declare as follows:

1.      I am a Contracting Officer at the Consumer Financial Protection Bureau.
A Contracting Officer negotiates, administers, and terminates contracts on behalf of the United
States. The statements made in this declaration are based on my personal knowledge.

2.      I am submitting this declaration pseudonymously because I fear retaliation. But if
the Court would like to know my name, I would be willing to provide it ex parte and under seal.

3.      I have been a contracting officer for many years, through multiple changes in
administration. The events of the past few weeks are unlike anything I've ever seen at any agency
during any change in administration (or at any other time). The instructions to contracting officers
did not reflect a change in policy direction, but rather a wholesale termination of the contracts
needed to keep the CFPB running.

4.      On February 11, 2025, all contracting officers received an email ordering us to log
in and begin terminating the vast majority of the CFPB's contracts. We were directed to "terminate
all Enforcement (102 contracts), Supervision (16 contracts), External Affairs (3 contracts),
Consumer Response (20 contracts), Office of Director (33 Contracts), and Legal Division (all

except 2 contracts – FD Online licenses and litigation data)." We were directed to "get these Termination Notifications out ASAP." The Bureau repeatedly authorized overtime for us to be able to terminate the contracts within a few days.

5.     Following this directive, between February 11, 2025 and February 14, 2025, the CFPB issued notices of termination for over one-hundred contracts that supported the Bureau's work. The Bureau terminated almost all of the contracts it had with vendors, including all contracts related to enforcement, supervision, external affairs, and consumer response. Among many other things, these contracts included contracts for storing, maintaining, and transferring data. They included contracts for maintaining the consumer complaint database; scrubbing the database of personally identifiable information; enabling consumer complaint information to be shared with the public and with states, localities, and other federal agencies; and protecting the complaint database from computer viruses. All expert contracts, including contracts with experts in pending litigation, were canceled. Contracts for training examiners who supervise banks and for administering the test that employees must take to become examiners were canceled. Contracts for ensuring that the CFPB's website and publicly available information is accessible as required under the Americans with Disabilities Act. Contracts for the tools necessary for CFPB employees to do their jobs were canceled.

6.     Before issuing contract termination notices, the Bureau asked CFPB employees to provide feedback on what contracts were necessary for the Bureau to continue to carry out its statutorily required functions. But the Bureau decided to ignore this feedback, instead issuing an urgent directive to the contracting department to cancel all of the agency's contracts. I am aware of only two exceptions to this initial directive: the contract for storing litigation data and the database that houses employees' financial disclosure information.

7.      A very small number of contracts have been reinstated. For example, following widespread media attention on the cancellation of the consumer complaint hotline, that contract was reinstated. But because the contract to maintain the database that houses those complaints remains canceled, the database is quickly degrading. And I understand that there is a backlog of thousands of complaints that have not been forwarded to financial institutions. The vast majority of the contracts the Bureau needs to perform its functions remain terminated, and they have not been replaced.

8.      The contract termination notices sent the week of February 11, 2025 informed contractors that they should stop work on the contract, that the Bureau intended to terminate the contract, and that the contractor had 30 days to report to the Bureau any outstanding costs or costs related to terminating the contract.

9.      These stop-work orders do not themselves complete the termination of a contract. In order to complete a contract's termination, the vendor must report its settlement costs, the Bureau must pay those costs, and there must be what's called a "closeout modification" of the contract, signed by both the vendor and a Bureau contracting officer.

10.      If a contract is fully terminated, that termination cannot simply be rescinded. Federal Acquisition Regulations govern the process agencies must go through to requisition goods or services, and once a contract is fully terminated, procurement must go through that process. Unless the agency can justify awarding the contract without having a competitive bidding process, it will need to go through that entire process again. That process often takes six months to a year or more. Even the process of justifying an exemption from competitive bidding can take months. Re-procuring services for the CFPB to get up and running again would likely take even longer than usual here because the CFPB's contracting office is already understaffed. The Bureau was

3

JA131

slated to hire additional Contract Specialists, but following a directive from Acting Director Vought, those offers were rescinded.

11. This full contract termination process is ordinarily completed within 30 days of the notice of termination, sometimes sooner. The Bureau recently began issuing directives to contracting officers that we should complete the termination process for the more than one hundred contracts for which it had issued stop-work notices as quickly as possible. We were directed to complete contract termination, even if the ordinary, required steps, such as consulting with legal, receiving and approving settlement costs, and even getting the vendor's signature, had not been completed. Following what I understand was a temporary agreement between the plaintiffs and the Government pending this Court's hearing on March 3, we were directed to pause the finalization of contract terminations. Absent that agreement, many of the CFPB's contracts would have been fully and irrevocably terminated by the end of this week. Once that agreement expires after the hearing, if there is no order prohibiting the continuation of contract terminations, I expect the vast majority of the CFPB's contracts to be fully terminated within the week.

12. To my knowledge, the Bureau has not taken any efforts to preserve CFPB data that is possessed by vendors whose contracts are terminated. Previously, when I issued a final contract termination, I would include a data preservation notice to ensure that Bureau data was not deleted. But none of the stop-work notices or other termination paperwork that I am aware of contains a provision requiring data preservation, requiring the return of data to the CFPB, or anything else governing data. We are being required to use form language that does not include anything about data preservation, and are not permitted to add that (or anything else) to the language provided.

13. As someone has been working in government procurement for 25 years, I have been a stalwart protector against waste, fraud, and abuse. I pride myself on being an excellent steward

of the tax payers' dollars, which is a cornerstone of government procurement. That is what contracting officers do. The wholesale termination of contracts will not prevent waste, fraud, or abuse. Instead, the government will incur—and already has incurred—substantial expense because the government will have to pay contractors their costs to terminate a contract, and then pay them again the costs to re-start that contract (such as re-hiring employees, re-creating or re-starting any databases or software, re-purchasing any necessary tools etc.). In addition, if the contracts are fully terminated, it will require substantial work from government employees to re-procure the services they provided.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 27, 2025, in Washington, D.C.

/s/ *Charlie Doe*
Charlie Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>NATIONAL TREASURY<br>EMPLOYEES UNION, <em>et al.</em>,<br><br>      <em>Plaintiffs</em>,<br><br>   v.<br><br>RUSSELL VOUGHT, in his official capacity<br>as Acting Director of the Consumer Financial<br>Protection Bureau, <em>et al.</em>,<br><br>      <em>Defendants</em>.</td><td>Case No. 25-cv-0381-ABJ</td></tr>
</table>

**DECLARATION OF DREW DOE**

I, Drew Doe, declare as follows:

1.    I am an employee at the Consumer Financial Protection Bureau (CFPB).  This declaration is being written to establish a written record of conditions that I observed over the past month. The statements in this declaration are based on my personal knowledge.

2.    I am filing this declaration pseudonymously because I fear retaliation. If requested, I would be willing to share my name and position at the CFPB with the Court ex parte and under seal.

3.    On Thursday, February 6, and Friday, February 7, 2025, employees of the United States DOGE Service visited the CFPB and were given CFPB laptops. Contrary to the affidavit of Adam Martinez filed in *AFL-CIO v. Dep't of Labor* (No. 25-339), those DOGE employees had not—and to this day, still have not—completed the required cybersecurity and privacy training. In addition, contrary to CFPB policy, they were allowed access to the CFPB's systems and data before any agreement between the CFPB and DOGE regarding their work was signed.

4.    On February 7, DOGE employees were given full privileged access to CFPB systems and data, without following the process that the CFPB ordinarily requires to do so. For

1

JA134

example, the DOGE employees did not sign the documents that outline the rules governing the use of CFPB systems and data. They did not complete the training required for users who have such a high level of access to CFPB systems and data. Nor was any document waiving these requirements signed by an official with the power to authorize such a waiver.

5.    On multiple occasions between Friday, February 7, 2025 and Tuesday, February 25, 2025, multiple Senior Executives shared that the intention of the leadership was to fire everyone but the five positions required by the Dodd-Frank Act. They also shared that all five of the CFPB's buildings (the headquarters in DC and all of the agency's regional offices) were being returned to the agencies that had leased the buildings to CFPB. On multiple occasions, staff were told by Senior Executives that "the writing was on the wall" and that "it was all over but the terminations." By Thursday, February 13th, most of the CFPB's contracts had been terminated, all of the probationary employees had been fired (via a failed mail merge), and all term employees who had not already agreed to resign were fired. It was clear to internal staff that this was not a pause, nor audit, nor any form of analysis.

6.    The CFPB terminated all contracts for Supervision, Enforcement, Consumer Response, Regulations, Front Office, and most of Operations contracts—approximately $200 million terminated contracts out of approximately $227 million total contracts. The hasty termination of almost all of the Bureau's contracts resulted in systems and services being turned off before CFPB or contract personnel returned CFPB data. Because not all systems have off-line backups, some of the CFPB's data may have been deleted. Among other things, this data may include CFPB Human Resource records, Reasonable Accommodation records, Ombudsman records, and Equal Employment Opportunity records. The data may not be recoverable and as of February 25th, CFPB is trying to now figure out which systems and services have records.

2

JA135

7.     During meetings about the CFPB's shut-down that took place between Monday, February 18 and Tuesday, February 25, staff were told by Senior Executives that the CFPB would be eliminated except for the five statutorily mandated positions; that the CFPB would exist in name only; and that, once this Court's injunction was over, everything would need to be either removed from the building or destroyed. Staff were told by Senior Executives that the CFPB would no longer have an employee location and that data could not be stored at any CFPB location because there wouldn't be any locations left. Staff were told that no DHS, OIG, GAO, OMB, Internal Controls, Congressional, or other compliance would be necessary because the CFPB would "not exist" and it would no longer be "our problem."

8.     Senior Executives explained that the work stoppage on February 10 was characterized as a work stoppage to avoid the 10-day legal limit on administrative leave. Because of the work stoppage, only the barest of information intake has been happening, and full data handling has been slowed if not eliminated due to the contract terminations and reversals. There has been no attempt internally to hide the fact that the disassembly of the CFPB continues despite the Court's order. The status quo as of February 14th has not been maintained.

9.     When Senior Executives were approached by staff about the inaccuracies in affidavits provided by Adam Martinez, the Senior Executives stated that they were not going to discuss the facts, and staff were told to stop asking. The majority of operations have been terminated. Moreover, for those few systems that have been allowed to continue, their operations staff have been largely terminated. Given the stop work order, the CFPB's systems may be able to detect and log an ongoing issue, but may not be able to maintain secure operations or respond to a problem, as most of the contract staff are gone with no transfer of institutional knowledge.

10.     Because of the stop-work order, the work required to maintain the security and stability of the CFPB's computer systems—including systems that collect and maintain CFPB data—is not happening.  Requests to perform this necessary work were denied by Senior Executives. Multiple iterations of cuts have left the CFPB systems with unclear support and maintenance. If this continues, almost all CFPB systems will be ended, with the few remaining systems reported to be transferred to another agency. The direction given was not to conduct streamlining but instead mandated that programs, staff, and contracts be pared beyond what can sustain any effective operation. One Senior Executive said that CFPB will become a "room at Treasury, White House, or Federal Reserve with five men and a phone in it." Concerns raised to the Senior Executives have been largely ignored, even when positions or requirements are mandated by statutes other than Dodd-Frank. I am unaware of any effort to assess whether these actions have or will create any streamlining or efficiency gains.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 26, 2025, in Washington, D.C.

/s/ *Drew Doe*
Drew Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

                  *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

             *Defendants*.

Case No. 25-cv-0381-ABJ

**DECLARATION OF ADAM SCOTT**

I, Adam Scott, declare as follows:

1.      I am the Director of Digital Services at the Consumer Financial Protection Bureau. The statements made in this declaration are based on my personal knowledge.

2.      On February 18, 2025, I was cced on an email from another employee to Chief Operating Officer Adam Martinez and Chief Information Officer Christopher Chilbert, requesting authorization to work to repair the CFPB's homepage. The employee reported that members of the "DOGE Organization" had "delet[ed] the homepage for some unknown reason." And he detailed the ways in which the "broken homepage ha[d] damaged several aspects of our technical operations already."

3.      I was also cced on Mr. Chilbert's response, sent approximately an hour later. Mr. Chilbert denied authorization, stating "My understanding is that the decision to delete the homepage was made by Acting Director Vought, and it was not an error made by the members of the DOGE team. We do not have authorization at this time to restore the homepage[.]"

4.      The email chain containing the initial email requesting work authorization and Mr, Chilbert's response are attached as **Exhibit A.**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 27, 2025, in Washington, D.C.

Adam Scott

2

# Exhibit A

**RE: Requesting authorization to repair the cf.gov homepage**

**Chilbert, Christopher (CFPB)** <_____>                                Today at 9:32 AM

To: _____      ● Martinez, Adam (CFPB);  Cc:  ● Scott, Adam (CFPB)  ⌄

_____

My understanding is that the decision to delete the homepage was made by Acting Director Vought, and it was not an error made by the members of the DOGE team. We do not have authorization at this time to restore the homepage or engage the DOGE team in an AAR.

Chris Chilbert
_____

**From:** _____ >
**Sent:** Tuesday, February 18, 2025 8:15 AM
**To:** Martinez, Adam _____      Chilbert, Christopher ████████████y>
**Cc:** Scott, Adam (CFPB)_____
**Subject:** Requesting authorization to repair the cf.gov homepage

Adam and Chris,

Apologies for the unusual email address. These are unusual times, `` and I have a request for authorization to work that I'm not sure should be addressed to one or the other of you, so I figured I would keep you both in the loop. I have also cc'ed my manager for visibility, so he can be aware if such work is authorized.

Based on news reports that Gavin Kliger is now at the IRS, it seems like the DOGE Organization is largely done with its technical work at the agency to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems."

As part of this work on improving quality, they also damaged the website by deleting the homepage for some unknown reason. I have heard that CFPB staff were able to persuade them to not delete everything entirely (as they did for USAID). I struggle to understand why this deletion was necessary at all and why they demanded access to the website with extreme urgency late on a Friday night. Despite their stated assurances, it seems they did not follow our processes, nor did they wait for an employee signing on under overtime to onboard them into our website's CMS, Wagtail. From what I understand, it seems that they instead used global admin privileges on our SSO identity provider to force access into our system and make the change on their own. I have many questions still, but I hope to be able to explore them through a more established process rather than relying on hearsay (see below).

I know some teams have been received authorization to continue working despite the general stop-work order from the Acting Director. I would like to request authorization for two scopes of work:

1. I would like for my team to repair the website's homepage. The rest of the site does remain accessible to the general public, but having a broken homepage has damaged several aspects of our technical operations already:
   a. Site crawling by search indices like Google is likely not happening, this will damage our SEO and visibility to the world and cause our content to become less visible in search over time
   b. I have confirmed also that our automated accessibility scanning is now malfunctioning and is unable to verify our site still meets its mandated 508 compliance for accessibility

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
                    *Plaintiffs,*

v.                                          Case No. 25-cv-381-ABJ

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,
                    *Defendants.*

### DECLARATION OF MATTHEW PFAFF

I, Matthew Pfaff, declare as follows:

1.      I am employed at the Consumer Financial Protection Bureau, where I currently serve as the Chief of Staff for the Office of Consumer Response. Consumer Response is the unit responsible for "the centralized collection of, monitoring of, and response to consumer complaints," as well as sharing data, as required by 12 U.S.C. § 5493(b)(3)(A)-(D). It is also responsible for executing one of the CFPB's primary functions of "collecting, investigating, and responding to consumer complaints" and providing "timely regulator response to consumers" as required by 12 U.S.C. § 5511(c)(2) and 12 U.S.C. § 5534(a), respectively. As the Chief of Staff, I am responsible for leading the Office's efforts to meet its statutory obligations and support CFPB priorities and initiatives. I started serving as the Chief of Staff on February 14, 2021. I have been with the CFPB since October 2013, and I have worked in the Office of Consumer Response the entire time. The following is based on my personal knowledge or information provided to me while performing my duties.

## The CFPB's Consumer Complaint Process

2.      The CFPB's consumer complaint process is the primary way that the CFPB hears from individuals and families about problems they experience with bank accounts, mortgages, credit reporting, and other consumer financial products. These complaints come from active-duty military members, veterans, rural consumers, older Americans, and students. They come from all 50 states. They come from individuals of all backgrounds and all socio-economic statuses.

3.      Submitting a complaint is simple. Consumers can submit complaints online, over the phone, and by mail. Other federal agencies (e.g., Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Federal Trade Commission, Federal Reserve, National Credit Union Administration), states, congressional offices, and the White House can also refer complaints to the CFPB for processing.

4.      Processing complaints at scale, however, is much more complex. Once the CFPB is in receipt of a complaint, it will ensure that the complaint is complete and direct the complaint to a company for a response or to another federal agency for handling. Complaints meeting the CFPB's publication criteria are eligible for inclusion in the public Consumer Complaint Database.

5.      The complaint process has proven to be an efficient and effective forum for everyday people to have their problems addressed. Indeed, of the more than 2.7 million complaints published in the CFPB's Consumer Complaint Database last year, companies provided a timely response 99.7% of the time and reported providing money back or other relief (e.g., corrections to consumer reports) in about half of those complaints. Since the CFPB opened its doors, companies have reported returning more than $300 million dollars in response to complaints. Companies have also reported that they discontinued mortgage foreclosure proceedings, cancelled student loans, refunded incorrect late fees, and reversed transactions for consumers who were scammed.

## The Declaration of Adam Martinez

6.     I have reviewed the declaration that the CFPB's Chief Operating Officer and Acting Chief Human Capital Officer, Adam Martinez, submitted in this case. ECF No. 31-1. Mr. Martinez summarily concludes that "[t]he Bureau is performing its statutory obligations, including those listed in 12 U.S.C. § 5493(b)(3)(A)." *Id.* at ¶ 22. Mr. Martinez also declares that "[o]perations related to the Consumer Complaint Database are continuing and that "[c]ontracts needed for work related to the Consumer Complaint Database have remained intact and operational." *Id.*

7.     Mr. Martinez's statements are misleading, inaccurate, or both.

8.     Mr. Martinez's statements further demonstrate a lack of understanding about the consumer complaint program. When individuals or their representatives submit a complaint to the CFPB, the complaint is submitted to and included in a case management system. This case management system allows consumers, companies, and the CFPB to securely share information and engage in the complaint process. This case management system is also how both the CFPB and companies can deliver timely responses to consumers as required by law. Information from the case management system populates other systems to meet data sharing requirements with federal and state agencies, as well as with the public via the Consumer Complaint Database. People—both federal employees and contractors—make this entire operation run successfully.

9.     On Monday, February 10, 2025, Acting CFPB Director Russell Vought directed staff to "not perform any work tasks" and to "stand down from performing any work task." *Id.* at Ex. F. Consumer Response staff complied with the Acting Director's order. As a result of this compliance, the "operations related to the Consumer Complaint Database" are *not* "continuing." And many of the "contracts needed for work related to the Consumer Complaint Database" have *not* "remained intact and operational."

3

**JA144**

**Operations Related to the Consumer Complaint Program
and Database are Not Continuing**

10.     Consumer Response is composed of several teams, each tasked with carrying out one (or a set of) the CFPB's statutory obligations. On February 13, 2025, members of the "Department of Government Efficiency" (DOGE) requested that Consumer Response define competitive areas—areas explicitly required by statute—for purposes of a Reduction in Force (RIF). I drafted a memo that provided information about the teams within Consumer Response that align to specific statutory obligations. Mr. Martinez was provided a copy of this memo. A copy of that memo is attached hereto as Exhibit A.

11.     None of the teams listed in the memo, which align to statutory obligations, have been activated to work. As a result, the complaint handling operation has experienced a significant disruption.

12.     Complaints referred by congressional offices, states, and most federal agencies are not being reviewed and sent to companies. These complaints require federal staff to review and process.

13.     Complaints about companies that are not yet participating in the complaint program are not being addressed. These complaints require federal staff review and a manual invitation to participate in the program.

14.     Complaints in which consumers misspelled the name of the company are not being sent to companies. These complaints require federal staff review and manual processing.

15.     Incomplete complaints are not being processed or worked by anyone. These complaints require federal staff to conduct outreach to consumers for additional information.

16.     Taken together, in these categories alone, I expect that more than 10,000 complaints are currently awaiting federal staff review. This is a large and unprecedented backlog.

4

17.     Complaints are not being "monitored." Consumer Response has a team of subject matter experts who monitor complaints to ensure that consumers are receiving timely, accurate, and complete responses to their complaints. Subject matter experts also monitor complaints for emergent issues across market and at companies. This ongoing monitoring provides a necessary check on the complaint program to ensure that consumers receive meaningful responses. Without this work, company responses are likely declining in quality.

18.     Complaints are not being "investigated." In addition to monitoring complaints, subject matter experts perform targeted investigations on certain complaints. These investigations typically involve asking companies follow-up questions to ensure rules and regulations have been followed. And often, these targeted investigations yield additional relief for consumers.

19.     Escalated issues are not being addressed. Consumer Response's Escalated Case Management team responds to consumers who are facing imminent foreclosure, may be a risk to others or themselves, and other sensitive issues.

20.     Complaint systems, including the case management system and systems for sharing data, are not being maintained. Complaint systems require federal and contractor staff to monitor and respond to issues affecting system health. Automatically generated error notices indicate the system has already experienced problems. If these errors are not addressed, at some point, the system will break entirely. Additionally, companies that receive complaints through this system have received error notices that they are unable to export complaints out of the system, which will impede their ability to review and respond to complaints.

21.     Stakeholder support tickets are not being resolved. Consumer Response receives hundreds of support tickets every month from company, congressional, and government stakeholders. Support tickets range from companies trying to remedy potential privacy concerns

to resetting passwords. These tickets are not being reviewed and resolved, which is almost certainly frustrating the ability of stakeholders to complete their work.

22.     Coordination with other federal regulators is not occurring. Indeed, I am aware of at least one federal agency that has noted the disruption in complaint processing. This disruption in timely referrals mean that other federal agencies will not be able to initiate their investigative processes.

23.     Complaints submitted by servicemembers and their families are not being monitored. It is my understanding that no one from the Office of Servicemember Affairs has been activated to work.

24.     Student loan complaints are not being reviewed and informally resolved. The Student Loan Ombudsman role is vacant. Mr. Martinez seemingly suggests that the CFPB Ombudsman is an appropriate substitute. Yet again, this reflects a basic misunderstanding of the functions of that office and the authorities granted to the CFPB Ombudsman by the Consumer Financial Protection Act. The CFPB Ombudsman does not assist in resolving any issues between consumers and companies; rather, it merely ensures that the CFPB is following its own internal processes and procedures.

25.     Audits and quality controls have halted. Consumer Response maintains an audit function that ensures complaint processes and procedures are being followed, and vendors are appropriately interacting with members of the public. This function also responds to oversight inquiries, such as those from the CFPB Ombudsman and the Office of Inspector General. There is currently no one performing these essential functions.

6

26.     Activities to monitor and safeguard the system to prevent bad actors from misusing it have stopped. This risks overwhelming the system and wastes the CFPB's technical resources and the resources of companies responding to complaints.

### Contracts Needed for Work Related to the Consumer Complaint Program and Database Have Not Remained Intact and Operational

27.     On February 11, 2025, the CFPB's Chief Financial Officer, Jafnar Gueye, requested that offices review a list of contracts to determine which, if any, directly supported a statutory requirement. I reviewed the list of contracts managed by Consumer Response and determined that five contracts directly supported a statutory requirement. All five contracts were nevertheless terminated for convenience—*after* it was determined that they were necessary to support statutory requirements.

28.     Since those terminations, following inquiries on the shutdown of Consumer Response, the contract for the Consumer Resource Center has been reactivated. This contract enables the CFPB to operate its toll-free telephone number. The Consumer Resource Center, which handles several thousand calls on any given day, recently had an outage lasting an entire day, meaning that nobody who called the CFPB's toll-free number to speak to someone to have their question answered, submit a complaint, or obtain a status update. Additionally, there is currently no oversight of the Consumer Resource Center by the CFPB.

29.     Contracts for the maintenance of complaint systems, including the case management system and systems for sharing data, remain terminated.

30.     Contracts managed by other offices but that affect complaint systems have also been terminated. Among these contracts was a subscription to virus scanning software. Without this software, most complaints cannot be sent to companies for review and response. Similarly, consumers cannot access any attachments that companies may upload in response to the complaint.

7

Although this contract was recently reinstated, the disruption in virus scanning software meant that tens of thousands of complaints were not been promptly sent to companies and are now instead part of a large backlog.

### Whistleblower Disclosure

31.    I have provided a copy of this declaration to the Office of Special Counsel pursuant to the Whistleblower Protection Act. I am making this whistleblower disclosure based on my reasonable belief that the conduct described in this declaration constitutes a violation of a federal law and an abuse of authority. 5 U.S.C. § 2302(b)(8)(A).

\*\*\*

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC this 26th day of February, 2025.

_____

Matthew Pfaff

# Exhibit A

February 13, 2025
Information Memo for the Acting Director

| FROM | ████████████████████, Consumer Response & Education |
| SUBJECT | Divisional Staffing |

| Select Applicable Information Type(s) | ☐ Situational Awareness | ☐ Request for Directional Feedback | ☒ Reply to Inquiry from Director/FO | ☐ Draft Document Feedback Request |

## Issue
This purpose of this memorandum is to provide information about how the staff of the Consumer Response and Education Division align to the Consumer Financial Protection Bureau's (CFPB's) statutory obligations.

## Divisional Background
The Consumer Response and Education Division (CRE) is responsible for executing the CFPB's first two statutory functions: (1) conducting financial education programs, and (2) collecting, investigating, and responding to consumer complaints. *See* 12 USC 5511(c)(1)–(2). CRE is the public face of the CFPB to individuals and their families, delivering scalable services and tools designed to empower consumers to share their experiences in the marketplace, respond to challenges, and make better informed financial decisions.

There are two offices within CRE: the Office of Financial Education and the Office of Consumer Response. Financial Education is responsible for managing a suite of more than 50 educational tools and resources, distributing those tools to users, and researching the effectiveness of financial education programs. Financial Education is also responsible for supporting the Director's membership in the Financial Literacy and Education Commission. Financial Education's content is some of the most frequently visited content on the CFPB's website.

Consumer Response is responsible for answering questions, handling complaints, and sharing data and insights. Consumer Response manages the CFPB's toll-free number and complaint program from end-to-end. Consumer Response is also responsible for assisting complaint process stakeholders (e.g., responding to congressional members with their constituents' complaints, assisting Company Portal users as they respond to their customer's concerns) and sharing complaint information with Federal and State agencies.

The current headcount for CRE is approximately 150-155 full-time employees. The functional areas listed below aligned to statutory responsibilities total approximately 80 to 85.

## Office of Financial Education

12 USC 5493(d) requires the Director to "establish an Office of Financial Education, which shall be responsible for developing and implementing initiates intended to educate and empower consumers to make better informed financial decisions." There is one competitive area within the Financial Education, responsible for delivering several statutory obligations:

- Developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions. *See* 12 USC 5493(d)(1).
- Developing and implementing a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission. *See* 12 USC 5493(d)(2).
- Coordinating with other units within the Bureau in carrying out its functions, including working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and working with the research unit established by the Director to conduct research related to consumer financial education and counseling. *See* 12 USC 5493(d)(3).
- Submitting a report on its financial literacy activities and strategy to improve financial literacy of consumers *See* 12 USC 5493(d)(4).

The current headcount for this area is 12.

## Office of Consumer Response

12 USC 5493(b)(3)(A) requires the Director to "establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database … to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products and or services." 12 USC 5534(a) requires the CFPB "to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person." 15 USC 1681i(e) establishes a process by which the CFPB must act and report out on certain credit and consumer reporting complaints. Consumer Response must coordinate with certain CFPB offices and personnel, including the Private Student Loan Ombudsman and Office of Servicemember Affairs. *See* 12 USC 5493(e), 12 USC 5535.

Consumer Response has several competitive areas:

### Consumer Resource Center

12 USC 5493(b)(3)(A) directs the CFPB to create establish a single, toll-free number. This team manages a Consumer Resource Center (CRC), which receives more than 40,000 calls per month. The CRC answers consumers' inquiries, accepts and provides status updates on complaints, and directs consumers resources such as state and local services.

The current headcount for this area is 3.

### Complaint Handling

12 USC 5534(a) requires the CFPB to timely respond to consumers, including any responses received by the regulator from the covered person. This team directs the complaints to companies for a response.

The current headcount for this area is 7.

### Portal Operations
12 USC 5534(b) requires certain covered persons to provide a timely response to the regulator. This team is responsible for responding to stakeholder support tickets, including tickets submitted by company, congressional, and government portal users.

The current headcount for this area is 7.

### Mosaic Program
12 USC 5493(b)(3)(A) directs the CFPB to create establish a database to facilitate the centralized collection of complaints. 12 USC 5493(b)(3)(D) requires the CFPB to share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies. This team manages the technology that facilitates the handling of more than 350,000 complaints per month

The current headcount for this area is 5.

### Investigations (Regulatory Compliance, Complaint Monitoring, Research and Analysis, Escalation Case Management)
12 USC 5511(c)(2) requires the CFPB to "investigate" complaints. Additionally, 12 USC 5493(b)(3)(A) requires the CFPB to "monitor" complaints. This team is responsible for monitoring and investigating the more than three million complaints the CFPB receives annually. This team conducts investigative inquiries received by the Director's Office. This team also conducts analyses that support the Chief of Staff's team efforts to meet the publication of statutory reports and supports rule lookback assessments as required by 12 USC 5512.

The current headcount for this area is 30.

### Data Reporting
12 USC 5493(e) and 12 USC 5535 requires Consumer Response to coordinate with the Office of Servicemember Affairs and the Private Student Loan Ombudsman, respectively. This team is responsible for working with these offices for their complaint monitoring work.

The current headcount for this area is 4.

### Stakeholder Engagement
12 USC 5493(b)(3)(A) directs the CFPB to "coordinate with the Federal Trade Commission or other Federal agencies to route complaints to such agencies, where appropriate." Additionally, 12 USC 5493(b)(3)(D) requires the CFPB to "share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies …". This team is responsible for working with federal and state agencies, including state Attorneys General.

The current headcount for this area is 5.

## *Chief of Staff Team*

Consumer Response is responsible for publishing or contributing to the publication of several reports. Those reports include:

- Consumer Response Annual Report (as required by 12 USC 5493(b)(3)(D))
- Fair Credit Reporting Act 611(e) Report (as required by 15 USC 1681i(e)(5))
- Fair Debt Collection Practices Act Report (as required by 15 USC 1692m)
- CFPB Semi-Annual Reports (required by 12 USC 5496)

This team is responsible for the production and publication of these reports, including any follow-up questions from oversight bodies.

The current headcount for this area is 5.

## Management and Operations

This team provided the executive direction for both offices within the division. The current divisional executives each have a dual role both division and office level executives. The office level executive positions remain vacant. The team also provides centralized support to each office regarding resource management functions including budget, acquisition management, training, management reporting, and coordination with internal and external stakeholders, and oversight bodies such as GAO and OIG.

The current headcount for this area is 5.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, *Plaintiffs*, v. RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, *Defendants*. | Case No. 25-cv-381-ABJ |

**DECLARATION OF BRIAN SHEARER**

I, Brian Shearer, declare:

1.    I currently serve as the Assistant Director in charge of the Office of Policy Planning and Strategy at the Consumer Financial Protection Bureau (CFPB). The Office of Policy Planning and Strategy is a sub-office within the Director's Front Office that manages and coordinates the policy functions of the agency consistent with statutory restrictions and responsibilities.

2.    I have been in this role since March 2024. Before that, I served in senior roles in the CFPB's Front Office. I was on the CFPB agency review team for the last presidential transition and part of the "landing team" for the CFPB in 2020. Starting on January 20, 2021, I served as the lead advisor on enforcement and supervision for Acting Director David Uejio. When Director Rohit Chopra was confirmed in October 2021, I became his lead advisor on regulatory policy.

3.    I also worked at the CFPB from September 2011 to July 2018. I spent most of that time as an attorney in the Office of Supervision Policy, but from early 2017 up until his departure from the agency in November 2017, I was Director Richard Cordray's Senior Advisor. For the first several months of Acting Director Mick Mulvaney's tenure, I was a Senior Advisor to

Associate Director of Supervision, Enforcement, and Fair Lending Chris D'Angelo, until leaving the CFPB in July 2018.

Associate Director of Supervision, Enforcement, and Fair Lending Chris D'Angelo, until leaving the CFPB in July 2018.

4.     I have been personally involved in every presidential administration change that the CFPB has experienced since its inception. During the transition from President Obama to President Trump appointees in 2017, I was one of the staffers who briefed the Trump appointees as they took over leadership of the agency. For example, I helped brief then Acting Director Mulvaney on the then-existing enforcement docket, and briefed the first Trump Administration's new political appointees on the CFPB's supervision work. During the transition from President Trump to President Biden appointees, I was one of the appointees who arrived at the CFPB after Director Kraninger resigned, and I advised Acting Director Uejio during that transition before Director Chopra was confirmed by the Senate. And I have now observed the recent transition from Director Chopra to Acting Director Bessent and Acting Director Vought.

5.     The typical actions of a transition, which both Acting Directors Mulvaney and Uejio immediately took, include (1) requiring new approval for publication of materials that have not been approved by the new leadership, (2) postponing the effective dates of outstanding rules pending reconsideration, (3) instructing the CFPB to pursue new projects consistent with new priorities, (4) receiving briefings on the outstanding enforcement docket and examination calendars in order to begin to steer the enforcement docket and examination calendar towards new priorities and to make decisions on individual investigations and exams, (5) fielding voluminous memoranda and briefings on whether to start, continue, or discontinue various projects, and (5) holding meetings to introduce themselves and convey priorities to the staff and management chain of command.

6.    More specifically, in a normal transition, the CFPB's consumer complaint function continues largely unaffected because it is statutorily required and does not implicate ideology or matters of policy. Examinations that have already started continue, but the incoming administration makes adjustments to the *future* examination calendar. Enforcement matters in active litigation in court continue to be prosecuted. Enforcement investigations continue, though over time new investigative priorities are conveyed to staff to realign the work, and the Acting Director decides on a case-by-case basis whether to grant the enforcement staff authority to seek settlements, file lawsuits, reach out to targets of investigations, or close investigations. Economists continue to conduct research, but the Acting Director and his appointees review the research reports before approving them for publication. And other internal work of the agency continues in a similar vein. This is what Acting Director Mulvaney did under the prior Trump Administration.

7.    In short, transitionary Acting Directors that serve between confirmed Directors have no legitimate need to bring the agency to a complete stop in order to shift the agency's policy priorities—and, indeed, they have never done so at any prior point in the agency's history. Instead, the agency's work continues. And transition periods are busy times. Agency staff have many meetings with new leadership and write many memos seeking new direction. Staff seek guidance from the new administration's leadership, and the new agency leadership reviews and approves, adjusts, or rejects individual investigations, regulations, exam reports, research reports, and other output before they are published. The new administration also starts new projects at the direction of the new agency leadership, and over a short amount of time the back-log of projects started under the prior administration are replaced by projects started by the new administration.

8.      Based on my personal experience with CFPB transitions, including the differences between this transition and the beginning of the first Trump administration, the current transition is not normal and does not appear designed to redirect the agency towards new policy priorities. The incoming Trump appointees have not held all-hands or all-manager meetings. They have not communicated with most managers at the agency, including me. They have not even announced themselves to the agency.

9.      The incoming administration has not approved the publication of any materials. They have not instructed the CFPB to pursue any new affirmative projects that I am aware of. They have not expressed the agency's new priorities to the staff.

10.     Notably, I have informed the incoming administration that I will be resigning and I have not heard of any plans to replace me. I occupy a position that guides policy across the agency under the Director's vision. The fact that this administration has not bothered to fill my position suggests they are not engaged in a serious effort to redirect the agency's policy work.

11.      What the incoming administration has done is take the unprecedented action of putting everyone on *paid* administrative leave with limited exceptions. That means that examinations that were underway have been canceled, even though the American taxpayers are still paying the examiners. It means that the Office of Enforcement has stopped investigating cases, even though the taxpayers are still paying the investigators. It means that many of the actions necessary to keep the CFPB's consumer complaint process fully functional have ceased. It means that the CFPB's Markets teams are being paid to *not* meet with industry representatives. It means that the CFPB's Research team is paid to not conduct ongoing, nonpartisan research. It means that the CFPB has stopped processing Freedom of Information Act (FOIA) requests, even though we still pay for employees whose sole job is to help the CFPB comply with FOIA, and even though

the law requires that we respond to such requests. And the CFPB has stopped reviewing comments on open proposed regulations, which it is obligated to review under the Administrative Procedure Act even if the incoming administration does not wish to finalize those rules (something one should not assume given that many of the open rulemakings have broad bipartisan consensus).

12.    If one actually wanted to quickly re-align the CFPB to new priorities, the best (and most obvious) way to do so would be to put the agency staff to work briefing the leadership on the various available options on pending matters. CFPB staff often work overtime during transition periods to handle the workload necessary to quickly re-align priorities and policy in a responsible manner. And CFPB staff are professionals who put their personal views aside to present all available options to leadership—policy approaches taken under Director Chopra regularly involved debate and disagreement, but staff never let that get in the way of ensuring that the agency pursues the Director's policy priorities. Placing staff on paid administrative leave en masse makes it impossible to perform this process at the volumes necessary to responsibly steer the agency towards new policy objectives.

13.    Notably, leadership does not need to put everyone on paid leave to stop them from making announcements or taking public actions without permission. CFPB staff are accustomed to obtaining permission from leadership before speaking publicly or issuing anything on behalf of the CFPB. A great deal of the CFPB's work is preparatory and non-public. For example, you do not need to cease work on document review in pending investigations in order to ensure the agency does not reach out to the target of the investigation without permission. You do not need to stop internal memo writing, comment review, or case law research to ensure that a regulation is not issued without permission. In fact, that is the very work necessary to brief the incoming leadership so that they are informed when making a decision on whether to proceed with those matters.

14.    The incoming administration has also taken the unprecedented step of immediately laying off employees in their probationary period or with time-limited employment contracts. And it has rushed to cancel contracts, including the CFPB's lease. They have removed the CFPB signage from the agency's DC headquarters building. They have closed the CFPB's offices. They immediately, on the very first day of Acting Director Vought's tenure, sent a letter to the Federal Reserve System determining that the funds in the CFPB's operating account were sufficient to cover CFPB's expenses through the 2025 fiscal year (i.e. to September 31, 2025).

15.    The combination of (1) indiscriminately putting staff on administrative leave, (2) not setting up a process to make a high volume of individual decisions on discrete, ongoing matters, (3) immediately laying off tranches of employees with fewer employment protections, (4) terminating the lease and removing the CFPB's signage from the building, (5) canceling contracts in a hasteful manner, (6) never introducing new members of leadership staff to existing staff or conveying any message at all to the agency about what it should be affirmatively working on, (7) telling the Federal Reserve System they would not ask for further funding for the rest of the fiscal year, (8) closing the agency's offices amid an administration wide push to return to the office, (9) public statements by the President of the United States and the head of the new Department of Government Efficiency that the CFPB is being shut down, and (10) the unexplainable speed and urgency of each of those steps, suggests that the current acting leadership is attempting to shut down the CFPB expeditiously. In fact, I have heard from several other CFPB employees that they were directly told by the new leadership that we are in "wind down mode."

16.    The speed with which these actions are being taken is extraordinary. If the agency's leadership wanted to marginally or even significantly shrink the agency's headcount, redirect the agency's efforts, and cut costs, it could do so in an orderly fashion over time, considering contracts,

investigations, and projects on an individual basis, after staffing up the political leadership structure of the agency in order to perform those tasks responsibly. This would not require a work stoppage, and in fact would require a substantial portion of the agency's staff. The speed with which these efforts are being taken, and the fact that the leadership is not using the staff to make these decisions, suggests that the temporary acting leadership is attempting to "wind down" the agency before a court can enjoin their efforts. I cannot think of any other reason for this reckless speed given that the current presidential administration has four years—plenty of time—to accomplish its goals.

17.    In particular, I would like to draw attention to a number of statements made in a declaration by Adam Martinez on February 24 that are either misleading by omission or are outright falsehoods:

- The declaration, at paragraph 11, references the Acting Director's February 8 email to employees and describes it as communicating "eight functions" that CFPB staff should refrain from unless it is approved by the Acting Director or required by law. This email is framed in the declaration as suggesting that the CFPB is still performing functions required by law, which is false to a significant extent. He omits that this email was followed up by another email on February 10 directing staff to stop all work. Mr. Martinez states that this step was "not unusual," but it is a step that has never been taken before in the history of the agency. The CFPB has never stopped substantially all work during a transition, and has never put the majority of agency staff on administrative leave.

- The declaration appears to focus on a caveat in the February 8th email about "statutorily required" work, but does not acknowledge that the February 10th email eliminated that caveat. Nor does it acknowledge the basic fact that the CFPB's core statutory responsibilities have, in fact, completely ceased, including the full supervision and enforcement divisions. The full division of the CFPB tasked with managing the consumer complaint function is on administrative leave (some of the automated processes are still live, but the manual maintenance and work has ceased). Staff in statutorily required offices or positions (e.g. student loan ombudsman, Office of Fair Lending and Equal Opportunity, Office of Research, Office of Financial Education) have been fired or put on administrative leave.

- The declaration falsely suggests that the entire headquarters building was closed for safety, citing small union protests and one incident where an employee pushing a baby stroller took pictures of White House staff. The CFPB's employee union has picketed the agency

before, including recently during a labor dispute with management during Mr. Martinez's tenure at the CFPB. The CFPB's office is near the White House, and thus, the streets around the office are often filled with protestors advocating for a variety of causes. The CFPB has security guards capable of handling this security environment, locks on doors, and the ability to take individual personnel actions in response to incidents or to turn off individuals' access to the building. The cited security reasons for closing the building are simply not credible and were not articulated at the time of the closure.[1]

- In paragraph 21, the declaration claims that leadership has approved the following tasks: (1) onboarding political leadership, (2) data security, (3) maintaining a discrete set of systems, (4) maintaining a consumer complaint call center contract, and (5) processing Civil Penalty Fund payments to consumers. Of course, the CFPB has many other statutory obligations, including the obligations to enforce federal consumer financial law, conduct examinations of regulated entities, and many other functions. The CFPB has turned off whole divisions tasked with performing those statutory duties.

- In particular, in paragraph 21, Mr. Martinez claims that even though the Student Loan Ombudsman position is currently vacant, consumers can seek support from the CFPB's Ombudsman Office for their student loan related issues. This is patently false. Both positions are statutorily required, but their functions are completely different. The CFPB Ombudsman Office is, by statute, a liaison between the CFPB and effected persons. 12 USC 5493(a)(5). In other words, it is an office outside parties can use if they have complaints or concerns *about the CFPB*, not if they need help dealing with a regulated entity. Only the Student Loan Ombudsman performs the statutorily required work of assisting consumers with individual student loan related issues. This mistake is particularly concerning because it suggests a lack of familiarity with the functions of the agency—it appears to be a mistake based on the fact that the names of the roles are similar.

- In paragraph 22, Mr. Martinez states that the agency has not pulled down the CFPB's complaint website, and has not canceled contracts relating to the complaint database, without mentioning that the whole Consumer Response division that maintains the CFPB's complaint function is currently on administrative leave.

- In paragraph 26, Mr. Martinez states that Acting Director Vought determined that the current operating balance of the CFPB was enough to cover projected expenses for the upcoming quarter. But Acting Director Vought said that the funds were sufficient to cover expenses through the end of the *fiscal year,* not just the upcoming quarter. And Mr. Martinez neglected to convey that the Acting Director claimed that the CFPB had a balance of $711 million, when in fact a large percentage of that money is obligated and unavailable for future CFPB expenses. For example, $100 million in the account is from a settlement

---

[1] See Kate Berry, *Justice Dept. insists 'there will continue to be a CFPB'*, The American Banker, Feb. 25, 2025 (reporting that the government's legal filings in this case "falsely claimed that it closed the CFPB's Washington D.C. headquarters in response to protests by employees — even though the protests happened only after the office was shuttered.").

with Navient Corp. and must be distributed as redress to victims once the CFPB takes the applicable employees off administrative leave.

- In paragraph 27, Mr. Martinez states that Acting Director Vought considered a variety of factors including the impact of anticipated efficiency initiatives at the CFPB and consumer interests, before deciding that the funds in the operating account are enough to cover the agency's expenses through September 31, 2025. If that were true, and the agency had a concrete plan about the specific budget and expenses necessary to continue the functions it intends to continue, the agency would be able to articulate that concrete spending plan to the court. These kinds of financial plans are not confidential—the CFPB publishes its financial reports, and I would expect that the agency would publish this information in the Chief Financial Officer's next update, which is due to be published right around now.

18.    Lastly, I wish to highlight the ongoing harm to the public associated with the continued work stoppage at the CFPB. Every day, CFPB staff work to investigate cases, conduct examinations of regulated entities, produce valuable research, and publish data about consumer finance in the United States, review public comments and issue regulations, provide guidance to industry, and facilitate complaints. On a relatively small budget of just over $800 million per year (none of which comes directly from appropriations), the CFPB produces billions of dollars in quantifiable savings to the American people every year. For example:

- The CFPB's enforcement team has returned over $20 billion ill-gotten gains to consumers since the agency's founding.

- In December, the CFPB returned double the agency's annual budget, $1.6 billion, to victims of a single debt relief scam.

- The CFPB's recent "junk fee" initiatives have reduced fees by up to $21 billion annually, including $10 billion from the CFPB's credit card late fee rule, $6 billion in contracting overdraft and non-sufficient fund fees in response to the agency's policy and law enforcement work, and $5 billion from the CFPB's recent overdraft rule.

- The CFPB's Qualified Mortgage Rule, issued under Director Kraninger, saves at least $4 billion annually.

- The CFPB's Regulation X, issued in 2014, continues to save $45 million every year in forced-placed insurance premiums.

- The CFPB's complaint function processes over one million consumer complaints annually, which, for comparison, is more than 10 times the volumes handled by the Better Business

Bureau. Over the course of the CFPB's short existence, the CFPB has closed over 2.5 million complaints with non-monetary relief, and in over 171,000 complaints, the company reported to the CFPB that it provided monetary relief.

- In the last two years alone, the CFPB's supervision function returned $350 million to consumers harmed by various illegal fee practices.

19.    As with any other effective law enforcement agency, the CFPB's work creates an undeniable deterrence effect. When companies know that there is an active supervision program to examine for compliance with the law, a robust enforcement team investigating lawbreaking, and a complaint function that consumers use, very large bureaucratic corporations invest in compliance efforts to ensure compliance with the law. Right now, companies are almost certainly deprioritizing compliance in light of the news of the agency's work stoppage, planting the seeds for a white-collar financial crime spree that will likely manifest in the coming years.

20.    In addition to the monetary relief, each investigation or examination has a chance to produce value for American consumers in the form of illegal practices that are stopped. For example, before the CFPB was created, many banks used deceptive practices to attach "add-on" services to credit cards, which consumers paid for but never benefited from. A sweep of CFPB enforcement actions in 2014 put an end to that practice. The CFPB's enforcement team, under leadership appointed by Presidents Obama, Trump, and Biden also ended the widespread practice of banks opening fake checking accounts in people's names (sometimes leading to consumer charges) in order to inflate account-opening metrics. As has been publicly revealed in editions of *Supervisory Highlights*, the CFPB's supervision team, under leadership appointed by Presidents Obama, Trump, and Biden, stopped auto loan companies from accidentally repossessing cars when the loan was not in default, and stopped auto loan companies from withholding consumers' personal property found in repossessed vehicles until the consumer paid a fee. CFPB enforcement and supervision teams stop hundreds of harmful law violations every year.

21.    The CFPB's complaint function saves consumers unquantifiable amounts of money, through both monetary relief granted by companies in response, non-monetary relief, and the incentive created to provide higher quality customer service. In particular, the CFPB automatically escalates complaints involving a pending home foreclosure for manual attention to prevent an unnecessary foreclosure if possible, something that is not currently happening. And agency staff spot-check the complaint database for complaints that would benefit from individualized, manual handling, which is also currently not happening.

22.    The CFPB's research and data releases are foundational to the public's understanding of the financial markets. For example, the CFPB releases data on consumer credit trends that outside researchers regularly use. And the CFPB publishes the most detailed data on the credit card market available, something that is statutorily required but currently halted.

23.    The agency only has so much capacity to handle enforcement investigations, examinations, complaints, research reports, and other work. We will not be able to make up for lost production caused by the current work stoppage, even if any individual case or examination or report can be finished later. An examination that is not occurring now, and is pushed off to next year, would occupy capacity that could have been used for another examination. If you shut down a car factory, you can restart it a month later and finish the car you didn't complete before shutting down the factory, but you can't make up the lost aggregate production of cars. The same is true for enforcement investigations, for complaints filed with the CFPB that require manual processing, for supervisory examinations, for research reports, and for nearly every other function of the CFPB that produces output for the benefit of the public and American consumers.

24.    The CFPB was created in response to the predatory mortgage crisis that caused the Great Recession. When a small number of primarily nonbank mortgage lenders started originating

loans that set consumers up to fail in the 2000s, federal regulators failed to respond due to a lack

of authority and the competing priorities of bank safety and soundness and monetary policy. The

CFPB was established by an act of Congress to fill that gap and Congress assigned the CFPB with

the responsibility and duty to police the market so that this never happens again. Since the creation

of the CFPB, the United States has not experienced another economic recession caused by the

consumer finance sector. But if the agency does not perform its statutory duties, I am concerned

history will repeat itself.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

Executed in Washington, DC                                          _/s/ Brian Shearer_____
February 27, 2025                                                   Brian Shearer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
                    *Plaintiffs*,

          v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,
                    *Defendants*.

Case No. 25-cv-0381-ABJ

### THIRD DECLARATION OF ERIE MEYER

I, Erie Meyer, declare the following under penalty of perjury:

1.       I served as the Chief Technologist and Senior Advisor to the Director at the Consumer Financial Protection Bureau from October 2021 until February 7, 2025, when I resigned. Because of my experience in that role, I have expertise regarding the agency's website management, data protocols, contract oversight, and the impact of contract terminations.

***Mishandled Data Retention Practices***

2.       I have reviewed the declaration of Charlie Doe, a Contracting Officer at the CFPB, regarding the mass termination of contracts between February 11, 2025, and February 14, 2025—and the CFPB's effort to finalize those terminations as quickly as possible.

3.       The highly irregular actions that the Bureau has taken within the past few days to rush the final termination of virtually all of its contracts across the full range of functions raises serious concerns about data preservation and the Bureau's ability to function at all. Final cancellation of the Bureau's contracts will result in the irretrievable impairment and loss of Bureau data. I am also troubled that the Bureau appears not have taken appropriate steps to ensure compliance with this Court's February 14 Order on data preservation.

4.       The information in Charlie Doe's declaration accords with information that I have received from several other current Bureau employees—former colleagues of mine—who are in a

position to know this information. They have expressed grave concern that the Bureau's rush to finalize the termination of the vast majority of the CFPB's contracts risks the imminent loss of essential data and records. I understand that the government, upon the insistence of the plaintiffs in this case that these actions were not in compliance with the Court's February 14 Order, has agreed to temporarily suspend cancellation of contracts through the Court's March 3 hearing, but no further. If the government is not immediately prevented from proceeding with contract terminations efforts thereafter, it will be too late to forestall permanent loss of the Bureau's data.

5.    My understanding is that the contracts that the Bureau seeks to fully terminate include—among others—contracts with experts (who have sensitive litigation data), with other litigation contractors, and with companies that store, transmit, and maintain Bureau data. That data is crucial to everything from identifying and assisting victims of consumer fraud and providing them court-ordered relief, to tracking the financial information that is critical to the Bureau's role in helping to stabilize financial markets, to responding to consumer complaints. As I explained in my prior supplemental declaration, if the data possessed or maintained by these vendors is deleted or impaired, that would be a catastrophic loss for the Bureau and seriously impair its ability to carry out its obligations.

6.    The rush to finalize the termination of the vast majority of the Bureau's contracts is very likely to cause irretrievable data deletion, and to impair the data and records that are not deleted. It is standard industry practice that following contract terminations, contractors delete any government data, because ordinarily contractors are not permitted to retain that data once they no longer have a contract to perform work that requires it. Particularly in the absence of a data preservation clause in the termination notice, contract termination will almost certainly result in the deletion of data either immediately or after a very short period (typically days or weeks). Even if the final termination modification contained a data preservation clause, this rush to terminate

contracts is still very likely to result in the deletion of data and records the Bureau will be unable to lawfully get back. For example, if the retention period elapses before a functioning, approved government System of Record is available to accept and process that data, if there are not enough contracting officers to oversee that the firms are complying with the retention clauses, if the files are corrupted before a CFPB employee is able to detect and act on that emergency, a band-aid of a retention clause will not fully remediate the harm.

7.    In addition, in the absence of continuous maintenance of CFPB databases—contracts that I understand the Bureau is seeking to fully terminate—there is a serious risk that the data they contain will be impaired. Without the benefit of virus scanning and other security software, audit logs to ensure that if data is improperly accessed that there is forensic evidence of that access and any manipulation, a continuity of operations protocol or staffing to address any unexpected outages or failures, or meaningful backups to compare data to for authenticating accuracy of the information, the data is at existential risk.

8.    Some contracts also provide support for CFPB-maintained data. Those contracts exist because in those cases, the CFPB does not have the capability to maintain the data on its own. Although the CFPB can manage temporary fixes for a limited period of time, if the contracts are permanently terminated and the CFPB must go without support for months or more while those services are re-procured, data will inevitably be impaired.

9.    The data possessed and maintained by CFPB contractors includes the personal information of consumers and employees, as well as sensitive information about financial markets and corporations. In addition to the risk of deletion, the rush to terminate the CFPB's contracts puts this data at serious risk of misuse or access by unauthorized parties.

10.    I urge the Court to consider the significant and long-term consequences of data loss that could arise from these contract terminations, especially where no clear measures have been

taken to ensure data retention or retrieval.

### *Mass Cancellation of Cyber Security Contracts*

11.    I have reviewed the February 24, 2025 declaration of Adam Martinez, the CFPB's Chief Operating Officer. As previously stated in my earlier declaration, I worked alongside Mr. Martinez for several years and respected him as a colleague. In his declaration, he claimed security monitoring tasks were being performed and operations were being maintained. Unfortunately, based on the following facts, I have reason to believe that claim to be false.

12.    In recent days, 32 cybersecurity contracts have been cancelled, as reported on doge.gov/savings. Of these, five contracts have been posted in detail on the Federal Procurement Data System (FPDS), with a cancellation date of February 13th. The remaining 27 contracts, however, have not yet been published in detail due to what doge.gov has described as a "lag" in FPDS publications. A chart listing all 32 contracts, the cybersecurity impact of that contract, and the date of cancellation, is attached to this declaration as **Exhibit A.**

13. On February 14th, doge.gov/savings read simply "Receipts coming soon, no later than Valentine's day 💘"[1] Then starting February 15th, doge.gov/savings read "Receipts coming over the weekend!"[2] Ultimately, on Tuesday February 17th, doge.gov/savings was populated with content including cancelled contracts, including those back-dated to February 14th.

13.    I understand that a court order was issued on February 14th, directing the CFPB to preserve and not impair any data held by the Bureau. I am particularly concerned that the cancellation of the 27 remaining contracts may have occurred *after* the issuance of the order, which raises serious questions about whether the Bureau is taking the steps necessary to ensure compliance with the order.

---

[1] https://web.archive.org/web/20250214152452/https://doge.gov/savings
[2] https://web.archive.org/web/20250215213222/https://doge.gov/savings

14.    As of the date of this declaration, it remains unclear when these 27 cancellations occurred, aside from the fact that they must have taken place after February 13th, and were touted on doge.gov no sooner than February 18th. The lack of clarity regarding the cancellation timeline and backdating exacerbates my concerns.

15.    The cancelled contracts cover a wide range of critical cybersecurity services, including but not limited to:

- Application security (code vulnerability scanning, penetration testing)
- Centralized management and enforcement of security configurations across IT infrastructure
- Cyber vulnerability tracking/reporting across hardware and software
- Certified Information System Auditor training
- Cybersecurity audit/event log analysis
- Cybersecurity contractors for the Security Authorization Environment
- Email server security and encryption
- Identity and access management (including single sign-on and software)
- IT network, systems, and applications management
- Network/application vulnerability scanning
- Secure equipment disposal
- Virus scanning and cybersecurity for SaaS services
- VPN deployment on employee laptops
- Website and file virus scanning, among others.

16.    In light of these abrupt cancellations, I am particularly concerned that bureau data and systems are at serious risk of compromise, or have already been compromised.

17.    The revocation of contracts for cybersecurity audit and event log analysis is

particularly concerning, because it could mean that there will be no evidence available if unauthorized users are accessing Bureau systems and data. The CFPB would not be able to tell what happened, and it could compromise ongoing litigation, trade secrets, and even implicate market stability.

### Blocking Consumers from Help

18.    During my tenure as Chief Technologist and Senior Advisor to the Director at CFPB, I worked closely with the consumerfinance.gov and consumer education teams to develop strategies that ensured that the Bureau's content reached people when they most needed it, even if they had not heard of CFPB. Using desk research, the team identified the key areas where consumers commonly sought out information about topics such as avoiding scams and shopping for mortgages – most consumers start on search engines. To address this, we implemented an open standard schema that allowed search engines to index CFPB's content, ensuring that the most common consumer questions appeared prominently in search results, including "Position Zero" or "P0" rankings. Search results with "P0" ranking are often featured snippets that directly answer consumer queries on the results page, and were critically important in preventing and interrupting fraud and scams by making reliable, government-backed information the top result.

19.    On February 7th, 2025, the CFPB homepage at consumerfinance.gov–the launching pad for most American consumers' interactions with the CFPB–was changed to a "404 - Site Not Found" error message.

20.    I have been reliably informed that the decision to delete the CFPB homepage was an intentional decision by Acting Director Vought and that efforts by staff to repair the homepage were expressly rebuffed by senior management, citing Voght's authority.

21.    This error, particularly when it affects the homepage of a website, can have severe repercussions. Specifically, it significantly harms the accessibility of important consumer information that the CFPB provides. A "404 error" on a homepage results in the following

detrimental effects:

○ **Poor Experience:** When someone lands on a 404 page on the homepage, they are immediately presented with a frustrating experience. Consumers, particularly those seeking important financial information or assistance, will likely abandon the site.

○ **Indexing Issues:** Search engine crawlers rely on accessible pages to index and rank content. A 404 error on the homepage can prevent crawlers from properly accessing the site, thereby hindering the search engines' ability to index the Bureau's important financial resources. This directly impacts the site's ability to appear in search results, making it more difficult for consumers to find reliable, government-backed financial information.

22.    Since the implementation of the 404 error on the homepage of consumerfinance.gov on February 7th, 2025, the Bureau's web content—ranging from important in-the-moment guidance on financial abuse for victims of domestic violence, to help for military servicemembers to assert their rights under the Servicemembers' Civil Relief Act—has been removed from the most visible results despite no other changes to the site or schema. Those top results have been replaced in some cases by content farms or worse, scam sites. This is a direct consequence of the 404 error disrupting CFPB's search engine visibility, leaving vulnerable consumers to be targeted by fraudulent actors instead of receiving accurate, reliable information from the Bureau. This disruption is not just a technical oversight; it is a direct risk to consumer protection efforts, as the Bureau's content is now being supplanted by potentially harmful, deceptive websites.

23.    These changes are in direct opposition to the statutory goal of providing consumers with timely and understandable information to make responsible decisions about financial transactions under 12 U.S.C. § 511(b). This unnecessary action—breaking the homepage of this federal consumer protection agency to a 404 error page—has had a profoundly negative impact on

the ability of the CFPB to meet consumers where they are in their moments of need, especially when they are seeking to protect themselves from fraud and make informed financial decisions. My years of experience and working directly with consumers looking for help inform my belief that people are being irreparably harmed when they are looking for help and instead find scams.

24.    I am concerned that by breaking functionality of the website and in fact making it harder for consumers to access the critical financial information that they seek, recent actions have made it impossible for the Bureau to comply with its statutory obligation to maintain a consumer-facing website under 12 U.S.C. § 5493(b)(3).

***"Your Recent or Impending Separation[s]"***

25.    In recent days, when employees have emailed the Bureau's Human Relations (HR) staff with questions, they have received an unusual mass auto-response email indicating that the office will eventually address "your recent or impending separation." A true and correct PDF copy of such an auto-response email that I received in response to an inquiry is attached as **Exhibit B.**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Washington, DC on February 27, 2025          */s/ Erie Meyer*
                                                          Erie Meyer

# EXHIBIT A

## Mass Cancellation of CFPB Cyber Security Contracts

Prepared 2/27/25

The list below is taken from doge.gov/savings and reflects 32 cyber security contracts they report having mass cancelled. The confirmed dates are as listed in the Federal Procurement Data System, and the unknown dates appear to have been cancelled sometime after 2/13. The doge site is experiencing lags and has evidence of backdating. The contracts below are listed on the doge site as having been "uploaded" on 2/14, but they were not listed before 2/18..

The work these contracts included protecting personally identifiable information, system integrity, and maintaining audit logs, among other critical security services.

| | Contract | Cybersecurity Impact | Date of cancellation |
|---|---|---|---|
| 1 | BEYONDTRUST LICENSES | Identity and access management software | 2/13/25 |
| 2 | YUBIENTERPRISE COMPLIANCE TIER PLUS PLAN | Physical 2FA keys issued to employees + software | 2/13/25 |
| 3 | CYBERSECURITY SUPPORT SERVICES - INFORMATION SECURITY STANDARDS (ISS) | Cybersecurity contractors | 2/13/25 |
| 4 | CYBERSECURITY SUPPORT SERVICES BPA ORDER - SAFEGUARDS AND RISK MANAGEMENT (SRM) | Cybersecurity contractors | 2/13/25 |
| 5 | CYBERSECURITY SUPPORT SERVICES BPA ORDER - SECURITY ARCHITECTURE AND ENGINEERING (SAE) | Cybersecurity contractors for SAE - team that performs cybersecurity review of new systems & sets required mitigations for ATO | 2/13/25 |
| 6 | CLOUD TRAINING | Technical training on cloud environments including cyber / cloud security and certification courses | Unknown |

| 7 | CERTIFIED INFORMATION SYSTEMS AUDITOR (CISA) IN-PERSON TRAINING | CISA training | Unknown |
|---|---|---|---|
| 8 | EZPROTECT SERVICES | Virus scanning and cybersecurity for SaaS services | Unknown |
| 9 | CENTRALIZED PLATFORM CONTROL STANDARDS SUPPORT SERVICES | Cybersecurity contractors | Unknown |
| 10 | ANOMALI LICENSES FOR CFPB | Security Event & Information Management (SIEM) platform | Unknown |
| 11 | SOLARWINDS MAINTENANCE AND SUPPORT | IT network, systems, and applications management | Unknown |
| 12 | NUTANIX HARDWARE DESKTOP ENGINEERING LAB SYSTEM UPGRADE | Management platform for IT hardware deployment and configuration | Unknown |
| 13 | CISCO SMARTNET MAINTENANCE | Security alerts, updates, and tech support for core network equipment | Unknown |
| 14 | ZIXGATEWAY ENTERPRISE LICENSE RENEWAL | Email server security & encryption | Unknown |
| 15 | ACCELLION KITEWORKS ENTERPRISE | Secure file share / transfer services | Unknown |
| 16 | VERACODE SERVICE BUNDLE SUBSCRIPTION | Application security - code vulnerability scanning and penetration testing | Unknown |
| 17 | SECUREAUTH IDP LICENSE RENEWAL | Identity and access management - single sign on | Unknown |
| 18 | AXONIUS SECURITY ASSET MANAGEMENT PLATFORM | Centralized tracking / reporting for cyber vulnerability across IT hardware and software | Unknown |
| 19 | CISCO ANYCONNECT LICENSE AND SUPPORT RENEWAL | VPN on laptops issued to employees | Unknown |
| 20 | ANNUAL SUBSCRIPTION TO THE BITSIGHT LARGE TPRM PACKAGE | Third Party Risk Management (TPRM) - vendor security assessment, monitoring, and reporting | Unknown |

| 21 | CYBERARK ENTERPRISE LICENSES AND MAINTENANCE | Identity security - manage, rotate, and monitor application credentials / secret keys | Unknown |
|----|----|----|----|
| 22 | RADIANT LOGIC LICENSES | Identity data management and audit | Unknown |
| 23 | PUPPET LABS RENEWAL | Centralized management, tracking, and enforcement of security configuration across IT infrastructure | Unknown |
| 24 | CISCO AND NUTANIX HARDWARE AND SOFTWARE | Network, hardware, and datacenter management | Unknown |
| 25 | SAFECONSOLE ENTERPRISE LICENSES | Provision, manage, and audit secure encrypted USB drives | Unknown |
| 26 | VIRUSTOTAL BASIC SUBSCRIPTION | Website and file virus scanning | Unknown |
| 27 | QMULOS AUDIT/COMPLIANCE APPS | Cybersecurity audit / event log analysis | Unknown |
| 28 | TENABLE LICENSES AND SCANNER | Network and application vulnerability scanning | Unknown |
| 29 | IT DEVICE DESTRUCTION | Secure equipment disposal | Unknown |
| 30 | SAFECONSOLE LICENSES | Provision, manage, and audit secure encrypted USB drives | Unknown |
| 31 | KNOWB4 SUBSCRIPTION | Online provider of bureau-wide mandatory cybersecurity training | Unknown |
| 32 | ORDER 1 - CYBER PROGRAM MANAGEMENT | Cybersecurity contractors | Unknown |

# EXHIBIT B

## Automatic reply: Question about my HR docs ➤   Inbox ×

**CFPBHROps** <CFPBHROps@fiscal.treasury.gov>  Wed, Feb 19, 12:30 PM (8 days ago)  ☆  ☺  ↩  ⋮

to me ▾

We are working diligently with the agency during this transition to provide necessary documents related to your recent or impending separation.

Please provide a personal email address and updated mailing address to ensure timely and effective communications.

All separated employees will be receiving a copy of their SF-50, Notice of Personnel Action, as well as a separation packet with information regarding unemployment, benefits and lump sum annual leave payment, if applicable.

Employees will have a 31-day extension of their health insurance from the date of separation provided by your health insurance carrier at no cost to you. Dental and Vision benefits will terminate upon the date of separation.

Thank you for your patience.



↩ Reply    → Forward    ☺

# EXHIBIT A

## Mass Cancellation of CFPB Cyber Security Contracts

Prepared 2/27/25

The list below is taken from doge.gov/savings and reflects 32 cyber security contracts they report having mass cancelled. The confirmed dates are as listed in the Federal Procurement Data System, and the unknown dates appear to have been cancelled sometime after 2/13. The doge site is experiencing lags and has evidence of backdating. The contracts below are listed on the doge site as having been "uploaded" on 2/14, but they were not listed before 2/18..

The work these contracts included protecting personally identifiable information, system integrity, and maintaining audit logs, among other critical security services.

|   | Contract | Cybersecurity Impact | Date of cancellation |
|---|---|---|---|
| 1 | BEYONDTRUST LICENSES | Identity and access management software | 2/13/25 |
| 2 | YUBIENTERPRISE COMPLIANCE TIER PLUS PLAN | Physical 2FA keys issued to employees + software | 2/13/25 |
| 3 | CYBERSECURITY SUPPORT SERVICES - INFORMATION SECURITY STANDARDS (ISS) | Cybersecurity contractors | 2/13/25 |
| 4 | CYBERSECURITY SUPPORT SERVICES BPA ORDER - SAFEGUARDS AND RISK MANAGEMENT (SRM) | Cybersecurity contractors | 2/13/25 |
| 5 | CYBERSECURITY SUPPORT SERVICES BPA ORDER - SECURITY ARCHITECTURE AND ENGINEERING (SAE) | Cybersecurity contractors for SAE - team that performs cybersecurity review of new systems & sets required mitigations for ATO | 2/13/25 |
| 6 | CLOUD TRAINING | Technical training on cloud environments including cyber / cloud security and certification courses | Unknown |

| 7 | CERTIFIED INFORMATION SYSTEMS AUDITOR (CISA) IN-PERSON TRAINING | CISA training | Unknown |
|---|---|---|---|
| 8 | EZPROTECT SERVICES | Virus scanning and cybersecurity for SaaS services | Unknown |
| 9 | CENTRALIZED PLATFORM CONTROL STANDARDS SUPPORT SERVICES | Cybersecurity contractors | Unknown |
| 10 | ANOMALI LICENSES FOR CFPB | Security Event & Information Management (SIEM) platform | Unknown |
| 11 | SOLARWINDS MAINTENANCE AND SUPPORT | IT network, systems, and applications management | Unknown |
| 12 | NUTANIX HARDWARE DESKTOP ENGINEERING LAB SYSTEM UPGRADE | Management platform for IT hardware deployment and configuration | Unknown |
| 13 | CISCO SMARTNET MAINTENANCE | Security alerts, updates, and tech support for core network equipment | Unknown |
| 14 | ZIXGATEWAY ENTERPRISE LICENSE RENEWAL | Email server security & encryption | Unknown |
| 15 | ACCELLION KITEWORKS ENTERPRISE | Secure file share / transfer services | Unknown |
| 16 | VERACODE SERVICE BUNDLE SUBSCRIPTION | Application security - code vulnerability scanning and penetration testing | Unknown |
| 17 | SECUREAUTH IDP LICENSE RENEWAL | Identity and access management - single sign on | Unknown |
| 18 | AXONIUS SECURITY ASSET MANAGEMENT PLATFORM | Centralized tracking / reporting for cyber vulnerability across IT hardware and software | Unknown |
| 19 | CISCO ANYCONNECT LICENSE AND SUPPORT RENEWAL | VPN on laptops issued to employees | Unknown |
| 20 | ANNUAL SUBSCRIPTION TO THE BITSIGHT LARGE TPRM PACKAGE | Third Party Risk Management (TPRM) - vendor security assessment, monitoring, and reporting | Unknown |

| 21 | CYBERARK ENTERPRISE LICENSES AND MAINTENANCE | Identity security - manage, rotate, and monitor application credentials / secret keys | Unknown |
|----|----------------------------------------------|-----------------------------------------------------------------------------------|---------|
| 22 | RADIANT LOGIC LICENSES | Identity data management and audit | Unknown |
| 23 | PUPPET LABS RENEWAL | Centralized management, tracking, and enforcement of security configuration across IT infrastructure | Unknown |
| 24 | CISCO AND NUTANIX HARDWARE AND SOFTWARE | Network, hardware, and datacenter management | Unknown |
| 25 | SAFECONSOLE ENTERPRISE LICENSES | Provision, manage, and audit secure encrypted USB drives | Unknown |
| 26 | VIRUSTOTAL BASIC SUBSCRIPTION | Website and file virus scanning | Unknown |
| 27 | QMULOS AUDIT/COMPLIANCE APPS | Cybersecurity audit / event log analysis | Unknown |
| 28 | TENABLE LICENSES AND SCANNER | Network and application vulnerability scanning | Unknown |
| 29 | IT DEVICE DESTRUCTION | Secure equipment disposal | Unknown |
| 30 | SAFECONSOLE LICENSES | Provision, manage, and audit secure encrypted USB drives | Unknown |
| 31 | KNOWB4 SUBSCRIPTION | Online provider of bureau-wide mandatory cybersecurity training | Unknown |
| 32 | ORDER 1 - CYBER PROGRAM MANAGEMENT | Cybersecurity contractors | Unknown |

# EXHIBIT B

## Automatic reply: Question about my HR docs  ➤  Inbox ×  🖨 ☐

**CFPBHROps** <CFPBHROps@fiscal.treasury.gov>  Wed, Feb 19, 12:30 PM (8 days ago)  ☆  ☺  ↩  ⋮
to me ▾

We are working diligently with the agency during this transition to provide necessary documents related to your recent or impending separation.

Please provide a personal email address and updated mailing address to ensure timely and effective communications.

All separated employees will be receiving a copy of their SF-50, Notice of Personnel Action, as well as a separation packet with information regarding unemployment, benefits and lump sum annual leave payment, if applicable.

Employees will have a 31-day extension of their health insurance from the date of separation provided by your health insurance carrier at no cost to you. Dental and Vision benefits will terminate upon the date of separation.

Thank you for your patience.



( ↩ Reply )  ( ↪ Forward )  ( ☺ )

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES' UNION, *et al.*,

             *Plaintiffs*,

      v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

             *Defendants*.

Case No. 25-cv-381-ABJ

**DECLARATION OF JULIA BARNARD**

I, Julia Barnard, declare as follows:

1.      I have served at the Consumer Financial Protection Bureau as the agency's designated Student Loan Ombudsman since 2024 and as a Markets & Policy Fellow since 2022.

2.      Starting in February 2022 and until February 13th, 2025, when my contract was abruptly terminated, I was employed by the CFPB as a Markets & Policy Fellow. The termination notice that I received, from Chief Operating Officer Adam Martinez, said that my employment was "terminated effective at the close of business on February 13, 2025, due to Executive Order Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative - The White House dated February 11, 2025." No other reason was provided.

3.      Separately, I was also designated as the Student Loan Ombudsman of the CFPB by Janet Yellen in her capacity as the Secretary of the U.S. Treasury on February 12, 2024. I have not received notice that the current Secretary of the Treasury, Scott Bessent, has de-designated me or made any another designation.[1] There was no reference to this designation in my termination notice

---

[1] *See* 12 U.S.C. § 5535 (providing that the Ombudsman is designated by the Secretary of the Treasury, in consultation with the Director of the CFPB).

or in any other communications that I have received. For that reason, it is not entirely clear to me whether I have been formally removed as the Student Loan Ombudsman. Regardless, as a practical matter, I have been unable to carry out any of the statutory duties of the Student Loan Ombudsman since my termination, and no other person has been designated to perform those duties.

4.      In my role as the Student Loan Ombudsman, I worked with only one other colleague to fulfill the statutory requirements of the position. There were other colleagues who, on an ad hoc basis, helped review and analyze complaints, reached out to borrowers and financial companies to resolve complaints through case work, and built processes to scale our work. Myself, my colleague, and the colleagues on the ad hoc team who had recently been involved with the complaint review and case work functions were terminated on February 13, 2025.

5.      In my role as the Student Loan Ombudsman, I was responsible for providing timely assistance to borrowers of both private and federal education loans. The Consumer Financial Protection Act specifies that the Student Loan Ombudsman shall "resolve complaints in collaboration with the Department of Education" and "ensure coordination in providing assistance to and serving borrowers seeking to resolve complaints related to their private education or Federal student loans."[2] Because of this responsibility, I met regularly with senior staff at the Department of Education including the Student Loan Ombudsman and their staff at the Office of Federal Student Aid. In fact, all prior Ombudsmen serving during the Obama, Trump, and Biden Administrations dealt with federal student loan issues regularly.[3] The contrary suggestion in the defendants' opposition to the motion for preliminary injunction (ECF 31 at 23)—that the

---

[2] 12 U.S.C. § 5535.
[3] See, e.g., Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf at 38 (establishing recurring patterns in prior annual reports related to federal student loans).

Case 1:25-cv-00381-ABJ    Document 38-10    Filed 02/27/25    Page 3 of 9
USCA Case #25-5091    Document #2114200    Filed: 05/05/2025    Page 190 of 637

Ombudsman only assists works on private student loans—thus reflects an elementary misunderstanding about the functions of the position.

6.      To select which of the thousands of complaints we received each year to address through case work, my team and I read thousands of complaints each month, sorted complaints by issue type, and read through company complaint responses. The complaints that we selected for case work were those that received a response that we found to be incomplete, inaccurate, or missing entirely—and that we felt were actionable—meaning that we felt that an intervention from us could actually help the borrower resolve their problem. In many instances, we were successful in resolving borrower complaints using this process.[4]

7.      For example, we were in the middle of a project that included review and case work of approximately 900 complaints related to the cancellation of private student loans based on school misconduct.[5] For several weeks, I had been communicating directly with private student lenders to inquire about the status of borrowers' private loans that were likely eligible for discharge. In some cases, this outreach resulted in the cancellation of borrowers' loans and, in other cases, we were engaged in conversation with the lenders to work towards an informal resolution, as is required by the statute.[6] That work has now been suspended.

---

[4] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf at 57 ("The Student Loan Ombudsman's Office worked directly with colleges and schools to resolve transcript withholding complaints. Several colleges released transcripts after being contacted directly by the Student Loan Ombudsman, enabling borrowers to apply to jobs or other programs. One borrower who received their transcript with help from the Ombudsman's Office said: '[I] cried [when the transcript was released], it was as if it was a hold on my life, over the years I became desperate for an education.... I am still in disbelief.'")
[5] *Id*, at 53.
[6] 12 U.S.C. § 5535(c)(1).

8.      In fact, we were in the middle of making our process more efficient and increasing our case load. During the week of February 10th, we were in the process of identifying hundreds of borrowers with private and federal loans to assist through case work but were unable to continue this work after the directive on February 10th and our terminations on February 13th.

9.      The responsibility to provide timely assistance to borrowers is why I was working with Pastor Eva Steege and many other borrowers to help them seek relief or navigate repayment related to federal and private student loans. Her story is one of many similar stories, and the systemic failure that has led to this tragic outcome for her family continues to impact millions of other borrowers.[7]

10.      The Department of Education and its subcontractors have not provided adequate assistance to many borrowers like Pastor Steege.[8] I submitted my annual report to Congress last November and reported that student loan servicers routinely make blunders, oversights, and errors that harm millions of borrowers and likely cost them millions of dollars. Borrowers told us through their complaints that these servicing errors were enormously consequential. They reported that servicing issues made them late on rent, miss their car payments, lose eligibility for mortgages and homeownership, forego saving for retirement, change employment, and even put some borrowers at risk of homelessness.[9] Borrowers also reported substantial emotional distress and described the

---

[7] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf.
[8] *Id.*
[9] *Id*, at 4-5.

student loan experience as a "nightmare," told us that they felt "hopeless and taken advantage of," and were trapped in a "death loop to nowhere."[10]

11.    Many of the issues that borrowers like Pastor Steege face related to federal student loans are, in fact, related to the acts and practices of private student loan servicing companies. One such company, Navient, was recently banned from student loan servicing by the CFPB due to past misconduct.[11] Other student loan servicers are subject to ongoing supervision by the CFPB,[12] and their practices related to long call hold times and extended delays were recently described as unfair, deceptive, and abusive by the CFPB's Office of Supervision.[13] Similarly, the Office of Supervision also identified several unfair and deceptive acts and practices related to the administration of the Public Service Loan Forgiveness program.[14]

---

[10] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf at 5.

[11] Consumer Financial Protection Bureau, (Sep. 2024), *CFPB Bans Navient from Federal Student Loan Servicing and Orders the Company to Pay $120 Million for Wide-Ranging Student Lending Failures*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-bans-navient-from-federal-student-loan-servicing-and-orders-the-company-to-pay-120-million-for-wide-ranging-student-lending-failures/.

[12] *See, e.g.,* Consumer Financial Protection Bureau, (Jan. 2024), *Issue Spotlight: Federal Student Loan Return to Repayment*, https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-federal-student-loan-return-to-repayment/ ("The Consumer Financial Protection Act directs the CFPB to conduct risk-based supervision that considers the dangers to consumers created by the provision of consumer financial products or services and focuses resources toward areas with greater risk. The CFPB determined that the return to repayment of federally owned student loans presents significant consumer risks and initiated its supervisory response due to the number of impacted consumers [over 28 million], consumer complaints and other field market intelligence, and the history of compliance issues by student loan servicers.").

[13] Consumer Financial Protection Bureau, (Dec. 2024), *Supervisory Highlights: Special Edition Student Lending (Issue 36)*, https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights-special-ed-student-lending-issue-36-winter_2024-12.pdf at 16-20.

[14] Consumer Financial Protection Bureau, (Jun. 2021), *Supervisory Highlights* (Issue 24), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-24_2021-06.pdf at 34-37.

12.     It is my understanding that Pastor Steege had reached out to her student loan servicer and the Office of Federal Student Aid for help but, like many other borrowers, was experiencing long delays and was unable to understand the guidance provided.[15] It is my belief that, without urgent escalation and cooperation between the parties involved in the administration of the federal student loan system, Pastor Steege's family will be forced to pursue a death discharge after her death and will lose the opportunity to receive over $15,000 in refunds of overpayments. This causes harm of a very significant magnitude to one family. Still, it is only one example in a much larger group of borrowers who have served the public faithfully for decades but are unable to actually achieve Public Service Loan Forgiveness due to the complex program requirements and program and servicer failures that result in "doom loops" where many borrowers are unable to get useful information or navigate the program despite their best efforts.[16]

13.     After receiving guidance on February 8th, 2025 from Acting Director Vought specifying that work should cease "unless expressly…required by law," I determined that my work could proceed because it was expressly required by law.

---

[15] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf; *See also* Consumer Financial Protection Bureau, (Sep. 2022), *Supervisory Highlights: Student Loan Servicing Special Edition*, https://files.consumerfinance.gov/f/documents/cfpb_student-loan-servicing-supervisory-highlights-special-edition_report_2022-09.pdf at 19 (explaining the CFPB's recent determination that excessive PSLF processing delays can be unfair and cause harm to borrowers).

[16] Consumer Financial Protection Bureau, (Nov. 2024), *Annual Report of the Student Loan Ombudsman*, https://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdfhttps://files.consumerfinance.gov/f/documents/cfpb_2024-annual-student-loan-ombudsmans-report_2024-11.pdf at 15-18 (Outlining common problems faced by borrowers related to PSLF) and 32 (explaining that the term "doom loop" describes the common experience where automated or otherwise insufficient servicer responses fail to resolve a customer's issue and instead lead them in continuous loops of repetitive, unhelpful jargon or legalese, which can leave borrowers unable to access their basic financial information and increase their frustration.)

14.    However, after receiving additional guidance from Acting Director Vought two days later, on February 10th, specifying that all employees should "stand down from performing *any* work task"—this time without any mention of an exception for statutorily-required activities—we cancelled our meeting with Pastor Steege and other upcoming meetings. I did not seek approval on any urgent matters on February 10th prior to being terminated on February 13th because the prior carve-out for statutorily required work had been clearly rescinded. Like many of my colleagues,[17] I was unsure whether requesting an exception or compiling information to explain my in-process work would themselves be violations of the order.

15.    It is unclear to me how the CFPB could currently be capable of performing these statutory duties, as Mr. Martinez claims in his declaration. I cannot imagine how all of this work could be continuing if the Student Loan Ombudsman position is vacant (or if I am currently serving in the position without pay and without the ability to use email, the files we were using to organize our work, the internal complaint database) and if employees, including the Student Loan Ombudsman, are unable to perform work tasks.

16.    The Consumer Complaint system cannot replace the work of a dedicated team of experts focused on resolving borrowers' problems. Mr. Martinez's declaration states that, in the absence of a Student Loan Ombudsman, borrowers can still seek relief through the Consumer Complaint system. In fact, our case work process was built on a review of those complaints and

---

[17] Cowley, S., (Feb. 10, 2025), "Confusion Reigns as 'a Wrecking Ball' Hits the Consumer Bureau," *The New York Times*, https://www.nytimes.com/2025/02/10/business/cfpb-shutdown-confusion.html ("[E]mployees spent Monday[, February 10th,] in a state of deep confusion about what they should - or should not - be doing…. Could they talk to one another on the bureau's Microsoft Teams messaging system? Could they read their email, or would that be a violation of the stop-work command?.... No answers were forthcoming, said several agency employees…. Department leaders were left to field questions from alarmed employees without any guidance from their new bosses on what to say.").

the associated company responses.[18] The cases that were resolved through that system were not the cases we were involved with, so this process is not a substitute for our escalated case work process. Furthermore, it is my understanding that my colleagues, including those in Consumer Response, are not able to perform work tasks and, thus, the complaint process is significantly degraded. Indeed, an early analysis of publicly available information indicates that thousands of consumer complaints are not being processed.[19]

17.    The defendants' opposition to the motion for preliminary injunction (ECF 31 at 23 n.6) reflects yet another elementary misunderstanding of the Bureau's operations when it suggests that the CFPB's general Ombudsman's Office could somehow provide assistance to consumers like Pastor Steege. That office is entirely distinct from, and is no way a replacement for, a team of issue experts focused on consumer redress. To be clear, I did not have any affiliation with that Office or with the staff located there. In fact, the CFPB's website explicitly states that the general Ombudsman's Office does "**not assist in resolving issues as between consumers and financial entities**" (emphasis added).[20] Rather, the Ombudsman's Office "review[s] whether the CFPB is

---

[18] We also regularly monitored complaint responses by student loan servicers and lenders to ensure student loan lenders and servicers were providing timely, accurate, and complete responses. To my knowledge, this function is now suspended.

[19] Minority Staff of the U.S. Senate Committee on Banking, Housing, and Urban Affairs, (Feb. 2025), *Left in Limbo: How President Trump's Efforts to Dismantle the Consumer Financial Protection Bureau Force Consumers to Face Corporate Greed Alone*, https://www.banking.senate.gov/imo/media/doc/left_in_limbo_how_president_trumps_efforts_to_dismantle_the_consumer__financial_protection_bureau_force_consumers_to_face_corporate_greed_alone.pdf ("Analysis of the Consumer Complaint Database in recent days suggests that the agency is uploading an average of just 2,234 of the complaints it receives each day to the Database. Furthermore, the Database shows the agency submitting an average of just 2,067 complaints per day to companies. This represents an 80 percent reduction in complaints submitted to companies.").

[20] Consumer Financial Protection Bureau, *CFPB Ombudsman Frequently Asked Questions Webpage*, (accessed Feb. 26, 2025), https://www.consumerfinance.gov/cfpb-ombudsman/ombudsman-faqs/.

following its own processes and procedures."[21] By contrast, in my capacity as the Student Loan Ombudsman, I was seeking to substantively resolve consumer complaints.[22]

18.    Furthermore, I have been developing my own knowledge of the student loan system for over a decade and do not believe that this critical role can be performed by someone with little or no prior knowledge of our notoriously complicated student loan system. Even more and especially without the benefit of an orderly transition and in a situation where the staff members previously engaged in the work were suddenly terminated.

19.    Finally, the Student Loan Ombudsman is meant to do more than resolve consumer complaints. The case work and analyses are meant to power insights, improve the case work process, develop policy recommendations, identify illegal conduct, and ultimately to improve the broader student loan system. For example, prior to my termination, I was working with my colleagues on non-public law enforcement matters and was meeting regularly with the state-based Student Loan Ombudsmen to help share knowledge, provide technical assistance, and increase collaboration. The Student Loan Ombudsman is also statutorily required to prepare an annual report.[23] Neither the Martinez declaration nor the defendants' opposition to the preliminary injunction motion explain how they contemplate the continuation of these statutorily required functions.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on February 26, 2025

Julia Barnard

---

[21] Consumer Financial Protection Bureau, *CFPB Ombudsman Frequently Asked Questions Webpage*, (accessed Feb. 26, 2025), https://www.consumerfinance.gov/cfpb-ombudsman-faqs/.
[22] 12 U.S.C. §5535.
[23] 12 U.S.C. §5535.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br><br>      *Plaintiffs*, <br><br>    v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, <br><br>      *Defendants*. | Case No. 25-cv-381-ABJ |

**DECLARATION OF LORELEI SALAS**

I, Lorelei Salas, declare:

1.      I served as the Supervision Director at the Consumer Financial Protection Bureau from November 8, 2021 to February 11, 2025. I am preparing this declaration to inform this Court about the irreversible and lasting effects of the unprecedented decision to halt all of the Bureau's statutorily required supervision activity.

2.      As the Supervision Director, I was the senior executive responsible for management of the Bureau's 550-person Supervision Division. Until its operations came to abrupt and complete halt as a result of Mr. Vought's February 8, 2025 stop-work order, the Supervision Division conducted supervisory activities for the purposes of assessing compliance with Federal consumer financial law, obtaining information about a supervised institution's activities and compliance systems and procedures, and detecting and assessing risks to consumers and to markets for consumer financial products and services.

3.      In the most recent two years, the Supervision Division advised banks and mortgage companies to refund more than $350 million dollars that were charged in illegal junk fees to people's accounts. This is just one example of the far-reaching impact of the Bureau's supervisory

activities. We discuss our findings in an anonymized manner in *Supervisory Highlights* editions that are published periodically and that bring transparency to the consumer financial markets over which we have oversight. So, in addition to the millions of consumers we have touched directly via our examinations, millions more benefit from our work when market participants make changes to their practices because we have called out unlawful and unfair practices in our guidance. The supervision staff work behind the scenes to protect the financial lives and futures of all American families, but most people will never know that we were behind the unsolicited refund that they received by mail from their mortgage company, or the credit that was made to their account that they did not ask for. Neither the companies we supervise, nor the Bureau, discuss publicly who is under supervision, but that critical work is happening every day—or at least it was, until now.

4.    Under the Consumer Financial Protection Act, enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the Bureau has the exclusive authority to conduct examinations and other supervisory activities for compliance with Federal consumer financial laws for insured depository institutions with over $10 billion in assets and is the only federal agency with supervisory authority over certain non-bank entities—such as debt collectors and payday lenders—that provide consumer financial products and services. These supervisory activities are required under the CFPA and are critical to carrying out Congress's intent.

5.    On February 8, 2025, the Bureau's Supervision staff received a stop-work order that remains in effect.

6.    In direct response to this order, the Supervision staff immediately halted all supervision-related activity.

7.      While I was Supervision Director under Acting Director Russell Vought, all Supervision activity had come to a complete and indefinite stop. I am reliably informed by current Supervision staff and by public reporting that this continues to be true.

8.      The Supervision Division has the smallest examination workforce of all the Federal bank regulators. Every year, the Division conducts a risk assessment and planning process to determine which entities to prioritize for examination. Supervision examiners require specialized training and certification, making it difficult to hire and replace qualified staff. Before February 8, the Supervision Division was already short staffed and we were in the process of training a dozen new examiners. These examiners, along with a number of attorneys and analysts that support the examinations, were included on the list of probationary employees that were terminated from the Bureau en masse.

9.      The stoppage of supervision that is occurring now is causing irreversible harm. Because there is a limited team of examiners, halting the training and work of new people and firing or halting the work of experienced people will have lasting ripple effects. Even if activities resume, it will take a long time to even have the necessary complement of trained examiners at all. Moreover, in the interim, while supervision is stopped, society is not catching predatory, fraudulent, or otherwise illegal practices. And once it restarts, if it does, the Bureau cannot possibly examine all of the institutions that would have been examined in the interim along with whatever other institutions would be examined ordinarily upon restarting. There just aren't enough examiners in the workforce for that to be feasible. And so consumers will be at much higher risk of losing money from their bank accounts in the form of junk overdraft fees, simply because their banks use complex payment ordering processes that make it impossible to track one's expenses. They will be more vulnerable to the deceptive and unfair practices we have uncovered in

companies that advertise "no fee" loans but are actually extracting money from consumers via the use of dark patterns and other deceptive tactics. Student borrowers will be subjected to poor servicing of their loans and will be sold repayment plans that take away their basic rights. Car owners and home owners will be at the mercy of lenders that underinvest in their compliance operations and lack well trained staff who can answer questions and update their accounts promptly. Service members and their families will be more likely to be targeted with predatory loan products that exceed the interest rate capped by law. When the Bureau is functioning, the supervision staff is constantly monitoring risks to consumer and enforcing key laws that protect consumers' most precious assets and that bring financial safety to the marketplace. These laws and regulations include the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Truth in Lending Act, the Electronic Fund Transfer Act, the Fair Credit Reporting Act, among others, and the prohibition on Unfair, Deceptive, or Abusive Acts or Practices.

9.     As of late January 2025, there were a half-dozen exams about to kick-off where the Bureau was working in close partnership with state regulators. These coordinated exams promote efficiency and reduce the burden on entities that are under supervision by both the Bureau and the states. Exams covered mortgage lenders, auto finance companies, and debt collection agencies, among other important markets where the data shows risks to consumers are high. There were another six or more exams planned for the second half of 2025. Now all those examinations are suspended and state partners likely cannot get in touch with the examiners scheduled to work with them.

10.     I have also learned that the Bureau is planning to cancel the credit cards for all of the examiners within the Bureau. Some examiners report that their available credit was recently lowered to $1 and it was later restored. An examiner's role is to travel to various financial

institutions to perform supervisory duties; examiners cannot do their jobs if they do not have the means to book travel and in fact canceling an examiner's credit card is generally quickly followed by their termination.

11.     The complete and unprecedented shutdown of the Supervision Division will result in incalculable and irreparable injury to consumers, organizations that serve consumers, state and local governments, and other Bureau stakeholders. As mandated by statute, the Supervision Division identifies and addresses consumer harm through the supervisory process and acts to prevent such harm before it happens. When the Bureau staff were issued the stop-work order on February 8, there were dozens of exams taking place across the country. Examiners were looking into companies that offer medical credit cards. They were scrutinizing new types of lenders such as Buy Now Pay Later companies and payroll advance companies. They were reviewing new credit decisioning models that use artificial intelligence to process credit card applications. They were responding to the millions of complaints from consumers that pointed to errors in their credit reports. None of that important work is happening right now and consumers are at higher risk of losing their homes, their cars, and their savings because the one agency whose job is to protect all American consumers has been shut down.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in New York, NY                          */s/ Lorelei Salas*
February 27, 2025                                 Lorelei Salas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES' UNION, *et al.*,

                   *Plaintiffs*,

     v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

                   *Defendants*.

Case No. 25-cv-381-ABJ

**SECOND DECLARATION OF ERIC HALPERIN**

I, Eric Halperin, declare:

1.      I served as the Enforcement Director of the Consumer Financial Protection Bureau from October 24, 2021 to February 11, 2025. As the Enforcement Director, I was the senior executive responsible for management of the Bureau's Enforcement Division. This declaration supplements my February 13, 2025 declaration. ECF 14-9.

2.  The enforcement of Federal consumer financial law is a primary function of the Consumer Financial Protection Bureau mandated by the Dodd-Frank Act, which was passed in the wake of the 2008 financial crisis and Great Recession.

3.      Before the creation of the CFPB, consumer financial protection had not been the primary focus of any federal agency, and no agency had effective tools to set the rules for and oversee the entire market for consumer financial products and services.  The Dodd-Frank Act consolidated consumer financial protection authorities that had existed across several different federal agencies and centralized them in the CFPB.  Congress also provided by law that the CFPB is the primary enforcer of the more than a dozen Federal consumer financial laws with respect to many non-depository financial institutions and is the primary enforcer of the Federal consumer

financial laws with respect to all very large banks, savings associations, and credit unions. See 12 U.S.C. § 5515(c); see also 12 U.S.C. § 5481(12), (14). Section 1031 of the Dodd Frank Act prohibits entities under the CFPB's jurisdiction from engaging in abusive acts and practices and granted the CFPB the authority to bring enforcement actions to prevent and stop this conduct. The CFPB is the primary enforcer of this prohibition for very large financial institutions, and for thousands of non-bank consumer financial service providers, no other federal agency possesses this authority.

4.     The Act further requires the CFPB to enforce Federal consumer financial law consistently as it applies to depository entities and non-depository entities—or, in common parlance, banks and "non-banks" such as payday lenders, auto title lenders, debt collectors, digital payment platforms, and consumer reporting agencies. The CFPB is the only federal financial regulatory enforcement agency with broad jurisdiction over both banks and non-banks. Moreover, a significant number of non-banks are not subject to the CFPB's supervisory jurisdiction but *are* subject to the CFPB's enforcement authority.

5.     The dismantling of the CFPB's enforcement function thus means that there is a large gaping hole in the legal regime mandated by Congress. The federal government's capacity to enforce more than a dozen Federal consumer financial protection laws against both banks and non-banks will be completely eviscerated—leaving regulatory oversight of the financial sector even weaker than it was before the financial crisis.

6.     While many enforcement matters arise through CFPB's ongoing supervision, most of Enforcement's investigations, especially of non-banks and service providers to financial institutions, arise through other sources—consumer complaints, referrals, whistleblower tips, and

the CFPB's other market risk monitoring tools. The Enforcement Division evaluates this information and determines if enforcement action is warranted.

7.    Enforcement actions, whether they originate from the CFPB's supervision process or otherwise, require significant resources to take appropriate actions to address violations of Federal consumer financial protection laws, including securing relief for consumers who have been harmed by entities that have broken the law. Over the last thirteen years of the CFPB's existence it has returned nearly $21 billion to consumers as a result of enforcement actions. In recent years, the market for consumer financial products and services has grown explosively, particularly in the non-bank sector. This growth has underlined the need for an Enforcement Division with the capacity to conduct ever-more-complex investigations and litigations.

8.    Over the last two years, to address this need, the Enforcement Division hired additional highly qualified attorneys, data analysts, technologists, investigators, and legal support specialists. The CFPB expended significant time and resources in hiring and training to fill these specialized roles.

9.    During the week of February 10th, many of these staffers were terminated en masse by Acting Director Russell Vought when he terminated staff who were on probation or who were hired to serve for a fixed term of years.

10.    Firing Enforcement staff hired to meet the need to respond to the rapidly evolving marketplace for consumer financial products and services will have a serious adverse impact on the CFPB's ability to enforce Federal consumer financial law.

11.    My understanding is that the Acting Director may dismiss all or almost all the Enforcement staff. If that unprecedented event should occur, it would cause irreparable harm. The CFPB's capacity to enforce the Federal consumer financial laws cannot be recreated or rebuilt

quickly. Even if staff were ultimately rehired much of the capacity and expertise would be lost permanently.  When there is no enforcement of the law, there will be no recourse or remedies for consumers that are injured and there will be less incentive for companies to comply with the law, harming law-abiding companies and consumers.

12.      The Enforcement Division has already been directed to stop performing all work tasks, with, apparently, the sole exception of dismissing enforcement actions that are currently being litigated.   Stopping all work tasks would likely stop payment of redress to consumers in some cases where entities have been ordered to make payments to consumers since Enforcement staff must review redress plans submitted by the entity and those plans must be approved by the Enforcement Director.

13.      It has also been publicly reported that the CFPB has cancelled all contracts with all expert witnesses in *all* existing enforcement litigation. See Evan Weinberger, *CFPB Nixes All Expert Witness Contracts in Enforcement Halt*, Bloomberg Law, https://news.bloomberglaw.com/banking-law/cfpb-nixes-all-expert-witness-contracts-in-enforcement-shutdown, Feb. 13, 2025. A mass cancellation of expert contracts makes it impossible for the CFPB to successfully prosecute its claims in many cases.

14.      The CFPB has additionally mass cancelled contracts for services that provide litigation support and management.  *See* https://doge.gov/savings.  In a typical investigation or litigation, the CFPB collects a large volume of information and data, including confidential business information and, when necessary, consumers' personal identifiable information.  Without critical services to manage that data, it would be impossible to effectively conduct investigations, or meet the CFPB's discovery obligations in litigation.

15.    As of February 27, 2025, the Acting Director of the CFPB has voluntarily dismissed, with prejudice, six active litigations that the CFPB was prosecuting in federal court.  Before this, the CFPB had voluntarily dismissed only one case in its entirety without relief to consumers in the previous 13 years of its existence, which spanned three presidential administrations (Obama, Trump, and Biden).  And that case was dismissed without prejudice.

16.    The cases dismissed by the CFPB sought relief on behalf of students who were subject to illegal collections on loans that had been discharged in bankruptcy; borrowers who were deceived about the true cost of loans made on a peer-to-peer nonbank lending platform; people shopping for a mortgage loan that were victims  of an illegal scheme to steer them to a specific lender; manufactured home buyers who were set up to fail with unaffordable loans; struggling customers of small dollar loans who were induced into a fee-harvesting and loan-churning scheme; and consumers who were deceived about their personal savings accounts.  The CFPB's complaints had alleged that consumers in these cases experienced billions of dollars of harm.

17.    Should the Acting Director continue to voluntarily dismiss the active cases currently being litigated by the CFPB, millions of consumers injured by banks and non-banks will not receive a remedy for harm that they have suffered. This includes servicemembers and their families who were charged illegal interest rates by their lenders; disabled and older Americans who receive Social Security, and coal miners with black lung disease who receive federal benefits; delivery drivers who were forced to open high-cost deposit accounts in order to receive their pay; students who were subjected to illegal debt collection practices; people attempting to correct errors on their credit reports; and the hundreds of thousands of consumers who experienced fraud on the peer-to-peer payment network operated by the nation's largest banks.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.


Executed in Washington, DC                    */s/ Eric Halperin*
February 27, 2025                             Eric Halperin

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

              *Plaintiffs*,

     v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

           *Defendants*.

Case No. 25-cv-381-ABJ

**DECLARATION OF SETH FROTMAN**

I, Seth Frotman, declare:

1.      I served as General Counsel and Senior Advisor to the Director of the Consumer

Financial Protection Bureau from 2021 through Friday, February 7, 2025. In those capacities, I

was the chief legal officer of the CFPB and was also extensively involved in the day-to-day

management of the agency, including by sitting on many senior leadership committees devoted to

agency administration. I also previously served at the CFPB from 2015 to 2018 as the Student

Loan Ombudsman and Assistant Director for the Office of Students and from 2011 to 2015 in the

Office of Servicemember Affairs.

2.      I have reviewed the filings in this case, including the defendants' opposition to the

preliminary-injunction motion, ECF 31, and the declaration attached to that opposition. I am

preparing this declaration to address statements or implications in those two documents that are,

to the best of my knowledge, either inaccurate or misleading, or both.

3.      In my role as General Counsel and Senior Advisor to the Director, I communicated

frequently with members of the CFPB Legal Division's senior leadership team; senior

management and staff in all CFPB departments, including specifically the CFPB's Offices of

Operations, Information & Technology, and Human Capital (*i.e.,* human resources); the CFPB's

Deputy Director; and eventually with staff at the Department of Treasury operating on behalf of

then-Acting CFPB Director Secretary Scott Bessent.

4.      It is my understanding—based on firsthand accounts from within the Bureau,

screen shots of emails sent within the Bureau that have been published, and public news reports—

that CFPB employees were directed "not [to] perform any work tasks," with no reference to

performing duties required by law, at the beginning of the first business day (February 10, 2025)

following my last day as General Counsel (February 7, 2025) and have been directed to adhere to

that directive since that time. I also reviewed public statements from President Trump later in the

day on February 10 indicating that the CFPB "was a very important thing to get rid of." *See* CNN,

*Trump confirms goal to "totally eliminate" the Consumer Financial Protection Bureau* (Feb. 10,

2025).[1] These facts are inconsistent with the picture painted in the defendants' opposition

memorandum.

5.      I have also reviewed public statements from Acting CFPB Director Russel Vought

specifically instructing CFPB employees not to perform statutorily mandated duties. For example,

I have observed an X (formerly Twitter) account named "CFPB Tip Line," with markings

indicating a confirmed government-affiliated account, that included the following text: "Are you

being pursued by CFPB enforcement or supervision staff, in violation of Acting Director Russ

Vought's stand down order? If so, DM us or send an email."

---

[1] https://www.cnn.com/politics/live-news/trump-doge-presidency-news-02-10-25/index.html



6.      This "CFPB Tip Line" raises a number of significant legal issues. First, enforcement and supervision are both core activities that Congress has required the agency, by statute, to perform. Second, the establishment of this unusual "Tip Line" is inconsistent with the notion that Mr. Vought's "stand down order" is some kind of ordinary, transitional "pause" of the kind portrayed in the defendants' opposition and accompanying declaration. Instead, it suggests an unprecedented campaign to frighten Bureau employees out of performing their statutory duties—clearly confirming that the "stand down order" applies to all activities of "CFPB enforcement or supervision staff," with no mention of activities required by law. Indeed, I served at the CFPB during the previous leadership transition to Acting Director Mick Mulvaney, and nothing remotely similar occurred at that time. Third, this bizarre project has Mr. Vought's direct approval—I reviewed a message from Vought himself on X (Twitter) confirming his personal involvement in this "tip line." *See* American Bankers Association (ABA) Banking Journal, *CFPB launches 'tip line' to report on bureau employees* (Feb 20, 2025).[2]

---

[2] https://bankingjournal.aba.com/2025/02/cfpb-launches-tip-line-to-report-on-bureau-employees/

***Indiscriminate Leave or Terminations of CFPB Employees, Contractors, or Contracts Would
Result in the CFPB Failing to Meet Its Legal Obligations***

7.       In Title X of the Dodd-Frank Act, Congress imposed a number of specific legal

requirements on the CFPB, including with respect to administration and management of the

agency, as well as obligations to maintain certain departments and perform certain functions. As a

federal government agency, the CFPB is also subject to many other statutory requirements and

legal obligations, including, *e.g.,* records retention requirements under the Federal Records Act,

disclosure requirements under the Freedom of Information Act, cybersecurity obligations pursuant

to the Federal Information Security Management Act and other statutes, and requirements related

to the protection of confidential and personally identifiable information under the Privacy Act, the

Trade Secrets Act, and CFPB regulations, 12 C.F.R. Subpart D. The CFPB is also subject to

obligations arising from judicial proceedings, such as active litigation holds. Some of these

requirements have criminal liability for noncompliance.

8.       In my role as General Counsel and Senior Advisor to the CFPB Director, I was

extensively involved with the staffing and management of the agency. Specifically, I served on

nearly every committee of agency senior leadership dedicated to agency staffing during my tenure.

I also was extensively involved with agency budgeting, contracting, and related decisions.

9.       In my extensive experience with management of the CFPB as well as my familiarity

with the agency's legal obligations as General Counsel, the CFPB relies on a combination of

employees, contractors, and contracts to meet its legal obligations.

10.      Based on my extensive experience with management of the CFPB as well as my

familiarity with the agency's legal obligations, the agency cannot possibly be meeting its legal

obligations if employees and contractors are not "perform[ing] any work tasks," nor could the

agency do so if the vast majority of its employees were indiscriminately put on leave or terminated. To give just some of the many available examples:

11. ***Exclusive Federal Examiner and Primary Enforcer:*** As of my departure, a very significant portion of the CFPB's staff—in the range of 500 employees, *i.e.*, 30-40% of all employees—was dedicated to examination activity, which Congress required the CFPB by law to conduct. *See, e.g.,* 12 U.S.C. § 5514(b)(1) ("The Bureau shall require reports and conduct examinations on a periodic basis of [nondepository covered persons] . . . .").

12. As of my departure, a significant portion of the CFPB's staff—in the range of 200 employees, *i.e.*, 10-20% of all employees—was dedicated to enforcement activity, which Congress required the CFPB by law to conduct. *See, e.g.,* 12 U.S.C. § 5511(a)(1) ("The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.").

13. Thousands of institutions meet the definition of "nondepository covered persons" that the CFPB is required to "conduct examinations [of] on a periodic basis." 12 U.S.C. § 5514(b)(1). The CFPB is the only federal regulator that can examine many of these nondepository financial institutions, such as credit reporting agencies, debt collectors, and payday lenders.

14. Congress also provided by law that the CFPB is the exclusive federal examiner for consumer financial protection law of all very large banks, savings associations, and credit unions (i.e., insured depository institutions and credit unions with total assets of more than $10 billion and their affiliates). *See* 12 U.S.C. § 5515(a)(1). As of September 2024, there were about 180 very large banks, savings associations, and credit unions meeting these criteria.

15.     Congress also provided by law that the CFPB is the primary enforcer of the more than a dozen federal consumer financial laws with respect to many nondepository financial institutions and is the primary enforcer of the federal consumer financial laws with respect to all very large banks, savings associations, and credit unions. *See* 12 U.S.C. § 5515(c); *see also* 12 U.S.C. § 5481(12), (14).

16.     CFPB examination staff is responsible for supervising compliance with numerous court and administrative orders. *See, e.g.,* Stipulated Final Judgment and Order, *CFPB v. Navient*, No. 3:17-CV-00101-RDM (M.D. Pa. Sept. 12, 2024) (requiring regular submissions to the CFPB Supervision Director).

17.     Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, a work stoppage or indiscriminate mass layoff of the staff dedicated to examination activity would make it impossible to continue to meet the agency's legal obligations with respect to the thousands of institutions that the CFPB, and only the CFPB, examines at the federal level. If the CFPB were to terminate most of its staff, I do not believe the CFPB would be able to meet its legal obligations with respect to examinations and enforcement.

18.     Additionally, Acting Director Vought's order "not [to] perform any work tasks" and subsequent creation of the "CFPB Tip Line" to inform on any activity by "CFPB enforcement or supervision staff" is obviously an instruction not to perform the supervision and enforcement activities that Congress required by law. Indeed, I understand from court filings in this case that Acting Director Vought specifically instructed CFPB employees to "[c]ease all supervision and examination activity" and "[n]ot [to] commence, take additional investigative activities related to, or settle enforcement actions." I also understand that the agency has ceased ongoing work on

examinations, has failed to begin exams that were already scheduled, and has fired expert witnesses, missed deadlines, and dropped active enforcement matters.

19.    ***Consumer Complaints:***    As of my departure, a very significant portion of the CFPB's staff—more than 100 full-time equivalent employees—was dedicated to the CFPB's statutory obligations with respect to receiving, responding to, and otherwise handling consumer complaints.

20.    Congress required the CFPB to establish a unit "to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services." 12 U.S.C. § 5493(b)(3)(A). The CFPB is required by law "to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person, including– (1) steps that have been taken by the regulator in response to the complaint or inquiry of the consumer. . . ." 12 U.S.C. § 5534(a)(1). The CFPB is also required "to present an annual report to Congress not later than March 31 of each year on the complaints received by the Bureau in the prior year regarding consumer financial products and services" and to "share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State Agencies." 12 U.S.C. § 5493(b)(3)(C), (D).

21.    Congress also put various other legal requirements on the CFPB and other entities with respect to consumer complaints received by the Bureau. *See, e.g.,* 12 U.S.C. § 5493(e)(1)(B) (requiring the CFPB's Office of Service Member Affairs to, among other things, "coordinate with the unit of the Bureau established [by law to receive consumer complaints] in order to monitor complaints by service members and their families and responses to those complaints by the Bureau or other appropriate Federal or State Agency"); 12 U.S.C. § 5535(c)(3) (requiring the CFPB Student Loan Ombudsman to "compile and analyze data on borrower complaints"); 15 U.S.C. §

1681i (requiring preparation of annual report about consumer complaints related to consumer reporting and transmittal of those complaints to consumer reporting agencies, which are required to review them).

22.     The number of complaints to the CFPB has grown consistently from year to year. During the period of April 1, 2023, through March 31, 2024, the CFPB received approximately 1.8 million consumer complaints.

23.     Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, the agency would need significant staff dedicated to receiving, responding to, and otherwise handling consumer complaints to continue to meet these legal obligations.

24.     Indeed, according to press accounts, the CFPB is currently telling consumers that it is not meeting its legal obligations with respect to complaints, such as responding to or otherwise handling complaints that it has received. *See* National Public Radio, *Personal Finance columnist says CFPB is important 'one stop shop' to protect consumers* (Feb. 19, 2025) ("I actually called their hotline and a person did answer. . . . what she told me was that she could still take complaints, but they have stopped action.").[3]

25.     ***Student Loan Ombudsman:*** As noted above, I was previously the CFPB's Student Loan Ombudsman—designated, as Congress required by law, by the Secretary of the Treasury, "in consultation with the [CFPB] Director, . . . to provide timely assistance to borrowers of private education loans." 12 U.S.C. § 5535(a). Congress required the CFPB Student Loan Ombudsman by law to perform certain specific duties, including, for example, to "receive, review, and attempt

---

[3] https://www.npr.org/2025/02/19/nx-s1-5297840/personal-finance-columnist-says-cfpb-is-important-one-stop-shop-to-protect-consumers

to resolve informally complaints from borrowers of loans," to "make appropriate recommendations" to federal government agencies and Congress, and to prepare annual reports. 12 U.S.C. § 5535(c), (d).

26.    It is my understanding from her public statements that the current CFPB Student Loan Ombudsman, Julia Barnard, was recently unlawfully terminated and that no replacement has been designated by the Secretary of the Treasury. The statutory duties of the Student Loan Ombudsman are not being fulfilled during a work stoppage or with no one in the position. For instance, borrowers who attempt to contact the CFPB Student Loan Ombudsman will not be able to have her "receive, review, and attempt to resolve informally" such complaints. 12 U.S.C. § 5535(a).

27.    *Regulations:* One of the core mandates that Congress required of the CFPB is to ensure that consumer financial regulations are not "outdated, unnecessary, or unduly burdensome," 12 U.S.C. § 5511(b)(3), and one of the primary functions of the CFPB is "issuing rules, orders, and guidance implementing Federal consumer financial law," 12 U.S.C. § 5511(c)(5).

28.    As part of those obligations, Congress required the CFPB to promulgate a host of regulations. For example, Congress required the CFPB to complete several mortgage-related regulations that the agency finalized shortly after the agency's creation. Congress also required the CFPB to promulgate a small business lending data rule in Section 1071 of the Dodd-Frank Act, and the CFPB completed that rule in recent years under a court order requiring its completion. That rule has not yet gone into effect. Congress also required the CFPB to complete an open banking rule in Section 1033 of the Dodd-Frank Act. The CFPB recently completed that rule, but it has not yet gone into effect. Both of those rules will require ongoing implementation work—to administer the data collection and recognize standard-setting bodies, respectively.

29.     Since passage of the Dodd-Frank Act, Congress has assigned additional regulatory tasks to the CFPB as well. For example, Congress recently passed the Financial Data Transparency Act of 2022, which requires the CFPB to conduct multiple rulemakings. The CFPB continues to be legally obligated to perform this important work.

30.     The CFPB also has half a dozen open rulemakings. Under the Administrative Procedure Act, the CFPB has a legal obligation to review comments it receives in those rulemakings and complete the rulemaking process for each. And the CFPB has dozens of open rulemaking petitions that the CFPB is legally obligated under the Administrative Procedure Act to respond to.

31.     The CFPB has an Office of Regulations and Legal Division that maintain existing regulations that are required by statute to ensure that they do not become outdated over time and that industry has appropriate guidance on how to comply. This is ongoing work under the statutory mandate to perform this function, as well as to maintain the regulations that were created by Congressional separately. For example, the CFPB has to update its regulations to adjust various monetary figures for inflation, based in some cases on specific statutory direction, and in other cases based on regulatory obligations.

32.     Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, the agency is not fulfilling its legal obligations with respect to regulations under the work stoppage and would not be able to meet these legal obligations if the defendants were to carry out their planned indiscriminate mass layoff.

33.     ***Specific Functional Units****:* As of my departure, a significant portion of the CFPB's staff was dedicated to meeting legal obligations of "specific functional units" that Congress required by law to perform certain specific functions. *See generally* 12 U.S.C. § 5493 (mandating

the creation of and specific obligations for Offices of Research; Consumer Complaints; Community Affairs; Fair Lending and Equal Opportunity; Financial Education; Service Member Affairs, and Financial Protection for Older Americans).[4]

34.    Based on my extensive experience with management of the CFPB as well as my familiarity with the agency's legal obligations, the agency cannot possibly be meeting the obligations of these units under the current work stoppage, and could not meet the legal obligations of these offices if the defendants were to carry out their planned indiscriminate mass layoff. Further, to the degree that the CFPB has indiscriminately terminated contracts, it raises questions about whether the agency intends to meet other continuous legal obligations in the Dodd-Frank Act, such as to monitor markets, on an ongoing basis.[5]

---

[4] *See* 12 U.S.C. § 5493(b)(1) (mandating the creation of the Office of Research, "whose functions shall include researching, analyzing, and reporting on" certain specific topics); *id.* § 5493(b)(2) (mandating the creation of the Office of Community Affairs, "whose functions shall include providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities"); *id.* § 5493(c) (mandating the creation of the Office of Fair Lending and Equal Opportunity, whose functions must include, among other things, "providing oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit," "working with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education," and "providing annual reports to Congress on the efforts of the Bureau to fulfill its fair lending mandate"); *id.* § 5493(d) (mandating the creation of the Office of Financial Education, "which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions," among other duties); *id.* § 5493(e) (mandating the creation of the Office of Service Member Affairs, "which shall be responsible for developing and implementing initiatives for service members and their families" for various specific purposes); *id.* § 5493(g) (mandating the creation of the Office of Financial Protection for Older Americans, which "shall," among several other things, "coordinate consumer protection efforts of seniors with other Federal agencies and State regulators, as appropriate, to promote consistent, effective, and efficient enforcement" and "work with community organizations, non-profit organizations, and other entities that are involved with educating or assisting seniors").

[5] For example, the law indicates that "[i]n order to support its rulemaking and other functions, the Bureau shall monitor for risks to consumers in the offering or provision of consumer financial products or services, including developments in markets for such products or services."

35.    ***Other Legal Obligations:*** Finally, generally stopping work or indiscriminately putting on leave or terminating CFPB employees, contractors, or contracts would be extremely likely to cause the agency to immediately be violating its other legal obligations, including specifically requirements related to active litigation holds, record retention, responding to FOIA requests, requirements related to the protection of trade secrets, personally identifiable information, and confidential supervisory information, and cybersecurity requirements.

36.    Indeed, if the CFPB has already indiscriminately terminated CFPB employees, contractors, or contracts, it would be extremely likely that agency leadership has created the potential for widespread exposure of industry trade secrets and confidential supervisory information, as well as consumers' personally identifiable information, in violation of law, among other violations of the agency's legal obligations.

37. The statutory obligations that I have mentioned in this declaration are not exhaustive. Generally speaking, the CFPB's staff is almost entirely oriented towards the statutorily required functions of enforcement, supervision, complaints, financial education, research, market monitoring, regulations (including statutorily required regulations), specific functional units, complying with legal obligations applicable across government agencies, and the basic administrative, management, legal, accounting, and technology staff that is necessary to support the work of those teams. This is not surprising, as these are the "primary functions" Congress provided for in law for the CFPB. *See* 12 U.S.C. § 5511(c).

---

12 U.S.C. § 5512(c)(1). The CFPB had various contracts with industry providers to be able to perform this market-monitoring function. I have reviewed public statements from the "Department of Governmental Efficiency" indicating that it has canceled contracts that are crucial to this function, such as the Consumer Credit Information Panel.

*Termination of CFPB Probationary Employees Was Considered and Rejected by the Agency*

38.    As CFPB General Counsel and Senior Advisor to the Director, I was involved in many decisions involving management of CFPB employees.

39.    Specifically, with respect to probationary employees, I had primary responsibility for advising CFPB management on agency decisions, where appropriate and at the direction of the CFPB Director, to carry out the U.S. Office of Personnel Management's January 20, 2025 memorandum entitled "Guidance on Probationary Periods, Administrative Leave and Details." In particular, that memorandum directed agencies to (1) "identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment" and (2) "promptly determine whether those employees should be retained at the agency."

40.    At the time of my departure from the agency, the CFPB employed many employees on probationary periods—employees whose appointment "becomes final," 5 U.S.C § 3321(a), only after a period of time that has not yet elapsed. This included both employees in and outside of the CFPB's collective bargaining unit (i.e. eligible to be a member of the CFPB union).

41.    In response to OPM's January 20, 2025 guidance, I consulted formally, orally and in writing, with agency leaders about the CFPB's employees on probationary periods, to determine whether those employees were necessary for ensuring compliance with the agency's statutory objectives and whether there were any performance issues with those employees or any other non-political reasons for their termination.

42.    Based on those consultations, the CFPB's assessment was that those employees are indeed necessary to support the CFPB's ongoing functioning, including to meet its legal obligations. The agency did not identify any employees on probationary periods with performance

or conduct issues that would have justified their termination. Indeed, in my consultation with agency leadership, not a single reason for terminating any employees on probationary periods was raised from January 20, 2025 through my last day as General Counsel on February 7, 2025.

43.    Accordingly, from January 20, 2025 through February 7, 2025, no employees on probationary periods were terminated by the CFPB.

44.    *The New York Times* has reported on a memorandum, attributed to me, providing the CFPB's determination about whether employees on probationary periods should be retained at the agency. *See* The New York Times, *Trump Names 2 New Top Financial Regulators* (Feb 11, 2025).[6] The *Times* article indicated that this memorandum by me "to agency leaders" explained the CFPB's reasoned justification for retaining employees on probationary periods, who "helped the bureau obtain more than $30 million in remedies for consumers." Based on my personal knowledge of the facts, I would not dispute the accuracy of these assertions.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC                         */s/ Seth Frotman*
February 27, 2025                                   Seth Frotman

---

[6] https://www.nytimes.com/2025/02/11/us/politics/trump-financial-regulators-jonathan-mckernan-gould.html

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br><br>                    *Plaintiffs*, <br><br>        v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, <br><br>                    *Defendants*. | Case No. 25-cv-0381-ABJ |

**DECLARATION OF JUANITA WEST-TILLMAN**

I, Juanita West-Tillman, declare as follows:

1.    I am a member of the National Association for the Advancement of Colored People ("NAACP") and the former Secretary of the Pasadena branch. I am more than 18 years of age and competent to testify about the facts contained in this declaration. The statements made in this declaration are based on my personal knowledge.

2.    I live in Altadena, California, which was recently devastated by a fire that destroyed thousands of buildings and took nearly twenty lives. I, and other members of my NAACP branch, lost everything in the Altadena fire, including my house and all my possessions therein.

3.    Following the fire, there were numerous financial scams and predatory schemes targeted at fire victims—fraudulent loans, loans with illegal terms, mortgage scams.  A multitude of types of financial fraud was, and is, being targeted at people who, like me, have just lost their homes. I had a difficult time determining what assistance was legitimate and what was fraudulent. I know other members of the Altadena Branch of the NAACP who had the same experience.

1

4.      When the Consumer Financial Protection Bureau  stopped work in early February 2025, NAACP members were already taking advantage of the Bureau's assistance to help them avoid predatory financial schemes, educate fellow members about them, and provide direct assistance, including connecting us with resources that could help us get back on our feet. I was intending to take advantage of and rely on such assistance. But the CFPB abruptly stopped offering it. Without the CFPB, I and other NAACP members who are victims of the Altadena fire will be unable to recover money lost to financial predators.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 27, 2025, in Los Angeles, CA.

*Juanita West-Tillman*

Juanita West-Tillman

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,
                    *Plaintiffs*,

     v.

RUSSELL VOUGHT, in his official capacity     Case No. 25-cv-381-ABJ
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

                    *Defendants*.

**DECLARATION OF CHRISTINA COLL**

I, Christina Coll, declare as follows:

1.     I am an officer and board member of the CFPB Employee Association. The statements made in this declaration are based on my personal knowledge and information available to me through my duties at the Employee Association.

2.     The Employee Association is a membership organization of dedicated public servants committed to advocating for the interests of the Consumer Financial Protection Bureau's mission and employees.[1]

3.     Our members are current and former employees of the CFPB, including employees who are not represented by the National Treasury Employees Union. Our non-union members currently include probationary and term employees who were terminated during the week of February 10, 2025, and include current employees who fear losing their jobs as part of a future mass firing.

---

[1] Paragraph 18 of the Amended Complaint, ECF #7, which describes the Employee Association's mission, inadvertently omits the words "mission and employees."

4.     Some Employee Association members supervised probationary and term employees who were fired the week of February 10th. The supervisors did not identify poor performance or misconduct before the firings; to the contrary many of those fired were top performers.

5.     The firings of probationary and term employees have harmed the Employee Association's members. Members who were fired lost their income and have lost, or will soon lose, important benefits, such as health insurance. One Employee Association member who was fired as part of the firing of probationary employees, for example, is now unable to pay her mortgage loan. She is also now unable to provide for her two children and so has been relying on food banks to feed her family.

6.     Another Employee Association member who was fired as part of the firing of term employees recently learned that she could have a chronic auto-immune condition. At her doctor's recommendation, she was planning to have further testing completed in late March or early April. When she learned of her termination and that she would lose her health insurance in mid-March, she scheduled an ultrasound and a biopsy to be sooner and closer together than recommended by her doctor. She expects that she will lose her CFPB health insurance during the critical stage of setting up a treatment plan with her doctor; if diagnosed, her care could range from prescription medication to an organ transplant.

7.     If the CFPB conducts further mass layoffs, Employee Association members who have not yet been fired will face the same harms as those who were already terminated. For example, an Employee Association member who is still employed but is at risk of being terminated has a spouse who has been on full medical leave with an ongoing serious medical condition. This Employee Association member is the insurance provider for the family, and any potential lapse in

2

JA220

coverage would result in the inability to provide necessary medical care for her spouse. Her employment situation is so stressful that she is now suffering from chronic migraines.

### The Work Stoppage of the CFPB

8.      On February 10th, Acting Director Vought directed all CFPB staff to "not perform any work tasks" unless they received approval in writing from the Chief Legal Officer for an urgent matter. Martinez Decl. Ex. F. Members noticed that Acting Director Vought's February 10th email did not contain an exception for activities required by law. As reported by Banking Dive (bankingdive.com), on February 10th, the Chief Legal Officer emailed the Enforcement Division, directing employees "not make any further communications… to parties that are subject to any pending enforcement matter or prospective enforcement matter without getting my approval in writing," and that "[f]ailure to abide by these instructions constitutes insubordination and we will take appropriate personnel action." Around the same time, members also reported that a "cfpb_tipline" account on X asked people to report work done by CFPB enforcement or supervision staff, and a CFPB spokesperson stated that any employees found to be in violation of the stop-work order "will be dealt with accordingly." To the best of my knowledge, nearly all of the Employee Association's members who are still employed at the CFPB remain on administrative leave.

9.      The sudden shutdown of the CFPB's work has harmed the Employee Association's members. Members report that the stop-work order has negatively impacted their ability to comply with professional and ethical obligations. Members report that the totality of the new administration's actions has created an atmosphere of fear and uncertainty about what constitutes a "work task." Members worry that they will be fired for even checking their email to see if there are any new directives.

10.    Some of the Employee Association's members have worked at the CFPB through each administration change since the CFPB's inception, and some members have worked at other government agencies through earlier administrative transitions, as well. According to these members, the effect of the stop-work order on the ability of Bureau to perform its statutory functions is unlike anything they have witnessed before in federal service. For example, according to these members, previous transitions did not involve the mass firing of probationary and term employees for reasons unrelated to performance, the placement of nearly all remaining employees on administrative leave, the closure of agency offices, the widespread cancellation of contracts that are necessary to carry out statutory functions, an order to stop all work tasks unless specifically authorized, or the complete or near-complete stoppage of core statutory functions like enforcement and supervision work.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on February 27, 2025, in El Cerrito, CA.

                                    /s/ *Christina Coll*
                                    Christina Coll

4

JA222

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, *Plaintiffs*, v. RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, *Defendants*. | Case No. 25-cv-0381-ABJ |

**DECLARATION OF PEYTON DIOTALEVI**

I, Peyton Diotalevi, declare as follows:

1.      I am National Counsel for the National Treasury Employees Union in NTEU's

Washington, D.C. Field Office. I have worked at NTEU since 2010.

2.      NTEU represents approximately 160,000 bargaining-unit employees across 37

departments and agencies. I supervise a staff of five attorneys in NTEU's Washington, D.C. Field

Office who provide representational advice and guidance to bargaining-unit employees in 28

NTEU chapters, including NTEU Chapter 335. NTEU Chapter 335 exclusively represents

bargaining-unit employees at the Consumer Financial Protection Bureau.

3.      By virtue of my job duties, I am familiar with the details of NTEU's relationships

with the chapter leaders, members, and bargaining-unit employees of NTEU Chapter 335. The

statements made in this declaration are based on my personal knowledge or information available

to me through my duties at NTEU.

4.      ***Mass Firings and Administrative Leave.*** On February 13, 2025, as the

memorandum in support of a temporary restraining order in this case was being finalized, NTEU

began receiving word that mass firings at the CFPB had already begun. The Bureau had already

fired all of its probationary employees on February 11. And by the end of February 13, it had fired all of its term employees. My understanding, based on the accounts of multiple people with direct knowledge, was that the Bureau was planning to fire virtually all of its remaining employees the next day, February 14. That was forestalled only by this Court's order that same day, temporarily prohibiting the CFPB and Acting Director Russell Vought from initiating any further mass terminations. Following the issuance of this Court's order, Human Capital Operations Manager Roland Jacob sent an email to all remaining CFPB staff placing them on "administrative leave until otherwise instructed." A true and correct copy of that email is attached as **Exhibit A**. Most CFPB employees remain on administrative leave.

5.    I am aware that some employees have requested authorization to work despite the stoppage, and those requests have gone ignored.

6.    ***"Tip Line."*** The CFPB has now set up a "Tip Line" to report any "violation[s] of Acting Director Russ Vought's stand down order."[1] Inverting the ordinary situation, in which the public might complain about fraud or deceit by lenders or debt collectors, this tip line asks the lenders or debt collectors to report if *they* are "being pursued by CFPB enforcement or supervision staff." In all of my years representing federal employees, I have never before seen an agency ask the public to report a government employee for doing their job. In response to a reporter questioning whether it was really true that "the CFPB appears to have set up" such a tip line, Vought responded, "Yes, we have."[2]

---

[1] https://x.com/cfpb_tipline/ ("Are you being pursued by CFPB enforcement or supervision staff, in violation of Acting Director Russ Vought's stand down order? If so, DM us or send an email.").

[2] https://x.com/russvought/status/1890105212230349130.

2

7.    ***"Impending Separation[s]."*** Following the mass terminations of term and probationary employees—and while this Court's order prohibiting further mass firings was in place—anyone who sent an email to CFPB's Human Resources received an auto-reply stating that Human Resources was "working diligently with the agency during this transition to provide necessary documents related to your recent *or impending* separation." That auto-reply still appears to be on as of this writing. A true and correct copy of that email is attached as **Exhibit B.**

8.    ***D.C. Headquarters Closure.*** On February 9, 2025, a Sunday, the CFPB closed its D.C. headquarters, with no notice to the union or to employees. Some NTEU members were still in the building working when it was closed down. Because the closure took place on a Sunday, though, most employees who regularly work at headquarters were not in the building. As a result, they could not recover any of their personal belongings, identify important records for document-retention purposes, or secure data. The headquarters building has remained closed to CFPB employees since. However, the daycare and coffee shop remained open and were open as of the date of the filing of this declaration.

9.    I have reviewed Adam Martinez's declaration, filed in support of the defendants' opposition to a preliminary injunction. He states that he was "advised by" unspecified "new leadership" that the D.C. headquarters "would be closed" starting February 10, 2025, "due to safety concerns." ECF 31-1 ¶ 12. The email sent by Mr. Martinez to employees advising them of the building closure did not mention anything about safety concerns. *Id.*, Ex. E**.** The leadership of the CFPB bargaining unit—which ordinarily would be informed of such concerns—was also not

3

notified of any safety concerns. The closure did, however, coincide with the presence of DOGE employees in the building going through the agency's records.[3]

10.    Mr. Martinez states that on February 7, 2025, a single employee disrupted a meeting. *Id.* ¶ 7. Mr. Martinez was not present at the meeting. He instead relies on an incident report, created shortly before his declaration was submitted to this Court—weeks after the incident took place. *Id.*, Ex. B. NTEU was informed about the incident soon after it occurred, and my understanding of the events diverges from Mr. Martinez's recounting. I am not aware of (and neither Mr. Martinez nor the incident report identifies) any actual threat posed by this employee— or any reason that a single employee interrupting a single meeting would necessitate closing a major federal agency's Washington, D.C. headquarters building for weeks. In fact, the building remained open the rest of that day and the following day.

11.    Mr. Martinez states that on February 7, 2025, NTEU "employees began protesting outside of the CFPB Headquarters building." ECF 31-1 ¶ 8. I believe that statement to be false. To my knowledge, no CFPB employees protested outside the building that day. There were a few members of the public—less than a dozen—who, on February 7, protested the shutdown of the CFPB. A reporter took a picture of the protest, which shows about four unidentified people in front of the building.[4]

12.    Indeed, the day after the government's response brief was filed in this case, the *American Banker*—a banking-industry trade publication that closely tracks events at the CFPB— reported that the government, in reliance on the Martinez declaration, had "falsely claimed that it

---

[3] *See* Nancy Cook and Joshua Green, *Musk Team's Blitz on Consumer Financial Agency Unsettles Trump Allies*, Bloomberg (Feb. 22, 2025), https://www.bloomberg.com/news/articles/2025-02-22/trump-allies-unsettled-by-musk-s-doge-blitz-on-cfpb .

[4] https://bsky.app/profile/hamiltonnolan.bsky.social/post/3lhmc5xlx7k2r.

closed the CFPB's Washington D.C. headquarters in response to protests by employees — even though the protests happened only after the office was shuttered."[5]

13.     The other protests that Mr. Martinez identifies were attended by NTEU members, but they took place after the building had already been closed. And, to my knowledge, they were entirely peaceful. Members of Congress even participated. Mr. Martinez does not identify—and I am unaware of—any evidence that these peaceful protests posed any safety threat to the CFPB, its employees, or the public. If they had, CFPB Facilities would have been required to notify chapter leadership, who would, in turn, have alerted NTEU. Moreover, as a practical matter, the CFPB headquarters building is located directly across the 17th street security gate to the White House complex, at 17th and G Streets. If a safety or security threat were posed by any nearby protest, one would expect a rapid police response given such close proximity to the White House—and no such response occurred during these protests.

14.     ***Closure of All CFPB Regional Offices.*** Mr. Martinez's declaration omits that not only did the CFPB close its headquarters, it also closed its four regional offices across the country. The email from Mr. Martinez announcing the closures did not identify any safety concern, or any other rationale, that would justify closing these regional offices. A true and correct copy of that email is attached as **Exhibit C.**

15.     ***Termination of D.C. and Regional Leases.*** I have seen an email sent on February 21, 2025, from a CFPB Realty Officer, stating that by that date, the "CFPB's main focus" was "moving out of [its] large headquarters building" on a "a very, very tight timeframe ... (30 days)." The February 21 email also states that the Bureau will move out "of the regional offices with San

---

[5] Kate Berry, *Justice Dept. insists there will continue to be a CFPB*, American Banker, February 25, 2025, https://www.americanbanker.com/news/justice-dept-insists-there-will-continue-to-be-a-cfpb

Francisco being the first one." The CFPB has since admitted that it is seeking to quickly terminate its lease on the D.C. headquarters.

16.     On February 26, 2025, the Bureau allowed some managers entry into the headquarters building to identify records, collect their personal belongings, and, if they wished, to collect their employees' belongings. To my knowledge, the managers were only informed that day that they would be permitted into the building.

17.     Bargaining-unit employees were not given an opportunity to enter the building. Some NTEU members have been told that their personal belongings will be boxed up, and at some point they will be given a fifteen-minute time slot in which they can come pick them up. Others have been given no guidance at all. To my knowledge, there has been no instruction about what to do about any sensitive records or data.

18.     Just this morning, CFPB Facilities sent an email to the terminated probationary and term employees stating that "the Operations team has packed up your personal belongings for pickup at" the headquarters building. It instructs that "[t]o retrieve your personal belongings, you must schedule an appointment by emailing" "[y]our full name," where the property is located, and a time during business hours on March 3-6 (i.e. next week). The email states that items cannot be shipped. And "[e]xcept in special situations, items that are not picked up by March 6, 2025 will be considered abandoned and will be disposed of."  A true and correct copy of this email is attached as **Exhibit D.**

19.     Although the email instructs former employees that they may return CFPB equipment like laptops, iPhones, and secure thumb drives during the same window, it does not provide any instructions for those who cannot do so. Nor does it say anything about record retention, data preservation, or data security.

6

20.    This morning, CFPB employees also received an advisory that as of February 28, 2025, the CFPB's Virtual Desktop—that is, the program that allows employees to securely log in to the CFPB system when they are not at a CFPB computer—will no longer be available. A true and correct copy of this email is attached as **Exhibit E**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 27, 2025, in Alexandria, Virginia.

/s/ *Peyton Diotalevi*
Peyton Diotalevi

7

# Exhibit A

From: ███████████ ███████████████
Subject: Updated Timekeeping Instructions for PP03
Date: February 14, 2025 at 4:15 PM
To:
Cc: ███████████████████████

---

Colleagues,

On Monday, February 10th CFPB's Acting Director issued guidance for Bureau staff to pause work tasks. In accordance with the Acting Director's guidance employees should exercise administrative leave until otherwise instructed. For staff who have been asked to work by the Acting Director, the Chief Legal Officer, or another designee (i.e. through their leadership chain, etc.) they should record that time as they normally would. All time not in a working status should be reflected in webTA under the "Admin/Excused Absence" leave transaction category.

Please refer questions to the CFPB_WorkLife@cfpb.gov box so the Office of Human Capital can provide clarifying guidance as needed.

V/R

Roland Jacob
Human Capital Operations Manager
Systems and Operations | Office of Human Capital
███████████████████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit B

**From: CFPBHROps** CFPBHROps@fiscal.treasury.gov
**Subject:** Automatic reply: question re separation papers
**Date:** February 27, 2025 at 9:27 AM
**To:** ███████████████

We are working diligently with the agency during this transition to provide necessary documents related to your recent or impending separation.

Please provide a personal email address and updated mailing address to ensure timely and effective communications.

All separated employees will be receiving a copy of their SF-50, Notice of Personnel Action, as well as a separation packet with information regarding unemployment, benefits and lump sum annual leave payment, if applicable.

Employees will have a 31-day extension of their health insurance from the date of separation provided by your health insurance carrier at no cost to you. Dental and Vision benefits will terminate upon the date of separation.

Thank you for your patience.

# Exhibit C



**From:** █████████████████████  █
**Subject:** Please Read: CFPB Regional Office Operating Status (Week of 2/17)
**Date:** February 17, 2025 at 1:21 PM
**To:** ████████████████████████████
████████████████████████████
████████████████████████████

(This message is sent on behalf of Adam Martinez, Chief Operating Officer, for CFPB Regional Office Staff and Contractors)

Dear Colleagues:

The CFPB Regional Offices will remain closed this week (2/17-2/21). Employees and contractors approved to work should do so remotely unless otherwise instructed.

Thank you.

Adam

Adam Martinez
Chief Operating Officer



**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit D

From:
Date: Thu, Feb 27, 2025 at 11:25 AM
Subject: Pickup of Personal Belongings and Return of Equipment from the CFPB HQ
To:
CC:

Good afternoon,

We recognize that you have personal property, work materials, and federal records in your office or cubicle. To prepare to vacate the building, the Operations team has packed up your personal belongings for pickup at 1700 G Street. They are working closely with your division's leadership to take great care with your personal property, confidential matters, federal records, and other items.

To retrieve your personal belongings, you must schedule an appointment by emailing the following information to

- Your full name
- Your designee, if needed (see below for additional details)
- Where your property is located (e.g., office/cubicle number, 6th floor locker number, pantry)
- A time on March 3rd, 4th, 5th, or 6th between 8am-4pm
- Any additional details related to your personal property that can help us identify or properly handle them (e.g., medications in the refrigerator that need to remain cold, personal papers that contain private information, etc.)

If you have equipment to return to the CFPB, you may return your IT equipment and PIV card during this visit. Please note that you will:
- Need to return all laptops, iPhones, secure thumb drives and any other equipment with an asset tag
- Not need to return printers, keyboard, mice, monitors, docking stations, laptop bags/backpacks, headsets, laptop locks, filing cabinets, paper shredders, or cables
- Receive a hardware asset receipt identifying the equipment you return

After scheduling an appointment, you will receive a confirmation email with additional details. Except in special situations, items that are not picked up by March 6, 2025 will be considered abandoned and will be disposed of. While we cannot ship items to you, you may designate another staff member with a valid identification to pick up your items on your behalf.

If driving, consider parking at a public parking garage, on the street, or the loading dock area on F Street. The parking garage at 1700 G Street will not be open for these pickups.

We recognize that this is a difficult situation and here to support your transition.

# Exhibit E

| **From:** | Service Desk (CFPB) |
| **Subject:** | Service Advisory: Virtual Desktop Access Unavailable After 2/28/2025 |
| **Date:** | Wednesday, February 26, 2025 10:14:16 AM |

**What's Happening?** The Citrix Virtual Desktop will be unavailable after Friday, February 28, 2025, at 11:59 PM EST.  You are receiving this notification because you logged into the Virtual Desktop in the past 90 days. Access to the Virtual Desktop via https://work.cfpb.gov and https://csf.cfpb.local will no longer be available.

**When:** Friday, February 28, 2025, at 11:59 PM EST

**Need More Info?** Please refer any questions or concerns regarding this event to the CFPB Service and Support Portal, the CFPB Service Desk at 202-435-7777 (external), x57777 (internal), or email ServiceDesk@cfpb.gov.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES
UNION, *et al.*,

       *Plaintiffs*,

v.

RUSSELL VOUGHT, in his official
capacity as Acting Director of the
Consumer Financial Protection Bureau,
*et al.*,

       *Defendants*.

No. 1:25-cv-00381-ABJ

## SUPPLEMENTAL DECLARATION OF ADAM MARTINEZ

1.      My name is Adam Martinez.  I am currently employed at the Consumer Financial Protection Bureau ("CFPB" or "the Bureau") serving as its Chief Operating Officer ("COO") and Acting Chief Human Capital Officer.  I previously submitted a declaration in this matter dated February 24, 2025.  I make this declaration based upon my personal knowledge and information provided to me in the course of my official duties.

2.      For purposes of this declaration, I have reviewed Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 40; all of the supplemental declarations attached to Plaintiffs' Motion for Leave to File Supplemental Attachments in Support of their Motion for a Preliminary Injunction, ECF No. 38; as well as the supplemental declarations attached to Plaintiffs' Notice of Corrected Attachments, ECF No. 41.  I provide this declaration to clarify and expand upon my previous testimony in light of these materials.

3.      I have reviewed the declaration that Alex Doe submitted in this case.  In her testimony, A. Doe describes deliberative and predecisional events occurring during the week of February 10, 2025, including a statement where I referenced the "closure of the agency."  I have also reviewed the declaration that Blake Doe submitted in this case.  In his testimony, B. Doe also describes deliberative and predecisional events occurring during the week of February 10, 2025, including a statement where I referenced a "wind down mode."  A. Doe's testimony and B. Doe's testimony regarding my statements are not inaccurate.  Prior to Russell Vought's designation as Acting Director of CFPB, agency staff had received guidance from DOGE-associated personnel consistent with those statements, which I believed at the time to reflect the position of agency leadership, and continued to believe to reflect agency leadership's position for a brief time thereafter.

4.      In the short time since then, and by the date that I submitted my earlier declaration, a great deal has evolved at the CFPB.  On the evening of February 7, 2025, Russell Vought was named Acting Director of the agency.  Rather than a closure of the agency, Acting Director Vought's new leadership has focused on running a substantially more streamlined and efficient bureau, refocusing its priorities, and "right sizing" the agency.  But, from my perspective, a very fluid situation continued during the week of February 10, 2025, as new leadership started to take control.  Time was needed for new leadership to refocus the Bureau.  By the time of my earlier declaration, however, the situation was somewhat more stable.  And now, the Acting Director and Chief Legal Officer are taking time to assess, listen, and explore the state of the Bureau.  Based on that assessment, new leadership continues to believe that there are substantially more employees than appropriate for a "right-sized" CFPB.  But the new leadership, including the Chief Legal Officer, have taken a methodical approach to handling the Bureau's operations and responding to senior executives who have recommended or requested guidance to perform each of the CFPB's critical statutory responsibilities.  Moreover, I have personally engaged with several of my colleagues to guide them through navigating the change and seeking clarification where and when its needed.

5.      Notably, the President has nominated Jonathan McKernan to serve as a permanent Director of the CFPB.  Mr. McKernan testified before the Senate Banking, Housing, and Urban Affairs Committee on February 27.  I believe that having a Senate-confirmed permanent Director for the CFPB will further ensure that the Bureau carries out its statutory responsibilities.

6.      B. Doe's testimony refers to an email dated February 11, 2025, in which I stated that the agency's Chief Financial Officer (CFO) had been in communication with the Federal Reserve.  As stated in my original declaration, the Bureau has not attempted to transfer any of its funds back to the Federal Reserve.  Moreover, I am not aware of a mechanism to transfer funds back to the Federal Reserve.  That said, CFPB's CFO did receive an inquiry about whether "excess" funds from the Bureau Fund could be transferred back to the Federal Reserve. He shared that as far as he was aware, it could not, and that the only mechanism in statute to account for unobligated funds is to offset future requests but, pursuant to that inquiry, he would conduct research, including communicating with the Federal Reserve to determine if there was any authority or mechanism from the Federal Reserve's perspective that he was unaware of.  Based on that research, he determined that there indeed is no authority or mechanism to transfer excess funds back to the Federal Reserve, to transfer excess funds to the Federal Reserve's control, or to transfer excess funds to the control of any other entity.  The agency has therefore not attempted to do so. The Bureau only transfers funds for the payment of expenditures incurred in the normal course of Bureau activities pursuant to its statutory obligations.  In fact, pursuant to Dodd Frank, the Bureau Fund is a separate fund established in the Federal Reserve, and most of the CFPB funds (both the Bureau Fund and the Civil Penalty Fund) reside at the Federal Reserve. Routinely the Federal Reserve completes cash disbursements at the CFPB's request to Treasury-held CFPB accounts for CFPB operating expenses.

7.    I have reviewed the declaration that Drew Doe submitted in this case.  D. Doe testifies that unnamed "Senior Executives" told staff that the CFPB would "not exist[.]"  D. Doe Decl. ¶ 7.  In addition to not identifying the individuals, D. Doe does not identify the date when he claims these statements were made.  D. Doe does not testify that those statements were premised on directives from Acting Director Vought or the CFPB Chief Legal Officer and I understand those statements to be inconsistent with their directives.  It is also inconsistent with the President nominating a permanent Director of CFPB.

8.    I have reviewed the declaration that Matthew Pfaff submitted in this case, which is dated February 26, 2025.  On February 27, 2025, the CFPB Chief Legal Officer activated work related to compliance with the agency's critical statutory responsibilities in the area of the Office of Consumer Response.  Thus, as of February 27, 2025, members of the Escalated Case Management team, for example, are working.  These actions and others are inconsistent with D. Doe's testimony suggesting that the agency will eliminate all positions except for five positions identified in the Dodd-Frank Act.  Again, I am not aware of the identity of the "multiple Senior Executives" referenced in D. Doe's testimony, and D. Doe does not testify that those statements were premised on directives from Acting Director Vought or the CFPB Chief Legal Officer.  I understand the statement referenced in paragraph five of D. Doe's declaration regarding an "intention of the leadership" to reduce CFPB staff to "everyone but the five positions required by the Dodd-Frank Act" to be inconsistent with Acting Director Vought and the Chief Legal Officer's directives.

9.    It is correct that the CFPB Ombudsman Office may not replace or directly resolve work conducted by the Student Loan Ombudsman position.  And as I have previously testified, that position is currently vacant.  But consumers may always utilize the CFPB Ombudsman Office for support.  For example, if a consumer attempts to contact the Student Loan Ombudsman and receives no response, the consumer may always contact the CFPB Ombudsman to point out the non-responsiveness of the office and seek support.  Again, the CFPB Ombudsman Office helps ensure that the CFPB continues to engage with the public.

***

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 2nd day of March, 2025.


_____
Adam Martinez
Chief Operating Officer

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

<em>Plaintiffs,</em>

v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

<em>Defendants.</em>

Case No. 25-cv-381-ABJ

### SECOND DECLARATION OF MATTHEW PFAFF

I, Matthew Pfaff, declare as follows:

1.      I am employed at the Consumer Financial Protection Bureau, where I currently serve as the Chief of Staff for the Office of Consumer Response. I have been with the CFPB since October 2013. The purpose of this second declaration is to supplement testimony provided in my first declaration and whistleblower disclosure. ECF 38-7. The following is based on my personal knowledge or information provided to me while performing my duties.

2.      I have reviewed the Supplemental Declaration of Adam Martinez. ECM 47-1. Consistent with his first declaration, Mr. Martinez's statements are misleading, inaccurate, or both.

3.      Mr. Martinez states that "[o]n February 27, 2025, the CFPB Chief Legal Officer activated work related to compliance with the agency's critical statutory responsibilities in the area of the Office of Consumer Response. Thus, as of February 27, 2025, members of the Escalated Case Management team, for example, are working." ECF 47-1 at ¶ 8. The first sentence is misleading. The second sentence is blatantly false.

4.      None of the activities listed in my original declaration, including responding to escalated issues via the Escalated Case Management Team, are currently happening. ECF 38-7 at ¶¶ 12-26.

5.      This is concerning. Many consumers are not receiving timely responses to their complaints as required by 12 U.S.C. § 5534(a). And for those who face urgent situations—e.g., a person who submits a complaint about losing their home to an imminent foreclosure—there is simply no one at the CFPB to help.

6.      Mr. Martinez suggests that he is guiding colleagues "through navigating the change and seeking clarification where and when its needed." ECF 47-1 at ¶ 4. As I explained in my prior declaration, I drafted a memo that described key statutory work and teams most directly aligned to these statutory obligations. ECF 38-7 at ¶ 10 and Ex. A. Mr. Martinez received that memo more than two weeks ago. *Id.* at ¶ 10. As of the time of Mr. Martinez's Supplemental Declaration, he has not inquired about—or provided guidance on—this statutory work.

7.      Mr. Martinez's non-response is not limited to the consumer complaint function. Indeed, I am aware of several inquiries to Mr. Martinez, requesting authorization to perform statutorily authorized work, which have been ignored. On February 27, Mr. Martinez wrote to certain CFPB executives—who all work outside of Consumer Response—that "statutorily required work and/or work required by law are authorized" and "teams are authorized to continue carrying out these responsibilities." I am aware of at least two CFPB executives who sent requests to Mr. Martinez following that email, seeking to activate staff to perform statutory work. Those requests, however, have been ignored.

***

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in Washington, DC this 2nd day of March, 2025.

_____
Matthew Pfaff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*,<br><br>                    *Plaintiffs*,<br><br>     v.<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,<br><br>                    *Defendants*. | Case No. 25-cv-0381-ABJ |

**DECLARATION OF EMORY DOE**

I, Emory Doe, declare as follows:

1.      I have supervision over the Escalated Case Management team at the CFPB. The statements made in this declaration are based on my personal knowledge.

2.      I am submitting this declaration pseudonymously because I fear retaliation. But if the Court would like to know my name and position, I am willing to provide it ex parte and under seal.

3.      On February 10, 2025, Acting Director Russell Vought sent an agency-wide email, instructing all employees to "stand down from performing any work task." That directive had no exception for statutorily mandated functions. Accordingly, neither I, nor any member of the Escalated Case Management Team, has performed any work since that order.

4.      I read the supplemental declaration of Chief Operating Officer Adam Martinez, filed today, March 2, 2025. Mr. Martinez testified that, "as of February 27, 2025, members of the Escalated Case Management team, for example, are working." That is false.

5.      No member of the Escalated Case Management has performed any work since at least the February 10th stop-work order. Neither I, nor any member of the Escalated Case

1

JA246

Management team, was asked (or authorized) to work on February 27th, or any date before or after that. To confirm my understanding, I contacted each member of the Escalated Case Management team, all of whom confirmed that they remained unauthorized to work. I also checked my email inbox, as well as the shared team inbox, and neither contains any directive or authorization for the Escalated Case Management team to resume working.

6.      The Escalated Case Management (ECM) team serves as a single point of contact for executives and other colleagues across the Bureau who are contacted directly by consumers regarding consumer complaint-related issues. These issues are referred to ECM in accordance with instructions published on the Bureau's intranet, and ECM responds to consumers on the Bureau's behalf, with ad hoc guidance from the team's chain of command or Legal Division, as needed. The team also handles requests from the Consumer Resource Center (CRC or call center) to evaluate disability accommodation requests that the CRC could not resolve itself. In most cases, ECM provides guidance to the CRC for handling the request, while in other instances ECM handles the necessary consumer follow up directly. Additionally, ECM team members review foreclosure-related complaints when the consumer has entered an imminent foreclosure date in the appropriate field during the complaint submission process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 2, 2025, in Washington, D.C.

/s/ *Emory Doe*
Emory Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-0381-ABJ |

**DECLARATION OF FRANCIS DOE**

I, Francis Doe, declare as follows:

1.      I am a Financial Analyst in the Research, Monitoring, and Regulations division of the CFPB. The statements made in this declaration are based on my personal knowledge.

2.      I am submitting this declaration pseudonymously because I fear retaliation. But if the Court would like to know my name, I am willing to provide it ex parte and under seal.

3.      On February 10, 2025, Acting Director Russell Vought sent an agency-wide email, instructing all employees to "stand down from performing any work task." The email made clear that even work on "urgent matters" could not be performed without "approval in writing," which it directed could only be secured by alerting the Acting Director himself through "Mark Paoletta, Chief Legal Officer." There were no exceptions to this stop-work order for statutorily required work.

4.      I, my colleagues, and my manager all understood this email as an order to stop all work, regardless of whether it was required by statute. Accordingly, we have not performed any work, since it was sent. My office is responsible for statutorily mandated reports, for which I have

1

upcoming deadlines. I have not worked on these reports (or anything else) since we received the February 10 stop-work order.

5.      On the morning of Friday, February 28, 2025, I became aware that the prior afternoon (February 27, 2025), CFPB Chief Operating Officer Adam Martinez had sent an email to the leadership of my division, including the assistant director responsible for overseeing my team, John McNamara. That email stated that Mr. Martinez and Acting Director Vought "wanted to ensure that [staff is] aware that statutorily required work and/or work required by law are authorized." Although Mr. Martinez cited a February 8, 2025 email from Acting Director Vought, he did not mention the subsequent February 10 email, which had explicitly directed all employees to stop all work—without any exception for work required by law.

6.      I learned of Mr. Martinez's February 27 email from a colleague. When I learned of the email, I had not received any authorization from my management to resume work. Seeking clarification, I sent an email from my CFPB email account to Mr. McNamara, and cc-ed my direct manager. That email sought clarification about whether I should resume work on the statutorily mandated reports for which I am responsible. My direct manager responded, stating that Mr. McNamara "will be reaching out to you shortly." Immediately thereafter, my direct manager texted me and two of my colleagues on our personal cell phones, stating: "In response to Adam Martinez's email, John [McNamara] has instructed us to stand down until further notice." In response to my manager's text, I asked that Mr. McNamara "provide written guidance to our CFPB emails."

7.      Mr. McNamara then sent an email just to me and my direct manager (to our CFPB emails), stating that he would "like to get started" on statutorily mandated reports, but that I should

"[s]tay tuned for guidance." Separately, he sent an email to my whole team, which said that he had emailed "Adam Martinez letting him know that [he planned] to recommence work on all areas."

8.    Confused, I then emailed Mr. McNamara again, asking "To clarify, should I get started or wait for guidance?" Mr. McNamara responded that I should "[w]ait for guidance."

9.    Having not received any further guidance, I continue to remain unauthorized to perform any work. Despite Mr. Martinez's February 27 email, my understanding is that the stop-work order issued on February 10th remains in effect.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on March 2, 2025, in Washington, D.C.

/s/ *Francis Doe*
Francis Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

                    *Plaintiffs*,

     v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

                    *Defendants*.

Case No. 25-cv-381-ABJ

**DECLARATION OF GREER DOE**

I, Greer Doe, declare:

      1.      I am a management official at the Consumer Financial Protection Bureau (CFPB).

The statements in this declaration are based on my personal knowledge. I am making this

declaration to offer a written record of what I have observed concerning the unprecedented,

ongoing stoppage of critical and statutorily required work by the CFPB up through today and to

respond to the incorrect suggestion in the Second Declaration of Adam Martinez that the Bureau

is "perform[ing] each of CFPB's critical statutory responsibilities." ECF 47-1 ¶ 4. I make this

declaration pseudonymously out of concern for retaliation. If requested, I will share my name and

position ex parte and under seal.

      2.      The Consumer Financial Protection Act of 2010, the part of the Dodd-Frank Act

that establishes the CFPB, mandates that the Bureau continuously carry out certain functions to

protect consumers and serve the public.[1] Among other things, the CFPB is required to have a

consumer-complaint collection and response system and a public-facing website. *See* 12 U.S.C. §

---

[1] A partial list is available here: *Statutory Requirements for Continuous Operation of the CFPB*, Feb. 13, 2025, https://protectborrowers.org/wp-content/uploads/2025/02/CFPB-Statutory-Requirements-2.13.25.pdf (attached as **Exhibit A**)

5493(b)(3). The CFPB is also required by statute to have specific named offices with key functions. Among other things, the statute requires the Bureau to have an Office of Student Loan Ombudsman (12 U.S.C. § 5535(a)), an Office of Servicemember Affairs (12 U.S.C. § 5493(e)(1)), an Office for Older Americans (12 U.S.C. § 5493(f)(1)), an Office of Financial Education (12 U.S.C. § 5493(d)(1)), and an Office of Community Affairs (12 U.S.C. § 5493(b)(2))—all offices that must provide specified services to consumers and other Bureau stakeholders, such as consumer groups and state and local governments and federal government partners, on a timely basis.

3.      Since Acting Director Vought's work-stoppage directive on February 10, to the best of my knowledge, no work has been done in the offices named above—and that remains true as of today. This means that the Office of Service Member Affairs is not assisting military service members, veterans, and their families. Nobody is performing the statutorily required complaint monitoring function for service members and veterans who are entitled to our help when they are scammed or defrauded, sometimes because they are deployed overseas or are otherwise rendered vulnerable as a result of their service to the Nation. The Office of Older Americans is not providing any services to older consumers who may be victims of elder abuse. The Student Loan Ombudsman was terminated on February 13 without the naming of a replacement, which means that people with student-loan problems cannot receive the timely assistance that the statute requires. The Office of Financial Education and the Office of Community Affairs are likewise at a standstill. As described in the declaration of Director of Digital Services Adam Scott, the CFPB's homepage—most Americans' first point of contact with the CFPB—was deleted at the direction of Acting Director Vought and remains down. And, as detailed in the declaration of Matthew Pfaff, the Chief of Staff of the Office of Consumer Response, the CFPB's consumer-complaint and response system remains inoperable because of the work stoppage. For individual consumers;

consumer groups and legal aid providers; federal, state, and local government partners; and other CFPB stakeholders, the Bureau has gone dark.

4.      On February 10, 2025, all CFPB employees—including myself—received an email from Acting Director Vought directing all CFPB employees to "not perform any work tasks" and to "stand down from performing any work tasks."  The February 10 email directed employees that, "If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task." This February 10 email followed an earlier email on February 8, 2025 from Acting Director Vought —also sent to all CFPB employees— ordering a stoppage of CFPB work, "unless expressly approved by the Acting Director or required by law." This February 10 email prohibited "any work tasks" and did not include any exception for work "required by law" and it directed all employees to otherwise "stand down from performing any work tasks." This lack of any exception for legally required work was widely noted and implemented across the Bureau. Following the February 8 email, virtually all work stopped, including statutorily required functions. Nobody believed they truly had authority to continue tasks unless specifically authorized to do so by Vought. The Febraury 10 email then cemented this understanding.

5.      Acting Director Vought's February 10 email was not ambiguous. Like my colleagues in my office and across the Bureau, I interpreted the email as an express directive to cease any and all work, regardless of whether it was required by statute. Other CFPB management repeatedly expressed to me the same understanding.

6.      Upon receipt of Acting Director Vought's February 10, 2025 email, all work in my office ceased, including all work statutorily required under the CFPA. This has meant that critically important work that is required of the CFPB has been subject to a complete work stoppage,

including key areas of work on which consumers and other Bureau stakeholders depend. The terminations of nearly 200 CFPB employees that followed on February 11 and 13 further ensured that no work would proceed, with staff expressing concern to me that they might be fired for even checking their email or requesting authorization to complete statutorily required work.

7.     Seventeen days later, late on Friday, February 27, 2025, Adam Martinez, the Chief Operating Officer (COO) of the CFPB sent an email regarding work authorization. This email was addressed only to senior management and, to my best of my knowledge, only to senior management in a single CFPB division (Research, Monitoring, and Regulations). The email was sent on the evening that the plaintiffs' reply brief and supplemental declarations in this case were due to be filed. In this new email, COO Martinez stated that "statutorily required work and/or work required by law are authorized." COO Martinez explicitly referenced Acting Director Vought's February 8 email ordering a stoppage of work "unless expressly approved by the Acting Director or required by law," but did not reference Acting Director Vought's February 10 email ordering all work to stop, with no distinction or exception for statutorily required work. The February 10 email, however, has not been rescinded or modified, and so COO Martinez's email has generated confusion.

8.     Because of uncertainty about the meaning of COO Martinez's February 27 email—particularly its failure to address the complete work stoppage order from the Acting Director's February 10 email—no work in my office has restarted.

9.     Staff in my office have privately reported extreme anxiety to me about performing any work not expressly authorized by the Acting Director, out of concern that they may be terminated for insubordination in light of his February 10 work stoppage order, particularly given the chilling effect of the mass terminations on February 11 and 13, for no apparent cause, and

internal reports that mass layoffs were imminent. They have specifically expressed concern that they might be terminated for insubordination in light of the February 10 work stoppage order.

10.     I do not take COO Martinez's February 27 email as a sincere attempt to ensure that the Bureau fulfills its statutory requirements under the CFPA. Rather, I interpret COO Martinez's email as a somewhat transparent effort—in advance of a hearing in this Court—to create the appearance that statutorily required work is taking place across the Bureau when in fact it is not.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 2, 2025.                                */s/ Greer Doe*
                                                          Greer Doe

 

## Statutory Requirements for Continuous Operation of the CFPB

February 13, 2025

*Persis Yu, Student Borrower Protection Center*
*Erin Witte, Consumer Federation of America*

The Consumer Financial Protection Bureau (CFPB), created in the devastating wake of the 2008 financial crisis, is an independent agency that enforces consumer protection laws and protects people who have been cheated by financial companies. This memorandum summarizes the many responsibilities and obligations that the CFPB is legally obligated to perform. Listed below are 87 such provisions in Title 12 of the U.S. Code – a non-exhaustive list of the CFPB's legal responsibilities and obligations, with a short description of each. In addition to those on this list, there are additional responsibilities and obligations, including in Title 15 of the U.S. Code. *See, e.g.*, 15 U.S.C. § 1603 note (requiring the CFPB annually to make certain inflation adjustments).

The overwhelming majority of these items are responsibilities or obligations that the law requires the CFPB to continuously satisfy, while a relatively small number are one-time mandates that the CFPB has already satisfied. Additionally, the list does not include certain rulemakings that the CFPB has interpreted as required under sections 1033 (personal financial data rights) and 1071 (small business lending) of the Consumer Financial Protection Act.[1]

Of the **87** provisions surveyed:
- **13** require the CFPB to continuously operate specific offices/departments (such as an Office of Servicemember Affairs and Office of Financial Protection for Older Americans);
- **14** involve required rulemaking activities (such as issuing a notice of proposed rulemaking when a majority of States has enacted a resolution);
- **13** involve required reports or reporting (such as reporting at least annually on emerging risks to consumers);
- **10** involve required public engagement activities (such as responding timely to consumer complaints);

---

[1] Although the CFPB has interpreted these provisions as imposing mandatory rulemaking requirements, stakeholders have made strong arguments that covered entities that are not currently in compliance with these statutory provisions are plainly in violation of federal law. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (declining to defer to agency's interpretation of statutory language).

- **8** involve requirements for the Bureau's enforcement, supervision, or examination activities (such as conducting periodic examinations of nonbank entities);[2]
- **7** obligate assumption of other federal agencies' responsibilities (such as duties of the former Office of Thrift Supervision);
- **6** involve mandatory consumer disclosures (such as periodically creating materials for consumers to understand the nature and costs of real estate settlement services).
- **5** involve required inter-agency coordination;
- **3** involve required intra-Bureau coordination;
- **5** include mandatory labor protections for Bureau employees;
- **3** impose civil rights-related obligations; and
- **1** provides funding-related obligations.

---

[2] Statutes categorized below as pertaining to "enforcement" include those dealing with supervision and examinations.

2

JA257

**Provisions Enacted in 12 U.S.C. ch. 53, sub-ch. V "Bureau of Consumer Financial Protection"**

| Class | Statutory Mandate | Statutory Citation | Language |
|---|---|---|---|
| Rulemaking | Regulate all financial products and services | 12 U.S.C. § 5491(a) | [The Bureau] shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws |
| Labor protections | Comply with federal labor protections | 12 U.S.C. § 5493(a)(4) | Chapter 71 of title 5 shall apply to the Bureau and the employees of the Bureau. |
| Statutory office | Maintain an ombudsman | 12 U.S.C. § 5493(a)(5) | (B) The ombudsman appointed in accordance with subparagraph (A) shall— (i) act as a liaison between the Bureau and any affected person with respect to any problem that such party may have in dealing with the Bureau, resulting from the regulatory activities of the Bureau; and (ii) assure that safeguards exist to encourage complainants to come forward and preserve confidentiality. |
| Statutory office | Maintain a Research Office | 12 U.S.C. § 5493(b)(1) | The Director shall establish a unit whose functions shall include researching, analyzing, and reporting on— (A) developments in markets for consumer financial products or services, including market areas of alternative consumer financial products or services with high growth rates and areas of risk to consumers; (B) access to fair and affordable credit for traditionally underserved communities; (C) consumer awareness, understanding, and use of disclosures and communications regarding consumer financial products or services; (D) consumer awareness and understanding of costs, risks, and benefits of consumer financial products or services; (E) consumer behavior with respect to consumer financial products or services, including performance on mortgage loans; and (F) experiences of traditionally underserved consumers, including |

3

JA258

| | | | un-banked and under-banked consumers. |
|---|---|---|---|
| Statutory office | Maintain a Community Affairs Office | 12 U.S.C. § 5493(b)(2) | The Director shall establish a unit whose functions shall include providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities. |
| Statutory office | Maintain an Office for collecting and tracking consumer complaints | 12 U.S.C. § 5493(b)(3) | The Director shall establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database or utilizing an existing database to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services. The Director shall coordinate with the Federal Trade Commission or other Federal agencies to route complaints to such agencies, where appropriate. |
| Reporting | Report to Congress annually re: received complaints | 12 U.S.C. § 5493(b)(3)(C) | The Director shall present an annual report to Congress not later than March 31 of each year on the complaints received by the Bureau in the prior year regarding consumer financial products and services. Such report shall include information and analysis about complaint numbers, complaint types, and, where applicable, information about resolution of complaints. |

4

JA259

| | | | |
|---|---|---|---|
| Reporting | Share complaint data with other regulators | 12 U.S.C. § 5493(b)(3)(D) | To facilitate preparation of the reports required under subparagraph (C), supervision and enforcement activities, and monitoring of the market for consumer financial products and services, the Bureau shall share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies, subject to the standards applicable to Federal agencies for protection of the confidentiality of personally identifiable information and for data security and integrity. |
| Statutory office | Maintain an Office of Fair Lending and Equal Opportunity | 12 U.S.C. § 5493(c)(1) | The Director shall establish within the Bureau the Office of Fair Lending and Equal Opportunity. |
| Enforcement | Execute duties related to Fair Lending and Equal Opportunity | 12 U.S.C. § 5493(c)(2) | The Office of Fair Lending and Equal Opportunity shall have such powers and duties as the Director may delegate to the Office, including— (A) providing oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau, including the Equal Credit Opportunity Act [15 U.S.C. 1691 et seq.] and the Home Mortgage Disclosure Act [12 U.S.C. 2801 et seq.]; (B) coordinating fair lending efforts of the Bureau with other Federal agencies and State regulators, as appropriate, to promote consistent, efficient, and effective enforcement of Federal fair lending laws; (C) working with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education; and (D) providing annual reports to Congress on the efforts of the Bureau to fulfill its fair lending mandate. |
| Statutory office | Appoint an Assistant Director for Fair Lending & Equal Opportunity | 12 U.S.C. § 5493(c)(3) | There is established the position of Assistant Director of the Bureau for Fair Lending and Equal Opportunity, who— (A) shall be appointed by the Director; and (B) shall carry out such duties as the Director may delegate to |

5

| | | | |
|---|---|---|---|
| | | | such Assistant Director. |
| Statutory office | Maintain an Office of Financial Education | 12 U.S.C. § 5493(d)(1) | The Director shall establish an Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions. |
| Public engagement | Execute duties related to Financial Education | 12 U.S.C. § 5493(d)(2) | The Office of Financial Education shall develop and implement a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission, consistent with the National Strategy for Financial Literacy, through activities including providing opportunities for consumers to access—<br>(A) financial counseling, including community-based financial counseling, where practicable;<br>(B) information to assist with the evaluation of credit products and the understanding of credit histories and scores;<br>(C) savings, borrowing, and other services found at mainstream financial institutions;<br>(D) activities intended to—<br>(i) prepare the consumer for educational expenses and the submission of financial aid applications, and other major purchases;<br>(ii) reduce debt; and<br>(iii) improve the financial situation of the consumer;<br>(E) assistance in developing long-term savings strategies; and<br>(F) wealth building and financial services during the preparation process to claim earned income tax credits and Federal benefits. |

6

| Coordination | Coordinate with other units re: Financial Education | 12 U.S.C. § 5493(d)(3) | The Office of Financial Education shall coordinate with other units within the Bureau in carrying out its functions, including— (A) working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and (B) working with the research unit established by the Director to conduct research related to consumer financial education and counseling. |
|---|---|---|---|
| Reporting | Report to Congress annually re: financial literacy activities | 12 U.S.C. § 5493(d)(4) | Not later than 24 months after the designated transfer date, and annually thereafter, the Director shall submit a report on its financial literacy activities and strategy to improve financial literacy of consumers to— (A) the Committee on Banking, Housing, and Urban Affairs of the Senate; and (B) the Committee on Financial Services of the House of Representatives. |
| Statutory office | Maintain an Office of Service Member Affairs | 12 U.S.C. § 5493(e)(1) | The Director shall establish an Office of Service Member Affairs, which shall be responsible for developing and implementing initiatives for service members and their families intended to— (A) educate and empower service members and their families to make better informed decisions regarding consumer financial products and services; (B) coordinate with the unit of the Bureau established under subsection (b)(3), in order to monitor complaints by service members and their families and responses to those complaints by the Bureau or other appropriate Federal or State agency; and (C) coordinate efforts among Federal and State agencies, as appropriate, regarding consumer protection measures relating to consumer financial products and services offered to, or used by, service members and their families. |

7

| Statutory office | Maintain an Office of Financial Protection for Older Americans | 12 U.S.C. § 5493(f)(1) | Before the end of the 180-day period beginning on the designated transfer date, the Director shall establish the Office of Financial Protection for Older Americans, the functions of which shall include activities designed to facilitate the financial literacy of individuals who have attained the age of 62 years or more (in this subsection, referred to as "seniors") on protection from unfair, deceptive, and abusive practices and on current and future financial choices, including through the dissemination of materials to seniors on such topics. |
|---|---|---|---|
| Statutory office | Appoint an Assistant Director for Protection of Older Americans | 12 U.S.C. § 5493(f)(2) | The Office of Financial Protection for Older Americans (in this subsection referred to as the "Office") shall be headed by an assistant director. |

8

JA263

| | | | |
|---|---|---|---|
| | | | The Office shall—<br>(A) develop goals for programs that provide seniors financial literacy and counseling, including programs that—<br>(i) help seniors recognize warning signs of unfair, deceptive, or abusive practices, protect themselves from such practices;<br>(ii) provide one-on-one financial counseling on issues including long-term savings and later-life economic security; and<br>(iii) provide personal consumer credit advocacy to respond to consumer problems caused by unfair, deceptive, or abusive practices;<br>(B) monitor certifications or designations of financial advisors who advise seniors and alert the Commission and State regulators of certifications or designations that are identified as unfair, deceptive, or abusive;<br>(C) not later than 18 months after the date of the establishment of the Office, submit to Congress and the Commission any legislative and regulatory recommendations on the best practices for—<br>(i) disseminating information regarding the legitimacy of certifications of financial advisers who advise seniors;<br>(ii) methods in which a senior can identify the financial advisor most appropriate for the senior's needs; and<br>(iii) methods in which a senior can verify a financial advisor's credentials;<br>(D) conduct research to identify best practices and effective methods, tools, technology and strategies to educate and counsel seniors about personal finance management with a focus on—<br>(i) protecting themselves from unfair, deceptive, and abusive practices;<br>(ii) long-term savings; and<br>(iii) planning for retirement and long-term care;<br>(E) coordinate consumer protection efforts of seniors with other Federal agencies and State regulators, as appropriate, to promote consistent, effective, and efficient enforcement; and |
| Public engagement | Execute duties related to Financial Protection for Older Americans | 12 U.S.C. § 5493(f)(3) | (F) work with community organizations, non-profit organizations, |

9

| | | | |
|---|---|---|---|
| | | | and other entities that are involved with educating or assisting seniors (including the National Education and Resource Center on Women and Retirement Planning). |
| Public engagement | Establish a Consumer Advisory Board | 12 U.S.C. § 5494(a) | (a) Establishment required<br>The Director shall establish a Consumer Advisory Board to advise and consult with the Bureau in the exercise of its functions under the Federal consumer financial laws, and to provide information on emerging practices in the consumer financial products or services industry, including regional trends, concerns, and other relevant information. |

10

| | | | |
|---|---|---|---|
| Public engagement | Seek out and appoint a range of consumer stakeholders to Consumer Advisory Board | 12 U.S.C. § 5494(b) | In appointing the members of the Consumer Advisory Board, the Director shall seek to assemble experts in consumer protection, financial services, community development, fair lending and civil rights, and consumer financial products or services and representatives of depository institutions that primarily serve underserved communities, and representatives of communities that have been significantly impacted by higher-priced mortgage loans, and seek representation of the interests of covered persons and consumers, without regard to party affiliation. Not fewer than 6 members shall be appointed upon the recommendation of the regional Federal Reserve Bank Presidents, on a rotating basis. |
| Public engagement | Hold regular meetings of the Consumer Advisory Board, at least twice a year | 12 U.S.C. § 5494(c) | The Consumer Advisory Board shall meet from time to time at the call of the Director, but, at a minimum, shall meet at least twice in each year. |
| Inter-agency Coordination | Coordinate with other regulators | 12 U.S.C. § 5495 | The Bureau shall coordinate with the Commission, the Commodity Futures Trading Commission, the Federal Trade Commission, and other Federal agencies and State regulators, as appropriate, to promote consistent regulatory treatment of consumer financial and investment products and services. |
| Reporting | Report to Congressional Committees semi-annually | 12 U.S.C. § 5496(b) | The Bureau shall, concurrent with each semi-annual hearing referred to in subsection (a), prepare and submit to the President and to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services and the Committee on Energy and Commerce of the House of Representatives, a report, beginning with the session following the designated transfer date. The Bureau may also submit such report to the Committee on Commerce, Science, and Transportation of the Senate. |

11

| | | | |
|---|---|---|---|
| Reporting | Address specific topics in semi-annual Congressional Reports | 12 U.S.C. § 5496(c) | The reports required by subsection (b) shall include—<br>(1) a discussion of the significant problems faced by consumers in shopping for or obtaining consumer financial products or services;<br>(2) a justification of the budget request of the previous year;<br>(3) a list of the significant rules and orders adopted by the Bureau, as well as other significant initiatives conducted by the Bureau, during the preceding year and the plan of the Bureau for rules, orders, or other initiatives to be undertaken during the upcoming period;<br>(4) an analysis of complaints about consumer financial products or services that the Bureau has received and collected in its central database on complaints during the preceding year;<br>(5) a list, with a brief statement of the issues, of the public supervisory and enforcement actions to which the Bureau was a party during the preceding year;<br>(6) the actions taken regarding rules, orders, and supervisory actions with respect to covered persons which are not credit unions or depository institutions;<br>(7) an assessment of significant actions by State attorneys general or State regulators relating to Federal consumer financial law;<br>(8) an analysis of the efforts of the Bureau to fulfill the fair lending mission of the Bureau; and<br>(9) an analysis of the efforts of the Bureau to increase workforce and contracting diversity consistent with the procedures established by the Office of Minority and Women Inclusion. |
| Funding | Expend funds transferred by Fed on Agency Activities | 12 U.S.C. § 5497(c) | Funds obtained by, transferred to, or credited to the Bureau Fund shall be immediately available to the Bureau and under the control of the Director, and shall remain available until expended, to pay the expenses of the Bureau in carrying out its duties and responsibilities. |
| Rulemaking | Maintain data standards | 12 U.S.C. § 5498 | The Bureau shall, by rule, adopt data standards for all collections of information that are regularly filed with or submitted to the Bureau. |

12

JA267

| | | | |
|---|---|---|---|
| Reporting | Maintain public access to all published data sets | 12 U.S.C. § 5499 | All public data assets published by the Bureau shall be—<br>(1) made available as an open Government data asset (as defined in section 3502 of title 44);<br>(2) freely available for download; |
| Enforcement | Actively monitor emerging risks to consumers | 12 U.S.C. § 5512(c)(1) | In order to support its rulemaking and other functions, the Bureau shall monitor for risks to consumers in the offering or provision of consumer financial products or services, including developments in markets for such products or services. |
| Reporting | Issue reports on emerging risks to consumers, no less than annually | 12 U.S.C. § 5512(c)(3) | The Bureau shall publish not fewer than 1 report of significant findings of its monitoring required by this subsection in each calendar year... |
| Rulemaking | Prescribe rules for maintaining consumer confidentiality | 12 U.S.C. § 5512(c)(6) | The Bureau shall prescribe rules regarding the confidential treatment of information obtained from persons in connection with the exercise of its authorities under Federal consumer financial law. |
| Enforcement | Regularly examine covered entities | 12 U.S.C. § 5514(b)(1) | The Bureau shall require reports and conduct examinations on a periodic basis of persons described in subsection (a)(1) for purposes of—<br>(A) assessing compliance with the requirements of Federal consumer financial law;<br>(B) obtaining information about the activities and compliance systems or procedures of such person; and<br>(C) detecting and assessing risks to consumers and to markets for consumer financial products and services. |
| Inter-agency Coordination | Coordinate supervisory activities with other regulators | 12 U.S.C. § 5514(b)(3) | To minimize regulatory burden, the Bureau shall coordinate its supervisory activities with the supervisory activities conducted by prudential regulators, the State bank regulatory authorities, and the State agencies that licence, supervise, or examine the offering of consumer financial products or services, including establishing their respective schedules for examining persons described in subsection (a)(1) and requirements regarding reports to be submitted by such persons |

13

| Rulemaking | Prescribe rules for supervision | 12 U.S.C. § 5514(b)(7)(A) | The Bureau shall prescribe rules to facilitate supervision of persons described in subsection (a)(1) and assessment and detection of risks to consumers. |
|---|---|---|---|
| Enforcement | Exercise exclusive enforcement authority | 12 U.S.C. § 5514(c)(1) | Except as provided in paragraph (3) and section 5581 of this title, with respect to any person described in subsection (a)(1), to the extent that Federal law authorizes the Bureau and another Federal agency to enforce Federal consumer financial law, the Bureau shall have exclusive authority to enforce that Federal consumer financial law. |
| Rulemaking | Exercise exclusive rulemaking authority | 12 U.S.C. § 5514(d) | Notwithstanding any other provision of Federal law and except as provided in section 5581 of this title, to the extent that Federal law authorizes the Bureau and another Federal agency to issue regulations or guidance, conduct examinations, or require reports from a person described in subsection (a)(1) under such law for purposes of assuring compliance with Federal consumer financial law and any regulations thereunder, the Bureau shall have the exclusive authority to prescribe rules, issue guidance, conduct examinations, require reports, or issue exemptions with regard to a person described in subsection (a)(1), subject to those provisions of law. |
| Enforcement | Exercise exclusive examination authority | 12 U.S.C. § 5515(b)(1) | The Bureau shall have exclusive authority to require reports and conduct examinations on a periodic basis of persons described in subsection (a) for purposes of—<br>(A) assessing compliance with the requirements of Federal consumer financial laws;<br>(B) obtaining information about the activities subject to such laws and the associated compliance systems or procedures of such persons; and<br>(C) detecting and assessing associated risks to consumers and to markets for consumer financial products and services. |

14

JA269

| | | | |
|---|---|---|---|
| Coordination | Coordinate examination activities with other regulators | 12 U.S.C. § 5515(b)(2) | To minimize regulatory burden, the Bureau shall coordinate its supervisory activities with the supervisory activities conducted by prudential regulators and the State bank regulatory authorities, including consultation regarding their respective schedules for examining such persons described in subsection (a) and requirements regarding reports to be submitted by such persons. |
| Enforcement | report tax law noncompliance | 12 U.S.C. § 5515(b)(5) | The Bureau shall provide the Commissioner of Internal Revenue with any report of examination or related information identifying possible tax law noncompliance. |
| Coordination | Coordinate simultaneous / overlapping examination activities with other regulators | 12 U.S.C. § 5515(e) | (1) A prudential regulator and the Bureau shall, with respect to each insured depository institution, insured credit union, or other covered person described in subsection (a) that is supervised by the prudential regulator and the Bureau, respectively— (A) coordinate the scheduling of examinations of the insured depository institution, insured credit union, or other covered person described in subsection (a); (B) conduct simultaneous examinations of each insured depository institution or insured credit union, unless such institution requests examinations to be conducted separately; (C) share each draft report of examination with the other agency and permit the receiving agency a reasonable opportunity (which shall not be less than a period of 30 days after the date of receipt) to comment on the draft report before such report is made final; and (D) prior to issuing a final report of examination or taking supervisory action, take into consideration concerns, if any, raised in the comments made by the other agency.<br><br>(2) Coordination with State bank supervisors The Bureau shall pursue arrangements and agreements with State bank supervisors to coordinate examinations, consistent with paragraph (1). |

15

JA270

| Public engagement | Establish data formats for consumer information requests | 12 U.S.C. § 5533(d) | The Bureau, by rule, shall prescribe standards applicable to covered persons to promote the development and use of standardized formats for information, including through the use of machine readable files, to be made available to consumers under this section. |
|---|---|---|---|
| Public engagement | Respond timely to consumer complaints | 12 U.S.C. § 5534(a) | The Bureau shall establish, in consultation with the appropriate Federal regulatory agencies, reasonable procedures to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person, including—<br>(1) steps that have been taken by the regulator in response to the complaint or inquiry of the consumer;<br>(2) any responses received by the regulator from the covered person; and<br>(3) any follow-up actions or planned follow-up actions by the regulator in response to the complaint or inquiry of the consumer. |
| Public engagement | Coordinate with other federal agencies re: consumer complaints | 12 U.S.C. § 5534(d) | The Bureau shall enter into a memorandum of understanding with any affected Federal regulatory agency regarding procedures by which any covered person, and the prudential regulators, and any other agency having jurisdiction over a covered person, including the Secretary of the Department of Housing and Urban Development and the Secretary of Education, shall comply with this section. |
| Statutory Office | Maintain a Private Education Loan Ombudsman | 12 U.S.C. § 5535(a) | The Secretary, in consultation with the Director, shall designate a Private Education Loan Ombudsman (in this section referred to as the "Ombudsman") within the Bureau, to provide timely assistance to borrowers of private education loans. |

| | | | |
|---|---|---|---|
| Public engagement | Execute consumer outreach, complaint handling, education, and reporting re: education loans | 12 U.S.C. § 5535(c) | The Ombudsman designated under this subsection shall—<br>(1) in accordance with regulations of the Director, receive, review, and attempt to resolve informally complaints from borrowers of loans described in subsection (a), including, as appropriate, attempts to resolve such complaints in collaboration with the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in private education loan programs;<br>(2) not later than 90 days after the designated transfer date, establish a memorandum of understanding with the student loan ombudsman established under section 1018(f) of title 20, to ensure coordination in providing assistance to and serving borrowers seeking to resolve complaints related to their private education or Federal student loans;<br>(3) compile and analyze data on borrower complaints regarding private education loans; and<br>(4) make appropriate recommendations to the Director, the Secretary, the Secretary of Education, the Committee on Banking, Housing, and Urban Affairs and the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Financial Services and the Committee on Education and Labor of the House of Representatives. |
| Reporting | Report to Congress re: education loan activities | 12 U.S.C. § 5535(d) | (1) In general<br>The Ombudsman shall prepare an annual report that describes the activities, and evaluates the effectiveness of the Ombudsman during the preceding year.<br>(2) Submission<br>The report required by paragraph (1) shall be submitted on the same date annually to the Secretary, the Secretary of Education, the Committee on Banking, Housing, and Urban Affairs and the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Financial Services and the Committee on Education and Labor of the House of Representatives. |

17

| | | | |
|---|---|---|---|
| Public engagement | Maintain a grant program for enhanced protection of seniors | 12 U.S.C. § 5537(b) | The Office [of Financial Literacy] shall establish a program under which the Office may make grants to States or eligible entities—<br>(1) to hire staff to identify, investigate, and prosecute (through civil, administrative, or criminal enforcement actions) cases involving misleading or fraudulent marketing;<br>(2) to fund technology, equipment, and training for regulators, prosecutors, and law enforcement officers, in order to identify salespersons and advisers who target seniors through the use of misleading designations;<br>(3) to fund technology, equipment, and training for prosecutors to increase the successful prosecution of salespersons and advisers who target seniors with the use of misleading designations;<br>(4) to provide educational materials and training to regulators on the appropriateness of the use of designations by salespersons and advisers in connection with the sale and marketing of financial products;<br>(5) to provide educational materials and training to seniors to increase awareness and understanding of misleading or fraudulent marketing;<br>(6) to develop comprehensive plans to combat misleading or fraudulent marketing of financial products to seniors; and<br>(7) to enhance provisions of State law to provide protection for seniors against misleading or fraudulent marketing. |
| Rulemaking | Initiate rulemaking when a majority of the states so request | 12 U.S.C. § 5551(c)(1) | The Bureau shall issue a notice of proposed rulemaking whenever a majority of the States has enacted a resolution in support of the establishment or modification of a consumer protection regulation by the Bureau. |
| Rulemaking | Explain any decision not to prescribe a final regulation | 12 U.S.C. § 5551(c)(3)(B) | whenever the Bureau determines not to prescribe a final regulation, shall publish an explanation of such determination in the Federal Register, and provide a copy of such explanation to each State that enacted a resolution in support of the proposed regulation, the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives. |

18

JA273

| | | | |
|---|---|---|---|
| Rulemaking | Prescribe regulations for information sharing with states | 12 U.S.C. § 5552(c) | The Bureau shall prescribe regulations to implement the requirements of this section and, from time to time, provide guidance in order to further coordinate actions with the State attorneys general and other regulators. |
| Reporting | Not interfere with Congressional access to submitted materials | 12 U.S.C. § 5562(d)(2) | No rule established by the Bureau regarding the confidentiality of materials submitted to, or otherwise obtained by, the Bureau shall be intended to prevent disclosure to either House of Congress or to an appropriate committee of the Congress, |
| Rulemaking | Prescribe rules for hearings and adjudication proceedings | 12 U.S.C. § 5563(e) | The Bureau shall prescribe rules establishing such procedures as may be necessary to carry out this section. |
| Assumption of other agency powers | Assume all duties formerly assigned to the Board of Governors related to consumer financial protection | 12 U.S.C. § 5563(b)(1)(B) | The Bureau shall have all powers and duties that were vested in the Board of Governors, relating to consumer financial protection functions, on the day before the designated transfer date. |
| Assumption of other agency powers | Assume all duties formerly assigned to the Comptroller of the Currency related to consumer financial protection | 12 U.S.C. § 5563(b)(2)(B) | The Bureau shall have all powers and duties that were vested in the Comptroller of the Currency, relating to consumer financial protection functions, on the day before the designated transfer date. |
| Assumption of other agency powers | Assume all duties formerly assigned to the Director of the Office of Thrift Supervision related to consumer financial protection | 12 U.S.C. § 5563(b)(3)(B) | The Bureau shall have all powers and duties that were vested in the Director of the Office of Thrift Supervision, relating to consumer financial protection functions, on the day before the designated transfer date. |
| Assumption of other agency powers | Assume all duties formerly assigned to the Federal Deposit Insurance Corporation related to consumer financial protection | 12 U.S.C. § 5563(b)(4)(B) | The Bureau shall have all powers and duties that were vested in the Federal Deposit Insurance Corporation, relating to consumer financial protection functions, on the day before the designated transfer date. |
| Assumption of other agency powers | Assume joint responsibility for duties formerly assigned exclusively to the Federal Trade Commission related to consumer financial protection | 12 U.S.C. § 5563(b)(5)(B)(i) | The Bureau shall have all powers and duties under the enumerated consumer laws to prescribe rules, issue guidelines, or to conduct studies or issue reports mandated by such laws, that were vested in the Federal Trade Commission on the day before the designated transfer date. |

19

JA274

| | | | |
|---|---|---|---|
| Inter-agency Coordination | Coordinate joint responsibilities with FTC | 12 U.S.C. § 5563(b)(5)(D) | To avoid duplication of or conflict between rules prescribed by the Bureau under section 5531 of this title and the Federal Trade Commission under section 18(a)(1)(B) of the Federal Trade Commission Act [15 U.S.C. 57a(a)(1)(B)] that apply to a covered person or service provider with respect to the offering or provision of consumer financial products or services, the agencies shall negotiate an agreement with respect to rulemaking by each agency, including consultation with the other agency prior to proposing a rule and during the comment period. |
| Assumption of other agency powers | Assume all duties formerly assigned to the National Credit Union Administration related to consumer financial protection | 12 U.S.C. § 5563(b)(6)(B) | The Bureau shall have all powers and duties that were vested in the National Credit Union Administration, relating to consumer financial protection functions, on the day before the designated transfer date. |
| Assumption of other agency powers | Assume all duties formerly assigned to HUD related to consumer financial protection | 12 U.S.C. § 5563(b)(7)(B) | The Bureau shall have all powers and duties that were vested in the Secretary of the Department of Housing and Urban Development relating to the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.), the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (12 U.S.C. 5101 et seq.), and the Interstate Land Sales Full Disclosure Act (15 U.S.C. 1701 et seq.), on the day before the designated transfer date. |
| Inter-agency Coordination | Honor broad savings provisions re: transferred duties | 12 U.S.C. § 5583(b)(7)(B) | [Re: all foregoing transfers of duties,] Section 5581(b)(X) of this title does not affect the validity of any right, duty, or obligation of the United States, [X Agency], or any other person that— (A) arises under any provision of law relating to any consumer financial protection function of the [X Agency] transferred to the Bureau by this title; [1] and[ |
| Labor protections | Maintain appropriate staffing to execute the transferred duties | 12 U.S.C. § 5583(a)(7) | [Re: all foregoing transferrs of duties,] The Bureau and each of the transferor agencies (except the Federal Trade Commission) shall jointly determine the number of employees and the types and grades of employees necessary to perform the functions of the Bureau under part A, including consumer education, financial literacy, policy analysis, responses to consumer complaints and |

20

| | | | inquiries, research, and similar functions. All employees jointly identified under this paragraph shall be transferred to the Bureau for employment. |
|---|---|---|---|
| Labor protections | Fulfill the requirements of 5 U.S.C. § 35 when executing any reduction in force | 12 U.S.C. § 5583(h)(2)(A) | If the Bureau determines, at any time after the 3-year period beginning on the designated transfer date, that a reorganization of the staff of the Bureau is required, any resulting reduction in force shall be governed by the provisions of chapter 35 of title 5, |
| Labor protections | Make flexible work arrangements available to Bureau staff | 12 U.S.C. § 5587(b)(2)(B) | The Bureau shall submit a workforce flexibility plan that includes, to the extent practicable—<br>(i) telework;<br>(ii) flexible work schedules;<br>(iii) phased retirement;<br>(iv) reemployed annuitants;<br>(v) part-time work;<br>(vi) job sharing;<br>(vii) parental leave benefits and childcare assistance;<br>(viii) domestic partner benefits;<br>(ix) other workplace flexibilities; or<br>(x) any combination of the items de-scribed in clauses (i) through (ix). |
| Inter-agency Coordination | Assist Financial Literacy Commission | 12 U.S.C. § 5601(c)(2) | As part of its [2] duties as members of the Financial Literacy and Education Commission, the Bureau, the Federal banking agencies, and the National Credit Union Administration shall assist the Financial Literacy and Education Commission in executing the Strategy for Assuring Financial Empowerment (or the "SAFE Strategy"), as it relates to remittances. |
| Rulemaking | Maintain rules and/or programs concerning exchange facilitation and reverse mortgages | 12 U.S.C. § 5603(c) | the Bureau shall, consistent with part B, propose regulations or otherwise establish a program to protect consumers who use exchange facilitators. |

21

## **Additional Provisions Enacted in 12 U.S.C.**

| | | | |
|---|---|---|---|
| Rulemaking | Regulate disclosures required of depository institutions lacking Federal deposit insurance | 12 U.S.C. § 1831t | (c) Manner and content of disclosure<br>To ensure that current and prospective customers understand the risks involved in foregoing Federal deposit insurance, the Bureau, by regulation or order, shall prescribe the manner and content of disclosure required under this section, which shall be presented in such format and in such type size and manner as to be simple and easy to understand |
| Consumer Disclosures | Maintain model disclosure forms for mortgage loan transactions | 12 U.S.C. § 2603(a) | The Bureau shall publish a single, integrated disclosure for mortgage loan transactions (including real estate settlement cost statements) which includes the disclosure requirements of this section and section 2604 of this title, in conjunction with the disclosure requirements of the Truth in Lending Act [15 U.S.C. 1601 et seq.] that, taken together, may apply to a transaction that is subject to both or either provisions of law. The purpose of such model disclosure shall be to facilitate compliance with the disclosure requirements of this chapter 1 and the Truth in Lending Act, and to aid the borrower or lessee in understanding the transaction by utilizing readily understandable language to simplify the technical nature of the disclosures. Such forms shall conspicuously and clearly itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement and shall indicate whether any title insurance premium included in such charges covers or insures the lender's interest in the property, the borrower's interest, or both. |

(Page 282 of Total)

JA277

| | | | |
|---|---|---|---|
| Consumer Disclosures | Maintain home buying information booklets | 12 U.S.C. § 2604 | The Director of the Bureau of Consumer Financial Protection (hereafter in this section referred to as the ''Director'') shall prepare, at least once every 5 years, a booklet to help consumers applying for federally related mortgage loans to understand the nature and costs of real estate settlement services. The Director shall prepare the booklet in various languages and cultural styles, as the Director determines to be appropriate, so that the booklet is understandable and accessible to homebuyers of different ethnic and cultural backgrounds. The Director shall distribute such booklets to all lenders that make federally related mortgage loans. The Director shall also distribute to such lenders lists, organized by location, of homeownership counselors certified under section 1701x(e) of this title for use in complying with the requirement under subsection (c) of this section. |
| Rulemaking | Regulate servicing of mortgage loans and administration of escrow accounts | 12 U.S.C. § 2605(j)(3) | The Bureau shall establish any requirements necessary to carry out this section. Such regulations shall include the model disclosure statement required under subsection (a)(2). |
| Consumer Disclosures | Regulate disclosures required of all depository institutions that handle mortgage loans | 12 U.S.C. § 2803(e) | Subject to subsection (h), the Bureau shall prescribe a standard format for the disclosures required under this section. |
| Consumer Disclosures | Regulate disclosures required for all mortgage loans | 12 U.S.C. § 2804(a) | The Bureau shall prescribe such regulations as may be necessary to carry out the purposes of this chapter. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary and proper to effectuate the purposes of this chapter, and prevent circumvention or evasion thereof, or to facilitate compliance therewith. |

23

| | | | |
|---|---|---|---|
| Civil rights | Develop and refine systems for matching addresses to census tracts for civil rights reporting | 12 U.S.C. § 2806(a)(1) | The Director of the Bureau of Consumer Financial Protection, with the assistance of the Secretary, the Director of the Bureau of the Census, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and such other persons as the Bureau deems appropriate, shall develop or assist in the improvement of, methods of matching addresses and census tracts to facilitate compliance by depository institutions in as economical a manner as possible with the requirements of this chapter. |
| Civil rights | Report to Congress annually regarding utility of civil rights reporting | 12 U.S.C. § 2807 | The Bureau, in consultation with the Secretary of Housing and Urban Development, shall report annually to the Congress on the utility of the requirements of section 2803(b)(4) of this title. [the number and dollar amount of mortgage loans and completed applications involving mortgagors or mortgage applicants grouped according to census tract, income level, racial characteristics, age, and gender] |
| Reporting | Compile statistics, on an ongoing basis, on mortgage issuance | 12 U.S.C. § 2809(a) | The Council shall also produce tables indicating, for each primary metropolitan statistical area, metropolitan statistical area, or consolidated metropolitan statistical area that is not comprised of designated primary metropolitan statistical areas, aggregate lending patterns for various categories of census tracts grouped according to location, age of housing stock, income level, and racial characteristics. |
| Labor protections | Provide staff and resources for civil rights reporting | 12 U.S.C. § 2809(b) | The Bureau shall provide staff and data processing resources to the Council to enable it to carry out the provisions of subsection (a). |
| Reporting | Make mortgage issuance data available to the public | 12 U.S.C. § 2809(c) | The data and tables required pursuant to subsection (a) shall be made available to the public by no later than December 31 of the year following the calendar year on which the data is based. |

(Page 284 of Total)

| | | | |
|---|---|---|---|
| Statutory office | Send a qualified delegate to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council | 12 U.S.C. § 3310 | There shall be within the Council a subcommittee to be known as the ''Appraisal Subcommittee'', which shall consist of the designees of the heads of the Federal financial institutions regulatory agencies, the Bureau of Consumer Financial Protection, and the Federal Housing Finance Agency. Each such designee shall be a person who has demonstrated knowledge and competence concerning the appraisal profession. |
| Consumer Disclosures | Specify required elements of consumer disclosures for savings accounts (TISA) | 12 U.S.C. § 4303(a) | Each depository institution shall maintain a schedule of fees, charges, interest rates, and terms and conditions applicable to each class of accounts offered by the depository institution, in accordance with the requirements of this section and regulations which the Bureau shall prescribe. The Bureau shall specify, in regulations, which fees, charges, penalties, terms, conditions, and account restrictions must be included in a schedule required under this subsection. A depository institution need not include in such schedule any information not specified in such regulation. |
| Rulemaking | Prescribe special regulations for depository accounts that provide interest that cannot be accurately expressed as a simple APR | 12 U.S.C. § 4304 | The Bureau shall require, in regulations which the Bureau shall prescribe, such modification in the disclosure requirements under this chapter relating to annual percentage yield as may be necessary to carry out the purposes of this chapter in the case of— (1) accounts with respect to which determination of annual percentage yield is based on an annual rate of interest that is guaranteed for a period of less than 1 year; (2) variable rate accounts; (3) accounts which, pursuant to law, do not guarantee payment of a stated rate; (4) multiple rate accounts; and (5) accounts with respect to which determination of annual percentage yield is based on an annual rate of |

| | | | interest that is guaranteed for a stated term. |
|---|---|---|---|
| Rulemaking | Prescribe regulations to enforce all substantive provisions of TISA | 12 U.S.C. § 4308(a)(1) | ...the Bureau, after consultation with each agency referred to in section 4309(a) of this title and public notice and opportunity for comment, shall prescribe regulations to carry out the purpose and provisions of this chapter. |
| Consumer Disclosures | Publish model forms to support all substantive provisions of TISA | 12 U.S.C. § 4309(b)(1) | The Bureau shall publish model forms and clauses for common disclosures to facilitate compliance with this chapter. In devising such forms, the Bureau shall consider the use by depository institutions of data processing or similar automated machines. |
| Enforcement | Enforce all substantive requirements for mortgage disclosures | 12 U.S.C. § 4909(a) | Subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.], compliance with the requirements imposed under this chapter shall be enforced under— ...(4) subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], by the Bureau of Consumer Financial Protection, with respect to any person subject to this chapter. |
| Enforcement | Maintain a registration system for loan originators | 12 U.S.C. § 5106(a)(1) | The Bureau shall develop and maintain a system for registering employees of a depository institution, employees of a subsidiary that is owned and controlled by a depository institution and regulated by a Federal banking agency, or employees of an institution regulated by the Farm Credit Administration, as registered loan |

(Page 286 of Total)

| | | | originators with the Nationwide Mortgage Licensing System and Registry. |
|---|---|---|---|
| Reporting | Report to Congress annually: re: loan originator registration and bonding requirements | 12 U.S.C. § 5115(a) | Not later than 1 year after July 30, 2008, and annually thereafter, the Director shall submit a report to Congress on the effectiveness of the provisions of this chapter, including legislative recommendations, if any, for strengthening consumer protections, enhancing examination standards, streamlining communication between all stakeholders involved in residential mortgage loan origination and processing, and establishing performance based bonding requirements for mortgage originators or institutions that employ such brokers. |
| Statutory office | Maintain an Office of Minority and Women Inclusion | 12 U.S.C. § 5452(a)(1) | A) In general<br>...each agency shall establish an Office of Minority and Women Inclusion that shall be responsible for all matters of the agency relating to diversity in management, employment, and business activities.<br>(B) Bureau<br>The Bureau shall establish an Office of Minority and Women Inclusion not later than 6 months after the designated transfer date established under section 5582 of this title. |
| Civil rights | Prioritize minority and women-owned businesses and activities | 12 U.S.C. § 5452(c)(1) | The Director of each Office shall develop and implement standards and procedures to ensure, to the maximum extent possible, the fair inclusion and utilization of minorities, women, and minority-owned and women-owned businesses in all business and activities of the agency at all levels, including in procurement, insurance, and all types of contracts. |

(Page 287 of Total)

JA282

| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) < ████████████████ > |
| **Sent:** | Monday, February 10, 2025 12:00 PM |
| **To:** | Chilbert, Christopher (CFPB); Chang, Jean (CFPB) |
| **Cc:** | Broeksmit, Samuel (CFPB); Gueye, Jafnar (CFPB) |
| **Subject:** | RE: Additional Directives on Bureau Activities |

Yes, I think that is a wise thing to do.  Please feel free to create the list and provide to our contracting team.  AO did something similar this weekend.

Thank you.

Adam

Adam Martinez
Chief Operating Officer

---

**From:** Chilbert, Christopher (CFPB) < █████████████ >
**Sent:** Monday, February 10, 2025 11:58 AM
**To:** Martinez, Adam (CFPB) < ███████████ >; Chang, Jean (CFPB) < ████████████ >
**Cc:** Broeksmit, Samuel (CFPB) < ████████████████ >; Gueye, Jafnar (CFPB) < ███████████████ >
**Subject:** RE: Additional Directives on Bureau Activities

Adam,
I have received a request whether it is an acceptable work task to proactively identify a list of contractors who would be necessary to support operational emergencies. I've done this before when there have been government shut-downs in other agencies. If there are contractual stop work orders, then we would not get their support in case of an emergency, and I'd like to get in front of that.


Chris Chilbert
████████████

---

**From:** Martinez, Adam (CFPB)█████████████
**Sent:** Monday, February 10, 2025 8:54 AM
**To:** Chilbert, Christopher (CFPB)█████████████; Chang, Jean (CFPB) < ██████████ >
**Subject:** RE: Additional Directives on Bureau Activities

That is all correct.  The USDS Team will let you or me know if any other work is needed.  We'll do the same level of support as we have the past couple of days.

Adam Martinez
Chief Operating Officer

---

**From:** Chilbert, Christopher (CFPB) < ████████████ >
**Sent:** Monday, February 10, 2025 8:53 AM
**To:** Martinez, Adam (CFPB) < █████████████ >; Chang, Jean (CFPB █████████████ >
**Subject:** FW: Additional Directives on Bureau Activities

CFPB_00001 **JA283**

Adam/Jean,

I want to clarify the level of support we should be providing based on this email. I think the minimum is:

1) Onboarding new political leadership and providing them with necessary service desk support to them
2) Performing security monitoring tasks for our networks
3) Supporting US DOGE members with requests
4) Perform any maintenance tasks needed to ensure that the HMDA application, Consumer Complaint Database operate, ServiceNow, and Microsoft365 platform (email/SharePoint) continue to operate.
5) Support any other requests from the Acting Director or new political leadership.

I think this is the minimum, but I want to confirm before giving the team direction.


Chris Chilbert

████████

---

**From:** Vought, Russell <████████████████>
**Sent:** Monday, February 10, 2025 8:30 AM
**To:** _DL_CFPB_AllHands <████████████████>
**Subject:** Additional Directives on Bureau Activities

Good morning, CFPB staff,

As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is ████████████████ . Otherwise, employees should stand down from performing any work task. Thank you for your attention on this matter.

Best,

Russ Vought

Acting Director

Bureau of Consumer Financial Protection

CFPB_00002 JA284

| From: | Johnson, Christopher (CFPB) |
|---|---|
| To: | Elliott, Shannon (CFPB); Aujla, Lucky (CFPB); Russell, Kesa (CFPB); Galicki, Joshua (CFPB); Gueye, Jafnar (CFPB); Martinez, Adam (CFPB) |
| Cc: | Dorsey, Darian (CFPB); Pfaff, Matthew (CFPB); Kothari, Anand (CFPB); Chilbert, Christopher (CFPB); Rogers, Morgan (CFPB); Bark, David (CFPB); Beres, Tonya (CFPB) |
| Subject: | Contracts in support of the Bureau"s complaint handling operations |
| Date: | Monday, February 10, 2025 1:55:38 PM |

Hello team,

I understand from discussions with the COO, Adam Martinez, that the work stoppage will not apply to the Bureau's Consumer Resource Center aka Contact Center Services Contract. Thank you for resolving this matter.

Per conversations, the Deloitte Mosaic O&M contract for operations, maintenance, monitoring of the complaint system is critical to ensure consumers and companies can submit and respond to consumer complaints, as well as the contact center agents can address caller inquiries, including intaking of complaints by phone and sharing status of complaints. In addition, we have a few subscription services that support the complaint management system, they include Adaptus (EZProtect virus scan of consumer attachments, Address Doctor to support statutorily required communications to consumers throughout the complaint process, Provar automated testing tool). As these contracts are critical to support the complaint management system, we would like to request approval to continue to move forward with these investments a well.

Thank you, and please let me know if you have any questions. We will await guidance from the Operations Division's Office of Finance and Procurement.


Christopher Johnson
Associate Director | Division of Consumer Response and Education
Office: ▮▮▮▮▮▮▮ | Mobile: ▮▮▮▮▮▮▮

Bureau of Consumer Financial Protection
consumerfinance.gov


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

| From: | Brown, Jason (CFPB) |
|---|---|
| To: | Paoletta, Mark (CFPB) |
| Cc: | Dietrich, Jason (CFPB); Pappalardo, Janis (CFPB); Martinez, Adam (CFPB) |
| Subject: | RE: APOR work paused |
| Date: | Tuesday, February 11, 2025 12:23:07 PM |

Confirmed.

---

**From:** Paoletta, Mark (CFPB) ███████████████████
**Sent:** Tuesday, February 11, 2025 12:02 PM
**To:** Brown, Jason (CFPB) ████████████
**Cc:** Dietrich, Jason (CFPB) ██████████████████; Pappalardo, Janis (CFPB) ██████████████████; Martinez, Adam (CFPB) ██████████████
**Subject:** RE: APOR work paused

Jason,

The APOR and all work associated with gathering and publishing this information on a weekly basis are exempt indefinitely from this stop work order.  I am specifically directing you (and any other colleague necessary to publish the APOR) to continue indefinitely to perform all tasks necessary to publish the APOR on weekly basis.
Please confirm receipt and your acknowledgment of my directive.
Thank you.
Mark Paoletta
Chief Legal Officer
CFPB

---

**From:** Brown, Jason (CFPB) ████████████████
**Sent:** Tuesday, February 11, 2025 9:26 AM
**To:** Paoletta, Mark (CFPB) ████████████
**Cc:** Dietrich, Jason (CFPB) ██████████████████; Pappalardo, Janis (CFPB) ██████████████████; Martinez, Adam (CFPB) ██████████████
**Subject:** RE: APOR work paused

Message received. We will continue publication of the APOR this Thursday. If you have further guidance on future publications of the APOR, please let us know. Otherwise, we will assume that the APOR may be published for this week only and we will need to seek permission again next week and going forward.

---

**From:** Paoletta, Mark ████████████████████
**Sent:** Monday, February 10, 2025 7:15 PM
**To:** Brown, Jason (CFPB) ██████████████████
**Cc:** Dietrich, Jason (CFPB) ██████████████████; Pappalardo, Janis (CFPB) ██████████ Martinez, Adam (CFPB) ██████████████
**Subject:** RE: APOR work paused

Good evening, Jason,

Thanks for email. The task of doing the work to publish the Average Prime Offer Rate (APOR) and publishing it are exempted from the stop work order. Specifically, you are directed to continue the work to take in data from ICE Mortgage Technology and to continue to construct the weekly APOR for publication this Thursday. You are directed to perform any work that needs to be done to publish the APOR by Thursday.

Please confirm your receipt of this email and that you will perform the necessary work to publish the APOR by Thursday.

Thank you.

Mark Paoletta
Chief Legal Officer
CFPB

---

**From:** Brown, Jason (CFPB) ███████████████
**Sent:** Monday, February 10, 2025 4:43 PM
**To:** Paoletta, Mark ███████████████
**Cc:** Dietrich, Jason (CFPB) ███████████████; Pappalardo, Janis (CFPB) ███████████████
**Subject:** APOR work paused

Hi Mark,

Just an FYI that, per the Acting Director's directives to stop work tasks and issuance of stop work orders for contractors, the Office of Research is pausing the intake of data from ICE Mortgage Technology and the construction of the weekly average prime offer rates (APOR), which are used for various federal mortgage rules. These APORs are usually updated every Thursday. Please let Jason (cc'd here) or me know if there are any questions.

Jason Brown
Assistant Director, Research
Consumer Financial Protection Bureau

| | |
|---|---|
| **From:** | Paoletta, Mark (CFPB) |
| **To:** | Gueye, Jafnar (CFPB) |
| **Cc:** | Young, Christopher (CFPB); Martinez, Adam (CFPB); Wick, Jordan (CFPB) |
| **Subject:** | Cancellation of CFPB contracts |
| **Date:** | Tuesday, February 11, 2025 4:32:33 PM |

Good afternoon, Jafnar,

On behalf of Acting Director Vought,  I have reviewed CFPB contracts and authorize and direct the cancellation of all contracts in the following divisions:  Enforcement (102 contracts), Supervision (16 contracts), External Affairs (3 contracts), Consumer Response (20 contracts), Office of Director (33 contracts),and Legal Division (all except 2 contracts – FD Online Licenses and litigation data). Further, on behalf of the Acting Director, I direct the cancellation of the contract for concrete repairs.

Mark Paoletta
Chief Legal Officer
CFPB

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | White, Sonya (CFPB) |
| Cc: | Paoletta, Mark (CFPB); Shapiro, Daniel (CFPB) |
| Subject: | RE: Legal Assistance with Procurement Template for Contract Termination |
| Date: | Friday, February 21, 2025 11:30:00 AM |

Hi Sonya —  (+Mark P. and Dan for Situational Awareness)

Legal Division is authorized to support all operational matters being exercised on behalf of our new leadership and our regulatory/statutorily requirements including:

Procurement/Contract Actions
Financial Management Actions
Human Capital Actions
Labor Relations Actions
Employee Relations Actions
Ethics Actions including vetting of new PAS/SCH Cs
Technology and Infrastructure Support
Administrative Operations Actions (Security, facilities, maintenance)
Data Governance/Administration
EEO Processing Counsel Support
Reasonable Accommodation Counsel Support

Mission related support should be coordinated directly through Mark or Dan.

Adam


Adam Martinez
Chief Operating Officer

---

**From:** White, Sonya (CFPB) ████████████████>
**Sent:** Friday, February 21, 2025 11:15 AM
**To:** Martinez, Adam (CFPB) ████████████████
**Subject:** Legal Assistance with Procurement Template for Contract Termination

Hi Adam

Josh reached for a legal review on the contract termination template.  Confirming that LD is authorized to assist?

Thanks
Sonya

Sonya A. White (she/her/hers)
Deputy General Counsel
General Law & Ethics | Legal Division
Office: ██████████ | Mobile: ██████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

| | |
|---|---|
| **From:** | Chilbert, Christopher (CFPB) |
| **To:** | Martinez, Adam (CFPB) |
| **Subject:** | RE: FDIC request for HMDA status update |
| **Date:** | Friday, February 21, 2025 3:18:59 PM |

We're going to request that FDIC go through Mark Paoletta if they want an update. We are doing our best effort to support the data collection, but it is at risk due to several contracts being terminated. We've requested that three of them be turned on, at least temporarily.

Chris Chilbert

---

**From:** Martinez, Adam (CFPB) █████████████████
**Sent:** Friday, February 21, 2025 2:58 PM
**To:** Chilbert, Christopher (CFPB) █████████████████
**Subject:** RE: FDIC request for HMDA status update

If it's a technical assistance meeting, I would say, yes, he should attend. If it's policy, reg, enf, etc. related, then it should go through Mark. We should not commit to anything.

Adam Martinez
Chief Operating Officer

---

**From:** Chilbert, Christopher (CFPB) █████████████████
**Sent:** Friday, February 21, 2025 2:55 PM
**To:** Martinez, Adam (CFPB) █████████████████
**Subject:** FW: FDIC request for HMDA status update

Adam,
FDIC reached out to Eric Spry requesting for him to join a meeting regarding the status of HMDA collection. Is it ok for him to attend this meeting, or do we need Mark Paoletta's approval?

Chris Chilbert

---

**From:** Spry, Eric (CFPB) █████████████████
**Sent:** Friday, February 21, 2025 2:48 PM
**To:** Chilbert, Christopher (CFPB) █████████████████
**Cc:** Shelton, Monica (CFPB) █████████████████
**Subject:** FDIC request for HMDA status update

Hi Chris,

I was contacted via Teams chat by Chris Rangert at FDIC. He requested a meeting with myself,

Stuart Hoff (FDIC HMDA Subcommittee member) and Paul Robin (FDIC).

Chris Rangert said,

"My supervisor, Paul Robin and Stuart Hoff will reach out to you for a meeting at 3:00 (I won't be able to attend). They are trying to figure out the situation with HMDA filings, Help response lines and such."

I am happy to provide simple status update. Normally the HMDA Subcommittee chair at CFPB, Hallie Ryan, would be the primary contact. I'm checking to see if Hallie is available.

Please let me know if I should join the FDIC meeting today at 3p ET or if I should ask FDIC to make a request to the CFPB Acting Director.

Best,
-Eric
--
Eric W. Spry
Regulatory Technology Program Manager
CFPB Technology & Innovation
Office: Remote / Pacific Time

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

| From: | Chilbert, Christopher (CFPB) |
|---|---|
| To: | Fiano, Liane (CFPB); Martinez, Adam (CFPB); Warren, LaShaun (CFPB) |
| Cc: | Gilford, Samuel (CFPB); Gueye, Jafnar (CFPB); Michalosky, Martin (CFPB); Shapiro, Daniel (CFPB); Licata, Anthony |
| Subject: | RE: Sprinklr - Social Media Records |
| Date: | Tuesday, February 25, 2025 4:48:22 PM |

Hi Liane,

If the contract with Sprinklr has our standard cybersecurity terms and conditions, they are required to provide us with any CFPB data upon request at the termination of the contract.

Thanks,


Chris Chilbert

▓▓▓▓▓▓▓


**From:** Fiano, Liane (CFPB) ▓▓▓▓▓▓▓▓▓▓
**Sent:** Tuesday, February 25, 2025 1:43 PM
**To:** Martinez, Adam (CFPB) ▓▓▓▓▓▓▓▓▓; Warren, LaShaun (CFPB)
▓▓▓▓▓▓▓▓▓
**Cc:** Gilford, Samuel (CFPB) ▓▓▓▓▓▓▓▓▓; Chilbert, Christopher (CFPB)
▓▓▓▓▓▓; Gueye, Jafnar (CFPB) ▓▓▓▓▓▓▓▓; Michalosky,
Martin (CFPB)▓▓▓▓▓▓▓▓▓▓ Shapiro, Daniel (CFPB) ▓▓▓▓▓▓▓▓;
Licata, Anthony ▓▓▓▓▓▓▓▓
**Subject:** RE: Sprinklr - Social Media Records


Social media is not a legally required function. However, maintaining the records is required.

I don't believe we have any other systems that fall into that category. I will acknowledge that we will still have a gap in records prior to 2017 (when I joined the CFPB and we began using the system), though I am unclear how far back the records schedule requires we maintain social media records.


**From:** Martinez, Adam (CFPB)▓▓▓▓▓▓▓▓▓▓
**Sent:** Tuesday, February 25, 2025 1:38 PM
**To:** Fiano, Liane (CFPB)▓▓▓▓▓▓▓▓ Warren, LaShaun (CFPB)
▓▓▓▓▓▓▓
**Cc:** Gilford, Samuel (CFPB) ▓▓▓▓▓▓▓▓ Chilbert, Christopher (CFPB)
▓▓▓▓▓▓▓▓; Gueye, Jafnar (CFPB)▓▓▓▓▓▓▓ Michalosky,
Martin (CFPB) ▓▓▓▓▓▓▓▓; Shapiro, Daniel (CFPB) ▓▓▓▓▓▓▓
Licata, Anthony ▓▓▓▓▓▓
**Subject:** RE: Sprinklr - Social Media Records


Was the account part of a statutorily required function and/or legally required?

What other systems does your office maintain that may store data outside of the CFPB servers or cloud?

I would advise that you work with Jafnar's team to find out if the company will
provide you with a  download of your records.

Adam Martinez
Chief Operating Officer

---

**From:** Fiano, Liane (CFPB) ███████████████████████
**Sent:** Tuesday, February 25, 2025 1:34 PM
**To:** Martinez, Adam (CFPB) ████████████████████; Warren, LaShaun (CFPB)
███████████████████
**Cc:** Gilford, Samuel (CFPB) ████████████████; Chilbert, Christopher (CFPB)
██████████████████████; Gueye, Jafnar (CFPB) █████████████████████ Michalosky,
Martin (CFPB) ████████████████
**Subject:** RE: Sprinklr - Social Media Records

Sprinklr is a software license that manages our social media accounts, it is not a social media channel
itself. Our primary records were on the social media channels themselves. Our backup records were
in Sprinklr as our software publishing tool. They could be searched and exported at any point, which
makes it more effective for records retention. I have had several discussions with the records team
over time, but I don't know with what level of specificity they may recall those discussions.

Had we known that the channels were going to be deleted, we could have taken steps to preserve a
hard copy on CFPB systems. I was unaware that our backup system was also being compromised. I
am not sure if the contract was cut, but that would be my guess as to why we are not able to access
it anymore. If that's not the case, I may seek authorization with the Legal team to investigate further.

---

**From:** Martinez, Adam (CFPB) ███████████████████████
**Sent:** Tuesday, February 25, 2025 1:28 PM
**To:** Fiano, Liane (CFPB) ████████████████████; Warren, LaShaun (CFPB)
███████████████████
**Cc:** Gilford, Samuel (CFPB) ████████████████; Chilbert, Christopher (CFPB)
██████████████████████; Gueye, Jafnar (CFPB) █████████████████████ Michalosky,
Martin (CFPB) ████████████████
**Subject:** RE: Sprinklr - Social Media Records

Could you provide additional background?  Is Sprinklr a subscription?  Was the
Records Team aware that records were being held on this social media site?

Adam Martinez
Chief Operating Officer

---

**From:** Fiano, Liane (CFPB) ████████████████████>
**Sent:** Tuesday, February 25, 2025 1:25 PM
**To:** Warren, LaShaun (CFPB) █████████████████████
**Cc:** Martinez, Adam (CFPB) ████████████████████; Gilford, Samuel (CFPB)

**Subject:** Sprinklr - Social Media Records

Hi LaShaun —

I no longer have access to Sprinklr, which is where are social media backup records are maintained. We have hard copy exports for Director Chopra's account, but everything else lived within Sprinklr and on our public channel.

As the public channels were removed unexpectedly, we may not be in compliance with our records retention requirements.

--

Liane Fiano
Staff Director, Digital Communications | Office of Communications
Office: (███████████ | Mobile: ████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

| **From:** | Martinez, Adam (CFPB) |
| **To:** | Dasgupta, Richa (CFPB); Gueye, Jafnar (CFPB); Chilbert, Christopher (CFPB) |
| **Cc:** | Petersen, Cara (CFPB); Gelfond, Rebecca (CFPB); Licata, Anthony; Shapiro, Daniel (CFPB) |
| **Subject:** | RE: Consumer Sentinel Account Deactivation Warning... |
| **Date:** | Tuesday, February 25, 2025 5:05:00 PM |

Richa —

Please work through Rebecca and Cara to coordinate with Jafnar's Team.  If there are concerns regarding data preservation issues and/or application to statute or legal requirements I'd recommend that Enforcement also work with Mark P. to advise him on what is needed.

Adam

Adam Martinez
Chief Operating Officer

**From:** Dasgupta, Richa (CFPB) ██████████████████████
**Sent:** Tuesday, February 25, 2025 9:55 AM
**To:** Martinez, Adam (CFPB) ███████████████████
**Cc:** Petersen, Cara (CFPB) █████████████████████; Gelfond, Rebecca (CFPB)
███████████████████>; Dasgupta, Richa (CFPB) ████████████████████████
**Subject:** FW: Consumer Sentinel Account Deactivation Warning...

Adam -

Are you able to advise about this?

Thanks,
Richa

**From:** Smullin, Rebecca (CFPB) ██████████████████████
**Sent:** Tuesday, February 25, 2025 8:53 AM
**To:** Dasgupta, Richa (CFPB) ██████████████████████
**Subject:** FW: Consumer Sentinel Account Deactivation Warning...

Richa:

I am forwarding you an email that explains that, with some time sensitivity, I need to log into my Consumer Sentinel account to preserve my access.

I am flagging this time-sensitive account issue because my Sentinel account is connected to several holds that I placed on searches of Sentinel data related to Bureau matter(s) for which Bureau litigation holds in place.

For further reference:

1. Sentinel has a function to allow users to put holds on data that Sentinel would otherwise purge. I do not know what would happen to these holds if my account expired, since the holds are ones attached to my account.
2. To prevent my account from expiring, all I need to do is log in (which could also require resetting my password); I would not need to undertake any substantive use of data.
3. The email I received on Sat Feb 22 says I have two weeks to address this. To err on the safe side (and in case I need to call anyone for help resetting a password), I would recommend addressing this during business hours, prior to <u>March 7</u>.

Do you have authority to provide me permission to login to the system to preserve my account? If not, could I ask someone else?

Thank you.

Best,

Rebecca Smullin
Senior Litigation Counsel | Office of Enforcement
Office: ███████████    Mobile: ███████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** no-reply@consumersentinel.gov <no-reply@consumersentinel.gov>
**Sent:** Saturday, February 22, 2025 2:16 AM
**To:** Smullin, Rebecca (CFPB) ███████████
**Subject:** Consumer Sentinel Account Deactivation Warning...

Your Consumer Sentinel Network account will expire in two weeks due to inactivity. Please login to https://www.consumersentinel.gov to retain your access.

Please do not reply to the email, as its inbox is not being monitored.

The Consumer Sentinel Network Team.

| From: | Johnson, Christopher (CFPB) |
|---|---|
| To: | Paoletta, Mark (CFPB) |
| Cc: | Martinez, Adam (CFPB); Dorsey, Darian (CFPB); Chilbert, Christopher (CFPB); Barrett, Katy (CFPB); Shapiro, Daniel (CFPB) |
| Subject: | RE: 20250213 CFPB Information Memo_CRE |
| Date: | Thursday, February 27, 2025 8:06:01 AM |

Thank you for your confirmation, sir. Darian and I will begin to mobilize appropriate team members against each requests this AM. Take care.

---

**From:** Paoletta, Mark (CFPB) ███████████████████
**Sent:** Thursday, February 27, 2025 6:03 AM
**To:** Johnson, Christopher (CFPB) ███████████████████
**Cc:** Martinez, Adam (CFPB) ████████████████; Dorsey, Darian (CFPB) ███████████████████; Chilbert, Christopher (CFPB) ████████████████████; Barrett, Katy (CFPB) ███████████████ Shapiro, Daniel (CFPB) ████████████
**Subject:** RE: 20250213 CFPB Information Memo_CRE

Good morning, Christopher,

Thanks for email. Your requests (1,2,3 below) are approved.

Mark

---

**From:** Johnson, Christopher (CFPB) ████████████████████
**Sent:** Wednesday, February 26, 2025 11:01 AM
**To:** Paoletta, Mark (CFPB) ██████████████████
**Cc:** Martinez, Adam (CFPB) ██████████████████; Dorsey, Darian (CFPB) ███████████████████; Chilbert, Christopher (CFPB) ████████████████; Barrett, Katy (CFPB) ███████████████
**Subject:** FW: 20250213 CFPB Information Memo_CRE

Hello Chief Legal Officer Paoletta,

I hope all is well. First, I wanted to take moment to introduce myself. My name is Chris Johnson and I currently serve as the Associate Director within the Division of Consumer Response of Education. For background, the division brings together two of the Bureau's six primary functions and at its most consumer facing capabilities – assisting consumers with complaints and providing consumers with unbiased financial education content, tools, and resources. Per the email chain below, I was invited to participate in a brief meeting with Jordan and Jeremy to share an overview of the CFPB's statutory obligations as it relates to the division's work in support of defining competitive areas, those that could aid in accurately defining critical areas for purposes of a RIF process. The attached memorandum was requested the same day and produced by my team.

I'm reaching out today, as we (Darian and I) received a question from our complaint handling counterparts at the FDIC seeking to understand whether and to what extend we're still processing

complaints and referrals.  As referenced in the memorandum, and thanks to approvals from the Acting Director and his leadership team, the Consumer Resource Center (aka call center services contract) and online complaint form are operational. However, a subset of Consumer Response federal staff historically performs many other complaint tasks.  I shared with Jordan and Jeremy during our discussion while several aspects of the complaint handling operation have been built to scale through years of work focused on automation and efficiency, there remain critical areas that require human intervention by our federal employees and a subset of contractors.

**The Ask:**

1. Per our Office of Procurement this AM (see attached), there is a request to activate the Contracting Officer Representative and two Program Managers that provide oversight of the call center contractor to address billing, technical, and governance requests.  In addition, the technical issues that have arisen are typically addressed through a contract with Deloitte, "CUSTOMER RELATIONSHIP MANAGEMENT (CRM) OPERATIONS, MAINTENANCE AND DEVELOPMENT SUPPORT".  The technical issues involve the manual process performed by contractors to remove or redact PII from complaints.  Please let me know if you are amenable to reactivating up to three federal employees supporting this contact center program as well as the vendor/contractor that provides technical operations and maintenance support for the Complaint Management System. I have also copied my colleagues, Chris Chilbert, CIO, and Katy Barrett, EPT Lead, for awareness.

2. To assess complaint handling with a focus on identifying any processing backlogs or system issues, I'm seeking approval to activate a team of no more than 10 staff for up to 24 hours each (I can provide a list of employees if helpful)  Some examples of the work this team would perform includes:

    - Assessing the volume and nature of backlogs across various work in progress queues (e.g., congressional and regulator referrals, portal support tickets)
    - Assessing our complaint related systems (Mosaic, Complaint Analytics, and the Consumer Complaint Database) to ensure important application programming interfaces (APIs) are operational to ensure sharing of data with the prudential regulators and the FTC, data pipelines in support of complaint sharing tools that are utilized by more than 125 state and federal agencies are operational, and monitoring licensing and other user limits related to the Salesforce Mosaic complaint management system in partnership with our colleagues in the Technology and Innovation Office.

The above would require what I'm referring to as **Phase 1 – Assessment**.  This work would commence later today or tomorrow with your approval and likely conclude by end of business Monday or Tuesday of next week.  Divisional leadership would then summarize the current state**. Phase 2** – within 24 to 48 hours of the conclusion of Phase 1,   would include divisional leadership preparing a recommendation and sharing at your request, if desired.  The recommendation may include a subset of Consumer Response federal staff, and potential contractors to activate to address any backlogs aligned narrowly to statutorily related complaint

tasks.  This would include a description of the work to be performed,  estimated hours per week, and staff.

3.  Finally, the Office of Consumer Response, per section 1013(b)(3)(C) is required to produce a report to Congress each year.  The good news is our team completed a good portion of the work in January.  However, to ensure the Bureau meets is statutory deadline of March 31, 2025, I would like to request to activate up to approximately (8) Consumer Response staff throughout the month of March for up to (16) hours per week to finalize the report.  We also want to ensure we provide sufficient lead time for the Acting Director and his leadership to review and provide feedback, prior to the Bureau submitting the report to the required committees in Congress.  Please let me know if you are supportive of this request as well.

| 1013(b)(3)(C) | (C) REPORTS TO THE CONGRESS.—The Director shall present an annual report to Congress not later than March 31 of each year on the complaints received by the Bureau in the prior year regarding consumer financial products and services. Such report shall include information and analysis about complaint numbers, complaint types, and, where applicable, information about resolution of complaints. | *Consumer Response cited to this authority in Federal Register notice 2012-15161.* Consumer Response publishes an annual report, in accordance with this mandate. Additionally, the Bureau's semi-annual reports to Congress have a section devoted to discussion of Consumer Response. |
| --- | --- | --- |

Below are a few prior year reports for reference, if helpful.

https://www.consumerfinance.gov/data-research/research-reports/consumer-response-annual-report-2023/

https://www.consumerfinance.gov/data-research/research-reports/2022-consumer-response-annual-report/

https://www.consumerfinance.gov/data-research/research-reports/2021-consumer-response-annual-report/

https://www.consumerfinance.gov/data-research/research-reports/2020-consumer-response-annual-report/

Upon your approval/guidance, we will quickly mobilize team members to initiate work on the three items described above.  If you have any questions, our team is happy to discuss further at your convenience, sir.

Christopher Johnson

CFPB_00018  JA300

Associate Director | Division of Consumer Response and Education
Office: ███████████ | Mobile: ███████████

Bureau of Consumer Financial Protection
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Johnson, Christopher (CFPB)
**Sent:** Thursday, February 13, 2025 4:42 PM
**To:** Wick, Jordan (CFPB) ████████████; Lewin, Jeremy ██████████████████>
**Cc:** Martinez, Adam (CFPB) ████████████
**Subject:** 20250213 CFPB Information Memo_CRE

Hello Jeremy and Jordon,

As requested, I have identified those teams/functions across the CRE division that are aligned to the division's statutory mandates.  I have omitted those team/functions that do not to make the is easier to digest.  The division has approximately 150 to 155 full-time employees.  The current staffing for the statutory functions totals approximately 80 to 85.  We could then apply the RIF framework to each of these areas and further adjust staffing as needed. Feel free to give me a call to assist with any further adjustments or refinements as needed. I will remain on standby throughout the night for questions or direction.

Christopher Johnson
Associate Director | Division of Consumer Response and Education
Office: ███████████ | Mobile: ███████████

Bureau of Consumer Financial Protection
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

February 13, 2025
Information Memo for the Acting Director

| FROM | Christopher Johnson, Associate Director, Consumer Response & Education |
|---|---|
| SUBJECT | Divisional Staffing |

| Select Applicable Information Type(s) | ☐ Situational Awareness | ☐ Request for Directional Feedback | ☒ Reply to Inquiry from Director/FO | ☐ Draft Document Feedback Request |
|---|---|---|---|---|

Issue

This purpose of this memorandum is to provide information about how the staff of the Consumer Response and Education Division align to the Consumer Financial Protection Bureau's (CFPB's) statutory obligations.

**Divisional Background**

The Consumer Response and Education Division (CRE) is responsible for executing the CFPB's first two statutory functions: (1) conducting financial education programs, and (2) collecting, investigating, and responding to consumer complaints. *See* 12 USC 5511(c)(1)-(2). CRE is the public face of the CFPB to individuals and their families, delivering scalable services and tools designed to empower consumers to share their experiences in the marketplace, respond to challenges, and make better informed financial decisions.

There are two offices within CRE: the Office of Financial Education and the Office of Consumer Response. Financial Education is responsible for managing a suite of more than 50 educational tools and resources, distributing those tools to users, and researching the effectiveness of financial education programs. Financial Education is also responsible for supporting the Director's membership in the Financial Literacy and Education Commission. Financial Education's content is some of the most frequently visited content on the CFPB's website.

Consumer Response is responsible for answering questions, handling complaints, and sharing data and insights. Consumer Response manages the CFPB's toll-free number and complaint program from end-to-end. Consumer Response is also responsible for assisting complaint process stakeholders (e.g., responding to congressional members with their constituents' complaints, assisting Company Portal users as they respond to their customer's concerns) and sharing complaint information with Federal and State agencies.

==The current headcount for CRE is approximately 150-155 full-time employees. The functional areas listed below aligned to statutory responsibilities total approximately 80 to 85.==

**Office of Financial Education**

12 USC 5493(d) requires the Director to "establish an Office of Financial Education, which shall be responsible for developing and implementing initiates intended to educate and empower consumers to make better informed financial decisions." There is one competitive area within the Financial Education, responsible for delivering several statutory obligations:

- Developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions. *See* 12 USC 5493(d)(1).
- Developing and implementing a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission. *See* 12 USC 5493(d)(2).
- Coordinating with other units within the Bureau in carrying out its functions, including working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and working with the research unit established by the Director to conduct research related to consumer financial education and counseling. *See* 12 USC 5493(d)(3).
- Submitting a report on its financial literacy activities and strategy to improve financial literacy of consumers *See* 12 USC 5493(d)(4).

The current headcount for this area is 12.


**Office of Consumer Response**

12 USC 5493(b)(3)(A) requires the Director to "establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database … to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products and or services." 12 USC 5534(a) requires the CFPB "to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person." 15 USC 1681i(e) establishes a process by which the CFPB must act and report out on certain credit and consumer reporting complaints. Consumer Response must coordinate with certain CFPB offices and personnel, including the Private Student Loan Ombudsman and Office of Servicemember Affairs. *See* 12 USC 5493(e), 12 USC 5535.

Consumer Response has several competitive areas:

***Consumer Resource Center***

12 USC 5493(b)(3)(A) directs the CFPB to create establish a single, toll-free number. This team manages a Consumer Resource Center (CRC), which receives more than 40,000 calls per month. The CRC answers consumers' inquiries, accepts and provides status updates on complaints, and directs consumers resources such as state and local services.

The current headcount for this area is 3.

***Complaint Handling***

12 USC 5534(a) requires the CFPB to timely respond to consumers, including any responses received by the regulator from the covered person. This team directs the complaints to companies for a response.

The current headcount for this area is 7.

### *Portal Operations*
12 USC 5534(b) requires certain covered persons to provide a timely response to the regulator. This team is responsible for responding to stakeholder support tickets, including tickets submitted by company, congressional, and government portal users.

The current headcount for this area is 7.

### *Mosaic Program*
12 USC 5493(b)(3)(A) directs the CFPB to create establish a database to facilitate the centralized collection of complaints. 12 USC 5493(b)(3)(D) requires the CFPB to share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies. This team manages the technology that facilitates the handling of more than 350,000 complaints per month

The current headcount for this area is 5.

### *Investigations (Regulatory Compliance, Complaint Monitoring, Research and Analysis, Escalation Case Management)*
12 USC 5511(c)(2) requires the CFPB to "investigate" complaints. Additionally, 12 USC 5493(b)(3)(A) requires the CFPB to "monitor" complaints. This team is responsible for monitoring and investigating the more than three million complaints the CFPB receives annually. This team conducts investigative inquiries received by the Director's Office. This team also conducts analyses that support the Chief of Staff's team efforts to meet the publication of statutory reports and supports rule lookback assessments as required by 12 USC 5512.

The current headcount for this area is 30.

### *Data Reporting*
12 USC 5493(e) and 12 USC 5535 requires Consumer Response to coordinate with the Office of Servicemember Affairs and the Private Student Loan Ombudsman, respectively. This team is responsible for working with these offices for their complaint monitoring work.

The current headcount for this area is 4.

### *Stakeholder Engagement*
12 USC 5493(b)(3)(A) directs the CFPB to "coordinate with the Federal Trade Commission or other Federal agencies to route complaints to such agencies, where appropriate." Additionally, 12 USC 5493(b)(3)(D) requires the CFPB to "share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies …". This team is responsible for working with federal and state agencies, including state Attorneys General.

The current headcount for this area is 5.

*Chief of Staff Team*

Consumer Response is responsible for publishing or contributing to the publication of several reports. Those reports include:

- Consumer Response Annual Report (as required by 12 USC 5493(b)(3)(D))
- Fair Credit Reporting Act 611(e) Report (as required by 15 USC 1681i(e)(5))
- Fair Debt Collection Practices Act Report (as required by 15 USC 1692m)
- CFPB Semi-Annual Reports (required by 12 USC 5496)

This team is responsible for the production and publication of these reports, including any follow-up questions from oversight bodies.

The current headcount for this area is 5.

**Management and Operations**

This team provided the executive direction for both offices within the division. The current divisional executives each have a dual role both division and office level executives. The office level executive positions remain vacant. The team also provides centralized support to each office regarding resource management functions including budget, acquisition management, training, management reporting, and coordination with internal and external stakeholders, and oversight bodies such as GAO and OIG.

The current headcount for this area is 5.

| | |
|---|---|
| **From:** | Paoletta, Mark (CFPB) ███████████████ > |
| **Sent:** | Thursday, February 27, 2025 12:07 PM |
| **To:** | Vespa-Papaleo, Frank (CFPB) |
| **Cc:** | Sutton, Jocelyn (CFPB); Miller, Samuel (CFPB); Martinez, Adam (CFPB); Shapiro, Daniel (CFPB) |
| **Subject:** | RE: Request to Commence Fair Lending Activity |

Good afternoon, Frank,

Thanks for email.  You are authorized to perform the statutory functions set forth in 12 U.S.C. 5493(c)(2), including the four examples you identified below.  Any action or communication to an outside party should be send to me and Daniel Shapiro for review and approval before being transmitted.

Thanks.

Mark

**From:** Vespa-Papaleo, Frank (CFPB) ███████████████
**Sent:** Thursday, February 27, 2025 11:51 AM
**To:** Paoletta, Mark (CFPB) ███████████ >
**Cc:** Sutton, Jocelyn (CFPB) ███████████████ ; Miller, Samuel (CFPB) ███████████████ ; Martinez, Adam (CFPB) ███████████
**Subject:** Request to Commence Fair Lending Activity

Hi Mark,

Acting Director Vought instructed CFPB staff to not perform any work tasks. The email also specified that if there were any urgent matters, staff must alert Acting Director Vought through you and obtain written approval before working on them.  **The Office of Fair Lending requests approval to perform the statutory functions expressly identified in 12 U.S. Code § 5493(c)(2).**

These functions include: (A): providing oversight and enforcement of federal laws that ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities, including the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act; (B) coordinating the fair lending efforts of the Bureau with other federal agencies and state regulators; (C) working with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education; and (D) providing annual reports to Congress on the efforts of the Bureau to fulfill its fair lending mandate.

As a result, I hereby request authorization to re-commence work consistent with these statutory provisions. Some examples of pending work include: (1) supporting fair lending examinations and enforcement activity and research related to access to credit; (2) coordinating HMDA compliance efforts with the FFIEC's HMDA Subcommittee; (3) responding to previously-received requests to participate in educational programming with private industry and other advocates; and (4) completing the drafting of the 2024 Annual Report to Congress.

Thank you for your consideration; please advise if you need anything else from me regarding this request.

J. FRANK VESPA-PAPALEO
Assistant Director, Office of Fair Lending

1

1700 G Street, NW
Washington, DC 20552
Mobile: █████████████

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

2

CFPB_00025  JA307

| | |
|---|---|
| **From:** | Paoletta, Mark (CFPB) |
| **To:** | Martin, Angela (CFPB) |
| **Cc:** | Martinez, Adam (CFPB); Petersen, Cara (CFPB); Rice, Jim (CFPB); Liu, Wen (CFPB); Shapiro, Daniel (CFPB) |
| **Subject:** | RE: (Responding to military requests) FW: Additional Directives on Bureau Activities |
| **Date:** | Thursday, February 27, 2025 12:14:49 PM |

Hello, Angela,

Thanks for email. You are authorized and directed: to attend the March 6th meeting; to attend the March 15 meeting in Houston; to provide virtual training on the MLA on March 27; to accept other requests for virtual training from Army JAG School, Naval Justice School, and USAF Legal Assistance Division; and to reply to any email query from the JAG field.

Thanks.

Mark

---

**From:** Martin, Angela (CFPB) ██████████████████████
**Sent:** Thursday, February 27, 2025 11:38 AM
**To:** Paoletta, Mark (CFPB)██████████████████
**Cc:** Martinez, Adam (CFPB)████████████████████; Petersen, Cara (CFPB) ████████████████████ Rice, Jim (CFPB) ██████████████████; Liu, Wen (CFPB) ████████████
**Subject:** (Responding to military requests) FW: Additional Directives on Bureau Activities

Dear Mr. Paoletta (cc Mr. Martinez/Ms. Peterson for situational awareness and Mr. Jim Rice and Mr. Wen Liu in OSA),

I've written previously on other issues, please do not take this email as insubordination.

I request permission to perform the following urgent work tasks. I don't want to leave others, particularly military attorneys, in abeyance while awaiting a response from me. I also make this request so external stakeholders will know to clear their calendars or find a substitution.

1. Send immediate notice of cancellation of next Thursday's (**March 6**) CFPB Military Legal Assistance Working Group Meeting. External members include DOD/DHS Military Legal Assistance Service Chiefs, DOJ Civil Division SCRA team, DOJ Consumer Protection Branch, JAG school professors, Service field representatives, and military legal assistance field offices.
2. Send immediate notice to the National Guard Bureau that I will not be presenting at the 2025 National Guard All States Legal Update in Houston (**March 15**). They have sent repeated requests for materials. They should also be informed to remove the Bureau block of instruction from their schedule.
3. Send immediate notice that I will not provide virtual training on the MLA in support of the Navy's Personal Financial Manager Townhall (**March 27**).
4. Reply to any other requests for virtual training with a decline of the same (currently pending:

Army JAG School, Naval Justice School, and USAF Legal Assistance Division).

5. Reply to any email queries from the JAG field. Note: I request permission to respond substantively but if you decline to grant that request, then at least respond that I won't be responding and suggest the military attorneys file a consumer complaint. I have pending queries from multiple locations.

For your reference, I've attached a copy of the Joint Statement of Principles (JSOP) which overlaps to some extent with OSA's statutory mission. I serve as Enforcement's single point of contact in providing technical guidance on military consumer law and Bureau resources to military legal staff worldwide. The request for guidance generally comes via email from the JAG field. The JSOP also established a Military Legal Assistance Working Group "with the goal of achieving a coordinated response to unlawful conduct targeted at servicemembers and their families" which meets quarterly. Lastly, the JSOP set up an avenue for the Bureau (OSA and ENF) to have training and outreach opportunities with the JAG community, especially the JAG schools. Mr. Liu and I train military lawyers and legal staff on Bureau resources, including OSA, the mechanics of submitting consumer complaints, and military consumer law basics, with an emphasis on the MLA. We have recurring engagements.

I thank you in advance for considering this request to continue to serve those who serve our country.

Respectfully,

Angela

**Angela Martin**
Senior Enforcement Attorney/Military Affairs Liaison | Enforcement Division
*Typical availability: 0600-0730; 1000-1430; 1600-1900 (Eastern time zone) with accommodation possible for all time zones*
Consumer Financial Protection Bureau
Mobile: ███████████
consumerfinance.gov
Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Vought, Russell <███████████
**Sent:** Monday, February 10, 2025 8:30 AM
**To:** _DL_CFPB_AllHands ███████████
**Subject:** Additional Directives on Bureau Activities

Good morning, CFPB staff,

As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is ███████████████ Otherwise, employees should stand down from performing any work task. Thank you for your attention on this matter.

Best,

Russ Vought

Acting Director

Bureau of Consumer Financial Protection

| | |
|---|---|
| **From:** | Vespa-Papaleo, Frank (CFPB) |
| **To:** | Paoletta, Mark (CFPB) |
| **Cc:** | Sutton, Jocelyn (CFPB); Miller, Samuel (CFPB); Martinez, Adam (CFPB); Shapiro, Daniel (CFPB) |
| **Subject:** | Re: Request to Commence Fair Lending Activity |
| **Date:** | Thursday, February 27, 2025 12:21:28 PM |

Understood. Thanks for your prompt response.

---

**From:** Paoletta, Mark (CFPB) ████████████████████
**Sent:** Thursday, February 27, 2025 12:07:12 PM
**To:** Vespa-Papaleo, Frank (CFPB) ████████████████████
**Cc:** Sutton, Jocelyn (CFPB) ████████████████ >; Miller, Samuel (CFPB)
████████████████ ; Martinez, Adam (CFPB) ████████████ >; Shapiro, Daniel
(CFPB) ████████████████
**Subject:** RE: Request to Commence Fair Lending Activity

Good afternoon, Frank,

Thanks for email.  You are authorized to perform the statutory functions set forth in 12 U.S.C. 5493(c)(2), including the four examples you identified below.  Any action or communication to an outside party should be send to me and Daniel Shapiro for review and approval before being transmitted.

Thanks.

Mark

---

**From:** Vespa-Papaleo, Frank (CFPB) ████████████████████
**Sent:** Thursday, February 27, 2025 11:51 AM
**To:** Paoletta, Mark (CFPB) ████████████████
**Cc:** Sutton, Jocelyn (CFPB) ████████████████ Miller, Samuel (CFPB)
████████████████ ; Martinez, Adam (CFPB) ████████████████
**Subject:** Request to Commence Fair Lending Activity

Hi Mark,

Acting Director Vought instructed CFPB staff to not perform any work tasks. The email also specified that if there were any urgent matters, staff must alert Acting Director Vought through you and obtain written approval before working on them.  **The Office of Fair Lending requests approval to perform the statutory functions expressly identified in 12 U.S. Code § 5493(c)(2).**

These functions include: (A): providing oversight and enforcement of federal laws that ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities, including the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act; (B) coordinating the fair lending efforts of the Bureau with other federal agencies and state regulators; (C) working with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education; and (D) providing annual reports to Congress on the efforts of the Bureau to fulfill its fair lending

mandate.

As a result, I hereby request authorization to re-commence work consistent with these statutory provisions. Some examples of pending work include: (1) supporting fair lending examinations and enforcement activity and research related to access to credit; (2) coordinating HMDA compliance efforts with the FFIEC's HMDA Subcommittee; (3) responding to previously-received requests to participate in educational programming with private industry and other advocates; and (4) completing the drafting of the 2024 Annual Report to Congress.

Thank you for your consideration; please advise if you need anything else from me regarding this request.

J. Frank Vespa-Papaleo
Assistant Director, Office of Fair Lending
1700 G Street, NW
Washington, DC 20552
Mobile: ███████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) |
| **To:** | Michalosky, Martin (CFPB) |
| **Cc:** | Adams, Danielle (CFPB); Nguyen, Hoan (CFPB) |
| **Subject:** | RE: Processing FOIA and Privacy Act Requests |
| **Date:** | Thursday, February 27, 2025 1:29:00 PM |

Hi Marty.  Approved to move forward.  Thank you!

Adam

Adam Martinez
Chief Operating Officer

**From:** Michalosky, Martin (CFPB) ████████████████████████
**Sent:** Thursday, February 27, 2025 1:29 PM
**To:** Martinez, Adam (CFPB) ███████████████████>
**Cc:** Adams, Danielle (CFPB) █████████████████; Nguyen, Hoan (CFPB) ███████████████v>
**Subject:** Processing FOIA and Privacy Act Requests
**Importance:** High

Hi Adam,

The FOIA statute (5 U.S.C. § 552) requires agencies to process requests for records from the public. FOIA has a specific timeframe (20 working days) for federal agencies, including the CFPB, to respond to requests.  There is a risk of litigation for agencies that are not able to respond in this timeframe, which excludes federal holidays.  Additionally, the Privacy Act provides the public to request records about them.  The FOIA team processes both FOIA and Privacy Act requests, and responds to inquires related to those requests.

I recommend that the FOIA team be able to continue their work processing FOIA and Privacy Act requests.

Thanks,
Marty

CFPB_00031     JA313

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Russell, Jessica (CFPB); Pham, Danny (CFPB) |
| Cc: | Spry, Eric (CFPB); Liu, Feng (CFPB); Brown, Jason (CFPB); Pappalardo, Janis (CFPB) |
| Subject: | RE: Requests to approve HMDA data access |
| Date: | Thursday, February 27, 2025 3:55:00 PM |

Hi Jessica – Good afternoon!

Jason's Team has authority to execute our HMDA legal and statutory authority/legal requirements.

Thank you.

Adam

Adam Martinez
Chief Operating Officer

---

**From:** Russell, Jessica (CFPB) ███████████████
**Sent:** Thursday, February 27, 2025 3:10 PM
**To:** Pham, Danny (CFPB) ██████████████ Martinez, Adam (CFPB)
███████████████
**Cc:** Spry, Eric (CFPB) ██████████████ >; Liu, Feng (CFPB) ████████████
**Subject:** RE: Requests to approve HMDA data access

Ok, I will just leave them in the system until I have authorization to reject them.

Thanks,
Jessica

---

**From:** Pham, Danny (CFPB) ██████████████
**Sent:** Thursday, February 27, 2025 3:03 PM
**To:** Russell, Jessica (CFPB) ███████████████; Martinez, Adam (CFPB)
███████████████
**Cc:** Spry, Eric (CFPB) ██████████████ Liu, Feng (CFPB) ████████████
**Subject:** RE: Requests to approve HMDA data access

Hi Jessica,

Is my fault on clicking the wrong one when I was working with ICAM team to make sure SailPoint auto configure the user profile. So just reject the request .

Thank you,
Danny

---

**From:** Russell, Jessica (CFPB) ███████████████

**Sent:** Thursday, February 27, 2025 3:02 PM
**To:** Martinez, Adam (CFPB) ██████████████████; Pham, Danny (CFPB)
████████████████
**Cc:** Spry, Eric (CFPB) ████████████; Liu, Feng (CFPB) ████████████████
**Subject:** Requests to approve HMDA data access

Hi Adam,

I am the data steward for the HMDA datasets, which means that I review requests for access
to the HMDA data. Danny Pham submitted several requests on behalf of others.  Do I have
authorization to work on this?

@Pham, Danny (CFPB) – Could you provide justifications for these access requests?

Thanks,

Jessica

**Jessica Russell**
Mortgage Markets
Tel: ████████
Mob: ████████
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete
the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Pappalardo, Janis (CFPB); Sokolov, Dan (CFPB); Epstein, Ann (CFPB); Hedgespeth, Grady (CFPB); Brown, Jason (CFPB); McArdle, Mark (CFPB); McNamara, John (CFPB); Brown, Desmond (CFPB); Cole, Lisa (CFPB); Royster, Deborah (CFPB); Rice, Jim (CFPB); Dodd-Ramirez, Daniel (CFPB) |
| Bcc: | Paoletta, Mark (CFPB); Shapiro, Daniel (CFPB) |
| Subject: | Statutory/Legal Required Work |
| Date: | Thursday, February 27, 2025 4:18:00 PM |
| Attachments: | Directives on Bureau Activities.msg |

Hi RMR Colleagues — Good afternoon.

Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau. He did exclude areas approved by him or required by law. We want to ensure that you are aware that statutorily required work and/or work required by law are authorized.

Your teams are authorized to continue carrying out these responsibilities. Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director. Alternatively, you are always welcome to reach out to me if needed. I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam

Adam Martinez
Chief Operating Officer

CFPB_00034     JA316

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Warren, LaShaun (CFPB) |
| Bcc: | Paoletta, Mark (CFPB); Shapiro, Daniel (CFPB) |
| Subject: | Statutory/Legal Required Work |
| Date: | Thursday, February 27, 2025 4:47:00 PM |
| Attachments: | Directives on Bureau Activities.msg |

Hi LaShaun – Good afternoon.

Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau including work conducted by External Affairs.  He did exclude areas approved by him or required by law including statutory requirements.

We want to ensure that you are aware that you may reach out to Mark Paoletta, Chief Legal Officer with any questions regarding required reports or products you believe should continue at this time.  Any actions or communications with outside parties must be sent to Mark and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director.  Alternatively, you are always welcome to reach out to me if needed.  I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam

Adam Martinez
Chief Operating Officer

CFPB_00035    JA317

| From: | Chilbert, Christopher (CFPB) |
|---|---|
| To: | Gelfond, Rebecca (CFPB) |
| Cc: | Martinez, Adam (CFPB) |
| Subject: | RE: CFPB Data / Record Analysis and Return |
| Date: | Thursday, February 27, 2025 6:03:33 PM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |

Hi Rebecca,

Yes, retrieving Bureau data and records from contractors in accordance with the terms and conditions of the contracts is authorized work. We need to ensure that it is preserved.

Chris Chilbert
██████████████

---

**From:** Gelfond, Rebecca (CFPB) ████████████████████
**Sent:** Thursday, February 27, 2025 5:54 PM
**To:** Chilbert, Christopher (CFPB) ███████████████
**Subject:** FW: CFPB Data / Record Analysis and Return

Hi Chris,

Tiina suggested I check with you. Can you please confirm this is authorized work?

Thanks!
Rebecca

CFPB Enforcement Chief of Staff
Office: ████████████ | ██████████████

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Gelfond, Rebecca (CFPB)
**Sent:** Thursday, February 27, 2025 5:43 PM
**To:** Rodrigue, Tiina (CFPB) ██████████████████
**Cc:** Malik, Irfan (CFPB) ██████████████████████; Lazier, Raynell (CFPB) █████████████
**Subject:** RE: CFPB Data / Record Analysis and Return

Hi Tiina,

Thanks for the email. Can you please confirm that the Acting Director has authorized this work?

Thanks!
Rebecca

CFPB Enforcement Chief of Staff
Office: █████████████ | Mobile: ███████████████

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Rodrigue, Tiina (CFPB) ██████████████
**Sent:** Thursday, February 27, 2025 5:41 PM
**To:** Rodrigue, Tiina (CFPB)██████████████
**Cc:** Malik, Irfan (CFPB) ██████████████; Lazier, Raynell (CFPB) ██████████████
**Subject:** CFPB Data / Record Analysis and Return
**Importance:** High

Dear Business, System, Service, or Application Owner,

Please work with your CORs/PoCs to identify if CFPB data or records are at risk of being deleted due to contract cancellations, memorandum/agreement terminations, or other causes. Please note that per the CFPB standard cybersecurity clause language and CFPB Policy, all CFPB data must be returned at the end of a contract/agreement.  Any deviations must be signed off by the Authorizing Official.

If you need T&I assistance to store the returned CFPB data/records, please reach out to me.  I will help you find the a secure storage solution.

Please let me know if you have any questions.  I am on Teams.

# Dr. Tiina K.O. Rodrigue  (hear pronunciation here)
CISSP, PMP, Compliance Mapper,
CEA, CSM, ITIL, A+, FAC P/PM III, Female
ADKAR Change Management Practitioner

Chief Information Security Officer – CISO
Cyberstar: Level 5
⭐ ⭐ ⭐ ⭐ ⭐

*My workday might not be the same as yours. Unless I indicate this is an emergency, please do not feel pressure to respond to this message outside of your standard work hours.*





1700 G Street NW #6022
Washington, DC 20552
Email — ▮▮▮▮▮▮▮▮▮▮▮v
Telephone — ▮▮▮▮▮▮▮▮
Telework Days- Every Day

**consumerfinance.gov**

Confidentiality Notice: If you received this e-mail by mistake, you should notify the sender of the error and delete the e-mail and any attachments. Inadvertent disclosure does not waive any privileges.

**CYBERSECURITY AWARENESS**
Increasing cybersecurity awareness for the Bureau's personnel is vital to ensuring the successful execution of CFPB's mission.

You should report phishing if you believe the e-mail has malicious intent. If you think that you have received a phishing e-mail: **STOP. THINK before you CLICK**.

Do not click any links or attachments included in any suspicious e-mail. Immediately report the suspicious e-mail to the CFPB Suspect Inbox using the Report Phishing button to send the e-mail to **suspect@cfpb.gov** for immediate analysis.

Become a **Cyberstar.** For more information, see
**https://team.cfpb.local/wiki/index.php/CFPB_Phishing_Awareness**

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Gueye, Jafnar (CFPB); Brand, Melissa (CFPB); Galicki, Joshua (CFPB) |
| Cc: | Grant, Lori (CFPB) |
| Bcc: | Paoletta, Mark (CFPB); Shapiro, Daniel (CFPB) |
| Subject: | RE: CFPB Data / Record Analysis and Return |
| Date: | Friday, February 28, 2025 8:54:00 AM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |

(bcc: Mark Paoletta and Daniel Shapiro for situational awareness)

Good morning.

I would advise that we should reinstate the ETK contract if it is still available in the short term.  ETK will help us prevent further litigation and/or settlements as a result of the data base being down.  The system is the database and workstream for:

EEO Cases
Reasonable Accommodation Cases
Anti-Harassment/Bullying Cases

These are all required to be processed by law.  However, long term I would encourage OCR, OHC, and OMWI to work with T&I on an alternative secured solution going forward such as SharePoint or something similar to store data and process complaints.

Adam Martinez
Chief Operating Officer

**From:** Gueye, Jafnar (CFPB)
**Sent:** Friday, February 28, 2025 8:30 AM
**To:** Brand, Melissa (CFPB)                              ; Galicki, Joshua (CFPB)
                          >
**Cc:** Grant, Lori (CFPB)                              ; Martinez, Adam (CFPB)
**Subject:** RE: CFPB Data / Record Analysis and Return

Good morning Melissa,

I defer to Adam but I would recommend reaching out to Mark Paoletta. We've frozen all termination actions on contracts until next week and we're working on getting an answer for the actual contract.

Respectfully,

Jafnar

**From:** Brand, Melissa (CFPB)
**Sent:** Friday, February 28, 2025 8:19 AM
**To:** Gueye, Jafnar (CFPB)                              Galicki, Joshua (CFPB)

**Cc:** Grant, Lori (CFPB) ███████████████; Martinez, Adam (CFPB) ████████████████

**Subject:** RE: CFPB Data / Record Analysis and Return

**Importance:** High

Good morning Jafnar and Josh.

Cyber told me to have my CORs identify if CFPB data or records are at risk of being deleted due to contract cancellations. I highlighted to Vanessa our inability to access EEO complaints data in ETK, who advised me to reach out to those above me regarding contracts that I need to have active again. Since I report directly to the Director, I was wondering who you suggest I reach out to? Is there a main POC that you have been collaborating with that I should reach out to? Or is this something that is already being worked on and me reaching out is not necessary?

Thank you.

Melissa

---

**From:** Del Toro, Vanessa (CFPB) ████████████████

**Sent:** Friday, February 28, 2025 8:12 AM

**To:** Brand, Melissa (CFPB) ████████████

**Cc:** Grant, Lori (CFPB) █████████████; Stroud, Renita (CFPB) ██████████████████ Villano, Michael (CFPB) █████████████

**Subject:** RE: CFPB Data / Record Analysis and Return

HI Melissa,

Adding Mike Villano who is the contracting officer for the Entellitrak contract. That contract, 9531CB23F0046, was on the list we were directed to terminate.

We stopped doing the modification to terminate and have mostly sent out the stope work/ termination notices. If you need this one to be active again, please reach out to those above you. Some vendors that were asked to "turn back on" operations were able to, others cannot be back on so easily. And as we stopped work and sent the termination notice as directed by those above us, this also means that the vendor does not have to necessarily comply with the request to continue to provide services they were previously told were terminated.

Sorry, it is a bit of a mess, but we can only do what directed to. If you need this, please reach out to leadership above you so that we in Procurement can get different direction.

Thanks,

*Vanessa del Toro*

CFPB_00040 **JA322**

Contracting Officer | Office of Finance and Procurement

Mobile: ██████████

Consumer Financial Protection Bureau

[consumerfinance.gov](consumerfinance.gov)

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

**From:** Brand, Melissa (CFPB) ████████████████████
**Sent:** Friday, February 28, 2025 7:18 AM
**To:** Del Toro, Vanessa (CFPB) ████████████████
**Cc:** Grant, Lori (CFPB) ██████████████████; Stroud, Renita (CFPB) ██████████████████
**Subject:** FW: CFPB Data / Record Analysis and Return
**Importance:** High

Hi Vanessa.  Renita works with Ludy on the ETK contract, however Renita is out today and I am not sure of Ludy's work status. I am hoping you can help.

I want to make sure that we are flagging that Entellitrak is our system of record for EEO cases, and we cannot do our work without it.  We are struggling right now with our current and past cases without access to this data in the ETK system, and we will not be able to run statutorily required reports without it.  We definitely need the data that was put into ETK – but beyond that, we really *need* ETK to make use of the data.

Thank you,

Melissa

**From:** Rodrigue, Tiina (CFPB) ████████████████
**Sent:** Thursday, February 27, 2025 5:41 PM
**To:** Rodrigue, Tiina (CFPB) ████████████████
**Cc:** Malik, Irfan (CFPB) ██████████████████; Lazier, Raynell (CFPB) ████████████████████
**Subject:** CFPB Data / Record Analysis and Return
**Importance:** High

Dear Business, System, Service, or Application Owner,

Please work with your CORs/PoCs to identify if CFPB data or records are at risk of being deleted due to contract cancellations, memorandum/agreement terminations, or other causes.  Please note that per the CFPB standard cybersecurity clause language and CFPB Policy, all CFPB data must be returned at the end of a

CFPB_00041   JA323

contract/agreement.  Any deviations must be signed off by the Authorizing Official.

If you need T&I assistance to store the returned CFPB data/records, please reach out to me.  I will help you find the a secure storage solution.

Please let me know if you have any questions.  I am on Teams.

# Dr. Tiina K.O. Rodrigue 
CISSP, PMP, Compliance Mapper,
CEA, CSM, ITIL, A+, FAC P/PM III, Female
ADKAR Change Management Practitioner

Chief Information Security Officer – CISO
Cyberstar: Level 5
⭐⭐⭐⭐⭐

*My workday might not be the same as yours. Unless I indicate this is an emergency, please do not feel pressure to respond to this message outside of your standard work hours.*





1700 G Street NW #6022
Washington, DC 20552
Email – ████████████
Telephone – ████████████
<span style="color:red">Telework Days- Every Day</span>

**consumerfinance.gov**

Confidentiality Notice: If you received this e-mail by mistake, you should notify the sender of the error and delete the e-mail and any attachments. Inadvertent disclosure does not waive any privileges.

**CYBERSECURITY AWARENESS**
Increasing cybersecurity awareness for the Bureau's personnel is vital to ensuring the successful execution of CFPB's mission.

You should report phishing if you believe the e-mail has malicious intent. If you think that you have received a phishing e-mail: **STOP. THINK before you CLICK**.

Do not click any links or attachments included in any suspicious e-mail. Immediately report the suspicious e-mail to the CFPB Suspect Inbox using the Report Phishing button to send the e-mail to **suspect@cfpb.gov** for immediate analysis.

Become a **Cyberstar.** For more information, see
**https://team.cfpb.local/wiki/index.php/CFPB_Phishing_Awareness**

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Pappalardo, Janis (CFPB) |
| Subject: | RE: Guidance . . . |
| Date: | Friday, February 28, 2025 10:20:00 AM |

Hi Jan.  That is correct.

If there are any mission/statutory concerns, you may always reach out to Mark for guidance as well.  But you the management responsibilities are all good.

Let me know if I can help in any way.

Adam

Adam Martinez
Chief Operating Officer

---

**From:** Pappalardo, Janis (CFPB) ████████████████
**Sent:** Friday, February 28, 2025 10:18 AM
**To:** Martinez, Adam (CFPB) ████████████████
**Subject:** Guidance . . .

Hi Adam,

I hope you are well!

In light of your e-mail and discussion yesterday, my understanding is that we can resume all regular work related to fulfilling statutory obligations, including regular management activities.  Is that correct?

With appreciation,
Jan


--
Janis K. Pappalardo
Deputy Associate Director and Acting Associate Director
Research, Monitoring, and Regulations
Mobile: ████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

CFPB_00045    JA327

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Chilbert, Christopher (CFPB); Gelfond, Rebecca (CFPB) |
| Subject: | RE: CFPB Data / Record Analysis and Return |
| Date: | Friday, February 28, 2025 12:48:00 PM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |

That is my understanding as well.

Adam Martinez
Chief Operating Officer

---

**From:** Chilbert, Christopher (CFPB) ███████████████████
**Sent:** Friday, February 28, 2025 12:39 PM
**To:** Gelfond, Rebecca (CFPB) ███████████████████; Martinez, Adam (CFPB)
████████████
**Subject:** RE: CFPB Data / Record Analysis and Return

My understanding is that he has authorized us to retain federal records and perform contract close-out activities for contracts that have been terminated.

Chris Chilbert
████████████

---

**From:** Gelfond, Rebecca (CFPB) ███████████████████
**Sent:** Friday, February 28, 2025 12:32 PM
**To:** Chilbert, Christopher (CFPB) ███████████████████; Martinez, Adam (CFPB)
████████████
**Subject:** RE: CFPB Data / Record Analysis and Return

Hi Chris and Adam.

Has the Acting Director or Mark P specifically authorized this work?

Thanks!
Rebecca

CFPB Enforcement Chief of Staff
Office: ████████████ | Mobile: ████████████

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Chilbert, Christopher (CFPB) ███████████████████
**Sent:** Thursday, February 27, 2025 6:04 PM
**To:** Gelfond, Rebecca (CFPB) ███████████████████
**Cc:** Martinez, Adam (CFPB) ████████████████

**Subject:** RE: CFPB Data / Record Analysis and Return

Hi Rebecca,

Yes, retrieving Bureau data and records from contractors in accordance with the terms and conditions of the contracts is authorized work. We need to ensure that it is preserved.

Chris Chilbert

███████████

---

**From:** Gelfond, Rebecca (CFPB) ███████████████████████
**Sent:** Thursday, February 27, 2025 5:54 PM
**To:** Chilbert, Christopher (CFPB)████████████████
**Subject:** FW: CFPB Data / Record Analysis and Return

Hi Chris,

Tiina suggested I check with you. Can you please confirm this is authorized work?

Thanks!
Rebecca

CFPB Enforcement Chief of Staff
Office: ███████████ | Mobile: ███████████

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Gelfond, Rebecca (CFPB)
**Sent:** Thursday, February 27, 2025 5:43 PM
**To:** Rodrigue, Tiina (CFPB)█████████████████████
**Cc:** Malik, Irfan (CFPB) ████████████████████; Lazier, Raynell (CFPB) ████████████████
**Subject:** RE: CFPB Data / Record Analysis and Return

Hi Tiina,

Thanks for the email. Can you please confirm that the Acting Director has authorized this work?

Thanks!
Rebecca

CFPB Enforcement Chief of Staff
Office: ███████████ | Mobile: ███████████

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

CFPB_00047    JA329

**From:** Rodrigue, Tiina (CFPB) ███████████████████
**Sent:** Thursday, February 27, 2025 5:41 PM
**To:** Rodrigue, Tiina (CFPB) █████████████████
**Cc:** Malik, Irfan (CFPB)█████████████  Lazier, Raynell (CFPB) ████████████████
**Subject:** CFPB Data / Record Analysis and Return
**Importance:** High

Dear Business, System, Service, or Application Owner,

Please work with your CORs/PoCs to identify if CFPB data or records are at risk of being deleted due to contract cancellations, memorandum/agreement terminations, or other causes. Please note that per the CFPB standard cybersecurity clause language and CFPB Policy, all CFPB data must be returned at the end of a contract/agreement. Any deviations must be signed off by the Authorizing Official.

If you need T&I assistance to store the returned CFPB data/records, please reach out to me. I will help you find the a secure storage solution.

Please let me know if you have any questions. I am on Teams.

## Dr. Tiina K.O. Rodrigue (hear pronunciation here)
CISSP, PMP, Compliance Mapper,
CEA, CSM, ITIL, A+, FAC P/PM III, Female
ADKAR Change Management Practitioner

Chief Information Security Officer – CISO
Cyberstar: Level 5
⭐⭐⭐⭐⭐

*My workday might not be the same as yours. Unless I indicate this is an emergency, please do not feel pressure to respond to this message outside of your standard work hours.*


Consumer Financial Protection Bureau


SERVE LEAD INNOVATE — Director's Mission Achievement Award Recipient

1700 G Street NW #6022
Washington, DC 20552
Email – ████████████████

Telephone – ███████████

**consumerfinance.gov**

Confidentiality Notice: If you received this e-mail by mistake, you should notify the sender of the error and delete the e-mail and any attachments. Inadvertent disclosure does not waive any privileges.

**CYBERSECURITY AWARENESS**
Increasing cybersecurity awareness for the Bureau's personnel is vital to ensuring the successful execution of CFPB's mission.

You should report phishing if you believe the e-mail has malicious intent. If you think that you have received a phishing e-mail: **STOP. THINK before you CLICK**.

Do not click any links or attachments included in any suspicious e-mail. Immediately report the suspicious e-mail to the CFPB Suspect Inbox using the Report Phishing button to send the e-mail to **suspect@cfpb.gov** for immediate analysis.

Become a **Cyberstar.** For more information, see
**https://team.cfpb.local/wiki/index.php/CFPB_Phishing_Awareness**

| From: | Hagins, Calvin (CFPB) ⬛⬛⬛> |
|---|---|
| Sent: | Friday, February 28, 2025 1:19 PM |
| To: | Huggins, Cassandra (CFPB); Martinez, Adam (CFPB) |
| Cc: | Hagins, Calvin (CFPB) |
| Subject: | RE: Statutory/Legal Required Work |

Adam:

Thanks for the confirmation.

Casey:

I have not changed by thinking about NOT starting/continuing any "supervision" work (i. e. examination related activities).

Calvin R. Hagins
Principal Deputy Assistant Director for the Office of Supervision Examinations

**Supervision (SUP)**
**Office of Supervision Examinations (OSE)**
⬛⬛⬛

**Office Location:  Office Primary – Monday – Friday**
**Room:  3036**

**Office:** ⬛⬛
**Mobile:** ⬛⬛



**Consumer Financial Protection Bureau**
**consumerfinance.gov**

**Confidentiality Notice:  If you receive this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments.  An inadvertent disclosure is not intended to waive any privileges.**

**From:** Huggins, Cassandra (CFPB) ⬛⬛⬛
**Sent:** Friday, February 28, 2025 11:09 AM
**To:** Martinez, Adam (CFPB) ⬛⬛⬛ Hagins, Calvin (CFPB) ⬛⬛⬛
**Subject:** Re: Statutory/Legal Required Work

This is all very helpful, thanks Adam. Much appreciated.

**From:** Martinez, Adam (CFPB) ⬛⬛⬛
**Sent:** Friday, February 28, 2025 10:58:08 AM

1

**To:** Huggins, Cassandra (CFPB) ██████████████████████; Hagins, Calvin (CFPB) ██████████████
**Subject:** RE: Statutory/Legal Required Work

That is correct.  If there are any reports to congress per statute or anything like that, I'd recommend reaching out to Mark.  Other divisions are raising questions about reports or other statutory requirements.  I'm personally trying to be helpful to just ensure people know they can ask questions or seek clarification, even it's just on operational issues.

Thank you, Casey.

Adam Martinez
Chief Operating Officer

**From:** Huggins, Cassandra (CFPB)██████████████████
**Sent:** Friday, February 28, 2025 10:33 AM
**To:** Martinez, Adam (CFPB) ██████████████████; Hagins, Calvin (CFPB) ██████████████████
**Subject:** RE: Statutory/Legal Required Work

Adam,

To be clear, the Feb. 8 email directed us to cease all supervision and examination activity. Am I correct that directive still stands?

Thanks,
Casey

Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
Mobile:██████████

Consumer Financial Protection Bureau
**consumerfinance.gov**


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ██████████████████
**Sent:** Thursday, February 27, 2025 4:35 PM
**To:** Huggins, Cassandra (CFPB) ██████████████████; Hagins, Calvin (CFPB) ██████████████████
**Subject:** Statutory/Legal Required Work

Hi Casey and Calvin – Good afternoon.

Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau including specific work conducted by Supervision.  He did exclude areas approved by him or required by law including statutory requirements.

We want to ensure that you are aware that you may reach out to Mark Paoletta, Chief Legal Officer with any questions regarding required reports or products you believe should continue at this time. Any actions or communications with outside parties must be sent to Mark and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director. Alternatively, you are always welcome to reach out to me if needed. I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam

Adam Martinez
Chief Operating Officer

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Herndon, Michael (CFPB) |
| Subject: | RE: Statutory/Legal Required Work |
| Date: | Friday, February 28, 2025 3:20:00 PM |

Hi Michael – you are authorized to coordinate with your leadership or management on work matters. Thank you.

Adam Martinez
Chief Operating Officer

**From:** Herndon, Michael (CFPB) ███████████████
**Sent:** Friday, February 28, 2025 2:49 PM
**To:** Martinez, Adam (CFPB) ███████████████
**Subject:** Fw: Statutory/Legal Required Work

Dear Adam Martinez,

I have been, based upon the email chain below, asked to attend a meeting on Monday to discuss the rollout of this guidance.

Can you confirm I am authorized to perform the work task of attending this meeting.

If so, I will need further guidance on what work status to enter into a timesheet.

Regards,

Michael

.

**From:** Pappalardo, Janis (CFPB) ███████████████
**Sent:** Thursday, February 27, 2025 5:35 PM
**To:** Sokolov, Dan (CFPB) ███████████████ >; Epstein, Ann (CFPB) ███████████████ Hedgespeth, Grady (CFPB) ███████████████ Brown, Jason (CFPB) ███████████████ McArdle, Mark (CFPB) ███████████████ McNamara, John (CFPB) ███████████████ ; Brown, Desmond (CFPB) ███████████████ Cole, Lisa (CFPB) ███████████████ ; Royster, Deborah (CFPB) ███████████████ ; Rice, Jim (CFPB) ███████████████ ; Dodd-Ramirez, Daniel (CFPB) ███████████████
**Cc:** Martinez, Adam (CFPB) ███████████████
**Subject:** RE: Statutory/Legal Required Work

Greetings, All!

I just talked to Adam (cc'd) and thanked him for this clarification (thanks Adam!).

Adam confirmed that you are free to cascade his email with your managers, and managers are free to cascade to their staff.  I think this cascade approach makes sense.

I imagine that there will be many questions as this guidance gets rolled out.
Please keep track of questions and share them.  I will work with you and RMRFO to summarize issues to seek coordinated additional clarification from leadership, which we can then share back out.

Of course, if you have an urgent question for leadership, do not wait for me -- ask away.
However,  please cc me so I understand the flow of issues and responses in RMR.

The idea is to ensure that information flows efficiently, both horizontally and vertically.

Have a nice evening!

With appreciation,
Jan


--
Janis K. Pappalardo
Deputy Associate Director and Acting Associate Director
Research, Monitoring, and Regulations
Mobile: ██████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Martinez, Adam (CFPB) ████████████████████
**Sent:** Thursday, February 27, 2025 4:18 PM
**To:** Pappalardo, Janis (CFPB) ████████████████; Sokolov, Dan (CFPB) ████████████████; Epstein, Ann (CFPB) ████████████; Hedgespeth, Grady (CFPB) ████████████████; Brown, Jason (CFPB) ████████████; McArdle, Mark (CFPB) ████████████████; McNamara, John (CFPB) ████████████████; Brown, Desmond (CFPB) ████████████████>; Cole, Lisa (CFPB) ████████████; Royster, Deborah (CFPB) ████████████████; Rice, Jim (CFPB) ████████████ Dodd-

Ramirez, Daniel (CFPB) ▮▮▮▮▮▮▮▮▮▮
**Subject:** Statutory/Legal Required Work

Hi RMR Colleagues – Good afternoon.

Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau. He did exclude areas approved by him or required by law. We want to ensure that you are aware that statutorily required work and/or work required by law are authorized.

Your teams are authorized to continue carrying out these responsibilities. Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director. Alternatively, you are always welcome to reach out to me if needed. I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam

Adam Martinez
Chief Operating Officer

| From: | Martinez, Adam (CFPB) |
|---|---|
| Cc: | Paoletta, Mark (CFPB) |
| Subject: | All Hands Message re: Work Required by Law |
| Date: | Sunday, March 2, 2025 3:33:06 PM |

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00056   JA338

| From: | Paoletta, Mark (CFPB) |
| To: | McNamara, John (CFPB); Martinez, Adam (CFPB) |
| Cc: | Shapiro, Daniel (CFPB) |
| Subject: | RE: All Hands Message re: Work Required by Law |
| Date: | Sunday, March 2, 2025 4:10:37 PM |

No objections.  Please proceed.

Thank you.

**From:** McNamara, John (CFPB) █████████████
**Sent:** Sunday, March 2, 2025 4:09 PM
**To:** Martinez, Adam (CFPB) ████████████
**Cc:** Paoletta, Mark (CFPB) ████████████
**Subject:** RE: All Hands Message re: Work Required by Law

Unless you have objections, Markets will contact CARD Act 1022 targets to respond to their requests.

We will work on the FDCPA Annual report with a planned delivery date in early to mid-May.

We will conduct statutorily required market monitoring, copying you, Mark and Dan Shapiro on substantive matters but not scheduling and maintenance issues.  We also plan to make you both (Dan and Mark) aware of market monitoring meetings.

Thanks in advance for your help.

John McNamara
Principal Assistant Director, Market
Division of Research, Monitoring & Regulations

**Consumer Financial Protection Bureau**

1700 G Street NW
Washington, DC 20552
Office-████████
Mobile-███████

**Confidentiality Notice:**  If you received this email by mistake, you should notify the sender of the

mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Martinez, Adam (CFPB) ███████████████
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ███████████████
**Subject:** All Hands Message re: Work Required by Law

### Message from Mark Paoletta, Chief Legal Officer

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00058 JA340

| | |
|---|---|
| **From:** | Paoletta, Mark (CFPB) |
| **To:** | Warren, LaShaun (CFPB); Martinez, Adam (CFPB) |
| **Cc:** | _DL_CFPB_EA_Mgmt; Shapiro, Daniel (CFPB) |
| **Subject:** | RE: Statutory/Legal Required Work |
| **Date:** | Sunday, March 2, 2025 5:13:01 PM |

Good afternoon, LaShaun,

Thanks for reaching out.  I will review your request in Number One and get back with you this week. Your requests 2-18 are approved.

Thank you.

Mark

Mark Paoletta
Chief Legal Officer
CFPB

---

**From:** Warren, LaShaun (CFPB) ███████████████████>
**Sent:** Sunday, March 2, 2025 3:41 PM
**To:** Paoletta, Mark (CFPB)████████████████ Martinez, Adam (CFPB)
███████████████
**Cc:** _DL_CFPB_EA_Mgmt ████████████████████
**Subject:** RE: Statutory/Legal Required Work

Good afternoon,

As a follow up to Adam's request to identify work areas that should continue at this time, EA is submitting the following. Please note the first item was previously submitted on Thursday, February 27th and requires submission by March 14, 2025

1.  Pursuant to the Federal Advisory Committee Act (5 U.S.C. § 10), the Consumer Advisory Board's (CAB) charter and Membership Balance Plan (MBP) are required to be updated and submitted to the General Services Administration (GSA) by March 14, 2025. Attached are the draft documents for review and approval. The approval should be from CFPB's Director and Chief Legal Officer prior to submitting to the General Services Administration's Committee Management Secretariat, the CFPB's House and Senate authorizing committees, and the Librarian of Congress by March 14th.  The CFPB must also issue a Federal Register notice and post the two documents on the CFPB's public website as part of satisfying this obligation. Kimberley Medrano is CFPB's Committee Management Officer for the CAB and will liaise with GSA. Once

the attached documents have been approved, EA requests approval for Kimberley Medrano, Patrick O'Brien and LaShaun Warren to complete this request.

2. The Digital Communications team has identified CFPB data and records that are at risk of being deleted due to the contract termination. EA requests approval for Liane Fiano (Staff Director, Digital Communications) to work with Cybersecurity, Procurement and Finance to restore CFPB's social media records and ensure compliance to the records retention requirements  [44 U.S.C. §3301]

3. External Affairs seeks approval to monitor EA mailboxes for official correspondence from stakeholders, including letters to the Acting Director, petitions, and meeting requests; acknowledge receipt of official correspondence from stakeholders; and to draft CFPB updates to the Acting Director summarizing requests and proposed response. [12 U.S.C. § 5493(f)(3), 12 U.S.C. § 5493(c)(2), 12 U.S.C. § 5493(d)(2), 12 U.S.C. § 5493(e)(1), and 12 U.S.C. §5493(e)]. This will also allow us to ensure that any emails that should be construed as FOIA requests are properly handled in accordance with our statutory transparency obligations. [5 U.S.C. §552]

4. EA seeks approval to review and process incoming messages from the news media to ensure that any emails that should be construed as FOIA requests are properly handled in accordance with our statutory transparency obligations. [5 U.S.C. §552]

5. External Affairs seeks approval to monitor EA mailboxes for official correspondence from stakeholders, including letters to the Acting Director, petitions, and meeting requests; acknowledge receipt of official correspondence from stakeholders; and to draft CFPB updates to the Acting Director summarizing requests and proposed response. [12 U.S.C. § 5493(f)(3), 12 U.S.C. § 5493(c)(2), 12 U.S.C. § 5493(d)(2), 12 U.S.C. § 5493(e)(1), and 12 U.S.C. §5493(e)]. This will also ensure that any emails construed as FOIA requests are properly handled in accordance with our statutory transparency obligations. [5 U.S.C. §552]

6. External Affairs seeks approval to work with Consumer Response to coordinate with FTC and other federal and state agencies to route complaints and access the consumer portal, where appropriate [(12 U.S.C. § 5493(b)(3)]

7. External Affairs seeks approval to facilitate sharing consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies, subject to the standards applicable to Federal agencies for protection of the confidentiality of personally identifiable information and for data security and integrity [12 U.S.C. § 5493(b)(3)(D)]

8. External Affairs seeks approval to coordinate with colleagues in the Office of Older Americans, the Office of Fair Lending and Equal Opportunity, the Office of Financial Education, and the Office of Servicemember Affairs, to fulfill statutory enforcement and public engagement requirements to work with other federal agencies and State regulators, private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education, consumer advocates, community organizations, civil rights organizations, non-profit organizations, and other relevant entities that fall under the responsibility of EA [12 U.S.C. § 5493(f)(3), 12 U.S.C. § 5493(c)(2), 12 U.S.C. § 5493(d)(2), 12 U.S.C. § 5493(e)(1), and 12 U.S.C. §5493(e)].

9. External Affairs seeks approval to coordinate with colleagues approved for work in

CRE, SEFL, Enforcement, and RMR to support their market monitoring requirements in Dodd-Frank. The Digital Communications team is responsible for social media monitoring and may need to reinstate the social media monitoring contract to ensure that teams are appropriately able to monitor trends in the market. [12 U.S.C. § 5512(c)(1)

10. External Affairs seeks approval to coordinate with colleagues in Design and Development to continue work required under the 21st Century IDEA Act and supporting OMB guidance which dictates requirements for all government websites, including related to accessibility from Section 508 of the Rehabilitation Act of 1973. [29 U.S.C. 794d, 44 U.S.C. §3501 and OMB Memo M-23-22]

11. External Affairs seeks approval to coordinate with colleagues in Design and Development to continue work to ensure the public can access statutorily required web content. [See attached]

12. External Affairs seeks approval to coordinate with colleagues in Financial Education to implement initiatives intended to educate and empower consumers, such as a digital financial toolkit for recently terminated financial employees seeking financial assistance with bills, in alignment with Financial Education requirements within Dodd-Frank. [12 U.S.C. § 5493(d)(2)]

13. External Affairs seeks approval to coordinate with other regulators including the Commission, the Commodity Futures Trading Commission, the Federal Trade Commission, and other Federal agencies and State regulators, as appropriate, to promote consistent regulatory treatment of consumer financial and investment products and services [12 U.S.C. § 5495 and 12 U.S.C. § 5496(c)].

14. External Affairs seeks approval to collaborate with colleagues in Supervision and Examinations to coordinate examinations and supervisory activities with the supervisory activities conducted by prudential regulators and the State bank regulatory authorities [12 U.S.C. §5514(b); 12 U.S.C. §5515(a), 12 U.S.C. §5515(e)].

15. External Affairs seeks approval to coordinate with Regulations once rulemaking recommences to allow for information flow between stakeholders and Bureau decision makers regarding agency rules (in proposed and finalized form) [12 U.S.C. §5512(b)].

16. External Affairs seeks approval to engage stakeholders to support markets teams in their statutorily mandated market monitoring activities [12 U.S.C. §5493(b) and 5512 (c)].

17. External Affairs seeks approval to collaborate with Supervision and Enforcement staff to identify opportunities for stakeholders to share information about patterns and practices consumers are experiencing that may violate the law [12 U.S.C. §5515 and §5516].

18. External Affairs seeks approval to work with offices within RMR who have been approved by CFPB leadership to begin market monitoring functions including by conducting outreach to stakeholders that fall under the responsibility of EA [12 U.S.C. § 5493(f)(3), 12 U.S.C. § 5493(c)(2), 12 U.S.C. § 5493(d)(2), 12 U.S.C. § 5493(e)(1), and 12 U.S.C. §5493(e)].

We look forward to hearing your thoughts on continuing the work outlined above.

Thanks,

**LaShaun Warren**
Deputy Associate Director, External Affairs
███████████ - Mobile

*Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.*

---

**From:** Warren, LaShaun (CFPB)
**Sent:** Thursday, February 27, 2025 7:12 PM
**To:** Martinez, Adam (CFPB) ████████████████
**Cc:** O'Brien, Patrick (CFPB) ████████████
**Subject:** RE: Statutory/Legal Required Work

Hi Adam,

Thanks for sending the email.

While the February 8, 2025 email from Acting Director Russ Vought outlined specific activities employees could not participate in unless expressly approved, the February 9, 2025 email from Acting Director Vought (attached and copied below) indicated employees should "not perform **any** work tasks."

Over the last few weeks, External Affairs received and supported several "approved" requests including (1) reviewing contracts for termination, (2) terminating the advisory councils and (3) prepping and packing 1700 G Street due to the termination of the lease. In addition, earlier today Patrick O'Brien and I discussed the requirement to update the Consumer Advisory Boards charter and Membership Balance Plan by March 15, 2025. As a result, Patrick sent an email to Mark Paoletta (copied) at 2:47pm seeking guidance. Unfortunately, you were not copied on the email so please accept my apologies. The documents must be reviewed and approved by CFPB's Director and Chief Legal Officer prior to submitting to the General Services Administration's Committee Management Secretariat, the CFPB's House and Senate authorizing committees, and the Librarian of Congress by March 14th. The CFPB must also issue a Federal Register notice and post the two documents on the CFPB's public website as part of satisfying this obligation. The documents were previously cleared several weeks ago but recognize current leadership will likely want to review. Please let us know who these documents should be submitted to and the desired process to obtain approval.

This is the only immediately required statutorily required activity that I am aware of. I have polled my leadership team to see if there are any other urgent requests.

As you are aware, we are dedicated public servants ready to engage and serve the American people at any time. In the meantime, unless otherwise directed, we will abide by the guidance issued and will continue to raise items that are statutorily mandated.

Thank you for your continued support.

**From:** Vought, Russell ████████████████████

**Sent:** Monday, February 10, 2025 8:30 AM
**To:** _DL_CFPB_AllHands < ████████████████████ >
**Subject:** Additional Directives on Bureau Activities

Good morning, CFPB staff,

As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week. Employees should not come into the office. ==Please do not perform any work tasks.== If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task. His email is ████████████████████ Otherwise, ==employees should stand down from performing any work task.== Thank you for your attention on this matter.

Best,

Russ Vought

Acting Director

Bureau of Consumer Financial Protection


## LaShaun Warren

**Deputy Associate Director, External Affairs**
████████████████ - Mobile

*Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.*

---

**From:** Martinez, Adam (CFPB) ████████████████████
**Sent:** Thursday, February 27, 2025 4:47 PM
**To:** Warren, LaShaun (CFPB) ████████████████████
**Subject:** Statutory/Legal Required Work

Hi LaShaun – Good afternoon.

Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau including work conducted by External Affairs. He did exclude areas approved by him or required by law including statutory requirements.

We want to ensure that you are aware that you may reach out to Mark Paoletta, Chief Legal Officer with any questions regarding required reports or products you believe should continue at this time. Any actions or communications with outside parties must be sent to Mark and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer

as directed by the Acting Director.  Alternatively, you are always welcome to reach out to me if needed.  I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam

Adam Martinez
Chief Operating Officer

| From: | Paoletta, Mark (CFPB) |
|---|---|
| To: | Johnson, Christopher (CFPB); Martinez, Adam (CFPB) |
| Cc: | Dorsey, Darian (CFPB) |
| Subject: | Re: All Hands Message re: Work Required by Law |
| Date: | Sunday, March 2, 2025 8:10:41 PM |

Hi Christopher,
Thanks for reaching out.  Yes, please reactivate staff to support your work and to reach out to stakeholders.
Thanks.
Mark

**From:** Johnson, Christopher (CFPB) █████████████████████████
**Sent:** Sunday, March 2, 2025 8:06:01 PM
**To:** Martinez, Adam (CFPB) ████████████████
**Cc:** Paoletta, Mark (CFPB) █████████████████; Dorsey, Darian (CFPB) ████████████████████
**Subject:** RE: All Hands Message re: Work Required by Law

Hi Mark,

Thank you for providing clarity about performing work required by law.

Consistent with your direction and in light of our statutory obligations to conduct financial education programs (*Section 1021(c)(1)*) and to collect, investigate, and respond to consumer complaints (*(Section 1021(c)(2))*), the Division of Consumer Response and Education will take steps to reactivate all staff full-time. This includes staff that perform statutorily mandated work and the small number of staff that provide critical support for these efforts (e.g., quality assurance audits, access management). I plan to communicate this direction to staff early tomorrow morning.

Those staff activated with your approval last Thursday (see attached) are continuing that work. From the complaint handling assessment, we have already determined that we have a backlog of requests from complaint process stakeholders, including companies, federal and state agencies, congressional offices, and others. Consistent with Acting Director's February 8th email, we are seeking your approval to engage these external stakeholders to address their concerns.

Please let me know if you have questions or concerns.

Christopher Johnson
Associate Director | Division of Consumer Response and Education
Office: ████████████ | Mobile: ████████████

Bureau of Consumer Financial Protection
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ████████████████████

**Sent:** Sunday, March 2, 2025 3:33 PM

**Cc:** Paoletta, Mark (CFPB) ████████████████ >

**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta

Chief Legal Officer

CFPB

| From: | Paoletta, Mark (CFPB) ████████████████ |
|---|---|
| **Sent:** | Sunday, March 02, 2025 8:11 PM |
| **To:** | Johnson, Christopher (CFPB); Martinez, Adam (CFPB) |
| **Cc:** | Dorsey, Darian (CFPB) |
| **Subject:** | Re: All Hands Message re: Work Required by Law |

Hi Christopher,

Thanks for reaching out.  Yes, please reactivate staff to support your work and to reach out to stakeholders.

Thanks.

Mark

---

**From:** Johnson, Christopher (CFPB) ████████████████
**Sent:** Sunday, March 2, 2025 8:06:01 PM
**To:** Martinez, Adam (CFPB) ████████████
**Cc:** Paoletta, Mark (CFPB) ████████████████; Dorsey, Darian (CFPB) ████████████
**Subject:** RE: All Hands Message re: Work Required by Law

Hi Mark,

Thank you for providing clarity about performing work required by law.

Consistent with your direction and in light of our statutory obligations to conduct financial education programs (*Section 1021(c)(1)*) and to collect, investigate, and respond to consumer complaints (*(Section 1021(c)(2)*), the Division of Consumer Response and Education will take steps to reactivate all staff full-time. This includes staff that perform statutorily mandated work and the small number of staff that provide critical support for these efforts (e.g., quality assurance audits, access management). I plan to communicate this direction to staff early tomorrow morning.

Those staff activated with your approval last Thursday (see attached) are continuing that work. From the complaint handling assessment, we have already determined that we have a backlog of requests from complaint process stakeholders, including companies, federal and state agencies, congressional offices, and others. Consistent with Acting Director's February 8th email, we are seeking your approval to engage these external stakeholders to address their concerns.

Please let me know if you have questions or concerns.


Christopher Johnson
Associate Director | Division of Consumer Response and Education
Office: ████████████ | Mobile: ████████████

Bureau of Consumer Financial Protection
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) <███████████████>
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ███████████
████████████████████████████████

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00068 JA350

| From: | Correal, Dubis (CFPB) |
|---|---|
| To: | Martinez, Adam (CFPB); Carmer, Alan (CFPB); Johnson, Christopher (CFPB) |
| Cc: | Paoletta, Mark (CFPB); _DL_CFPB_CRE_FinEd_FinEd_All |
| Subject: | RE: All Hands Message re: Work Required by Law |
| Date: | Monday, March 3, 2025 8:20:30 AM |

Hi Adam and Alan,

Chris sent an email this morning reactivating the work of the Division, including the Office of Financial Education.

**Dubis Correal**
Deputy Assistant Director | Office of Financial Education
Mobile: ▮▮▮▮▮▮▮

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ▮▮▮▮▮▮▮
**Sent:** Monday, March 3, 2025 8:16 AM
**To:** Carmer, Alan (CFPB) ▮▮▮▮▮▮▮ Johnson, Christopher (CFPB) ▮▮▮▮▮▮▮
**Cc:** Paoletta, Mark (CFPB) ▮▮▮▮▮▮▮; _DL_CFPB_CRE_FinEd_FinEd_All ▮▮▮▮▮▮▮

**Subject:** RE: All Hands Message re: Work Required by Law

Alan –

I'd recommend that you check-in with your Associate Director this morning to discuss. Chris has the authority needed to continue the statutorily required work under his division.

Adam

Adam Martinez
Chief Operating Officer

**From:** Carmer, Alan (CFPB) ▮▮▮▮▮▮▮
**Sent:** Monday, March 3, 2025 3:15 AM
**To:** Martinez, Adam (CFPB) ▮▮▮▮▮▮▮
**Cc:** Paoletta, Mark (CFPB) ▮▮▮▮▮▮▮; _DL_CFPB_CRE_FinEd_FinEd_All ▮▮▮▮▮▮▮

**Subject:** RE: All Hands Message re: Work Required by Law

Mr. Martinez,

I believe all the work in the Office of Financial Education is statutorily authorized and mandated. Please make clear whether the Office of Financial Education staff should resume their assigned duties to improve the financial literacy of consumers. A general outline of statutory responsibilities follows:

- *12 U.S.C § 5411(c)(1)* states that "conducting financial education programs" is the first of several "primary functions" of the CFPB. **This work has been halted and should resume.**
- *12 U.S.C. § 5493(d )* requires the Office of Financial Education to develop *and implement* a strategy to improve the financial literacy of consumers. **This work has been halted and should resume.**
- 12 U.S.C. § 5493(d)(2) states the office shall implement activities in several areas including financial counseling, savings, understanding credit scores, and debt strategies. **This work has been halted and should resume.**
- *12 U.S.C. 5493(d)(2)(D)(iii)* states the office shall implement activities to "improve the financial situation of the consumer." **This work has been halted and should resume.**
- *12 U.S.C. 5493(d)(3)* requires staff to coordinate with other units in the bureau and specifically lists the Consumer Affairs Office and the research unit. **This work has been halted and should resume.**
- *(see 20 U.S.C § 9702)* Financial Literacy and Education Commission (FLEC).
  - *20 USC § 9702(d)* states that the Director of the CFPB serves as the co-Chair of the Financial Literacy and Education Commission (FLEC) with the Treasury Secretary as the chair.
  - *20 U.S.C. § 9702(c)(1)* states that the FLEC comprises representatives from 23 federal agencies and the White House Domestic Policy Council.
  - *20 U.S.C § 9702(e)* states the FLEC must hold a public meeting every 4 months. The last meeting was on 11/14/2024. **Staff planning for the next meeting has been halted and should resume.**
    - *12 U.S.C. § 5493(d)(2)* states the Office of Financial Education must work in consultation with the FLEC. **This work has been halted and should resume.**
- *12 U.S.C. § 5493(d)(4)* requires an annual report to Congress on the CFPB's strategy and activities to improve financial literacy. **This work has been halted and should resume.**

I have served through each change of administration in the CFPB and fully expect any new director or acting director to communicate new priorities through management. Indeed, the Office of Financial Education has experienced multiple reorganizations and has been in at least 3 different divisions as priorities evolve with changes in leadership. Each reorganization was disruptive in its own way, but our work was never halted entirely as it seems to be now.

Again, please clarify that Office of Financial Education staff should resume their assigned duties to improve the financial literacy of consumers until new leadership is able to clearly communicate a change in financial education priorities.

The primary statute relied upon to establish the Office of Financial Education is copied below the

signature for reference.

Alan S. Carmer
Attorney-Advisor
Office of Financial Education
Mobile: ███████████

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete
the e-mail and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

12 U.S.C. § 5493(d)
*(1)Establishment*
*The Director shall establish an Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions.*

*(2)Other duties*
*The Office of Financial Education shall develop and implement a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission, consistent with the National Strategy for Financial Literacy, through activities including providing opportunities for consumers to access—*
*(A)financial counseling, including community-based financial counseling, where practicable;*
*(B)information to assist with the evaluation of credit products and the understanding of credit histories and scores;*
*(C)savings, borrowing, and other services found at mainstream financial institutions;*
*(D)activities intended to—*
*(i)prepare the consumer for educational expenses and the submission of financial aid applications, and other major purchases;*
*(ii)reduce debt; and*
*(iii)improve the financial situation of the consumer;*
*(E)assistance in developing long-term savings strategies; and*
*(F)wealth building and financial services during the preparation process to claim earned income tax credits and Federal benefits.*
*(3)Coordination*
*The Office of Financial Education shall coordinate with other units within the Bureau in carrying out its functions, including—*
*(A)working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and*
*(B)working with the research unit established by the Director to conduct research related to consumer financial education and counseling.*
*(4)Report*
*Not later than 24 months after the designated transfer date, and annually thereafter, the Director shall submit a report on its financial literacy activities and strategy to improve financial literacy of consumers to—*
*(A)the Committee on Banking, Housing, and Urban Affairs of the Senate; and*
*(B)the Committee on Financial Services of the House of Representatives.*

**From:** Martinez, Adam (CFPB) ███████████████>
**Sent:** Sunday, March 2, 2025 12:33 PM
**Cc:** Paoletta, Mark (CFPB) ███████████
**Subject:** All Hands Message re: Work Required by Law

### Message from Mark Paoletta, Chief Legal Officer

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.


Mark Paoletta
Chief Legal Officer
CFPB

| | |
|---|---|
| **From:** | Johnson, Christopher (CFPB) |
| **To:** | Martinez, Adam (CFPB); Carmer, Alan (CFPB) |
| **Cc:** | Paoletta, Mark (CFPB); _DL_CFPB_CRE_FinEd_FinEd_All; Dorsey, Darian (CFPB) |
| **Subject:** | RE: All Hands Message re: Work Required by Law |
| **Date:** | Monday, March 3, 2025 8:20:47 AM |

Thank you for looping me in, Adam.  Good morning, Alan.  Please note an email was shared with all CRE Staff, including you at 6AM, that you are activated for work.  Specific guidance will be shared with Dubis Correal this AM who will relay that in FinEd's Monday morning team meeting.  Feel free to reach out to me directly if you have any questions.

**From:** Martinez, Adam (CFPB) ██████████████████>
**Sent:** Monday, March 3, 2025 8:16 AM
**To:** Carmer, Alan (CFPB) ████████████; Johnson, Christopher (CFPB)
████████████████
**Cc:** Paoletta, Mark (CFPB) ██████████████>; _DL_CFPB_CRE_FinEd_FinEd_All
████████████████
**Subject:** RE: All Hands Message re: Work Required by Law

Alan –

I'd recommend that you check-in with your Associate Director this morning to discuss.  Chris has the authority needed to continue the statutorily required work under his division.

Adam

Adam Martinez
Chief Operating Officer

**From:** Carmer, Alan (CFPB) ██████████████
**Sent:** Monday, March 3, 2025 3:15 AM
**To:** Martinez, Adam (CFPB) ██████████████
**Cc:** Paoletta, Mark (CFPB) ██████████████; _DL_CFPB_CRE_FinEd_FinEd_All
████████████████
**Subject:** RE: All Hands Message re: Work Required by Law

Mr. Martinez,

I believe all the work in the Office of Financial Education is statutorily authorized and mandated.  Please make clear whether the Office of Financial Education staff should resume their assigned duties to improve the financial literacy of consumers.  A general outline of statutory responsibilities follows:

- *12 U.S.C § 5411(c)(1)* states that "conducting financial education programs" is the first of several "primary functions" of the CFPB.  **This work has been halted and should resume.**
- *12 U.S.C. § 5493(d )* requires the Office of Financial Education to develop *and implement* a

strategy to improve the financial literacy of consumers.  **This work has been halted and should resume.**

- 12 U.S.C. § 5493(d)(2) states the office shall implement activities in several areas including financial counseling, savings, understanding credit scores, and debt strategies.  **This work has been halted and should resume.**
- *12 U.S.C. 5493(d)(2)(D)(iii)* states the office shall implement activities to "improve the financial situation of the consumer."  **This work has been halted and should resume.**
- *12 U.S.C. 5493(d)(3)* requires staff to coordinate with other units in the bureau and specifically lists the Consumer Affairs Office and the research unit.  **This work has been halted and should resume.**
- *(see 20 U.S.C § 9702)*   Financial Literacy and Education Commission (FLEC).
  - *20 USC § 9702(d)* states that the Director of the CFPB serves as the co-Chair of the Financial Literacy and Education Commission (FLEC) with the Treasury Secretary as the chair.
  - *20 U.S.C. § 9702(c)(1)* states that the FLEC comprises representatives from 23 federal agencies and the White House Domestic Policy Council.
  - *20 U.S.C § 9702(e)* states the FLEC must hold a public meeting every 4 months.  The last meeting was on 11/14/2024.  **Staff planning for the next meeting has been halted and should resume.**
    - *12 U.S.C. § 5493(d)(2)* states the Office of Financial Education must work in consultation with the FLEC.  **This work has been halted and should resume.**
- *12 U.S.C. § 5493(d)(4)* requires an annual report to Congress on the CFPB's strategy and activities to improve financial literacy.  **This work has been halted and should resume.**

I have served through each change of administration in the CFPB and fully expect any new director or acting director to communicate new priorities through management. Indeed, the Office of Financial Education has experienced multiple reorganizations and has been in at least 3 different divisions as priorities evolve with changes in leadership.  Each reorganization was disruptive in its own way, but our work was never halted entirely as it seems to be now.

Again, please clarify that Office of Financial Education staff should resume their assigned duties to improve the financial literacy of consumers until new leadership is able to clearly communicate a change in financial education priorities.

The primary statute relied upon to establish the Office of Financial Education is copied below the signature for reference.

Alan S. Carmer
Attorney-Advisor
Office of Financial Education
Mobile: ▉▉▉▉▉▉▉▉▉

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

12 U.S.C. § 5493(d)
*(1)Establishment*
*The Director shall establish an Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions.*

*(2)Other duties*
*The Office of Financial Education shall develop and implement a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission, consistent with the National Strategy for Financial Literacy, through activities including providing opportunities for consumers to access—*
*(A)financial counseling, including community-based financial counseling, where practicable;*
*(B)information to assist with the evaluation of credit products and the understanding of credit histories and scores;*
*(C)savings, borrowing, and other services found at mainstream financial institutions;*
*(D)activities intended to—*
*(i)prepare the consumer for educational expenses and the submission of financial aid applications, and other major purchases;*
*(ii)reduce debt; and*
*(iii)improve the financial situation of the consumer;*
*(E)assistance in developing long-term savings strategies; and*
*(F)wealth building and financial services during the preparation process to claim earned income tax credits and Federal benefits.*
*(3)Coordination*
*The Office of Financial Education shall coordinate with other units within the Bureau in carrying out its functions, including—*
*(A)working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and*
*(B)working with the research unit established by the Director to conduct research related to consumer financial education and counseling.*
*(4)Report*
*Not later than 24 months after the designated transfer date, and annually thereafter, the Director shall submit a report on its financial literacy activities and strategy to improve financial literacy of consumers to—*
*(A)the Committee on Banking, Housing, and Urban Affairs of the Senate; and*
*(B)the Committee on Financial Services of the House of Representatives.*

---

**From:** Martinez, Adam (CFPB) ███████████████
**Sent:** Sunday, March 2, 2025 12:33 PM
**Cc:** Paoletta, Mark (CFPB) ████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00076 JA358

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Adams, Danielle (CFPB); Michalosky, Martin (CFPB) |
| Subject: | RE: FOIA Processing |
| Date: | Monday, March 3, 2025 8:29:00 AM |
| Attachments: | image001.png |

HI Danielle –

Anyone involved in the FOIA process should comply with your team's request. When your team sends out request perhaps they can include a line that the work is legally required so the employee must comply.

Let me know if that works.

Thank you.

Adam

Adam Martinez
Chief Operating Officer

**From:** Adams, Danielle (CFPB) ███████████████
**Sent:** Monday, March 3, 2025 6:58 AM
**To:** Martinez, Adam (CFPB) ███████████████ Michalosky, Martin (CFPB)
███████████
**Subject:** RE: FOIA Processing
**Importance:** High

Adam,

Does your recent all hands mean that anyone who supports the FOIA Team will also be permitted to perform work tasks? How should I facilitate that process?

Thanks,
Danielle

Danielle Duvall Adams
she/her/hers
FOIA Manager
Mobile: ███████████

Consumer Financial Protection Bureau
consumerfinance.gov



Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Martinez, Adam (CFPB) <Adam.Martinez@cfpb.gov>
**Sent:** Thursday, February 27, 2025 1:25 PM
**To:** Michalosky, Martin (CFPB) <Martin.Michalosky@cfpb.gov>; Adams, Danielle (CFPB) <Danielle.Adams@cfpb.gov>
**Subject:** FOIA Processing

Hi Marty and Danielle –

I just spoke with Marty and FOIA has the green light to continue processing requests. Anyone on your team are authorized to perform the work.

Thank you.

Adam

Adam Martinez
Chief Operating Officer

| From: | Johnson, Christopher (CFPB) |
|---|---|
| To: | Martinez, Adam (CFPB) |
| Subject: | FW: All Hands Message re: Work Required by Law |
| Date: | Monday, March 3, 2025 8:37:35 AM |

Information share, sir. Thanks, and let me know if you have any questions. I will be working with the teams throughout the day to ensure compliance.

---

**From:** Johnson, Christopher (CFPB) █████████████
**Sent:** Monday, March 3, 2025 5:59 AM
**To:** _DL_CFPB_CRE_All █████████████
**Subject:** FW: All Hands Message re: Work Required by Law

Hello CRE Team,

I hope you each are doing well. I'm reaching out this morning to share that the CFPB's Chief Legal Officer has approved the reactivation of all CRE team members full-time in accordance with the guidance below. For any potential exceptions, I will reach out to share guidance directly with managers and section leaders this morning. As you resume your duties and normal work schedules, I'm sure questions will arise, please share those questions with your immediate Supervisor or Section leaders. We will do our best to work to obtain answers in a timely manner. I look forward to connecting with you soon. More importantly, thank you for your continued and unwavering commitment and service to the millions of consumers the CRE division assist each year in navigating an evolving financial marketplace.

Thanks,

Christopher Johnson
Associate Director | Division of Consumer Response and Education
Office: ██████████  | Mobile: ██████████

Bureau of Consumer Financial Protection
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Paoletta, Mark (CFPB) █████████████
**Sent:** Sunday, March 2, 2025 8:11 PM
**To:** Johnson, Christopher (CFPB) █████████████ ; Martinez, Adam (CFPB)
█████████████
**Cc:** Dorsey, Darian (CFPB) █████████████

**Subject:** Re: All Hands Message re: Work Required by Law

Hi Christopher,
Thanks for reaching out.  Yes, please reactivate staff to support your work and to reach out to stakeholders.
Thanks.
Mark

**From:** Johnson, Christopher (CFPB) ███████████████████████
**Sent:** Sunday, March 2, 2025 8:06:01 PM
**To:** Martinez, Adam (CFPB) ██████████████████
**Cc:** Paoletta, Mark (CFPB) ████████████████████; Dorsey, Darian (CFPB)
████████████████
**Subject:** RE: All Hands Message re: Work Required by Law

Hi Mark,

Thank you for providing clarity about performing work required by law.

Consistent with your direction and in light of our statutory obligations to conduct financial education programs (*Section 1021(c)(1)*) and to collect, investigate, and respond to consumer complaints (*(Section 1021(c)(2)*)), the Division of Consumer Response and Education will take steps to reactivate all staff full-time. This includes staff that perform statutorily mandated work and the small number of staff that provide critical support for these efforts (e.g., quality assurance audits, access management). I plan to communicate this direction to staff early tomorrow morning.

Those staff activated with your approval last Thursday (see attached) are continuing that work. From the complaint handling assessment, we have already determined that we have a backlog of requests from complaint process stakeholders, including companies, federal and state agencies, congressional offices, and others. Consistent with Acting Director's February 8th email, we are seeking your approval to engage these external stakeholders to address their concerns.

Please let me know if you have questions or concerns.

Christopher Johnson
Associate Director | Division of Consumer Response and Education
Office: ████████████ | Mobile: ██████████████

Bureau of Consumer Financial Protection
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ███████████████████
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ███████████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.


Mark Paoletta
Chief Legal Officer
CFPB

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Huggins, Cassandra (CFPB) |
| Cc: | Hagins, Calvin (CFPB) |
| Subject: | RE: All Hands Message re: Work Required by Law |
| Date: | Monday, March 3, 2025 10:09:00 AM |

Hi Casey – Good morning.

I would highly encourage you to communicate with Mark P. regarding expectations. However, you are correct that the email sent out yesterday does not change the specific work stoppage in the bullet points issued on 8 February.

Adam

Adam Martinez
Chief Operating Officer

**From:** Huggins, Cassandra (CFPB) █████████████████ >
**Sent:** Monday, March 3, 2025 10:02 AM
**To:** Martinez, Adam (CFPB) █████████████ >
**Cc:** Hagins, Calvin (CFPB) < ████████████████ >
**Subject:** RE: All Hands Message re: Work Required by Law

Good morning,

I've received a number of messages from staff who are understandably confused by the information in this email. I would like to get clarification on what exactly Supervision staff is expected to be doing.

The Acting Director's February 8 message directed the stoppage of all supervision and examination activity, despite the fact that the work is required by law (12 CFR 1024, 1025, and 1026 require the Bureau to conduct such supervisory activities). We've also stopped all work supporting supervision and examination activity, including operational activities such as policy/procedure development; quality management reviews; systems and registration oversight; reporting, analytics, monitoring, exam prioritization/scheduling; and human capital activities that support supervision. We've also told staff to not engage in activities requiring coordination with parties outside of the Bureau, including coordination with other federal/state regulatory agencies, participation on FFIEC task forces/subcommittees, or engagement with supervised entities.

Supervision staff has been authorized to work on some isolated tasks ( ████████████████████
████████████████ , a handful of briefings/information gathering for Sr. leadership, and administrative tasks like WebTA/Concur approval), but otherwise it is my understanding that **they should continue to operate on administrative leave unless a discrete activity has been approved. Please confirm that the message you sent is not intended to authorize the reinstatement of supervision/examination activity despite the fact that the Bureau is required by law to conduct these activities.**

Thanks,
Casey

Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
Mobile: ███████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ◄████████████████
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ◄████████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer

CFPB

CFPB_00084 JA366

| From: | Pappalardo, Janis (CFPB) |
|---|---|
| To: | Paoletta, Mark (CFPB) |
| Cc: | Martinez, Adam (CFPB); Shapiro, Daniel (CFPB) |
| Subject: | RE: All Hands Message re: Work Required by Law |
| Date: | Monday, March 3, 2025 10:15:15 AM |

Hi Mark,

I hope this note find you well!

I am reaching out to ensure that RMR meets your expectations on the scope and implementation of your March 2 guidance and guidance we received last week from Adam Martinez.

**Scope:** I understand that RMR is authorized to conduct all regular work related to fulfilling statutory obligations and/or work required by law, including regular management activities, albeit with limits on contact with outside parties. For example, I understand that we are authorized to perform work to comply with The Dodd-Frank Act and other laws and statutes, such as Section 502(a) of the Consumer Credit Card Market Act of 2009.

The RMR leadership team and I have reviewed our work against provisions of Dodd-Frank and other statutes. I believe that virtually all our work is conducted to meet the CFPB's statutory obligations. This implies that I expect we will bring virtually all RMR staff back to work.

**Implementation:**

Outside Party Communication: According to the February 27 guidance from Adam Martinez: "Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer." Given the volume and nature of communications involved in carrying out our work, I understand that this is difficult to implement. I also understand that you recently approved Assistant Director McNamara's request to conduct statutorily required market monitoring, with a cc to Adam, Daniel, and you on substantive matters, but not on scheduling and maintenance issues and that the Office of Markets will make you and Daniel aware of market monitoring meetings. We plan to apply this same understanding to external monitoring communications by other RMR Offices.

I am proposing some additional implementation strategies for all RMR, below. Please let me know if you have any questions or concerns about these proposals.

- That communications within the federal government, with contracted entities, and within the Federal Reserve system that help us fulfill our statutory responsibilities will be pre-approved and not require your involvement. For example, a regular meeting with Federal Reserve system researchers about developments in risks to household

financial stability can continue.

- That we resume engagement with outside researchers and other parties to advance the Bureau's research responsibilities. This would include discussing research findings in meetings, workshops, and conferences with other government agencies, presenting research findings at academic conferences, and attending research conferences. We expect to follow the usual Bureau procedures for authorizing and clearing any presentations and conference attendance and will alert you and Daniel prior to any presentation or attendance at a non-governmental conference.

- That internal reports go forward without prior approval.

- That we will await guidance on publishing material on the Bureau website, although refreshing data on the Bureau website for the Consumer Credit Trends and Mortgage Performance Trends will continue.

- That we will resume disseminating our research findings under the Independent Research Policy. This includes resuming posting on the working paper series on Social Sciences Research Network, an outlet for disclaimed research, and in proceeding with academic publications.

- That we resume the regulatory inquiries function through which the Office of Regulations responds to requests from external parties, particularly small businesses, for informal guidance on regulatory matters.  This is one of several tools the office uses to comply with its SBREFA obligations.

-

Please let me know if there is specific work that you would like us to move forward on or hold. Absent specific direction, I will use my discretion and best judgment to assign statutorily required work to staff.


Respectfully yours,


Jan


--
Janis K. Pappalardo
Deputy Associate Director and Acting Associate Director
Research, Monitoring, and Regulations
Mobile: ███████████

Consumer Financial Protection Bureau
**consumerfinance.gov**


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ██████████████████ >
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ████████████████
**Subject:** All Hands Message re: Work Required by Law

**<u>Message from Mark Paoletta, Chief Legal Officer</u>**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00087    JA369

| From: | Kamenshine, Wendy (CFPB) |
|---|---|
| To: | Paoletta, Mark (CFPB) |
| Cc: | Martinez, Adam (CFPB); Asar, Sharon (CFPB); Garmon, Felisa (CFPB); Milner, Heather (CFPB); Fields, John (CFPB) |
| Subject: | RE: All Hands Message re: Work Required by Law |
| Date: | Monday, March 3, 2025 10:54:12 AM |

In accordance with the email below, the CFPB Ombudsman's Office team will work in conjunction with the statute.

The CFPB Ombudsman's Office provides an independent, impartial, and confidential resource to informally assist individuals, companies, consumer and trade groups, and others in resolving process issues with the CFPB.

Best,
Wendy

**Wendy E. Kamenshine**

Ombudsman
CFPB Ombudsman's Office

Tel: ████████████████
Telecommunications Relay Service (TRS) users, dial ██
██████████████████

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Martinez, Adam (CFPB) ██████████████████
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ██████████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing

statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

| | |
|---|---|
| **From:** | Kamenshine, Wendy (CFPB) |
| **To:** | Paoletta, Mark (CFPB) |
| **Cc:** | Martinez, Adam (CFPB); Asar, Sharon (CFPB); Garmon, Felisa (CFPB); Milner, Heather (CFPB); Fields, John (CFPB) |
| **Subject:** | RE: All Hands Message re: Work Required by Law |
| **Date:** | Monday, March 3, 2025 10:54:12 AM |

In accordance with the email below, the CFPB Ombudsman's Office team will work in conjunction with the statute.

The CFPB Ombudsman's Office provides an independent, impartial, and confidential resource to informally assist individuals, companies, consumer and trade groups, and others in resolving process issues with the CFPB.

Best,
Wendy

**Wendy E. Kamenshine**

Ombudsman
CFPB Ombudsman's Office

Tel: ███████████████
Telecommunications Relay Service (TRS) users, dial ██

**consumerfinance.gov/ombudsman**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Martinez, Adam (CFPB) ███████████████
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ███████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing

statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00091 JA373

| From: | Lee, Scott (CFPB) |
|---|---|
| To: | Martinez, Adam (CFPB) |
| Cc: | Chang, Jean (CFPB); Broeksmit, Samuel (CFPB) |
| Subject: | RE: Mandated Reports - Ops Q2/Q3 |
| Date: | Monday, March 3, 2025 11:30:40 AM |

Ok thanks Adam — will reach out and coordinated with our offices.

Scott

---

**From:** Martinez, Adam (CFPB) ▬▬▬▬▬▬
**Sent:** Monday, March 3, 2025 10:58 AM
**To:** Lee, Scott (CFPB) ▬▬▬▬
**Cc:** Chang, Jean (CFPB) ▬▬▬▬>; Broeksmit, Samuel (CFPB) ▬▬▬
**Subject:** RE: Mandated Reports - Ops Q2/Q3

Hey Scott –

Thank you for pulling all this together. It's helpful to see it all in one place because it really does expose the bureaucracy we deal with. Wow!

Please proceed with working with each Ops office to coordinate the continuation of work to respond to each of these. You may reference the legal requirement up front when asking for offices to perform the work, if necessary.

Adam

Adam Martinez
Chief Operating Officer

---

**From:** Lee, Scott (CFPB) ▬▬▬▬▬
**Sent:** Monday, March 3, 2025 10:35 AM
**To:** Martinez, Adam (CFPB) ▬▬▬
**Cc:** Chang, Jean (CFPB) ▬▬▬▬; Broeksmit, Samuel (CFPB) ▬▬▬
**Subject:** Mandated Reports - Ops Q2/Q3

Hi Adam,

Per the recent request – we've pulled a list of the mandated reports that Operations produces for Q2 – Q3. We've filtered it from between Feb. 15 – June 30 to limit the timeframe down. Per the previous order to work stop; unclear on the progress made on the ones due in February and early March.

Question for you: Given these reports are tied to a legal requirement, should we have our offices reinitiate work on these items. If so – I can begin reaching out to those offices and their POCs to have them begin.

Scott

| OFFICE OR TEAM | REPORT/PUBLICATION TITLE | DESCRIPTION AND ACTION(S) REQUIRED | LEGAL REQUIREMENT | RECEIVING ORGANIZATION | FY25 PUBLICATION DUE DATE(S) | DUE DATE STATUTORILY REQUIRED | APPROVING OFFICIAL |
|---|---|---|---|---|---|---|---|
| OFP/CFO | Annual Performance Plan and Report, and Budget Overview (Managed by OSPP) | The report describes the resources needed to accomplish our goals and measure our performance against our strategic plan. Strategy owns this document. The document also includes a budget section which the OCFO is responsible for. Budget section fulfills statutory requirement of 1017(a)(4)(A) financial operating plans and forecasts. | Dodd-Frank §1017(a)(4)(A) – Director shall provide to the Director of the Office of Management and Budget copies of the financial operating plans and forecasts of the Director, as prepared by the Director in the ordinary course of the operations of the Bureau. S 1016 also requires that a justification of the budget request of the previous year be provided with the semiannual report to Congress. [Note: there may be other requirements that govern the publication of strategic plans and performance information] | FRB OMB Congress | 2/15/2025 | N | DIR |
| OFP/CFO | DATA Act | Submission of reconciliations of financial and procurement data that supports USASpending.gov | Public Law 113-101, dated May 9, 2014 and the official title is "Digital Accountability and Transparency Act of 2014" | USASpending.gov | 2/15/2025 | N | CFO |
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 2/18/2025 | N | CFO |
| CRO | GAO-IG Act Reporting | Annual report of external findings from GAO and OIG | Good Accounting Obligation in Government Act (GAO-IG Act) (Public Law 115-414) | Congress GAO OIG | 2/28/2025 | N | DD |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 2/28/2025 | N | CFO |
| OFP/PROC | Service Contract Inventory | Presents an analysis on CFPB's service contract inventory to determine if contract labor is used appropriately and the mix of Federal employees and contractors is balanced. | FY 2010 Consolidated Appropriations Act- Public Law 111-117 OMB memo, Dated Dec 19, 2011 | OMB, MAX.GOV | 2/28/2025 | Y | COO |
| OFP/CFO | Annual Independent Performance Audit | Annual independent audit of the operations and budget of the Bureau. The purpose of this audit is to provide objective analyses to improve program performance and operations, reduce costs, facilitate decision-making, and contribute to public accountability | 12 USC § 5496a | Public (published on cfpb.gov) | 2/28/2025 | N | DD |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 2/28/2025 | N | CFO |

| | | quarter. | | | | | |
|---|---|---|---|---|---|---|---|
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 2/28/2025 | N | CFO |
| OCDO | Federal Electronic Records and Email Management Maturity Model Report | Report to determine how federal agencies manage electronic records. | The Federal Records Act (44 U.S.C. 31) | NARA | 3/15/2025 | N | COO |
| OCDO | Records Management Self-Assessment | The goal of the self assessment is to determine whether federal agencies are compliant with statutory and regulatory records management requirements. | The Federal Records Act (44 U.S.C. 31) | NARA | 3/15/2025 | N | COO |
| OCDO | Senior Agency Official of Records Management Report | Report documents how the Bureau is managing RIM activities and goals established by NARA | The Federal Records Act (44 U.S.C. 31) | NARA | 3/15/2025 | N | COO |
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 3/18/2025 | N | CFO |
| OFP/CFO | Quarterly Transfer Requests | Letters requesting transfer of funds from the Fed Reserve to CFPB | Dodd-Frank § 1017(a)(1) | FRB Congress | 3/20/2025 | N | DIR |
| CRO | OIG Semiannual Report | OIG Federal Reserve provides semiannual report of signigicant activities, finds, and recommendations during a six month period. | P.L. 95-452 | HFSC and BHUA | 3/31/2025 | Y | DIR |
| OHC | Financial Literacy and Education Plan (for Bureau Employees) | OPM requires agency benefits representatives to submit an annual financial literacy and education plan for agency employees. | Thrift Savings Plan Open Elections Act of 2004 (Public Law 108-469) | OPM | 3/31/2025 | N | CHCO |
| OHC | Student Loan Repayment Incentives | Agencies must submit an annual written report to the U.S. Office of Personnel Management (OPM) on their use of student loan repayments during the previous calendar year (CY), as required by 5 U.S.C. 5379(h). | 5 U.S.C. 5379(h)(1) and 5 CFR 537.110(b) | OPM | 3/31/2025 | Y | CHCO |
| OCDO | Chief FOIA Officer Report | In accordance with the FOIA, each agency Chief FOIA Officer must "review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing [the FOIA]. | The Freedom of Information Act (FOIA), 5 U.S.C § 552(j)(2)(D). | DOJ | 3/31/2025 | Y | COO |
| OHC | Annual Data Call for Pathways Programs and Early Career Talent Hiring Reporting | Under Section 6 of Executive Order 14035: Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce, the Biden-Harris Administration directs agencies to increase availability of paid internships, fellowships, apprenticeships, and other early career programs. | 5 CFR 362.109 | OPM | 4/1/2025 | Y | CHCO |
| OHC | Telework Data Call | Participation in this annual survey is a requirement under the Telework Enhancement Act of 2010, Public Law 111-292 (the Act and is reported by OPM to Congress. The questions in this survey ask for information about agencies' telework program. | Telework Enhancement Act of 2010, Public Law 111-292 | OPM | 4/10/2025 | N | COO |
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 4/18/2025 | N | CFO |
| T&I | Fiscal Year 20XX-20XX Guidance on Federal Information Security and Privacy Management Requirements - EO14028 Metrics (Q1 & Q3) & Chief Information Officer Metrics (Q2) | FY XX Q1 – Q3 Reporting via Cyberscope. | FY24 FISMA Guidance is not yet released. OMB M-23-03 - FY23 [MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES] | DHS OMB | 4/18/2025 | Y | COO |
| T&I | Strengthening the Cybersecurity of Federal Agencies by Enhancing the High Value Asset Program | FY2X HVA list report on a quarterly basis and provide updates and modifications via Homeland Security Information Network (HSIN) | OMB M-19-03 | DHS | 4/18/2025 | Y | COO |
| T&I | Improving Vulnerability Identification, | BOD 20-01 Vulnerability Disclosure Policy | OMB-M-20-32 | DHS | 4/18/2025 | Y | OTHER |

| | Management, and Remediation | reporting via Cyberscope | | | | | |
|---|---|---|---|---|---|---|---|
| OCDO | Quarterly FOIA Report | In accordance with the FOIA, the Department of Justice requires agencies to provide quarterly reporting of four key FOIA statistics so that they can be posted on FOIA.gov. | 5 U.S.C. § 552(e)(5), (j)(2)(D) | DOJ | 4/25/2025 | Y | CDO |
| T&I | Migrating to Post-Quantum Cryptography (Inventory) | By May 4, 2023, and annually thereafter until 2035, or as directed by superseding guidance, agencies are directed to submit a prioritized inventory of information systems and assets, excluding national security systems, that contain CRQC-vulnerable cryptographic systems to ONCD and the Department of Homeland Security Cybersecurity and Infrastructure Security Agency (CISA) | M-23-02 | DHS OMB | 5/3/2025 | Y | COO |
| OFP/CFO | DATA Act | Submission of reconciliations of financial and procurement data that supports USASpending.gov | Public Law 113-101, dated May 9, 2014 and the official title is "Digital Accountability and Transparency Act of 2014" | USAspending.gov | 5/15/2025 | N | CFO |
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 5/18/2025 | N | CFO |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017?? | Public (published on cfpb.gov) | 5/30/2025 | N | CFO |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017?? | Public (published on cfpb.gov) | 5/30/2025 | N | CFO |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017?? | Public (published on cfpb.gov) | 5/30/2025 | N | CFO |
| OCDO | Financial Stability Oversight Council (FSOC) Data Inventory | The Interagency Data Inventory is a product of the Data Committee of the Financial Stability Oversight Council (FSOC). The inventory catalogs the data collected by FSOC member organizations. The inventory contains information — metadata — about each data collection. It does not contain the underlying datasets. For each data collection, the inventory has basic information, such as a brief description of the collection, collecting organization, and the name and number of the form used to collect the data. | Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 | FSOC | 5/31/2025 | N | COO |
| OFP/CFO | Semiannual Report of Payments Accepted from a Non-Federal Source | As required by the statute, the Bureau must submit to the Director of the Office of Government Ethics reports of payments of more than $250 accepted from non-Federal sources for travel, subsistence, and related expenses with respect to an employee's attendance at any meeting or similar function relating to the official duties of the employee. | 31 U.S.C. 1353 | OGE | 5/31/2025 | Y | CFO |
| T&I | Migrating to Post-Quantum Cryptography (Funding Estimates) | By June 4, 2023, and annually thereafter until 2035, or as directed by superseding guidance, agencies are required to submit to ONCD and OMB an assessment of the funding required to migrate information systems and assets inventoried under this memorandum to post-quantum cryptography during the following fiscal year. | M-23-02 | DHS OMB | 6/4/2025 | Y | COO |
| T&I | Update to Memorandum M-22-18, Enhancing the Security of the Software Supply Chain through Secure Software Development Practices | Agencies must submit metrics on collected attestation letters for all software subject to the requirements of M-22-18, as amended by this memorandum, as well as the on agency approval of POA&Ms AND number of extensions and waivers in place at each agency. | OMB M-23-16 | OMB | 6/9/2025 | Y | CFO |
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 6/18/2025 | N | CFO |
| OFP/CFO | Quarterly Transfer Requests | Letters requesting transfer of funds from the Fed Reserve to CFPB | Dodd-Frank § 1017(a)(1) | FRB Congress | 6/20/2025 | N | DIR |
| OFP/PROC | Federal Activities Inventory Report (FAIR) | The inventory depicts the CFPB's workforce by functions (or activities) performed by Bureau employees. The inventory further breaks down these activities into Inherently Governmental (activities that can only be performed by a federal employee) and Commercial (Activities that can be performed by Federal or contract employees) categories. The number of Full-Time Equivalents (FTEs) is also displayed by location. | Federal Activities Inventory Reform Act of 1998 (P.L. 105-270) and OMB Circular A-76 - Competitive Sourcing | Congress, OMB, MAX.GOV | 6/30/2025 | Y | COO |

CFPB_00094 JA376

Scott Lee
Senior Advisor to the Chief Operating Officer - Operations
Consumer Financial Protection Bureau (CFPB)

| From: | Gueye, Jafnar (CFPB) |
|---|---|
| To: | Chilbert, Christopher (CFPB); Johnson, Christopher (CFPB); Dorsey, Darian (CFPB); Brown, Jason (CFPB); Warren, LaShaun (CFPB); Vespa-Papaleo, Frank (CFPB); Huggins, Cassandra (CFPB); Gelfond, Rebecca (CFPB) |
| Cc: | Martinez, Adam (CFPB); Malik, Irfan (CFPB); Mullins, Katherine (CFPB); Chang, Jean (CFPB); James, Dana (CFPB); Galicki, Joshua (CFPB); Olson, Nicholas (CFPB) |
| Subject: | RE: All Hands Message re: Work Required by Law |
| Date: | Monday, March 3, 2025 11:39:29 AM |

Thanks Chris,

To add to that, we're getting a lot of requests to turn contracts back on. I will send out guidance shortly but for your awareness we are not turning back on every contract we've had. We're taking a very narrow approach: if without the contract the Bureau **can't** meet a statutory requirement then it will be considered for reactivation. Meaning that a contract enhancing our ability to meet a statutory requirement is not enough to get it back on. It needs to be the only way the bureau can currently meet that requirement.

Also as you're providing justifications please be prepared to have to defend those to external parties. We've been routinely asked to provide for names of the people providing the justification.

Respectfully,

Jafnar

**From:** Chilbert, Christopher (CFPB) <span style="background:black">████████████████</span>
**Sent:** Monday, March 3, 2025 10:22 AM
**To:** Johnson, Christopher (CFPB) <span style="background:black">████████████</span>; Dorsey, Darian (CFPB) <span style="background:black">████████</span>; Brown, Jason (CFPB) <span style="background:black">████████</span>; Warren, LaShaun (CFPB) <span style="background:black">████</span>>; Vespa-Papaleo, Frank (CFPB) <span style="background:black">████████</span> Huggins, Cassandra (CFPB) <span style="background:black">████████</span>; Gelfond, Rebecca (CFPB) <span style="background:black">████████</span>>; Gueye, Jafnar (CFPB) <span style="background:black">████████</span>
**Cc:** Martinez, Adam (CFPB) <span style="background:black">████████</span>; Malik, Irfan (CFPB) <span style="background:black">████</span> Mullins, Katherine (CFPB) <span style="background:black">████████</span>
**Subject:** FW: All Hands Message re: Work Required by Law

Colleagues – As you work to restart some tasks that had stopped, please be aware that some of our T&I capacity is reduced. If there are capabilities that need to be restored, please let me know as soon as possible what specifically is needed and for what purpose.

Thanks,

Chris Chilbert
<span style="background:black">████████</span>

<span style="background:black">████</span> Martinez, Adam (CFPB) <span style="background:black">████████</span>>
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) <span style="background:black">████████</span>
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.


Mark Paoletta
Chief Legal Officer
CFPB

| | |
|---|---|
| **From:** | Olson, Nicholas (CFPB) |
| **To:** | Gueye, Jafnar (CFPB); Bolton, Nykea (CFPB); Martinez, Adam (CFPB) |
| **Cc:** | CFPB_ReasonableAccommodations; CFPB_Section508; Jones, Stacie (CFPB); Nassar, Shaba (CFPB); Galicki, Joshua (CFPB) |
| **Subject:** | RE: Request for contract reinstatement for legally/statutorily required approved DAPS work |
| **Date:** | Monday, March 3, 2025 11:41:42 AM |
| **Attachments:** | RE Entellitrak question.msg |

Nykea and all – Regarding the Entellitrak contract, Jafnar is correct that it has been reinstated. See attached email. If I recall correctly, this one (1) Entellitrak contract covers all applicable CFPB Offices (each office *used* to have its own separate contract). Please note that from the attached email, from the vendor's Team: "Tyler says that they can get everything up and running by COB on Tuesday. If the sites also have SSO, it might take some additional steps, which could push to Wednesday."


Sincerely,

Nick Olson
Procurement Team Lead | Office of Finance and Procurement
Mobile: ██████████


Consumer Financial Protection Bureau
**consumerfinance.gov**


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Gueye, Jafnar (CFPB) ██████████████████████
**Sent:** Monday, March 3, 2025 11:33 AM
**To:** Bolton, Nykea (CFPB) ███████████████████>; Martinez, Adam (CFPB) ████████████████>
**Cc:** CFPB_ReasonableAccommodations ██████████████████████████;
CFPB_Section508████████████████████; Jones, Stacie (CFPB)██████████████
Nassar, Shaba (CFPB)██████████████████; Galicki, Joshua (CFPB)██████████████████;
Olson, Nicholas (CFPB)██████████████████
**Subject:** RE: Request for contract reinstatement for legally/statutorily required approved DAPS work

Good morning Nykea,

Thank you for reaching.
- I'll double check but I thought Entellitrak was turned back on.

- In general we are very narrowly turning back contracts (or portions of contracts) that directly support statutory requirements. In other words if without the contract the bureau would fail to meet those requirements, we would turn it back on. If the contract enhances or otherwise supplements our ability to meet requirements, they are not being turned back on at this stage because in those cases the bureau can meet its requirement (even if minimally) without it. Those contracts are subject to further review in our ongoing efforts to streamline bureau operations.

- For the ones you shared: can I please get a succinct justification for each contract you are requesting be reinstated? Specifically can you outline for each contract what (statutorily required) action will not be able to be accomplished at all without the contract? I can't stress enough that this needs to be as specific as possible. We'll need to be prepared to have someone on the team defend this justification to external parties.

- All PCards across the bureau have been cancelled. We've been authorized to reopen one for the entire bureau with a very limited limit so we are triaging the requests as they come in. I'm using the same criteria as above (i.e. directly being indispensable to meet a statutory requirement).

Respectfully,

Jafnar

**From:** Bolton, Nykea (CFPB) █████████████████
**Sent:** Monday, March 3, 2025 11:10 AM
**To:** Gueye, Jafnar (CFPB) ████████████████; Martinez, Adam (CFPB) ████████████████
**Cc:** CFPB_ReasonableAccommodations ████████████████████████;
CFPB_Section508 ██████████████████; Jones, Stacie (CFPB) ██████████████
Nassar, Shaba (CFPB) ██████████████
**Subject:** Request for contract reinstatement for legally/statutorily required approved DAPS work

Good morning Jafnar,

I am reaching out after a call I had with Adam last week.

The Disability and Accessibility Program Section (DAPS ) has been given permission to resume its statutorily required work. To meet the demands of the statutes governing our work, we must have the resources of our contracts that were recently terminated. I have attached the Reasonable Accommodations (contract budgets sat with OMWI and T&I if tech aligned) and 508 (contract budget sat with T&I) contracts that provide services/resources we must legally provide if/when needed by the Bureau staff and public. We also would need our instance of the Entellitrak system of record reinstated, as we are legally required to keep and maintain a system of record for reasonable accommodations (we need access to the data previously entered and moving forward need a system to enter data in for processing and reporting efforts).

Can you assist us with identifying if we can reestablish these necessary/required contracts?

We are also trying to identify how we can do pcard purchases for incoming work, as well as paying invoices down that have been submitted due to contract terminations.

We will have to identify some sort of solution to provide the services we must legally provide to individuals with disabilities here at the Bureau and to public customers/users of our products and services, otherwise we could incur significant risks. I know this may take time to figure out, so any temporary solutions/processes would be helpful to identify if we can just turn the contracts back

on. If they cannot be re-instated, we will need to find a permanent solution as quickly as possible.

I am happy to meet to discuss the required needs and to answer any questions.

Thanks for your support!


Nykea Bolton
Section Chief, Disability and Accessibility Programs Section
Consumer Financial Protection Bureau
Consumerfinance.gov

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Tirrell, Pax (CFPB); Rosenthal, Lisa (CFPB) |
| Cc: | Paoletta, Mark (CFPB); Huggins, Cassandra (CFPB); Hagins, Calvin (CFPB) |
| Subject: | RE: All Hands Message re: Work Required by Law |
| Date: | Monday, March 3, 2025 12:41:00 PM |

Pax – Please feel free to seek guidance from your supervisor and Supervision Front Office. Any questions or concerns you have should be shared with Casey and Calvin who can then advise our Chief Legal Officer receive clarification.

Adam Martinez
Chief Operating Officer

---

**From:** Tirrell, Pax (CFPB) █████████████
**Sent:** Monday, March 3, 2025 11:46 AM
**To:** Martinez, Adam (CFPB) ████████████████
**Cc:** Paoletta, Mark (CFPB) ██████████████
**Subject:** RE: All Hands Message re: Work Required by Law

My current understanding was that supervisory work was supposed to stop.
But under 12 USC 5514(b)(1) the Bureau "shall require reports and conduct examinations on a periodic basis" of non-depository institutions. Therefore examination work of non-depository institutions appears to be a statutorily required function. Could you please authorize me to work on scheduled examinations of non-depository institutions?

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Martinez, Adam (CFPB) ███████████████████ >
**Sent:** Sunday, March 2, 2025 12:33 PM
**Cc:** Paoletta, Mark (CFPB) █████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00102  JA384

| | |
|---|---|
| **From:** | Paoletta, Mark (CFPB) █████████████████ |
| **Sent:** | Monday, March 03, 2025 8:07 PM |
| **To:** | Carmer, Alan (CFPB); Martinez, Adam (CFPB) |
| **Cc:** | _DL_CFPB_CRE_FinEd_FinEd_All |
| **Subject:** | RE: All Hands Message re: Work Required by Law |

Good evening, Alan,

Thanks for your email.  Consistent with my email, you should be performing these statutorily required duties.

Thanks.

Mark

**From:** Carmer, Alan (CFPB) █████████████████
**Sent:** Monday, March 3, 2025 3:15 AM
**To:** Martinez, Adam (CFPB) █████████████████████;
**Cc:** Paoletta, Mark (CFPB) █████████████████████; _DL_CFPB_CRE_FinEd_FinEd_All
█████████████████████████████

**Subject:** RE: All Hands Message re: Work Required by Law

Mr. Martinez,

I believe all the work in the Office of Financial Education is statutorily authorized and mandated. Please make clear whether the Office of Financial Education staff should resume their assigned duties to improve the financial literacy of consumers.  A general outline of statutory responsibilities follows:

- *12 U.S.C § 5411(c)(1)* states that "conducting financial education programs" is the first of several "primary functions" of the CFPB.  **This work has been halted and should resume.**
- *12 U.S.C. § 5493(d )* requires the Office of Financial Education to develop *and implement* a strategy to improve the financial literacy of consumers.  **This work has been halted and should resume.**
- 12 U.S.C. § 5493(d)(2) states the office shall implement activities in several areas including financial counseling, savings, understanding credit scores, and debt strategies.  **This work has been halted and should resume.**
- *12 U.S.C. 5493(d)(2)(D)(iii)* states the office shall implement activities to "improve the financial situation of the consumer."  **This work has been halted and should resume.**
- *12 U.S.C. 5493(d)(3)* requires staff to coordinate with other units in the bureau and specifically lists the Consumer Affairs Office and the research unit.  **This work has been halted and should resume.**
- *(see 20 U.S.C § 9702)*  Financial Literacy and Education Commission (FLEC).
  - *20 USC § 9702(d)* states that the Director of the CFPB serves as the co-Chair of the Financial Literacy and Education Commission (FLEC) with the Treasury Secretary as the chair.
  - *20 U.S.C. § 9702(c)(1)* states that the FLEC comprises representatives from 23 federal agencies and the White House Domestic Policy Council.
  - *20 U.S.C. § 9702(e)* states the FLEC must hold a public meeting every 4 months.  The last meeting was on 11/14/2024**. Staff planning for the next meeting has been halted and should resume.**
  - *12 U.S.C. § 5493(d)(2)* states the Office of Financial Education must work in consultation with the FLEC.  **This work has been halted and should resume.**
- *12 U.S.C. § 5493(d)(4)* requires an annual report to Congress on the CFPB's strategy and activities to improve financial literacy.  **This work has been halted and should resume.**

I have served through each change of administration in the CFPB and fully expect any new director or acting director to communicate new priorities through management. Indeed, the Office of Financial Education has experienced multiple reorganizations and has been in at least 3 different divisions as priorities evolve with changes in leadership.  Each reorganization was disruptive in its own way, but our work was never halted entirely as it seems to be now.

Again, please clarify that Office of Financial Education staff should resume their assigned duties to improve the financial literacy of consumers until new leadership is able to clearly communicate a change in financial education priorities.

The primary statute relied upon to establish the Office of Financial Education is copied below the signature for reference.

Alan S. Carmer
Attorney-Advisor
Office of Financial Education
Mobile: ████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

12 U.S.C. § 5493(d)
*(1)Establishment*
*The Director shall establish an Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions.*

*(2)Other duties*
*The Office of Financial Education shall develop and implement a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission, consistent with the National Strategy for Financial Literacy, through activities including providing opportunities for consumers to access—*
*(A)financial counseling, including community-based financial counseling, where practicable;*
*(B)information to assist with the evaluation of credit products and the understanding of credit histories and scores;*
*(C)savings, borrowing, and other services found at mainstream financial institutions;*
*(D)activities intended to—*
*(i)prepare the consumer for educational expenses and the submission of financial aid applications, and other major purchases;*
*(ii)reduce debt; and*
*(iii)improve the financial situation of the consumer;*
*(E)assistance in developing long-term savings strategies; and*
*(F)wealth building and financial services during the preparation process to claim earned income tax credits and Federal benefits.*
*(3)Coordination*
*The Office of Financial Education shall coordinate with other units within the Bureau in carrying out its functions, including—*
*(A)working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and*
*(B)working with the research unit established by the Director to conduct research related to consumer financial education and counseling.*
*(4)Report*
*Not later than 24 months after the designated transfer date, and annually thereafter, the Director shall submit a report on its financial literacy activities and strategy to improve financial literacy of consumers to—*
*(A)the Committee on Banking, Housing, and Urban Affairs of the Senate; and*

2

*(B)the Committee on Financial Services of the House of Representatives.*

**From:** Martinez, Adam (CFPB) ██████████████
**Sent:** Sunday, March 2, 2025 12:33 PM
**Cc:** Paoletta, Mark (CFPB) ██████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.


Mark Paoletta
Chief Legal Officer
CFPB

3

CFPB_00105 JA387

| | |
|---|---|
| **From:** | Paoletta, Mark (CFPB) ███████████████ |
| **Sent:** | Monday, March 03, 2025 8:11 PM |
| **To:** | Martinez, Adam (CFPB); Muchnik, Irina (CFPB); Chilbert, Christopher (CFPB); Malik, Irfan (CFPB) |
| **Cc:** | Sayre, Stephen (CFPB); Scott, Adam (CFPB) |
| **Subject:** | RE: All Hands Message re: Work Required by Law |

Good evening, Irina,

Yes, I concur with Adam's guidance.

Thanks.

Mark

---

**From:** Martinez, Adam (CFPB) ███████████████
**Sent:** Monday, March 3, 2025 10:05 AM
**To:** Muchnik, Irina (CFPB) ███████████; Chilbert, Christopher (CFPB) ███████████ Malik, Irfan (CFPB) ███████████
**Cc:** Paoletta, Mark (CFPB) ███████████ Sayre, Stephen (CFPB) ███████████>; Scott, Adam (CFPB) ███████████
**Subject:** RE: All Hands Message re: Work Required by Law

Hi Irina.  Please work with Chris and Irfan to shift any resources needed to comply with the statute and any applicable laws/regulations.  Thank you.

Adam Martinez
Chief Operating Officer

---

**From:** Muchnik, Irina (CFPB) ███████████
**Sent:** Monday, March 3, 2025 10:02 AM
**To:** Martinez, Adam (CFPB) ███████████
**Cc:** Paoletta, Mark (CFPB) ███████████; Sayre, Stephen (CFPB) ███████████; Scott, Adam (CFPB) ███████████>
**Subject:** Re: All Hands Message re: Work Required by Law

Hi Adam,
Based on every email starting  2/10 the unambiguous guidance was to stop all work tasks, no stipulation of statue requirements was made.

As of today, Consumer Complaint Database(CCDB) has not had been refreshed with new data since 02/22/2025 and displays an eror banner:
https://www.consumerfinance.gov/data-research/consumer-complaints/search/?chartType=line&dateInterval=Month&dateRange=3y&date_received_max=2025-02-21&date_received_min=2022-02-21&lens=Product&searchField=all&subLens=sub_product&tab=Trends

**Dodd Frank mandates:**
**The Consumer Financial Protection Bureau (CFPB) to maintain a public database where consumer complaints against financial institutions are recorded and published, ensuring transparency in the financial marketplace; this database is commonly referred to as the "CFPB Consumer Complaint Database".**

I am seeking authorization to fix underlying issue with data pipelines which load data for CCDB. Since the Data Products team lost all other developers when all contracts were canceled, I am also seeking authorization to utilize other member of D&D and EDA to assist as needed.

Thanks for your prompt attention,

Irina Muchnik

---

**From:** Martinez, Adam (CFPB) ██████████████████
**Date:** Sunday, March 2, 2025 at 3:33 PM
**To:**
**Cc:** Paoletta, Mark (CFPB) ██████████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00107    JA389

| From: | Paoletta, Mark (CFPB) ███████████ |
|-------|------------------------------------|
| Sent: | Monday, March 03, 2025 8:14 PM |
| To: | Pappalardo, Janis (CFPB) |
| Cc: | Martinez, Adam (CFPB); Shapiro, Daniel (CFPB) |
| Subject: | RE: All Hands Message re: Work Required by Law |

Good evening, Janis,

Thanks for email.  Please proceed with your proposed implementation strategies.

Thanks.

Mark

**From:** Pappalardo, Janis (CFPB) ████████████████
**Sent:** Monday, March 3, 2025 10:15 AM
**To:** Paoletta, Mark (CFPB) ███████████
**Cc:** Martinez, Adam (CFPB) ████████████████ Shapiro, Daniel (CFPB) ████████████
**Subject:** RE: All Hands Message re: Work Required by Law

Hi Mark,

I hope this note find you well!

I am reaching out to ensure that RMR meets your expectations on the scope and implementation of your March 2 guidance and guidance we received last week from Adam Martinez.

**Scope:**  I understand that RMR is authorized to conduct all regular work related to fulfilling statutory obligations and/or work required by law, including regular management activities, albeit with limits on contact with outside parties.  For example, I understand that we are authorized to perform work to comply with The Dodd-Frank Act and other laws and statutes, such as Section 502(a) of the Consumer Credit Card Market Act of 2009.

The RMR leadership team and I have reviewed our work against provisions of Dodd-Frank and other statutes.  I believe that virtually all our work is conducted to meet the CFPB's statutory obligations. This implies that I expect we will bring virtually all RMR staff back to work.

**Implementation:**

<u>Outside Party Communication:</u> According to the February 27 guidance from Adam Martinez: "Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer."  Given the volume and nature of communications involved in carrying out our work, I understand that this is difficult to implement.  I also understand that you recently approved Assistant Director McNamara's request to conduct statutorily required market monitoring, with a cc to Adam, Daniel, and you on substantive matters, but not on scheduling and maintenance issues and that the Office of Markets

will make you and Daniel aware of market monitoring meetings. We plan to apply this same understanding to external monitoring communications by other RMR Offices.

I am proposing some additional implementation strategies for all RMR, below. Please let me know if you have any questions or concerns about these proposals.

- That communications within the federal government, with contracted entities, and within the Federal Reserve system that help us fulfill our statutory responsibilities will be pre-approved and not require your involvement. For example, a regular meeting with Federal Reserve system researchers about developments in risks to household financial stability can continue.
- That we resume engagement with outside researchers and other parties to advance the Bureau's research responsibilities. This would include discussing research findings in meetings, workshops, and conferences with other government agencies, presenting research findings at academic conferences, and attending research conferences. We expect to follow the usual Bureau procedures for authorizing and clearing any presentations and conference attendance and will alert you and Daniel prior to any presentation or attendance at a non-governmental conference.
- That internal reports go forward without prior approval.
- That we will await guidance on publishing material on the Bureau website, although refreshing data on the Bureau website for the Consumer Credit Trends and Mortgage Performance Trends will continue.
- That we will resume disseminating our research findings under the Independent Research Policy. This includes resuming posting on the working paper series on Social Sciences Research Network, an outlet for disclaimed research, and in proceeding with academic publications.
- That we resume the regulatory inquiries function through which the Office of Regulations responds to requests from external parties, particularly small businesses, for informal guidance on regulatory matters. This is one of several tools the office uses to comply with its SBREFA obligations.

Please let me know if there is specific work that you would like us to move forward on or hold. Absent specific direction, I will use my discretion and best judgment to assign statutorily required work to staff.

Respectfully yours,

Jan

--
Janis K. Pappalardo
Deputy Associate Director and Acting Associate Director
Research, Monitoring, and Regulations
Mobile: █████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ██████████████████ >
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ██████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

CFPB_00110 **JA392**

| | |
|---|---|
| **From:** | Huggins, Cassandra (CFPB) < ██████████████ > |
| **Sent:** | Tuesday, March 4, 2025 5:13 PM |
| **To:** | Paoletta, Mark (CFPB) |
| **Cc:** | Hagins, Calvin (CFPB); Martinez, Adam (CFPB); Shapiro, Daniel (CFPB); Vought, Russell (CFPB); _DL_CFPB_Supervision_ALL |
| **Subject:** | RE: request for clarification for Supervision staff- FW: All Hands Message re: Work Required by Law |
| **Attachments:** | FW: All Hands Message re: Work Required by Law |

Mark,

I am acknowledging that I received and read your email.

I am attaching, as requested, the email that I sent to Supervision staff. I did not provide this email to the media, and I do not know who did.

I did not intend to undermine the new administration's ability to supervise agency staff- my only intention was to ensure that our staff did not act against the direction in the February 8 email from Acting Director Vought to cease all supervisory and examination activity. I will work with Supervision leadership to prepare the reports you have requested, and will request that all supervision staff provide the information you requested, by the stated deadline.

Thank you.

Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
Mobile: ██████████

Consumer Financial Protection Bureau
**consumerfinance.gov**


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Paoletta, Mark (CFPB) < ████████████████ >
**Sent:** Tuesday, March 4, 2025 4:51 PM
**To:** Huggins, Cassandra (CFPB) < ██████████████ >
**Cc:** Hagins, Calvin (CFPB) < ██████████ >; Martinez, Adam (CFPB) < ████████████████ >; Shapiro, Daniel (CFPB) < ████████ >; Vought, Russell (CFPB) < ████████████ >; _DL_CFPB_Supervision_ALL < ██████████████ >
**Subject:** RE: request for clarification for Supervision staff- FW: All Hands Message re: Work Required by Law

Good afternoon, Cassandra,

I am writing to raise significant concerns regarding an internal agency communication you apparently sent yesterday that directly contradicts an email from me to all CFPB staff about my direction for all staff to perform all statutorily required work.

In an email Adam Martinez sent on Sunday (March 2nd) conveying a message from me to the entire CFPB staff, I directed ALL CFPB staff to perform all work required by law and that they did not need to seek prior approval to do so. Nothing I have said or written since then contradicts that. You reached out to me yesterday, and as I am dual hatted and have job duties at OMB, I was not able to review and respond to your email yesterday. But I read a news report in Reuters that you reportedly sent an internal agency communication claiming that "We have requested and received clarification that their message was not intended to authorize the reinstatement of supervision/examination activity, even though the Bureau is required by law to carry out these activities."

Importantly, you did not receive that message from me. You apparently relied on an email from Adam, but his email refers you to Acting Director Vought's February 8th email which specifically states that you are to perform any work "required by law." And he encouraged you to communicate with me, and presumably, wait to hear from me before sending out an email that directly contradicted my message on March 2nd to CFPB employees.

I am concerned that you sent out an internal agency communication on such an unfounded basis that is false and directly contradicts my March 2nd message without first getting confirmation directly from me. Your actions severely undermine the Agency leadership's ability to supervise the agency staff and to ensure that statutorily required duties are being performed.

Moreover, your internal communication somehow made its way to the press, further undermining our efforts to supervise agency staff.

Let me be clear to you and the entire supervision office, which I have cc'd on this email: You are authorized and directed to work on matters specifically required by statute. That said, it is of course within the new leadership's discretion as to what matters CFPB will focus on.

The Bureau's new leadership seeks to understand the status of all of the agency's actions so it can align such actions to the Bureau's new priorities consistent with law. We have been aided in doing so by reports prepared by the Enforcement Division, Legal Division, and Office of Regulations showing the status of all actions within their respective purview, upcoming deadlines, statutory requirements, and other relevant matters. Such information is vital to allowing new leadership to ensure the Bureau is faithfully executing the law. And in fact, I have approved numerous requests from these and other divisions to perform work that is statutorily required or mission-aligned with the new leadership.

Accordingly, I am directing you to prepare a report for the Bureau's leadership providing a description of all pending examination actions, including their current status. Provide the name of the lead CFPB examiner on each matter, and the contact information for the lead attorney for the company under examination.

As part of this report, please flag any particular actions that you believe are specifically required by statute. Leadership will review it and determine which actions to continue to pursue and to close.

Additionally, please notify every employee in your division to provide to me a written summary of the specific matters they are working on, with the name of the entity being examined, how the matter was commenced and approximately how many hours they have spent on the matter.

Please submit your report and direct every employee in your division to submit their response to me by COB Monday, March 10th.

Please confirm by 6 pm today that you have received and read this email.

Please forward to me by 6 pm the internal agency communication you reportedly sent that is quoted in the Reuters news report.

Finally, did you provide your internal agency communication to the media or do you know who provided it?   Please provide your answer to me by 6 pm today.

Thank you for your prompt attention to this matter.


Mark

Mark Paoletta
Chief Legal Officer
CFPB

---

**From:** Huggins, Cassandra (CFPB) < ████████████████ >
**Sent:** Monday, March 3, 2025 10:33 AM
**To:** Paoletta, Mark (CFPB) < ████████████ >
**Cc:** Hagins, Calvin (CFPB) < ██████████████ >
**Subject:** request for clarification for Supervision staff- FW: All Hands Message re: Work Required by Law

Good morning Mark,

I've received a number of messages from staff who are understandably confused by the information in the email sent by Adam Martinez. I would like to get clarification on what exactly Supervision staff is expected to be doing. I did reach out to Adam, and although he did say that supervision/examination activity is not to resume, he encouraged me to reach out to you directly for confirmation.

The Acting Director's February 8 message directed the stoppage of all supervision and examination activity, despite the fact that the work is required by law (12 CFR 1024, 1025, and 1026 require the Bureau to conduct such supervisory activities). We've also stopped all work supporting supervision and examination activity, including operational activities such as policy/procedure development; quality management reviews; systems and registration oversight; reporting, analytics, monitoring, exam prioritization/scheduling; and human capital activities that support supervision. We've also told staff to not engage in activities requiring coordination with parties outside of the Bureau, including coordination with other federal/state regulatory agencies, participation on FFIEC task forces/subcommittees, or engagement with supervised entities.

Supervision staff has been authorized to work on some isolated tasks ( ████████████████████████████████ , a handful of briefings/information gathering for Sr. leadership, and administrative tasks like WebTA/Concur approval), but otherwise it is my understanding that **they should continue to operate on administrative leave unless a discrete activity has been approved. Please confirm that the message you sent is not intended to authorize the reinstatement of supervision/examination activity and the activities that support this function despite the fact that the Bureau is required by law to conduct these activities.**


Thanks,
Casey


Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
Mobile: ███████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

3

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) <████████████████>
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) <██████████████>
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

| From: | Huggins, Cassandra (CFPB) <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> |
|-------|---------------------------------------------------|
| Sent: | Monday, March 3, 2025 12:13 PM |
| To: | _DL_CFPB_Supervision_ALL |
| Subject: | FW: All Hands Message re: Work Required by Law |

Supervision staff,

Calvin and I know that there is quite a bit of confusion surrounding the message we received from Adam Martinez/Mark Paoletta on March 2. We have requested and received clarification that **their message was not intended to authorize the reinstatement of supervision/examination activity, even though the Bureau is required by law to carry out these activities.** We are also not to resume any functions that support the supervision/examination program, and are not to communicate with parties outside of the Bureau on Bureau matters without receiving approval from the Chief Legal Officer.

It has been communicated to me that **Supervision staff should continue to operate on administrative leave as directed by the Acting Director unless you have received express permission to work on a task.** In general, this permission will come from Calvin, me, or your supervisor. Please do not work on anything else without authorization. If you have a question about whether you've been authorized to perform a task, please reach out to your supervisor. As a reminder, staff have been given permission to conduct some administrative tasks such as validating/certifying timecards in WebTA and submitting/approving vouchers in Concur. Some staff have also been authorized to work on discrete tasks and may continue to work on those as directed.

OSPO managers- if your teams are responsible for carrying out any other statutorily-mandated activities and you aren't sure whether they fall under the broader umbrella of supervisory or examination activity or activities that support this function, please send me an email with the activity and the specific statutory language that requires it, and I will send a request to the Chief Legal Officer.

Thanks,
Casey


Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
Mobile: ▮▮▮▮▮▮▮▮▮

Consumer Financial Protection Bureau
**consumerfinance.gov**


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Martinez, Adam (CFPB) <▮▮▮▮▮▮▮▮▮▮▮>
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) <▮▮▮▮▮▮▮▮▮▮>
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

2

CFPB_00116 JA398

**INDEX OF EMAILS, TEXT MESSAGES, AND OTHER COMMUNICATIONS (MARCH 4, 2025)**

| Exhibit | Date | Description |
|---|---|---|
| A | 2/11 | Email to contracting officers with subject line "Urgent Action: Contract Termination and Continuation Notifications (Emails)" |
| B | 2/11 | "Urgent update" to contracting officers with "direction to terminate all Enforcement, … Supervision, … External Affairs, … Consumer Response, … [and] Office of Director" contracts |
| C | 2/11 | Adam Martinez memorandum terminating probationary employees |
| D | 2/11 | Notice to NCLC regarding CFPB's "blanket Stop Work Order" |
| E | 2/11 | Email from Adam Martinez regarding civil penalty fund and returning CFPB's money to Federal Reserve |
| F | 2/11 | Email from Consumer Response identifying contracts that directly support its statutory requirements |
| G | 2/12 | Termination of NCLC contract |
| H | 2/13 | Adam Martinez memorandum terminating the Student Loan Ombudsman |
| I | 2/13 | Memo from Matthew Pfaff regarding staffing at Consumer Response |
| J | 2/14 | Email instructing all staff to "exercise administrative leave" |
| K | 2/17 | Email regarding closure of regional offices |
| L | 2/18 | Email from Christopher Chilbert (CFPB Chief Information Officer) declining request to fix the CFPB's homepage |
| M | 2/26 | Email regarding discontinuation of "Citrix Virtual Desktop" |
| N | 2/27 | Auto-response from HR regarding "recent or impending separation" |
| O | 2/27 | Email directing employees to retrieve personal belongings from CFPB building and return CFPB equipment |
| P | 2/27 | Email from Adam Martinez regarding "Statutory/Legal Required Work" |
| Q | 2/28 | Email from Assistant Director of Research regarding resumption of "statutory work" |
| R | 2/28 | Emails with Francis Doe regarding statutorily mandated reports |
| S | 2/28 | Text message telling Francis Doe to "stand down until further notice" |
| T | 3/1 | Email to Office of Finance and Procurement inquiring about statutory requirements |
| U | 3/3 | Email to supervision examiners asking them to "refrain from all work activity other than ministerial tasks" pending further guidance |
| V | 3/3 | Email instructing supervision staff to "continue to comply with the stop work order" |
| W | 3/3 | Email notifying supervision staff that Martinez and Paoletta's 3/2 email do not authorize them to carry out activities "required by law" |
| X | 3/3 | Email from CFPB's CFO discussing "very narrow approach" to "turning back on … contract[s]" |

| **Y** | **3/3** | Status update on Research, Monitoring, and Regulations' ability to "comply with the directive to resume statutory responsibilities" |
| **Z** | **3/3** | Email about "getting the [Consumer Complaint Database] back up and running" |
| **AA** | **3/3** | Email to operations about "statutory requirements" |
| **BB** | **3/3** | Email providing probationary employee with Notification of Termination (approved on 2/13) pursuant to "E.O. 14210 and the stop work email from Russ Vought" |
| **CC** | **3/3** | Email providing term employee with notification of Termination (approved on 2/15) pursuant to "E.O. 14210 and the stop work email from Russ Vought" |
| **DD** | **3/4** | Email from Christopher Chilbert declining request to fix the homepage |
| **EE** | **3/4** | Email from CFO in response to request to pay for Google Analytics platform, without which CFPB "will lose all historical data" |
| **FF** | **3/4** | Email chain between Mark Paoletta and Cassandra Huggins about status of Supervision |
| **GG** | **3/4** | Screen shot of "CFPB Tip Line" taken from X on March 4 at 11:05 PM |
| **HH** | **3/4** | White House statement says that "President Trump ordered the" CFPB "to halt operations" |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

                   *Plaintiffs*,

     v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

              *Defendants*.

Case No. 25-cv-0381-ABJ

**NOTICE OF ERRATA**

Attached is a corrected, text-searchable version of the communications filed as an exhibit

to ECF No. 57.

Respectfully submitted,

Dated: March 5, 2025

*/s/ Deepak Gupta*
Deepak Gupta (DC Bar No. 495451)
Robert Friedman (DC Bar No. 1046738)
Gabriel Chess (DC Bar No. 90019245)*
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett (pro hac vice)
Gupta Wessler LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group

1

1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

* motion for admission pending

Julie Wilson (DC Bar No. 482946)
General Counsel
Paras N. Shah (DC Bar No. 983881)
Deputy General Counsel
Allison C. Giles (DC Bar No. 439705)
Assistant Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

*Counsel for Plaintiff National Treasury Employees Union*

2

# Exhibit A

**From:**
**Sen** Tuesday, February 11, 2025 12:47 PM
**To:**

**Subject:** Urgent Action: Contract Termination and Continuation Notifications (Emails)

Contracting Officers,

Thank you for logging on – we really appreciate it.  Please take a few minutes to read through the information below.  I am *not* "Blind Carbon Copying" (BCC'ing) you all, like I usually do.  So, if you notice any huge "red flags" in the guidance below, please "Reply All" and Josh, Vanessa, Laurent, and/or I can get you answers **as a group**.  We need to get these Termination Notifications out ASAP.

We have been and will be receiving information on a "rolling" basis.  Shortly, you will receive access to a Spreadsheet owned by Mike Gleason (copied here) that includes contract actions for CRE.  We will receive Spreadsheets from other Offices / Divisions shortly.  Mike G. will do his best to combine those Spreadsheets if/when possible, but since there is time sensitivity here, we are asking you to push forward with what we have.

Here is how we're requesting you issue Termination for Convenience Notifications **and** Continuation of Services emails in the coming hours (ASAP):

- The Spreadsheets you receive will include contracts where a Termination for Convenience is required (denoted by a "T4C" in the "Disposition" column to the far right within the Spreadsheet) as well as contracts that shall continue (again, as identified in the "Disposition" column).
- We are asking you to send a **separate** email for **each** contract that requires a Termination Notification, as well as **each** contract that is authorized to continue (see below for required email notification wording).

  - We understand that "one-by-one emails" obviously means "more emails to send," but there are many logistical entanglements that make sending a "BCC" email to all vendors impossible and unadvisable.  In particular, we have already identified "overlap" where *some* Vendors have contracts that must be Terminated for Convenience *and* contracts that will Continue (essential services or otherwise).  We anticipate additional "overlap," as well.

- The Spreadsheets may include Vendor POCs (Contract Manager email addresses) for the contracts at issue, but please confirm they are correct before sending any communications.  Please find Vendor POCs in your contracts or emails, if needed.
- For Termination Notifications:  Please create a separate "Termination" folder within the Modifications folder, and save the Termination email in it.  That way, when the formal Modification to Terminate for Convenience is issued at a later date, the notification is there for easy reference.
- For Continuation of Services notifications:  Please save the email in the Post-Award folder used for communications with the vendor/contractor.
- Use the Spreadsheets to denote when you have sent the Termination Notification or the Continuation of Services Notification (again, see below for required wording).  The Spreadsheets will have an "Email Sent to Vendor" column, where you should list "Yes" once you have sent and saved the applicable email (Termination or Continuation of Services).

  - We will use these Spreadsheets to Track our progress, and we will discuss these at the Procurement Pipeline Meeting tomorrow (Wednesday) morning.

**Required Email Notification Wording**

For contracts that require a Termination Notification, please send the following email (one email for each respective contract):

**Email Subject:  Termination for Convenience of the Government – Contract #** *Insert Contract Number*

Pursuant to FAR clause 52.212-4(l), the Consumer Financial Protection Bureau (CFPB) hereby terminates in its entirety the subject contract, effective today.  As such, you are directed to immediately stop all work under the subject contract, terminate all subcontracts, and place no further orders.  You are also directed to provide by electronic means similar instructions to all subcontractors and suppliers.  You are required to keep detailed, individual records of your steps taken and expenditures, if any, you intend to claim as a result of the CFPB terminating this contract. We request that you provide within 30 days the entirety of the termination settlement proposal(s), if any, you will be submitting for the subject contract.  Finally, it is necessary that you immediately confirm receipt of this termination for convenience notice via an electronic mail (e-mail) response to me, the Contracting Officer for the subject contract.

For contracts that shall continue, please send the following email (one email for each respective contract):

**Email Subject:  Continuation of Services Notification – Contract #** *Insert Contract Number*

You might have received a blanket Stop Work Order from the Office of Finance and Procurement yesterday.  Please note that you are being instructed to continue work on the subject contract and there will not be a work stoppage.  The Office of Finance and Procurement will follow up if there are any additional changes in direction.

Again, thank you so much for your work on these!  Please monitor your email for the first (and future) Spreadsheet(s) from Mike Gleason.  Thank you!!

Sincerely,

Nick Olson

Procurement Team Lead | Office of Finance and Procurement

Mobile: █████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit B



**From:** Galicki, Joshua (CFPB) <                               >
**Sent:** Tuesday, February 11, 2025 5:14 PM
    : Olson, Nicholas (CFPB)                         ; Palmer, Catherine (CFPB)
                         >; Whaley, Marcus (CFPB)                         >; Fils, Nicole (CFPB)
                   >; Gleason, Michael (CFPB)                     >; Wright, Peggy (CFPB)
               >; Del Toro, Vanessa (CFPB) <                         >; McKay, Crystal
(CFPB) <                   >; Pichet, Laurent (CFPB)                 >; Salinas, Jerry
(CFPB)                       >; Sisk, Patrick (CFPB)                   >; Villano, Michael (CFPB)
<                             '; Coleman, CC (CFPB) <                 >
**Cc:** Mark A. Board <                             >; Braden K. Sanner <
                   >
**Subject:** RE: Urgent Action: Contract Termination and Continuation Notifications (Emails)


## URGENT UPDATE


Team,


We just received direction to terminate all Enforcement (102 contracts), Supervision (16 contracts), External Affairs (3 contracts), Consumer Response (20 contracts), Office of Director (33 contracts), and Legal Division (all except 2 contracts – FD Online Licenses and litigation data).

I've asked Mike to change the disposition for all these contracts in the shared sheets.  We have some changes we'll need to make with CRE, Director's Office, and Supervision since those notifications went out already.


This means we're just now waiting on decisions for the Ops contracts.


Adding our BFS colleagues here as well.


Thx!


Josh

# Exhibit C

**cfpb** Consumer Financial
Protection Bureau

1700 G Street, N.W., Washington, DC 20552

February 11, 2025

MEMORANDUM FOR [EmployeeFirstName] [EmployeeLastName], [JobTitle], [Division]

FROM:                 Adam Martinez
                      Acting Chief Human Capital Officer
                      Operations Division, Front Office

SUBJECT:              Notification of Termination During Probationary Period

REFERENCES:           5 U.S.C. § 7511
                      5 U.S.C. § 3321(a)
                      5 C.F.R. §§ 315.803 and 804
                      5 C.F.R. § 316.304

This is to provide notification that I am removing you from your position of [JobTitle] and federal service consistent with the above references.

On [AppointmentDate], the agency appointed you to the position of [JobTitle]. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service"[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

Unfortunately, the Agency finds that that you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs.

For these reasons, I regrettably inform you that I am removing you from your position of [JobTitle] with the agency and the federal civil service effective [EffectiveDate].

If you believe this action is being taken based on partisan political reasons or marital status, you have a right to file an appeal with the Merit Systems Protection Board (MSPB) under 5 C.F.R. § 315.806. You must file an appeal within 30 days of the effective

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id*.

date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office.

You will be sent a postage paid box to return your CFPB ID badge, laptop, iPhone, and other equipment or items owned by CPFB.

For questions related to employee benefits (such as continuation of coverage for health coverage, withdrawal of retirement contributions, etc.) or other matters associated with employee benefits contact CFPB_HRBenefits@cfpb.gov.

I appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please you may contact the CFPB Employee Relations team at CFPB_EmployeeRelations@cfpb.gov.

# Exhibit D

**NCLC** National Consumer Law Center

Katie Eelman <span style="background:black">████</span>

---

## Stop Work Notice - Contract ████████

**Braden K. Sanner** < ███████ >                    Tue, Feb 11, 2025 at 10:27 PM
To: ████████
Cc: ████████████████████

Good Evening,

You might have received a blanket Stop Work Order from the Consumer Financial Protection Bureau (CFPB), Office of Finance and Procurement yesterday, 02/10/2025.  Please note that this is your official notice, in accordance with FAR 52.242-15, with instruction to stop work on the subject contract immediately, incurring no additional costs, until otherwise instructed by the Contracting Officer.  Fiscal Service Procurement will follow up if there are any additional changes in direction. This notice is effective immediately, 02/11/2025.

Please confirm receipt of this email as soon as possible.


**Braden K. Sanner**

Supervisory Contracting Officer

Bureau of the Fiscal Service

████████████████

████████

# Exhibit E

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | Bishop, James; Paoletta, Mark (CFPB) |
| Cc: | Gueye, Jafnar (CFPB); Szybala, Julia (CFPB); Young, Christopher (CFPB) |
| Subject: | CPF and Funding Transfer |
| Date: | Tuesday, February 11, 2025 12:36:29 PM |

Hi Dan and Mark –

I wanted to introduce you both to Jafnar Gueye, our Chief Financial Officer. There are two items he is ready to assist on.

1. At your convenience he will be ready to provide you a briefing on the Civil Penalty Fund including the contractor/vendor that serves as the Bureau's intermediary and the process for disbursements of funds to consumers.
2. Jafnar is currently in communications with the Federal Reserve regarding the Bureau's ability to return money to either Treasury or the Federal Reserve if needed. He can provide you with an update and perhaps how the money is transferred to us, which is unique.

Adam

Adam Martinez
Chief Operating Officer

# Exhibit F

**Subject:**  FW: DUE AT NOON: Statutory requirement for contract data
**Date:**  Tuesday, February 11, 2025 at 11:11:39 AM Eastern Standard Time
**From:**  Dorsey, Darian (CFPB) ███████████████
**To:**  Pfaff, Matthew (CFPB) ████████████████
**Attachments:**  CR_Active Contracts List Completed.xlsx

Best,
Darian

Darian Dorsey
Deputy Associate Director | Division of Consumer Response and Education
Office: ████████████ | Mobile: ████████████

**From:** Dorsey, Darian (CFPB)
**Sent:** Tuesday, February 11, 2025 11:10 AM
**To:** Gueye, Jafnar (CFPB) ████████████████
**Cc:** Johnson, Christopher (CFPB) ████████████    ; Galicki, Joshua (CFPB)
████████████    ; James, Dana (CFPB) ████████████████    ; Martinez, Adam (CFPB)
**Subject:** RE: DUE AT NOON: Statutory requirement for contract data

Hi Jafnar,

Please see attached for Consumer Response and Education.

Best,
Darian

Darian Dorsey
Deputy Associate Director | Division of Consumer Response and Education
Office: ████████████ | Mobile: ████████████

**From:** Gueye, Jafnar (CFPB) ████████████████
**Sent:** Tuesday, February 11, 2025 10:27 AM
**To:** Pass, Sonya (CFPB) ████    Sokolov, Dan (CFPB) ████████████████ >; Gelfond,
Rebecca (CFPB) ████████████    ; Dorsey, Darian (CFPB) ████████
Chang, Jean (CFPB) ████████    ; Warren, LaShaun (CFPB) ████████████    ;
Huggins, Cassandra (CFPB) ████████    ; Sutton, Jocelyn (CFPB) ████
████████    ; White, Sonya (CFPB) ████████
**Cc:** Galicki, Joshua (CFPB) ████████    ; James, Dana (CFPB) ████████    ;
Halperin, Eric (CFPB) ████████    ; Salas, Lorelei (CFPB) ████████    ; Johnson,
Christopher (CFPB) ████████    ; Martinez, Adam (CFPB) ████
████████    ; Pappalardo, Janis (CFPB) ████████████
**Subject:** DUE AT NOON: Statutory requirement for contract data

Deputies,


We have a very quick turnaround data call asking you to identify which of your contracts directly support a statutory requirement, meaning that we would not be able to meet a statutory requirement without this contract.
This is similar to the data call sent earlier but applies to all of your contracts.
Please look at your respective files and mark in col [F] all the contracts that fall under the criteria along with a brief one sentence summarizing the statutory language that supports the requirement.
Apologies for the quick turnaround.


Thank you


Respectfully,


Jafnar Gueye
Chief Financial Officer (CFO)
Office of Finance and Procurement
Room 3020
Office: █████████
Mobile: █████████

Consumer Financial Protection Bureau
**consumerfinance.gov**


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit G

# Fwd: Termination for Convenience of the Government – Contract 20343021C00006

1 message

**Katie Eelman**                                                          Wed, Feb 12, 2025 at 4:17 PM
To:

FYI on the below.

Can someone let me know if I should respond to confirm receipt?

Thanks!

---------- Forwarded message ---------
From: **Mark A. Board**                  >
Date: Wed, Feb 12, 2025 at 3:19 PM
Subject: Termination for Convenience of the Government – Contract 20343021C00006
To:          >
Cc: Syedain, Jawad (CFPB)              >, Sanders, Kathy (CFPB)               >, Braden K. Sanner
<          >

Good Afternoon,

On 02/11/2025, you were notified to stop work. Pursuant to FAR clause 52.212-4(l), Fiscal Service Procurement on the behalf of the Consumer Financial Protection Bureau (CFPB) hereby terminates in its entirety the subject contract, **effective 02/12/2025**.  As such, you are directed to immediately stop all work under the subject contract, terminate all subcontracts, and place no further orders.  You are also directed to provide by electronic means similar instructions to all subcontractors and suppliers.  You are required to keep detailed, individual records of your steps taken and expenditures, if any, you intend to claim as a result of the CFPB terminating this contract.  We request that you provide within 30 days the entirety of the termination settlement proposal(s), if any, you will be submitting for the subject contract.

Finally, it is necessary that you immediately confirm receipt of this termination for convenience notice via an electronic mail (e-mail) response to me, the Contracting Officer for the subject contract.

Thanks,

Mark Board
**Lead Contracting Officer**
Bureau of the Fiscal Service
Office of Shared Services/DPS
Office:

# Exhibit H

**cfpb** Consumer Financial
Protection Bureau

1700 G Street, N.W., Washington, DC 20552

| | |
|---|---|
| MEMORANDUM FOR: | JULIA BARNARD<br>MARKETS & POLICY FELLOW (PROG MANAGER)<br>DIRECTOR, OFF POLICY PLAN & STRAT |
| FROM: | Adam Martinez<br>Acting Chief Human Capital Officer<br>Operations Division, Front Office |
| DATE: | February 13, 2025 |
| SUBJECT: | Termination of Temporary/Excepted Appointment |

On February 27, 2022, you were hired on a Temporary Excepted Service appointment as a/an MARKETS & POLICY FELLOW (PROG MANAGER) in DIRECTOR, OFF POLICY PLAN & STRAT, at the Consumer Financial Protection Bureau for a period not to exceed February 27, 2026.

The purpose of this memorandum is to notify you that your employment will be terminated effective at the close of business on February 13, 2025, due to Executive Order Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative – The White House dated February 11, 2025.

If you believe this termination is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, pregnancy and/or reprisal for prior EEO activity, you may file a discrimination complaint with the Agency's Office of Civil Rights. To initiate the formal discrimination complaint process, you must first contact an EEO Counselor within forty-five (45) calendar days of the employment action or event you believe is discriminatory, harassing, or retaliatory. You may contact the Office of Civil Rights at ███████████████ or ███████████, ███████████ or ███████████ (TTY).

If you believe this action is in retaliation for your making protected whistleblowing disclosures, you may also seek corrective action from the U.S. Office of Special Counsel (OSC). If you do so, your appeal may be limited to whether the Agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures, and you will not be able to challenge the decision on other bases in that action. To seek corrective action from the OSC, you may submit your complaint online. More information on or about filing a complaint with the OSC may be found at https://osc.gov/Pages/File-Complaint.aspx.  As an alternative, you may communicate in writing to the following address:

Complaints Examining Unit
U.S. Office of Special Counsel
1730 M Street, N.W., Suite 218
Washington, DC 20036-4505

If you believe you qualify as an employee under 5 U.S.C. § 7511, you may have the right to appeal this action to the Merit Systems Protection Board (MPSB) no later than 30 calendar days after the effective date.  Failure to file a timely appeal could result in dismissal of your appeal absent good cause.  Your appeal may be made by mail, facsimile, commercial overnight delivery, personal delivery, or electronically at http://e-appeal.mspb.gov.  A downloadable appeal form and additional information are also available at the MSPB website at https://www.mspb.gov/appeals/forms.htm.  The date of filing by mail is considered to be the date of the postmark, the date of the filing by facsimile or electronically is the date of successful transmission.  If the filing is by personal deliver, it shall be considered filed on the date it is received by the MSPB.

The appeal should be filed with the MSPB Regional Office located closest to the employee's duty station - https://www.mspb.gov/about/contact.htm.

Any appeal to the MSPB must include the following information, which identifies the Agency official to whom the MSPB will send a copy of your MSPB appeal and the Acknowledgement Order issued on your appeal: Assistant General Counsel, Legal Division, CFPB, 1700 G Street, NW, Washington, DC, 20552, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

You will be sent a postage paid box to return your CFPB ID badge, laptop, iPhone, and other equipment or items owned by CPFB.

For questions related to employee benefits (such as continuation of coverage for health coverage, withdrawal of retirement contributions, etc.) or other matters associated with employee benefits contact CFPB_HRBenefits@cfpb.gov.

You can request a copy of your OPF documents from Bureau of Fiscal Services (BFS) at ▆▆▆▆ ▆▆▆▆▆ option 4 or OPFInquiries@fiscal.treasury.gov.

I appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please you may contact the CFPB Employee Relations team at CFPB_EmployeeRelations@cfpb.gov.

# Exhibit I

February 13, 2025
Information Memo for the Acting Director

| FROM | ████████████████████, Consumer Response & Education |
|---|---|
| SUBJECT | Divisional Staffing |

| Select Applicable Information Type(s) | ☐ Situational Awareness | ☐ Request for Directional Feedback | ☒ Reply to Inquiry from Director/FO | ☐ Draft Document Feedback Request |
|---|---|---|---|---|

## Issue
This purpose of this memorandum is to provide information about how the staff of the Consumer Response and Education Division align to the Consumer Financial Protection Bureau's (CFPB's) statutory obligations.

## Divisional Background
The Consumer Response and Education Division (CRE) is responsible for executing the CFPB's first two statutory functions: (1) conducting financial education programs, and (2) collecting, investigating, and responding to consumer complaints. *See* 12 USC 5511(c)(1)–(2). CRE is the public face of the CFPB to individuals and their families, delivering scalable services and tools designed to empower consumers to share their experiences in the marketplace, respond to challenges, and make better informed financial decisions.

There are two offices within CRE: the Office of Financial Education and the Office of Consumer Response. Financial Education is responsible for managing a suite of more than 50 educational tools and resources, distributing those tools to users, and researching the effectiveness of financial education programs. Financial Education is also responsible for supporting the Director's membership in the Financial Literacy and Education Commission. Financial Education's content is some of the most frequently visited content on the CFPB's website.

Consumer Response is responsible for answering questions, handling complaints, and sharing data and insights. Consumer Response manages the CFPB's toll-free number and complaint program from end-to-end. Consumer Response is also responsible for assisting complaint process stakeholders (e.g., responding to congressional members with their constituents' complaints, assisting Company Portal users as they respond to their customer's concerns) and sharing complaint information with Federal and State agencies.

==The current headcount for CRE is approximately 150-155 full-time employees. The functional areas listed below aligned to statutory responsibilities total approximately 80 to 85.==

## Office of Financial Education

12 USC 5493(d) requires the Director to "establish an Office of Financial Education, which shall be responsible for developing and implementing initiates intended to educate and empower consumers to make better informed financial decisions." There is one competitive area within the Financial Education, responsible for delivering several statutory obligations:

- Developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions. *See* 12 USC 5493(d)(1).
- Developing and implementing a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission. *See* 12 USC 5493(d)(2).
- Coordinating with other units within the Bureau in carrying out its functions, including working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and working with the research unit established by the Director to conduct research related to consumer financial education and counseling. *See* 12 USC 5493(d)(3).
- Submitting a report on its financial literacy activities and strategy to improve financial literacy of consumers *See* 12 USC 5493(d)(4).

The current headcount for this area is 12.

## Office of Consumer Response

12 USC 5493(b)(3)(A) requires the Director to "establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database ... to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products and or services." 12 USC 5534(a) requires the CFPB "to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person." 15 USC 1681i(e) establishes a process by which the CFPB must act and report out on certain credit and consumer reporting complaints. Consumer Response must coordinate with certain CFPB offices and personnel, including the Private Student Loan Ombudsman and Office of Servicemember Affairs. *See* 12 USC 5493(e), 12 USC 5535.

Consumer Response has several competitive areas:

### Consumer Resource Center

12 USC 5493(b)(3)(A) directs the CFPB to create establish a single, toll-free number. This team manages a Consumer Resource Center (CRC), which receives more than 40,000 calls per month. The CRC answers consumers' inquiries, accepts and provides status updates on complaints, and directs consumers resources such as state and local services.

The current headcount for this area is 3.

### Complaint Handling

12 USC 5534(a) requires the CFPB to timely respond to consumers, including any responses received by the regulator from the covered person. This team directs the complaints to companies for a response.

The current headcount for this area is 7.

### Portal Operations
12 USC 5534(b) requires certain covered persons to provide a timely response to the regulator. This team is responsible for responding to stakeholder support tickets, including tickets submitted by company, congressional, and government portal users.

The current headcount for this area is 7.

### Mosaic Program
12 USC 5493(b)(3)(A) directs the CFPB to create establish a database to facilitate the centralized collection of complaints. 12 USC 5493(b)(3)(D) requires the CFPB to share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies. This team manages the technology that facilitates the handling of more than 350,000 complaints per month

The current headcount for this area is 5.

### Investigations (Regulatory Compliance, Complaint Monitoring, Research and Analysis, Escalation Case Management)
12 USC 5511(c)(2) requires the CFPB to "investigate" complaints. Additionally, 12 USC 5493(b)(3)(A) requires the CFPB to "monitor" complaints. This team is responsible for monitoring and investigating the more than three million complaints the CFPB receives annually. This team conducts investigative inquiries received by the Director's Office. This team also conducts analyses that support the Chief of Staff's team efforts to meet the publication of statutory reports and supports rule lookback assessments as required by 12 USC 5512.

The current headcount for this area is 30.

### Data Reporting
12 USC 5493(e) and 12 USC 5535 requires Consumer Response to coordinate with the Office of Servicemember Affairs and the Private Student Loan Ombudsman, respectively. This team is responsible for working with these offices for their complaint monitoring work.

The current headcount for this area is 4.

### Stakeholder Engagement
12 USC 5493(b)(3)(A) directs the CFPB to "coordinate with the Federal Trade Commission or other Federal agencies to route complaints to such agencies, where appropriate." Additionally, 12 USC 5493(b)(3)(D) requires the CFPB to "share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies …". This team is responsible for working with federal and state agencies, including state Attorneys General.

The current headcount for this area is 5.

*Chief of Staff Team*

Consumer Response is responsible for publishing or contributing to the publication of several reports. Those reports include:

- Consumer Response Annual Report (as required by 12 USC 5493(b)(3)(D))
- Fair Credit Reporting Act 611(e) Report (as required by 15 USC 1681i(e)(5))
- Fair Debt Collection Practices Act Report (as required by 15 USC 1692m)
- CFPB Semi-Annual Reports (required by 12 USC 5496)

This team is responsible for the production and publication of these reports, including any follow-up questions from oversight bodies.

The current headcount for this area is 5.

**Management and Operations**

This team provided the executive direction for both offices within the division. The current divisional executives each have a dual role both division and office level executives. The office level executive positions remain vacant. The team also provides centralized support to each office regarding resource management functions including budget, acquisition management, training, management reporting, and coordination with internal and external stakeholders, and oversight bodies such as GAO and OIG.

The current headcount for this area is 5.

# Exhibit J

**From:** CFPB_HCSysOps ⬛⬛⬛
**Subject:** Updated Timekeeping Instructions for PP03
**Date:** February 14, 2025 at 12:27 PM
**To:**
**Cc:** CFPB_WorkLife ⬛⬛⬛

Colleagues,

On Monday, February 10th CFPB's Acting Director issued guidance for Bureau staff to pause work tasks. In accordance with the Acting Director's guidance employees should exercise administrative leave until otherwise instructed. For staff who have been asked to work by the Acting Director, the Chief Legal Officer, or another designee (i.e. through their leadership chain, etc.) they should record that time as they normally would. All time not in a working status should be reflected in webTA under the "Admin/Excused Absence" leave transaction category.

Please refer questions to the CFPB_WorkLife@cfpb.gov box so the Office of Human Capital can provide clarifying guidance as needed.

V/R

Roland Jacob
Human Capital Operations Manager
Systems and Operations | Office of Human Capital
Office: ⬛⬛⬛ | Mobile: ⬛⬛⬛

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

JA429

# Exhibit K



**From:** ▌▌▌▌▌▌▌▌  ▌▌▌▌▌▌▌  ▌
**Subject:** Please Read: CFPB Regional Office Operating Status (Week of 2/17)
**Date:** February 17, 2025 at 1:21 PM
**To:** ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

(This message is sent on behalf of Adam Martinez, Chief Operating Officer, for CFPB Regional Office Staff and Contractors)

Dear Colleagues:

The CFPB Regional Offices will remain closed this week (2/17-2/21).  Employees and contractors approved to work should do so remotely unless otherwise instructed.

Thank you.

Adam

Adam Martinez
Chief Operating Officer

 

**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

# Exhibit L



RE: Requesting authorization to repair the cf.gov homepage

Chilbert, Christopher (CFPB)                                                    Today at 9:32 AM

To:                            Martinez, Adam (CFPB);  Cc:  Scott, Adam (CFPB)  ⌄

My understanding is that the decision to delete the homepage was made by Acting Director Vought, and it was not an error made by the members of the DOGE team. We do not have authorization at this time to restore the homepage or engage the DOGE team in an AAR.

Chris Chilbert

From:
Sent: Tuesday, February 18, 2025 8:15 AM
To: Martinez, Adam                          Chilbert, Christopher                              >
Cc: Scott, Adam (CFPB)
Subject: Requesting authorization to repair the cf.gov homepage

Adam and Chris,

Apologies for the unusual email address. These are unusual times, `` and I have a request for authorization to work that I'm not sure should be addressed to one or the other of you, so I figured I would keep you both in the loop. I have also cc'ed my manager for visibility, so he can be aware if such work is authorized.

Based on news reports that Gavin Kliger is now at the IRS, it seems like the DOGE Organization is largely done with its technical work at the agency to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems."

As part of this work on improving quality, they also damaged the website by deleting the homepage for some unknown reason. I have heard that CFPB staff were able to persuade them to not delete everything entirely (as they did for USAID). I struggle to understand why this deletion was necessary at all and why they demanded access to the website with extreme urgency late on a Friday night. Despite their stated assurances, it seems they did not follow our processes, nor did they wait for an employee signing on under overtime to onboard them into our website's CMS, Wagtail. From what I understand, it seems that they instead used global admin privileges on our SSO identity provider to force access into our system and make the change on their own. I have many questions still, but I hope to be able to explore them through a more established process rather than relying on hearsay (see below).

I know some teams have been received authorization to continue working despite the general stop-work order from the Acting Director. I would like to request authorization for two scopes of work:

1.  I would like for my team to repair the website's homepage. The rest of the site does remain accessible to the general public, but having a broken homepage has damaged several aspects of our technical operations already:
    a.  Site crawling by search indices like Google is likely not happening, this will damage our SEO and visibility to the world and cause our content to become less visible in search over time
    b.  I have confirmed also that our automated accessibility scanning is now malfunctioning and is unable to verify our site still meets its mandated 508 compliance for accessibility

# Exhibit M

**From:**           Service Desk (CFPB)
**Subject:**        Service Advisory: Virtual Desktop Access Unavailable After 2/28/2025
**Date:**           Wednesday, February 26, 2025 10:14:16 AM

**What's Happening?** The Citrix Virtual Desktop will be unavailable after Friday, February 28, 2025, at 11:59 PM EST.  You are receiving this notification because you logged into the Virtual Desktop in the past 90 days. Access to the Virtual Desktop via https://work.cfpb.gov and https://csf.cfpb.local will no longer be available.

**When:** Friday, February 28, 2025, at 11:59 PM EST

**Need More Info?** Please refer any questions or concerns regarding this event to the CFPB Service and Support Portal, the CFPB Service Desk at 202-435-7777 (external), x57777 (internal), or email ServiceDesk@cfpb.gov.

# Exhibit N

**From:** **CFPBHROps** CFPBHROps@fiscal.treasury.gov
**Subject:** Automatic reply: question re separation papers
**Date:** February 27, 2025 at 9:27 AM
**To:** ████████████████████

We are working diligently with the agency during this transition to provide necessary documents related to your recent or impending separation.

Please provide a personal email address and updated mailing address to ensure timely and effective communications.

All separated employees will be receiving a copy of their SF-50, Notice of Personnel Action, as well as a separation packet with information regarding unemployment, benefits and lump sum annual leave payment, if applicable.

Employees will have a 31-day extension of their health insurance from the date of separation provided by your health insurance carrier at no cost to you. Dental and Vision benefits will terminate upon the date of separation.

Thank you for your patience.

# Exhibit O

From:
Date: Thu, Feb 27, 2025 at 11:25 AM
Subject: Pickup of Personal Belongings and Return of Equipment from the CFPB HQ
To:
CC:

Good afternoon,
We recognize that you have personal property, work materials, and federal records in your office or cubicle. To prepare to vacate the building, the Operations team has packed up your personal belongings for pickup at 1700 G Street. They are working closely with your division's leadership to take great care with your personal property, confidential matters, federal records, and other items.

To retrieve your personal belongings, you must schedule an appointment by emailing the following information to

- Your full name
- Your designee, if needed (see below for additional details)
- Where your property is located (e.g., office/cubicle number, 6th floor locker number, pantry)
- A time on March 3rd, 4th, 5th, or 6th between 8am-4pm
- Any additional details related to your personal property that can help us identify or properly handle them (e.g., medications in the refrigerator that need to remain cold, personal papers that contain private information, etc.)

If you have equipment to return to the CFPB, you may return your IT equipment and PIV card during this visit. Please note that you will:
- Need to return all laptops, iPhones, secure thumb drives and any other equipment with an asset tag
- Not need to return printers, keyboard, mice, monitors, docking stations, laptop bags/backpacks, headsets, laptop locks, filing cabinets, paper shredders, or cables
- Receive a hardware asset receipt identifying the equipment you return

After scheduling an appointment, you will receive a confirmation email with additional details. Except in special situations, items that are not picked up by March 6, 2025 will be considered abandoned and will be disposed of. While we cannot ship items to you, you may designate another staff member with a valid identification to pick up your items on your behalf.

If driving, consider parking at a public parking garage, on the street, or the loading dock area on F Street. The parking garage at 1700 G Street will not be open for these pickups.

We recognize that this is a difficult situation and here to support your transition.

# Exhibit P



**From:** Martinez, Adam (CFPB) <
**Sent:** Thursday, February 27, 2025 4:18 PM
    : Pappalardo, Jani   CFPB) <                          >; Sokol   Dan (CFPB)
                 >; Epstein   n (CFPB)                   >; Hedgesp   Grady
(CFPB)                          >; Brown, Jason (CFPB) <                   >;
   cArdle, Mark (CFPB) <                 ; McNamara, John (CFPB)
                          >;   own, Desmond (CFPB) <                      >;   e,
Lisa (CFPB) <                      >;   ster, Deborah (CFPB)                       >;
   ice, Jim (CFPB) <                  >; Dodd-Ramirez, Daniel (CFPB)
                  >
**Subject:** Statutory/Legal Required Work

Hi RMR Colleagues – Good afternoon.

Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau.  He did exclude areas approved by him or required by law.  We want to ensure that you are aware that statutorily required work and/or work required by law are authorized.

Your teams are authorized to continue carrying out these responsibilities.  Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director.  Alternatively, you are always welcome to reach out to me if needed.  I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam

Adam Martinez
Chief Operating Officer

# Exhibit Q

**From: Brown, Jason (CFPB)** ███████████████
**Subject:** updates
**Date:** February 28, 2025 at 5:11 PM
**To:** _____████████████

Hi All,

I believe all of you have received the direction from the COO through your section chiefs that we are to fulfill our statutory obligations subject to the limitations provided in the February 8 email from Acting Director Vought. We stopped most of our statutory work, I know, not because of the February 8 email, but because of the February 10 email. I clarified this point with the COO.

I interpret the direction to mean that we should resume conducting research, a statutory responsibility. This means accessing the research servers, cleaning and analyzing data, and writing drafts and reviewing research. I would also include corresponding with co-authors as an essential research function.

This leaves a number of questions, particularly with regards to external engagement. Questions about external engagement include 1) posting data to the Bureau website; 2) publishing Bureau research and SDR; 3) attending outside events, including research conferences; 4) presenting at outside events, including research conferences. In conjunction with the RMR FO, we are seeking guidance on these questions. There are specific activities I am seeking immediate approval for:
1. Publication of the Consumer Credit Trends and Mortgage Performance Trends
2. Permission for FHFA to field the NSMO
3. Household Financial Stability phone call with the Federal Reserve System
4. Consumer Finance Round Robin
5. Boulder Conference (presenters only)

Because we have not sought approval for anything yet, I would like to hold off for the next few days on seeking approval to post papers on SSRN or submit new pieces to journals. If you have materials already under review at journals, I encourage you to continue working and corresponding with the editors with the expectation that our current posture will have changed by the time publication is imminent.

In other non-research responsibilities (e.g., rulemakings and exam work), there is some conflicting guidance about whether we should move forward or not. We are asking about that.

But this leads to another question: under what conditions should someone in OR continue to take administrative leave, or do we take this direction as instruction to work full-time on research and other approved statutory responsibilities, unless there is nothing research-related for someone to do? How do we code WebTA at the end of the pay period? We are also seeking guidance on this.

Many of you have already jumped at the chance to resume your research. Alas, many of you are finding that the Research Environment is not functioning as before, impairing your ability to fulfill our statutory research obligations. Thank you for noting the difficulties you are encountering and passing them on to your supervisor. I have let the CIO and COO know that we are encountering difficulties in resuming our statutory research obligations because of the functioning of the Research Environment, that we are cataloguing the difficulties, and that we will meet with them next week to explain our challenges so they can help us resolve them.

I know this leaves a lot of questions unanswered, but I hope it gives you a sense of where we are. Please stay in communication with your supervisor so we can try to give you the direction you need.

Jason Brown
Assistant Director, Research
Consumer Financial Protection Bureau

# Exhibit R

**From:** ██████████████████
**Subject:** Re: Statutorily Mandated Work
**Date:** February 28, 2025 at 10:37 AM
**To:** ██████████████, McNamara, John (CFPB) █████████████

Yes, John will likely be reaching out to you shortly. ███████ has decided to retire so we need to figure out who is available to continue the work in his absence. I would assume that you will handle the FDCPA report but let's wait to hear from John.
Hope you are doing ok.

██████

**From:** ████████████████████████
**Sent:** Friday, February 28, 2025 10:33:38 AM
**To:** McNamara, John (CFPB) <██████████████████████>
**Cc:** ████████████████████████
**Subject:** Statutorily Mandated Work

Hello,

The other offices in RMR have received notification from their management that Adam Martinez changed his guidance and we are now allowed to work on statutorily mandated work. Will you be providing an update to Markets staff?

If statutorily required work is going forward, I would like to know if I will continue to work on the Card Report and FDCPA report.

Best,

████████

██████████████

Financial Analyst | Consumer Credit, Payments, and Deposits Markets
Mobile: ██████████████

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** McNamara, John (CFPB) ███████████████
**Subject:** FW: Statutory/Legal Required Work
**Date:** February 28, 2025 at 11:20 AM
**To:** ██████████████████████

See below from Adam Martinez.  This is for your awareness, and I ask that you let your manager and me know of any statutorily required work.

We have data collections and CARD Act for our Credit Card Team and the FDCPA Annual Report for our Debt Collections Team.

More broadly we have market monitoring for all Markets teams.

I have an email in to Adam Martinez letting him know that I plan to recommence work on all areas.  I also have a question about what types of communications Mark Paoletta and Daniel Shapiro wish to be copied.  I told Adam that I assumed they would only want to be copied on substantive matters and be made aware of meetings Markets was having with external stakeholders.

This email is for your awareness.  Stay tuned for more guidance.


John McNamara
Assistant Director, Consumer Credit, Payments, and Deposits Markets
Division of Research, Monitoring & Regulations

**Consumer Financial Protection Bureau**

1700 G Street NW
Washington, DC 20552
Office ████████████
Mobile ████████████

**Confidentiality Notice:**  If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ██████████████
**Sent:** Thursday, February 27, 2025 4:18 PM
**To:** Pappalardo, Janis (CFPB) <████████████████████; Sokolov, Dan (CFPB)
████████████████████; Epstein, Ann (CFPB) ████████████████; Hedgespeth,
Grady (CFPB) ████████████████; Brown, Jason (CFPB)
████████████████ McArdle, Mark (CFPB) ███████████████        McNamara



**Subject:** Statutory/Legal Required Work

Hi RMR Colleagues – Good afternoon.

Thank you for your patience as we continue through transition and our new leadership's review of the Bureau.

On February 8 (email attached), our Acting Director outlined several areas where work stoppage was being implemented at the Bureau. He did exclude areas approved by him or required by law. We want to ensure that you are aware that statutorily required work and/or work required by law are authorized.

Your teams are authorized to continue carrying out these responsibilities. Any actions or communications with outside parties must be sent to Mark Paoletta, Chief Legal Officer and Daniel Shapiro, Deputy Chief Legal Officer.

Should you have any questions at all, please feel free to contact our Chief Legal Officer as directed by the Acting Director. Alternatively, you are always welcome to reach out to me if needed. I am happy to share guidance provided to other leaders and employees regarding authorized work, including my own team.

Thank you for your support.

Adam

Adam Martinez
Chief Operating Officer



Mail Attachment.eml
14 KB

**From:** McNamara, John (CFPB) ███████████
**Subject:** RE: Statutorily Mandated Work
**Date:** February 28, 2025 at 2:11 PM
**To:** █████████████
**Cc:** ████████████████

Thanks for asking.  Wait for guidance.  I am waiting for a response from Adam Martinez.

John McNamara
Assistant Director, Consumer Credit, Payments, and Deposits Markets
Division of Research, Monitoring & Regulations

## Consumer Financial Protection Bureau

1700 G Street NW
Washington, DC 20552
Office-█████████████
Mobile-████████████

**Confidentiality Notice:**  If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** ███████████████████
**Sent:** Friday, February 28, 2025 1:54 PM
**To:** McNamara, John (CFPB) ████████████████
**Cc:** ████████████████████
**Subject:** Re: Statutorily Mandated Work

To clarify, should I get started or wait for guidance?

**From:** McNamara, John (CFPB) <████████████████████
**Sent:** Friday, February 28, 2025 10:57 AM
**To:** ██████████████████
**Cc:** ████████████████████
**Subject:** RE: Statutorily Mandated Work

Stay tuned for guidance.  As I see it, the FDCPA Annual Report is statutorily mandated work, and I would like to get started on it.

John McNamara
Assistant Director, Consumer Credit, Payments, and Deposits Markets
Division of Research, Monitoring & Regulations

## Consumer Financial Protection Bureau

1700 G Street NW
Washington, DC 20552
Office ▮▮▮▮▮▮▮▮
Mobile ▮▮▮▮▮▮▮▮

**Confidentiality Notice:** If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, February 28, 2025 10:34 AM
**To:** McNamara, John (CFPB) ▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Statutorily Mandated Work

Hello,

The other offices in RMR have received notification from their management that Adam Martinez changed his guidance and we are now allowed to work on statutorily mandated work. Will you be providing an update to Markets staff?

If statutorily required work is going forward, I would like to know if I will continue to work on the Card Report and FDCPA report.

Best,

▮▮▮▮▮▮▮▮

******

▮▮▮▮▮▮▮▮▮▮    Consumer Credit, Payments, and Deposits Markets

Mobile: ▮▮▮▮▮▮▮▮

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit S



# Exhibit T



**From:** Coleman, CC (CFPB) < ███████████████ >
**Sent:** Saturday, March 1, 2025 7:46 AM
**To:** ██████████████████ | ████████████ ;████████ >; ████████████████████ >
**Subject:** Re: ████████ (CFPB) shared "OFP Statutory Requirements" with you

Please add the statute, regulation, clause, etc. that's the authority for the process-requirement you're reporting.
Regards, C

**From:** Coleman, CC (CFPB) < ████████████ >
**Sent:** Friday, February 28, 2025 5:21:06 PM
**To:** █████████████ >; ██████████████ >; ████████████████████ >;
**Subject:** Re: ████████ (CFPB) shared "OFP Statutory Requirements" with you

Hi team. Please separately send me your processes that are required by statute, regulation, or something else (new add). ████████ said the spreadsheet is for OFP managers only. Need by noon Tuesday please so I can consolidate for COB Tuesday.
Thanks! C

**From:** Coleman, CC (CFPB) < ████████████ >
**Sent:** Friday, February 28, 2025 2:19:40 PM
**To:** ████████████ >; Green, Lakeisha (CFPB) < ████████████ ;█████████
**Subject:** Fw: ████████ (CFPB) shared "OFP Statutory Requirements" with you

Team, please let me m ow if you can't access the file. We need to add anything that we're responsible for on our team that's required by statute or regulation, so certification, CPARs, etc.
Josh said it's due by Tuesday.
Thanks, C

**From:** ████████ (CFPB) ████████ >
**Sent:** Friday, February 28, 2025 9:24 AM
**To:** Ahmad, Rumana (CFPB) < ████████████ ; Braham, Regina (CFPB)
< ████████████ ; Coleman, CC (CFPB) ████████████ ; Del Toro, Vanessa (CFPB)
████████ >; Dunham, Tonya (CFPB) < ████████████ ; Galicki, Joshua (CFPB)
████████ ; Gueye, Jafnar (CFPB) ████████ ; James, Dana (CFPB)
████████ ; Olson, Nicholas (CFPB) ████████ >; Pichet, Laurent (CFPB)
████████ >; Velez, Freddy (CFPB) ████████ >
**Subject:** ████████ (CFPB) shared "OFP Statutory Requirements" with you

███████████████ (CFPB) invited you to edit a file

Here's the document that ████████████ (CFPB) shared with you.

X══  OFP Statutory Requirements

🔒 This invite will only work for you and people with existing access.

Open                    Share

cfpb  Consumer Financial
      Protection Bureau

This email is generated through CFPB's use of Microsoft 365 and may contain content that is controlled by CFPB.

# Exhibit U

**From:** (null)
**Subject:** FW: All Hands Message re: Work Required by Law
**Date:** March 4, 2025 at 3:52 PM
**To:**

---

**From:** Schroeder, John (CFPB) <████████████████>
**Sent:** Monday, March 3, 2025 10:13 AM
**To:** _DL_CFPB_Examiners Midwest <██████████████████>
**Subject:** FW: All Hands Message re: Work Required by Law

Casey and Calvin are seeking clarity from new agency leadership re the below email, and will pass along direction as soon as they can receive it. In the meantime please refrain from all work activity other than ministerial tasks as previously approved by Adam Martinez.

I apologize for the continued confusion being caused by multiple misleading and inconsistent email. Please stand by for additional direction from SPV leadership. Thank you.


John J. Schroeder
Regional Director – Midwest Region
Supervision, Enforcement and Fair Lending
Consumer Financial Protection Bureau

230 South Dearborn Street, Suite 1590
Chicago, IL 60604
Mob: ████████████

consumerfinance.gov

Confidentiality Notice: The information contained in this transmittal, including attachments if any, may be confidential or privileged under applicable law, or otherwise may be protected from disclosure to anyone other than the intended recipient(s). Any review, use, distribution, or copying of the contents of this e-mail or its attachments by any person other than the intended recipient for any purpose other than its intended use, is strictly prohibited and may be unlawful. This communication is not intended as a waiver of the confidential, privileged or exempted status of the information transmitted. If you have received this e-mail in error, you should permanently delete the e-mail and any attachments. Do not save, copy, disclose, or rely on any part of the information contained in this e-mail or its attachments. Also immediately notify the sender of the misdirection of this transmittal. Your cooperation is appreciated.

---

**From:** Martinez, Adam (CFPB) ██████████████████
**Sent:** Sunday, March 02, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ████████████████
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational

control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

This message was secured by **ZixCorp**©.
*To reach ZixCorp, go to: http://www.zixcorp.com/info/zixmail*

# Exhibit V

███████████████

**From:** Sellers, Katelyn (CFPB) ███████████████
**Sent:** Monday, March 3, 2025 8:45 AM
**To:** ████████████████████████████████████
████████████████
**Subject:** FW: follow-up on Qs about informal guidance to entities

Hi Team,

FYSA on the note below to Casey.  I will let you know what I hear back.  In the meantime, please continue to comply with the stop work order and stand by for further instruction from me regarding whether you should engage in any ILSA or NMLS work.  Thank you!

Katelyn

Katelyn Sellers
Program Director, Systems & Registrations
Office of Supervision Examinations
(m) ███████████

**From:** Sellers, Katelyn (CFPB)
**Sent:** Monday, March 3, 2025 8:42 AM
**To:** Huggins, Cassandra (CFPB) ████████████████████ >
**Subject:** RE: follow-up on Qs about informal guidance to entities

Hi Casey,
Pursuant to Adam Martinez's email yesterday, 3/2/25 regarding performing statutorily mandated work, I am resurfacing the email below to inquire as to whether we ever got any response from leadership.  As you know, the SES items below are only "mandated" to the extent that exams are being performed and require technical support and tools.  And I believe NBR would also be in the category of "supervision" class of activities that are under the stop work order.

However, the NMLS and ILSA items are not related to whether exams/supervision activities are occurring, and they are required by statute (Secure and Fair Enforcement for Mortgage Licensing [SAFE] Act and Interstate Land Sales Disclosure Act, respectively).

My team is standing by and is ready to resume minimally required work on these programs if authorized.  Please note that a routine (daily) part of running these two programs requires external stakeholder engagement (with registrants, CSBS/NMLS, contractors, etc.), and we are unsure whether each instance of external outreach would need to be authorized.

Thank you,
Katelyn

Katelyn Sellers
Program Director, Systems & Registrations
Office of Supervision Examinations
(m) ███████████

**From:** Sellers, Katelyn (CFPB)
**Sent:** Wednesday, February 5, 2025 4:10 PM
**To:** Huggins, Cassandra (CFPB) ███████████████████ >
**Cc:** Bleicken, David (CFPB) < ███████████████████ >
**Subject:** FW: follow-up on Qs about informal guidance to entities

Hi Casey,

This might be more than was being asked for, but the systems/programs are somewhat different, so I'm breaking the examples out program by program:

**Supervision Examination System (SES)**
- The most common questions the SES team receives from external parties are centered around the Supervision Portal, which is the secure portal Supervision uses for the Entities to respond to requests from the Exam teams. Examples:
  - I forgot my password, can you reset it?
  - I got a new phone and the MFA no longer works, can you fix it?
  - I am having trouble logging into the portal, can you help?
- Impact: If we do not answer these questions/provide this support over email, the Entity user *would not be able to log into the CFPB Supervision Portal and provide information to the Exam teams, which would stop exams from moving forward*.

**Nonbank Registry (NBR)**
- Example questions:
  - I am unable login to my NBR account (i.e., password/multi-factor authentication (MFA) errors or I need change my email address). Can CFPB help?
    - If we don't respond, user is not able to access their NBR account and cannot comply with the NBR rule (i.e. cannot submit or update their required filing)
  - I entered an incorrect value in the company's identifying information (e.g., typo in NMLS ID). Can CFPB correct it?
    - If we don't respond, Company's unique identifying information remains incorrect in the Nonbank Registry and leads to data quality issues in CFPB use of the identifying data to support the Supervision program.
  - I can't access my company's CFPB Consumer Response account, how do I reply to a complaint I received from the CFPB on behalf of a consumer?
    - If we don't respond, Company representative does not learn the correct way to respond to a complaint, and their customer who originally submitted the complaint does not get a response through CFPB's complaint system.
- Holding scheduled external meetings styled as "office hours" to provide guidance and updates for Nonbank Registry
  - During these meetings with state regulators, state attorneys general, and Tribal Governments, the NBR team provides updates on NBR metrics (e.g., number of registered companies, number of registered orders), solicits input of "data sharing and data use" ideas from attendees, and talks about steps toward potential publication in the future.
    - If we don't hold these meetings, work may slow down on the implementation of the NBR rule, including potential publication.

**Interstate Land Sales Act (ILSA)**
Example questions from developers trying to comply with ILSA/Regulation J:
- I usually get an email from CFPB confirming my submission (i.e., 1) register lots to sell in a new subdivision, 2) add lots to sell in an existing registered subdivision, and/or 3) amend information regarding lots to sell in an

existing registered subdivision) – did CFPB receive my submission and/or is there any additional information I'm required to submit?
- o If we don't respond, developer may reach out to other CFPB offices or political representatives because they have not received communication from the CFPB ILSA office.

- What is the ILSA # CFPB is assigning to my subdivision?
  - o If we don't respond, the Property Report may be noncompliant with ILSA/Regulation J and/or the purchaser/consumer does not receive information on the Property Report as required by ILSA/Regulation J.

- What is the effective date of the Property Report we are required to provide to purchasers so that we may sell the lots?
  - o If we don't respond:
    - ▪ Developer may lose income because they are not sure if they can legally sell the lots in the subdivision due to potential non-compliance with the ILSA/Regulation J.
    - ▪ Purchasers may not receive the Property Report required by the ILSA/Regulation J or one that appears to be noncompliant; this could result in a developer being sued by a purchaser due to the Property Report not being properly filed with the CFPB.

**Nationwide Multistate Licensing System and Registry (NMLS)**
To effectively oversee the contract between the CFPB and the NMLS's State Regulatory Registry, LLC (SRR), our office has taken a proactive approach to communicating with the SRR during the Background Investigation Process for new and renewal of ~177 contractors (in a constant state of onboarding/offboarding). In our emails, we communicate such things as: confirm the receipt of a request of a background check, ask for more information to complete a background check, provide status updates on certain individuals, confirm temporary authorization to work, and confirm final approval of a person being thoroughly vetted so they may continue work on the system.
- If we no longer communicate the items above:
  - o SRR's overall ability to perform under its contract with CFPB could be negatively impacted.
  - o SRR may reach out to other CFPB offices in confusion and/or may complain that CFPB is no longer providing information on the process.
  - o SRR could be unaware that information is missing and the background investigation process is paused/individuals would be able to work on the system as needed by CFPB
  - o Information required to complete the background investigation remains incomplete and/or the background investigation may time out and require re-initiation of process.

Katelyn Sellers
Program Director, Systems & Registrations
Office of Supervision Examinations
(m) ███████████

---

**From:** Huggins, Cassandra (CFPB) ███████████████████████
**Sent:** Wednesday, February 5, 2025 11:25 AM
**To:** Sellers, Katelyn (CFPB) ████████████████████>; Bleicken, David (CFPB) ██████████████████>
**Subject:** follow-up on Qs about informal guidance to entities
**Importance:** High

Hi Katelyn- We had submitted the question the other day about whether we could provide certain types of informal guidance to entities. Legal is going to run this question up to the Acting Director, but wants some examples of the types of questions that typically fall into these categories and the impact if the Bureau does not respond to it. Would you/your team be able to put that together? It's a tight turn-around- would need it by the end of today.

- Answering questions from supervised entities to provide user support for Supervision Examination System, Nonbank Registry, Nationwide Multistate Licensing System (NMLS), and Interstate Land Sales Act (ILSA) programs
- Holding scheduled external meetings styled as "office hours" to provide guidance and updates for Nonbank Registry

Thanks,
Casey


Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
Mobile: ████████

Consumer Financial Protection Bureau
**consumerfinance.gov**


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit W

**From:** Huggins, Cassandra (CFPB) <                    >

**To:** _DL_CFPB_Supervision_ALL <                                        >
**Subject:** FW: All Hands Message re: Work Required by Law


Supervision staff,


Calvin and I know that there is quite a bit of confusion surrounding the message we received from Adam Martinez/Mark Paoletta on March 2. We have requested and received clarification that **their message was not intended to authorize the reinstatement of supervision/examination activity, even though the Bureau is required by law to carry out these activities.** We are also not to resume any functions that support the supervision/examination program, and are not to communicate with parties outside of the Bureau on Bureau matters without receiving approval from the Chief Legal Officer.


It has been communicated to me that **Supervision staff should continue to operate on administrative leave as directed by the Acting Director unless you have received express permission to work on a task.** In general, this permission will come from Calvin, me, or your supervisor. Please do not work on anything else without authorization. If you have a question about whether you've been authorized to perform a task, please reach out to your supervisor. As a reminder, staff have been given permission to conduct some administrative tasks such as validating/certifying timecards in WebTA and submitting/approving vouchers in Concur. Some staff have also been authorized to work on discrete tasks and may continue to work on those as directed.


OSPO managers- if your teams are responsible for carrying out any other statutorily-mandated activities and you aren't sure whether they fall under the broader umbrella of supervisory or examination activity or activities that support this function, please send me an email with the activity and the specific statutory language that requires it, and I will send a request to the Chief Legal Officer.


Thanks,

Casey



Cassandra Huggins

Principal Deputy Assistant Director | Supervision Policy & Operations

Mobile:

Consumer Financial Protection Bureau
consumerfinance.gov


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) ███████████████
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) ██████████████
**Subject:** All Hands Message re: Work Required by Law


**Message from Mark Paoletta, Chief Legal Officer**


On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.


On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.


It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.


Thank you for your attention to this matter.


Mark Paoletta

Chief Legal Officer

CFPB

# Exhibit X



**Gueye, Jafnar (CFPB)**

To Chilbert, Christopher (CFPB), +14                    ⋯

11:39 AM

Thanks Chris,

To add to that, we're getting a lot of requests to turn contracts back on. I will send out guidance shortly but for your awareness we are not turning back on every contract we've had. We're taking a very narrow approach: if without the contract the Bureau **can't** meet a statutory requirement then it will be considered for reactivation. Meaning that a contract enhancing our ability to meet a statutory requirement is not enough to get it back on. It needs to be the only way the bureau can currently meet that requirement.

Also as you're providing justifications please be prepared to have to defend those to external parties. We've been routinely asked to provide for names of the people providing the justification.

Respectfully,

Jafnar

# Exhibit Y

**From:** (null)
**Subject:**
**Date:** March 4, 2025 at 9:57 AM
**To:**

---

**From:** Brown, Jason (CFPB) <███████████████████>
**Sent:** Monday, March 3, 2025 6:07 PM
**To:** _DL_CFPB_OR <███████████████>
**Subject:** updates

Hi OR,

Just wanted to give you a status update.

Jan submitted a proposal to Mark Paoletta outlining how RMR would comply with the directive to resume statutory responsibilities. She proposed that:

- RMR would bring nearly everyone back to work, because nearly all of RMR engages in statutorily required work. Given that research responsibilities are well documented in Dodd-Frank and all of the research work we do is linked to fulfilling Dodd-Frank's requirements, this would mean that anyone who could support the research functions of Dodd-Frank should return to work. This is consistent with what I shared last Friday.
- Communications within the federal government, with contracted entities, and within the Federal Reserve system that help us fulfill our statutory responsibilities will be pre-approved and not require involvement of the DFO.
- Engagement with outside researchers and other parties to advance the Bureau's research responsibilities would resume. This would include discussing research findings in meetings, workshops, and conferences with other government agencies, presenting research findings at academic conferences, and attending research conferences. She noted that we would follow usual Bureau procedures for authorizing and clearing any presentations and conference attendance and would inform him and Dan Shapiro prior to any presentation or attendance at a non-governmental conference.
- Refreshing data on the Bureau website, specifically the CCT and Mortgage Performance Trends, will continue. We will await further guidance on Bureau-hosted publications.
- Dissemination of research findings through the SSRN page and through academic journals would resume.

Jan has not received a response yet. But I will pass it on as soon as I get it. In the meantime, please continue (or resume) fulfilling the non-public aspects of your work to the extent possible.

There are questions on timecards. We expect further guidance on Thursday.

I know that as we are resuming our work, we are confronting a few challenges, including:

- Loss of personnel. The firing of much of our staff impacts our ability to complete assignments as planned. We are trying to make sure we have access to the files of the staff who have left. The OR management team also will be looking to reassign staff from work streams that have stopped. If you find you have capacity, please alert your chief. And if you need additional staff support for your projects, please

alert your chief.

- Loss of IT resources. Several contracts that have supported our work have been cancelled. We have seen some impairment in our ability to do our work, and in some cases we can't tell if the struggles we're facing are because of cancelled contracts or glitches, and the people who would ordinarily help us out have themselves been terminated. Many thanks to those who have been documenting your experiences and sharing workarounds. Kat has been running point on this. The CIO knows we're having issues and once we get a full picture of the situation and the extent to which we cannot fulfill our responsibilities, we will share with him and work with him on how to fix it.
- Loss of data. Several of our data contracts have been cancelled. Also, because the IT systems have been in flux while data were being migrated (or even just stored), there is some question as to where some of the data and how to access them. Shaista will be working with the data stewards of each of our data assets to ensure that the data are accessible and complete.
- Loss of other tools to conduct research. These include the qualitative researcher contract and the lab contracts. We're assessing how the loss of these other contracts affects our ability to fulfill our duties.

Thank you for your patience and cooperation as we try to sort all this out.

Finally, I know many of you submitted promising work to the Consumer Finance Round Robin. Because of the uncertainty of our participation, the other agencies moved forward without including papers that were authored only by CFPB researchers. Assuming we get the go-ahead to continue engagements like the Round Robin, we are welcome to nonetheless attend. We're looking to plan an alternate Round Robin for our submissions that didn't make it on to the program.

Jason

# Exhibit Z

**From:**
**To:** ███████████████
**Subject:** FW: All Hands Message re: Work Required by Law
**Date:** Monday, March 3, 2025 5:29:52 PM

███████,

Per the authorization below, ████ is looking into getting the CCDB back up and running. As part of this work, we're also authorizing you and ████ to help assess the state of things across CCDB/CGGP/complaints products, identify people and resources that are remaining to support these platforms, and understand the backlog in light of the new state of things.

I'm working with the other D+D leads to assess the state of work and resources more broadly, as Adam mentioned in his email this afternoon. A read from you, ████, and ████ of the complaints portfolio will be invaluable as we figure out next steps. Reach out to me any time if I can be of help, provide more guidance, etc.

Thanks,

████

--
Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** ██████████████ ██████████████ >
**Date:** Monday, March 3, 2025 at 5:04 PM
**To:** ████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████████████
**Subject:** FW: All Hands Message re: Work Required by Law

Hi Folks,

Below is the email thread I referenced regarding authorization to "shift any resources needed to comply with the statute and any applicable laws/regulations" as noted by Adam M.

Best,

████

**From:** ████████████████████████

**Date:** Monday, March 3, 2025 at 10:21 AM

**To:** ████████████████████████ Chilbert, Christopher (CFPB)
< ████████████████ >

**Cc:** ████████████ ████████████ >, Scott, Adam (CFPB)
████████████████ >

**Subject:** RE: All Hands Message re: Work Required by Law

Minus Adam and Mark,

Irina please check with Steve once he comes online please let me know if anything is needed
from Infrastructure or other teams to address the issue.

Thanks,

████████
Deputy Chief Information Officer | Technology & Innovation
Mobile: ████████████

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete
the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** ████████████████ >
**Sent:** Monday, March 3, 2025 10:11 AM
**To:** Martinez, Adam (CFPB) ████████████████ >; Chilbert, Christopher (CFPB)
████████████████ >; Malik, Irfan (CFPB) ████████████ >
**Cc:** Paoletta, Mark (CFPB) ████████████ >; Sayre, Stephen (CFPB)
████████████ >; Scott, Adam (CFPB) ████████████ >
**Subject:** Re: All Hands Message re: Work Required by Law

Will do. Thanks.
Chris and ████ ,
All of the contractors are gone, am I correct?
The first issue I see is that EXT Jenkins is returning 502. That is where the pipelines run. I
wonder if it because some other service got shut down. I lack access privileges. ████████████
would need to take a look to see if we can get it back up and I can try to take it from there.
I don't know how to reach him though, would need ████ to reach out when he is back online.

**From:** Martinez, Adam (CFPB) ████ ████████████ >
**Date:** Monday, March 3, 2025 at 10:05 AM
**To:** ████████████████ >, Chilbert, Christopher (CFPB)
< ████████████ >, ████████████ ████████████ >
**Cc:** Paoletta, Mark (CFPB) < ████████████ >, ████████████ >

< ████████████████ , Scott, Adam (CFPB) < ████████████████ >

**Subject:** RE: All Hands Message re: Work Required by Law

Hi ████ .  Please work with Chris and ████ to shift any resources needed to comply with the statute and any applicable laws/regulations.  Thank you.

Adam Martinez
Chief Operating Officer



**From:** ████████████████████
**Sent:** Monday, March 3, 2025 10:02 AM
**To:** Martinez, Adam (CFPB) < ████████████████ >
**Cc:** Paoletta, Mark (CFPB) < ██████████████████████████ )
< ████████████████ >; Scott, Adam (CFPB) < ██████████████████ >
**Subject:** Re: All Hands Message re: Work Required by Law

Hi Adam,
Based on every email starting  2/10 the unambiguous guidance was to stop all work tasks, no stipulation of statue requirements was made.

As of today, Consumer Complaint Database(CCDB) has not had been refreshed with new data since 02/22/2025 and displays an eror banner:
https://www.consumerfinance.gov/data-research/consumer-complaints/search/?chartType=line&dateInterval=Month&dateRange=3y&date_received_max=2025-02-21&date_received_min=2022-02-21&lens=Product&searchField=all&subLens=sub_product&tab=Trends

**Dodd Frank mandates:**
**The Consumer Financial Protection Bureau (CFPB) to maintain a public database where consumer complaints against financial institutions are recorded and published, ensuring transparency in the financial marketplace; this database is commonly referred to as the "CFPB Consumer Complaint Database".**

I am seeking authorization to fix underlying issue with data pipelines which load data for CCDB. Since the Data Products team lost all other developers when all contracts were canceled, I am also seeking authorization to utilize other member of D&D and EDA  to assist as needed.

Thanks for your prompt attention,

████████████████

**From:** Martinez, Adam (CFPB) <Adam.Martinez@cfpb.gov>
**Date:** Sunday, March 2, 2025 at 3:33 PM
**To:**
**Cc:** Paoletta, Mark (CFPB) <███████████████████>
**Subject:** All Hands Message re: Work Required by Law

**<u>Message from Mark Paoletta, Chief Legal Officer</u>**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.

Mark Paoletta
Chief Legal Officer
CFPB

# Exhibit AA



**From:** Lee, Scott (CFPB) <
**Sent:** Monday, March 3, 2025 1:52 PM
**To:** Chang, Jean (CFPB) <                >; Chilbert, Christopher (CFPB) <                >; Essene, Ren (CFPB) <                >; Gueye, Jahar (CFPB) <                >; Galicki,
Martinez, Adam (CFPB) <                >; Michalosky, Martin (CFPB) <                >; DiPalma, Nikki (CFPB) <                >
**Cc:** Jacob, Roland (OSFP) <                >; Switzer, Kristin (CFPB) <                >; James, Dana (CFPB) <                >;
Joshua (CFPB) <                >; Nguyen, Hoan (CFPB) <                >; Austin, Richard (CFPB) <                >; Roth, Marianne (CFPB) <                >
**Subject:** Operations: Statutory Requirements

Hi all,

We have some updated guidance on a few items:

1. **Mandated Reports:** Adam has approved (see attached) to work on all reports that fulfill a legal requirement. See below for a list of reports due through June. Please have your teams restart work on these items through the normal drafting, review with stakeholders, and clearance (Ops FO and Exec. Sec.). If there are items missing from this list, please let me know.
2. **Statutory Requirements:** New guidance is instructing us to work on all statutory requirements for the Bureau. Our Ops work ties to this work (directly and indirectly). We are working (with Legal) to develop a framework on what is required and how Ops work is implicated.

We know there's many questions around this – so we're going to schedule a couple of meetings to ensure we're all aligned on this.

Scott

| OFFICE OR TEAM | REPORT/PUBLICATION TITLE | DESCRIPTION AND ACTION(S) REQUIRED | LEGAL REQUIREMENT | RECEIVING ORGANIZATION | FY25 PUBLICATION DUE DATE(S) | DUE DATE STATUTORILY REQUIRED |
|---|---|---|---|---|---|---|
| OFP/CFO | Annual Performance Plan and Report, and Budget Overview (Managed by OSPP) | The report describes the resources needed to accomplish our goals and measure our performance against our strategic plan. Strategy owns this document. The document also includes a budget section which the OCFO is responsible for. Budget section fulfills statutory requirement of 1017(a)(4)(A) financial operating plans and forecasts. | Dodd-Frank §1017(a)(4)(A) - Director shall provide to the Director of the Office of Management and Budget copies of the financial operating plans and forecasts of the Director, as prepared by the Director in the ordinary course of the operations of the Bureau. S.1016 also requires that a justification of the budget request of the previous year be provided with the semiannual report to Congress. (Note: there may be other requirements that govern the publication of strategic plans and performance information) | FRB OMB Congress | 2/15/2025 | N |
| OFP/CFO | DATA Act | Submission of reconciliations of financial | Public Law 113-101, dated May 9, 2014 | USAspending.gov | 2/15/2025 | N |

| Division | Report | Description | Legal Reference | Distribution | Date | Flag |
|---|---|---|---|---|---|---|
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 2/18/2025 | N |
| CRO | GAO-IG Act Reporting | Annual report of external findings from GAO and OIG | Good Accounting Obligation in Government Act (GAO-IG Act) (Public Law 115-414) | Congress GAO OIG | 2/28/2025 | N |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 2/28/2025 | N |
| OFP/PROC | Service Contract Inventory | Presents an analysis on CFPB's service contract inventory to determine if contract labor is used appropriately and the mix of Federal employees and contractors is balanced. | FY 2010 Consolidated Appropriations Act- Public Law 111-117 OMB memo, Dated Dec 19, 2011 | OMB, MAX.GOV | 2/28/2025 | Y |
| OFP/CFO | Annual Independent Performance Audit | Annual independent audit of the operations and budget of the Bureau. The purpose of this audit is to provide objective analyses to improve program performance and operations, reduce costs, facilitate decision-making, and contribute to public accountability | 12 USC § 5496a | Public (published on cfpb.gov) | 2/28/2025 | N |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 2/28/2025 | N |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 2/28/2025 | N |
| OCDO | Federal Electronic Records and Email Management Maturity Model Report | Report to determine how federal agencies manage electronic records. | The Federal Records Act (44 U.S.C. 31) | NARA | 3/15/2025 | N |
| Admin Ops | Records Management Self-Assessment | The goal of the self assessment is to determine whether federal agencies are compliant with statutory and regulatory records management requirements. | The Federal Records Act (44 U.S.C. 31) | NARA | 3/15/2025 | N |

| | | | | | | |
|---|---|---|---|---|---|---|
| Admin Ops | Senior Agency Official of Records Management Report | Report documents how the Bureau is managing RIM activities and goals established by NARA | The Federal Records Act (44 U.S.C. 31) | NARA | 3/15/2025 | N |
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 3/18/2025 | N |
| OFP/CFO | Quarterly Transfer Requests | Letters requesting transfer of funds from the Fed Reserve to CFPB | Dodd-Frank § 1017(a)(1) | FRB Congress | 3/20/2025 | N |
| CRO | OIG Semiannual Report | OIG Federal Reserve provides semiannual report of signigicant activities, finds, and recommendations during a six month period. | P.L. 95-452 | HFSC and BHUA | 3/31/2025 | Y |
| OHC | Financial Literacy and Education Plan (for Bureau Employees) | OPM requires agency benefits representatives to submit an annual financial literacy and education plan for agency employees. | Thrift Savings Plan Open Elections Act of 2004 (Public Law 108-469) | OPM | 3/31/2025 | N |
| OHC | Student Loan Repayment Incentives | Agencies must submit an annual written report to the U.S. Office of Personnel Management (OPM) on their use of student loan repayments during the previous calendar year (CY), as required by 5 U.S.C. 5379(h). | 5 U.S.C. 5379(h)(1) and 5 CFR 537.110(b) | OPM | 3/31/2025 | Y |
| OCDO | Chief FOIA Officer Report | In accordance with the FOIA, each agency Chief FOIA Officer must "review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing [the FOIA]. | The Freedom of Information Act (FOIA), 5 U.S.C § 552(i)(2)(D). | DOJ | 3/31/2025 | Y |
| OHC | Annual Data Call for Pathways Programs and Early Career Talent Hiring Reporting | Under Section 6 of Executive Order 14035: Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce, the Biden-Harris Administration directs | 5 CFR 362.109 | OPM | 4/1/2025 | Y |

| Office | Item | Description | Authority | Agency | Date | Y/N |
|---|---|---|---|---|---|---|
| OHC | Telework Data Call | Participation in this annual survey is a requirement under the Telework Enhancement Act of 2010, Public Law 111-292 (the Act and is reported by OPM to Congress. The questions in this survey ask for information about agencies' telework program. | Telework Enhancement Act of 2010, Public Law 111-292 | OPM | 4/10/2025 | N |
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 4/18/2025 | N |
| T&I | Fiscal Year 20XX-20XX Guidance on Federal Information Security and Privacy Management Requirements - EO14028 Metrics (Q1 & Q3) & Chief Information Officer Metrics (Q2) | FY XX Q1 - Q3 Reporting via Cyberscope. | FY24 FISMA Guidance is not yet released. / OMB M-23-03 - FY23 (MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES) | DHS OMB | 4/18/2025 | Y |
| T&I | Strengthening the Cybersecurity of Federal Agencies by Enhancing the High Value Asset Program | FY2X HVA list report on a quarterly basis and provide updates and modifications via Homeland Security Information Network (HSIN) | OMB M-19-03 | DHS | 4/18/2025 | Y |
| T&I | Improving Vulnerability Identification, Management, and Remediation | BOD 20-01 Vulnerability Disclosure Policy reporting via Cyberscope | OMB-M-20-32 | DHS | 4/18/2025 | Y |
| Admin Ops | Quarterly FOIA Report | In accordance with the FOIA, the Department of Justice requires agencies to provide quarterly reporting of four key FOIA statistics so that they can be posted on FOIA.gov. | 5 U.S.C. § 552(e)(5), (i)(2)(D) | DOJ | 4/25/2025 | Y |
| T&I | Migrating to Post-Quantum Cryptography (Inventory) | By May 4, 2023, and annually thereafter until 2035, or as directed by superseding guidance, agencies are directed to submit a prioritized inventory of information systems and assets, excluding national security systems, that contain CRQC-vulnerable cryptographic systems to ONCD and the Department of Homeland Security Cybersecurity and Infrastructure Security Agency (CISA) | M-23-02 | DHS OMB | 5/3/2025 | Y |
| OFP/CFO | DATA Act | Submission of reconciliations of financial and procurement data that supports USASpending.gov | Public Law 113-101, dated May 9, 2014 and the official title as "Digital Accountability and Transparency Act of 2014" | USAspending.gov | 5/15/2025 | N |

| | | | | | | |
|---|---|---|---|---|---|---|
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 5/18/2025 | N |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 5/30/2025 | N |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 5/30/2025 | N |
| OFP/CFO | Quarterly Financial Reports (CFO Updates) | Budget execution by Budget Category, Division, and largest obligations for each quarter. | Dodd-Frank § 1017? | Public (published on cfpb.gov) | 5/30/2025 | N |
| OCDO | Financial Stability Oversight Council (FSOC) Data Inventory | The Interagency Data Inventory is a product of the Data Committee of the Financial Stability Oversight Council (FSOC). The inventory catalogs the data collected by FSOC member organizations. The inventory contains information — metadata — about each data collection. It does not contain the underlying datasets. For each data collection, the inventory has basic information, such as a brief description of the collection, collecting organization, and the name and number of the form used to collect the data. | Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 | FSOC | 5/31/2025 | N |
| OFP/CFO | Semiannual Report of Payments Accepted from a Non-Federal Source | As required by the statute, the Bureau must submit to the Director of the Office of Government Ethics reports of payments of more than $250 accepted from non-Federal sources for travel, subsistence, and related expenses with respect to an employee's attendance at any meeting or similar function relating to the official duties of the employee. | 31 U.S.C. 1353 | OGE | 5/31/2025 | Y |
| T&I | Migrating to Post-Quantum Cryptography (Funding Estimates) | By June 4, 2023, and annually thereafter until 2035, or as directed by superseding guidance, agencies are required to submit to ONCD and OMB an assessment of the funding required to migrate information systems and assets inventoried under this memorandum to post-quantum cryptography during the following fiscal year. | M-23-02 | DHS OMB | 6/4/2025 | Y |
| T&I | Update to Memorandum M-22-18, Enhancing the Security of the Software Supply Chain through Secure Software Development Practices | Agencies must submit metrics on collected attestation letters for all software subject to the requirements of M-22-18, as amended by this | OMB M-23-16 | OMB | 6/9/2025 | Y |

Case 1:25-cv-00381-ABJ    Document 60-1    Filed 03/05/25    Page 81 of 107

| Development Teams | | | | |
|---|---|---|---|---|
| | | memorandum, as well as the on agency approval of POA&Ms AND number of extensions and waivers in place at each agency. | | | |
| OFP/CFO | GTAS | Submission of monthly financial and budget execution data; fulfill statutory requirement of 1017(a)(4)(A) quarterly reports of financial condition and results of operations | Chapter 4700 of the TFM entitled "Agency Reporting Requirements for the Financial Report of the United States Government" | OMB Treasury | 6/18/2025 | N |
| OFP/CFO | Quarterly Transfer Requests | Letters requesting transfer of funds from the Fed Reserve to CFPB | Dodd-Frank § 1017(a)(1) | FRB Congress | 6/20/2025 | N |
| OFP/PROC | Federal Activities Inventory Report (FAIR) | The Inventory depicts the CFPB's workforce by functions (or activities) performed by Bureau employees. The Inventory further breaks down these activities into Inherently Governmental (activities that can only be performed by a Federal employee) and Commercial (Activities that can be performed by Federal or contract employees) categories. The number of Full-Time Equivalents (FTEs) is also displayed by location. | Federal Activities Inventory Reform Act of 1998 (P.L. 105-270) and OMB Circular A-76 - Competitive Sourcing | Congress, OMB, MAX.GOV | 6/30/2025 | Y |

Scott Lee

Senior Advisor to the Chief Operating Officer - Operations

Consumer Financial Protection Bureau (CFPB)

# Exhibit BB

**From:** "Tabitha L. Bond" ████████████████████████
**Date:** March 4, 2025 at 7:50:37 AM EST
**To:** ████████████
**Subject: SF50 attached**
**Reply-To:** ████████████████████

## New ZixCorp secure email message

## Open Message

To view the secure message, click Open Message.

The secure message expires on May 03, 2025 @ 11:50 AM (GMT).

Do not reply to this notification message; this message was auto-generated by the sender's security system. To reply to the sender, click Open Message.

If clicking Open Message does not work, copy and paste the link below into your Internet browser address bar.

████████████████████████████████████████████████████

Want to send and receive your secure messages transparently?
Click here to learn more.

# Exhibit BB

**Date:** March 4, 2025 at 7:50:37 AM EST

**Subject: SF50 attached**

## New ZixCorp secure email message

### Open Message

To view the secure message, click Open Message.

The secure message expires on May 03, 2025 @ 11:50 AM (GMT).

Do not reply to this notification message; this message was auto-generated by the sender's security system. To reply to the sender, click Open Message.

If clicking Open Message does not work, copy and paste the link below into your Internet browser address bar.

Want to send and receive your secure messages transparently?
Click here to learn more.

Standard Form 50
Rev 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| ███ | | | 02-11-2025 |

## FIRST ACTION / SECOND ACTION

| | FIRST ACTION | | SECOND ACTION |
|---|---|---|---|
| 5-A. Code 385 | 5-B. Nature of Action TERM DURING PROB/TRIAL PERIOD | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code L4M | 5-D. Legal Authority REG 315.804 EQ | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| ███ | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ | ███ | | | | | .00 | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| ███ | ███ | ███ | .00 | .00 | .00 | .00 | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| CONSUMER FINANCIAL PROTECT BUREAU | |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 - None  3 - 10 Point/Disability  5 - 10 Point/Other<br>2 - 5 Point  4 - 10 Point/Compensable  6 - 10 Point/Compensable/30% | 0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite | | ███ YES  ███ NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| ███ | ███ | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule F  FULL TIME | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career Reserved | E - Exempt<br>N - Nonexempt | | ███ |

| 38. Duty Station Code | 39. Duty Station  (City-County-State or Overseas Location) |
|---|---|

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

**45. Remarks**
E.O. 14210 AND THE STOP WORK EMAIL FROM RUSS VOUGHT ENTITLED "ADDITIONAL
DIRECTIVES ON BUREAU ACTIVITIES" DTD 2/10/2025.
HEALTH BENEFITS COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE
ELIGIBLE TO CONVERT TO INDIVIDUAL POLICY (NONGROUP CONTRACT).

FORWARDING ADDRESS: ███
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.

| 46. Employing Department or Agency CONSUMER FINANCIAL PROTECTION BUR | 50. Signature/Authentication and Title of Approving Official ELECTRONICALLY SIGNED BY: |
|---|---|
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date 02-13-2025 | ADAM MARTINEZ ACTING CHIEF HUMAN CAPITAL OFFICER |

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6236

**1 - Employee Copy - Keep for Future Reference**

# NOTICE TO EMPLOYEE

**This is your copy of the official notice of a personnel action. Keep it with your records because it could be used to make  employment, pay, and qualifications decisions about you in the future.**

**The Action**
- Blocks 5-B and 6-B describe the personnel action(s) that occurred.
- Blocks 15-22 show the position and organization to which you are assigned.

**Pay**
- When the personnel action is an award or bonus, block 20 shows the amount of that one-time cash payment. When the action is not an award or bonus, block 12 shows your former total annual salary, and block 20 shows your new total annual salary (block 20C plus 20D). The amounts in blocks 12 and 20 do not  include any one-time cash payments (such as performance awards and recruitment or relocation bonuses) or payments that may vary from one pay period to the next (such as overtime pay), or other forms of premium pay.
- Block 20A is the scheduled amount for your grade and step, including any special salary rate you receive. It does not include any locality-based pay. This rate of pay serves as the basis for determining your rate of pay upon promotion, change to a lower grade, or reassignment, and is used for pay retention purposes.
- Block 20B is the annual dollar amount of your Interim Geographic Adjustment or, beginning in 1994, your locality-based comparability payment.
- Block 20C is your Adjusted Basic Pay, the total of blocks 20A and 20B. It servers as the basis for computing your retirement benefits, life insurance, premium pay, and severance pay.
- Block 20D is the total dollar amount of any Retention Allowances, Supervisory Differentials, and Staffing Differentials that are listed in the remarks block. These payments are made in the same manner as basic pay, but are not a part of basic pay for any purposes.

**Block 24 - Tenure**
- Identifies the nature of your appointment and is used to determine your rights during a reduction in force (RIF). Tenure groups are explained in more detail in subchapter 26 of FPM Supplement 296-33 and RIF is explained in FPM Supplement 351-1; both should be available for review in your personnel office.

**Block 26 - Veterans Preference for RIF**
- Indicates whether you have preference for reduction-in-force purposes.

**Block 30 - Retirement Plan**
| | |
|---|---|
| - FICA | -Social Security System |
| - CS | -Civil Service Retirement System |
| - CS-Spec | -Civil Service Retirement System for law enforcement and firefighter personnel |
| - FS | -Foreign Service Retirement and Disability System |
| -FERS | -Federal Employees' Retirement System |
| -FERS Reserve Tech | -Federal Employees' Retirement System for National Guard Reserve Technicians |
| -FERS ATC | -Federal Employees' Retirement System for Air Traffic Controllers |
| -FERS Spec | -Federal Employees' Retirement System for law enforcement and firefighter personnel |
| -FSPS | -Foreign Service Pension System |

**Block 31 - Service Computation Date (Leave)**
- Shows when your Federal service began unless you have prior creditable service. If so, this date is constructed to include your total years, months, and days of prior creditable civilian and military service.
- Full-time employees with fewer than 3 years of service earn 4 hours of annual leave each pay period; those with 3 or more years but less than 15 years earn 6 hours each pay period; and those with 15 or more years earn 8 hours each pay period
- Your earnings and leave statement or your time and attendance card will show the rate at which you earn leave and your current unused leave balance.

**Block 32 - Work Schedule**
- Your work schedule is established by your supervisor.
- A full-time employee works on a prearranged scheduled tour of duty that is usually 40 hours per week. A part-time employee has a prearranged scheduled tour of duty that is usually between 16 and 32 hours per week. An intermittent employee has no prearranged scheduled tour of duty and works when needed.
- Full-time and part-time employees whose appointments are for 90 days or more are usually eligible to earn annual leave; intermittent employees are not.
- Seasonal employees work on an annually recurring basis for periods of less than 12 months each year; they may have a full-time, a part-time, or an intermittent schedule during their work season.
- On-call employees work during periods of heavy workload and are in pay status for a t least 6 months of each year; they may have either a full-time or a part-time schedule when they are in pay status.

**Block 33 - Part-time Hours Per Biweekly Pay Period**
- Indicates the number of hours a part-time employees is scheduled to work during a two-week pay period.

**Block 34 - Position Occupied**
- Identifies the employment system under which you are serving - the Competitive Service, the Excepted service, or the Senior Executive Service (SES).
- The employment system determines your eligibility to move to other jobs in the Federal service, your rights in disciplinary and adverse actions, and your eligibility for reemployment if you leave Federal service.

**Block 35 - FLSA Category**
- Exempt employees are not covered by the minimum wage and overtime law (the Fair Labor Standards Act); nonexempt employees **are** covered.

**Block 37 - Bargaining Unit Status**
- Identifies a bargaining unit to which you belong; whether or not you are actually a member of a labor organization. Code "7777" indicates you are eligible but not in a bargaining unit; code "8888" indicates you are ineligible for inclusion in a bargaining unit.

**Blocks 38 and 39 - Duty Station**
- Identifies the city, county and state or the overseas location, where you actually work.

## OTHER INFORMATION

- If your appointment entitles you to elect health benefits or life insurance, and you have not been provided materials explaining the programs available and the enrollment forms, contact your personnel specialist.
-Your personnel specialist will also tell you if your position is covered by an agreement between an employee organization (union) and agency. If you are eligible to and elect to join an employee organization, you can elect to have

your dues withheld from your salary.
- If you have questions or need more information about your rights and benefits, ask your supervisor or your personnel office.
- Definitions for any coded data in Blocks 1-24, 27-39 and 45-50 may be found in Federal Personnel Manual Supplement 292-1.

**It is your responsibility to read all the information on the front of this notice and tell your personnel office immediately if there is an error in it.**

# Exhibit CC

From: Jeremy A. Crouse ███████████████████████
Date: On Monday, March 3rd, 2025 at 12:31 PM
Subject: Separation SF50
To: ████████████████████████████████

Good Morning,

Attached you will find your Separation SF50 that was pulled from your eOPF.

Thank you,

Jeremy A. Crouse

Jeremy A. Crouse

Human Resources Assistant

Bureau of the Fiscal Service

Personnel Actions Processing Branch

████████████████████████████

Phone: ██████████████

***CONTROLLED UNCLASSIFIED INFORMATION***

<image001.png>

NOTE: Please be aware that if you email documents containing personally identifiable information
(PII), the information may not be secure and your email may be intercepted or otherwise viewed
against your wishes. ARC strongly encourages you not to use unsecured email as a means to
communicate sensitive information to us. To help secure your data, please contact me and request
that I send you an encrypted email message; you can then open and respond to the message and this
will then encrypt your message and any attachments you send me.

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

**NOTIFICATION OF PERSONNEL ACTION**

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| ▇▇▇▇▇▇▇▇ | | ▇▇▇▇▇▇ | ▇▇▇▇▇ | 02/13/2025 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5–A. Code 330 | 5–B. Nature of Action REMOVAL | 6–A. Code | 6–B. Nature of Action |
| 5–C. Code ZLM | 5–D. Legal Authority EO 14210 DTD 2/11/25 | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| ▇▇▇▇▇▇ | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| ▇▇▇▇ | ▇▇▇ | ▇▇▇▇ | .00 | | .00 | | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| CONSUMER FINANCIAL PROTECT BUREAU DIRECTOR ▇▇▇▇▇▇ | ▇▇▇▇▇▇ |

**EMPLOYEE DATA**

| 23. Veterans Preference 1 – None   3 – 10–Point/Disability   5 – 10–Point/Other 2 – 5–Point   4 – 10–Point/Compensable   6 – 10–Point/Compensable/30% | 24. Tenure 0 – None   2 – Conditional 1 – Permanent   3 – Indefinite | 25. Agency Use | 26. Veterans Preference for RIF YES [X]  NO |
|---|---|---|---|

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| | | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule F  FULL TIME | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied 1 – Competitive Service   3 – SES General 2 – Excepted Service   4 – SES Career Reserved | 35. FLSA Category E – Exempt N – Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| | ▇▇▇▇ |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks
E.O. 14210 AND THE STOP WORK EMAIL FROM RUSS VOUGHT ENTITLED ADDITIONAL
DIRECTIVES ON BUREAU ACTIVITIES DTD 02/10/2025.
FORWARDING ▇▇▇▇▇▇
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.

| 46. Employing Department or Agency CONSUMER FINANCIAL PROTECTION BUR | 50. Signature/Authentication and Title of Approving Official ELECTRONICALLY SIGNED BY: |
|---|---|
| 47. Agency Code  48. Personnel Office ID  49. Approval Date 02/15/2025 | ADAM MARTINEZ ACTING CHIEF HUMAN CAPITAL OFFICER |

2 - OPF Copy - Long-Term Record - DO NOT DESTROY    Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

# Exhibit DD

**From:** **Chilbert, Christopher (CFPB)** ▮▮▮▮▮▮▮
**Subject:** RE: Request to fix the consumerfinance.gov homepage
**Date:** March 4, 2025 at 8:45 AM
**To:** Scott, Adam (CFPB) Adam.Scott@cfpb.gov, ▮▮▮▮▮▮▮▮

Thanks Adam, ▮▮▮▮▮▮▮. I believe it is important to restore the home page as soon as possible, but that is not currently authorized. It will be a priority for me once we are authorized to restore it.
Thanks,

Chris Chilbert

▮▮▮▮▮▮

**From:** Scott, Adam (CFPB) ▮▮▮▮▮▮▮▮▮>
**Sent:** Tuesday, March 4, 2025 6:53 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ Chilbert, Christopher (CFPB) ▮▮▮▮▮▮▮▮>;
▮▮▮▮▮▮▮
**Subject:** Re: Request to fix the consumerfinance.gov homepage

Thank you, ▮▮▮▮. I strongly agree with all of the statements you have made. I have added Chris and ▮▮▮ so that they may send this to leadership for approval.

Please note, we have made this request as recently as yesterday and it was denied at that time.

-Adam

**From:** ▮▮▮▮▮▮▮▮▮
**Sent:** Monday, March 3, 2025 8:37:05 PM
**To:** Scott, Adam (CFPB) ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
**Subject:** Request to fix the consumerfinance.gov homepage

Hey Adam and ▮▮▮,

The homepage of www.consumerfinance.gov has been returning a 404 (Not Found) error since Feb 7th. I believe this negatively impacts our statutorily mandated reporting requirements (eg for research) and subverts the statutorily mandated initiatives developed for consumer education and engagement. By returning a 404, our homepage has been **\*removed\*** from google search results for "cfpb" whereas previously it was above the fold on the first page (and usually the first result). This will negatively impact consumers, business groups, and government partners attempting to orient themselves on our site, as the homepage was specifically designed to guide these users to the information and data we are legally obligated to provide.

I am therefore requesting work authorization to republish the www.consumerfinance.gov homepage with the content from Feb 6th, to ensure users can find what they need on our website.

Thanks and regards,

▮▮▮▮

# Exhibit EE

**From:** Gueye, Jafnar (CFPB) <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, March 4, 2025 8:58 AM
**To:** Chilbert, Christopher (CFPB) <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>; Galicki, Joshua (CFPB)
<▮▮▮▮▮▮▮▮▮▮▮▮>; Olson, Nicholas (CFPB) <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Cc:** Malik, Irfan (CFPB) <▮▮▮▮▮▮▮▮▮>; Mullins, Katherine (CFPB)
<▮▮▮▮▮▮▮▮▮▮>; Wilson, Peter (CFPB) <▮▮▮▮▮▮▮▮▮▮▮▮>; Files, Shannon
(CFPB) <▮▮▮▮▮▮▮▮▮▮▮▮▮▮>; Flugel, Jonathan (CFPB) <▮▮▮▮▮▮▮▮▮▮>; James,
Dana (CFPB) <▮▮▮▮▮▮▮▮▮>; Hassouni, Lauren (CFPB) <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Subject:** RE: Google Cloud Platform & APIs: Payment was declined for ▮▮▮▮▮▮▮▮▮▮▮▮▮

Good morning Chris,

I suspect for all requests I'll have very similar questions as the one below so feel free to preemptively answer them
moving forward. For some context in addition to the overall requirements around tightened standards for non-pay
spending, PCards have an additional complication. There is only one Pcard exception approved by GSA for the
entire bureau with a very limited total limit. We are triaging Pcard purchases.

For all the justifications please let me know who's name to put.

A few questions:

- Is this payment for services already incurred or for renewal? If renewal do we have an ability to safeguard the
  past data?
- What is this data and what is it used for?
- Are these records?
- What, if any, statutory requirement will the Bureau not be able to meet **at all** without this purchase? This is a
  threshold (yes/no) not a level (well/poorly) question.

Thanks.

Respectfully,

Jafnar

**From:** Chilbert, Christopher (CFPB) ████████████████████ >
**Sent:** Tuesday, March 4, 20 5 8:38 A
    **:** Gueye, Jafnar (CF ████ ███████████ ; Galicki, Joshua (CF
████████████ > Olson, Nichol    CF █████████
 **c:** Malik, Irfan (CFPB ████████ ; Mullin , Katherine (CFPB) █████
 FPB) ██████████ son, Pe     CFPB) █████████████ >; File    annon
    FPB) ████████████ ; Flugel, Jonathan   FPB)
**Subject:** FW: Google Cloud Pl    m & APIs: Payment was dec ined for ████████████

Jafnar – I will be passing along several requests today. In this case, we will lose all historical data on our Google Analytics platform if we don't pay the bill. Historically it was a pCard purchase. What do we need to do to pay it?

Thanks,

Chris Chilbert

████████████

**From:** Files, Shannon (CFPB) ████████████████
**Sent:** Monday, March 3, 2025 5
**To:** Chilbert, Christopher (CFPB ████████████████████
 B) ████████████████ gel, Jonathan (CFPB)
████████████ >
**Subject:** ████████ Platform & APIs: Payment was declined for ████████████

Hi Chris,

I don't believe we want to lose all our historical data. This is a fairly low PCard purchase, until we understand what we are losing and how it might impact mission and operations, I suggest we make the payment if possible.

Thank you,

--

Shannon Files

Director of Data and Analytics | Technology and Innovation

Consumer Financial Protection Bureau (CFPB)

**From:** CFPB_DigitalAnalytics ████████████████████

**Date:** Monday, March 3, 2025 at 3:44 PM
**To:** Files, Shannon (CFPB)  ███████████    Flugel, Jonathan (CFPB)  ██████████    Timmons, Debra (CFPB)
**Subject:** Fw: Google Cloud Platform & APIs: Payment was declined for ██████████████████
██████

Forwarding for awareness. We will loose all historical data if this is not update with valid payment.

---

**From:** Google Payments <payments-noreply@google.com>
**Sen** ████
**To:** ███████████████████████████████
**Subject:** Google Cloud Platform & APIs: Payment was declined for ██████████████████

# Exhibit FF



**From:** Huggins, Cassandra (CFPB) <_____>
**Sent:** Tuesday, March 4, 2025 4:13 PM
**To:** Paoletta, Mark (CFPB) <_____>; Martinez, Adam (CFPB)
<_____>; Vought, Russell (CFPB)
<_____DL_CFPB_Supervision_ALL <_____>
**Subject:** RE: request for clarification for Supervision staff- FW: All Hands Message re: Work Required by
Law

Mark,

I am acknowledging that I received and read your email.

I am attaching, as requested, the email that I sent to Supervision staff. I did not provide this email to the
media, and I do not know who did.

I did not intend to undermine the new administration's ability to supervise agency staff- my only intention
was to ensure that our staff did not act against the direction in the February 8 email from Acting Director
Vought to cease all supervisory and examination activity. I will work with Supervision leadership to prepare
the reports you have requested, and will request that all supervision staff provide the information you
requested, by the stated deadline.

Thank you.

Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
Mobile: _____

Consumer Financial Protection Bureau
consumerfinance.gov


Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and
any attachments. An inadvertent disclosure is not intended to waive any privileges.



**From:** Paoletta, Mark (CFPB) <_____>
**Sent:** Tuesday, March 4, 2025 4:51 PM
**To:** Huggins, Cassandra (CFPB) <_____>; Martinez, Adam (CFPB)
<_____>; Vought, Russell (CFPB)
<_____>, _DL_CFPB_Supervision_ALL <_____>
**Subject:** RE: request for clarification for Supervision staff- FW: All Hands Message re: Work Required by
Law


Good afternoon, Cassandra,

I am writing to raise significant concerns regarding an internal agency communication you apparently sent yesterday that directly contradicts an email from me to all CFPB staff about my direction for all staff to perform all statutorily required work.

In an email Adam Martinez sent on Sunday (March 2nd) conveying a message from me to the entire CFPB staff, I directed ALL CFPB staff to perform all work required by law and that they did not need to seek prior approval to do so. Nothing I have said or written since then contradicts that.  You reached out to me yesterday, and as I am dual hatted and have job duties at OMB, I was not able to review and respond to your email yesterday.  But I read a news report in Reuters that you reportedly sent an internal agency communication claiming that "We have requested and received clarification that their message was not intended to authorize the reinstatement of supervision/examination activity, even though the Bureau is required by law to carry out these activities."

Importantly, you did not receive that message from me.  You apparently relied on an email from Adam, but his email refers you to Acting Director Vought's February 8th email which specifically states that you are to perform any work "required by law."  And he encouraged you to communicate with me, and presumably, wait to hear from me before sending out an email that directly contradicted my message on March 2nd to CFPB employees.

I am concerned that you sent out an internal agency communication on such an unfounded basis that is false and directly contradicts my March 2nd message without first getting confirmation directly from me.  Your actions severely undermine the Agency leadership's ability to supervise the agency staff and to ensure that statutorily required duties are being performed.

Moreover, your internal communication somehow made its way to the press, further undermining our efforts to supervise agency staff.

Let me be clear to you and the entire supervision office, which I have cc'd on this email:  You are authorized and directed to work on matters specifically required by statute. That said, it is of course within the new leadership's discretion as to what matters CFPB will focus on.

The Bureau's new leadership seeks to understand the status of all of the agency's actions so it can align such actions to the Bureau's new priorities consistent with law. We have been aided in doing so by reports prepared by the Enforcement Division, Legal Division, and Office of Regulations showing the status of all actions within their respective purview, upcoming deadlines, statutory requirements, and other relevant matters. Such information is vital to allowing new leadership to ensure the Bureau is faithfully executing the law.  And in fact, I have approved numerous requests from these and other divisions to perform work that is statutorily required or mission-aligned with the new leadership.

Accordingly, I am directing you to prepare a report for the Bureau's leadership providing a description of all pending examination actions, including their current status.  Provide the name of the lead CFPB examiner on each matter, and the contact information for the lead attorney for the company under examination.

As part of this report, please flag any particular actions that you believe are specifically required by statute. Leadership will review it and determine which actions to continue to pursue and to close.

Additionally, please notify every employee in your division to provide to me a written summary of the specific matters they are working on, with the name of the entity being examined, how the matter was commenced and approximately how many hours they have spent on the matter.

Please submit your report and direct every employee in your division to submit their response to me by COB Monday, March 10th.

Please confirm by 6 pm today that you have received and read this email.

Please forward to me by 6 pm the internal agency communication you reportedly sent that is quoted in the Reuters news report.

Finally, did you provide your internal agency communication to the media or do you know who provided it? Please provide your answer to me by 6 pm today.

Thank you for your prompt attention to this matter.


Mark

Mark Paoletta
Chief Legal Officer
CFPB


**From:** Huggins, Cassandra (CFPB) <​                                        >
**Sent:** Monday, March 3, 2025 10:33 AM
**To:** Paoletta, Mark (CFPB) <​                                >
**Cc:** Hagins, Calvin (CFPB) <​                            >
**Subject:** request for clarification for Supervision staff- FW: All Hands Message re: Work Required by Law

Good morning Mark,

I've received a number of messages from staff who are understandably confused by the information in the email sent by Adam Martinez. I would like to get clarification on what exactly Supervision staff is expected to be doing. I did reach out to Adam, and although he did say that supervision/examination activity is not to resume, he encouraged me to reach out to you directly for confirmation.

The Acting Director's February 8 message directed the stoppage of all supervision and examination activity, despite the fact that the work is required by law (12 CFR 1024, 1025, and 1026 require the Bureau to conduct such supervisory activities). We've also stopped all work supporting supervision and examination activity, including operational activities such as policy/procedure development; quality management reviews; systems and registration oversight; reporting, analytics, monitoring, exam prioritization/scheduling; and human capital activities that support supervision. We've also told staff to not engage in activities requiring coordination with parties outside of the Bureau, including coordination with other federal/state regulatory agencies, participation on FFIEC task forces/subcommittees, or engagement with supervised entities.

Supervision staff has been authorized to work on some isolated tasks (unwinding the larger participants payments rule, a handful of briefings/information gathering for Sr. leadership, and administrative tasks like WebTA/Concur approval), but otherwise it is my understanding that **they should continue to operate on administrative leave unless a discrete activity has been approved. Please confirm that the message you sent is not intended to authorize the reinstatement of supervision/examination activity and the activities that support this function despite the fact that the Bureau is required by law to conduct these activities.**

Thanks,
Casey

Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
Mobile: ███████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Martinez, Adam (CFPB) <███████████████████>
**Sent:** Sunday, March 2, 2025 3:33 PM
**Cc:** Paoletta, Mark (CFPB) <██████████████████>
**Subject:** All Hands Message re: Work Required by Law

**Message from Mark Paoletta, Chief Legal Officer**

On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email.

On February 8, 2025, you received an email from Acting Director Vought directing you to halt several classes of work unless "required by law" or expressly approved by the Acting Director. On February 10, 2025, you received an email from Acting Director Vought directing you to reach out to me for the authorization required by the February 8 email. These measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties. Many of you understood this and continued to perform functions required by law and sought approval from me to perform work, which I have promptly granted.

It has come to my attention, however, that some employees have not been performing statutorily required work. Let me be clear: Employees should be performing work that is required by law and do not need to seek prior approval to do so. If you have any questions, please reach out to me immediately, and I will promptly give you an answer and authorization if warranted. If you are aware of other employees that are needed to assist you in performing a statutorily required task but are not doing so, please raise this with me immediately.

Thank you for your attention to this matter.


Mark Paoletta
Chief Legal Officer
CFPB

# Exhibit GG



# Exhibit HH

LIVE NOW



WORK FOR YOU AGAIN

March 4, 2025

President Donald J. Trump immediately undertook a bold, necessary effort to downsize the federal government by ending the waste, fraud, and abuse that has permeated virtually all aspects of the bureaucracy — making sure government works for the taxpayers who fund it.

- President Trump established the Department of Government Efficiency (DOGE) to maximize government productivity and ensure the best use of taxpayer funds — which has already achieved billions of dollars in savings for taxpayers.

- President Trump <u>commenced</u> his plan to downsize the federal bureaucracy and eliminate waste, bloat, and insularity.

  - President Trump <u>ordered</u> federal workers to return to the office five days a week.

  - President Trump <u>ordered</u> federal agencies hire no more than one employee for every four employees who leave.

  - President Trump <u>ended</u> the wasteful Federal Executive Institute, which had become a training ground for bureaucrats.

  - President Trump <u>ordered</u> the termination of all federal Fake News media contracts.

- President Trump is reigning in agencies overtaken by unelected bureaucrats.

  - President Trump stopped the <u>waste, fraud, and abuse within USAID</u> — ensuring taxpayers are no longer on the hook for funding the pet projects of entrenched bureaucrats, such as sex changes in Guatemala.

  - President Trump <u>ordered</u> the Consumer Financial Protection Bureau — the brainchild of Elizabeth Warren, which <u>funneled</u> cash to left-wing advocacy groups — to halt operations.

  - The Environmental Protection Agency <u>canceled</u> tens of millions of dollars in contracts to left-wing advocacy groups, <u>announced</u> an investigation into a scheme by Biden EPA staffers to shield billions of dollars from oversight and accountability, and <u>put</u> 168 "environmental justice" employees on leave.

  - President Trump <u>reversed</u> the massive <u>over-expansion</u> of the IRS that took place during the Biden Administration.

  - President Trump <u>ordered</u> a review of funding for all non-governmental organizations so taxpayers are no longer funding

those that undermine America's interests.

- The review <u>identified</u> 15,000 grants worth $60 billion for potential elimination.

  ○ The Department of State issued a "pause" on existing foreign aid grants to ensure accountability and efficiency.

  ○ President Trump <u>shut down</u> the wasteful Biden-era "Climate Corps" program.

- President Trump <u>lifted</u> last-minute collective bargaining agreements issued by the Biden Administration, which sought to impede reform.

News

Administration

Issues

Contact

Visit

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

## SUPPLEMENTAL INDEX OF EMAILS AND OTHER COMMUNICATIONS

| Exhibit | Date | Description |
|---|---|---|
| II | 2/12 | Emails between Adam Martinez and OPM regarding "RIF Consulting Services" |
| JJ | 2/14 | Emails between Adam Martinez and OPM regarding CFPB's request for an exception to the "90-day rule for competitive areas" (8:28am) |
| KK | 2/14 | Status update from Adam Martinez regarding "today's [RIF] actions and notifications to staff" (12:38pm) |
| LL | 2/14 | Email to Adam Martinez notifying him of TRO hearing in this case in planning for timing of termination notices (1:39pm) |
| MM | 2/14 | Email urgently requesting materials for RIFs from OPM (1:44pm) |
| NN | 2/14 | Email including list of employees to be fired (2:27pm) |
| OO | 2/14 | Email from OPM approving request for exemption from the 60-day notice requirement for RIFs (3:25pm) |
| PP | 2/14 | Email from Adam Martinez confirming that he will be included with the "next group" of RIFs (4:57pm) |
| QQ | 2/14 | Email regarding materials for RIFs (9:56pm) |
| RR | 2/28 | Email regarding impact of contract status on resuming work |
| SS | 3/5 | Email regarding indefinite postponement of mandatory training |
| TT | | Site showing that staff are not authorized to take mandatory training |
| UU | 3/5 | Email regarding reporting on supervision examination activity |
| VV | 3/5 | Email regarding reporting on supervision examination activity |
| WW | 3/6 | Email regarding reporting on supervision activity and return to administrative leave |
| XX | 3/6 | Email regarding impact of contract cancellations on Office of Markets |
| YY | 3/7 | Email regarding impact of contract cancellation and employee terminations on CARD Act analysis |
| ZZ | 3/7 | Email from head of Office of Students team indicating that they are currently unable to perform required complaint-review function |

# Exhibit II

**From:** Martinez, Adam (CFPB)
**Sent:** Wednesday, February 12, 2025 6:51 PM
**To:** Gueye, Jafnar (CFPB); ███████████████████████
**Cc:** ███████
**Subject:** FW: Draft agreement for CFPB RIF assistance
**Attachments:** OPM HRS - RIF Consulting Services - CFPB.pdf

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

FYSA – Once OPM confirms, I'll sign the SOW.

Jafnar – I went ahead and provided your name directly so you can handle with your team carefully given the topic.

Thank you all.

Adam

Adam Martinez
Chief Operating Officer

**From:** Martinez, Adam (CFPB)
**Sent:** Wednesday, February 12, 2025 6:49 PM
**To:** 'Parman, Jason C.' ████████████████; Wick, Jordan ████████████████; Young, Christopher
**Cc:** ████████████████████████████████████
**Subject:** RE: Draft agreement for CFPB RIF assistance

Thank you again for supporting us.

We have reviewed the agreement, and we are ready to move forward. Please let me know if we are good to sign or if you have any additional changes on your end. I've included our POC information below.

Finance POC:
Jafnar Gueye
Chief Financial Officer
████████████████████

Project Team Leads:
████████████████████████

1



Adam Martinez
Chief Operating Officer

**From:** Parman, Jason C. ▮▮▮▮▮▮▮▮
**Sent:** Wednesday, February 12, 2025 4:16 PM
**To:** Martinez, Adam (CFPB) ▮▮▮▮▮▮▮; Wick, Jordon (CFPB) ▮▮▮▮▮▮; Young, Christopher ▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ; ▮▮▮▮▮▮ ; ▮▮▮▮▮▮▮▮▮▮▮▮ > ▮▮
▮▮▮▮▮ ; ▮▮▮▮▮▮
**Subject:** Draft agreement for CFPB RIF assistance

Adam, Jordan, and Chris-

Per our meeting, attached please find a draft statement of work (SOW) for restructuring assistance services. The SOW covers the range of activities we may do for you throughout the project, and the initial funding of $171,925 covers the activities necessary to provide you immediate planning assistance, decision support, and to prepare and scope the remaining activities in the coming phases.

We are glad to meet ASAP to refine the language if needed. If this meets your needs, ▮▮▮▮▮▮ (our financial specialist, copied here) is ready to work with your team to execute the agreement.

Please review and if this meets your needs, we can connect our finance team with yours to execute the agreement. Feel free to contact me directly at ▮▮▮▮▮▮ or ▮▮▮▮▮▮ (copied here) with questions, or just reply to this email that you are ready to go.

We look forward to working with you on this critical initiative.

Thanks,
Jason

**Jason C. Parman**
Deputy Associate Director
U.S. Office of Personnel Management
HR Strategy & Evaluation Solutions



OPM.gov

**OPM** U.S.Office of
Personnel Management

# Exhibit JJ

| From: | Martinez, Adam (CFPB) |
| To: | |
| Subject: | FW: Request for Comp Area Exception |
| Date: | Friday, February 14, 2025 8:28:19 AM |

The competitive areas were approved.

Adam Martinez
Chief Operating Officer

**From:** Peters, Noah ████████
**Sent:** Thursday, February 13, 2025 10:12 PM
**To:** Lewin, Jeremy ████████; Mahoney, Michael J ████████
Martinez, Adam (CFPB) ████████; Armstrong, Anthony
████████
**Cc:** Young, Christopher (CFPB) ████████; Wick, Jordon (CFPB)
████████;
Parman, Jason C. ████████
**Subject:** RE: Request for Comp Area Exception

Jeremy- OPM has approved the competitive area exceptions.

**From:** Lewin, Jeremy ████████
**Sent:** Thursday, February 13, 2025 10:10 PM
**To:** Mahoney, Michael J ████████ Martinez, Adam (CFPB)
████████; Armstrong, Anthony ████████
**Cc:** Young, Christopher (CFPB) ████████ Wick, Jordon (CFPB)
████████
Parman, Jason C. ████████; Peters, Noah ████████
**Subject:** Re: Request for Comp Area Exception

+Anthony, who suggested I reach out. We owe Acting Director Vought an update at 10am
tomorrow – do we have an ETA on an OPM response?

Thank you!
Jeremy

**From:** Mahoney, Michael J ████████
**Date:** Thursday, February 13, 2025 at 7:17 PM
**To:** Martinez, Adam (CFPB) ████████
**Cc:** Young, Christopher (CFPB) ████████, Lewin, Jeremy
████████, Wick, Jordon (CFPB) ████████ ████████ Parman,
Jason C. ████████, Peters, Noah ████████

**Subject:** RE: Request for Comp Area Exception

Thanks

**From:** Martinez, Adam (CFPB) █████████████
**Sent:** Thursday, February 13, 2025 7:15 PM
**To:** Mahoney, Michael J █████████████
**Cc:** Young, Christopher (CFPB) █████████████ Lewin, Jeremy
█████████████; Wick, Jordon (CFPB) █████████████
█████████████; █████████████ Parman, Jason C. █████████████
Peters, Noah █████████████
**Subject:** RE: Request for Comp Area Exception

Hi Mike -- numbers are attached.

**Adam Martinez**
**Chief Operating Officer**

**From:** Mahoney, Michael J █████████████
**Sent:** Thursday, February 13, 2025 6:31 PM
**To:** Martinez, Adam (CFPB) █████████████
**Cc:** Young, Christopher (CFPB) █████████████ Lewin, Jeremy
█████████████ Wick, Jordon (CFPB) █████████████
█████████████ █████████████; Parman, Jason █████████████
Peters, Noah █████████████
**Subject:** RE: Request for Comp Area Exception

Hi Adam,

Could you put numbers next to the different Cas in your request?

In other words, I'm assuming the 1200 will be spread across the CA; can your team break that up and
assign to each CA

Thanks,

-mike

**From:** Martinez, Adam (CFPB) █████████████
**Sent:** Thursday, February 13, 2025 5:01 PM
**To:** Mahoney, Michael J █████████████
**Cc:** Young, Christopher (CFPB) █████████████ Lewin, Jeremy
█████████████ Wick, Jordon (CFPB) █████████████ █████████████
█████████████ Parman, Jason C. █████████████

Peters, Noah █████████████
**Subject:** Request for Comp Area Exception

Hi Michael –

Attached is CFPB's request for an exception to the 90-day rule for competitive areas.

Please let me know if you have any questions or need additional information.

Thank you.

Adam

Adam Martinez
**Chief Operating Officer**
**Consumer Financial Protection Bureau**
████████████████

 Consumer Financial
Protection Bureau

1700 G Street NW, Washington, D.C. 20552

February 13, 2025

**TO:**        **Michael J. Mahoney, Office of Personnel Management**

**FROM:**      **Adam Martinez, Chief Operating Officer/Acting Chief Human Capital Officer**

**SUBJECT:**   **Establishment of Competitive Areas**   ADAM MARTINEZ  Digitally signed by ADAM MARTINEZ
Date: 2025.02.13 19:12:52 -05'00'

This memorandum serves as the Consumer Financial Protection Bureau's (CFPB) request for an exception to the competitive area 90-day rule.  Please find the CFPB responses below with regards to our competitive areas.

1. **Identification of the proposed competitive area, including the organizational segment, geographic location, and limits of the local commuting area;**

   **Answer:** Below are the divisions, offices and units that will be immediately impacted by a possible reduction-in-force.  Additional competitive areas will be identified in the next round of divisions, offices, and/or units including the Division of Operations, Division of Research Monitoring and Regulations, and Division of Consumer Response.

   - Office of the Director - 106 positions
     - Legislative Affairs  - 4 position
     - Office of Policy and Strategy - 19 positions
     - Office of Civil Rights - 13 positions
     - Office of Fair Lending and Equal Opportunity - 17 positions
     - Office of the Director - 53 positions
   - Division of External Affairs  - 51 positions
     - Communications - 16 positions
     - External Affairs Division 16 positions
     - Intergovernmental Affairs - 7 positions
     - Private Sector Engagement  - 5 positions
     - Public Engagement  - 7 positions

**consumerfinance.gov**

- Division of Supervision - 528 positions
  - o Supervision Policy and Operations - 124 positions
  - o Supervision Examinations - 6 positions
  - o Supervision Midwest Region - 96 positions
  - o Supervision Northeast Region - 98 positions
  - o Supervision Southeast Region - 110 positions
  - o Supervision West Region - 94 positions
- Division of Enforcement  - 283 positions
- Division of Research - 170 positions
  - o Competition and Innovation - 10 positions
  - o Consumer Populations  - 54 positions
  - o Markets  - 42 positions
  - o Research  -  64 positions
- Division of Operations - 37 positions
  - o Operations Front Office - 10 positions
  - o Chief Data Officer - 22 positions
  - o Administrative Operations
    - Events Management  - 5 positions

2. **A description of how the proposed area differs from the one previously established for the same unit and geographic area;**
   **Answer:** No competitive areas were established for the groups above.  The groups listed above include entire divisions, offices, and/or units.

3. **An organizational chart of the agency showing the relationship between the organizational components within the competitive area and other components in the commuting area;**
   **Answer:** Organizational chart attached.

4. **The number of competing employees in the proposed competitive area; Answer:**

   Approximately 1175 positions

5. **A description of the operation, work function, staff, and personnel administration of the proposed area and, where appropriate, a description of how the area is distinguished from others in these respects; and**

**Answer:** All functions are unique to the specific division, office and/or unit and support that unit's mission.

6. **A discussion of the circumstances that led to the proposed changes less than 90 days before a proposed reduction.**

**Answer:** The CFPB is responding to Executive Order Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative – The White House dated February 11, 2025 and the CFPB Acting Director's work stoppage order dated February 10, 2025.

consumerfinance.gov                                                          3

# Exhibit KK

████████████████████████████████████████████████

**From:** Martinez, Adam (CFPB)
**Sent:** Friday, February 14, 2025 12:38 PM
**To:** ████████████████████████████████████████
**Subject:** FW: Status

FYSA

Adam Martinez
Chief Operating Officer

**From:** Martinez, Adam (CFPB)
**Sent:** Friday, February 14, 2025 12:34 PM
**To:** Young, Christopher (CFPB)████████████████ Lewin, Jeremy ████████████ Wick, Jordon (CFPB)████████████
**Cc:** Paoletta, Mark (CFPB)████████████ Shapiro, Daniel ████████████
**Subject:** Status

Good afternoon –

My team and I had a productive conversation with OPM this morning to work out any identified risks and answer follow-up questions regarding today's actions and notifications to staff. OPM shared that typically during the 30-day notice, employees work during this time to transfer any duties. Mark P. just happened to call me, and I was able to ask for clarification and expectations for the first phase of notifications.

We are going to place all staff on administrative leave for the 30-day notice period. This will provide the flexibility for our new leadership team to call back staff to fulfill closeout duties such as enforcement cases. If there are pockets of staff who we later determine do not need to be called back, we can immediately offboard them (i.e., terminate access) for the duration of the notice period.

I will provide you all notice right before the letters go out, along with the final numbers. This will all be done this afternoon.

Adam

Adam Martinez
Chief Operating Officer

# Exhibit LL

**From:**          Martinez, Adam (CFPB)
**Sent:**          Friday, February 14, 2025 1:39 PM
**To:**
**Cc:**
**Subject:**       RE: Heads Up Re: Timing of Notices

Thanks.

Adam Martinez
Chief Operating Officer

**From:**
**Sent:** Friday, February 14, 2025 1:36 PM
**To:** Martinez, Adam (CFPB)
**Cc:**
**Subject:** Heads Up Re: Timing of Notices

Hi Adam,

Wanted to make sure you were aware there is a hearing for a temporary restraining order or preliminary injunction related to today's activities scheduled for 2pm today. While we will continue preparing, it's just a consideration when deciding when to send out the notices.

https://www.guptawessler.com/wp-content/uploads/2025/02/TROMemorandum.pdf

Thanks.

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit MM

| | |
|---|---|
| **From:** | |
| **To:** |  |
| **Cc:** | |
| **Subject:** | RE: Exception Template |
| **Date:** | Friday, February 14, 2025 1:44:00 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | RE Exception Template.msg |
| **Importance:** | High |

Thanks for everything you're doing, but we need the last set of attachments now. We cannot wait until COB. We also need an answer on the attached question about the guidance. Apologies, but we have been instructed we do not have until COB.



Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** 
**Sent:** Friday, February 14, 2025 11:36 AM
**To:** ⬛⬛⬛ ; Parman, Jason C.
⬛⬛⬛
**Cc:** ⬛⬛⬛

**Subject:** RE: Exception Template

Good morning,

The following documents have been attached.
1. MSPB Appeal Information
2. OPM Retention Regulations
3. Severance Pay Estimate Worksheet
4. Unemployment Insurance
5. CTAP, ICTAP and Reemployment Priority List (RPL) Program Information

We are working to provide an example for the following and will as soon as complete.
1. Authorization for Release of Employment Information
2. Acknowledgement of Receipt
3. State Workforce Programs

Very Respectfully,



Teams Phone ▐

**OPM** U.S. Office of
Personnel Management

Follow us on LinkedIn | Twitter | YouTube

**From:** ▐
**Sent:** Friday, February 14, 2025 8:59 AM
**To:** ▐ Parman, Jason C. ▐
**Cc:** ▐
▐ )
**Subject:** RE: Exception Template

> Some people who received this message don't often get email from ▐ Learn why this is important

10am would be great. Thank you.



Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** ▐
**Sent:** Friday, February 14, 2025 8:31 AM
**To:** ▐ Parman, Jason C.
**Cc:** ▐
**Subject:** RE: Exception Template

Good morning,

Yes, please let us know the time and we will clear our schedules and establish a team meeting.

Very Respectfully,



Teams Phone

**OPM** U.S. Office of
Personnel Management

Follow us on LinkedIn | Twitter | YouTube

**From:** ████████████ ████████████
**Sent:** Friday, February 14, 2025 8:26 AM
**To:** ████████████
**Cc:** ████████████

**Subject:** RE: Exception Template

> Some people who received this message don't often get email from ████████████ Learn why this is important

Thank you, we appreciate it. We are about to meet internally but will very likely still have questions where we'll need your expertise for the Notices deliverables. Does any of the team have availability to meet to talk through the questions for 30 mins today?



nance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Parman, Jason ████████████
**Sent:** Friday, February 14, 2025 8:19 AM
**To:** ████████████ ████████████; ████████████
████████████
**Cc:** ████████████

**Subject:** RE: Exception Template

████████████

Yes, we can help with this. We will get to work on scrubbing and packaging these and sending them to you.

Jason

**From:** █████████████ ████████████
**Sent:** Friday, February 14, 2025 6:48 AM
**To:** ████████ ██████████ >
**Cc:** ███████████████████████████████████
████████████

**Subject:** RE: Exception Template

Some people who received this message don't often get email from███████████   Learn why this is important

██████

Do you have copies of the seven attachments referenced in the template?

1. Acknowledgement of Receipt
2. MSPB Appeal Information
3. OPM Retention Regulations
4. Severance Pay Estimate
5. Unemployment Insurance and State Workforce Programs
6. Authorization for Release of Employment Information
7. CTAP, ICTAP and Reemployment Priority List (RPL) Program Information

Although we'll be doing the severance pay estimate, a sample format would be helpful given our timeframes to send these out.

Much appreciated.

██████



consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** ████████ ████████████
**Sent:** Thursday, February 13, 2025 7:53 PM
**To:** Martinez, Adam (CFPB)████████████ ███ ██ ███████████

**Cc:** ███████████████████████████████████████

**Subject:** RE: Exception Template

Greetings,

Attached are templates of Reduction in Force notifications with and without Severance Pay. Please be mindful that this is a to be used as a guide for developing your internal RIF notice for issuance. When developing your agency's RIF notices, the team should develop standard language when appropriate (e.g., all notices should contain the same language on the reasons for the RIF). It is recommended that you and your team have agency management, and the agency's legal staff, approve the notices. Finally, the team should designate staff to review and proofread each notice for any errors in content, format, and spelling before issuing.

Very Respectfully,



Teams Phone ████████

**OPM** U.S. Office of
Personnel Management

Follow us on LinkedIn | Twitter | YouTube

**From:** Martinez, Adam (CFPB) ████████████████
**Sent:** Thursday, February 13, 2025 6:17 PM
**To:** ████████ ████████████
**Cc:** ████████████████████████████████

**Subject:** RE: Exception Template

Thank you, ██████. I'll have this over shortly. I emailed Jason separately, but who can we get a copy of the furlough letter/template from?

Adam Martinez
Chief Operating Officer

**From:** ████████ ████████████
**Sent:** Thursday, February 13, 2025 5:29 PM
**To:** Martinez, Adam (CFPB) ████████████
**Cc:** ████████████████████████████

**Subject:** Exception Template

Good afternoon, Adam,

As requested, the template for the exception to the 60-day notification is attached.
I will send a separate email to schedule next week's meeting.

Please provide ██████ email address to include in future emails.

Thank you,



U.S. Office of Personnel Management
HR Solutions/Federal Classification Center



OPM.gov

**OPM** U.S. Office of
Personnel Management

Follow us on LinkedIn | X (formerly Twitter) | YouTube

# Exhibit NN

| | |
|---|---|
| **From:** | ██████████████████ |
| **To:** | ██████████████████████████████ |
| **Cc:** | |
| **Subject:** | Validate the Population and the Fields |
| **Date:** | Friday, February 14, 2025 2:27:41 PM |
| **Attachments:** | List of Employees 2025-02-14 DRAFT 1300PM.xlsx |
| | Consolidated list of separations.xlsx |
| | CFPB Comp Area Request.pdf |

Hi you all. The first attachment is the list. The second list contains what I think is a consolidated list of all the separations. Make sure the people on the second attachment aren't on the first attachment.

Also, see the PDF. Make sure everyone in the orgs identified in the PDF are on the file.

After this is done we need to verify that the fields in the forms are correct but first validate the population and get back to me ASAP.

If you find issues, please email me. We do not want to bother ██ right now with this stuff. He is heads down programming.

# Exhibit OO

███████████████████████████████████████████████████████

**From:** Martinez, Adam (CFPB)
**Sent:** Friday, February 14, 2025 3:25 PM
**To:** ███████████████████████
**Subject:** FW: Request for Exception to 60 day notice
**Attachments:** CFPB exception to 90 CA rule SIGNED 2-14-2025 .pdf; CFPB exceptn to the 60 day notice period SIGNED 2-14-2025.pdf

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

For the file. Thanks.

Adam Martinez
Chief Operating Officer

**From:** Mahoney, Michael J███████████████
**Sent:** Friday, February 14, 2025 3:07 PM
**To:** Martinez, Adam (CFPB)████████████; Internet, WPI Employ████████████
**Cc:** Young, Christopher (CFPB)███████████; Lewin, Jeremy████████████; Wick, Jordon
(███████████████ Parman, Jason C.██████████████
**Subject:** RE: Request for Exception to 60 day notice

Adam,

Attached are the signed letters

-mike

**From:** Martinez, Adam (CFPB)████████████████
**Sent:** Thursday, February 13, 2025 7:48 PM
**To:** Peters, Noah███████████; Internet, WPI Employ███████
**Cc:** Young, Christopher (CFPB)██████████ Lewin, Jeremy███████████; Wick, Jordon
(███████████████ Mahoney, Michael J███████████; Parman, Jason C.
████████████
**Subject:** RE: Request for Exception to 60 day notice

Thank you, Noah.

Adam Martinez
Chief Operating Officer

**From:** Peters, Noah██████████████
**Sent:** Thursday, February 13, 2025 7:40 PM
**To:** Martinez, Adam (CFPB)███████████; Internet, WPI Employ████████████
**Cc:** Young, Christopher (CFPB)█████████████ Lewin, Jeremy███████████; Wick, Jordon
(CFPB)█████████ Mahoney, Michael J████████████; Parman, Jason C.
████████████

**Subject:** RE: Request for Exception to 60 day notice

Approved.

Best,

**Noah Peters**
*Senior Advisor to the Director*
*U.S. Office of Personnel Management*
**1900 E Street, N.W. | Washington, D.C. 20415**
█████████████████████████████████



**From:** Martinez, Adam (CFPB) ███████████████
**Sent:** Thursday, February 13, 2025 7:30 PM
**To:** Internet, WPI Employ ██████████████████
**Cc:** Young, Christopher (CFPB)████████████████ Lewin, Jeremy ███████████ Wick, Jordon
(CFPB)████████████ Mahoney, Michael J ███████████████ Parman, Jason C.
███████████ Peters, Noah ████████████
**Subject:** Request for Exception to 60 day notice

Good evening.

Attached is a request for the 60-day notice exception for RIF notification.

Please let me know if you have any questions or need additional information. Thank you.

Adam

Adam Martinez
Chief Operating Officer



UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
Washington, DC 20415

February 14, 2025

Mr. Adam Martinez
Chief Operating Officer/Acting Chief Human Capital Officer
Consumer Financial Protection Bureau
1700 G St NW
Washington, DC 20552

Dear Mr. Martinez:

The Office of Personnel Management (OPM) approves, with one exception, the Consumer
Financial Protection Bureau's (CFPB) February 13, 2025, request for OPM approval of an
exception to the 60-day notice period provided given to employees selected for release through a
reduction in force (RIF). Your request indicates that a RIF is necessary due to the impact of the
Executive Order (EO) titled, "Implementing The President's "Department of Government
Efficiency" Workforce Optimization Initiative" (February 11, 2025), and the CFPB Acting
Director's work stoppage order dated February 10, 2025.

OPM approves your request in accordance with 5 CFR 351.801(b). Under this provision OPM
may approve a notice period of less than 60 days when a RIF is caused by unforeseeable
circumstances. The minimum notice period must cover at least 30 full days.  In accordance with
the EO CFPB must act quickly to conduct a RIF of employees in the divisions, offices, and units,
mentioned in your request, *with one exception*: this approval does not include the 'Office of the
Director/Office of Civil Rights – 13 positions' indicated in your request. In a In a February 14,
2025, meeting with OPM staff CFPB clarified this competitive area should be removed from the
request. The urgency with which CFPB must comply with the EO makes the standard 60-day
notice period impracticable. OPM is approving a notice period of 30-days for employees in the
entities in your request except the Office of the Director/Office of Civil Rights.

Please contact [REDACTED] by email at [REDACTED] or phone at [REDACTED] should
you or staff have any questions with this response.

Sincerely,

Veronica E. Hinton
Associate Director
Workforce Policy and Innovation

# Exhibit PP

| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) |
| **Sent:** | Friday, February 14, 2025 4:57 PM |
| **To:** | |
| **Cc:** | |
| **Subject:** | RE: Exceptions to RIF from Ops Front Office |

Yes. I'm dual hatted right now with Ops and OHC. I will be on the RIF list but in the next group.

Adam Martinez
Chief Operating Officer

**From:**
**Sent:** Friday, February 14, 2025 4:56 PM
**To:** Martinez, Adam (CFPB)
**Cc:**

**Subject:** Exceptions to RIF from Ops Front Office

Hi Adam,

You show up on the RIF report because you are in the Director's Front Office. Are you the only exception?

Consumer Financial Protection Bureau
consumerfinance.gov

# Exhibit QQ

**From:** ▮▮▮▮▮▮▮
**Sent:** Friday, February 14, 2025 9:56 PM
**To:**

**Cc:**
**Subject:** coding for separation actions

Hi you all. Here's the proposed coding for the separation actions. Can you please review and approve for me?

I used auth ZLM for all three since Adam said he wanted agency cites. I could be wrong but I thought we used ZLM when we did Agency cites. PAR remark code M499 just means the remarks are custom. The action & action reason may not be perfect for the situation but this information doesn't go anyway. It stays in HRC and is mostly used for reporting purposes.

▮▮▮▮▮▮▮ – Can you all use the action reason to determine which actions need to be changed to a NOA 330 and which need to be changed to a NOA 285? The RIFs will be loaded via MPI. For Tuesday, you will only have the NOA 330 and 385.

▮▮▮ – we will need to key these over the weekend so they are there Tuesday morning.

| Type of Separation | NOA | Auth Code | Par Remark Nbr | PAR Remark Content | Effect Dt | Action[1] | Action Reason[1] |
|---|---|---|---|---|---|---|---|
| Term Appointments | 330 | ZLM | M499 | EO entitled "Implementing the President's "Dept of Govt Efficiency" Workforce Optimization Initiative" dtd 2/11/2025 and the stop work email from Russ Vought entitled "Additional Directives on Bureau Activities" dtd 2/10/2025. LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE | 2/13/2025 | TER | Staff Reduction |
| Probation | 385 | ZLM | M499 | EO entitled "Implementing the President's "Dept of Govt Efficiency" Workforce Optimization Initiative" dtd 2/11/2025 and the | 2/11/2205 | TER[2] | DPP[2] |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | stop work email from Russ Vought entitled "Additional Directives on Bureau Activities" dtd 2/10/2025. LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE | | | |
| RIF | 356 | ZLM | M44 | EO entitled "Implementing the President's "Dept of Govt Efficiency" Workforce Optimization Initiative" dtd 2/11/2025 and the stop work email from Russ Vought entitled "Additional Directives on Bureau Activities" dtd 2/10/2025. LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE | TBD | TER[3] | Staff Reduction |

[1] This information is only in HRConnect. It doesn't display on the SF-50, go to NFC or go to OPM. The field is used mostly for reporting.

2 Ter = Termination; DPP = Probation/Trial Period



# Exhibit RR

**From:** ████████████████████████████████
**Subject:** Return to research next steps
**Date:** February 28, 2025 at 12:03 PM
**To:** ████████████████████████████████████

Hello all,

ORFO just met to discuss next steps regarding yesterday's new guidance that we should resume non-public statutory research work.

Our first step is trying to figure what we can and can't do in terms of systems access and data access. I have not been able to access certain systems, and I don't believe we have an accurate list of what data contracts remain and how it may limit statutory research.

So could you all please log on and send me the answers to the following questions:

1. Can you access all of the technical systems, including the Research Environment, in the ways you normally used to do to fulfill research activities.
2. Can you access all of the data that you used to in order to fulfill research activities.
3. For those of you who are CORs/ACORs, can you report back what data contracts have been cancelled.
4. What conferences have you been accepted to that you are waiting for guidance on whether you can attend? ORFO knows about Boulder, and the Round Robin.

Additionally, we will be seeking guidance on how to properly code timesheets.

All Best,

████

# Exhibit SS

**From:** Olstad, Per (CFPB) ███████████
**Sent:** Wednesday, March 5, 2025 7:27 AM
**To:** _DL_CFPB_RMR_CP_All ████████████████
**Subject:** Fw: Confirming requirements re: mandatory training

Hi all – see below re: usually required compliance trainings and deadlines …

Thanks,
Per

---

**From:** Sacco, Matthew (CFPB) ███████████████
**Sent:** Tuesday, March 4, 2025 10:59:27 AM
**To:** Olstad, Per (CFPB) ████████
**Cc:** Sacco, Matthew (CFPB) █████████████████; CFPB_Learn ██████████████
**Subject:** RE: Confirming requirements re: mandatory training

Per –

　　Hello, I hope that you are well.  Thank you for your timely question.  I'll also apologize on our collective behalf about any system-generated reminder emails that went out to many today (and a few weeks ago).  That was not intended, and we are acting on that piece as well.

　　We have extended the former March 17 due date, and have an updated News Article posted on Beam Announcements - FY25 Mandatory Training deadline extended until further notice

　　Our current Mandatory Compliance Training (MCT) is now extended. The deadline has been postponed until further notice, and applies to all assigned courses in both the KnowBe4 system, and the CFPB Learning Management System.

　　Unless otherwise advised by CFPB Leadership, completing these courses is <u>not</u> authorized work during current paused work status.

　　If status and direction on this change, we'll provide more and updated communications, however until then working on these MCT courses is <u>not</u> authorized work.

　　I hope that this helps.  If you have any further questions on this, please feel free to contact me directly at ██████████████████ or the team via ████████████████

Take care,

Matt

**Matt Sacco**

Talent Development Manager

**Office of Human Capital**

**Consumer Financial Protection Bureau**

Tel: ████████████

Mob: ████████████

████████████████████

**www.consumerfinance.gov**

---

**From:** Olstad, Per (CFPB)████████████████
**Sent:** Tuesday, March 4, 2025 10:04 AM
**To:** CFPB_Learn████████████████
**Subject:** Confirming requirements re: mandatory training
**Importance:** High

Hi – On Feb 21, re: mandatory trainings, there was a directive (on Beam) to "not take these training courses" and that the March 17 deadline would be extended. Can you advise whether staff should resume taking the trainings and if there is a new deadline?

Thank you,
Per

Per Olstad

Acting Deputy Assistant Director & Senior Advisor

Office of Consumer Populations

Division of Research, Monitoring, and Regulations

Consumer Financial Protection Bureau

████████████████████

████████████

www.consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit TT

3/7/25, 12:14 AM                    Mandatory training requirements remain suspended
Case 1:25-cv-00381-ABJ     Document 66-1     Filed 03/07/25     Page 40 of 60
USCA Case #25-5091     Document #2114360     Filed: 05/05/2025     Page 554 of 637



*Please ignore any reminders.*

As previously announced, CFPB staff are **not** authorized to undertake annual mandatory training at this time. Please ignore any reminders generated automatically by the training platforms. We have communicated any exceptions directly to individuals who do have requirements.

The CFPB will revisit mandatory training later in the fiscal year. Please direct questions to ███████████████.

## Page Properties

**Owning Team**

Human Capital

**Topic**

Training

# Exhibit UU

**From:** Huggins, Cassandra (CFPB) ███████████████████████
**Sent:** Wednesday, March 5, 2025 10:01 AM
**To:** _DL_CFPB_Examiners Midwest ████████████████████████████
_DL_CFPB_NE_Region_Directory ██████████████████████████████;
_DL_CFPB_Supervision Policy ███████████████████; _DL_CFPB_Examiners
SE ████████████████████████████; _DL_CFPB_Examiners West
██████████████████████████
**Cc:** Hagins, Calvin (CFPB)██████████████████████
**Subject:** optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Regions/OSP-

As you are likely aware, CLO Mark Paoletta has requested each member of Supervision to provide him with information on the exams they are currently working on. You are authorized to work on this assignment.

Attached is a template that you may use to put together your response- it includes places to fill in all of the information that he requested. I've included rationale for why an event was scheduled, in case you aren't sure what to put in response to that request. You can copy/paste to represent as many open events of each type that you need, and may delete any event types that you are not currently assigned to work on.

As a reminder, this report is due COB Monday March 10. You may submit your report directly to Mark Paoletta, with a cc to your manager. If your manager has left the Bureau and you haven't been assigned a new manager, please cc the next supervisor up in the management chain.

If you are a manager who oversees others who work on exams, you may respond to the request with all open supervisory events that you are overseeing.

If you are in any other role that does not actively work on individual exams (for example, regional  analyst), please hold on submitting anything until I receive clarification from leadership on their expectations for staff in those roles.

Thanks for your assistance with this request.

Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
████████████████████████

Consumer Financial Protection Bureau

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.



optional
template.docx

# Exhibit VV

**From:** Huggins, Cassandra (CFPB) ███████████████████
**Sent:** Wednesday, March 5, 2025 5:11:00 PM
**To:** ████████████████████████
**Subject:** Re: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

████████  the only item you raise that you need to be concerned with for the purposes of your report is the reporting of approximate time spent on the exam. I would recommend you put your best guess as to the amount of time you spent working on each exam until the work stoppage in 2/10. I am not asking what they plan to do with the information.

**From:** ████████████████████████
**Sent:** Wednesday, March 5, 2025 5:05:26 PM
**To:** Huggins, Cassandra (CFPB) ████████████████████ >
**Subject:** FW: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Casey,

Please see below, particularly my 3:11pm message to Chris. There are a lot of unknows here, and I'd like to know if anyone has asked Mark (or others) for clarification. I am particularly concerned with the time allocated calculations and questions pertaining to how all of these submissions will be used.

Thanks,

████████

**From:** ████████████████████
**Sent:** Wednesday, March 5, 2025 3:24 PM
**To:** Young, Christopher (CFPB) █████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Chris,

Thank you so much for sharing this information. It is helpful to know that Casey is preparing a report.

However, that information alone is not specific enough to address my questions. As such, they still stand.

Thanks,

█████

---

**From:** Young, Christopher (CFPB) ███████████████████████
**Sent:** Wednesday, March 5, 2025 3:18 PM
**To:** ██████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Clarification—Casey is preparing a report addressing much of the information requested.

Our job is to prepare reports including **a written summary of the specific matters they are working on, with the name of the entity being examined, how the matter was commenced and approximately how many hours they have spent on the matter.**

Christopher J Young
Deputy Assistant Director, Supervision Division
██████████████████████████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Young, Christopher (CFPB)
**Sent:** Wednesday, March 5, 2025 3:16 PM
**To:** ██████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

█████

Casey is preparing a report asking for much of this information. We are focused on preparing a report that addresses the following request --

"Additionally, please notify every employee in your division to provide to me **a written summary of the specific matters they are working on, with the name of the entity being examined, how the matter was commenced and approximately how many hours they have spent on the matter.**

Please submit your report and direct every employee in your division to submit their response to me by COB Monday, March 10th."

Christopher J Young
Deputy Assistant Director, Supervision Division
█████████████████████████████████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** █████████████████████████████████████
**Sent:** Wednesday, March 5, 2025 3:11 PM
**To:** Young, Christopher (CFPB)████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Chris,

Thank you so much for this clarification. Ahead of our team meeting this afternoon, I have a few questions:

1. *Mark's request to capture time spent* – In our conversation earlier, you requested exam start dates or similar information to use as part of a determination of how much time team members spent on each exam. I want you to know that I'm looking to you for the most appropriate language to capture this information. I also have concerns:
    a. What is Supervision doing to ensure the time spent calculations are based on the same methodology? For example because, unlike a law firm, we don't report our time as "billable hours" every 15 minutes by case. As a result of how we DO report our time, different teams could come up with vastly different totals if they're using different

methods to calculate this information.

    b. Do we know how they're planning to use this information? If not, has anyone inquired?

2. *Mark's request for lead examiner and lead attorney* - Mark's email also requested the following: "name of the lead CFPB examiner on each matter, and the contact information for the lead attorney for the company under examination." This is not captured in Casey's template. It evidences a lack of understanding of our work and a lack of familiarity with our structure.

    a. Has anyone requested clarification on which role(s) are appropriate to list for the "name of the lead CFPB examiner?" Would this be the FM, EIC, RD, OSP POC(s) [for our team, analyst AND attorney], and/or Deputy Assistant Director?

    b. Has anyone requested whether the "contact information for the lead attorney for the company under examination" is requesting the entity's contact information (e.g., CCO's name and number) or is it instead a request for our internal/lead CFPB attorney's contact information?

    c. Do we know how they're planning to use this information? If not, has anyone inquired?

3. Other items

    a. High-level information about exam scope seems useful here. I'd like to include it. We can discuss more in our meeting.

    b. I have follow-up questions regarding the individual responses. We can also discuss more in our meeting.

Thanks,

█████

---

**From:** Young, Christopher (CFPB) ████████████████
**Sent:** Wednesday, March 5, 2025 1:50 PM
**To:** ████████████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Thanks ████. And to confirm, I'll be preparing a report as manager of the Cross-Program Team and the Compliance Technology Supervision Program, and each individual team member will also prepare their own reports for submission.

Christopher J Young
Deputy Assistant Director, Supervision Division
████████████████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete

the email and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

**From:** ███████████████████████

**Sent:** Wednesday, March 5, 2025 1:34 PM

**To:** Young, Christopher (CFPB) ███████████████

**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Chris,

Thank you for reaching out this morning. I'm very happy to assist with fulfilling leadership's recent request.

Per our discussion:
- We will prepare the report requested in the 3/4/2025 and 3/5/2025 messages from Mark Paoletta and Casey Huggins as it pertains to our team.
- Include the future planned exams and follow-up events (planned via prioritization process), active exams ████████████████████ consultation activities
- Include the start date.
- I'll produce an initial list before our next meeting this afternoon.
- Use Word format

Best,

████

**From:** Young, Christopher (CFPB) ██████████████

**Sent:** Wednesday, March 5, 2025 11:26 AM

**To:** ████████████████████

**Subject:** Re: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

████ — I will ring you on Teams at 11:45 if that works.

Christopher J Young
Deputy Assistant Director for Supervision Policy
███████████████████████

Consumer Financial Protection Bureau

**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

**From:** ██████████████████████

**Sent:** Wednesday, March 5, 2025 11:22:57 AM
**To:** Young, Christopher (CFPB) ███████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

One more heads up on this – I have some existing reports in SES that may streamline the process for collecting this information. They are not perfectly aligned to this ask, but they should help.

---

**From:** ███████████████████████████████
**Sent:** Wednesday, March 5, 2025 11:07 AM
**To:** Young, Christopher (CFPB) ███████████████████
**Subject:** Fw: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

I'm awaiting your direction based on Casey's latest email.

---

**From:** Huggins, Cassandra (CFPB) ████████████████████████
**Sent:** Wednesday, March 5, 2025 11:00:54 AM
**To:** _DL_CFPB_Examiners Midwest ████████████████████████
_DL_CFPB_NE_Region_Directory < ███████████████████████████████;
_DL_CFPB_Supervision Policy < ████████████████████; _DL_CFPB_Examiners SE
< ██████████████████████>; _DL_CFPB_Examiners West
< ██████████████████████ >
**Cc:** Hagins, Calvin (CFPB) < ███████████████████████
**Subject:** optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Regions/OSP-

As you are likely aware, CLO Mark Paoletta has requested each member of Supervision to provide him with information on the exams they are currently working on. You are authorized to work on this assignment.

Attached is a template that you may use to put together your response- it includes places to fill in all of the information that he requested. I've included rationale for why an event was scheduled, in case you aren't sure what to put in response to that request. You can copy/paste to represent as many open events of each type that you need, and may delete any event types that you are not currently assigned to work on.

As a reminder, this report is due COB Monday March 10. You may submit your report directly to Mark Paoletta, with a cc to your manager. If your manager has left the Bureau and you haven't been assigned a new manager, please cc the next supervisor up in the management chain.

If you are a manager who oversees others who work on exams, you may respond to the request with

all open supervisory events that you are overseeing.

If you are in any other role that does not actively work on individual exams (for example, regional analyst), please hold on submitting anything until I receive clarification from leadership on their expectations for staff in those roles.

Thanks for your assistance with this request.

**Cassandra Huggins**
**Principal Deputy Assistant Director | Supervision Policy & Operations**
██████████████████

**Consumer Financial Protection Bureau**
**consumerfinance.gov**


**Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.**

# Exhibit WW

**From:** █████████████████

**Sent:** Thursday, March 6, 2025 1:08 PM

**To:** ████████████████████████████

**Cc:** ███████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

**Subject:** Recap of 3.6.25 call on Report for Exam actives due 3.10.25

Hi ████████,

Just wanted to do a brief recap of what we talked about on our team call from earlier:

1. After we are done with providing the information for the report Casey requested yesterday we are to go back on Administrative Leave. If there is a conflict, while we are completing the report, that we would normally use leave for, we should check with Work Life to find the appropriate leave category to use at this time.
2. We had some discussion regarding the CSI, when sending the report to Mark P. and the report should not be sent as an attachment but the report we had prepared in word should be copied and pasted into the body of the email.
3. Lastly, during the call managers received an email about the status of open events, monitoring and planned events, and you would be reaching out to us individually to get a status on those open events.

Again just wanted to make sure I had the info correct.

████████████████████
Examiner
Consumer Financial Protection Bureau
█████████████████
Supervision, Enforcement, Fair Lending & Equal Opportunity
████████████████████████

consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

This message was secured by **Zix**Corp©.

# Exhibit XX

**From:** McNitt, Bryce (CFPB) 
**Sent:** Thursday, March 6, 2025 6:17 PM
**To:**

**Cc:** McNamara, John (CFPB) <                    >;

<

**Subject:** Status of Office of Markets Contracts

Good Afternoon,

📄 Markets Procurement Status - Justifications.docx

Linked above is the last known status of all Office of Markets contracts.

I have also copied the list into the body of the email below.  Some notes:

- All contracts except for one have had "Termination For Convenience" (T4C) notifications sent. This means the CFPB intends to cancel the contract, but for most contracts the formal modification cancelling the contract has not been signed.
  - **Staff are not to log into or utilize the resources of any contract where a T4C has been issued** (all contracts but Inside Mortgage Finance).
- Inside Mortgage Finance is the only contract that was not cancelled.
- Bloomberg Terminal has been formally cancelled and a refund is being issued.
- A few contracts were cancelled in Q1 FY25, and a couple were new contracts that will not be competed.
- Contracts that are either already fully cancelled or that were new and won't be competed are in gray in the attached sheet, we will not be pursuing those.

For those contracts that where cancellation has been initiated but not formalized, we are beginning a process of making a request to restore those contracts we believe to be necessary to carry out our statutorily required market monitoring work.  We are going to start with simple bullets and iterate the list within RMR.

In the attached document, if you believe that the data source is essential to maintain our market monitoring activities, please place some bulleted justification(s) in the appropriate box below the status.

We will try to get a preliminary list to Jan & Dan on Monday and iterate from there.

Please let me know if you have any questions.

Bryce

# Status Office of Markets Procurements as of 3/6/2025

| Contract Name | Status |
|---|---|
| AITE | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| AURIEMMA (Cardbeat) | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| Auto ABS Data | Cancelled Q1 FY 25. |
| CARD MAIL MONITOR REPORTS (Competiscan) | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| EXPERIAN VELOCITY/AUTOCOUNT | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| CRA Auto-focused data purchase | Unlikely to be competed. (New Contract) |
| MERCATOR GROUP/Javelin/Escalent | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| MORTGAGE DATA PRICE INDICES (HPI) (Black Knight) | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| Mortgage Data - GUI | Cancelled Q1 FY 25. |
| INSIDE MORTGAGE FINANCE | Active |
| MOBILE INTELLIGENCE DATA | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| Personal Loan Data | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| Bloomberg Terminal | Formally cancelled, refund being issued. |
| Elliptic (crypto) | Unlikely to be competed. (New Contract) |

# Exhibit YY

**From:** ▓▓▓▓▓▓▓▓▓
**Sent:** Friday, March 7, 2025 10:24 AM
**To:** Timmons, Debra (CFPB) ▓▓▓▓▓▓▓▓▓▓▓▓ >
**Subject:** Following up from yesterday's discussion on work tasks

Hello,

Summarizing what we talked about yesterday as far as work tasks:

- While our team had planned to release the dataset that is important for the statutorily required Card Act Analysis on the week of February 10th into Databricks Production, we will not be able to do so at this time. The contractors involved in the development of the datasets, the data validation of the dataset, and the federal employee who promoted the dataset to production were all terminated during the work stoppage in the middle of finalizing documentation.
    - Status: We have granted access to the testing dataset (in staging) to the new Card Act team but they cannot use this dataset for finalized analysis.
- Also as discussed, we should not move forward with developing new platform features or data products (as we had been) because we need to spend time figuring out how we will support our statutorily required functions with dramatically less staff/contractors/fewer systems. You will let me know if I am required to perform this taking stock task for Databricks.

I appreciate your leadership and support.



# Exhibit ZZ



## SUPPLEMENTAL INDEX OF EMAILS AND OTHER COMMUNICATIONS

| Exhibit | Date | Description |
|---|---|---|
| II | 2/12 | Emails between Adam Martinez and OPM regarding "RIF Consulting Services" |
| JJ | 2/14 | Emails between Adam Martinez and OPM regarding CFPB's request for an exception to the "90-day rule for competitive areas" (8:28am) |
| KK | 2/14 | Status update from Adam Martinez regarding "today's [RIF] actions and notifications to staff" (12:38pm) |
| LL | 2/14 | Email to Adam Martinez notifying him of TRO hearing in this case in planning for timing of termination notices (1:39pm) |
| MM | 2/14 | Email urgently requesting materials for RIFs from OPM (1:44pm) |
| NN | 2/14 | Email including list of employees to be fired (2:27pm) |
| OO | 2/14 | Email from OPM approving request for exemption from the 60-day notice requirement for RIFs (3:25pm) |
| PP | 2/14 | Email from Adam Martinez confirming that he will be included with the "next group" of RIFs (4:57pm) |
| QQ | 2/14 | Email regarding materials for RIFs (9:56pm) |
| RR | 2/28 | Email regarding impact of contract status on resuming work |
| SS | 3/5 | Email regarding indefinite postponement of mandatory training |
| TT | | Site showing that staff are not authorized to take mandatory training |
| UU | 3/5 | Email regarding reporting on supervision examination activity |
| VV | 3/5 | Email regarding reporting on supervision examination activity |
| WW | 3/6 | Email regarding reporting on supervision activity and return to administrative leave |
| XX | 3/6 | Email regarding impact of contract cancellations on Office of Markets |
| YY | 3/7 | Email regarding impact of contract cancellation and employee terminations on CARD Act analysis |
| ZZ | 3/7 | Email from head of Office of Students team indicating that they are currently unable to perform required complaint-review function |

# Exhibit II

| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) |
| **Sent:** | Wednesday, February 12, 2025 6:51 PM |
| **To:** | Gueye, Jafnar (CFPB); |
| **Cc:** | |
| **Subject:** | FW: Draft agreement for CFPB RIF assistance |
| **Attachments:** | OPM HRS - RIF Consulting Services - CFPB.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

FYSA – Once OPM confirms, I'll sign the SOW.

Jafnar – I went ahead and provided your name directly so you can handle with your team carefully given the topic.

Thank you all.

Adam

Adam Martinez
Chief Operating Officer

**From:** Martinez, Adam (CFPB)
**Sent:** Wednesday, February 12, 2025 6:49 PM
**To:** 'Parman, Jason C.'                        ; Wick, Jordan                        ; Young, Christopher

**Cc:**

**Subject:** RE: Draft agreement for CFPB RIF assistance

Thank you again for supporting us.

We have reviewed the agreement, and we are ready to move forward. Please let me know if we are good to sign or if you have any additional changes on your end. I've included our POC information below.

Finance POC:
Jafnar Gueye
Chief Financial Officer

Project Team Leads:



Adam Martinez
Chief Operating Officer

From: Parman, Jason C. ████████████████████
Sent: Wednesday, February 12, 2025 4:16 PM
To: Martinez, Adam (CFPB) ████████████████; Wick, Jordon (CFPB) ████████████; Young, Christopher ████████
Cc: ████████████; ████████; ██████████████████; ████
████████; ████████████
Subject: Draft agreement for CFPB RIF assistance

Adam, Jordan, and Chris-

Per our meeting, attached please find a draft statement of work (SOW) for restructuring assistance services. The SOW covers the range of activities we may do for you throughout the project, and the initial funding of $171,925 covers the activities necessary to provide you immediate planning assistance, decision support, and to prepare and scope the remaining activities in the coming phases.

We are glad to meet ASAP to refine the language if needed. If this meets your needs, ████████ (our financial specialist, copied here) is ready to work with your team to execute the agreement.

Please review and if this meets your needs, we can connect our finance team with yours to execute the agreement. Feel free to contact me directly at ████████ or ████████████ (copied here) with questions, or just reply to this email that you are ready to go.

We look forward to working with you on this critical initiative.

Thanks,
Jason

**Jason C. Parman**
Deputy Associate Director
U.S. Office of Personnel Management
HR Strategy & Evaluation Solutions



OPM.gov



# Exhibit JJ

| From: | Martinez, Adam (CFPB) |
|---|---|
| To: | ▮▮▮▮▮▮▮▮▮ |
| Subject: | FW: Request for Comp Area Exception |
| Date: | Friday, February 14, 2025 8:28:19 AM |

The competitive areas were approved.

Adam Martinez
Chief Operating Officer

**From:** Peters, Noah ▮▮▮▮▮▮▮
**Sent:** Thursday, February 13, 2025 10:12 PM
**To:** Lewin, Jeremy ▮▮▮▮▮▮▮; Mahoney, Michael J ▮▮▮▮▮▮▮▮▮
Martinez, Adam (CFPB) ▮▮▮▮▮▮▮; Armstrong, Anthony
▮▮▮▮▮▮▮
**Cc:** Young, Christopher (CFPB) ▮▮▮▮▮▮▮▮ Wick, Jordon (CFPB)
▮▮▮▮▮▮▮▮▮▮▮▮▮;
Parman, Jason C. ▮▮▮▮▮▮▮▮
**Subject:** RE: Request for Comp Area Exception

Jeremy- OPM has approved the competitive area exceptions.

**From:** Lewin, Jeremy ▮▮▮▮▮▮▮
**Sent:** Thursday, February 13, 2025 10:10 PM
**To:** Mahoney, Michael J ▮▮▮▮▮▮▮ Martinez, Adam (CFPB)
▮▮▮▮▮▮▮; Armstrong, Anthony ▮▮▮▮▮▮▮
**Cc:** Young, Christopher (CFPB) ▮▮▮▮▮▮▮ Wick, Jordon (CFPB)
▮▮▮▮▮▮▮▮▮▮▮
Parman, Jason C. ▮▮▮▮▮▮▮; Peters, Noah ▮▮▮▮▮▮▮
**Subject:** Re: Request for Comp Area Exception

+Anthony, who suggested I reach out. We owe Acting Director Vought an update at 10am
tomorrow – do we have an ETA on an OPM response?

Thank you!
Jeremy

**From:** Mahoney, Michael J ▮▮▮▮▮▮▮▮▮
**Date:** Thursday, February 13, 2025 at 7:17 PM
**To:** Martinez, Adam (CFPB) ▮▮▮▮▮▮▮
**Cc:** Young, Christopher (CFPB) ▮▮▮▮▮▮▮ Lewin, Jeremy
▮▮▮▮▮▮▮ Wick, Jordon (CFPB) ▮▮▮▮▮▮▮▮▮▮▮ Parman,
Jason C. ▮▮▮▮▮▮▮ Peters, Noah ▮▮▮▮▮▮▮▮

**Subject:** RE: Request for Comp Area Exception

Thanks

**From:** Martinez, Adam (CFPB) ████████████████████
**Sent:** Thursday, February 13, 2025 7:15 PM
**To:** Mahoney, Michael J ██████████████████
**Cc:** Young, Christopher (CFPB) ████████████████ Lewin, Jeremy ████████████████; Wick, Jordon (CFPB) ████████████████ ████████████; Parman, Jason C. ██████████████████
Peters, Noah ██████████████
**Subject:** RE: Request for Comp Area Exception

Hi Mike -- numbers are attached.

**Adam Martinez**
**Chief Operating Officer**

**From:** Mahoney, Michael J ████████████████
**Sent:** Thursday, February 13, 2025 6:31 PM
**To:** Martinez, Adam (CFPB) ████████████████
**Cc:** Young, Christopher (CFPB) ████████████ Lewin, Jeremy ████████████ Wick, Jordon (CFPB) ████████████████ ████████████; Parman, Jason ████████████████
Peters, Noah ████████████
**Subject:** RE: Request for Comp Area Exception

Hi Adam,

Could you put numbers next to the different Cas in your request?

In other words, I'm assuming the 1200 will be spread across the CA; can your team break that up and assign to each CA

Thanks,

-mike

**From:** Martinez, Adam (CFPB) ████████████████
**Sent:** Thursday, February 13, 2025 5:01 PM
**To:** Mahoney, Michael J ████████████
**Cc:** Young, Christopher (CFPB) ████████████████ Lewin, Jeremy ████████████████ Wick, Jordon (CFPB) ████████████████ ████████████ Parman, Jason C. ██████████████████

Peters, Noah ███████████████

**Subject:** Request for Comp Area Exception

Hi Michael –

Attached is CFPB's request for an exception to the 90-day rule for competitive areas.

Please let me know if you have any questions or need additional information.

Thank you.

Adam

Adam Martinez
**Chief Operating Officer**
**Consumer Financial Protection Bureau**
███████████████

 Consumer Financial
Protection Bureau

1700 G Street NW, Washington, D.C. 20552

February 13, 2025

**TO:**        **Michael J. Mahoney, Office of Personnel Management**

**FROM:**        **Adam Martinez, Chief Operating Officer/Acting Chief Human Capital Officer**

**SUBJECT:**        **Establishment of Competitive Areas**    ADAM MARTINEZ    Digitally signed by ADAM MARTINEZ
Date: 2025.02.13 19:12:52 -05'00'

This memorandum serves as the Consumer Financial Protection Bureau's (CFPB) request for an exception to the competitive area 90-day rule.  Please find the CFPB responses below with regards to our competitive areas.

1. **Identification of the proposed competitive area, including the organizational segment, geographic location, and limits of the local commuting area;**

   **Answer:** Below are the divisions, offices and units that will be immediately impacted by a possible reduction-in-force.  Additional competitive areas will be identified in the next round of divisions, offices, and/or units including the Division of Operations, Division of Research Monitoring and Regulations, and Division of Consumer Response.

   - Office of the Director - 106 positions
     - Legislative Affairs  - 4 position
     - Office of Policy and Strategy - 19 positions
     - Office of Civil Rights - 13 positions
     - Office of Fair Lending and Equal Opportunity - 17 positions
     - Office of the Director - 53 positions
   - Division of External Affairs  - 51 positions
     - Communications - 16 positions
     - External Affairs Division 16 positions
     - Intergovernmental Affairs - 7 positions
     - Private Sector Engagement  - 5 positions
     - Public Engagement  - 7 positions

**consumerfinance.gov**

- Division of Supervision - 528 positions
  - o Supervision Policy and Operations - 124 positions
  - o Supervision Examinations - 6 positions
  - o Supervision Midwest Region - 96 positions
  - o Supervision Northeast Region - 98 positions
  - o Supervision Southeast Region - 110 positions
  - o Supervision West Region - 94 positions
- Division of Enforcement - 283 positions
- Division of Research - 170 positions
  - o Competition and Innovation - 10 positions
  - o Consumer Populations - 54 positions
  - o Markets - 42 positions
  - o Research - 64 positions
- Division of Operations - 37 positions
  - o Operations Front Office - 10 positions
  - o Chief Data Officer - 22 positions
  - o Administrative Operations
    - ▪ Events Management - 5 positions

2. **A description of how the proposed area differs from the one previously established for the same unit and geographic area;**

   **Answer:** No competitive areas were established for the groups above. The groups listed above include entire divisions, offices, and/or units.

3. **An organizational chart of the agency showing the relationship between the organizational components within the competitive area and other components in the commuting area;**

   **Answer:** Organizational chart attached.

4. **The number of competing employees in the proposed competitive area; Answer:**

   Approximately 1175 positions

5. **A description of the operation, work function, staff, and personnel administration of the proposed area and, where appropriate, a description of how the area is distinguished from others in these respects; and**

**Answer:** All functions are unique to the specific division, office and/or unit and support that unit's mission.

6. **A discussion of the circumstances that led to the proposed changes less than 90 days before a proposed reduction.**

   **Answer:** The CFPB is responding to Executive Order Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative – The White House dated February 11, 2025 and the CFPB Acting Director's work stoppage order dated February 10, 2025.

# Exhibit KK

████████████████████████████████████████████████████████

**From:**      Martinez, Adam (CFPB)
**Sent:**      Friday, February 14, 2025 12:38 PM
**To:**        ███████████████████████████████████████
**Subject:**   FW: Status

FYSA

Adam Martinez
Chief Operating Officer

**From:** Martinez, Adam (CFPB)
**Sent:** Friday, February 14, 2025 12:34 PM
**To:** Young, Christopher (CFPB)████████████████ Lewin, Jeremy ████████████ Wick, Jordon
(CFPB) █████████████████
**Cc:** Paoletta, Mark (CFPB)███████████████ Shapiro, Daniel ███████████████
**Subject:** Status

Good afternoon –

My team and I had a productive conversation with OPM this morning to work out any identified risks
and answer follow-up questions regarding today's actions and notifications to staff. OPM shared that
typically during the 30-day notice, employees work during this time to transfer any duties. Mark P.
just happened to call me, and I was able to ask for clarification and expectations for the first phase of
notifications.

We are going to place all staff on administrative leave for the 30-day notice period. This will provide
the flexibility for our new leadership team to call back staff to fulfill closeout duties such as
enforcement cases. If there are pockets of staff who we later determine do not need to be called back,
we can immediately offboard them (i.e., terminate access) for the duration of the notice period.

I will provide you all notice right before the letters go out, along with the final numbers. This will all
be done this afternoon.

Adam

Adam Martinez
Chief Operating Officer

# Exhibit LL

**From:**       Martinez, Adam (CFPB)
**Sent:**       Friday, February 14, 2025 1:39 PM
**To:**
**Cc:**
**Subject:**    RE: Heads Up Re: Timing of Notices

Thanks.

Adam Martinez
Chief Operating Officer

**From:**
**Sent:** Friday, February 14, 2025 1:36 PM
**To:** Martinez, Adam (CFPB)
**Cc:**
**Subject:** Heads Up Re: Timing of Notices

Hi Adam,

Wanted to make sure you were aware there is a hearing for a temporary restraining order or preliminary injunction related to today's activities scheduled for 2pm today. While we will continue preparing, it's just a consideration when deciding when to send out the notices.

https://www.guptawessler.com/wp-content/uploads/2025/02/TROMemorandum.pdf

Thanks.

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit MM

| From: | |
|---|---|
| To: | |
| Cc: | |
| Subject: | RE: Exception Template |
| Date: | Friday, February 14, 2025 1:44:00 PM |
| Attachments: | image001.png |
| | image002.png |
| | RE Exception Template.msg |
| Importance: | High |

Thanks for everything you're doing, but we need the last set of attachments now. We cannot wait until COB. We also need an answer on the attached question about the guidance. Apologies, but we have been instructed we do not have until COB.



Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:**
**Sent:** Friday, February 14, 2025 11:36 AM
**To:**                                ; Parman, Jason C.

**Cc:**

**Subject:** RE: Exception Template

Good morning,

The following documents have been attached.
1. MSPB Appeal Information
2. OPM Retention Regulations
3. Severance Pay Estimate Worksheet
4. Unemployment Insurance
5. CTAP, ICTAP and Reemployment Priority List (RPL) Program Information

We are working to provide an example for the following and will as soon as complete.
1. Authorization for Release of Employment Information
2. Acknowledgement of Receipt
3. State Workforce Programs

Very Respectfully,



Teams Phone

**OPM** U.S. Office of
Personnel Management

Follow us on LinkedIn | Twitter | YouTube



**From:**
**Sent:** Friday, February 14, 2025 8:59 AM
**To:** ████████ Parman, Jason C. ████████
**Cc:** ████████

**Subject:** RE: Exception Template

> Some people who received this message don't often get email from ████████ Learn why this is important

10am would be great. Thank you.

Consumer Financial Protection Bureau
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.



**From:**
**Sent:** Friday, February 14, 2025 8:31 AM
**To:** ████████ Parman, Jason C.
**Cc:**

**Subject:** RE: Exception Template

Good morning,

Yes, please let us know the time and we will clear our schedules and establish a team meeting.

Very Respectfully,



Teams Phone ▮▮▮▮▮

**OPM**  U.S. Office of
Personnel Management

Follow us on LinkedIn | Twitter | YouTube

---

**From:** ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, February 14, 2025 8:26 AM
**To:** ▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮

**Subject:** RE: Exception Template

> Some people who received this message don't often get email from ▮▮▮▮▮▮▮   Learn why this is
> important

Thank you, we appreciate it. We are about to meet internally but will very likely still have questions
where we'll need your expertise for the Notices deliverables. Does any of the team have availability
to meet to talk through the questions for 30 mins today?



nance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete
the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** Parman, Jason ▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, February 14, 2025 8:19 AM
**To:** ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮

**Subject:** RE: Exception Template

▮▮▮▮▮

Yes, we can help with this. We will get to work on scrubbing and packaging these and sending them to you.

Jason

**From:** ███████████████████ ██████████████████████

**Sent:** Friday, February 14, 2025 6:48 AM

**To:** ████████████ ████████████████

**Cc:** ████████████████████████████████████████████

**Subject:** RE: Exception Template

> Some people who received this message don't often get email from ████████████    Learn why this is important
>
> ██████████

Do you have copies of the seven attachments referenced in the template?

1. Acknowledgement of Receipt
2. MSPB Appeal Information
3. OPM Retention Regulations
4. Severance Pay Estimate
5. Unemployment Insurance and State Workforce Programs
6. Authorization for Release of Employment Information
7. CTAP, ICTAP and Reemployment Priority List (RPL) Program Information

Although we'll be doing the severance pay estimate, a sample format would be helpful given our timeframes to send these out.

Much appreciated.

██████



**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

**From:** ████████████ ████████████████

**Sent:** Thursday, February 13, 2025 7:53 PM

**To:** Martinez, Adam (CFPB) ████████████████ ██████ ██████ ████████████

**Cc:** ███████████████████████████████████████

**Subject:** RE: Exception Template

Greetings,

Attached are templates of Reduction in Force notifications with and without Severance Pay. Please be mindful that this is a to be used as a guide for developing your internal RIF notice for issuance. When developing your agency's RIF notices, the team should develop standard language when appropriate (e.g., all notices should contain the same language on the reasons for the RIF). It is recommended that you and your team have agency management, and the agency's legal staff, approve the notices. Finally, the team should designate staff to review and proofread each notice for any errors in content, format, and spelling before issuing.

Very Respectfully,



Teams Phone ██████████

**OPM** U.S.Office of
Personnel Management
Follow us on LinkedIn | Twitter | YouTube

**From:** Martinez, Adam (CFPB) ████████████████████
**Sent:** Thursday, February 13, 2025 6:17 PM
**To:** ████████  ████████████
**Cc:** ██████████████████████████████████████

**Subject:** RE: Exception Template

Thank you, ████. I'll have this over shortly. I emailed Jason separately, but who can we get a copy of the furlough letter/template from?

Adam Martinez
Chief Operating Officer

**From:** ███████  ███████████
**Sent:** Thursday, February 13, 2025 5:29 PM
**To:** Martinez, Adam (CFPB) ████████████
**Cc:** ████████████████████████████████████████

**Subject:** Exception Template

Good afternoon, Adam,

As requested, the template for the exception to the 60-day notification is attached.
I will send a separate email to schedule next week's meeting.

Please provide ▮▮▮▮▮ email address to include in future emails.

Thank you,



U.S. Office of Personnel Management
HR Solutions/Federal Classification Center



OPM.gov

**OPM** U.S. Office of
Personnel Management

Follow us on LinkedIn | X (formerly Twitter) | YouTube

# Exhibit NN

| | |
|---|---|
| **From:** | |
| **To:** | |
| **Cc:** | |
| **Subject:** | Validate the Population and the Fields |
| **Date:** | Friday, February 14, 2025 2:27:41 PM |
| **Attachments:** | List of Employees 2025-02-14 DRAFT 1300PM.xlsx |
| | Consolidated list of separations.xlsx |
| | CFPB Comp Area Request.pdf |

Hi you all.  The first attachment is the list. The second list contains what I think is a consolidated list of all the separations. Make sure the people on the second attachment aren't on the first attachment.

Also, see the PDF. Make sure everyone in the orgs identified in the PDF are on the file.

After this is done we need to verify that the fields in the forms are correct but first validate the population and get back to me ASAP.

If you find issues, please email me. We do not want to bother ██ right now with this stuff. He is heads down programming.

# Exhibit OO

**From:** Martinez, Adam (CFPB)
**Sent:** Friday, February 14, 2025 3:25 PM
**To:**
**Subject:** FW: Request for Exception to 60 day notice
**Attachments:** CFPB exception to 90 CA rule SIGNED 2-14-2025 .pdf; CFPB exceptn to the 60 day notice period SIGNED 2-14-2025.pdf

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

For the file. Thanks.

Adam Martinez
Chief Operating Officer

**From:** Mahoney, Michael J
**Sent:** Friday, February 14, 2025 3:07 PM
**To:** Martinez, Adam (CFPB)                    ; Internet, WPI Employ
**Cc:** Young, Christopher (CFPB)                    ; Lewin, Jeremy                    ; Wick, Jordon
                    Parman, Jason C.
**Subject:** RE: Request for Exception to 60 day notice

Adam,

Attached are the signed letters

-mike

**From:** Martinez, Adam (CFPB)
**Sent:** Thursday, February 13, 2025 7:48 PM
**To:** Peters, Noah                    ; Internet, WPI Employ
**Cc:** Young, Christopher (CFPB)                    Lewin, Jeremy                    ; Wick, Jordon
                    Mahoney, Michael J                    ; Parman, Jason C.

**Subject:** RE: Request for Exception to 60 day notice

Thank you, Noah.

Adam Martinez
Chief Operating Officer

**From:** Peters, Noah
**Sent:** Thursday, February 13, 2025 7:40 PM
**To:** Martinez, Adam (CFPB)                    ; Internet, WPI Employ
**Cc:** Young, Christopher (CFPB)                    Lewin, Jeremy                    ; Wick, Jordon
(CFPB)                    Mahoney, Michael J                    ; Parman, Jason C.

**Subject:** RE: Request for Exception to 60 day notice

Approved.

Best,

**Noah Peters**
*Senior Advisor to the Director*
*U.S. Office of Personnel Management*
1900 E Street, N.W. | Washington, D.C. 20415
█████████████████████████████████



**From:** Martinez, Adam (CFPB) ████████████████████
**Sent:** Thursday, February 13, 2025 7:30 PM
**To:** Internet, WPI Employ ████████████████████
**Cc:** Young, Christopher (CFPB) █████████████Lewin, Jeremy ████████████Wick, Jordon
(CFPB)██████████Mahoney, Michael J██████████████Parman, Jason C.
██████████████ Peters, Noah ███████████
**Subject:** Request for Exception to 60 day notice

Good evening.

Attached is a request for the 60-day notice exception for RIF notification.

Please let me know if you have any questions or need additional information. Thank you.

Adam

Adam Martinez
Chief Operating Officer



UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
Washington, DC 20415

February 14, 2025

Mr. Adam Martinez
Chief Operating Officer/Acting Chief Human Capital Officer
Consumer Financial Protection Bureau
1700 G St NW
Washington, DC 20552

Dear Mr. Martinez:

The Office of Personnel Management (OPM) approves, with one exception, the Consumer
Financial Protection Bureau's (CFPB) February 13, 2025, request for OPM approval of an
exception to the 60-day notice period provided given to employees selected for release through a
reduction in force (RIF). Your request indicates that a RIF is necessary due to the impact of the
Executive Order (EO) titled, "Implementing The President's "Department of Government
Efficiency" Workforce Optimization Initiative" (February 11, 2025), and the CFPB Acting
Director's work stoppage order dated February 10, 2025.

OPM approves your request in accordance with 5 CFR 351.801(b). Under this provision OPM
may approve a notice period of less than 60 days when a RIF is caused by unforeseeable
circumstances. The minimum notice period must cover at least 30 full days. In accordance with
the EO CFPB must act quickly to conduct a RIF of employees in the divisions, offices, and units,
mentioned in your request, *with one exception*: this approval does not include the 'Office of the
Director/Office of Civil Rights – 13 positions' indicated in your request. In a In a February 14,
2025, meeting with OPM staff CFPB clarified this competitive area should be removed from the
request. The urgency with which CFPB must comply with the EO makes the standard 60-day
notice period impracticable. OPM is approving a notice period of 30-days for employees in the
entities in your request except the Office of the Director/Office of Civil Rights.

Please contact ▮▮▮▮▮ by email at ▮▮▮▮▮ or phone at ▮▮▮▮▮ should
you or staff have any questions with this response.

Sincerely,

Veronica E. Hinton
Associate Director
Workforce Policy and Innovation

# Exhibit PP

| | |
|---|---|
| **From:** | Martinez, Adam (CFPB) |
| **Sent:** | Friday, February 14, 2025 4:57 PM |
| **To:** | |
| **Cc:** | |
| **Subject:** | RE: Exceptions to RIF from Ops Front Office |

Yes. I'm dual hatted right now with Ops and OHC. I will be on the RIF list but in the next group.

Adam Martinez
Chief Operating Officer

**From:**
**Sent:** Friday, February 14, 2025 4:56 PM
**To:** Martinez, Adam (CFPB)
**Cc:**
**Subject:** Exceptions to RIF from Ops Front Office

Hi Adam,

You show up on the RIF report because you are in the Director's Front Office. Are you the only exception?



Consumer Financial Protection Bureau
consumerfinance.gov

# Exhibit QQ

**From:**
**Sent:**       Friday, February 14, 2025 9:56 PM
**To:**

**Cc:**
**Subject:**    coding for separation actions

Hi you all. Here's the proposed coding for the separation actions. Can you please review and approve for me?

I used auth ZLM for all three since Adam said he wanted agency cites. I could be wrong but I thought we used ZLM when we did Agency cites. PAR remark code M499 just means the remarks are custom. The action & action reason may not be perfect for the situation but this information doesn't go anyway. It stays in HRC and is mostly used for reporting purposes.

██████████ – Can you all use the action reason to determine which actions need to be changed to a NOA 330 and which need to be changed to a NOA 285? The RIFs will be loaded via MPI. For Tuesday, you will only have the NOA 330 and 385.

██████ – we will need to key these over the weekend so they are there Tuesday morning.

| Type of Separation | NOA | Auth Code | Par Remark Nbr | PAR Remark Content | Effect Dt | Action[1] | Action Reason[1] |
|---|---|---|---|---|---|---|---|
| Term Appointments | 330 | ZLM | M499 | EO entitled "Implementing the President's "Dept of Govt Efficiency" Workforce Optimization Initiative" dtd 2/11/2025 and the stop work email from Russ Vought entitled "Additional Directives on Bureau Activities" dtd 2/10/2025. LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE | 2/13/2025 | TER | Staff Reduction |
| Probation | 385 | ZLM | M499 | EO entitled "Implementing the President's "Dept of Govt Efficiency" Workforce Optimization Initiative" dtd 2/11/2025 and the | 2/11/2205 | TER[2] | DPP[2] |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | stop work email from Russ Vought entitled "Additional Directives on Bureau Activities" dtd 2/10/2025. LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE | | | |
| RIF | 356 | ZLM | M44 | EO entitled "Implementing the President's "Dept of Govt Efficiency" Workforce Optimization Initiative" dtd 2/11/2025 and the stop work email from Russ Vought entitled "Additional Directives on Bureau Activities" dtd 2/10/2025. LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE | TBD | TER[2] | Staff Reduction |

[1] This information is only in HRConnect. It doesn't display on the SF-50, go to NFC or go to OPM. The field is used mostly for reporting.

2 Ter = Termination; DPP = Probation/Trial Period



# Exhibit RR

**From:** ███████████████████████
**Subject:** Return to research next steps
**Date:** February 28, 2025 at 12:03 PM
**To:** ████████████████████████

Hello all,

ORFO just met to discuss next steps regarding yesterday's new guidance that we should resume non-public statutory research work.

Our first step is trying to figure what we can and can't do in terms of systems access and data access. I have not been able to access certain systems, and I don't believe we have an accurate list of what data contracts remain and how it may limit statutory research.

So could you all please log on and send me the answers to the following questions:

1. Can you access all of the technical systems, including the Research Environment, in the ways you normally used to do to fulfill research activities.
2. Can you access all of the data that you used to in order to fulfill research activities.
3. For those of you who are CORs/ACORs, can you report back what data contracts have been cancelled.
4. What conferences have you been accepted to that you are waiting for guidance on whether you can attend? ORFO knows about Boulder, and the Round Robin.

Additionally, we will be seeking guidance on how to properly code timesheets.

All Best,

████

# Exhibit SS

**From:** Olstad, Per (CFPB) ████████████████
**Sent:** Wednesday, March 5, 2025 7:27 AM
**To:** _DL_CFPB_RMR_CP_All ███████████████████████
**Subject:** Fw: Confirming requirements re: mandatory training

Hi all – see below re: usually required compliance trainings and deadlines …

Thanks,
Per

---

**From:** Sacco, Matthew (CFPB) ██████████████████
**Sent:** Tuesday, March 4, 2025 10:59:27 AM
**To:** Olstad, Per (CFPB) ████████
**Cc:** Sacco, Matthew (CFPB) ███████████████████; CFPB_Learn ████████████████
**Subject:** RE: Confirming requirements re: mandatory training

Per –

Hello, I hope that you are well. Thank you for your timely question. I'll also apologize on our collective behalf about any system-generated reminder emails that went out to many today (and a few weeks ago). That was not intended, and we are acting on that piece as well.

We have extended the former March 17 due date, and have an updated News Article posted on Beam Announcements - FY25 Mandatory Training deadline extended until further notice

Our current Mandatory Compliance Training (MCT) is now extended. The deadline has been postponed until further notice, and applies to all assigned courses in both the KnowBe4 system, and the CFPB Learning Management System.

Unless otherwise advised by CFPB Leadership, completing these courses is <u>not</u> authorized work during current paused work status.

If status and direction on this change, we'll provide more and updated communications, however until then working on these MCT courses is <u>not</u> authorized work.

I hope that this helps. If you have any further questions on this, please feel free to contact me directly at
██████████ or the team via ████████████████

Take care,

Matt

**Matt Sacco**

Talent Development Manager

**Office of Human Capital**

**Consumer Financial Protection Bureau**

Tel: ███████████

Mob: ███████████

███████████████

**www.consumerfinance.gov**

---

**From:** Olstad, Per (CFPB)███████████
**Sent:** Tuesday, March 4, 2025 10:04 AM
**To:** CFPB_Learn███████████
**Subject:** Confirming requirements re: mandatory training
**Importance:** High

Hi – On Feb 21, re: mandatory trainings, there was a directive (on Beam) to "not take these training courses" and that the March 17 deadline would be extended. Can you advise whether staff should resume taking the trainings and if there is a new deadline?

Thank you,
Per

Per Olstad

Acting Deputy Assistant Director & Senior Advisor

Office of Consumer Populations

Division of Research, Monitoring, and Regulations

Consumer Financial Protection Bureau

███████████████

███████

www.consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

# Exhibit TT



*Please ignore any reminders.*

As previously announced, CFPB staff are **not** authorized to undertake annual mandatory training at this time. Please ignore any reminders generated automatically by the training platforms. We have communicated any exceptions directly to individuals who do have requirements.

The CFPB will revisit mandatory training later in the fiscal year. Please direct questions to ████████████████.

## Page Properties

**Owning Team**

Human Capital

**Topic**

Training

# Exhibit UU

**From:** Huggins, Cassandra (CFPB) ███████████████████
**Sent:** Wednesday, March 5, 2025 10:01 AM
**To:** _DL_CFPB_Examiners Midwest ████████████████████████
_DL_CFPB_NE_Region_Directory ███████████████████████████;
_DL_CFPB_Supervision Policy ██████████████████; _DL_CFPB_Examiners
SE ████████████████████████; _DL_CFPB_Examiners West
████████████████████████
**Cc:** Hagins, Calvin (CFPB)████████████████████
**Subject:** optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Regions/OSP-

As you are likely aware, CLO Mark Paoletta has requested each member of Supervision to provide him with information on the exams they are currently working on. You are authorized to work on this assignment.

Attached is a template that you may use to put together your response- it includes places to fill in all of the information that he requested. I've included rationale for why an event was scheduled, in case you aren't sure what to put in response to that request. You can copy/paste to represent as many open events of each type that you need, and may delete any event types that you are not currently assigned to work on.

As a reminder, this report is due COB Monday March 10. You may submit your report directly to Mark Paoletta, with a cc to your manager. If your manager has left the Bureau and you haven't been assigned a new manager, please cc the next supervisor up in the management chain.

If you are a manager who oversees others who work on exams, you may respond to the request with all open supervisory events that you are overseeing.

If you are in any other role that does not actively work on individual exams (for example, regional  analyst), please hold on submitting anything until I receive clarification from leadership on their expectations for staff in those roles.

Thanks for your assistance with this request.

Cassandra Huggins
Principal Deputy Assistant Director | Supervision Policy & Operations
████████████████████
Consumer Financial Protection Bureau

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.



optional
template.docx

# Exhibit VV

**From:** Huggins, Cassandra (CFPB) ███████████████
**Sent:** Wednesday, March 5, 2025 5:11:00 PM
**To:** ████████████████████████
**Subject:** Re: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

█████████ the only item you raise that you need to be concerned with for the purposes of your report is the reporting of approximate time spent on the exam. I would recommend you put your best guess as to the amount of time you spent working on each exam until the work stoppage in 2/10. I am not asking what they plan to do with the information.

**From:** ████████████████████████
**Sent:** Wednesday, March 5, 2025 5:05:26 PM
**To:** Huggins, Cassandra (CFPB) ███████████████████ >
**Subject:** FW: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Casey,

Please see below, particularly my 3:11pm message to Chris. There are a lot of unknows here, and I'd like to know if anyone has asked Mark (or others) for clarification. I am particularly concerned with the time allocated calculations and questions pertaining to how all of these submissions will be used.

Thanks,

████

**From:** ████████████████
**Sent:** Wednesday, March 5, 2025 3:24 PM
**To:** Young, Christopher (CFPB) ███████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Chris,

Thank you so much for sharing this information. It is helpful to know that Casey is preparing a report.

However, that information alone is not specific enough to address my questions. As such, they still stand.

Thanks,

█████

---

**From:** Young, Christopher (CFPB) ████████████████████████████
**Sent:** Wednesday, March 5, 2025 3:18 PM
**To:** ████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Clarification—Casey is preparing a report addressing much of the information requested.

Our job is to prepare reports including **a written summary of the specific matters they are working on, with the name of the entity being examined, how the matter was commenced and approximately how many hours they have spent on the matter.**

Christopher J Young
Deputy Assistant Director, Supervision Division
████████████████████████████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments.  An inadvertent disclosure is not intended to waive any privileges.

---

**From:** Young, Christopher (CFPB)
**Sent:** Wednesday, March 5, 2025 3:16 PM
**To:** ████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

█████

Casey is preparing a report asking for much of this information. We are focused on preparing a report that addresses the following request --

"Additionally, please notify every employee in your division to provide to me **a written summary of the specific matters they are working on, with the name of the entity being examined, how the matter was commenced and approximately how many hours they have spent on the matter.**

Please submit your report and direct every employee in your division to submit their response to me by COB Monday, March 10th."

Christopher J Young
Deputy Assistant Director, Supervision Division
█████████████████████████████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments. An inadvertent disclosure is not intended to waive any privileges.

---

**From:** ███████████████████████████████
**Sent:** Wednesday, March 5, 2025 3:11 PM
**To:** Young, Christopher (CFPB)████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Chris,

Thank you so much for this clarification. Ahead of our team meeting this afternoon, I have a few questions:

1. *Mark's request to capture time spent* – In our conversation earlier, you requested exam start dates or similar information to use as part of a determination of how much time team members spent on each exam. I want you to know that I'm looking to you for the most appropriate language to capture this information. I also have concerns:
   a. What is Supervision doing to ensure the time spent calculations are based on the same methodology? For example because, unlike a law firm, we don't report our time as "billable hours" every 15 minutes by case. As a result of how we DO report our time, different teams could come up with vastly different totals if they're using different

methods to calculate this information.

    b. Do we know how they're planning to use this information? If not, has anyone inquired?

2. *Mark's request for lead examiner and lead attorney* - Mark's email also requested the following: "name of the lead CFPB examiner on each matter, and the contact information for the lead attorney for the company under examination." This is not captured in Casey's template. It evidences a lack of understanding of our work and a lack of familiarity with our structure.

    a. Has anyone requested clarification on which role(s) are appropriate to list for the "name of the lead CFPB examiner?" Would this be the FM, EIC, RD, OSP POC(s) [for our team, analyst AND attorney], and/or Deputy Assistant Director?

    b. Has anyone requested whether the "contact information for the lead attorney for the company under examination" is requesting the entity's contact information (e.g., CCO's name and number) or is it instead a request for our internal/lead CFPB attorney's contact information?

    c. Do we know how they're planning to use this information? If not, has anyone inquired?

3. Other items

    a. High-level information about exam scope seems useful here. I'd like to include it. We can discuss more in our meeting.

    b. I have follow-up questions regarding the individual responses. We can also discuss more in our meeting.


Thanks,

██████

---

**From:** Young, Christopher (CFPB) ████████████████████
**Sent:** Wednesday, March 5, 2025 1:50 PM
**To:** ████████████████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)


Thanks ██████.  And to confirm, I'll be preparing a report as manager of the Cross-Program Team and the Compliance Technology Supervision Program, and each individual team member will also prepare their own reports for submission.


Christopher J Young
Deputy Assistant Director, Supervision Division
████████████████████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete

**the email and any attachments.  An inadvertent disclosure is not intended to waive any privileges.**

**From:** ███████████████████
**Sent:** Wednesday, March 5, 2025 1:34 PM
**To:** Young, Christopher (CFPB) ███████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Chris,

Thank you for reaching out this morning. I'm very happy to assist with fulfilling leadership's recent request.

Per our discussion:
- We will prepare the report requested in the 3/4/2025 and 3/5/2025 messages from Mark Paoletta and Casey Huggins as it pertains to our team.
- Include the future planned exams and follow-up events (planned via prioritization process), active exams ████████████ consultation activities
- Include the start date.
- I'll produce an initial list before our next meeting this afternoon.
- Use Word format

Best,

███

**From:** Young, Christopher (CFPB) ████████████
**Sent:** Wednesday, March 5, 2025 11:26 AM
**To:** ███████████████
**Subject:** Re: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

███ —I will ring you on Teams at 11:45 if that works.

Christopher J Young
Deputy Assistant Director for Supervision Policy
████████████████

Consumer Financial Protection Bureau
**consumerfinance.gov**

**Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the email and any attachments.  An inadvertent disclosure is not intended to waive any privileges.**

**From:** ███████████████

**Sent:** Wednesday, March 5, 2025 11:22:57 AM
**To:** Young, Christopher (CFPB) ██████████████████████
**Subject:** RE: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

One more heads up on this – I have some existing reports in SES that may streamline the process for collecting this information. They are not perfectly aligned to this ask, but they should help.

---

**From:** ███████████████████████████████
**Sent:** Wednesday, March 5, 2025 11:07 AM
**To:** Young, Christopher (CFPB) ██████████████████████
**Subject:** Fw: optional template and instructions for submitting reports on exam activity (report due COB 3/10)

I'm awaiting your direction based on Casey's latest email.

---

**From:** Huggins, Cassandra (CFPB) █████████████████████
**Sent:** Wednesday, March 5, 2025 11:00:54 AM
**To:** _DL_CFPB_Examiners Midwest ████████████████████
_DL_CFPB_NE_Region_Directory <████████████████████████>;
_DL_CFPB_Supervision Policy <████████████████>; _DL_CFPB_Examiners SE
<██████████████████████>; _DL_CFPB_Examiners West
<████████████████████>
**Cc:** Hagins, Calvin (CFPB) <██████████████████████>
**Subject:** optional template and instructions for submitting reports on exam activity (report due COB 3/10)

Regions/OSP-

As you are likely aware, CLO Mark Paoletta has requested each member of Supervision to provide him with information on the exams they are currently working on. You are authorized to work on this assignment.

Attached is a template that you may use to put together your response- it includes places to fill in all of the information that he requested. I've included rationale for why an event was scheduled, in case you aren't sure what to put in response to that request. You can copy/paste to represent as many open events of each type that you need, and may delete any event types that you are not currently assigned to work on.

As a reminder, this report is due COB Monday March 10. You may submit your report directly to Mark Paoletta, with a cc to your manager. If your manager has left the Bureau and you haven't been assigned a new manager, please cc the next supervisor up in the management chain.

If you are a manager who oversees others who work on exams, you may respond to the request with

all open supervisory events that you are overseeing.

If you are in any other role that does not actively work on individual exams (for example, regional analyst), please hold on submitting anything until I receive clarification from leadership on their expectations for staff in those roles.

Thanks for your assistance with this request.

**Cassandra Huggins**
**Principal Deputy Assistant Director | Supervision Policy & Operations**
██████████████

**Consumer Financial Protection Bureau**
**consumerfinance.gov**

**Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.**

# Exhibit WW

**From:** █████████████████

**Sent:** Thursday, March 6, 2025 1:08 PM

**To:** ███████████████████████████

**Cc:** ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

**Subject:** Recap of 3.6.25 call on Report for Exam actives due 3.10.25

Hi ██████████,

Just wanted to do a brief recap of what we talked about on our team call from earlier:

1. After we are done with providing the information for the report Casey requested yesterday we are to go back on Administrative Leave. If there is a conflict, while we are completing the report, that we would normally use leave for, we should check with Work Life to find the appropriate leave category to use at this time.
2. We had some discussion regarding the CSI, when sending the report to Mark P. and the report should not be sent as an attachment but the report we had prepared in word should be copied and pasted into the body of the email.
3. Lastly, during the call managers received an email about the status of open events, monitoring and planned events, and you would be reaching out to us individually to get a status on those open events.

Again just wanted to make sure I had the info correct.


███████████████████████
Examiner
Consumer Financial Protection Bureau
██████████████████
Supervision, Enforcement, Fair Lending & Equal Opportunity
████████████████████████████
consumerfinance.gov

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.


This message was secured by **ZixCorp**©.

# Exhibit XX

**From:** McNitt, Bryce (CFPB) ███████████████
**Sent:** Thursday, March 6, 2025 6:17 PM
**To:** ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████
**Cc:** McNamara, John (CFPB) < ████████████████ >; ████████████████
< ████████████████████████████████████████
████████████████
**Subject:** Status of Office of Markets Contracts

Good Afternoon,

📄 Markets Procurement Status - Justifications.docx

Linked above is the last known status of all Office of Markets contracts.

I have also copied the list into the body of the email below. Some notes:

- All contracts except for one have had "Termination For Convenience" (T4C) notifications sent. This means the CFPB intends to cancel the contract, but for most contracts the formal modification cancelling the contract has not been signed.
  - **Staff are not to log into or utilize the resources of any contract where a T4C has been issued** (all contracts but Inside Mortgage Finance).
- Inside Mortgage Finance is the only contract that was not cancelled.
- Bloomberg Terminal has been formally cancelled and a refund is being issued.
- A few contracts were cancelled in Q1 FY25, and a couple were new contracts that will not be competed.
- Contracts that are either already fully cancelled or that were new and won't be competed are in gray in the attached sheet, we will not be pursuing those.

For those contracts that where cancellation has been initiated but not formalized, we are beginning a process of making a request to restore those contracts we believe to be necessary to carry out our statutorily required market monitoring work. We are going to start with simple bullets and iterate the list within RMR.

In the attached document, if you believe that the data source is essential to maintain our market monitoring activities, please place some bulleted justification(s) in the appropriate box below the status.

We will try to get a preliminary list to Jan & Dan on Monday and iterate from there.

Please let me know if you have any questions.

Bryce

# Status Office of Markets Procurements as of 3/6/2025

| Contract Name | Status |
|---|---|
| AITE | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| AURIEMMA (Cardbeat) | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| Auto ABS Data | Cancelled Q1 FY 25. |
| CARD MAIL MONITOR REPORTS (Competiscan) | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| EXPERIAN VELOCITY/AUTOCOUNT | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| CRA Auto-focused data purchase | Unlikely to be competed. (New Contract) |
| MERCATOR GROUP/Javelin/Escalent | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| MORTGAGE DATA PRICE INDICES (HPI) (Black Knight) | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| Mortgage Data - GUI | Cancelled Q1 FY 25. |
| INSIDE MORTGAGE FINANCE | Active |
| MOBILE INTELLIGENCE DATA | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| Personal Loan Data | Cancellation initiated 2/11. Formal cancellation paused until further notice. |
| Bloomberg Terminal | Formally cancelled, refund being issued. |
| Elliptic (crypto) | Unlikely to be competed. (New Contract) |

# Exhibit YY

**From:** ████████████

**Sent:** Friday, March 7, 2025 10:24 AM

**To:** Timmons, Debra (CFPB) ████████████████ >

**Subject:** Following up from yesterday's discussion on work tasks

Hello,

Summarizing what we talked about yesterday as far as work tasks:

- While our team had planned to release the dataset that is important for the statutorily required Card Act Analysis on the week of February 10th into Databricks Production, we will not be able to do so at this time.  The contractors involved in the development of the datasets, the data validation of the dataset, and the federal employee who promoted the dataset to production were all terminated during the work stoppage in the middle of finalizing documentation.
    - Status: We have granted access to the testing dataset (in staging) to the new Card Act team but they cannot use this dataset for finalized analysis.
- Also as discussed, we should not move forward with developing new platform features or data products (as we had been) because we need to spend time figuring out how we will support our statutorily required functions with dramatically less staff/contractors/fewer systems.  You will let me know if I am required to perform this taking stock task for Databricks.

I appreciate your leadership and support.



# Exhibit ZZ



Hi everyone,

I was going through complaints today and found that every attachment was inaccessible – the site gave an error that just said 'Service Error (500)'. I've flagged for Matt Pfaff, but wanted to confirm with any of you that you are having the same issue?

Some of the companies that we look at complaints about regularly attach a pdf as its full response so it makes it impossible to review complete information about complaints from those companies.

Austin

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY
EMPLOYEES UNION, *et al.*,

                *Plaintiffs*,

    v.

RUSSELL VOUGHT, in his official capacity
as Acting Director of the Consumer Financial
Protection Bureau, *et al.*,

                *Defendants*.

Case No. 25-cv-381-ABJ

## NOTICE OF FILING OF AMENDED PROPOSED
## PRELIMINARY INJUNCTION ORDER

Following the evidentiary hearing on March 11, 2025, the Court urged the parties to meet and confer about a proposed preliminary injunction order, should the Court decide to issue one. The parties have conferred, and the defendants' position is that they continue to oppose the entry of a preliminary injunction. They therefore declined to file a joint proposed order. Nevertheless, the plaintiffs have revised their proposed order in response to the Court's and the defendants' comments at the March 11th hearing. That revised proposed order is attached here.

At the hearing, the defendants' main objection to the prior proposed order seemed to be that two provisions referenced the Bureau's statutorily required functions. Tr. of Mar. 11, 2025 Hearing, Dkt. 74, at 115-117. The plaintiffs included those references based on the defendants' claim that they were now committed to the Bureau performing these functions. But although the defendants insist that the CFPB is performing its statutorily required functions, they also insist that a preliminary injunction order requiring them to do so would be "ambigu[ous]." *Id.* And despite this professed concern, the defendants also refused to identify the duties that they believe the Bureau is statutorily required to perform. *See id.*

Still, the plaintiffs have amended their proposed order in light of the defendants' comments. With respect to the work stoppage, the amended proposed order does not rely on the Bureau's statutory functions. Instead, it would enjoin the enforcement of the February 10, 2025 stop-work order and prohibit the defendants from reinstituting a work stoppage.

With respect to the contract termination provision, the CFPB appears to have a "master spreadsheet" of contracts, which contains a list of the CFPB's contracts, their status, and a description of their relationship to the Bureau's statutory functions. Tr. of Mar. 10, 2025 Hearing, Dkt. 73, at p.72–73 (defendants' counsel asking about this spreadsheet); Dkt. 66-2, at CFPB_00117 (internal email describing this spreadsheet). The plaintiffs have repeatedly asked for this list—to enable them to propose a specific list of contracts that shall not be terminated—but the defendants have not provided it.

Absent this information, the amended proposed order offers another option for taking into account the defendants' professed concern that they might disagree with the plaintiffs or the Court about which contracts enable the Bureau's statutorily required functions. The amended order prohibits the wholesale cancellation of contracts, but allows the defendants to halt services under a contract if they determine, based on an individualized assessment of that contract, that the contract is unnecessary for the fulfillment of statutory functions. They may not, however, finalize that contract's termination. The purpose of this amendment is to balance the need to preserve the court's ability to award full relief at the end of the case—including relief that would require contract reinstatement—with the defendants' asserted need to discontinue contracts that they believe are unnecessary to meet the agency's statutory requirements.

The other objection to the prior proposed order that the defendants emphasized at the hearing is that they would like to be able to conduct reductions in force. But the hearing confirmed

that the agency continues to plan to terminate the vast majority of CFPB employees—which, as the government's own witness explained, would cause irreparable harm. Tr. Mar. 10, 2025 Hearing, at 153, 232; Tr. Mar. 11, 2025, at 61-64. The amended proposed order, therefore, leaves in place the prohibition on mass terminations that was agreed upon at the beginning of this case.[1]

Dated: March 19, 2025

Respectfully submitted,

*/s/ Deepak Gupta*
Deepak Gupta (DC Bar No. 495451)
Robert Friedman (D.C. Bar No. 1046738)
Gabriel Chess (DC Bar No. 90019245)*
Gupta Wessler LLP
2001 K Street, NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

Jennifer D. Bennett (pro hac vice)
Gupta Wessler LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

* motion for admission pending

*Counsel for Plaintiffs*

 */s/ Wendy Liu*
Wendy Liu (DC Bar No. 1600942)
Adam R. Pulver (DC Bar No. 1020475)
Allison M. Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

Julie Wilson (DC Bar No. 482946)
General Counsel
Paras N. Shah (DC Bar No. 983881)
Deputy General Counsel
Allison C. Giles (DC Bar No. 439705)
Assistant Counsel
National Treasury Employees Union
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500
*Counsel for Plaintiff National Treasury Employees Union*

---

[1] The plaintiffs have deleted the funding provision from the proposed order based on the dissolution of the TRO governing funding in *Mayor and City Council of Baltimore v. Consumer Financial Protection Bureau*, Civ. No. MJM-25-458. That case involved an APA challenge solely to the Bureau's failure to draw funds for this quarter and the threat of returning the CFPB's funds to Treasury or the Federal Reserve—not a separation of powers (or APA) challenge to the decision to dismantle the agency. Nevertheless, in an effort to draw as narrow a preliminary injunction as possible, and based on the government's representations that it is not possible to transfer the CFPB's funds to Treasury or the Federal Reserve, the plaintiffs are no longer requesting that relief as part of the preliminary injunction.