**ORAL ARGUMENT SCHEDULED MAY 16, 2025**
**Nos. 25-5091, 25-5132**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL TREASURY EMPLOYEES UNION, ET AL.,

*Plaintiffs-Appellees,*

– v. –

RUSSELL VOUGHT, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 24-cv-0381-ABJ (The Hon. Amy Berman Jackson)

## BRIEF OF 42 NONPROFIT VETERANS, LEGAL SERVICES, AND CONSUMER ORGANIZATIONS AS AMICI CURIAE IN SUPPORT OF APPELLEES

Seth E. Mermin
David S. Nahmias
John Kauffman
CENTER FOR CONSUMER LAW &
ECONOMIC JUSTICE
UC BERKELEY SCHOOL OF LAW
308 Berkeley Law
Berkeley, CA 94720-7200
tmermin@law.berkeley.edu
dnahmias@law.berkeley.edu

*Counsel for Amici Curiae*

May 9, 2025

Ariel Levinson-Waldman
A.J. Hong-Huber
TZEDEK DC
UDC DAVID A. CLARKE SCHOOL OF LAW
4340 Connecticut Ave. NW, Ste. 345
Washington, D.C. 20008
(202) 441-9959
alw@tzedekdc.org
ah@tzedekdc.org

Persis S. Yu
R.T. Winston Berkman-Breen*
STUDENT BORROWER PROTECTION CENTER
(A fiscally sponsored project of the
Shared Ascent Fund)

1025 Connecticut Ave NW, #717
Washington, DC 20036
persis@protectborrowers.org
winston@protectborrowers.org

*\* Not admitted to the Bar of the District of Columbia but admitted to practice law in the state of New York. Practice limited to federal court matters.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amici curiae certify as follows:

**A.    Parties and Amici.**

Except for the amici curiae listed below and amici curiae former CFPB officials, all parties, intervenors, and amici appearing before the district court and this Court are listed in the Opening Brief of Appellants Russell Vought et al.

- Alaska Public Interest Research Group
- Americans for Financial Reform Education Fund
- Arkansans Against Abusive Payday Lending
- Arkansas Community Organizations
- CASA of Oregon
- Center for Consumer Law and Economic Justice
- Center for Economic Integrity
- Center For Elder Law and Justice
- Center for LGBTQ Economic Advancement & Research
- Center for Responsible Lending
- Connecticut Citizen Action Group
- Connecticut Veterans Legal Center
- Consumer Action
- Consumer Federation of America

- Communications Workers of America Local 1081

- Fordham University School of Law: Feerick Center for Social Justice

- Georgia Watch

- Legal Action Chicago

- Legal Assistance for Seniors

- Legal Counsel for the Elderly

- Mid-Minnesota Legal Assistance, Inc.

- Minority Veterans of America

- Mobilization for Justice

- Mountain State Justice, Inc.

- National Association of Consumer Advocates

- National Fair Housing Alliance

- New Jersey Appleseed Public Interest Law Center

- New York Legal Assistance Group

- NextGen Policy

- Oregon Consumer Justice

- People Power United

- Prosperity Works

- Public Counsel

- Public Justice Center

- Queens Volunteer Lawyers Project, Inc.

- Rise Economy

- Student Borrower Protection Center (a fiscally sponsored project of Shared Ascent Fund)

- Texas Appleseed

- Tzedek DC

- Virginia Citizens Consumer Council

- Western New York Law Center

- Woodstock Institute

**B.     Ruling under Review.**

References to the rulings at issue appear in the Opening Brief of Appellants Russell Vought et al.

**C.     Related Cases.**

As stated in the Opening Brief of Appellants Russell Vought, et al., this matter has not previously come before this Court, and counsel for the amici curiae is not aware of any related cases pending in this Court or any other court.

Respectfully submitted,

/s/ Ariel Levinson-Waldman
Ariel Levinson-Waldman
*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

No party to this filing has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any party to this filing.

## CERTIFICATE OF COUNSEL

Pursuant to D.C. Circuit Rule 29(d), amici curiae are aware of three other potential amicus briefs in support of Appellees from Members of Congress, States, and former CFPB officials. Separate briefs are necessary because this brief offers the distinct perspective of national, state, and local non-profit organizations from across the country that advocate for the ordinary Americans who engage daily in the consumer financial marketplace and who would face inordinate harm if the CFPB is eliminated and its statutory functions ceased. The other briefs, by contrast, focus on the separation of powers concerns at issue in this case from the perspective of Congress, the consequences to the States' enforcement and financial supervisory efforts if the CFPB is shuttered, and the particular viewpoints of officials of the agency. Amici curiae believe that their brief will help the Court to assess the interests to the public at large involved and the balance of equities that favored the issuance of the district court's injunction.

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iii

CORPORATE DISCLOSURE STATEMENT ........................................................vi

CERTIFICATE OF COUNSEL ............................................................... vii

TABLE OF CONTENTS ........................................................................ viii

TABLE OF AUTHORITIES........................................................................x

GLOSSARY ........................................................................................ xviii

INTEREST OF AMICI CURIAE ..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT .........................................................................................8

I.    THE PRELIMINARY INJUNCTION IS NECESSARY TO
      PRESERVE THE CFPB IN ORDER TO PROTECT
      AMERICANS' FINANCIAL HEALTH AND SAFEGUARD
      THE ECONOMY....................................................................9

      A.    The Public Interest Favors Maintaining The CFPB's
            Administration Of Laws To Protect The Financial
            Wellbeing Of All Americans. ........................................10

      B.    The Public Interest Favors the CFPB's Continued
            Enforcement of Laws Benefiting Critical Segments Of The
            Population Like Servicemembers, Veterans, And Older
            Adults...................................................................15

      C.    The Public Interest Favors Preserving The CFPB's Ability
            To Address Emerging Threats To Consumers And The
            Economy. ..............................................................20

II.   THE BALANCE OF EQUITIES WEIGHS HEAVILY IN
      FAVOR OF AFFIRMING THE INJUNCTION. ...................................25

CONCLUSION ....................................................................................29

CERTIFICATE OF SERVICE.............................................................31

CERTIFICATE OF COMPLIANCE ...................................................32

# TABLE OF AUTHORITIES

## CASES

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ...................................................................2, 28

*CFPB v. CFSA*,
    601 U.S. 416 (2024) .....................................................................8, 10

*CFPB v. Kern*,
    No. 20-cv-00786-DCC (D.S.C. Jan. 21, 2021) ............................19

*Davidson v. United Auto Credit Corp.*,
    65 F.4th 124 (4th Cir. 2023) ........................................................17

*Espin v. Citibank, N.A.*,
    126 F.4th 1010 (4th Cir. 2025) ....................................................19

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) ...........................................................12

*Goodluck v. Biden*,
    104 F.4th 920 (D.C. Cir. 2024) .....................................................9

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013). ...................................................2, 27

*INS v. Chadha*,
    462 U.S. 919 (1983) ...................................................................26, 27

*Kendall v. United States*,
    37 U.S. (12 Pet.) 524 (1838) .........................................................9

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..........................................................26

*Louis v. Bluegreen Vacations, Inc.*,
    No. 22-12217, 2024 WL 2873778 (11th Cir. June 7, 2024) .........19

*Nat'l Treasury Emps. Union v. Vought*,
No. 25-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) ...................6, 24, 26

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) ........................................................10

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020)...................................................................4, 11

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ........................................................25

*TD Bank N.A. v. Hill*,
928 F.3d 259 (3d Cir. 2019)..........................................................10

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978).....................................................................27

*The Confiscation Cases*,
87 U.S. 92 (1873) ........................................................................26

*U.S. Telecom Ass'n v. FCC*,
855 F.3d 381 (D.C. Cir. 2017) ........................................................7

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) ......................................................................9

*Util. Air Regulatory Grp. v. EPA*,
572 U.S. 302 (2014)................................................................27, 28

*West Virginia v. EPA*,
597 U.S. 697 (2022)...........................................................7, 27, 28

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...................................................................2, 3, 9

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 3.................................................................27

## STATUTES

12 U.S.C. § 2804 ......................................................................8

§ 5481 ....................................................................14, 28
§ 5491(a) ....................................................................8
§ 5492(a)(5) ................................................................6
§ 5493(b) ..................................................................15
§ 5493(b)(3) ..............................................................20
§ 5493(d)(1) ................................................................8
§ 5493(e) ..............................................................4, 16
§ 5493(g) ...........................................................4, 16, 20
§ 5495 ....................................................................14
§ 5511 .................................................................8, 11
§ 5511(a) ..............................................................2, 10
§ 5511(c)(4) ..............................................................11
§ 5514 ......................................................................8
§ 5514(b)(1) ..............................................................11
§ 5514(b)(3) ..............................................................15
§ 5515 ......................................................................8
§ 5535(d) ...................................................................8
§ 5561 ......................................................................8
§ 5566 ......................................................................8
§ 5581 ....................................................................14
§ 5499 ....................................................................28

15 U.S.C. § 1681(a)(1) ..............................................................14

## LEGISLATIVE MATERIALS

H.R. Rep. No. 111-157 (June 29, 2010) (Conf. Rep.)...........................................8

## RULES

Fed. R. App. P. 29(a)...................................................................................1

## ADMINISTRATIVE ADJUDICATIONS

*Accelerate Mortg.*,
    CFPB No. 2020-BCFP-0014 (Sept. 4, 2020)................................18

*ClearPath Lending, Inc.*,
    CFPB No. 2020-BCFP-0015 (Sept. 14, 2020).............................18

*Low VA Rates, LLC*,
    CFPB No. 2020-BCFP-0018 (Oct. 26, 2020) ..............................18

*Navy Fed. Credit Union*,
    CFPB No. 2024-CFPB-0014 (Nov. 7, 2024) ...............................18

*Prime Choice Funding, Inc.*,
    CFPB No. 2020-BCFP-0006 (July 24, 2020) ..............................18

*Sovereign Lending Grp.*,
    CFPB No. 2020-BCFP-0006 (July 24, 2020) ..............................18

## OTHER AUTHORITIES

603 Legal Aid, *Consumer Financial Products & Services:*
    *Your Legal Rights Concerning Financial Services and Products* ...............23

Adam J. Levitin, *The Consumer Financial Protection Bureau:*
    *An Introduction*, 32 Rev. Banking & Fin. L. 321 (2013).......................11, 14

Brief of 90 State & Local Nonprofit Orgs. as Amici Curiae....................................3

Brief of Amici Curiae Fin. Regulation Scholars, *CFPB v. CFSA*,
    No. 22-448 (U.S. May 15, 2023) ..................................................3

Brief of Comm. Dev. Fin. Insts. & Credit Unions et al. as Amici Curiae, *CFPB v. CFSA*, No. 22-448 (U.S. May 15, 2023) ............................................3

Brief of Farm Action et al. as Amici Curiae, *CFPB v. CFSA*, No. 22-448 (U.S. May 15, 2023) ....................................................3

Brief of Mortg. Bankers Ass'n et al. as Amici Curiae, *CFPB v. CFSA*, No. 22-448 (U.S. May 15, 2023) ...........................................3, 13

CFPB, *Arkansas State AG Settle With Brokers of High Interest Credit Offers* ................................................................19

CFPB, *CFPB Issues Interpretive Rule on Certain Mortgage and Disclosure Timing Requirements for the 2021 Juneteenth Federal Holiday* (Aug. 5, 2021)......................................................13

CFPB, *Consumer Response Annual Report: January 1 – December 31, 2024* (May 1, 2025) ....................................................21

CFPB, *Financial Resources for Serving Servicemembers, Veterans, and Military Families* (Jan. 3, 2025)................................................4

CFPB, *Four Million Complaints: More Than Just a Milestone* (Sept. 29, 2023) .........................................................21

CFPB, Off. of Servicemember Affairs, *The CFPB is Protecting the Military Community and Providing Relief* (May 23, 2024).........................18

CFPB, *Sample Letters to Dispute Information on a Credit Report* (last modified Oct. 17, 2023) ........................................24

CFPB, S*tatement by CFPB Acting Director Dave Uejio on Impact of the Juneteenth National Independence Day Federal Holiday on Residential Mortgage Closings* (June 18, 2021)...........................13

CFPB, *Submit a Complaint About a Financial Product or Service* (last modified Mar. 12, 2025) .......................................20, 21

CFPB, *Supervisory Highlights* (last modified Apr. 25, 2025) ................................12

xiv

CFPB, *Supervisory Highlights: Mortgage Servicing Special Edition, Issue 11* (June 2016) .......................................................................12

CFPB, *Supervisory Highlights: Issue 18* (Mar. 2019) ...........................................12

CFPB, *Supervisory Highlights: Junk Fees Special Edition: Issue 29* (Winter 2023) ...........................................................................12

CFPB, *Supervisory Highlights: Issue 30* (Summer 2023) ......................................12

CFPB, *Supervisory Highlights: Issue 33* (Spring 2024) .........................................12

CFPB, *What Should I Do When a Debt Collector Contacts Me?* (last modified Aug. 8, 2023) ..........................................................24

CFPB, *Working with Older Adults* (Dec. 4, 2024) ...................................................4

Charlotte Haendler & Rawley Z. Heimer, *The Hidden Costs of Financial Services: Consumer Complaints and Financial Restitution* (Apr. 15, 2025) ...........................................................22

Douglas Gillison & Chris Prentice, *US Consumer Watchdog Sign Comes Down at Washington HQ*, Reuters (Feb. 20, 2025) ........................................6

E. Tammy Kim, *Killing The Military's Consumer Watchdog*, The New Yorker (Mar. 18, 2025) ..........................................................4, 17

Fed. Reserve Bank of N.Y., *Quarterly Report on Household Debt and Credit—2024: Q4* (Feb. 2025) ..............................................................3, 29

Ian Ayres et al., *Skeletons in the Database: An Early Analysis of the CFPB's Consumer Complaints*, 19 Fordham J. Corp. & Fin. L. 343 (2014) ..........................................................21

Jason Richardson & Allyson Emblom, *The CFPB's Consumer Complaint Database Tells a Story About Our Economy We Need to Hear*, Nat'l Cmty. Reinv. Coal. (Apr. 5, 2019) ...............................21

Jilenne Gunther, AARP, *The Scope of Elder Financial Exploitation:
What It Costs Victims* (2023) ........................................................19

Legal Aid Soc'y of San Bernardino,
*Helpful Resources* ......................................................................23

Legal Servs. of Long Island, *New Tool Helps Family Members
Avoid Improper Debt Collection By Nursing Facilities*...............23

Marcus Baram, *With the Destruction of the Consumer Financial
Protection Bureau, Fraud Victim 'Not Hopeful' He'll Be
Refunded*, Capital & Main (Apr. 4, 2025).....................................22

Matt Sedensky, *Consumer Watchdog Agency Called "Vicious"
By Trump Seen As A Hero To Many It Aided*,
L.A. Times (Feb. 18, 2025)............................................................22

Matthew A. Bruckner & Christopher J. Ryan, *The Magic of Fintech?
Insights for a Regulatory Agency From Analyzing
Student Loan Complaints Filed with the CFPB*,
127 Dick. L. Rev. 49 (2022) ..........................................................21

Nat'l Ass'n of Federally-Insured Credit Unions, Comment Letter on
Proposed Rulemaking on the "Role of Supervisory Guidance"
(Dec. 30, 2020)...............................................................................12

Nat'l Veterans Tech. Assistance Ctr., *Research Roundup: The Financial
Impact of Military Service*...............................................................16

Ron Lieber, *Where Military Paychecks are Prime Targets*, N.Y. Times
(June 22, 2023)...........................................................................4, 17

Ryan Bubb & Prasad Krishnamurthy, *Regulating Against Bubbles:
How Mortgage Regulation Can Keep Main Street and Wall Street Safe—
From Themselves*, 163 U. Pa. L. Rev. 1539 (2015)......................13

Steven M. Graves & Christopher L. Peterson, *Predatory Lending and the
Military: The Law and Geography of "Payday" Loans in
Military Towns*, 66 Ohio St. L.J. 653 (2005) ..........................16, 17

U.S. Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (Aug. 9, 2006) ......................................................................4, 16, 17

U.S. Dep't of Def., *Report on the Military Lending Act and the Effects of High Interest Rates on Readiness* (2021).....................................17

Yiwei Dou et al., *Learning from Peers: Evidence from Disclosure of Consumer Complaints*, 77 J. Acct. & Econ. 101620 (2024)........................21

# **GLOSSARY**

CFPB        Consumer Financial Protection Bureau

CFSA        Community Financial Services Association of America

DOD         United States Department of Defense

NTEU        National Treasury Employees Union

VA          United States Department of Veterans Affairs

## INTEREST OF AMICI CURIAE[1]

Amici curiae are 42 nonprofit state, local, and national organizations located in 18 states and the District of Columbia that rely on the Consumer Financial Protection Bureau (CFPB). Amici include organizations that serve populations at particular risk of fraud and deception in the lending market—populations that the CFPB is required by statute to assist. Others provide input into, and benefit every day from, generally applicable CFPB rulemakings and guidance. Still others rely on CFPB materials to support their clients. Together, these organizations hold a collective interest in the continued viability of the CFPB as Congress established it in the Dodd-Frank Act.

The array of amici curiae submitting this brief—from organizations dedicated to serving veterans and older Americans to those focused on housing, from providers of free legal services to advocates working in state legislatures—are particularly well suited to articulate the interests of the myriad sectors of the American population that benefit from the CFPB's work and suffer the consequences of Defendants' decision to dismantle the Bureau without lawful authority.

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than amici curiae, their members, and their counsel made a monetary contribution to the preparation or submission of this brief. Fed. R. App. P. 29(a). All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"[T]his is a case about one branch of government arrogating to itself power belonging to another." *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

An acting agency director arrogated to himself the authority to shut down the Consumer Financial Protection Bureau (CFPB), a congressionally established administrative agency that for a decade and a half has protected Americans' access to "fair, transparent, and competitive" financial markets. 12 U.S.C. § 5511(a). Over just a few days, Defendants halted all of the Bureau's enforcement, supervisory, educational, and regulatory activities and planned to fire its staff. The district court, recognizing an unprecedented and unconstitutional violation of the separation of powers, wisely pressed pause on this administrative power grab.

The substantial harms to Americans and the national economy from Defendants' unconstitutional closure plan strongly support district court's injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (requiring an injunction to be in the public interest and the balance of equities in favor of the plaintiff); *Gordon v. Holder*, 721 F.3d 638, 643-44 (D.C. Cir. 2013). Elimination of the Bureau would threaten widespread economic disruption and burden the hundreds of millions of Americans who collectively hold $18 trillion in household

2

debt[2] and depend on the Bureau's active oversight and protection. *See Winter*, 555 U.S. at 25 (requiring "particular regard for the public consequences" of an injunction).

By multiple measures, the public interest weighs in favor of the Bureau's continued existence. For instance, the Bureau performs an essential role in monitoring the consumer financial sector and enforcing federal law. Yet these statutory responsibilities cannot be performed if the agency is shuttered. Closure of the Bureau means it cannot conduct investigations, secure restitution payments for harmed consumers, and achieve accountability for predatory financial actors. Dismantling the CFPB further risks upsetting the financial system as a whole—a risk that mortgage lenders, credit unions, farmers, financial scholars, and nonprofit groups all warned about in recent U.S. Supreme Court litigation rejecting a challenge to the Bureau's funding structure.[3] Eliminating the CFPB, the Court

---

[2] *See* Fed. Reserve Bank of N.Y., *Quarterly Report on Household Debt and Credit—2024: Q4* (Feb. 2025), https://perma.cc/B8U6-DBVD (aggregating mortgage, student, automobile, credit card, and other forms of household debt).

[3] *See* Brief of Mortg. Bankers Ass'n et al. as Amici Curiae, *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.* (*CFSA*), No. 22-448 (U.S. May 15, 2023), https://perma.cc/Z2H4-MYXH  (mortgage lenders); Brief of Comm. Dev. Fin. Insts. & Credit Unions et al. as Amici Curiae, *CFSA*, https://perma.cc/3Q5L-MN74 (credit unions); Brief of Farm Action et al. as Amici Curiae, *CFSA*, https://perma.cc/DB3C-CDXN (farmers); Brief of Amici Curiae Fin. Regulation Scholars, *CFSA*, https://perma.cc/5HMM-H9KT; Brief of 90 State & Local Nonprofit Orgs. as Amici Curiae, https://perma.cc/P69W-MJW8.

observed separately, "would trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena." *Seila Law LLC v. CFPB*, 591 U.S. 197, 236-37 (2020).

Moreover, the consequences would be particularly severe for those populations that are disproportionately targeted with unfair and deceptive practices and that the Dodd-Frank Act expressly protects—servicemembers, veterans, and older adults. Congress structured the Bureau to address these risks, requiring the Bureau to create specialized offices to serve these groups. 12 U.S.C. § 5493(e), (g).[4] For example, predatory lenders routinely ensnare military members in high-cost loan traps that can cause financial instability, thus hindering their overall readiness to serve and placing the nation's security at risk.[5] Shutting down the CFPB would vitiate Congress's command that the CFPB perform these statutorily mandated duties to protect American servicemembers from financial abuse.

---

[4] *See also* CFPB, *Financial Resources for Serving Servicemembers, Veterans, and Military Families* (Jan. 3, 2025), https://perma.cc/9VVZ-D2YG (providing educational tools and describing enforcement actions taken); CFPB, *Working with Older Adults* (Dec. 4, 2024), https://perma.cc/VJ3R-2WYG (same).

[5] *See* E. Tammy Kim, *Killing The Military's Consumer Watchdog*, The New Yorker (Mar. 18, 2025), https://perma.cc/KZ8S-QMPR; Ron Lieber, *Where Military Paychecks are Prime Targets*, N.Y. Times (June 22, 2023), https://tinyurl.com/4vehazzn; U.S. Dep't of Def. (DOD), *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* 10-22 (Aug. 9, 2006), https://perma.cc/2848-GA97 (hereafter DOD Rep.).

Likewise, without the vigilance of the Bureau, older Americans who rely on the Bureau are at heightened risk of falling prey to hucksters who take advantage of seniors' often precarious financial situations and are less likely to obtain relief without the Bureau's investigations and enforcement.

Finally, Defendants' shuttering of the CFPB compromises the Bureau's ability to respond to consumers who are targeted upon by predatory lenders, monitor markets for harmful products and practices, and to educate the public about dangerous financial products. Without a CFPB, consumers and their advocates lose critical tools like the public complaint process and database, educational initiatives, and informal resolution mechanisms that support the Bureau's work on behalf of consumers with limited resources. These losses pose grave harm to the public interest that only a preliminary injunction can forestall.

Meanwhile, Defendants offer no meaningful argument that eliminating the CFPB serves the public interest. *See* App. Br. at 6-7, 58-64. Instead, they attempt to dismiss the Plaintiffs' case as resting on a "single mistaken premise: that defendants plan to close the Bureau and thus prevent it from performing its statutory duties." App. Br. at 2. But that premise is not "mistaken." Their own affidavits state that they barred employees from entering the building, terminated contracts, relinquished funding, and instigated mass layoffs. A155-A168. They

even scraped the congressionally authorized seal from the Bureau's headquarters,

12 U.S.C. § 5492(a)(5):



Douglas Gillison & Chris Prentice, *US Consumer Watchdog Sign Comes Down at*

*Washington HQ*, Reuters (Feb. 20, 2025).[6] In fact, as the district court found,

Defendants deliberately orchestrated a plan "to shut the agency down entirely and

to do it fast." *Nat'l Treasury Emps. Union v. Vought* (*NTEU*), No. 25-0381, 2025

WL 942772, at *1 (D.D.C. Mar. 28, 2025).

    The balance of the equities thus leans heavily toward Plaintiffs and

maintaining the preliminary injunction. On the one side is the preservation of the

federal agency that Congress and the President created to protect American

consumers from the kinds of deceptive practices that caused the 2008 financial

---

[6] Available at https://tinyurl.com/3e5nzcya.

crisis—a catastrophe from which many Americans are still recovering. On the other side lie only Defendants' vague concerns about the preliminary injunction's potential harm to the government. Yet an unconstitutional power grab carries no weight in the balance-of-equities analysis. There is no public interest in permitting an executive agency to make policy decisions that properly belong to Congress alone. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("Congress intends to make major policy decisions itself, not leave those decisions to agencies" (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc))). Nor is there a valid interest in executing a plan that violates the separation of powers. Neither the Dodd-Frank Act nor any other source of federal law gives Defendants the authority to shutter a congressionally constituted agency without Congress's involvement and to render that agency incapable of fulfilling its statutory mandates.

This Court should treat Defendants' actions as what they were: a unilateral attempt by the executive branch to delete the nation's top consumer financial watchdog. The overwhelming harms that would befall ordinary Americans who engage in the consumer financial marketplace daily are too great to permit Defendants to carry out their plan.

The district court's order granting a preliminary injunction should be affirmed.

# ARGUMENT

When Congress created the CFPB in the wake of the 2008 financial crisis, it "vest[ed] the Bureau with sweeping authority," *CFPB v. CFSA*, 601 U.S. 416, 422 (2024), to ensure access to "fair, transparent, and competitive" financial markets for "all consumers." 12 U.S.C. § 5511 (delineating five objectives and six primary functions of the Bureau). To prevent future collapses, lawmakers vested the Bureau with broad supervisory, regulatory, and enforcement powers to oversee the nation's vast consumer financial market and maintain a fair and stable financial system. *See* 12 U.S.C. § 5491(a) (enabling the CFPB to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws"); *id.* §§ 5514-5515, 5561-5566; *see also* H.R. Rep. No. 111-157, at 874 (June 29, 2010) (Conf. Rep.) (stating that Congress intended the CFPB to "have the authority and accountability to ensure that existing consumer protection laws and regulations are comprehensive, fair, and vigorously enforced"). In addition to these general powers, Congress imposed numerous statutory obligations, such as regulating home mortgage disclosures, 12 U.S.C. § 2804; operating specialized offices, including an Office of Financial Education, *id.* § 5493(d)(1); and submitting regular reports to Congress, *id.* § 5535(d).

In the course of just a few days, however, Defendants shattered this carefully constructed framework. The public interest weighs heavily in favor of enjoining

their plan, maintaining the status quo, and preserving a congressionally mandated agency. *See Goodluck v. Biden*, 104 F.4th 920, 926 (D.C. Cir. 2024) (observing that "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation" (quoting *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001))).

The overwhelming harms to the American public vastly outweigh any of Defendants' vague references to administrative streamlining. *See Winter*, 555 U.S. at 24 (noting courts evaluating a preliminary injunction must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief"). Defendants cannot credibly assert any public interest in sustaining unconstitutional actions. As the Supreme Court recognized nearly two centuries ago, "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the Constitution, and entirely inadmissible." *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838).

## I.     THE PRELIMINARY INJUNCTION IS NECESSARY TO PRESERVE THE CFPB IN ORDER TO PROTECT AMERICANS' FINANCIAL HEALTH AND SAFEGUARD THE ECONOMY.

The interests of American consumers who engage daily in the multitrillion-dollar consumer financial market counsel in favor of maintaining a functioning

CFPB that can perform its statutory responsibilities. *See Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (explaining that "[t]he public interest mostly concerns the injunction's impact on nonparties"); *TD Bank N.A. v. Hill*, 928 F.3d 259, 284 (3d Cir. 2019) ("To determine where the public interest lies, a court should weigh the advantages and disadvantages to the public."). The public benefits enormously from the CFPB's work detecting and preventing the predatory lending, consumer fraud, and deceptive practices that precipitated the Great Recession. *CFSA*, 601 U.S. at 421-22. Attempts to dismantle the Bureau and eliminate its statutory functions—from supervising lenders' compliance with federal law, to protecting specified populations, and responding to day-to-day fraud on consumers—put the nation's consumer economy at risk. The district court properly considered these interests and enjoined Defendants' brazen attempt to extinguish a congressionally authorized agency.

### A.     The Public Interest Favors Maintaining The CFPB's Administration Of Laws To Protect The Financial Wellbeing Of All Americans.

The public interest in preserving a "fair, transparent, and competitive" consumer financial marketplace, 12 U.S.C. § 5511(a), weighs heavily in favor of halting Defendants' plans to close the CFPB. Congress established the Bureau

as the country was reeling from reckless financial practices in the mortgage market

that "wiped out over $10 trillion in American household wealth and cost millions

of Americans their jobs, their retirements, and their homes." *Seila*, 591 U.S. at 205.

Congress tasked the Bureau not just with enforcing existing consumer protection

laws, but also with proactively supervising the financial industry, identifying risks,

and coordinating across agencies to safeguard consumers. 12 U.S.C. § 5511.

The Bureau performs essential supervisory functions that help ensure

financial firms' compliance with federal consumer financial laws and promote a

stable and functioning financial sector. 12 U.S.C. § 5511(c)(4). Intended to avert

future economic calamities, this examination authority is a frontline method for

identifying abusive market practices, deterring noncompliance, and quietly

resolving emerging risks before they metastasize.[7] But effective examinations

require a functioning agency.

The CFPB shares the results of their examinations with industry actors to

guide compliance and promote consistency and predictability. *See* 12 U.S.C. §

5514(b)(1) (requiring such reporting for consumer risk assessment and

---

[7] *See also* Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*, 32 Rev. Banking & Fin. L. 321, 355-56 (2013) ("The examination process is a critical way for the CFPB to gather intelligence about market practices, to learn where regulatory problems lie, and to informally communicate concerns to regulated entities.").

compliance).[8] The Bureau's *Supervisory Highlights* regularly flag problematic industry trends, including continuing deficiencies in mortgage servicing loss mitigation and payment handling.[9] Businesses rely on this guidance to shape internal compliance programs and avoid liability.[10]

This is especially true for the housing market—the sector that nearly sank the world economy during the Great Recession. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 154 (2d Cir. 2017) (crediting evidence that "shoddy mortgage-loan origination practices . . . contributed to the housing

---

[8] *See, e.g.*, CFPB, *Supervisory Highlights* (last modified Apr. 25, 2025), https://perma.cc/EFX3-T82R (purpose of sharing examination findings is to advise financial institutions about industry trends "to limit risks to consumers and comply with federal consumer financial law").

[9] *See, e.g.*, CFPB, *Supervisory Highlights: Issue 33* (Spring 2024), https://perma.cc/HWQ3-6WEH; CFPB, *Supervisory Highlights: Issue 30*, at 21-25 (Summer 2023), https://perma.cc/HWQ3-6WEH; CFPB, *Supervisory Highlights: Junk Fees Special Edition: Issue 29*, at 9-12 (Winter 2023), https://perma.cc/HWQ3-6WEH; CFPB, *Supervisory Highlights: Mortgage Servicing Special Edition, Issue 11* (June 2016), https://perma.cc/HWQ3-6WEH. In March 2019, for example, the Bureau identified mortgage servicers charging consumers unauthorized amounts, misrepresenting private mortgage insurance cancellation denial reasons, failing to exercise reasonable diligence in completing loss mitigation applications, and sending insufficient notices to successors-in-interest of home equity mortgages. CFPB, *Supervisory Highlights: Issue 18*, at 6-10 (Mar. 2019), https://perma.cc/64ZM-H85B.

[10] *See, e.g.*, Nat'l Ass'n of Federally-Insured Credit Unions, Comment Letter on Proposed Rulemaking on the "Role of Supervisory Guidance" (Dec. 30, 2020), https://perma.cc/VM4E-GA8A ("Supervisory guidance plays a critical role in assisting credit unions to shape their practices, policies, and procedures. Transparent guidance serves as a valuable resource to provide a more consistent supervisory approach.").

bubble that created the 2008 financial crisis").[11] CFPB rules "are now baked into the daily functioning of the mortgage industry," along with compliance programs that "ensure adherence of the CFPB's rules for loan origination and servicing" and "mandatory disclosures and business operation regulations for transparency and consistency."[12] Industry leaders fear that ending the Bureau's essential work could cause the mortgage market to "grind to a halt," and "chaos would ensue."[13] The deftness with which the Bureau operates is notable: after Congress adopted a new federal holiday in 2021 with little lead time, for example, the CFPB swiftly issued interpretive guidance to mortgage lenders to prevent a shutdown of the loan disclosure process.[14] This sort of responsive expertise cannot be replicated if the agency is closed.

---

[11] *See also* Ryan Bubb & Prasad Krishnamurthy, *Regulating Against Bubbles: How Mortgage Regulation Can Keep Main Street and Wall Street Safe—From Themselves*, 163 U. Pa. L. Rev. 1539, 1555-62 (2015) ("It is no exaggeration to say that had there not been a bubble in the housing market, there would not have been a financial crisis or indeed any recession approaching the severity of the Great Recession.").

[12] Amicus Brief of Mortg. Bankers at 6, *CFPB v. CFSA*, *supra* note 3.

[13] *Id.* at 11-12.

[14] CFPB, *CFPB Issues Interpretive Rule on Certain Mortgage and Disclosure Timing Requirements for the 2021 Juneteenth Federal Holiday* (Aug. 5, 2021), https://perma.cc/7GL7-MKZG; CFPB, S*tatement by CFPB Acting Director Dave Uejio on Impact of the Juneteenth National Independence Day Federal Holiday on Residential Mortgage Closings* (June 18, 2021), https://perma.cc/RV2Y-V4WP.

In addition to supervision, the CFPB enforces a suite of federal consumer protection laws that Congress expressly enacted to protect the health and stability of the national economy. These laws include eighteen federal statutes, enumerated at 12 U.S.C. § 5481, that predate the Dodd-Frank Act. For example, the Fair Credit Reporting Act promotes "fair and accurate credit reporting" given that "[i]naccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681(a)(1). Without public enforcement, these laws are often paper shields. Consumers lose trust, bad actors go unchecked, and the risk of contagion grows.

What's more, the CFPB plays a crucial structural role in the federal financial regulatory system which, in the absence of an adequately staffed Bureau, could suffer from the same gaps in oversight that precipitated the Great Recession.[15] The sheer magnitude and complexity of the U.S. financial system calls for a robust regulatory scheme. In the Dodd-Frank Act, Congress expressly contemplated the CFPB playing a central role to buttress the oversight of the system. Congress transferred core functions from multiple agencies to the Bureau, 12 U.S.C. § 5581, and charged it with coordinating supervision, rulemaking, and enforcement across jurisdictions. *See, e.g.*, *id.* § 5495 (mandating coordination with the Federal Trade

---

[15] Levitin, *supra* note 7, at 330.

Commission, Commodity Futures Trading Commission, and other federal and state agencies); *id.* § 5514(b)(3) (requiring coordination of supervisory activities with federal and state banking regulators). Congress also required the Bureau to regularly submit reports that address no fewer than nine mandatory topics, including summaries of consumer problems in the financial services market and supervisory, enforcement, and regulatory actions taken to address them. *Id.* § 5496(c). These are not bureaucratic formalities; they are how Congress designed financial oversight to function after the 2008 global financial crisis. Without a fully operational CFPB, that entire system would falter.

The Bureau is the linchpin of modern consumer financial protection in the United States. Eliminating the CFPB not only disrupts individual programs but also exposes the American economy to systemic risk. The public interest lies decisively in ensuring that the Bureau can fulfill its statutory mandate.

**B.     The Public Interest Favors the CFPB's Continued Enforcement of Laws Benefiting Critical Segments Of The Population Like Servicemembers, Veterans, And Older Adults.**

Congress also specifically mandated that the Bureau protect so-called "traditionally underserved communities"—including servicemembers and older adults—from financial exploitation. *See* 12 U.S.C. § 5493(b). The public interest

lies overwhelmingly in preserving the functions that Congress enacted to serve these communities.

Congress established dedicated CFPB offices with tailored mandates and institutional expertise—recognizing that those groups are specifically targeted with fraud, deception, and predatory lending schemes, and that they have limited ability to obtain redress through private enforcement,. *See, e.g.*, 12 U.S.C. § 5493(e), (g) (establishing the Offices of Servicemember Affairs and Financial Protection for Older Americans). Closing the Bureau renders these protections illusory and leaves vulnerable populations without a meaningful federal shield.

Take, for example, servicemembers and veterans. The Department of Defense has long recognized that members of the military are uniquely susceptible to financial abuse,[16] and that the transient nature of military service makes servicemembers and veterans prime targets for abusive lending practices and deceptive marketing schemes.[17] Compared to the general population, servicemembers are also disproportionately young, come from lower

---

[16] DOD Rep., *supra* note 5, at 10; *see also* Steven M. Graves & Christopher L. Peterson, *Predatory Lending and the Military: The Law and Geography of "Payday" Loans in Military Towns*, 66 Ohio St. L.J. 653, 659 (2005) (finding "irrefutable geographic evidence demonstrating that payday lenders are actively and aggressively targeting U.S. military personnel").

[17] Nat'l Veterans Tech. Assistance Ctr., *Research Roundup: The Financial Impact of Military Service*, https://perma.cc/8TN6-7NHH.

socioeconomic backgrounds, and are geographically isolated on their bases.[18]
Consequently, aggressive and deceptive lenders routinely target members of the
military with onerous, high-cost loans that can burden them with unmanageable
debt.[19] The resulting financial instability can compromise servicemembers' job
performance, "which undermines military readiness, harms the morale of troops
and their families, and adds to the cost of fielding an all-volunteer fighting force."
*Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 140-41 (4th Cir. 2023)
(Wilkinson, J., dissenting).[20]

The CFPB plays a crucial role in protecting active duty servicemembers and
veterans from unscrupulous lenders and scammers, a role that could not be fulfilled
if Defendants fully implement their plans to destroy the agency.[21] In fact, Congress
created the CFPB's Office of Servicemember Affairs to meet precisely these
challenges; no other federal agency has a comparable mandate. The office handles
complaints, coordinates cross-agency enforcement, and monitors trends in

---

[18] DOD Rep., *supra* note 5, at 10; Graves & Peterson, *supra* note 15, at 675-78.

[19] Lieber, *supra* note 5; DOD Rep., *supra* note 5, 10-11, 45; Graves & Peterson,
*supra* note 15, at 659.

[20] *See also* DOD, *Report on the Military Lending Act and the Effects of High
Interest Rates on Readiness* 14-15 (2021), https://perma.cc/6D5Q-WJ83
(examining the impact on readiness); DOD Rep., *supra* note 5, at 39-43 (offering
servicemember case studies).

[21] *See* Kim, *Killing The Military's Consumer Watchdog*, *supra* note 5.

17

financial harm to military families. Over the past fourteen years military families have submitted more than 400,000 complaints to the CFPB—with a dramatic increase in the past few years—and received $183 million in relief from the CFPB's work..[22] The Bureau has brought multiple enforcement actions under this authority, including several in 2020 against mortgage lenders that advertised Department of Veterans Affairs-backed loans to servicemembers and veterans using deceptive mailers.[23] One such pair of lenders, for example, illegally misrepresented their credit terms and falsely advertised themselves as being affiliated with the VA.[24] The Bureau also recently issued a consent order against Navy Federal Credit Union, which has more than 13 million members with ties to the armed forces, for charging account holders without authorization.[25] The CFPB further partnered with the states of Arkansas and South Carolina to secure a

---

[22] CFPB, Off. of Servicemember Affairs, *The CFPB is Protecting the Military Community and Providing Relief* (May 23, 2024), https://perma.cc/3P3J-ZHJY.

[23] *See, e.g.*, *Low VA Rates, LLC*, CFPB No. 2020-BCFP-0018 (Oct. 26, 2020), https://perma.cc/L23P-L73H; *ClearPath Lending, Inc.*, CFPB No. 2020-BCFP-0015 (Sept. 14, 2020), https://perma.cc/HJ7Z-HBAZ; *Accelerate Mortg.*, CFPB No. 2020-BCFP-0014 (Sept. 4, 2020), https://perma.cc/UC9S-FVLU.

[24] *Prime Choice Funding, Inc.*, CFPB No. 2020-BCFP-0006 (July 24, 2020), https://perma.cc/UC9S-FVLU; *Sovereign Lending Grp.*, CFPB No. 2020-BCFP-0006 (July 24, 2020), https://perma.cc/4PKU-J8QV.

[25] *Navy Fed. Credit Union*, CFPB No. 2024-CFPB-0014 (Nov. 7, 2024), https://perma.cc/9CGZ-NE5L.

judgment against a group of brokers that sold high-interest loans to disabled veterans.[26]

Because it is difficult for private servicemembers to bring these types of cases themselves,[27] the Bureau is often the only federal authority that holds systematic offenders accountable. Shuttering the CFPB, including the Office of Servicemember Affairs, violates both the language of Congress's mandate and Congress's intent.

The same logic applies to Congress's creation of the CFPB's Office for Older Americans. Elder financial abuse—which includes fraud, manipulation, and unauthorized use of seniors' assets—costs victims more than $28 billion annually.[28] Mindful that aggressive lenders routinely prey on senior citizens, Congress gave the CFPB fifteen distinct duties through this office, including

---

[26] Stip. Final J. & Order, *CFPB v. Kern*, No. 20-cv-00786-DCC (D.S.C. Jan. 21, 2021), https://perma.cc/4S58-YE8Z; *see also* CFPB, *Arkansas State AG Settle With Brokers of High Interest Credit Offers* (Aug. 19, 2019), https://perma.cc/PG44-JFBM (action with State of Arkansas against purveyor of high-interest loans to disabled veterans).

[27] *See, e.g.*, *Espin v. Citibank, N.A.*, 126 F.4th 1010, 1019 (4th Cir. 2025) (compelling arbitration of Servicemembers Civil Relief Act claims against lender for overcharging servicemembers after they left active duty); *Louis v. Bluegreen Vacations, Inc.*, No. 22-12217, 2024 WL 2873778 (11th Cir. June 7, 2024) (dismissing for lack of Article III standing suit brought under the Military Lending Act against timeshare for misrepresenting the full cost of a loan and including illegal terms in promissory note to U.S. army private and his wife).

[28] Jilenne Gunther, AARP, *The Scope of Elder Financial Exploitation: What It Costs Victims* 1 (2023), https://perma.cc/Q3Y9-M8KR.

conducting market studies, designing educational materials, and coordinating with state regulators. *See* 12 U.S.C. § 5493(g). None of these functions could meaningfully continue if the Bureau is closed.

### C.    The Public Interest Favors Preserving The CFPB's Ability To Address Emerging Threats To Consumers And The Economy.

Finally, the dismantling of the CFPB would remove the most important watchdog on the beat for ordinary Americans who fall victim to fraudsters and scammers.

Eliminating the CFPB's numerous public outreach and public-facing projects poses a palpable and imminent threat to consumers and their advocates. For example, the CFPB operates a statutorily mandated, unique complaint process and database[29] that helps expose bad actors, resolve individual matters informally and without the expense and delay of litigation, and identify broader trends in the consumer financial marketplace to inform future enforcement. *See* 12 U.S.C. § 5493(b)(3). The portal allows consumers to file complaints directly with the agency, which in almost all cases results in a response from the lender and

---

[29] *See generally* CFPB, *Submit a Complaint About a Financial Product or Service* (last modified Mar. 12, 2025), https://perma.cc/5JW4-BP4S.

resolution within sixty days.[30] The platform's transparency and accessibility make it invaluable to direct service providers, allowing them to identify patterns and practices that they can use to hold bad actors accountable for fraud and deception.[31] Additionally, public access to company responses has created a strong incentive for compliance and informal resolution without litigation—outcomes that benefit both consumers and the financial system as a whole.[32]

The CFPB's complaint process has obtained invaluable resolutions for millions of consumers.[33] One recent study found that companies subject to complaints lodged with the Bureau have returned $1,470 per complaint to

---

[30] *Id.* Of the nearly three million complaints the CFPB forwarded to companies for review in 2024, "[a]pproximately 13% of complaints were closed within the initial response period of 15 days and 98% were closed within the final response period of 60 days." CFPB, *Consumer Response Annual Report: January 1 – December 31, 2024*, at 17 (May 1, 2025), https://perma.cc/UE3K-5SH3.

[31] *See, e.g.*, Matthew A. Bruckner & Christopher J. Ryan, *The Magic of Fintech? Insights for a Regulatory Agency From Analyzing Student Loan Complaints Filed with the CFPB*, 127 Dick. L. Rev. 49 (2022); Jason Richardson & Allyson Emblom, *The CFPB's Consumer Complaint Database Tells a Story About Our Economy We Need to Hear*, Nat'l Cmty. Reinv. Coal. (Apr. 5, 2019), https://perma.cc/KWU4-UA3M; Ian Ayres et al., *Skeletons in the Database: An Early Analysis of the CFPB's Consumer Complaints*, 19 Fordham J. Corp. & Fin. L. 343 (2014).

[32] Yiwei Dou et al., *Learning from Peers: Evidence from Disclosure of Consumer Complaints*, 77 J. Acct. & Econ. 101620 (2024).

[33] CFPB, *Four Million Complaints: More Than Just a Milestone* (Sept. 29, 2023), https://perma.cc/DF84-WGEZ.

consumers over time.[34] The complaint process helped one now-retired teacher in Phoenix stop debt collectors from harassing her 95-year-old father over unpaid medical bills: just one day after she filed a complaint with the CFPB, the calls stopped, and then a week later the case was closed—the debt collectors had been pursuing the wrong man.[35] The complaint process also helped a retired auto dealership manager in Las Vegas stop receiving bills from his mortgage company for local taxes that the lender was supposed to pay,[36] and it provided reimbursement to an elderly couple from rural Virginia who had been scammed out of roughly $45,000 from online payment platforms.[37]

Also, resource-strapped legal services organizations often refer clients to the CFPB's complaint submission portal when the CFPB has superior expertise on an issue, when its enforcement powers are more likely to resolve the matter, or when the legal services provider does not have the resources to provide assistance

---

[34] Charlotte Haendler & Rawley Z. Heimer, *The Hidden Costs of Financial Services: Consumer Complaints and Financial Restitution* 12 (Apr. 15, 2025), https://ssrn.com/abstract=5218602.

[35] Matt Sedensky, *Consumer Watchdog Agency Called "Vicious" By Trump Seen As A Hero To Many It Aided*, L.A. Times (Feb. 18, 2025), https://perma.cc/CQ5N-K94F.

[36] *Id.*

[37] Marcus Baram, *With the Destruction of the Consumer Financial Protection Bureau, Fraud Victim 'Not Hopeful' He'll Be Refunded*, Capital & Main (Apr. 4, 2025), https://perma.cc/UE2M-F494.

itself.[38] One legal aid client in Washington, D.C., for example, had no success

disputing fraudulent charges on his prepaid card, even after his attorneys sent a

demand letter on his behalf. Then he submitted a complaint to the CFPB; the next

day the company credited the money back to his account.[39] The Bureau's work

through the complaint database has resulted in thousands of similar stories.

Likewise, consumer groups rely on the Bureau's materials, trainings, and

enforcement to prepare presentations that inform clients of their legal rights and

steps they can take toward financial security. They also use Bureau resources to

bolster their own investigations into fraudulent practices. For example, over the

last two years at over 100 community events, amicus Tzedek DC has shared

critical tools such as the CFPB's "Your Money, Your Goals" toolkits, information

about rebuilding credit, and how-to resources for when a debt collector calls.[40]

Groups can also point their clients to the Bureau's easy-to-use materials to help

resolve consumer problems informally.[41] For example, the CFPB publishes "debt

---

[38] *See, e.g.*, Legal Aid Soc'y of San Bernardino, *Helpful Resources*, https://perma.cc/LGF4-QVK9 (referring legal aid clients to the CFPB complaint portal); 603 Legal Aid, *Consumer Financial Products & Services: Your Legal Rights Concerning Financial Services and Products*, https://perma.cc/2R95-4X8T (same).

[39] Brief of Tzedek DC as Amicus Curiae at 3, *NTEU v. Vought*, No. 25-381 (D.D.C. Feb. 21, 2025), ECF No. 27-1.

[40] *Id.* at 9-10.

[41] *See, e.g.*, Legal Servs. of Long Island, *New Tool Helps Family Members Avoid Improper Debt Collection By Nursing Facilities*, https://perma.cc/FX27-6VMZ

validation" and "no contact" letter templates for community members facing harassment by debt collectors,[42] as well as sample credit reporting dispute letters.[43] The continued publication and dissemination of these materials will grind to a halt if the agency is closed.

The dismantling of the Bureau jeopardizes the continued accuracy and availability of these invaluable resources. As the district court found based on testimony by CFPB personnel, when Defendants first implemented their planned closure, operations related to the complaint database briefly ceased. *NTEU*, 2025 WL 942772, at *30-31. That short closure left individual consumers without access to or recourse from the complaint resolution process and resulted in a backlog of 16,000 complaints, including complaints that required immediate responses (e.g., home foreclosure). *Id.* If the complaint portal is shut down, millions of Americans will lose what is often the only accessible mechanism for vindicating their statutorily guaranteed consumer protection rights. Similarly, without access to updated, targeted materials, consumer advocates will be forced to turn community members away.

---

(describing CFPB Know Your Rights tools for caregivers of nursing home residents).

[42] CFPB, *What Should I Do When a Debt Collector Contacts Me?* (last modified Aug. 8, 2023), https://perma.cc/9347-FQGZ.

[43] *See* CFPB, *Sample Letters to Dispute Information on a Credit Report* (last modified Oct. 17, 2023), https://perma.cc/RF4A-VZKB.

Defendants' abrupt, chaotic attempt to eliminate the Bureau gravely undermines the CFPB's ability to function as the law requires. The district court's injunction preserves not just an agency, but a set of protections Congress specifically enacted to guard the interests of American consumers and the wider economy. Without it, the legal guarantees Congress wrote into the Dodd-Frank Act will become nothing more than empty promises. That outcome serves no one except the bad actors the Bureau was designed to hold accountable.

## II.    THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF AFFIRMING THE INJUNCTION.

The public interest in issuing and affirming the injunction and preserving the status quo is urgent and compelling. This factor weighs significantly to the side of the Plaintiffs when balancing the equities of issuing an injunction. *See Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (explaining that "[t]he balance of the equities and the public interest merge when, as here, the Government is the opposing party"). On the other side of the ledger, Defendants can muster little more than vague appeals to administrative efficiency. *See* App. Br. at 6, 60. Nor can they justify their extraordinary assertion of unchecked power to close the Bureau, which exceeds not only the statutory limits governing the agency but also the constitutional bounds of executive authority enshrined in the separation of powers. A preliminary injunction is the proper remedy to address this textbook and

25

time-sensitive violation of the Constitution. *See INS v. Chadha*, 462 U.S. 919, 962-63 (1983) (Powell, J., concurring) (noting that "where one branch has impaired or sought to assume a power central to another branch, the Court has not hesitated to enforce the [separation of powers] doctrine").

The government's asserted interest in implementing the unconstitutional closure of a congressionally mandated agency carries no weight. "No power was ever vested in the President to repeal an act of Congress." *The Confiscation Cases*, 87 U.S. 92, 112-13 (1873). After conducting significant factfinding, the district court concluded that the Defendants intended to implement a wholesale elimination of a statutorily mandated agency. *NTEU*, 2025 WL 942772, at *41 (describing the planned shutdown in the context of irreparable harm). That judicial finding obviates any possible interest weighing against an injunction. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."). No public interest supports such blatant disregard for the law.

Crucially, the dismantling of the CFPB without congressional authorization would violate the separation of powers that undergirds the nation's constitutional order. Defendants have arrogated to themselves a power the Constitution flatly

denies them: the power to amend or nullify a duly enacted law without Congress's approval. Such unconstitutional conduct militates in favor of the district court's injunction because "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d at 653.

"Under our system of government, Congress makes laws and the President, acting at times through agencies . . . 'faithfully executes' them." *Util. Air Regulatory Grp. v. EPA*, 572 U.S. 302, 327 (2014) (quoting U.S. Const. art. II, § 3). Congress holds the "exclusive" power to "formulate policies, mandate programs and projects . . . [and] establish their relative priority for the nation"; the Executive Branch is charged with carrying out those policies. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

Here, however, the Executive acted without authority to eliminate an agency created by Congress to regulate the vast and reticulated consumer financial marketplace. *See West Virginia v. EPA*, 597 U.S. at 723 (requiring, based on "separation of powers principles," "clear congressional authorization" to justify assertions of broad administrative power in "extraordinary cases" with "economic and political significance"). The drastic steps Defendants have taken to dismantle the Bureau encroach on the unequivocal ambit of Congress to enact laws like the Dodd-Frank Act establishing agencies and requiring them to perform certain functions. *See Chadha*, 462 U.S. at 963 (Powell, J., concurring) (explaining that

the separation of powers "may be violated when one branch assumes a function that more properly is entrusted to another").

The sudden dismantling of the CFPB implicates precisely the kind of unilateral agency action that raises serious separation of powers concerns. Of course, Presidents may steer the personnel and policy priorities of executive agencies. *See Util. Air*, 573 U.S. at 327 (acknowledging the Executive's "authority and responsibility to resolve some questions left open by Congress that arise during the law's administration"). But they may not, without clear statutory authorization, shut down a congressionally mandated agency.

Nothing in the Dodd-Frank Act authorizes the Executive to unilaterally close down the CFPB. To the contrary, "'the basic and consequential tradeoffs' inherent in [such] a mass . . . program 'are ones that Congress would likely have intended for itself.'" *Biden v. Nebraska*, 600 U.S. at 506 (quoting *West Virginia*, 597 U.S. at 730). The statute's text and structure clearly reflect Congress's intent to ensure the Bureau's durability, independence, and ongoing performance, *see* 12 U.S.C. §§ 5481-5499, not its demise at the hand of the acting Director nor any other executive branch official. Furthermore, "[t]he economic and political significance of the [Defendants'] actions is staggering." *Nebraska*, 600 U.S. at 502. It is

28

difficult to imagine a more consequential domain of federal regulation than the $18 trillion of consumer debt held by U.S. households.[44]

The actions at issue here amount to an effort to accomplish administratively what could not be accomplished legislatively: the dismantling of an agency created to protect millions of American families from financial harm. Defendants' conduct gravely undermines the public interest in a transparent and fair financial system, and it imposes significant harms on the particular constituencies the CFPB must serve—as well as the broader public. Defendants' actions also strike at the heart of the constitutional balance of powers, violating the principle that no branch of government may usurp the core functions of another. In extraordinary times, courts are authorized—indeed, they are required—to intervene to protect the public and restore the balance of power. Here, the financial health of American consumers, and of the American economy, demands no less.

## CONCLUSION

The district court's order granting the preliminary injunction should be affirmed.

---

[44] Fed. Reserve, *supra* note 2.

Dated: May 9, 2025                          Respectfully submitted,


                                            /s/ *Ariel Levinson-Waldman*
Seth E. Mermin                              Ariel Levinson-Waldman
David S. Nahmias                            A.J. Hong-Huber
John Kauffman                               TZEDEK DC
CENTER FOR CONSUMER LAW &                   UDC DAVID A. CLARKE SCHOOL OF LAW
ECONOMIC JUSTICE                            4340 Connecticut Ave. NW, Ste. 345
UC BERKELEY SCHOOL OF LAW                   Washington, D.C. 20008
308 Berkeley Law                            (202) 441-9959
Berkeley, CA 94720-7200                     alw@tzedekdc.org
tmermin@law.berkeley.edu                    ah@tzedekdc.org
dnahmias@law.berkeley.edu
                                            Persis S. Yu
*Counsel for Amici Curiae*                  R.T. Winston Berkman-Breen*
                                            STUDENT BORROWER PROTECTION
                                            CENTER
                                            (A fiscally sponsored project of the
                                            Shared Ascent Fund)
                                            1025 Connecticut Ave NW, #717
                                            Washington, DC 20036
                                            persis@protectborrowers.org
                                            winston@protectborrowers.org

                                            **Not admitted to the Bar of the District*
                                            *of Columbia but admitted to practice*
                                            *law in the state of New York. Practice*
                                            *limited to federal court matters.*

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<div style="margin-left: 50%;">

<u>/s/ Ariel Levinson-Waldman</u>
Ariel Levinson-Waldman
*Counsel for Amici Curiae*

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,412 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. The text is in 14-point Times New Roman type.

<u>/s/ Ariel Levinson-Waldman</u>
Ariel Levinson-Waldman
*Counsel for Amici Curiae*