[ORAL ARGUMENT SCHEDULED FOR MAY 16, 2025]
Nos. 25-5091, 25-5132

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATIONAL TREASURY EMPLOYEES UNION, *et al.*,

*Appellees*,

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer
Financial Protection Bureau, *et al.*,

*Appellants*.

---

*On Appeal from the United States District Court
for the District of Columbia*

---

## BRIEF OF CURRENT AND FORMER MEMBERS OF CONGRESS
## AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE

---

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Anna K. Jessurun
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* are current and former members of Congress who are familiar with the Consumer Financial Protection Bureau (CFPB) and the critical work that it does on behalf of the American people. Indeed, many *amici* participated in the drafting and passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("the Dodd-Frank Act") that established the CFPB and thus can offer a unique perspective on that law and its requirements.

As members of Congress, *amici* also have a strong interest in the separation of powers issues at the heart of this case. As *amici* well know, the Constitution empowers Congress—not the executive—to determine the structure of the federal government, and thus Congress has been creating, restructuring, and even eliminating executive offices, departments, and agencies since the Founding. Conversely, when the executive has sought to eliminate or restructure a department

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici curiae* or their counsel made a monetary contribution to its preparation or submission.

i

or agency, it has asked Congress for the authority to do so, recognizing that it cannot take that action unilaterally.  *Amici* have a strong interest in ensuring that this Court is familiar with this history, and because Congress created the CFPB—and Congress alone has the power to abolish it—*amici* have a strong interest in this case.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.    **PARTIES AND *AMICI***

Except for *amici* Current and Former Members of Congress and any other *amici* who had not yet entered an appearance in this case as of the filing of Appellants' brief, all parties, intervenors, and *amici* appearing in this Court are listed in Appellants' brief.

II.    **RULINGS UNDER REVIEW**

Reference to the ruling under review appears in Appellants' brief.

III.    **RELATED CASES**

Reference to any related cases pending before this Court appears in Appellants' brief.

Dated:  May 9, 2025                /s/ Brianne J. Gorod
                                       Brianne J. Gorod

                                       *Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ iv

GLOSSARY.................................................................................. xi

INTEREST OF *AMICI CURIAE* ................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ............................................................................... 6

    I.    Congress Has the Sole Authority to Create, Restructure, and
        Abolish Federal Departments and Agencies ..................................... 6

    II.   As Historical Practice Demonstrates, When Congress Wants to
        Give the President Reorganization Authority, It Does So Through
        Legislation ....................................................................... 14

    III.  Congress Created the CFPB to Combat the Abuses that Caused the
        Devastating 2008 Financial Crisis, and the President Does Not
        Have the Power to Abolish It. ............................................... 19

CONCLUSION ............................................................................ 28

APPENDIX .................................................................................. 1A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ...................................................................... 3

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ........................................................................ 6

*CFPB v. Cmty. Fin. Servs. Ass'n*,
    601 U.S. 416 (2024) ................................................................... 20

*Free Ent. Fund v. PCAOB*,
    561 U.S. 477 (2010) ................................................................ 2, 6

*INS v. Chadha*,
    462 U.S. 919 (1983) .............................................................. 13, 19

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) ..................................................................... 25

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ................................................................... 10

*Myers v. United States*,
    272 U.S. 52 (1926) ...................................................................... 6

*Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*,
    462 U.S. 810 (1983) ................................................................... 12

*NFIB v. OSHA*,
    595 U.S. 109 (2022) ................................................................. 7, 9

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ................................................................... 13

*The Pocket Veto Case*,
    279 U.S. 655 (1929) ................................................................... 13

*Seila L. LLC v. CFPB*,
    591 U.S. 197 (2020) .......................................................... 5, 19, 26

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ................................................................... 13

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................. 14, 25, 26


CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 1 ....................................................................   3, 6

U.S. Const. art. I, § 7, cl. 2 ...........................................................   13

U.S. Const. art. I, § 8, cl. 18 .........................................................   6

U.S. Const. art. II, § 2, cl. 2 .........................................................   6

U.S. Const. art. II, § 3 ...................................................................   13


STATUTES AND LEGISLATIVE MATERIALS

Act of July 27, 1789, ch. 4, 1 Stat. 28 ..........................................   7, 8

Act of Aug. 7, 1789, ch. 7, 1 Stat. 49 ...........................................   7, 8

Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 .........................................   7

Act of Sept. 11, 1789, ch. 13, 1 Stat. 67 .......................................   8

Act of Sept. 15, 1789, ch. 14, 1 Stat. 68 .......................................   10

Act of Apr. 25, 1812, ch. 68, 2 Stat. 716 .......................................   10

Act of July 4, 1836, ch. 352, 5 Stat. 107 ........................................   10

Act of July 4, 1836, ch. 357, 5 Stat. 117 ........................................   10

Act of Mar. 2, 1849, ch. 108, 9 Stat. 395 .......................................   11

Act of Mar. 3, 1849, ch. 108, 9 Stat. 395 .......................................   8

Act of June 22, 1870, ch. 150, 16 Stat. 162 ...................................   8

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Act of June 30, 1932, Pub. L. No. 72-212, 47 Stat. 382 ............................. 16

Act of Mar. 3, 1933, Pub. L. No. 72-428, tit. IV, 47 Stat. 1489 ................. 16, 17

Act of Oct. 19, 1984, Pub. L. 98-532, 98 Stat. 2705 .................................. 19

Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) .......................... 8

75 Cong. Rec. (1932) .................................................................................. 15

83 Cong. Rec. (1938) .................................................................................. 17

Department of Agriculture Reorganization Act of 1994, Pub. L. No.
 103-354, tit. II, 108 Stat. 3178 ................................................................ 13

Energy Reorganization Act of 1974, Pub. L. No. 93-438,
 88 Stat. 1233 ............................................................................................. 13

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No.
 105-277, div. G, 112 Stat. 2681-761 ....................................................... 12

Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency:
 The Interstate Commerce Commission* (2024) ....................................... 9, 11

Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization
 Authority: History, Recent Initiatives, and Options for Congress*
 (2012) ...................................................................................................... 14, 16-19

H.R. Rep. No. 91-1104 (1970) ................................................................... 11, 12

H.R. Rep. No. 111-367 (2009) .................................................................... 20

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ..... 12

ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 903 (1995) .............. 11

*Perspectives on the Consumer Financial Protection Agency: Hearing
 Before the H. Fin. Servs. Comm.*, 111th Cong. (2009) ........................... 21

Postal Reorganization Act, Pub. L. 91-375, 84 Stat. 719 (1970) .............. 12, 19

Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561 ................... 17, 18

vi

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613 .................. 18

Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 ...................... 18

Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192 ........................................................................................ 19

S. Rep. No. 111-176 (2010) ....................................................... 2, 20-22

5 U.S.C. § 901 .............................................................................. 4, 19

5 U.S.C. § 902 .............................................................................. 4, 19

5 U.S.C. § 903 .............................................................................. 4, 19

5 U.S.C. § 904 .............................................................................. 4, 19

5 U.S.C. § 905 .............................................................................. 4, 19

5 U.S.C. § 906 .............................................................................. 4, 19

5 U.S.C. § 907 .............................................................................. 4, 19

5 U.S.C. § 908 .............................................................................. 4, 19

5 U.S.C. § 909 .............................................................................. 4, 19

5 U.S.C. § 910 .............................................................................. 4, 19

5 U.S.C. § 911 .............................................................................. 4, 19

5 U.S.C. § 912 .............................................................................. 4, 19

6 U.S.C. § 111 ................................................................................... 9

12 U.S.C. § 5491 ............................................................................... 25

12 U.S.C. § 5493 ..................................................................... 22, 23, 26

12 U.S.C. § 5511 ......................................................................... 20, 27

12 U.S.C. § 5514 ........................................................................... 5, 23

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

12 U.S.C. § 5515 ............................................................... 5, 23

12 U.S.C. § 5531 ............................................................... 23

12 U.S.C. § 5535 ............................................................... 23

12 U.S.C. § 5561 ............................................................... 27

12 U.S.C. § 5562 ............................................................... 23, 27

12 U.S.C. § 5563 ............................................................... 23, 27

12 U.S.C. § 5564 ............................................................... 27

12 U.S.C. § 5565 ............................................................... 27

12 U.S.C. § 5566 ............................................................... 27

12 U.S.C. § 5567 ............................................................... 27

12 U.S.C. § 5581 ............................................................... 2, 22

12 U.S.C. § 5584 ............................................................... 22

15 U.S.C. § 1646 ............................................................... 26

20 U.S.C. § 3411 ............................................................... 9

20 U.S.C. § 3441 ............................................................... 15

20 U.S.C. § 3508 ............................................................... 15

21 U.S.C. § 393 ............................................................... 9

42 U.S.C. § 901 ............................................................... 9

51 U.S.C. § 20111 ............................................................... 9

## EXECUTIVE BRANCH MATERIALS

Bank of America, N.A., CFPB No. 2023-CFPB-0007 (July 11, 2023) ..... 24

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

CFPB, *Financial Report of the Consumer Financial Protection Bureau: Fiscal Year 2024* (Nov. 14, 2024)................................................... 24

Exec. Order No. 13,781, 82 Fed. Reg. 13959 (Mar. 14, 2017) ................ 19

Executive Office of the President, *Delivering Government Solutions in the 21st Century* (2018)........................................................... 19

76 Fed. Reg. 43569 (July 21, 2011)............................................. 2, 22

Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631 .................................. 15

Reorganization Plan No. 3 of 1970, *in* 84 Stat. 2086 ............................... 15

Reorganization Plan No. 3 of 1978, *in* 92 Stat. 3788 ............................... 15

Statement About Congressional Action on Reorganization of the Executive Branch (Feb. 24, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* (U.S. Gov't Printing Off., Wash. 1977) .......... 15

Statement About Signing the "Economy Act" (June 30, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* (U.S. Gov't Printing Off., Wash. 1977) ................................................. 16

T.D. Bank, N.A., BCFP No. 2020-BCFP-0007 (Aug. 20, 2020)............... 24

### BOOKS, ARTICLES, AND OTHER AUTHORITIES

Susan Block-Lieb, *Accountability and the Bureau of Consumer Financial Protection*, 7 Brook. J. Corp. Fin. & Com. L. 25 (2012)........................................... 21

CFPB, *CFPB Bans Navient from Federal Student Loan Servicing and Orders the Company to Pay $120 Million for Wide-Ranging Student Lending Failures* (Sept. 12, 2024), https://perma.cc/G2ES-PPEL......... 25

CFPB, *Equifax, Inc.* (July 22, 2019), https://perma.cc/FSP3-5839............ 24

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Paul Stephen Dempsey, *The Rise and Fall of the Interstate Commerce
  Commission: The Tortuous Path from Regulation to Deregulation of
  America's Infrastructure*,
  95 Marq. L. Rev. 1151 (2012) .................................................................. 9, 11

*Fed's Powell: No Agency Other than CFPB Tasked with Consumer
  Protection Enforcement*, Reuters, Feb. 11, 2025, www.reuters.com/
  world/us/feds-powell-no-agency-other-than-cfpb-tasked-with-consumer-
  protection-2025-02-11/ ........................................................................... 5

Robert L. Rabin, *Federal Regulation in Historical Perspective*,
  38 Stan. L. Rev. 1189 (1986) ................................................................. 8, 9

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ....... 7

# GLOSSARY

CFPB        Consumer Financial Protection Bureau

EPA         Environmental Protection Agency

FCC         Federal Communications Commission

FEMA        Federal Emergency Management Agency

GLO         General Land Office

HEW         Department of Health, Education, and Welfare

HHS         Department of Health and Human Services

ICC         Interstate Commerce Commission

NASA        National Aeronautics and Space Administration

NFIB        National Federation of Independent Business

NLRB        National Labor Relations Board

OSHA        Occupational Safety and Health Administration

PCAOB       Public Company Accounting Oversight Board

## INTEREST OF *AMICI CURIAE*

*Amici* are current and former members of Congress who are familiar with the Consumer Financial Protection Bureau (CFPB) and the critical work that it does for the American people.  Indeed, many *amici* participated in the drafting and passage of the Dodd-Frank Act that established the CFPB.  Having studied the financial crisis of 2008, its causes, and its consequences for the American people, they understand the importance of having an agency with the centralized authority necessary to protect America's consumers.  *Amici* have a strong interest in the continued existence of the CFPB and its ability to perform its statutorily mandated responsibilities.

As members of Congress, *amici* also have a strong interest in the separation of powers issues at the heart of this case.  The Constitution empowers Congress— not the executive—to determine the structure of the federal government, and thus Congress has been creating, restructuring, and eliminating executive offices, departments, and agencies since the Founding.  Conversely, in the past, when the executive has sought to eliminate or restructure a department or agency, it has always asked Congress for the authority to do so.  Because Congress created the CFPB—and Congress alone has the power to abolish it—*amici* have a strong interest in this case.

A full listing of *amici* appears in the Appendix.

# INTRODUCTION
# AND SUMMARY OF ARGUMENT

When Congress establishes an agency, that agency is required by law to exist.  Only Congress—not the President—has "plenary control over the . . . existence of executive offices."  *Free Ent. Fund v. PCAOB*, 561 U.S. 477, 500 (2010).  Thus, any action to create, restructure, or eliminate a federal agency must stem from an act of Congress.

Congress exercised this power when it created the CFPB.  In 2010, Congress passed the Dodd-Frank Act in response to the 2008 recession—a crisis that "shattered" lives, "shuttered" businesses, "evaporated" savings, and caused millions of families to lose their homes.  S. Rep. No. 111-176, at 39 (2010).  After extensively studying the crisis, Congress determined that the fragmented manner in which authority was apportioned among federal agencies led to government delay in responding to the mortgage abuses that precipitated the crisis.

To solve this problem, Congress established the CFPB, an agency with the sole mission of protecting Americans from harmful practices of the financial services industry.  Congress consolidated federal consumer-protection responsibilities in a single agency, transferring "consumer financial protection functions" from seven existing agencies to the CFPB, 12 U.S.C. § 5581; 76 Fed. Reg. 43569, 43569 (July 21, 2011).  Since its creation, the CFPB has successfully

2

protected consumers from unfair and predatory practices in the financial services industry.

Yet Appellants now seek to effectively shutter the Bureau.  After all, wherever the precise line may be between the sorts of routine changes in policies and priorities that occur from one administration to another and the evisceration of an agency's ability to perform its statutory mandates, Appellants have crossed it: "firing all probationary and term-limited employees without cause, cutting off funding, terminating contracts, closing all of the offices, and implementing a reduction in force . . . that would cover everyone else."  JA634.  Appellants' actions infringe on Congress's legislative powers and in so doing violate the Constitution's separation of powers, the "structural protections against abuse of power [that are] critical to preserving liberty."  *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).  As longstanding historical practice confirms, the authority to abolish or fundamentally restructure the CFPB through a drastic downsizing of the agency lies exclusively with Congress through the lawmaking process prescribed by Article I.

The Constitution vests "[a]ll legislative Powers" in Congress, U.S. Const. art. I, § 1, and with these powers, Congress has created, restructured, and eliminated executive departments and agencies since the Founding.  Among Congress's first statutes were those creating the Departments of Treasury, War,

3

and Foreign Affairs.  As the nation grew and faced new challenges, Congress

established different departments, agencies, and offices to address them.  And in

response to changing conditions, Congress has at times reorganized, downsized,

and eliminated executive agencies.  Critically, all of these actions to restructure the

executive branch have been accomplished through legislation passed by Congress

and signed into law by the President.

Congress's exclusive power to reorganize the executive branch is

underscored by the fact that when Presidents have reorganized the executive

branch, they have always done so pursuant to congressional delegations of that

power—delegations made through legislation and subject to appropriate restraints.

Throughout the twentieth century, Congress passed statutes called Reorganization

Acts.  *See, e.g.*, 5 U.S.C. §§ 901-12.  These Acts, which always had expiration

dates, authorized the President to make substantial changes to the executive branch

that could not be accomplished through ordinary discretionary actions like

modifying internal operations, managing federal employees, and determining

policy priorities.  These reorganizations ranged from creating and abolishing

certain agencies to consolidating agency statutory functions.  *Id.* § 902(2).  The

history of the Reorganization Acts demonstrates that when Congress wants to give

the President reorganization power, it knows how to do so.  But absent such

authorization, that power remains solely with Congress.

4

The creation of the CFPB following the 2008 financial crisis is a quintessential example of Congress exercising its power over executive offices to provide for the welfare of the American people.  Without the CFPB, there would be no federal regulator charged with making sure that banks comply with the rules protecting consumers from deceptive practices, as Federal Reserve Chair Jerome Powell recently noted.  *Fed's Powell: No Agency Other than CFPB Tasked with Consumer Protection Enforcement*, Reuters (Feb. 11, 2025), www.reuters.com/ world/us/feds-powell-no-agency-other-than-cfpb-tasked-with-consumer-protection-2025-02-11/.  And state regulators cannot fill this gap on their own, particularly given the CFPB's "exclusive authority" to "supervis[e]" our nation's largest banks, savings associations, and credit unions, 12 U.S.C. § 5515(b)(1), not to mention its oversight over non-bank financial institutions like payday lenders and mortgage companies, *id.* § 5514.  Abolishing the CFPB or reducing it in size to the point that it is incapable of fulfilling its statutory mandates would thus not only harm American consumers, but would also "trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena," *Seila L. LLC v. CFPB*, 591 U.S. 197, 237 (2020).

Appellants cite no constitutional or statutory power authorizing their steps toward eliminating the Bureau against Congress's express wishes because there is none.  This Court should affirm the preliminary injunction.

5

## ARGUMENT

I.  **Congress Has the Sole Authority to Create, Restructure, and Abolish Federal Departments and Agencies.**

The Constitution provides that "[a]ll legislative Powers," U.S. Const. art. I, § 1, including "plenary control over the . . . existence of executive offices," *Free Ent. Fund*, 561 U.S. at 500, "shall be vested in a Congress of the United States," U.S. Const. art. I, § 1.  Pursuant to this prerogative, Congress has been creating, restructuring, and eliminating executive offices, departments, and agencies since the Founding.  At the same time, because power over the basic structure of the federal government is Congress's alone, the executive branch cannot unilaterally establish or abolish an executive agency.

**A.**  The Constitution grants Congress the exclusive power to "carr[y] into Execution" not only the "foregoing Powers" under Article I, Section 8, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8, cl. 18.  By referencing the Vesting Clauses of Article II and Article III, this affirmative textual grant of congressional power "undoubtedly" authorizes Congress to pass legislation creating executive departments, agencies, and offices.  *Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *see* U.S. Const. art. II, § 2, cl. 2 (granting Congress the authority to establish offices "by Law"); *Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of

6

offices [and] the determination of their functions and jurisdiction.").  Once the President signs that legislation, it becomes law.  U.S. Const. art. I, § 7, cl. 2. Agencies are thus "creatures of statute," *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam), and Congress has plenary authority over the structure of the federal government.

With that plenary authority comes substantial flexibility.  Indeed, the Framers rejected a plan to delineate in the Constitution the specific departments of the executive branch and their duties, choosing instead to give Congress the power to create those departments through the legislative process.  *See* 2 *Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911).  The First Congress promptly exercised that power, recognizing that executive departments would be essential to a functional government.  Some of the first statutes Congress passed established executive departments, including the Department of Treasury, Act of Sept. 2, 1789, ch. 12, § 1, 1 Stat. 65, 65; the Department of War, Act of Aug. 7, 1789, ch. 7, § 1, 1 Stat. 49, 49-50; and the Department of Foreign Affairs, Act of July 27, 1789, ch. 4, § 1, 1 Stat. 28, 28-29.

To ensure that these departments functioned as envisioned, the First Congress gave some of them specifically delineated responsibilities, while instructing others simply to execute the duties the President assigned them. *Compare* Act of Sept. 2, 1789, § 2, 1 Stat. at 65-66 (requiring the Treasury

Secretary to "digest and prepare plans for the improvement and management of the revenue . . . ; to prepare and report estimates of the public revenue, and the public expenditures . . . and generally to perform all such services relative to . . . finances"), *with* Act of July 27, 1789, § 1, 1 Stat. at 29; *see* Act of Aug. 7, 1789, §1, 1 Stat. at 50 (similar) (authorizing the Secretaries of War and Foreign Affairs to "perform and execute such duties as shall from time to time be enjoined on or intrusted to him by the President"). And whatever the scope of their statutorily designated responsibilities, Congress ensured that these departments could hire the staff they needed to accomplish their work. *See* Act of Sept. 11, 1789, ch. 13, § 2, 1 Stat. 67, 68. Over the next several decades, Congress created additional executive departments to meet the fledgling nation's new needs. *See, e.g.*, Act of Mar. 3, 1849, ch. 108, § 1, 9 Stat. 395, 395 (Interior Department); Act of June 22, 1870, ch. 150, § 1, 16 Stat. 162, 162 (Justice Department).

Congress's power over the structure of the federal government extends beyond the establishment of executive departments to the creation of agencies to address the nation's most pressing problems. In 1887, Congress created the first regulatory agency: the Interstate Commerce Commission (ICC). *See* Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887). Railroads were "central[] . . . to the national economy in the post-Civil War period," Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 Stan. L. Rev. 1189, 1197

(1986), but with this booming industry came considerable challenges, including "[r]uinous rate wars," "price fixing and pooling agreements," and "onerous" working conditions.  Paul Stephen Dempsey, *The Rise and Fall of the Interstate Commerce Commission: The Tortuous Path from Regulation to Deregulation of America's Infrastructure*, 95 Marq. L. Rev. 1151, 1155-56, 1159 (2012).  Because states were unable to address these problems themselves, *see* Rabin, *supra*, at 1206, a national solution was needed.  Congress thus created the ICC to "regulate the rates and practices of the railroads," Dempsey, *supra*, at 1152, which included the power to receive and investigate complaints about rail carriers and issue orders if it found rates to be unjust or unreasonable, *see* Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The Interstate Commerce Commission* 4 (2024) [hereinafter Hogue, *ICC*].

In the years since, Congress has continued to create agencies and departments, including the Department of Education, 20 U.S.C. § 3411; the Department of Homeland Security, 6 U.S.C. § 111(a); the Food and Drug Administration, 21 U.S.C. § 393(a); the Social Security Administration, 42 U.S.C. § 901(a); and the National Aeronautics and Space Administration (NASA), 51 U.S.C. § 20111(a).  The creation of each of these departments and agencies reflected Congress's judgment about the proper means to respond to a unique moment in history, provide a public service, or effectuate a policy.  Each agency's

powers are prescribed by "the authority that Congress has provided" through statute. *NFIB*, 595 U.S. at 665. In other words, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). But once Congress mandates certain functions for an agency, those duties are nondiscretionary.

**B.** Congress also has the power to restructure and abolish federal agencies, including renaming them, subsuming one federal agency or office within another, changing an agency's functions, and eliminating an agency altogether. Congress has exercised this power since its earliest days. *See, e.g.*, Act of Sept. 15, 1789, ch. 14, § 1, 1 Stat. 68, 68 (renaming the "Department of Foreign Affairs" the "Department of State").

In the early nineteenth century, Congress also began creating new offices that were housed within executive departments and reassigning and reorganizing their functions and supervision. *See, e.g.*, Act of Apr. 25, 1812, ch. 68, § 1, 2 Stat. 716, 716 (establishing the General Land Office (GLO) within the Treasury Department); Act of July 4, 1836, ch. 352, §§ 1-5, 5 Stat. 107, 107-11 ("reorganiz[ing]" the GLO); Act of July 4, 1836, ch. 357, § 1, 5 Stat. 117, 117-18 (establishing the Patent Office within the State Department). Later, when Congress created the Interior Department, it transferred the GLO and the Patent Office from their original departments to the new Department and reassigned

certain powers previously exercised by the Secretaries of Treasury, War, and State to the new Secretary of the Interior. *See* Act of Mar. 2, 1849, ch. 108, §§ 2-7, 9 Stat. 395, 395-96.

Even when past Presidents have called for agencies to be abolished, they have always recognized that Congress retains the ultimate power to eliminate agencies and transfer their functions. Consider again the ICC. Beginning in the 1970s, as the importance of railways waned, railroads became less profitable and "regulation . . . took the blame." Dempsey, *supra*, at 1172. In a series of statutes, Congress began limiting the ICC's powers. *See id.* at 1173. Notably, President Reagan pushed to abolish the ICC and proposed legislation to do so, but Congress did not pass it. Hogue, *ICC*, *supra*, at 18. Thus, the ICC remained until 1995, when Congress enacted, and President Clinton signed into law, the ICC Termination Act, Pub. L. No. 104-88, 109 Stat. 903 (1995), transferring the ICC's remaining functions to a newly-created Surface Transportation Board and the Transportation Department, Hogue, *ICC*, *supra*, at 22.

The creation of today's Postal Service is another example of a past President recognizing that the proper means to seek reorganization of the executive branch is by recommending legislation to Congress. In 1970, postal service reform was urgently needed because, at the time, the nation's "vast sprawling postal complex [was] heavily overburdened and in deep trouble," and struggled to "[keep] pace

11

with the advances of the national economy." H.R. Rep. No. 91-1104, at 3652-53 (1970). After extensive negotiations about how to change the postal system, "President Nixon transmitted the proposed legislation to" Congress, *id.* at 3652, and the reorganization was implemented when "Congress enacted the Postal Reorganization Act," Pub. L. 91-375, 84 Stat. 719 (1970). *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 813 (1983). "The Act abolished the Post Office Department, which since 1789 had administered the Nation's mails," and "[i]n its place, . . . established the United States Postal Service as an independent agency." *Id.* (citations omitted).

Congress has reorganized agencies through legislation more recently as well, often to increase efficiency. In 1998, Congress passed the Foreign Affairs Reform and Restructuring Act, Pub. L. No. 105-277, div. G, 112 Stat. 2681-761, to "consolidate and reinvigorate" the United States' foreign affairs functions "by abolishing the United States Arms Control and Disarmament Agency, the United States Information Agency, and the United States International Development Cooperation Agency, and transferring the functions of these agencies to the Department of State." *Id.* § 1102(2), 112 Stat. at 2681-766. When Congress created the Department of Homeland Security in 2002 in response to 9/11, it abolished the Immigration and Naturalization Service and transferred its functions to the new Department through bipartisan legislation. *See* Homeland Security Act

of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified at 6 U.S.C.

§ 291).  Other examples abound.  *See, e.g.*, Department of Agriculture

Reorganization Act of 1994, Pub. L. No. 103-354, tit. II, §§ 202, 211, 108 Stat.

3178, 3209; Energy Reorganization Act of 1974, Pub. L. No. 93-438, §§ 101,

104(a), 88 Stat. 1233.

**C.**  This "[l]ong settled and established practice" of Congress using the

lawmaking process to reorganize or abolish agencies, and receiving due deference

from the President, underscores that the authority to create, restructure, and abolish

federal agencies lies with Congress as the nation's lawmaking body.  *NLRB v. Noel*

*Canning*, 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice" is

entitled to "'great weight in a proper interpretation of constitutional provisions'

regulating the relationship between Congress and the President." (quoting *The*

*Pocket Veto Case*, 279 U.S. 655, 689 (1929))).  That lawmaking process must "be

exercised in accord with [the] single, finely wrought and exhaustively considered,

procedure" of bicameralism and presentment that the Framers selected.  *INS v.*

*Chadha*, 462 U.S. 919, 951 (1983).  Pursuant to that process, the President can

recommend that Congress create an executive agency, *see* U.S. Const. art. II, § 3,

and he can veto a congressional effort to create one, *see id.* art. I, § 7, cl. 2, but he

has no power to create or destroy an agency on his own, for the Constitution

simply "does not confer upon him any power to enact laws or to suspend or repeal

such as the Congress enacts." *United States v. Midwest Oil Co.*, 236 U.S. 459, 505

(1915); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952)

(Jackson, J., concurring) ("The Executive, except for recommendation and veto,

has no legislative power.").  That is why when past Presidents have reorganized or

eliminated agencies through executive action, they have always done so pursuant

to statutory delegations of authority, as the next Section explains.

II.  **As Historical Practice Demonstrates, When Congress Wants to Give the President Reorganization Authority, It Does So Through Legislation.**

From 1932 to 1984, Congress gave the President reorganization authority by

passing and renewing laws known as the Reorganization Acts.  This history

demonstrates that when Congress believes that delegating its reorganization power

to the President will promote efficiency, it knows how to do so while

simultaneously protecting against presidential overreach.

Broadly speaking, the Reorganization Acts authorized the President to

reorganize executive agencies by submitting a Reorganization Plan to Congress.

Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization

Authority: History, Recent Initiatives, and Options for Congress* 1 (2012)

[hereinafter Hogue, *Presidential Reorganization*].  If Congress consented to the

plan (either by inaction or express approval), then the plan became law.  *Id.* at 1-2.

Some of today's major agencies were created by Reorganization Plans.  The

Department of Health, Education, and Welfare (HEW)—predecessor to the

14

Department of Health and Human Services (HHS) and Department of Education—
was established by President Eisenhower through a Reorganization Plan.  *See*
Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631; 20 U.S.C. § 3441 (transferring
the educational functions of the HEW Secretary to the new Education Secretary);
*id.* § 3508 (changing HEW's name to HHS).  The Environmental Protection
Agency (EPA) and the Federal Emergency Management Agency (FEMA) were
similarly created by Reorganization Plans.  *See* Reorganization Plan No. 3 of 1970,
*in* 84 Stat. 2086 (EPA); Reorganization Plan No. 3 of 1978, *in* 92 Stat. 3788
(FEMA).

Congress passed the first iteration of expressly delegated reorganization
authority in 1932 at the urging of President Hoover.  In a statement to Congress on
"[t]he need for reorganization," President Hoover emphasized that the "gradual
growth" of the executive branch had led to "overlapping and waste," and he
believed that "the number of agencies can be reduced."  75 Cong. Rec. 4181
(1932).  He recommended that the "[a]uthority under proper safeguards . . . to
effect these transfers and consolidations" should "be lodged in the President" via
executive orders subject to Congress's review.  *Id.* at 4182; *see* Statement about
Congressional Action on Reorganization of the Executive Branch (Feb. 24, 1932),
*in Public Papers of the Presidents of the United States: Herbert Hoover* 74, 74
(U.S. Gov't Printing Off., Wash. 1977) ("It is a most unpleasant task to abolish

15

boards and bureaus and to consolidate others . . . . [Reorganization] should be lodged with the Executive with the right of Congress to review the actions taken.").

Congress subsequently passed legislation to permit the President to transfer the functions of one agency to another and consolidate the functions of agencies or departments, but it did not allow the President to abolish agencies or departments. *See* An Act of June 30, 1932, Pub. L. No. 72-212, §§ 403, 406, 47 Stat. 382, 413-15.  Hoover lamented this limit on his authority.  *See* Statement About Signing the "Economy Act" (June 30, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover*, *supra*, at 283 ("the bill is so framed as to render abolition or consolidation of the most consequential commissions and bureaus impossible of consummation").

Hoover thus continued to push for the expansion of reorganization authority. Hogue, *Presidential Reorganization*, *supra*, at 7-8.  In 1933, with the Act set to expire in two years, Congress acquiesced in part, amending the Act to allow the President to abolish an executive agency (defined as "any commission, independent establishment, board, bureau, division, service or office in the executive branch of the Government"), but still prohibiting the abolition of an executive department.  *See* Act of Mar. 3, 1933, Pub. L. No. 72-428, tit. IV, §§ 402, 403, 409, 47 Stat. 1489, 1517-19.  Indeed, Congress explained that it was delegating this power to the President on only a temporary basis due to the "serious

16

emergency [that] exists by reason of the general economic depression" and an "imperative to reduce drastically governmental expenditures." *Id.* § 401, 47 Stat. at 1517. President Roosevelt used the power to, among other things, consolidate certain agency functions into newly-designated agencies, and abolish other agencies. *See* Hogue, *Presidential Reorganization*, *supra*, at 9.

In 1937, after the 1933 Act expired, President Roosevelt requested more robust reorganization authority from Congress. *Id.* at 10. One of the proposed bills would have allowed the President to reorganize the executive branch without any involvement from Congress and without an expiration date. *See id.* This proposal sparked sharp rebukes from members of Congress who were concerned about giving away their powers over departments and agencies in such a sweeping fashion. *See, e.g.*, 83 Cong. Rec. 4190 (1938) ("[L]eave final authority for changes in the Congress, where it belongs.") (Sen. Brown); *id.* at 4195 ("If the President could abolish or consolidate these agencies without authority of Congress you may rest assured he would not be here asking for authority. He cannot act [unless] we give him power which belongs to Congress.") (Sen. Borah); *id.* at 4196 ("The powers which are proposed to be given by the bill . . . are yet the greatest legislative powers which exist in the Congress of the United States.") (Sen. Johnson).

17

The next year, Congress passed the Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561, a narrower version of the bills proposed the year before—indeed narrower still than the reorganization authority Congress had granted in 1933.  The purpose of the Act was, among other things, to "increase efficiency of the operations of the Government" and "to abolish such agencies as may not be necessary."  *Id.* § 1(a)(2), (4), 53 Stat. at 561.  The Act permitted the President to reorganize federal agencies and departments through the submission of a Reorganization Plan (rather than executive order) to Congress, which would become law absent a concurrent resolution rejecting the Plan.  *Id.* §§ 4-5, 57 Stat. at 562-63.  This time, however, Congress prohibited the President from creating or abolishing executive departments or abolishing independent agencies in whole or in part.  *See id.* § 3, 57 Stat. at 561-62.  This Act expired in 1941.  *Id.* § 12, 57 Stat. at 564.

Over the ensuing decades, Congress passed additional Reorganization Acts, each with sunset dates, and at times modified the scope of the delegation of its reorganization power.  Hogue, *Presidential Reorganization*, *supra*, at 22; *see, e.g.*, Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613 (prohibiting the President from limiting the independence of an independent agency); Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 (allowing the President to create departments); Reorganization Act of 1977, Pub. L. No. 95-17,

18

91 Stat. 29 (prohibiting the President from creating or abolishing departments or abolishing an independent agency).

Congressionally authorized presidential reorganization power came to an end in the 1980s.  President Reagan requested the authority in 1981, but Congress did not renew the Act until 1984.  *See* Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192 (codified at 5 U.S.C. §§ 901-12).[2]  The 1984 Act expired on December 31, 1984, *see* 5 U.S.C. § 905(b), and since then, the reorganization authority has not been renewed, despite requests from President George W. Bush and President Obama, Hogue, *Presidential Reorganization*, *supra*, at 31-32, 34.  President Trump also sought to reorganize the government during his first term, but his administration conceded that "significant changes will require legislative action."  Executive Office of the President, *Delivering Government Solutions in the 21st Century* 4 (2018); *see also* Exec. Order No. 13,781, 82 Fed. Reg. 13959 (Mar. 13, 2017) (requiring OMB to create a report with reorganization recommendations).

---

[2] In light of the Supreme Court's then-recent decision holding the legislative veto unconstitutional, *Chadha*, 462 U.S. at 959, the 1984 Act required a joint resolution by Congress to approve the plans, *see* 5 U.S.C. § 906(a).  Congress also passed a law to ratify reorganization plans that had become law through the previous procedure.  Act of Oct. 19, 1984, Pub. L. 98-532, 98 Stat. 2705.

### III.    Congress Created the CFPB to Combat the Abuses that Caused the Devastating 2008 Financial Crisis, and the President Does Not Have the Power to Abolish It.

In response to the worst financial crisis since the Great Depression, Congress established the CFPB to "ensur[e] that consumer debt products are safe and transparent." *Seila L.*, 591 U.S. at 202-03. Specifically, Congress "charged the Bureau with enforcing consumer financial protection laws to ensure 'that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.'" *CFPB v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 421 (2024) (quoting 12 U.S.C. § 5511(a)). While Appellants have the authority to shift the Bureau's priorities, they do not have the authority to prevent it from fulfilling its statutory obligations as set out in Dodd-Frank. Appellants' actions are irreconcilable with Congress's mandate that the CFPB must exist and perform these vital functions to protect American consumers.

**A.** In 2008, the nation was plunged into a calamitous financial crisis that destroyed livelihoods and pushed the country to the brink of economic ruin. In response, Congress held more than fifty hearings in which it evaluated the causes of the financial crisis to "assess the types of reforms needed." S. Rep. No. 111-176, at 44. Based on that investigation, Congress concluded that the crisis was largely caused by "a long-standing failure of our regulatory structure to keep pace

20

with the changing financial system," particularly "the proliferation of poorly

underwritten mortgages with abusive terms." *Id.* at 40, 11.

The source of this "spectacular failure . . . to protect average American

homeowners," *id.* at 15, was the fact that consumer financial protection was

"governed by various agencies with different jurisdictions and regulatory

approaches," resulting in a "disparate regulatory system" that did not

"aggressive[ly] enforce[] against abusive and predatory loan products," H.R. Rep.

No. 111-367, pt. 1, at 91 (2009).  This fragmented structure "resulted in finger

pointing among regulators and inaction when problems with consumer products

and services arose."  S. Rep. No. 111-176, at 168; *see Perspectives on the*

*Consumer Financial Protection Agency: Hearing Before the H. Fin. Servs. Comm.*,

111th Cong. 2 (2009) (statement of Chairman Frank) ("I think it is fair to say that

no calluses will be found on the hands of those in the Federal bank regulatory

agencies who had consumer responsibilities.").  Thus, as *amici* came to understand,

a critical problem was how the executive branch's authority to prevent consumer

financial abuses was organized and exercised.  *See* Susan Block-Lieb,

*Accountability and the Bureau of Consumer Financial Protection*, 7 Brook. J.

Corp. Fin. & Com. L. 25, 33 (2012).

To remedy these failures and establish a regulatory framework that could

"respond to the challenges of a 21st century marketplace," S. Rep. No. 111-176, at

21

42, Congress enacted the Dodd-Frank Act. Critical to the Act was the creation of the CFPB, an agency with the sole responsibility of protecting consumers from harmful practices of the financial services industry. Congress believed that by establishing the CFPB and centralizing consumer protection regulation in the Bureau, it could prevent "a recurrence of the same problems" that fostered the financial crisis. *Id.*

With the CFPB, Congress sought to "end[] the fragmentation of the current system" and leave "inter-agency finger pointing in the past." *Id.* at 11, 168. Consistent with its long history of reorganizing agency functions, Congress transferred the "consumer financial protection functions" of seven agencies to the CFPB, *see* 12 U.S.C. § 5581; 76 Fed. Reg. 43569, 43569 (2011), and delineated how the employees responsible for those functions at other agencies would be transferred to the CFPB, *see* 12 U.S.C. § 5584.

Congress also wanted this single agency to be readily equipped and available to respond to American consumers' concerns. Indeed, a major cause of the financial crisis was the failure of existing regulators to use their authority "in a timely way" to address new consumer abuses, S. Rep. No. 111-176, at 17; *see, e.g.*, *id.* at 16-23, and lawmakers viewed this lack of responsiveness as "underscoring the importance of creating a dedicated consumer entity" that could "respond quickly and effectively to these new threats to consumers," *id.* at 18.

22

To effectuate such responsiveness, Congress required the Bureau to have certain offices dedicated to assisting consumers. For example, the CFPB must have a "unit whose functions shall include . . . facilitat[ing] the centralized collection of, monitoring of, and response to consumer complaints." 12 U.S.C. § 5493(b)(3)(A). The CFPB must also "designate a Private Education Loan Ombudsman . . . to provide timely assistance to borrowers of private education loans." *Id.* § 5535(a). And Congress required the CFPB to maintain several offices and units charged with researching and reporting on consumer protection issues, *see id.* § 5493(b)(2); "educat[ing] and empower[ing] consumers," *id.* § 5493(d)(1) (Office of Financial Education); and assisting specific communities, *see, e.g.*, *id.* § 5493(e) (Office of Service Member Affairs); *id.* § 5493(g)(1) (Office of Financial Protection for Older Americans).

Finally, Congress empowered the CFPB with "rulemaking, enforcement, and supervisory authority." JA640. The CFPB can, among other things, issue regulations "identifying as unlawful unfair, deceptive, or abusive acts or practices" connected to "consumer financial product[s] or service[s]," 12 U.S.C. § 5531(b); investigate and take enforcement actions against covered entities for violating consumer protection laws, *see id.* §§ 5562-63; and supervise financial institutions, *see id.* §§ 5514-15.

23

In the fifteen years since its establishment, the CFPB has been wildly successful.  As the district court explained, "[t]o date, the CFPB has returned more than $21 billion improperly taken from at least 205 million consumers, in addition to at least $5 billion in civil penalties made available to compensate consumers in cases where the business that took their money is insolvent."  JA637.

The CFPB has also been remarkably productive and efficient.  In fiscal year 2024, for example, the CFPB successfully resolved 100% of its public enforcement actions, responded to 99% of all consumer complaints within fifteen days (as the Bureau has done consistently for the past five years), and published thirty-two research reports on various topics.  CFPB, *Financial Report of the Consumer Financial Protection Bureau: Fiscal Year 2024*, at 12, 14, 16 (Nov. 14, 2024).

The CFPB has also enforced vital consumer protection laws against major banks to the benefit of American consumers.  For example, Bank of America paid $30 million in civil penalties for, among other things, "appl[ying] for and open[ing] credit cards for consumers without their consent."  Bank of America, N.A., CFPB No. 2023-CFPB-0007 (July 11, 2023).  And T.D. Bank paid $97 million in restitution and $25 million in civil penalties for "failing to obtain consumers' affirmative consent to enroll in [their] overdraft-protection service and subsequently charging those consumers overdraft fees."  T.D. Bank, N.A., BCFP No. 2020-BCFP-0007 (Aug. 20, 2020).

24

The CFPB's supervision of nonbanks has also led to significant enforcement actions.  For example, Equifax agreed to pay $700 million in monetary relief and penalties due to unfair and deceptive practices arising from a data breach "that impacted approximately 147 million consumers."  CFPB, *Equifax, Inc.* (July 22, 2019), https://perma.cc/FSP3-5839.  In addition, after "years of failures and lawbreaking" by Navient, the Bureau banned the company from federal loan servicing and secured $20 million in penalties and $100 million in redress to impacted borrowers.  CFPB, *CFPB Bans Navient from Federal Student Loan Servicing and Orders the Company to Pay $120 Million for Wide-Ranging Student Lending Failures* (Sept. 12, 2024), https://perma.cc/G2ES-PPEL.

In short, Congress created the CFPB to protect consumers from unfair practices and prevent the kind of fraudulent activities in the financial services industry that led to the 2008 crisis.  And that is exactly what the Bureau has done.

**B.**  Appellants' lawless attempt to reduce the Bureau to a hollow shell—incapable as a practical matter of fulfilling its statutory mandates—is flatly inconsistent with Congress's express requirement that the Bureau exist.  *See* 12 U.S.C. § 5491(a).  Like all statutes, Dodd-Frank was enacted through the constitutionally prescribed procedure of bicameralism and presentment.  And Congress has not repealed the statutory provisions establishing the CFPB and directing it to fulfill specific statutory mandates.

Appellants' efforts are thus "incompatible with the expressed or implied will of Congress," meaning Appellants' executive "power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  Without an act of Congress abolishing the CFPB or authorizing the President to do so, Appellants have no power to shutter the Bureau.  To hold otherwise would be to "assert[] a principle, which if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress."  *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 525 (1838); *see Youngstown*, 343 U.S. at 587 ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").

The administration's actions, if allowed to occur, would not just be unconstitutional—they would also be disastrous.  As the Supreme Court has explained, eliminating the CFPB would "trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena."  *Seila L.*, 591 U.S. at 237.  The CFPB currently exercises many functions that no other agency has the authority to exercise, and even where other agencies could, in theory, assume some of these responsibilities, they "do not have the staff or appropriations to absorb the CFPB's 1,500-employee, 500-million-dollar operations," as the Supreme Court has noted.  *Id.*  Thus, critical functions that

26

Congress established the CFPB to carry out will simply not be exercised if Appellants are allowed to accomplish their stated goal of shuttering the Bureau.

Without the CFPB, for example, consumers would have nowhere to turn for timely assistance from the federal government for help confronting unfair practices in the financial services industry. *See* 12 U.S.C. § 5493(b)(3)(A) (mandating the creation of a consumer complaint unit to give that assistance). Without the CFPB, consumers would not have access to the vital information published by the Bureau on consumer financial products and services. *See, e.g.*, 15 U.S.C. §§ 1646(a), (b) (requiring such reports). And without the CFPB, banks and nonbanks' legal violations would go uninvestigated and federal consumer protection laws would be underenforced. *See* 12 U.S.C. §§ 5561-67 (providing for investigations and enforcement). Congress established the CFPB to avoid precisely those results.

\* \* \*

Congress established the CFPB to "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Because the power to abolish executive branch agencies belongs exclusively to Congress, Appellants cannot unilaterally shutter the CFPB or render it incapable of fulfilling its statutory obligations. Allowing them to do so

would not only irreparably harm America's consumers and the national economy,

but also wreak havoc on our constitutional separation of powers.

## CONCLUSION

For the foregoing reasons, this Court should affirm the preliminary

injunction.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Anna K. Jessurun
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

Dated: May 9, 2025

# APPENDIX

List of *Amici*

**Current Members of Congress**

Sen. Elizabeth Warren

Rep. Maxine Waters

Sen. Charles E. Schumer

Rep. Hakeem Jeffries

Sen. Richard J. Durbin

Sen. Amy Klobuchar

Sen. Cory Booker

Sen. Mark Warner

Sen. Bernard Sanders

Sen. Tammy Baldwin

Sen. Catherine Cortez Masto

Sen. Brian Schatz

Sen. Christopher Murphy

Sen. Angela Alsobrooks

Sen. Michael Bennet

Sen. Richard Blumenthal

Sen. Lisa Blunt Rochester

Sen. Maria Cantwell

Sen. Chris Coons

Sen. Tammy Duckworth

Sen. John Fetterman

Sen. Ruben Gallego

Sen. Kirsten Gillibrand

Sen. Maggie Hassan

Sen. Martin Heinrich

Sen. John Hickenlooper

Sen. Mazie Hirono

Sen. Tim Kaine

Sen. Mark Kelly

Sen. Andy Kim

Sen. Ben Ray Luján

Sen. Ed Markey

Sen. Jeffrey A. Merkley

Sen. Patty Murray

Sen. Jon Ossoff

Sen. Alex Padilla

Sen. Gary C. Peters

Sen. Jack Reed

Sen. Jacky Rosen

Sen. Adam B. Schiff

Sen. Jeanne Shaheen

Sen. Elissa Slotkin

Sen. Tina Smith

Sen. Chris Van Hollen

Sen. Raphael Warnock

Sen. Peter Welch

Sen. Sheldon Whitehouse

Sen. Ron Wyden

Rep. Katherine Clark

Rep. Pete Aguilar

Rep. Ted Lieu

Rep. Joe Neguse

Rep. Alma S. Adams, PhD

Rep. Gabe Amo

Rep. Yassamin Ansari

Rep. Jake Auchincloss

Rep. Becca Balint

Rep. Nanette Diaz Barragán

Rep. Joyce Beatty

Rep. Wesley Bell

Rep. Ami Bera

Rep. Donald Beyer

Rep. Sanford Bishop

Rep. Suzanne Bonamici

Rep. Brendan F. Boyle

Rep. Shontel Brown

Rep. Julia Brownley

Rep. Nikki Budzinski

Rep. Janelle Bynum

Rep. Andre Carson

Rep. Troy A. Carter, Sr.

Rep. Ed Case

3A

Rep. Sean Casten

Rep. Kathy Castor

Rep. Joaquin Castro

Rep. Sheila Cherfilus-McCormick

Rep. Judy Chu

Rep. Gilbert R. Cisneros, Jr.

Rep. Yvette Clarke

Rep. Emanuel Cleaver, II

Rep. James Clyburn

Rep. Steve Cohen

Rep. Herb Conaway, Jr., MD

Rep. Gerald E. Connolly

Rep. J. Luis Correa

Rep. Joe Courtney

Rep. Angie Craig

Rep. Jasmine Crockett

Rep. Jason Crow

Rep. Danny K. Davis

Rep. Madeleine Dean

Rep. Diana DeGette

Rep. Rosa L. DeLauro

Rep. Suzan K. DelBene

Rep. Chris Deluzio

Rep. Mark DeSaulnier

Rep. Maxine Dexter

4A

Rep. Debbie Dingell

Rep. Lloyd Doggett

Rep. Sarah Elfreth

Rep. Veronica Escobar

Rep. Adriano Espaillat

Rep. Dwight Evans

Rep. Cleo Fields

Rep. Shomari Figures

Rep. Lizzie Fletcher

Rep. Bill Foster

Rep. Valerie Foushee

Rep. Lois Frankel

Rep, Laura Friedman

Rep. Maxwell Alejandro Frost

Rep. John Garamendi

Rep. Jesús G. "Chuy" García

Rep. Robert Garcia

Rep. Sylvia Garcia

Rep. Daniel Goldman

Rep. Jimmy Gomez

Rep. Vicente Gonzalez

Rep. Maggie Goodlander

Rep. Josh Gottheimer

Rep. Al Green

Rep. Jahana Hayes

5A

Rep. James Himes

Rep. Steven Horsford

Rep. Chrissy Houlahan

Rep. Steny Hoyer

Rep. Jared Huffman

Rep. Glenn F. Ivey

Rep. Jonathan L. Jackson

Rep. Sara Jacobs

Rep. Pramila Jayapal

Rep. Henry C. ("Hank") Johnson, Jr.

Rep. Julie Johnson

Rep. Marcy Kaptur

Rep. William Keating

Rep. Robin L. Kelly

Rep. Timothy M. Kennedy

Rep. Ro Khanna

Rep. Raja Krishnamoorthi

Rep. Greg Landsman

Rep. John B. Larson

Rep. George Latimer

Rep. Summer Lee

Rep. Susie Lee

Rep. Teresa Leger Fernandez

Rep. Mike Levin

Rep. Sam T. Liccardo

6A

Rep. Zoe Lofgren

Rep. Stephen F. Lynch

Rep. Seth Magaziner

Rep. John Mannion

Rep. Doris Matsui

Rep. Sarah McBride

Rep. April McClain Delaney

Rep. Jennifer L. McClellan

Rep. Betty McCollum

Rep. Kristen McDonald Rivet

Rep. Morgan McGarvey

Rep. James P. McGovern

Rep. LaMonica McIver

Rep. Gregory W. Meeks

Rep. Robert J. Menendez

Rep. Grace Meng

Rep. Kweisi Mfume

Rep. Dave Min

Rep. Gwen Moore

Rep. Joseph Morelle

Rep. Kelly Morrison

Rep. Jared Moskowitz

Rep. Seth Moulton

Rep. Frank Mrvan

Rep. Kevin Mullin

7A

Rep. Jerrold Nadler

Rep. Richard Neal

Rep. Donald Norcross

Rep. Eleanor Holmes Norton

Rep. Alexandria Ocasio-Cortez

Rep. Ilhan Omar

Rep. Nancy Pelosi

Rep. Scott Peters

Rep. Brittany Pettersen

Rep. Chellie Pingree

Rep. Mark Pocan

Rep. Nellie Pou

Rep. Ayanna Pressley

Rep. Mike Quigley

Rep. Delia C. Ramirez

Rep. Emily Randall

Rep. Jamie Raskin

Rep. Luz Rivas

Rep. Deborah K. Ross

Rep. Andrea Salinas

Rep. Linda Sanchez

Rep. Mary Gay Scanlon

Rep. Jan Schakowsky

Rep. Bradley Schneider

Rep. David Scott

8A

Rep. Robert C. "Bobby" Scott

Rep. Terri Sewell

Rep. Brad Sherman

Rep. Mikie Sherrill

Rep. Adam Smith

Rep. Melanie Stansbury

Rep. Greg Stanton

Rep. Haley Stevens

Rep. Marilyn Strickland

Rep. Suhas Subramanyam

Rep. Tom Suozzi

Rep. Eric Swalwell

Rep. Emilia Sykes

Rep. Mark Takano

Rep. Shri Thanedar

Rep. Bennie G. Thompson

Rep. Mike Thompson

Rep. Rashida Tlaib

Rep. Jill Tokuda

Rep. Paul D. Tonko

Rep. Norma J. Torres

Rep. Ritchie Torres

Rep. Lori Trahan

Rep. Derek T. Tran

Rep. Juan Vargas

9A

Rep. Nydia M. Velázquez

Rep. Eugene Vindman

Rep. Debbie Wasserman Schultz

Rep. Bonnie Watson Coleman

Rep. Nikema Williams

Rep. Frederica S. Wilson

**Former Members of Congress**

Sen. Chris Dodd

Rep. Barney Frank

Rep. Melvin Watt

Rep. Paul E. Kanjorski

Rep. Brad Miller

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,224 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 9th day of May, 2025.


/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of May, 2025, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: May 9, 2025

/s/ Brianne J. Gorod
Brianne J. Gorod