ORAL ARGUMENT SCHEDULED FOR MAY 16, 2025

Nos. 25-5091, 25-5132

# United States Court of Appeals
# for the District of Columbia Circuit

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees,*

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia (No. 25-cv-00381-ABJ)

**BRIEF FOR NEW YORK, NEW JERSEY, THE DISTRICT OF COLUMBIA, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

MATTHEW J. PLATKIN
 *Attorney General of New Jersey*
DAVID LETT
 *Assistant Attorney General*
CHANEL VAN DYKE
CLAIRE COREA
GRANT RAFFEL
 *Deputy Attorneys General*

124 Halsey Street, 5th Floor
Newark, New Jersey 07101

BRIAN L. SCHWALB
 *Attorney General of District of Columbia*
CAROLINE VAN ZILE
 *Solicitor General*
ASHWIN P. PHATAK
 *Principal Deputy Solicitor General*

400 Sixth Street, NW
Washington, D.C. 20001

LETITIA JAMES
 *Attorney General of New York*
BARBARA D. UNDERWOOD
 *Solicitor General*
ANDREA OSER
 *Deputy Solicitor General*
DUSTIN J. BROCKNER
 *Assistant Solicitor General*
KARUNA B. PATEL
 *Senior Counsel, Economic Justice*
CHRISTIAN REIGSTAD
 *Assistant Attorney General*

The Capitol
Albany, New York 12224
(518) 776-2017

Dated: May 9, 2025

*(Additional counsel on signature pages.)*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to this Court's Rule 28(a)(1), the undersigned counsel of record certifies as follows:

**A. Parties and Amici.** Except for New York, New Jersey, the District of Columbia, Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin, all parties, intervenors, and amici appearing in this Court are listed in the Brief of Appellants, Brief of Current and Former Members of Congress as Amici Curiae in Support of Appellees and Affirmance, the Brief of 42 Nonprofit Veterans, Legal Services, and Consumer Organizations as Amici Curiae in Support of Appellees, and the Brief for Former Consumer Financial Protection Bureau Officials as Amici Curiae in Support of Appellees.

**B. Rulings Under Review.** References to the ruling at issue appear in the Brief for Defendants-Appellants.

**C. Related Cases.** To amici's knowledge, there are no related cases.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

GLOSSARY ................................................................................ix

INTRODUCTION AND INTERESTS OF AMICI CURIAE ...................1

BACKGROUND ...........................................................................2

   A.  Congress Created the CFPB to Fill Significant Gaps in Federal Consumer Protection....................................................2

   B.  The CFPB Has Partnered with the States and Complemented Their Consumer-Protection Work...................8

SUMMARY OF ARGUMENT ....................................................13

ARGUMENT

  Defendants' Plan To Dismantle the CFPB Will Inflict Short- and Long-Term Harm on the States and Their Residents .........................................................................15

   A.  The Loss of the CFPB's Statutorily Mandated Functions Will Harm Consumers and the States' Enforcement Efforts.........................................................17

   B.  The CFPB's Abdication of Its Exclusive Supervisory Authority Over Very Large National Banks Will Disadvantage Consumers. ...................................................23

   C.  The CFPB's Failure to Fulfill Its Statutory Mandates of Supervision and Enforcement in Areas of Historic Collaboration Increases the Burden on States to Protect Consumers.........................................................27

**Page**

CONCLUSION ......................................................................... 34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.,*
   601 U.S. 416 (2024) ................................................................ 4

*CFPB v. Consumer Advocacy Ctr., Inc.,*
   No. 19-cv-01998 (C.D. Cal.) ................................................ 13

*CFPB v. Credit Acceptance Corp.,*
   No. 23-cv-00038 (S.D.N.Y.) ................................................ 10

*CFPB v. Genuine Title, LLC,*
   No. 15-cv-01235 (D. Md.) .................................................... 11

*CFPB v. ITT Educ. Servs., Inc.,*
   No. 14-cv-00292 (S.D. Ind.) ................................................ 12

*CFPB v. JPL Recover Solutions, LLC,*
   No. 20-cv-01217 (W.D.N.Y.) ............................................... 10

*CFPB v. Kern-Fuller,*
   No. 20-cv-00786 (D.S.C.) .................................................... 11

*CFPB v. MoneyGram Int'l Inc.,*
   No. 22-cv-03256 (S.D.N.Y.) ................................................ 10

*CFPB v. NationStar Mortg. LLC,*
   No. 20-cv-03550 (D.D.C.) .................................................... 11

*CFPB v. Navient Corp.,*
   No. 17-cv-00101 (M.D. Pa.) ................................................ 12

*CFPB v. StratFS, LLC,*
   No. 24-cv-00040 (W.D.N.Y.) .......................................... 11, 33

*CFPB v. Wells Fargo Bank, N.A.,*
   No. 15-cv-00179 (D. Md.) .................................................... 11

*Cuomo v. Clearing House Ass'n,*
   557 U.S. 519 (2009) ......................................................... 7, 25

iii

**Cases**                                                     **Page(s)**

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................ 16

*Grewal v. Navient Corp.,*
    No. ESX-C-172-2020 (N.J. Sup. Ct.) .................................... 12

*Illinois v. Navient Corp.,*
    No. 17 CH 00761 (Ill. Ch. Div.) ........................................... 12

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................. 15-16

*Pennsylvania v. Navient Corp.,*
    967 F.3d 273 (3d Cir. 2020) .................................................. 8

*Shvartser v. Lekser,*
    308 F. Supp. 3d 260 (D.D.C. 2018) ...................................... 19

**Federal Statutes**

Pub. L. No. 111-203, 124 Stat. 1376 ........................................... 3

12 U.S.C.
    § 484(a) ......................................................................... 7, 25
    § 2803 ................................................................................ 20
    § 2809 ................................................................................ 20
    § 5493(b)(3)(A) ................................................................... 9
    § 5497(d) ............................................................................ 20
    § 5511(c) .............................................................................. 6
    § 5511(c)(4) ........................................................................ 24
    § 5512(c)(1)–(3) .................................................................. 6
    § 5514(a)–(c) ........................................................................ 5
    § 5514(b)(3) ..................................................................... 6, 8
    § 5514(d) ......................................................................... 5, 19
    § 5515 ................................................................................ 28
    § 5515(a)–(b) ....................................................................... 5
    § 5515(b) ............................................................................ 23
    § 5515(b)(1) ............................................................. 7, 24, 28

**Federal Statutes**                                                      **Page(s)**

12 U.S.C. (cont'd)

§ 5515(b)(2)..................................................................................8

§ 5531 ........................................................................................25

§ 5531(a) ......................................................................................5

§ 5531(d) ......................................................................................5

§ 5534(a) ...................................................................................6, 9

§ 5552(a) ......................................................................................8

§ 5552(a)(1) ..................................................................................7

§ 5552(a)(2)(A) ........................................................................7, 25

§ 5552(a)(2)(B) ..............................................................................7

§ 5564(a) ......................................................................................7

§ 5581 ..........................................................................................4

**Federal Regulations**

12 C.F.R.

pt. 1026......................................................................................31

§ 1075.103 ..................................................................................20

§ 1075.104 ..................................................................................20

**Miscellaneous Authorities**

CFPB, *2013 CFPB-State Supervisory Coordination Framework*
(May 7, 2013), available at https://files.consumerfinance.gov/
f/201305_cfpb_state-supervisory-coordination-framework.pdf ..........10

CFPB, *An Introduction to CFPB's Exams of Financial
Companies* (Jan. 9, 2023), available at https://
files.consumerfinance.gov/f/documents/cfpb_an-introduction-
to-cfpbs-exams-of-financial-companies_2023-01.pdf..........................24

CFPB, *CFPB Statement of Intent for Sharing Information With
State Banking and Financial Services Regulators* (Dec. 6,
2012), available at https://files.consumerfinance.gov/f/
201212_cfpb_statement_of_Intent_for_sharing_information_
with_sbfsr.pdf...........................................................................8

**Miscellaneous Authorities**                              **Page(s)**

CFPB, *CFPB v. Tempoe, LLC*, available at https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/payments-by-case/tempoe/ .................................. 22

CFPB, *Civil Penalty Fund*, available at https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/civil-penalty-fund/ ........................................ 21-22

CFPB, *How to Avoid Foreclosure*, available at https://www.consumerfinance.gov/language/cfpb-in-english/how-to-avoid-foreclosure/ .................................................................. 18

CFPB, *Mortgage Data (HMDA)*, available at https://www.consumerfinance.gov/data-research/hmda/ ................... 20

CFPB, *Payments to Harmed Consumers by Case*, available at https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/payments-by-case/ ............................... 21

CFPB, Press Release, *CFPB and 11 States Order Prehired to Provide Students More than $30 Million in Relief for Illegal Student Lending Practices* (Nov. 20, 2023), available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-and-11-states-order-prehired-to-provide-students-more-than-30-million-in-relief-for-illegal-student-lending-practices/ ................ 22

CFPB, Press Release, *CFPB to Issue $95 Million in Redress to Consumers Harmed by Premier Student Loan Center* (Dec. 13, 2022), available at https://www.consumerfinance.gov/about-us/blog/cfpb-to-issue-95-million-redress-to-consumers-harmed-by-premier-student-loan-center/ ........................................ 13

**Miscellaneous Authorities**                                   **Page(s)**

CFPB, Press Release, *Consumer Financial Protection Bureau and Multiple States Enter Into Settlement with Owner of ITT Private Loans for Substantially Assisting ITT in Unfair Practices* (Sept. 15, 2020), available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-multiple-states-enter-settlement-itt-private-loans-owner-assisting-itt-unfair-practices/ ............................................ 12

CFPB, *Supervisory Highlights*, Issue 37 (Dec. 2024), available at https://files.consumerfinance.gov/f/documents/cfpb_Supervisory-Highlights-Issue-37_Winter-2024.pdf ........................... 28

CFPB, *Supervisory Highlights: Mortgage Servicing Edition*, Issue 33 (April 2024), available at https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-33_2024-04.pdf ................................... 31

CFPB, *Supervisory Highlights: Special Edition Auto Finance*, Issue 35 (Oct. 2024), available at https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights-special-ed-auto-finance_2024-10.pdf ............................... 31

Conference of State Bank Supervisors, *Nonbank Mortgage Regulation - Misconceptions & Background* (May 10, 2024), available at https://www.csbs.org/newsroom/nonbank-mortgage-regulation-misconceptions-background ........................... 19

Consent Order, *In re JPMorgan Chase Bank, N.A.*, No. 2015-CFPB-0001 (Jan. 22, 2015), available at https://files.consumerfinance.gov/f/201501_cfpb_consent-order_jp-morgan-chase-bank-na.pdf ................................................. 11

Consent Order, *In re Wells Fargo Bank, N.A.*, No. 2015-CFPB-0002 (Jan. 22, 2015), available at https://files.consumerfinance.gov/f/201501_cfpb_consent-order_wells-fargo-bank-na.pdf .................................................. 11

**Miscellaneous Authorities**                                     **Page(s)**

Dep't of Treasury, *Blueprint for a Modernized Financial Regulatory Structure* (Mar. 2008), available at https://www.govinfo.gov/content/pkg/GOVPUB-T-PURL-LPS110157/pdf/GOVPUB-T-PURL-LPS110157.pdf .......................... 24

Fin. Crisis Inquiry Comm'n, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (2011), available at https://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf ................................................................ 3

Mullin, John, Fed. Reserve Bank of Richmond, *Shopping for Bank Regulators,* Econ. Focus (2019), available at https://www.richmondfed.org/publications/research/econ_focus/2019/q4/federal_reserve ................................................................ 26

National Consumer Law Center, *Restore the States' Traditional Role as 'First Responder'* (Sep. 2009), available at https://filearchive.nclc.org/preemption/restore-the-role-of-states-2009.pdf ................................................................ 26

Navient AG Multi-State Settlement, *39 State Attorneys General Announce $1.85 Billion Settlement with Student Loan Servicer Navient* (Jan. 13, 2022), available at https://www.navientagsettlement.com/Home/portalid/0?portalid=0 ........... 12

Reuters, *Fed's Powell: No Agency Other Than CFPB Tasked With Consumer Protection Enforcement* (Feb. 11, 2025), available at https://www.reuters.com/world/us/feds-powell-no-agency-other-than-cfpb-tasked-with-consumer-protection-2025-02-11/ ................................................................ 23

S. Rep. No. 111-176 (2010) ............................................. 3, 5, 26

Wilmarth, Arthur E., Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1152 (1990) .................. 26

# GLOSSARY

CFPA          Consumer Financial Protection Act

CFPB          Consumer Financial Protection Bureau

HMDA          Home Mortgage Disclosure Act

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

The State of New York, the State of New Jersey, the District of Columbia, and the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin (collectively, "States") submit this brief in support of plaintiffs-appellees and affirmance of the district court's order granting a preliminary injunction. That injunction prevents defendants-appellants from taking steps—many irreversible—to dismantle the Consumer Financial Protection Bureau ("CFPB"), to the detriment of the States and their residents. The States agree with plaintiffs that the district court correctly held that plaintiffs have established irreparable harm and a likelihood of success on the merits. The States submit this brief to focus on why the district court correctly held that the public interest and equities strongly weighed in favor of injunctive relief.

Although the States' roles in consumer protection and financial regulation are robust and diverse, the States and their residents will suffer significant hardships if the injunction is vacated and defendants

are allowed to implement their plan to incapacitate the CFPB, in violation of the agency's statutory obligations. The CFPB has long provided statutorily mandated services, including a nationwide consumer-complaint system, that provide substantial benefits to consumers and support the States' investigative and enforcement efforts. Additionally, the States have relied on, and their residents have benefited from, the CFPB's exclusive authority to supervise very large national banks for compliance with consumer-protection laws. And the States have benefited from the CFPB's collaboration in several areas of joint supervision and enforcement. The abrupt withdrawal of these CFPB services, supervision, and assistance would inflict considerable short-term and long-term harm on the States and their residents. The States thus have a significant stake in ensuring that the CFPB remains functional.

## BACKGROUND

### A.    Congress Created the CFPB to Fill Significant Gaps in Federal Consumer Protection

In 2008, the United States suffered the worst financial downturn since the Great Depression. The Great Recession, as it has come to be

2

known, "nearly crippled the U.S. economy," S. Rep. No. 111-176, at 2 (2010), causing millions of Americans to lose their jobs, homes, and savings, *id*. at 9. While the underlying causes were complex, there is little debate that abusive subprime mortgage lending and the associated collapse of the real-estate market played a central role.[1] In examining the fallout, Congress concluded that the Great Recession resulted from "the failure of the federal banking and other regulators to address significant consumer protection issues detrimental to both consumers and the safety and soundness of the banking system." *Id*. The multitude of federal regulators were beset by "conflicting regulatory missions, fragmentation, and regulatory arbitrage," *id*. at 10, and these regulators' failure to sufficiently consider consumer protection "helped bring the financial system down," *id*. at 166.

In direct response to these failures, Congress enacted the Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376. Title X of Dodd-

---

[1] *See generally* Fin. Crisis Inquiry Comm'n, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* 67-80 (2011). (For sources available online, URLs are in the Table of Authorities. All websites last visited May 9, 2025.)

Frank contains the Consumer Financial Protection Act ("CFPA"), which created the CFPB. The CFPA reflects four main innovations:

- Consolidation of federal consumer-protection authority within one federal regulator: To address the fragmented and diffuse responsibility for enforcement of federal consumer protections among federal regulators, Congress transferred to the CFPB certain consumer-protection functions from existing federal agencies, including the Federal Reserve, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the National Credit Union Administration. *See* 12 U.S.C. § 5581; *CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421-22 (2024).

- Prohibition of "abusive" practices: For the first time for *any* federal regulator, the CFPB was granted the power to take enforcement action to stop "abusive" acts and practices—*i.e.*, those that materially interfere with consumers' ability to understand a term or condition of a consumer product or that unreasonably take advantage of consumers—in addition to

unfair and deceptive practices. 12 U.S.C. § 5531(a), (d); S. Rep.
No. 111-176, at 172.

- Supervision of very large banks: Congress granted the CFPB
  "exclusive authority" among federal regulators to supervise
  compliance with federal consumer-financial laws by "very large"
  banks, savings associations, and credit unions, *i.e.*, those federal-
  or state-chartered banks and depository institutions with at
  least $10 billion in assets. 12 U.S.C. § 5515(a)–(b).

- Authority over non-depository institutions: Congress granted
  the CFPB authority to regulate nonbank mortgage lenders,
  payday lenders, private education lenders, and other large
  participants in markets for consumer-financial products. *Id.*
  § 5514(a)–(c). As part of this authority, the CFPB was tasked
  with supervising these entities for compliance with federal
  consumer-financial laws, *see id.* § 5514(d), thus creating "for the
  first time consistent Federal oversight of nondepository
  institutions," S. Rep. No. 111-176, at 167 (noting that non-
  depository institutions were not previously subject to regular
  federal consumer-compliance supervisory examinations).

5

The CFPA additionally specifies the CFPB's other "primary functions" as: (i) "conducting financial education programs"; (ii) "collecting, investigating, and responding to consumer complaints"; (iii) analyzing data and other information "to identify risks to consumers" and to ensure that consumer-financial markets function; (iv) enforcing federal consumer-protection laws; (v) "issuing rules, orders, and guidance implementing" those laws; and (vi) performing other "support activities." 12 U.S.C. § 5511(c). To ensure the CFPB's ability to perform these functions and achieve its goals, Congress set forth a host of specific statutory mandates for the CFPB, including that the agency "shall publish" annual reports on its monitoring of "risks to consumers," *id.* § 5512(c)(1)–(3); that it "shall establish" procedures "to provide a timely response to consumers" regarding "complaints against, or inquiries concerning" activity in consumer-financial markets, *id.* § 5534(a); and that, to minimize regulatory burden, it "shall" coordinate designated supervisory activities with the relevant state and federal agencies, *id.* § 5514(b)(3).

With respect to national banks (*i.e.*, those authorized by federal charter), the CFPB has exclusive authority vis-à-vis the States in two

6

respects. First, state regulators are preempted from exercising any supervisory powers, including consumer-compliance supervision, over national banks, *see Cuomo v. Clearing House Ass'n,* 557 U.S. 519, 525-26, 535-36 (2009); 12 U.S.C. § 484(a), and the CFPB retains "exclusive authority" among federal regulators to supervise very large national banks for compliance with federal consumer-financial laws, 12 U.S.C. § 5515(b)(1). Bank supervision includes on-site examinations that are designed to help detect and assess risks to consumers and the consumer-financial markets. *Id.* Second, the CFPB—but not the States—has authority to enforce against national banks the provisions of the CFPA itself, including its prohibition against abusive practices. *See id.* §§ 5552(a)(2)(A), 5564(a). Although Congress authorized the States to enforce against such banks any CFPB regulation that implements the CFPA's prohibition on abusive practices, *id.* § 5552(a)(2)(B), the CFPB has not issued any such regulations to date. The States nonetheless can enforce other applicable, non-preempted consumer-protection laws and regulations against national (and state) banks, including CFPB regulations issued under the CFPA. *See id.* § 5552(a)(1), (a)(2)(B); *Cuomo,* 557 U.S. at 534-35.

**B.    The CFPB Has Partnered with the States and Complemented Their Consumer-Protection Work**

While Congress granted the CFPB certain exclusive and mandatory functions, Congress also intended the CFPB to partner with States to achieve general efficiencies and to complement work traditionally done by States in the areas of consumer protection and financial regulation. For example, the CFPB is statutorily required to coordinate with state regulators its examinations of nonbank entities and certain large state-chartered banks, 12 U.S.C. §§ 5514(b)(3), 5515(b)(2), a mandate the CFPB has interpreted to require it to share information with state regulators.[2] Congress also codified the authority of state attorneys general to enforce various federal consumer-financial laws, *id*. § 5552(a), thereby enabling cooperative state and federal enforcement as well as independent state enforcement, *see Pennsylvania v. Navient Corp.*, 967 F.3d 273, 286-87 (3d Cir. 2020).

In practice, the States have coordinated with the CFPB in diverse ways across the breadth of the agency's functions:

_____

[2] CFPB, *CFPB Statement of Intent for Sharing Information With State Banking and Financial Services Regulators* (Dec. 6, 2012).

Consumer-complaint system. The CFPB has maintained a statutorily mandated system for fielding and responding to consumer complaints that address the whole range of consumer-financial products. *See* 12 U.S.C. §§ 5493(b)(3)(A), 5534(a). States have relied on the nationwide data provided by the CFPB's system to support investigations of specific businesses, spot and monitor trends in their States, and explore opportunities for coordinated enforcement among States. And States have referred residents to the CFPB's consumer-complaint system for a variety of reasons, including when the CFPB has a track record for being able to quickly connect consumers with relevant providers, such as education lenders, mortgage originators, or servicing companies.

Bank and nonbank examinations. Many States have partnered with the CFPB for purposes of examining state-chartered large banks and nonbank entities, over which both States and the CFPB have supervisory authority. For example, California has coordinated with the CFPB on supervisory examinations of large institutions such as East West Bank, Cathay Bank, and Rocket Mortgage. In North Carolina, First Citizens Bank & Trust, Live Oak Banking Company of Wilmington, First Bank of Southern Pines, Truist Bank, and the North Carolina State

Employees Credit Union fall within the concurrent jurisdiction of the CFPB and state banking regulators. Colorado has worked with the CFPB to conduct joint examinations of student-loan servicers. And the CFPB has worked directly with the Conference of State Bank Supervisors through a coordination framework[3] that facilitates coordination with interested States of supervisory examinations of large nonbank entities—such as nonbank mortgage originators, automobile-financing companies, debt collectors, payday lenders, and money transmitters— that are governed by both federal and state laws.

Law enforcement. The CFPB, in addition to pursuing its own enforcement actions, has partnered with States to stop deceptive, unfair, and abusive conduct. For instance, in the past few years alone, the CFPB has worked with New York to stop improper debt collection, *CFPB v. JPL Recover Solutions, LLC*, No. 20-cv-01217 (W.D.N.Y.); inaccurate and misleading remittance transfers, *CFPB v. MoneyGram Int'l Inc.*, No. 22-cv-03256 (S.D.N.Y.); and harmful subprime automobile lending, *CFPB v. Credit Acceptance Corp.*, No. 23-cv-00038 (S.D.N.Y.). The CFPB

---

[3] CFPB, *2013 CFPB-State Supervisory Coordination Framework* (May 7, 2013).

10

partnered with New York and six other States to shut down an illegal debt-relief scheme. *CFPB v. StratFS, LLC*, No. 24-cv-00040 (W.D.N.Y.). And the CFPB worked with all 50 States and the District of Columbia to successfully enforce consumer-protection laws against a large mortgage servicer, *CFPB v. NationStar Mortg. LLC*, No. 20-cv-03550 (D.D.C.), and with a coalition of States to stop the unlawful brokerage of contracts offering high-interest credit to consumers, primarily disabled veterans, *CFPB v. Kern-Fuller*, No. 20-cv-00786 (D.S.C.). In addition, the CFPB worked with Maryland to obtain a series of consent orders in connection with an unlawful scheme to exchange marketing services for referrals of settlement-service business in connection with consumers' home-mortgage transactions.[4]

The CFPB has routinely collaborated with States on actions to root out frauds, including frauds targeting student borrowers. This collaboration has been instrumental to ensuring that the States'

---

[4] *CFPB* v. *Wells Fargo Bank, N.A.*, No. 15-cv-00179 (D. Md.); *CFPB v. Genuine Title, LLC*, No. 15-cv-01235 (D. Md.); Consent Order, *In re Wells Fargo Bank, N.A.*, No. 2015-CFPB-0002 (Jan. 22, 2015); Consent Order, *In re JPMorgan Chase Bank, N.A.*, No. 2015-CFPB-0001 (Jan. 22, 2015).

residents are protected in the marketplace and, when harmed, receive the redress that Congress intended. For example, the CFPB and several States sued the nation's then-largest student-loan servicer for deceiving borrowers by, among other things, steering them to costly repayment options. *See CFPB v. Navient Corp.*, No. 17-cv-00101 (M.D. Pa.); *Illinois v. Navient Corp.*, No. 17 CH 00761 (Ill. Ch. Div.); *Grewal v. Navient Corp.*, No. ESX-C-172-2020 (N.J. Sup. Ct.). With the CFPB's support, the multistate coalition obtained $1.85 billion in student debt relief and consumer restitution.[5] The CFPB likewise partnered with 47 States and the District of Columbia in an action against a for-profit school and its affiliates for knowingly making high-cost loans to students who would be unable to repay; that partnership resulted in $500 million in debt forgiveness for tens of thousands of students.[6] *CFPB v. ITT Educ. Servs., Inc.*, No. 14-cv-00292 (S.D. Ind.). And the CFPB partnered with Minnesota, North Carolina, and California to shut down an illegal

---

[5] Navient AG Multi-State Settlement, *39 State Attorneys General Announce $1.85 Billion Settlement with Student Loan Servicer Navient* (Jan. 13, 2022).

[6] CFPB, Press Release, *Consumer Financial Protection Bureau and Multiple States Enter Into Settlement with Owner of ITT Private Loans for Substantially Assisting ITT in Unfair Practices* (Sept. 15, 2020).

student-loan debt-relief scheme, recovering $95 million in consumer restitution.[7] *CFPB v. Consumer Advocacy Ctr., Inc.*, No. 19-cv-01998 (C.D. Cal.).

## SUMMARY OF ARGUMENT

The CFPB's statutorily mandated functions were tailored to fill the gaps in the federal regulatory regime that contributed to the Great Recession. The CFPB's performance of those functions has provided considerable benefits to the public. By unlawfully disrupting the CFPB's performance of those functions, defendants would in effect reinstitute the regulatory gaps that Congress sought to fill and impose significant hardships on the States and their residents in three critical ways.

*First,* the CFPB's consumer-complaint system provides valuable assistance to numerous consumers, including by helping many to avoid foreclosures. That system, as well as another CFPB database on mortgage products, provide an important resource that the States have utilized in their investigative and enforcement efforts. The complete or

---

[7] CFPB, Press Release, *CFPB to Issue $95 Million in Redress to Consumers Harmed by Premier Student Loan Center* (Dec. 13, 2022).

significant disruption of these statutorily mandated functions threatens to undermine the ability of the States and their residents to identify and remedy financial wrongs.

*Second*, the CFPB's dismantling would create a gap in supervision over the largest national banks that would allow these banks to loosen their regulatory compliance—to the detriment of consumers. This is so because States are preempted from exercising supervisory authority over any national bank, and thus must rely on federal regulators for such supervision. And the CFPB has exclusive authority among federal regulators to supervise the largest national banks for compliance with consumer-protection laws. Accordingly, the CFPB's dismantling would leave no regulator conducting consumer-compliance examinations of these large national banks.

*Third*, the CFPB's dismantling would mean that the States would lose the CFPB's significant expertise and resources that can be invaluable in ongoing efforts that protect their residents. For instance, the States that have collaborative enforcement investigations or active litigations pending, or that have previously established schedules for joint supervisory examinations, will be suddenly disrupted without the

CFPB's partnership. The States will thus be forced to divert their scarce resources to fill the void created by the loss of the sole federal agency devoted to consumer protection for financial products.

## ARGUMENT

### DEFENDANTS' PLAN TO DISMANTLE THE CFPB WILL INFLICT SHORT- AND LONG-TERM HARM ON THE STATES AND THEIR RESIDENTS

As the district court found, based on a multi-day evidentiary hearing and voluminous record, defendants' planned to dismantle the CFPB "and to do it fast." (Joint Appendix ["JA."] 634.) This dismantling, and the attendant loss of statutorily mandated services, would significantly harm the States, their residents, and the public interest.

The district court correctly held that those harms, which are detailed below, are relevant when assessing the public interest and the balance of equities—two of the factors that govern whether to grant a preliminary injunction. *See, e.g.*, *League of Women Voters of United States*

*v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).[8] Indeed, as the district court recognized (JA742-743), the harms that the States identify here constitute a distinct harm to the public interest, given the special role that the States play in our federal system. The States "possess sovereignty concurrent with that of the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), and therefore are equal—not subordinate—sovereign entities charged to advance the public interest. An injunction thus serves the public interest where, as here, it is tailored to prevent illegal agency action that harms the States and their residents. *See League of Women Voters of United States*, 838 F.3d at 12 (emphasizing that there is "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations") (internal quotation marks omitted).

---

[8] Those harms also amplify the harms identified by the consumer-oriented plaintiffs in this case, who relied on such harms to establish the requisite risk of irreparable harm. (JA733-738.) Given the States' consumer-protection activities, they are uniquely situated to provide information that bears on this Court's assessment of the irreparable harms that plaintiffs and their members are likely to face.

A.    **The Loss of the CFPB's Statutorily Mandated Functions Will Harm Consumers and the States' Enforcement Efforts.**

If the injunction were vacated and defendants permitted to proceed with their decision to dismantle the CFPB virtually overnight, the States and their residents would face the serious risk of both short- and long-term harm. One of the most significant sources of risk would result from the sudden loss, or significant disruption, of the agency's statutorily mandated consumer-complaint system. That system receives about 350,000 consumer complaints each month about financial products and services. (JA1243-1244.) As the district court found (JA714), just weeks after defendant Russell Vought, the CFPB's Acting Director, issued the stop-work order on February 10, 2025, over 16,000 unanswered consumer complaints accumulated. During this time, the system was effectively non-operational, as no actions were taken on unanswered complaints. (JA712-714.) For example, complaints referred by the States, congressional offices, and many federal agencies were neither being reviewed by the CFPB nor sent to companies for response. (JA713, JA1250-1251.)

Consumers would face immediate harm if defendants were permitted to resume the disabling of the consumer-complaint system. Among other tasks, the CFPB's intake process identifies and prioritizes complaints received in which a consumer asserts an imminent home foreclosure and then refers such consumers to local counselors to assist in resolving those disputes.[9] Indeed, CFPB staff testified before the district court that the CFPB's system has "stopped imminent foreclosures." (JA1244.) In the weeks following the February 10 stop-work order, however, the CFPB ceased addressing *any* complaints from consumers facing imminent foreclosure, as well as other time-sensitive issues. (JA713; *see* JA1263.)

Although some States have their own mechanisms to address consumer complaints from their residents, those mechanisms, even if considered together, could not replace overnight the CFPB's established, nationwide system. Thus, the loss or disruption of the CFPB's system would leave consumers without a critical resource and, in some States, that absence would mean an increased risk of foreclosure—an

---

[9] CFPB, *How to Avoid Foreclosure*.

18

irreparable and often enduring harm. *See, e.g.*, *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018). This risk is rendered particularly acute by the rise of nonbank mortgage lenders that operate nationwide, such as Rocket Mortgage, for which the CFPB is the sole federal regulator with supervisory authority to assess compliance with federal consumer-financial laws. *See* 12 U.S.C. § 5514(d).[10]

The loss of the CFPB's consumer-complaint system would harm the States in another respect. The States have utilized the data provided by that system to investigate specific entities, monitor trends in their States, and explore coordinated enforcement with other States. The system's sudden unavailability would deprive the States of an important resource that—unlike the State's own state-specific systems—provides insights into multi-state or national trends specifically on financial products.

The CFPB's dismantling would also deprive States and their residents of the benefits of two other statutorily required functions. The CFPB is required to collect and publish data pursuant to the Home

---

[10] Conference of State Bank Supervisors, *Nonbank Mortgage Regulation – Misconceptions & Background* (May 10, 2024).

Mortgage Disclosure Act ("HMDA"), *see* 12 U.S.C. §§ 2803, 2809, and the States regularly consult this data for insight into trends in mortgage-lending products, like the decline of refinancing and rise in closing costs.[11] The HMDA data that has been collected and maintained by the CFPB to date constitutes the single largest loan-level data set for mortgage lending across the country. If deprived of this data, States will suddenly find themselves significantly hampered in their ability to monitor nationwide mortgage-foreclosure trends—trends on which they rely to proactively address troubling developments in housing markets.

The CFPB's dismantling would also render the Civil Penalty Fund effectively inactive or, at the very least, severely incapacitated. A person or entity against whom the CFPB has taken legal action may be required to pay money into the agency's Civil Penalty Fund, which Congress established. *See* 12 U.S.C. § 5497(d). The CFPB, after determining that victims will not receive compensation from the wrongdoers or any other source of restitution, 12 C.F.R. §§ 1075.103, 1075.104, is authorized to distribute compensation to such victims from the Civil Penalty Fund. As

---

[11] CFPB, *Mortgage Data (HMDA)*.

of December 2024, the CFPB had distributed roughly $3.3 billion to consumers nationwide who have been harmed by violations of consumer-protection laws.[12]

As of this brief's filing, there are over a dozen matters for which distributions from the Civil Penalty Fund remain outstanding—*i.e.*, cases in which consumers have already been found to be entitled to relief, and who the CFPB has found will not receive compensation from another source.[13] If the Civil Penalty Fund became effectively inactive or so severely disabled that its distributions were unreasonably delayed, thousands of state residents would be deprived of monetary relief that they are expecting to receive from the Fund and left with no other avenue to redress their losses. For example, eleven States partnered with the CFPB in a suit against a company called Prehired for deceptive marketing and debt-collection practices. Prehired agreed to void all outstanding loan agreements nationwide, and the CFPB agreed to allocate roughly $4.3 million from the Civil Penalty Fund to compensate

---

[12] CFPB, *Civil Penalty Fund*.

[13] CFPB, *Payments to Harmed Consumers by Case*.

21

the victims but many, if not all, distributions remain outstanding.[14] The States whose consumers were entitled to relief in that matter provided the CFPB with victim address verifications in early 2025, but as of the date that the preliminary injunction was issued, those States had heard nothing further from the CFPB regarding distribution of funds. Now, however, with that injunction in place, the CFPB has represented that distributions will be completed shortly. And in another matter, the CFPB brought an administrative enforcement action against a company called Tempoe that was found to have deceptively leased goods to consumers who believed they were purchasing the goods. Distribution of over $192 million to the scheme's victims began this past October and remains incomplete.[15]

These harms to the States and their residents, including depriving consumers of what may well be their only hope of monetary relief, confirm that the public interest is furthered by the district court's preliminary

---

[14] CFPB, _Civil Penalty Fund_ (_see_ drop-down category "What cases have received an allocation?"); CFPB, Press Release, _CFPB and 11 States Order Prehired to Provide Students More than $30 Million in Relief for Illegal Student Lending Practices_ (Nov. 20, 2023).

[15] CFPB, _CFPB v. Tempoe, LLC_.

injunction to prevent defendants from unlawfully incapacitating the CFPB. (JA739-740.)

## B. The CFPB's Abdication of Its Exclusive Supervisory Authority Over Very Large National Banks Will Disadvantage Consumers.

As Jerome Powell, Chair of the Federal Reserve, acknowledged in his February 2025 testimony to Congress, in light of the CFPB's then-dormancy, no regulator was conducting supervisory examinations of very large national banks, such as JPMorgan and Wells Fargo, to review their compliance with consumer-protection laws.[16] The absence of an operational CFPB would thus create a regulatory vacuum that is even greater than what existed before the Great Recession. This outcome would harm the public in several ways.

To begin, the CFPB's dismantling would result in drastically reduced consumer-compliance supervision of very large national banks, to the detriment of consumers. Supervision, which is a comprehensive process that entails on-site examinations, *see* 12 U.S.C. § 5515(b), serves

---

[16] Reuters, *Fed's Powell: No Agency Other Than CFPB Tasked With Consumer Protection Enforcement* (Feb. 11, 2025).

an important prophylactic function: It allows a regulator to identify consumer-protection "issues before they become systemic or cause significant harm,"[17] and thereby obviates the need for formal law-enforcement measures.

If the CFPB were unable to carry out its supervisory obligations—one of its primary functions, 12 U.S.C. § 5511(c)(4)—other federal regulators would not be positioned to pick up the slack. Following the Department of the Treasury's recommendation after the Great Recession,[18] Congress expressly transferred to the CFPB certain consumer-protection functions that had previously been dispersed among multiple federal agencies. In so doing, Congress made clear that the CFPB is now the "exclusive" regulator authorized to supervise very large national banks for compliance with consumer-financial laws. *See* 12 U.S.C. § 5515(b)(1).

The States, meanwhile, cannot step in to fulfill this supervisory function because they are preempted from exercising supervisory powers

---

[17] CFPB, *An Introduction to CFPB's Exams of Financial Companies* (Jan. 9, 2023).

[18] Dep't of Treasury, *Blueprint for a Modernized Financial Regulatory Structure*, at 143-46 (Mar. 2008).

24

over national banks. *See Cuomo,* 557 U.S. at 525-26, 535-36; 12 U.S.C. § 484(a). The States are also statutorily precluded from enforcing the CFPA's abusive-practices prohibition against *any* national bank unless and until the CFPB promulgates implementing regulations, *see* 12 U.S.C. §§ 5531, 5552(a)(2)(A), which it has not yet done. The CFPB's dismantling would not only create a loss of supervision over some of the nation's largest banks; it would leave *no* entity empowered to enforce the CFPA's abusive-practices prohibition against national banks (including the nation's largest banks), effectively nullifying a crucial federal statutory protection for the nation's consumers.

That regulatory gap would cause yet another public harm. The loss of CFPB supervision and related enforcement would give very large national banks a competitive advantage over state-chartered banks (large or small), by enabling such national banks to loosen their regulatory compliance—to the detriment of consumers—as was seen in the years leading up to the Great Recession.

Indeed, consistent supervision helps to maintain a healthy dual banking system[19] by reducing the regulatory arbitrage that results in a race to the bottom. Material differences in the relative burdens posed by different regulators can incentivize banks to game the system, which harms everyday consumers.[20] And such gaming is not merely theoretical: Arbitrage and the introduction of risky products by financial institutions loosely supervised for consumer protection contributed to the Great Recession, and Congress crafted the CFPB's mandates to address that risk. S. Rep. No. 111-176, at 11 (observing that the CFPB "will establish a basic, minimum federal level playing field for all banks").[21]

In sum, the CFPB's improper dismantling would create the very real prospect of the States' residents being offered riskier products by unsupervised very large national banks, and state-chartered banks

---

[19] *See generally* Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1152 (1990).

[20] National Consumer Law Center, *Restore the States' Traditional Role as 'First Responder'*, at 21-22 (Sep. 2009).

[21] *See* John Mullin, Fed. Reserve Bank of Richmond, *Shopping for Bank Regulators,* Econ. Focus (2019).

losing customers and goodwill by being undercut by those unsupervised national banks.

## C. The CFPB's Failure to Fulfill Its Statutory Mandates of Supervision and Enforcement in Areas of Historic Collaboration Increases the Burden on States to Protect Consumers.

As the district court correctly found (JA742-743), defendants' decision to disable the CFPB would further harm the public by suddenly increasing the burden on States to protect their residents through enforcement and supervision of the financial industry to the extent they are not preempted from doing so. Indeed, the CFPB's incapacitation would have concrete and far-reaching implications. From collaborating on supervisory examinations of state-chartered banks, to sharing complaints and trend data, providing training, and partnering on joint investigations and litigations, the CFPB has been a force multiplier for the States' consumer-protection efforts. If defendants were permitted to implement their plan to unlawfully dismantle the CFPB, the States would be suddenly forced to divert scarce resources to compensate for the loss of the sole federal consumer-protection regulator devoted to the financial sector.

Supervision. The CFPB was designed to enable States to benefit from a synergistic relationship in many areas, ensuring coverage across sectors of a sprawling financial industry and its evolving products. While the CFPB has supervisory authority over approximately 200 of the largest financial institutions in the country,[22] it augments States' own supervisory efforts and shares supervisory authority with States in important ways. First, as noted, the States rely on the CFPB to supervise compliance with federal consumer-protection laws by very large national banks, over which the CFPB has "exclusive authority." 12 U.S.C. § 5515(b)(1).[23] Information obtained from this supervision is regularly shared with the States and informs their decisions on how to supervise and identify risk within those financial institutions under their direct

---

[22] This includes "very large" banks, thrifts, and credit unions—*i.e.*, those entities with assets over $10 billion and their affiliates. 12 U.S.C. § 5515. As of December 31, 2024, approximately 180 depository institutions and approximately 20 depository affiliates met this criteria. *See* CFPB, *Institutions Subject to CFPB Supervisory Authority* (*see* "current list PDF").

[23] *See, e.g.,* CFPB, *Supervisory Highlights*, Issue 37, at 4-6 (Dec. 2024) (summarizing CFPB's recent findings that some large institutions were charging unlawful overdraft fees or engaging in other unlawful conduct that resulted in multiple fees being charged to consumer bank accounts for having insufficient funds).

supervision. Second, the CFPB and States each have supervisory authority over the largest state-chartered banks, entities like nonbank mortgage lenders and payday lenders that offer consumer-financial products, and emerging markets such as digital payments. Because many of the States' decisions about how best to allocate resources have relied on the CFPB's role in these areas, the CFPB's absence will create gaps in supervision that will be difficult to fill at all, let alone promptly.

Moreover, this regulatory gap will uniquely burden the States. A number of the very large banks over which the CFPB has supervisory authority are state-chartered banks, each with more than $10 billion in assets. The absence of CFPB supervision of those banks will force States—especially those that particularly rely on the CFPB's expertise and resources—to divert their own resources to fill the void. Indeed, the CFPB's halt in February 2025 of its statutorily mandated supervision adversely affected several examinations that the CFPB was in the process of conducting jointly with California. Some of those examinations had already begun in late 2024 and thus were immediately disrupted when the CFPB's supervision team shut down pursuant to defendants' directives to stop work. The CFPB's dismantling, if allowed to take effect,

would adversely affect other joint examinations that were scheduled to proceed in the foreseeable future.

The CFPB's oversight of the largest state-chartered banks throughout the country also helps provide consistency in the examination process and allows the CFPB to monitor nationwide trends and similarities that may need to be addressed. Leaving authority entirely to individual States will deprive them of the CFPB's national perspective and thus hamper their ability to detect such trends.

Even for smaller state-chartered banks that do not fall under the CFPB's examination authority, the CFPB has provided essential resources and training to assist many States. Regular calls between the CFPB and the States have helped to identify emerging issues, and CFPB data and analytics have helped States identify trends. Many of the States also regularly refer to the CFPB's training materials and participate in CFPB-led trainings. For example, the District of Columbia regularly uses CFPB's materials in credit-repair workshops that it offers to District residents. And Illinois participates in the CFPB's in-depth trainings on the Loan Originator Compensation Requirements under the Truth in

Lending Act (Regulation Z), with which mortgage licensees must comply. 12 C.F.R. pt. 1026.

The States similarly benefit from the CFPB's concurrent jurisdiction over nonbank entities offering consumer-financial products. The CFPB's oversight has helped to root out and deter misconduct. Without that oversight, many consumers obtaining credit from a nonbank mortgage loan originator will be left without key protections. The same will be true for those seeking auto financing or payday loans, as well as those subject to debt collection or mortgage servicing.[24]

In addition, CFPB's coordination of multistate examinations and data collection has provided efficiency to the participating States and the nonbank institutions they regulate. The CFPB has used its robust data and analytics to help many of the States determine scope and priorities for examination, including by making training available to state agency personnel to ensure consistent and high standards. And for 2025, the

---

[24] *See, e.g.*, CFPB, *Supervisory Highlights: Special Edition Auto Finance*, Issue 35, at 4-19 (Oct. 2024) (summarizing results of examinations of auto finance companies); CFPB, *Supervisory Highlights: Mortgage Servicing Edition*, Issue 33, at 3-8 (April 2024) (summarizing results of mortgage servicing examinations).

coordinated multistate examination schedule was already set when defendant Vought issued the February 10, 2025 stop-work order. The States had committed resources on the understanding that the CFPB would supply expertise and examiners, as well as contribute significantly to examination planning and execution. The loss of CFPB's partnership in supervising nonbank entities and providing nationwide market data and insight into these sectors would greatly increase the burden on States to supervise in areas vital to consumers and the stability of the nation's economy.

Enforcement. The CFPB has exercised indispensable enforcement authority, alongside the States, over consumer-financial laws to protect consumers from unfair, deceptive, and abusive acts and practices.[25] Defendants' plan to quickly incapacitate the CFPB, if permitted to proceed, would be extremely disruptive to ongoing litigation in which the

---

[25] The CFPB has partnered with the States to help consumers outside of the enforcement context. For instance, Minnesota has secured redress for consumers on multiple occasions with the CFPB's assistance, including for a consumer who obtained corrections to credit reports, resulting in a credit-score increase of more than 150 points; a consumer who resolved several thousand dollars of disputed bank deposits; and a consumer who obtained relief from a cryptocurrency scam.

CFPB had been an active partner and would require States to take sole responsibility for joint litigation. One such case is *CFPB v. StratFS, LLC*, No. 24-cv-00040 (W.D.N.Y.), in which seven States partnered with the CFPB to shut down an illegal debt-relief scheme. The CFPB's sudden dismantling will require the States to be entirely responsible for the case, which remains active in both the trial and appellate courts. Meanwhile, the defendants in that case have already sought to take advantage of the CFPB's inactivity by seeking to have a previously entered injunction stayed on the ground that "the CFPB may still exist in theory, but it is wholly nonfunctional." *CFPB v. StratFS, LLC*, No. 24-cv-00040 (W.D.N.Y.), ECF No. 613 at 3.

Moreover, if the CFPB is unlawfully dismantled, the States will need to divert resources from other crucial law-enforcement efforts to fill the gap left by the CFPB. That absence will therefore have ripple effects throughout the country, to the detriment of consumers. The district court thus had ample basis to find that the public interest and equities weigh strongly in favor of granting injunctive relief to prevent defendants from implementing their plan to dismantle the CFPB. (JA738-743.)

33

# CONCLUSION

The Court should affirm the district court's order.

Dated:   Albany, New York
              May 9, 2025

                                                    Respectfully submitted,


MATTHEW J. PLATKIN                LETITIA JAMES
  *Attorney General*                  *Attorney General*
  *State of New Jersey*               *State of New York*
DAVID LEIT
  *Assistant Attorney General*     By:   /s/ Dustin J. Brockner
CHANEL VAN DYKE                      DUSTIN J. BROCKNER
CLAIRE COREA                         Assistant Solicitor General
GRANT RAFFEL
  *Deputy Attorneys General*         The Capitol
                                     Albany, New York 12224
124 Halsey Street, 5th Floor         (518) 776-2017
Newark, New Jersey 07101             dustin.brockner@ag.ny.gov


BRIAN L. SCHWALB                   BARBARA D. UNDERWOOD
  *Attorney General*                  *Solicitor General*
  *District of Columbia*           ANDREA OSER
CAROLINE VAN ZILE                     *Deputy Solicitor General*
  *Solicitor General*              KARUNA B. PATEL
ASHWIN P. PHATAK                      *Senior Counsel, Econ. Justice*
  *Principal Deputy Solicitor General*  CHRISTIAN REIGSTAD
                                        *Assistant Attorney General*
400 Sixth Street, NW
Washington, D.C. 20001


*(Counsel list continues on next page.)*


34

KRISTEN K. MAYES
  *Attorney General*
  *State of Arizona*
2005 N. Central Avenue
Phoenix, Arizona 85004

ROB BONTA
  *Attorney General*
  *State of California*
1515 Clay Street
Oakland, California 94612

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway, 10th Floor
Denver, Colorado 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, Connecticut 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, Delaware 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, Hawaiʻi 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 S. LaSalle Street
Chicago, Illinois 60603

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, Maine 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place, 20th
Floor
Baltimore, Maryland 21201

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
1 Ashburton Place
Boston, Massachusetts 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, Minnesota 55155

35

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, Nevada 89701

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
408 Galisteo Street
Santa Fe, New Mexico 87501

JEFF JACKSON
  *Attorney General*
  *State of North Carolina*
114 W. Edenton Street
Raleigh, North Carolina
27603

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, Oregon 97301

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 S. Main Street
Providence, Rhode Island
02903

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, Vermont 05609

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104

JOSHUA L. KAUL
  *Attorney General*
  *State of Wisconsin*
17 W. Main Street
Madison, Wisconsin 53703

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,920 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and corresponding local rules.

 /s/ Dustin J. Brockner
Dustin J. Brockner

# CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically filed the foregoing Brief of Amici Curiae New York, New Jersey, and the District of Columbia et al. with the Clerk of the Court for the United States Court of Appeals for D.C. Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


 /s/ Dustin J. Brockner     
Dustin J. Brockner