**ORAL ARGUMENT SCHEDULED FOR MAY 16, 2025**

Nos. 25-5091, 25-5132

---

# In The United States Court Of Appeals
# For The District Of Columbia Circuit

---

NATIONAL TREASURY EMPLOYEES UNION, *et al.*,

*Plaintiffs-Appellees*,

v.

RUSSELL VOUGHT, in his official capacity as Acting Director
of the Consumer Financial Protection Bureau, *et al*.

*Defendants-Appellants*.

---

On Appeal from the U.S. District Court for the District of Columbia
Case No. 1:25-cv-00381 (Hon. Amy Berman Jackson)

---

**BRIEF OF FORMER CONSUMER FINANCIAL PROTECTION BUREAU OFFICIALS AS *AMICI CURIAE* IN SUPPORT OF APPELLEES**

---

Harold Hongju Koh
Peter Gruber Rule of Law Clinic
Yale Law School
P.O. Box 2098215
New Haven, CT 06520
(203) 432-4932

Jed W. Glickstein
Matthew B. Underwood
Annie Garau Kelly
Annie Prossnitz
KAPLAN & GRADY LLC
2071 N. Southport Ave.
Chicago, IL 60614
(312) 852-2184
jglickstein@kaplangrady.com

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned certifies as follows:

**A.**  **Parties and *Amici*.** All parties, intervenors, and other *amici* appearing

before the district court and in this Court are listed in the Brief for Appellants.

**B.**  **Ruling Under Review.** References to the rulings at issue appear in the

Brief for Appellants.

**C.**  **Related Cases.** This case has not previously been before this Court.

Counsel is aware of no other related cases in this or any other Court.

Executed this 9th day of May 2025.

/s/ Jed W. Glickstein

Jed W. Glickstein

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

*Amici curiae* are sixteen former Consumer Financial Protection Bureau officials who served at the agency during multiple administrations. Counsel for the parties have consented to *amici*'s participation. Pursuant to Circuit Rule 29(d), the undersigned certifies that a separate brief is necessary to provide the Court with *amici*'s unique perspective on the role of the Bureau and the actions of incoming agency leadership as compared to past leadership transitions. The undersigned is not aware of any other *amici* who share this perspective or will address these issues and accordingly certifies that filing a joint brief would not be practicable.

Executed this 9th day of May 2025.

*/s/ Jed W. Glickstein*
Jed W. Glickstein

## TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................................1

SUMMARY OF ARGUMENT.......................................................................................1

ARGUMENT ....................................................................................................................3

I.  Congress intended the Consumer Financial Protection Bureau to be a robust agency capable of discharging important statutory duties. .................4

II.  Prior agency leadership has understood that the Bureau must exist and carry out its responsibilities as required by law............................................11

III.  The actions of incoming Bureau leadership in February subvert the laws passed by Congress.........................................................................................15

IV.  The recent plan to eviscerate the Bureau's staff underscores why the presumption of regularity does not apply here. ...........................................19

CONCLUSION ..............................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Constitutional Provisions**

U.S. Const., Art. I, § 1 ...........................................................................................18

**Cases**

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .........................................................................................16

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*,
  601 U.S. 416 (2024) ...........................................................................................3

*Ctr. for Biological Diversity v. EPA*,
  722 F.3d 401 (D.C. Cir. 2013) ........................................................................18

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) .................................................................................. 17, 21

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) .........................................................................................18

*Nat'l Treasury Employees Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ........................................................................19

*NRDC v. Regan*,
  67 F.4th 397 (D.C. Cir. 2023) .........................................................................18

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) .......................................................................................3, 5

*U.S. Lines, Inc. v. Fed. Marit. Comm'n*,
  584 F.2d 519 (D.C. Cir. 1978) ........................................................................16

*United States v. Chem. Found.*,
  272 U.S. 1 (1926) .............................................................................................16

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .........................................................................................19

**Statutes**

5 U.S.C.

§ 552(2)................................................................................................10

§ 552(3)................................................................................................10

§ 552a..................................................................................................10

12 U.S.C.

§ 481.....................................................................................................6

§ 1692l(b)...............................................................................................6

§ 1756...................................................................................................6

§ 1813(q)................................................................................................6

§ 1820(d)...............................................................................................6

§ 2808(a)................................................................................................6

§ 2808(b)(1)...........................................................................................6

§ 4308(a)................................................................................................5

§ 4309(a)................................................................................................6

§ 4511(a)................................................................................................4

§ 5491(a)................................................................................................4

§ 5493(b)............................................................................................8, 9

§ 5493(c)................................................................................................9

§ 5493(d)...............................................................................................9

§ 5493(e)................................................................................................8

§ 5493(g)................................................................................................8

§ 5496(a)................................................................................................9

§ 5496(b)................................................................................................9

§ 5511(c)................................................................................................5

§ 5512(c)................................................................................................8

§ 5514(b)................................................................................................7

§ 5515(b)................................................................................................7

§ 5531...................................................................................................7

§ 5534(a)................................................................................................8

§ 5535(a)................................................................................................8

§ 5535(c)................................................................................................8

§ 5535(d)...............................................................................................8

§ 5587..................................................................................................10

15 U.S.C.

§ 1604(a) .................................................................................5

§ 1607(a) .................................................................................6

§ 1632(d) .................................................................................6

§ 1637(r) ...............................................................................6, 9

§ 1639c(b) ..............................................................................5

§ 1681s(b) ..............................................................................6

§ 1681s(e) ..............................................................................5

§ 1691b(a) ..............................................................................5

§ 1691c(a) ..............................................................................6

§ 1692m(a) .............................................................................6

§ 1693b(a) ..............................................................................5

§ 1693o(a) ..............................................................................6

§ 2053(a) ................................................................................4

44 U.S.C.

§ 3506 ..................................................................................10

**Rules and Regulations**

12 C.F.R. § 1026.35(b) ...............................................................6

12 C.F.R. § 1026.43(e) ...............................................................6

Payday, Vehicle Title, and Certain High-Cost Installment Loans,
85 Fed. Reg. 44382 (July 22, 2020). ..........................................14

**Legislative History**

S. Rep. No. 111-176 (2010) ..........................................................3

**Other Sources and Authorities**

Consumer Fin. Prot. Bureau, *Acting Director Mulvaney Announces Call for Evidence Regarding Consumer Financial Protection Bureau Functions* (Jan. 17, 2018) ...................................................................................20

Consumer Fin. Prot. Bureau, *Building the CFPB: A Progress Report* (July 18, 2011) ...................................................................................10

Consumer Fin. Prot. Bureau, *Developing Our Human Capital: Annual Report to Congress* (July 21, 2011)....................................................................11

Elizabeth Dexheimer & Jennifer Jacobs, *Trump Considers Naming Mulvaney Interim CFPB Director*, Bloomberg (Nov. 16, 2017) .........................11

Elon Musk, (@elonmusk), Twitter (Feb. 7, 2025, 3:41 PM), https://x.com/elonmusk/status/1887979940269666769......................................15

Email from Mick Mulvaney to CFPB_(All Hands) (Jan. 23, 2018) .......................12

FRB OIG-11-088, *Review of the CFPB Implementation Planning Activities* (July 15, 2011)......................................................................................11

Kathleen Kraninger, *Speech at the Bipartisan Policy Center* (Apr. 17, 2019).................................................................................................... 14, 15

Steve Cocheo, *"Elections have consequences," Mulvaney Tells Bankers*, Banking Exchange (Apr. 25, 2018)....................................................................13

Transcript of Consum. Fin. Monitor (Season 8, Ep. 4): *Alan Kaplinsky's "Fireside Chat" with Kathy Kraninger, Former Director of the CFPB During Trump 1.0* ...............................................................................14

*Trump Confirms Goal to Shutter CFPB*, ABA Banking J. (Feb. 11, 2025)..............15

*Written Testimony of Kathy Kraninger*, *Director, CFPB, Before the S. Comm. on Banking, Hous., & Urb. Aff.* (Mar. 12, 2019)................15

*Written Testimony of Mick Mulvaney, Acting Director, CFPB, Before the H. Comm. on Fin. Servs.* (Apr. 10, 2018). ..........................................13

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are sixteen former Consumer Financial Protection Bureau officials who served at the agency during multiple administrations. They have extensive day-to-day experience with the Bureau's operations, management, personnel, and mission, including agency leadership transitions following a new presidential administration. Nowhere in that experience have *amici* seen anything like incoming leadership's approach which, the district court found, reflected a plan to shut down the agency without statutory authorization. Such a plan subverts the law Congress enacted and violates fundamental constitutional principles.

*Amici* submit this brief to provide the Court with their perspective on the Bureau, to explain how the actions of incoming leadership were highly irregular in contrast to prior transitions, and thus to rebut the government's suggestion that the actions of incoming leadership are entitled to a presumption of regularity. Details about individual *amici* are provided in the Appendix at the end of the brief.

## SUMMARY OF ARGUMENT

Congress established the Consumer Financial Protection Bureau in 2010 to regulate the offering and provision of consumer financial products and services under federal laws. The new agency was tasked with core functions that had

---

[1] No party's counsel authored this brief in whole or in part, and no person other than *amici* and *amici*'s counsel contributed money that was intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

previously been distributed across many other federal agencies. It also was given important new responsibilities to supplement the regulatory scheme in the wake of the 2008 financial crisis. The text, structure, and context of the agency's organic statute make clear that Congress intended the Bureau to play a central role in implementing and overseeing federal consumer protection law.

All members of the executive branch are required to faithfully follow the law. Thus, until recently, leadership appointed by Presidents from both parties has recognized the fundamental difference between steering a different course for the agency and preventing the agency from functioning altogether. While there has been no shortage of political debate about the Bureau, under the Constitution there should be no debate that unless Congress amends or repeals the law that created the agency, the Bureau must discharge its responsibilities regardless of the views of a particular administration.

In violation of these principles, the Bureau's current acting leadership shut down the Bureau within days of taking office, seeking to prevent it from carrying out its statutory obligations. As the district court found, these actions were intended to achieve a closure of the agency through executive fiat—something that, under the Constitution, only Congress can do. Although the government now asks this court to overturn those factual findings based on a "presumption of regularity," in *amici*'s experience there is nothing remotely "regular" about the recent transition. And recent

attempts to rush through a drastic reduction-in-force that in *amici*'s view would leave the Bureau completely unable to discharge its statutory responsibilities further demonstrate how far agency leadership has departed from normal practice.

In sum, Congress's intention that the Bureau exist and continue to carry out its important functions is clear and comprehensive, and the Constitution requires agency leadership to faithfully execute that law. The presumption of regularity does not excuse attempts by the Executive to flout Congress's commands.

## ARGUMENT

Congress created the Consumer Financial Protection Bureau while the country was still reeling from the most serious economic crisis since the Great Depression. Many millions of Americans were out of work, millions more had lost their homes or were nearing foreclosure, and $11 trillion in household wealth had vanished. It was in this context that Congress perceived an urgent need to create a new agency to protect consumers and address regulatory shortcomings. *See Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 421 (2024); S. Rep. No. 111-176 at 39-44 (2010).

Believing that this crisis was at least partially attributable to gaps in, and the failures of, the regulatory system, Congress created an independent body "tasked with ensuring that consumer debt products are safe and transparent." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 202-03 (2020). As explained below,

that task was enumerated in Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, denominated the "Consumer Financial Protection Act of 2010." Different agency leaders have had differing views about the appropriate way to achieve the aims of the Consumer Financial Protection Act over the Bureau's history. But until now, no leadership group has ever sought to defy Congress and preclude the agency from carrying out its statutory obligations.

I.    **Congress intended the Consumer Financial Protection Bureau to be a robust agency capable of discharging important statutory duties.**

The Consumer Financial Protection Act is a broad and comprehensive statute. The Act mandates not only specific tasks, many assigned to specific offices which the Act requires the Director to establish, but also a comprehensive set of functions and capabilities that Congress expressly directed the Bureau to perform.

In contrast to other organic statutes, which simply state that a particular agency is "established,"—*e.g.*, the Federal Housing Finance Agency, 12 U.S.C. § 4511(a), and the Consumer Product Safety Commission, 15 U.S.C. § 2053(a)— the Consumer Financial Protection Act both establishes an agency *and* defines its duty: the Bureau "shall regulate the offering and provision of consumer financial products or services" 12 U.S.C. § 5491(a). The contrast with the Federal Housing Finance Agency and Consumer Product Safety Commission is striking since the Bureau was modeled in part on these agencies, the first of which was created less than two years before the Dodd-Frank Act was passed.

Consistent with the broad duties and objectives set forth in the statute, Congress "tasked the [Bureau] with 'implement[ing]' and 'enforc[ing]' a large body of financial consumer protection laws." *Seila Law*, 591 U.S. at 206. Congress also specified six "primary functions" for the Bureau, including supervision, enforcement, and rulemaking. 12 U.S.C. § 5511(c). The choice to enumerate not just the agency's "purpose" and "objectives," but also specify the agency's primary functions, is significant. It indicates that Congress expects the Bureau to carry out these core duties regardless of how any particular agency leadership seeks to accomplish the agency objectives.

The Consumer Financial Protection Act transferred the administration of eighteen existing federal statutes to the Bureau, amending most of the statutes so that duties that previously rested on other federal agencies were placed on the Bureau instead. As a result of amendments effected by the Consumer Financial Protection Act, for example, the Truth in Lending Act, Truth in Savings Act, Equal Credit Opportunity Act, and other statutes now provide that the Bureau "shall prescribe regulations to carry out the purposes of" each of those laws.[2]

Additionally, each of the above-listed statutes and the Fair Debt Collection Practices Act now provide that, with respect to persons within the Bureau's

---

[2] *See* 12 U.S.C. § 4308(a)(1); 15 U.S.C. §§ 1604(a), 1691b(a), 1693b(a)(1), 1681s(e)(1). Congress also amended the Truth in Lending Act to require publication of an average prime offer rate for the mortgage markets and assigned the Bureau that duty. *Id*. § 1639c(b)(2)(B).

enforcement jurisdiction, each statute "shall be enforced" by the Bureau.[3] To the extent any of the above-mentioned statutes or regulations issued thereunder imposed obligations on another regulator, Congress transferred those to the Bureau as well.[4]

As a further part of the plan to centralize oversight of the federal consumer financial protection laws, Congress made significant changes to the system for supervising financial institutions engaged in consumer finance. Under the Federal Deposit Insurance Act, various banking regulators—the Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, and Board of Governors of the Federal Reserve System—are required at periodic intervals to conduct a full-scope, on-site examination of each insured depository institution.[5] The Consumer Financial Protection Act provides that the Bureau "shall have exclusive authority to require reports and conduct examinations" of depository institutions with assets over $10 billion (and their affiliates) for purposes of "assessing compliance with the

---

[3] *See* 12 U.S.C. §§ 4309(a)(3), 1692l(b)(6); 15 U.S.C. §§ 1607(a)(6), 1681s(b)(1)(H), 1691c(a)(9), 1693o(a)(5).

[4] For example, the Home Mortgage Disclosure Act exempts depository institutions with assets below a certain size and now requires that the threshold be adjusted annually by the Bureau. 12 U.S.C. § 2808(a), (b)(1). There are additional cost of living adjustments the Bureau is required to make pursuant to regulations promulgated by the Bureau since its inception. *E.g.*, 12 C.F.R. §§ 1026.35(b)(2)(iii)(C), 1026.43(e)(2)(vi), 1026.43(e)(3)(ii). Other statutes impose obligations relating to data collection, *e.g.*, 15 U.S.C. §§ 1632(d)(2), 1637(r)(2), and reporting, *e.g.*, 15 U.S.C. §§ 1692m(a), 1637(r)(3).

[5] *See, e.g.*, 12 U.S.C. §§ 1813(q) (defining "appropriate Federal banking agency"), 1820(d)(1) (requiring appropriate Federal banking agency to conduct examinations); 12 U.S.C. § 481 (national banks); 12 U.S.C. § 1756 (federal credit unions).

requirements of Federal consumer financial laws," "obtaining information about the activities subject to such laws and the associated compliance systems and procedures," and "detecting and assessing risks to consumers and to markets for consumer financial products and services." 12 U.S.C. § 5515(b)(1).

To close a gap in the regulatory scheme, Congress further provided that the Bureau "shall require reports and conduct examinations on a periodic basis" of certain non-depository institutions engaged in offering consumer financial products and services for the same purposes (*i.e.*, compliance assessment, information gathering, and risk detection and assessment). 12 U.S.C. § 5514(b). Congress required the Bureau to conduct these supervisory examinations based on its assessment of risk to consumers in relevant product and geographic markets and to coordinate examinations of non-depositories with other regulators and to use data submitted to those regulators. *Id.* And Congress prohibited entities under the Bureau's jurisdiction from engaging in abusive acts and practices and gave the Bureau enforcement authority to stop this conduct. *Id.* § 5531. The Bureau is the only federal agency authorized to enforce the abusive provision for thousands of non-depository consumer financial service providers.

The Consumer Financial Protection Act separately imposes a set of complementary duties on the Bureau and requires the Bureau or the Director to create specialized units or offices. These include:

-7-

- Research[6]

- Market Monitoring[7]

- Consumer Complaint Handling[8]

- Financial Education[9]

- Protection of Service Members[10]

- Protection of Traditionally Underserved Consumers[11]

- Protection of Older Americans[12]

- Protection of Student Loan Borrowers[13]

---

[6] 12 U.S.C. § 5493(b)(1) ("shall establish a unit whose functions shall include researching, analyzing, and reporting on" six delineated topics).

[7] 12 U.S.C. § 5512(c)(1), (3) ("shall monitor for risks to consumers in the offering or provision of consumer financial products and service*s*" and "shall publish not fewer than 1 report of significant findings . . . in each calendar year").

[8] 12 U.S.C. § 5493(b)(3)(A) ("shall establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database. . . to facilitate the centralized collection of, monitoring of, and response to consumer complaints"; *id*. § 5534(a) (in consultation with other agencies, shall establish "reasonable procedures to provide a timely response . . . to complaints").

[9] 12 U.S.C. § 5493(d)(1), (2) ("shall establish an Office of Financial Education . . . to educate and empower consumers to make better informed financial decisions" and "develop and implement a strategy to improve the financial literacy of consumers").

[10] 12 U.S.C. § 5493(e)(1) ("shall establish an Office of Service Member Affairs").

[11] 12 U.S.C. § 5493(b)(2) ("shall establish a unit whose functions shall include" providing guidance to "traditionally underserved consumers and communities").

[12] 12 U.S.C. § 5493(g)(1) ("shall establish the Office of Financial Protection for Older Americans").

[13] 12 U.S.C. § 5535(a), (c), (d) (requiring the Secretary of the Treasury, in consultation with the Director, to "designate a Private Education Loan Ombudsman" within the Bureau specifying statutory duties, including an annual report).

In addition, the Director must establish an Office of Fair Lending and Equal Opportunity, which "shall have such powers and duties as the Director may delegate," including four specified duties. 12 U.S.C. § 5493(c)(1). Congress spelled out specific functions, and in some cases specific positions, for these offices.

The components of the Bureau are interlocked and closely tied to the Congress's statutory objectives. Research, Monitoring, and Regulations, for example, is responsible for the required research, market monitoring, and rulemaking functions. Its activities can inform, or be informed by, the work of supervision and enforcement. The consumer complaint function can lead to enforcement investigations or effect rulemaking and supervision. The Office of Servicemember Affairs interacts directly with service members at military installations and can provide information for rulemaking and enforcement, and so on.

The Consumer Financial Protection Act also imposed specific reporting obligations on the Director and the Bureau. The Director is required to appear semi-annually before Congress; in connection with each appearance, the Bureau is required to prepare a report on its activities. *Id.* § 5496(a), (b).[14] The Act specifies

---

[14] The semi-annual reports are in addition to annual reports that the Director or others in the agency are required to submit regarding consumer complaints, financial education, and fair lending activities, *e.g.*, 12 U.S.C. §§ 5493(b)(3)(C), (c)(2)(D), (d)(4), and those required by other statutes, *e.g.*, 15 U.S.C. § 1637(r)(3).

several topics that must be covered in each semi-annual report, which largely track the list of the "primary functions" elsewhere in the Act. This again shows the importance of the Bureau's statutory responsibilities and Congress's desire to ensure that the agency is discharging its duties.

Finally, the Consumer Financial Protection Act is not the only law that governs the Bureau. Many other statutes impose obligations on administrative and executive branch agencies generally. For example, the Paperwork Reduction Act imposes obligations with respect to data collection, 44 U.S.C. § 3506; the Privacy Act imposes obligations with respect to protecting the privacy of individuals who are or may be identifiable in agency records, 5 U.S.C. § 552a; and the Freedom of Information Act imposes obligations with respect to the public disclosure of agency records on request, 5 U.S.C. § 552(2)(D), (3). The Bureau must comply with these requirements as well.

Building an agency that could fulfill the mandates set out by Congress was a significant undertaking. *See generally* Consumer Fin. Prot. Bureau, *Building the CFPB: A Progress Report* (July 18, 2011). Congress was keenly aware that substantial efforts would be required to make the Bureau effective and transfer subject-matter expertise. It put in place detailed reporting requirements to ensure that the Bureau would attract and retain a qualified workforce. 12 U.S.C. § 5587. The Treasury Department—which was responsible for standing up the agency—

-10-

commissioned a research study to gain insight into successes and areas of improvement for federal mergers, stand-ups, and reorganizations. FRB OIG-11-088, *Review of the CFPB Implementation Planning Activities* (July 15, 2011). The Bureau also submitted a report to Congress explaining how its hiring activities would allow the agency to accomplish its statutory purposes. Consumer Fin. Prot. Bureau, *Developing Our Human Capital: Annual Report to Congress* (July 21, 2011).

## II.   Prior agency leadership has understood that the Bureau must exist and carry out its responsibilities as required by law.

As noted above, Congress plainly expected the Bureau to be a robust agency that would play a primary role in overseeing and enforcing consumer financial law. Since the Bureau began operations, agency leadership has made changes to align with the political goals and priorities of successive administrations. In keeping with the statute's clear mandates, however, past agency leadership have always agreed that the Bureau must exist to carry out the duties assigned to it by Congress. Regardless of policy views, they have not sought to stop the agency in its tracks.

The first transition in the Bureau's history occurred in 2017 when Richard Cordray resigned as Director. President Trump named Mick Mulvaney to be Acting Director. Mulvaney was no fan of the Bureau during his time in Congress. He voted against the creation of the Consumer Financial Protection Bureau in the House of Representatives and once referred to it as a "sad, sick joke." Elizabeth Dexheimer & Jennifer Jacobs, *Trump Considers Naming Mulvaney Interim CFPB Director*,

Bloomberg (Nov. 16, 2017). Yet when Mulvaney took office as Acting Director, he made clear that he intended to satisfy the Bureau's statutory requirements. In an "all-hands" email to Bureau staff, he wrote:

> When I arrived at CFPB, I told folks that . . . I had no intention of shutting down the Bureau. Indeed, the law doesn't allow that, and as members of the Executive Branch we are charged with faithfully executing the laws. So let's be clear: the law mandates that we enforce consumer protection laws, and we will continue to do exactly that under my watch.

Email from Mick Mulvaney to CFPB_(All Hands) (Jan. 23, 2018), *available at* https://www.documentcloud.org/documents/4357880-Mulvaney-Memo.

To be sure, Acting Director Mulvaney had differences with the prior administration. For example, he imposed temporary freezes on the issuance of new reports (other than those statutorily required), intaking new data, and the filing of new enforcement actions. He hired Schedule C political appointees to oversee several of the Divisions and staff his front office. He created a new Office of Innovation within the Director's Office. He also removed the Office of Fair Lending and Equal Opportunity from the division responsible for supervision and enforcement, shifting its focus to advocacy, coordination, and education (although he transferred the Office's supervisory and enforcement duties to the supervision and enforcement offices and did not end them entirely).[15]

---

[15] Beyond that, as is a Director's prerogative, Acting Director Mulvaney redirected some Bureau priorities and positions. For example, he announced an intent to reconsider a rule

That said, the changes during Acting Director Mulvaney's tenure did not strike at the Bureau's very existence. To the contrary, as he recognized:

> [T]he law of the United States says that this entity shall exist and it shall do certain things. I'm going to respect that, and I'm going to do what the law says. So we're not going to shut it down. We're not going to set it on fire.

Steve Cocheo, *"Elections have consequences," Mulvaney Tells Bankers*, Banking Exchange (Apr. 25, 2018), https://www.bankingexchange.com/cfpb/item/7521-elections-have-consequences-mulvaney-tells-bankers. Consistent with these comments, in his first appearance before Congress, Acting Director Mulvaney urged a set of statutory amendments that would have fundamentally changed the character of the Bureau. *Written Testimony of Mick Mulvaney, Acting Director, CFPB, Before the H. Comm. on Fin. Servs.* (Apr. 10, 2018). But he did not attempt to implement these changes without congressional action.

Kathleen Kraninger, nominated by President Trump to replace Acting Director Mulvaney and confirmed in December 2018, took a similar approach. She stressed that changes in agency direction should be done in consultation with agency staff and other stakeholders. On her first day on the job, she "launched a three month listening tour," to include meetings with "consumer groups, state and local government officials, faith leaders, military personnel, academics, non-profits,

---

regulating payday loans under the prior Administration and opened a new rulemaking to reconsider various aspects of a Home Mortgage Disclosure Act rule promulgated in 2015.

financial institutions, former and current members of the Bureau's advisory committees, and consumers," as well as Bureau staff "at headquarters and across the country." Kathleen Kraninger, *Speech at the Bipartisan Policy Center* (Apr. 17, 2019), https://www.consumerfinance.gov/about-us/newsroom/kathleen-kraninger-director-consumer-financial-protection-bureau-bipartisan-policy-center-speech. She recently commented that "one of the great things that agencies do when they're preparing well for transition" is to present incoming leadership with all pending work and upcoming decisions and deadlines, so the new leadership has the "opportunity to really go through that and say, 'Okay, now let me lay out my vision for the agency and understand how all of that aligns.'" Transcript of Consum. Fin. Monitor (Season 8, Ep. 4), *Alan Kaplinsky's "Fireside Chat" with Kathy Kraninger, Former Director of the CFPB During Trump 1.0*, www.ballardspahr.com/-/jssmedia/main/podcast-transcripts/cfm0804.pdf.

Former Director Kraninger made different choices and emphasized different priorities for the agency than her predecessors too. For example, during her tenure, the Bureau rescinded parts of the mandatory underwriting provisions in the payday lending rule following public notice-and-comment. Payday, Vehicle Title, and Certain High-Cost Installment Loans, 85 Fed. Reg. 44382 (July 22, 2020). She also announced that she would prioritize what she termed "prevention of harm" over enforcement. *Written Testimony of Kathy Kraninger*, *Director, CFPB, Before the S.*

*Comm. on Banking, Hous., & Urb. Aff.* 8 (Mar. 12, 2019). At the same time, Director Kraninger acknowledged that Congress had "clearly articulated the purpose and objectives" of the agency and had given "significant powers and tools to the Director to carry out that mission, . . . each of which serves an important component in the Bureau's execution of that mission." *Speech at the Bipartisan Policy Center*, *supra*. Throughout the entire first Trump administration, no effort was made by leadership to shut down the agency.

### III.  The actions of incoming Bureau leadership in February subvert the laws passed by Congress.

The actions by the Bureau's current leadership stand in stark contrast with actions taken during previous leadership transitions. Acting Director Russell Vought assumed control of the agency on February 7, 2025. By February 10, he had ordered all work at the agency to stop. On February 11, the agency began canceling contracts *en masse* and firing probationary employees, and there were plans to terminate the entire staff until the district court entered a consent order following Plaintiffs' motion for a TRO. All this occurred against a backdrop of public pronouncements from the President and other key figures in the administration expressing a clear intent to shutter the agency against statutory directives and without congressional approval.[16]

---

[16] *E.g.*, *Trump Confirms Goal to Shutter CFPB*, ABA Banking J. (Feb. 11, 2025), https://bankingjournal.aba.com/2025/02/trump-confirms-goal-to-shutter-cfpb; Elon Musk, (@elonmusk), Twitter (Feb. 7, 2025, 3:41 PM), https://x.com/elonmusk/status/1887979940269666769 ("CFPB RIP 🪦 ").

Based on this and other evidence, the district court determined that leadership had decided to shut down the Bureau.

It is no secret that the Bureau's structure, funding, and authorities have been the subject of fierce debate. The President, legislators, supervised entities, and the public have different views about these questions—as did past administrations and agency leadership. But under the Constitution, there should be no debate that, unless and until Congress acts to amend or repeal the Consumer Financial Protection Act, the Bureau must exist, regardless of the views of a particular administration.

Before this Court, the government faults the district court for failing to apply a "presumption of regularity" in concluding that the evidence reflected a decision by leadership to close the agency. Appellants' Br. 53. But that doctrine merely presumes, *absent* evidence to the contrary, that the acts of public officials have been properly discharged. *United States v. Chem. Found.*, 272 U.S. 1, 14 (1926). The presumption of regularity does not "shield [agency] action from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). And it is only a presumption: a reviewing court still must determine for itself "whether the agency acted within its statutory authority" and complied with "applicable statutory and constitutional requirements." *U.S. Lines, Inc. v. Fed. Marit. Comm'n*, 584 F.2d 519, 526 (D.C. Cir. 1978).

-16-

In *amici*'s view, the record decisively refutes the presumption of regularity here. In particular, when presented "with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process," judges are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). There is no legitimate basis for bringing an agency's work to a complete stop, or laying off all the agency's workforce, in regular operations. These steps are not just unprecedented. They would be detrimental to any administration trying to exercise policy discretion while faithfully executing the laws passed by Congress.

Following the stop-work order, basic agency functions ceased. Evidence introduced in the district court showed that the agency stopped processing consumer complaints and FOIA requests. Employees in statutorily mandated areas like Servicemember Affairs and Older Americans were told to stop work. As the confusion throughout the Bureau reflects, basic efforts were not made to engage with stakeholders. In seeking to minimize the disruption and mass confusion that attended incoming leadership's decisions, the government asserts that "[t]o those engaged in the day-to-day work of running an agency, it should be unsurprising that on the-ground uncertainty can result from politically accountable officials' efforts to dramatically shift an agency's priorities." Appellants' Br. 52 n.5. But *amici*, who

each spent years engaged in the "day-to-day work" of running the Bureau, have seen nothing like incoming leadership's approach. To state the obvious, this in no way reflects a "regular" transition.

Current leadership's actions do not just depart sharply from past transitions at the agency. They also raise grave constitutional concerns. It is fundamental to the constitutional design that Congress—not the President or the executive agencies—makes the laws. *See* U.S. Const., Art. I, § 1. Accordingly, while an agency "has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities," *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007), that does not include the authority to disregard the law or substitute political leadership's views for Congress's views—much less eliminate an agency Congress has directed should exist and execute core duties.

Instead, the Constitution "gives Congress the legislative power to set policy in the first instance, and agencies then must act within those statutory boundaries." *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 414 (D.C. Cir. 2013); *see also NRDC v. Regan*, 67 F.4th 397, 404 (D.C. Cir. 2023) ("Regardless of how serious the [purported] problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"). Likewise, the Executive's duty to take care that the laws are faithfully executed is violated when the President or his

-18-

appointed officials disregard those laws and seek to usurp Congress's lawmaking power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587-88 (1952).

In short, it is axiomatic that there is no officer in government, "from the President down to the most subordinate agent, who does not hold office under the law, with prescribed duties and limited authority." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 609-10 (D.C. Cir. 1974). There is a clear difference between steering a new course for an agency consistent with statutory mandates and eliminating an agency altogether. An incoming President and his administration may do the former; but the latter violates the laws that Congress enacted.

## IV.   The recent plan to eviscerate the Bureau's staff underscores why the presumption of regularity does not apply here.

Recent events have made it even more evident why the presumption of regularity should not control here. On April 17—just days after this Court permitted defendants to engage in a reduction-in-force if they concluded after a "particularized assessment" that certain employees were not required to discharge the Bureau's statutory mandates—Bureau leadership hastily announced a plan to lay off nearly all of the agency's employees. Substantively and procedurally, this was also extraordinarily abnormal. The RIF would have eliminated some offices altogether and reduced others to a single person. Based on *amici*'s experience, moreover, it would have left the agency incapable of fulfilling its responsibilities under the Consumer Financial Protection Act and the other laws it must follow and enforce.

-19-

Take, for example, the changes that the RIF would have made to the statutorily required units and offices. Under the RIF, the Office of Research—tasked with researching, analyzing and reporting on six complex subject areas—would have been left with just three employees (an Assistant Director and two other managers). The Office of Monitoring, which monitors risks to consumers from consumer financial products or services and prepares multiple statutorily mandated reports, would have been left with just two (an Assistant Director and a manager). The Office of Financial Education, which must develop and implement initiatives to help consumers make financial decisions and improve financial literacy, would have been reduced to a single person. Even those offices that would have been reduced to a skeletal staff would, in *amici*'s view, have been left wholly unable to discharge their statutory responsibilities.

The government asserts that agency officials decided that the RIF was appropriate based on a "unit-by-unit assessment" of the Bureau's required activities. Appellants' Br. 10-11. Yet there has been no evidence of defective performance warranting such deep cuts. Nor has there been evidence of a genuine deliberative process commensurate with the gravity of the RIF.[17] It is inconceivable to *amici* that

---

[17] *Cf.* Consumer Fin. Prot. Bureau, *Acting Director Mulvaney Announces Call for Evidence Regarding Consumer Financial Protection Bureau Functions* (Jan. 17, 2018), https://www.consumerfinance.gov/about-us/newsroom/acting-director-mulvaney-announces-call-evidence-regarding-consumer-financial-protection-bureau-functions (discussing

incoming leadership could have so quickly determined that the Bureau could carry out its statutory obligations after such drastic cuts to staff. Agencies may not rely on "contrived" explanations or ones that are "incongruent with what the record reveals about the agency's priorities and decision making process." *Dep't of Commerce*, 588 U.S. at 785. There are serious questions as to whether defendants even went through the motions of making the "particularized assessment" that the injunction, as modified, required.

The issue in this appeal relates to the propriety of the preliminary injunction the district court issued on March 28, 2025 based on its finding that acting leadership were trying to shut down the agency. However, *amici* believe that the events that took place shortly after the temporary modification to the injunction further illustrate how that same leadership has abandoned any semblance of regular practice. In all events, this Court should not rely on a presumption of regularity to disregard the factual findings that formed the basis for the district court's ruling. Rather, the Court should make clear that the Executive has no statutory or constitutional authority to refuse to execute the consumer protection laws by shutting down the very agency Congress created to execute those duties.

---

the first of eleven public requests for information to "critically examine" the agency's policies and practices to "ensure they align with the Bureau's statutory mandate").

## CONCLUSION

The Court should affirm the decision below.


Dated: May 9, 2025                    Respectfully submitted,

                                      /s/ *Jed W. Glickstein*

Harold Hongju Koh                     Jed W. Glickstein
Peter Gruber Rule of Law Clinic       Matthew B. Underwood
Yale Law School                       Annie Garau Kelly
P.O. Box 2098215                      Annie Prossnitz
New Haven, CT 06520                   KAPLAN & GRADY LLC
(203) 432-4932                        2071 N. Southport Ave.
                                      Chicago, IL 60614
                                      (312) 852-2184
                                      jglickstein@kaplangrady.com


*Counsel for Amici Curiae*
*Former Consumer Financial Protection Bureau Officials*

## APPENDIX

*Amici curiae*, listed below, are former Consumer Financial Protection Bureau officials who served at the agency from 2011 to 2025. In some cases, *amici* held multiple titles or roles. For brevity, only the most recent role is indicated:

**Ron Borzekowski** worked at the Bureau from 2011 to 2019. He served as Assistant Director in the Office of Research.

**Patrick Campbell** worked at the Bureau from 2012 to 2019. He served as Deputy Assistant Director in the Office of Servicemember Affairs

**Stacy Canan** worked at the Bureau from 2012 to 2019. She served as Assistant Director in the Office for Older Americans.

**Edwin Chow** worked at the Bureau from 2011 to 2019. He served as Regional Director, West Region.

**Richa Dasgupta** worked at the Bureau from 2013 through 2025. She served as Deputy Enforcement Director.

**David DuBois** worked at the Bureau from 2012 to 2018. He served as Deputy Assistant Director in the Office of Servicemember Affairs.

**Katherine Gillespie** worked at the Bureau from 2011 to 2019. She served as Deputy Associate Director in the Consumer Education and Engagement Division.

**Gail Hillebrand** worked at the Bureau from 2011 to 2020. She served as Associate Director for Consumer Education and Engagement.

**Christine Ladd** worked at the Bureau from 2011 to 2025. She served as Assistant General Counsel in the Legal Division.

**Richard Lepley** worked at the Bureau from 2011 to 2018. He served as Principal Deputy General Counsel in the Legal Division.

**Mary McLeod** worked at the Bureau from 2016 to 2021. She served as General Counsel in the Legal Division.

**Mike Pierce** worked at the Bureau from 2011 to 2018. He served as Deputy Assistant Director in the Office for Students and Young Consumers.

**Paul Sanford** worked at the Bureau from 2011 to 2020. He served as Assistant Director in the Office of Supervision Examinations.

**David Silberman** worked at the Bureau from 2011 to 2020. He served as Associate Director in the Division of Research, Markets, and Regulations.

**Peggy Twohig** worked at the Bureau from 2011 to 2021. She served as Assistant Director for Supervision Policy.

**Stephen Van Meter** worked at the Bureau from 2011 to 2021. He served as Deputy General Counsel in the Legal Division.

Each of *amici* joins this brief in their personal capacity only.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B). It contains 5,031 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1).

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It was prepared using 14-point Times New Roman font in Microsoft Word.

Executed this 9th day of May 2025.

*/s/ Jed W. Glickstein*
Jed W. Glickstein

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and Cir. R. 25, the undersigned hereby certifies that on May 9, 2025, the foregoing brief was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Executed this 9th day of May 2025.

*/s/ Jed W. Glickstein*
Jed W. Glickstein