**ORAL ARGUMENT SCHEDULED FOR MAY 16, 2025**
**Nos. 25-5091/25-5132**

# In the United States Court of Appeals for the District of Columbia Circuit

---

NATIONAL TREASURY EMPLOYEES UNION ET AL.,
*Plaintiffs-Appellees,*

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-0381-ABJ (The Hon. Amy Berman Jackson)

---

## BRIEF OF PLAINTIFFS-APPELLEES

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0336

JULIE WILSON
*General Counsel*
PARAS N. SHAH
*Deputy General Counsel*
ALLISON C. GILES
*Assistant Counsel*
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

May 9, 2025

DEEPAK GUPTA
ROBERT FRIEDMAN
MICHAEL SKOCPOL
GABRIEL CHESS
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

WENDY LIU
ADINA H. ROSENBAUM
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### (A) Parties and Amici

National Treasury Employees Union – Plaintiff-Appellee

National Consumer Law Center – Plaintiff-Appellee

National Association for the Advancement of Colored People – Plaintiff-Appellee

Virginia Poverty Law Center – Plaintiff-Appellee

CFPB Employee Association – Plaintiff-Appellee

Ted Steege – Plaintiff-Appellee

Eva Steege – Plaintiff, terminated on March 28, 2025, upon suggestion of death (Dkt. 83) and grant of motion for substitution (Dkt. 85))

Russell T. Vought, in his official capacity as Acting Director of the Consumer Financial Protection Bureau – Defendant-Appellant

Consumer Financial Protection Bureau – Defendant-Appellant

Tzedek DC – Amicus curiae

State of New York – Amicus curiae

203 Members of Congress  – Amicus Curiae

New Jersey, District of Columbia, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin– Amici curiae

Janice Wolk Grenadier – Filed motion to intervene in district court, motion denied

### (B) Rulings Under Review

03/28/2025 Memorandum Opinion (Judge Amy Berman Jackson) – Dkt. 87.

i

03/28/2025 Order (Judge Amy Berman Jackson) – Dkt. 88.

**(C) Related Cases**

This case was before the district court as case No. 1:25-cv-00381-ABJ. The defendants appealed the district court's preliminary injunction order, and that appeal is before this Court as No. 25-5091.

May 9, 2025

Respectfully submitted,
*/s/ Deepak Gupta*
DEEPAK GUPTA
*Counsel of Record*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

# TABLE OF CONTENTS

Certificate as to parties, rulings, and related cases ....................................i

Table of authorities ...................................................................iv

Glossary ...............................................................................x

Introduction...........................................................................1

Pertinent statutes ....................................................................4

Statement..............................................................................4

Summary of argument ...............................................................14

Argument..............................................................................19

    I.    The plaintiffs are likely to succeed on the merits. ...............19

        A.    The district court did not clearly err in finding that the defendants decided to shut down the agency. ..........................19

        B.    The defendants' claim that there is no cause of action to challenge the defendants' unilateral decision to shut down is wrong...........................................................25

        C.    The plaintiffs are likely to succeed in establishing jurisdiction. .............................................................37

    II.    The remaining factors support an injunction. ...................45

    III.    The preliminary injunction was properly tailored to preserve the status quo during the pendency of the litigation..........................49

Conclusion............................................................................53

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) ............................................................... 45

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,*
    789 F.2d 931 (D.C. Cir. 1986) ............................................... 41

*AFGE v. Trump,*
    929 F.3d 748 (D.C. Cir. 2019) ............................................... 38

*Alpine Securities Corp. v. FINRA,*
    121 F.4th 1314 (D.C. Cir. 2024) ........................................... 38

*American Anti-Vivisection Society v. USDA,*
    946 F.3d 615 (D.C. Cir. 2020) ............................................... 41

*Awad v. Obama,*
    608 F.3d 1 (D.C. Cir. 2010) ............................................. 19, 23

*Axon Enterprise, Inc. v. Federal Trade Commission,*
    598 U.S. 175 (2023) ................................................... 16, 38, 39

*Barnhart v. Devine,*
    771 F.2d 1515 (D.C. Cir. 1985) ............................................. 38

*Bell v. Hood,*
    327 U.S. 678 (1946) ............................................................... 28

*Biden v. Texas,*
    597 U.S. 785 (2022) ............................................. 30, 31, 32, 33, 36

*Bohon v. FERC,*
    92 F.4th 1121 (D.C. Cir. 2024) ............................................. 39

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ............................................................... 34

*Brotherhood of Locomotive Engineers v. Federal Railroad Administration,*
    972 F.3d 83 (D.C. Cir. 2020) ............................................... 29

*Bullock v. Department of Air Force,*
  80 M.S.P.R. 361 (M.S.P.B 1998) ........................................................ 39

*Califano v. Sanders,*
  430 U.S. 99 (1977) ............................................................................. 45

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ............................................................................. 51

*Campbell v. McGruder,*
  580 F.2d 521 (D.C. Cir. 1978) ......................................................... 23

*Chacoty v. Pompeo,*
  392 F. Supp. 3d 1 (D.D.C. 2019) ...................................................... 28

*Chemical Weapons Working Group, Inc. v. United States Department of the Army,*
  111 F.3d 1485 (10th Cir. 1997) ........................................................ 30

*Chicago Teachers Union, Local No. 1 v. Hudson,*
  475 U.S. at 309 ................................................................................. 50

*Ciba-Geigy Corp. v. U.S.E.P.A.,*
  801 F.2d 430 (D.C. Cir. 1986) ......................................................... 33

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ............................................................................ 24

*City of Dania Beach v. FAA,*
  485 F.3d 1181 (D.C. Cir. 2007) ......................................................... 32

*Cuddy v. Carmen,*
  762 F.2d 119 (D.C. Cir. 1985) ......................................................... 20

*Dalton v. Specter,*
  511 U.S. 462 (1994) ..................................................................... 26, 31

*Defenders of Wildlife v. Salazar,*
  651 F.3d 112 (D.C. Cir. 2011) .......................................................... 30

*Department of Commerce v. New York,*
  588 U.S. 752 (2019) ........................................................................... 24

*Department of Homeland Security v. Regents of the University of California,*
  591 U.S. 1 (2020) ........................................................... 36

*Elk Run Coal Co. v. United States Department of Labor,*
  804 F. Supp. 2d 8 (D.D.C. 2011) ..........................................27

*English v. Town of Huntington,*
  448 F.2d 319 (2d Cir. 1971) ............................................... 50

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024) ........................................................ 43

*FEC v. Akins,*
  524 U.S. 11 (1998) ......................................................... 44

*Federal Bureau of Investigation v. Fikre,*
  601 U.S. 234 (2024) ........................................................ 23

*Federal Express Corp. v. United States Department of Commerce,*
  39 F.4th 756 (D.C. Cir. 2022) .............................................27

*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) ............................................. 37

*Free Enterprise Fund v. Public Company Acctounting Oversight Board,*
  561 U.S. 477 (2010) ........................................................ 26

*Fund for Animals, Inc. v. United States Bureau of Land Management,*
  460 F.3d 13 (D.C. Cir. 2006) ...........................................31, 32

*Helvering v. Oregon Mutual Life Insurance Co.,*
  311 U.S. 267 (1940) ........................................................ 26

*Hubbard v. Environmental Protection Agency,*
  809 F.2d 1 (D.C. Cir. 1986) ............................................26, 28

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022) ............................................. 49

*J.D. v. Azar,*
  925 F.3d 1291 (D.C. Cir. 2019) .........................................48, 51

vi

*Johnson v. Radford,*
    449 F.2d 115 (5th Cir. 1971) ................................................................ 49

*Kingman Park Civic Association v. Bowser,*
    815 F.3d 36 (D.C. Cir. 2016) ................................................................ 43

*Lackey v. Stinnie,*
    145 S. Ct. 659 (2025) ........................................................................... 49

*League of Women Voters of the United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................................... 41, 43, 48

*Local 2677, American Federation of Governmentt Employees v. Phillips,*
    358 F. Supp. 60 (D.D.C. 1973) ............................................................ 26

*Louisiana v. Biden,*
    622 F. Supp. 3d 267 (W.D. La. 2022) ................................................. 36

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) .............................................................................. 35

*Marin Audubon Society v. Federal Aviation Administration,*
    121 F.4th 902 (D.C. Cir. 2024) ........................................................... 30

*McComb v. Jacksonville Paper Co.,*
    336 U.S. 187 (1949) .............................................................................. 50

*Military Order of the Purple Heart of the United States of America v. Secretary of Veterans Affairs,*
    580 F.3d 1293 (Fed. Cir. 2009) ........................................................... 33

*Mountain States Legal Foundation v. Glickman,*
    92 F.3d 1228 (D.C. Cir. 1996) ............................................................. 40

*National Environmental Development Association's Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) ........................................................ 33, 34

*Nebraska v. Biden,*
    52 F.4th 1044 (8th Cir. 2022) ...................................................49, 50, 51

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014) .............................................................................. 47

*North Carolina v. Covington*,
    581 U.S. 486 (2017) ................................................................... 49, 50

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004) .......................................................................... 36

*NTCH, Inc. v. FCC*,
    950 F.3d 871 (D.C. Cir. 2020) ........................................................ 44

*Prutehi Litekyan: Save Ritidian v. United States Department of the Air Force*,
    128 F.4th 1089 (9th Cir. 2025) ....................................................... 30

*Puerto Rico v. United States*,
    490 F.3d 50 (1st Cir. 2007) ............................................................ 27

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    591 U.S. 197 (2020) .................................................................. 18, 47

*Senior Resources v. Jackson*,
    412 F.3d 112 (D.C. Cir. 2005) ....................................................... 30

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) .......................................................... 49

*Stryker Employment Co., LLC v. Abbas*,
    60 F.4th 372 (6th Cir. 2023) .......................................................... 50

*Swann v. Charlotte-Mecklenburg Board of Education*,
    402 U.S. 1 (1971) ........................................................................... 50

*Trudeau v. Federal Trade Commission*,
    456 F.3d 178 (D.C. Cir. 2006) ............................................... 26, 27, 28

*United States Army Corps of Engineers v. Hawkes Co.*,
    578 U.S. 590 (2016) ....................................................................... 28

*United States v. Broadie*,
    452 F.3d 875 (D.C. Cir. 2006) ....................................................... 20

*United States v. Loew's*,
    371 U.S. 38 (1962) ......................................................................... 50

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ........................................................... 50

*Venetian Casino Resort, LLC v. Equal Emplotment Opportunity Commission*,
    530 F.3d 925 (D.C. Cir. 2008) ............................................................ 29

*Village of Bald Head Island v. United States Army Corps of Engineers*,
    714 F.3d 186 (4th Cir. 2013) ................................................................ 30

*Western Watersheds Project v. Haaland*,
    850 F. App'x 14 (D.C. Cir. 2021) ........................................................ 30

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ............................................................................. 33

*Widakuswara v. Lake*,
    2025 WL 1288817 (D.C. Cir. May 3, 2025) .......................................... 19

*Wild Fish Conservancy v. Jewell*,
    730 F.3d 791 (9th Cir. 2013) ............................................................... 30

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ....................................................................... 25, 27

**Statutes**

5 U.S.C. § 706 ..............................................................................35, 36

**Other Authorities**

11A Wright & Miller,
    Federal Practice and Procedures § 2947 ............................................. 49

## GLOSSARY

APA          Administrative Procedure Act

CFPB         Consumer Financial Protection Bureau

FLRA         Federal Labor Relations Authority

MSPB         Merit System Protection Board

NAACP        National Association for the Advancement of Colored People

NCLC         National Consumer Law Center

OMB          Office of Management and Budget

OPM          Office of Personnel Management

RIF          Reduction in Force

VPLC         Virginia Poverty Law Center

# INTRODUCTION

Our Constitution's separation of powers establishes a fundamental principle that the defendants do not contest: The Executive Branch may not unilaterally abolish an agency created by Congress. Yet the district court found that is precisely what the defendants decided to do here—shut down the Consumer Financial Protection Bureau without congressional approval.

After a two-day evidentiary hearing, the district court found that, immediately after taking over as Acting Director, Russell Vought decided to "shut the agency down"—and undertook a "concerted, expedited effort" to execute that "plan." Within days of Vought's appointment, the defendants fired hundreds of employees, canceled scores of contracts, closed all office space, directed all employees to stop work, and secured formal approval from the Office of Personnel Management to fire more than a thousand additional employees and thereby eliminate numerous (statutorily required) divisions in the Bureau. The rest would temporarily remain only until they too were eliminated in a second mass firing. The defendants' Chief Operating Officer explained to employees that the agency was "legitimately shutting down."

As the district court concluded, absent the issuance of an injunction to preserve the status quo, "the whole agency would [have been] completely wiped out"—damage that the defendants' own witness admitted would be "irreparable."

Unable to defend the lawfulness of this extraordinary constitutional violation, the defendants instead argue that this Court should overturn the preliminary injunction anyway—allowing them to do it all over again. This Court should decline the invitation.

First, the defendants attempt to challenge the district court's factual finding that they decided to shutter the agency—despite a mountain of evidence supporting it, including their own witness's admissions. But the defendants can offer nothing more than inferences drawn from a handful of emails—inferences that the district court expressly considered and rejected as contrary to the record. That's nowhere near enough to demonstrate clear error.

Second, the defendants claim that their unconstitutional conduct is judicially unreviewable—a position that would effectively place the Executive Branch above the law. They argue that, even if they face of imminent and irreparable injury, the plaintiffs have no cause of action to challenge conduct that the defendants do not dispute is illegal. But it's well established that there is a direct cause of action under the Constitution to enjoin unconstitutional agency action. And the plaintiffs also have a cause of action under the APA. The defendants repeatedly assert that the plaintiffs raise a "programmatic" attack on the entire operations of the agency. But the plaintiffs are not challenging everything the agency does. They're challenging a single decision that the district court found the defendants made: the decision to shut

down the agency. That's discrete and reviewable. Imagine if it were published in the Federal Register. There'd be no doubt a court could set it aside. The defendants' contrary argument is little more than an attempt to profit from crafting their plan behind closed doors.

Third, the defendants assert that numerous concrete injuries to organizations and individuals who rely on the CFPB somehow fail to establish standing to challenge the agency's complete closure. The breadth of that assertion is staggering: If the defendants are correct, the court could not hear the claims of (1) a nonprofit that relies on Bureau-published data and reports to create its own publications, which are the lifeblood of its work to educate and support consumers; (2) the National Association for the Advancement of Colored People, which saw Bureau staff cancel promised assistance (including a planned trip for-in person guidance) to help its members navigate financial fraud; (3) a legal aid organization that relies on the Bureau's complaint processing system to serve its clients; or (4) a widower whose wife was working with the Bureau to fulfill her dying wish not to pass on her debt to her family, when the Bureau abruptly went dark after Vought took over. The defendants say that none of this provides Article III standing. But this Court's case law says otherwise. Just as wrong is the defendants' claim that two other plaintiffs must bring the serious constitutional claims this case presents in administrative for designed to adjudicate routine employment disputes.

Finally, the defendants claim that the district court abused its discretion in crafting its injunction and balancing the equities. But the injunction is precisely tailored to restrain the unconstitutional conduct that the defendants undertook in executing their proven plan to shut down the agency.

When a coordinate branch of government acts unconstitutionally, courts have not only the authority but the duty to intervene. The district court fulfilled this responsibility by enjoining the defendants' unprecedented attempt to unilaterally eliminate an agency that Congress created to protect American consumers. This Court should affirm.

## PERTINENT STATUTES

All applicable statutes are contained in the brief for appellants.

## STATEMENT

Russell Vought was appointed Acting Director of the CFPB on Friday, February 7. Soon after, the district court found, the defendants decided to shutter the Bureau. JA634-35, 655, 675, 677, 697, 705-06, 710, 739-40, 744; *see also* JA752 ("[T]he evidence . . . shows that the defendants made the choice not to run the agency at all—to close it down and fire all of the employees."). And they moved to implement that decision as fast as possible. The "concerted, expedited effort to shut down the agency" left no offices, no contracts, no work, and—if this lawsuit hadn't been filed when it was—no employees. JA646-654, JA697. Without the district court's

4

intervention, "the whole agency would [have been] completely wiped out." JA708. The defendants' own witness testified that if that happened, the damage would have been "irreparable." *Id.*[1]

**"Stand down from performing any work task."** The defendants began implementing their decision to shut down the agency almost immediately after Vought was appointed. On February 10, the Monday after he began, Vought instructed all staff and contractors to "stand down from performing any work task"— no exceptions for statutorily mandated work. JA646. The agency's work immediately ground to a halt. JA717-18. "[E]mployees understood that no work meant no work." JA674. So too did leadership. JA646 n.4; Dkt. 41-4 ¶ 6 (quoting https://x.com/russvought/status/1890105212230349130). In fact, the agency set up a tip line—endorsed by Vought himself—to report employees working in "violation of Acting Director Russ Vought's stand down order." JA650.

**"The cancellation of all contracts."** The day after Vought issued his stop-work order, he directed the Bureau to cancel virtually all of its contracts. JA649. Contrary to the defendants' assertion (at 6), the agency didn't cancel only "nonessential contracts." Vought's directive required the cancellation of *every* contract in Consumer Response, Enforcement, Supervision, External Affairs, and

---

[1] Unless otherwise specified, all internal quotation marks, citations, and alterations are omitted throughout this brief. References to Dkt. are to the district court docket.

the Director's Office (among others)—even though Bureau staff had identified many of these contracts as critical to the Bureau's obligations. JA648-49.

The Bureau's contracting officers were instructed to work overtime to "get these Termination Notifications out ASAP." JA649. And because the whole point was to shut down the Bureau, the "termination letters did not include" the Bureau's ordinary "instructions to vendors to preserve their data or records." JA700.

These termination notices stopped work and payment on the contracts. *See* JA412, 687. But the notices could be rescinded until the termination was finalized. JA131-32. So in advance of the preliminary injunction hearing, the defendants instructed the contracting officers to finalize the contract terminations as fast as possible—even ignoring requirements like getting the vendor's signature or consulting with the Bureau's legal division—so that their termination could not be undone. *Id.*

***"We cannot wait until COB"—the rush to fire all staff.*** On February 11—the same day as the contract cancellations—the defendants fired all probationary employees, citing as a justification Vought's February 10 stop-work order. JA648, 674-76. Two days later, they fired all term-limited employees, offering the same justification. JA650, 676.

With these firings under way, a "RIF team"—a team to carry out reductions-in-force—was formed to fire everyone else. JA649. On February 13, two Vought

6

deputies from the Department of Government Efficiency, following discussion with Vought, instructed the RIF team that more than 1,000 people must be fired the next day. JA649-50, 701.

Within two hours, Chief Operating Officer Adam Martinez emailed the Office of Personnel Management to request permission to shorten the ordinary 90-day notice requirement for reductions in force to 30 days. JA650. In an attached memo, he outlined the agency's two-phase plan for firing the rest of its employees—again citing the stop-work order as justification. JA518, 701. Phase 1, which would take place the next day, would terminate approximately 1,200 employees by "eliminating whole offices, divisions and units." JA650, 675, 701. Phase 2 would fire the remainder, including Martinez himself. JA653, 701. In the interim, the defendants would "place all staff on administrative leave." JA582.

But this lawsuit interrupted Vought's plan. The night before the Phase 1 RIF notices were set to go out, news of Vought's decision to shut down the agency leaked, and the plaintiffs moved for a temporary restraining order. Dkt. 10. The district court quickly scheduled a status conference for February 14 (the day the RIF notices were supposed to be sent). JA651. When a member of the RIF team notified Martinez of the status conference, the defendants didn't pause their plans—they sped up. JA652. Terminations, they urged, could no longer "wait until COB." *Id.*

But they couldn't do it fast enough to finish before the court ruled. So during the status conference, the defendants agreed to a consent order prohibiting the defendants from terminating any employees except for cause, deleting CFPB data, or transferring funds out of the CFPB (except for ordinary operating expenses). JA99-100. After the plaintiffs learned of the Bureau's rush to finalize contract terminations, the defendants also agreed to halt contract terminations. Dkt. 41-2.

***"Little confidence that the defense can be trusted to tell the truth about anything."*** Unable to defend the lawfulness of closing an agency Congress created, the defendants' opposition to the preliminary injunction motion took a different tack: It pretended that had never happened. The defendants ignored the February 10 stop-work order, relying instead on a prior email to claim that all Vought had done was "pause" activities that were not statutorily required. Dkt. 31, at 3, 25. They made no mention of cancelling the Bureau's contracts en masse or the effort to fire 1,200 employees that had taken place just days earlier. Instead, they claimed, the Bureau was operating as normal during a presidential transition, and its new leaders were "committed to having CFPB perform its statutory obligations." *Id.* at 3; JA106. In making this claim, they relied on a declaration from Martinez. JA106.

But Martinez's declaration was quickly proven false. Multiple employees submitted declarations testifying that, in fact, the Bureau was—in Martinez's own words—in "wind-down" mode. JA124-155. They detailed the efforts to cancel the

8

Bureau's contracts and fire all of its employees. *Id.* And they explained how the stop-work order had halted critical, statutorily required work across the agency. *Id.* These declarations, the court found, "blew huge holes in [Martinez's] assertions." JA723.

Just before the preliminary-injunction hearing, Martinez submitted a supplemental declaration conceding that the testimony about the efforts to close the agency was "not inaccurate." JA240. No longer able to conceal the attempt to shut down the CFPB, Martinez changed course, claiming that these events occurred "during the week of February 10, 2025" based on "guidance from DOGE-associated personnel" "[p]rior to" Vought's appointment. *Id.* "In the short time since then, and by the date that [he] submitted [his] earlier declaration," he asserted, "a great deal ha[d] evolved." JA241.

But these statements, too, were quickly proven false. At the evidentiary hearing, Martinez conceded that he based his declaration testimony that new leadership was committed to fulfilling the Bureau's statutory obligations on what Chief Legal Officer Mark Paoletta told him. JA725. And he admitted that Paoletta's assertions turned out not to be true. *See, e.g.*, *id.*

And while Martinez's declaration suggested that the attempt to shut down the agency was short-lived, the evidence—yet again including his own testimony—demonstrated otherwise. JA705-06. Well after the week of the 10th, the CFPB continued to be paralyzed—and its leadership continued to pursue the agency's

demise. *See* JA655, 705-16. Martinez himself told employees that the agency was "legitimately shutting down"—the defendants were just waiting for the district court's order to be lifted. JA655, 661, 706, 716. In fact, the RIF team still continued to meet, planning to execute mass terminations if and when the injunction was lifted. JA725-26.

Multiple witnesses testified to this. Martinez admitted it on the stand. JA1041-42. So too did the head of the RIF team. JA705. In testimony that the district court described as "extremely credible," the RIF team lead testified that the team continued its work to carry out the agency's closure even after the district court's order. JA705-06. At those meetings, Martinez explained—based on conversations with "new leadership and the chief legal officer"—that because the CFPB was going to be eliminated, its "administrative portfolio," such as recordkeeping and responding to FOIA requests for pre-closure documents, would need to be transferred to other agencies. JA705, 707, 1042.

The defendants filed a flurry of internal emails sent just before the preliminary-injunction hearing, "purporting to get things up and running again." JA721. But those emails, the court found, "could not be taken at face value." *Id.* For example, Paoletta wrote an email the day before the hearing purporting to be surprised that CFPB employees weren't working. JA716-17. That email, the court observed, contained "a stunning mischaracterization of the February 10 [stop-work]

order"—it suggested that the stop-work order did not actually stop work. *Id.* The court found that this description "cannot be squared with the plain language of the Vought directive, nor is it consistent with the manner in which the February 10 order was understood by the staff, implemented by the agency, or used to justify massive layoffs." JA717. And "the fact that Paoletta … suddenly" emailed about the stop-work order for the first time "on a weekend afternoon immediately before the Court was scheduled to hear the case, support[ed] an inference that the March 2 characterization was not what the order was intended to mean all along." *Id.*

The evidence demonstrated that the defendants' attempt to manufacture a new record days before the hearing was just that. JA721. "[E]mployees found out that" suddenly "being reactivated on paper" days before a court hearing "did not mean they could actually do the work." JA716 (employees were privately instructed to stand down); JA721-22 (examples of offices that lacked the ability to actually perform their work). And, Martinez testified, the stop-work order was never actually rescinded. JA718.

Ultimately, the court found that the defendants' "attempts to deny what was afoot are at odds with the undisputed facts in the record and the documents produced by both sides." JA679. Martinez's first declaration was "highly misleading, if not intentionally false." JA697. His live testimony "bore no resemblance to the impression his declaration had been drafted to convey." JA698. And the defendants'

"eleventh hour attempt to suggest immediately before the hearing" that they had not really tried to shut down the agency's operations "was so disingenuous that the Court [was] left with little confidence that the defense [could] be trusted to tell the truth about anything." JA697.

 In sum, the court found, "[t]he evidence reveals that: the defendants were in fact engaged in a concerted, expedited effort to shut the agency down entirely when the motion for injunctive relief was filed; while the effort to do so was stalled by the Court's intervention, the plan remains unchanged; and the defendants have absolutely no intention of operating the CFPB at all." *Id.*

**The district court's injunction.** Having found that the defendants had decided to shut down the agency—and that they would try again to carry out that decision if given the chance—the district court concluded that the plaintiffs were likely to succeed on the merits of their constitutional claims. JA731. The defendants did not dispute that closing an agency created by Congress violates the separation of powers. And, the district court explained, it's well established that courts have the power to hear claims that the executive has violated the constitution. JA668-70.

The district court also held that the plaintiffs are likely to succeed on their APA claims: It is both unlawful and arbitrary and capricious to shut down the agency. JA730-33. The defendants' primary argument to the contrary was that there was no final agency action—that the plaintiffs were "simply voicing a generalized

grievance about agency policy or management." JA671. But, the court explained, the plaintiffs' challenge "is not a challenge of any agency 'program.'" JA677. "It does not challenge any exercise of the agency's discretionary authority to regulate activities within its purview or to enforce particular statutory provisions." *Id.* Rather, it is a challenge to "the decision to shut down the agency completely." *Id.*

If the defendants' plan were implemented, the court concluded, the plaintiffs would be irreparably harmed. JA733. "Once the agency is gone, there will be no opportunity to afford relief at a later point in the litigation." *Id.*

Finally, the district court found that the equities and public interest cut sharply in the plaintiffs' favor. The "[d]efendants devote[d] less than a page" of their brief to these factors. JA738. Nevertheless, the court acknowledged the "significant interest" in ensuring that "the democratically-elected President" can "pursue his policy objectives." JA738-39. But the court held that that interest was not implicated because it was not enjoining the defendants' choices about what policies the agency should pursue or how. JA739. It was enjoining the defendants from "usurp[ing] the power" of another "democratically elected" branch of government by unilaterally shutting down an agency Congress created. *Id.*

On the other side of the ledger, the court cited a strong public interest in preventing the completion of the defendants' constitutional power grab. Citing the views of the Supreme Court, 203 members of Congress, twenty-two states, and the

District of Columbia, the district court explained that a shut-down of the CFPB would cause a "major regulatory disruption," "destroy[ ] the framework Congress created for safeguarding the finances of millions of consumers," and have "concrete and far-reaching implications" for states and their citizens. *Id.*

Having found that all four preliminary injunction factors were satisfied—and that an injunction was needed to preserve the status quo—the district court entered a preliminary injunction to prevent the CFPB from being shuttered before this lawsuit can be resolved on the merits. JA744. The injunction restored the agency to the status quo before the defendants had attempted to shutter it by reversing the actions the defendants took to implement the shut-down; and it prohibited the defendants from shutting down the agency again. JA746-47. To make the injunction concrete and administrable, the court specifically prohibited the steps the defendants previously took to effectuate the shut-down: mass terminations, wholesale work stoppages, data deletion, and contract terminations. *Id.*

## SUMMARY OF ARGUMENT

This Court should affirm the preliminary injunction. The district court's factual finding that the defendants decided to shut down the agency leads almost inexorably to the conclusion that the plaintiffs are likely to succeed on the merits. After all, the Executive may not unilaterally shut down an agency that Congress created. And the district court was well within its discretion to craft an injunction

14

that ensured that it could award complete relief at the end of the case by preventing the defendants from shuttering the agency in the interim.

**I.** The plaintiffs are likely to succeed on the merits.

**A.** Unable to argue that shutting down an agency is constitutional, the defendants try to convince this Court that they did not actually plan to do so. But the district court found otherwise: The defendants decided to shutter the CFPB. The defendants cannot demonstrate that this finding is clearly erroneous. After all, it is supported by the testimony of their own witness—and the consistent testimony of multiple other CFPB employees, including the head of the RIF team. It is undisputed that the defendants terminated the Bureau's contracts, shuttered its office space, halted its work, and attempted to fire its employees, all while its Chief Operating Officer explained to employees that these actions were part of the plan to shut down the Bureau. It was not clear error for the district court to decline to ignore all of this evidence in favor of a handful of emails that it found were created by the defendants to "paper over" the true facts. JA679.

**B.** The defendants next insist that no court can review the claim that they decided to unilaterally eliminate an agency Congress created. Not so. As the district court explained, the court's power to enjoin unconstitutional executive action is inherent in the Constitution itself. It's well established, therefore, that there is a direct cause of action under the Constitution to seek this injunction. The defendants never

squarely confront this rule, but suggest that the APA somehow eliminates this well-settled right. Yet the Supreme Court and this Court have repeatedly recognized the right to pursue constitutional claims directly even after the APA's enactment.

The district court also correctly held that the plaintiffs are likely to succeed on their APA claim. The defendants contest that a decision to close an agency is reviewable final agency action, but their argument rests on ignoring the district court's factual findings and the categorical claim that a "plan" can *never* be challenged under the APA. Decades of case law says otherwise. And they fare no better in arguing that the stop-work order is not reviewable. That directive came straight from the Acting Director, was used as justification to fire over a thousand employees, and immediately ground the Bureau to a halt. Courts routinely review internal directives with far less drastic consequences.

**C.** The plaintiffs demonstrated a "substantial likelihood" that the district court had jurisdiction over these claims. The National Treasury Employees Union and the CFPB Employee Association—whose standing is uncontested—can bring their claims in district court. By creating agencies to hear ordinary employment claims, Congress did not implicitly strip federal courts of their jurisdiction to resolve "fundamental, even existential" questions about the structure of our constitutional system. *Axon Enter. v. FTC*, 598 U.S. 175, 180, 185 (2023).

16

And whatever the case may be for the employee plaintiffs, there's no dispute that the non-employee plaintiffs' claims cannot be channeled to federal employment agencies. The defendants assert that these plaintiffs lack standing, but every one imminently faces (or has already suffered) concrete harm if the defendants are permitted to proceed with the shut-down: The National Consumer Law Center relies on CFPB reports and data to fulfill its mission of educating consumer advocates and consumers themselves. The NAACP collaborates with the CFPB to provide vital resources and education to its members. The Virginia Poverty Law Center depends on the Bureau's consumer complaint system to serve its legal-aid clients. And Ted Steege is relying on the Bureau to help discharge his late wife's loans, which she herself was unable to get discharged because of the stop-work order. If the Bureau shuts down, these organizations will lose resources vital to their mission—and Mr. Steege will lose help fulfilling his late wife's dying wish not to pass on her debt to her family.

**II.** The other factors also weigh heavily in favor of an injunction.

Without immediate action, the defendants will complete their closure of the CFPB, and by the end of the case it will be too late for the court to do anything about it. And harm that will inevitably be suffered by the plaintiffs in the wake of a shut-down will be irreparable.

The balance of equities and the public interest also both strongly favor an injunction. "Eliminat[ing] the CFPB" will "trigger a major regulatory disruption and [] leave appreciable damage to Congress's work in the consumer-finance arena." *Seila Law LLC v. CFPB*, 591 U.S. 197, 236–37 (2020). Large financial institutions will go unregulated—risking another financial collapse of the kind that led to the creation of the CFPB—and consumers will be left without critical resources in moments of dire need. On the other side of the ledger is only this: The defendants' interest in engaging in conduct they haven't defended as lawful. That supports, not cuts against, an injunction.

**III.** Finally, the defendants' efforts to once again assail the scope of the injunction fail. The preliminary injunction was carefully tailored to preserve the status quo. The injunction's provisions accomplish that end—collectively ensuring that, come the end of the case, the Bureau still exists. A narrower injunction would neither maintain the status quo until the end of the case nor prove workable in practice. The district court therefore did not abuse its discretion in crafting the injunction.

# ARGUMENT

## I.    The plaintiffs are likely to succeed on the merits.

### A.    The district court did not clearly err in finding that the defendants decided to shut down the agency.

The defendants can't argue that their decision to shutter the CFPB was lawful. So instead they assert that it never happened. But after reviewing dozens of declarations, reading hundreds of documents, and holding a two-day evidentiary hearing, the district court found otherwise: The defendants engaged in a "concerted" effort "to shut down the agency"—and absent the court's intervention, that "plan" would have been fully excuted. JA697.[2]

This appeal is not a second evidentiary hearing. To overcome the district court's factual finding, the defendants must show that it is clearly erroneous. They cannot do so.

**1.** The district court's "factual findings"—and inferences from those findings—are reviewed "for clear error." *Awad v. Obama*, 608 F.3d 1, 6-7 (D.C. Cir. 2010). That standard applies "regardless of whether the factual findings were based on live testimony or … documentary evidence." *Id.* This deference is stronger still

---

[2] This factual finding distinguishes this case from *Widakuswara v. Lake*, which this Court viewed as relying on the "suggest[ion]" based on "facts on the record and on the ground" that an agency was "being dismantled." 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025). Here, the district court *found* that the defendants, in fact, decided to shut down the agency.

for a district court's credibility rulings. *United States v. Broadie*, 452 F.3d 875, 880 (D.C. Cir. 2006). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it"—even if the appellate court is "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985).

**2.** The defendants cannot demonstrate that the district court "clearly erred" in finding that "the agency would be shut down absent the court's intervention." Opening Br. 47. Their own—and only—witness testified that that's precisely what would have happened. JA708. And that testimony is backed by the defendants' own actions: Within days after Vought took over the agency, the defendants ordered "a wholesale termination of the contracts needed to keep the CFPB running"; they canceled *every* lease on *every* office; and they began mass terminations. JA700-01, 708. Had the district court not intervened, 1,200 positions at the CFPB—whole divisions, offices, and units of the Bureau—would have been eliminated immediately, with the rest soon to follow. JA701. The defendants don't mention any of this, let alone dispute it.

Nor do they mention (or dispute) how the CFPB's own Chief Operating Officer explained what was happening to his employees at the time: The CFPB "w[as] legitimately shutting down." JA706, 1233. And "acting leadership wanted [the employees executing the shut-down] to move as quickly as possible." JA699, 1027,

1232. The agency, he said, was to "be eliminated"—"wiped out within 30 days." JA655, 706-07, 1049, 1233. Multiple witnesses, including, again, Martinez himself, testified that senior agency executives confirmed that the Bureau was being shut down. JA655, 706, 707, 1049, 1233. Even after the district court's intervention, there continued to be meetings to implement the shut-down—just as soon as the court's order was lifted. JA752, 1047, 1238.

It cannot be clear error for the district court to find that the defendants decided to do exactly what their Chief Operating Officer said at the time: shut down the agency.

**3.** In arguing otherwise before the district court and in their stay motion on appeal, the defendants heavily relied on Martinez's declaration, which claimed that acting leadership "worked to comply with statutorily required functions." JA106, 655. They have now abandoned any attempt to rely on Martinez's statements, which Martinez himself admitted on the stand he "knows now" were not true. JA725. Nevertheless, they continue to insist that "[o]nce Vought started," the agency committed "to comply[ing] with its statutory obligations." Opening Br. 47. But they have nothing left to point to other than to claim that the district court's findings rest on a "mistaken" interpretation of the stop work order and a handful of emails. As an initial matter, the district court relied on far more than that: Again, immediately following Vought's takeover, he directed the wholesale cancellation of contracts,

terminated the CFPB's office space, and endeavored to fire the entire workforce. All the while, the Chief Operating Officer was explaining to employees that the Bureau was legitimately shutting down.

In any event, there was nothing mistaken—let alone clearly erroneous—about the district court's interpretation of the stop-work order and the defendants made-for-court emails. According to the defendants (at 48), Vought's order to "stand down from performing any work task" wasn't really a stop-work order because it instructed employees to "alert" Vought himself, through his Chief Legal Officer, if there were "urgent matters." But the district court did not clearly err in concluding that that narrow caveat did not change the clear meaning of the order: employees, Bureau-wide, were to stop work. It's hard to interpret it any other way. Not only did employees stop working, the agency set up a tip line to report employees who worked in violation of that order. JA650. And it cited the stop-work order as justification for getting rid of the CFPB's workforce: no work, no employees necessary. JA675-76.

The defendants' reliance on a flurry of emails sent in the days leading up to the preliminary injunction hearing, suddenly purporting to authorize employees to work, is equally misplaced. The defendants contend that these emails demonstrate that they were committed to fulfilling the agency's statutory functions. But had the court not intervened on February 14, the defendants would have RIF'd the employees who perform those functions. JA675. And when they tried to return to work,

"employees found out that being reactivated on paper" days before a court hearing "did not mean they could actually do the work." JA716. While this was going on, the agency continued to prepare to implement the shut-down just as soon as the court's order was lifted. JA658, 664. It's no wonder—and it's certainly not clear error—that the district court found that the defendants curated paper trail could not be "taken at face value." JA721.

The defendants protest (at 45-46) that the court misinterpreted defense counsel's statement that they didn't know what the phrase "statutory obligations" meant. The court's finding that the defendants decided to shut down the agency did not rest on that statement—let alone so heavily as to demonstrate clear error. *Awad*, 608 F.3d at 7 ("[W]e do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole."). The defendants are also mistaken that counsel was making a purely legal argument. He stated *both* that, as a legal matter, he did not believe that it was appropriate to require the defendants to comply with their statutory obligations, *and* that, as a factual matter, they did not know what that meant. JA730, 1297-98.[3]

---

[3] The defendants stop short of making a voluntary cessation argument, perhaps recognizing that it would undermine their continued insistence that they never planned to shutter the agency in the first place. Even had they made the argument, "[t]he decision whether defendants' illegal conduct is likely to recur lies in the equitable discretion of the District Court." *Campbell v. McGruder*, 580 F.2d 521, 541 (D.C. Cir. 1978); *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (voluntary

**4.** Finally, the defendants briefly reference the presumption of regularity. Opening Br. 53. They did not invoke this presumption below—with good reason. The presumption does not "shield [agency] action from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Nor does it require courts to accept a narrative "that is incongruent with what the record reveals." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

The defendants' opposition to the preliminary injunction motion claimed that nothing out of the ordinary was happening at the CFPB—that there had been no attempt to shut down the agency. But that opposition omitted what is now undisputed: that far from an ordinary transition, the defendants had wholesale terminated the agency's contracts, canceled its office space, and were in the process of firing its employees. And the defendants' story relied on testimony in Martinez's declarations that was "highly misleading, if not intentionally false," JA697—testimony that Martinez himself has since disavowed. It's hard to imagine a circumstance in which the presumption of regularity is more thoroughly rebutted than one in which the government's declarant admits that he did not have personal

---

cessation doctrine applies no differently to "governmental defendants"). And the district court did not abuse that discretion in concluding that, having tried to shut down the agency and misled the court about it—and having continued to plan to implement its shut-down decision even after the court's intervention—there was a "cognizable danger" that the defendants would do so again. *United States Dep't of Just. v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016).

knowledge of the statements in his declaration and "know[s] now" that they were not true. JA1086-87.

### B. The defendants' claim that there is no cause of action to challenge the defendants' unilateral decision to shut down is wrong.

Because the defendants cannot dispute that their conduct was unlawful, they instead argue that no court can do anything about it anyway: Regardless of how unconstitutional their decision to shut down the agency, they say, there is no cause of action to challenge it. That's incorrect. There is both a direct cause of action under the Constitution and a cause of action under the APA.

### 1. There is a direct cause of action under the Constitution for the violation of separation of powers.

The district court correctly held that the Constitution prohibits the Executive from unilaterally shutting down the CFPB. JA693-94. The defendants do not argue otherwise.

They can't. The Executive's power "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution does not authorize the Executive to close an agency Congress created. Nor is there any statute that expressly or implicitly grants that power. *Id.* at 585. Congress created the CFPB, and "only Congress can take [it] away." *Helvering v. Or. Mut. Life Ins. Co.*, 311 U.S. 267, 272 (1940); *see also, e.g.*, *Loc. 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 64, 77 (D.D.C. 1973) (enjoining the

"dismantlement" of the Office of Economic Opportunity). The defendants' decision to shut down the agency anyway therefore violates the separation of powers.[4]

It is well settled that there is a "direct cause of action" under the Constitution for an injunction against unconstitutional agency action. *Trudeau v. FTC*, 456 F.3d 178, 190 & n.22 (D.C. Cir. 2006); *see Hubbard v. EPA,* 809 F.2d 1, 11 n. 15 (D.C. Cir. 1986). And it applies just as much to a "separation-of-powers claim" as to "every other constitutional claim." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

The defendants say nothing about this: Not once in their 15-page argument that the plaintiffs lack a cause of action do the defendants even mention the "separation of powers" or "the Constitution." Instead, they invoke the "strict limitations" that apply when an agency has violated a *statute* but there is no *statutory* cause of action to vindicate that violation.[5] Opening Br. 38 (citing *Fed. Express Corp.*

---

[4] The defendants have given up the argument—rejected by the district court—that the plaintiffs state only a statutory claim, not a separation-of-powers claim. JA668-671. That argument, which relied on *Dalton v. Specter*, 511 U.S. 462, 473 (1994), was premised on the assertion that there had been no effort to close the agency. Dkt. 31, at 38. But, again, the defendants have never disputed that such an effort violates the separation of powers. As *Dalton* explains, a claim alleging "excess or abuse of discretion in *exerting a power given*" is a statutory claim. 511 U.S. at 473. But a claim that the Executive has no power to take the action at all is a constitutional one. *Id.*

[5] The amended complaint uses the term "ultra vires," but there has never been any dispute that the plaintiffs claim that the defendants violated the Constitution.

*v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (discussing claims that an agency has acted "contrary to a specific prohibition in the statute")).

But a separation-of-powers claim is not a statutory claim; it's a constitutional one. And to succeed on a claim seeking to enjoin *unconstitutional* agency conduct, a plaintiff need only demonstrate that the Constitution was violated. *See, e.g.*, *Youngstown*, 343 U.S. at 585; *Free Enter.*, 561 U.S. at 491 n.2; *see also, e.g.*, *Trudeau*, 456 F.3d at 190 (distinguishing between a "direct cause of action" under the Constitution and a claim that agency exceeded statutory authority); *Elk Run Coal Co. v. U.S. Dep't of Lab.*, 804 F. Supp. 2d 8, 28, 31 (D.D.C. 2011) (dismissing statutory claim but allowing constitutional claim to proceed).[6]

Contrary to the defendants' suggestion (at 38), a direct constitutional claim does not somehow "circumvent" the APA's requirements. The "jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution" long predates the APA. *Bell v. Hood*, 327 U.S. 678, 684 (1946) (citing cases); *see Free Enter.*, 561 U.S. at 491 n.2. Indeed, it "is inherent in the Constitution itself."

---

[6] The only case that the defendants cite that even potentially involved a constitutional claim is the First Circuit's decision in *Puerto Rico v. United States*, 490 F.3d 50, 60 (1st Cir. 2007). That decision was about whether Puerto Rico had a cause of action "to obtain information from the [FBI] in connection with a criminal investigation into the activities of FBI employees." *Id.* at 54. And it resulted in three separate opinions, with no clear consensus reasoning. *See id.* at 53, 71, 73. To the extent it suggests that a cause of action directly under the Constitution is no different than a claim that an agency exceeded its statutory authority, it conflicts with this Court's decision in *Trudeau*, 456 F.3d at 190.

*Hubbard*, 809 F.2d at 11 n.15. The APA does not purport to limit that jurisdiction. *See Trudeau*, 456 F.3d at 187. Thus, a plaintiff can directly challenge unconstitutional Executive action, "regardless of whether [they] have a cause of action under" the APA. *Chacoty v. Pompeo*, 392 F. Supp. 3d 1, 12 (D.D.C. 2019)*; see Trudeau*, 456 F.3d at 187.

**2.    The plaintiffs may also challenge the defendants' decision to close the agency and Vought's stop-work order under the APA.**

The plaintiffs are also likely to succeed on their APA claims. Again, the defendants do not dispute that their conduct was contrary to law; nor do they contest that it was arbitrary and capricious. Instead, they contend that the plaintiffs are unlikely to succeed under the APA anyway because closing an agency—and ordering it to halt all work—are not final agency actions. Their own precedent shows otherwise.

For agency action to be final, it must satisfy "two conditions." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* Both requirements are satisfied here.

***a. Closing the agency.*** The plaintiffs are likely to succeed in showing that the defendants' decision to shut down the CFPB was final agency action. There was

nothing tentative about that decision: The defendants "barrel[ed] full speed ahead" to implement it. JA698. As its Chief Operating Officer repeatedly explained, the agency was "legitimately shutting down," it was in "wind-down mode," it was "clos[ing]." JA655, 701, 706. The defendants do not dispute that this shut-down would have had immediate legal consequences: The Bureau would no longer operate at all.

The defendants' primary response is that, as a factual matter, there was no decision to shut down the agency. But, again, the district court found otherwise, and the defendants have not shown clear error. The defendants assert (at 37) that because the district court did not pinpoint "any specific moment" when they decided to shut down the agency, that decision cannot be a final agency action.

But the plaintiffs' claims do not turn on when exactly the defendants made their decision. An agency action can be final, even if there are "details" that are "still unclear." *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008). And the reason that the court could not pinpoint the exact moment of decision is because the defendants tried to conceal that they had made it. An agency cannot escape review by attempting to hide its decision. *Cf. Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) ("Agency action generally need not be committed to writing to be final and judicially reviewable.").

The defendants' only other argument (at 37) on agency closure is to seize on the district court's description of their decision as a "plan" to shut down the CFPB.

They claim that a plan—"no matter how decisive"—can never be a final agency action. That assertion conflicts with decades of cases from this Court reviewing "plans" under the APA. *See, e.g.*, *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 905 (D.C. Cir. 2024) ("Air Tour Management Plan governing tourist flights over four national parks"); *Defs. of Wildlife v. Salazar*, 651 F.3d 112, 113 (D.C. Cir. 2011) ("plan to manage ... elk and bison populations"); *Senior Res. v. Jackson*, 412 F.3d 112, 119 (D.C. Cir. 2005) (Air Force base "redevelopment plan").

Contrary to the defendants' assertion, plans do not lack finality, simply because they require implementation. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 790, 808 (2022) (memorandum directing agency employees to "take all appropriate steps" to terminate program was final agency action); *W. Watersheds Project v. Haaland*, 850 F. App'x 14, 15 (D.C. Cir. 2021) (a "resource management plan" that required multiple steps to implement "constituted final agency action," while the implementing steps did not); *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013); *Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1110 (9th Cir. 2025); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801–02 & n.9 (9th Cir. 2013); *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir. 1997).

Thus, the decision to close a military base is a "final action." *Dalton v. Specter*, 511 U.S. 462, 470 (1994).[7] So too is the decision to end an agency program. *Texas*, 597 U.S. at 808. Both decisions require agency employees to take steps to implement the decision. *See id.* at 793. But they are nonetheless final because they do not express tentative, policy goals. They represent final decisions that have significant practical and legal consequences. The decision to close an agency is no different.

The defendants' argument to the contrary rests on a misunderstanding of a single case, *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006). That case held that a budget *request* to Congress that *proposed* a *strategy* for meeting the agency's statutory obligations was not final agency action. *Id.* at 20. The request did not bind anyone, including the agency itself; it created no rights or obligations; it had no legal consequences. *Id.* at 21-22. At most, it was a "statement" by the agency about "what it plans to do, at some point, provided it has the funds and there are not more pressing priorities." *Id.* Contrary to the defendants' assertion (at 31), the Court did not hold that all agency plans "are generally unreviewable." It explained that "*the* plans"—that is, land use plans like those at issue in the cases it was discussing—do not ordinarily constitute final agency action. *Id.* at 21. And that's

---

[7] The problem in *Dalton* was that this decision was made by the President, rather than the agency, and so it was not final *agency* action. 511 U.S. at 470.

because they are merely "statement[s] of priorities," which are used to guide agency action but do not "prescribe" it. *Id.*

Here, the defendants did not merely state that at some point in the future, if they got around to it, they would like to shut down the CFPB. They decided to shutter the agency. And that decision governed the agency's conduct immediately: If the district court had not intervened, the agency would have been wiped out within 30 days. That is final agency action.

**b. Stop-work order.** Even if the decision to close the agency did not constitute final agency action, Vought's stop-work order did. Nothing in the directive suggested that it was "tentative, open to further consideration, or conditional on future agency action." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007). To the contrary, the CFPB established a "tip line" to enforce compliance. JA701. And, in a formal memo to the Office of Personnel Management, the defendants relied on the stop-work order to justify firing more than a thousand employees. JA675-76.

Legal consequences flowed from the stop-work order. It bound all agency staff, directing them to stop work on all programs. *See Texas*, 597 U.S. at 808 (directive that "bound [agency] staff" by prohibiting them from implementing program was final agency action). Unsurprisingly, that had an immediate, concrete impact on the agency's ability to perform its statutory functions—16,000 consumer complaints went

unanswered, complaints referred by Congress were ignored, mandatory reporting deadlines were missed, and research and supervision activity ceased. JA364, 447, 470-71, 734, 1263; Dkt. 106-2, at 5. That's final agency action.

The defendants' arguments to the contrary conflict with longstanding precedent—and common sense. As an initial matter, the defendants assert (at 34-35) that Vought's order to the entire Bureau "not [to] perform any work," JA646, does not qualify as agency action at all. They didn't make this argument below, presumably because the law is clear that an agency can take action through directives to its staff. *See, e.g.*, *Texas*, 597 U.S. at 808 (memo that "bound DHS staff by forbidding them to continue [at-issue] program"); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1003, 1007 (D.C. Cir. 2014) ("directive" to EPA's regional directors about applicability of appellate decision); *Mil. Ord. of Purple Heart of U.S. v. Sec'y of Veterans Affs.*, 580 F.3d 1293, 1294 (Fed. Cir. 2009) (internal "directive" to Veterans' Administration regional offices about procedure for reviewing claims). An "action" under the APA "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). The CFPB exercised its power by halting everything the Bureau did.

The defendants fare no better challenging the order's finality. First, they argue (at 35) that the email was insufficiently formal. But an order need not be formal to be final. *See, e.g.*, *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 438 (D.C. Cir. 1986). The

defendants didn't tentatively consider pausing the agency's work. They issued an order backed by a public tip line to discipline employees that violate it and relied on that order in their attempt to fire 1,200 employees.

The defendants (at 36) also contend that the order was "subject to change." But agency action is always subject to change. That doesn't render it non-final. *Clean Air Project* 752 F.3d at 1006. And here, the purported "change"—or "clarification"— that the defendants rely on (at 36) are the emails that the district court found were created in a transparent attempt to "paper over" their effort to shut down the agency. JA634, 679.

Second, the defendants briefly argue (at 36-37) that the stop-work order had no "direct and appreciable effects." This assertion is perplexing. There's no dispute that after being ordered to "stand down," employees did so. JA717. That meant there was nobody to process consumer complaints, JA734; the Office of Service Member Affairs did not assist service members, JA252, 719; the Office of Older Americans did not provide services to victims of elder abuse, JA252; and the Supervision Division did not examine financial institutions, JA194-96.

The "central purpose" of the APA is to "provid[e] a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The defendants cite no authority that suggests that a directive to stop the work of an entire agency falls outside this "broad spectrum."

**c.** Unable to prevail on final agency action, the defendants resort to simply incanting the phrase "programmatic challenge" over and over again. *E.g.* Opening Br. 1, 3, 40. They cite *Lujan v. National Wildlife Federation*, a case in which the plaintiffs challenged thousands of "individual" land-classification decisions—not a specific policy governing those decisions, or even "a completed universe of particular" orders. 497 U.S. 871, 890 (1990). The plaintiffs "laid" before the court all of the varied "flaws" they'd identified in all of these orders—and those they believed would infect future orders—and asked the court to correct them all. *Id.* at 893. That's nothing like this case. The plaintiffs here are challenging a single plan to shut down the agency.

Similarly, the defendants' repeated assertion (at 39, 41, 42) that the plaintiffs seek to "compel agency action unlawfully withheld or unreasonably delayed" does not make it so. The plaintiffs do not seek to "*compel*" the defendants to take any action. 5 U.S.C. § 706(1) (emphasis added). They ask the court to "hold unlawful and set aside agency action" that is unlawful and arbitrary and capricious: the defendants' decision to shut down the agency. *Id.* § 706(2). The defendants do not dispute that the "mandamus-like standard" they spend pages describing applies only to actions to "*compel*" agency action under § 706(1). *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1280 (D.C. Cir. 2005).

The defendants suggest that if an agency terminates a program—or the agency itself is shut down—a plaintiff must apply to the nonexistent program or ask

for the no-longer-extant agency's services, wait an "egregious[ly]" long time, Opening Br. 42, and then seek to compel the nonexistent program or agency to respond. There's no authority for that proposition. Just like any other final agency action, when an agency makes an unlawful decision to terminate a program—or the agency itself—a plaintiff may challenge that decision and ask a court to set it aside under §706(2). *See, e.g.*, *Texas*, 597 U.S. at 808 (2022); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020); *see also Louisiana v. Biden*, 622 F. Supp. 3d 267, 286, 291-92, 294 (W.D. La. 2022) (challenging a decision to stop issuing "oil and gas leases").

The defendants' misunderstanding of the plaintiffs' claims also underlies its mistaken reliance (at 41) on *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004). Unlike here, the plaintiffs in *SUWA* did not seek to *set aside* an agency action under §706(2). Rather, they believed that the agency was not doing a good enough job complying with its "broad statutory mandates," so they sued to "*compel* agency action" under 5 U.S.C. § 706(1). *Id.* at 61, 66 (emphasis added). Granting that request, the Court held, would require the court to supervise whether the agency was, in fact, doing a good enough job—injecting it into the agency's "day-to-day" operations. *Id.* at 67. Again, here, the plaintiffs do not argue that the CFPB is not doing a good enough job; they do not seek to compel agency action. Instead, they seek to prohibit the defendants from shutting the agency down.

### C. The plaintiffs are likely to succeed in establishing jurisdiction.

Trying another tack, the defendants argue that even if the plaintiffs have a cause of action, no court has jurisdiction to hear it. But the plaintiffs have "show[n] a substantial likelihood" "of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). That's sufficient at this stage.

### 1. Congress did not intend to channel the Union and Employee Association's separation-of-powers claim to an agency created to deal with ordinary employment disputes.

The defendants argue (at 27) that the Union's and Employee Association's separation-of-powers claims must be brought before the federal agencies that decide ordinary federal employment disputes. But Congress did not intend to channel structural claims about the separation of powers to agencies created to hear ordinary employment disputes. The defendants' contrary argument (at 27-28) rests on the Civil Service Reform Act. But they point to no provision in the Act that withdraws from district courts the power to review a constitutional challenge to the Executive branch's attempt to unilaterally close an agency Congress created. Instead, the defendants argue that by creating a comprehensive review scheme for federal employment claims, the statute implicitly forecloses district court review of separation-of-powers questions that go to the heart of our constitutional order.

As the Supreme Court recently explained, whether a statutory scheme like the Civil Service Reform Act implicitly forecloses district-court jurisdiction over particular claims depends on whether those claims are "of the type Congress intended to be reviewed within this statutory structure." *Axon Enter. v. FTC*, 598 U.S. 175, 186 (2023). So, here, the question is whether Congress intended that a separation-of-powers claim challenging the unilateral shut-down of an agency would be channeled to the employment agencies that hear everyday employment claims. "Common [] sense" says no. *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1336 (D.C. Cir. 2024). The Merit Systems Protection Board adjudicates claims that an agency personnel action "ha[s] violated a merit system principle." *Barnhart v. Devine*, 771 F.2d 1515, 1520 (D.C. Cir. 1985). And the Federal Labor Relations Authority is "charged with adjudicating federal labor disputes, including 'negotiability' disputes and 'unfair labor practice disputes.'" *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). Congress did not, by sending ordinary employment disputes to those agencies, "implicitly" strip federal district courts of their jurisdiction to answer "fundamental, even existential" questions about the structure of our constitutional system. *Axon*, 598 U.S. at 180, 185.

That is confirmed by all three of the factors that courts consider when deciding if Congress has implicitly stripped them of their jurisdiction. If routed to the MSPB or FLRA, it will be "impossible to remedy" the employee-plaintiffs' injuries when

they eventually make it to federal court for "appellate review." *Id.* at 191. Once the CFPB is gone, there will be no roles to reinstate employees into. JA706 (Martinez testifying that "there [will] be no positions to compete for" once the agency is "eliminated"); *Bullock v. Dep't of Air Force*, 80 M.S.P.R. 361, 368–69 (M.S.P.B 1998) ("[T]he Board generally considers the abolishment of the position as a compelling reason for not reinstating the appellant[.]"). What's more, the claims here "have nothing to do with the" federal employment- and labor-related "matters [the agencies] regularly adjudicate." *Axon*, 598 U.S. at 193. And while the MSPB and FLRA "know[] a good deal about" the administration of the civil-service and labor-relations laws, neither knows anything "special about the separation of powers," and both "are generally ill suited to address structural constitutional challenges—like those maintained here." *Id.* at 194–95.

In arguing otherwise, the defendants rely exclusively (at 27–29) on decisions that pre-date *Axon*. But "*Axon* clarified" how to determine whether Congress impliedly stripped district courts of jurisdiction over constitutional claims. *Bohon v. FERC*, 92 F.4th 1121, 1124 (D.C. Cir. 2024). "The ultimate question is how best to understand what Congress has done." *Axon*, 598 U.S. at 186. There is only one answer to that question—federal courts have jurisdiction to hear existential separation of powers claims like those at issue here, even if brought by federal employees. *See id.* at 180.

## 2.     The plaintiffs have standing.

The defendants do not contend that the non-employee plaintiffs must pursue their claims through the Merit Systems Protection Board or the Federal Labor Relations Authority. Instead, they contend that these plaintiffs lack standing. To pursue a claim, only one plaintiff needs standing. *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Here, all of the plaintiffs are likely to succeed in establishing standing. There is no dispute that the National Treasury Employees Union and the Employee Association have standing. So too do the other plaintiffs.

The defendants argue at length that a "generalized interest" in safeguarding the separation of powers is insufficient to support standing. Opening Br. 17-19. We agree. The defendants' decision to shut down the agency is unlawful because it violates the separation of powers. But that's not why the plaintiffs have standing. They have standing because that unlawful decision—if not enjoined—will cause them concrete injury.

***National Consumer Law* Center**. The National Consumer Law Center is a non-profit devoted to "economic justice for low-income and other vulnerable people who have been abused, deceived, discriminated against, or left behind in our economy." JA22-23. Central to NCLC's mission is publishing reports, developing training materials, and providing guidance to legal services providers, consumer

advocates, and consumers themselves. JA79, 81-82. To do so, NCLC "relies heavily" on the CFPB. JA81. For example, several of NCLC's reports rely on data from the Bureau's consumer complaint database. JA82. It also relies on the complaint database to develop training materials to educate other consumer advocates. JA82. Its manuals rely on CFPB reports—from its statutorily required report on the credit card market to its publication of findings derived from recent supervision efforts. JA81-82. And its treatises depend on information published on the Bureau's website. JA81.

The defendants do not dispute that the loss of "key information that [NCLC] relies on to fulfill its mission" is a cognizable injury. *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2020); *see Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (organization suffered Article III injury when government "significantly restrict[ed]" "a generous flow of information" provided by an agency had standing to challenge agency actions that "significantly restrict that flow"); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (actions that "make it more difficult for [an organization] to accomplish [its] primary mission … provide injury").

Instead, they argue (at 24) that it's mere conjecture that if the CFPB shuts down, that will eliminate the "generous flow of information" that the CFPB provides.

But it's hardly speculative to conclude that if the CFPB does not exist, it will not provide any information.

**National Association for the Advancement of Colored People**. The NAACP is the nation's oldest and largest civil rights organization. JA57. It works to "accelerate the well-being, education, and economic security of Black people and all persons of color." *Id.* To achieve that aim, the NAACP "actively work[s]" with the CFPB to "protect and educate its members on consumer financial protection issues." JA57-59, 685-86. The Bureau regularly holds education calls with NAACP members, calls which would end if the Bureau were shut down. JA58. The NAACP worked with the Bureau to provide assistance and education to NAACP members who were victims of the Los Angeles wildfires—from helping them avoid the financial fraud that was rampant in the fires' aftermath to ensuring that mortgage companies provided the mortgage forbearance to which they were entitled. JA57, 686. CFPB staff were even about to fly to California to help these fire victims in person, when the stop-work order prevented them from doing so. JA58. And the NAACP was collaborating with the Bureau on a "state-by-state approach for helping NAACP members across the country." JA58. But the stop-work order, and the defendants' rush to close the agency, left the CFPB unable to move forward with that work. JA58.

The defendants are thus mistaken to contend (at 23) that the NAACP merely "hoped to collaborate with [the] agency." It was, in fact, collaborating with the

CFPB to provide vital education and assistance to its members. JA57-58. But that collaboration abruptly ended when the defendants attempted to shutter the agency—harming the NAACP's members, and undermining the organization's ability to fulfill its mission. That is injury-in-fact. *See Newby*, 838 F.3d at 9; *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39–40 (D.C. Cir. 2016).

**Virginia Poverty Law Center**. The Virginia Poverty Law Center provides legal aid to low-income Virginians and educates other legal aid providers, nonprofits, and agencies that advocate for consumers, as well as the public. JA71, 76. The Center operates a consumer helpline. JA72. And in doing so, it often refers consumers to the CFPB consumer complaint system and helps them file complaints. JA72-73. Doing so allows those who seek help from the Center to "get real and immediate results." JA73. It would "difficult if not impossible" for the Center to provide the same relief to consumers that they are able to provide by referring them to—and helping them use—the CFPB complaint system, and trying "would strain [the Center's] already limited resources." JA74.

The Center's reliance on the CFPB's complaint database are sufficient to support standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("perceptibly impair[ing] [an organization's] ability to provide counseling and referral services" is an Article III injury). The defendants' only response (at 26) is to assert that the Center offered only a "conclusory statement" that it would be harder

to fulfill its mission without the CFPB's assistance. But the Center offered far more than that. JA72-75. Its Chief Executive Officer detailed how the Center relies on the CFPB's consumer complaint system to help those who call its hotline; the relief they receive; the virtual impossibility of recreating that system internally; and, based on its experience trying to perform this work itself before the CFPB existed, that it would take too much money and time to help those consumers, without impairing its ability to serve its other clients, if there were no CFPB. *Id.*

**Ted Steege**. In January 2025, CFPB staff, including the Student Loan Ombudsman, were assisting Pastor Eva Steege to assist her with her loans. JA688-89. Pastor Steege, who was in hospice, was seeking to have her loans discharged before she died, to spare her family the burden of dealing with them after she passed. JA688. Following Vought's stop-work order, however, that assistance abruptly ended. JA189. And Pastor Steege died on March 15, without having received any additional help. JA689. Her husband Ted Steege has been substituted as a plaintiff.

The defendants offer a single reason why Mr. Steege lacks standing: They contend (at 26) that the Student Loan Ombudsman is not statutorily required to help with federal student loans. But even if that's true, the Ombudsman still would have done so—consistent with the Bureau's practice—had it not been for the defendants' efforts to close the Bureau. JA184. *See FEC v. Akins*, 524 U.S. 11, 25 (1998); *NTCH, Inc. v. FCC*, 950 F.3d 871, 879 (D.C. Cir. 2020).

### 3.    The plaintiffs' claims are ripe.

The defendants' arguments fare no better repurposed as a challenge to ripeness. Once again, the defendants contend (at 20-21) that the plaintiffs' claim is an "abstract disagreement over administrative policies." It is not. The defendants decided to shut down the agency. And, implementing that decision, they ordered the entire Bureau to stop all work. Those are concrete, "specifically identifiable ... violations of law." Opening Br. 21.

And their "effects" have already been "felt in a concrete way by" the plaintiffs. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). The defendants argue (at 20) that the plaintiffs must wait until the defendants take some action "that harms or threatens to harm them." But that has already happened. And if the injunction is lifted, and the agency shuts down—as the district court concluded it would—that harm would be irreparable. *See infra* section II. Not only do the plaintiffs not need to wait to challenge the defendants' decision to shut down the agency; they can't.

## II.    The remaining factors support an injunction.

***Irreparable Harm.*** Absent an injunction, the plaintiffs will suffer irreparable harm. The district court found that without an injunction, the defendants will shut down the agency. The defendants do not dispute that if the agency shuts down, it cannot be put back together. *See* JA634. Once the defendants cancel the

45

agency's contracts, delete its data, and eliminate the positions required to operate the Bureau, "there can be no do over and no redress." *Newby*, 838 F.3d at 9.

That means that absent a preliminary injunction, at the end of the case, there will be no Bureau. And as explained above, the evidence shows that the absence of the Bureau will devastate the ability of NCLC, the Virginia Poverty Law Center, and the NAACP to carry out their activities. *See id.* (holding that it is enough for irreparable harm that an action "perceptibly impair[s]" an organization's programs). It will be impossible for the Employee Association to fulfill its mission "to advance CFPB employees and the mission of the agency." *See id.* ("obstacles" that "unquestionably make it more difficult for [an organization] to accomplish [its] primary mission ... provide injury for purposes both of standing and irreparable harm"). And members of the Employee Association and the Union will be harmed in ways that lost wages cannot redress: Those with serious health conditions, for example, will lose their health insurance. JA684. *See Risteen v. Youth For Understanding*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) ("The loss of health insurance benefits—particularly for those who are unemployed—constitutes irreparable harm[.]").

The defendants' irreparable harm argument is, once again, premised on a misunderstanding of the plaintiffs' claims. Again, this is not an "unreasonable delay" case. That the plaintiffs' irreparable harm results *not* from unreasonable delay, but

instead from the defendants' efforts to close the CFPB, only further underscores that this case is not one about unreasonable delay.

**Balance of harms.** In addition to the significant harms the plaintiffs will suffer absent a preliminary injunction, the public interest also strongly favors an injunction. As the Supreme Court has recognized, "eliminat[ing] the CFPB" "would trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena." *Seila Law LLC v. CFPB*, 591 U.S. 197, 236–37 (2020). As 22 states and the District of Columbia explained below, "the States and their residents face a significant risk of irreparable harm" as a result of the defendants' actions. Dkt. 24 at 7. "[T]housands of state residents will be deprived of awarded monetary relief," "large financial institutions … will have carte blanche to loosen their regulatory compliance," and "consumers will be left without critical resources" that the CFPB provides, including help in dealing with acute crises like foreclosures. *Id.* at 8-9, 11. And, of course, there is a profound public interest in safeguarding the separation of powers—a carefully designed system which "serve[s] to safeguard individual liberty." *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014).

Against these weighty interests, the defendants have invoked (at 60) the executive branch's interest in "effectuat[ing] the President's policy priorities." The only policy priority they identify is an interest in shrinking "the federal government's operational footprint." Opening Br. 60. At oral argument on the motion for a stay

47

pending appeal, the defendants argued the same, explaining that the "key presidential policy initiative" impeded by the injunction is the joint guidance issued by OPM and OMB instructing agencies to develop plans for reductions in force. Tr. 91–92. The injunction did not, however, bar the defendants from developing the plans called for by that guidance or submitting those plans to OPM and OMB by the April 14 deadline set in the guidance. *See* Dkt. 70-2 at 4. Yet the defendants never made, let alone submitted, that plan. *See* Dkt. 131-1 at 96; *see also id.* at 129 (Adam Martinez saying he will "start strategizing on the" plan as of April 14). In other words, the defendants claim (at 60) that they are suffering "irreparable constitutional harm" because they cannot implement this policy initiative, but—despite being allowed to do so—have taken no steps to implement the initiative, including the steps that would lay necessary groundwork for the execution of RIFs.

Regardless, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. The defendants proceed (at 60) as if all they were up to was lawfully "effectuat[ing] the President's policy priorities." That "assumes the correctness of [their] position on the merits." *J.D. v. Azar*, 925 F.3d 1291, 1338 (D.C. Cir. 2019) That's a surprising assumption, given that the defendants have not *once* argued in this case that it would be lawful for them to close the CFPB—which is exactly what the district court found that they were doing. Because the

defendants are "unlikely to succeed" in proving the lawfulness of their actions, there is no public interest in allowing them to continue the same unlawful conduct. *Id.*

## III. The preliminary injunction was properly tailored to preserve the status quo during the pendency of the litigation.

**1.** The defendants rehash the same arguments about the scope of the injunction that they made in their stay briefing. Those arguments fare no better the second time around.

By definition, a preliminary injunction is a "stopgap measure." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). Its purpose "is to preserve t[he] status quo"—that is, "the last uncontested status which preceded the pending controversy"—so that the court can award meaningful relief at the end of the case. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022); *see* 11A Wright & Miller, Federal Practice and Procedures § 2947. The question, then, is not what relief should eventually be awarded should the plaintiffs prevail. It is what is necessary "to meet the exigencies of the situation," while the court proceeds on the merits. *Johnson v. Radford*, 449 F.2d 115, 117 (5th Cir. 1971) (a preliminary injunction "necessarily at times lacks the degree of precision which may be required on final decree"); *see Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022).

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025). That equitable discretion

is guided by "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017); *see Nebraska*, 52 F.4th at 1048. Thus, where "a proclivity for unlawful conduct has been shown," a court may need to enter a broader injunction to prevent "easy evasion." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137-38 (D.C. Cir. 2009). Similarly, where a defendant has engaged in otherwise lawful conduct to perpetuate an unlawful scheme, that conduct may need to be enjoined. *See United States v. Loew's*, 371 U.S. 38, 53 (1962); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16 (1971); *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. at 309; *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 382 (6th Cir. 2023); *English v. Town of Huntington*, 448 F.2d 319, 324 (2d Cir. 1971) (Friendly, J.). And the injunction, of course, should be administrable. *See Nebraska*, 52 F.4th at 1048 (citing *Covington*, 581 U.S. at 488).

Here, again, the district court found that the defendants had decided to shut down the agency—and misled the court about it. The court entered an injunction that restores the status quo by undoing the actions that the defendants took to implement their decision to shutter the Bureau; it also ensures that the court can award complete relief at the end of the case by preventing the defendants from taking those same actions again. The injunction goes no further than is necessary to preserve the status quo, without embroiling the district court in compliance disputes or allowing easy evasion. The court did not abuse its discretion in entering it.

**2.** Although the defendants assert generally that the injunction is broader than necessary, they challenge only a few of its provisions. The defendants' main objection is to the prohibition on RIFs.[8] But the district court did not abuse its discretion in temporarily prohibiting the defendants from using the very tool they sought to use to eliminate the agency, until the court can decide the case on the merits. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation.").

The defendants protest that the prohibition should be narrower, but they never say how. *See J.D. v. Azar*, 925 F.3d 1291, 1335 (D.C. Cir. 2019) (courts are "not require[d] ... to fashion narrower, ostensibly permissible policies from whole cloth"). Any narrower relief would either be unworkable or fail to preserve the status quo— or both. *See Nebraska*, 52 F.4th at 1048 (rejecting government's argument that preliminary injunction should be narrower because the court "discern[ed] no workable path in this emergency posture for narrowing the scope of relief").

The defendants' immediate attempt to RIF almost 90% of the agency following this Court's stay order demonstrates as much. The Chief Operating Officer and Chief Information Officer agreed that, if the RIF were allowed to stand, the

---

[8] The defendants also briefly challenge the reinstatement provision, but that provision merely restores the status quo before they began implementing their unconstitutional shut-down plan. And it's already been effectuated. The same is true of the provision requiring the rescission of the contract stop-work notices the defendants issued the week of February 10.

Bureau couldn't function "even for 60-days." Dkt. 131-1 at Ex. 23. Leaders from across the agency also agreed. *See, e.g.*, Dkt. 131-1 at Ex. 23; Dkt. 127-7 ¶¶ 7-9; Dkt. 127-5 ¶ 7; Dkt. 127-6 ¶ 4. But the defendants nevertheless claimed that they had undertaken a "particularized assessment" and determined that the Bureau could somehow perform its statutory functions without the RIF'd employees. JA895. And so, dubious as that claim was, an evidentiary hearing was necessary to determine its veracity— and thus whether the defendants had complied with the injunction, as partially stayed by this Court. JA896. As this episode demonstrates, a temporary prohibition on RIFs is the narrowest possible administrable relief. Anything narrower would either enable the defendants to easily evade the court's strictures or embroil the district court in exactly the kind of enforcement disputes the defendants argue it should avoid.

The prohibition on contract terminations is even narrower: It allows the defendants to stop work—and payment—on any contract. It merely prohibits them from finalizing contract terminations, such that they cannot be undone should the district court determine at the end of the case that's what's necessary to award complete relief. JA747. For the first time on appeal, the defendants contend (at 63-64) that a vendor may choose to continue incurring costs after a stop-work order. The provision they cite does not say that. And there is no evidence in the record that vendors incur any costs at all—let alone what those costs are or whether they differ

from costs incurred when a contract termination is finalized. The only evidence in the record is to the contrary. *See* JA412 (stop-work notice directing vendor to "incur[] no additional costs"). The district court cannot have abused its discretion in failing to consider a vague assertion that vendors could incur costs that has no support in the record and that the defendants did not raise below.

Finally, the defendants challenge the prohibition on work stoppages, asserting (at 62) that it prohibits "temporary pauses in work activities" to reassess agency priorities. Again, the provision doesn't say that—and, in fact, the district court distinguished the defendants' across-the-board stop-work order from a lawful, temporary pause. JA752-53.

Ultimately, the defendants muster no convincing argument that there is any narrower administrable injunction that would preserve the status quo.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
ROBERT FRIEDMAN
MICHAEL SKOCPOL
GABRIEL CHESS
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

*deepak@guptawessler.com*

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

WENDY LIU
ADINA H. ROSENBAUM
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

JULIE WILSON
*General Counsel*
PARAS N. SHAH
*Deputy General Counsel*
ALLISON C. GILES
*Assistant Counsel*
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

May 9, 2025                    *Counsel for Plaintiffs-Appellees*

### CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

I hereby certify that my word processing program, Microsoft Word, counted 12,971 words in the foregoing brief, exclusive of the portions excluded by Rule 32(f). The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface in 14-point Baskerville font.

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta