**[ORAL ARGUMENT SCHEDULED MAY 16, 2025]**

No. 25-5091

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees,*

*v.*

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

REPLY BRIEF FOR APPELLANTS

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
MELISSA N. PATTERSON
KEVIN J. KENNEDY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7234*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4214*

## TABLE OF CONTENTS

Page

GLOSSARY

INTRODUCTION AND SUMMARY ................................................................. 1

ARGUMENT ............................................................................................. 2

    I.    Plaintiffs' Challenge Suffers From Multiple Justiciability
    Problems. ........................................................................................ 2

        A.    Plaintiffs Have Not Established Jurisdiction...................... 2

        B.    Plaintiffs Cannot Identify A Valid Cause Of Action. ........ 9

    II.    Even Apart From Threshold Defects In Plaintiffs' Claims,
    The District Court's Legal And Factual Errors Warrant
    Vacating The Preliminary Injunction..........................................18

        A.    Plaintiffs Cannot Evade The Legal Standard That
            Applies To Claims Of Agency Failure to Fulfill
            Statutory Obligations.............................................................18

        B.    Plaintiffs Cannot Rehabilitate The District Court's
            Conclusion That Defendants Intend To Close CFPB........20

        C.    The Preliminary Injunction's Profound Overbreadth
            Supports Vacatur. ..................................................................29

    III.    The Equitable Factors Favor Relief From The Preliminary
    Injunction During This Litigation. ...............................................31

CONCLUSION............................................................................................ 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Abdullah v. Obama*,
    753 F.3d 193 (D.C. Cir. 2014) ........................................................30

*American Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
    946 F.3d 615 (D.C. Cir. 2020) ..................................................... 6

*American Fed'n of Gov't Emps. v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ..................................................... 8

*Awad v. Obama*,
    608 F.3d 1 (D.C. Cir. 2010) ..........................................................23

*Axon Enter., Inc. v. Federal Trade Comm'n*,
    598 U.S. 175 (2023) ..................................................................... 8

*Bennett v. Spear*,
    520 U.S. 154 (1997) .................................................................12, 13

*Biden v. Texas*,
    597 U.S. 785 (2022) ...................................................10, 11, 13, 15

*California Cmtys. Against Toxics v. Environmental Prot. Agency*,
    934 F.3d 627 (D.C. Cir. 2019) ....................................................14

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..................................................................... 5

*Dalton v. Specter*,
    511 U.S. 462 (1994) .................................................................17, 18

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ......................................................................10, 13

*Elgin v. Department of the Treasury*,
    567 U.S. 1 (2012) .......................................................................7, 8

ii

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024)............................................................6, 7

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ...........................................12

*Gill v. Whitford*,
  585 U.S. 48 (2018)............................................................29

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .......................................................... 6

*Independent Equip. Dealers Ass'n v. Environmental Prot. Agency*,
  372 F.3d 420 (D.C. Cir. 2004) .........................................14

*Latif v. Obama*,
  677 F.3d 1175 (D.C. Cir. 2012) ........................................28

*Loma Linda-Inland Consortium for Healthcare Educ. v. National Labor Relations Bd.*,
  No. 23-5096, 2023 WL 7294839 (D.C. Cir. May 25, 2023) ........................... 8

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)............................................................ 3

*Lujan v. National Wildlife Fed'n*,
  497 U.S. 871 (1990)........................................................4, 10

*National Park Hosp. Ass'n v. Department of the Interior*,
  538 U.S. 803 (2003)...........................................................3, 4

*National Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) .......................................... 6

*North Carolina v. Covington*,
  581 U.S. 486 (2017)............................................................30

*Norton v. Southern Utah Wilderness All.*,
  542 U.S. 55 (2004)...........................................10, 11, 19, 20

*Sampson v. Murray,*
 415 U.S. 61 (1974) .................................................................29, 32

*Soundboard Ass'n v. Federal Trade Comm'n,*
 888 F.3d 1261 (D.C. Cir. 2018) ....................................................15

*Southwest Airlines Co. v. U.S. Dep't of Transp.,*
 832 F.3d 270 (D.C. Cir. 2016) ....................................................13

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) .................................................................3, 4

*Western Watersheds Project v. Haaland,*
 850 F. App'x 14 (D.C. Cir. 2021) ................................................15

*Youngstown Sheet & Tube Co. v. Sawyer,*
 343 U.S. 579 (1952) ....................................................................17

**Statutes:**

Administrative Procedure Act:
 5 U.S.C. § 706(1) .................................................................9, 11, 19
 5 U.S.C. § 706(2) ....................................................................... 9

5 U.S.C. § 1204(a)(2) ....................................................................32

5 U.S.C. § 7701(g) ........................................................................32

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFPB | Consumer Financial Protection Bureau |
| NAACP | National Association for the Advancement of Colored People |

## INTRODUCTION AND SUMMARY

The district court entered a sweeping preliminary injunction barring the Executive Branch officials responsible for managing the Consumer Financial Protection Bureau (CFPB) from using important, lawful tools for controlling an Executive Branch agency. The plaintiffs who secured this extraordinary remedy plainly disagree with defendants' intention to streamline CFPB in accordance with the President's policies, and openly invite this Court to affirm the injunction to freeze the agency at the "status quo"—*i.e.*, at the personnel and contracting levels existing before CFPB's current leadership took charge. This Court should decline that invitation, which would force defendants to maintain a prior administration's CFPB under the guise of keeping the agency "open."

Instead, this Court should promptly relieve CFPB's politically accountable leaders from the restraints the district court imposed. Plaintiffs cannot establish jurisdiction over this broadside attack on defendants' management of CFPB's employees and operations; no cause of action permits such a challenge; the district court applied the incorrect legal standard to a claim of agency failure to fulfill statutory duties; the sole basis for any remedy here is the mistaken conclusion that defendants

intend to close CFPB entirely; plaintiffs failed to show irreparable harm; and the injunction is fatally overbroad. Any one of these grounds warrants vacatur in full.

## ARGUMENT

### I.     Plaintiffs' Challenge Suffers From Multiple Justiciability Problems.

#### A.     Plaintiffs Have Not Established Jurisdiction.

Whether under the rubric of standing, ripeness, or the preclusive effects of the statutory schemes regarding federal-employment-related claims, plaintiffs' bid for jurisdiction fails.

**1.** Plaintiffs' brief makes clear that their claims are premised solely on the contention that defendants intend to close CFPB entirely in violation of various statutes requiring the Bureau to perform certain duties. *See* Resp. Br. 1-6, 9-32, 35-48, 50-51. But, as they must, plaintiffs "agree" (Resp. Br. 40) that they lack an individualized interest in policing the Executive Branch's general compliance with congressional commands or in enforcing broader separation-of-powers principles. *See* Opening Br. 17-19. After all, federal courts do not "exercise general legal oversight of the Legislative and

Executive Branches," they redress concrete injuries to specific interests.

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).

Plaintiffs nonetheless maintain that their challenge to the entirety of the feared shutdown is judicially reviewable. But plaintiffs offer no real argument why a dispute "challeng[ing] a … generalized level of Government action" such as CFPB's asserted shutdown is fit for review, as a matter of either standing or ripeness. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992); *see National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 807-08 (2003). Indeed, the actual injuries they rely upon—lost employment and asserted injuries from the lack of government services—result (if at all) not from a "shutdown" writ large, which is just a label for multiple distinct actions, but rather from "specifically identifiable Government violations of law" such as unlawful terminations or the cessation of specific, statutorily required functions. *Defenders of Wildlife*, 504 U.S. at 568 (quotation marks omitted). As explained (Opening Br. 21, 27-29), if CFPB does take any action causing plaintiffs a concrete injury for which they can seek redress, plaintiffs can challenge that specific action in the normal course. Where the parties can vindicate their interests in suits appropriate for judicial resolution, declining to adjudicate a programmatic

challenge creates no genuine "hardship." *National Park Hosp. Ass'n*, 538 U.S. at 808.

**2.** The only individualized injuries that the consumer-advocacy organizations and sole individual plaintiff assert do not satisfy Article III. As explained (Opening Br. 22-27), these plaintiffs fail to identify any concrete, redressable injuries caused by a "shutdown." Moreover, because "standing is not dispensed in gross," *TransUnion*, 594 U.S. at 431, even supposing that any plaintiff could demonstrate Article III harm, it would support standing only to challenge CFPB's failure to fulfill specific statutory functions that harmed them—not the entire alleged "shutdown," which is a collection of "many individual actions" that cannot be packaged together and "laid before the courts for wholesale correction." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 893 (1990).

The National Association for the Advancement of Colored People's (NAACP) alleged injury, which turns on a loss of collaboration with CFPB, is not concrete or redressable. Plaintiffs do not provide enough detail (Resp. Br. 42-43) to assess whether any aspect of CFPB's collaboration was a statutorily required function—and plaintiffs' suit turns solely on allegations that defendants intend to defy statutory mandates, not

4

assertions that defendants intend to exercise their statutory discretion differently than their predecessors. And even if the NAACP's allegations do involve a statutorily required function, the agency is free to choose its partners. Plaintiffs do not and could not allege any statutory requirement that CFPB continue to collaborate with the NAACP.

The National Consumer Law Center's alleged injury suffers from similar shortcomings. Plaintiffs vaguely assert (Resp. Br. 41) that they "rely" on various reports and other information CFPB has previously made available. To the extent such reliance pertains to information CFPB has discretion to provide, any informational loss has nothing to do with CFPB's statutorily required duties. And with respect to any statutorily required information, mere past reliance is insufficient to confer standing for multiple reasons. The organization has not shown that it will not receive statutorily required reports going forward—it remains an "[a]llegation[] of *possible* future injury." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (first alteration in original) (quotation marks omitted). Nor does the organization explain how it has or imminently will be "compelled to fill the void" left by any statutorily required reports or how remedying CFPB's inaction would work a "consequent drain on the organization's resources."

*American Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (quotation marks omitted). Rather, plaintiffs simply assert the organization's work will be "detrimentally impacted." JA82. Article III requires more. *See National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (no organizational standing due to failure to identify "operational costs beyond those normally expended").

Plaintiffs' attempts to rehabilitate the Virginia Poverty Law Center's conclusory allegations are similarly unavailing. The organization has hardly shown that a closure of the complaint database is imminent. Indeed, its declaration states only that the complaint system and hotline were down for *one day*. JA74. Furthermore, the organization does not allege that any alleged failure to maintain the database "directly affected and interfered" with its helpline service, *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024); rather, it merely alleges that CFPB will cease to "properly collect[] and disseminat[e] information about" consumer complaints, making it "more difficult" to operate the service, *id.* Regardless of whether such allegations would have sufficed under cases relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), they fall on the wrong side of the Article III line the Supreme Court recently

6

articulated. *See Alliance for Hippocratic Med.*, 602 U.S. at 395-96 (warning

against "extend[ing] the *Havens* holding beyond its context"); *cf.* Resp. Br.

41 (citing cases relying on *Havens*).

Finally, plaintiffs do not dispute (Resp. Br. 44) that the alleged injury

regarding Pastor Steege flows from the loss of a function—assisting with

enrollment in the Department of Education's Public Service Loan

Forgiveness Program, *see* JA688-89—that CFPB is not statutorily required

to perform. Nor could they establish that any such injury is caused by

defendants' failure to abide by any statute or redressable by an order

requiring statutory compliance.

**3.** The district court similarly lacks jurisdiction over plaintiffs' claims

asserting employment-related injuries. As explained (Opening Br. 27-29),

the Supreme Court and this Court have repeatedly held that employment-

related claims—including claims challenging systemwide policies or

presenting separation-of-powers questions—must be pressed through the

statutorily prescribed channels. *See Elgin v. Department of the Treasury*, 567

U.S. 1, 5 (2012) (holding that the "[Civil Service Reform Act] provides the

exclusive avenue to judicial review when a qualifying employee challenges

an adverse employment action by arguing that a federal statute is

unconstitutional"); *American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748,

757-61 (D.C. Cir. 2019) (requiring channeling of constitutional claims).

Plaintiffs do not grapple with that precedent; nor, as plaintiffs imply,

did *Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175 (2023),

disturb it. The question the Supreme Court asked in *Axon*—whether

Congress intended to channel the relevant claims through the review

scheme—is the same one, with the same test, asked in *Elgin* and this

Court's cases. *See id.* at 186; *Elgin*, 567 U.S. at 9; *American Fed'n of Gov't*

*Emps.*, 929 F.3d at 755. *Axon* did not displace *Elgin,* it cited *Elgin*

affirmatively, merely "recogniz[ing] a narrow exception" to a statutory

review scheme where plaintiffs present "facial challenges to the

constitutional structure of administrative agencies' ability to operate." *Loma*

*Linda-Inland Consortium for Healthcare Educ. v. National Labor Relations Bd.*,

No. 23-5096, 2023 WL 7294839, at *11 (D.C. Cir. May 25, 2023) (per curiam).

Plaintiffs here raise no such constitutional challenge to CFPB's structure;

rather, their claims are like those in *Elgin*, which controls here.

### B.     Plaintiffs Cannot Identify A Valid Cause Of Action.

Plaintiffs' claims fail for an additional threshold reason: they lack a cause of action. They bring the wrong type of APA claim to seek a judicial order compelling CFPB to perform its statutory duties—and in any event, they cannot establish "final agency action." Plaintiffs abandon any reliance on an *ultra vires* claim. And their attempt to repackage their claims as a freestanding, nonstatutory constitutional claim similarly fails.

**1.** Plaintiffs continue to press the wrong sort of APA claim. Plaintiffs rely (Resp. Br. 35) on 5 U.S.C. § 706(2), which permits courts to "hold unlawful and set aside agency action." But, as plaintiffs' ubiquitous references to CFPB's purported closure make clear (Resp. Br. 1-6, 9-32, 35-48, 50-51), what plaintiffs fundamentally attack is not final agency action.

Rather, such complaints regarding cessation of agency duties are claims about agency *inaction*, which Congress channeled through 5 U.S.C. § 706(1)'s provision governing judicial review of "agency action unlawfully withheld." As in *National Wildlife Federation*, plaintiffs attempt to aggregate defendants' actions regarding "the continuing (and thus constantly changing) operations of the" agency under its governing statutes, and seek

9

wholesale judicial review of defendants' management of CFPB. 497 U.S. at 890. Defendants' challenged "execut[ion of]" the alleged "plan to eliminate the agency," JA695, is no more reviewable agency action than was the Bureau of Land Management's "land withdrawal review program," which was "simply the name" plaintiffs called the agency's operations, *National Wildlife Fed'n*, 497 U.S. at 890 (quotation marks omitted). As the Supreme Court made clear in *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55 (2004), the *National Wildlife Federation* plaintiffs "would have fared no better if they had characterized" their claims "in terms of 'agency action unlawfully withheld' under § 706(1), rather than agency action 'not in accordance with law' under § 706(2)." *Id.* at 65. Here too, plaintiffs cannot circumvent § 706(1)'s limits, *see infra* p.18-19, by simply "couch[ing]" their challenge as one to "unlawful agency 'action' that the plaintiffs wished to have 'set aside.'" *SUWA*, 542 U.S. at 64.

Contrary to plaintiffs' assertion (Resp. Br. 36), the challenged conduct here bears no resemblance to the final agency actions in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), or *Biden v. Texas*, 597 U.S. 785 (2022). It is not that terminating an agency program or policy, as in those cases, can never constitute final agency

action. But in addition to not being "final," *see infra* p.11-15, the asserted "action" here is that the agency will stop performing tasks mandated by law, *i.e.*, that defendants will "unlawfully withh[o]ld" such required agency action, 5 U.S.C. § 706(1). In *Regents*, the challenged action was defendants' decision to end a discretionary program, not anything statutorily required. And in *Texas*, the defendants altered a migrant-detention policy in a way that conflicted with the plaintiffs' interpretation of the relevant statute, which the Supreme Court found imposed only "discretionary" duties. *See* 597 U.S. at 802-07. But where, as here, plaintiffs are not urging that defendants are implementing governing statutes under an incorrect understanding, but rather are challenging a failure to perform statutorily required actions in any way, they may not evade the limits Congress placed on such challenges under § 706(1)—limits whose "principal purpose … is to protect agencies from undue judicial interference with their lawful discretion" and prevent courts from inappropriately "injecting the judge into day-to-day agency management." *SUWA*, 542 U.S. at 66-67.

**2.** In contorting their claims to meet § 706(2)'s requirements, plaintiffs identify two purported "final agency actions"—an internal, now-

superseded February 10 email and a conjectural "decision" to close the

agency—that do not resemble anything that the Supreme Court or this

Court has found to trigger APA review. Plaintiffs point to no case from

either court reviewing, as final agency action, an informal, internal email or

a suspected decision to shut down an agency. And for good reason.

Begin with the February 10 email, which directed staff not to perform

any work tasks without approval from CFPB's Chief Legal Officer. *See*

JA646; Opening Br. 34-37. Such emails are how agencies conduct "the

common business of managing government programs." *Fund for Animals,*

*Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). They are

not how agencies take final action. The problem is not the email's

informality *per se* (Resp. Br. 33), but rather the commonsense

understanding that such internal emails rarely represent the

"'consummation' of the agency's decisionmaking process." *Bennett v. Spear*,

520 U.S. 154, 177-78 (1997). And this email certainly did not represent the

culmination of the agency's decisionmaking process with respect to its

continuing functions, as the agency's later conduct confirmed. *See* Opening

Br. 48-51. Put differently, the email was nonfinal not only because it was

subject to change, *cf.* Resp. Br. 34—as many genuinely final agency actions

are—but rather because the agency plainly treated the since-superseded email as a temporary step in an evolving effort to gain "operational control over the agency while ensuring that it would continue to fulfill its statutory duties." JA661; *see Southwest Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (in evaluating finality, courts "look[] to the way in which the agency subsequently treats the challenged action").

Plaintiffs analogize (Resp. Br. 36) to *Biden v. Texas*, but the email is a far cry from a memorandum announcing a discrete and fully formed agency decision to "hereby terminat[e]" an agency policy and "rescind" a former agency decision. 597 U.S. at 808 (quotation marks omitted); *see also Regents*, 591 U.S. at 9 (addressing Acting Secretary's "memorandum terminating the [Deferred Action for Childhood Arrivals] program"). The email did not announce a decisive end or change to any policy or program. It simply paused nonurgent (and, properly understood, non-statutorily required) agency work so that the agency leadership could assess which further actions it might take in light of the new administration's priorities.

For that reason, the email did not itself determine any "rights or obligations" or result in "legal consequences." *Bennett*, 520 U.S. at 177-78 (quotation marks omitted). Plaintiffs attempt to pin a host of consequences

on the email itself (Resp. Br. 34), but as explained (Opening Br. 36-37), each of the consequences identified by the district court followed from a subsequent act to terminate probationary employees, end contracts, or carry out a reduction in force. *See* JA674-77. Thus, even to the extent the email "forecast[]" the agency's "definitive" position, it would nonetheless not be final because it did not carry legal consequences on its own. *California Cmtys. Against Toxics v. Environmental Prot. Agency*, 934 F.3d 627, 638 (D.C. Cir. 2019). And plaintiffs' attempt (Resp. Br. 34) to turn any agency action that has "[p]ractical consequences"—like employees' compliance with their superior's instructions—badly mistakes the final-agency-action analysis and would render all internal agency directions subject to APA review. *Independent Equip. Dealers Ass'n v. Environmental Prot. Agency*, 372 F.3d 420, 428 (D.C. Cir. 2004) (quotation marks omitted).

Nor is a supposed goal of terminating the Bureau final agency action. The district court inferred that aim from various "communications within the CFPB and with [the Office of Personnel Management] and other third parties," which it determined represented a "concerted, expedited effort to shut the agency down … [that] remains unchanged." JA696-97. That approach ignores that courts may not review an agency's "abstract decision

apart from specific agency action, as defined in the APA." *Texas*, 597 U.S. at 809. Were the type of diffuse actions the court cited sufficient to trigger APA review under § 706(2), courts could simply accept plaintiffs' invitation to "[i]magine" a Federal Register notice with plaintiffs' spin on agency emails into existence, Resp. Br. 3, and base judicial review on that imaginary agency action.

Indeed, unlike the cases cited by plaintiffs (Resp. Br. 30), the abstract "plan" the district court inferred is unmoored from any statutory or regulatory scheme that treats such plans as having legal force and effect. *See Western Watersheds Project v. Haaland*, 850 F. App'x 14, 15 (D.C. Cir. 2021) (holding that resource management plan was final agency action where regulations recognized that "[r]esource management plans are designed to guide and control future management actions") (quotation marks omitted); *see also Soundboard Ass'n v. Federal Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) ("The decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action ... represents the culmination of that agency's consideration of an issue.").

**3.** In addition to their APA claims, plaintiffs' complaint included Count One asserting a "non-statutory right of action to enjoin[] and declare unlawful official action that is ultra vires." JA44.

Now, however, plaintiffs abandon any reliance on an *ultra vires* theory and make no attempt to satisfy the demanding requirements applicable to such claims. *See* Opening Br. 38-39. Rather, plaintiffs assert (Resp. Br. 25-28) that Count One permits them to eschew such standards and instead proceed through a freestanding cause of action for equitable relief directly under the Constitution's separation-of-powers principles.

This Court should reject this theory, which the district court did not analyze and for good reason: plaintiffs' Count One does not articulate a claim for freestanding constitutional review separate and apart from an *ultra vires* claim. On the contrary, plaintiffs' allegations that defendants "exceed[ed] executive authority" and "usurp[ed] legislative authority" are advanced solely in support of the *ultra vires* action they now disclaim. JA44. Given plaintiffs' pleadings, the district court understandably relied on the view that they were bringing an "ultra vires" claim in deciding they were likely to succeed on Count One. *See* JA693, 695 n.19. The government explained the error in that decision. *See* Opening Br. 38-40.

16

Plaintiffs' current characterization of their claim as a freestanding constitutional one, moreover, cannot be reconciled with *Dalton v. Specter*, 511 U.S. 462 (1994). There, the Supreme Court explained that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Rather, the Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Plaintiffs' claim in Count One is a "statutory one." *Dalton*, 511 U.S. at 474. Plaintiffs cannot assert there is no relevant statutory authority to act in this arena: the Dodd-Frank Act empowers the Executive Branch to administer CFPB and tasks it with discrete, statutorily mandated functions. And plaintiffs recognize that they would have no claim if defendants

17

carried out those statutory mandates. Thus, there is no "conceded *absence of any* statutory authority." *Id.* at 473. Rather, plaintiffs' alleged harms stem from their assertions that defendants have transgressed that concededly valid statutory authorization by failing to carry out certain statutorily required functions. That is a statutory claim dressed in constitutional garb, and plaintiffs have no constitutional cause of action to assert it.

## II.   Even Apart From Threshold Defects In Plaintiffs' Claims, The District Court's Legal And Factual Errors Warrant Vacating The Preliminary Injunction.

Any one of the multiple threshold defects in plaintiffs' claims warrants vacatur of the preliminary injunction in full—but they are not the only bases for that result. Plaintiffs' disregard of the appropriate legal standard for actions seeking a judicial order requiring an agency to fulfill its statutory duties, the significant errors rendering the district court's key finding insupportable, and the vast overbreadth in the remedy ordered all independently support vacating the preliminary injunction.

### A.   Plaintiffs Cannot Evade The Legal Standard That Applies To Claims Of Agency Failure to Fulfill Statutory Obligations.

Plaintiffs repeatedly stake their case on their claim that defendants intend to close CFPB entirely, leaving the Bureau unable to perform

18

various duties mandated by statute—and as discussed above, such claims are subject to the traditional guardrails Congress carried forward in the APA's provision regarding "agency action unlawfully withheld" under 5 U.S.C. § 706(1). *See* Opening Br. 41-43; *SUWA*, 542 U.S. at 63. Plaintiffs acknowledge that such attempts to secure a judicial order requiring an agency to perform its duties are evaluated under § 706(1)'s "mandamus-like standard." Resp. Br. 35.

Plaintiffs, however, make no attempt to satisfy that standard. Nor did the district court acknowledge that standard except to make the puzzling suggestion that because "plaintiffs are not invoking" § 706(1), the limits on judicial orders requiring an agency to perform statutory obligations are somehow irrelevant. JA678 n.11. But plaintiffs' failure to tether their claims to discrete, enforceable statutory duties that CFPB would (in their view) stop performing did not free the district court to enjoin defendants on the theory that they must comply with broad, undifferentiated statutory mandates. Any other conclusion would permit plaintiffs to circumvent the important limitations Congress placed on Article III courts' ability to compel agencies to perform duties required by statute—limits that preserve Article II officials' prerogative to "work out compliance" with

19

relevant statutes free from "pervasive oversight by federal courts … not contemplated by the APA." *SUWA*, 542 U.S. at 66-67.

> **B.** **Plaintiffs Cannot Rehabilitate The District Court's Conclusion That Defendants Intend To Close CFPB.**

The district court's conclusion that defendants intend to close CFPB entirely is founded on legal and factual error; vacatur of the preliminary injunction is warranted on that basis alone. *See* Opening Br. 44-53.

**1.** The district court's finding on March 28 that defendants intended to "dismantle and disable the agency entirely," JA634, is impossible to reconcile with any fair view of the record as a whole. From the first full business day of Acting Director Vought's tenure—February 10—the record contains document after document reflecting defendants' actions to continue the performance of CFPB's statutory duties. *See* Opening Br. 49-50 & n.4 (listing numerous examples dating from February 10); JA284 (February 10 email confirming that work related to the consumer complaint database and home mortgage disclosure application should continue); JA416-17, 648 (February 11 email in which the Chief Financial Officer asks CFPB deputies to identify all "contracts support[ing] a statutory requirement"); JA654 (February 19 email from the Chief Legal

Officer instructing various employees "to not terminate or suspend any contracts without specific authorization from Acting Director Vought or me") (quoting Dkt. 66-2, at 2); JA655 (citing Dkt. 66-2 at 3) (February 19 Chief Legal Officer email directing rescission of contract termination notices); JA289 (February 21 Chief Operating Officer email confirming that Legal can support all statutory requirements); JA106-07 (February 24 Chief Operating Officer declaration explaining that work requests had been approved and he had never heard one denied).

Despite this evidence, the district court found that "[a]s of" the February 10 email, defendants were "fully engaged" in an attempt to close the agency "entirely." JA634. The district court did not explain why new leaders intent on closing an agency would have made such repeated efforts to identify the agency's statutory duties and enable their continued performance. Indeed, the court conceded that defendants "authorized the resumption of some work and the reactivation of some contracts," and even acknowledged that those actions could be attributable to "a belated, but genuine recognition that there were certain duties that had to be performed to comply with the law while the agency was still open." JA634; *see also* JA709-10 (acknowledging that after "February 10 or 11, agency

leadership circled back and took steps to approve certain activities or reactivate specific contracts related to statutorily mandated activities").

**2.** Nonetheless, the district court brushed aside the abundant evidence that defendants intended to continue performing statutorily mandated duties as "more likely a charade for the Court's benefit" and "purely temporary." JA634. That conclusion rests on legal error. *See* Opening Br. 44-46. The district court wrongly drew adverse inferences from government counsel's correct legal argument that an injunction requiring adherence to unspecified "statutory obligations" would be ambiguous and unadministrable, instead characterizing that point as a factual concession that "no one—not even the Acting Director of the agency—knows what it means" to "perform their statutory functions." JA730-31 (quoting JA1297); *see* JA1289-98 (portions of government counsel's argument on which the court relied).

Plaintiffs attempt to minimize this error, protesting (Resp. Br. 23) that "[t]he court's finding that the defendants decided to shut down the agency did not rest on that statement—let alone so heavily as to demonstrate clear error." But the point is not that the district court rested any finding regarding defendants' putative *initial* aims on this mistake; rather, this

mistake underlies the court's finding that it could dismiss as unreliable all later evidence demonstrating that "CPFB leadership remains committed to having CFPB perform its statutory obligations," and that "there will continue to be a CFPB," Dkt. 31 at 2-3.[1] It is plaintiffs—not defendants—who ask the Court to consider portions of the evidence "in isolation," rather than "consider[ing] all of the evidence taken as a whole," *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010), by accepting the district court's wrongful disregard of substantial swaths of the record.

Nor are plaintiffs correct to suggest (Resp. Br. 23) that this mistake was not a pivotal aspect of the district court's factual analysis. The court

---

[1] *See* JA240-41 (Chief Operating Officer's March 2 declaration acknowledging that evidence from the week of February 10 that he and others thought the agency would close was "not inaccurate," but also explaining that "since then … a great deal has evolved at the CFPB" and that "[r]ather than a closure of the agency, Acting Director Vought's new leadership has focused on running a substantially more streamlined and efficient bureau"); JA106-07 (explaining on February 24 that "[w]ork requests have been approved to allow the CFPB to maintain operations required by statute," including those related to the Home Mortgage Disclosure Act, the Consumer Complaint Database, the CFPB Call Centers, and Civil Penalty Fund payments); *see also* JA1292 (government counsel's argument at March 11 hearing that the "knowledge and understanding [about the Bureau] has grown over time, and that has affected the[] type of approvals that have taken place" by "new acting leadership at the Bureau that's only been there for a couple of weeks"); Opening Br. 49 & n.4 (collecting approvals for statutory duties after February 10).

said the exchange caused "defendants' contention they were intent on doing what the law required them to do [to] collapse[] like a balloon at the end of the Macy's Thanksgiving Day Parade." JA730. And plaintiffs' defense (Resp. Br. 23) of the district court's attribution to counsel of a "factual" concession cannot be squared with the transcript, which plainly indicates that counsel was protesting against an injunction requiring compliance with unspecified "statutory obligations" given the possibility of disagreement about what those obligations entail. JA1292 (noting the possibility that "plaintiffs have one view of what their statutory functions are, CFPB leadership may have a different view, and this Court may have a third view"); *see* JA1297-98.

**3.** Even apart from this legal error, plaintiffs' blinkered view of the record repeats the district court's clear error in finding on March 28 that there remained in place an "unchanged" "plan" "to shut the agency down entirely," and that "defendants have absolutely no intention of operating the CFPB at all." JA697. As noted, plaintiffs, like the district court, dismiss evidence from February 10 and thereafter reflecting defendants' intention to continue CFPB's existence and discharge its statutory duties. *See* Resp. Br. 20-22.

Plaintiffs do little to rehabilitate the district court's improper dismissal of "appropriate steps by the new leadership" to approve work and contracts necessary to accomplish "legally required" tasks. JA709-10; *see* Opening Br. 48-50, 49 n.4. They contend that the court was justified in dismissing such evidence because planning for a reduction in force continued. Resp. Br. 23. But as reflected in this Court's original partial-stay order, a reduction in force is not inherently inconsistent with "the performance of defendants' statutory duties." Order 1, Apr. 11, 2025. Plaintiffs suggest (Resp. Br. 22) that the district court properly ignored the February 10 email's instruction that employees could seek authorization to perform "urgent" work, JA646 (quoting JA101), based on their description of it as a "narrow caveat," Resp. Br. 22, without ever explaining why their view of this language's breadth renders it meaningless. And they wrongly suggest (Resp. Br. 23) that all reactivated employees were not permitted to "actually do the work." The only citation they give for that assertion is JA716, which in turn cites only evidence related to a few employees. *See* JA249, 452.

More generally, plaintiffs do not defend the district court's reasoning on this score. They do not address the court's logic that because it

considered defendants' approvals of statutorily required work insufficiently "inviting," such evidence was not probative of a commitment to perform such work. Opening Br. 52 (citing JA710-11). They do not contest that the court mischaracterized record evidence about employees' continuing ability to perform *any* statutory obligation as related primarily to internal-management matters. Opening Br. 49-50 (citing JA710). And they do not deny that the court routinely ignored the February 10 email's instruction that employees could seek authorization to perform some work, *see* Opening Br. 48-49 (discussing JA646, and citing JA667, 672, 674, 697-98, 712); Opening Br. 50-52.

Plaintiffs' failure to discuss the district court's actual reasoning for disregarding evidence of defendants' repeated actions "to revive legally required activities," JA710, is understandable. The court stated that such evidence did not support the conclusion "that the administration ever abandoned its plan to shut the CFPB down," because it "serve[d] to underscore how complete the shutdown was as of February 10" with "little thought and attention" before contracts and activities were "eliminated." JA709-10. Even putting aside defendants' disagreement with that characterization, *see* Opening Br. 48-49, this statement is a non sequitur.

The court's conclusion that there was initially an overbroad cessation of activities and contracts provides no logical support for disregarding later evidence that the agency thereafter "changed course." JA710.

Nor is this the only example of the district court's illogical approach to evidence that defendants intended to authorize CFPB's statutorily mandated functions going forward. Even during defendants' first days at the agency, CFPB leadership promptly authorized statutorily required tasks as they were identified, approving the Office of Research's work on the weekly average prime offer rates within hours of being notified such work was paused. *See* JA286-87. Without explanation, the court took this evidence as a sign that there was no "interrupt[ion to] the effort to close the agency down in any way." JA699 n.20. It is entirely unclear how a rational factfinder could consider prompt, ongoing authorization to perform work as evidence that defendants were not "in any way" deviating from a plan to shutter CFPB entirely.

Finally, plaintiffs argue (Resp. Br. 24) that the presumption of regularity should not apply, urging that defendants did not conduct an "ordinary transition." But "[t]he presumption of regularity is founded on inter-branch … comity," not whether the relevant "government actions …

result from processes that are … 'familiar.'" *Latif v. Obama*, 677 F.3d 1175, 1178-82 (D.C. Cir. 2012).

Moreover, plaintiffs and the district court unfairly impugned the declarations of the government's witness, CFPB's Chief Operating Officer, because he testified he lacked "personal knowledge about what was actually going on." JA723; *see* Resp. Br. 24-25. His declarations made clear they were offered "based on [his] personal knowledge o*r information provided to [him] in the course of performing [his] duties*," JA103, 240 (emphasis added), a usual way in which agency representatives provide information about agency activities to courts. And plaintiffs and the court are wrong to imply (Resp. Br. 24-25; JA725) that this witness disavowed his key statements. He never deviated from his essential, core message from his first February 24 declaration that CFPB "leadership has worked to comply with statutorily required functions" and that "[w]ork requests have been approved to allow the CFPB to maintain operations required by statute," JA106, statements borne out by the record, *see supra* p.20-21. *Accord* JA241 (explaining that "the new leadership" had been responsive "to senior executives who have recommended or requested guidance to perform each of the CFPB's critical statutory responsibilities").

### C.    The Preliminary Injunction's Profound Overbreadth Supports Vacatur.

Plaintiffs do not attempt to contest two bedrock principles underlying defendants' showing that the preliminary injunction is overbroad and should be vacated. First, courts must "limit[ ]" any equitable remedy to "the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (quotation marks omitted). Second, there is the "well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs," such that "traditional standards" do not apply, and a plaintiff seeking "preliminary injunctive relief … at the very least must make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases." *Sampson v. Murray*, 415 U.S. 61, 83-84 (1974). Nor do plaintiffs contest that overbreadth in an injunction is reversible error. *See* Opening Br. 57-58.

Instead, plaintiffs rely on the latitude afforded courts at the preliminary-injunction stage. *See* Resp. Br. 49-50. But the very case plaintiffs cite for that proposition emphasizes the importance of "well-

29

known principles of equity" under which a district court "*must* … select a

fitting remedy *for the legal violations it has identified*." *North Carolina v.

Covington*, 581 U.S. 486, 488 (2017) (per curiam) (emphases added)

(quotation marks omitted). This responsibility lies with the court, *see id.*,

and "the movant has the burden to show" that the preliminary-injunction

factors "weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193,

197 (D.C. Cir. 2014) (quotation marks omitted). As reflected by this Court's

entry of a partial stay, no leeway that district courts enjoy in crafting

interim relief could justify the enormous disconnect between the legal

violation found (that defendants would entirely close CFPB) and the

remedy entered (that defendants are barred from using lawful tools of

agency management available to open agencies).

Notably, the district court here did not even attempt such

justification. Instead, the court proclaimed an "agency is either open or it's

not," JA678, and that the preliminary injunction would prevent defendants

from "eliminat[ing] the agency before the Court has the opportunity to

decide whether the law permits them to do it," JA635. That asserted binary

does not reflect reality; there are many ways in which CFPB could remain

"open" that depart from the "status quo" before CFPB's current leadership

had an opportunity to begin reforms in line with the President's policies—a

status quo that plaintiffs openly urge this Court to maintain, Resp. Br. 49-

50; *see also* Nonprofit Groups Amicus Br. 8-9 (equating an injunction

"maintaining the status quo" with "preserving" CFPB). The district court's

failure to recognize as much and make any effort to craft relief matching

the violation found warrants vacatur.

### III.  The Equitable Factors Favor Relief From The Preliminary Injunction During This Litigation.

This Court has already concluded that the overbroad injunction

should not remain in full effect even during this expedited appeal. *See*

Order, Apr. 11, 2025. Both the equities and the aftermath of this Court's

partial stay order support promptly vacating the injunction entirely so that

CFPB's politically accountable leaders can use lawful tools to bring the

Bureau in line with the President's policy goals without further delay.

As defendants explained (Opening Br. 58-59), the district court erred

in concluding that plaintiffs' potential loss of employment or access to

CFPB services establishes irreparable harm. *See* JA734-38. In response,

plaintiffs invoke only these same complaints. *See* Resp. Br. 45-47. Even if

such harms establish jurisdiction here, they do not constitute irreparable

injury warranting preliminary judicial relief. *See Sampson*, 415 U.S. at 91-92, 92 n.68; *supra* pp. 18-19. Plaintiffs offer no reason for their position (Resp. Br. 45-46) that a closed CFPB could never reopen should they prevail in this case. Nor do they account for the fact that properly pursued employment claims challenging reductions in force could yield redress from the Merit Systems Protection Board, which could, in appropriate circumstances, order reinstatement with backpay. 5 U.S.C. §§ 1204(a)(2), 7701(g).

In contrast, the preliminary injunction directly and substantially harms both defendants and the public interest by thwarting the Executive Branch from carrying out the President's directions at CFPB. *See* Opening Br. 60-61. Plaintiffs get matters backward in asserting (Resp. Br. 47) that enabling a district court injunction—rather than the politically accountable CFPB leadership—to control important management matters advances the public interest and safeguards the separation of powers. Indeed, plaintiffs are quite open in their bid to have the Court uphold the injunction by adopting plaintiffs' view of how CFPB should operate over defendants'. *See* Resp. Br. 18, 47. Plaintiffs may disagree with the President's and defendants' assessment about the appropriate size and priorities of CFPB, but such determinations are committed to Article II officials, not Article III

32

judges acting on plaintiffs' policy preferences. And plaintiffs' observation (Resp. Br. 48) that the injunction does not bar defendants from *planning* a reduction in force that they may not effectuate is no answer to the district court's inappropriate intrusion on the Executive Branch's control of the agency.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and vacate the preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
MELISSA N. PATTERSON

 */s/ Kevin J. Kennedy*
KEVIN J. KENNEDY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7234*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4214*
  *kevin.j.kennedy@usdoj.gov*

MAY 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,488 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Kevin J. Kennedy*

_____

Kevin J. Kennedy

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2025, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals by using the appellate CM/ECF system. Service will be

accomplished by the appellate CM/ECF system.

/s/ *Kevin J. Kennedy*
Kevin J. Kennedy