# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 16, 2025                    Decided August 15, 2025

No. 25-5091

NATIONAL TREASURY EMPLOYEES UNION, ET AL.,
APPELLEES

v.

RUSSELL T. VOUGHT, IN HIS OFFICIAL CAPACITY AS ACTING
DIRECTOR OF THE CONSUMER FINANCIAL PROTECTION
BUREAU AND CONSUMER FINANCIAL PROTECTION BUREAU,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00381)

———

*Eric D. McArthur*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Mark R. Freeman*, *Melissa N. Patterson*, *Catherine Padhi*, and *Kevin J. Kennedy*, Attorneys.

*Jennifer D. Bennett* argued the cause for appellees. With her on the brief were *Julie Wilson*, *Paras N. Shah*, *Allison C. Giles*, *Deepak Gupta*, *Robert Friedman*, *Michael Skocpol*, *Gabriel Chess*, *Wendy Liu*, *Adina H. Rosenbaum*, *Julie Wilson*, *Paras N. Shah*, and *Allison C. Giles*.

2

*Ariel Levinson-Waldman* was on the brief for *amici curiae* 42 Nonprofit Veterans, et al. in support of appellees.

*Elizabeth B. Wydra* and *Brianne J. Gorod* were on the brief for *amici curiae* Current and Former Members of Congress in support of appellees.

*Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Brian L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, *Caroline Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Barbara D. Underwood*, Solicitor General, *Dustin J. Brockner*, Assistant Solicitor General, *Kristen K. Mayes*, Attorney General, Office of the Attorney General for the State of Arizona, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawaii, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of

3

Nevada, *Jeff Jackson*, Attorney General, Office of the Attorney General for the State of North Carolina, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Nicholas W. Brown*, Attorney General, Office of the Attorney General for the State of Washington, *Raul Torrez*, Attorney General, Office of the Attorney General for the State of New Mexico, *Dan Reyfield*, Attorney General, Office of the Attorney General for the State of Oregon, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, and *Joshua L. Kaul*, Attorney General, Office of the Attorney General for the State of Wisconsin, were on the brief for *amici curiae* State of New York, et al. in support of appellees.

*Harold Hongju Koh* and *Jed W. Clickstein* were on the brief for *amici curiae* Former Consumer Financial Protection Bureau Officials in support of appellees.

Before: PILLARD, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

Dissenting opinion filed by *Circuit Judge* PILLARD.

KATSAS, *Circuit Judge*: To promote the President's deregulatory agenda, the Consumer Financial Protection Bureau undertook a series of actions to substantially downsize the agency. These actions included terminating employees, cancelling contracts, declining additional funding, moving to smaller headquarters, and requiring advance approval for agency work. The plaintiffs in this case either represent CFPB employees or use services provided by the agency. They sued to stop what they describe as a decision to "shut down" the Bureau. The district court found that agency leadership had made such a decision and then entered a preliminary injunction severely restricting agency actions regarding employment,

4

contracting, and facilities, among other things.  We hold that the district court lacked jurisdiction to consider the claims predicated on loss of employment, which must proceed through the specialized-review scheme established in the Civil Service Reform Act.  And the other plaintiffs' claims target neither final agency action reviewable under the Administrative Procedure Act nor unconstitutional action reviewable in equity. Accordingly, we vacate the preliminary injunction.

I

A

In 2010, Congress established the Consumer Financial Protection Bureau to enforce federal laws that protect consumers of financial products.  12 U.S.C. § 5511(a). Congress transferred to the CFPB "the authority to administer 18 existing consumer protection statutes," and it "vested the Bureau with rulemaking, enforcement, and adjudicatory authority" over those statutes. *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 421–22 (2024).  Congress authorized the CFPB to pursue five general objectives: provide timely and understandable information to consumers, protect consumers from unfair practices, reduce regulatory burdens, enforce consumer financial laws consistently, and encourage the relevant markets to operate transparently and efficiently.  12 U.S.C. § 5511(b).

Congress gave the CFPB broad discretion regarding how to pursue these goals.  For example, the Bureau's general grant of rulemaking power is expressly permissive; it states that the agency "may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof." 12 U.S.C. § 5512(b)(1); *see also id.* § 5531(b) (CFPB

5

"may prescribe rules" regarding certain "unfair, deceptive, or abusive acts or practices"). The Bureau's enforcement authority is also discretionary. *See id.* § 5562 (CFPB "may" conduct investigations, subpoena witnesses, or demand documents). So is its adjudicatory authority. *Id.* § 5563(a) (CFPB "is authorized to conduct hearings and adjudication proceedings").

The CFPB is mostly free to organize its internal affairs as it wishes. For example, it may establish "general policies … with respect to all executive and administrative functions," 12 U.S.C. § 5492(a), including personnel and contracting matters, *id.* § 5492(a)(2), (3), (7). The Director also may "fix the number of, and appoint and direct, all employees of the Bureau." *Id.* § 5493(a)(1)(A). And the Director has unreviewable discretion to determine how much funding the Bureau needs to carry out its objectives, subject only to a statutory cap. *Id.* § 5497(a)(1)–(2); *see id.* § 5497(a)(2)(C) (barring congressional committees from reviewing the Director's determination).

Congress did require the CFPB to provide some specific services to the public. For example, the Bureau must establish "reasonable procedures to provide a timely response to consumers" for inquiries or complaints. 12 U.S.C. § 5534(a); *see id.* § 5493(b)(3)(A) (requiring toll-free telephone number, website, and database for consumer complaints). The agency must prepare reports about interest rates, credit cards, and other matters. *See id.* § 5493(b)(1); 15 U.S.C. §§ 1646(a)–(b), 1632(d)(3). It must help compile information about depository institutions. 12 U.S.C. § 2809(b). And it must have a "Private Education Loan Ombudsman" to "provide timely assistance to borrowers of private education loans." *Id.* § 5535(a).

6

B

In early 2025, the President took several steps to implement a new deregulatory agenda. On January 20, he imposed a cross-agency freeze on new regulatory actions. *See* Regulatory Freeze Pending Review, 90 Fed. Reg. 8249 (Jan. 20, 2025). On February 26, he imposed a cost-cutting initiative that required agency heads to scale back contracts, grants, real estate, and other expenses. *See* Exec. Order No. 14,222, 90 Fed. Reg. 11095 (Feb. 26, 2025).

These initiatives brought changes to the Bureau. On Friday, January 31, the President removed the incumbent CFPB Director and designated Scott Bessent as the agency's Acting Director. On Monday, February 3, Bessent instructed agency employees and contractors to pause most activities while he evaluated them for "consistency with the goals of the Administration." J.A. 110. Bessent made clear, however, that the pause did not apply to work "expressly approved by the Acting Director or required by law." *Id.* On February 7, the President designated Russell Vought to replace Bessent as Acting Director. On February 8, Vought reiterated the pause on CFPB work, with the same exception for activities "expressly approved by the Acting Director or required by law." *Id.* at 117. The same day, Vought concluded that existing funds—which exceeded $700 million—were "sufficient" for the Bureau to meet its statutory mandates for the next fiscal quarter. *Id.* at 123. On February 9, CFPB leadership decided to close the Bureau's headquarters for a week because of protests outside the building. *Id.* at 105–06, 119. Around the same time, they also decided to cancel the lease of agency headquarters, which had remained largely vacant since the COVID pandemic, and to move the Bureau to smaller headquarters. *Id.* at 104, 106.

7

On February 10, Vought issued a new directive reminding employees of the office closure and instructing them to "not perform any work tasks" without prior approval from Chief Legal Officer Mark Paoletta.  J.A. 101.  The parties dispute whether this directive required approval for legally mandated activities or whether it carried forward the exception from the February 3 and February 8 emails.  In any event, Paoletta did approve some legally required work, starting on February 10.  *See id.* at 286–87 (exempting "work to publish the Average Prime Offer Rate"—a legally required task—"from the stop work order").[1]  And on March 2, Paoletta clarified that "[e]mployees should be performing work that is required by law and do not need to seek prior approval to do so."  *Id.* at 387.  In the interim, though, some required work was neglected, such as maintenance of the consumer-complaint database.

Over the same timeframe, the Bureau also addressed contract and personnel matters.  On February 11, its Chief Financial Officer instructed component heads to identify which contracts directly supported statutory obligations. J.A. 416–17.  Agency leadership decided to cancel all contracts in five components and all but two contracts in a sixth, *id.* at 288, 407, though it is unclear how many of those contracts actually were

---

[1] *See also*, *e.g.*, J.A. 298–300 (approving work related to the call center, online complaint form, and a required report for Congress); *id.* at 306 (approving the Office of Fair Lending's request to perform statutory functions); *id.* at 308 (directing an employee to attend meetings and perform trainings); *id.* at 284 (Bureau COO confirming that work related to the consumer complaint database and home mortgage disclosure application should continue); *id.* at 285 (confirming that the COO stated the work stoppage "does not apply to the … Consumer Resource Center"); *id.* at 313 (COO approving the processing of FOIA requests); *id.* at 326 (COO confirming that employees "can resume all regular work related to fulfilling statutory obligations").

8

cancelled, *see id.* at 131 (plaintiffs' declaration explaining that contract cancellations would not take effect for at least thirty days). On February 19, Paoletta forbade employees from cancelling any contract "without specific authorization" from himself or the Acting Director, *id.* at 654, and at least some contracts were then reactivated, *see id.* at 378. As for personnel, the Bureau terminated 85 probationary employees and 130 term employees, including the "Student Loan Ombudsman." *Id.* at 421, 648, 650, 950–51. It planned to implement two Reductions in Force (RIFs), which would have terminated at least eighty percent of the Bureau's remaining workforce. *See id.* at 649, 953, 1052. It considered placing the remainder of its employees on administrative leave, unless they were authorized to perform a work task. *See*, *e.g.*, *id.* at 465. And it decided to eliminate software enabling employees to work remotely. *Id.* at 239.

C

Six plaintiffs claim various harms from these actions, which they characterize as a coordinated effort "to eliminate the CFPB." J.A. 44. Two plaintiff organizations—the National Treasury Employees Union (NTEU) and the CFPB Employee Association—represent Bureau employees. They allege that the wholesale termination of their members will harm the members and cause the organizations to lose revenue. Three plaintiff organizations—the National Association for the Advancement of Colored People (NAACP), the National Consumer Law Center (NCLC), and the Virginia Poverty Law Center (VPLC)—claim harm from the loss of services provided by the Bureau. NCLC also alleges that the Bureau cancelled subscriptions to several of its publications. The final plaintiff, Ted Steege, alleges that his late wife could not meet with the Student Loan Ombudsman after that official was fired.

9

The plaintiffs brought two claims. First, the government's "actions to eliminate" the Bureau "usurp legislative authority conferred upon Congress by the Constitution." J.A. 44. Second, the "actions to suspend or terminate CFPB's statutorily mandated activities—including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters—constitute final agency action" that is reviewable under the APA, unlawful, arbitrary, and in excess of the agency's authority. *Id.* at 46–47.[2] The plaintiffs asked the district court to set aside "actions and intended further actions to dismantle the CFPB, including issuance of stop-work instructions, cancellation of contracts, declining and returning funding, reductions in force, firing of employees, and termination of the lease for its headquarters." *Id.* at 47. The plaintiffs further sought to enjoin the CFPB from issuing stop-work instructions and to require the agency "to resume immediately all activities that CFPB is required by statute to perform." *Id.* at 48.

After a two-day evidentiary hearing, the district court granted a preliminary injunction on March 28. The court found that the government was "engaged in a concerted, expedited effort to shut the agency down" and that it had "no intention of operating the CFPB at all." *See NTEU v. Vought*, 774 F. Supp. 3d 1, 58 (D.D.C. 2025). From that premise, the court concluded that the plaintiffs were likely to prevail on their separation-of-powers claim, *id.* at 55–77, and their APA claims, *id.* at 77–78. The court identified only two putative final agency actions undergirding the APA claims: the February 10 email sent by Vought, *id.* at 77, and the "wholesale

---

[2] The plaintiffs also challenge the President's designation of Vought as the CFPB's Acting Director. J.A. 45. The district court did not pass on this claim, so neither do we.

10

cessation of activities—the decision to shut down the agency completely," *id.* at 46. Among other things, the preliminary injunction required the government to reinstate all probationary and term employees who had been fired after February 10; to refrain from firing any employee except for cause; to refrain from instituting any work stoppage; to rescind all contract terminations issued after February 10; to provide Bureau employees with "either fully-equipped office space" or the means to work remotely; and to maintain a toll-free telephone number, website, and database in order to respond to consumer complaints. *Id.* at 85–86.

The government appealed and moved for an emergency stay. For purposes of the stay motion, it challenged only the scope of the preliminary injunction. We issued a partial stay that allowed the CFPB to terminate employees or stop work if the agency determined, after a particularized assessment, that the employees or work at issue were unnecessary to the performance of the Bureau's statutory duties. *NTEU v. Vought*, No. 25-5091, 2025 WL 1721068 (D.C. Cir. Apr. 11, 2025).

Days later, the agency issued a RIF notice to more than eighty percent of its workforce. J.A. 894. The Bureau represented that it had made the individualized assessment required by our partial stay order. Rather than attempt to police compliance with that requirement, we lifted the partial stay insofar as it allowed the government to conduct RIFs. *NTEU v. Vought*, No. 25-5091, 2025 WL 1721136 (D.C. Cir. Apr. 28, 2025).

II

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the plaintiff "must establish

11

that he is likely to succeed on the merits, that he is likely to
suffer irreparable harm in the absence of preliminary relief, that
the balance of equities tips in his favor, and that an injunction
is in the public interest." *Id.* at 20. We have reserved the
question whether a strong showing on one of the *Winter* factors
may compensate for a weaker showing on another, despite
expressing some skepticism on that point. *Sherley v. Sebelius*,
644 F.3d 388, 392–93 (D.C. Cir. 2011). Regardless of that
possibility, if a court concludes that a claim fails as a matter of
law—on a point of jurisdiction or merits—then a preliminary
injunction is inappropriate. *See United States Ass'n of Reptile
Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017)
("When, as here, the ruling under review rests solely on a
premise as to the applicable rule of law, and the facts are
established or of no controlling relevance, we may resolve the
merits even though the appeal is from the entry of a preliminary
injunction." (cleaned up)); *see also*, *e.g.*, *Munaf v. Geren*, 553
U.S. 674, 691–92 (2008); *Wrenn v. D.C.*, 864 F.3d 650, 667
(D.C. Cir. 2017); *Arkansas Dairy Co-op Ass'n, Inc. v. USDA*,
573 F.3d 815, 832–33 (D.C. Cir. 2009).

Although we review the grant of a preliminary injunction
for abuse of discretion, we review *de novo* any "underlying
legal conclusions." *CityFed Fin. Corp. v. OTS*, 58 F.3d 738,
746 (D.C. Cir. 1995).

III

As always, we start with jurisdiction. Because the district
court granted a preliminary injunction, our appellate
jurisdiction is secure. *See* 28 U.S.C. § 1292(a)(1). The CFPB
contends that the district court lacked statutory jurisdiction
over the claims of organizations representing its employees and
that none of the other plaintiffs has Article III standing. We
agree with the first contention but disagree with the second.

12

A

District courts usually have jurisdiction over claims arising under federal law, 28 U.S.C. § 1331, but a special statutory review scheme may displace that jurisdiction. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). To decide whether such a scheme displaces section 1331, we consider two questions. First, we ask whether a preclusive intent is "fairly discernible in the statutory scheme." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (cleaned up). Second, we ask whether the claims at issue "are of the type Congress intended to be reviewed within" the special scheme. *Id.* at 212.

The injuries alleged by NTEU and the CFPB Employee Association flow from their members' loss of employment. NTEU represents agency employees who have already been fired or may soon be fired, which will harm the employees and decrease NTEU's revenue. The Employee Association likewise represents such employees. These plaintiffs thus seek to redress injuries from agency decisions to fire employees. But a specialized-review scheme governs such claims and ousts the district courts of their arising-under jurisdiction.

The Civil Service Reform Act, 5 U.S.C. § 1101 *et seq.*, which includes the Federal Service Labor-Management Relations Statute, comprehensively "regulates virtually every aspect of federal employment." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009). Through it, Congress "carefully constructed a system for review and resolution of federal employment disputes, intentionally providing—and intentionally not providing—particular forums and procedures for particular kinds of claims." *Filebark v. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009). The CSRA permits federal employees to seek review of adverse personnel actions in the Merit Systems Protection Board

13

(MSPB), which may grant relief including reinstatement, backpay, and attorney's fees. *See* 5 U.S.C. §§ 7701(a), 1204(a)(2), 7701(g); 5 C.F.R. § 351.901. MSPB decisions in turn are reviewable in the Federal Circuit. *See* 5 U.S.C. § 7703(a)(1), (b)(1). Similarly, the FSLMRS provides for the adjudication of federal labor disputes before the Federal Labor Relations Authority, which also may order reinstatement with backpay. *See id.* §§ 7105(a)(2)(G), 7116(a), 7118. Its decisions are reviewable in the courts of appeals. *Id.* § 7123(a), (c). For covered claims, this scheme is "exclusive." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012); *see AFGE v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019).

The organizations contend that their claims, though keyed to adverse employment actions taken against CFPB employees, fall outside the CSRA. "Claims will be found to fall outside of the scope of a special statutory scheme in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency." *AFGE*, 929 F.3d at 755 (cleaned up). Here, none of these considerations applies.

*First*, a finding of preclusion would not foreclose meaningful judicial review. The organizations' injuries arise from the termination of their members, which the MSPB and FLRA may remedy by ordering reinstatement with backpay. *See* 5 U.S.C. §§ 1204(a)(2), 7118(a)(7)(C). The organizations object that the MSPB or FLRA might not reinstate employees to positions that have been abolished. But they cite only one decision indicating that, as a matter of discretion, the MSPB does not typically reinstate employees to abolished positions when other comparable jobs are available. *See Bullock v. Dep't of Air Force*, 80 M.S.P.R. 361 (M.S.P.B. 1998). In any event,

14

the Supreme Court has held that the CSRA provides the exclusive means for federal employees to obtain judicial review of adverse personnel actions even in circumstances where, unlike here, the CSRA itself forecloses review. *See United States v. Fausto*, 484 U.S. 439, 447 (1988).

*Second*, the organizations' claims are not wholly collateral to the CSRA scheme. Claims that "seek to reverse the removal decisions" at issue are not wholly collateral to the CSRA, as the Supreme Court held in *Elgin*. *See* 567 U.S. at 22 ("A challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme."). The organizations seek to obtain reinstatement for members already terminated and to prevent the CFPB from terminating other members in the future, which is precisely the relief afforded through the CSRA.

*Third*, the organizations' claims are not beyond the expertise of the MSPB and the FLRA. As explained above, the claims seek redress for allegedly unlawful terminations—the heartland of CSRA coverage. The organizations object that these agencies have no expertise regarding broad disputes about agency shutdowns. In *Elgin*, however, the Supreme Court held that the CSRA review scheme is exclusive even where the harmed employee contends that a governing "federal statute is unconstitutional." 567 U.S. at 5. The same rationale controls here, where the claim is that an agency has violated the Constitution by disregarding federal statutes.[3]

_____

[3] It is unclear whether the CFPB Employees Association, which is neither a federal employee nor a labor union, could itself invoke the CSRA to obtain reinstatement for its members. But assuming it cannot, its "exclusion … from the provisions establishing administrative and judicial review for personnel action" is no reason to permit it to seek judicial review of personnel actions under other

15

In sum, the CSRA precludes district-court jurisdiction over the claims of the NTEU and CFPB Employee Association.

B

The remaining four plaintiffs do not seek redress for employment-related injuries, but the government contends that they lack constitutional standing under Article III. In assessing the sufficiency of standing allegations, we take the plaintiffs' merits theory as a given. *Tanner-Brown v. Haaland*, 105 F.4th 437, 444 (D.C. Cir. 2024). Here, that means we assume that CFPB leadership was unlawfully attempting to dismantle the Bureau. For standing purposes, the question is whether these plaintiffs have shown that dismantling the Bureau would cause them to suffer a concrete, particularized injury that a favorable decision would likely redress. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

An organization can establish standing based on an injury to one or more of its members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (*SFFA*). We call this kind of standing associational standing. *See, e.g.*, *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016). "To invoke it, an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted

---

provisions. *Fausto*, 484 U.S. at 455. In *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), the Supreme Court held that a statute creating a special statutory review scheme for challenges to regulatory action brought by dairy producers and handlers—but not consumers—foreclosed judicial review for claims by consumers. *Id.* at 347. The same reasoning applies here; if employees cannot end-run the CSRA's reticulated scheme of administrative and judicial review, then neither can organizations representing employees.

16

nor the relief requested requires the participation of individual members in the lawsuit." *SFFA*, 600 U.S. at 199 (cleaned up).

The NAACP meets these requirements. It is a membership organization that works to "accelerate the well-being, education, and economic security of Black people and all persons of color." J.A. 57. In furtherance of that mission, it was "actively working" with the CFPB "to address predatory practices for NAACP members who were victims of the Los Angeles wildfires." *Id.* On the NAACP's telling, the CFPB promised to send it educational materials for NAACP members but "did not do so because of the shutdown." *Id.* at 58. As a result, at least one NAACP member, Juanita West-Tillman, was denied access to these materials, which have at least some monetary value. *See id.* at 217–18. She therefore suffered a concrete injury. And her injury would likely be redressed by an injunction, which would enable CFPB staff to proceed with its plans to assist wildfire victims. Her injury also relates to the financial education of NAACP members, which is germane to the NAACP's purpose, and there is no reason this suit requires her individual participation. The NAACP thus has associational standing.

Because the NAACP's claims suffice to tee up the dispositive questions that we address below, we need not consider whether the other plaintiffs have Article III standing. *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

IV

This case arises from several actions taken by CFPB leadership to downsize the agency. They laid off employees, cancelled contracts, decided to move to smaller headquarters, declined additional funding, and subjected work to an advance-approval requirement. In the ordinary course, the plaintiffs here could challenge many of these actions in court. As

17

explained above, aggrieved employees (like members of NTEU and the CFPB Employee Association) could challenge their terminations before the MSPB or the FLRA. Aggrieved service providers (like the NCLC) could claim breaches of contract in the Court of Federal Claims. *See* 28 U.S.C. § 1491. And aggrieved consumers of services that the CFPB must provide to the public (like the NAACP, NCLC, and VPLC) could file APA actions alleging that the service has been unlawfully withheld or unreasonably delayed. *See* 5 U.S.C. § 706(1). Such challenges would target specific agency action or inaction that is alleged to be unlawful and to harm specific individual plaintiffs. And the courts, if they set aside the specific action alleged to be unlawful, or compelled the specific action alleged to be unlawfully withheld, could redress the specific injuries of individual plaintiffs.

This case is not constructed like that. Instead, the plaintiffs seek to challenge what they describe as a single, overarching decision to shut down the CFPB, which they infer from the various discrete actions noted above. To remedy that asserted decision, they seek pervasive judicial control over the day-to-day management of the agency, including decisions about how many employees the agency may terminate, how many contracts it may cancel, how it may approve work, which buildings it must occupy, and how employees will complete remote work. Furthermore, the plaintiffs urge all this despite the lack of any causal connection between many of the specific agency actions alleged to comprise the shutdown (for example, not providing reports regarding credit cards) and the specific injuries alleged by these plaintiffs (for example, Mr. Steege's ongoing difficulty in addressing his late wife's student loans).

As we now explain, this challenge is not viable. It cannot be brought under the APA because that statute provides a cause of action to challenge discrete, final agency action, which the

18

claims here do not target.  And it cannot be brought in equity because the claims here neither raise constitutional questions nor satisfy the stringent prerequisites for *ultra vires* review.

## V

The Administrative Procedure Act provides the standard means for obtaining judicial review of federal agency action. Yet the plaintiffs and the district court downplay it.  The district court treated the APA claims as an afterthought, warranting two short paragraphs of analysis after an exhaustive, 23-page discussion of what it described as non-APA "*ultra vires* and constitutional claims."  *NTEU*, 774 F. Supp. 3d at 55–78. Likewise, the plaintiffs lead with a contention that the Constitution itself confers an implied right of action to challenge what they describe as separation-of-powers violations.  The court and the plaintiffs have good reason to be skittish about the APA claims here.

## A

The APA cabins the timing, focus, and intensiveness of judicial review of federal agency action.  It requires the plaintiff to target specific agency action that has caused him an injury.  It requires that action to be final, ripe for review, and discrete.  And it does not permit the courts to superintend how an agency carries out its broad statutory responsibilities.

## 1

By its terms, the APA structures judicial review around "agency action" that harms the plaintiff and, unless another statute provides otherwise, around such "final" agency action. It provides that a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to

19

judicial review." 5 U.S.C. § 702. It permits judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. And it instructs reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed" or to "set aside agency action" that is arbitrary or otherwise unlawful. *Id.* § 706(1), (2). The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13); *see also id.* § 701(b)(2) (same definition).

To be reviewable through the APA, agency action must be final and ripe for review. *See* 5 U.S.C. § 704 (finality); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967) (ripeness). To be final, agency action must "mark the consummation of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up), and must impose "direct and appreciable legal consequences" on the plaintiff, *Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (quoting *Bennett*, 520 U.S. at 178). If an action affects the challenger's rights only "on the contingency of future administrative action," it is not final. *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (action must "directly affect the parties"). In assessing finality, we evaluate agency action relative to the "decisionmaking processes set out in [the] agency's governing statutes and regulations." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018). And we may consider "post-guidance events to determine whether the agency has applied the guidance as if it were binding on regulated parties." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.). The ripeness inquiry is similar: "[It] requires us to consider 'the fitness of the issues for judicial review and

20

the hardship to the parties of withholding court consideration.'" *Village of Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) (quoting *Abbott Laboratories*, 387 U.S. at 149). An action is ripe for review only if it has caused, or threatens, direct and immediate harm to the plaintiff. *Nat'l Ass'n of Home Builders v. Army Corps of Eng'rs*, 417 F.3d 1272, 1281, 1283 (D.C. Cir. 2005).

To illustrate these principles, consider the difference between a legislative rule and an agency plan. A legislative rule is typically reviewable. It is formally promulgated at the end of a defined process for the adoption of specific legal text. 5 U.S.C. § 553. And it binds both the agency and regulated parties, who must conform their behavior to the rule or else face legal penalties. *See Abbott Laboratories*, 387 U.S. at 151 (regulated parties); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954) (agency). These characteristics often make legislative rules an appropriate target for APA review, *Abbott Laboratories*, 387 U.S. at 150, unless the rule is unclear in its application or its immediate effects are modest, *see Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164–65 (1967). In contrast, an agency plan is unreviewable insofar as it reflects only a nonbinding statement of something the agency intends to do in the future. *See Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18–22 (D.C. Cir. 2006). Because such a plan has no immediate effect, a plaintiff cannot challenge the plan itself but instead must await further agency actions implementing it. *See id.* at 22. Finality and ripeness standards are flexible, so informal guidance documents sometimes are reviewable. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 634–36 (D.C. Cir. 2019). But to be reviewable, such items must impose standards that the agency treats as binding. *See, e.g., id.* at 638–40; *Nat'l Mining Ass'n*, 758 F.3d at 252 ("The most important factor concerns the actual legal effect (or lack thereof) of the agency

21

action in question on regulated entities."); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014) (internal directive "provide[d] firm guidance" that enforcement officials "relied on").

2

In *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), the Supreme Court held that "agency action" under the APA must also be "specific." *See id.* at 894. The plaintiffs there alleged that the Bureau of Land Management (BLM) made various land-use decisions that violated the governing statutes. *See id.* at 879. Rather than challenge any of these actions individually, the plaintiffs sought to challenge all of them together, grouped under what they described as a "land withdrawal review program." *Id.* at 890. Rejecting the challenge, the Supreme Court held that the APA requires a plaintiff to "direct its attack against some *particular* 'agency action' that causes it harm." *Id.* at 891 (emphasis added). The Court reasoned that the "land withdrawal review program" was not "derived from any authoritative text" in the governing statutes or regulations and did not "refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id.* at 890. Instead, it was simply shorthand for the "continuing (and thus constantly changing) operations of the BLM" in administering public lands, and was no more a "final agency action" than "a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration," neither of which would themselves be reviewable. *Id.* The Court stressed that any "flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably action yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of

22

them that is ripe for review adversely affects" one of the plaintiffs. *Id.* at 893. To the contrary, the APA requires a "case-by-case approach" targeting "specific 'final agency action,'" rather than "more sweeping actions" seeking "systemic improvement" at a "higher level of generality." *Id.* at 894; *see also id.* at 891 (APA does not authorize courts to consider "*wholesale* improvement" or "programmatic improvements" in agency administration).

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) (*SUWA*), elaborated on these principles in the context of APA actions under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld." The Court made clear that the withheld action must be a "circumscribed, discrete agency action[]," 542 U.S. at 62, which "precludes the kind of broad programmatic attack" rejected in *National Wildlife*, *id.* at 64. And consistent with traditional mandamus standards, the compelled action must also be one that the agency is "legally *required*" to take, *id.* at 63, which "rules out judicial direction of even discrete agency action that is not demanded by law," *id.* at 65. Combining both principles, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64. *SUWA* involved a statute requiring the BLM to manage certain lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c). The Court described this statute as "mandatory as to the object to be achieved," but still leaving the agency "a great deal of discretion in deciding how to achieve it." 542 U.S. at 66. The plaintiffs contended that BLM was violating the statute. *Id.* at 65. But instead of identifying any discrete action that BLM allegedly was taking or withholding unlawfully, they sought an order simply compelling BLM to comply with the non-impairment mandate. *See id.* at 66. Rejecting that claim, the Court explained that the APA does not

23

authorize general orders compelling compliance with such "broad statutory mandates." *Id.* Orders like that would require the courts, in determining whether "compliance was achieved," to become enmeshed in "day-to-day agency management." *Id.* at 66–67. And the APA does not permit "pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives." *Id.* at 67.

In *Fund for Animals*, this Court held that *National Wildlife* and *SUWA* barred APA review of a BLM "plan" to achieve a mandatory statutory goal of protecting wild horses. *See* 460 F.3d at 15, 20–22. The "plan" consisted of "many individual actions," some of which were not themselves legally required. *See id.* at 20–21 (cleaned up). For such general plans, we concluded, "it is only specific actions implementing the plans that are subject to judicial scrutiny." *Id.* at 21; *see also City of New York v. DoD*, 913 F.3d 423, 432 (4th Cir. 2019) (*National Wildlife* and *SUWA* limit review to "only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management").

\*   \*   \*   \*

These requirements—agency action, finality, ripeness, and discreteness—reflect that the APA does not make federal courts "roving commissions" assigned to pass on how well federal agencies are satisfying their statutory obligations. *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973). Rather, a court may intervene only when a specific unlawful action harms the plaintiff, and only to the extent necessary to set aside that action. By avoiding premature adjudication and narrowing the scope of judicial review, these requirements "protect

24

agencies from undue judicial interference with their lawful discretion[] and … avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 542 U.S. at 66.[4]

B

The plaintiffs here complain about a slew of different CFPB "actions" that include "issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters." J.A. 46–47.  But they point to only two actions that allegedly satisfy the finality, ripeness, and discreteness requirements summarized above.  One of them is an email asking employees to obtain approval before performing work.   Another is an

---

[4] Two other APA limitations reinforce these points.  First, APA review normally is based on an administrative record, obviating the need for intrusive discovery into internal agency processes.  *See*, *e.g.*, *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549 (1978); *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (per curiam). That limit is inconsistent with a focus on putative agency action that requires a multi-day evidentiary hearing just to identify.  Second, once the reviewing court corrects a discrete legal error, it normally must remand rather than retain jurisdiction to implement a complex remedial decree.  *See*, *e.g.*, *Calcutt v. FDIC*, 598 U.S. 623, 629 (2023) ("the function of the reviewing court ends when an error of law is laid bare" (quoting *FPC v. Idaho Power Co.*, 344 U.S. 17, 20 (1952))).  That limit is inconsistent with programmatic review of broad agency management.

25

asserted decision, inferred from the various discrete actions mentioned, to shut down the Bureau.

1

On February 10, the Acting Director of the CFPB emailed agency staff.  In its entirety, the email stated:

> As you have been informed by the Chief Operating Officer in an email yesterday, the Bureau's DC headquarters building is closed this week.  Employees should not come into the office.  Please do not perform any work tasks.  If there are any urgent matters, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task.  His email is [redacted].  Otherwise, employees should stand down from performing any work task.  Thank you for your attention on this matter.

J.A. 101.

This email does not qualify as final agency action.  To begin with, it did not mark the consummation of any agency decision-making process, much less a defined process for rulemaking, adjudication, or anything equivalent.  The email was not formally promulgated, much less published in the Code of Federal Regulations, the Federal Register, or any official agency records.  In context, it reflected a new presidential Administration and a new Acting Director trying to assess all agency activities.  And it linked the prior-approval requirement to a short-term exigency requiring the temporary closure of agency headquarters.  Most importantly, the email did not definitively decide anything.  Instead, it merely directed employees to obtain advance approval before performing work, while remaining silent on legally mandated work and leaving the Chief Legal Officer with discretion to approve it.

26

Likewise, the email triggered no appreciable legal consequences for employees, contractors, regulated parties, or members of the public.  It neither terminated any employees nor cancelled any contracts.  It did not purport to prohibit any statutorily required tasks.  Because the Chief Legal Officer did approve many tasks upon request, it is difficult to see how the email affected the plaintiffs even practically, much less how it directly changed their legal rights.  *See* note 1, *supra*.  Finally, less than three weeks after that email, the Chief Legal Officer sent another email clarifying that "[e]mployees should be performing work that is required by law and do not need to seek prior approval to do so."  J.A. 387.  So the February 10 email by its terms did not require legally mandatory work to be abandoned, and the CFPB did not apply the email "as if it were binding" on that question.  *See Nat'l Mining Ass'n*, 758 F.3d at 253.

The plaintiffs note that staff directives and other informal kinds of agency action are sometimes reviewable under the APA.  That is true, but only if the agency treats the action as binding, and only if the action has appreciable legal consequences for the plaintiff.  *See Cal. Cmtys. Against Toxics*, 934 F.3d at 638–40; *Nat'l Mining Ass'n*, 758 F.3d at 252.  The authorities cited by the plaintiffs confirm as much.  The internal directive in *National Environmental Development Association* "provide[d] firm guidance to enforcement officials," who "relied on" it in making permitting decisions throughout the country.  *See* 752 F.3d at 1007.  Likewise, the letter in *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986), informed a regulated party of the agency's considered view that the party had no right to a hearing it desired.  *See id.* at 436–38.  The February 10 email, in requiring advance approval to perform work, does nothing so firm or consequential.

27

2

We turn next to the putative shutdown decision.  The plaintiffs point to no regulation, order, document, email, or other statement, written or oral, purporting to shut down the CFPB.  Instead, they infer such an overarching decision from various discrete "actions" taken by agency leadership to downsize the Bureau, "including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters." J.A. 46–47.  The district court found a "decision to shut down the agency completely" and equated it to a "wholesale cessation" of CFPB activities. *NTEU*, 774 F. Supp. 3d at 46.

For its part, the government does not claim the power to "shut down" the CFPB.  Nor could it.  Congressional statutes create the Bureau and define its powers and duties.  Agency officials cannot wipe those provisions off the books.  Moreover, as explained above, many CFPB functions are mandatory; for example, the Bureau must respond to consumer complaints, disseminate various reports, and assist individuals with student loans.  The agency does not suggest that it could lawfully abandon these various responsibilities.  Finally, while the Bureau's rulemaking, enforcement, and adjudicatory powers are discretionary, we assume that it must engage in *some* regulation of, say, the Nation's largest banks.  *See Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985).

Instead, the government disputes that it undertook to shut down the CFPB.  First, it contends that agency leadership at all times intended for the Bureau to remain open and to perform all of its statutorily required functions.  Second, it contends that no decision to shut down the Bureau was ever reduced to final, reviewable agency action.  Questions of what CFPB leadership

28

wanted or intended to do at any particular point in time are factual, and we are reluctant to conclude that the district court's factual assessments were clearly erroneous. But the question of what counts as final agency action reviewable under the APA is a legal one, which we decide without deference to the district court. *See*, *e.g.*, *Soundboard Ass'n*, 888 F.3d at 1267–74; *Nat'l Mining*, 758 F.3d at 250–53. On that question, we agree with the government that there was no reviewable decision to shut down the CFPB.

*First*, the APA does not authorize review of "abstract decision[s] apart from specific agency action, as defined in the APA." *Biden v. Texas*, 597 U.S. 785, 809 (2022). In *Biden v. Texas*, the Secretary of Homeland Security issued a June 1, 2021 memorandum "officially terminating" a discretionary immigration program known as the Migrant Protection Protocols. *See id.* at 793. After a court set aside that termination and remanded for further consideration, the Secretary again formally terminated the program on October 29, 2021, this time with some forty pages of reasoning. *See id.* at 795–96. The court of appeals treated the second termination not as a separately reviewable agency action, but as a mere "*post hoc* rationalization[]" for what it described as a "Termination Decision" independent of the June 1 and October 29 memoranda. *See id.* at 796–97, 809–10. The Supreme Court reversed. Quoting from the APA's definition of a "rule," it held that the court of appeals had erred "by postulating the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability … designed to implement' that decision." *Id.* at 809 (quoting 5 U.S.C. § 551(4)).

Here, too, there is no such "action" as defined in the APA—*i.e.*, no such "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C.

29

§ 551(13). The plaintiffs suggest that the putative shutdown decision qualifies as a rule, which would require some "agency *statement*" designed "to implement, interpret, or prescribe law or policy." *Id.* § 551(4) (emphasis added). The plaintiffs point to no such statement, formal or informal, written or oral. Nor do they suggest that the putative shutdown decision is anything like an "order, license, sanction, [or] relief." These too are defined terms, *see id.* § 551(6), (8), (10), (11), and a decision to shut down an agency would not satisfy any of the definitions. In sum, the shutdown decision posited here, like the Termination Decision posited in *Biden v. Texas*, is an abstract decision "wholly apart from" any "specific agency action, as defined in the APA." 597 U.S. at 809.[5]

---

[5] The dissent responds that section 551(13)'s definition of "agency action" encompasses "comprehensively every manner in which an agency may exercise its power." *Post* at 22, 45 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). But *American Trucking* involved only a question about finality, not whether there was "agency action" to begin with. *See* 531 U.S. at 478–79. Moreover, in *SUWA*, the Court looked to the specific defined terms embedded in section 551(13)—"rule, order, license, sanction, relief, or the equivalent or denial thereof"—to limit the scope of what counts as "agency action" under the APA. *See* 542 U.S. at 62–63. Likewise, in *Biden v. Texas*, the Court looked to the specific definition of an APA "rule"—an "agency statement of general or particular applicability … designed to implement" a decision—to hold that an alleged abstract decision to terminate an agency program, distinct from the one announced by memorandum, was not "agency action" under the APA. *See* 597 U.S. at 809–10. We too "have long recognized that the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (cleaned up). For example, agencies do many things "in anticipation of" taking "agency action," such as making budget requests. *Fund for*

30

*Second*, the putative shutdown decision was not *final* agency action. No such decision by itself effected the termination of any employees or the cancellation of any contracts. To the contrary, as the CFPB attempted to downsize, it had to undertake separate, discrete actions to lay off workers and cancel contracts—actions that, had they not been preliminarily enjoined, would have been reviewable in the MSPB or the Court of Federal Claims. Nor did the posited shutdown prohibit any legally required work. As explained above, CFPB transitional leadership made a handful of statements addressing what work employees could do during the initial days of the new presidential Administration. While these statements all required prior approval to perform work, three of them expressly excepted legally required work, J.A. 110 (Bessent on Feb. 3); *id.* at 117 (Vought on Feb. 8); *id.* at 387 (Paoletta on Mar. 2), while one of them expressly empowered the Chief Legal Officer to approve work, *id.* at 101 (Vought on Feb. 10). And the Chief Legal Officer did, in fact,

---

*Animals, Inc.*, 460 F.3d at 19–20. A budget request "may serve as a useful planning document, but it is not a 'rule,'" *id.* at 20, because it is not a "statement … designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4). Neither are an agency director's non-public, unrecorded decisions.

The dissent further contends that the Acting Director's alleged unrecorded decision to shut down the Bureau was "the equivalent" of a rule. *Post* at 43–44 (quoting 5 U.S.C. § 551(13)). But again, a "rule" is an "agency *statement*." 5 U.S.C. § 551(4) (emphasis added). A "statement" is something that one says or writes, usually to make something known to others. *See Statement*, Webster's New International Dictionary of the English Language (2d ed. 1945) ("Act of stating, reciting, or presenting, orally or on paper"); *Present*, Webster's New International Dictionary of the English Language (2d ed. 1945) ("to bring to anyone's attention or cognizance … to show; display; set forth; describe"). Unexpressed decisions are the opposite of, not something "equivalent" to, such a "statement."

31

approve much legally required work. So there was neither a definitive agency decision to stop mandatory work nor a direct and appreciable impact on the rights of the plaintiffs.

*Third*, the posited shutdown decision is insufficiently discrete to qualify as "agency action." To begin with, no statute or regulation authorizes the CFPB to shut itself down, so the posited decision is not "derived from any authoritative text" that might help structure judicial review. *See Nat'l Wildlife Fed'n*, 497 U.S. at 890. Nor does the posited shutdown decision "refer to a single [CFPB] order or regulation, or even to a completed universe of particular [CFPB] orders and regulations." *See id.* Instead, it is the plaintiffs' way of referring to a constellation of then-ongoing actions—the February 10 email, firing employees, cancelling contracts, declining additional funding, and terminating the lease for the Bureau's current headquarters. Rather than seeking to challenge any of these discrete decisions that may have caused them harm, the plaintiffs seek to dress up these "many individual actions" as a single decision in order to challenge all of them at once, which is exactly what *National Wildlife* prevents. *See id.* at 893.

*Fourth*, the discreteness problem is made worse by the open-ended nature of the legal duties that the plaintiffs seek to enforce. Essentially, they seek an order compelling the CFPB to keep providing its mandatory services. *See* Oral Arg. Tr. 48–50 (proposing injunction barring the government from "try[ing] to shut down the agency"). But while the statute specifies various services that the Bureau *must* provide, it gives the agency "a great deal of discretion in deciding *how*" to provide them. *SUWA*, 542 U.S. at 66 (emphasis added). For example, how many employees must the Bureau have to ensure adequately functioning offices to process consumer complaints, disseminate reports, and afford student-loan

32

assistance?  Which contracts are essential for achieving those
objectives?  How much funding is necessary for doing so?
Congress gave the Bureau discretion to make decisions like
these.  *See* 12 U.S.C. § 5493(a)(1)(A) ("The Director may fix
the number of … employees of the Bureau."); *id.* § 5497(a)(1)
(Director shall determine the funding "reasonably necessary to
carry out the authorities of the Bureau").  An order requiring
the Bureau to retain specified levels of employment,
contracting, funding, and the like would run afoul of *SUWA*'s
prohibition of "judicial direction of even discrete agency action
that is not demanded by law."  542 U.S. at 65.  And any
"general" order merely "compelling compliance with broad
statutory mandates" would present essentially the same
problem:  The courts "would necessarily be empowered" to
"determine whether compliance was achieved—which would
mean that it would ultimately become the task of the
supervising court, rather than the agency, to work out
compliance with the broad statutory mandate, injecting the
judge into day-to-day agency management."  *Id.* at 66–67.

We faced exactly this problem in considering the
government's motion for a stay pending appeal.  Because the
government then challenged only the scope of the preliminary
injunction, we were presented with a dilemma that proved
insoluble:  Enjoin specific activity like the termination of
agency employees, as the preliminary injunction had done,
which would restrict a wide range of activity that the agency
may lawfully undertake.  Or, alternatively, craft a follow-the-
law injunction requiring the Bureau to retain enough
employees to meet its statutory obligations.  Our partial stay
order tried the latter course, and it immediately embroiled the
courts in compliance issues about how many employees were

33

necessary—a determination that the Judicial Branch is neither authorized nor competent to make.[6]

*Finally*, the challenge to the posited shutdown decision is unripe. For starters, the issues are not fit for review. As explained above, the plaintiffs point to no definitive statement regarding an agency shutdown but seek to infer one from various specific acts to downsize. Because the exact scope of the putative shutdown is thus unclear, judicial review "is likely to stand on a much surer footing in the context of a specific application." *Toilet Goods Ass'n*, 387 U.S. at 164. Moreover, agency consideration remained ongoing, which means that "judicial intervention would inappropriately interfere with further administrative action." *Ohio Forestry Ass'n. v. Sierra Club*, 523 U.S. 726, 733 (1998); *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (cleaned up)). Even if we assume, as the district court found, that interim CFPB leadership at one point made an abstract

_____

[6] The dissent contends that *SUWA* has "little to say regarding the merits of Plaintiffs' section 706(2) challenge" to set aside agency action because *SUWA* "is a section 706(1) case" to compel agency action. *Post* at 35. But *SUWA*'s analysis turned on the fact that section 706(1) "insist[s] upon an 'agency action,'" 542 U.S. at 62, as does section 706(2). Moreover, *SUWA* expressly built on *National Wildlife*, which construed the phrase "agency action" in a section 706(2) case. *See id.* at 64–65. And *SUWA*'s concerns about overly intrusive APA remedies do not fall away merely because a plaintiff sues under section 706(2). *See id.* at 67 ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated *by the APA*." (emphasis added)). The concerns apply equally here, where the plaintiffs ask us to enjoin the Bureau's putative decision not to meet its statutory responsibilities by issuing what is, in effect, a general order compelling the agency to meet them.

34

decision to shut down the Bureau, *see NTEU*, 774 F. Supp. 3d at 58–69, this decision was not final.  Instead, the leadership had an opportunity to change course before the decision resulted in the denial of any service.  And the Bureau did change course—it has reactivated certain contracts, J.A. 663; refined its RIF plans, *id.* at 758; and issued a directive to "ensure that everyone is carrying out any statutorily required work," *id.* at 387.  Under these circumstances, immediate judicial review would deny the Bureau "an opportunity to correct its own mistakes." *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980).  In sum, regularly moving targets do not raise issues fit for review. [7]

Moreover, the plaintiffs will suffer no unusual hardship from postponing review.  Unlike in cases allowing pre-enforcement review, the actions challenged here do not require them "to engage in, or to refrain from, any conduct." *Texas v. United States*, 523 U.S. at 301.  And if their fears come to pass, they may "protect all of their rights and claims by returning to court when the controversy ripens." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 285 (D.C. Cir. 2003).  Specifically, they

---

[7] The dissent dismisses the change in course as "whitewashing" and asserts that it goes only to mootness. *Post* at 31–32.  But the Acting Director's speedy renunciation of any intent to shut down the Bureau, backed with concrete action, bears directly on whether there was a *final* shutdown decision to begin with.  As explained above, we routinely consider shifting "post-guidance events" to determine whether an agency treats any informal guidance "as if it were binding." *Nat'l Mining Ass'n*, 758 F.3d at 253.  Moreover, a central purpose of prudential ripeness doctrine is to allow an agency space to "alter a tentative position." *Pub. Citizen Health Rsch. Grp. v. FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984); *see also Ohio Forestry Ass'n*, 523 U.S. at 735.  If the Bureau's change in course here—before any plaintiff was denied any statutorily required service—went only to mootness, then the ripeness doctrine would be futile.

35

may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In such suits, they would have to wait until the Bureau actually denied them a discrete service—and show either an immediate entitlement to it or an unreasonable delay in providing it. *See Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). This is not a hardship; it is par for the course, even in cases where plaintiffs' lives and livelihoods depend on the prompt receipt of agency services. *See, e.g.*, *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 810 (D.C. Cir. 2024) (delay in the provision of "special-immigrant visas to certain Iraqi and Afghan nationals who face serious threats because of their faithful service to the United States").

3

The plaintiffs respond by citing cases where unwritten action, agency plans, and decisions to terminate agency programs were held reviewable under the APA. They also seek to distinguish *National Wildlife* and *SUWA*. But the cited cases are inapposite, and the asserted distinctions fail.

*Unwritten action*. Cases involving final agency action not committed to writing are few and far between. The plaintiffs cite two. The first, *Brotherhood of Locomotive Engineers and Trainmen v. FRA*, 972 F.3d 83 (D.C. Cir. 2020), is entirely inapposite. It involved a regulatory scheme in which an agency's failure to act on a license application within a certain number of days constituted an approval by operation of law. *Id.* at 89–90. Approval of a license is final agency action, whether committed to writing or not. *Id.* at 90; *see* 5 U.S.C. § 551(8), (13). Even so, we pointed to the application itself as a "relevant written document" that would make clear exactly what the agency had approved. *See* 972 F.3d at 100–01.

36

The second case, *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), involved an EEOC policy allowing the agency to disclose confidential information without prior notice to the submitter. *Id.* at 929–30. The parties disputed which version of a written compliance manual setting forth the policy was operative, but the district court found the versions to be "identical in all material aspects," and neither party contested that finding on appeal. *See id.* at 928–30. Moreover, each version left "no doubt" that EEOC permitted disclosure without prior notice, and the agency conceded as much. *See id.* An employer who had submitted confidential information sued to enjoin EEOC from relying on the policy to disclose its information. EEOC objected that promulgating the manual was not final agency action because the manual was "merely a guidance document that d[id] not affect its own or the public's legal obligations." *Id.* at 931. This Court responded that "the agency took final action by adopting the policy, not by including it in the Manual." *Id.* We further noted that the policy was ripe for review because EEOC was on the cusp of applying it to harm the plaintiff. *See id.* at 927–28.

On the plaintiffs' telling, *Venetian Casino* stands for the proposition that the APA permits review of agencies' unrecorded abstract decisions. But the policy at issue there *was* recorded repeatedly, in different versions of an agency compliance manual. Its terms were clear from the manual and materially identical in both versions. *See* 530 F.3d at 929. Moreover, the manual was disseminated to agency employees precisely to guide their decisions. *See id.* at 928–29. So, statements in the manual qualified as a rule, *see* 5 U.S.C. § 551(13), which was final because the agency treated them as binding. *See, e.g.*, *Nat'l Mining Ass'n*, 758 F.3d at 253; *Nat'l Env't Dev. Ass'n's Clean Air Project*, 752 F.3d at 1007. None of this suggests that the unrecorded shutdown decision at issue here, which was expressed in no agency statement, qualifies as

37

a rule. To the contrary, courts cannot "postulat[e] the existence" of a rule "wholly apart from" any agency statement or its equivalent. *See Biden v. Texas*, 597 U.S. at 809. And especially so, as the dissent acknowledges, *post* at 41, when the agency *has* reduced the policy to writing, as it did in *Venetian Casino*. In any event, we reviewed the policy at issue there only because the agency was about to apply it to harm the plaintiff, so the policy implicated none of the finality or ripeness concerns associated with the shutdown decision here.

*Agency plans*. As explained above, agency plans generally are not final because they contemplate "specific actions implementing the plans." *Fund for Animals*, 460 F.3d at 21. But there are exceptions—some plans are made reviewable by statute, *see* 5 U.S.C. § 704, and others are final because a statute gives them some binding effect. The plaintiffs cite cases involving such plans. *See Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 906 (D.C. Cir. 2024) (plan made reviewable by statute); *Defs. of Wildlife v. Salazar*, 651 F.3d 112, 113 (D.C. Cir. 2011) (plan made binding by statute); *Senior Res. v. Jackson*, 412 F.3d 112, 115 (D.C. Cir. 2005) (same). These cases are inapposite, for no statute made the CFPB's putative shutdown decision binding or otherwise reviewable.

*Program terminations*. Finally, the plaintiffs point to cases reviewing decisions to terminate agency programs— most notably *DHS v. Regents of the University of California*, 591 U.S. 1 (2020), and *Biden v. Texas*. These cases prove that such decisions can be final agency action. But neither one suggests that the CFPB took final agency action here.

*Regents* involved Deferred Action for Childhood Arrivals (DACA), "a program for conferring affirmative immigration relief" on certain aliens unlawfully present in the United States. 591 U.S. at 18. DACA entitled qualifying aliens to apply for

38

deferred action—a status enabling the alien to remain in the United States, to work here, and to receive government benefits such as Social Security and Medicare. *See id.* at 10. Following a change in presidential administrations, the Acting Secretary of Homeland Security issued a written memorandum rescinding DACA. *See id.* at 12–13. The government argued that the memorandum was unreviewable because it was committed to agency discretion by law; the government never suggested that the memorandum, self-executing on its face and formally published by an acting Cabinet Secretary, was not final agency action. *See id.* at 17–19. Still, the Supreme Court stressed that the memorandum "provide[d] a focus for judicial review." *Id.* at 18 (cleaned up).

*Biden v. Texas* involved the Migrant Protection Protocols, which required certain aliens entering the country from Mexico to be returned to Mexico pending resolution of their removal proceedings. 597 U.S. at 791. Following a change in presidential administrations, the Acting Secretary of Homeland Security issued a self-executing, written memorandum formally ending the program. *See id.* at 808 ("I am hereby terminating MPP."). The Supreme Court held that the memorandum was final agency action because it "marked the consummation of the agency's decisionmaking process and resulted in rights or obligations being determined." *Id.* (cleaned up). Specifically, the memorandum "bound DHS staff by forbidding them to continue the program in any way from that moment on." *Id.* at 808–09 (cleaned up).

In short, reviewability in these cases did not turn on the fact that program terminations were at issue; it turned on the fact that the plaintiffs challenged final, written memoranda with formal legal consequence. Moreover, the Court in *Biden v. Texas* made clear that it was reviewing the formal memo itself, not any "abstract" termination decision "wholly apart

39

from" that final rule. 597 U.S. at 809. Here, in contrast, the plaintiffs seek to challenge an unrecorded decision that neither binds agency staff nor restricts access to agency benefits.[8]

*Discreteness precedents.* The plaintiffs' attempts to distinguish *National Wildlife* and *SUWA* also fall flat. The plaintiffs contend that the challengers in *National Wildlife* sought to contest "thousands" of decisions, whereas they seek to challenge only "a single plan to shut down the agency." Red Br. 35. But on the plaintiffs' own account, that asserted plan implicates hundreds of distinct contract and personnel decisions. *See*, *e.g.*, J.A. 648–49. And in any event, *National Wildlife* held that an APA challenge may not bundle together discrete actions in order to challenge them all together. *See* 497 U.S. at 890–94. Here, the plaintiffs equate all of the individual "actions to suspend or terminate CFPB's statutorily mandated activities—including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease" with the "final agency action"—in the singular—reviewable under the APA. J.A. 46–47. As for *SUWA*, the plaintiffs contend it is inapplicable because they seek to set aside an unlawful shutdown decision,

---

[8] The dissent suggests that our analysis would permit the government to terminate programs by "conceal[ing] … what it is doing." *Post* at 43; *see also id.* at 51 (positing action that "agencies manage to obfuscate"). But programs afford benefits, which the government could not rescind without *some* kind of public statement. If the denial of some benefit were judicially reviewable while the relevant program remained in effect, it would also be reviewable—and would surely be set aside—if the government invoked a secret termination decision as the basis for the denial. Moreover, if the government sought to implement a secret termination by simply refusing to provide benefits, or to act on applications for benefits, courts could compel those actions under section 706(1), as we have explained.

40

not to compel mandatory agency operations. But the same analysis of "agency action" governs both suits to set aside unlawful action under section 706(2) and suits to compel action unlawfully withheld under section 706(1). *See SUWA*, 542 U.S. at 64–65. And despite the plaintiffs' disclaimer, they sought and obtained a preliminary injunction ordering all kinds of agency actions that were not themselves legally required, such as a prohibition on conducting any RIFs.

4

The dissent asks us to imagine that the Acting Director had issued a "formal written memorandum" announcing the termination of the CFPB. *Post* at 23. The dissent argues that, because such a hypothetical memorandum would be reviewable, the shutdown decision inferred here must also be reviewable. *See id.* at 39–42.

One can easily imagine a shutdown memorandum that would be reviewable. Suppose the Acting Director had issued this edict: "The Bureau is shut down. Effective immediately, Bureau employees may not perform any work." This memo would be a *rule*—that is, "an agency statement … designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). And it would be *final*, reflecting the Bureau's firm decision to take an action with tangible legal consequences, namely refusing to provide services as required by Congress. *See Biden v. Texas*, 597 U.S. at 808–09. In effect, the memo would operate like a legislative rule eliminating services that the agency was required to provide. And because the memo would have tangible legal consequences, a court could meaningfully set it aside, restoring the Bureau's ability to perform mandatory services and, in so doing, redressing the injuries of individuals who use the agency services. In other

41

words, the reviewing court could undo the legal consequence imposed by the memo.

But it hardly follows that the APA permits review of an unrecorded rule—the existence of which the agency denies— inferred from a collection of disparate agency actions. The dissent cites no case in which any court reviewed a putative rule that the agency denied having promulgated. And the very notion of an unrecorded rule is almost oxymoronic. Agencies promulgate rules to alter legal relationships, which is why rules are often subject to pre-enforcement review. *See, e.g.*, *Abbott Laboratories*, 387 U.S. at 152. It is difficult to see how an agency could accomplish that through a secret decision not memorialized in any public statement, written or oral.

In any event, our analysis does not hinge on the absence of a memorandum alone. Even if there were a memo, it would not be reviewable unless it bound the agency. Suppose the Acting Director wrote this: "I intend to shut down the Bureau. Once the Bureau is shut down, it will have no employees and will perform no tasks. Employees should begin preparing to wind up the Bureau's operations." Suppose further that the Acting Director, immediately after issuing the memo, instructed employees to perform at least some of the Bureau's required work indefinitely. This memo would be a nonbinding statement of something the agency intends to do in the future. *See Fund for Animals*, 460 F.3d at 22. A court could not review it, but only specific actions taken to implement it. *See id.*

The dissent posits that the Acting Director decided to shut down the Bureau, and we do not contest this. But the dissent does not explain how that decision bound the agency. It acknowledges that the agency's Chief Legal Officer, just three weeks after the posited shutdown decision, instructed employees to perform all legally required work. *Post* at 30–31.

42

Moreover, the Acting Director took action inconsistent with a final shutdown decision just one day after the decision is alleged to have occurred.  *See* J.A. 286 (February 11 email to an employee:  "I am specifically directing you … to continue indefinitely to perform all tasks necessary to publish the APOR on weekly basis.").  So even if an inferred shutdown decision could be equivalent to a rule, the decision here was not *final*—in other words, conclusive and binding.

The dissent's analysis also reflects a mismatch between the final agency action inferred and the remedy provided.  If the Acting Director had promulgated a formal memorandum instructing Bureau employees not to perform any work, the memo would be final agency action, and the reviewing court could set it aside and thereby nullify its legal consequences.  But the court could not, in reviewing such a memo, enjoin or set aside *other* agency actions—such as a RIF announced around the same time.  Yet the dissent advocates just that approach.  Like the plaintiffs, the dissent contends that we should set aside not only the putative shutdown decision, which has no legal consequence except as implemented through other decisions, but that we should enjoin the constellation of discrete actions from which it infers the shutdown decision.  *See post* at 56–59.  As we have shown, the APA does not allow us to leverage our review from one discrete action to another.

\* \* \* \*

The plaintiffs seek to set aside an abstract decision, inferred from a constellation of discrete actions, to prophylactically ensure that the Bureau can fulfill its statutory mandate.  This theory contravenes all the APA limits discussed above—agency action, finality, ripeness, and discreteness alike.  If the plaintiffs' theory were viable, it would become the task of the judiciary, rather than the Executive Branch, to

43

determine what resources an agency needs to perform its broad statutory functions.  Such pervasive judicial control of agency administration falls well beyond limited APA review.

VI

With no express cause of action under the APA, the plaintiffs must resort to equity.

A

To seek judicial review, a party ordinarily needs a statutory cause of action expressly provided by Congress.  But sometimes, the Supreme Court has held, parties aggrieved by federal agency action may seek equitable relief even without an express statutory cause of action.  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006).  The availability of such implied equitable relief substantially depends on whether the plaintiff claims a statutory or constitutional violation.

Implied equitable claims that a federal agency has violated a federal statute, which we refer to as *ultra vires* claims, are "extremely limited" in scope.  *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988).  Confirming this point, the Supreme Court recently described *ultra vires* challenges as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *NRC v. Texas*, 145 S. Ct. 1762, 1776 (2025) (quoting *Nyunt*, 589 F.3d at 449).  To succeed on an *ultra vires* claim, the plaintiff must show that (1) judicial review is not expressly foreclosed; (2) the agency made an extreme legal error; and (3) there is no alternative means for the plaintiff to seek judicial review.  *See, e.g.*, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022); *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019).  The

44

plaintiffs expressly disavow any such *ultra vires* claim. For good reason: As explained above, aggrieved CFPB employees may seek judicial review through the CSRA scheme, and aggrieved consumers of CFPB services may seek review through the APA cause of action for unreasonable delay.

Courts also have long recognized implied equitable claims arising under the Constitution. *See Trudeau*, 456 F.3d at 190. And although the Supreme Court has all but eliminated implied damages actions for constitutional claims, *see*, *e.g.*, *Egbert v. Boule*, 596 U.S. 482 (2022), it has continued to recognize implied equitable actions "directly under the Constitution," *Free Enter. Fund*, 561 U.S. at 491 n.2. For implied equitable claims under the Constitution, we have imposed neither the requirements for *ultra vires* review nor those for APA review.[9]

B

To avoid the requirements for an *ultra vires* claim, the plaintiffs seek to describe their equitable claim here as a constitutional one. The claim targets the defendants' putative decision to shut down the CFPB. As explained above, the plaintiffs contend that a shutdown would violate statutes that establish the Bureau and require it to perform various tasks.

---

[9] We have described such implied claims as involving "a direct cause of action under" the Constitution. *Trudeau*, 456 F.3d at 190; *see also Free Enter. Fund*, 561 U.S. at 491 n.2 ("an implied private right of action directly under the Constitution"). This terminology is perhaps imperfect insofar as equity courts did not speak of "causes of action" as such. *See* Bray & Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1772–76 (2022). Regardless of historical labels, the "cause of action" or "private right of action" terminology does help distinguish between two critically different questions—whether the defendant has violated some provision of substantive law and whether an injured plaintiff may seek redress in court.

45

And because the Executive Branch cannot "amend statutes unilaterally" or "usurp legislative authority conferred upon Congress," the plaintiffs say that a shutdown would also violate the separation of powers.  J.A. 44.  Invoking *Free Enterprise Fund*, the plaintiffs thus assert what they describe as a "cause of action under the Constitution for the violation of the separation of powers."  Red Br. 25.

In *Dalton v. Specter*, 511 U.S. 462 (1994), the Supreme Court rejected a similar attempt to transform statutory claims into constitutional ones.  *Dalton* involved a presidential decision to close the Philadelphia Naval Shipyard.  *Id.* at 464.  Review through the APA was unavailable because the President is not an "agency" for APA purposes.  *See id.* at 469–70.  Nonetheless, following its decision in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Court assumed an implied equitable action to review presidential decisions "for constitutionality."  *Dalton*, 511 U.S. at 471–72.  The plaintiffs argued that the President's decision to close the shipyard violated various provisions in the governing statute.  *See id.*  They further argued that these statutory violations had a "constitutional aspect" because "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine."  *Id.* at 471.  Accordingly, they concluded, "judicial review must be available to determine whether the President has statutory authority for whatever action he takes."  *Id.* (cleaned up).

The Supreme Court rejected this argument.  The Court explained that it had "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."  511 U.S. at 472.  And if "all executive actions in excess of statutory authority were *ipso facto* unconstitutional," then these precedents would have had "little need" for "specifying unconstitutional and ultra vires

46

conduct as separate categories." *Id.* Moreover, "if every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception identified in *Franklin* would be broadened beyond recognition." *Id.* at 474. Yet the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Id.* For these reasons, the Court held that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims" freely reviewable in equity. *Id.* at 473.

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), reinforces this analysis. That case presented the question whether healthcare providers have an implied equitable action for statutory violations in state Medicaid plans. *Id.* at 324. The providers argued that their claims were constitutional because any state violation of a federal statute would also violate the Supremacy Clause of the Constitution, which makes federal law supreme over state law. *See* U.S. Const. Art. VI, cl. 2; 575 U.S. at 324. The Supreme Court refused to treat the claim as a constitutional one giving rise to an unrestricted equitable action. *See id.* at 324–27. Instead, it treated the claim as statutory—and applied ordinary canons of construction to conclude that Congress had foreclosed equitable relief. *See id.* at 327–29. In other words, statutory claims do not become constitutional ones by operation of the separation-of-powers principles that prevent the States and the Executive Branch from disregarding federal statutes.

Those principles control this case. The assertedly constitutional claim here begins with the premise that shutting down the CFPB would violate the statutes that create the agency and require it to perform various mandatory tasks. Because CFPB leadership decided to violate these statutes, the

47

argument goes, it "also violate[d] the constitutional separation-of-powers doctrine." *Dalton*, 511 U.S. at 471. This supposed separation-of-powers violation turns entirely on whether CFPB officials violated the governing statutes, so *Dalton* requires us to analyze the claim as an *ultra vires* one. *See id.* at 472–74.[10]

C

The plaintiffs offer three responses to this straightforward conclusion, but none is persuasive.

First, they contend that *Dalton* rested on a conclusion that the statute at issue there committed base-closure decisions to the discretion of the President, whereas no statute here authorizes executive officials to shut down the CFPB. That argument confuses two distinct rulings in *Dalton*. After holding that constitutional review was unavailable because the claims at issue were not constitutional, the Court then separately considered whether *ultra vires* review was available. As it did for the alleged constitutional claims, the Court "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." 511 U.S. at 474. But, the Court explained, such *ultra vires* review "is not available when the statute in question commits the decision to the discretion of the President." *Id.* Then, the Court concluded that the statute at issue did not "limit the President's discretion," which foreclosed *ultra vires* review. *See id.* at 476. None of this reasoning narrowed the Court's prior conclusion that implied equitable review for constitutional claims is

---

[10] In *Global Health Council v. Trump*, --- F.4th ---, No. 25-5097 (D.C. Cir. Aug. 13, 2025), this Court applied *Dalton* to hold that an asserted separation-of-powers claim is statutory rather than constitutional for reviewability purposes. *See id.* at __ (slip op. at 16–24). Our analysis is fully consistent with *Global Health Council*.

48

unavailable where the plaintiff argues that statutory violations by executive officials implicate the separation of powers. *See id.* at 472–74.

Second, the plaintiffs invoke the Supreme Court's statement in *Free Enterprise Fund* that the Constitution creates an "implied private right of action" for "separation-of-powers claim[s]" as well as for individual-rights claims. *See* 561 U.S. at 491 n.2. But the separation-of-powers claim vindicated in *Free Enterprise Fund* was that Article II of the Constitution prohibits Congress from insulating executive officers from presidential control through two levels of for-cause removal protection. *See id.* at 514. And since *Free Enterprise Fund*, cases engaging in implied equitable review for separation-of-powers claims have likewise involved claims that statutes themselves violate Article II or other structural constitutional provisions. *See*, *e.g.*, *Axon*, 598 U.S. at 180; *Collins v. Yellen*, 594 U.S. 220, 227–28 (2021). None of these cases casts doubt on *Dalton*'s holding that claims alleging nothing more than executive actions in contravention of statutes give rise to *ultra vires* claims but not implied constitutional claims.

Finally, the plaintiffs invoke *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), which held that neither the Vesting Clause nor the Commander-in-Chief Clause of Article II authorized the President to seize the nation's steel mills. *See id.* at 585–89; U.S. Const. Art. II, § 1, cl. 1 & § 2, cl. 1. The dispute in *Youngstown* was entirely constitutional. As the Supreme Court explained in *Dalton*, the government had "disclaimed any statutory authority for the President's seizure of steel mills" in *Youngstown*, so the case "necessarily turned on whether the Constitution authorized the President's actions" through a freestanding Article II power. 511 U.S. at 473 (citing *Youngstown*, 343 U.S. at 585–87). This case is the opposite: The Executive has invoked no such freestanding Article II

49

power.  Instead, the only constitutional source of executive authority in this case is the President's obligation to take care that the *statutes* governing the CFPB are faithfully executed.  *See* U.S. Const. Art. II, § 3.  And as *Dalton* made clear, a claim that executive officials have not discharged such a responsibility under the Take Care Clause gives rise at most to an *ultra vires* claim.  *See* 511 U.S. at 472–74.[11]

## VII

Some of the plaintiffs cannot establish jurisdiction, and the others have no viable cause of action.  The plaintiffs' claims therefore fail as a matter of law.  We vacate the preliminary injunction and remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

[11]  The dissent worries that a test characterizing claims according to the authority invoked by the government would empower it to avoid judicial review.  *Post* at 54–55.  But the question is not whether the government may avoid judicial review; it is rather whether plaintiffs must comply with statutory limits on APA review or judge-made limits on *ultra vires* review.  As we have shown, *Dalton* holds that plaintiffs may not plead around those limits simply by contending that the Executive Branch violates the Constitution by acting in violation of a statute.  *See* 511 U.S. at 472–74.  As for the dissent's further hypothetical about a President nationalizing steel mills yet denying it in litigation, *post* at 54, we repeat a point made earlier:  It is difficult to imagine a form of executive action sufficiently public and conclusive to inflict immediate injuries but not sufficiently public and conclusive to support judicial review, through the APA or otherwise.

PILLARD, *Circuit Judge*, dissenting:  Congress created the Consumer Financial Protection Bureau to safeguard consumers and the broader financial system after the unprecedented chaos and hardship of the 2008 financial crisis and the ensuing Great Recession.  Congress gave the Bureau rulemaking, enforcement, and direct-service duties and authorities befitting its mission.  The Bureau's statutory mandates, like those of other agencies, allow presidential administrations to exercise significant discretion in adjusting agency priorities to account for changing conditions and the vision and mandate of the serving President.  The exercise of that prerogative is subject to the ordinary judicial review that prevents final agency action that is arbitrary, capricious, or in violation of a statutory command or constitutional right.  The President's chosen CFPB leadership may—within those constraints—run the Bureau as it determines best serves the public interest.  But it is emphatically not within the discretion of the President or his appointees to decide that the country would benefit most if there were no Bureau at all.  Congress made the contrary decision in legislation establishing the CFPB, and the power to repeal that law lies with the legislative branch.

The district court found that Defendants acted to unilaterally abolish the CFPB, apparently viewing its continued existence to be inconsistent with President Trump's vision for the federal government.  The court therefore appropriately entered a preliminary injunction to preserve the *status quo ante* and prevent the destruction of the Bureau before the lawfulness of that action could be adjudicated.

Neither the government nor the majority seriously disputes that, if we accept the district court's findings of fact, Defendants' actions violated both the CFPB's organic statute and the constitutional separation of powers.  The majority appropriately rejects the government's arguments that Plaintiffs lack standing to challenge the destruction of the CFPB, and that we otherwise lack jurisdiction to hear their

2

claims.  And the majority does not—and could not on the record before us—conclude that the district court's factual findings setting out Defendants' actions at the time this suit was filed were clearly erroneous.  The district court's power to act when it did to preliminarily enjoin Defendants' unlawful action should be apparent and uncontroversial.

My colleagues nonetheless vacate the preliminary injunction because they deem the decision to unilaterally abolish the CFPB not a type of agency action we are authorized to review.  That constricted view of our statutory and equitable power contravenes statutes, precedent, and basic principles of our constitutional government.  Congress created the CFPB, assigned it important missions and powers, and subjected its decisions to the strong presumption of judicial review that applies as a matter of course to the final actions of federal agencies.  It is untenable to hold that same Congress meant the agency's continued existence to be a matter of unilateral and unexplained presidential edict.

The notion that courts are powerless to prevent the President from abolishing the agencies of the federal government that he was elected to lead cannot be reconciled with either the constitutional separation of powers or our nation's commitment to a government of laws.  I respectfully dissent from the decision vacating the district court's amply supported preliminary injunction.

**I.**

**A.**

Following the 2008 financial crisis, Congress enacted the Consumer Financial Protection Act of 2010 (CFPA, or Act) as part of the broader Dodd–Frank Wall Street Reform and Consumer Protection Act to overhaul supervision of the

3

financial industry. Pub. L. No. 111-203, 124 Stat. 1955 (2010) (codified at 12 U.S.C. § 5481 *et seq.*). After holding more than 50 hearings to inform its development of an effective legislative response, Congress decided to consolidate authority to enforce 18 preexisting, separate consumer protection statutes in a single agency. *CFPB v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 421-22 (2024); *see* Members of Congress Amicus Br. 20-22. The Act therefore created the Consumer Financial Protection Bureau (CFPB or the Bureau), "which shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a).

Congress determined that the new agency, with existing regulatory tools under common leadership, was essential to safeguard consumers' financial interests and the stability of the financial system. Congress gave the CFPB responsibility to combat misleading and fraudulent consumer financial products. It sought to ensure that the true costs to consumers of what are often their most expensive and consequential investments are clearly and accurately communicated in advance. And Congress understood that sound regulation, reliably enforced, is also essential to a level playing field among competitors. Without it, transparent and fair financial services cannot survive a race to the bottom led by unscrupulous competitors with inferior products. *See* Members of Congress Amicus Br. 20-24.

It has thus been the CFPB's duty since 2010 to encourage compliance with and enforce violations of existing statutes, including the Truth in Lending Act, 12 U.S.C. § 4308(a)(1), the Equal Credit Opportunity Act, 15 U.S.C. § 1691c(a)(9), the Home Mortgage Disclosure Act, 12 U.S.C. § 2808(a), and others. The financial services Congress tasked the CFPB to regulate include credit and debit cards, Compl. ¶ 25 (J.A. 28),

4

student loans, Barnard Decl. ¶ 5 (J.A. 184), automobile loans, Shearer Decl. ¶ 20 (J.A. 164), home mortgages, *see* 12 U.S.C. § 5581(b)(7), home equity loans, *see* 12 C.F.R. § 1026.40, payday lenders, *see* 12 U.S.C. § 5514(a)(1)(E), debt collectors, Meyer Decl. ¶ 6 (J.A. 62), payment apps like PayPal and Venmo, *see* Defining Larger Participants of a Market for General-Use Digital Consumer Payment Applications, 89 Fed. Reg. 99582 (Dec. 10, 2024), and consumer credit reporting services, Meyer Decl. ¶ 5 (J.A. 62).

Congress also gave the Bureau some new enforcement tools. *See* Former CFPB Officials Amicus Br. 6-7. For example, the Bureau elicits reports from and conducts examinations of non-depository institutions, entities like mortgage companies or payday lenders that are not banks but still offer consumer financial products. 12 § U.S.C. 5514(b). The Bureau has exclusive authority to supervise very large banks with more than $10 billion in assets—whose malfeasance poses unique risks to the broader economy—for compliance with federal consumer-protection laws. *Id.* § 5515(a)-(b). That supervisory power, which preempts similar efforts by state regulators, enables the Bureau to identify in advance and communicate to regulated entities new "consumer-protection issues before they become systemic or cause significant harm" and informs future enforcement actions against violators. States Amicus Br. 6-7, 24; *see also* Former CFPB Officials Amicus Br. 7; Members of Congress Amicus Br. 24-25.

The Bureau's enforcement activities, including its coordination of other regulatory bodies, are the "linchpin" of Congress's chosen financial oversight regime. Nonprofit Orgs Amicus Br. 15; *see* Halperin Decl. ¶ 5 (J.A. 198). They reach both "banks and 'non-banks' such as payday lenders, auto title lenders, debt collectors, digital payment platforms, and

5

consumer reporting agencies," ensuring that even companies
not subject to the CFPB's direct supervisory authority comply
with federal consumer protection laws. Halperin Decl. ¶ 4 (J.A.
198).    The CFPB's responsibility for supervising and
conducting examinations of financial institutions entails
assessing their financial health, risk management policies and
practices, and compliance with applicable laws.    CFPB
supervision heads off financial problems like the 2008 financial
crisis before they occur by enabling the Bureau to "flag
problematic industry trends" and share its findings with
regulated parties "to guide compliance and promote
consistency and predictability."  Nonprofit Orgs. Amicus Br.
11-12.  The CFPB also has regulatory authority to set common
ground rules for the industry.  Its guidance on loan origination
and servicing, for example, now shapes daily practice in the
mortgage industry, after "th[at] sector . . . nearly sank the
world economy during the Great Recession."  Nonprofit Orgs
Amicus Br. 12-13.

    The CFPB's work since 2010 has curbed fraudulent and
misleading practices, including illegal junk fees, deceptive
credit card charges, and the unlawful seizure of consumers'
personal vehicles.  Salas Decl. ¶ 3 (J.A. 192); Shearer Decl.
¶¶ 18, 20 (J.A. 163-64).  More generally, the Bureau's work
has served to deter regulated entities—particularly the largest
financial institutions who are largely exempt from state
financial regulations—from engaging in unlawful,
destabilizing, and consumer-harming behavior.  *See* States
Amicus Br. 24-25.  "Before the creation of the CFPB,
consumer financial protection had not been the primary focus
of any federal agency."  Halperin Decl. ¶ 3 (J.A. 197).  The
2008 financial crisis provided a stark reminder of the risks of
such a regime.  Without the work of "the one agency whose job
is to protect all American consumers," Americans will

6

inevitably face a "higher risk of losing their homes, their cars, and their savings." Salas Decl. ¶ 11 (J.A. 196).

Congress made extensive provision for the CFPB to carry out its mission. The Act required the creation of several identified divisions and the performance of discrete functions, including enforcement, supervision, and adjudicatory functions. *See* 12 U.S.C. §§ 5515, 5562-63. The Bureau is also required to research congressionally identified topics, *id.* § 5493(b)(1), maintain and staff a telephone number and website to receive and respond to consumer complaints, *id.* § 5493(b)(3), maintain and staff offices dedicated to financial education and the protection of service members, traditionally underserved consumers, older Americans, and student loan borrowers, *id.* §§ 5493(d)(1), (e)(1), (b)(2), (g)(1); *id.* § 5535, and carry out other statutorily specified functions conducive to its core mission. *See* Former CFPB Officials Amicus Br. 7-9.

The CFPB has continued to carry out its obligations across multiple presidential administrations despite the regulated sector's significant political and legal challenges to the Bureau since its creation. In *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), the Supreme Court determined that the Act's removal protections for the CFPB Director violated the constitutional separation of powers. *Id*. at 213, 220. When the Court severed those protections from the rest of the statute, however, it held that the Act's provisions "bearing on the CFPB's structure and duties remain fully operative." *Id*. at 235 (plurality opinion); *see also id.* at 296-97 (Kagan, J., concurring in part and dissenting in part). The CFPB's unusual funding system, which empowers the Bureau's director to request funds directly from the Federal Reserve System rather than proceeding through the normal appropriations process, 12 U.S.C. § 5497(a), also drew legal challenge, but the Supreme Court

7

upheld Congress's chosen method to fund the Bureau. *Cmty. Fin. Servs. Ass'n*, 601 U.S. at 424.

Until the events of this case, however, there has never been any suggestion that Congress's directives in establishing the CFPB were somehow optional or lacking full operative effect. During the first Trump administration, for example, Acting CFPB Director Mick Mulvaney critiqued the Bureau's funding mechanism as "den[ying] the American people their rightful control over how the Bureau spends their money." Letter from Mick Mulvaney, Acting Dir., CFPB, to the Hon. Jerome Powell, Chair, Bd. of Governors of the Fed. Rsrv. Sys. (Mar. 23, 2018), https://perma.cc/D62E-JE6M. But, even before the Court sustained that funding mechanism, Acting Director Mulvaney recognized his obligation "to execute the law as written," and accordingly requested agency funding from the Federal Reserve. *Id.* What happened here represents a sea change.

## B.

Virtually all the facts relevant to this appeal are undisputed. The district court's opinion clearly sets forth the court's findings of fact and amply supports them by reference to the record. *See NTEU v. Vought*, 774 F. Supp. 3d 1, 16-39 (D.D.C. 2025). Those findings more than adequately justify the district court's entry of a preliminary injunction to preserve the possibility of relief if Plaintiffs ultimately prevail. I briefly recount here the key facts.

Starting on February 6, officials at the Department of Treasury directed the Bureau to allow officials from the United States Department of Government Efficiency (DOGE) access to CFPB headquarters. *Id.* at 40. The next day, February 7, President Trump designated Office of Management and Budget Director Russell Vought as acting director of the Bureau.

8

Under the new leadership, the CFPB's homepage was taken offline, Third Meyer Decl. ¶¶ 19-21 (J.A. 172-73), and Elon Musk—whom President Trump described as "head[ing] DOGE"[1]—posted "CFPB RIP" alongside a tombstone emoji on his personal X account, Am. Compl. ¶ 39 (J.A. 33).

The next day, OMB Director Vought instructed CFPB staff not to approve any rules or guidance, take enforcement actions, issue public communications, or take certain other actions "unless . . . required by law." Feb. 8 Vought Email (J.A. 117). That email echoed language from an earlier message to Bureau staff from then-Acting Director (and Treasury Secretary) Scott Bessent. *See* Feb. 3 Bessent Email (J.A. 110). Vought followed that missive with a directive to all Bureau Employees on the morning of Monday, February 10, categorically ordering them to "not perform any work tasks" without securing written approval from him through the Bureau's new Chief Legal Officer, Mark Paoletta. Feb. 10 Vought Email (Stop Work Order) (J.A. 101). Unlike previous communications, the Stop Work Order referenced no exception for performing statutorily required work. It was soon followed by the announcement of a public tip line encouraging members of the public to report CFPB employees who might be attempting to do their jobs "in violation" of the Stop Work Order. Frotman Decl. ¶¶ 5-6 (J.A. 204-05).

On the heels of the Bureau-wide Stop Work Order, President Trump triumphantly told a reporter that "we did the right thing" because the Bureau "was a very important thing to get rid of," and he "praised his administration for shutting [down] the CFPB." Compl. ¶ 47 (J.A. 36). In contrast to the typical process of re-prioritization during a transition from one

---

[1] Megan Lebowitz, *Lawyer Submits 'New Evidence' in Case against DOGE, Using Trump's Own Words*, NBC (Mar. 5, 2025), https://perma.cc/24DA-TX5R.

9

administration to the next, Shearer Decl. ¶¶ 6-7 (J.A. 157), Bureau leadership began to execute its shut-down policy by indiscriminately ceasing and unwinding ongoing work.  They directed staff to terminate hard-fought litigation midstream:

> The cases dismissed by the CFPB sought relief on behalf of students who were subject to illegal collections on loans that had been discharged in bankruptcy; borrowers who were deceived about the true cost of loans made on a peer-to-peer nonbank lending platform; people shopping for a mortgage loan that were victims of an illegal scheme to steer them to a specific lender; manufactured home buyers who were set up to fail with unaffordable loans; struggling customers of small dollar loans who were induced into a fee-harvesting and loan-churning scheme; and consumers who were deceived about their personal savings accounts.  The CFPB's complaints had alleged that consumers in these cases experienced billions of dollars of harm.

Halperin Decl. ¶ 16 (J.A. 201).  Bureau leadership halted impending examinations at mortgage lenders, auto finance companies, debt collection agencies, and other consumer-facing industries that the Bureau was undertaking in cooperation with state regulators.  Salas Decl. ¶ 9 (J.A. 195).  Only a trickle of public-facing activities resumed after Paoletta instructed staff to at least partially restart them—a step he took in response to advice that keeping them offline risked a public backlash.  *See* Mar. 10 Hearing Tr. 89:2-6, 192:21-25 (J.A. 988, 1091).

With the Bureau's work effectively shuttered, Defendants then took steps to permanently unwind the agency.  During the week that started with the Stop Work Order on Monday,

10

Defendants fired all the Bureau's probationary and term employees. Drew Doe Decl. ¶ 5 (J.A. 135). That Tuesday, the Bureau's Chief Financial Officer directed staff to inform leadership of any "contracts directly support[ing] a statutory requirement, meaning that [the Bureau] would not be able to meet a statutory requirement without this contract." Ex. F (J.A. 416-17). But that exercise was pointless. Rather than conduct any discernably rational assessment of which contracts were necessary for the Bureau to continue to do the work Congress assigned it, Paoletta simply terminated all contracts across five separate divisions of the Bureau—a mere six hours after supposedly expressing an interest in knowing which contracts had to be preserved. Feb. 11 Paoletta Email (J.A. 288). The terminated contracts included, for example, every contract in the Office of Consumer Response, even though that Office had responded to leadership's earlier request and singled out some of those contracts as necessary for statutorily required work. Ex. F (J.A. 417); Pfaff Decl. ¶ 27 (J.A. 148). Bureau leadership directed contracting officers to terminate the chosen contracts less than an hour after Paoletta's order. Feb. 11 Galicki Email (J.A. 407). Presumably because of Defendants' urgency to eliminate those necessary contracts as soon as possible, the termination letters included no directions to contractors to preserve Bureau data or records they held on behalf of the Bureau. Mar. 10 Hearing Tr. 174:6-10 (J.A. 1073). As a result, critical systems were turned off before the CFPB's employees or contractors could secure the agency's data, raising the risk that some of the data loss may have been irrecoverable. Drew Doe Decl. ¶ 6 (J.A. 135).

Having eliminated the Bureau's contracts and probationary and term employees, Defendants moved on by Wednesday to shed the CFPB's permanent staff. On the evening of February 12, the Bureau agreed to pay OPM for "restructuring assistance services" related to a planned

11

Reduction in Force (RIF).   Ex. II (J.A. 572-73).   Federal
regulations ordinarily require agencies to give employees who
will be subjected to a RIF 90 days' advance notice to enable
those employees to compete for other positions.  *See* 5 C.F.R.
§ 351.402(c).  However, on Thursday CFPB Chief Operating
Officer Adam Martinez asked OPM for an exception to the 90-
day rule, explaining that the RIF was being done in immediate
response to the Stop Work Order.  Feb. 13 RIF Request (J.A.
578-80).  OPM approved the request, and Defendants began
preparing the paperwork to fire about 1200 employees with the
bare minimum 30-day notice, leaving the Bureau with less than
a fifth of its original headcount, and to place the employees on
administrative leave in the interim.  Feb. 13 RIF Request (J.A.
578-80); Feb. 14 Martinez Administrative Leave Email (J.A.
582); *see* Mar. 11 Hearing Tr. 45:9-18 (J.A. 1219).  Martinez
explained to staff that the regulation's 90-day period, designed
to give employees subject to RIFs the opportunity to compete
for remaining positions, was unnecessary because the Bureau's
elimination would leave no remaining positions.   Mar. 11
Hearing Tr. 59:14-22 (J.A. 1233).  Defendants planned for the
RIF of the vast majority of the Bureau's staff to take place by
the end of the day on Friday February 14, one week after
Vought was named Acting Director.   Feb. 14 Martinez
Administrative Leave Email (J.A. 582).  Those plans were
disrupted by this litigation.

### C.

Plaintiffs, a group of nonprofits that benefit from the
CFPB's work together with organizations that represent the
Bureau's employees, filed suit on February 9.  On February 13,
Plaintiffs filed an amended complaint and moved for a
temporary restraining order.  On February 14, the district court
scheduled a hearing on the TRO motion for that afternoon.
Martinez and the others working on the ongoing RIF planning

12

were soon informed of the scheduled hearing.  Ex. LL (J.A. 584).

Impending court proceedings gave Defendants no pause; they responded by doubling down.  Less than 10 minutes after Martinez received an email alerting him to the scheduled federal court hearing—and a mere 16 minutes before the hearing was scheduled to begin—the Bureau told OPM that it could no longer "wait until COB" and instead "need[ed] the last set of [RIF materials] now."  Ex. MM (J.A. 586).  The Bureau's leadership and OPM continued to send emails back and forth for the next few hours, with OPM confirming that the RIF was necessary to implement the Stop Work Order, and Martinez explaining that the remaining Bureau employees (including himself) would be terminated "in the next group" by an ensuing RIF.  Feb. 14 Martinez RIF Email (J.A. 539).

Defendants were unable to finalize the RIF before the district court acted.  On the afternoon of Friday, February 14, the court entered a partial stay by consent order.  The stay order prohibited Defendants from deleting CFPB data, terminating additional CFPB employees (except for cause), or transferring away the Bureau's funds.  Consent Order (J.A. 99-100).  The initial stay order was supplemented by an agreement between the parties to freeze any additional contract terminations pending the district court's ruling on a preliminary injunction. *See* Joint Notice of Agreement, ECF No. 65.[2]

The RIF team at the CFPB continued to meet during the following week, with Martinez informing colleagues that the RIF would resume and the agency would completely shut down after the court order was lifted.  Mar. 11 Hearing Tr. 56-59 (J.A. 1230-33).  Senior Bureau executives told staff that all CFPB

---

[2] All citations to ECF Numbers are to *National Treasury Employees Union v. Vought*, No. 25-cv-00381.

13

offices would close and that all data storage and compliance activities would cease to be necessary. Drew Doe Decl. ¶¶ 7-8 (J.A. 136). Meanwhile, the Stop Work Order remained in effect and the Bureau's congressionally assigned functions halted. The agency drifted along in that state of limbo until early March.

The district court scheduled oral argument on the preliminary injunction motion for March 3. On the afternoon before the scheduled argument, Paoletta sent a message to all Bureau staff stating "[i]t has come to my attention . . . that some employees have not been performing statutorily required work" since the Stop Work Order. Mar. 2 Paoletta Email (J.A. 338). Paoletta informed staff that "work that is required by law" could proceed without prior approval from Bureau leadership—although he gave no instruction on which work was and was not "required by law." Over the next few days, Paoletta authorized some requests from staff to resume functions that had been halted by the Stop Work Order. *See* Mar. 2 Paoletta/Warren Emails (J.A. 341-44); Mar. 2 Paoletta/Johnson Emails (J.A. 347); Mar. 3 Correal Email (J.A. 351); Mar. 3 Martinez/Lee Emails (J.A. 374-77); Mar. 3 Paoletta/Pappalardo Emails (J.A. 390-91).

The White House appears not to have understood the newfound importance of demonstrating a commitment to the Bureau's statutory work. The White House website soon celebrated that the CFPB had been "ordered . . . to halt operations." *Vought*, 774 F. Supp. 3d at 47. And, given the lack of direction, staff remained confused as to what work, if any, they were authorized to perform. *See* Mar. 10 Hearing Tr. 105:12-16, 109:13-21 (J.A. 1004, 1008).

On March 10-11, the district court held a two-day evidentiary hearing on the motion for a preliminary injunction,

14

at which Martinez testified as Defendants' primary witness. Before the hearing, Martinez submitted a declaration stating that, notwithstanding the Stop Work Order, the Bureau was continuing to fulfill its statutory obligations, and that the CFPB's leadership was "engaging in ongoing decision-making to assess how to make the Bureau more efficient and accountable." First Martinez Decl. ¶¶ 19-23 (J.A. 106-07). But once Plaintiffs submitted evidence showing that Defendants' actions had in fact prevented the Bureau from performing its required activities, and that Martinez himself had told staff that the CFPB was shutting down, Martinez revised his position.

In a supplemental declaration, Martinez conceded that claims from Bureau employees that Martinez had said the agency was closing entirely were "not inaccurate," and in fact aligned with DOGE directives that Martinez understood "to reflect the position of agency leadership." Supp. Martinez Decl. ¶ 3 (J.A. 240). However, Martinez continued, "since then . . . a great deal has evolved at the CFPB," and the current leadership—admittedly, the same people as before—was now "focused on running a substantially more streamlined and efficient [B]ureau," having moved on from the "very fluid situation" around February 10. *Id.* ¶ 4 (J.A. 241).

At the hearing, Martinez testified to similar effect. He confirmed what he averred in his supplemental declaration: Based on communications from DOGE staff operating with authorization of agency leadership, he had understood as of the week of February 10 that the CFPB was being closed down and that his statements to the contrary in his first declaration were inaccurate. Mar. 10 Hearing Tr. 54-55, 126-28 (J.A. 953-54, 1025-27). He also testified that Defendants had been in the process of eliminating entire statutorily required divisions of the CFPB before the district court intervened. Mar. 10 Hearing Tr. 130-31 (J.A. 1029-30). But, Martinez added,

15

"circumstances [had] changed since the week of February 10," and Vought did not currently intend to implement the plans that were being carried out during the week of February 10.  Mar. 10 Hearing Tr. 56, 61:6-8 (J.A. 955, 960).

Then, on cross-examination, Martinez backtracked again. He conceded that neither Vought, Paoletta, nor anyone else had told him that the plan had changed at any time since the announcement that the Bureau was to be abolished.  Mar. 10 Hearing Tr. 158, 229-230 (J.A. 1057, 1128-29).  He acknowledged that he did not know the current plans for the CFPB.  Mar. 11 Hearing Tr. 24-25 (J.A. 1198-99).

Martinez further testified that, until the eve of the March 3 district court argument when Vought sent out his email telling staff that they had apparently been free to do statutorily required work all along, Bureau employees had not been performing required activities since the Stop Work Order.  *See* Mar. 10 Hearing Tr. 66:10-16 (J.A. 965).  Martinez conceded that statements in his first declaration—that the Bureau had in fact been performing obligatory functions despite the Stop Work Order—were false.  *See* Mar. 10 Hearing Tr. 187-88 (J.A. 1086-87).  He further admitted he would "not [be] surprise[d]" if staff remained sidelined even after Vought's supposedly clarifying email, and that he did not know how many staff had been brought back from administrative leave following Defendants' newly professed commitment to the Bureau's resumption of statutorily required work.  Mar. 10 Hearing Tr. 67-68 (J.A. 966-67).  Martinez also acknowledged that, without any apparent forethought or assessment, Defendants had cancelled scores of contracts necessary to the Bureau's work.  *See* Mar. 10 Hearing Tr. 70-71 (J.A. 969-70).

Plaintiffs presented two witnesses at the hearing.  The first, a pseudonymous CFPB employee listed in the record as Alex

16

Doe, testified that on the week of February 10 Martinez and DOGE staffers, relaying instructions from Defendants, explained that the Bureau was in the process of being eliminated, Mar. 11 Hearing Tr. 39-40 (J.A. 1213-14), and that all staff would be subjected to RIFs across multiple divisions with no employees to be retained, Mar. 11 Hearing Tr. 43 (J.A. 1217). Doe further testified that Martinez said that the plan remained unchanged after the week of February 10. Mar. 11 Hearing Tr. 59-60, 63-64 (J.A. 1233-34, 1237-38). The second witness, Matthew Pfaff, Chief of Staff at the Bureau's Office of Consumer Response, testified that his office had been unable to respond to consumer complaints or referrals because of the Stop Work Order and Defendants' cancellation of contracts, including contracts that employees had told Defendants were necessary to perform statutorily required work. Mar. 11 Hearing Tr. 76-79 (J.A. 1250-53).

Following the evidentiary hearing, the district court granted the preliminary injunction. The court held that Plaintiffs had a cause of action under the Constitution to challenge the alleged termination of the Bureau on separation-of-powers grounds, and that they could challenge both the Stop Work Order and the action shuttering the CFPB under the APA. The court also determined that the plaintiff nonprofit organizations had standing because they and their members would be harmed by the shutdown of the Bureau, and that harm could be redressed by a court order preventing Defendants from abolishing the agency. *Vought*, 774 F. Supp. 3d at 49-53.

On the merits, the court rejected Defendants' "attempts to deny what was afoot" as "at odds with the undisputed facts in the record and the documents produced by both sides." *Id*. at 47. The court found that Defendants' attempts to demonstrate that the Bureau was carrying out its required work were "highly misleading, if not intentionally false," and "ha[d] been shown

17

to be unreliable and inconsistent with the agency's own contemporaneous records." *Id.* at 57. The court emphasized that Defendants' efforts to characterize the Stop Work Order, in defiance of the record, as "not really a stop work order at all" were "so disingenuous that the [c]ourt is left with little confidence that [Defendants] can be trusted to tell the truth about anything." *Id.*

The court concluded by finding that Defendants "were in fact engaged in a concerted, expedited effort to shut the agency down entirely when the motion for injunctive relief was filed; while the effort to do so was stalled by the [c]ourt's intervention, the plan remains unchanged; and [Defendants] have absolutely no intention of operating the CFPB at all." *Id.* at 57-58.

On that basis, the court held that Plaintiffs were likely to succeed on the merits of their claim that Defendants had unlawfully ordered the shuttering of the Bureau. *Id.* Plaintiffs had shown irreparable harm, the court found, because Defendants would finish eliminating the agency in short order in the absence of a preliminary injunction forbidding it. The balance of equities and the public interest also favored an injunction. The public interest would be served by preventing Defendants from "overstep[ping] their statutory and constitutional authority and usurp[ing] the power of the members of Congress." *Id.* at 82. And the public interest would be served by preventing the massive disruption of the financial sector that would occur if the CFPB were shut down. *Id.* at 82-84.

The preliminary injunction directed Defendants to: 1) maintain and not delete Bureau records and data, 2) reinstate the probationary and term employees who had been fired, 3) not terminate or subject to a RIF any additional CFPB

18

employee, except for cause, 4) not enforce the Stop Work Order, 5) provide Bureau employees with the means to work in-office or remotely, 6) maintain the Office of Consumer Response's consumer complaint system, and 7) rescind notices of contract termination and not finalize the termination of any future contract (although Defendants were permitted to halt contracts following an individualized assessment that they were unnecessary).  Preliminary Injunction Order at 1-3 (J.A. 745-47).

Defendants appealed to this court and sought to stay the preliminary injunction pending appeal.  In seeking a stay, Defendants did not meaningfully contest the propriety of an injunction preventing them from unlawfully abolishing the CFPB; they argued only that portions of the preliminary injunction were overbroad in ways that impermissibly restricted their management discretion.  *See* Stay Mot. Oral Arg. Tr. 6-7.  We responded by partially staying the preliminary injunction to afford legitimate managerial leeway. The stay order permitted Defendants to refrain from reinstating terminated employees whom they had determined were unnecessary to fulfilling the Bureau's statutory duties, to conduct further terminations or RIFs of employees who had been determined to be similarly unnecessary, and to conduct limited work stoppages of activities that Defendants had determined were not necessary for the Bureau's legal obligations. *NTEU v. Vought*, No. 25-5091, 2025 WL 1721068 (D.C. Cir. Apr. 11, 2025).

Days after our partial stay, Defendants attempted a RIF of approximately 90% of the Bureau's employees.  When Plaintiffs asked the district court to halt that RIF as inconsistent with the unstayed portions of the preliminary injunction, the government sought clarification from us.  We reinstated the original prohibition of all RIFs to avoid further collateral

19

litigation or personnel action that might prevent Plaintiffs from "receiv[ing] meaningful final relief should [Defendants] not prevail" on their appeal. *NTEU v. Vought*, No. 25-5091, 2025 WL 1721136 (D.C. Cir. Apr. 28, 2025).

## II.

We review the district court's decision to grant a preliminary injunction for abuse of discretion, its legal conclusions *de novo*, and its factual findings for clear error. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 573 (D.C. Cir. 2025). "[D]eciding whether to grant a preliminary injunction is normally to make a choice under conditions of grave uncertainty." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) (quoting *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (en banc) (McConnell, J., concurring)). The purpose of a preliminary injunction is not to finally set the obligations of the parties, but to "preserve the status quo pending the outcome of litigation." *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d. 165, 168 (D.C. Cir. 1969).

I concur in the majority's holding that at least one plaintiff nonprofit organization is likely to demonstrate standing to challenge the unlawful shutdown of the CFPB. Because only one plaintiff need have standing for us to reach the merits, *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996), we need not address whether the employee plaintiffs' claims were also properly asserted in district court or must instead be channeled through the separate administrative structure Congress created for federal employment disputes.

20

**III.**

Plaintiffs press an APA challenge to Defendants' "final, concrete decision to shut down the agency entirely." *Vought*, 774 F. Supp. 3d at 47. Defendants strenuously deny the existence of such a decision. They insist they never adopted any policy to unlawfully abolish the Bureau. But the district court made well-supported findings of fact to the contrary. Defendants offered no contemporaneous alternative explanation for their challenged conduct that squares with both the facts and the Bureau's statutory obligations going forward. And they certainly have not carried their burden to show clear error in the district court's findings.

Defendants argue instead that Plaintiffs lack a cause of action under the APA to contest a decision to abolish an agency created by Congress. Rather than seek APA review of any shutdown order, Defendants assert, Plaintiffs must await and challenge each of the steps the agency would have taken to implement the Bureau's shuttering. Vought Br. 37-38. Alternatively, Defendants argue, Plaintiffs should have waited until the Bureau had been abolished entirely and then challenged its inevitable failure to perform statutorily required work under the APA quasi-mandamus provision allowing a plaintiff to "compel agency action unlawfully withheld or unreasonably delayed." Vought Br. 40-41 (quoting 5 U.S.C. § 706(1)). Plaintiffs' challenge to the directive to shut down the agency, Defendants say, exceeds limits Congress placed on any APA cause of action, such as the bar on "programmatic challenges" that do not identify a discrete agency action amenable to review. Vought Br. 22, 30-31.

Defendants' position that Plaintiffs have no APA cause of action to challenge an agency's policy decision to cease some (actually all) of its ongoing work is incompatible with binding

21

precedent.  Notwithstanding all of Defendants' objections that their challenged action is non-final or too diffuse, or that Plaintiffs' claim is somehow unripe, the Supreme Court has undertaken APA review of agency action that, like the policy decision Plaintiffs challenge in this case, directed an agency to shut down its activities.  *Biden v. Texas*, 597 U.S. 785, 809 (2022); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16-18 (2020); *see also Public Citizen v. Steed*, 733 F.2d 93, 98 (D.C. Cir. 1984).  At bottom, the basis Defendants rely on to distinguish those cases is that the agencies there made formal, published announcements of their policy decisions, whereas the record in this case contains no similarly public announcement.  But Defendants may not evade APA review solely because, as the district court found, Defendants acted to abolish the agency without bothering to draft an official memorandum first.

Circuit precedent is clear that agency action need not "be committed to writing" to be judicially reviewable.  *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020).  We have held an agency takes final action "by adopting [a] policy" that binds its employees, regardless of whether or how the agency memorializes that policy's adoption.  *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008).  Any rule to the contrary would simply encourage agencies to act in secret, in defiance of foundational principles of administrative law.

Plaintiffs may challenge the decision to abolish the CFPB as final agency action under the APA.  Because Defendants have never argued that their shutting down of the Bureau was lawful under any substantive standard we might apply to such action, the district court appropriately found that Plaintiffs were likely to succeed on that challenge and entered a

22

preliminary injunction to preserve the agency while litigation continues.

**A.**

Plaintiffs' statutory claims face a threshold question whether they have identified a "final agency action" subject to challenge under the APA. *See* 5 U.S.C. § 704. The "central purpose" of the APA is to permit a "broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Courts therefore read the word "action" generously to encompass "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). The "bite" in the statute is instead provided by the condition that the action also be "final," *id.*, requiring that it both "mark the consummation of the agency's decisionmaking process" and "be [an action] by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). An action's effects need not be immediate for it to be subject to APA challenge, so long as it "result[s] in a final determination of rights or obligations." *Biden v. Texas*, 597 U.S. at 809 n.7 (citation omitted). And, as just noted above, we may review agency action even if it is not "committed to writing." *Bhd. of Locomotive Eng'rs*, 972 F.3d at 100.

The district court held that the "final, concrete decision to shut down the agency entirely" was final agency action subject to challenge under the APA. *Vought*, 774 F. Supp. 3d at 47. Defendants' primary argument to the contrary is that a decision to eliminate the Bureau would only be "a preliminary step along the way to a final action." Vought Br. 37. In other words, Defendants suggest that Plaintiffs were required to delay filing their suit until the Bureau had been destroyed,

23

rather than challenge the determination to eliminate the CFPB in the first place. The law assuredly does not so require.

An example drawn from Plaintiffs' brief helps to illustrate the point. *See* NTEU Br. 3. Imagine if, on February 10, Acting Director Vought had issued a formal written memorandum to CFPB staff announcing that the Bureau was closing up shop and telling employees to "take all appropriate actions to terminate the Bureau." By itself, such a memo would have no immediate, real-world effect on any person who, like the nonprofit plaintiffs in this case, benefited from the CFPB's existence and would be harmed by its shuttering. Only once subordinate staff began to implement the order by, for example, halting lawsuits promising relief, terminating contracts needed for the Bureau's work, refusing to accept or respond to hotline requests, and firing the Bureau's employees would the memo's impact on would-be plaintiffs be felt. But the law is clear that such a memo reflects reviewable agency action. Plaintiffs need not wait until the policy decision is fully implemented before they can challenge it. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967) (explaining that agency action is ripe for judicial review when "the impact of the administrative action could be said to be felt immediately by those subject to it").

In *Biden v. Texas*, the Supreme Court endorsed APA review of a decision that could just as easily be characterized as "a preliminary step along the way" to a complete action, Vought Br. 37, as the Bureau shutdown in this case. The district court accepted the claim for review as soon as Homeland Security Secretary Mayorkas issued the memo terminating the "Remain in Mexico" program and directing staff "to take all appropriate actions to terminate [the program], including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program." *Biden v. Texas*, 595 U.S. at 793-94.

24

That memo qualified as final agency action because it bound staff to stop implementing the terminated program—just as the hypothesized Vought memo would have bound Bureau staff to discontinue their own work. *See id.* at 808-09. In fact, in *Biden v. Texas* the Supreme Court also held that a later, similar memo likewise qualified as reviewable agency action even though that memo ordered staff to take no action to terminate the program until ongoing litigation was completed. *Id.* at 809 n.7. No matter that, by its own terms, the memo could have no real-world effect until the occurrence of a separate event beyond the agency's control. Nothing in *Biden v. Texas* suggests that the government could have forestalled a court challenge by ordering the termination of the entirety of Customs and Border Protection, or the whole Department of Homeland Security, instead of that individual program.

In this case, of course, there is no record of such a memo. It is especially remarkable that Defendants rely on the absence of documentation here, at a litigation stage prior to any discovery into the internal machinations of Bureau leadership, and on a record that reflects Defendants' deliberate avoidance of the ordinary tools of openly reasoned and vetted agency decision making. The lack of evidence that Vought reduced his directive to writing is of no legal import—just as the result in *Biden v. Texas* would have been the same had Secretary Mayorkas elected to terminate the Remain in Mexico program orally or by semaphore rather than by written command.

Binding circuit precedent confirms the point. In *Venetian Casino Resort*, the plaintiff challenged the EEOC's alleged policy authorizing Commission staff to disclose an employer's confidential business information without first notifying the employer. 530 F.3d at 927. As part of its defense, the EEOC argued that its internal compliance manual, which appeared to authorize such disclosures, was not reviewable final agency

25

action because it was a guidance document and did not create any legal obligations. *Id*. at 931. But we held that argument "misdirected," as:

> Venetian does not contend the Manual itself is a final agency action. Rather, Venetian challenges the decision of the Commission to adopt a policy of disclosing confidential information without notice. The Manual is relevant insofar as it illuminates the nature of the policy, *but the agency took final action by adopting the policy, not by including it in the Manual*. Adopting a policy of permitting employees to disclose confidential information without notice is surely a consummation of the agency's decisionmaking process, and one by which [the submitter's] rights [and the agency's] obligations have been determined.

*Id*. (formatting altered). So too here.

The CFPB took final action when it adopted a policy to shut itself down, just as the Department of Homeland Security took final action by adopting a policy to terminate the Remain in Mexico program. The specific verbal and written statements of Vought and others are critical evidence as to what action the Bureau did or did not take, but the action itself is the "manner in which an agency . . . exercise[s] its power," *Am. Trucking*, 531 U.S. at 478, rather than the method by which that exercise of power is communicated or memorialized. Indeed, at oral argument the government's counsel conceded the point that courts may "infer from circumstantial evidence that there's a decision." Oral Arg. Tr. 78:6-7. In the district court, Plaintiffs also pursued an alternative theory that the Stop Work Order was itself final agency action challengeable under the APA. *See Vought*, 774 F. Supp. 3d at 42-46; NTEU Br. 32-34. But

26

the gravamen of their claim is simply that "[D]efendants decided to shut down the agency." NTEU Br. 14. The scope and effects of the Stop Work Order certainly reinforce the nature of the action Defendants took, but resolving this case does not require analyzing that Order separately under the APA.

**B.**

Because binding precedent establishes that adopting a policy to terminate the CFPB would constitute final reviewable agency action, the next question is whether Defendants in fact adopted such a policy. The district court found in the affirmative. As the court explained: "The decision to close an agency is not a theoretical or hypothetical concept—it's real. The agency is either open or it's not." *Vought*, 774 F. Supp. 3d at 47. And the record supports the district court's finding that Defendants made "a final, concrete decision to shut down the agency entirely." *Id.* Following a two-day evidentiary hearing and review of extensive written evidence, the district court concluded that "defendants were in fact engaged in a concerted, expedited effort to shut the agency down entirely" on the week of February 10. *Id.* at 58. Defendants had ordered "the wholesale cessation of activities" through "the decision to shut down the agency completely, *id.* at 46, and "the agency was barreling full speed ahead in [the] effort to dismantle the agency completely by the end of the week [of February 10]," *id.* at 58, before the district court intervened. Those findings are well supported by the record and certainly survive clear error review.

To recap the most relevant undisputed facts of record: The same day that Vought was named acting CFPB director, CFPB leadership took the Bureau's website offline and deleted its X account, while Elon Musk—whose DOGE subordinates were

27

embedded within the Bureau—posted "CFPB RIP" alongside a tombstone emoji on his personal X account. Third Meyer Decl. ¶ 19 (J.A. 172); Kaspar Decl. ¶ 6 (J.A. 52). On February 10, the first full workday after Vought's appointment, Vought directed CFPB employees to "not perform any work tasks." Stop Work Order (J.A. 101). President Trump announced the same day that "[t]he CFPB was a very important thing to get rid of" and "we did the right thing." Frotman Decl. ¶ 4 (J.A. 204); Roston/Scible Decl. Ex. G, ECF No. 38-17; *see Vought*, 774 F. Supp. 3d at 16-38, 40. The next day, Bureau Chief Legal Officer Paoletta ordered the cancellation of all contracts in several of the CFPB's largest and most important divisions, including Enforcement, Supervision, and Consumer Response. Feb. 11 Paoletta Email (J.A. 288). The terminated contracts included the contracts that staff had, at Paoletta's request, identified as necessary for the Bureau's (statutorily required) work. Pfaff Decl. ¶ 27 (J.A. 148). CFPB employees were directed to terminate contracts as fast as possible without bothering to take typical measures to preserve CFPB data. Mar. 10 Hearing Tr. 174 (J.A. 1073); Charlie Doe Decl. ¶¶ 3-5, 12 (J.A. 129-30, 132). After terminating all probationary and term-limited employees, Defendants then began preparing the paperwork to terminate all other Bureau employees in two phases. Mar. 10 Hearing Tr. 129-30 (J.A. 1028-29); *see* Feb. 14 Martinez RIF Email (J.A. 539). Those efforts were paused by the district court's consent order (the effect of which we extended in a stay pending decision of this expedited appeal). Martinez meanwhile continued to inform Bureau employees that the Bureau would be closed entirely once the order was lifted and it became possible to do so. Mar. 11 Hearing Tr. 57-59 (J.A. 1231-33).

Based on those findings of fact, the district court's factual conclusion that Defendants had adopted a policy to eliminate the CFPB is unassailable. Analogizing again to *Biden v. Texas*,

28

imagine if no formal memo had issued but President Biden had made public statements that it was "very important" to have gotten rid of the Remain in Mexico program; that Department of Homeland Security leadership had ordered employees who had been implementing the policy to cease their activities, terminated contracts necessary to carry out the policy, and stated that DHS staff responsible for the policy were slated for termination without replacement; and that the Department's Chief Operating Officer had informed staff that the policy would be formally terminated as soon as a court order preventing them from doing so was lifted.  A court reviewing that record would reasonably conclude that Secretary Mayorkas had in fact directed the Department of Homeland Security to terminate the Remain in Mexico program, or that the Department had otherwise adopted a policy of terminating that program.  The district court's intervention through the consent order and stay to forestall Defendants' implementation of some of the necessary steps to abolish the CFPB does not alter the calculus, just as the second memo in *Biden v. Texas* was a final, reviewable agency action even though it could not have operative effect until an injunction protecting the Remain in Mexico policy was lifted.  597 U.S. at 809 n.7.

Defendants strenuously deny any intent to shut down the Bureau, but the evidence they point to regarding their activities around February 10—that is, at the time when the district court found that they adopted a binding policy to abolish the CFPB— is scarce indeed.  For example, Defendants emphasize that Paoletta approved restarting the statutorily required consumer complaint hotline and publication of data under the Home Mortgage Disclosure Act after both had ceased pursuant to the Stop Work Order.  Oral Arg. Tr. 21:19-23.  But Martinez testified that such work was restarted primarily because Agency leadership feared a backlash if public-facing activities of the Bureau were to go dark.  Mar. 10 Hearing Tr. 89:2-6,

29

192:21-25 (J.A. 988, 1091). The district court dismissed Defendants' limited efforts to restart some workstreams the week of February 10 as too little, too late. Leadership's approvals were "narrow and grudging," and "when it was doing anything, the agency was largely doing what was statutorily mandated to manage itself internally," not reviving what was needed to carry on the Bureau's public-protective activities. *Vought*, 774 F. Supp. 3d at 65. The district court's factfinding is dispositive.

More importantly, even as the Bureau took limited steps to restore limited, public-facing functions, any restoration was illusory because it remained impossible to run the activities ostensibly restarted, such as the CFPB Consumer Resource Center's consumer complaint hotline and database, without the contracts necessary to their operation. For example, Defendants had cancelled and not restored five contracts for components including systems enabling data sharing, and for virus scanning software, each of which was required for the complaint hotline's case management system. Without the contracts, the hotline could not effectively respond to calls from members of the public, whether to submit a complaint, answer a question, or provide an update. *See* Pfaff Decl. ¶¶ 27-30 (J.A. 148-49). Even as Defendants went through the motions of starting to bring a limited set of public-facing activities back online, they simultaneously sought permission from OPM to permanently eliminate, on an accelerated timeline, the entirety of the offices and staff responsible for much of that work. Memorandum from Adam Martinez to Michael J. Mahoney (Feb. 13, 2025) (J.A. 518).

On clear error review, we "may not reverse" a district court's factual findings that are "plausible in light of the record viewed in its entirety." *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985). The government's counsel insisted at oral

30

argument that "there's a fog of confusion about what's going on in the early days" of Vought's leadership of the Bureau. Oral Arg. Tr. 78:13-14. But the district court found based on record evidence that Defendants' actions—stopping essentially all of the Bureau's work, terminating contracts necessary for the CFPB's operations, preparing to eliminate the entirety of the agency's staff, and informing staff that the Bureau would cease to exist after the court's order was lifted—resulted from an intentional effort to implement the policy decision announced by the President, the leader of DOGE, and the Bureau's own Chief Operating Officer. That policy decision was to close the CFPB and cease to perform the work that Congress created it to perform. The only other conceivable explanation would seem to be recklessness and gross incompetence, but Defendants have not advanced that explanation.

Instead, Defendants principally argue that, even accepting that they attempted to abolish the CFPB in February, they had repudiated any such policy by early March. *See* Vought Br. 49-52. But Defendants cannot recast the action that forced Plaintiffs to file this suit—the shutdown decision that they had begun implementing when the district court acted—solely by claiming to have later changed their minds. And the evidence of such an about-face is, in any event, minimal and failed to persuade the district court. To be sure, on March 2 Paoletta informed Bureau staff that employees had been expected all along to carry out statutorily required work without any prior permission. Mar. 2 Paoletta Email (J.A. 338). He did not explain how that squared with the Stop Work Order's requirement of prior permission to do essential work, or the tip line to report and stop any work proceeding without permission. Paoletta's new order was followed by a flurry of directives from March 2-3 authorizing staff to perform certain required tasks. Martinez gestured at this theory when he

31

testified that, although "DOGE came in with a very hard fist," there had since been a "change in posture" and a "differing approach[]" once Vought and his deputies—whom Martinez referred to as "the adults"—were in command.  Mar. 10 Hearing Tr. 23:2-5 (J.A. 922).  Notably, the record contains no evidence that Defendants had in fact developed any plan whatsoever for running the agency—as opposed to eliminating it.

The district court rejected Defendants' effort to reframe the evidence and the conclusions Defendants insisted could flow from it as a "charade for the [c]ourt's benefit," given that Defendants sent the putative course-correction emails shortly before the district court's scheduled hearing on the motion for a preliminary injunction.  *Vought*, 774 F. Supp. 3d at 11.  Neither those emails nor any other evidence in the record could give a reasonable observer a "definite and firm conviction" that a mistake was made.  *Cooper v. Harris*, 581 U.S. 285, 309 (2017) (internal quotation marks omitted).  The district court was on solid evidentiary ground when it rejected Defendants' contentions that the CFPB's Chief Legal Officer was somehow unaware for almost three weeks that the Bureau's statutorily required work had halted, and the termination was intended to be permanent.

Indeed, Defendants' continued insistence that the Stop Work Order was never intended to pause statutorily required work squarely conflicts with their contemporaneous attempt to use that same Order to justify the accelerated, permanent firing of the employees who performed the work that Defendants now say they intended to continue.  And the government could not even stick to its talking points.  Shortly *after* Paoletta's whitewashing email, the White House publicly celebrated that President Trump had "ordered [the Bureau] . . . to halt operations."  *Id.* at 47.

32

In any event, the argument that Plaintiffs cannot obtain an injunction because, weeks after they filed suit, Defendants took steps to reverse the policy Plaintiffs challenged is at most a suggestion that the case is moot—an argument that Defendants are not making, and that is unsupported.  To be sure, federal courts may not resolve a case after "a complaining party manages to secure outside of litigation all the relief he might have won in it," but it is well established that a defendant may not "automatically moot a case by the simple expedient of suspending its challenged conduct after it is sued."  *FBI v. Fikre*, 601 U.S. 234, 240-41 (2024) (internal quotation marks omitted).  Any defendant seeking to show mootness in such circumstances faces a "formidable burden" to prove that the challenged practice "cannot 'reasonably be expected to recur.'"  *Id.* at 241 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189-90 (2000)).

Defendants have never—not before the district court nor on appeal—sought to bear their formidable burden to show that Plaintiffs' claims are moot.  Nor have they ever sought to modify or vacate the preliminary injunction on grounds of changed circumstances rendering its continued enforcement no longer equitable.  *See Horne v. Flores*, 557 U.S. 433, 447 (2009) (holding that a party may move to modify or vacate a judgment or order if "a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest."); *cf. Petties v. District of Columbia*, 662 F.3d 564, 571 (D.C. Cir. 2011).  They cannot stitch together evidence of what they say is a post-litigation embrace of their legal obligations to recharacterize the record as it existed—showing just the opposite—when the case was filed.

33

**C.**

Defendants' efforts to portray Plaintiffs' claims as, at their heart, a miscast attempt to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), fare no better.  Vought Br. 39-42.  Throughout this case, Plaintiffs have made clear that they challenge Defendants' decision to shut down the CFPB rather than seek to compel the performance of any specific agency duty or service.  NTEU Br. 35-36.  Defendants insist that anticipation of "losing access to services [Plaintiffs] allege CFPB is statutorily required to provide" can only support a quasi-mandamus APA suit to compel agency action "unlawfully withheld or unreasonably delayed."  Vought Br. 39; 5 U.S.C. § 706(1).  Their insistence that Plaintiffs' only recourse under the APA must be found in section 706(1) is squarely foreclosed by precedent.

This case challenges the Executive's unilateral decision to disband an agency Congress created by statute, not that agency's failure to answer individual queries or bring certain wished-for enforcement actions.  The public that Congress intended to benefit is not disallowed from bringing the former kind of challenge nor relegated exclusively to the latter.  *Regents* illustrates the point.  The plaintiffs there challenged a DHS memorandum ordering the termination of the "DACA Program," which allowed certain undocumented immigrants to apply for forbearance of removal, work authorization, and other federal benefits.  591 U.S. at 8-10.  Those plaintiffs, who would have been harmed by DACA's abolition, challenged the order terminating the program under 5 U.S.C. § 706(2), which permits courts to "hold unlawful and set aside agency action."  591 U.S. at 16.  The Supreme Court undertook review in *Regents* and vacated the DHS order.  It did so even though the plaintiffs' claims, which necessarily arose from the harms they would have suffered had the agency failed to continue

34

implementing the to-be-cancelled DACA Program, might have equally been described as an attempt to compel the agency to perform actions unlawfully withheld—such as acting on their individual DACA applications or providing them benefits they would be afforded if they qualified under DACA.

*Biden v. Texas* is further support. Plaintiffs' APA claim arose from the injury they would incur if DHS stopped enrolling noncitizens in the Remain in Mexico program. The suit could easily have been framed as an attempt to compel the agency to act by continuing those enrollments. *See* 597 U.S. at 793-94. The Court nonetheless recognized the case as challenging final agency actions that had occurred, and not as a quasi-mandamus suit to compel actions that plaintiffs claimed the agency had unlawfully failed to take. *Id.* at 807-08. Congress in the APA did not confine persons in Plaintiffs' position to claiming that the agency must reconstruct, piecemeal and from the bottom up, each of the components of the terminated agency on which they depend for specific services or broader legal protections.

To be sure, demonstrating standing to challenge the shutting down of the CFPB requires Plaintiffs to show that the challenged agency action causes them harm that likely would be redressed if the challenged action were set aside. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). But the standing inquiry—wherein Plaintiffs must identify how they benefit from the Bureau's activities to support their claim that its abolition would injure them by ceasing those activities — does not somehow transform their section 706(2) challenge to the CFPB's shutdown into a premature section 706(1) challenge to the Bureau's failure to provide future services or protection.

35

Nor does it matter that eliminating the CFPB would affect Plaintiffs indirectly, rather than regulating their own primary conduct. It is "typical" in APA suits that "[a]n unregulated plaintiff" will "challenge an allegedly unlawful agency rule that regulates others but also has adverse downstream effects on the plaintiff," and seek to benefit from the court's broad power to vacate unlawful agency actions. *Corner Post, Inc. v. Bd. Of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826-27, 829-30 (2024) (Kavanaugh, J., concurring).

Defendants' argument that *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55 (2004), forecloses Plaintiffs' suit is wide of the mark. *See* Vought Br. 41-43. *SUWA* held that plaintiffs may not invoke the APA's compel-agency-action provision unless they "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*." *Id*. at 64. *SUWA* is a section 706(1) case, with little to say regarding the merits of Plaintiffs' section 706(2) challenge. Plaintiffs have never asked that the court force the CFPB to do anything other than vacate its unlawful order to disband the agency. Defendants' objections that, in doing so, Plaintiffs must nonetheless identify a "specific, unequivocal command" producing a "clear duty" for the agency to act in the manner Plaintiffs desire similarly carry no weight. *See* Vought Br. 43 (citations omitted). Defendants have never disputed that the Bureau is unambiguously legally obliged not to shut itself down.

And, in the posture of a 706(2) suit, a plaintiff is free to challenge an agency's decision to halt ongoing operations even when there is no dispute that those activities were not specifically statutorily required. *See Regents*, 591 U.S. at 16 (noting that "[a]ll parties" agreed that the government was not legally obliged to continue DACA). Of course, the CFPB's existence and operation is statutorily required, but Defendants'

36

actions would be subject to review even if it were not. One central function of the 706(2) cause of action is to ensure that, even when agencies take (or refrain from) action that the agency's own statute leaves in their discretion, the agencies must comply with the fundamental requirement of reasoned decision making. The fact that Congress permits agencies a degree of discretion in what action to take does not invite agencies to act arbitrarily, without forethought, transparency, or public comment on the decisions they choose. And it surely does not insulate from review an agency's decision to unwind itself.

**D.**

Defendants also argue that Plaintiffs are barred from mounting an APA challenge to the order to shut down the CFPB because their requested relief is impermissibly "programmatic." Vought Br. 21-22. It is uncontroversial that plaintiffs "cannot seek *wholesale* improvement of [an agency] program by court decree," but must instead "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). If Plaintiffs' argument were that Defendants' management of the Bureau is too lax, inattentive, or lethargic, that dispute would presumably have to be resolved "in the offices of the [Bureau] or the halls of Congress, where programmatic improvements are normally made." *Id.* Similarly, even though the management of an agency is, necessarily, made up of various discrete actions, many of which might be subject to APA challenge, a plaintiff cannot mount a "generic challenge to all aspects of [the agency's] program" by aggregating ongoing and changing agency operations into a package they label a discrete, reviewable action. *Id.* at 890 n.2. The Court in *Lujan* accordingly rejected plaintiffs' efforts to mount an APA section 706(2) challenge,

37

as parties "aggrieved" under section 702 by the Bureau of Land Management's "land withdrawal review program." *Id.* at 890. The Court explained that the "program" plaintiffs identified was not an "identifiable agency action" but only "the name by which petitioners have occasionally referred to" BLM's ongoing "operations . . . in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by [statute]." *Id.* (internal quotation marks omitted).

This case, challenging a distinct agency decision of major legal and practical import, bears no resemblance to the diffuse collection of agency activities at issue in *Lujan*. Defendants weakly contest the factual footing of Plaintiffs' claim that Defendants adopted a policy to terminate the CFPB, but that challenge fails for reasons already discussed. *See supra* Part III.B. Defendants cannot achieve the same result by treating *Lujan* as if it were a thread they can pull to unravel the established APA cause of action that Plaintiffs invoke here. *See* 5 U.S.C. § 706(2). That APA cause of action is available to challenge Defendants' highly focused agency action. It is not defeated under *Lujan* because the action has broad effects—effects that might even be fairly labeled as "programmatic"—across all the Bureau's operations. Nothing in *Lujan* supports Defendants' contention that the decision by CFPB's new leadership to abolish the Bureau is unreviewable under section 706(2) to determine whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Indeed, *Lujan* itself underscored in no uncertain terms that plaintiffs may challenge a specific action "applying . . . across the board to all [land] classification terminations," even though "the entire 'land withdrawal review program,' insofar as the content of that particular action is concerned, would thereby be

38

affected." 497 U.S. at 890 n.2. It is hard to imagine an agency action that more clearly applies "across the board" to all ensuing agency operations than an order to terminate an agency entirely. That conclusion is confirmed by the Supreme Court's treatment of the challenges to the termination of the DACA and Remain in Mexico programs as justiciable APA challenges to discrete, reviewable agency action, rather than impermissible programmatic challenges to the general way the defendant agencies intended to oversee those programs. Defendants cannot evade judicial review of their unlawful action simply because their adopted policy's effects are complicated and will have comprehensive, programmatic impact on how the agency does (or, more to the point here, does not) carry out its obligations. Plaintiffs have a cause of action to challenge under the APA the decision to terminate the CFPB's activities and shut down the agency.

**E.**

The majority embraces every argument Defendants make as reason to defeat Plaintiffs' statutory cause of action. After summarizing well-accepted guidelines constraining judicial review of agency action, my colleagues object that:

- Plaintiffs have not identified a specific rule or "agency *statement*" authorizing the Bureau's shutdown, Majority Op. 29 (quoting 5 U.S.C. § 551(4) and adding emphasis);
- any shutdown order was not final because ensuing agency actions like contract terminations and RIFs would need to occur before the decision would be fully implemented, Majority Op. 30;
- shutting down the Bureau is "insufficiently discrete" to merit judicial review because the CFPA itself provides

39

no structure for the Bureau's exercise of that power, Majority Op. 31;

- preventing the CFPB's unlawful abolition would require overly intrusive judicial management of the Bureau's functions, Majority Op. 31-32; and

- any shutdown was not ripe for review because, they say, Defendants have reevaluated their plans since the week of February 10—despite the district court's explicit findings to the contrary, Majority Op. 33-34; *see Vought*, 774 F. Supp. 3d at 58.

I have already explained why none of those hurdles applies to justify vacating the preliminary injunction.

The keystone on which all of Defendants' attacks on the preliminary injunction rest is a much simpler, singular assertion. Their unifying premise is that an agency categorically immunizes its exercise of power from judicial review by refraining from memorializing its directives as such. After all, each of Defendants' other reasons for asserting that Plaintiffs lack a cause of action would, in theory, equally apply if the record showed that, on or around February 10, Vought sent a memo to Paoletta and other members of the Bureau's leadership directing them to take "all appropriate actions" to abolish the CFPB in defiance of Congress's command otherwise.

As discussed above, even an authoritative written memo would, on Defendants' view, require further agency action to implement it to the detriment of Plaintiffs or other interested parties before Plaintiffs could bring an APA challenge to the policy it memorializes. Such a memo would not derive from any specific "authoritative text" that might help structure judicial review—at least if the majority is right that "no statute or regulation authorizes the CFPB to shut itself down."

40

Majority Op. 31. It is also quite possible that, by the time a court vacates an unlawful shutdown decision, agency leadership might in the meantime have decided to pursue a different policy. But binding precedent is unambiguous that such a shutdown order, if shown to be unlawful, can be reviewed in court and vacated or "set aside." And, notwithstanding the majority's catalogue of hurdles, I do not understand my colleagues to disagree with that. Rather, the majority ultimately rests on distinguishing *Biden v. Texas* and *Regents*—both of which permitted judicial review of shutdown orders despite sharing the difficulties the majority also catalogues—on the ground that those cases involved "written memoranda." Majority Op. 38.

The issue, then, is what weight should be placed on the absence of any such memo in the record here. To analogize to *Regents*, consider the dilemma of a district court seeking to follow the majority's approach in that case if there were no memo, but the record included unrebutted statements by the President and agency leadership that the DACA program had been abolished, testimony of DHS employees that they had been told that the program was being abolished, and evidence that all the employees and contracts necessary for the program had been terminated such that the program was not in fact being implemented. The majority does not explain why the result should be different on that record for want of "written memoranda" reflecting the order that DHS staff abolish DACA. Majority Op. 38. Defendants, for their part, appear to suggest that the district court, even if certain that the DACA program had been unlawfully abolished, would lack authority to enjoin its termination, and could only encourage the plaintiffs to file quasi-mandamus suits under section 706(1) to attempt to force the agency to recreate the program piecemeal. I cannot agree.

41

To begin with, consider the illogic and perverse incentives inherent in adopting Defendants' preferred approach. My colleagues suggest the ability of any affected plaintiff to obtain relief turns entirely on the form of the evidence establishing the agency's action. But there is no substantive distinction between a termination of a program triggered by a formal memo decreeing it and one mandated without such memorialization: Even if Plaintiffs could proffer a memo, the agency "action" we review would be the same agency closure, not the preparation or circulation of the memo. And the import of the availability of a memo for the judicial review process is primarily evidentiary. In either case, the legality of any such shutdown turns on the agency's statutory authority to abolish the program at issue, and perhaps on the agency's contemporaneous reasons for doing so, rather than on whether the termination happened by memo, email, or verbal directive.

The majority relies on *Biden v. Texas* and *Regents* for its preferred rule, Majority Op. 37-39, but nothing in these cases suggests that the written nature of the program terminations at issue was pivotal to their outcomes. Because the government there had proceeded in the ordinary fashion by announcing major policy changes via written directives, the Court naturally relied on those documents in identifying the relevant agency action. (We would have, too.) Neither decision, however, purported to hold that "final, written memoranda" were always necessary for agency action. Majority Op. 38. To the contrary: *Regents* explained that the "action [that] provide[d] a focus for judicial review" was the "creation" of DACA and its "rescission," not the written memorandum. 591 U.S. at 18 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). And *Biden* held only that, where a formal memorandum terminating Remain in Mexico *did* exist, it served as the "operative agency action[]" because it qualified as a rule on its own terms and "bound [agency] staff by forbidding them to continue the

42

program in any way from that moment on."   597 U.S. at
808-09, 810 (internal quotation marks omitted) (citing 5 U.S.C.
§ 551(4)).   It strains credulity to think that either outcome
would have been different had DHS proceeded as the CFPB
did here, rather than by memorializing its decisions.   In holding
as much, the panel majority essentially punches a hole in the
"basic presumption of judicial review" of agency action
codified in the APA, *McLaughlin Chiropractic Assocs. v.
McKesson Corp.*, 145 S. Ct. 2006, 2015 (2025) (internal
quotation marks omitted), to the benefit of agencies that, for
whatever reason, proceed without a record of their reasoning or
formal public notice that leaves a paper trail.

That said, the majority's rule remains somewhat unclear.
In attempting to distinguish *Biden v. Texas* and *Regents* from
this case, the opinion emphasizes the presence in those cases of
"written memoranda," Majority Op. 38, but it elsewhere
suggests that even an "informal" or "oral" statement might
suffice, Majority Op. 29, 41.   Certainly, this case would be
more straightforward if Defendants had announced in the
Federal Register their decision to close the CFPB.   But the
majority does not make clear why the record here fails to satisfy
even its own newfound rule.   If it does not, what would?   An
email from Vought stating that the decision had been made to
close the agency?   The same announcement at an all-staff
meeting?   A press conference where the decision is made
public?   In my view, agency leadership's mode of
communicating its decision to abolish the agency—a decision
the district court found was made—does not change the
decision's susceptibility to APA review.   It is the agency's
decision itself that is the focus of our review.

Defendants' argument that Plaintiffs lack an APA section
706(2) cause of action is also wholly at odds with the basic
purpose of administrative law to ensure that agency actions are

43

"the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983), and that an agency "clearly disclose[]" its reasons for acting as it does, *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). That is why, for example, agencies cannot act and then defend their actions with justifications developed after the fact. *Id.* at 94-95; *see, e.g., Regents*, 591 U.S. at 20. That is also why it counts strongly against an agency when, in a judicial proceeding challenging the agency's action, the record shows that the agency concealed its true reasons for acting. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Defendants argue—and my colleagues now appear to hold—that if the agency not only conceals its reasons for acting, but obfuscates what it is doing while it acts, it may thereby immunize its operations from judicial review. There is no plausible reason why Congress would have wanted to afford *less* judicial scrutiny to executive agencies when they make critical decisions—including shutting down an agency created by statute—without any publicly available, lawful, nonarbitrary reasoning to justify them.

To be sure, an APA section 706(2) cause of action is definitionally limited to its statutory scope. If Congress had in fact provided for judicial review only insofar as a final agency action is effectuated by a clear, written directive, then I would credit Defendants' argument. But Congress did no such thing. The relevant statutory provision defines an agency action as "includ[ing] the whole or a part of an agency rule, order, license, sanction, relief, *or the equivalent . . . thereof*." 5 U.S.C. § 551(13) (emphasis added).

My colleagues affirm that the Bureau's action shutting itself down would be reviewable under section 706(2) if there were a memo or oral announcement directing it. *See* Majority Op. 40-41. But they offer no reason why the agency's doing

44

the same thing without the overarching announcement necessarily falls outside of Congress's residual reference to "equivalent" types of agency action. 5 U.S.C. § 551(13). Instead, they fall back on the reference to a "statement" in the statutory definition of an agency "rule." Majority Op. 29 n.5 (quoting 5 U.S.C. § 551(4)). That bears, at most, on whether the form of action shutting down the CFPB was an agency "rule." It does nothing to establish that every type of agency action—whether "rule, order, license, sanction, relief, or the equivalent . . . thereof," 5 U.S.C. § 551(13)—must be encapsulated in a "statement" to be subject to judicial review. By barring review of the decision to shut down the Bureau for want of a memorandum or "statement" announcing it, the court without comment reads "the equivalent . . . thereof" out of Congress's intentionally capacious definition of agency action. *See id.*

The majority further cabins the APA by holding that a "collection of disparate agency actions" is not a fit focus of judicial review, and characterizing the decision to shut down the Bureau as just such an unreviewable amalgam. Majority Op. 41. But Plaintiffs challenge a *single* action—the shutdown decision—as to which a collection of different agency actions is probative evidence. Nothing about those actions themselves is "disparate." Rather, the record reflects a concerted and coordinated campaign undertaken by agency leadership simultaneously to dismantle every functional requisite of the Bureau's, with all steps keyed to the single goal stated publicly by the President and his subordinates: "get[ting] rid of" the CFPB. *See supra* pp. 26-27. That is a far cry from a random assortment of "disparate agency actions" or a "secret," "unrecorded," or "[u]nexpressed" shutdown decision made by a single agency head. Majority Op. 29 n.5, 41.

45

Nor is there anything "oxymoronic" about recognizing that an "unrecorded" agency action could be the subject of APA review. Majority Op. 41. The expansive statutory definition of "agency action" is designed to reach situations in which agencies adopt an "equivalent" of any of the most common types of agency action without necessarily making the formal "statement" typical of an agency rule. The declarations by the President and his subordinates of their objective, together with swift and near-complete execution, suffices anyway as "a statement" of the agency's decision. That no prior case has reviewed such a situation speaks only to the unprecedented nature of the government's actions here.

In any event, we do not interpret the APA's text on a blank slate. The Supreme Court has explained that "agency action" as used in the APA is "meant to cover comprehensively every manner in which an agency may exercise its power." *Am. Trucking*, 531 U.S. at 478; *see FTC v. Standard Oil Co. of Calif.*, 449 U.S. 232, 238 n.7 (1980). When this circuit has identified agency action as outside that "broad sweep," we have done so because the action complained of had no "concrete impact . . . whatsoever" and "imposed no obligations and denied no relief." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (2004). It is self-evident that an agency acting to eliminate itself is an "exercise [of] its power" with "concrete impact[s]." Such an action is, moreover, "discrete" in the same way a rule is. *SUWA*, 542 U.S. at 62.

The majority disclaims resting on the absence of a memo alone, Majority Op. 41, noting that even an unstated action would have to bind the agency to be final and reviewable, and asserting that Vought's decision to shut down the CFPB was not binding, Majority Op. 41-42. The district court, however, found precisely the opposite. After a two-day evidentiary hearing, it found that the "consequences" of the shutdown

46

decision were "swift": employees understood that they were to stand down entirely from their tasks, sweeping terminations of job positions and contracts quickly followed (with the rest to follow soon thereafter), and the day-to-day operation of the Bureau ground to a halt. *Vought*, 774 F. Supp. 3d at 44-46, 58-60.  To conclude otherwise, the majority would have to establish that those factual findings were clearly erroneous, a step it pointedly does not take.  And the facts rule out the majority's alternative embrace of Defendants' assertion that no purported shutdown decision was ever finalized.  Majority Op. 33-34, 41-42.  The district court found that the last-minute actions Defendants highlight were mere "window dressing" ahead of the impending preliminary-injunction hearing, not proof that no shutdown decision had been made.  *Vought*, 774 F. Supp. 3d at 11.

Perhaps the majority means that the elimination of an agency is "agency action," but it is not "final" unless it is communicated or memorialized with sufficient levels of formality.  I doubt it, though, as that position is legally unsupported and makes no sense on its own terms.  What makes an agency action "final," and thus reviewable, is that it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (citations omitted).  If an agency promptly shuts itself down in response to its leadership's adoption of a policy to that effect, that action both concludes the decision-making process and produces legal consequences. That is true even if the agency leaders fail to commemorate their decision with a formal announcement.

Binding precedent reaffirms that commonsense understanding of the scope of APA review.  In *Venetian Casino Resort*, we held that an agency takes final, reviewable action

47

by "adopting [a] policy" that has legal consequences, regardless of whether or how that policy's adoption is written down. 530 F.3d at 931. Defendants do not dispute that basic principle. They accept that we may "infer from circumstantial evidence that there's a decision," such as the adoption of a policy, subject to judicial review. Oral Arg. Tr. 78:6-7. The district court's finding of just such a decision is enough to meet that standard. The majority nonetheless endeavors to skirt *Venetian Casino Resort*'s binding holding. It argues that, unlike here, "the policy at issue there was recorded repeatedly, in different versions of an agency compliance manual," and thus "qualified as a rule." Majority Op. 36 (emphasis omitted). That is not quite right. We were explicit in *Venetian Casino Resort* that the final agency action at issue consisted of "adopting the *policy*" of disclosing confidential information without notice, "not . . . including it in the [m]anual." 530 F.3d at 931 (emphasis added). And nowhere did we hint that it mattered to our holding whether the statements in the manual separately qualified as a "rule." To the contrary, we emphasized that the relevant agency action under review was "the decision of the Commission to adopt a policy," not "the [m]anual itself." *Id.*

The majority also insists that *Venetian Casino Resort* is distinguishable because the court there reviewed the policy only when "EEOC was on the cusp of applying it to harm the plaintiff," so the policy "implicated none of the finality or ripeness concerns associated with the shutdown decision here." Majority Op. 36-37. The district court here, however, found that Defendants had already gone beyond "the cusp" of applying their policy decision against Plaintiffs—the policy's implementation was well underway and in overdrive at the time of the initial consent order. *See Vought*, 774 F. Supp. 3d at 58-61. Besides, finality and ripeness are distinct from the separate requirement of "agency action," so they

48

provide no reason to distinguish *Venetian Casino Resort* on that basis.

The majority ultimately relies on language from *Biden v. Texas* cautioning against "reviewing an abstract decision apart from specific agency action, as defined in the APA." 597 U.S. at 809; *see* Majority Op. 28-29 & n.5, 38-39. But nobody is suggesting that Plaintiffs may obtain judicial review of an "abstract decision" that is not final agency action—*i.e.*, that is not "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent . . . thereof," 5 U.S.C. § 551(13), and is not also an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (citation omitted). The Supreme Court applied that test to identify the final agency action in *Biden v. Texas*, and it equally applies here to defeat the suggestion that Plaintiffs lack a cause of action under section 706(2).

The finality issue in *Biden v. Texas* arose because, after Secretary Mayorkas's first memorandum terminating the Remain in Mexico program was enjoined by a district court, which "found that the agency failed to engage in reasoned decisionmaking and therefore acted arbitrarily and capriciously in violation of the APA," the agency "considered anew" whether to terminate the program. 597 U.S. at 794-95 (citation omitted). The agency then released a second memorandum that also ordered the abolition of the program but included additional explanation of the agency's reasons. *Id*. The Fifth Circuit refused to treat the second memorandum (with its more detailed reasoning) as a separate reviewable action, holding instead that it only "explained" the decision the agency had already made by terminating the Remain in Mexico program the first time. *Id*. at 796-97 (citation and emphasis omitted). That was error. The Supreme Court recognized that the agency

49

took one final, reviewable action by terminating the program through the first memo, and then elected to "tak[e] *new* agency action" after its first action was enjoined in court. *Id.* at 807-08 (internal quotation marks omitted). The Fifth Circuit should not have ignored the second action or treated it only "as *post hoc* rationalizations" of the first action, as if the object of review were some underlying "abstract decision" to abolish the Remain in Mexico program, rather than an actual final agency action under the APA. *Id.* at 809-10.

What follows is that Plaintiffs must identify the agency action that is the subject of their APA challenge. Plaintiffs have done so. They do not deny that an "abstract decision" on the part of Vought or another agency leader to abolish the CFPB at some point in the future would be unlikely to qualify as final and reviewable. Even decisive identification of a possible future action is unlikely to count as an exercise of agency authority, and it is hard to see how any such decision, by itself, would create rights, obligations, or legal consequences. What *Biden v. Texas* shows is that, if Plaintiffs prevail in this suit, any future decision Defendants might take to abolish the CFPB is likely to be a distinct agency action, reviewable on its own terms.

But it decidedly does not follow from *Biden v. Texas*, where no such issue was before the Court, that an agency could categorically evade judicial review by declining to write down its directives on paper. Nothing in *Biden v. Texas* is fairly read to cast doubt on *Venetian Casino Resort*'s holding that an agency's adoption of a policy with binding, legal effect qualifies as reviewable agency action. And, as previously noted, I strongly doubt the Supreme Court in *Biden v. Texas* understood itself as holding that Secretary Mayorkas could have abolished the Remain in Mexico program entirely without exposing the agency to judicial review through the simple

50

expedient of proceeding directly to the program's shutdown without first drafting any memo. The majority's oblique hint to the contrary does not suffice to avoid the binding effect of *Venetian Casino Resort*'s holding on the scope of reviewable agency action, nor has the majority claimed any prerogative not to follow it.

The majority additionally sees a supposed "mismatch" between "the final agency action inferred" (*i.e.*, the shutdown decision) "and the remedy provided" (*i.e.*, enjoining or setting aside the "constellation of discrete actions" comprising the shutdown). Majority Op. 42. But that would equally have prevented review in *Regents* and *Biden v. Texas*, as each case likewise challenged termination of programs that could readily have been described as constellations of discrete components. Terminating DACA, for instance, involved halting work authorizations, ending eligibility for Medicaid, and providing new enforcement guidance to ICE. *See Regents*, 591 U.S. at 18-19. But the Court did not hold that review must be had, if at all, via quasi-mandamus suits under section 706(1). It understood that the decision to terminate a program is itself an agency action reviewable under section 706(2). The same reasoning controls here.

Perhaps most worryingly, the upshot of the government's and the majority's position is that an agency may either completely evade judicial review of its activities—or, technically, face challenges only under section 706(1)'s inapt standard—if it can just keep its shutdown plans non-public until they are *fait accompli*. Defendants do not deny that a unilateral Executive Branch decision to shut down CFPB would be unlawful. They focus instead on attacking Plaintiffs' right to challenge their action because—at least as far as we now know—they decided on the challenged action without the kind of memorialization the majority requires. In adopting

51

Defendants' preferred gloss on the APA, the majority does not appear to consider that an agency determined to perform an act of dubious legality might be disinclined to publicly announce what it has determined to do.

Rather than grapple with the perverse incentives its decision creates, the majority insists that section 706(1) provides an adequate avenue for judicial review of termination decisions not formally announced that result in withholding or unreasonably delaying mandatory agency action. Majority Op. 39 n.8. But a section 706(1) remedy is insufficient here for all the reasons previously explained. *See supra* Part III.C. To re-emphasize just one, it provides no relief to plaintiffs injured by the agency's complete abdication of its duties in matters committed to its general discretion—that is, the bulk of what the Bureau was set up to do. To its credit, the majority rightly assumes that the CFPB "must engage in *some* regulation of, say, the Nation's largest banks," Majority Op. 27 (citing *Chaney*, 470 U.S. at 833 n.4), even though its rulemaking, enforcement, and adjudicatory authorities are discretionary. *See* 12 U.S.C. §§ 5512(b)(1), 5531(b), 5562, 5563(a). It is anyone's guess how that acknowledgement—which is surely correct—squares with the majority's insistence that section 706(1) is the only avenue for judicial review.

The government's preference for a rule that empowers an agency to stymie meaningful APA review of presumptively unlawful action is clear. How their approach squares with the APA's provision for judicial review of agency action remains, at least to me, entirely obscure. Defendants seek effective immunity from meaningful oversight in the federal courts of even the most consequential actions by agencies, provided the agencies manage to obfuscate the scope and reasons for their action—and perhaps the reality that they are acting at all. The court's decision to endorse the government's attack on the

52

district court's preliminary injunction is incompatible with the
core principles underlying APA review and, more generally,
corrosive of the rule of law.

**IV.**

Even if Plaintiffs lacked a cause of action under the APA,
they have an independent claim under the Constitution against
the Executive's unilateral action to shut down the CFPB.
Defendants do not dispute the general, well-established
principle that a plaintiff who is injured by unconstitutional
government action may sue to enjoin it even if the action is not
also amenable to suit under the APA.  *See Dalton v. Specter*,
511 U.S. 462, 469 (1994); *Trudeau v. FTC*, 456 F.3d 178, 190
(D.C. Cir. 2006); *see also Webster v. Doe*, 486 U.S. 592, 603
(1988).  That principle applies "without regard to the particular
constitutional provisions at issue," including to a "separation-
of-powers claim."  *Free Enter. Fund v. Pub. Co. Acct.
Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

Defendants maintain that this case concerns solely
*statutory* claims.  Plaintiffs point out that the legal authority to
eliminate an agency Congress created rests with Congress, so
eliminating the agency by unilateral Executive Branch policy
choice unconstitutionally usurps congressional power.  Only
Congress can repeal its own enactments.  But in Defendants'
view, that constitutional argument merely repackages
Plaintiffs' allegations that abolishing the Bureau would violate
the agency's organic statute.  Vought Reply Br. 17-18.

Defendants rest principally on *Dalton*.  A plaintiff has a
constitutional claim, they assert, only insofar as an executive
official either relies solely on an invocation of inherent
constitutional authority, or "on a statute that itself violates the
Constitution."  Vought Reply Br. 17.  Challenges to all other
executive activity must be treated as statutory, constrained by

53

the availability of statutory causes of action and the limits of *ultra vires* review, and subject to resolution by statutory interpretation alone.

That analysis misapprehends the nature of Plaintiffs' constitutional claim. Defendants seek to equate this case to *Dalton*, but *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), is the better analogue. The power Plaintiffs allege Defendants arrogate to themselves is undisputably beyond the Executive's legitimate reach: Neither Defendants nor my colleagues have ever suggested that Defendants have any statutory authority—under any statute—to eliminate the CFPB unilaterally. This case is therefore unlike *Dalton*, which affirmed the statutory character of a challenge to the President's exercise of a statutory base-closing power where the plaintiffs' only objection was that he failed to follow certain statutorily prescribed procedures when doing so. Rather, like *Youngstown*, this case "involve[s] the conceded *absence* of *any* statutory authority" to undertake the challenged action. *Dalton*, 511 U.S. at 473. The majority, for its part, avoids that clear parallel only by repeating the error that plagues its APA analysis: it insists that the gravamen of Plaintiffs' complaint is that the Executive failed to "take care" that the Bureau performed its statutorily mandated duties, Majority Op. 49, an equitable constitutional claim it reads *Dalton* to foreclose. As previously explained, that framing misconstrues the issue. Plaintiffs object not to the cessation of discrete and mandatory agency duties, but to the decision to shutter an agency created by Congress—an action for which the President's authority, if it is to exist at all, "must be found in . . . the Constitution." *Youngstown*, 343 U.S. at 587.

For like reasons, this circuit's recent decision in *Global Health Council v. Trump*, No. 25-5097 (D.C. Cir. Aug. 13, 2025), is inapposite. That case concerned the claim that the

54

President's impoundment of congressionally appropriated foreign-aid funds violated the separation of powers.  Slip op. 15.  Relying on *Dalton*, the panel majority rejected that equitable constitutional claim as essentially statutory in character.  *See id.* at 18-24.  Notably, however, Congress has delegated authority to the President, via the Impoundment Control Act, to propose rescissions or deferrals of appropriated funds.  *Id.* at 6-7 (citing 2 U.S.C. § 681 *et seq.*).  In *Global Health Council*, therefore—as in *Dalton*—a statute directly contemplated the presidential action under consideration.  *See Global Health Council*, No. 25-5097, slip op. at 20-21.  Here, by contrast, no statute contemplates that the Executive might shutter an agency created by Congress—much less authorizes him to do so.  In ordering the Bureau to shut down, the President did not act in "excess" of a specific statutory power, *Dalton*, 511 U.S. at 472; he acted without any statutory authorization whatsoever.

This case differs from *Youngstown* only in that President Truman conceded in *Youngstown* that he had ordered the nationalization of the steel mills but sought to defend his constitutional authority to do so.  343 U.S. at 585-87.  But Defendants here simply deny the action—ordering the elimination of the CFPB—that the district court found they had undertaken without *any* authority, conditional or otherwise, from Congress.  Nowhere, before the district court or on appeal, have Defendants identified any statutory or constitutional authority that permits them to shut down the CFPB.  Nor have they disputed that unilaterally abolishing the Bureau would "amount[] to lawmaking, a legislative function which the Constitution has expressly confided to the Congress and not to the President."  *Id.* at 582.

To show how *Youngstown*'s framework applies here, assume that, although he acknowledged the lack of any statute

55

or constitutional provision authorizing him alone to nationalize the steel mills, President Truman simply denied having ordered any nationalization. If a court found that, Truman's denials to the contrary, he had in fact issued such an order, would the court lack authority to invalidate his action as a violation of the constitutional separation of powers? The order's constitutional defect would be identical to the defect in the actual *Youngstown* case, unaltered by Truman's hypothetical litigation strategy of disputing the facts rather than the constitutional character of the arrogation of power.

Defendants' apparent theory here is that courts may only review under the Constitution action of executive officers who explicitly and exclusively invoke constitutional authority for their conduct. That theory is artificially cramped and indefensible. Its implicit premise is that any constitutional claim evaporates if officers simply deny having taken an action that all recognize as indisputably unconstitutional. Any rule that so richly rewards deceptive Executive Branch gamesmanship has a burden of justification unmet here. Plaintiffs claim and the district court found that Defendants exercised a power that no statute delegates to them and that all parties agree is not theirs under the Constitution, but Congress's. Equity therefore permits plaintiffs injured by the exercise of such a power to seek to have it enjoined in federal court.

The majority credits Defendants' effort to distinguish *Youngstown* because that "dispute . . . was entirely constitutional." Majority Op. 48. But, again, the *Youngstown* dispute was only more obviously "constitutional" than this one insofar as President Truman acknowledged that he exercised a power of disputed constitutionality, rather than *denying* that he wielded a power of undisputed *un*constitutionality. Just as plaintiffs may not "plead around" *Dalton*'s limitations by

56

recasting a statutory claim as a constitutional one, Majority Op. 49 n.11, so, too, the Executive may not neuter an implied constitutional claim through obfuscatory litigation tactics. Neither *Youngstown* nor *Dalton* requires us to so reward an agency for acting without the transparency the law demands from our government.

**V.**

It suffices to resolve this appeal that we decide Defendants' attacks on Plaintiffs' standing and cause of action. But it is worth underscoring what is not raised here. Defendants have never argued that unilateral action to abolish the CFPB is within the executive's constitutional authority. And Defendants have not responded to the APA claim with any plausible explanation of their conduct as anything other than arbitrary, capricious, and contrary to law.

Defendants' remaining argument is that the district court's injunction was too broad. Vought Br. 53-58. They made materially identical arguments in seeking a stay pending appeal, which we largely accommodated in our partial stay of the injunction issued earlier this year. *NTEU v. Vought*, No. 25-5091, 2025 WL 1721068 (D.C. Cir. Apr. 11, 2025). As Plaintiffs note, the only provision of the preliminary injunction that Defendants now seriously dispute is the temporary prohibition on reductions in force—meaning a pause on the agency's ability to finalize permanent, mass firings of all or virtually all of the agency's staff. When we sought to tailor our stay to afford maximal leeway to Defendants, consistent with preliminary relief preserving the *status quo* pending final judgment, Defendants immediately took steps to fire 90 per cent of Bureau staff. *See* NTEU Br. 51-52. At that juncture, the district court was on solid ground in concluding that "[a]llowing [D]efendants to execute their plans without

57

preliminary relief will cause irreparable harm to the Bureau, the plaintiffs in this case, and plaintiffs' members and constituents." *Vought*, 774 F. Supp. 3d at 79.

RIFs are a typical, lawful personnel-management tool under normal circumstances. But it can be appropriate to enjoin "otherwise permissible practices connected with the acts found to be illegal" so that "relief is effectual." *United States v. Loew's*, 371 U.S. 38, 53 (1962). As we noted in reimposing the relevant portion of the district court's injunction, preventing Defendants from instituting large-scale RIFs that would have the effect of terminating many (if not all) of the Bureau's functions is necessary here to "ensure[] that [P]laintiffs can receive meaningful final relief should [Defendants] not prevail in this [litigation.]" *NTEU v. Vought*, No. 25-5091, 2025 WL 1721136, at *1 (D.C. Cir. Apr. 28, 2025).

It will be cold comfort to Plaintiffs if they ultimately succeed on the merits in their challenge to the CFPB's shutdown only to discover that Defendants have put the agency in a hole from which it can never fully recover. That would be the effect of the agency's decisions to fire all or virtually all employees who once worked at the agency, terminate every contract that supported their work, purge all the data they amassed, and ghost all the experts and organizations with whom they had built up beneficial working relationships. Without the district court's preliminary injunction, the agency would have permanently destroyed the valuable resources on which the Bureau has long relied to understand and tackle the problems Congress established it to address. At best, the defunct agency would face a years-long process of rebuilding.

A preliminary injunction is necessarily a "stopgap measure" aimed at preserving the *status quo*, rather than a

58

definitive resolution of a case or controversy. *Singh*, 56 F.4th at 95 (citations omitted). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The district court did not abuse its discretion or its reasoned judgment in determining that restrictions on RIFs were necessary to ensure that there would still be a Bureau when the time came to rule definitively on the merits of Plaintiffs' challenges.

It is uncontested that responsibility for the Bureau's operations lies with the President and his chosen, politically accountable leadership rather than with the judiciary. The district court has appropriately invited Defendants to "propose[] reasonable and appropriate modifications to the preliminary injunction that preserve [their] day-to-day managerial discretion." April 3 Order at 1, ECF No. 102. We have made clear that concerns of overbreadth "do[] not necessitate the dissolution of the preliminary injunction," as "[t]he district court retains the power to modify the injunction in the exercise of its sound discretion" to accommodate the enjoined party. *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 325-26 (D.C. Cir. 1987). Defendants have not taken up the district court's invitation. Indeed, it is striking that, throughout all their objections to the scope of relief in this case, Defendants never offered any "workable path in this emergency posture for narrowing the scope of relief." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). A district court cannot be forced to "fashion narrower, ostensibly permissible policies from whole cloth" where Defendants have proposed no such policy themselves. *J.D. v. Azar*, 925 F.3d 1291, 1335 (D.C. Cir. 2019). It is up to the government, not the district court, to "suggest the contours of any such approach." *Id.* They have not.

59

I would therefore reject Defendants' arguments that the district court abused its discretion in acting to preserve the status quo while litigation over their unlawful attempt to terminate the agency continues.

## VI.

Throughout this case, Defendants have offered no convincing explanation for their activity on the week of February 10. Before the district court, Martinez, with impressive understatement, suggested that Defendants' actions created a "very fluid situation" at the Bureau. Supplemental Martinez Decl. ¶ 4 (J.A. 241). In oral argument to this court, Defendants' counsel described the situation as obscured by "a fog of confusion." Oral Arg. Tr. 78:13-14. In this preliminary posture, in circumstances in which the speed and scope of the government's action put enormous pressure on the court and the litigants, and without the benefit of discovery, the record is doubtlessly less clear than we might like.

But the evidence that is before us is damning. Many of Defendants' undisputed actions cannot reasonably be understood as advancing any purpose other than the willful destruction of a congressionally created agency, in the face of the "bedrock principle[] of constitutional law" that the executive "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). Had the district court not acted, there is very little reason to believe that the CFPB would have existed by the end of March.

The majority does not deny that Defendants acted as the district court found. Nor do my colleagues dispute that such actions were unlawful for all the reasons that Plaintiffs have alleged. Nevertheless, they elect to shield Defendants' illegality from any effective judicial oversight. Defendants

60

announced and celebrated their lawless decision to reporters and the broader public. But they did not announce their decision in the pages of the Federal Register, and my colleagues take that lack of formal recordation as grounds to vacate the preliminary injunction. Doing so is an invitation to agency evasion and deception. Our constitutional and statutory responsibility to hold executive agencies to the law requires more. I respectfully dissent.