**ORAL ARGUMENT HELD MAY 16, 2025**
**No. 25-5091**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR DISTRICT OF COLUMBIA CIRCUIT**

NATIONAL TREASURY EMPLOYEES UNION, *et al.*,

*Plaintiffs-Appellees*,

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Columbia
No. 1:25-cv-00381 (The Hon. Amy Berman Jackson)

**BRIEF OF 36 MEMBERS OF CONGRESS AS *AMICI CURIAE***
**IN SUPPORT OF APPELLEES' PETITION FOR REHEARING EN BANC**

Leah M. Nicholls
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

Hannah Kieschnick
PUBLIC JUSTICE
475 14th St., Ste. 610
Oakland, CA
(510) 622-8150
hkieschnick@publicjustice.net

October 6, 2025

*Counsel for Amici Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING[1]

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* represents that counsel for all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* are the Democratic Leader of the Senate as well as the Democratic members of the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives, the committees that oversee the Consumer Financial Protection Bureau. In addition, many *amici* participated in the passage of the legislation which established the CFPB. As a result, *amici* have specialized knowledge regarding the CFPB and its role in protecting American consumers and guarding against the type of conduct that led to the 2008 financial crisis. Moreover, members of Congress have filed *amicus* briefs in multiple cases about the constitutional separation of powers, including on the merits in this case in the district court and this Court. Beyond their firsthand experience legislating, *amici* have therefore developed expertise in the constitutionality of decisions by the Executive to dismantle statutorily-created agencies.

---

[1] No party or party's counsel authored this brief, in whole or in part, or contributed money that was intended to fund preparing or submitting this brief.

i

# TABLE OF CONTENTS

Statement Regarding Consent to File and Separate Briefing ................................... i

Table of Contents ........................................................................................ ii

Table of Authorities.................................................................................... iii

Interests of *Amici Curiae* ...........................................................................1

Introduction and Summary of Argument ....................................................1

Argument.....................................................................................................4

    I.    Congress created the CFPB in response to the 2008 financial crisis. ........4

    II.    Only Congress has the power to shutter the CFPB. ................................6

    III.    Shuttering the CFPB would leave consumers and consumer financial markets exposed. ........................................................9

Conclusion ................................................................................................14

Certificate of Compliance ........................................................................

Certiciate of Service................................................................................

Appendix: List of *Amici Curiae*................................................................

# TABLE OF AUTHORITIES

**Cases**

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ................................................................6

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................................7

*Myers v. United States,*
    272 U.S. 52 (1926) ................................................................6

*NFIB v. OSHA,*
    595 U.S. 109 (2022) ................................................................6

*United States v. Midwest Oil Co.,*
    236 U.S. 459 (1915) ..............................................................6, 7

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ..............................................................4, 5

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................................ 6, 7, 8

**Statutes and Regulations**

5 U.S.C. § 904 ................................................................7

12 U.S.C. § 5412 ................................................................8

12 U.S.C. § 5493 ..............................................................5, 11

12 U.S.C. § 5496 ................................................................7

12 U.S.C. § 5512 ................................................................5

12 U.S.C. § 5514 ..............................................................5, 6

12 U.S.C. § 5515 ..............................................................5, 6

12 U.S.C. § 5531 ................................................................5

12 U.S.C. § 5581 ................................................................5

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,
Pub. L. No. 111-203, 124 Stat. 1376 ........................................................... *passim*

Equal Credit Opportunity Act, 15 U.S.C. § 1691 ...................................................12

Home Mortgage Disclosure Act, 12 U.S.C. § 2801...................................................11

Military Lending Act of 2006, 5 U.S.C. § 987 .......................................................12

National Defense Authorization Act for Fiscal Year 2022,
Pub. L. No. 117-81, 135 Stat. 1541 (2021) ...........................................................7

## Legislative Materials

H.R. 3118, 114th Cong. (2015)....................................................................7

S. Rep. No. 111-176 (2010) ............................................................... 4, 5, 8

## Secondary Sources

Bobby Conner, et al., *The CFPB is working to reinforce the foundation of a fair,
nondiscriminatory and competitive mortgage market*, Consumer Fin. Prot.
Bureau (June 28, 2024), https://perma.cc/9VUE-EYV9......................................11

*CFPB Bans Navient from Federal Student Loan Servicing and Orders the
Company to Pay $120 Million for Wide-Ranging Student Lending Failures*,
Consumer Fin. Prot. Bureau (Sept. 12, 2024), https://perma.cc/X4DK-U5N5 ...10

*CFPB Orders Bank of America to Pay $12 Million for Reporting False
Mortgage Data*, Consumer Fin. Prot. Bureau (Nov. 28, 2023),
https://perma.cc/GRS2-5MW9....................................................................11

*CFPB Takes Action Against Draper & Kramer Mortgage for Discriminatory
Mortgage Lending Practices*, Consumer Fin. Prot. Bureau (Jan. 17, 2025),
https://perma.cc/VH6N-92DJ....................................................................12

Cong. Rsch. Serv., RL30876, *The President's Reorganization Authority:
Review and Analysis* (2001) ...................................................................7

Fed. Deposit Ins. Corp., *Crisis and Response:
an FDIC History 2008-2013* (2018)...........................................................4

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (2011) ..........3, 4

iv

Letter from Maxine Waters, Ranking Member, U.S. House of Representatives Comm. on Fin. Servs., to Russell Vought, Acting Director, Consumer Fin. Prot. Bur. (Sept. 30, 2025), https://perma.cc/FHR6-CSNZ .............................................3

Office of Servicemember Affairs, *The CFPB is protecting the military community and providing relief*, Consumer Fin. Prot. Bureau (May 23, 2024), https://perma.cc/EH8F-TD7C ...............................................................................13

*The CFPB*, Consumer Fin. Prot. Bureau (last updated Dec. 3, 2024), https://perma.cc/MDD4-CQP6.................................................................................9

Tommy Andres, *Divided Decade: How the financial crisis changed housing*, Marketplace (Dec. 17, 2018), https://perma.cc/8CHZ-XP3S ...............................4

U.S. Dep't of Treasury, *The Financial Crisis Response In Charts* (Apr. 2012), https://perma.cc/CGE9-G3EP ...............................................................................4

## Administrative Proceedings

*Bank of America, N.A.*, CFPB No. 2023-CFPB-0007 (July 11, 2023)....................10

## INTERESTS OF *AMICI CURIAE*

Proposed *amici* are the Democratic Leader of the Senate as well as the Democratic members of the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives—the committees that oversee the Consumer Financial Protection Bureau. Many *amici* also participated in the passage of Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank), Pub. L. No. 111-203, 124 Stat. 1376, which established the CFPB. *Amici* are therefore familiar with the CFPB and the central role it plays in protecting America's consumers.

As the district court found, absent a preliminary injunction, Defendants will eliminate the CFPB. JA634-35, 697. Allowing Defendants to do so would represent a blatant disregard for Congress's constitutional role and threaten the consumers the CFPB was created to protect. *Amici* thus have a substantial interest in this case.

A full list of *amici* appears in the Appendix.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The CFPB was born out of the "worst financial meltdown since the Great Depression."[2] Congress investigated the causes of the 2008 crisis and found that regulatory failures were partly to blame. So, Congress passed Dodd-Frank. One of the greatest achievements of that bipartisan effort was to consolidate consumer

---

[2] Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* 3 (2011).

1

financial protection in a single agency, the CFPB, that would be a watchdog for consumers, armed with the authority necessary to prevent another financial meltdown.

Defendants seek to undo this, leaving consumers and financial markets unprotected. Almost immediately, Acting Director Vought instructed staff to "stand down from performing any work task," without exception for the CFPB's statutorily required work. JA646. Defendants also cancelled the contracts needed to keep the CFPB running and initiated mass terminations, starting with probationary and term employees before planning to fire everyone else. JA648-49, 650, 674-76, 701.

These actions are not part of an ordinary presidential transition. They reflect a decision to disband the CFPB in brazen violation of the separation of powers. Congress exercised its Article I power to create the CFPB. A President, of course, may disagree with Congress's choice. When that happens, the remedy is to participate in the political process and make a proposal to Congress, not to usurp legislative power and unilaterally dismantle an agency Congress created.

Shuttering the CFPB would not just run afoul of the Constitution, it would also destroy the framework Congress created to safeguard American consumers. That framework has been a resounding success, with the Bureau delivering *billions* back to consumers who have been defrauded. In its absence, entire swaths of the

market will be unprotected from the type of predatory conduct that caused the 2008 crisis and led to the creation of the CFPB.

The panel majority did not disturb the district court's finding that Defendants have decided to shutter the CFPB and, absent a preliminary injunction, would proceed with the "permanent, mass firings of all or virtually all of the agency's staff." Dissent Op. 56; JA634-35, 697.[3] Even so, the majority blesses that obviously unconstitutional decision by insulating it from judicial scrutiny. If the majority's opinion is left to stand, courts in this Circuit will thus be "powerless" to stop a President from acting with impunity and dismantling any statutorily-created agency—or ignoring any statute he so chooses. Dissent Op. at 2. That result simply "cannot be reconciled with either the constitutional separation of powers or our nation's commitment to a government of laws." *Id.* En banc review is urgently needed to avoid such an outcome. *Amici* therefore respectfully urge this Court to grant Plaintiffs-Appellees' petition for rehearing en banc.

---

[3] Defendants' actions since the panel's order, including their stated intent to exploit current circumstances and terminate more federal workers, only confirm their commitment to dismantling the agency. *See* Letter from Maxine Waters, Ranking Member, U.S. House of Representatives Comm. on Fin. Servs., to Russell Vought, Acting Director, Consumer Fin. Prot. Bur. (Sept. 30, 2025), https://perma.cc/FHR6-CSNZ.

3

**ARGUMENT**

## I.  Congress created the CFPB in response to the 2008 financial crisis.

The 2008 financial crisis "shattered" lives, "shuttered" businesses, and "evaporated" savings and wealth. S. Rep. No. 111-176, at 39 (2010). The numbers are staggering: More than 26 Americans found themselves out of full-time work[4]; nearly 10 million Americans lost their homes to foreclosure[5]; and Americans lost an estimated $19.2 *trillion* in household wealth.[6] *See also Seila Law LLC v. CFPB*, 591 U.S. 197, 205 (2020) (cataloging similar impacts). The crisis touched institutions too: Almost 500 banks failed at a cost of approximately $73 billion to the Deposit Insurance Fund.[7] At the height of the crisis, investors lost confidence in markets, credit markets froze, and the government was required to intervene on an unprecedented scale.[8]

Congress determined this catastrophe was caused partly by a "spectacular failure" of regulators "to protect average American" consumers. S. Rep. No. 111-176, at 15. Before Dodd-Frank, regulatory authority was dispersed across agencies,

---

[4] *Financial Crisis Inquiry Report*, *supra*, at xv.

[5] Tommy Andres, *Divided Decade: How the financial crisis changed housing*, Marketplace (Dec. 17, 2018), https://perma.cc/8CHZ-XP3S.

[6] U.S. Dep't of Treasury, *The Financial Crisis Response In Charts* 1 (Apr. 2012), https://perma.cc/CGE9-G3EP.

[7] Fed. Deposit Ins. Corp., *Crisis and Response: an FDIC History 2008-2013* xiii (2018).

[8] *Id.* at xvi.

4

*id.* at 10, resulting in "finger pointing among regulators and inaction when problems with consumer products and services arose." *Id.* at 168. To remedy these failures, Congress enacted Title X of Dodd-Frank, which created the CFPB as a new agency focused solely on protecting consumers. It transferred to the CFPB the "consumer financial protection functions" of other agencies, *id.* at 11; 12 U.S.C. § 5581, and gave the CFPB new authority necessary to protect consumers and promote stability in consumer financial markets, *Seila Law*, 591 US at 206.

To ensure that the CFPB could "respond quickly and effectively to [] new threats to consumers," S. Rep. No. 111-176, at 18, Congress required the Bureau to maintain certain offices that would, among other things, collect, monitor, and respond to consumer complaints, 12 U.S.C. § 5493(b)(3)(A), research and report on consumer protection issues, *id.* §§ 5493(b)(1), 5512(c)(1), (c)(3), and assist specific communities, like servicemembers and older Americans, *id.* §§ 5493(e)(1), (g)(1). The CFPB also has significant rulemaking authority, including issuing regulations "identifying as unlawful unfair, deceptive, or abusive acts or practices" connected to "consumer financial product[s] or service[s]." *Id.* § 5531(b). Moreover, it has exclusive authority to supervise large banks, *id.* §§ 5515(a)(1), (b)(1), and, reflecting lessons learned from the 2008 crisis, authority to supervise "nonbank" financial companies, like mortgage companies and private student lenders, *id.* § 5514(a)(1); S. Rep. No. 111-176, at 167. In addition, the CFPB has primary authority to enforce

5

consumer financial laws against the banks under its supervision, 12 U.S.C. § 5515(c)(1), and exclusive authority among federal agencies to enforce consumer financial laws against the nonbanks under its supervision, *id.* § 5514(c)(1). No other federal agency has authority to supervise and enforce consumer financial protection laws against the institutions at the highest risk of contributing to instability in financial markets.

## II.    Only Congress has the power to shutter the CFPB.

Even Defendants don't dispute the obvious: The Constitution bars them from undoing the creation of the CFPB without going through the legislative process. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). As to the latter, Article I vests "all legislative powers" in Congress, U.S. Const., art. I, § 1, which includes the power to create agencies. *See Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction[.]"); *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (agencies are "creatures of statute"). When Congress has enacted a statute, as it did with Dodd-Frank, "no provision in the Constitution [] authorizes the President to enact, to amend, or to repeal" it. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915) (The Constitution "does

6

not confer upon [the President] any power to enact laws or to suspend or repeal such as the Congress enacts"). That power rests with Congress, and Congress alone. *INS v. Chadha*, 462 U.S. 919, 954 (1983) (The "repeal of statutes, no less than enactment, must conform with Art. I.").

There is no statutory basis for Defendants' actions either. No "act of Congress" either "expressly authorizes the President" to dissolve the CFPB or "fairly implie[s]" that power. *See Youngstown*, 343 U.S. at 585. There is no general authorization to restructure the executive branch, including by dissolving a statutorily-created agency, as Congress let such authorization lapse four decades ago.[9] Nor does Dodd-Frank delegate to the President the authority to dismantle the CFPB. Rather, the Act vests in *Congress* substantial oversight over the Bureau. Among other things, Congress receives regular reports from the agency[10] and directs the agency to undertake particular rulemakings.[11] And, even while amending the CFPB's governing statutes, Congress has rejected efforts to eliminate the Bureau wholesale.[12]

---

[9] *See* Cong. Rsch. Serv., RL30876, *The President's Reorganization Authority: Review and Analysis* 1, 4-9 (2001); 5 U.S.C. § 904 (1984).

[10] *See* 12 U.S.C. § 5496(a).

[11] *See, e.g.*, National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, § 6102, 135 Stat. 1541, 2383-84 (2021) (directing CFPB to issue rule related to adverse information in consumer reports resulting from human trafficking).

[12] *See* H.R. 3118, 114th Cong. (2015) (proposed bill to "eliminate" CFPB).

7

Without power "from the Constitution itself" or "an act of Congress," *Youngstown*, 343 U.S. at 585—both of which are wholly lacking here—a President who disagrees with a law enacted by Congress is "limit[ed] . . . to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Id.* at 587. In other words, the President must participate in the political process and adhere to the Constitution's structure, not ignore it. The country's history includes numerous examples of the branches working together to eliminate statutorily-created agencies. Dodd-Frank is one. Following a legislative process and a specific proposal from the President, the Act eliminated the Office of Thrift Supervision, which had been responsible for regulating the thrifts that accounted for 73% of failed institution assets during the 2008 crisis, and transferred its remaining powers to other agencies. *See* 12 U.S.C. § 5412(b)(2)(B)(i); S. Rep. No. 111-176, at 25-26. Here, rather than trying to persuade Congress to exercise *its* authority to amend or repeal portions of Dodd-Frank, the President seeks to evade that process with an unconstitutional power grab.

Contrary to the panel majority's opinion, that cannot stand. Under the majority's rule, the Executive could—as Defendants aim to do here—unilaterally eliminate any statutorily-created agency with impunity. But the decision isn't cabined to shuttering agencies and the panel majority's license will embolden the President to remake the federal government without regard for statutory limitations.

8

En banc review is urgently needed to ensure courts are not powerless when the President does so.

### III. Shuttering the CFPB would leave consumers and consumer financial markets exposed.

Defendants' decision to shutter the CFPB—and the panel majority's decision allowing this—threatens more than foundational constitutional principles. Since its creation, the Bureau has used its powers to regulate consumer financial markets, ensuring that banks and nonbank entities are not engaging in risky, deceptive, or unfair practices that could destabilize the market and lead to another financial meltdown. As a result of its supervision and enforcement work, the CFPB has returned more than $21 billion improperly taken from at least 205 million consumers, in addition to at least $5 billion in civil penalties made available to compensate consumers in cases where the business that took their money is insolvent.[13] A sudden halt to this work would be devastating for consumers and the country's overall financial stability. Below are a few examples of the CFPB's work and the harm that would result if Defendants dismantle the Bureau.

*Supervising Financial Institutions.* The CFPB is either the exclusive or primary federal agency authorized to supervise for compliance with consumer financial protection laws the institutions most likely to destabilize the national

---

[13] *The CFPB*, Consumer Fin. Prot. Bureau (last updated Dec. 3, 2024), https://perma.cc/MDD4-CQP6.

economy: large banks, nonbanks of all sizes in particular markets, like mortgage companies, and larger nonbanks, like debt collectors and credit reporting agencies. *See* section I, *supra*. The Bureau has taken this authority seriously, identifying potentially unlawful practices early and remedying them before the need for enforcement arises.

Where needed, this supervision has led to significant enforcement actions for violations of consumer protection laws. For example, Bank of America agreed to pay $250 million for opening fake credit card accounts, illegally charging repeated "insufficient funds" fees, and withholding rewards promised to consumers.[14] And student-loan servicer Navient Corporation, now permanently barred from servicing federal student loans, agreed to pay a $20 million civil penalty fine and return $100 million to consumers for botching payment processing and misleading borrowers about their repayment plans.[15]

If the district court had not intervened, Defendants would have fired the staff doing this important supervisory and enforcement work and, in service of their

---

[14] *Bank of America, N.A.*, CFPB No. 2023-CFPB-0007 (July 11, 2023) (consent order); *CFPB Takes Action Against Bank of American for Illegally Charging Junk Fees, Withholding Credit Card Rewards, and Opening Fake Accounts*, Consumer Fin. Prot. Bureau (July 11, 2023), https://perma.cc/4UEA-V6TD.

[15] *CFPB Bans Navient from Federal Student Loan Servicing and Orders the Company to Pay $120 Million for Wide-Ranging Student Lending Failures*, Consumer Fin. Prot. Bureau (Sept. 12, 2024), https://perma.cc/X4DK-U5N5.

10

decision to shutter the CFPB, eliminated those positions entirely. Without the Bureau serving as a watchdog, financial institutions will be emboldened to engage in unfair, deceptive, and abusive practices in violation of consumer protection laws—hurting consumers, placing smaller banks that remain subject to regulation by other agencies at a competitive disadvantage, and creating the kind of instability that Dodd-Frank was designed to prevent.

*Combatting Discrimination in Consumer Financial Markets.* The CFPB has also carried out its mandate to "ensure the fair, equitable, and non-discriminatory access to credit for both individuals and communities." 12 U.S.C. § 5493(c)(2). The CFPB's Office of Fair Lending and Equal Opportunity must report to Congress and coordinate its efforts with other agencies and states. *Id.* §§ 5493(c)(1), (2). And, under the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. § 2801 *et seq.*, the CFPB must collect and publish demographic data essential for identifying discrimination and other concerning trends in the mortgage lending industry, and it brings enforcement actions to ensure that lenders provide the required information.[16] Not only does this data help the CFPB enforce fair lending laws, it also helps states and members of the public do so too. The loss of HMDA data would leave regulators

---

[16] *See, e.g.*, Bobby Conner, et al., *The CFPB is working to reinforce the foundation of a fair, nondiscriminatory and competitive mortgage market*, Consumer Fin. Prot. Bureau (June 28, 2024), https://perma.cc/9VUE-EYV9; *CFPB Orders Bank of America to Pay $12 Million for Reporting False Mortgage Data*, Consumer Fin. Prot. Bureau (Nov. 28, 2023), https://perma.cc/GRS2-5MW9.

11

and the public in the dark about possible discrimination and problematic trends in mortgage lending that could signal another financial crisis.

The CFPB has also advanced Congress's mandate by supervising financial institutions' compliance with the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, which protects consumers from discrimination in credit transactions, and robustly enforcing the Act when financial institutions do not comply. For example, in January 2025, the CFPB took enforcement action against a mortgage company for discriminatory redlining practices that resulted in disproportionately low numbers of mortgages in majority-Black and Hispanic neighborhoods as compared to other lenders.[17] The CFPB's consent order bans the company from engaging in residential mortgage lending for five years and requires it to pay a $1.5 million civil penalty.[18]

***Protecting servicemembers.*** Further, the CFPB works to protect servicemembers, including by enforcing the Military Lending Act of 2006 (MLA), 10 U.S.C. § 987. Before Defendants' actions, the CFPB's congressionally mandated Office of Servicemember Affairs had fielded more than 400,000 complaints, provided guidance to financial institutions on how to comply with consumer financial protection laws affecting servicemembers, and referred complaints to other

---

[17] *CFPB Takes Action Against Draper & Kramer Mortgage for Discriminatory Mortgage Lending Practices*, Consumer Fin. Prot. Bureau (Jan. 17, 2025), https://perma.cc/VH6N-92DJ.

[18] *Id.*

12

agencies that also have enforcement authority but do not receive complaints directly.[19] The CFPB had also initiated enforcement actions resulting in $183 million in redress.[20] Defendants' actions, however, threaten to leave servicemembers exposed to predatory practices Congress sought to halt with Dodd-Frank, the MLA, and other laws.

***

The breadth of the Bureau's work cannot be overstated. Without the CFPB, new rulemaking would cease, preventing regulatory responses to evolving financial technology and markets; supervision would cease, leaving many financial institutions free to engage in unscrupulous behavior; and enforcement of consumer financial protection laws would be limited, leaving millions of consumers, including the country's most economically vulnerable populations, with little recourse for losses from unlawful financial practices. By design, no other federal agency is authorized to pick up the CFPB's mantle should Defendants eliminate the Bureau. Even beyond *amici*'s constitutional concerns—and they are grave—the effects of dismantling the CFPB would be felt in all corners of the markets for consumer financial products and services. En banc review is warranted for this reason too.

---

[19] Office of Servicemember Affairs, *The CFPB is protecting the military community and providing relief*, Consumer Fin. Prot. Bureau (May 23, 2024), https://perma.cc/EH8F-TD7C.

[20] *Id.*

13

## CONCLUSION

For the foregoing reasons, *amici* respectfully ask this Court to grant Plaintiffs-Appellees' petition for rehearing en banc.

Respectfully submitted,

Leah M. Nicholls

PUBLIC JUSTICE

1620 L St. NW, Ste. 630

Washington, DC 20036

(202) 797-8600

lnicholls@publicjustice.net


October 6, 2025

*/s/ Hannah M. Kieschnick*

Hannah M. Kieschnick

PUBLIC JUSTICE

475 14th St., Ste 610

Oakland, CA

(510) 622-8150

hkieschnick@publicjustice.net


*Counsel for Amici Curiae*

14

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) because it contains 2,596 words, excluding the parts of the brief exempted by Rule 32(f).

I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in a 14-point Times New Roman font.

Dated: October 6, 2025                    */s/ Hannah M. Kieschnick*
                                          Hannah M. Kieschnick

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2025, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: October 6, 2025                    */s/ Hannah M. Kieschnick*
                                          Hannah M. Kieschnick

# APPENDIX

List of *Amici Curiae*

1.  Sen. Charles E. Schumer
2.  Sen. Elizabeth Warren
3.  Rep. Maxine Waters
4.  Sen. Jack Reed
5.  Sen. Mark Warner
6.  Sen. Chris Van Hollen
7.  Sen. Catherine Cortez Masto
8.  Sen. Tina Smith
9.  Sen. Raphael Warnock
10.  Sen. Andy Kim
11.  Sen. Ruben Gallego
12.  Sen. Lisa Blunt Rochester
13.  Sen. Angela Alsobrooks
14.  Rep. Nydia M. Velázquez
15.  Rep. Brad Sherman
16.  Rep. Gregory M. Meeks
17.  Rep. David Scott
18.  Rep. Stephen F. Lynch
19.  Rep. Al Green
20.  Rep. Emanuel Cleaver, II
21.  Rep. Jim Himes
22.  Rep. Bill Foster
23.  Rep. Joyce Beatty
24.  Rep. Juan Vargas
25.  Rep. Josh Gottheimer
26.  Rep. Vicente Gonzalez
27.  Rep. Sean Casten
28.  Rep. Ayanna Pressley
29.  Rep. Rashida Tlaib
30.  Rep. Ritchie Torres
31.  Rep. Sylvia R. Garcia
32.  Rep. Nikema Williams
33.  Rep. Brittany Pettersen
34.  Rep. Cleo Fields
35.  Rep. Janelle S. Bynum
36.  Rep. Sam T. Liccardo