**[ORAL ARGUMENT SCHEDULED FEBRUARY 24, 2026]**

No. 25-5091

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees,*

*v.*

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

EN BANC BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
DEREK WEISS
SIMON GREGORY JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiffs are National Treasury Employees Union, National Consumer Law Center, National Association for the Advancement of Colored People, Virginia Poverty Law Center, Ted Steege,[1] and CFPB Employee Association.  Defendants are Russell Vought, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, and the Consumer Financial Protection Bureau.

Amici are in the district court and this Court are Tzedek DC, various Members of Congress, and the States of New York, New Jersey, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin, and the District of Columbia.  Amici in the district court only are a group of former officials of the Federal Reserve.  Amici in this Court only are a group of former officials of the Consumer Financial Protection Bureau, the Alaska Public Interest Research Group, Americans for Financial Reform

---

[1] Plaintiff Ted Steege was substituted for former plaintiff Eva Steege upon the latter's death.  *See* Dkt. 83.

Education Fund, Arkansans Against Abusive Payday Lending, Arkansas Community Organizations, CASA of Oregon, Center for Consumer Law and Economic Justice, Center for Economic Integrity, Center for Elder Law and Justice, Center for LGBTQ Economic Advancement and Research, Center for Responsible Lending, Connecticut Citizen Action Group, Connecticut Veterans Legal Center, Consumer Action, Consumer Federation of America, Communications Workers of America, Local 1081, Fordham University School of Law, Feerick Center for Social Justice, Georgia Watch, Legal Action Chicago, Legal Assistance for Seniors, Legal Counsel for the Elderly, Inc., Mid-Minnesota Legal Assistance, Minority Veterans of America, Mobilization for Justice, Mountain State Justice, National Association of Consumer Advocates, National Fair Housing Alliance, New Jersey Appleseed Public Interest Law Center, New York Legal Assistance Group, NextGen Policy, Oregon Consumer Justice, People Power United, Prosperity Works, Public Counsel, Public Justice Center, Queens Volunteer Lawyers Project, Inc., Rise Economy, Student Borrower Protection Center, Texas Appleseed, Virginia Citizens Consumer Council, Western New York Law Center, Woodstock Institute, CASH Campaign of Maryland, Center for Digital Democracy, Community Economic

Empowerment Network, Constitutional Accountability Center, Consumer Advocates Against Reverse Mortgage Abuse, Consumers for Auto Reliability and Safety, DannLaw, Legal Aid DC, New Economy Project, New Jersey Citizen Action, Project GREEN, Prosperity Indiana, Protect Borrowers, and Texas A & M School of Law—Family & Veterans Advocacy Clinic.

Janice Wolk Grenadier filed a motion to intervene in district court, but her intervention motion was denied.

### B.   Rulings Under Review

The rulings under review are the Honorable Amy Berman Jackson's memorandum opinion and order granting plaintiffs' motion for a preliminary injunction in *National Treasury Employees Union v. Vought*, No. 1:25-cv-381 (D.D.C.), Dkts. 87, 88 (JA633-747), both dated March 28, 2025. The memorandum opinion was reported in the Federal Supplement at 774 F. Supp. 3d 1.

### C.   Related Cases

This case has not previously been before this Court, and undersigned counsel is aware of no other related cases currently pending in this Court or in any other court.

iii

*/s/ Simon G. Jerome*

Simon G. Jerome

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................ 1

STATEMENT OF JURISDICTION ................................................ 3

STATEMENT OF THE ISSUES .................................................... 4

PERTINENT STATUTES ............................................................. 4

STATEMENT OF THE CASE ....................................................... 4

    A.   Statutory Background ........................................................4

    B.   Factual Background .........................................................6

    C.   This Litigation ...............................................................9

SUMMARY OF ARGUMENT ..................................................... 13

STANDARD OF REVIEW ........................................................... 17

ARGUMENT .................................................................................. 17

I.   The Government Is Likely To Succeed Because Plaintiffs' Claims Are Not Justiciable. ..................................................... 18

    A.   The District Court Lacks Jurisdiction Over Plaintiffs' Claims...............................................................................18

        1.   Plaintiffs Lack Standing. ......................................19

        2.   The CSRA Precludes District-Court Jurisdiction Over Employment-Related Claims. ...................26

    B.   Plaintiffs Lack A Cause Of Action. .................................29

        1.   Plaintiffs Cannot Bring An APA Action.............29

2.    Plaintiffs Cannot Rely On A Nonstatutory Cause Of Action.........................................................................39

II.    The Preliminary Injunction Rests On Legal And Factual Error And Should Be Vacated. ........................................................... 41

A.    The District Court Applied An Incorrect Legal Standard..........42

B.    The District Court's Conclusion That Defendants Intend To Close CFPB Is Unsound. ............................................................45

C.    The Preliminary Injunction Is Vastly Overbroad. ......................56

III.    The Remaining Factors Favor Vacatur. ................................................. 61

CONCLUSION ...................................................................................... 68

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                           **Page(s)**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) .................................................................... 30, 31, 32

*Abbott v. LULAC,*
  607 U.S. ----, 2025 WL 3484863 (Dec. 4, 2025) ................................ 55

*Alexander v. South Carolina State Conf. of the NAACP,*
  602 U.S. 1 (2024) ............................................................................ 47, 48

*AFGE v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) ............................................................. 28

*Anderson v. City of Bessemer,*
  470 U.S. 564 (1985) ............................................................................. 50

*Anglers Conservation Network v. Pritzker,*
  809 F.3d 664 (D.C. Cir. 2016) ............................................................. 43

*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................................... 30, 34

*Biden v. Texas,*
  597 U.S. 785 (2022) ............................................................................. 36

*Buchanan v. Evans,*
  439 U.S. 1360 (1978) ........................................................................... 56

*Califano v. Sanders,*
  430 U.S. 99 (1977) ............................................................................... 30

*California Cmtys. Against Toxics v. EPA,*
  934 F.3d 627 (D.C. Cir. 2019) ............................................................. 31

*Case v. Morrisette,*
  475 F.2d 1300 (D.C. Cir. 1973) ........................................................... 47

*Changji Esquel Textile Co. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) ..........................................................................41

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)..........................................................................61

*City of New York v. U.S. Dep't of Def.*,
  913 F.3d 423 (4th Cir. 2019) .................................................................... 32, 33

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)............................................................................... 1, 21, 23

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001).................................................................. 44, 45

*Cobell v. Norton*,
  334 F.3d 1128 (D.C. Cir. 2003)..........................................................................64

*Cuddy v. Carmen*,
  762 F.2d 119 (D.C. Cir. 1985).................................................................... 17, 49

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)...........................................................................................20

*Dalton v. Specter*,
  511 U.S. 462 (1994)................................................................................... 39, 40

*Dayton Bd. of Educ. v. Brinkman*,
  433 U.S. 406 (1977)...........................................................................................61

*Department of Educ. v. Brown*,
  600 U.S. 551 (2023)................................................................................... 22, 23

*Department of Just. v. FLRA*,
  981 F.2d 1339 (D.C. Cir. 1993).................................................................. 29, 41

*DRG Funding Corp. v. Secretary of Hous. & Urb. Dev.*,
  76 F.3d 1212 (D.C. Cir. 1996) ..........................................................................35

*Elgin v. Department of Treasury,*
    567 U.S. 1 (2012) ..................................................................... 27, 28

*FDA v. Alliance for Hippocratic Med.,*
    602 U.S. 367 (2024) ........................................................... 23, 24, 59

*Filebark v. Department of Transp.,*
    555 F.3d 1009 (D.C. Cir. 2009)............................................................28

*Flyers Rts. Educ. Fund, Inc. v. FAA,*
    864 F.3d 738 (D.C. Cir. 2017)............................................................62

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992)............................................................30

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
    460 F.3d 13 (D.C. Cir. 2006)...................................................... 33, 37

*Gill v. Whitford,*
    585 U.S. 48 (2018)............................................................56

*Global Health Council v. Trump,*
    153 F.4th 1 (D.C. Cir. 2025) ............................................................40

*Grosdidier v. Chairman,*
    560 F.3d 495 (D.C. Cir. 2009)...................................................... 27, 28

*Heckler v. Chaney,*
    470 U.S. 821 (1985)............................................................65

*In re Bluewater Network,*
    234 F.3d 1305 (D.C. Cir. 2000)...................................................... 43, 45

*In re Cheney,*
    544 F.3d 311 (D.C. Cir. 2008)............................................................64

*In re Core Commc'ns,*
    531 F.3d 849 (D.C. Cir. 2008)...................................................... 43, 62

*In re Navy Chaplaincy,*
    697 F.3d 1171 (D.C. Cir. 2012)........................................................................17

*In re Sealed Case No. 98-3077,*
    151 F.3d 1059 (D.C. Cir. 1998)........................................................................64

*Independent Equip. Dealers Ass'n v. EPA,*
    372 F.3d 420 (D.C. Cir. 2004)..........................................................................29

*Inwood Labs., Inc. v. Ives Labs., Inc.,*
    456 U.S. 844 (1982)...........................................................................................48

*Latif v. Obama,*
    677 F.3d 1175 (D.C. Cir. 2011)........................................................................48

*Lewis v. Casey,*
    518 U.S. 343 (1996)...........................................................................................56

*Lujan v. National Wildlife Fed'n,*
    497 U.S. 871 (1990)........................................................................... 32, 33, 37

*Make the Rd. N.Y. v. Wolf,*
    962 F.3d 612 (D.C. Cir. 2020)..........................................................................17

*McMahon v. New York,*
    145 S. Ct. 2643 (2025).......................................................................................21

*National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
    417 F.3d 1272 (D.C. Cir. 2005)............................................................. 31, 32, 38

*National Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014)................................................................ 31, 38

*National Park Hosp. Ass'n v. Department of Interior,*
    538 U.S. 803 (2003)...........................................................................................25

*Nken v. Holder,*
    556 U.S. 418 (2009)...........................................................................................61

*Norton v. Southern Utah Wilderness All.*,
542 U.S. 55 (2004) .................................. 30, 32, 33, 36, 37, 42, 43, 44, 45, 46, 64

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .................................................................................. 41

*Nyunt v. Chairman*,
589 F.3d 445 (D.C. Cir. 2009) ............................................................ 26, 41

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) .................................................................................. 38

*OPM v. AFGE*,
145 S. Ct. 1914 (2025) ............................................................................ 23

*Public Citizen Health Rsch. Grp. v. Commissioner*,
740 F.2d 21 (D.C. Cir. 1984) .................................................................. 38

*Raines v. Byrd*,
521 U.S. 811 (1997) .................................................................................. 19

*Saline Parents v. Garland*,
88 F.4th 298 (D.C. Cir. 2023) ........................................................... 25, 31

*Sampson v. Murray*,
415 U.S. 61 (1974) .............................................................................. 57, 62

*Schlesinger v. Reservists Comm. to Stop the War*,
418 U.S. 208 (1974) .................................................................................. 20

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) .............................................................. 35

*Southwest Airlines v. U.S. Dep't of Transp.*,
832 F.3d 270 (D.C. Cir. 2016) ................................................................ 34

*Telecommunications Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ....................................................... 43-44, 44, 45

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021)..................................................................20

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025)..................................................................56

*United States v. Armstrong,*
   517 U.S. 456 (1996)..................................................................49

*United States v. Fausto,*
   484 U.S. 439 (1988)............................................................ 26, 28

*United States v. Hallford,*
   816 F.3d 850 (D.C. Cir. 2016)..................................................49

*United States ex rel. Accardi v. Shaughnessy,*
   347 U.S. 260 (1954)..............................................................30-31

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)..................................................................40

**Statutes:**

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No.
   111-203, 124 Stat. 1376 ......................................................... 4-5

5 U.S.C. § 551(4), (6), (8), (10), (11), (13) .........................................36

5 U.S.C. § 551(6) .....................................................................34

5 U.S.C. § 551(13) ....................................................................30

5 U.S.C. § 704 ........................................................................30

5 U.S.C. § 706(1) ................................................................. 42, 43

5 U.S.C. §§ 7101-7135 ...............................................................26

12 U.S.C. § 5493(a) ...................................................................58

12 U.S.C. § 5493(b) ....................................................................5

12 U.S.C. § 5493(d) ....................................................................5

12 U.S.C. § 5493(e) ....................................................................5

12 U.S.C. § 5493(g) ....................................................................5

12 U.S.C. § 5511(a) .....................................................................5

12 U.S.C. § 5512(b) .....................................................................5

12 U.S.C. § 5531(b) .....................................................................5

12 U.S.C. § 5535(a) ...................................................................25

28 U.S.C. § 1292(a) .....................................................................4

28 U.S.C. § 1331 ...........................................................................3

**Executive Orders:**

*Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order No. 14,210, 90 Fed. Reg. 9669 ...............7

**Legislative Materials:**

S. Rep. No. 111-176.....................................................................5

**Other Materials:**

Federal Acquisition Regulation 52.242-15 ......................................66

J. Roberts, *Article III Limits on Statutory Standing*,
    42 Duke L.J. 1219 (1993) .......................................................59-60

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFPB or Bureau | Consumer Financial Protection Bureau |
| CSRA | Civil Service Reform Act |
| NAACP | National Association for the Advancement of Colored People |

## INTRODUCTION

The district court entered an extraordinary injunction preventing the new leadership of the Consumer Financial Protection Bureau (CFPB or Bureau) from running the agency in line with the President's policy initiative to reform the federal bureaucracy to better serve the American public. This Court should vacate that injunction and restore authority over CFPB to its politically accountable agency leaders.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). This case exemplifies the dangers of inviting the judiciary into matters well beyond its constitutional role. Believing CFPB to be at imminent risk of dissolution, plaintiffs invited the district court to seize the agency's reins by preventing *all* employee terminations and micromanaging the agency's funding, contracting, and real estate decisions. The district court not only obliged but went further, and—far more than requiring defendants to "vacate [an] … order to disband the agency," Panel Dissent 35—issued an astonishingly intrusive, eight-part preliminary injunction that governs the agency's data-retention practices,

mandates reinstatement of employees, prohibits reductions in force entirely, enjoins "work stoppages," and unwinds contract terminations. The terms of that injunction are not tied to any specific injury plaintiffs identify, nor to any specific statutory duty Congress made mandatory; they instead govern agency-wide operations generally, including activities that Congress left to the agency's discretion.  In granting this sweeping injunction, the court strayed far beyond the proper boundaries of Article III and into territory our Constitution reserves for the Executive Branch, frustrating the ability of politically accountable leaders to carry out Presidential directives.  The results of that overreach are substantial:  so long as the preliminary injunction remains in effect, defendants' operational decisions large and small—from the appropriate size of CFPB's workforce to the handling of consumer complaints—are either outright dictated by the district court or made under the shadow of contempt proceedings.

This remarkable order infringing on the Executive's discretion was entered without jurisdiction, in the absence of any cause of action, and on the basis of a single, mistaken premise:  that defendants plan to close the Bureau and thus prevent it from performing its statutory duties.

Defendants have already made clear they do "not claim the power to 'shut down' the CFPB."  Panel Op. 2 (Op.).  If the only matter at issue here were a judicial order vacating a closure decision defendants disclaim the authority to make, defendants may well have consented to such a judgment.  But this litigation involves a sweeping preliminary injunction preventing the politically accountable CFPB leadership from taking lawful steps to streamline the agency or redirect its policy priorities, as well as the possibility that the district court will enter a permanent injunction subjecting the agency to perpetual judicial supervision.

Because the law forecloses plaintiffs' attempt to prevent the Executive Branch from taking lawful measures to reform the agency in conformity with the President's instructions, and because the equities strongly favor removing the improper constraints the district court placed on the Article II officials responsible for running the Bureau, this Court should vacate the injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.  JA22.  The district court entered a preliminary injunction on March

28, 2025.  JA745-47.  Defendants appealed the next day.  JA748-49.  This Court has jurisdiction under 28 U.S.C. § 1292(a).

## STATEMENT OF THE ISSUES

1.  Whether plaintiffs' preemptive challenge to CFPB's overall operation is justiciable, and whether plaintiffs have a valid cause of action under which to bring such a programmatic challenge.

2.  Whether the district court erred in concluding that defendants plan to close CFPB entirely and in entering an injunction sweeping far beyond what is necessary to address the purported legal violations the court identified and any resulting harms to plaintiffs.

3.  Whether the equities favor vacatur to permit politically accountable Executive Branch officials to manage the Bureau absent judicial constraints during this litigation.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

In 2010, Congress created the Consumer Financial Protection Bureau. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No.

4

111-203, 124 Stat. 1376 (2010) (codified at 12 U.S.C. § 5301 et seq.); *see* S.

Rep. No. 111-176, at 2 (2010).  The Dodd-Frank Act transferred to CFPB

certain consumer financial protection authorities of several existing

agencies, and it created other new powers.  The statute directs CFPB "to

implement and, where applicable, enforce Federal consumer financial law"

to ensure, among other things, that consumer financial markets are "fair,

transparent, and competitive."  12 U.S.C. § 5511(a).

In service of these goals, the statute requires CFPB to establish units

to, among other things, conduct consumer finance research, provide

financial education services, and collect and track consumer complaints in

a centralized database.  *See* 12 U.S.C. § 5493(b); *see also id.* § 5493(d)-(e), (g).

Beyond these specific requirements, the Dodd-Frank Act also gives CFPB

broad discretion to supervise providers of financial services, impose

reporting requirements, take various enforcement actions, and promulgate

rules prohibiting "unfair, deceptive, or abusive acts or practices in

connection with any transaction with a consumer for a consumer financial

product or service."  *Id.* § 5531(b); *see id.* § 5512(b)(1).

5

### B.    Factual Background

Following the January 2025 presidential transition, CFPB underwent

significant leadership changes and an accompanying period of internal

reassessment.  While initial communications and actions caused the district

court to believe the Administration intended to wind down all agency

operations, subsequent developments—including clarifications from new

Bureau leadership—made clear that the Bureau will remain open and

continue performing its congressionally mandated duties.

**1.**  On January 31, the President appointed Treasury Secretary Scott

Bessent as CFPB's Acting Director.  JA641-42.  Shortly thereafter, on

February 7, the President appointed Russell Vought, the Director of the

Office of Management and Budget, as CFPB's new Acting Director.  JA643.

Under Bessent's and Vought's leadership, the agency instituted a

temporary freeze on certain activities during a broader evaluation of

CFPB's operations.  For instance, on February 3, Acting Director Bessent

directed staff to refrain from taking certain actions, including issuing rules

or guidance, commencing or settling enforcement actions, and making

most litigation filings, without express approval.  JA642.

6

On February 8, Acting Director Vought sent a similar email directing staff not to undertake these and other tasks "unless expressly approved by the Acting Director or required by law."  JA644.  Two days later, on February 10, he sent an email directing staff not to perform any work tasks without approval from CFPB's new Chief Legal Officer, Mark Paoletta.  JA646.  Concurrently, growing protests and disruptions at CFPB's D.C. headquarters prompted safety concerns, and agency leadership directed employees not to come into the office.  JA645; JA104-06.

In addition to these internal directives, the agency took certain discretionary steps to streamline the agency's operational footprint.  *See* JA240.  For instance, agency leadership began plans to cancel the CFPB headquarters lease based on a determination that the office space was unnecessary for the agency's needs.  *See* JA106.  On February 11, consistent with the President's directive to optimize the federal workforce, CFPB terminated approximately 85 probationary employees.  JA648; *see* Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025).  The agency also instructed staff to begin vacating office space and canceling nonessential contracts.  JA648-49.

**2.** As the new leadership team evaluated CFPB's operations, it made clear that it remained committed to fulfilling statutory obligations. JA240-41 ¶¶ 3-4 (noting that since the week of February 10, "a great deal has evolved at the CFPB"); JA106 ¶ 19-20. As Chief Operating Officer Adam Martinez explained, the new agency leadership is not seeking a "closure of the agency," but is instead focused on "running a substantially more streamlined and efficient bureau" with "refocus[ed] … priorities," while ensuring that the agency continues to "perform each of [its] critical statutory responsibilities." JA240-41 ¶¶ 3-4.

This perspective was reflected in communications to agency staff. On February 27, Martinez assured various divisions that "statutorily required work and/or work required by law are authorized." JA658-59. On March 2, Paoletta sent an all-hands email emphasizing that "[e]mployees should be performing work that is required by law and do not need to seek prior approval to do so." JA662; *see* JA661 ("On behalf of Acting Director Vought, I am writing to you to ensure that everyone is carrying out any statutorily required work."). This email highlighted that earlier communications regarding work stoppage had excepted tasks "required by law" or identified how to seek express approval and explained that

8

"[t]hese measures were intended to ensure that new leadership could establish operational control over the agency while ensuring that it would continue to fulfill its statutory duties." JA661. Agency leadership thus made clear by early March that CFPB would continue to perform all functions required by law.

## C. This Litigation

Plaintiffs are two CFPB employee organizations, three consumer advocacy organizations, and the husband of a deceased pastor who had student loans. JA22-24 ¶¶ 13-18; Dkt. 84.

**1.** On February 13, 2025, plaintiffs filed an amended complaint alleging, as relevant here, that CFPB's actions violate the separation of powers and the Administrative Procedure Act (APA). JA18-49. Upon the parties' agreement, the Court converted plaintiffs' motion for a temporary restraining order into a motion for a preliminary injunction and entered a consent order imposing temporary restrictions on defendants. JA99-100; *see also* Dkts. 53, 71.

The district court held an evidentiary hearing on March 10-11. Plaintiffs continued to argue that the agency was improperly winding down operations. *See* JA701, 706. The government, on the other hand,

9

presented evidence showing that while CFPB had initially undertaken a broad reassessment of all aspects of its operation, the agency had since clarified its commitment to maintaining statutorily required functions while emphasizing that the agency leadership continued to evaluate how best to allocate resources and personnel in accordance with the administration's priorities.  *See* JA729.

On March 28, the district court issued a preliminary injunction.  The court found that plaintiffs were likely to succeed on their APA and constitutional claims challenging the alleged closure of the Bureau, concluding that the agency's early actions supported the conclusion that it had exceeded its authority by initiating a stop to its statutorily required functions.  *See* JA667, JA693-733.  The court dismissed the Bureau's repeated assurances—including statements made by Bureau leadership— as insufficient to dispel concerns that a "plan" to "shut the agency down entirely" is "unchanged" and that "defendants have absolutely no intention of operating the CFPB at all."  JA697.  The court expressed skepticism about defendants' representations and declared that continued judicial oversight was necessary to prevent CFPB's closure.

On that basis, the court entered an eight-part injunction requiring CFPB to rehire all terminated employees, provide all employees with office space or laptops configured for remote work, refrain from deleting any agency data, reactivate a toll-free telephone line, monitor and respond to consumer complaints, reinstate all terminated contracts, and refrain from engaging in any reductions in force or attempting to stop work through any means.  JA633-747.

**2.**  Defendants appealed, and this Court issued a partial stay pending appeal on CFPB's motion.  This Court stayed the requirement that defendants rehire terminated employees "insofar as it requires defendants to reinstate employees whom defendants have determined, after an individualized assessment, to be unnecessary to the performance of defendants' statutory duties."  Stay 1.  This Court also provided that the work-stoppage provision would remain in effect only on the understanding that it "allow[s] work stoppages that defendants have determined, after a particularized assessment, would not interfere with the

performance of defendants' statutory duties." Stay 1-2. The injunction's other provisions remain in effect.[2]

**3.** A divided panel of this Court vacated the preliminary injunction. The panel held that the district court lacked jurisdiction over the employee organizations' termination-related claims because the Civil Service Reform Act (CSRA) provides the exclusive means of review. Op. 12-15. The panel concluded that at least one plaintiff—the NAACP—has standing to challenge the purported closure of CFPB because one of its members was denied access to the Bureau's informational materials. Op. 16. On the merits, the panel held that plaintiffs' challenge is "not viable." Op. 17. Under the APA, the panel concluded that plaintiffs' claims failed for failure to allege ripe, discrete, final agency action, explaining that plaintiffs "seek to set aside an abstract decision, inferred from a constellation of discrete

---

[2] This Court's partial stay originally also permitted defendants to terminate "employees whom defendants have determined, after a particularized assessment, to be unnecessary to the performance of defendants' statutory duties." Stay 1. After disputes arose regarding the application of that language, this Court "restore[d] the interim protection of paragraph (3) of the preliminary injunction" barring employee terminations "rather than continue collateral litigation over the meaning and reviewability of the 'particularized assessment' requirement imposed by this court's stay order." Order 2 (Apr. 28, 2025).

actions, to prophylactically ensure that the Bureau can fulfill its statutory mandate."  Op. 42; *see* Op. 18-43.  Nor could plaintiffs "resort to equity" given the absence of an APA cause of action.  Op. 43.  The panel observed that "plaintiffs expressly disavow" an *ultra vires* claim, *i.e.*, an "[i]mplied equitable claim[] that a federal agency has violated a federal statute."  Op. 43-44.  And plaintiffs' "implied equitable claim[] arising under the Constitution" fails under Supreme Court precedent rejecting "a similar attempt to transform statutory claims into constitutional ones," since plaintiffs' "supposed separation-of-powers violation turns entirely on whether CFPB officials violated the governing statutes."  Op. 44-47.

This Court granted rehearing en banc, vacating the panel's judgment and making clear that the panel's partial stay of the preliminary injunction, as modified, remains in effect.

## SUMMARY OF ARGUMENT

The district court erred legally, factually, and equitably in entering a preliminary injunction.

**I. A.**  The district court lacks jurisdiction over plaintiffs' sweeping and prospective challenge to CFPB's overall operation, which is based on a collection of disparate grievances that are not themselves justiciable.

13

Plaintiffs lack standing to pursue their central claim that the government

intends to close CFPB in violation of the separation of powers between the

Executive and Legislative Branches.  All citizens share an interest in the

independence of each branch of government, but this generalized interest

is far too abstract to satisfy Article III and is not redressable in any event.

Plaintiffs offer two principal theories of injury beyond their broad interest

in policing interbranch boundaries, but neither gives rise to a justiciable

claim.  Plaintiffs' concerns that CFPB will stop providing services that they

rely on do not amount to a certainly impending injury redressable by a

court order.  And any employment-related grievances must be adjudicated

through the comprehensive scheme Congress established for the resolution

of federal employment disputes.  Plaintiffs may not circumvent these

jurisdictional barriers by aggregating such claims into one broader dispute

about the agency's future operation.

**B.**  Plaintiffs also lack a cause of action.  The APA permits review

only of ripe, final agency action, but there is no agency action, much less

sufficiently ripe and final agency action, for the court to review.  Plaintiffs

cannot overcome this defect by recasting their claim as a nonstatutory

challenge.  Insofar as plaintiffs have brought an equitable claim under the

14

Constitution, binding Supreme Court precedent forecloses their attempt to reframe their allegations that CFPB officials will violate statutes as a separation-of-powers claim.  And plaintiffs have specifically disavowed their complaint's *ultra vires* theory, which would in any event fail.

**II.**  Independent of the multiple threshold defects in plaintiffs' claims, the preliminary injunction should be vacated because it is premised on legal and factual error.

**A.**  The district court failed to apply the correct legal framework. Where a plaintiff alleges an agency has failed to perform a duty required by statute, that claim must be evaluated and remedied under the mandamus-like standard for agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1)—a standard the district court ignored and plaintiffs cannot satisfy.

**B.**  The district court's conclusion that defendants plan to close CFPB cannot be reconciled with the record in its entirety or with the presumption of regularity.  That conclusion was based on the district court's legal error in treating a legal argument made by counsel as a factual concession; the court clearly erred on that basis alone.  And the court further clearly erred in determining that defendants were intent on closing the agency despite

15

the many manifestations from the agency's new leadership that they intend to fulfill the Bureau's statutory duties.

    **C.** Regardless, under any standard and apart from factual errors, the preliminary injunction's sweeping provisions prohibiting lawful management tools available to agencies that undoubtedly remain operational far outstrips any relief that could be warranted in light of a purported closure and plaintiffs' asserted injuries.

    **III.** The equitable balance strongly favors vacatur. Plaintiffs have not identified any grave and irreparable harm. Lost employment generally does not qualify as irreparable harm, and plaintiffs have experienced no delay in receiving any required statutory services, let alone the sort of egregious delay that could support relief for a claim of unlawfully withheld agency action. The preliminary injunction meanwhile interferes with significant swaths of Executive Branch discretion to manage CFPB's day-to-day affairs and prevents leadership from implementing the President's directives to streamline federal agencies. At minimum, this Court should vacate those provisions that most significantly trench on the Executive Branch's discretion in managing the Bureau—provisions 2, 3, 4,

16

and 7—along with the now-past compliance-reporting requirement in provision 8.

## STANDARD OF REVIEW

This Court reviews legal questions de novo, factual questions for clear error, and the entry of injunctive relief for an abuse of discretion. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). This Court will find clear error even where "there is some evidence supporting a finding" if the entirety of the evidence leaves it "with the definite and firm conviction that a mistake has been committed." *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985) (quotation marks omitted).

## ARGUMENT

To justify the extraordinary remedy of a preliminary injunction, plaintiffs must establish that "(1) they are likely to succeed on the merits of their … claims, (2) [they] are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. As part of establishing a likelihood of success on the merits, [plaintiffs] must first demonstrate a likelihood of success in establishing jurisdiction." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020) (citation omitted).

I.    **The Government Is Likely To Succeed Because Plaintiffs'**
      **Claims Are Not Justiciable.**

Plaintiffs are associations of agency employees, as well as

organizations and individuals who benefit from CFPB services.  They

allege that the government intends to close the agency, causing the

wrongful termination of CFPB employees and the cessation of statutorily

required services.  As explained below, no such plan exists.  *Infra* pp. 45-56.

But if plaintiffs ever do suffer discrete and concrete injuries from CFPB's

implementation of the alleged plan, they could obtain administrative and

judicial review through the remedial schemes Congress established.

Plaintiffs may not circumvent those legislative choices—or various

jurisdictional hurdles—by bundling their potential grievances together and

repackaging them as a preemptive strike against defendants' overall

management of the agency.

A.    **The District Court Lacks Jurisdiction Over Plaintiffs'**
      **Claims.**

Plaintiffs' chief contention is that the government plans to shut CFPB

down in violation of the statute establishing the Bureau, and that this

statutory violation also violates the separation of powers.  But most of

plaintiffs' theories involve non-cognizable injuries that cannot support

18

Article III standing, such as a generalized interest in policing interbranch boundaries and speculative harm if certain CFPB services (including services not required by statute) cease.  And plaintiffs' employment-related claims are independently barred by the CSRA because they arise out of federal employment relationships and therefore must be channeled to the MSPB in the first instance.

### 1.    Plaintiffs Lack Standing.

**a.**  Plaintiffs lack standing to bring a broad, prospective challenge to CFPB operations.  Under Article III, a plaintiff must "have suffered an invasion of a legally protected interest which is … concrete and particularized."  *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (alteration in original) (citation and quotation marks omitted).  "[W]hen reaching the merits of the dispute would force [the courts] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the "standing inquiry [is] especially rigorous."  *Id.* at 819-20.

Plaintiffs' principal contention is that the Executive Branch is encroaching on the Legislative Branch's prerogatives by closing an agency established by statute.  This interest in vindicating the separation of powers

is exactly the sort of abstract and generalized grievance that cannot be redressed by a federal court.  First, plaintiffs lack a particularized interest in the separation of powers, because "[a]ll citizens" share "an interest in the independence of each branch of Government."  *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 226 (1974).  Second, such a generalized injury is not redressable, as it requires "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of ... administration, contrary to the more modest role Article III envisions."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (quotation marks omitted); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021) ("Federal courts do not exercise general legal oversight of the Legislative and Executive Branches[.]").

**b.**  Beyond their generalized grievances, several plaintiffs—the NAACP, the National Consumer Law Center, the Virginia Poverty Law Center, and an individual with student loans—allege harm because they fear that CFPB will stop performing its statutorily required duties.  But they fail to carry their burden to show concrete and redressable injuries sufficient to establish standing.

20

The NAACP's allegations fall short of Article III's standards.  The district court first stated that the NAACP "demonstrated the necessary injury in fact" because a loss of CFPB services would "impede" the NAACP's ability to "protect and educate its members on consumer financial protection issues."  JA685-86.  As for specifics, the NAACP was "forced to cancel plans to provide CFPB resources" at upcoming conferences "to protect [the association's] members from financial harm."  JA685-86.  The court also pointed to a declaration stating that the NAACP had "anticipated continu[ed] … collaboration" with CFPB in holding joint "education calls for NAACP members," but that such collaboration would end if CFPB shut down.  JA58-59; *see* JA685-86.

To begin, none of these asserted harms is the type of "concrete," "particularized," and nonspeculative—in other words, "*certainly impending*"—injury that could suffice to establish standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *see also McMahon v. New York*, 145 S. Ct. 2643 (2025) (staying a preliminary injunction barring reductions in force entered at the behest of plaintiffs who used agency's services).  And even assuming an organization's inability to engage in "anticipated" collaboration with an agency could

21

constitute injury-in-fact, the NAACP fails to show redressability:  the order

to continue operations plaintiffs requested—even at prior staffing levels—

does not establish a likelihood that the agency will decide to provide

particular resources to the organization.  *Compare Department of Educ. v.*

*Brown*, 600 U.S. 551, 564 (2023) (explaining the Court has never "accepted

that an injury is redressable when the prospect of redress turns on the

Government's wholly discretionary decision"), *with* Op. 16 (concluding

only that an injunction "would *enable* CFPB staff to proceed with its plans

to assist wildfire victims" (emphasis added)).

    The district court also credited the NAACP's assertion that one of its

members suffered an injury-in-fact because she was a target of financial

scams after she lost her home in a fire.  This member states only that she

"was intending to take advantage of and rely on" Bureau assistance like

that *other* unidentified "NAACP members" were "taking advantage of."

JA218.  A vague intention to use agency resources cannot give rise to an

injury-in-fact—especially when unsupported by any details about what the

individual needed from the agency and might fail to get.  And as with the

NAACP itself, this member has not established redressability, since her

asserted injuries are insufficient and an order generally requiring

22

continued agency operations does not establish a likelihood that the agency would opt to provide, and the member would obtain access to, the assistance the member intended to seek.  *See Clapper*, 568 U.S. at 409; *Brown*, 600 U.S. at 564.

The standing analysis for the other two consumer advocacy organizations, National Consumer Law Center and Virginia Poverty Law Center, is similarly sparse.  The National Consumer Law Center uses CFPB-provided information in its publications; its concern that it may lose access to these "essential resources upon which it has relied," JA82, at best alleges "*possible* future injury," which is "not sufficient."  *Clapper*, 568 U.S. at 409; *see also OPM v. AFGE*, 145 S. Ct. 1914 (2025) (issuing stay where organizations' allegations they may be denied agency services are "presently insufficient to support" standing).  The organization's expectation of increased work if CFPB stops providing useful services, *see* JA687-88, is inadequate for the same reason.  Moreover, even if such an injury were imminent, a mere "setback to the organization's abstract social interests" does not satisfy Article III.  *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (quotation marks omitted).

23

The National Consumer Law Center also alleged that CFPB canceled both a subscription to its publications and a training series for CFPB staff. JA687.  It did not, however, allege that CFPB must subscribe to this publication or use its trainings to fulfill statutory obligations, nor would such an allegation be plausible.  Such an injury is very unlikely to be redressed by a favorable judgment requiring CFPB to fulfill its statutory obligations.

Nor does the Virginia Poverty Law Center have standing based on its assertion that it "relies on CFPB's … assist[ance] … in providing aid to consumers who call [its] … helpline" absent which its "mission" would be "much harder."  JA688.  In addition to sharing the same problems outlined above, such a conclusory statement unsupported by any further factual detail does not satisfy Article III.  *See Alliance for Hippocratic Med.*, 602 U.S. at 394.

Finally, the district court erred in concluding that Pastor Steege established standing based on her allegation that CFPB canceled a follow-up meeting after terminating the Private Education Loan Ombudsman. JA688-89.  This ombudsman assists borrowers with *private* student loans, not public ones, and Pastor Steege's allegations concern only public loans.

24

Dkt. 31, at 33-34; 12 U.S.C. § 5535(a) (directing the ombudsman to "provide timely assistance to borrowers of private education loans").  Accordingly, Pastor Steege's allegation fails Article III in two respects:  (1) it does not establish an injury in fact as it has nothing to do with CFPB's statutory obligation to maintain a "Private Education Loan Ombudsman," and (2) any judgment concerning this obligation would not have redressed her injuries.

Viewed another way, this Court lacks jurisdiction over plaintiffs' challenge because it is not ripe for review.  *See Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023) (noting that ripeness can implicate "Article III limitations" as well as "prudential concerns" (quoting *National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 808 (2003))).  To evaluate ripeness, courts look to (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *National Park*, 538 U.S. at 808.  Here, plaintiffs present an "abstract disagreement[] over administrative policies" unfit for judicial resolution. *National Park,* 538 U.S. at 807.  Nor would denying review at this stage impose any legally cognizable hardship:  if CFPB does take any action causing plaintiffs a concrete, redressable injury, plaintiffs can challenge

25

that specific action in the normal course.  *See infra* pp. 26-28, 42-45.

Plaintiffs' desire for earlier judicial intervention than what Congress has

chosen to provide does not justify premature review.

> **2.    The CSRA Precludes District-Court Jurisdiction Over Employment-Related Claims.**

The district court lacked jurisdiction over claims arising from

employment-related injuries, as any such claims must be pressed through

the statutorily prescribed channels for litigating federal employment

disputes.

The CSRA establishes an "integrated scheme of administrative and

judicial review" for challenges to personnel actions taken against civil-

service members.  *United States v. Fausto*, 484 U.S. 439, 445 (1988).  The

CSRA includes the Federal Service Labor-Management Relations Statute,

which governs labor relations between the Executive Branch and its

employees.  *See* 5 U.S.C. §§ 7101-7135.  Through this scheme, Congress

"regulates virtually every aspect of federal employment and 'prescribes in

great detail the protections and remedies' applicable to adverse personnel

actions, 'including the availability of administrative and judicial review.'"

*Nyunt v. Chairman*, 589 F.3d 445, 448 (D.C. Cir. 2009) (quoting *Fausto*, 484

U.S at 443).  Accordingly, the CSRA provides the "exclusive means" for vindicating injuries relating to federal employment.  *Elgin v. Department of Treasury*, 567 U.S. 1, 5, 8 (2012).

The district court erred in permitting plaintiffs to circumvent this comprehensive scheme by repackaging employment-related claims as a generalized challenge to broader agency action.  While the court expressly acknowledged the government's argument that the court lacked subject-matter jurisdiction over claims concerning federal employment matters, it determined that it "need not decide now whether it can or should address [the] legality" of these claims because, "at this point, [the court's] focus is the closure of the agency as a whole."  JA685 n.15.

That reasoning is flatly incompatible with precedent and invites end-runs around the CSRA.  Federal employees and their unions may not circumvent the statute by framing their employment-related challenge as a broad administrative challenge or, more generally, as seeking relief that they could not secure under the CSRA.  *Grosdidier v. Chairman*, 560 F.3d 495, 497 (D.C. Cir. 2009).  As this Court has repeatedly explained, "Congress designed [this] remedial scheme with care, 'intentionally providing—and intentionally not providing—particular forums and

27

procedures for particular kinds of claims.'"  *Id.* (quoting *Filebark v. Department of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009)).  Under the CSRA, "what you get … is what you get," *id.* (quotation marks omitted)— and this principle applies to claims concerning individual employees and broader labor management practices alike, *see AFGE v. Trump*, 929 F.3d 748, 761 (D.C. Cir. 2019).

The same conclusion holds with even greater force for the non-union plaintiffs, who are strangers to the government-employee relationship.  If end-users of government services or employee associations could challenge the legality of personnel actions and obtain reinstatement of terminated employees without the CSRA's constraints, that would turn the CSRA "upside down" by privileging those who are, at most, indirectly affected by a termination over the employees whom the legislative scheme seeks to protect.  *Fausto*, 484 U.S. at 449.  Allowing separate litigation by such end-users would "seriously undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567 U.S. at 14, and harm "the development … of a unitary and consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449.

### B.    Plaintiffs Lack A Cause Of Action.

Even if plaintiffs could establish jurisdiction, their challenge would fail for want of a cause of action.  Plaintiffs identify two potential causes of action, but neither suffices.  First, the APA is unavailable because plaintiffs do not challenge a ripe, discrete "final agency action."  Perhaps recognizing these obstacles, plaintiffs also bring essentially the same claim under a theory of nonstatutory review.  But that claim, which plaintiffs have described in both constitutional and statutory terms, fails.  The Constitution provides no cause of action for a separation-of-powers claim like plaintiffs', which is based entirely on alleged failure to comply with statutory mandates.  And to the extent that plaintiffs bring an *ultra vires* challenge alleging statutory violations, they cannot make the "nearly insurmountable" showing necessary to bring such an extraordinary claim. *Department of Just. v. FLRA*, 981 F.2d 1339, 1343 (D.C. Cir. 1993).

### 1.    Plaintiffs Cannot Bring An APA Action.

The APA does not "authorize [courts] to exercise judicial review [over] everything done by an administrative agency."  *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (second alteration in original).  Here, plaintiffs' APA claims fail because they do not

challenge agency "action" that is "final, ripe for review, and discrete."  Op. 18.

**a.**  Reviewable agency "action" is limited to the set of "circumscribed, discrete agency actions" defined by the APA—*i.e.*, "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13).  *See Norton v. Southern Utah Wilderness All. (SUWA)*, 542 U.S. 55, 62 (2004).  And even if a challenged act qualifies as an "action" under 5 U.S.C. § 551(13), it is not reviewable unless it is "final" within the APA's meaning, *i.e.*, it "mark[s] the 'consummation' of the agency's decisionmaking process" and is one by which "rights or obligations have been determined" or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations marks omitted); *see also* 5 U.S.C. § 704.

With respect to *Bennett*'s second criterion, the "core question" is whether the agency action "will directly affect the parties."  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967) (examining the legal effect of the challenged regulation in holding it "final"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267

30

(1954) (noting that regulations with the force of law may constrain Executive power); *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (looking to "the actual legal effect (or lack thereof) of the agency action in question on regulated entities").  Crucially, the *Bennett* test is conjunctive:  even a final agency decision is unreviewable if it lacks direct legal effect on regulated parties or on the agency itself.  *See California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638, 641 (D.C. Cir. 2019).

Closely related to the APA's finality requirement is a plaintiff's obligation to show that the controversy is ripe for judicial review.  *See supra* pp. 25-26 (noting need to show fitness of issues for, and hardship of withholding, judicial review); *Abbott Labs.*, 387 U.S. at 148; *Saline Parents*, 88 F.4th at 306 (noting that "[t]he ripeness doctrine … is a threshold inquiry" "even in its prudential aspect" (first alteration in original) (quotation marks omitted)).  Both finality and ripeness doctrines share "the dual concerns of prematurity of judicial intervention in agency processes and the proper and principled exercise of judicial power."  *National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs* (*NAHB*), 417 F.3d 1272, 1281 (D.C. Cir. 2005) (quotation marks omitted).  To that end, a plaintiff may not challenge an agency's decision until it "has been formalized and its effects felt in a

concrete way by the challenging parties." *Id.* (quoting *Abbott Labs.*, 387 U.S. at 148-49). Thus, "[a]n action is ripe for review only if it has caused, or threatens, direct and immediate harm to the plaintiff." Op. 20 (citing *NAHB*, 417 F.3d at 1281, 1283).

Further reinforcing the APA's balance "between meaningful judicial review and the needs of effective administration" is the requirement that a challenged agency action be discrete and specific. *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019) (addressing claim to compel agency action). This requirement appears in the APA's text itself, which defines "action" to include categories of "circumscribed, discrete agency actions." *SUWA*, 542 U.S. at 62 (describing 5 U.S.C. § 551(13) and explaining that section's reference to an "equivalent ... thereof" "must also be discrete (or it would not be equivalent)" (alteration in original) (quotation marks omitted)). And the discreteness requirement has repeatedly been applied by the Supreme Court, this Court, and its sister courts to reject attempts to make federal courts agents of wholesale agency reform. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 890-91, 894 (1990) ("land withdrawal review program" "d[id] not refer to a single [agency] order or regulation, or even to a completed universe of particular [agency]

32

orders and regulations," and so was insufficiently "specific" for APA review); *SUWA*, 542 U.S. at 64 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in [*National Wildlife Federation*]" in a Section 706(2) action."); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006) (explaining that "only specific actions implementing [an agency's] plans," not the plans themselves, "are subject to judicial scrutiny"); *City of New York*, 913 F.3d at 433 (declining to "supervise an agency's compliance with" its "broad statutory mandate" (quotation marks omitted)).

**b.** Neither of the two agency determinations the district court identified— an email sent on February 10 and a "decision" (according to the court's own inference) to close the agency—qualifies for APA review.

***i.*** The February 10 email, which directed staff not to perform any work tasks without approval from the agency's Chief Legal Officer, is a quintessentially unreviewable operational measure. *See National Wildlife Fed'n*, 497 U.S. at 899. Even accepting the dubious premise that an internal email qualifies as one of the agency "action[s]" defined at 5 U.S.C. § 551(13)—the only conceivable match is an "order," but no one would

33

naturally describe this email as the "disposition … of an agency in a matter," 5 U.S.C. § 551(6)—it was not "final."

To start, the email did not "consummat[e]" any decisionmaking process. *Bennett*, 520 U.S. at 177-78. Rather, on its face, it makes clear it is "not the agency's final word on" the circumstances in which employees should halt or continue working, expressly contemplating that employees could seek approval to perform work. *Southwest Airlines v. U.S. Dep't of Transp.*, 832 F.3d 270, 276 (D.C. Cir. 2016); *see* Op. 25 (noting the "email did not definitively decide anything … merely direct[ing] employees to obtain advance approval before performing work"). Context confirms this conclusion: the February 10 email was sent by the Acting Director just minutes into his first business day on the job. *See* JA646 (email sent 8:30 a.m. Monday, February 10); JA1058 (noting Acting Director Vought's appointment the evening of Friday, February 7). Like hundreds of email directives agency management sends each day, this email was subject to further clarification and refinement, *see supra* pp. 6-9 (detailing subsequent emails clarifying that the February 10 email did not stop statutorily required work). To the extent the district court considered these later instructions a shift in the agency's position instead of a clarification, JA717-

34

18, that determination would only underscore that the email was subject to change.  *See Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268 (D.C. Cir. 2018) (letter not final where it was "subject to rescission at any time without notice").

Next, under *Bennett*'s second prong, the email is utterly devoid of any legally binding effect on the agency or the plaintiffs.  Here, the district court emphasized that the email had "consequences," and it examined how the email played a role in subsequent decisions to terminate probationary employees, end contracts, and carry out reductions in force.  *See* JA674-77.  But the court identified not one instance in which the email alone, without any subsequent act, directly affected plaintiffs, or in which the agency treated the February 10 email as a binding directive.  Because the effects described were contingent on future action, they are not attributable to the email for purposes of the second *Bennett* prong.  *See DRG Funding Corp. v. Secretary of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996).

*ii.*  The district court's separate determination that agency management decided to close CFPB fares no better.  For the reasons given *infra* at 45-56, the court erred in finding such a decision.  But even if defendants had reached an abstract, unwritten decision to shutter the

35

agency, such a decision would not be subject to APA review. *See* Op. 28-29.
As an initial matter, as the Supreme Court has explained, a court errs
where it subjects to judicial review an "abstract decision" divorced from
any "specific agency action[] as defined in the APA." *Biden v. Texas*, 597
U.S. 785, 809 (2022). The district court did just that, in examining the
"wholesale cessation of activities" plaintiffs alleged defendants intended,
JA677, whose existence cannot be traced to any definite "rule, order,
license, sanction, relief" or their equivalent, as the APA defines those terms,
5 U.S.C. § 551(4), (6), (8), (10), (11), (13). It is no answer to say that an
unexpressed "decision" to shutter an agency qualifies as the "equivalent"
of an agency action, *see* Panel Dissent 43-44, for "[a] 'statement' is
something that one says or writes, usually to make something known to
others. … Unexpressed decisions are the opposite of, not something
'equivalent' to, such a 'statement.'" Op. 30 n.5 (citations omitted); *cf.*
*SUWA*, 542 U.S. at 62.

Furthermore, the postulated shutdown decision was not final agency
action because it had no consequences, legal or otherwise, for plaintiffs.
"No such decision by itself effected the termination of any employees or
the cancellation of any contracts," actions the agency attempted to effect by

"undertak[ing] separate, discrete actions."  Op. 30.  "Nor did the posited shutdown" decision itself "prohibit any legally required work."  *Id.*  Rather, at most, a decision to shut down an agency would represent a plan—and unlike "specific actions implementing … plans," an agency's plan or goal, no matter how decisive, is only a preliminary (and unreviewable) step along the way to any reviewable final action.  *Fund for Animals*, 460 F.3d at 21-22.

Moreover, the district court disregarded the need to identify "*discrete* agency action."  *SUWA*, 542 U.S. at 64.  The court accepted plaintiffs' framing of "a constellation of then-ongoing actions—the February 10 email, firing employees, cancelling contracts, declining additional funding, and terminating the lease for the Bureau's current headquarters"—as a "shutdown decision."  Op. 31.  But plaintiffs cannot "dress up these 'many individual actions' as a single decision in order to challenge all of them at once."  *Id.* (quoting *National Wildlife Fed'n*, 497 U.S. at 893).  The district court's contrary conclusion both contravenes precedent forbidding "broad programmatic attack[s]" under the APA, *SUWA*, 542 U.S. at 64, and abrogates defendants' discretion to decide how best to effectuate CFPB's statutory mandates, *see id.* at 66.

37

Finally, plaintiffs' challenge to a conjectured decision to close CFPB is unripe.  Even assuming the district court correctly found "that interim CFPB leadership at one point made an abstract decision to shut down the Bureau," Op. 33-34; *but see infra* pp. 45-56, judicial consideration of such an inchoate choice "would benefit from [awaiting] a more concrete setting," *NAHB*, 417 F.3d at 1281 (quotation marks omitted).  As the panel correctly observed, "a central purpose of prudential ripeness doctrine is to allow an agency space to 'alter a tentative position.'"  Op. 34 n.7 (quoting *Public Citizen Health Rsch. Grp. v. Commissioner*, 740 F.2d 21, 31 (D.C. Cir. 1984)).  The uncontested record shows that "agency consideration remained ongoing" and even assuming a shutdown decision, it was rapidly followed by a "change [in] course."  Op. 33-34 (noting reactivation of contracts and directives to perform statutorily required work).  Permitting "immediate judicial review" of the alleged shutdown decision would inappropriately "hinder agency efforts to refine its policies."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998); *see also National Mining Ass'n*, 758 F.3d at 253 (looking to "post-guidance events" to determine "whether judicial review [under the APA] is available *now*").  Nor would denying review at this

stage impose any cognizable hardship on plaintiffs, who have other

avenues to seek relief. *See supra* pp. 26-28; *infra* pp. 42-45.

### 2. Plaintiffs Cannot Rely On A Nonstatutory Cause Of Action.

Whether viewed as an equitable constitutional claim or an *ultra vires*

challenge to agency action contravening federal statutes, plaintiffs cannot

circumvent the APA's final agency action requirement by resorting to a

nonstatutory theory of judicial review. *See* JA695 n.19 (noting plaintiffs

pleaded an "*ultra vires*" claim alleging "constitutional and statutory"

violations).

Insofar as plaintiffs' nonstatutory "*ultra vires*" claim turns on the

theory that the Executive has unconstitutionally arrogated legislative

powers to itself, JA44, the panel correctly concluded that argument fails

under *Dalton v. Specter*, 511 U.S. 462 (1994). *See* Op. 45-47. *Dalton* teaches

that not "every action by the President, or by another executive official, in

excess of his statutory authority is *ipso facto* in violation of the

Constitution." 511 U.S. at 472. Rather, the Supreme Court has

"distinguished between claims of constitutional violations and claims that

an official has acted in excess of his statutory authority," treating them as

"separate categories." *Id.* (collecting cases). The Constitution is implicated if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473. Here, despite references to the Constitution, plaintiffs' Count One seeking nonstatutory review is really a "statutory one," *id.* at 474, because it turns on plaintiffs' assertion that defendants exceeded their statutory authority. *See Global Health Council v. Trump*, 153 F.4th 1, 14-17 (D.C. Cir. 2025) (applying *Dalton* to reject a nominally constitutional claim resting on allegations of statutory violations).

Nor can plaintiffs obtain review outside the APA on an *ultra vires* theory. To begin, despite pleading an "ultra vires" claim, JA44, and securing a preliminary injunction based in part on a likelihood of success on an "ultra vires" claim, *see* JA693, plaintiffs have since "expressly disavow[ed] any such *ultra vires* claim," Op. 44. *See* Panel Response Br. 25-28, 26 n.5. And even apart from such disavowal, plaintiffs cannot satisfy

40

the "painstakingly delineated procedural boundaries" on *ultra vires* claims. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quotation marks omitted); *id.* at 681-82 (describing an *ultra vires* claim as "essentially a Hail Mary pass") (quoting *Nyunt*, 589 F.3d at 449)).  Those "nearly insurmountable" limitations, *Department of Just.*, 981 F.2d at 1343, require plaintiffs to show, *inter alia*, that "there is no alternative procedure for review of the statutory claim" and that "the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory," *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quotation marks omitted).  Here, other avenues of review exist.  *See supra* pp. 26-28; *infra* pp. 42-45.  And plaintiffs do not even attempt to identify any "specific prohibition" the Bureau has failed to honor, instead describing the Bureau's responsibilities in generic terms.  *See* JA24-29.

## II.    The Preliminary Injunction Rests On Legal And Factual Error And Should Be Vacated.

The threshold defects in plaintiffs' claims alone establish that the preliminary injunction is unsupported by a likelihood that plaintiffs will

succeed on the merits.  But even apart from these defects, the preliminary injunction is premised on legal and factual errors that warrant vacatur.

## A.    The District Court Applied An Incorrect Legal Standard.

The district court fundamentally erred in addressing plaintiffs' claims that defendants will "eliminate the CFPB" and "suspend or terminate CFPB's statutorily mandated activities."  JA44, JA46-47.  As discussed above, the crux of such claims is that CFPB will fail to perform functions it is obliged by statute to carry out; they are thus governed by the APA's provision permitting courts to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1).  Plaintiffs cannot succeed under 5 U.S.C. § 706(1)'s mandamus-like standard, and the district court's failure to apply it warrants reversal of the preliminary injunction.

**1.**  As the Supreme Court has explained, "the only agency action that can be compelled under the APA is action legally *required*."  *SUWA*, 542 U.S. at 63.  In 5 U.S.C. § 706(1), "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through" writs like mandamus, a remedy "normally limited to enforcement of a specific, unequivocal command, the ordering of a precise, definite act ...

42

about which [an official] had no discretion whatever." *Id.* (alterations in original) (citation and quotation marks omitted).  Thus, "Section 706(1) permits judicial review of agency inaction, but only within strict limits," mirroring "the common law writ of mandamus." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016).

As this Court has made clear, relief under Section 706(1) is controlled by the mandamus standard, and "starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." *In re Core Commc'ns*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)).  Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *Bluewater*, 234 F.3d at 1315 (quoting 5 U.S.C. § 706(1)).  And even once there has been an "unreasonable delay" in fulfilling the required statutory duty, this Court evaluates "whether the agency's delay is so egregious as to warrant mandamus." *Core Commc'ns, Inc.*, 531 F.3d at 855 (quoting *Telecommunications Rsch. & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 79 (D.C.

Cir. 1984)).  Where there is sufficiently egregious delay in performance of a

required duty, courts must still be careful not to "enmesh[]" the judiciary

"in the minutiae of agency administration."  *Cobell v. Norton*, 240 F.3d 1081,

1108-09 (D.C. Cir. 2001) (quotation marks omitted).  And this Court has

noted that "[i]t is proper for a court to allow the government the

opportunity to cure" a violation "declared by the court."  *Id.* (quotation

marks omitted).  Indeed, this Court has previously withheld relief, and

only retained jurisdiction, once an agency "assured" the Court "it is now

moving expeditiously to resolve" unreasonably delayed duties.  *TRAC*, 750

F.2d at 72.

    **2.**  Rather than applying these well-established standards to

plaintiffs' request for preliminary relief, the district court treated plaintiffs'

claim as one challenging an agency action.  *See* JA671-80.  That was error

because, as in *SUWA*, there is no "agency action" that plaintiffs could

challenge here.  *See supra* pp. 29-39; *SUWA*, 542 U.S. at 64.  And even if

plaintiffs had identified a discrete and statutorily required action that CFPB

was in danger of withholding, any relief would have to accord with the

remedial principles this Court has announced under Section 706(1).  Yet the

district court made no attempt to identify any "specific, unequivocal

44

command" such that it could "order[] … a precise, definite act." *SUWA*, 542 U.S. at 63. It found no "transparent violations of a clear duty to act," let alone one that has been withheld so long as to be "unreasonably delayed." *Bluewater*, 234 F.3d at 1315 (citation omitted). And it certainly declined to stay its hand once the agency "assure[d]" the court it would continue to fulfill its statutory obligations, *TRAC*, 750 F.2d at 72, or to "allow the government the opportunity to cure" any statutory violation it found, *Cobell*, 240 F.3d at 1108-09. The relief the district court granted should be vacated.

### B.    The District Court's Conclusion That Defendants Intend To Close CFPB Is Unsound.

The preliminary injunction rests on the district court's conclusion that there remains an "unchanged" effort "to shut the agency down entirely" and that "defendants have absolutely no intention of operating the CFPB at all." JA697; *see also* JA739-40. That conclusion is based on legal error, and to the extent it constitutes a factual finding, it is clearly erroneous.

**1.** The district court briefly conceded that it is "a matter of record," that "the new leadership" who arrived at CFPB several weeks into the new administration took a number of "appropriate steps" to "approve certain

45

activities or reactivate specific contracts related to statutorily mandated activities."  JA709-10 (first citing JA283; and then citing Dkt. 66-2). Nonetheless, the court disregarded these steps and all the other evidence in the record that defendants had for weeks been attempting to ensure that the Bureau fulfilled its statutory obligations and were committed to doing so going forward.  *See, e.g.*, JA634 (concluding that the record "suggest[s] … that the change of heart was more likely a charade for the Court's benefit"); *infra* pp. 48-56.  A key step in the court's analysis turned on an exchange with agency counsel that the court viewed as indicating that "no one—not even the Acting Director of the agency—knows what it means" to "perform their statutory functions."  JA731; *see* JA730 (citing JA1297).

The district court's assessment of this exchange, however, was rooted in legal error.  As explained above and at the hearing, the Supreme Court has held that courts may not enter injunctions subjecting agencies to judicial supervision over their implementation of "broad statutory mandates."[3]  *SUWA*, 542 U.S. at 66.  The district court concluded that

---

[3] *See supra* pp. 19-20; JA1294-97 (government counsel protesting that "the statutory functions that plaintiffs have identified appear to be literally everything that the Agency does," citing "*SUWA*," and urging that

*Continued on next page.*

counsel's agreement that "the term 'statutory obligations' is too broad and

not enforceable," JA1297-98, was somehow tantamount to "insisting" that

"no one" at the agency knows what the agency's obligations are—and then

extrapolating from that conclusion that CFPB leadership was insincere in

its repeatedly stated intent to fulfill those obligations, JA730-31.  But

government counsel made a correct *legal* argument—not a factual

concession—in opposing an injunction requiring compliance with

"statutory obligations."  JA1289-98.  The court's disregard of the legal

principle counsel articulated was legal error, and the court's factual

inference "induced by [this] erroneous application of the law" cannot

stand.  *Case v. Morrisette*, 475 F.2d 1300, 1307-08 (D.C. Cir. 1973); *see also*

*Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 18-19 (2024)

---

"Congress tasked the Agency, not this Court, with going through and figuring out a process for identifying how it's going to comply with each one of [its] statutory obligations" and that "a plaintiff … who is injured by … an individualized failure to act" could bring an action under [5 U.S.C. §] 706[(1)]").  There is no doubt that plaintiffs were indeed seeking the type of broad and unenforceable injunction regarding general statutory provisions that counsel protested against in this exchange, as is clear from the plaintiffs' "chart of statutory duties" the district court invoked.  JA1290 (citing JA258 (chart including 12 U.S.C. § 5491(a) (providing that CFPB "shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws")).

("If [a] trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855, n. 15 (1982)) (alteration in original)).

**2.** To the extent the district court found—independent of its legally erroneous assessment of counsel's well-founded protests against a "follow-the-law" injunction—that defendants intend to close CFPB entirely, this finding is also both infected by legal error and clearly erroneous. *See* JA710 (stating that the Court "cannot find that … the administration ever abandoned its plan to shut the CFPB down").

As a legal matter, the district court committed reversible error by failing to apply the presumption of regularity that attaches to actions of Executive officers in the course of their official duties. The clear-error standard will not save a finding made under incorrect legal principles, *see Alexander*, 602 U.S. at 18-19—and indeed, this Court has previously vacated a lower-court decision for failing to correctly apply the presumption of regularity in weighing contested facts. *See Latif v. Obama*, 677 F.3d 1175, 1199 (D.C. Cir. 2011); *see id.* at 1201-05 (Henderson, J., concurring in the

judgment). That is the appropriate course here, where far from contending with the presumption, the district court did not even acknowledge it.

As a factual matter, the district court's failure to apply the correct legal standard was material—for not only did plaintiffs' support for a hypothesized shutdown decision fall short of the "clear evidence" required to disturb the presumption of regularity, *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quotation marks omitted), it did not show such a decision even apart from that error. *See Cuddy*, 762 F.2d at 124 ("[E]ven if there is some evidence supporting a finding, that finding is clearly erroneous if 'on the entire evidence [the reviewing court] is left with the definite and firm conviction that a mistake has been committed.'" (second alteration in original)).

The record as a whole demonstrates that the district court clearly erred in determining that the agency would be shut down absent the court's intervention. *See United States v. Hallford*, 816 F.3d 850, 857-58 (D.C. Cir. 2016) (finding clear error where district court relied on an "apparent assumption" rather than "evidentiary support" that a suspect was "still in pain" a day after an emergency-room visit). Once Acting Director Vought assumed his role, he indicated from the first that work "expressly

49

approved by the Acting Director or required by law" could continue. JA644 (quoting Dkt. 23-2 (February 8 email)). The record is replete with evidence from that point on that the agency intends to comply with its statutory obligations—and lacking in any substantial evidence that it plans to stop such compliance absent an injunction. The district court's contrary view turns on mistaken or incomplete descriptions of documents that plainly reflect the agency's intent to fulfill statutory requirements. *See Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985) (explaining that on clear-error review, "the district court's account of the evidence" must be "plausible in light of the record viewed in its entirety").[4]

First, in describing Vought's February 10 email as an order to cease all work, *see* JA667, JA672, JA674, JA697-98, JA712, the district court routinely failed to note that the email's plain text permits some work,

---

[4] The district court's misapprehension of the record is illustrated by its incorrect belief that CFPB's Acting Director, Russell Vought, is also the head of the Office of Personnel Management. Russell Vought is the Director of the Office of Management and Budget, not the Office of Personnel Management. The district court expressly suggested that Vought's putative role at the Office of Personnel Management may have improperly affected his actions at CFPB, *see* JA674-76, and it is impossible to determine in what other ways the court's mistake could have colored its assessment of the record.

stating that "[i]f there are any urgent matters, please alert [Acting Director Vought] through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task."  JA646 (quoting Dkt. 23-4).  And when the district court did acknowledge this aspect of the February 10 email, it inaccurately dismissed that important caveat as being "generally" applied by the agency only to "operational needs," like "keeping the lights on" and "effectuat[ing] the [reductions in force]."  JA674 n.9.  That characterization cannot be squared with the record, which contains multiple instances in the days after February 10 of agency leadership promptly approving the performance of substantive statutory obligations.[5]

---

[5] *See* JA286-87 (February 10 and 11 emails exempting "work to publish the Average Prime Offer Rate… from the stop work order"); JA285 (February 10 email documenting "that the work stoppage will not apply to the Bureau's Consumer Resource Center aka Contact Center Services"); JA298-90 (February 26 email approving request to work on statutorily required report to Congress); JA306 (February 27 email approving Office of Fair Lending's request to perform functions identified in 12 U.S.C. § 5493(c)(2)); JA326 (February 28 email confirming an employee's understanding that they "can resume all regular work related to fulfilling statutory obligations"); JA341-44 (March 2 email approving performance of multiple statutory duties); JA347 (March 2 email granting approval to respond to external stakeholders per statutory duties); JA351-52 (March 3 email documenting "reactivati[on]" of "the work of the Office of Financial Education"); JA374-76 (March 3 email documenting permission to work on list of statutorily required reports); JA385 (March 3 email confirming that

*Continued on next page.*

51

Similarly, the district court mischaracterized other record evidence that agency leadership approved statutorily required work.  For instance, the court characterized approvals as "primarily related to operations" such that "the agency was largely doing what was statutorily mandated to manage *itself* internally," such as accommodating disabled employees. JA710.  But the very documents the court cites in support of this contention also clearly indicate employees' continuing ability to perform *any* statutory obligation.  *See* JA289 (February 21 email confirming that "Legal Division is authorized to support all operational matters being exercised on behalf of our new leadership *and our regulatory/statutorily requirements*" and directing "[m]ission related support" to be "coordinated directly through [Chief Legal Officer] Mark [Paoletta] or [Deputy Chief Legal Officer] Dan [Shapiro]" (emphasis added)); JA344 (February 27 email not only listing

_____

the Office of Financial Education "should be performing these statutorily authorized duties"); JA388 (March 3 email approving a "shift in resources needed to comply with the statute and any applicable laws/regulations" regarding the Consumer Complaint Database); JA390-91 (March 3 email approving proposed implementation strategies to perform "statutory obligations and/or work required by law" by the Research, Monitoring, and Regulations division).

various operational tasks, but also discussing an "immediately required statutorily required activity" involving an update to "the Consumer Advisory Boards charter and Membership Balance Plan," including submission to Congress and issuance of "a Federal Register notice").

Next, these approvals to conduct statutorily required duties accord with agency leadership's follow-up emails explaining that the February 10 email was not intended to stop performance of such duties. On February 27, Chief Operating Officer Martinez emailed various offices "to ensure that [they were] aware that statutorily required work and/or work required by law are authorized," and that the relevant "teams are authorized to continue carrying out these responsibilities." JA316; JA317 (similar). And on March 2, Martinez emailed the whole agency on behalf of Acting Director Vought, noting the February 8 email's preservation of work "'required by law' or expressly approved by the Acting Director" and explaining that the February 10 email directed employees "to reach out … for the authorization" the Director had required. JA338.

The district court dismissed the March 2 email as having "little evidentiary value," positing that it contains a "stunning mischaracterization of the February 10" email. JA716-17. But contrary to

53

the court's reasoning, there is no difficulty "squar[ing]" the March 2 email's description of the February 10 email "with the plain language of the Vought directive." JA717. Vought's directive on February 10—like that on February 8—permitted some work to go forward, and it is unclear why the district court refused to understand "urgent" work as encompassing work "required by law." *See* JA717. Indeed, the district court's categorical assertion that the March 2 interpretation was not how "the February 10 order was understood by the staff" or "implemented by the agency" is flatly at odds with the record. *See* JA318; JA326 (February 28 confirmation that some employees understood that they could "resume all regular work related to fulfilling statutory obligations" based on February 27 email and "discussion").[6]

---

[6] The district court's incredulity that such understanding was not universal and that agency leadership encountered confusion during this period, *see* JA679 (citing *Casablanca*), underscores the Supreme Court's wisdom in warning against programmatic injunctions that interfere with the Executive Branch's ability to manage agencies. To those engaged in the day-to-day work of running an agency, it should be unsurprising that on-the-ground uncertainty can result from politically accountable officials' efforts to dramatically shift an agency's priorities.

Finally, the district court's assessment of the evidence wrongly dismisses the agency's stated intent to fulfill statutory duties because that intent was manifested in a way the district court considered "not particularly inviting," "narrow and grudging," or "chilling." JA710-11. There is nothing wrong with an agency taking a "very narrow approach" to spending or seeking "justifications" for such spending that will withstand external scrutiny. JA711 (quoting JA378-81). The district court's disapproval of such management methods is hardly a reasoned basis for disregarding the plain text of emails approving the restoration of contracts without which the Bureau "can't meet a statutory requirement." JA378 (emphasis omitted).

At most, the district court could have concluded that the evidence painted a mixed picture—and in such a scenario, absent the clear evidence that might justify a different conclusion, the presumption of regularity precludes finding such actions unlawful. *Cf. Abbott v. LULAC*, 607 U.S. ----, 2025 WL 3484863, at *1 (Dec. 4, 2025) (granting a stay where the district court committed the "serious error[]" of "fail[ing] to honor the presumption of legislative good faith by construing ambiguous direct and circumstantial evidence against the legislature"). Accordingly, the district

55

court clearly erred in find improper government motives based on its view that the evidence merely "suggest[s]" as much. *See* JA634 (stating that the record "suggest[ed]" that the government's actions to ensure compliance with statutory obligations "were nothing more than window dressing" and "more likely a charade for the Court's benefit").

### C. The Preliminary Injunction Is Vastly Overbroad.

Even apart from the district court's errors regarding the appropriate standard for compelling an agency to perform its statutory duties and CFPB closure, the preliminary injunction is so overbroad as to warrant vacatur. Per the "familiar rule," "once a … violation is found, a federal court is required to tailor the scope of the remedy to fit the … violation." *Buchanan v. Evans*, 439 U.S. 1360, 1362 (1978) (Brennan, J., in chambers) (alterations and quotation marks omitted). Indeed, constitutional and equitable principles require that such extraordinary relief be no broader than necessary. *Cf. Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Trump v. CASA, Inc.*, 606 U.S. 831, 843-44 (2025) (describing a historical limitation on

equitable relief to injured parties only).[7]  And where an injunction trenches on the Executive Branch's "dispatch of its own internal affairs," which courts should give "the widest latitude," courts are "quite wrong [to] routinely apply[] … the traditional standards governing more orthodox stays." *Sampson v. Murray*, 415 U.S. 61, 83-84 (1974) (quotation marks omitted).

Here, the preliminary injunction suffers from a fundamental, reversible error—it imposes sweeping and intrusive requirements on the Executive Branch's management of its own internal affairs that go far beyond what is necessary to achieve its stated purposes of keeping the agency open and performing its statutory duties.  In addition to judicially supervising such matters as data retention and whether CFPB continues to provide "Elevated Case Management" in response to consumer complaints, JA745-46, the injunction precludes defendants from imposing

---

[7] Because injunctive relief must be tailored to demonstrated injury, *see supra*, it did not "suffice[] to resolve this appeal," Panel Dissent 56, to determine only that one plaintiff had standing.  Rather, to uphold the injunction, the Court must ascertain whether it is "limited to the inadequacy that produced the injury in fact that the plaintiff[s] ha[d] established."  *Gill*, 585 U.S. at 50 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

"a work stoppage" though "any … means."  JA746.  But much of CFPB's work is done at its leadership's discretion, and the district court made no attempt to limit the language of its injunction to the agency's specific statutory obligations.[8]

Next, take the injunction's effect on the ability of CFPB's politically accountable leadership to manage the size of its workforce, a question Congress left to the Director's discretion.  *See* 12 U.S.C. § 5493(a)(1)(A) (empowering the Director to "fix the number of … employees of the Bureau ….").  The district court required CFPB to rehire *all* terminated employees without regard for whether these employees were necessary for the agency to carry out its statutory functions.  JA746.  Nor can the agency terminate a single one of those employees "except for cause related to the individual employee's performance or conduct."  JA746.  The district court indicated that such language permits "routine workplace management," JA753, but there is nothing routine about exposing an agency to the threat

---

[8]  In its stay, this Court permitted this provision to stay in effect during this appeal on the "understanding" that it "allow[s] work stoppages that defendants have determined, after a particularized assessment, would not interfere with the performance of defendants' statutory duties."  Stay 2-3.

of contempt proceedings over disputes about whether it had adequate cause to terminate an employee. Indeed, the injunction has already subjected CFPB to the threat of contempt proceedings based on workforce management. *See infra* p. 64 (describing the district court's inquiry into the adequacy of CFPB's assessment about the resources necessary to satisfy its statutory obligations).

The injunction's effect on CFPB's contracting authority is similarly intrusive and similarly disconnected from the district court's stated goal of ensuring CFPB remains open to fulfill its statutory obligations. The injunction requires that the Bureau rescind *all* notices of contract termination issued after February 11, regardless of whether the contract was terminated consistent with the agency's statutory obligations and in reflection of adjusted priorities. *See* JA747. The injunction also prohibits CFPB from finalizing any subsequent contract termination, even if the agency has "halted" that contract "based on an individualized assessment" that "the contract involved is unnecessary for the agency to fulfill its statutory functions." JA747. The court's determination that its injunction should extend to any contract termination across the entire agency exemplifies its failure to appreciate the "properly limite[d] role of the

59

courts in a democratic society." *Alliance for Hippocratic Med.*, 602 U.S. at 380 (quoting J. Roberts, *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1220 (1993) (quotation marks omitted)). Agencies routinely enter into and terminate contracts based on their needs and priorities, and the district court has no basis for curtailing the agency's discretion to do so merely to further the stated goal of keeping the agency open.

At base, the preliminary injunction is built on a contradiction: to ensure that the Bureau remains open and functional, the district court enjoined the Bureau's political leadership from using ordinary management tools that are available to all open and functioning agencies. The district court opined that the "agency is either open or it's not," and declared that it was issuing the preliminary injunction for the purpose of ensuring that CFPB remains "open." JA678; *see also*, *e.g.*, JA633, JA635, JA693, JA733. Yet agencies that remain fully "open" possess broad discretion to allocate resources and make personnel decisions, under the control of politically appointed leadership. Remarkably, the district court provided not a word of explanation—anywhere in its 100-plus page opinion—for why it is necessary to impose the injunction's broad

60

requirements to ensure that the Bureau satisfies its minimum statutory responsibilities.

This fundamental mismatch between the putative legal violation the district court found and the sweeping relief ordered warrants vacatur. An injunction broader than necessary to address the problem identified by the district court is reversible error. *See, e.g., Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 418-19 (1977) (concluding there was a "disparity between the evidence of constitutional violations and the sweeping remedy finally decreed" and that it was "clear that the presently mandated remedy cannot stand upon the basis of the violations found by the District Court"). To the extent this Court concludes there is any possible basis for any form of relief, the most appropriate course would be to vacate the overbroad preliminary injunction and remand to the district court to consider the matter afresh in light of this Court's guidance.

## III.  The Remaining Factors Favor Vacatur.

Plaintiffs have not established irreparable injury, and any such harm would plainly be outweighed by the government's and the public's interest, which "merge" here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**1.** At the outset, plaintiffs' failure to establish irreparable harm is reason alone to vacate the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The district court concluded that plaintiffs established irreparable harm based on loss of employment or access to CFPB services and because one plaintiff had died. JA734-38. None of these determinations withstands scrutiny. First, terminations of federal employees will generally "not support a finding of irreparable injury, however severely" the discharge "may affect a particular individual." *Sampson*, 415 U.S. at 92 & n.68.

Second, the feared loss of access to agency services is not irreparable harm warranting preliminary relief: as explained above, agency-inaction claims require delay "so egregious as to warrant mandamus." *Core Commc'ns, Inc.*, 531 F.3d at 855. Where the applicable legal framework requires such an extraordinary showing to secure *any* relief, granting a preliminary injunction before any delay in services materializes—and certainly before any delay becomes egregious—would short-circuit the deferential standards under which courts evaluate such claims. *See Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 743 (D.C. Cir. 2017).

Finally, the district court erred in concluding, without explanation, that prospective relief is warranted to prevent irreparable harm where the court concluded that the plaintiff's death means that such "harm ... has already come to pass."  JA738.

**2.**  On the other side of the ledger, the district court's injunction inflicts irreparable constitutional harm on the government at every turn.  It frustrates the public's interest in having the President effectuate policy priorities—including by reducing the federal government's operational footprint—through lawful direction.  It inserts the Judicial Branch into the day-to-day, internal operations of a federal agency, impinging on its flexibility to shift resources and make staffing decisions—tools essential to any agency's management.  And given the sweeping and intrusive restrictions, it locks the agency into a static operational structure preventing leadership from determining how best to fulfill the agency's statutory obligations in line with the President's priorities.

Worse yet, the order exposes the government to the risk of contempt proceedings and sanctions over wide swaths of agency-administration matters.  While the injunction lasts, routine and lawful firings could be the subject of contempt proceedings.  The same is true of the agency's decision

63

to halt contract work, with its determination about what is "unnecessary for the agency to fulfill its statutory functions" subject to second-guessing in court.  JA747.  Such judicial supervision over an agency's exercise of lawful discretion is unwarranted and impermissible, but it will continue, potentially for many more months, unless the injunction is vacated.  *See SUWA*, 542 U.S. at 66-67.  That risk is especially concerning given the district court's apparent willingness to require mini-trials, discovery, and testimony from senior officials — all to probe defendants' determinations about what resources are necessary for the continued performance of statutory duties.  *See* JA896 (permitting discovery and setting hearing to examine defendants' determinations); Minute Order (Apr. 21, 2025) (requiring Mark Paoletta to be available to testify).  This invasive inquiry initiated under the unstayed portions of the preliminary injunction highlights the significance of the injunction's incursion on Article II prerogatives.  *See, e.g.*, *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008); *Cobell v. Norton*, 334 F.3d 1128, 1140 (D.C. Cir. 2003); *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998).

**3.** At a minimum, this Court should vacate the portions of the district court's injunction that most severely intrude on the agency's day-to-day operations.

Provisions 2 and 3 of the injunction require the reinstatement of all probationary and term employees, regardless of circumstance, and prevent any reductions in force, even if such reductions would not affect the agency's ability to carry out its statutorily mandated activities. *See* JA746. Together, these provisions effectively eliminate all Executive discretion over huge swaths of personnel matters—even those unrelated to agency closure or statutory requirements. Indeed, they prevent even ordinary staffing adjustments routinely made by new administrations.

Provision 4 similarly reaches far beyond what is necessary to ensure the agency's continued operation by preemptively prohibiting temporary pauses in work activities while agency priorities are reassessed. *See* JA746. Such pauses can serve legitimate management purposes and are an important tool of agency management during presidential transitions. Preserving Executive Branch discretion is particularly important for agencies that—like CFPB—have enforcement discretion requiring evaluation of "the many variables involved in the proper ordering of

65

[agency] priorities." *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (noting the "general unsuitability for judicial review of agency decisions to refuse enforcement"). By broadly prohibiting work stoppages, the injunction unnecessarily intrudes on day-to-day operations and enforcement discretion.

Provision 7 of the injunction should also be vacated. It requires reinstatement of all terminated contracts regardless of whether any given contract is consistent with current agency priorities or necessary to fulfill any statutory duties. It also prohibits the agency from finalizing any subsequent decision to terminate a contract— even if the agency has "halted" the contract because, for example, the contractor's performance is unsatisfactory. This restriction inflicts ongoing harm on the agency because contractors can incur reasonable costs—for which the government will be responsible—until the contract is terminated. *See* Federal Acquisition Regulation 52.242-15. Thus, if the contractor reasonably determines that it is necessary to keep project managers assigned to the contract to ensure continuity if the work is ever resumed, or contractors with technical expertise and specialized knowledge that would be difficult to replace, the government may be responsible for paying for this

continued staffing even though no work is being performed on the

contract.  By contrast, if a contract is terminated, the contractor must settle

all outstanding liabilities and, crucially, may not incur new ones.  *See*

Federal Acquisition Regulation 52.249-2.  This provision of the injunction,

which by its very terms burdens routine contract management *unrelated* to

agency closure, cannot be justified as necessary to ensure CFPB's continued

operation.

Finally, consistent with vacatur of these substantive provisions, this

Court should also vacate provision 8, which requires the agency to certify

its compliance with the injunction.

# CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and vacate the preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
MELISSA N. PATTERSON
DEREK WEISS

 */s/ Simon Gregory Jerome*
SIMON GREGORY JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*
  *simon.g.jerome@usdoj.gov*

January 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,987 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

 */s/ Simon G. Jerome*              
Simon G. Jerome

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2026, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals by using the appellate CM/ECF system.  Service will be

accomplished by the appellate CM/ECF system.


*/s/ Simon G. Jerome*
Simon G. Jerome

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 551 ................................................................................ A1

5 U.S.C. § 704 ................................................................................ A3

5 U.S.C. § 706 ................................................................................ A4

12 U.S.C. § 5491 ............................................................................. A5

12 U.S.C. § 5493 ............................................................................. A5

12 U.S.C. § 5512 ............................................................................ A13

12 U.S.C. § 5535 ............................................................................ A13

**5 U.S.C. § 551. Definitions**

For the purpose of this subchapter—

> (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

>> (A) the Congress;

>> (B) the courts of the United States;

>> (C) the governments of the territories or possessions of the United States;

>> (D) the government of the District of Columbia;

> or except as to the requirements of section 552 of this title—

>> (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

>> (F) courts martial and military commissions;

>> (G) military authority exercised in the field in time of war or in occupied territory; or

>> (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix;

> (2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

> (3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a

party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency—
    (A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;
    (B) withholding of relief;
    (C) imposition of penalty or fine;
    (D) destruction, taking, seizure, or withholding of property;

(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;
(F) requirement, revocation, or suspension of a license; or
(G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency—
(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;
(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or
(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

## 5 U.S.C. § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise

requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## 5 U.S.C. § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

A4

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 12 U.S.C. § 5491. Establishment of the Bureau of Consumer Financial Protection

(a) Bureau established

There is established in the Federal Reserve System, an independent bureau to be known as the "Bureau of Consumer Financial Protection", which shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. The Bureau shall be considered an Executive agency, as defined in section 105 of Title 5. Except as otherwise provided expressly by law, all Federal laws dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of Title 5, shall apply to the exercise of the powers of the Bureau.

* * *

## 12 U.S.C. § 5493. Administration

* * *

(b) Specific functional units

    (1) Research

    The Director shall establish a unit whose functions shall include researching, analyzing, and reporting on—

        (A) developments in markets for consumer financial products or services, including market areas of alternative consumer financial products or services with high growth rates and areas of risk to consumers;

        (B) access to fair and affordable credit for traditionally underserved communities;

        (C) consumer awareness, understanding, and use of disclosures and communications regarding consumer financial products or services;

        (D) consumer awareness and understanding of costs, risks, and benefits of consumer financial products or services;

(E) consumer behavior with respect to consumer financial products or services, including performance on mortgage loans; and

(F) experiences of traditionally underserved consumers, including un-banked and under-banked consumers.

(2) Community affairs

The Director shall establish a unit whose functions shall include providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities.

(3) Collecting and tracking complaints

(A) In general

The Director shall establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database or utilizing an existing database to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services. The Director shall coordinate with the Federal Trade Commission or other Federal agencies to route complaints to such agencies, where appropriate.

(B) Routing calls to States

To the extent practicable, State agencies may receive appropriate complaints from the systems established under subparagraph (A), if—

(i) the State agency system has the functional capacity to receive calls or electronic reports routed by the Bureau systems;

(ii) the State agency has satisfied any conditions of participation in the system that the Bureau may establish, including treatment of personally identifiable information and sharing of information on complaint resolution or related compliance procedures and resources; and

(iii) participation by the State agency includes measures necessary to provide for protection of personally identifiable information that conform to the standards for protection of the confidentiality of personally identifiable

A6

information and for data integrity and security that apply to the Federal agencies described in subparagraph (D).

(C) Reports to the Congress

The Director shall present an annual report to Congress not later than March 31 of each year on the complaints received by the Bureau in the prior year regarding consumer financial products and services. Such report shall include information and analysis about complaint numbers, complaint types, and, where applicable, information about resolution of complaints.

(D) Data sharing required

To facilitate preparation of the reports required under subparagraph (C), supervision and enforcement activities, and monitoring of the market for consumer financial products and services, the Bureau shall share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies, subject to the standards applicable to Federal agencies for protection of the confidentiality of personally identifiable information and for data security and integrity. The prudential regulators, the Federal Trade Commission, and other Federal agencies shall share data relating to consumer complaints regarding consumer financial products and services with the Bureau, subject to the standards applicable to Federal agencies for protection of confidentiality of personally identifiable information and for data security and integrity.

(c) Office of Fair Lending and Equal Opportunity

(1) Establishment

The Director shall establish within the Bureau the Office of Fair Lending and Equal Opportunity.

(2) Functions

The Office of Fair Lending and Equal Opportunity shall have such powers and duties as the Director may delegate to the Office, including—

(A) providing oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are

enforced by the Bureau, including the Equal Credit
Opportunity Act and the Home Mortgage Disclosure Act;
(B) coordinating fair lending efforts of the Bureau with other
Federal agencies and State regulators, as appropriate, to
promote consistent, efficient, and effective enforcement of
Federal fair lending laws;
(C) working with private industry, fair lending, civil rights,
consumer and community advocates on the promotion of fair
lending compliance and education; and
(D) providing annual reports to Congress on the efforts of the
Bureau to fulfill its fair lending mandate.
(3) Administration of Office
There is established the position of Assistant Director of the Bureau
for Fair Lending and Equal Opportunity, who—
(A) shall be appointed by the Director; and
(B) shall carry out such duties as the Director may delegate to
such Assistant Director.
(d) Office of Financial Education
(1) Establishment
The Director shall establish an Office of Financial Education, which
shall be responsible for developing and implementing initiatives
intended to educate and empower consumers to make better
informed financial decisions.
(2) Other duties
The Office of Financial Education shall develop and implement a
strategy to improve the financial literacy of consumers that includes
measurable goals and objectives, in consultation with the Financial
Literacy and Education Commission, consistent with the National
Strategy for Financial Literacy, through activities including providing
opportunities for consumers to access—
(A) financial counseling, including community-based financial
counseling, where practicable;
(B) information to assist with the evaluation of credit products
and the understanding of credit histories and scores;
(C) savings, borrowing, and other services found at mainstream
financial institutions;
(D) activities intended to—

A8

(i) prepare the consumer for educational expenses and the submission of financial aid applications, and other major purchases;

(ii) reduce debt; and

(iii) improve the financial situation of the consumer;

(E) assistance in developing long-term savings strategies; and

(F) wealth building and financial services during the preparation process to claim earned income tax credits and Federal benefits.

(3) Coordination

The Office of Financial Education shall coordinate with other units within the Bureau in carrying out its functions, including—

(A) working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and

(B) working with the research unit established by the Director to conduct research related to consumer financial education and counseling.

(4) Report

Not later than 24 months after the designated transfer date, and annually thereafter, the Director shall submit a report on its financial literacy activities and strategy to improve financial literacy of consumers to—

(A) the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(B) the Committee on Financial Services of the House of Representatives.

(5), (6) Omitted

(7) Study and report on financial literacy program

(A) In general

The Comptroller General of the United States shall conduct a study to identify—

(i) the feasibility of certification of persons providing the programs or performing the activities described in paragraph (2), including recognizing outstanding programs, and developing guidelines and resources for community-based practitioners, including—

(I) a potential certification process and standards for certification;

(II) appropriate certifying entities;

(III) resources required for funding such a process; and

(IV) a cost-benefit analysis of such certification;

(ii) technological resources intended to collect, analyze, evaluate, or promote financial literacy and counseling programs;

(iii) effective methods, tools, and strategies intended to educate and empower consumers about personal finance management; and

(iv) recommendations intended to encourage the development of programs that effectively improve financial education outcomes and empower consumers to make better informed financial decisions based on findings.

(B) Report

Not later than 1 year after July 21, 2010, the Comptroller General of the United States shall submit a report on the results of the study conducted under this paragraph to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives.

(e) Office of Service Member Affairs

(1) In general

The Director shall establish an Office of Service Member Affairs, which shall be responsible for developing and implementing initiatives for service members and their families intended to—

(A) educate and empower service members and their families to make better informed decisions regarding consumer financial products and services;

(B) coordinate with the unit of the Bureau established under subsection (b)(3), in order to monitor complaints by service members and their families and responses to those complaints by the Bureau or other appropriate Federal or State agency; and

A10

(C) coordinate efforts among Federal and State agencies, as appropriate, regarding consumer protection measures relating to consumer financial products and services offered to, or used by, service members and their families.

(2) Coordination

(A) Regional services

The Director is authorized to assign employees of the Bureau as may be deemed necessary to conduct the business of the Office of Service Member Affairs, including by establishing and maintaining the functions of the Office in regional offices of the Bureau located near military bases, military treatment facilities, or other similar military facilities.

(B) Agreements

The Director is authorized to enter into memoranda of understanding and similar agreements with the Department of Defense, including any branch or agency as authorized by the department, in order to carry out the business of the Office of Service Member Affairs.

(3) Definition

As used in this subsection, the term "service member" means any member of the United States Armed Forces and any member of the National Guard or Reserves.

(f) Timing

The Office of Fair Lending and Equal Opportunity, the Office of Financial Education, and the Office of Service Member Affairs shall each be established not later than 1 year after the designated transfer date.

(g) Office of Financial Protection for Older Americans

(1) Establishment

Before the end of the 180-day period beginning on the designated transfer date, the Director shall establish the Office of Financial Protection for Older Americans, the functions of which shall include activities designed to facilitate the financial literacy of individuals who have attained the age of 62 years or more (in this subsection, referred to as "seniors") on protection from unfair, deceptive, and abusive practices and on current and future financial choices, including through the dissemination of materials to seniors on such topics.

A11

(2) Assistant director

The Office of Financial Protection for Older Americans (in this subsection referred to as the "Office") shall be headed by an assistant director.

(3) Duties

The Office shall—

> (A) develop goals for programs that provide seniors financial literacy and counseling, including programs that—
>
>> (i) help seniors recognize warning signs of unfair, deceptive, or abusive practices, protect themselves from such practices;
>> (ii) provide one-on-one financial counseling on issues including long-term savings and later-life economic security; and
>> (iii) provide personal consumer credit advocacy to respond to consumer problems caused by unfair, deceptive, or abusive practices;
>
> (B) monitor certifications or designations of financial advisors who advise seniors and alert the Commission and State regulators of certifications or designations that are identified as unfair, deceptive, or abusive;
>
> (C) not later than 18 months after the date of the establishment of the Office, submit to Congress and the Commission any legislative and regulatory recommendations on the best practices for—
>
>> (i) disseminating information regarding the legitimacy of certifications of financial advisers who advise seniors;
>> (ii) methods in which a senior can identify the financial advisor most appropriate for the senior's needs; and
>> (iii) methods in which a senior can verify a financial advisor's credentials;
>
> (D) conduct research to identify best practices and effective methods, tools, technology and strategies to educate and counsel seniors about personal finance management with a focus on—
>
>> (i) protecting themselves from unfair, deceptive, and abusive practices;

A12

          (ii) long-term savings; and

          (iii) planning for retirement and long-term care;

(E) coordinate consumer protection efforts of seniors with other Federal agencies and State regulators, as appropriate, to promote consistent, effective, and efficient enforcement; and

(F) work with community organizations, non-profit organizations, and other entities that are involved with educating or assisting seniors (including the National Education and Resource Center on Women and Retirement Planning).

\* \* \*


## 12 U.S.C. § 5512. Rulemaking authority

\* \* \*

(b) Rulemaking, orders, and guidance

    (1) General authority

    The Director may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof.

\* \* \*


## 12 U.S.C. § 5535. Private Education Loan Ombudsman

(a) Establishment

The Secretary, in consultation with the Director, shall designate a Private Education Loan Ombudsman (in this section referred to as the "Ombudsman") within the Bureau, to provide timely assistance to borrowers of private education loans.

\* \* \*