No. 25-5091

# In the United States Court of Appeals
# for the District of Columbia Circuit

—————————

NATIONAL TREASURY EMPLOYEES UNION, *et al.*,
*Appellees*,
v.

RUSSELL T. VOUGHT, in his official capacity as Acting Director of the Consumer
Financial Protection Bureau, *et al.*,
*Appellants*.

—————————

## On Appeal from the United States District Court
## for the District of Columbia

—————————

## Brief *Amicus Curiae* of
## America's Future,
## Citizens United,
## Public Advocate of the United States, Public Advocate Foundation,
## U.S. Constitutional Rights Legal Defense Fund, and
## Conservative Legal Defense and Education Fund
## in Support of Appellants and Reversal

—————————

MICHAEL BOOS
  CITIZENS UNITED
  1006 Pennsylvania Ave. SE
  Washington, DC 20003

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA  24506

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180
  (703) 356-5070
  wjo@mindspring.com
*Counsel of Record
Attorneys for *Amici Curiae*
January 16, 2025

—————————

# CERTIFICATE AS TO
# PARTIES, RULINGS, AND RELATED CASES

## Parties and *Amici*

Except for the following, all parties, intervenors, and *amici curiae* appearing

before the district court below and this Court are listed in the briefs for the parties:

*Amici curiae* are America's Future, Citizens United, Public Advocate of the

United States, Public Advocate Foundation, U.S. Constitutional Rights Legal

Defense Fund, and Conservative Legal Defense and Education Fund.

## Ruling under Review

References to the ruling at issue appear in the Appellants' Brief filed

January 9, 2026.

## Related Cases

Counsel adopt and incorporate by reference parties' statements with respect

to related cases.

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* America's Future, Citizens United, Public Advocate of the

United States, Public Advocate Foundation, U.S. Constitutional Rights Legal

Defense Fund, and Conservative Legal Defense and Education Fund, through their

undersigned counsel, submit this Corporate Disclosure Statement pursuant to

Rules 26.1(b) and 29(c) of the Federal Rules of Appellate Procedure, and Rule

26.1 of the Rules of the United States Court of Appeals for the District of Columbia Circuit.

*Amici curiae* are non-stock, nonprofit corporations, which have no parent company, and no person or entity owns them or any part of them.

*Amici curiae* are represented herein by William J. Olson, counsel of record, and Jeremiah L. Morgan of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, VA 22180-5615; Michael Boos of Citizens United, 1006 Pennsylvania Ave. SE, Washington, DC 20003; and Rick Boyer of Integrity Law Firm, P.O. Box 10953, Lynchburg, VA 24506.

_____*/s/ William J. Olson*_____
William J. Olson

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES . . . . . . i

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

GLOSSARY OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT

I.  THE DISTRICT COURT MERELY ASSUMED THAT THE PRESIDENT'S
    REORGANIZATIONS AND REDUCTIONS IN FORCE WILL CAUSE
    AGENCIES TO VIOLATE CONGRESSIONALLY ASSIGNED DUTIES . . . . . . . . . . 9

II. THE DISTRICT COURT LACKED JURISDICTION TO REVIEW
    THE PLAINTIFFS' CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  The Employee Plaintiffs' Claims Can Only Be Reviewed under
        the Exclusive Remedial Framework of the CSRA . . . . . . . . . . . . . . 12

    B.  The Non-Employee Plaintiffs' Statutory Claims Are Foreclosed
        under the APA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.  Supreme Court Precedent Forecloses Plaintiffs' Attempt to
        Convert a Statutory Claim Into a Constitutional One . . . . . . . . . . . 15

III.   To Protect Employees from the Effects of Layoffs,
       the District Court Invents a "Gone-too-far" Test . . . . . . . . . . . . . 17

IV.    The Executive's Historical Authority to Conduct
       Reductions in Force and Reorganizations Is Well
       Established . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

**CONSTITUTION**
Article II, Section 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Article II, Section 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**STATUTES**
Civil Service Reform Act of 1978 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 17, 18

**REGULATIONS**
5 C.F.R. § 351.901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**CASES**
*AFGE v. Clinton*, 180 F.3d 727 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . 20
*Bennett v. Spear*, 520 U.S. 154 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14
*\*Dalton v. Specter*, 511 U.S. 462 (1994). . . . . . . . . . . . . . . . . . . . . . . . 4, 16, 17
*\*Franklin v. Massachusetts*, 505 U.S. 788 (1992). . . . . . . . . . . . . . . . . . . . . . . 13
*Harmon v. Brucker*, 355 U.S. 579 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*National Treasury Employees Union v. Reagan*, 663 F.2d 239 (D.C. Cir. 1981). 20
*\*Trump v. AFGE*, 145 S. Ct. 2635 (2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2
*\*Trump v. CASA, Inc*., 606 U.S. 831 (2025) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12
*United States v. Carolene Products Co.*, 304 U.S. 144 (1938) . . . . . . . . . . . . . . . 7

**MISCELLANEOUS**
"A Study of the Long-Term Effects of Federal Workforce Reduction in the
     1990s," *Coalition for Effective Change* (Mar. 2013) . . . . . . . . . . . . . . 19, 20
"Budget Basics: National Defense," *Peter G. Peterson Foundation* (Updated
     Sept. 9, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
"The Budget and Economic Outlook: 2025 to 2035 By the Numbers,"
     *Congressional Budget Office* (Jan. 2025) . . . . . . . . . . . . . . . . . . . . . . . . . 5
"Federal Personnel" *Congressional Budget Office* . . . . . . . . . . . . . . . . . . . . . . . 5
G. Henderson, "Reagan RIFs concentrated in Washington," *UPI*
     (Aug. 15, 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
T. Riccard, "Reductions in Force (RIFs): An Overview," *Congressional Research
     Service* (Feb. 13, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

\* Authorities upon which we chiefly rely are marked with asterisks.

F. Siddiqui, *et al.*, "Federal layoffs 'likely' if too few employees choose to quit, memo says," *Washington Post* (Feb. 5, 2025) . . . . . . . . . . . . . . . . . . 19

"Treasury Confirms $602 Billion Deficit in First Three Months of FY 2026," *Committee for a Responsible Federal Budget* (Jan. 13, 2026) . . . . . . . . . . 5

"US Federal Budget 2025: Spending, Revenue, and the $1.8 Trillion Deficit," *Economics Insider* (May 23, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

W. White, "If Something Cannot Go on Forever, it Will Stop," *Council on Economic Policies* (Apr. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

* Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY OF ABBREVIATIONS

APA        Administrative Procedure Act

CFPB       Consumer Financial Protection Bureau

CSRA       Civil Service Reform Act

MSPB      Merit Systems Protection Board

NTEU      National Treasury Employees Union

RIF         Reduction in Force

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* America's Future, Citizens United, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal income taxation under Section 501(c)(3) or Section 501(c)(4) of the Internal Revenue Code, which have filed hundreds of *amicus curiae* briefs in federal and state courts.

In an earlier frontal assault to the authority of the Trump Administration to conduct reductions in force ("RIFs"), some of these *amici* filed an *amicus* brief in the U.S. Supreme Court in *Trump v. American Federation of Government Employees*, No. 24A1174, Brief *Amicus Curiae* of America's Future, *et al.* (June 9, 2025), supporting the Government's Application for Stay of an injunction issued by the U.S. District Court for the Northern District of California which blocked the Trump Administration from conducting RIFs. On July 8, 2025, the Supreme Court stayed that injunction "[b]ecause the Government is likely to

---

[1] No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

succeed on its argument that the Executive Order and Memorandum are lawful." *Trump v. AFGE*, 145 S. Ct. 2635 (2025).

## STATEMENT OF THE CASE

On February 7, 2025, President Trump appointed Russell Vought as acting director of the Consumer Financial Protection Bureau ("CFPB"). *See Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1, 18 (D.D.C. 2025) ("*NTEU I*"). The following day, Vought sent an email to CFPB staff advising that there would be significant cutbacks in the staff of the CFPB and the scope of its regulatory mission. *Id.* On February 11, 2025, 85 probationary CFPB employees were terminated. *Id.* at 22. Two days later, another 130 CFPB employees were terminated. *Id.* at 24.

Meanwhile, on February 9, 2025, Plaintiffs filed this action, seeking to stop terminations of employees and the downsizing of the agency. *Id.* at 12. The Plaintiffs made a constitutional separation of powers claim, "alleg[ing] that the defendants' actions to dismantle and shut down the CFPB are unconstitutional because they exceed the executive's authority and usurp the legislature's authority." *NTEU I* at 40. They also made an Administrative Procedure Act ("APA") claim, alleging that Defendants had made a "decision to shut down the agency." *Id.* at 47.

On March 28, 2025, the district court issued a sweeping injunction against the CFPB and its acting director, Vought. In its injunction, the court asserted that "the defendants were fully engaged in a hurried effort to dismantle and disable the agency entirely." *Id.* at 11. Characterizing the first count alternatively as a constitutional claim and an *ultra vires* claim, the court found that "it is likely that plaintiffs [would] succeed on the merits" because "the defendants were in fact engaged in a concerted, expedited effort to shut the agency down." *Id.* at 58. The court also found that the Plaintiffs were likely to succeed on the merits of their APA claims, as "the APA claims alleg[ed] at least one discrete, final action taken in violation of law and without a rational basis to support it," a "stop work" order to CFPB employees on February 10, 2025. *Id.* at 77.

The court further found that the employee Plaintiffs had alleged irreparable injury due to some having been fired and others being threatened with firing, and that the advocacy organizations had alleged irreparable harm due to threatened loss of CFPB services. *Id.* at 78-81.

The district court then entered a detailed order supervising multiple aspects of CFPB operations. The court forbade the CFPB from firing any employees except for cause, ordered all terminated employees to be rehired, ordered Defendants to maintain a toll-free number for consumer complaints and to rescind

all prior orders terminating contracts, and forbade the agency from enforcing the February 10 "stop work" order. *Id.* at 85-86.

Soon thereafter, this Court issued a partial stay pending appeal. This Court permitted the CFPB to continue to order limited work stoppages and decline to rehire terminated employees — so long as the agency could continue to fulfill statutory responsibilities. *See En Banc* Brief for Appellants ("Aplt. Br.") at 11-12.

A divided panel of this Court vacated the preliminary injunction. On the APA claim, the panel ruled that the Plaintiffs "seek to set aside an abstract decision, inferred from a constellation of discrete actions," not a "final agency action" that is proper for APA review. *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 790 (D.C. Cir. 2025) ("*NTEU II*"). The panel also ruled that "'claims simply alleging that the President has exceeded his statutory authority are not "constitutional" claims' freely reviewable in equity." *Id.* at 792 (*quoting Dalton v. Specter*, 511 U.S. 462, 473 (1994)).

This Court then granted *en banc* review. *Nat'l Treasury Emps. Union v. Vought*, 2025 U.S. App. LEXIS 33453 (D.C. Cir. 2025).

**STATEMENT**

The Federal Budget for FY 2025 shows a deficit of $1.865 trillion, or 27 percent of federal spending.[2] Decades of profligate spending have created a federal debt exceeding $38.6 trillion which is growing by $6-8 billion per day or over $600 billion per quarter.[3] According to the Congressional Budget Office, the interest on the federal debt that will be paid in FY 2026 is $1 trillion[4] — more than the nation spends on defense.[5] The Federal Government currently has a civilian workforce of about 2.25 million.[6] If significant reductions in force and efficiencies are not implemented, and quickly, this nation will collapse under the

---

[2] "US Federal Budget 2025: Spending, Revenue, and the $1.8 Trillion Deficit," *Economics Insider* (May 23, 2025).

[3] *See* USDebtClock.org; "Treasury Confirms $602 Billion Deficit in First Three Months of FY 2026," *Committee for a Responsible Federal Budget* (Jan. 13, 2026).

[4] "The Budget and Economic Outlook: 2025 to 2035 By the Numbers," *Congressional Budget Office* (Jan. 2025).

[5] "Budget Basics: National Defense," *Peter G. Peterson Foundation* (updated Sept. 9, 2025).

[6] "Federal Personnel," *Congressional Budget Office*.

weight of debt.  As economist Herbert Stein wrote in the *Wall Street Journal*, if a thing "can't go on forever it will stop."[7]

There is much truth in another old saying as well:  "It's easier to fire a Supreme Court Justice than a federal employee."  But what must be done really must be done.  Plaintiffs seek to stop reductions in force only at one agency, but the precedent established here likely would affect many other federal employees as well.  There is no principle of law that federal employment guarantees a lifetime job which must be spared from any significant downsizing, but something close to such a principle has been fashioned by the district court.

The private sector understands that efficiencies can be obtained by downsizing.  Downsizing can save a company — or even a government — from bankruptcy.  Downsizing does not automatically and necessarily cripple operations, or every private business that has downsized would soon be out of business.  The risk to government operations from downsizing is even less serious, because federal workers have been almost immune from being fired, allowing the idle or inefficient to remain on the payroll, and many of these positions have

---

[7]  W. White, "If Something Cannot Go on Forever, it Will Stop," *Council on Economic Policies* (Apr. 2021).

become sinecures. This abuse of American taxpayers can no longer be left unaddressed.

## SUMMARY OF ARGUMENT

In issuing the injunction below, the district court engaged in speculation leading to usurpation of the President's power. In doing so, the district court undermined the Constitution's vesting and take care clauses, which provide: "The executive Power shall be vested in a President of the United States of America," and "he shall take Care that the Laws be faithfully executed...." Article II, Sections 1 and 3. Were this Court to permit this injunction to stay in place, it would countenance the misuse of federal judicial power to frustrate the policies this President was elected to implement. This would continue long enough to "run out the clock" until the next presidential election, hoping that the next President would preserve the historic status quo. While it did not use heightened judicial scrutiny, the district court treated federal workers who exercise vast power over Americans as though they were "discrete and insular minorities" without political power and needing the court's protection. *See generally United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938).

The federal judiciary is not empowered by the Constitution to function as a firewall to resist changes implemented by new Presidents. The current case is

particularly egregious for two reasons. First, the district court clearly acted *ultra vires*, as Congress denied initial jurisdiction over federal employee complaints to district courts when it committed such issues to separate review processes. Second, the district court never enumerated even a single congressionally imposed duty that would not be fulfilled if the CFPB were staffed with fewer employees.

The district court lacked jurisdiction to usurp the role of the Merit Systems Protection Board ("MSPB") under the exclusive remedial procedure of the Civil Service Reform Act ("CSRA") by hearing a challenge to a prospective workforce reduction and enjoining even its planning. Plaintiffs' APA claims cannot be adjudicated at this time, as there is no "final agency action" in existence to bring before this Court. Nor can the district court convert a statutory claim such as this into an "inherent constitutional claim." The district court does not have the authority to just assume that large-scale layoffs would make the CFPB unable to fulfill its congressionally assigned duties, which it identified as the central reason it was granting relief.

Government reductions in force date back to the Civil War. Presidents Reagan and Clinton made significant cuts in the federal workforce without judicial intervention. The district court appears to hold that the power the President normally would enjoy to reduce the federal workforce should be curtailed here

because he has, in essence, "gone too far." There is no support for such a proposition, especially since the district court could not make findings that congressionally delegated responsibilities could not be carried out by fewer workers.

## ARGUMENT

### I. THE DISTRICT COURT MERELY ASSUMED THAT THE PRESIDENT'S REORGANIZATIONS AND REDUCTIONS IN FORCE WILL CAUSE AGENCIES TO VIOLATE CONGRESSIONALLY ASSIGNED DUTIES.

Without reliance on any real authority, the district court **assumed** that the President had no authority to make any large-scale reorganizations or large-scale reductions in the federal workforce without specific congressional authorization because the agencies *ipse dixit* then would be unable to carry out their duties.

Contrary to Plaintiffs' claims, the district court concluded that Director Vought's direction to the agency was not in fact to shut down, but rather that on February 8, 2025, Vought emailed CFPB staff that "effective immediately, **unless** expressly approved by the Acting Director or **required by law**, all employees, contractors, and other personnel of the Bureau shall," *inter alia*, "Not approve or issue any proposed or final rules or formal or informal guidance.... Not commence, take additional investigative activities related to, or settle enforcement

actions.... Not open any new investigation in any manner, and cease any pending investigations.... Cease all supervision and examination activity." *NTEU I* at 18 (emphasis added). Two days later, Vought added in an additional email, "the Bureau's DC headquarters building is closed this week. Employees should not come into the office. Please do not perform any work tasks. If there are any **urgent matters**, please alert me through Mark Paoletta, Chief Legal Officer, to get approval in writing before performing any work task.... Otherwise, employees should stand down from performing any work task." *Id.* at 20 (emphasis added).

Then, on March 2, before the district court's injunction, CFPB chief operating officer Adam Martinez emailed agency staff, "On behalf of Acting Director Vought, I am writing to you **to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email**." *Id.* at 35 (emphasis added).

None of these emails stated that the agency would be shut down. The first made clear that staff could perform tasks "as required by law," the second permitted such "urgent matters" to continue, and the third followed up on the first to ensure that statutorily mandated tasks were being completed. The plain reading of these combined emails is that the CFPB was to limit itself to performing only statutorily required work. Nonetheless, the Court seized on statements from

President Trump and Elon Musk calling for the eventual shutdown of the agency, and decided on the basis of those comments to proceed as though Vought or someone else in the CFPB had in fact ordered the agency shut down, though no one in the agency did. The panel avoided the district court's hyperbole, instead noting correctly that Defendants sought to "substantially downsize the agency." *NTEU II* at 770.

The district court merely **asserts** that, if a reorganization or a reduction in force is too significant, the agencies will not be able to follow Congress's mandates, and those mandates will be disregarded. For a district court to make such bald assertions, which are better described as assumptions or accusations, without evidence, is highly improper, and certainly provides no basis for injunctive relief.

The district court enthusiastically assumed the authority to "determine if the executive branch is abiding by the terms of legislative enactments," because "our system of government is founded on the rule of law." *NTEU I* at 39. But the court "decries an imperial Executive while embracing an imperial Judiciary." *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025). Indeed, "[n]o one disputes that the Executive has a duty to follow the law. But the Judiciary does not have unbridled

authority to enforce this obligation — in fact, sometimes the law prohibits the

Judiciary from doing so." *Id.* Such is the case here.

## II.   THE DISTRICT COURT LACKED JURISDICTION TO REVIEW THE PLAINTIFFS' CLAIMS.

### A.   The Employee Plaintiffs' Claims Can Only Be Reviewed under the Exclusive Remedial Framework of the CSRA.

The district court apparently believed that the specialized statutory systems

established by Congress are not up to the task, and that if the administration

proposes RIFs that are "too large," the courts magically acquire the authority to

step in despite Congress having established a clear statutory framework for

judicial review.

The Civil Service Reform Act of 1978 "permits federal employees to seek

review of adverse personnel actions in the Merit Systems Protection Board which

may grant relief including reinstatement, backpay, and attorney's fees. *See* 5

U.S.C. §§ 7701(a), 1204(a)(2), 7701(g); 5 C.F.R. § 351.901." *NTEU II* at 775. As

the panel in this Court correctly noted, "MSPB decisions in turn are reviewable in

the Federal Circuit," not district courts. *Id.*

Specifically, according to 5 C.F.R. § 351.901, employees who have been

furloughed, separated, or demoted by a RIF may appeal to the MSPB. It is

impossible to view the CSRA, establishing specialized procedures for resolving

federal personnel disputes, and providing for a right of appeal to the Federal

Circuit, to be anything but a withdrawal of authority from district courts to resolve

these same disputes.  Thus, as the panel found, the district court had no

jurisdiction to consider the employees' claims.

**B.     The Non-Employee Plaintiffs' Statutory Claims Are Foreclosed under the APA.**

The words of a President, and even an executive order by a President,

cannot constitute a "final agency action" that permits APA review.  The Supreme

Court has made this crystal clear.  Where "the final action complained of is that of

the President," because "the President is not an agency within the meaning of the

Act" there is "no final agency action that may be reviewed under the APA

standards." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Accordingly,

the district court had no "inherent constitutional authority" to review what is at

bottom a statutory APA challenge.

The APA's requirement that there be a "final agency action" before judicial

review may be triggered bars the claims of the non-employee Plaintiffs at this

juncture.  The Supreme Court has explained that the APA "final agency action"

requirement contains two elements.

As a general matter, two conditions must be satisfied for
agency action to be "final":  First, the action must mark the

> "consummation" of the agency's decisionmaking process ... it must
> not be of a merely tentative or interlocutory nature. And second, the
> action must be one by which "rights or obligations have been
> determined," or from which "legal consequences will flow." [*Bennett
> v. Spear*, 520 U.S. 154, 177-78 (1997).]

The district court essentially admitted that its invocation of "final agency action" was a legal fiction under the facts of this case. "[E]ven if the February 10 work stoppage order **does not satisfy the requirements of a 'final order**,'" the APA claims in Counts Three and Four **can be construed** as challenging a final, concrete decision to shut down the agency entirely." *NTEU I* at 47 (emphasis added).

But the Supreme Court in *Bennett* was clear. A couple of emails from a department head slowing (but not terminating) the work of the agency are not a final action. Indeed, on March 2, 2025, before the district court's injunction, CFPB chief operating officer Adam Martinez emailed agency staff, "On behalf of Acting Director Vought, I am writing to you **to ensure that everyone is carrying out any statutorily required work, as he set forth in his February 8th email**." *NTEU I* at 35 (emphasis added). Despite the court's scornful dismissal of the March 2 email as "a charade for the Court's benefit" (*id.* at 11), the email simply reiterated the instruction in Vought's initial February 8 email that statutorily required work should continue. Any comments in the interim by non-CFPB actors

endorsing the shutdown of the agency are undercut by the March 2 reiteration of Vought's February 8 instruction. There is nothing in the facts conceded by the district court that can be "construed" as a final agency action to shut itself down. Thus, the panel found:

> the plaintiffs seek to challenge what they describe as a single, overarching decision to shut down the CFPB, which they infer from the various discrete actions noted above. To remedy that asserted decision, they seek pervasive judicial control over the day-to-day management of the agency.... Furthermore, the plaintiffs urge all this despite the lack of any causal connection between many of the specific agency actions alleged to comprise the shutdown... [T]his challenge is not viable. It cannot be brought under the APA because that statute provides a cause of action to challenge discrete, final agency action, which the claims here do not target. [*NTEU II* at 777.]

Thus, in its rush to confront what it viewed as "*ultra vires*" action by the CFPB, the district court itself acted *ultra vires* in derailing the Trump Administration's effort to reduce federal workforce expenses and increase government efficiency.

### C. Supreme Court Precedent Forecloses Plaintiffs' Attempt to Convert a Statutory Claim into a Constitutional One.

The district court did not stop at ignoring the fact that the APA provides no judicial review in the absence of a final agency action. The court also attempted to evade the APA's strictures by accepting the Plaintiffs' invitation to recast its challenge as a "constitutional" separation of powers issue. The court claimed that

"the court's power to enjoin unconstitutional acts by the government ... is inherent in the Constitution itself." *NTEU I* at 40.

But the Supreme Court has rejected the idea that the courts have a freestanding equitable power to convert statutory questions into constitutional ones. The Court has rejected "the proposition that an action taken by the President in excess of his statutory authority necessarily violates the Constitution.... [C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Dalton v. Specter* at 473. Nor did the *Dalton* Court break any new ground:

> In *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 691, n. 11 ... (1949), for example, we held that sovereign immunity would not shield an executive officer from suit if the officer acted either "unconstitutionally *or* beyond his statutory powers." (Emphasis added.) If all executive actions in excess of statutory authority were ipso facto unconstitutional, as the Court of Appeals seemed to believe, there would have been little need in *Larson* for our **specifying unconstitutional and ultra vires conduct as separate categories**. [*Dalton* at 472 (emphasis added).]

The Supreme Court repeated the theme again in 1958: "In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' **nonconstitutional claim** that respondent acted **in excess of powers granted him by Congress**." *Harmon v. Brucker*, 355 U.S. 579, 581 (1958) (emphasis added). Thus, the *Dalton* Court

reiterated the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other...." *Dalton* at 474.

Thus, the panel of this Court quite properly ruled that "[t]his supposed separation-of-powers violation turns entirely on whether CFPB officials violated the governing statutes," and it must be reviewed under the APA and CSRA, rather than be converted into a freestanding "constitutional" claim. *NTEU II* at 793.

## III. TO PROTECT EMPLOYEES FROM THE EFFECTS OF LAYOFFS, THE DISTRICT COURT INVENTS A "GONE-TOO-FAR" TEST.

One does not have to read far into the district court's opinion to understand that its real objection to the President's Executive Order, and the efforts by the Office of Management and Budget and Office of Personnel Management to implement it, is that it fundamentally disagrees with the policy.

While conceding that Defendants in fact continued forward with plans to award contracts to accomplish statutorily mandated tasks, the district court disparaged the agency for being too stingy with its expenditures:

> [W]hen the agency solicited information about contracts that needed to be revived to fulfill statutory directives, those communications were not particularly inviting. Employees were admonished that the agency was taking a "very narrow approach," and that "if you're providing justifications, please be prepared to defend those to external parties." ... ("In general we are very narrowly turning back

contracts (or portions of contracts) that directly support statutory
requirements ... Specifically can you outline for each contract what
(statutorily required) action will not be able to be accomplished at all
without the contract?  I can't stress enough that this needs to be as
specific as possible.  We'll need to be prepared to have someone on
the team defend this justification to external parties.  All PCards
across the bureau have been cancelled.  We've been authorized to
reopen one for the entire bureau with a very limited limit so we are
triaging the requests as they come in."). [*NTEU I* at 65-66.]

The district court denounced the department's conservative approach with
new contracts as "chilling."  *Id.* at 66.  Not content with the agency's maintaining
contracts for statutorily required obligations, the district court complained,
"[m]eanwhile, the effort to identify additional contracts to cancel remained
underway."  *Id.*

By its reasoning, the district court implicitly concedes that some level of
force reductions might be permissible, but that President Trump's "large-scale"
cuts simply have gone too far.  For its application of what could be described as a
"gone-too-far" test, or how this test evades standard procedures for judicial review
under the APA and CSRA, no authority has been provided.

## IV.  THE EXECUTIVE'S HISTORICAL AUTHORITY TO CONDUCT REDUCTIONS IN FORCE AND REORGANIZATIONS IS WELL ESTABLISHED.

Although Congress has established rules to follow, the Executive Branch's authority to hire employees carries with it the concurrent power to fire people, including through reductions in force.  "Congress has expressly recognized agencies' authority to implement RIFs since shortly after the Civil War...."[8]

Previous RIFs by previous Presidents passed without any apparent concern by the courts.  *Id*. at 9-11.  President Reagan's RIFs downsized 33,000 federal workers in his first term alone.[9]  "[D]uring the Reagan administration ... more than 800 of 11,500 [General Services Administration] employees received reduction-in-force notices."[10]  During Reagan's administration, "reductions led to a 7.2 percent cut to non-defense personnel."[11]  President Clinton called for "reinventing government."  Under Clinton's "National Performance Review

---

[8]  Defendant's Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause, Dkt. 60, at 40 (May 7, 2025), *AFGE v. Trump*, N.D. Cal. No. 3:25-cv-03698.

[9]  G. Henderson, "Reagan RIFs concentrated in Washington," *UPI* (Aug. 15, 1985).

[10]  F. Siddiqui, *et al.*, "Federal layoffs 'likely' if too few employees choose to quit, memo says," *Washington Post* (Feb. 5, 2025).

[11]  "A Study of the Long-Term Effects of Federal Workforce Reduction in the 1990s" at 1-2, *Coalition for Effective Change* (Mar. 2013).

(NPR) ... between 1993 and 1998, the federal workforce shrank 15.4 percent." *Id.*

at 1. The Congressional Research Service recently noted that agencies have had

"discretion to determine if a RIF is necessary, the number and types of positions

needed to be abolished, and the timing of when a RIF occurs."[12]

This Court upheld President Reagan's 1981 hiring freeze against a

challenge by employee unions. There, this Court noted that "the President did not

attempt to rescind the appointment authority of the department heads. Instead, he

directed the relevant appointing authorities to implement the freeze and issued

'instructions' for them to follow." *National Treasury Employees Union v.*

*Reagan*, 663 F.2d 239, 250 (D.C. Cir. 1981). In President Clinton's case, suit was

filed by AFGE alleging that a Clinton RIF had improperly transferred jobs to a

private contractor to allow for the plaintiffs' termination as federal employees.

The Sixth Circuit dismissed the case on standing grounds. *AFGE v. Clinton*, 180

F.3d 727 (6th Cir. 1999). In contrast to the CFPB's reductions, the Reagan and

Clinton RIFs occurred largely without judicial interference.

---

[12] T. Riccard, "Reductions in Force (RIFs): An Overview" at 1, *Congressional Research Service* (Feb. 13, 2025).

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the district court.

Respectfully submitted,

/s/ William J. Olson

MICHAEL BOOS
  CITIZENS UNITED
  1006 Pennsylvania Ave., SE
  Washington, DC  20003

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA  24506

January 16, 2026

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
  wjo@mindspring.com
*Counsel of Record
Attorneys for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

IT IS HEREBY CERTIFIED:

1. That the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Appellants and Reversal complies with the type-volume limitation of Rule 29(a)(5), Federal Rules of Appellate Procedure, because this brief contains 4,356 words, excluding the parts of the brief exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 18.0.0.200 in 14-point Times New Roman.

*/s/ William J. Olson*

_____
William J. Olson
Counsel for *Amici Curiae*

Dated: January 16, 2026

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Appellants and Reversal, was made, this 16th day of January 2026, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*

_____

William J. Olson
Counsel for *Amici Curiae*