**ORAL ARGUMENT SCHEDULED FEBRUARY 24, 2026**
**No. 25-5091**

# In the United States Court of Appeals for the District of Columbia Circuit

―――――――――――

NATIONAL TREASURY EMPLOYEES UNION, et al.,
*Plaintiffs-Appellees,*

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.,
*Defendants-Appellants.*

―――――――――――

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-cv-0381-ABJ (The Hon. Amy Berman Jackson)

―――――――――――

## EN BANC BRIEF OF PLAINTIFFS-APPELLEES

―――――――――――

DEEPAK GUPTA
ROBERT FRIEDMAN
STEFANIE OSTROWSKI
GUPTA WESSLER LLP
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street, Suite 629
San Francisco, CA 94104
(415) 573-0336
*jennifer@guptawessler.com*

PARAS N. SHAH
*General Counsel*
ALLISON C. GILES
*Associate General Counsel*
NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

February 2, 2026                    *Counsel for Plaintiffs-Appellees*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## (A) Parties and Amici

National Treasury Employees Union – Plaintiff-Appellee

National Consumer Law Center – Plaintiff-Appellee

National Association for the Advancement of Colored People – Plaintiff-Appellee

Virginia Poverty Law Center – Plaintiff-Appellee

CFPB Employee Association – Plaintiff-Appellee

Ted Steege – Plaintiff-Appellee

Eva Steege – Plaintiff, terminated on March 28, 2025, upon suggestion of death (Dkt. 83) and grant of motion for substitution (Dkt. 85

Russell T. Vought, in his official capacity as Acting Director of the Consumer Financial Protection Bureau – Defendant-Appellant

Consumer Financial Protection Bureau – Defendant-Appellant

Current and Former Members of Congress: Sen. Elizabeth Warren, Rep. Maxine Waters, Sen. Charles E. Schumer, Rep. Hakeem Jeffries, Sen. Richard J. Durbin, Sen. Amy Klobuchar, Sen. Cory Booker, Sen. Mark Warner, Sen. Bernard Sanders, Sen. Tammy Baldwin, Sen. Catherine Cortez Masto, Sen. Brian Schatz, Sen. Christopher Murphy, Sen. Angela Alsobrooks, Sen. Michael Bennet, Sen. Richard Blumenthal, Sen. Lisa Blunt Rochester, Sen. Maria Cantwell, Sen. Chris Coons, Sen. Tammy Duckworth, Sen. John Fetterman, Sen. Ruben Gallego, Sen. Kirsten Gillibrand, Sen. Maggie Hassan, Sen. Martin Heinrich, Sen. John Hickenlooper, Sen. Mazie Hirono, Sen. Tim Kaine, Sen. Mark Kelly, Sen. Andy Kim, Sen. Ben Ray Luján, Sen. Ed Markey, Sen. Jeffrey A. Merkley, Sen. Patty Murray, Sen. Jon Ossoff, Sen. Alex Padilla, Sen. Gary C. Peters, Sen. Jack Reed, Sen. Jacky Rosen, Sen. Adam B. Schiff, Sen. Jeanne Shaheen, Sen. Elissa Slotkin, Sen. Tina Smith, Sen. Chris Van Hollen, Sen. Raphael Warnock, Sen. Peter Welch, Sen. Sheldon Whitehouse, Sen. Ron Wyden, Rep. Katherine Clark, Rep. Pete Aguilar, Rep. Ted Lieu, Rep. Joe Neguse, Rep. Alma S. Adams, PhD, Rep. Gabe Amo, Rep. Yassamin Ansari, Rep. Jake Auchincloss, Rep. Becca Balint, Rep. Nanette Diaz Barragán, Rep. Joyce Beatty, Rep. Wesley Bell, Rep. Ami Bera, Rep. Donald Beyer, Rep.

Sanford Bishop, Rep. Suzanne Bonamici, Rep. Brendan F. Boyle, Rep. Shontel Brown, Rep. Julia Brownley, Rep. Nikki Budzinski, Rep. Janelle Bynum, Rep. Andre Carson, Rep. Troy A. Carter, Sr., Rep. Ed Case, Rep. Sean Casten, Rep. Kathy Castor, Rep. Joaquin Castro, Rep. Sheila Cherfilus-McCormick, Rep. Judy Chu, Rep. Gilbert R. Cisneros, Jr., Rep. Yvette Clarke, Rep. Emanuel Cleaver, II, Rep. James Clyburn, Rep. Steve Cohen, Rep. Herb Conaway, Jr., MD, Rep. Gerald E. Connolly, Rep. J. Luis Correa, Rep. Joe Courtney, Rep. Angie Craig, Rep. Jasmine Crockett, Rep. Jason Crow, Rep. Danny K. Davis, Rep. Madeleine Dean, Rep. Diana DeGette, Rep. Rosa L. DeLauro, Rep. Suzan K. DelBene, Rep. Chris Deluzio, Rep. Mark DeSaulnier, Rep. Maxine Dexter, Rep. Debbie Dingell, Rep. Lloyd Doggett, Rep. Sarah Elfreth, Rep. Veronica Escobar, Rep. Adriano Espaillat, Rep. Dwight Evans, Rep. Cleo Fields, Rep. Shomari Figures, Rep. Lizzie Fletcher, Rep. Bill Foster, Rep. Valerie Foushee, Rep. Lois Frankel, Rep, Laura Friedman, Rep. Maxwell Alejandro Frost, Rep. John Garamendi, Rep. Jesús G. "Chuy" García, Rep. Robert Garcia, Rep. Sylvia Garcia, Rep. Daniel Goldman, Rep. Jimmy Gomez, Rep. Vicente Gonzalez, Rep. Maggie Goodlander, Rep. Josh Gottheimer, Rep. Al Green, Rep. Jahana Hayes, Rep. James Himes, Rep. Steven Horsford, Rep. Chrissy Houlahan, Rep. Steny Hoyer, Rep. Jared Huffman, Rep. Glenn F. Ivey, Rep. Jonathan L. Jackson, Rep. Sara Jacobs, Rep. Pramila Jayapal, Rep. Henry C. ("Hank") Johnson, Jr., Rep. Julie Johnson, Rep. Marcy Kaptur, Rep. William Keating, Rep. Robin L. Kelly, Rep. Timothy M. Kennedy, Rep. Ro Khanna, Rep. Raja Krishnamoorthi, Rep. Greg Landsman, Rep. John B. Larson, Rep. George Latimer, Rep. Summer Lee, Rep. Susie Lee, Rep. Teresa Leger Fernandez, Rep. Mike Levin, Rep. Sam T. Liccardo, Rep. Zoe Lofgren, Rep. Stephen F. Lynch, Rep. Seth Magaziner, Rep. John Mannion, Rep. Doris Matsui, Rep. Sarah McBride, Rep. April McClain Delaney, Rep. Jennifer L. McClellan, Rep. Betty McCollum, Rep. Kristen McDonald Rivet, Rep. Morgan McGarvey, Rep. James P. McGovern, Rep. LaMonica McIver, Rep. Gregory W. Meeks, Rep. Robert J. Menendez, Rep. Grace Meng, Rep. Kweisi Mfume, Rep. Dave Min, Rep. Gwen Moore, Rep. Joseph Morelle, Rep. Kelly Morrison, Rep. Jared Moskowitz, Rep. Seth Moulton, Rep. Frank Mrvan, Rep. Kevin Mullin, Rep. Jerrold Nadler, Rep. Richard Neal, Rep. Donald Norcross, Rep. Eleanor Holmes Norton, Rep. Alexandria Ocasio-Cortez, Rep. Ilhan Omar, Rep. Nancy Pelosi, Rep. Scott Peters, Rep. Brittany Pettersen, Rep. Chellie Pingree, Rep. Mark Pocan, Rep. Nellie Pou, Rep. Ayanna Pressley, Rep. Mike Quigley, Rep. Delia C. Ramirez, Rep. Emily Randall, Rep. Jamie Raskin, Rep. Luz Rivas, Rep. Deborah K. Ross, Rep. Andrea Salinas, Rep. Linda Sanchez, Rep. Mary Gay Scanlon, Rep. Jan Schakowsky, Rep. Bradley Schneider, Rep. David Scott, Rep. Robert C. "Bobby" Scott, Rep. Terri Sewell, Rep. Brad Sherman, Rep. Mikie Sherrill, Rep. Adam Smith, Rep. Melanie Stansbury, Rep. Greg Stanton, Rep. Haley Stevens, Rep. Marilyn Strickland, Rep.

Suhas Subramanyam, Rep. Tom Suozzi, Rep. Eric Swawell, Rep. Emilia Sykes, Rep. Mark Takano, Rep. Shri Thanedar, Rep. Bennie G. Thompson, Rep. Mike Thompson, Rep. Rashida Tlaib, Rep. Jill Tokuda, Rep. Paul D. Tonko, Rep. Norma J. Torres, Rep. Ritchie Torres, Rep. Lori Trahan, Rep. Derek T. Tran, Rep. Juan Vargas, Rep. Nydia M. Velázquez, Rep. Eugene Vindman, Rep. Debbie Wasserman Schultz, Rep. Bonnie Watson Coleman, Rep. Nikema Williams, Rep. Frederica S. Wilson, Sen. Chris Dodd, Rep. Barney Frank, Rep. Melvin Watt, Rep. Paul E. Kanjorski, and Rep. Brad Miller – Amicus curiae

Former Consumer Financial Protection Bureau Officials: Ron Borzekowski, Patrick Campbell, Stacy Canan, Edwin Chow, Richa Dasgupta, David DuBois, Katherine Gillespie, Gail Hillebrand, Christine Ladd, Richard Lepley, Mary McLeod, Mike Pierce, Paul Sanford, David Silberman, Peggy Twohig, Stephen Van Meter – Amicus curiae

New York New Jersey, District of Columbia, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin – Amici curiae

Alaska Public Interest Research Group – Amicus curiae

Americans for Financial Reform Education Fund – Amicus curiae

Arkansans Against Abusive Payday Lending – Amicus curiae

Arkansas Community Organizations – Amicus curiae

CASA of Oregon – Amicus curiae

Center for Consumer Law and Economic Justice – Amicus curiae

Center for Economic Integrity – Amicus curiae

Center for Elder Law and Justice – Amicus curiae

Center for LGBTQ Economic Advancement & Research – Amicus curiae

Center for Responsible Lending – Amicus curiae

Connecticut Citizen Action Group – Amicus curiae

Consumer Action – Amicus curiae

Consumer Federation of America – Amicus curiae

Communications Workers of America, Local 1081 – Amicus curiae

Fordham University School of Law, Feerick Center for Social Justice – Amicus curiae

Georgia Watch – Amicus curiae

Legal Action Chicago – Amicus curiae

Legal Assistance for Seniors – Amicus curiae

Legal Counsel for the Elderly, Inc. – Amicus curiae

Mid-Minnesota Legal Assistance, Inc. – Amicus curiae

Minority Veterans of America – Amicus curiae

Mobilization for Justice – Amicus curiae

Mountain State Justice – Amicus curiae

National Association of Consumer Advocates – Amicus curiae

National Fair Housing Alliance – Amicus curiae

New Jersey Appleseed Public Interest Law Center – Amicus curiae

New York Legal Assistance Group – Amicus curiae

NextGen Policy – Amicus curiae

Oregon Consumer Justice – Amicus curiae

People Power United – Amicus curiae

Prosperity Works – Amicus curiae

Public Counsel – Amicus curiae

Public Justice Center – Amicus curiae

Queens Volunteer Lawyers Project, Inc. – Amicus curiae

Rise Economy – Amicus curiae

Student Borrower Protection Center – Amicus curiae

Texas Appleseed – Amicus curiae

Tzedek DC – Amicus curiae

Virginia Citizens Consumer Counsel – Amicus curiae

Western New York Law Center – Amicus curiae

Woodstock Institute – Amicus curiae

CASH Campaign of Maryland – Amicus curiae

Center for Digital Democracy – Amicus curiae

Community Economic Empowerment Network – Amicus curiae

Constitutional Accountability Center – Amicus curiae

Consumer Advocates Against Reverse Mortgage Abuse – Amicus curiae

Consumers for Auto Reliability and Safety – Amicus curiae

DannLaw – Amicus curiae

Legal Aid DC – Amicus curiae

New Economy Project – Amicus curiae

New Jersey Citizen Action – Amicus curiae

Project GREEN – Amicus curiae

Prosperity Indiana – Amicus curiae

Protect Borrowers – Amicus curiae

Texas A & M School of Law - Family & Veterans Advocacy Clinic – Amicus curiae

America's Future – Movant-Amicus Curiae

Public Advocate of the United States – Movant-Amicus Curiae

Public Advocate Foundation – Movant-Amicus Curiae

U.S. Constitutional Rights Legal Defense Fund – Movant-Amicus Curiae

Conservative Legal Defense and Education Fund – Movant-Amicus Curiae

**(B) Rulings Under Review**

03/28/2025 Memorandum Opinion (Judge Amy Berman Jackson) – Dkt. 87.

03/28/2025 Order (Judge Amy Berman Jackson) – Dkt. 88.

**(C) Related Cases**

This case was before the district court as case No. 1:25-cv-00381-ABJ.

February 2, 2026                                   Respectfully submitted,
                                                   */s/ Jennifer D. Bennett*
                                                   JENNIFER D. BENNETT
                                                       *Counsel of record*
                                                   GUPTA WESSLER LLP
                                                   235 Montgomery Street, Suite 629
                                                   San Francisco, CA 94104

(415) 573-0336
*jennifer@guptawessler.com*

# TABLE OF CONTENTS

Certificate as to parties, rulings, and related cases.....................................i

Table of contents ..................................................................... viii

Table of authorities.................................................................... ix

Glossary ............................................................................... xv

Introduction ........................................................................... 1

Pertinent statutes...................................................................... 4

Statement .............................................................................. 4

Summary of argument ................................................................... 14

Argument .............................................................................. 19

    I.    The plaintiffs are likely to succeed on the merits ............................... 19

        A.    The district court did not clearly err in finding that the defendants decided to shut down the agency............................ 19

        B.    Federal courts have the power to review the decision to shut down an agency.................................................24

        C.    The plaintiffs are likely to succeed in establishing jurisdiction................................................................38

    II.    The remaining factors support an injunction.....................................46

    III.    The preliminary injunction was properly tailored to preserve the status quo during the pendency of the litigation ..........................49

Conclusion ...........................................................................54

# TABLE OF AUTHORITIES

## Cases

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,*
     789 F.2d 931 (D.C. Cir. 1986) ................................................................ 41

*Alpine Securities Corp. v. FINRA,*
     121 F.4th 1314 (D.C. Cir. 2024) .............................................................. 44

*American Anti-Vivisection Society v. USDA,*
     946 F.3d 615 (D.C. Cir. 2020) ................................................................ 41

*Armstrong v. Exceptional Child Center,*
     575 U.S. 320 (2015) ............................................................................... 24

*Awad v. Obama,*
     608 F.3d 1 (D.C. Cir. 2010) ............................................................... 19, 23

*Axon Enterprise v. FTC,*
     598 U.S. 175 (2023) ....................................................................... 18, 44-46

*Barnhart v. Devine,*
     771 F.2d 1515 (D.C. Cir. 1985) .............................................................. 44

*Bhd. of Locomotive Engineers & Trainmen v. Federal Railroad Administration,*
     972 F.3d 83 (D.C. Cir. 2020) ................................................................. 29

*Biden v. Texas,*
     597 U.S. 785 (2022) ............................................................ 29-30, 35-37

*Califano v. Yamasaki,*
     442 U.S. 682 (1979) ............................................................................... 51

*Chemical Weapons Working Group, Inc. v. U.S. Department of the Army,*
     111 F.3d 1485 (10th Cir. 1997) .............................................................. 31

*Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson,*
     475 U.S. 292 (1986) ............................................................................... 50

*Ciba-Geigy Corp. v. EPA,*
     801 F.2d 430 (D.C. Cir. 1986) ............................................................... 29

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ................................................................. 23

*City of Dania Beach v. FAA,*
  485 F.3d 1181 (D.C. Cir. 2007) ............................................. 35

*Collins v. Yellin,*
  594 U.S. 220 (2021) ......................................................... 24, 38

*Cuddy v. Carmen,*
  762 F.2d 119 (D.C. Cir. 1985) .............................................. 19

*Dalton v. Specter,*
  511 U.S. 462 (1994) ......................................................... 25, 26

*Department of Commerce v. New York,*
  588 U.S. 752 (2019) ............................................................... 23

*Department of Homeland Security v. Regents,*
  591 U.S. 1 (2020) ............................................................ 29, 37

*English v. Town of Huntington,*
  448 F.2d 319 (2d Cir. 1971) .................................................. 50

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024) ............................................................... 42

*Federal Election Commission v. Akins,*
  524 U.S. 11 (1998) ........................................................... 41, 43

*Free Enterprise Fund v. Public Co. Accounting Oversight Board,*
  561 U.S. 477 (2010) ................................................ 24, 25, 38, 40

*Fund for Animals, Inc. v. U.S. Bureau of Land Management,*
  460 F.3d 13 (D.C. Cir. 2006) ................................................. 31

*Global Health Council v. Trump,*
  153 F.4th 1 (D.C. Cir. 2025) ................................................. 27

*Harris v. Bessent,*
  160 F.4th 1235 (D.C. Cir. 2025) ............................................ 46

x

*Helvering v. Oregon Mutual Life Insurance Co.*,
    311 U.S. 267 (1940) ................................................................. 25

*Hispanic Affairs Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) ................................................. 29

*Hubbard v. EPA*,
    809 F.2d 1 (D.C. Cir. 1986) ..................................................... 24

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ................................................. 49

*J.D. v. Azar*,
    925 F.3d 1291 (D.C. Cir. 2019) ............................................... 51

*Johnson v. Radford*,
    449 F.2d 115 (5th Cir. 1971) ................................................... 49

*Kingman Park Civic Association v. Bowser*,
    815 F.3d 36 (D.C. Cir. 2016) ................................................... 40

*Lackey v. Stinnie*,
    604 U.S. 192 (2025) ............................................................... 50

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................... 40, 47, 48

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ............................................................... 32

*M'Culloch v. Maryland*,
    17 U.S. 316 (1819) ................................................................. 25

*McComb v. Jacksonville Paper Co.*,
    336 U.S. 187 (1949) ........................................................... 50, 54

*Mountain States Legal Foundation v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ................................................. 38

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................. 25

*National Association of Home Builders v. U.S. Army Corps of Engineers,*
417 F.3d 1272 (D.C. Cir. 2005) ............................................................... 33, 37

*National Association of Immigration Judges v. Owen,*
139 F.4th 293 (4th Cir. 2025) ................................................................... 46

*National Environment Developmental Association's Clean Air Project v. EPA,*
752 F.3d 999 (D.C. Cir. 2014) ................................................................ 35, 36

*Nebraska v. Biden,*
52 F.4th 1044 (8th Cir. 2022) ................................................................. 50, 51

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) ................................................................................... 48

*North Carolina v. Covington,*
581 U.S. 486 (2017) ................................................................................... 50

*Norton v. Southern Utah Wilderness Alliance (SUWA),*
542 U.S. 55 (2004) ................................................................................... 32

*NTCH, Inc. v. FCC,*
950 F.3d 871 (D.C. Cir. 2020) ................................................................. 43

*Prutehi Litekyan: Save Ritidian v. United States Department of Airforce,*
128 F.4th 1089 (9th Cir. 2025) ............................................................... 31

*Risteen v. Youth For Understanding, Inc.,*
245 F. Supp. 2d 1 (D.D.C. 2002) ............................................................ 47

*San Francisco Herring Association v. Department of the Interior,*
946 F.3d 564 (9th Cir. 2019) ................................................................... 37

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020) ................................................................. 19, 38, 40, 48

*Singh v. Berger,*
56 F.4th 88 (D.C. Cir. 2022) ................................................................... 49

*Sink v. U.S. Postal Service,*
1994 WL 719071 (M.S.P.B. Dec. 19, 1994) ............................................ 45

*Stryker Employment Co. v. Abbas,*
  60 F.4th 372 (6th Cir. 2023) ................................................................. 50

*Sustainability Institute v. Trump,*
  2026 WL 157120 (4th Cir. Jan. 21, 2026) .......................................... 27

*Swann v. Charlotte-Mecklenburg Brotherhood of Education,*
  402 U.S. 1 (1971) ................................................................................. 50

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) ........................................................... 24

*U.S. Army Corps of Engineers v. Hawkes Co.,*
  578 U.S. 590 (2016) ............................................................................ 28

*United States v. Broadie,*
  452 F.3d 875 (D.C. Cir. 2006) ........................................................... 19

*United States v. Loew's,*
  371 U.S. 38 (1962) .............................................................................. 50

*United States v. Philip Morris USA Inc.,*
  566 F.3d 1095 (D.C. Cir. 2009) ......................................................... 50

*Venetian Casino Resort, LLC, v. EEOC,*
  530 F.3d 925 (2008) ........................................................................... 29

*Village of Bald Head Island v. U.S. Army Corps of Engineers,*
  714 F.3d 186 (4th Cir. 2013) .............................................................. 31

*Western Watersheds Project v. Haaland,*
  850 F. App'x 14 (D.C. Cir. 2021) ...................................................... 30

*Whitman v. American Trucking Associations,*
  531 U.S. 457 (2001) ........................................................................... 28

*Wild Fish Conservancy v. Jewell,*
  730 F.3d 791 (9th Cir. 2013) .............................................................. 31

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ....................................................................... 25-27

**Statutes**

5 U.S.C. § 551.................................................................................................29

5 U.S.C. § 704.................................................................................................27

5 U.S.C. § 706.................................................................................................37

**Other authorities**

*365 Wins in 365 Days: President Trump's Return Marks New*
    *Era of Success, Prosperity,*
    The White House (Jan. 20, 2026).....................................................14

*Bullock v. Department of Air Force,*
    80 M.S.P.R. 361 (M.S.P.B 1998) ....................................................45

*Currier v. U.S. Postal Service,*
    1996 WL 663085 (M.S.P.B. Nov. 1, 1996)....................................45

# GLOSSARY

APA          Administrative Procedure Act

CFPB         Consumer Financial Protection Bureau

CSRA         Civil Service Reform Act

FLRA         Federal Labor Relations Authority

MSPB         Merit System Protection Board

NAACP        National Association for the Advancement of Colored People

NCLC         National Consumer Law Center

NTEU         National Treasury Employees Union

OMB          Office of Management and Budget

OPM          Office of Personnel Management

RIF          Reduction in Force

# INTRODUCTION

The Executive Branch may not unilaterally abolish an agency created by Congress. Yet, after a two-day evidentiary hearing, the district court found that is precisely what the defendants attempted to do here: eliminate the Consumer Financial Protection Bureau without congressional approval.

Immediately after taking over as Acting Director, Russell Vought decided to "shut the agency down"—and undertook a "concerted, expedited effort" to implement that decision. JA697. As the Bureau's Chief Operating Officer explained at the time, "the whole agency" was to be "completely wiped out in thirty days." JA706, 708. And within days of Vought's appointment, the defendants had directed all employees to stop work, canceled scores of contracts, closed all offices, fired hundreds of workers, and secured approval from the Office of Personnel Management to eliminate over a thousand more positions. The remaining CFPB employees were to temporarily stay on to finish winding down the agency, and then their jobs, too, would be eliminated.

As the district court found, absent a preliminary injunction, the agency would be gone within weeks—damage that the defendants' own witness admitted would be "irreparable," JA708. Still, the defendants ask this Court to vacate the injunction and allow them to finish what they started.

The defendants do not argue that shutting down the CFPB is legal. Instead, they contend that it doesn't matter—the district court had no power to stop them. But, as the defendants concede, courts' power to enjoin unconstitutional Executive action is well established. And there's no serious dispute that unilaterally eliminating an agency that Congress created violates the separation of powers. The defendants argue that the cause of action that allows courts to enjoin constitutional violations does not apply to claims that the Executive had statutory authority to act but exceeded that authority. But that is not the claim here. The problem isn't that Vought was permitted to shut down the CFPB but didn't comply with the statutory requirements for doing so. The problem is that the Executive has *no* authority to shut down an agency at all. Under longstanding precedent from both this Court and the Supreme Court, that's a separation-of-powers claim, and there's a cause of action to bring that claim in federal court.

Vought's decision to shut down the CFPB is also reviewable under the Administrative Procedure Act. Contrary to the defendants' assertion (at 37), the plaintiffs have not lodged a "broad programmatic attack" on how the defendants might choose to "effectuate [the] CFPB's statutory mandates." The challenge is to a single decision: the decision to eliminate the agency. The defendants argue that the APA does not permit review of "abstract," "preliminary" intentions that "have no consequences." But there was nothing abstract or preliminary about Vought's

shutdown decision. Within a matter of days, the defendants had implemented that decision by stopping all work, canceling the Bureau's contracts, and working to fire all of its employees. As a result, the Bureau stopped assisting homeowners facing imminent foreclosure; CFPB employees did not show up to provide the assistance the Bureau had promised NAACP members after the Los Angeles wildfires; and the thousands of consumers who depend on the agency when they face problems with their bank or credit card company could not get help.

There's no dispute that if Vought had published his decision to close the agency in the Federal Register, that decision would be reviewable under the APA. So the defendants' argument boils down to the contention that a decision is not agency action unless it is written down. But that has never been the law. Agencies do not gain immunity from judicial review by attempting to conceal their decisions.

As the Supreme Court has recognized, eliminating the CFPB would "trigger a major regulatory disruption"—devastating consumers and upending industry. Nothing prevents courts from reviewing agency action that would fundamentally alter the structure of our government without congressional authorization. Nor did the district court abuse its discretion in entering a preliminary injunction to preserve the status quo while it undertakes that review. As the agency's Chief Operating Officer testified, if the defendants succeed in abolishing the agency, the harm will be "irreparable." The preliminary injunction is the only thing preventing them from

causing that "irreparable" harm before the court is able to determine whether it's lawful for them to do so. This Court should leave that temporary measure in place while the litigation proceeds.

## PERTINENT STATUTES

All applicable statutes are contained in the brief for appellants.

## STATEMENT

Russell Vought was appointed Acting Director of the CFPB on Friday, February 7, 2025. Soon after, the district court found, the defendants decided to shutter the Bureau. JA634-35, 697, 705-06, 752. They moved to implement that decision as fast as possible. The "concerted, expedited effort to shut the agency down" left no offices, no contracts, no work, and—if this lawsuit hadn't been filed when it was—no employees. JA646-54, 697. Without the district court's intervention, "the whole agency would [have been] completely wiped out." JA708. The defendants' own witness testified that if that had happened, the damage would have been "irreparable." *Id.*[1]

***The agency shutdown.*** The defendants carried out their decision to shut down the agency almost immediately after Vought was appointed. On February 10, the Monday after he began, Vought instructed all staff and contractors to "stand

---

[1] Unless otherwise specified, all internal quotation marks, citations, and alterations are omitted throughout this brief. References to Dkt. are to the district court docket, and references to Opening Br. are to the defendants' opening en banc brief.

down from performing any work task." JA646. The agency's work immediately ground to a halt. JA717-18. "[E]mployees understood that no work meant no work." JA674. So did leadership. JA646 n.4; Dkt. 41-2 ¶ 6. In fact, the agency set up a tip line—endorsed by Vought himself—to report employees working in "violation of Acting Director Russ Vought's stand down order." JA650.

The day after Vought issued his stop-work order, he directed the Bureau to cancel virtually all its contracts. JA649. Contrary to the defendants' assertion (at 7), the agency didn't cancel only "nonessential contracts." Vought's directive required the cancellation of *every* contract in Consumer Response, Enforcement, Supervision, External Affairs, and the Director's Office (among others)—even though Bureau staff had identified many of these contracts as critical to the Bureau's obligations. JA648-49. The Bureau's contracting officers were instructed to work overtime to "get these Termination Notifications out ASAP." JA649.

The same day as the contract cancellations, the defendants fired all probationary employees, citing as a justification Vought's stop-work order. JA648-49, 674-76. Two days later, they fired all term-limited employees, offering the same justification. JA650, 676.

With these firings under way, a "RIF team"—a team to carry out reductions-in-force—was formed to fire everyone else and eliminate their positions. JA649. On February 13, two Vought deputies from the Department of Government Efficiency,

following discussion with Vought, ordered that more than 1,000 positions be eliminated the next day. JA649-50, 701. Within two hours, Chief Operating Officer Adam Martinez emailed the Office of Personnel Management to request permission to shorten the ordinary 90-day notice requirement to 30 days. JA650. He outlined the agency's two-phase plan for eliminating its workforce—again citing the stop-work order as justification. JA518, 701. Phase 1, which would take place the next day, would terminate approximately 1,200 employees by "eliminating whole offices, divisions and units." JA650, 675, 701. During this phase, the defendants would retain the employees necessary to finish winding down the agency. Those employees (the remainder of the Bureau's workforce) would then be fired in Phase 2. JA653, 701. In the interim, the defendants would "place all staff on administrative leave." JA582.

Only this lawsuit interrupted Vought's plan. The night before the Phase 1 RIF notices were set to go out, news of Vought's decision to shut down the agency leaked, and the plaintiffs moved for a temporary restraining order. Dkt. 10. The district court quickly scheduled a status conference for the next day. JA651. When Martinez learned of the status conference, the defendants didn't pause the effort to eliminate the agency—they sped up. JA652. Terminations, they urged, could no longer "wait until COB." *Id.*

But they couldn't finish before the court ruled. So, to avoid the entry of a temporary restraining order, the defendants agreed to a temporary consent order

pending preliminary-injunction proceedings. That order prohibited the defendants from terminating any employees except for cause, deleting CFPB data, or transferring funds out of the CFPB (except for ordinary operating expenses). JA99-100.

***"Little confidence that the defense can be trusted to tell the truth about anything."*** To determine whether to issue a preliminary injunction, the district court reviewed briefing, considered hundreds of internal agency documents, and held a two-day evidentiary hearing. The defendants never claimed that eliminating the CFPB is lawful. Instead, they tried to convince the court that's not what they were doing. In their initial response to the preliminary-injunction motion, the defendants ignored Vought's stop-work order. Dkt. 31 at 3, 25. They made no mention of cancelling the Bureau's contracts en masse or the effort to eliminate all of its employees. Instead, they claimed, the Bureau was operating as normal during a presidential transition, and its new leaders were "committed to having CFPB perform its statutory obligations." *Id.* at 3; JA106. In making this claim, they relied on a declaration from Chief Operating Officer Martinez. JA106.

But Martinez's declaration was quickly proven false. Multiple employees submitted declarations testifying that the Bureau was—in Martinez's own words—in "wind-down" mode; there would "no longer be a CFPB"; it would be "wiped out within 30 days." JA124-55, 655. They detailed the defendants' hurried efforts to cancel

the Bureau's contracts and fire all its employees. *Id*. And they explained how the stop-work order had halted critical work across the agency. *Id*. These declarations, the court found, "blew huge holes in [Martinez's] assertions." JA723.

Just before the preliminary-injunction hearing, Martinez submitted a supplemental declaration conceding that the testimony detailing the defendants' efforts to close the agency was "not inaccurate." JA240. No longer able to conceal the attempt to shut down the CFPB, Martinez changed course, claiming that those events occurred "during the week of February 10, 2025" based on "guidance from DOGE-associated personnel" "[p]rior to" Vought's appointment. *Id*. "In the short time since then, and by the date that [he] submitted [his] earlier declaration," Martinez asserted, "a great deal ha[d] evolved." JA241.

But these statements, too, were quickly proven false. While Martinez's declaration suggested that the attempt to shut down the agency was short-lived, the evidence—including his own testimony—demonstrated otherwise. JA705-06. Well after the week of the 10th, the CFPB continued to be paralyzed, and its leadership continued to pursue the agency's demise. *See* JA655, 705-16. In late February, President Trump publicly announced that his administration had "shut down the out-of-control CFPB." JA706. And Martinez himself told employees that the agency was "legitimately shutting down"—the defendants were just waiting for the district court's order to be lifted. JA655, 661, 706, 716.

Indeed, the RIF team continued to meet, to ensure they could execute the planned mass terminations if the temporary order prohibiting them from doing so was lifted. JA725-26. Martinez admitted as much on the stand. JA1041-42. And the head of the RIF team confirmed it. JA705-06. At those meetings, Martinez explained—based on conversations with "new leadership and the chief legal officer"—that because the CFPB was going to be eliminated, its "administrative portfolio," such as recordkeeping and responding to FOIA requests, would need to be transferred to other agencies. JA705, 707, 1042.

Just before the preliminary-injunction hearing, the defendants sent—and then filed with the court—a flurry of internal emails "purporting to get things up and running again." JA721. Those emails, the court found, "could not be taken on face value." *Id.* For example, Chief Legal Officer Mark Paoletta wrote an email the day before the hearing purporting to be surprised that CFPB employees weren't working. JA716-17. But that "feign[ed] surprise," the court found, could not "be squared with the plain language of the Vought [stop-work order], nor is it consistent with the manner in which the … order was understood by the staff, implemented by the agency, or used to justify massive layoffs." JA717-18. And "the fact that Paoletta … suddenly" emailed about the stop-work order for the first time "on a weekend afternoon immediately before the Court was scheduled to hear the case,

support[ed] an inference that" his belated attempt to recharacterize the order "was not what the order was intended to mean all along." *Id.*

There was additional evidence that the defendants' emails were nothing more than an attempt to manufacture a new record "for the Court's consumption." JA721-22. "[E]mployees found out that" suddenly "being reactivated on paper" days before a court hearing "did not mean they could actually do the work." JA721. After the public emails were sent, employees were privately instructed to stand down. JA716. And offices that were supposedly reactivated didn't have the tools or the people—or the permission—they needed to work. JA721-22.

Ultimately, the court found that the defendants' "attempts to deny what was afoot are at odds with the undisputed facts in the record and the documents produced by both sides." JA679. Martinez's first declaration was "highly misleading, if not intentionally false." JA697. His live testimony "bore no resemblance to the impression his declaration had been drafted to convey." JA698. And the defendants' "eleventh hour attempt to suggest immediately before the hearing" that they had not really tried to shut down the agency's operations "was so disingenuous that the Court [was] left with little confidence that the defense [could] be trusted to tell the truth about anything." JA697.

In sum, the court found, "[t]he evidence reveals that: the defendants were in fact engaged in a concerted, expedited effort to shut the agency down entirely when

the motion for injunctive relief was filed; while the effort to do so was stalled by the Court's intervention, the plan remains unchanged; and the defendants have absolutely no intention of operating the CFPB at all." *Id.*

    ***The preliminary injunction.*** Having found that the defendants had tried to shut down the agency—and that they would try again if given the chance—the district court concluded that the plaintiffs were likely to succeed on the merits of their constitutional claims. JA731. The defendants did not dispute that closing an agency created by Congress violates the separation of powers. And, the district court explained, it's well established that courts have the power to hear claims that the Executive has violated the Constitution. JA668-70. The district court also held that the plaintiffs are likely to succeed on their APA claims: It is both unlawful and arbitrary and capricious to shut down the agency. JA730-33. The court rejected the defendants' contention that the plaintiffs' claim was nothing more than "a generalized grievance about agency policy or management." JA671. "Defendants' repeated incantation of the words 'programmatic' and 'abstract,'" the court explained, "cannot change the character of what is actually going on." *Id.* The plaintiffs' complaint "does not challenge any exercise of the agency's discretionary authority to regulate activities within its purview or to enforce particular statutory provisions." JA677. It challenges "the decision to shut down the agency completely." *Id.* And that decision "is not a theoretical or hypothetical concept – it's real." *Id.* If

the court hadn't intervened, the agency would have been eliminated. JA677-79. The decision to do so, the court held, is reviewable, final agency action. *Id.*

The court entered a preliminary injunction to prevent the CFPB from being shuttered before this lawsuit can be resolved on the merits. JA744. The injunction restored the agency to the status quo by reversing the actions the defendants took to implement the shutdown, and it prohibited the defendants from shutting down the agency again. JA746-47. To make the injunction concrete and administrable, the court specifically prohibited the steps the defendants previously took to effectuate the shutdown: mass terminations, wholesale work stoppages, data deletion, and contract terminations. *Id.*

**Appellate proceedings.** The defendants asked this Court to stay the preliminary injunction pending appeal. Stay Mot., *NTEU v. Vought*, No. 25-5091 (D.C. Cir. Mar. 31, 2025). The Court largely denied the stay, but amended the mass-termination prohibition to permit the defendants to fire employees if they first made a "particularized assessment" that doing so would not impair the Bureau's ability to fulfill its statutory obligations. Order at 1, *NTEU v. Vought*, No. 25-5091 (D.C. Cir. Apr. 11, 2025). Just days later, the defendants sent notices to 1,483 employees—90% of the agency—informing them that their positions were being eliminated and their systems access would be cut off the next day. Dkt. 127 at 7; Dkt. 109 at 137. The Bureau's Chief Information Officer and Chief Operating Officer agreed that the CFPB would not

be able to "keep operating even for 60-days." Dkt. 131-1 at 92. This Court then sua sponte restored the full prohibition on reductions in force. Order at 2, *NTEU v. Vought*, No. 25-5091 (D.C. Cir. Apr. 28, 2025).

***The panel opinion.*** A divided panel vacated the preliminary injunction. All three judges agreed that at least one plaintiff has standing. Op. 16. And all three rejected the defendants' assertion that the district court's "factual assessments were clearly erroneous." Op. 27-28. Not a single panel member defended the lawfulness of the defendants' effort to eliminate the agency. But the panel majority held that there is no mechanism to challenge it. Op. 4. Judge Pillard dissented. The Court stayed the mandate pending a petition for rehearing en banc, allowing the preliminary injunction to remain in effect. Order, *NTEU v. Vought*, No. 25-5091 (D.C. Cir. Aug. 15, 2025).

In October, while the en banc petition was still pending, Vought told the press that his efforts to "close down the agency" would finally "be successful probably within the next two, three months." Dkt. 167 at 18; *see also id.* ("We want to put it out."). Then, in November, the defendants told the district court that despite the preliminary injunction, they would stop operating the CFPB in early 2026 because they had chosen not to seek the funding necessary to keep it going. Dkt. 145 at 2. Only when the district court clarified that choosing not to seek funding would not excuse violating the injunction did Vought request (and receive) funding. Dkt. 167, 169. In

the midst of this most recent shutdown attempt, this Court granted rehearing en banc.

Still, just a couple weeks ago—not long after DOJ told this Court in its en banc brief that there had been no effort to close the CFPB—the Administration boasted that among its accomplishments in the past year, it had "ordered the Consumer Financial Protection Bureau … to halt operations." *365 Wins in 365 Days: President Trump's Return Marks New Era of Success, Prosperity*, The White House (Jan. 20, 2026), perma.cc/8LR6-MMEF.

## SUMMARY OF ARGUMENT

This Court should affirm the preliminary injunction. The district court's factual finding that the defendants decided to shut down the agency leads almost inexorably to the conclusion that the plaintiffs are likely to succeed on the merits. After all, the defendants concede that the Executive may not unilaterally shut down an agency that Congress created. And the district court was well within its discretion to craft an injunction that ensured that it could award complete relief at the end of the case by preventing the defendants from shuttering the agency in the interim.

**I.** The plaintiffs are likely to succeed on the merits.

**A.** Unable to argue that shutting down an agency is lawful, the defendants try to convince this Court that they did not actually decide to do so. But the district court found otherwise. And the defendants cannot demonstrate that this finding is clearly

erroneous. It is supported by the testimony of their own witness—and the consistent testimony of multiple other CFPB employees, including the head of the team responsible for eliminating the agency's workforce. It is undisputed that the defendants terminated the Bureau's contracts, shuttered its office space, halted its work, and attempted to fire its employees, all while its Chief Operating Officer explained to employees that the agency was "legitimately shutting down." JA706. It was not clear error for the district court to decline to ignore all of this evidence in favor of a handful of emails that it found were created by the defendants to "paper over" the true facts. JA679.

**B.1.** The defendants argue that it doesn't matter whether they decided to shut down the CFPB because no court can review that decision anyway. But as the defendants themselves concede, it's well established that courts have the power to review unconstitutional agency action. And there's no real dispute that unilaterally eliminating an agency that Congress created violates the separation of powers. The defendants argue that there is no cause of action to challenge separation-of-powers violations if an agency merely exceeds its statutory authority—by, for example, failing to comply with the statute's procedural requirements for exercising it. But that's not the claim here. The problem is not that the Executive has the authority to shut down the CFPB but Vought did it wrong. The claim is that the Executive has

no authority to eliminate the CFPB at all. That's a separation-of-powers violation, and the plaintiffs have a cause of action to assert it.

**2.a.** The defendants' shutdown decision may also be challenged under the Administrative Procedure Act. In arguing otherwise, the defendants protest that their decision wasn't written down. But this Court has repeatedly recognized that agency action need not be written down to be reviewable. Adopting the defendants' contrary rule would allow the Executive to immunize any decision from judicial review: just don't put it in writing.

The defendants fare no better claiming that the APA does not permit challenges to decisions that require implementation. That would leave most agency decisions unreviewable. The APA does not require that result. And decades of precedent holds otherwise.

**b.** If the shutdown decision wasn't final agency action, the stop-work order was. That directive came straight from the Acting Director, was used to justify firing over a thousand employees, and immediately ground the Bureau to a halt. Courts routinely review internal directives with far less drastic consequences.

**c.** Finally, the defendants' attempt to characterize this case as a suit seeking to compel agency action misunderstands the plaintiffs' claim. The plaintiffs aren't trying to compel the agency to take action. They are challenging an action the agency already took. Contrary to the defendants' contention, the plaintiffs do not

need to wait for a non-existent CFPB to fail to act for an unreasonably long time before they can challenge its elimination. Just like any other final agency action, an agency's decision to terminate a program—or the agency itself—may be set aside under the APA.

There was thus no barrier to challenging the defendants' shutdown decision—either under the APA or through a direct separation-of-powers claim.

**C.**  And the plaintiffs demonstrated a "substantial likelihood" that the district court had jurisdiction over these claims. The defendants concede that the National Treasury Employees Union and the Employee Association have standing. The non-employee plaintiffs do too—each imminently faces (or has already suffered) concrete harm if the defendants are permitted to proceed with the shutdown. The NAACP collaborates with the CFPB to provide vital resources and education to its members, and its members were promised help from the agency in the aftermath of the Los Angeles wildfires that did not arrive because of the attempted shutdown. The National Consumer Law Center relies on CFPB reports and data to fulfill its mission of educating consumer advocates and consumers themselves. The Virginia Poverty Law Center depends on the Bureau's consumer complaint system to serve its legal-aid clients. And Ted Steege is relying on the Bureau to help discharge his late wife's loans, which she herself was unable to get discharged before she passed away because of the stop-work order. If the Bureau shuts down, these organizations will lose

resources vital to their mission, and Mr. Steege will lose help fulfilling his late wife's dying wish not to burden her family with her debt.

The defendants argue that even though the National Treasury Employees Union and the CFPB Employee Association have standing, they may not bring their claims in federal court but instead must bring them before administrative agencies that hear ordinary federal employment claims. This Court need not reach the issue because other plaintiffs have standing, so the court could issue the preliminary injunction regardless of whether the union or the Employee Association's claims remained in the case. Regardless, Congress did not implicitly strip federal courts of their jurisdiction to resolve "fundamental, even existential" questions about the structure of our constitutional system, simply by creating agencies to hear ordinary employment claims. *Axon Enter. v. FTC*, 598 U.S. 175, 180, 185 (2023).

**II.** The other factors also support the preliminary injunction.

Without the injunction, the defendants will eliminate CFPB, and by the end of the case it will be too late for the court to do anything about it. And the harm that will inevitably be suffered by the plaintiffs in the wake of a shutdown will be irreparable.

The balance of equities and the public interest also both strongly favor an injunction. "Eliminat[ing] the CFPB" will "trigger a major regulatory disruption and … leave appreciable damage to Congress's work in the consumer-finance

arena." *Seila Law LLC v. CFPB*, 591 U.S. 197, 236–37 (2020). On the other side of the ledger is only the defendants' interest in engaging in conduct they haven't even attempted to argue is lawful.

**III.** Finally, the preliminary injunction was carefully tailored to preserve the status quo. The injunction accomplishes that end—ensuring that, come the end of the case, the Bureau still exists. A narrower injunction would neither maintain the status quo until the end of the case nor prove workable in practice.

## ARGUMENT

## I.    The plaintiffs are likely to succeed on the merits.

### A.    The district court did not clearly err in finding that the defendants decided to shut down the agency.

**1.** "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it." *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985). The district court's "factual findings"—and inferences from those findings—are reviewed "for clear error." *Awad v. Obama*, 608 F.3d 1, 6-7 (D.C. Cir. 2010). This deference is stronger still for its credibility rulings. *United States v. Broadie*, 452 F.3d 875, 880 (D.C. Cir. 2006).

**2.** After a two-day evidentiary hearing, the district court found that the defendants engaged in a "concerted" effort "to shut down the agency"; absent the court's intervention, that "plan" would have been fully executed; and without a preliminary injunction, the defendants will eliminate the CFPB. JA697. Although in

the press, Vought and the Administration tout their efforts to shut down the CFPB, *see supra* at 13-14, in their briefing before this Court, they claim (at 45) it never happened. But they do not come close to showing that the district court's contrary findings were clearly erroneous. Indeed, all three members of the panel rejected that argument. Opening Br. 49; Op. 27-28.

And with good reason. The defendants' own—and only—witness testified that absent the court's intervention, the CFPB would have been dismantled "completely by the end of the week." JA698. That testimony is backed by the defendants' own actions: Within days after Vought took over the agency, they ordered "a wholesale termination of the contracts needed to keep the CFPB running"; they canceled *every* lease on *every* office; and they began mass terminations. JA700-01, 708. Had the district court not intervened, 1,200 positions at the CFPB would have been eliminated immediately, with the rest soon to follow. JA701. The defendants don't mention any of this.

Nor do they mention (or dispute) how the CFPB's own Chief Operating Officer explained what was happening at the time: The CFPB "w[as] legitimately shutting down." JA706, 1233. And "acting leadership wanted [those executing the shutdown] to move as quickly as possible." JA699, 1027, 1232-33. The agency, he said, was to "be eliminated"—"wiped out within 30 days." JA655, 706-07, 1049, 1233. Multiple witnesses, including Martinez himself, testified that senior agency

executives confirmed that the Bureau was being shut down. JA655, 706-07, 1049, 1233. Even after the district court's intervention, there continued to be meetings to implement the shutdown—just as soon as the court's order was lifted. JA752, 1047, 1238.

It cannot be clear error for the district court to find that the defendants decided to do exactly what their Chief Operating Officer said they were doing: shutting down the agency.

**3.** The defendants insist (at 49-50) that "[o]nce … Vought assumed his role," the agency committed to remaining open. But as the district court explained, the wholesale cancellation of contracts, termination of office space, and mass firings occurred after "Vought assumed his role"—they took place at his direction. JA723. And everyone from the agency's Chief Operating Officer to Vought to the White House itself admitted they were trying to eliminate the agency. JA697-716.

The defendants take issue with how the district court understood Vought's stop-work order. They claim (at 50-51) that the order to "stand down from performing any work task" didn't mean that employees had to actually "stand down," because Vought told them to contact him if there were "urgent matters." JA646. But the district court did not clearly err in concluding that this request to be alerted of any emergencies did not change the meaning of the order: As the order said, employees were prohibited from performing "*any* work task." JA646 (emphasis added). That's

how it was understood across the agency. JA717-18. Indeed, the agency set up a tip line to report employees who worked in violation of that order. JA650. And the defendants cited the stop-work order as a formal justification for eliminating the agency's workforce. JA675-76.

The defendants also argue (at 51-55) that the court was required to believe that the flurry of emails the defendants sent in advance of the preliminary-injunction hearing—and then promptly filed with the court—demonstrated that they were not actually trying to eliminate the agency. But the court did not clearly err in declining to credit the defendants' last-minute attempt to rewrite the record—especially because their made-for-court emails could not be squared with the other evidence. Although the emails claimed to permit some offices to restart some work, they were not given the tools or staff to do so, and employees who were publicly authorized to work were privately told to stand down. JA716; 721-22. Meanwhile, the team responsible for eliminating the agency's workforce continued to meet, and the agency continued to prepare to shut down, just as soon as the court's order was lifted. JA658, 664. It's no wonder—and certainly not clear error—that the district court found that the defendants' curated paper trail could not be "taken at face value." JA721.

In an effort to escape the clear-error standard, the defendants argue (at 46-47) that the court somehow committed legal error by misinterpreting defense counsel's assertion at a hearing that the defendants don't know what the agency's "statutory

obligations" are. But determining what counsel meant is not a legal determination; it's a factual one. The court did not misinterpret the statement: That's what counsel said. *See* JA730, 1291-92. And, in any event, the record supports the finding that the defendants decided to shut down the agency with or without that statement. *See Awad*, 608 F.3d at 7 ("[W]e do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole."). The Chief Operating Officer testified that the agency was closing. JA706-08, 1049-50. And every action it took—relinquishing all of its office space, canceling its contracts, halting its work, and firing its employees—supported that testimony.

**4.** The defendants fall back on the presumption of regularity, which they invoked for the first time on appeal. Opening Br. 48. But the presumption does not "shield [agency] action from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Nor does it require courts to accept a narrative "that is incongruent with what the record reveals." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). And it has no place where the testimony of the defendants' only witness was "highly misleading, if not intentionally false," and the agency was so "disingenuous" that it could not "be trusted to tell the truth about anything." JA697.

**B.    Federal courts have the power to review the decision to shut down an agency.**

Ultimately, the defendants insist, it doesn't matter whether they decided to shut down the CFPB—or that doing so is concededly unlawful—because there's no cause of action to challenge that decision anyway. But it's well established that courts have the power to enjoin unconstitutional agency action. And the Administrative Procedure Act also provides a cause of action. After all, the defendants do not dispute that shutting down the CFPB is both unlawful and arbitrary and capricious.

**1.    There is a cause of action to enjoin separation-of-powers violations.**

**a.** The defendants concede that there is a "direct cause of action" to enjoin unconstitutional agency action, *Trudeau v. FTC*, 456 F.3d 178, 190 & n.22 (D.C. Cir. 2006); *see, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Hubbard v. EPA Adm'r*, 809 F.2d 1, 11 n. 15 (D.C. Cir. 1986). This cause of action "reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015). Thus, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellin*, 594 U.S. 220, 245 (2021).

The defendants have never disputed that the Constitution prohibits the Executive from unilaterally eliminating an agency Congress created. When the Executive acts, its power "must stem either from an act of Congress or from the

Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The defendants point to no act of Congress that delegates the power to shut down the CFPB. Nor do they point to any constitutional provision authorizing the Executive to close an agency Congress created. Congress created the CFPB, and "only Congress can take [it] away." *Helvering v. Or. Mut. Life Ins. Co.*, 311 U.S. 267, 272 (1940); *see also Free Enter. Fund*, 561 U.S. at 500 ("Congress has plenary control over the … existence of executive offices."); *Myers v. United States*, 272 U.S. 52, 129 (1926) (similar); *M'Culloch v. Maryland*, 17 U.S. 316, 431 (1819).

**b.** The defendants nonetheless insist (at 40) that there is no cause of action to challenge the constitutionality of the elimination of the CFPB. That surprising conclusion, they say, is mandated by *Dalton v. Specter*, 511 U.S. 462 (1994). But *Dalton* did not eliminate constitutional claims for Executive action that violates the separation of powers.

To the contrary, *Dalton* confirmed that there is a direct cause of action for claimed separation-of-powers violations. *Id.* at 474. But, it held, this cause of action does not apply to claims that an official has statutory authority to act but merely "exceeded [that] authority." *Id.* It applies only where the claim is that there is "no statutory authority" for the action at all. *Id.*

The claim in *Dalton* itself was an exceeds-statutory-authority claim. *Id.* The President had decided to close military bases under a statute that empowered him to

do so. Everyone agreed that the President had the statutory authority to close the bases. But some shipyard employees sued anyway, arguing that he'd "exceeded" that authority because the closure did not comport with the statute's procedural requirements. *Id.* at 464-65. That claim, the Supreme Court held, is really a statutory claim; it's not the kind of claim for which there's a direct cause of action for a constitutional violation.

The Court distinguished the exceeds-authority claim in *Dalton* from the claim in *Youngstown*, in which the President seized steel mills without statutory authority at all. *Dalton*, 511 U.S. at 473. The *Youngstown* claim—that the Executive acted in the "absence of any statutory authority"—the Court explained, is a constitutional separation-of-powers claim for which a direct cause of action may be brought. *Id.*; *see also Youngstown*, 343 U.S. at 585-86. Contrary to the defendants' suggestion (at 40), the Court did not limit that cause of action to cases in which the Executive at least claims to have constitutional authority to act—that would mean that agencies could escape review just by conceding that they acted without the authority to do so. Nothing in *Dalton* (or any of the Court's other cases) allows that. Rather, *Dalton* stands for the proposition that while there is no separation-of-powers claim for "a mere excess or abuse of discretion in exerting" statutory authority, there is a claim for acting without any authority whatsoever. 511 U.S. at 474.

26

The claim here, like the claim in *Youngstown*, is a lack-of-authority claim, not an exceeds-statutory-authority claim. The claim is not simply that by shutting down, the CFPB will inadequately perform its statutory requirements. It's that the Executive has no authority at all—be it from Congress or the Constitution—to eliminate the CFPB. In fact, the defendants expressly concede (at 3) that they lack "the power to 'shut down' the CFPB."[2] *Cf. Youngstown*, 343 U.S. at 585 ("[W]e do not understand the Government to rely on statutory authorization for the seizure."). That's a separation-of-powers claim, and the plaintiffs have a cause of action to assert it.

> ### 2. The plaintiffs may also challenge the defendants' decision to close the agency and Vought's stop-work order under the APA.

The plaintiffs are also likely to succeed on their APA claims. Again, the defendants do not dispute that their conduct was contrary to law; nor do they contest that it was arbitrary and capricious. Instead, they contend that closing an agency—and ordering it to halt all work—are not final agency actions. That's wrong.

The APA authorizes district courts to review "final agency action." 5 U.S.C. § 704. By using the term "agency action," Congress "meant to cover

---

[2] This case is thus distinct from cases in which the Executive has at least purported to exercise statutory authority to determine whether and how to allocate grants. *See Sustainability Inst. v. Trump*, 2026 WL 157120 (4th Cir. Jan. 21, 2026); *Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). It's undisputed that no statute authorizes the Executive to shut down the CFPB under any circumstance.

comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). For such an action to be final, it must satisfy "two conditions." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* The decision to shut down the CFPB and the stop-work order meet both requirements.

### a.     The decision to close the CFPB was final agency action.

The decision to shut down the CFPB was final agency action. There was nothing tentative about it: The defendants "barrel[ed] full speed ahead" to implement it. JA698. As its Chief Operating Officer repeatedly explained, the agency was "legitimately shutting down," it was in "wind-down mode," it was "clos[ing]." JA655, 701, 706. And a shutdown would have had immediate legal consequences: The Bureau would no longer operate at all.

**1.** The defendants' lead argument to the contrary (at 35) is that, as a factual matter, there was no decision to shut down the agency. But, again, the district court found otherwise, and the defendants have not shown clear error. *See supra* at 19-23.

The defendants next rely (at 35-36) on a novel rule announced by the panel majority: that an agency action that isn't written down ceases to be agency action at

all. But agency action is any "rule, order, license, sanction, relief, *or the equivalent*." 5 U.S.C. § 551(13) (emphasis added). A memorandum announcing the Bureau's shutdown "[e]ffective immediately" "would be reviewable" agency action. Op. 40 (citing *Biden v. Texas*, 597 U.S. 785, 808-09 (2022)); *see also Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 20 (2020) (elimination of DACA program constitutes final agency action). An unwritten decision to shut down the CFPB is "the equivalent." 5 U.S.C. § 551(13). The real-world effect is the same—only the form is different. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986) ("an agency may not avoid judicial review merely by choosing" to express its decision in a certain "form").

This Court has repeatedly held that agency action need not be in writing to be reviewable. *Venetian Casino Resort, LLC, v. EEOC*, 530 F.3d 925, 931 (2008); *see Bhd. of Locomotive Eng'rs*, 972 F.3d at 100 ("Agency action generally need not be committed to writing to be final and judicially reviewable."); *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018) (relying on "multiple declarations" and "extensive evidence" to identify a "de facto" policy that constituted final agency action).

As Judge Pillard explained, adopting a writing requirement would allow agencies to "immunize" their decisions from judicial review merely by "obfuscat[ing]" them. Dissent 43. Consider this case: The President announced that the CFPB would be eliminated. JA706. The agency's Chief Operating Officer said that the Bureau was "legitimately shutting down." *Id*. Agency leadership had almost

29

finished implementing the shutdown when the district court intervened. Still, the defendants argue that's not enough because the agency—which the district court found had been "so disingenuous" that it could not "be trusted to tell the truth about anything," JA697—did not issue a sufficient statement accompanying its decision. "There is no plausible reason … to afford *less* judicial scrutiny" when agencies act "without any publicly available, lawful, nonarbitrary reasoning to justify" their action. Dissent 43.

**2.** Shifting gears, the defendants argue (at 36) that, even if the decision to shut down the CFPB constitutes agency action, it is not *final* agency action because the decision "had no consequences." That claim is hard to understand: Due to the decision, the agency fired employees, canceled contracts, gave up its office space, and stopped assisting consumers.

To the extent the defendants' argument is simply that the decision required implementation, that argument fails too. It was implemented immediately. *See supra* at 5. And agency actions do not lack finality simply because they require implementation. *See, e.g.*, *Texas*, 597 U.S. at 790, 808 (memorandum directing agency employees to "take all appropriate steps" to terminate program was final agency action); *W. Watersheds Project v. Haaland*, 850 F. App'x 14, 15 (D.C. Cir. 2021) (a "resource management plan" that required multiple steps to implement "constituted final agency action," while the implementing steps did not); *Vill. of Bald Head Island v.*

*U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013); *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1110 (9th Cir. 2025); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801-02 & n.9 (9th Cir. 2013); *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of Army*, 111 F.3d 1485, 1494 (10th Cir. 1997).

The defendants' contrary argument rests on a misunderstanding of a single case, *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006). That case held that a budget *request* to Congress that *proposed* a *strategy* for meeting the agency's statutory obligations was not final agency action. *Id.* at 20. The request did not bind anyone, including the agency itself; it created no rights or obligations; it had no legal consequences. *Id.* at 21-22. At most, it was a "statement" by the agency about "what it plans to do, at some point, provided it has the funds and there are not more pressing priorities." *Id.*

Here, the defendants did not merely state that at some point in the future, if they got around to it, they would like to shut down the CFPB. They decided to shutter the agency. And that decision governed the agency's conduct immediately: If the district court had not intervened, the agency would have been wiped out within 30 days. That is final agency action.

**3.** Next, the defendants accuse the plaintiffs (at 32, 37) of launching a "broad programmatic attack" seeking "wholesale agency reform." But the claim here does

not seek to reform the Bureau, broadly or otherwise. It challenges a single, discrete decision: the decision to eliminate the CFPB entirely.

The Supreme Court's decision in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), therefore, does not help the defendants. The plaintiffs there challenged thousands of "individual," unrelated land-classification decisions—not a specific policy governing those decisions, or even "a completed universe of particular" orders. *Id.* at 890. The plaintiffs "laid" before the court the varied "flaws" they'd identified in these orders—and those they believed would infect future orders—and asked the court to correct them all. *Id.* at 893. The Court held that the APA did not allow the plaintiffs to seek "wholesale improvement" in how the agency administered land-use applications. *Id.* at 891. They had to identify a specific decision or policy that harmed them. *Id.* The plaintiffs here have done exactly that: the decision to shut down the CFPB.

The defendants' attempt to seek refuge in *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55 (2004), fails for the same reason. In *SUWA*, the plaintiffs alleged that the Bureau of Land Management was not doing enough to fulfill its statutory obligation to avoid "impair[ing]" the "preservation" of federal lands "as wilderness." *Id.* at 59. The Supreme Court held that they could not proceed under the APA because they failed to identify a "discrete action" that the agency either unlawfully took or failed to take. *Id.* at 62-63. A "general" assertion that the agency

is not fulfilling its "broad statutory mandates" to the plaintiff's satisfaction is not enough. *Id.* at 66. That conclusion has no bearing here. Again, the plaintiffs' claim is not that the CFPB is not doing a good enough job. It's a challenge to the defendants' decision to close the agency.

**4.** Finally, contrary to the defendants' assertion (at 38), that challenge is ripe for review. A claim is ripe where it presents issues "fit" for judicial review and where there would be "hardship to the parties" if a judicial decision were withheld. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1281 (D.C. Cir. 2005). That standard is easily satisfied here. Whether the Executive may unilaterally eliminate the CFPB is precisely the type of "purely legal issue[]" that is fit for judicial decision. *Id.* at 1282. And contrary to the defendants' assertion (at 39), the plaintiffs will suffer hardship without judicial intervention.

As the panel recognized (at 16), the CFPB's shutdown attempt has already inflicted injury: The agency abandoned victims of the California wildfire that were depending on it, stopped helping consumers facing imminent foreclosures, and left thousands of consumer requests for help unanswered. *See* JA685-89, 735-38, 740-43. The district court found that, absent an injunction, the defendants would "swift[ly]" do what remains to shut down the agency. JA739-40. If the action is not ripe for suit now, there will be no agency to sue whenever it is.

The defendants suggest (at 38) that they no longer intend to shut down the CFPB. They've tried this move before. During the preliminary-injunction proceedings in the district court, the defendants argued that any shutdown decision was subsequently reversed, but the evidence demonstrated otherwise: The agency's own witness testified that the defendants were simply waiting for the district court's order to be lifted, so they could carry on their plans. JA655, 661, 706, 716. And they haven't stopped. Over the past few months, the defendants have continued publicly stating their intent to shut the CFPB down; they have attempted to do so—despite the preliminary injunction—by defunding the agency; and the Administration has boasted about ordering the Bureau's closure. *Supra* at 14.

The defendants' argument is really a claim of voluntary cessation. But they can't make that argument explicitly because it would undermine their continued insistence that they never planned to shutter the agency in the first place. Even had they made the argument, "[t]he decision whether defendants' illegal conduct is likely to recur lies in the equitable discretion of the District Court." *Campbell v. McGruder*, 580 F.2d 521, 541 (D.C. Cir. 1978); *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (voluntary cessation applies no differently to "governmental defendants"). And the district court did not abuse that discretion in concluding that, having tried to shut down the agency and misled the court about it—and having continued to plan to implement its shut-down decision even after the court's intervention—there was a "cognizable danger"

that the defendants would do so again. *U.S. DOJ v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016). The court was not required to wait for them to finish the job before deciding whether it was lawful for them to do so.

### b. The stop-work order constitutes final agency action.

If the decision to close the agency did not constitute final agency action, Vought's stop-work order did. Nothing in that directive suggested that it was "tentative, open to further consideration, or conditional on future agency action." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007). To the contrary, the CFPB established a "tip line" to enforce compliance. JA701. And, in a formal memo to the Office of Personnel Management, the defendants relied on the stop-work order to justify firing more than a thousand employees. JA675-76.

That wasn't the only legal consequence to flow from the stop-work order. It bound all agency staff, directing them to stop work on all programs. *See Texas*, 597 U.S. at 808 (directive that "bound [agency] staff" by prohibiting them from implementing program was final agency action); *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1003, 1007 (D.C. Cir. 2014) (internal "directive" to EPA's regional directors about applicability of appellate decision was final agency action).

Unsurprisingly, that had an immediate, concrete impact on the agency's ability to perform its statutory functions—16,000 consumer complaints went

unanswered, complaints referred by Congress were ignored, mandatory reporting deadlines were missed, and research and supervision activity ceased. JA364, 447, 470-71, 734, 1263; Dkt. 106-2, at 5-6. That's final agency action.

The defendants argue (at 34) that the order was "not the agency's final word" on the matter and was "subject to further clarification and refinement." But agency action is always subject to change. That doesn't render it non-final. *Clean Air Project* 752 F.3d at 1006. And here, the purported "clarification" that the defendants rely on (at 34) are the emails that the district court found that the defendants created in a transparent attempt to "paper over" their effort to shut down the agency. JA634, 679.

The defendants also briefly argue (at 35) that the stop-work order "alone, without any subsequent act," did not "directly affect[] plaintiffs." This assertion is perplexing. There's no dispute that after being ordered to "stand down," employees did so. JA717. That meant, among much else, plans to help the NAACP's members were cancelled, JA58; there was nobody to process consumer complaints, JA734; the Office of Service Member Affairs did not assist service members, JA252, 719; the Office of Older Americans did not provide services to victims of elder abuse, JA252; and the Supervision Division did not examine financial institutions, JA194-96.

### c.     The district court applied the correct legal standard.

Falling back, the defendants argue (at 42) that the district court applied the wrong legal standard when evaluating the plaintiffs' APA claim. According to the

defendants, the plaintiffs seek to "compel agency action unlawfully withheld or unreasonably delayed."

But the plaintiffs do not seek to "compel" anything. 5 U.S.C. § 706(1). They ask the court to "hold unlawful and set aside agency action" that is unlawful and arbitrary and capricious: the defendants' decision to shut down the agency. *Id.* § 706(2). Just like any other final agency action, an agency's decision to terminate a program (or the agency itself) is agency action that can be set aside under § 706(2). *See e.g.*, *Texas*, 597 U.S. at 808; *Regents of the Univ. of Cal.*, 591 U.S. at 20. The defendants do not dispute that the "mandamus-like standard" they spend pages describing applies only to claims seeking to *compel* agency action, not claims seeking to set it aside. *Nat'l Ass'n of Home Builders*, 417 F.3d at 1280.

The defendants suggest (at 43) that if an agency terminates a program—or the agency itself is shut down—a plaintiff must apply to the nonexistent program or ask for the no-longer-extant agency's services, wait an "egregious[ly]" long time, and then seek to compel the nonexistent program or agency to respond. There's no authority for that proposition. Once there is a final agency action, plaintiffs are "not required to engineer a *further* final agency action in a different form in order to bring suit." *S.F. Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 579 (9th Cir. 2019).

### C.    The plaintiffs are likely to succeed in establishing jurisdiction.

The defendants next argue that even if the plaintiffs have a cause of action, no court has jurisdiction to hear it. They concede that the National Treasury Employees Union and the Employee Association have standing. But they argue that those plaintiffs must bring their claims before the Merit Systems Protection Board or Federal Labor Relations Authority, even though the CFPB would be shut down long before those claims are ever heard. As for the other plaintiffs, the defendants claim they have no standing—a claim that the panel correctly rejected.

### 1.    The plaintiffs have standing.

Whether a party seeking a preliminary injunction is likely to succeed on the merits includes whether there is "a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Only one plaintiff needs standing for a district court to entertain a claim. *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). So all that's necessary here is a "substantial likelihood" that one plaintiff has standing. The panel correctly concluded that the NAACP does. Op. 16. The rest of the plaintiffs, which the panel did not address, do as well.[3]

---

[3] Contrary to the defendants' insistence (at 19), there is no heightened standing requirement for separation-of-powers claims. *See, e.g.*, *Collins*, 594 U.S. at 242; *Seila Law LLC v. CFPB*, 591 U.S. 197, 210-11 (2020); *Free Enter. Fund*, 561 U.S. at 512 n.12.

The defendants' primary argument to the contrary (at 19-20) is that a "generalized interest" in safeguarding the separation of powers is insufficient to support standing. We agree. But that's not why the plaintiffs have standing. They have standing because the defendants' decision to shut down the agency—if not enjoined—will cause them concrete injury.

***National Association for the Advancement of Colored People***. The panel agreed that the NAACP has standing. Op. 16. It was right. For decades, the NAACP has sought to "accelerate the well-being, education, and economic security of Black people and all persons of color." JA57. To achieve that aim, the NAACP "actively work[s]" with the CFPB to "protect and educate its members on consumer financial protection issues." JA57-59, 685-86. Before the shutdown, the Bureau regularly held educational calls with NAACP members and was developing a state-by-state plan to assist members throughout the country. JA58.

The NAACP was also working with the CFPB to help NAACP members in the aftermath "of the Los Angeles wildfires." JA57. The CFPB was "helping the NAACP educate its members to avoid post-fire financial fraud," "helping NAACP members affected by the wildfires make connections to other resource groups across California," and "helping to ensure that mortgage companies provided the [mortgage] forbearance" they were required to provide in the wake of the fires. JA57-

58. All that stopped when the defendants decided to shut down the agency, injuring both the NAACP as an organization and its members.

As one member, Juanita West-Tillman, averred, because of the shutdown, the Bureau never sent promised educational resources, and it cancelled a planned trip to assist her (and other victims of the fire) as they rebuild their lives. JA58, 217-18. The panel correctly recognized that Ms. Tillman's experience is sufficient, on its own, to demonstrate that the NAACP "has associational standing." Op. 16.

That is more than a mere "anticipated" collaboration, Opening Br. 21; it's active collaboration to provide services to members that a shutdown would (and did) cut off. As this Court has held, actions that "make it more difficult for [an organization] to accomplish [its] primary mission"—here, educating members and ensuring their economic security—"provide injury." *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39–40 (D.C. Cir. 2016). The defendants argue (at 22) that these injuries are not redressable because the agency was not required to assist the NAACP to begin with. But "a litigant challenging governmental action" under the "separation of powers is not required to prove that the Government's course of conduct would have been different in a 'counterfactual world'" in which the violation had not taken place. *Seila Law*, 591 U.S. at 211 (quoting *Free Enter. Fund*, 561 U.S. at 512 n.12). "[T]hose adversely affected" by agency action "have standing to complain that the agency based its

decision upon an improper legal ground"—even if the agency "might later, in the exercise of its lawful discretion, reach the same result for a different reason." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998).

**National Consumer Law Center**. NCLC is a non-profit devoted to "economic justice for low-income and other vulnerable people." JA22-23. Central to NCLC's mission is publishing reports, developing training materials, and providing guidance to legal services providers, consumer advocates, and consumers themselves. JA79, 81-82. To do so, NCLC "relies heavily" on otherwise inaccessible information that the CFPB publishes. JA81. For example, several NCLC reports rely on complaint information submitted only to the Bureau and aggregated only in the Bureau's consumer complaint database; data collected from market participants and reported in statutorily mandated Bureau publications; and information drawn from the CFPB's work supervising and examining banks. JA81-82.

The defendants do not dispute that the loss of "key information that [NCLC] relies on to fulfill its mission" is a cognizable injury. *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2020); *see Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (organization had standing to challenge actions that "significantly restrict[ed]" a "flow of information" from the agency).

Instead, they argue (at 23) that it's merely "possible" that if the CFPB shuts down, NCLC will lose access to this information. But it's hardly speculative to conclude that if the CFPB does not exist, it will not provide any information.

***Virginia Poverty Law Center***. The Virginia Poverty Law Center provides legal aid to low-income Virginians and educates other legal-aid providers, nonprofits, and agencies that advocate for consumers. JA71, 76. The Center operates a consumer helpline through which it often refers consumers to the CFPB consumer complaint system and helps them file complaints. JA72-73. That allows those who seek help from the Center to "get real and immediate results" without burdening the Center's limited resources. JA73. As the Center's CEO explained, it would be "difficult if not impossible" for the Center to provide consumers the same relief itself without sacrificing other services. JA72-75. That impairment of the Center's work is sufficient for standing. JA72-75. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("perceptibly impair[ing] [an organization's] ability to provide counseling and referral services" is an Article III injury).

***Ted Steege***. In January 2025, CFPB staff, including the Student Loan Ombudsman, were assisting Pastor Eva Steege with her loans. JA688-89. Pastor Steege, who was in hospice, was seeking to have her loans discharged before she died, to spare her family the burden of dealing with them after she passed. JA688.

Following Vought's stop-work order, that assistance abruptly ended. JA189. Her husband was substituted as a plaintiff after Pastor Steege passed away in March.

The defendants contend (at 24) that Mr. Steege lacks standing because the Student Loan Ombudsman is not statutorily required to help with federal student loans. But even if that's true, the Ombudsman still would have done so—consistent with the Bureau's practice—had it not been for the defendants' efforts to close the Bureau. JA184. *See Akins*, 524 U.S. at 25; *NTCH, Inc. v. FCC*, 950 F.3d 871, 879 (D.C. Cir. 2020).

> **2.    Congress did not channel the union and Employee Association's separation-of-powers claim to an agency created to deal with ordinary employment disputes.**

The defendants contend (at 26-28) that the union and Employee Association must bring their claims before the Merit Systems Protection Board, the agency that decides ordinary federal employment disputes. That argument rests on the Civil Service Reform Act, though the defendants point to no provision in the Act withdrawing jurisdiction from district courts. This Court need not decide the issue. Because other plaintiffs have standing, the preliminary injunction is proper either way. But if the Court does reach the question, it should reject the claim that by creating an administrative-review scheme for ordinary employment claims, Congress implicitly foreclosed district court review of separation-of-powers questions that go to the heart of our constitutional order.

**a.** Whether a statutory scheme like the Civil Service Reform Act implicitly forecloses district-court jurisdiction over particular claims depends on whether those claims are "of the type Congress intended to be reviewed within th[at] statutory structure." *Axon Enter. v. FTC*, 598 U.S. 175, 186 (2023). So, here, the question is whether Congress intended that a separation-of-powers claim challenging the unilateral shutdown of an agency would be channeled to the agency that hears everyday employment claims. "Common [] sense" says no. *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1336 (D.C. Cir. 2024).

The Merit Systems Protection Board adjudicates claims that an agency personnel action "ha[s] violated a merit system principle"—that is, that it violates civil-service protections. *Barnhart v. Devine*, 771 F.2d 1515, 1520 (D.C. Cir. 1985). Congress did not, by sending ordinary employment disputes to the MSPB, "implicitly" strip federal district courts of their jurisdiction to answer "fundamental, even existential" questions about the structure of our constitutional system. *Axon*, 598 U.S. at 180, 185.

**b.** The court's power to entertain the union and Employee Association's claims is confirmed by all three factors that courts consider when deciding if Congress has implicitly stripped them of their jurisdiction: (1) whether agency adjudication would "foreclose all meaningful judicial review," (2) whether the claim is "wholly collateral" to the relevant statute's review provisions, and (3) whether the

claim is outside the agency's expertise. *Axon*, 598 U.S. at 186. *First*, if routed to the MSPB, there will be no "*meaningful* judicial review" because it will be "impossible to remedy" the employee-plaintiffs' injuries once the claims make it back to federal court for "appellate review." *Id.* at 190-91 (emphasis added). Once the CFPB is gone, there will be no agency to reinstate employees into. JA706-07. Indeed, it's the MSPB's longstanding position not to reinstate employees to "abolish[ed]" positions. *See, e.g.*, *Bullock v. Dep't of Air Force*, 80 M.S.P.R. 361, 368-69 (M.S.P.B 1998); *Currier v. U.S. Postal Serv.*, 1996 WL 663085 (M.S.P.B. Nov. 1, 1996); *Sink v. U.S. Postal Serv.*, 1994 WL 719071 (M.S.P.B. Dec. 19, 1994).

The other two prongs also counsel in favor of jurisdiction. The claims here "have nothing to do with the" federal employment- and labor-related "matters [the agencies] regularly adjudicate" and are thus wholly collateral to systems set up to adjudicate those disputes. *Axon*, 598 U.S. at 193. And while the MSPB and FLRA "know[] a good deal about" the administration of the civil-service and labor-relations laws, neither knows anything "special about the separation of powers," and both "are generally ill suited to address structural constitutional challenges—like those maintained here." *Id.* at 194-95.

The panel concluded otherwise because "unlawful terminations" are the "heartland of CSRA coverage." Op. 14. This case, however, is not about "unlawful terminations" or, as the defendants frame it, "broader labor management practices,"

Opening Br. 27-28. It's about unilateral agency closure; terminations are merely a byproduct. That is why the claims here are that the defendants violated the APA and the Constitution, not the Civil Service Reform Act or any other statute governing federal employment.

**c.** The conclusion that Congress would not have "intended" the MSPB to have exclusive jurisdiction over these claims, *Axon*, 598 U.S. at 186, is strengthened by this Court's recent decision that "Congress may not restrict the President's ability to remove MSPB members," *Harris v. Bessent*, 160 F.4th 1235, 1256 (D.C. Cir. 2025). Congress would not have intended to channel separation-of-powers claims to a body lacking "independence" from the President. *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 306 (4th Cir. 2025). Neither this Court nor the Supreme Court has ever held that Congress *impliedly* stripped district courts of jurisdiction in favor of sending constitutional claims to non-independent agencies. It should not do so for the first time now.

## II.    The remaining factors support an injunction.

***Irreparable Harm.*** The district court found that without a preliminary injunction, the defendants will shut down the agency. The defendants do not dispute that if the agency shuts down, it cannot be put back together. *See* JA634. Once the defendants cancel the agency's contracts, delete its data, and eliminate the positions

required to operate the Bureau, "there can be no do over and no redress." *Newby*, 838 F.3d at 9.

That means that absent a preliminary injunction, at the end of the case, there will be no CFPB. And as explained above, the evidence shows that the absence of the Bureau will devastate the ability of the NAACP, NCLC, and the Virginia Poverty Law Center to carry out their activities. *See id.* at 8 (holding that it is enough for irreparable harm that an action "perceptibly impair[s]" an organization's programs). It will be impossible for the Employee Association to fulfill its mission "to advance CFPB employees and the mission of the agency." *See id.* ("obstacles" that "unquestionably make it more difficult for [an organization] to accomplish [its] primary mission … provide injury for purposes both of standing and irreparable harm"). And members of the Employee Association and the Union will be harmed in ways that lost wages cannot redress: Those with serious health conditions, for example, will lose their health insurance. JA684. *See Risteen v. Youth for Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002) ("The loss of health insurance benefits—particularly for those who are unemployed—constitutes irreparable harm.").

The defendants' irreparable harm argument (at 62) is premised on a misunderstanding of the plaintiffs' claims. Again, the claim here is not about agency inaction. *Contra* Opening Br. 62. The defendants made an affirmative decision—to eliminate the agency—that, if allowed to proceed, would cause irreparable harm.

Nothing prevents the district court from temporarily enjoining the defendants from carrying out that decision until the court determines whether it is lawful.

**Balance of harms.** The public interest also strongly favors an injunction. The Supreme Court has recognized that "eliminat[ing] the CFPB" "would trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena." *Seila Law*, 591 U.S. at 236-37. As 22 states explained below, "the States and their residents face a significant risk of irreparable harm" as a result of the defendants' actions. Dkt. 24 at 7. "[C]onsumers will be left without critical resources" that the CFPB provides, including help in dealing with acute crises like foreclosures. *Id.* at 8-9, 11. And, of course, safeguarding the separation of powers "serve[s] to safeguard individual liberty." *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014).

Against these weighty interests, the defendants invoke (at 60) the Executive Branch's interest in "effectuat[ing]" the President's "policy priorities." The defendants proceed (at 60) as if all they were up to was *lawfully* "effectuat[ing]" the President's "policy priorities." But they have not *once* argued that it is lawful for them to close the CFPB. "There is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12.

In any event, the only policy priority they identify is an interest in shrinking "the federal government's operational footprint." Opening Br. 63. At oral argument

on the motion for a stay pending appeal, the defendants made the same argument, explaining that the "key presidential policy initiative" impeded by the injunction is the joint guidance issued by OPM and OMB instructing agencies to develop plans for reductions in force. Oral Arg. Tr. 91-92, *NTEU v. Vought*, No. 25-5091 (Apr. 9, 2025). But the preliminary injunction does not bar the defendants from developing reduction-in-force plans, nor did it prohibit them from submitting those plans by the April 14, 2025 deadline. *See* Dkt. 70-2 at 4. Yet, the defendants did not make, let alone submit, a plan. *See* Dkt. 131-1 at 96; *see also id.* at 129 (Martinez saying he will "start strategizing on the" plan as of April 14). If they wish to do so now, nothing is stopping them.

### III.   The preliminary injunction was properly tailored to preserve the status quo during the pendency of the litigation.

**1.** By definition, a preliminary injunction is a "stopgap measure." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). Its purpose "is to preserve t[he] status quo"—that is, "the last uncontested status which preceded the pending controversy"—so that the court can award meaningful relief at the end of the case. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). The question, then, is not what relief should eventually be awarded should the plaintiffs prevail. It is what is necessary "to meet the exigencies of the situation," while the court proceeds on the merits. *Johnson v. Radford*, 449 F.2d 115, 117 (5th Cir. 1971) (a preliminary injunction "necessarily at times

lacks the degree of precision which may be required on final decree"); *see Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022).

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025). That equitable discretion is guided by "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017); *see Nebraska*, 52 F.4th at 1048. Thus, where "a proclivity for unlawful conduct has been shown," a court may need to enter a broader injunction to prevent "easy evasion." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-93 (1949); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137-38 (D.C. Cir. 2009). Similarly, where a defendant has engaged in otherwise lawful conduct to perpetuate an unlawful scheme, that conduct may need to be enjoined. *See United States v. Loew's*, 371 U.S. 38, 53 (1962); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971); *Chi. Tchrs. Union, Loc. No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 309 (1986); *Stryker Emp. Co. v. Abbas*, 60 F.4th 372, 382 (6th Cir. 2023); *English v. Town of Huntington*, 448 F.2d 319, 324 (2d Cir. 1971) (Friendly, J.). And the injunction, of course, must be administrable. *See Nebraska*, 52 F.4th at 1048 (citing *Covington*, 581 U.S. at 488).

The district court found that the defendants had decided to shut down the agency—and misled the court about it. The court entered an injunction that restores the status quo by undoing the actions that the defendants took to implement their

decision to shutter the Bureau; it also ensures that the court can award complete relief at the end of the case by preventing the defendants from taking those same actions again. The injunction goes no further than is necessary to preserve the status quo without embroiling the district court in compliance disputes or allowing easy evasion. The court did not abuse its discretion in entering it.

**2.** Although the defendants assert generally that the injunction is broader than necessary, they challenge only a few of its provisions. The defendants' main objection (at 58-59) is to the prohibition on mass terminations.[4] But the district court did not abuse its discretion in temporarily prohibiting the defendants from using the very tool they sought to use to eliminate the agency, until the court can decide the case on the merits. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation.").

The defendants protest that the prohibition should be narrower, but they never say how. *See J.D. v. Azar*, 925 F.3d 1291, 1335 (D.C. Cir. 2019) (courts are "not require[d] … to fashion narrower, ostensibly permissible policies from whole cloth"). Any narrower relief would either be unworkable or fail to preserve the status quo— or both. *See Nebraska*, 52 F.4th at 1048 (rejecting government's argument that

---

[4] The defendants also briefly challenge the reinstatement provision, but that provision merely restores the status quo. And it's already been effectuated. The same is true of the provision requiring the rescission of the contract-termination notices the defendants issued the week of February 10.

preliminary injunction should be narrower because the court "discern[ed] no workable path in this emergency posture for narrowing the scope of relief").

That's evident from the defendants' immediate attempt to eliminate almost 90% of the agency following this Court's initial stay order. That order amended the injunction to allow the defendants to fire employees if they'd made a particularized assessment that the employees were unnecessary to fulfill the Bureau's statutory functions. The Chief Operating Officer and Chief Information Officer agreed that, if the defendants had succeeded, the Bureau couldn't function "even for 60-days." Dkt. 131-1 at 92-94. So too did other leaders from across the agency. *See, e.g.*, Dkt. 131-1 at 92-94; Dkt. 127-7 ¶¶ 7-9; Dkt. 127-5 ¶ 7; Dkt. 127-6 ¶ 4. But the defendants nevertheless claimed that they had undertaken a "particularized assessment" and determined that the Bureau could somehow perform its statutory functions with only a handful of employees. JA895. And so, dubious as that claim was, an evidentiary hearing was necessary to determine whether the defendants had performed the "particularized assessment" mandated by this Court. JA896. Presumably that's why the panel sua sponte reinstated the full prohibition on mass terminations pending a decision on the merits. That is the narrowest possible administrable relief. Anything narrower would either enable the defendants to easily evade the court's strictures or embroil the district court in exactly the kind of enforcement disputes the defendants argue it should avoid.

The prohibition on contract terminations is even narrower: It allows the defendants to stop work—and payment—on any contract. It merely prohibits them from *finalizing* contract terminations, such that they cannot be undone should the district court determine at the end of the case that's what's necessary to award complete relief. JA747. For the first time on appeal, the defendants contend (at 66-67) that a vendor may choose to continue incurring costs after a stop-work order. The provision they cite does not say that. And the only evidence in the record is to the contrary. *See* JA412 (stop-work notice directing vendor to "incur[] no additional costs"). The district court cannot have abused its discretion in failing to consider a vague assertion that has no support in the record and that the defendants did not raise below.

Finally, the defendants challenge the prohibition on work stoppages, asserting (at 65) that it prohibits "temporary pauses in work activities" to reassess agency priorities. Again, the provision doesn't say that—and, in fact, the district court distinguished the defendants' across-the-board stop-work order from a lawful, temporary pause. JA752-53. The defendants' now-failed attempt to stop the agency's work by foregoing funding proves the necessity of this provision. *Supra* at 13-14. Without funding, the Bureau might technically have employees (on furlough), but it would cease to function at all—a work stoppage—and the plaintiffs would suffer the same injuries.

The defendants have demonstrated a jarring "proclivity for unlawful conduct." *McComb*, 336 U.S. at 192. They rushed to fire employees before the district court could entertain a challenge to them doing so, and then acted with similar haste to permanently cancel all contracts before anyone could stop them. When this Court gave them a partial stay, they used that leeway to attempt to destroy the agency's ability to function by eliminating 90% of the agency's staff. And they tried to choke the agency of funding while this Court decided the en banc petition. If ever there has been a need for an injunction to err on the side of avoiding easy evasion, this is it. But the district court did not err; it narrowly tailored the relief, and the defendants muster no convincing argument that there is any narrower administrable injunction that would preserve the status quo.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

*/s/ Jennifer D. Bennett*
JENNIFER D. BENNETT
GUPTA WESSLER LLP
235 Montgomery Street, Suite 629
San Francisco, CA 94104
(415) 573-0336
jennifer@guptawessler.com

DEEPAK GUPTA
ROBERT FRIEDMAN
STEFANIE OSTROWSKI
GUPTA WESSLER LLP

2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

PARAS N. SHAH
*General Counsel*
ALLISON C. GILES
*Associate General Counsel*
NATIONAL TREASURY EMPLOYEES UNION
800 K Street, NW, Suite 1000
Washington, DC 20001
(202) 572-5500

February 2, 2026                    *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

I hereby certify that my word processing program, Microsoft Word, counted 12,987 words in the foregoing brief, exclusive of the portions excluded by Rule 32(f). The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface in 14-point Baskerville font.

*/s/ Jennifer D. Bennett*
Jennifer D. Bennett

## CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jennifer D. Bennett*
Jennifer D. Bennett