# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL TREASURY EMPLOYEES UNION, ET AL.,

*Plaintiffs-Appellees,*

– v. –

RUSSELL VOUGHT, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 24-cv-0381-ABJ (The Hon. Amy Berman Jackson)

**EN BANC BRIEF OF NONPROFIT VETERANS, LEGAL
SERVICES, AND CONSUMER ORGANIZATIONS AS
AMICI CURIAE IN SUPPORT OF APPELLEES**

Seth E. Mermin
David S. Nahmias
Adam Dean
CENTER FOR CONSUMER LAW &
ECONOMIC JUSTICE
UC BERKELEY SCHOOL OF LAW
308 Berkeley Law
Berkeley, CA 94720-7200
(510) 643-3519
tmermin@law.berkeley.edu
dnahmias@law.berkeley.edu

Persis S. Yu (D.C. Bar No. 90014714)
PROTECT BORROWERS*
1025 Connecticut Ave NW, #717
Washington, DC 20036

Ariel Levinson-Waldman
A.J. Hong-Huber
John K. Blake
Marissa Ditkowksy
TZEDEK DC
UDC DAVID A. CLARKE SCHOOL OF LAW
4340 Connecticut Ave. NW, Ste. 345
Washington, D.C. 20008

R.T. Winston Berkman-Breen
PROTECT BORROWERS*
40 Rector Street, 9th Floor
New York, NY 10006

*A fiscally sponsored project of the
Shared Ascent Fund*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amici curiae certify as follows:

**A. Parties and Amici.**

Apart from the amici curiae listed below and any amici who have not yet entered an appearance in this case, all parties, intervenors, and amici appearing in this Court are listed in the En Banc Brief of Plaintiffs-Appellees.

- Americans for Financial Reform Education Fund

- Arkansas Community Organizations

- CASA of Oregon

- CASH Campaign of Maryland

- Center for Economic Integrity

- Center For Elder Law and Justice

- Center for LGBTQ Economic Advancement & Research

- Center for Responsible Lending

- Connecticut Veterans Legal Center

- Consumer Action

- Consumer Federation of America

- Consumers for Auto Reliability and Safety

- DannLaw

- Georgia Watch

- Legal Aid DC

- Legal Assistance for Seniors

- Mid-Minnesota Legal Aid

- Minority Veterans of America

- Mobilization for Justice

- Mountain State Justice, Inc.

- National Association of Consumer Advocates

- National Fair Housing Alliance

- New Economy Project

- New Jersey Appleseed Public Interest Law Center

- New Jersey Citizen Action

- New York Legal Assistance Group

- Oregon Consumer Justice

- People Power United

- Prosperity Indiana

- Protect Borrowers

- Public Counsel

- Public Good Law Center

- Public Justice Center

- Rise Economy

- Texas A & M School of Law - Family & Veterans Advocacy Clinic

- Texas Appleseed

- Tzedek DC

- Western New York Law Center

- Woodstock Institute

**B.    Ruling under Review.**

Reference to the ruling at issue appears in the En Banc Brief of Plaintiffs-Appellees.

**C.    Related Cases.**

Reference to any related cases pending before this Court appears in the En Banc Brief of Plaintiffs-Appellees.

Respectfully submitted,

/s/ David S. Nahmias
David S. Nahmias
*Counsel for Amici Curiae*

## **CORPORATE DISCLOSURE STATEMENT**

No party to this filing has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any party to this filing.

# CERTIFICATE OF COUNSEL

Pursuant to D.C. Circuit Rule 29(d), amici curiae are aware of five other potential amicus briefs in support of Appellees from Members of Congress, States and the District of Columbia, former CFPB officials, unions, and the Constitutional Accountability Center. Separate briefs are warranted. This brief offers the distinct perspective of national, state, and local veterans and other consumer organizations from across the country that advocate for the ordinary Americans who engage daily in the consumer financial marketplace and who would face inordinate harm if the CFPB is eliminated and its statutory functions ceased. The other briefs, by contrast, focus on the separation-of-powers concerns at issue in this case from the unique perspective of Congress, the consequences to the States' enforcement and financial supervisory efforts if the CFPB is shuttered, the particular viewpoints of former officials of the agency, organized labor groups including those representing federal employees, and a nonprofit organization with a specific interest in separation-of-powers questions.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENT ..........................................v

CERTIFICATE OF COUNSEL ..............................................................vi

TABLE OF CONTENTS ..................................................................... vii

TABLE OF AUTHORITIES................................................................. viii

GLOSSARY .......................................................................................xvi

INTEREST OF AMICI CURIAE ...........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.........................2

ARGUMENT .......................................................................................7

    I.    THE INJUNCTION PRESERVING THE CFPB IS
        NECESSARY TO PROTECT AMERICANS' FINANCIAL
        HEALTH, SAFEGUARD THE ECONOMY, AND PROMOTE
        THE PUBLIC INTEREST.................................................................8

        A.    The American Economy Relies on the CFPB to
            Administer Critical Federal Financial Laws. ...........................9

        B.    Critical Populations Benefit from the CFPB's Continued
            Enforcement of Financial Laws. ............................................12

        C.    The Injunction Preserves the CFPB's Vital Complaint
            Database. ................................................................................15

    II.    THE BALANCE OF EQUITIES WEIGHS HEAVILY IN
         FAVOR OF AFFIRMING THE INJUNCTION. ...............................19

    III.    THE ATTEMPTED SHUTDOWN VIOLATED THE
          SEPARATION OF POWERS. ..........................................................22

        A.    The Plaintiffs Properly Asserted an Independent Cause of
            Action to Challenge Defendants' Violation of the
            Separation Of Powers..............................................................23

        B.    Congress Did Not "Clearly Authorize" the CFPB
            Director to Dismantle the Agency...........................................26

CONCLUSION ...................................................................................28

CERTIFICATE OF SERVICE.............................................................31

CERTIFICATE OF COMPLIANCE ....................................................32

# TABLE OF AUTHORITIES

## CASES

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) ...................................................24

*Barlow v. Collins*,
397 U.S. 159 (1970)...................................................6, 23

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................24

*Biden v. Nebraska*,
600 U.S. 477 (2023)...................................................6, 27, 28

*Biden v. Texas*,
597 U.S. 785 (2022) ...................................................24

*Bond v. United States*,
564 U.S. 211 (2011) ...................................................23

*CFPB v. CFSA*,
601 U.S. 416 (2024)...................................................7, 10

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ...................................................24

*City & Cty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ...................................................26

*City of Arlington v. FCC*,
569 U.S. 290 (2013)...................................................25

*Collins v. Yellen*,
594 U.S. 220 (2021) ...................................................23, 25

*Dalton v. Specter*,
511 U.S. 462 (1994)...................................................6, 24, 25

*FCC v. Consumers' Rsch.*,
    606 U.S. 656 (2d Cir. 2017).........................................................27

*FHFA v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)..........................................................12

*Freytag v. Comm'r*,
    501 U.S. 868 (1991)...................................................................22

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025)........................................................25

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013). ................................................2, 27

*Hanson v. Dist. of Columbia*,
    120 F.4th 223 (2024)....................................................................9

*Hecht Co. v. Bowles*,
    21 U.S. 321 (1944).....................................................................20

*In re Aiken Cty.*,
    725 F.3d 255 (D.C. Cir. 2013) ...............................................20, 26

*INS v. Chadha*,
    462 U.S. 919 (1983)...................................................................22

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .......................................................20

*Matthews v. Zane's Lessee*,
    9 U.S. 92, 99 (5 Cranch 92) (1809) ............................................27

*Media Matters v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) ...................................................19

*NTEU v. Vought*,
    774 F. Supp. 3d 1 (D.D.C. 2025) ...............................2, 3, 19, 25

*NTEU v. Vought*,
    149 F.4th 762 (D.C. Cir. 2025) ...................................................3, 6

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020).................................................................2, 3, 9

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ........................................................................5

*The Confiscation Cases*,
    87 U.S. 92 (1873) .........................................................................23

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .....................................................................23

*Util. Air Regul. Grp. v. EPA*,
    572 U.S. 302 (2014)................................................................23, 27

*West Virginia v. EPA*,
    597 U.S. 697 (2022)...........................................................6, 27, 28

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................3, 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................23, 26

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 3................................................................23

## STATUTES

10 U.S.C. § 2687(b)...................................................................24

12 U.S.C. § 5481 ...................................................................9, 10
    § 5491(a)..................................................................................7
    § 5492(a)(5) .............................................................................6
    § 5493 ....................................................................................12
    § 5493(b)(3)............................................................................15

§ 5493(e)..............................................................4, 13
§ 5493(g)..............................................................14
§ 5495 ....................................................................9
§ 5511 ....................................................................9
§ 5511(a)................................................................9
§ 5514 ....................................................................7
§ 5514(b)(1)..........................................................10
§ 5514(b)(3)............................................................9
§ 5515 ....................................................................7
§ 5561 ....................................................................7
§ 5566 ....................................................................7
§ 5496(c)................................................................9
§ 5499 ..................................................................28

15 U.S.C. § 1601(a)..............................................10
§ 1681(a)(1)............................................10

## LEGISLATIVE MATERIALS

H.R. Rep. No. 111-157 (June 29, 2010) (Conf. Rep.)................................8

## RULES

Fed. R. App. P. 29(a)................................................1

## ADMINISTRATIVE ADJUDICATIONS

*Prime Choice Funding, Inc.*,
    CFPB No. 2020-BCFP-0006 (July 24, 2020) ................................14

*Sovereign Lending Grp.*,
    CFPB No. 2020-BCFP-0006 (July 24, 2020) ................................14

## OTHER AUTHORITIES

603 Legal Aid, *Consumer Financial Products & Services:*
    *Your Legal Rights Concerning Financial Services and Products* ..........17, 18

Brief of Fin. Regulation Scholars as Amici Curiae, *CFPB v. CFSA*,
    No. 22-448 (U.S. May 15, 2023) ................................11

Brief of Comm. Dev. Fin. Insts. & Credit Unions et al. as Amici Curiae, *CFPB v. CFSA*, No. 22-448 (U.S. May 15, 2023) ...................................................11

Brief of Farm Action et al. as Amici Curiae, *CFPB v. CFSA*, No. 22-448 (U.S. May 15, 2023) ...............................................11

Brief of Mortg. Bankers Ass'n et al. as Amici Curiae, *CFPB v. CFSA*, No. 22-448 (U.S. May 15, 2023) ...........................................11, 12

Brief of Tzedek DC as Amicus Curiae at 3, *NTEU v. Vought*, No. 25-381 (D.D.C. Feb. 21, 2025) ..........................................30

CFPB, *Annual Report: January 1 – December 31, 2024* (May 1, 2025)...............................................................15, 16

CFPB, *Annual Report of the CFPB Private Education Student Loan Ombudsman* (Jan. 9, 2026) ................................................21

CFPB, *Financial Resources for Serving Servicemembers, Veterans, and Military Families* (Jan. 3, 2025)............................................13

CFPB, *Four Million Complaints: More Than Just a Milestone* (Sept. 29, 2023)......................................................18

CFPB, Off. of Servicemember Affairs, *The CFPB is Protecting the Military Community and Providing Relief* (May 23, 2024)........................14

CFPB, *Submit a Complaint About a Financial Product or Service* (last modified Mar. 12, 2025) ...................................................15

CFPB, *Supervisory Highlights* (last modified Apr. 25, 2025) ...............................10

CFPB, *Supervisory Highlights: Mortgage Servicing Special Edition, Issue 11* (June 2016) ..................................................11

CFPB, *Supervisory Highlights: Issue 18* (Mar. 2019) ...........................................11

CFPB, *Supervisory Highlights: Junk Fees Special Edition: Issue 29* (Winter 2023)..................................................11

CFPB, *Supervisory Highlights: Issue 30* (Summer 2023) ......................................11

CFPB, *Supervisory Highlights: Issue 33* (Spring 2024) ........................................11

CFPB, *CFPB Takes Action Against Reverse Mortgage Lender for Deceptive Advertising* (Aug. 24, 2021) .......................................15

CFPB, *Working with Older Adults* (Dec. 4, 2024)................................................14

Charlotte Haendler & Rawley Z. Heimer, *The Hidden Costs of Financial Services: Consumer Complaints and Financial Restitution* (Apr. 15, 2025) ..........................................17

*Consumer Complaint Database*, CFPB (as of Feb. 9, 2026, 12:50 pm ET) ..........16

Eden Harris, *CFPB Ends Key Mortgage Alert Service For Banks*, The Banker (Jan. 29, 2026)............................................21

E. Tammy Kim, *Killing The Military's Consumer Watchdog*, The New Yorker (Mar. 18, 2025) ..................................................13

Evan Weinberger, *CFPB to Slash Examinations, Switch to All-Virtual Reviews*, Bloomberg (Jan. 29, 2026)............................................22

Fed. Reserve Bank of N.Y., *Quarterly Report on Household Debt and Credit—2024: Q4* (Feb. 2025) ....................................................4, 8

Ian Ayres et al., *Skeletons in the Database: An Early Analysis of the CFPB's Consumer Complaints*, 19 Fordham J. Corp. & Fin. L. 343 (2014) ........................................16

Jason Richardson & Allyson Emblom, *The CFPB's Consumer Complaint Database Tells a Story About Our Economy We Need to Hear*, Nat'l Cmty. Reinv. Coal. (Apr. 5, 2019) ..............................16

Jilenne Gunther, AARP, *The Scope of Elder Financial Exploitation: What It Costs Victims* (2023) ........................................14

Jeff Kauflin, *How Trump's Hatchet Man Is Destroying Consumer Protections*,
Forbes (Nov. 3, 2025) ...............................................................21

Joel Jacobs, *These GOP Lawmakers Referred Constituents to the
CFPB for Help. Then They Voted to Gut the Agency*,
ProPublica (Aug. 6, 2025) .....................................................7, 17

Juan M. Sánchez & Masataka Mori, Fed. Reserve Bank of St. Louis,
*The Broad, Continuing Rise in Delinquent U.S. Credit Card Debt
Revisited* (Mar. 9, 2025) .............................................................8

Legal Aid Soc'y of San Bernardino,
*Helpful Resources* .....................................................................17

Marcus Baram, *With the Destruction of the Consumer Financial
Protection Bureau, Fraud Victim 'Not Hopeful' He'll Be
Refunded*, Capital & Main (Apr. 4, 2025).....................................18

Matt Sedensky, *Consumer Watchdog Agency Called "Vicious"
By Trump Seen As A Hero To Many It Aided*,
L.A. Times (Feb. 18, 2025)...........................................................18

Matthew A. Bruckner & Christopher J. Ryan, *The Magic of Fintech?
Insights for a Regulatory Agency From Analyzing
Student Loan Complaints Filed with the CFPB*,
127 Dick. L. Rev. 49 (2022) ........................................................16

Nandita Bose et al., *White House Budget Director Plans to Shut US Consumer
Finance Watchdog Within Months*, Reuters (Oct. 15, 2025).........21

Nat'l Ass'n of Federally-Insured Credit Unions, Comment Letter on
Proposed Rulemaking on the "Role of Supervisory Guidance"
(Dec. 30, 2020)...........................................................................10

Ron Lieber, *Where Military Paychecks are Prime Targets*, N.Y. Times
(June 22, 2023)........................................................................4, 17

Sachin Shiva & Lilith Fellowes-Granda, *The Consumer Financial Protection Bureau Has Helped Millions of Americans*, Ctr. for Am. Progress (June 10, 2025) ....................................................16, 17

Steven M. Graves & Christopher L. Peterson, *Predatory Lending and the Military: The Law and Geography of "Payday" Loans in Military Towns*, 66 Ohio St. L.J. 653 (2005) ................................................13

U.S. Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (Aug. 9, 2006) ............................................................................................13

U.S. Dep't of Def., *Report on the Military Lending Act and the Effects of High Interest Rates on Readiness* (2021)......................................13

Yiwei Dou et al., *Learning from Peers: Evidence from Disclosure of Consumer Complaints*, 77 J. Acct. & Econ. 101620 (2024).........................16

# <u>GLOSSARY</u>

CFPB        Consumer Financial Protection Bureau

CFSA        Community Financial Services Association of America

FCC          Federal Communications Commission

FHFA        Federal Housing Finance Agency

GAO         Government Accountability Office

NTEU        National Treasury Employees Union

VA            United States Department of Veterans Affairs

# INTEREST OF AMICI CURIAE[1]

Amici curiae are nonprofit organizations that rely on the Consumer Financial Protection Bureau (CFPB) for information, enforcement, and client education. Amici include organizations that serve populations at particular risk of fraud and deception in the lending market—including populations that Congress mandated that the CFPB assist. Others contribute to and benefit from generally applicable CFPB rulemakings, guidance, and materials to support their clients. They consist of organizations dedicated to serving veterans and older Americans to those focused on housing, from providers of free legal services to advocates working in state legislatures.

All amici curiae hold a collective interest in the continued viability of the CFPB, and they are well-suited to articulate the interests of the myriad sectors of the American population that suffer the consequences of Defendants' decision to dismantle the Bureau without lawful authority and in violation of the separation of powers.

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than amici curiae, their members, and their counsel made a monetary contribution to the preparation or submission of this brief. Fed. R. App. P. 29(a). All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"[T]his is a case about one branch of government arrogating to itself power belonging to another." *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

In February and March 2025, the new acting director of the CFPB attempted to arrogate to himself the authority to eliminate the CFPB. Congress never gave him that power. After taking evidence over two days, the district court found that Defendants had attempted "to dismantle and shut down the agency entirely, in violation of statutory mandates" and immediately enjoined them from finishing their plan. *NTEU v. Vought*, 774 F. Supp. 3d 1, 81-82 (D.D.C. 2025) (*NTEU I*). Absent that court's injunction, the CFPB would have been abolished— jeopardizing 340 million consumers and returning the nation to the unprotected state in which it stood prior to the Great Recession.

Congress created the CFPB in 2010 after unchecked predatory practices in the residential mortgage market caused the loss of $11 trillion in household wealth and resulted in the worst economic crisis since the Great Depression. To prevent future collapses, lawmakers empowered the CFPB to oversee the nation's vast consumer financial market, maintain a fair and stable financial system, and ensure that a collapse like the 2008 financial crisis would not happen again. Eliminating the CFPB "would trigger a major regulatory disruption and would leave

appreciable damage to Congress's work in the consumer-finance arena." *Seila Law LLC v. CFPB*, 591 U.S. 197, 236-37 (2020).

Yet that is exactly what Defendants aimed to do. They deliberately orchestrated a plan "to shut the agency down entirely and to do it fast." *NTEU I*, 774 F. Supp. 3d at 11. Their own testimony affirms that Defendants barred employees from entering the CFPB's building, terminated contracts, relinquished funding, and instigated mass layoffs. *See, e.g.*, J.A. 88-95, 101, 103-114, 117-122, 240-242. The district court, recognizing an unprecedented and unconstitutional violation of the separation of powers, correctly halted this executive overreach. The panel's divided decision that it could not review the legality of those actions, *NTEU v. Vought*, 149 F.4th 762, 790, 793 (D.C. Cir. 2025) (*NTEU II*), does not accord with cornerstone principles of the separation of powers, *id.* at 824-25 (Pillard, J., dissenting).

The substantial harms to Americans and the national economy from Defendants' unconstitutional actions strongly support the district court's order halting their planned closure of the CFPB. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (requiring an injunction to be in the public interest and the balance of equities in favor of the plaintiff). Because Plaintiffs claims are also justiciable and likely to succeed on the merits, the district court's injunction should be affirmed. *Id.* First, the Bureau performs an essential role in supervising the $18

trillion household consumer debt market[2] and enforcing federal law. Multiple industries in the financial sector now rely on the Bureau's supervision and examination authority to conduct business. Yet these statutory responsibilities cannot be performed if the agency is shuttered. Closure of the Bureau means it cannot conduct investigations, secure restitution payments for harmed consumers, or provide stability for financial markets.

Second, the consequences of the Defendants' action are particularly severe for those populations that are disproportionately targeted with unfair and deceptive practices—including servicemembers, veterans, and seniors. Congress expressly reflected its intent to protect these populations in the Dodd-Frank Act, structuring the Bureau to addressed heightened risks faced by these groups and directing the Bureau to create specialized offices to serve them. 12 U.S.C. § 5493(e), (g). Shutting down the CFPB would vitiate Congress's command that the CFPB direct specialized focus to, provide educational services to, and safeguard especially vulnerable communities. Without the Bureau's investigations and enforcement, those groups are less likely to obtain protections and relief.

Third, Defendants' shuttering of the CFPB compromises the Bureau's ability to respond to consumers who are targeted by predatory lenders, informally resolve

---

[2] *See* Fed. Reserve Bank of N.Y., *Quarterly Report on Household Debt and Credit—2024: Q4* (Feb. 2025), https://perma.cc/B8U6-DBVD (aggregating mortgage, student, automobile, credit card, and other forms of household debt).

fraud complaints, and monitor markets for dangerous financial products and practices. In the CFPB's absence, consumers and their advocates will lose the Bureau's unique and congressionally mandated public complaint database. Dismantling the database poses grave harm to the public interest that only a preliminary injunction can forestall.

The balance of the equities thus leans heavily toward Plaintiffs and maintaining the preliminary injunction. Meanwhile, Defendants offer no meaningful arguments that eliminating the CFPB serves the public interest—nor could they. *See* OB 16, 62-64. An unlawful power grab carries no weight in the balance-of-equities analysis. Defendants' policy arguments about administrative efficiency are better directed toward Congress, which holds the "exclusive" power to "formulate policies [and] mandate programs and projects" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). Defendants' additional stated concerns about judicial intrusion into agency affairs are belied by their repeated attempts to flout the injunction; those attempts make clear that abolishing the CFPB remains their ultimate goal. That goal cannot be lawfully achieved through executive action.

This Court should treat Defendants' actions as what they were: a unilateral and unconstitutional attempt to breach the separation of powers and abolish the nation's consumer financial watchdog. Neither the Dodd-Frank Act nor any other source of federal law gives Defendants the authority to destroy a congressionally

constituted agency without Congress's involvement. The panel's "constricted view" of the judiciary's ability—echoed by Defendants—to review agency actions like those in this case misreads U.S. Supreme Court precedent. *NTEU II*, 149 F.4th at 795 (Pillard, J., dissenting); *see Dalton v. Specter*, 511 U.S. 462 (1994) (holding as unreviewable claim that the President exceeded his authority under a specific statute that conferred him discretionary authority); *Barlow v. Collins*, 397 U.S. 159, 166 (1970) (explaining that "judicial review of [federal] administrative action is the rule, and nonreviewability an exception which must be demonstrated"). If this constricted view were correct, no one could ever challenge any violations of the separation of powers.

The Executive Branch eliminating an agency created by Congress is a textbook separation of powers violation. Such a "highly consequential" kind of executive action requires "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (explicating the "major questions doctrine"). The "staggering" political and economic risks, *Nebraska*, 600 U.S. at 502, that would befall millions of Americans who engage in the consumer financial marketplace daily are too great to permit Defendants to carry out their plan without congressional approbation. Congress never gave the Executive any power to eviscerate the CFPB.

The district court's preliminary injunction should be affirmed.

**ARGUMENT**

The CFPB is the linchpin of modern consumer financial protection in the United States. In the Dodd-Frank Act, Congress "vest[ed] the Bureau with sweeping authority," *CFPB v. CFSA*, 601 U.S. 416, 422 (2024), and mandated that it perform a wide array of activities to oversee the nation's vast consumer financial market and maintain a fair and stable financial system. *See* 12 U.S.C. §§ 5491(a), 5514-5515, 5561-5566; J.A. 256-282 (enumerating the CFPB's mandates). The public interest points decisively toward ensuring that the Bureau can fulfill those statutory mandates.

The equities plainly lie in favor of enjoining Defendants' plan, maintaining the status quo, and preserving a congressionally mandated agency. Elimination of the Bureau would abolish the agency that the American public relies on to root out toxic financial products, predatory lending, and fraudulent schemes—an agency that has returned over $20 billion to consumers in the fifteen years that it has been operating.[3] It would also threaten widespread economic disruption and burden the hundreds of millions of Americans who collectively hold $18 trillion in household

---

[3] Joel Jacobs, *These GOP Lawmakers Referred Constituents to the CFPB for Help. Then They Voted to Gut the Agency*, ProPublica (Aug. 6, 2025), https://perma.cc/6Q42-34LA.

debt[4] and depend on the Bureau's active oversight and protection. *See Winter*, 555 U.S. at 25 (requiring "particular regard for the public consequences" of an injunction). With consumer financial fragility now reaching 2008 levels by some metrics,[5] the gutting of the Bureau today poses significant danger to the U.S. economy and contravenes the very purpose of the Dodd-Frank Act.

Defendants here do not dispute the substance of Plaintiffs' statutory and constitutional claims or their likelihood of success; instead, they merely attack their justiciability, the credibility of the district court's evidentiary findings, and a supposedly burdensome injunction. Yet Defendants cannot plausibly assert any public interest in sustaining these unconstitutional actions. To the contrary, eliminating the Bureau and, in doing so, permitting the Executive to violate the balance of powers threatens significant harm to the American public.

## I. THE INJUNCTION PRESERVING THE CFPB IS NECESSARY TO PROTECT AMERICANS' FINANCIAL HEALTH, SAFEGUARD THE ECONOMY, AND PROMOTE THE PUBLIC INTEREST.

The interests of the hundreds of millions of Americans who engage daily in the multitrillion-dollar consumer financial market lie in favor of maintaining a

---

[4] *See* Fed. Reserve Bank of N.Y., *supra* (aggregating mortgage, student, automobile, credit card, and other forms of household debt).

[5] *See* Juan M. Sánchez & Masataka Mori, Fed. Reserve Bank of St. Louis, *The Broad, Continuing Rise in Delinquent U.S. Credit Card Debt Revisited* (Mar. 9, 2025), https://perma.cc/C729-G7MS.

functioning CFPB. *See Hanson v. Dist. of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (weighing the harms of issuing an injunction to the public). The public benefits enormously from the CFPB's work detecting and preventing the type of predatory lending, consumer fraud, and deceptive practices that precipitated the Great Recession.

## A. The American Economy Relies on the CFPB to Administer Critical Federal Financial Laws.

The injunction halting Defendants' planned closure of the CFPB serves the public's substantial interest in maintaining a "fair, transparent, and competitive" consumer financial marketplace. 12 U.S.C. § 5511(a). Congress established the Bureau after the 2008 financial crisis "cost millions of Americans their jobs, their retirements, and their homes" in order to "safeguard consumers' financial interests and the stability of the financial system." *Seila*, 591 U.S. at 205. Congress tasked the CFPB with proactively supervising the financial industry, identifying risks to consumers, coordinating agencies to maintain a stable financial sector, and reporting on the health of the financial sector. *See, e.g.*, 12 U.S.C. §§ 5481, 5495, 5496(c), 5511, 5514(b)(3); *see also* H.R. Rep. No. 111-157, at 874 (June 29, 2010) (Conf. Rep.) (stating that Congress intended the CFPB to "have the authority and accountability to ensure that existing consumer protection laws and regulations are comprehensive, fair, and vigorously enforced"). Congress also directed the CFPB to enforce eighteen federal statutes that predate the Dodd-Frank Act and are meant

to promote transparency, competition, and public confidence in the banking sector. 12 U.S.C. § 5481; *see, e.g.*, 15 U.S.C. § 1601(a) (Truth In Lending Act); *id.* § 1681(a)(1) (Fair Credit Reporting Act).

Eliminating the CFPB threatens to bring back the conditions that led to the 2008 financial crisis. Additionally, among many duties intended to avert future economic calamities, the Bureau's examination authority helps ensure financial firms' compliance with federal consumer financial laws and promote a stable and functioning financial sector. *See* 12 U.S.C. § 5514(b)(1) (requiring examinations reporting for consumer risk assessment and compliance).[6] The Bureau's *Supervisory Highlights* regularly flag problematic industry trends and offer guidance on which businesses rely to shape internal compliance programs and avoid liability.[7] The industry now relies on the CFPB's examination authority to provide stability to the economy. Dismantling the CFPB risks upsetting this

---

[6] *See also* CFPB, *Supervisory Highlights* (last modified Apr. 25, 2025), https://perma.cc/EFX3-T82R (purpose of sharing examination findings is to advise financial institutions about industry trends "to limit risks to consumers and comply with federal consumer financial law").

[7] *See, e.g.*, Nat'l Ass'n of Federally-Insured Credit Unions, Comment Letter on Proposed Rulemaking on the "Role of Supervisory Guidance" (Dec. 30, 2020), https://perma.cc/VM4E-GA8A ("Supervisory guidance plays a critical role in assisting credit unions to shape their practices, policies, and procedures. Transparent guidance serves as a valuable resource to provide a more consistent supervisory approach.").

carefully constructed system—a risk about which mortgage lenders, credit unions, farmers, and financial scholars have all warned the Supreme Court.[8]

For instance, the CFPB's robust supervision of the mortgage industry—the sector that most "contributed to the housing bubble that created the 2008 financial crisis," *FHFA v. Nomura Holding Am., Inc.*, 873 F.3d 85, 154 (2d Cir. 2017), and nearly sank the world economy—will end if Defendants are permitted to abolish the agency. Recent editions of the *Supervisory Highlights* have identified unfair, deceptive, and potentially unlawful practices by mortgage servicers, "particularly in the areas of loss mitigation and servicing transfers," that could pose "considerable risk to consumers," and that offer recommendations for servicer compliance.[9] CFPB rules "are now baked into the daily functioning of the

---

[8] *See* Brief of Mortg. Bankers Ass'n et al. as Amici Curiae, *CFPB v. CFSA*, No. 22-448 (U.S. May 15, 2023), https://perma.cc/Z2H4-MYXH (mortgage lenders); Brief of Comm. Dev. Fin. Insts. & Credit Unions et al. as Amici Curiae, *CFSA*, https://perma.cc/3Q5L-MN74 (credit unions); Brief of Farm Action et al. as Amici Curiae, *CFSA*, https://perma.cc/DB3C-CDXN (farmers); Brief of Fin. Regulation Scholars as Amici Curiae, *CFSA*, https://perma.cc/5HMM-H9KT.

[9] CFPB, *Supervisory Highlights: Issue 33* (Spring 2024), https://perma.cc/HWQ3-6WEH; CFPB, *Supervisory Highlights: Issue 30*, at 21-25 (Summer 2023), https://perma.cc/HWQ3-6WEH; CFPB, *Supervisory Highlights: Junk Fees Special Edition: Issue 29*, at 9-12 (Winter 2023), https://perma.cc/HWQ3-6WEH; CFPB, *Supervisory Highlights: Mortgage Servicing Special Edition, Issue 11* (June 2016), https://perma.cc/HWQ3-6WEH. In March 2019, for example, the Bureau identified mortgage servicers charging consumers unauthorized amounts, misrepresenting private mortgage insurance cancellation denial reasons, failing to exercise reasonable diligence in completing loss mitigation applications, and sending insufficient notices to successors-in-interest of home equity mortgages.

mortgage industry," along with compliance programs that "ensure adherence of the CFPB's rules for loan origination and servicing" and "mandatory disclosures and business operation regulations for transparency and consistency."[10] Industry leaders fear that ending the Bureau's essential work could cause the mortgage market to "grind to a halt," and "chaos would ensue."[11] Yet that is the likely result if the Defendants are permitted to execute their shutdown plan and eliminate the regime that Congress created to oversee the financial industry after the 2008 crisis.

## B. Critical Populations Benefit from the CFPB's Continued Enforcement of Financial Laws.

Closing the Bureau, as Defendants attempted to do, also jeopardizes Congress's mandate that the CFPB protect "traditionally underserved communities," like servicemembers and older adults, from financial exploitation and predatory lending schemes. *See* 12 U.S.C. § 5493. Congress established dedicated offices within the Bureau to serve particular populations, recognizing that those groups are specifically targeted by fraudsters and that they may have limited ability to protect themselves. *Id.* The public interest lies overwhelmingly in preserving the functions that Congress enacted to serve these communities.

---

CFPB, *Supervisory Highlights: Issue 18*, at 6-10 (Mar. 2019), https://perma.cc/64ZM-H85B.

[10] Brief of Mortg. Bankers at 6, *CFPB v. CFSA*, *supra* note 8.

[11] *Id.* at 11-12.

For example, the CFPB protects active duty servicemembers and veterans from scammers and unscrupulous lenders. The Bureau cannot fulfill that role if Defendants are permitted to shut down the agency. Aggressive lenders have long routinely targeted servicemembers and veterans with high-cost loans that burden them with unmanageable debt and can lead to disciplinary action and even discharge.[12] The resulting financial instability can compromise servicemembers' job readiness and raises acute national security concerns.[13] Congress created the CFPB's Office of Servicemember Affairs to meet these challenges. 12 U.S.C. § 5493(e).[14] The office handles complaints, coordinates cross-agency enforcement, and monitors trends in financial harm to military families. Over the past fourteen years, military families have submitted more than 400,000 complaints to the CFPB—with a dramatic increase in the past few years—and received $183 million

---

[12] U.S. Dep't of Def., *Report on the Military Lending Act and the Effects of High Interest Rates on Readiness* 15 (2021), https://perma.cc/6D5Q-WJ83 (warning that servicemembers' individual financial insecurity can impact military readiness); E. Tammy Kim, *Killing The Military's Consumer Watchdog*, The New Yorker (Mar. 18, 2025), https://perma.cc/KZ8S-QMPR; *see also* Steven M. Graves & Christopher L. Peterson, *Predatory Lending and the Military: The Law and Geography of "Payday" Loans in Military Towns*, 66 Ohio St. L.J. 653, 659 (2005).

[13] U.S. Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and their Dependents* 50-53 (2006), https://perma.cc/6BW3-RGKS (declaring that "predatory lending undermines military readiness").

[14] *See* CFPB, *Financial Resources for Serving Servicemembers, Veterans, and Military Families* (Jan. 3, 2025), https://perma.cc/9VVZ-D2YG.

in relief from the CFPB's work.[15] The Bureau has also brought actions against mortgage lenders that disseminated deceptive mailers to servicemembers and veterans about VA-guaranteed loans that illegally misrepresented credit terms.[16] Because the Bureau is often the only federal authority that holds systematic offenders accountable, dismantling its operations— including the Office of Servicemember Affairs—puts military families at risk.

Similarly, millions of older Americans would lose the primary cop on the beat protecting them from corporate fraud. Elder financial abuse costs victims more than $28 billion annually.[17] Mindful that aggressive lenders routinely prey on senior citizens, Congress created an Office of Financial Protection for Older Americans within the CFPB with fifteen distinct research, education, and coordination responsibilities. 12 U.S.C. § 5493(g).[18] The Bureau has also

---

[15] CFPB, Off. of Servicemember Affairs, *The CFPB is Protecting the Military Community and Providing Relief* (May 23, 2024), https://perma.cc/3P3J-ZHJY.

[16] *See, e.g.*, *Prime Choice Funding, Inc.*, CFPB No. 2020-BCFP-0006 (July 24, 2020), https://perma.cc/UC9S-FVLU; *Sovereign Lending Grp.*, CFPB No. 2020-BCFP-0006 (July 24, 2020), https://perma.cc/4PKU-J8QV.

[17] Jilenne Gunther, AARP, *The Scope of Elder Financial Exploitation: What It Costs Victims* 1 (2023), https://perma.cc/Q3Y9-M8KR.

[18] CFPB, *Working with Older Adults* (Dec. 4, 2024), https://perma.cc/VJ3R-2WYG.

prosecuted cases against companies that target older homeowners with deceptive reverse mortgage products and advertisements.[19]

None of the Bureau's required functions protecting servicemembers and older Americans will continue if the injunction is vacated and the Bureau is closed. Absent the district court's injunction, vulnerable populations will lose the only federal agency dedicated to protecting their financial wellbeing.

## C. The Injunction Preserves the CFPB's Vital Complaint Database.

Finally, the elimination of the CFPB would undermine the Bureau's most effective system to monitor markets, defend consumer welfare, and serve ordinary Americans who fall victim to financial fraud: its statutorily mandated, unique complaint process and database. The CFPB's active management of the complaint database helps expose bad actors, resolve individual matters informally, and identify patterns in the marketplace to inform future enforcement. *See* 12 U.S.C. § 5493(b)(3); J.A. 61-68.[20] The portal allows consumers to file complaints directly with the agency, which ordinarily results in a response from the lender and resolution within sixty days.[21] The platform's transparency and accessibility make

---

[19] CFPB, *CFPB Takes Action Against Reverse Mortgage Lender for Deceptive Advertising* (Aug. 24, 2021), https://perma.cc/Q5AZ-8ZHT.

[20] *See generally* CFPB, *Submit a Complaint About a Financial Product or Service* (last modified Mar. 12, 2025), https://perma.cc/5JW4-BP4S.

[21] *Id.* Of the nearly three million complaints the CFPB forwarded to companies for review in 2024, "[a]pproximately 13% of complaints were closed within the initial

it invaluable to direct service providers, allowing them to identify patterns and

practices that they can use to hold bad actors accountable for fraud and deception.[22]

Additionally, public access to company responses has created a strong incentive

for compliance and dispute resolution without litigation—outcomes that benefit

both consumers and the financial system as a whole.[23] An astounding 98 percent of

complaints forwarded to companies have received "timely responses."[24] Since the

portal launched in 2011, it has processed nearly 13 million consumer complaints,

including at least 340,000 submitted by servicemembers and older Americans.[25]

---

response period of 15 days and 98% were closed within the final response period of 60 days." CFPB, *Consumer Response Annual Report: January 1 – December 31, 2024*, at 17 (May 1, 2025), https://perma.cc/UE3K-5SH3.

[22] *See, e.g.*, Matthew A. Bruckner & Christopher J. Ryan, *The Magic of Fintech? Insights for a Regulatory Agency From Analyzing Student Loan Complaints Filed with the CFPB*, 127 Dick. L. Rev. 49 (2022); Jason Richardson & Allyson Emblom, *The CFPB's Consumer Complaint Database Tells a Story About Our Economy We Need to Hear*, Nat'l Cmty. Reinv. Coal. (Apr. 5, 2019), https://perma.cc/KWU4-UA3M; Ian Ayres et al., *Skeletons in the Database: An Early Analysis of the CFPB's Consumer Complaints*, 19 Fordham J. Corp. & Fin. L. 343 (2014).

[23] Yiwei Dou et al., *Learning from Peers: Evidence from Disclosure of Consumer Complaints*, 77 J. Acct. & Econ. 101620 (2024).

[24] Sachin Shiva & Lilith Fellowes-Granda, *The Consumer Financial Protection Bureau Has Helped Millions of Americans*, Ctr. for Am. Progress (June 10, 2025), https://tinyurl.com/4vayhbss.

[25] *Consumer Complaint Database*, CFPB (as of Feb. 9, 2026, 12:50 pm ET), https://tinyurl.com/5jdtvfb4.

One recent study found that companies subject to complaints lodged with the Bureau have returned on average $1,470 per complaint to consumers.[26]

If Defendants succeed in their quest to eliminate the Bureau, they will likely disable the CFPB complaint database—one of the most valuable and responsive tools operated by the federal government to serve the American public. Members of Congress from both parties have steered nearly 24,000 complaints from their constituents to the Bureau, which has "lessened the burden on congressional offices."[27] One recent analysis notably shows a high number of complaints filed in states in the Southeast and rural districts.[28] Resource-strapped legal services organizations also often refer clients to the CFPB's complaint submission portal when the CFPB has greater expertise on an issue, when its enforcement powers are more likely to resolve the matter, or when the legal services provider does not have the resources to provide assistance itself. J.A. 72-75 (affidavit from Plaintiff Virginia Poverty Law Center).[29] One legal aid client in Washington, D.C., for

---

[26] Charlotte Haendler & Rawley Z. Heimer, *The Hidden Costs of Financial Services: Consumer Complaints and Financial Restitution* 12 (Apr. 15, 2025), https://ssrn.com/abstract=5218602.

[27] Jacobs, *supra*.

[28] *See* Shiva & Fellowes-Granda, *supra*.

[29] Legal Aid Soc'y of San Bernardino, *Helpful Resources*, https://perma.cc/LGF4-QVK9 (referring legal aid clients to the CFPB complaint portal); 603 Legal Aid, *Consumer Financial Products & Services: Your Legal Rights Concerning Financial Services and Products*, https://perma.cc/2R95-4X8T (same).

example, had no success disputing fraudulent charges on his prepaid card, even with the support of counsel, until he submitted a complaint to the CFPB; the next day the company credited the money back to his account.[30] The CFPB's complaint process has obtained beneficial resolutions for millions of similar consumers—from a retired teacher in Arizona harassed by debt collectors to an elderly couple in Virgina that was scammed by fintech platforms.[31] The Bureau's work through the complaint database has resulted in thousands of similar stories and outcomes for the populations Congress sought to protect when establishing the CFPB.

The dismantling of the Bureau jeopardizes the continued accuracy and availability of this invaluable tool. As the district court found based on testimony by CFPB personnel, when Defendants first implemented their planned closure, operations related to the complaint database ceased and resulted in a backlog of

---

[30] Brief of Tzedek DC as Amicus Curiae at 3, *NTEU v. Vought*, No. 25-381 (D.D.C. Feb. 21, 2025).

[31] CFPB, *Four Million Complaints: More Than Just a Milestone* (Sept. 29, 2023), https://perma.cc/DF84-WGEZ; *see, e.g.*, Matt Sedensky, *Consumer Watchdog Agency Called "Vicious" By Trump Seen As A Hero To Many It Aided*, L.A. Times (Feb. 18, 2025), https://perma.cc/CQ5N-K94F (describing how the CFPB complaint process helped one person in Phoenix stop debt collectors from harassing her 95-year-old father over unpaid medical bills, and helped a retired auto dealership manager in Las Vegas stop receiving unnecessary bills from his mortgage lender); Marcus Baram, *With the Destruction of the Consumer Financial Protection Bureau, Fraud Victim 'Not Hopeful' He'll Be Refunded*, Capital & Main (Apr. 4, 2025), https://perma.cc/UE2M-F494 (describing a retired couple scammed out of $45,000 by PayPal and CashApp who received partial refunds only after filing a complaint with the CFPB).

16,000 complaints. *NTEU*, 774 F. Supp. 3d at 66. It only survived once the district court intervened. If the complaint portal is shut down, millions of Americans will lose what is often the only accessible mechanism for vindicating their statutorily guaranteed consumer protection rights.

* * *

If fully executed, Defendants' plan to eliminate the Bureau would eviscerate a statutorily created agency and run roughshod over Congress. The district court's injunction preserves an entire regulatory regime that Congress enacted to guard the interests of American consumers and bolster the economy. Without the Bureau, the legal guarantees Congress wrote in the Dodd-Frank Act will become empty promises. That outcome serves no one except the actors lawmakers intended to hold accountable for harming consumers.

## II. THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF AFFIRMING THE INJUNCTION.

The public interest in issuing and affirming the injunction and preserving the status quo is compelling. That factor, and thus the balance of equities, tips the scale solidly toward Plaintiffs. *See Media Matters v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (explaining that "[t]he balance of equities and public interest factors merge if the government is the opposing party"). On the other side, Defendants gesture vaguely toward a public interest in the President's effectuating his "policy

priorities" including "reducing the federal government's operational footprint." *See* OB 6, 63. Yet a presidential policy priority does not serve the public interest by violating the law. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."). Moreover, the ultimate policy decision to cut agency expenditures is reserved for Congress. *In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.) ("[F]ederal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress").

Defendants' choice to defy the district court's orders further indicate that the equities favor the injunction. Defendants bemoan "invasive" actions by the district court, which has repeatedly had to step in to enforce its injunction. OB 63-64. But what these episodes demonstrate is not "interfere[nce]," OB 16, but a federal court employing its equitable authority to hold Defendants accountable for their blatant attempts to evade the injunction. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329-330 (1944) (recognizing federal district courts' equitable power to "mould each decree to the necessities of the particular case"). The injunction is the only shield protecting Americans from a shuttered CFPB and, with it, the re-proliferation of unfair and deceptive financial practices that prey on consumers.

Notwithstanding the injunction, Defendants have repeatedly tried to hamstring the Bureau. For instance, maintenance of the complaint database has deteriorated over the past year, with slower response times from respondent complaints and a sharp increase in unresolved complaints.[32] Also, the CFPB recently stopped conducting in-person examinations[33] and notifying banks about changes to a mortgage disclosure platform that financial institutions rely on to monitor fair lending compliance.[34] Most egregiously, the acting director openly tried to flout the injunction by announcing that the agency would be gone within "two or three months"[35] and refusing to request any more funding for the agency, *see* J.A. 123. Given Defendants' unmistakable intent to complete their unlawful quest to eliminate the Bureau, the balance of equities weighs firmly toward upholding the injunction.

---

[32] *See* Jeff Kauflin, *How Trump's Hatchet Man Is Destroying Consumer Protections*, Forbes (Nov. 3, 2025), https://perma.cc/XUY4-WFYZ. Even the Bureau acknowledges the decrease in timely responses. CFPB, *Annual Report of the CFPB Private Education Student Loan Ombudsman* 2 (Jan. 9, 2026), https://perma.cc/36HF-TZV9.

[33] Evan Weinberger, *CFPB to Slash Examinations, Switch to All-Virtual Reviews*, Bloomberg (Jan. 29, 2026), https://tinyurl.com/yc6p8jd2.

[34] Eden Harris, *CFPB Ends Key Mortgage Alert Service For Banks*, The Banker (Jan. 29, 2026), https://tinyurl.com/4swb54sr.

[35] Nandita Bose et al., *White House Budget Director Plans to Shut US Consumer Finance Watchdog Within Months*, Reuters (Oct. 15, 2025), https://tinyurl.com/5x5sb5tf.

## III. THE ATTEMPTED SHUTDOWN VIOLATED THE SEPARATION OF POWERS.

Finally, Defendants cannot justify their extraordinary assertion of unchecked power to close the Bureau, which exceeds the constitutional bounds of executive authority enshrined in the separation of powers. An injunction is the proper remedy to address this textbook violation of the Constitution. *See Freytag v. Comm'r*, 501 U.S. 868, 678 (1991) (noting the judiciary's "strong interest" in "maintaining the constitutional plan of separation of powers"); *INS v. Chadha*, 462 U.S. 919, 962-63 (1983) (Powell, J., concurring) (noting that "where one branch has impaired or sought to assume a power central to another branch, the Court has not hesitated to enforce the [separation of powers] doctrine"). Accordingly, Plaintiffs' claims are justiciable and likely to succeed on the merits.

The dismantling of the CFPB without congressional authorization would violate the balance of powers that is "woven into" the fabric of our nation. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 421-23 (2021). Defendants' actions fundamentally disrupt the tripartite system of government by attempting to override—not execute—the duly enacted judgment of Congress expressed in the Dodd-Frank Act. *See Util. Air Regulatory Grp. v. EPA*, 572 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President, acting at times through agencies . . . 'faithfully executes' them" (quoting U.S. Const. art. II, § 3)). Yet as the Supreme Court declared over a century ago, "No power was

ever vested in the President to repeal an act of Congress." *The Confiscation Cases*, 87 U.S. 92, 112-13 (1873).

### A. The Plaintiffs Properly Asserted an Independent Cause of Action to Challenge Defendants' Violation of the Separation Of Powers.

The federal courts have, and must have, the authority to adjudicate the constitutionality of an acting director's attempt to eliminate a federal agency. Defendants' assertion that an unconstitutional action is unreviewable conflicts directly with Supreme Court precedent. *See, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *Bond v. United States*, 564 U.S. 211, 223-24 (2011); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-86 (1952); *see also Barlow*, 397 U.S. at 166. Defendants lack any statutory authority—under the Dodd-Frank Act or any other law—to unilaterally shut down the Bureau.[36]

Defendants' reliance on *Dalton v. Specter*, 511 U.S. 462 (1994), is misplaced. In that case, Congress explicitly authorized the Secretary of Defense to close military bases after conducting a careful review process and obtaining presidential approval. *Id.* at 465; *see* 10 U.S.C. § 2687(b). The Supreme Court

---

[36] The shutdown was also a quintessentially a reviewable "final agency action" because it "mark[ed] the consummation of the agency's decisionmaking process" and one "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see Biden v. Texas*, 597 U.S. 785, 808-09 & n.7 (2022) (memoranda ordering agency staff to halt program and "agency's final determinations of its employees' obligations" was final agency action).

explained that the claimed separation-of-powers violation was essentially a statutory abuse-of-discretion claim. *Dalton*, 511 U.S. at 474. Because the statute conferred discretion on the President, "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review." *Id.* at 474-76.

The narrow circumstances in *Dalton* offer little guidance here. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331-32 & n.5 (D.C. Cir. 1996) (explaining *Dalton*'s "limited" holding to "when a statute entrusts a discrete specific decision to the President"); *accord Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023). Nowhere in the Dodd-Frank Act did Congress contemplate giving the acting director of the CFPB the power to unilaterally close the Bureau, let alone the discretionary decisionmaking to do so. *See Dalton*, 511 U.S. at 477. Because there is no statutory basis for Defendants' actions, Plaintiffs' claim is not "statutory" either. *See* OB 40.[37] Rather, it is a valid constitutional objection.

Further Defendants had no constitutional authority whatsoever to erase an agency enacted by Congress. *NTEU I*, 774 F. Supp. 3d at 57-58. The Constitution

---

[37] This question turns on what the Court recently articulated as the third and fourth holdings of *Dalton*. *Global Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025). That case is distinguishable. There, the Court found that the statute at issue provided a mechanism for executive action and that the constitutional claims were predicated on statutory violations. *Id.* at 16-17. By contrast, there is no statutory basis for the executive to eliminate the CFPB. *See id.* at 17 n.14.

does not permit the Executive to refuse to carry out congressional directives; federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). That is what Plaintiffs contend here. Because their separation-of-powers claim is fundamentally constitutional, it is susceptible to judicial consideration. *Collins*, 594 U.S. at 245 ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge").

The implications of Defendants' assertion that the judiciary may not review "whether the Executive has unconstitutionally arrogated legislative powers to itself," OB 39, are breathtaking. Taken to its logical conclusion, Defendants' reasoning would mean that a constitutional violation of the separations of powers could never be challenged. If that astonishing argument were true, it would be impossible to stop the President from seizing private property without congressional authorization. *Youngstown*, 343 U.S. at 585-86 (recognizing that the President's attempt to seize steel mills did not rely on statutory bases and rejecting the attempt as an exercise of unilateral executive power). Nor, if Defendants were correct, could anyone try to stop the Executive Branch from tearing down the Department of Homeland Security or the Securities and Exchange Commission— or any other executive department or commission—and jeopardizing national security or the stability of our markets. The Defendants' flawed reasoning could

even justify not holding the Executive accountable for refusing to comply with an express congressional directive, or for withholding congressionally appropriated funding for local governments to achieve unrelated policy objectives. Both of actions, which this Court and others have foreclosed, are far less severe than the wholesale evisceration of a federal agency. *See, e.g.*, *Aiken*, 725 F.3d at 260 (ruling unconstitutional the Nuclear Regulatory Commission's refusal to execute licensing process for nuclear waste facility); *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1234-35 (9th Cir. 2018) (refusing to permit administration to withdraw federal grant money from sanctuary jurisdictions). The separation of powers is too fundamental a part of the nation's structure to countenance such an abdication of judicial oversight as Defendants demand.

## B. Congress Did Not "Clearly Authorize" the CFPB Director to Dismantle the Agency.

The Executive has no authority under Article II to unilaterally abolish the CFPB, an agency created by Congress to regulate the consumer financial marketplace. *See Util. Air*, 572 U.S. at 327 ("Under our system of government, Congress makes laws and the President, acting at times through agencies . . . 'faithfully executes' them" (quoting U.S. Const. art. II, § 3)). This keystone principle has been evident since the Founding. *See Matthews v. Zane's Lessee*, 9 U.S. 92, 99 (5 Cranch 92) (1809) (Marshall, C.J.) ("The president cannot dispense with the law, nor suspend its operation."). The sudden closure of an agency

empowered by Congress to perform a wide array of functions violates any reasonable conception of the separation of powers. Of course, Presidents may steer the personnel and policy priorities of an agency like the CFPB. *See Util. Air*, 573 U.S. at 327. But they may not, without clear statutory authorization, simply shut that agency down.

In fact, Defendants' sweeping actions are "of such magnitude and consequence," *Nebraska*, 600 U.S. at 504, that they invoke the same separation of powers principles that animate the Supreme Court's major questions jurisprudence. *West Virginia*, 597 U.S. at 723; *see also FCC v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring) (explaining that the "major questions canon reflects . . . background separation of powers understandings"). That standard requires "clear congressional authorization" when "agencies assert[] highly consequential power" in "extraordinary cases" with "economic and political significance." *West Virginia*, 597 U.S. at 723. This case clearly meets that test.

Nothing in the Dodd-Frank Act authorizes the Executive to unilaterally shutter the CFPB. The statute's text and structure clearly reflect Congress's intent to ensure the Bureau's durability, independence, and ongoing performance, *see* 12 U.S.C. §§ 5481-5499, not its demise at the hand of the acting Director or any other executive branch official. Furthermore, "[t]he economic and political significance of the [Defendants'] actions is staggering." *Nebraska*, 600 U.S. at 502. It is

difficult to imagine a more consequential domain of federal regulation than the $18 trillion of consumer debt held by U.S. households.[38] The Executive needs congressional authorization to abolish the primary federal agency charged with supervising that industry, enforcing its governing laws, and resolving the related complaints of millions of Americans. *See Nebraska*, 600 U.S. at 504 (requiring a "decision of such magnitude and consequence" to emanate from Congress). Yet Congress has never authorized, explicitly or implicitly, the dismantling of the CFPB. The Constitution requires that the Bureau remain operational unless and until Congress says otherwise.

## CONCLUSION

The actions at issue here amount to an effort to accomplish administratively what could not be accomplished legislatively: the dismantling of an agency created to protect Americans from financial harm. Defendants' conduct undermines the public interest in a transparent and fair financial system, and it imposes significant harms on the particular constituencies the CFPB must serve—as well as the broader public. Defendants' actions also strike at the heart of the constitutional balance of powers, violating the principle that no branch of government may usurp the core functions of another. In extraordinary times, courts are authorized—

---

[38] Fed. Reserve Bank of N.Y., *supra*.

indeed, they are required—to intervene to protect the public and restore the balance of power. Here, the financial health of American consumers and the American economy demands no less.

The district court's order granting the preliminary injunction should be affirmed.


Dated: February 9, 2026       Respectfully submitted,

               /s/ *Seth E. Mermin*
               Seth E. Mermin
               David S. Nahmias
               Adam Dean
               CENTER FOR CONSUMER LAW &
               ECONOMIC JUSTICE
               UC BERKELEY SCHOOL OF LAW
               308 Berkeley Law
               Berkeley, CA 94720-7200
               tmermin@law.berkeley.edu
               dnahmias@law.berkeley.edu

               Ariel Levinson-Waldman
               A.J. Hong-Huber
               John K. Blake
               Marissa Ditkowksy
               TZEDEK DC
               UDC DAVID A. CLARKE SCHOOL OF LAW
               4340 Connecticut Ave. NW,
               Suite 345
               Washington, D.C. 20008

               Persis S. Yu (D.C. Bar No. 90014714)
               PROTECT BORROWERS*
               1025 Connecticut Ave NW, #717
               Washington, DC 20036

R.T. Winston Berkman-Breen
PROTECT BORROWERS*
40 Rector Street, 9th Floor
New York, NY 10006

*A fiscally sponsored project of the
Shared Ascent Fund

**Counsel for Amici Curiae**

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ David S. Nahmias
David S. Nahmias
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,479 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. The text is in 14-point Times New Roman type.

/s/ David S. Nahmias
David S. Nahmias
*Counsel for Amici Curiae*