# United States Court of Appeals
# for the District of Columbia Circuit

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees,*

v.

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia (No. 25-cv-00381-ABJ)

## EN BANC BRIEF FOR NEW YORK, NEW JERSEY, THE DISTRICT OF COLUMBIA, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

JENNIFER L. DAVENPORT
 *Acting Attorney General of New Jersey*
SHANKAR DURAISWAMY
 *Deputy Solicitor General*

25 Market Street
Trenton, New Jersey 08265


BRIAN L. SCHWALB
 *Attorney General of District of Columbia*
CAROLINE S. VAN ZILE
 *Solicitor General*
ASHWIN P. PHATAK
 *Principal Deputy Solicitor General*

400 Sixth Street, NW
Washington, D.C. 20001

LETITIA JAMES
 *Attorney General of New York*
BARBARA D. UNDERWOOD
 *Solicitor General*
ANDREA OSER
 *Deputy Solicitor General*
DUSTIN J. BROCKNER
 *Assistant Solicitor General*
KARUNA B. PATEL
 *Senior Counsel, Economic Justice*
CHRISTIAN REIGSTAD
 *Assistant Attorney General*

The Capitol
Albany, New York 12224
(518) 776-2017

Dated: February 9, 2026

*(Additional counsel on signature pages.)*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to this Court's Rule 28(a)(1), the undersigned counsel of record certifies as follows:

**A. Parties and Amici.** Except for amici curiae American Federation of State, County, and Municipal Employees, American Federation of Government Employees, American Foreign Service Association, and The NewsGuild-CWA, all parties, intervenors, and amici curiae that have appeared in this Court are listed in the En Banc Brief of Plaintiffs-Appellees.

**B. Rulings Under Review.** References to the rulings at issue appear in the En Banc Brief of Plaintiffs-Appellees.

**C. Related Cases.** To amici's knowledge, there are no related cases.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...................................................................iii

GLOSSARY ..............................................................................ix

INTRODUCTION AND INTERESTS OF AMICI CURIAE ....................1

BACKGROUND .........................................................................3

    A.   Congress Created the CFPB to Fill Significant Gaps in Federal Consumer Protection....................................................3

    B.   The CFPB Has Partnered with the States and Complemented Their Consumer-Protection Work...................8

SUMMARY OF ARGUMENT ...................................................13

ARGUMENT ...........................................................................15

DEFENDANTS' DECISION TO DISMANTLE THE CFPB WILL INFLICT SHORT- AND LONG-TERM HARM ON THE STATES AND THEIR RESIDENTS .........................................................................15

    A.   The Loss of the CFPB's Statutorily Mandated Functions Will Harm Consumers and the States' Enforcement Efforts........................................................................17

    B.   The CFPB's Abdication of Its Exclusive Supervisory Authority Over Very Large National Banks Will Disadvantage Consumers. .....................................................23

    C.   The CFPB's Failure to Fulfill Its Statutory Mandates of Supervision and Enforcement in Areas of Historic Collaboration Increases the Burden on States to Protect Consumers.........................................................26

**Page**

CONCLUSION ......................................................................... 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) ......................................................................... 4

*Cuomo v. Clearing House Ass'n*,
557 U.S. 519 (2009) .................................................................... 7, 24

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ...................................................................... 16

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........................................................ 16-17

*Nat'l Treasury Emps. Union v. Vought*,
No. 25-cv-0381, 2025 WL 3771192 (D.D.C. Dec. 30, 2025) ............... 16

*Rhode Island v. Trump*,
No. 25-cv-128, 2025 WL 3251113 (D.R.I. Nov. 21, 2025) .................... 1

*Shvartser v. Lekser*,
308 F. Supp. 3d 260 (D.D.C. 2018) ................................................. 19

*State of New York v. Kennedy*,
789 F. Supp. 3d 174 (D.R.I. 2025) ................................................... 1

**Federal Statutes**

Pub. L. No. 111-203, 124 Stat. 1376 ...................................................... 4

12 U.S.C.
§ 484(a) .............................................................................. 7, 24
§ 2803 .................................................................................... 9
§ 2809 .................................................................................... 9
§ 5493(b)(3)(A) ......................................................................... 8
§ 5493(b)(3)(D) ...................................................................... 8, 19
§ 5497(d) ............................................................................... 20
§ 5511(c) ................................................................................. 6
§ 5511(c)(4) ............................................................................ 24

**Federal Statutes**                                              **Page(s)**

12 U.S.C. (cont'd)

    § 5514(a)-(c) ............................................................... 5

    § 5514(b)(3) .............................................................. 6

    § 5514(d) ................................................................ 19

    § 5515 ................................................................... 27

    § 5515(a)-(b) .............................................................. 5

    § 5515(b) ................................................................ 23

    § 5515(b)(1) ...................................................... 7, 24, 28

    § 5531 ................................................................... 25

    § 5531(a) ................................................................. 5

    § 5531(d) ................................................................. 5

    § 5534(a) .............................................................. 6, 8

    § 5552(a)(1) ............................................................. 7

    § 5552(a)(2)(A) ...................................................... 7, 25

    § 5552(a)(2)(B) .......................................................... 7

    § 5564(a) ................................................................. 7

    § 5581 ............................................................... 4, 24


**Federal Regulations**

12 C.F.R.

    § 1075.103 ............................................................... 21

    § 1075.104 ............................................................... 21


**Miscellaneous Authorities**

CFPB, *2013 CFPB-State Supervisory Coordination Framework* (May 7, 2013), available at https://files.consumerfinance.gov/ f/201305_cfpb_state-supervisory-coordination-framework.pdf .......... 10

CFPB, *An Introduction to CFPB's Exams of Financial Companies* (Jan. 9, 2023), available at https:// files.consumerfinance.gov/f/documents/cfpb_an-introduction- to-cfpbs-exams-of-financial-companies_2023-01.pdf ......................... 24

**Miscellaneous Authorities**                                  **Page(s)**

CFPB, *CFPB v. Prehired LLC*, available at https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/payments-by-case/prehired/ ............................................ 22

CFPB, *Civil Penalty Fund*, available at https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/civil-penalty-fund/ ............................................ 21

CFPB, *Consumer Response Annual Report: January 1 - December 31, 2024* (May 1, 2025), available at https://files.consumerfinance.gov/f/documents/cfpb_cr-annual-report_2025-05.pdf ................................................... 9

CFPB, *How to Avoid Foreclosure*, available at https://www.consumerfinance.gov/language/cfpb-in-english/how-to-avoid-foreclosure/ ................................................... 18

CFPB, *Institutions Subject to CFPB Supervisory Authority*, available at https://www.consumerfinance.gov/compliance/supervision-examinations/institutions/ ............................................ 27

CFPB, *Mortgage Data (HMDA)*, available at https://www.consumerfinance.gov/data-research/hmda/ ................................. 9

CFPB, *Payments to Harmed Consumers by Case*, available at https://www.consumerfinance.gov/enforcement/payments-harmed-consumers/payments-by-case/ ............................................ 21

CFPB, Press Release, *CFPB and 11 States Order Prehired to Provide Students More than $30 Million in Relief for Illegal Student Lending Practices* (Nov. 20, 2023), available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-and-11-states-order-prehired-to-provide-students-more-than-30-million-in-relief-for-illegal-student-lending-practices/ ................ 22

**Miscellaneous Authorities**                                    **Page(s)**

CFPB, Press Release, *CFPB to Issue $95 Million in Redress to Consumers Harmed by Premier Student Loan Center* (Dec. 13, 2022), available at https://www.consumerfinance.gov/about-us/blog/cfpb-to-issue-95-million-redress-to-consumers-harmed-by-premier-student-loan-center/ .......................................... 12

CFPB, Press Release, *Consumer Financial Protection Bureau and Multiple States Enter Into Settlement with Owner of ITT Private Loans for Substantially Assisting ITT in Unfair Practices* (Sep. 15, 2020), available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-multiple-states-enter-settlement-itt-private-loans-owner-assisting-itt-unfair-practices/ ........................................... 12

CFPB, *Supervisory Highlights*, Issue 37 (Dec. 2024), available at https://files.consumerfinance.gov/f/documents/cfpb_Supervisory-Highlights-Issue-37_Winter-2024.pdf ................... 28

CFPB, *Supervisory Highlights: Mortgage Servicing Edition*, Issue 33 (April 2024), available at https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-33_2024-04.pdf ....................................... 30

CFPB, *Supervisory Highlights: Special Edition Auto Finance*, Issue 35 (Oct. 2024), available at https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights-special-ed-auto-finance_2024-10.pdf ............................... 30

Complaint, *State of New York v. Vought*, No. 25-cv-02384 (D. Or. Dec. 22, 2025), ECF No. 1 ....................................... 15

Conference of State Bank Supervisors, *Nonbank Mortgage Regulation - Misconceptions & Background* (May 10, 2024), available at https://www.csbs.org/newsroom/nonbank-mortgage-regulation-misconceptions-background ............................ 19

vi

| Miscellaneous Authorities | Page(s) |
|---|---|

Fin. Crisis Inquiry Comm'n, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (2011), available at https://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf ............................................................3

Mullin, John, Fed. Reserve Bank of Richmond, *Shopping for Bank Regulators,* Econ. Focus (2019), available at https://www.richmondfed.org/publications/research/econ_focus/2019/q4/federal_reserve ............................................................26

National Consumer Law Center, *Restore the States' Traditional Role as 'First Responder'* (Sep. 2009), available at https://filearchive.nclc.org/preemption/restore-the-role-of-states-2009.pdf ............................................................26

Navient AG Multi-State Settlement, *39 State Attorneys General Announce $1.85 Billion Settlement with Student Loan Servicer Navient* (Jan. 13, 2022), available at https://www.navientagsettlement.com/Home/portalid/0?portalid=0?portalid=0 ............................................................12

New Jersey Office of the Att'y Gen. and New Jersey Div. on Civ. Rts., *Investigation of Republic First Bank: Public Report and Summary of Finding* (Oct. 2024), available at https://www.njoag.gov/wp-content/uploads/2024/10/2024-1029_Republic-First-Report-Final.pdf ............................................................10, 20

Reuters, *Fed's Powell: No Agency Other Than CFPB Tasked With Consumer Protection Enforcement* (Feb. 11, 2025), available at https://www.reuters.com/world/us/feds-powell-no-agency-other-than-cfpb-tasked-with-consumer-protection-2025-02-11/ ............................................................23

S. Rep. No. 111-176 (2010) ............................................................3-5, 26

**Miscellaneous Authorities**                          **Page(s)**

Wilmarth, Arthur E., Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133 (1990)............................25

**GLOSSARY**

CFPA       Consumer Financial Protection Act

CFPB       Consumer Financial Protection Bureau

HMDA     Home Mortgage Disclosure Act

# INTRODUCTION AND INTERESTS OF AMICI CURIAE

The State of New York, the State of New Jersey, the District of Columbia, and the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, and Washington (collectively, "States") submit this brief in support of plaintiffs-appellees and affirmance of the district court's order granting a preliminary injunction. That injunction prevents defendants-appellants from taking steps—many irreversible—to dismantle the Consumer Financial Protection Bureau ("CFPB"), to the detriment of the States and their residents. The States agree that the district court correctly held that plaintiffs have established irreparable harm and a likelihood of success on the merits; indeed, many of the States have challenged the current administration's attempt to dismantle other federal agencies or agency programs as violating the Administrative Procedure Act and the U.S. Constitution's separation of powers.[1]

---

[1] *See, e.g.*, *Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 3251113 (D.R.I. Nov. 21, 2025)*, appeal pending*, No. 26-1070 (1st Cir.); *State of New York v. Kennedy*, 789 F. Supp. 3d 174 (D.R.I. 2025).

The States submit this brief to focus on why the district court correctly found that the public interest and equities strongly favor injunctive relief. The States and their residents will suffer significant harms if the injunction is vacated and defendants are allowed to implement their decision to incapacitate the CFPB. The CFPB has long provided statutorily mandated services, including a nationwide consumer-complaint system, that provide substantial benefits to consumers and support the States' investigative and enforcement efforts. The States have also relied on, and their residents have benefited from, the CFPB's exclusive authority to supervise very large national banks' compliance with consumer-protection laws. And the States have benefited from the CFPB's collaboration in several areas of joint supervision and enforcement. The abrupt withdrawal of these CFPB services, supervision, and assistance would inflict considerable harm on the States, including by denying them access to information to which they are statutorily entitled and impairing their consumer protection activities. The States thus have a significant stake in ensuring that the CFPB continues to perform these functions.

## BACKGROUND

### A.  Congress Created the CFPB to Fill Significant Gaps in Federal Consumer Protection

In 2008, the United States suffered the worst financial downturn since the Great Depression. The Great Recession "nearly crippled the U.S. economy," S. Rep. No. 111-176, at 2 (2010), causing millions of Americans to lose their jobs, homes, and savings, *id*. at 9. While the underlying causes were complex, abusive subprime mortgage lending and the associated collapse of the real-estate market played a central role.[2] In examining the fallout, Congress concluded that the Great Recession resulted from "the failure of the federal banking and other regulators to address significant consumer protection issues detrimental to both consumers and the safety and soundness of the banking system." *Id*. Existing federal regulators were beset by "conflicting regulatory missions, fragmentation, and regulatory arbitrage," *id*. at 10, and these

---

[2] *See generally* Fin. Crisis Inquiry Comm'n, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* 67-80 (2011). (For sources available online, URLs are in the Table of Authorities. All websites last visited February 9, 2026.)

regulators' failure to sufficiently consider consumer protection "helped bring the financial system down," *id.* at 166.

In response, Congress enacted the Dodd-Frank Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, which includes the Consumer Financial Protection Act ("CFPA") that created the CFPB. The CFPA instituted several innovations:

Consolidation of federal consumer-protection authority within a single federal regulator. To address the fragmented responsibility for enforcing federal consumer protections among federal regulators, Congress transferred to the CFPB certain consumer-protection functions from existing federal agencies, including the Federal Reserve, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency. *See* 12 U.S.C. § 5581; *CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421-22 (2024).

Supervision of very large banks. Congress granted the CFPB "exclusive authority" among federal regulators to supervise compliance with Federal consumer financial laws by "very large" banks, savings associations, and credit unions—*i.e.*, those federal- or state-chartered

banks and depository institutions with at least $10 billion in assets. 12 U.S.C. § 5515(a)-(b).

Oversight over non-depository institutions. Congress created "for the first time consistent Federal oversight of nondepository institutions"— *i.e.*, non-bank entities that provide financial products, such as mortgage loans, to consumers. S. Rep. No. 111-176, at 167. The CFPB was tasked with supervising mortgage lenders, brokers, and servicers, as well as payday lenders, and other large participants in the consumer financial products market, 12 U.S.C. § 5514(a)-(c), thereby filling an important gap in federal supervision of such institutions, *see* S. Rep. No. 111-176, at 167 (noting that non-depository institutions were not previously subject to regular federal consumer-compliance examinations).

Prohibition of "abusive" practices. For the first time for *any* federal regulator, the CFPB was granted the power to take enforcement action against acts and practices that are not only unfair or misleading but also those that are "abusive"—*i.e.*, acts and practices that materially interfere with consumers' ability to understand a term or condition of a consumer product or that unreasonably take advantage of consumers. 12 U.S.C. § 5531(a), (d); S. Rep. No. 111-176, at 172.

The CFPA additionally specifies the CFPB's other "primary functions" as: (i) "conducting financial education programs"; (ii) "collecting, investigating, and responding to consumer complaints"; (iii) analyzing data and other information "to identify risks to consumers" and to ensure that consumer-financial markets function; (iv) enforcing federal consumer-protection laws; (v) "issuing rules, orders, and guidance implementing" those laws; and (vi) performing other "support activities." 12 U.S.C. § 5511(c). To ensure the CFPB's ability to perform these functions, Congress set forth a host of statutory mandates for the CFPB, including that it "shall establish" procedures "to provide a timely response to consumers" regarding "complaints against, or inquiries concerning" activity in consumer-financial markets, *id*. § 5534(a); and that, to minimize regulatory burden, it "shall" coordinate designated supervisory activities with the relevant state and federal agencies, *id*. § 5514(b)(3).

With respect to national banks (*i.e.*, those authorized by federal charter), the CFPB has exclusive regulatory authority vis-à-vis the States in two respects. First, States are preempted from exercising any supervisory powers, including consumer-compliance supervision, over

national banks, *see Cuomo v. Clearing House Ass'n,* 557 U.S. 519, 525-26, 535-36 (2009); 12 U.S.C. § 484(a), and the CFPB retains "exclusive authority" among federal regulators to supervise very large national banks for compliance with federal consumer-financial laws, 12 U.S.C. § 5515(b)(1). Bank supervision includes on-site examinations that are designed to help detect and assess risks to consumers and the consumer-financial markets. *Id.*

Second, the CFPB—but not the States—has authority to enforce against national banks the provisions of the CFPA itself, including its prohibition against abusive practices. *See id.* §§ 5552(a)(2)(A), 5564(a). Although Congress authorized the States to enforce against such banks any CFPB regulation that implements the CFPA's prohibition on abusive practices, *id.* § 5552(a)(2)(B), the CFPB has not issued any such regulations to date. The States nonetheless can enforce other applicable, non-preempted consumer-protection laws and regulations against national (and state) banks, including CFPB regulations issued under the CFPA. *See id.* § 5552(a)(1), (a)(2)(B); *Cuomo,* 557 U.S. at 534-35.

**B.** **The CFPB Has Partnered with the States and Complemented Their Consumer-Protection Work**

While Congress granted the CFPB certain exclusive and mandatory functions, Congress also intended the CFPB to assist the States and to complement work traditionally done by States in the areas of consumer protection and financial regulation. In practice, the States have coordinated with the CFPB in multiple ways:

Consumer-complaint system. The CFPB has maintained a statutorily mandated system for fielding and responding to consumer complaints across all consumer-financial products. *See* 12 U.S.C. §§ 5493(b)(3)(A), 5534(a). The CFPB is statutorily required to "share consumer complaint information" with state agencies. *Id.* § 5493(b)(3)(D). The States have relied on this information to support investigations of specific businesses, to identify and monitor marketplace trends, and to explore opportunities for coordinated enforcement among States.

The States have also referred their residents to the CFPB's consumer-complaint system for many reasons, including when the CFPB has a track record for being able to quickly connect consumers with relevant providers, such as education lenders, mortgage originators, or servicing companies. According to the CFPB, companies reported

providing monetary relief totaling over $90 million directly to consumers in response to complaints in 2024—including tens of millions of dollars to consumers in the States.[3]

Home Mortgage Disclosure Act data. Under the Home Mortgage Disclosure Act ("HMDA"), the CFPB is required to collect and publish demographic and geographic lending data. *See* 12 U.S.C. §§ 2803, 2809.[4] The HMDA data that has been maintained by the CFPB constitutes the single largest loan-level data set for mortgage lending across the country. The States regularly consult this data for insight into trends in mortgage-lending products, like the decline in refinancing and rise in closing costs. And several States rely on the HMDA data to support ongoing investigations, including into racially discriminatory mortgage lending practices. New Jersey, for instance, relied on the HMDA data to conclude that a bank had engaged in a pattern of "redlining" minority communities—*i.e.*, withholding financial services—in violation of New Jersey's

---

[3] CFPB, *Consumer Response Annual Report: January 1 – December 31, 2024*, at 93-96 (May 1, 2025).

[4] CFPB, *Mortgage Data (HMDA)*.

antidiscrimination law.[5] Similarly, Maryland has used HMDA data to identify potential race discrimination in mortgage lending and to develop evidence necessary to pursue an investigation of a local bank.

Bank and nonbank examinations. Many States have partnered with the CFPB to examine state-chartered large banks and nonbank entities, over which both States and the CFPB have supervisory authority. California has coordinated with the CFPB on supervisory examinations of large institutions, including Rocket Mortgage. Colorado has worked with the CFPB to conduct joint examinations of student-loan servicers. And the CFPB has worked directly with the Conference of State Bank Supervisors through a framework[6] that facilitates coordination with interested States of supervisory examinations of large nonbank entities—such as nonbank mortgage originators, automobile-financing companies, debt collectors, payday lenders, and money transmitters—that are governed by both federal and state laws.

---

[5] New Jersey Office of the Att'y Gen. and New Jersey Div. on Civ. Rts., *Investigation of Republic First Bank: Public Report and Summary of Finding*, at 1, 5 (Oct. 2024).

[6] CFPB, *2013 CFPB-State Supervisory Coordination Framework* (May 7, 2013).

Law enforcement. The CFPB has partnered with States to stop deceptive, unfair, and abusive conduct. This partnership has been instrumental to ensuring that the States' residents are protected and, when harmed, receive redress. For instance, in the past few years alone, the CFPB has worked with New York to stop improper debt collection, *CFPB v. JPL Recover Solutions, LLC*, No. 20-cv-01217 (W.D.N.Y.); inaccurate and misleading remittance transfers, *CFPB v. MoneyGram Int'l Inc.*, No. 22-cv-03256 (S.D.N.Y.); and harmful subprime automobile lending, *CFPB v. Credit Acceptance Corp.*, No. 23-cv-00038 (S.D.N.Y.). The CFPB partnered with New York and six other States to shut down an illegal debt-relief scheme. *CFPB v. StratFS, LLC*, No. 24-cv-00040 (W.D.N.Y.). And the CFPB worked with all 50 States and the District of Columbia to successfully enforce consumer-protection laws against a large mortgage servicer. *CFPB v. NationStar Mortg. LLC*, No. 20-cv-03550 (D.D.C.).

The CFPB has also routinely collaborated with States to root out fraud targeting student borrowers. For example, the CFPB and several States sued the Nation's then-largest student-loan servicer for deceiving borrowers by, among other things, steering them to costly repayment options. *See CFPB v. Navient Corp.*, No. 17-cv-00101 (M.D. Pa.); *Illinois*

*v. Navient Corp.*, No. 17 CH 00761 (Ill. Ch. Div.); *Grewal v. Navient Corp.*, No. ESX-C-172-2020 (N.J. Sup. Ct.). With the CFPB's support, the multistate coalition obtained $1.85 billion in student debt relief and consumer restitution.[7] The CFPB likewise partnered with 47 States and the District of Columbia in an action against a for-profit school and its affiliates for knowingly making high-cost loans to students who would be unable to repay; that partnership resulted in $500 million in debt forgiveness for tens of thousands of students.[8] *CFPB v. ITT Educ. Servs., Inc.*, No. 14-cv-00292 (S.D. Ind.). And the CFPB partnered with several States to shut down an illegal student-loan debt-relief scheme, recovering $95 million in consumer restitution.[9] *CFPB v. Consumer Advocacy Ctr., Inc.*, No. 19-cv-01998 (C.D. Cal.).

---

[7] Navient AG Multi-State Settlement, *39 State Attorneys General Announce $1.85 Billion Settlement with Student Loan Servicer Navient* (Jan. 13, 2022).

[8] CFPB, Press Release, *Consumer Financial Protection Bureau and Multiple States Enter Into Settlement with Owner of ITT Private Loans for Substantially Assisting ITT in Unfair Practices* (Sep. 15, 2020).

[9] CFPB, Press Release, *CFPB to Issue $95 Million in Redress to Consumers Harmed by Premier Student Loan Center* (Dec. 13, 2022).

## SUMMARY OF ARGUMENT

Congress created the CFPB and required that it administer and enforce federal law to fill the gaps in the federal regulatory regime that contributed to the Great Recession. Since that time, the CFPB has provided considerable benefits to the States and the general public. If defendants are allowed to implement their unlawful decision to close the CFPB, defendants will recreate the very regulatory gaps that Congress sought to fill and impose significant hardships on the States and their residents in three critical ways.

First, the CFPB's consumer-complaint system provides valuable assistance to numerous consumers, including by helping many avoid foreclosures. That system, as well as the HMDA data on mortgage products, are integral components of the States' consumer protection work, including their investigative and enforcement efforts. The complete or significant disruption of these statutorily mandated functions would threaten to undermine the ability of the States and their residents to identify and remedy financial wrongs.

Second, the CFPB's dismantling would create a gap in supervision over the largest national banks that would allow these banks to loosen

their regulatory compliance. This is so because States are currently preempted from exercising supervisory authority over any national bank, and thus must rely on federal regulators for such supervision. The CFPB has exclusive authority among federal regulators to supervise the largest national banks—whose malfeasance poses unique risks to the broader economy—for compliance with consumer-protection laws. Accordingly, the CFPB's dismantling would leave *no* regulator conducting consumer-compliance examinations of these large national banks.

Third, the CFPB's dismantling would deprive the States of the CFPB's significant expertise and resources, both of which have been invaluable to the States' ongoing efforts to protect their residents. The loss of the CFPB would create a gap in federal consumer-compliance supervision of residential mortgage lenders, brokers, and servicers—the entities responsible for a large swath of residential mortgage loans today. And the States have collaborated with the CFPB in joint supervisory examinations, enforcement investigations, as well as active litigations. If the preliminary injunction were to be vacated, the States would have to divert their scarce resources to fill the void created by the loss of the sole federal agency devoted to consumer protection for financial products.

# ARGUMENT

## DEFENDANTS' DECISION TO DISMANTLE THE CFPB WILL INFLICT SHORT- AND LONG-TERM HARM ON THE STATES AND THEIR RESIDENTS

Following a multi-day evidentiary hearing and the compilation of a voluminous record, the district court found that defendants planned to shut down the CFPB entirely "and to do it fast." (Joint Appendix ["JA"] 634.) As the district court found, although defendants' hurried efforts to shut down the CFPB had been "stalled by the [c]ourt's intervention," defendants have "absolutely no intention of operating the CFPB at all." (JA697.) That intended shuttering of the CFPB, and the attendant loss of statutorily mandated services, would significantly harm the States, their residents, and the public interest.[10]

---

[10] Several of the States have filed suit to challenge defendants' most recent efforts to dismantle the CFPB—namely, their attempt to defund the agency. *See* Complaint, *State of New York v. Vought*, No. 25-cv-02384 (D. Or. Dec. 22, 2025), ECF No. 1. That suit challenges as unlawful the November 2025 decision of CFPB Acting Director Russell Vought that he is legally prohibited from requesting funds for the CFPB from the Federal Reserve because the Federal Reserve is not currently sufficiently "profitable." *See id.* at 2-3, 29-42. As of this brief's filing, the plaintiff States' motion for summary judgment remains pending.

*(continued on the next page)*

The district court correctly found that those harms, which are detailed below, are relevant when assessing the public interest and the balance of equities—two of the factors that govern whether to grant a preliminary injunction. *See, e.g.*, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).[11] Indeed, as the district court recognized (JA742-743), the harms that the States identify here constitute a distinct harm to the public interest, given the special role that the States play in our federal system. The States "possess sovereignty concurrent with that of the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), and therefore are equal—not subordinate— sovereign entities charged to advance the public interest. An injunction

---

Separately, in this case, the district court granted plaintiffs' motion for an order clarifying that defendants may not justify violating the preliminary injunction by refusing to request funding from the Federal Reserve, as Director Vought had sought to do. *Nat'l Treasury Emps. Union v. Vought*, No. 25-cv-0381, 2025 WL 3771192, at *3 (D.D.C. Dec. 30, 2025). The court reasoned that "defendants are actively and unabashedly trying to shut the agency down again, through different means," *id.* at *4, and the court clarified that its preliminary injunction prohibits defendants' "unsupported and transparent attempt to starve the CFPB of funding," *id.* at *17.

[11] Those harms also amplify the harms identified by the consumer-oriented plaintiffs in this case, who relied on such harms to establish the requisite risk of irreparable harm. (JA733-738.)

thus serves the public interest where, as here, it is tailored to prevent illegal agency action that harms the States and their residents. *See League of Women Voters of United States*, 838 F.3d at 12 (emphasizing that there is "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations") (internal quotation marks omitted).

## A. The Loss of the CFPB's Statutorily Mandated Functions Will Harm Consumers and the States' Enforcement Efforts.

If the injunction were vacated and defendants permitted to again proceed with their plan to quickly dismantle the CFPB, the States and their residents would suffer both short- and long-term harm. One of the most significant harms would result from the loss, or significant disruption, of the agency's statutorily mandated consumer-complaint system. That system receives roughly 350,000 consumer complaints each month about financial products and services. (JA1243-1244.) As the district court found (JA714), within just weeks after defendant Russell Vought issued the stop-work order on February 10, 2025, over 16,000 unanswered consumer complaints accumulated. During this time, the system was effectively non-operational, as no actions were taken on

unanswered complaints. (JA712-714.) For example, complaints referred by the States, congressional offices, and many federal agencies were neither being reviewed by the CFPB nor being sent to companies for response. (JA713, JA1250-1251.)

Consumers would face immediate harm if defendants were permitted to resume the disabling of the consumer-complaint system. Among other tasks, the CFPB's intake process identifies and prioritizes complaints received in which a consumer asserts an imminent home foreclosure; for such a complaint, the CFPB would often refer the consumer to a local counselor to assist in resolving the dispute.[12] And CFPB staff testified before the district court that the CFPB's system had "stopped imminent foreclosures." (JA1244.) In the weeks following the February 10 stop-work order, however, the CFPB ceased addressing *any* complaints from consumers facing imminent foreclosure, as well as other time-sensitive issues. (JA713; *see* JA1263.)

The loss or disruption of the CFPB's system would leave consumers without a critical resource and, in some States, the absence of the CFPB's

---

[12] CFPB, *How to Avoid Foreclosure*.

system would increase the risk of foreclosure—an irreparable and often enduring harm. *See, e.g.*, *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018). This risk is rendered particularly acute by the rise of nonbank mortgage lenders that operate nationwide, such as Rocket Mortgage, for which the CFPB is the sole federal regulator with supervisory authority to assess compliance with federal consumer-financial laws. *See* 12 U.S.C. § 5514(d).[13]

The disruption of the CFPB's consumer-complaint system would harm the States further by directly impairing their own consumer protection activities. The States would lose a critical source of information—to which they are statutorily entitled, *id.* § 5493(b)(3)(D)—that they have relied upon to investigate specific entities, monitor marketplace trends, explore coordinated enforcement with other States, and assist consumers. Although some States have their own state-specific systems, the loss of the CFPB's well-established system would deprive the States of a key resource that, unlike any state-specific system, provides insights into multi-state or national trends specifically on financial products.

---

[13] Conference of State Bank Supervisors, *Nonbank Mortgage Regulation – Misconceptions & Background* (May 10, 2024).

The CFPB's dismantling would also deprive the States and their residents of two other statutorily required functions. First, the States would lose access to the HMDA data, the single largest loan-level nationwide data set for mortgage lending. Many of the States have relied on the HMDA data to support investigations and enforcement litigation, including efforts to prevent racially discriminatory mortgage lending practices.[14] The States have also relied on the dataset to monitor mortgage-foreclosure trends—trends on which they rely to proactively address troubling developments in housing markets. The loss of this data would therefore deprive the States of an integral component of their consumer protection work.

Second, the CFPB's dismantling would render the Civil Penalty Fund effectively inactive or, at the very least, severely incapacitated. A person or entity against whom the CFPB has taken legal action may be required to pay money into the agency's Civil Penalty Fund, which Congress established. *See* 12 U.S.C. § 5497(d). The CFPB, after determining that victims will not receive compensation from wrongdoers or

---

[14] *See* Investigation of Republic First Bank, *supra* n.5*,* at 1, 5.

any other source of restitution, 12 C.F.R. §§ 1075.103, 1075.104, is authorized to distribute compensation to such victims from the Civil Penalty Fund. As of December 2025, the CFPB had distributed roughly $3.6 billion to consumers nationwide who have been harmed by violations of consumer-protection laws.[15]

As of this brief's filing, there are over a dozen matters for which distributions from the Civil Penalty Fund remain outstanding—*i.e.*, cases in which consumers have already been found to be entitled to relief but unable to obtain compensation from another source.[16] If the Civil Penalty Fund became effectively inactive or so severely disabled that its distributions were unreasonably delayed, thousands of state residents would be deprived of monetary relief that they are expecting to receive from the Fund and would be left with no other avenue to redress their losses. For example, eleven States partnered with the CFPB in a suit against a company called Prehired for deceptive marketing and debt-collection practices. Prehired agreed to void all outstanding loan agreements

_____

[15] CFPB, *Civil Penalty Fund*.

[16] CFPB, *Payments to Harmed Consumers by Case* (*see* "Ongoing cases").

nationwide, and the CFPB agreed to allocate roughly $4.2 million from the Civil Penalty Fund to compensate the victims but distributions remain outstanding.[17] The States whose consumers were entitled to relief in that matter provided the CFPB with victim address verifications in early 2025; as of the date that the preliminary injunction was issued, however, those States had heard nothing further from the CFPB regarding distribution of funds. It was only thereafter, with that injunction in place, that the CFPB began distributing funds.[18]

These various harms to the States and their residents, including depriving consumers of what may well be their only hope of monetary relief, confirm that the public interest is furthered by the district court's preliminary injunction to prevent defendants from unlawfully incapacitating the CFPB. (JA739-740.)

---

[17] CFPB, Press Release, *CFPB and 11 States Order Prehired to Provide Students More than $30 Million in Relief for Illegal Student Lending Practices* (Nov. 20, 2023).

[18] CFPB, *CFPB v. Prehired LLC*.

**B.**   **The CFPB's Abdication of Its Exclusive Supervisory Authority Over Very Large National Banks Will Disadvantage Consumers.**

As Jerome Powell, Chair of the Federal Reserve, acknowledged in his February 2025 testimony to Congress, in light of the CFPB's then-dormancy, no regulator was conducting supervisory examinations of very large national banks, such as JPMorgan and Wells Fargo, to review their compliance with consumer-protection laws.[19] The absence of an operational CFPB would thus create a regulatory vacuum that is even greater than what existed before the Great Recession. This outcome would harm the public in several ways.

For one thing, the CFPB's dismantling would result in drastically reduced consumer-compliance supervision of very large national banks, to the detriment of consumers. Supervision is a comprehensive process that entails on-site examinations, 12 U.S.C. § 5515(b), and serves an important prophylactic function: It allows a regulator to identify consumer-protection "issues before they become systemic or cause

---

[19] Reuters, *Fed's Powell: No Agency Other Than CFPB Tasked With Consumer Protection Enforcement* (Feb. 11, 2025).

significant harm,"[20] and thereby obviates the need for formal law-enforcement measures.

If the CFPB were unable to carry out its supervisory obligations—one of its primary functions, 12 U.S.C. § 5511(c)(4)—other federal regulators would not be able to pick up the slack. In enacting the Dodd-Frank Act, Congress transferred to the CFPB certain consumer-protection functions that had previously been dispersed among multiple federal agencies. *See id.* § 5581. As part of this consolidation, Congress made the CFPB the "exclusive" federal regulator for supervising very large national banks for compliance with consumer-financial laws. *Id.* § 5515(b)(1).

The States, meanwhile, cannot step in to fulfill this function because they are preempted from exercising *any* supervisory powers over national banks. *See Cuomo,* 557 U.S. at 525-26, 535-36; 12 U.S.C. § 484(a). What is more, the States are statutorily precluded from enforcing the CFPA's abusive-practices prohibition against any national bank unless and until the CFPB promulgates implementing regulations, *see*

---

[20] CFPB, *An Introduction to CFPB's Exams of Financial Companies*, at 3-4 (Jan. 9, 2023).

12 U.S.C. §§ 5531, 5552(a)(2)(A), which it has not yet done. Accordingly, the CFPB's shuttering would not only result in a loss of consumer-compliance supervision over some of the nation's largest banks; it would leave *no* entity empowered to enforce the CFPA's abusive-practices prohibition against national banks (including the nation's largest banks), effectively nullifying a crucial federal statutory protection for consumers.

That regulatory gap would cause yet another public harm. The loss of CFPB supervision and related enforcement would give very large national banks a competitive advantage over state-chartered banks (large or small), by enabling such national banks to loosen their regulatory compliance—to the detriment of consumers—as was seen in the years leading up to the Great Recession.

Consistent supervision helps to maintain a healthy dual banking system[21] by reducing the regulatory arbitrage that results in a race to the bottom. Material differences in the relative burdens posed by different regulators can incentivize banks to game the system, which harms every-

---

[21] *See generally* Arthur E. Wilmarth, Jr., *The Expansion of State Bank Powers, the Federal Response, and the Case for Preserving the Dual Banking System*, 58 Fordham L. Rev. 1133, 1152 (1990).

day consumers.[22] And such gaming is not merely theoretical: Arbitrage and the introduction of risky products by financial institutions loosely supervised for consumer protection contributed to the Great Recession, and Congress crafted the CFPB's mandates to address that very problem. S. Rep. No. 111-176, at 11 (observing that the CFPB "will establish a basic, minimum federal level playing field for all banks").[23]

In sum, the CFPB's dismantling would create the very real prospect of the States' residents being offered riskier products by unsupervised very large national banks, and state-chartered banks losing customers and goodwill by being undercut by those unsupervised national banks.

## C. The CFPB's Failure to Fulfill Its Statutory Mandates of Supervision and Enforcement in Areas of Historic Collaboration Increases the Burden on States to Protect Consumers.

As the district court correctly found (JA742-743), defendants' decision to disable the CFPB would further harm the public by suddenly increasing the burden on the States to protect their residents through

_____

[22] National Consumer Law Center, _Restore the States' Traditional Role as 'First Responder'_, at 21-22 (Sep. 2009).

[23] _See_ John Mullin, Fed. Reserve Bank of Richmond, _Shopping for Bank Regulators,_ Econ. Focus (2019).

enforcement and supervision of the financial industry to the extent they are not preempted from doing so. Indeed, the CFPB's incapacitation would have concrete and far-reaching implications. From collaborating on supervisory examinations of state-chartered banks, to sharing complaints and trend data, to partnering on joint investigations and litigations, the CFPB has been a force multiplier for the States' consumer-protection efforts. If defendants were permitted to implement their plan to unlawfully dismantle the CFPB, the States would be forced to divert scarce resources to compensate for the complete loss of the sole federal consumer-protection regulator devoted to the financial sector.

Starting with supervision, although the CFPB has supervisory authority over nearly 200 of the country's largest financial institutions,[24] it augments States' own efforts and shares authority with States in important ways. First, as noted, States are dependent on the CFPB to supervise compliance with federal consumer-protection laws by very

___

[24] This includes "very large" banks, thrifts, and credit unions—*i.e.*, entities with assets over $10 billion and their affiliates. 12 U.S.C. § 5515. As of September 30, 2025, an estimated 176 depository institutions and 20 depository affiliates met this criterion. *See* CFPB, *Institutions Subject to CFPB Supervisory Authority* (*see* "Current list PDF").

large national banks, over which the CFPB has "exclusive authority." 12 U.S.C. § 5515(b)(1).[25] Information obtained from this supervision has been regularly shared with States and informs their decisions on how to identify risk within those financial institutions under their direct supervision. Second, the CFPB and States each have supervisory authority over the largest state-chartered banks, entities like nonbank mortgage lenders and payday lenders, and emerging markets such as digital payments. Because many of the States' decisions about how to allocate resources have relied on the CFPB's role, the CFPB's shuttering will cause gaps in supervision that will be difficult to fill.

Moreover, a number of the very large banks over which the CFPB has supervisory authority are state-chartered banks, each with more than $10 billion in assets. The complete absence of CFPB supervision of those banks will force States—especially those that particularly rely on the CFPB's expertise—to divert their own scarce resources to fill the void. The CFPB's oversight of the country's largest state-chartered banks also

_____

[25] *See, e.g.,* CFPB, *Supervisory Highlights*, Issue 37, at 4-6 (Dec. 2024) (summarizing findings that several institutions had charged unlawful overdraft fees or engaged in other unlawful conduct that resulted in consumers being charged multiple fees for insufficient funds).

helps provide consistency in the examination process and allows the CFPB to monitor nationwide trends. Leaving authority entirely to individual States will deprive them of the CFPB's national perspective.

Even for smaller state-chartered banks that do not fall under the CFPB's examination authority, the CFPB has provided essential resources and training to assist many States. Regular calls between the CFPB and the States have helped to identify emerging issues, and CFPB data and analytics have helped the States identify trends. Many of the States also regularly rely on the CFPB's training materials and participate in CFPB-led trainings. The District of Columbia, for example, regularly uses CFPB materials in credit-repair workshops that it offers to District residents.

The States similarly benefit from the CFPB's concurrent jurisdiction over nonbank entities offering consumer-financial products, especially nonbank mortgage lenders. The CFPB's oversight has helped to root out and deter misconduct. Without that oversight, many consumers obtaining credit from a nonbank mortgage loan originator will be left without key protections. The same will be true for those seeking auto

financing or payday loans, as well as those subject to debt collection or mortgage servicing.[26]

In addition, the CFPB's coordination of multistate examinations and data collection has provided efficiency to the participating States and the nonbank institutions they regulate. The CFPB has used its robust data and analytics to help many of the States determine scope and priorities for examination, including by making training available to state agency personnel to ensure consistent and high standards. The loss of CFPB's partnership in supervising nonbank entities and providing nationwide market data and insight would greatly increase the burden on such States to supervise in areas vital both to consumers and to the stability of the nation's economy.

The CFPB has also exercised indispensable enforcement authority, alongside the States, over consumer-financial laws to protect consumers from unfair, deceptive, and abusive acts and practices. *See supra* at

---

[26] *See, e.g.*, CFPB, *Supervisory Highlights: Special Edition Auto Finance*, Issue 35, at 4-19 (Oct. 2024) (summarizing results of examinations of auto finance companies); CFPB, *Supervisory Highlights: Mortgage Servicing Edition*, Issue 33, at 3-8 (April 2024) (summarizing results of mortgage servicing examinations).

11-12. If the CFPB is unlawfully dismantled, the States will need to divert crucial resources from other law-enforcement efforts to fill the gap left by the CFPB. That absence will have ripple effects throughout the country, to the detriment of consumers.

The district court thus had ample basis to find that the public interest and equities weigh strongly in favor of granting injunctive relief to prevent defendants from implementing their plan to dismantle the CFPB. (JA738-743.)

# CONCLUSION

The Court should affirm the district court's order.

Dated: Albany, New York
       February 9, 2026

Respectfully submitted,

JENNIFER L. DAVENPORT
  *Acting Attorney General*
  *State of New Jersey*
SHANKAR DURAISWAMY
  *Deputy Solicitor General*

25 Market Street
Trenton, New Jersey 08625


BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
CAROLINE S. VAN ZILE
  *Solicitor General*
ASHWIN P. PHATAK
  *Principal Deputy Solicitor General*

400 Sixth Street, NW
Washington, D.C. 20001

LETITIA JAMES
  *Attorney General*
  *State of New York*

By:  /s/ *Dustin J. Brockner*
    DUSTIN J. BROCKNER
    Assistant Solicitor General

The Capitol
Albany, New York 12224
(518) 776-2017
dustin.brockner@ag.ny.gov

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
KARUNA B. PATEL
  *Senior Counsel, Econ. Justice*
CHRISTIAN REIGSTAD
  *Assistant Attorney General*

*(Counsel list continues on next pages.)*

KRISTEN K. MAYES
 *Attorney General*
 *State of Arizona*
2005 N. Central Avenue
Phoenix, Arizona 85004

PHILIP J. WEISER
 *Attorney General*
 *State of Colorado*
1300 Broadway, 10th Floor
Denver, Colorado 80203

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 N. French Street
Wilmington, Delaware 19801

KWAME RAOUL
 *Attorney General*
 *State of Illinois*
115 S. LaSalle Street
Chicago, Illinois 60603

ANTHONY G. BROWN
 *Attorney General*
 *State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21201

DANA NESSEL
 *Attorney General*
 *State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

ROB BONTA
 *Attorney General*
 *State of California*
1515 Clay Street
Oakland, California 94612

WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capitol Avenue
Hartford, Connecticut 06106

ANNE E. LOPEZ
 *Attorney General*
 *State of Hawaiʻi*
425 Queen Street
Honolulu, Hawaiʻi 96813

AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, Maine 04333

ANDREA JOY CAMPBELL
 *Attorney General*
 *Commonwealth of Massachusetts*
1 Ashburton Place
Boston, Massachusetts 02108

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, Minnesota 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, Nevada 89701

JEFF JACKSON
  *Attorney General*
  *State of North Carolina*
114 W. Edenton Street
Raleigh, North Carolina 27603

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 S. Main Street
Providence, Rhode Island 02903

NICHOLAS W. BROWN
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
408 Galisteo Street
Santa Fe, New Mexico 87501

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, Oregon 97301

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, Vermont 05609

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,598 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and corresponding local rules.

 /s/ *Dustin J. Brockner*
Dustin J. Brockner

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2026, I electronically filed the foregoing En Banc Brief of Amici Curiae New York, New Jersey, and the District of Columbia et al. with the Clerk of the Court for the United States Court of Appeals for D.C. Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Dustin J. Brockner*
Dustin J. Brockner