**No. 25-5091**

*In the*

# United States Court of Appeals
*for the*
# District of Columbia Circuit

————————————————

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiff-Appellants*,

– v. –

RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al.,

*Defendants-Appellee.*

————————————————

On appeal from the United States District Court for the District of Columbia
Case No. 25-cv-0381, Hon. Amy Berman Jackson

————————————————

**BRIEF OF MAYOR AND CITY COUNCIL OF BALTIMORE AS *AMICUS CURIAE* SUPPORTING PLAINTIFFS-APPELLEES IN SUPPORT OF AFFIRMANCE**

————————————————

LOUIS R. KATZ
ALETHEA ANNE SWIFT
ROBIN F. THURSTON
  *Democracy Forward*
  *Foundation*
  *P.O. Box 34553*
  *Washington, D.C. 20043*
  *(202) 448-9090*

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* is a municipal corporation organized pursuant to Articles XI and XI-A of the Maryland Constitution. It has no parent corporation, and no publicly held corporation owns any portion of it.

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A. **Parties and *Amici***. All parties and *amici* appearing before the district court and in this court are listed in Plaintiffs-Appellees' brief.

B. **Rulings Under Review**. References to the rulings at issue appear in Defendant-Appellants' brief.

C. **Related Cases**. This case was before the district court as case no. 1:25-cv-00381-ABJ.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................i

Certificate as to Parties, Rulings, and Related Cases ............................. ii

Table of Contents ................................................................... iii

Table of Authorities .................................................................vi

Glossary.............................................................................ix

Interest of the *Amicus Curiae* ....................................................1

Introduction and Summary of the Argument....................................2

Pertinent Statutes...................................................................3

Argument.............................................................................3

I.    A Written-Statement Rule Is a Roadmap for Agencies to
Avoid Legal and Political Accountability.........................................3

II.   Piecemeal, After-the-Fact Litigation Is an Inadequate
Substitute for Directly Challenging Unwritten Policies. ..................10

    A.   An APA challenge to an unwritten policy is often the
only vehicle for judicial review..............................................11

    B.   Piecemeal litigation is not an adequate substitute..................13

    C.   Section 706(1) of the APA is not an adequate substitute.........15

III.  A Written-Statement Rule Would Have Allowed Agencies to
Evade Review in Canonical Administrative Law Cases................18

Conclusion .......................................................................21

# TABLE OF AUTHORITIES

**CASES**                                                                   **Page(s)**

*Afghan & Iraqi Allies v. Blinken*,
103 F.4th 807 (D.C. Cir. 2024) ...................................................... 17

*Al Otro Lado, Inc. v. Nielsen*,
327 F. Supp. 3d 1284 (S.D. Cal. 2018) ........................................... 5

*Am. Bar Ass'n v. U.S. Dep't of Educ.*,
370 F. Supp. 3d 1 (D.D.C. 2019) ................................................... 6

*Aracely, R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) ........................................... 6, 13

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........................................................... 3, 18, 19

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ..................................................................... 8

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ..................................................................... 8

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ............................................................... 11, 20

*Da Costa v. Immigr. Inv. Program Off.*,
80 F.4th 330 (D.C. Cir. 2023) ....................................................... 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..................................................................... 9, 19

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ..................................................................... 9

*Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*,
283 F. Supp. 2d 1249 (D.N.M. 2003) ............................................ 9

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ................................................................... 14

*Hispanic Affs. Project v. Acosta*,
901 F.3d 378 (D.C. Cir. 2018) ................................................. 12, 16

*Indep. Bankers Ass'n of Am. v. Smith*,
534 F.2d 921 (D.C. Cir. 1976) ..................................................... 15

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ................................................................ 8

*Kucana v. Holder*,
558 U.S. 233 (2010) .............................................................. 10

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................... 7, 8

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020) .............................................................. 14

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................................... 3, 7, 20, 21

*Nebraska v. Biden*,
52 F.4th 1044 (8th Cir. 2022) .............................................. 18

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......................................................... 12, 16

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) ......................................... 9

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ................................................................ 8

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .............................................................. 12

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ................................................ 19

*United States v. Mitchell*,
463 U.S. 206 (1983) .............................................................. 14

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ................................................................ 7

*United States v. Texas*,
579 U.S. 547 (2016) .............................................................. 19

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) ............................................... 5

## STATUTES, RULES, & REGULATIONS

5 U.S.C. § 553 ..................................................................... 6, 7

5 U.S.C. § 706(1) ................................................................. 10, 16

5 U.S.C. § 706(2)(A) ................................................................. 5

20 U.S.C. § 1098bb(b) .............................................................. 19

28 U.S.C. § 1491 ..................................................................... 14

**MISCELLANEOUS**

Bryan Clark & Amanda C. Leiter, *Regulatory Hide and Seek:*
*What Agencies Can (and Can't) Do to Limit Judicial*
*Review*, 52 B.C. L. Rev. 1687 (2011)....................................... 4

# GLOSSARY

APA   Administrative Procedure Act

CFPB   Consumer Financial Protection Bureau

## INTEREST OF THE *AMICUS CURIAE*[1]

The Mayor and City Council of Baltimore ("Baltimore") is a municipal corporation located in Maryland. Baltimore is organized pursuant to Articles XI and XI-A of the Maryland Constitution and entrusted with all the powers of local self-government and home rule afforded by those articles.

Baltimore has a responsibility to protect Baltimoreans from predatory business practices of all kinds. It thus has an interest in the continued functioning of the Consumer Financial Protection Bureau, and it has previously brought litigation to protect against the elimination of the agency. More generally, to serve its residents, Baltimore sometimes engages in affirmative litigation to challenge harmful and unlawful actions of federal agencies and so has an interest in ensuring that those actions remain subject to judicial review.

---

[1] *Amicus* affirms that no counsel for a party authored this brief in whole or in part and that no person other than *amicus*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

The government in this case endorses a jaw-dropping rule: The Administrative Procedure Act ("APA") does not permit review over "unwritten" agency action. Appellants' Br. at 35; *see also* Panel Op. at 28–29 & n.5, 40–42. As the appellees explain, this written-statement rule is contrary to both the statute and precedent. Appellees' Br. at 28–30. This brief explains why the practical consequences of the rule would be disastrous as well.

A written-statement rule lays out an easy path for the government to avoid judicial scrutiny. Simply communicate an unlawful action through means other than a public writing, and no court can review it under the APA. That rule is upside-down. It encourages agencies to engage in the least orderly and reasoned form of action, in direct conflict with bedrock principles of administrative law. And it invites agencies to shield their actions from the public, circumventing democratic accountability.

Judicial review over direct challenges to policies must be available even when those policies are unwritten or unpublished. Often, a direct challenge is the only opportunity to contest an unwritten policy. But even where subsequent proceedings are available, litigating the individual impacts of an unlawful policy piece-by-piece is a poor substitute for direct APA review. Sometimes, plaintiffs cannot raise their legal theories in piecemeal proceedings; other times, they cannot

obtain the relief they seek. And in any case, piecemeal proceedings are an ineffi-
cient and inadequate means of addressing major government policies with wide-
ranging implications. The availability of review under section 706(1) of the APA is
similarly chimerical—that rule only applies in a narrow set of cases and is ill-
suited to addressing sweeping administrative actions. A written-statement rule
would thus have allowed agencies to escape judicial review in major, precedent-
setting cases like *Biden v. Nebraska*, 600 U.S. 477 (2023), and *Motor Vehicle
Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463
U.S. 29 (1983). A rule so absurd and far-reaching cannot be the law.

## PERTINENT STATUTES

Except for the statutes reproduced in the addendum to this brief, all applica-
ble statutes are contained in the brief for Defendants-Appellants.

## ARGUMENT

### I.     A Written-Statement Rule Is a Roadmap for Agencies to Avoid Legal and Political Accountability.

Drawing on the panel opinion, the government contends that agency action
is unreviewable under the Administrative Procedure Act unless it is memorialized
in a written document. Appellants' Br. at 35–36 (citing Panel Op. 28–29). This
written-statement rule, if adopted by the en banc court, would be a disaster for both
administrative law and democratic governance.

A written-statement rule creates "perverse incentives" for agency policy-making. Panel Dissent at 41. To avoid APA review, all an agency would have to do is give verbal orders to low-level staff. Or it could issue a secret internal memo containing a new policy or inform interested parties about regulatory changes on a conference call.[2] In any case, a written-statement rule encourages agencies to adopt these unorthodox policymaking tactics by shielding them from judicial review.

This risk of circumvention is not speculative. "[A]gencies regularly act in ways that . . . limit judicial review." Bryan Clark & Amanda C. Leiter, *Regulatory Hide and Seek: What Agencies Can (and Can't) Do to Limit Judicial Review*, 52 B.C. L. Rev. 1687, 1688 (2011). Indeed, even though courts have routinely rejected the written-statement approach, agencies sometimes avoid memorializing their actions—precisely because, as a practical matter, shielding their activities from the public eye avoids legal and political accountability.

Thus, it is not uncommon for adversely affected parties to bring APA challenges to unwritten agency actions. And because unwritten action is often hidden from the public, its existence often must be proven by presenting multiple pieces of

---

[2] The government is somewhat unclear on the nature of the rule it asks this Court to adopt. Appellants' Br. at 36. But no matter its precise scope, the defect is the same: Deeming a certain form of action categorically unreviewable invites agencies to issue their policies in exactly that form.

evidence. That can be a difficult showing to make: Courts often find individual data points to be too weak to infer the existence of a single agency action. *See, e.g.*, *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1320 (S.D. Cal. 2018) (holding that "disparate 'examples'" of conduct do not "support[] the inference that there is an overarching policy"). But other times, there is strong evidence that the agency, despite the lack of public memorialization, has adopted a final agency action well-suited for judicial review.

For instance, in *Venetian Casino Resort, LLC v. EEOC*, this Court confronted an alleged agency policy of disclosing the confidential information of employers without notification. 530 F.3d 925, 927 (D.C. Cir. 2008). Although an agency manual nominally laid out the agency's policies, it was ambiguous which version of the manual was operative, and both versions were "not clear" on what the agency's policy was. *Id.* at 928. Indeed, the most this Court found was that the manuals "cast[] no doubt" on plaintiff's allegation of a policy of disclosure. *Id.* at 930. Still, the Court found, after reviewing other evidence—including the agency's failure to deny the allegation in its papers, an agency official's declaration, and counsel's concessions at argument—that the agency had adopted a policy of disclosure without notice. *Id.* at 929–930. As the Court made clear, the agency's manual was "relevant insofar as it illuminate[d] the nature of the policy, but the agency took final action by adopting the policy, not by including it in the [m]anual." *Id.*

*American Bar Association v. United States Department of Education* is similar. There, student loan borrowers argued that the Department of Education had unlawfully, and silently, raised its standards for defining employment under the Public Service Loan Forgiveness program. 370 F. Supp. 3d 1 (D.D.C. 2019). After conducting an exhaustive review of the evidence, including evidence drawn from outside the record, the court held that the agency had changed its standards in two discrete and identifiable ways. *Id*. at 26–31.[3] The new standards were not laid out in a written document—indeed, the agency denied that they existed. *Id.* at 26–27. Nevertheless, having found that the agency had changed course, the court had little difficulty concluding it could "review the Department's adoption of th[ose] standards as final agency action." *Id.* at 26–27 & n.6 (citing *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 139 (D.D.C. 2018)).

This kind of agency decisionmaking is hardly the norm, in part because the APA and the prospect of judicial review keep it in check. Unwritten legislative rules by definition do not comport with the notice-and-comment provisions of the APA. *See* 5 U.S.C. § 553. Outside of the rulemaking context, agencies that adopt a policy without memorializing it may have difficulty surviving arbitrary and capricious review. *See id.* § 706(2)(A). Policymaking through formal, public statements

---

[3] A third change alleged by the plaintiffs, however, was "unsupported by the evidence." *Id.* at 31–32.

helps ensure that the agency has thought through its choice before acting. Verbal directives, secret memos, and other unorthodox means heighten the risks that the agency will have missed something—that it will have failed to acknowledge prior policy, overlooked reliance interests, ignored a key aspect of the problem, or offered a weak or nonexistent justification for the new policy. So while agencies might prefer to keep their policy under wraps, the procedural irregularities inherent in that approach generate serious legal risk.

But for agencies to internalize the costs of illegal action, they must know that they will be held legally accountable on the back end. Treating agency action as unreviewable unless it is memorialized would perversely encourage agencies to enact policy through secret, unreasoned, oral communications—the type of action *least* conducive to considered decisionmaking.

That rule would flip administrative law on its head. The APA was designed "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). It thus imposes meaningful requirements on how agencies do business. Agency rules must be enacted according to specific procedures. *Id.* § 553. The substance of any action must be the product of "reasoned decisionmaking." *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. at 52. And there exists a "strong presumption that Congress intends judicial review" of agency actions to be available. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). When courts do review those actions, they judge them "solely" on "the grounds invoked by the agency," *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), and only "on the full administrative record," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

The APA thus channels agencies into an orderly, responsible process for taking administrative action—with judicial review as a critical backstop. Yet a written-statement rule would *reward* agencies for acting through secret, irregular procedures. It is hard to think of a rule more at odds with the "fundamental charter of the administrative state." *Loper Bright*, 603 U.S. at 392 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 580 (2019)).

Even worse, if the government got its way, agencies could not just evade legal accountability—they would insulate themselves from political accountability as well. The publication of government actions ensures democratic deliberation by guaranteeing that everyone—interested parties, the media, and the general public—can keep tabs on what the government is doing. Opponents of a policy can speak out against it. Supporters may push back. Voters make decisions based on what arguments they find persuasive. A legal regime that actively encourages agencies to keep their decisions out of the public eye is thus one that encourages agencies to

evade political accountability too. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)) (explaining that the APA not only ensures that agency action is "subject to review by the courts" but also that "federal agencies are accountable to the public").

The panel opinion suggests that we should not be so concerned about policy-making without a memorialized statement because its usefulness is limited. *See* Panel Op. at 41 ("It is difficult to see how" an agency could "alter legal relation-ships" "through a secret decision not memorialized in any public statement[.]"). But that suggestion is hard to understand. As just one obvious example, agency of-ficials can regulate their subordinates by issuing directives. Subordinates, in turn, are obligated to follow those directives or risk discipline. And their execution of those directives creates legal consequences for private parties—in the form of per-mit adjudications, funding decisions, and much more. This method of exercising agency authority is commonplace. Yet nothing about its effect hinges on whether the directive is oral or written, public or not.

The written-statement rule advanced by the government would thus "allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (quoting *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003)). The Supreme Court has rejected similar self-serving

arguments that would give the government "a free hand to shelter its own decisions from . . . court review." *Kucana v. Holder*, 558 U.S. 233, 252 (2010); *see also id.* (labeling this concern a "paramount factor"). This Court should do the same.

## II. Piecemeal, After-the-Fact Litigation Is an Inadequate Substitute for Directly Challenging Unwritten Policies.

The panel opinion suggests that, even though unwritten policies may not be challenged directly, those policies are not immune from judicial scrutiny. "In the ordinary course," the panel explains, "aggrieved employees . . . could challenge their terminations before the [Merit Systems Protection Board] or the [Federal Labor Relations Authority]" and "[a]ggrieved service providers . . . could claim breaches of contract in the Court of Federal Claims." Panel Op. at 16–17. For their part, "aggrieved consumers of services that the CFPB must provide to the public . . . could file APA actions alleging that the service has been unlawfully withheld or unreasonably delayed." *Id.* at 17 (citing 5 U.S.C. § 706(1)).

But these backup options—multiple proceedings addressing each separate instantiation of an unwritten policy—are fundamentally ineffective because they do not address the unlawful action itself. Meaningful review requires the option of directly challenging unwritten policies under the APA.

**A.    An APA challenge to an unwritten policy is often the only vehicle for judicial review.**

Whatever the viability of piecemeal litigation in *this* case, in many others, there is only one chance to challenge unlawful agency action: a direct APA challenge to the unpublished policy.

Direct APA review of unpublished actions is especially important in suits where the beneficiary of agency protections challenges the government's under-regulation of someone else. These cases are ubiquitous. For example, see the "wide range of administrative law suits in which businesses target the alleged unlawful under-regulation of other businesses, such as their competitors." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 833 (2024) (Kavanaugh, J., concurring) (collecting cases). Likewise, a "common form of environmental litigation" involves "private citizens su[ing] a federal agency based on the externalities that an agency's action is likely to produce." *Id.* at 835 (collecting cases).

In these scenarios, a written-statement rule would allow agencies to escape judicial review by simply declining to memorialize a decision to loosen regulations. When an agency deregulates, that's typically the end of the matter: There is no subsequent enforcement action in which the unregulated but adversely affected party can contest the policy's validity. *Cf. id.* at 826 (explaining that an APA suit to vacate unlawful agency action is often the "only" way that an "unregulated plaintiff can obtain meaningful relief"). Nor is section 706(1) of the APA likely to

11

be much help—at least if, as will usually be the case, the plaintiff wants to raise a challenge other than the "agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

The idea that an agency might adopt an undisclosed policy of deregulation is not fanciful. Indeed, that was precisely the issue before this Court in *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018). There, domestic sheep herders challenged the Department of Homeland Security's unwritten policy of automatically extending temporary visas to foreign shepherds. *Id.* at 382. The Court found that this permissive, unwritten policy was final agency action based on "extensive evidence" of a "*de facto* policy." *Id.* at 386. But had the Court come out the other way, the harm caused by the decision would have gone unredressed. After all, the agency's visa policy was not enforced against the domestic herders, and they could hardly have challenged each individual visa extension on a case-by-case basis. Among other legal and practical hurdles, the plaintiffs would have struggled to identify each extension of a visa, much less show that any specific extension was likely to cause them injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

Even where the plaintiff is a regulated party, a direct APA challenge to an unwritten policy may be the plaintiff's only bite at the apple. One such scenario is where the follow-up enforcement actions are treated as unreviewable.

*Aracely, R. v. Nielsen* is representative. There, the plaintiffs challenged an unwritten agency policy that, they claimed, unlawfully directed agency officials "to consider immigration deterrence as a factor in evaluating individual . . . asylum seekers' parole requests." 319 F. Supp. 3d at 145, 149. After reviewing a range of evidence presented by both sides, the district court concluded that the plaintiffs were likely to establish the existence of the alleged policy, and so it issued a preliminary injunction. *Id.* at 145–149, 157–58. As the court explained, while it could review the legality of agency's unwritten policy, it lacked the authority to "second guess . . . individual parole determinations" because those decisions are committed to agency discretion by law. *Id.* at 136 n.14. The direct APA challenge, in other words, was the only route for relief.

### B.  Piecemeal litigation is not an adequate substitute.

Where an unwritten policy causes harm, adjudication of each discrete consequence of that policy may sometimes be an alternative for affected parties to seek limited redress. But this piece-by-piece system of adjudication—relitigating an unwritten policy over and over across many different cases—is inefficient for courts and the parties and is no replacement for direct challenges to unwritten policies themselves.

The first problem is that adjudicators may not be authorized to consider the same types of claims in piecemeal proceedings. For example, in this case, the panel

opinion claimed that contractors affected by the Consumer Financial Protection Bureau's ("CFPB") shutdown order may be able to bring contract claims under the Tucker Act, 28 U.S.C. § 1491. Panel Op. at 17. But even if so, it seems unlikely that they could raise the specific claim identified by plaintiffs here: that the shutdown order violated the law because it prevented the CFPB from carrying out its statutory duties. "Not every claim invoking . . . a federal statute . . . is cognizable under the Tucker Act," which means the plaintiffs would need to show that the CFPB's organic statute specifically required the payment of damages to aggrieved contractors—likely a tall order. *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) ("[M]oney-mandating provisions are uncommon[.]"). So the fact that plaintiffs could bring a breach-of-contract claim in the Court of Federal Claims—as the panel opinion contended, Panel Op. at 17—misses the point. Breach of contract is not the basis that plaintiffs invoke for finding the agency action here unlawful.

Moreover, there is a remedial mismatch between a direct challenge under the APA and piecemeal litigation. Again, the Tucker Act is illustrative. Injunctive relief under that statute is typically unavailable because "the Court of Federal Claims 'does not have the general equitable powers of a district court to grant prospective relief.'" *Maine Cmty. Health Options*, 590 U.S. at 327 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). So in that respect, too,

piecemeal litigation is unlikely to compensate for the lack of a vacatur remedy under the APA.

Piecemeal litigation, even taken as a whole, also fails to redress the same scope of unlawful activity as a direct challenge. In this case, for instance, even if current employees and contractors have avenues to challenge their terminations, prospective employees or contractors do not have equivalent opportunities. Nor, if the defendants have their way, are there obviously ways to challenge the other steps the Defendants would take to shutter the CFPB: work stoppages, dismissals of litigation, office closures, data deletion, and more. The mere fact that *some* other avenues for relief are open does not imply that such relief is sufficient.

Finally, even in the best of circumstances, piecemeal litigation is an inefficient means of addressing unlawful agency action with sweeping effects. Forcing plaintiffs to file a multitude of "separate lawsuit[s]" "flies directly in the face of efficient judicial administration." *Indep. Bankers Ass'n of Am. v. Smith*, 534 F.2d 921, 928 (D.C. Cir. 1976). In many cases, relitigating the core legal dispute in proceeding after proceeding and against plaintiffs' wishes would waste judicial, administrative, and private resources.

## C.  Section 706(1) of the APA is not an adequate substitute.

The panel opinion asserted that those affected by the CFPB's shutdown order had another option for judicial review: filing APA claims arguing that the

agency was unlawfully withholding or unreasonably delaying certain statutory duties. *See* 5 U.S.C. § 706(1). But this alternative, too, is insufficient.

To start, section 706(1) is only a plausible backstop for a challenge to an unwritten agency policy when that policy has the effect of "unlawfully withh[o]ld[ing]" or "unreasonably delay[ing]" agency action. *Id.* But many unwritten policies will not have such an effect. *Hispanic Affairs Project* illustrates the problem. The plaintiffs there were challenging agency action—a policy of extending visas—not inaction. 901 F.3d at 385. Section 706(1) would have been of no help.

Even when inaction is at issue, section 706(1) may be inapplicable. Under section 706(1), courts can only compel an agency "to take a *discrete* agency action that it is *required to take*." *S. Utah Wilderness All.*, 542 U.S. at 64. It thus does not cover most challenges to policies of inaction—such as claims that the policy was arbitrary or promulgated without notice and comment.

This case demonstrates these limitations. At the heart of plaintiffs' claims is the contention that the CFPB shutdown violated the law by preventing the agency from engaging in its statutory duties. That might look like an "unlawfully withheld" claim. But many of the CFPB's duties may be characterized as general enforcement responsibilities and the like—not discrete actions that are required by law. So while no one disputes that a complete cessation of the CFPB's

enforcement activities would violate the law, *see* Panel Op. at 27, section 706(1) is inadequate to rectify that violation. *See* Panel Dissent at 51.

Even where a section 706(1) order could theoretically make the plaintiff whole, it still may be ineffectual in practice. Under longstanding precedent, courts only compel agency action after applying a multifactor balancing test. *See Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 815 (D.C. Cir. 2024). Under that test, courts routinely decline to compel action even when the agency has failed to act for years. *See, e.g.*, *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 342 (D.C. Cir. 2023) (holding that a four-and-a-half year delay is not per se unreasonable). And even after finding that the agency acted unlawfully, courts may decide not to compel immediate action and instead "establish deadlines" for the agency to act. *Afghan & Iraqi Allies*, 103 F.4th at 815.

The prospect of a long delay is an especially glaring deficiency of section 706(1) in a case like this one. In the period between the CFPB's decision to shut itself down and the hypothetical issuance of a court order under section 706(1), the agency will have wiped out the infrastructure necessary to comply. A CFPB with no employees, no contracts, and no resources cannot carry out its statutory responsibilities, no matter what a court tells it to do.

**III. A Written-Statement Rule Would Have Allowed Agencies to Evade Review in Canonical Administrative Law Cases.**

Under a written-statement rule, agencies could have easily bypassed judicial review and public scrutiny with respect to major administrative actions. These counterfactuals demonstrate how far-reaching and unlikely the government's proposed approach would be. The APA does not give the government such an easy route to shield its actions from scrutiny.

First, in *Biden v. Nebraska*, a divided Supreme Court concluded that a centerpiece of President Biden's economic policy agenda, his student loan cancellation plan, was unlawful. 600 U.S. 477. The majority and the dissent disagreed about Article III standing, the lawfulness of the debt cancellation policy, and the reach of the major questions doctrine. However, no one denied that the policy in question, published in the Federal Register, *id.* at 488, was final agency action.

Yet if a written-statement rule were in effect, senior officials could have shielded the debt-cancellation policy from review. The Secretary of Education could have called up his subordinates and told them to cancel student debt. On the government's account, that non-public, verbal instruction would have been immune from both public accountability and judicial review. And according to the Eighth Circuit, plaintiffs would have lacked other recourse to reverse the policy after the agency executed it. *See Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) (holding that the plan was "irreversible").

To be sure, the Secretary could not *lawfully* have cancelled student debt without memorializing his decision in a public writing. *See Biden v. Nebraska*, 600 U.S. at 499 (recognizing that 20 U.S.C. § 1098bb(b) requires the reporting of waivers and modifications in the Federal Register). But that just demonstrates the absurdity of a written-statement rule. It rewards agencies for violating the very procedural requirements that are supposed to constrain their behavior.

Second, take the Obama Administration's deferred action programs—the centerpiece of that administration's immigration policy. In *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015), the Fifth Circuit affirmed a preliminary injunction holding the Deferred Action of Parents of Americans and Lawful Permanent Residents program unlawful. An equally divided Supreme Court affirmed. *United States v. Texas*, 579 U.S. 547 (2016) (per curiam). The decision left untouched the separate Deferred Action for Childhood Arrivals program. But when the Trump Administration in 2017 attempted to rescind that program, the Supreme Court ruled that the rescission, too, was unlawful. *Regents of the Univ. of Cal.*, 591 U.S. 1.

A written-statement rule would have allowed both administrations to escape judicial attention. Under President Obama, the agency could have verbally instructed its employees to defer action with respect to certain specified individuals. And under President Trump, the agency would have verbally informed employees

that the prior policy was off. On the government's account, neither administration would have engaged in final agency action, and APA review would be unavailable. Thus, in these major administrative law cases, a written-statement rule would have plowed a clear path for the government to evade judicial review entirely.

Third, *State Farm* famously lays out the textbook features of arbitrary and capricious agency action. 463 U.S. at 43. The Supreme Court there also applied those features to assess the agency action in question—a published rescission of a regulation requiring passive restraints in vehicles—and found that action unlawful. *Id.* at 37–38, 46.

Under the government's position here, however, the agency made a strategic blunder in publishing the rescission. It should have instead gathered the heads of large auto manufacturers, put them in a conference room together, and verbally rescinded the passive restraint rule. Had the agency done so, neither the plaintiff insurers in the case nor anyone else could have challenged the rescission. The new, unwritten policy would not, on the government's account, be reviewable agency action. There would be no subsequent enforcement proceedings for affected parties to raise an arbitrary-and-capricious challenge; the whole point is that the agency would no longer be enforcing the passive restraint rule. *See Corner Post*, 603 U.S. at 834–35 (Kavanaugh, J., concurring) ("[T]he insurers could obtain relief . . . only if the insurers could obtain vacatur of that rescission."). And section 706(1) would

be of no use—it does not authorize challenges to arbitrary and capricious inaction, and the passive restraint rule was not required by statute, *see State Farm*, 463 U.S. at 33–34 (identifying the capacious statutes authorizing the agency to act).[4]

**CONCLUSION**

This Court should affirm the judgment of the district court.

Respectfully submitted,

/s/ *Alethea Anne Swift*

Louis R. Katz
Alethea Anne Swift
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34556
Washington, D.C. 20043
(202) 448–9090

*Counsel for* Amicus Curiae

Dated: February 9, 2026

---

[4] Consumers or insurers could also have tried to sue auto makers for defective cars directly, perhaps in tort. But those suits would be an inadequate substitute for APA review: They would be inefficient, generate uneven outcomes between cases, and any change in behavior would be speculative at best. Indeed, the whole point of having an *ex ante* regulatory scheme for auto safety is to avoid dealing with the harms of accidents *after* people get hurt. *Cf. id.* at 33 (recognizing that Congress passed the National Traffic and Motor Vehicle Safety Act of 1966 because "the current loss of life on our highways is unacceptably high").

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 32(g), the undersigned counsel for Mayor and City Council of Baltimore certifies that this brief:

(i)    complies with the type-volume limitation of FRAP 32(a)(7)(B) because it contains 4,831 words, including footnotes and excluding the parts of the brief exempted by FRAP 32(f) and Circuit Rule 32(e)(1); and

(ii)    complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared using Microsoft Office Word and is set in Times New Roman font in a size equivalent to 14 points or larger.

Dated: February 9, 2026          /s/ *Alethea Anne Swift*

**CERTIFICATE OF COUNSEL**

In accordance with Circuit Rule 29(d), I certify that a separate brief for *amicus curiae* is warranted. As far as counsel is aware, no other brief filed in support of Plaintiffs-Appellees is focusing on the specific issue addressed by *amicus*: the consequences of a rule that agency action is unreviewable under the Administrative Procedure Act if it is not memorialized in writing.

Dated: February 9, 2026 /s/ *Alethea Anne Swift*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2026, I electronically filed a copy of the foregoing.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM-ECF system.

Dated: February 9, 2026 /s/ *Alethea Anne Swift*

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 553 ....................................................................... A1

20 U.S.C. § 1098bb ............................................................. A3

28 U.S.C. § 1491 ................................................................. A6

## 5 U.S.C. § 553 – Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed;

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved; and

(4) the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

**20 U.S.C. § 1098bb - Waiver authority for response to military contingencies and national emergencies**

(a) Waivers and modifications

(1) In general

Notwithstanding any other provision of law, unless enacted with specific reference to this section, the Secretary of Education (referred to in this part as the "Secretary") may waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act [20 U.S.C. 1070 et seq.] as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by paragraph (2).

(2) Actions authorized

The Secretary is authorized to waive or modify any provision described in paragraph (1) as may be necessary to ensure that—

(A) recipients of student financial assistance under title IV of the Act who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals;

(B) administrative requirements placed on affected individuals who are recipients of student financial assistance are minimized, to the extent possible without impairing the integrity of the student financial assistance programs, to ease the burden on such students and avoid inadvertent, technical violations or defaults;

(C) the calculation of "annual adjusted family income" and "available income", as used in the determination of need for student financial assistance under title IV of the Act for any such affected individual (and the determination of such need for his or her spouse and dependents, if applicable), may be modified to mean the sums received in the first calendar year of the award year for which such determination is made, in order to reflect more accurately the financial condition of such affected individual and his or her family;

A3

(D) the calculation under section 484B(b)(2) of the Act (20 U.S.C. 1091b(b)(2)) of the amount a student is required to return in the case of an affected individual may be modified so that no overpayment will be required to be returned or repaid if the institution has documented (i) the student's status as an affected individual in the student's file, and (ii) the amount of any overpayment discharged; and

(E) institutions of higher education, eligible lenders, guaranty agencies, and other entities participating in the student assistance programs under title IV of the Act that are located in areas that are declared disaster areas by any Federal, State or local official in connection with a national emergency, or whose operations are significantly affected by such a disaster, may be granted temporary relief from requirements that are rendered infeasible or unreasonable by a national emergency, including due diligence requirements and reporting deadlines.

(b) Notice of waivers or modifications

(1) In general

Notwithstanding section 1232 of this title and section 553 of title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section.

(2) Terms and conditions

The notice under paragraph (1) shall include the terms and conditions to be applied in lieu of such statutory and regulatory provisions.

(3) Case-by-case basis

The Secretary is not required to exercise the waiver or modification authority under this section on a case-by-case basis.

(c) Impact report

The Secretary shall, not later than 15 months after first exercising any authority to issue a waiver or modification under subsection (a), report to the Committee on Education and the Workforce of the House of Representatives and the

Committee on Health, Education, Labor and Pensions of the Senate on the impact of any waivers or modifications issued pursuant to subsection (a) on affected individuals and the programs under title IV of the Act [20 U.S.C. 1070 et seq.], and the basis for such determination, and include in such report the Secretary's recommendations for changes to the statutory or regulatory provisions that were the subject of such waiver or modification.

(d) No delay in waivers and modifications

Sections 482(c) and 492 of the Higher Education Act of 1965 (20 U.S.C. 1089(c), 1098a) shall not apply to the waivers and modifications authorized or required by this part.

**28 U.S.C. § 1491 - Claims against United States generally; actions involving Tennessee Valley Authority**

(a)

(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 [1] of that Act.

(b)

(1) Both the Unites [2] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

(5) If an interested party who is a member of the private sector commences an action described in paragraph (1) with respect to a public-private competition conducted under Office of Management and Budget Circular A–76 regarding the performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A–76, then an interested party described in section 3551(2)(B) of title 31 shall be entitled to intervene in that action.

(6) Jurisdiction over any action described in paragraph (1) arising out of a maritime contract, or a solicitation for a proposed maritime contract, shall be governed by this section and shall not be subject to the jurisdiction of the district courts of the United States under the Suits in Admiralty Act (chapter 309 of title 46) or the Public Vessels Act (chapter 311 of title 46).

(c) Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade, or of any action against, or founded on conduct of, the Tennessee Valley Authority, or to amend or modify the provisions of the Tennessee Valley Authority Act of 1933 with respect to actions by or against the Authority.