IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————————————

NATIONAL TREASURY EMPLOYEES UNION, et al.,

*Plaintiffs-Appellees,*

*v.*

RUSSELL VOUGHT, in his official capacity as Acting Director of the
Consumer Financial Protection Bureau, et al.,

*Defendants-Appellants.*

——————————————

On Appeal from the United States District Court
for the District of Columbia

——————————————

EN BANC REPLY BRIEF FOR APPELLANTS

——————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
DEREK WEISS
SIMON GREGORY JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................... i

TABLE OF AUTHORITIES.................................................................. ii

GLOSSARY .................................................................................. vii

INTRODUCTION AND SUMMARY ................................................. 1

ARGUMENT .................................................................................. 2

I.    Plaintiffs' Challenge Suffers Multiple Threshold Problems.................. 2

    A.    Plaintiffs Have Not Established Jurisdiction...................................2

    B.    Plaintiffs Cannot Identify A Valid Cause Of Action.....................9

        1.    Plaintiffs Cannot Bring An APA Action..............................9

        2.    Plaintiffs Cannot Rely On A Nonstatutory Cause Of Action......................................................................18

        3.    Plaintiffs Have Other Avenues For Judicial Review. .......21

II.   The District Court's Legal And Factual Errors Also Warrant Vacating The Preliminary Injunction...................................................... 22

    A.    Plaintiffs Cannot Evade The § 706(1) Legal Standard.. ..............22

    B.    Plaintiffs Cannot Rehabilitate The District Court's Conclusion That Defendants Intend To Close CFPB. .................23

    C.    The Injunction's Profound Overbreadth Supports Vacatur. ............................................................................28

III.   The Equities Favor Defendants.................................................. 31

CONCLUSION .............................................................................. 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Abdullah v. Obama*,
753 F.3d 193 (D.C. Cir. 2014) .......................................................................... 29

*Alexander v. S.C. State Conf. of the NAACP*,
602 U.S. 1 (2024) ............................................................................................ 24

*American Fed'n of Gov't Emps. v. Trump (AFGE)*,
929 F.3d 748 (D.C. Cir. 2019) ................................................................. 6, 7, 21

*Axon Enterprise, Inc. v. Federal Trade Commission*,
598 U.S. 175 (2023) ....................................................................................... 6, 7

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................ 10, 11, 16

*Biden v. Texas*,
597 U.S. 785 (2022) ............................................................................ 10, 12, 15

*Brotherhood of Locomotive Eng'rs & Trainmen v. FRA*,
972 F.3d 83 (D.C. Cir. 2020) ........................................................................... 14

*California Cmtys. Against Toxics v. EPA*,
934 F.3d 627 (D.C. Cir. 2019) ......................................................................... 11

*Case v. Morrisette*,
475 F.2d 1300 (D.C. Cir. 1973) .................................................................. 23-24

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986) ......................................................................... 13

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................................................ 15

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ........................................................................................ 20

*Dalton v. Specter,*
  511 U.S. 462 (1994) ................................................................. 11-12, 19-21, 22

*Department of Educ. v. Brown,*
  600 U.S. 551 (2023) ................................................................. 4

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ..................................................................... 10-11

*Elgin v. Department of the Treasury,*
  567 U.S. 1 (2012) ..................................................................... 6, 7

*FEC v. Akins,*
  524 U.S. 11 (1998) .................................................................... 5

*FDA v. Wages & White Lion Invs., L.L.C.,*
  604 U.S. 542 (2025) ..................................................................15

*Federal Express Corp. v. Department of Com.,*
  39 F.4th 756 (D.C. Cir. 2022) ................................................. 22

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................. 17

*Fund for Animals, Inc. v. Bureau of Land Mgmt.,*
  460 F.3d 13 (D.C. Cir. 2006) ................................................... 9

*Gill v. Whitford,*
  585 U.S. 48 (2018) ................................................................... 29

*Global Health Council v. Trump,*
  153 F.4th 1 (D.C. Cir. 2025) ................................................... 20

*Harris v. Bessent,*
  160 F.4th 1235 (D.C. Cir. 2025) ............................................. 8

*Hispanic Affs. Project v. Acosta,*
  901 F.3d 378 (D.C. Cir. 2018) ................................................ 14

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022) ................................................. 30

*Independent Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ......................................................... 12

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986).........................................................................20

*Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*,
    No. 23-5096, 2023 WL 7294839 (D.C. Cir. May 25, 2023) (per curiam) ....... 7

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................... 3, 5

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................ 16

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021) ........................................................... 6

*National Ass'n of Immigration Judges v. Owen*
    139 F.4th 293 (4th Cir. 2025) ........................................................... 9

*National Envt'l Dev't Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) .......................................................... 11

*National Insts. of Health v. American Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) .................................................................. 4, 8

*National Park Hosp. Ass'n v. Department of the Interior*,
    538 U.S. 803 (2003) ........................................................................ 3

*North Carolina v. Covington*,
    581 U.S. 486 (2017) ....................................................................... 30

*Norton v. Southern Utah Wilderness All. (SUWA)*,
    542 U.S. 55 (2004) ................................................................ 13-14, 23

*PETA v. USDA*,
    797 F.3d 1087 (D.C. Cir. 2015)...........................................................4

*Sampson v. Murray*,
    415 U.S. 61 (1974) .............................................................. 28, 31-32

iv

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) ................................................................. 9

*Southwest Airlines Co. v. Department of Transp.*,
    832 F.3d 270 (D.C. Cir. 2016) ........................................... 10

*Sustainability Inst. v. Trump*,
    No. 25-1575, 2026 WL 157120 (4th Cir. Jan. 21, 2026) ................................. 20

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................................. 2

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ................................................. 6, 29, 30

*Trump v. New York*,
    592 U.S. 125 (2020) ........................................................... 18

*United States v. Armstrong*,
    517 U.S. 456 (1996) ........................................................... 24

*United States v. Loew's, Inc.*,
    371 U.S. 38 (1962) ............................................................. 31

*United States v. Morgan*,
    313 U.S. 409 (1941) ........................................................... 15

*Venetian Casino Resort, LLC v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) ........................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..................................................... 19, 22

**Administrative Adjudications:**

*Bullock v. Department of the Air Force,*
  80 M.S.P.R. 361 (1998) ...................................................................... 8

*Currier v. USPS,*
  72 M.S.P.R. 191 (1996) ...................................................................... 8

*Metger v. Department of the Navy,*
  68 M.S.P.R. 225 (1995) ...................................................................... 8

*Sink v. USPS,*
  65 M.S.P.R. 628 (1994) ...................................................................... 8

**Statutes:**

5 U.S.C. § 551 ................................................................... 13, 14, 15

5 U.S.C. § 702 ............................................................................... 12

5 U.S.C. § 706(1) ................................................................. 21, 22-23, 32

5 U.S.C. § 1204(a) .........................................................................32

5 U.S.C. § 5596.............................................................................32

5 U.S.C. § 7701(g)..........................................................................32

War Claims Act of 1948,
  ch. 826, 62 Stat. 1240..................................................................19

Emergency Price Control Act of 1942,
  ch. 26, 56 Stat. 23......................................................................19

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFPB or Bureau | Consumer Financial Protection Bureau |
| COO | Chief Operating Officer |
| CSRA | Civil Service Reform Act |
| MSPB | Merit Systems Protection Board |
| NAACP | National Association for the Advancement of Colored People |
| RIF | Reduction in force |

## INTRODUCTION AND SUMMARY

The district court entered a sweeping preliminary injunction barring the Executive officials responsible for the Consumer Financial Protection Bureau (CFPB) from using important, lawful tools for managing an agency. Plaintiffs who secured this extraordinary order plainly disagree with defendants' intention to streamline CFPB in accordance with the President's policies, and they invite this Court to affirm the injunction forcing CFPB to maintain the prior administration's personnel and contracting levels, asserting it is necessary to keep the agency "open."

Multiple, independent grounds warrant vacating the injunction. Plaintiffs cannot establish jurisdiction over this programmatic attack on defendants' management of CFPB's employees and operations; no cause of action permits such a challenge; the sole basis for any remedy here is the mistaken conclusion that defendants intend to close CFPB entirely; plaintiffs lack irreparable harm; and the injunction is fatally overbroad.

Particularly problematic are plaintiffs' novel reviewability theories, which would radically transform administrative law. At bottom, this suit is not about vacating challenged agency action: it makes little practical difference to defendants if an alleged shutdown decision they did not make

(and agree they could not make) is vacated.  Instead, this case is about whether plaintiffs can attack unexpressed "decisions" they hypothesize underlie discrete agency actions to obtain injunctive relief barring those discrete actions.  Permitting such review would call for district-court inquiries into officials' mental processes, despite the lack of any basis in the APA for treating decisionmakers' mental states as final agency action, and despite the Supreme Court's longstanding caution against such probes. Should the Executive Branch ever shutter an agency that Congress has required to exist, established administrative-law principles provide routes to judicial remedies, but plaintiffs' challenge is not among them.

## ARGUMENT

## I.    Plaintiffs' Challenge Suffers Multiple Threshold Problems.

### A.    Plaintiffs Have Not Established Jurisdiction.

Whether under the rubric of standing, ripeness, or channeling, plaintiffs' bid for jurisdiction fails.

**1.**  Plaintiffs "agree" (at 39) they lack an individualized interest in policing the Executive's general compliance with statutes or in enforcing broader separation-of-powers principles.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).  They nonetheless maintain they can challenge

an asserted "decision to eliminate the CFPB entirely." Resp. Br. 32. But plaintiffs offer no real argument why a "challenge [to] a … generalized level of Government action" such as the asserted CFPB shutdown—instead of "separate decisions" on particular matters "allegedly causing them harm"—is fit for review, as a matter of either standing or ripeness. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992); *see National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 807-08 (2003). They assert employment- and services-related injuries that result (if at all) not from a "shutdown" writ large, but rather from "specifically identifiable Government violations of law" (such as unlawful terminations or the cessation of specific, statutorily required functions) that can be challenged in the normal course. *Defenders of Wildlife*, 504 U.S. at 568 (quotation marks omitted); *see* Opening Br. 25-28, 42-45.

**2.** The individualized injuries the consumer-advocacy organizations and individual plaintiff assert do not satisfy Article III because they fail to identify any redressable, concrete injuries caused by a "shutdown." *See* Opening Br. 21-25. Allegations regarding services and collaborations that CFPB is free to end are fundamentally disconnected from plaintiffs' challenge to an alleged shutdown of CFPB entirely. *See, e.g.*, Resp. Br. 39-41

(National Association for the Advancement of Colored People's (NAACP) complaint that CFPB ceased "helping"); Resp. Br. 43 (asserting the Student Loan Ombudsman would have helped even if "not statutorily required" to do so). Plaintiffs cannot show that an order to keep CFPB open is likely to redress injuries stemming from CFPB's "wholly discretionary decision[s]." *Department of Educ. v. Brown*, 600 U.S. 551, 564 (2023); *see* Op. 42 (reviewing a shutdown decision would not justify "enjoin[ing] or set[ting] aside *other* agency actions—such as a [reduction in force (RIF)] announced around the same time"); *National Insts. of Health v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2661-62 (2025) (Barrett, J., concurring) (vacating agency guidance does not "void decisions made under it"). And vague allegations that an organization relies on agency materials or may adjust its work fail to state a concrete injury-in-fact. *See* Resp. Br. 41-42 (discussing National Consumer Law Center's reliance on CPFB publications and Virginia Poverty Law Center's "impairment" of its work); *cf. PETA v. USDA*, 797 F.3d 1087, 1099-1106 (D.C. Cir. 2015) (separate opinion of Millett, J.) (doubting whether the failure to provide information establishes standing absent "any legal *right* to such information").

Nor do cases like *FEC v. Akins*, 524 U.S. 11 (1998), aid plaintiffs. *See* Resp. Br. 40-43. The Court there held that setting aside a discretionary action "based … upon an improper legal ground" and remanding to the agency would provide redress if the agency's reconsideration of the challenged action absent legal error might alleviate plaintiffs' injuries. *Akins*, 524 U.S. at 25; *cf. Defenders of Wildlife*, 504 U.S. at 572 n.7 (discussing the relaxed redressability standard for procedural rights). But these plaintiffs identify no legal error underlying the action that causes their asserted injuries: CFPB's policy decision to eliminate discretionary functions. *See* Resp. Br. 39-43. Plaintiffs do not contend *that* policy decision is "based … upon an improper legal ground," *Akins*, 524 U.S. at 25—on the contrary, they insist their challenge does not extend to such a decision, *see, e.g.*, Resp. Br. 2 ("The challenge is to a single decision: the decision to eliminate the agency."). There is nothing for the agency to reconsider in light of the proper legal standard. Indeed, rather than wanting CFPB to redo the decision by "exercis[ing] … its lawful discretion" as in *Akins*, 524 U.S. at 25, these plaintiffs sought and obtained an injunction *prohibiting* CFPB from lawfully exercising its discretion.

Finally, while one plaintiff with standing suffices to reach the merits, *see* Resp. Br. 38, it would not suffice to affirm the injunction. Because plaintiffs' asserted injuries differ, *see* Resp. Br. 38-43, the appropriate scope of an injunction providing relief to each differs. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025); *infra* pp. 29-31. This Court must assess each plaintiff's standing to appropriately tailor any relief. *Cf. M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021) (explaining why the one-good-plaintiff rule does not apply when relief would differ).

**3.** The district court similarly lacks jurisdiction over plaintiffs' employment-related claims, which must be pressed through the prescribed administrative channels, Opening Br. 26-28; Op. 12-15, regardless of their asserted constitutional basis, *see Elgin v. Department of the Treasury*, 567 U.S. 1, 5 (2012) (requiring channeling of constitutional claims); *American Fed'n of Gov't Emps. v. Trump (AFGE)*, 929 F.3d 748, 757-61 (D.C. Cir. 2019) (same).

Plaintiffs do not grapple with the foregoing precedents; nor, as plaintiffs imply (at 44), did *Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175 (2023), disturb them. The question in *Axon*—whether Congress intended to channel the relevant claims through the review scheme—is the same one, with the same test, in *Elgin* and this Court's

6

cases.  *See id.* at 186; *Elgin*, 567 U.S. at 9; *AFGE*, 929 F.3d at 755.  *Axon* did

not displace *Elgin*; it cited *Elgin* affirmatively and merely "recognized a

narrow exception" where plaintiffs present "facial challenges to the

constitutional structure of administrative agencies' ability to operate."

*Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, No. 23-5096,

2023 WL 7294839, at *11 (D.C. Cir. May 25, 2023) (per curiam).  Plaintiffs

here raise no such constitutional challenge to CFPB's structure.

   Plaintiffs cannot escape *Elgin* by insisting (at 45) their claims are

really "not about 'unlawful terminations.'"  To start, that is untrue, as

plaintiffs sought an injunction preventing "any action to terminate the

employment of CFPB employees."  Dkt. 10-1, at 1; *see* Dkt. 10.  Just as the

Civil Service Reform Act (CSRA) channeled Elgin's challenge to his

termination "on the ground that the statute authorizing that action is

unconstitutional," *Elgin*, 567 U.S at 13, the CSRA channels plaintiffs'

challenges to employees' terminations on the ground that action is a

"byproduct" of an unlawful "agency closure," Resp. Br. 46.  Plaintiffs may

not "end-run" Congress's scheme for "redress for allegedly unlawful

terminations—the heartland of CSRA coverage," Op. 14 & n.3 — simply by

bundling unreviewable claims with reviewable claims. *Cf. NIH*, 145 S. Ct. at 2661-62 (Barrett, J., concurring).

Nor are plaintiffs correct (at 45) that the Merit Systems Protection Board (MSPB) cannot provide a remedy to an employee whose position is "abolish[ed]." Where MSPB determines a RIF was unlawful, it can order agencies to unwind personnel actions taken pursuant to it and "restore" employees to "positions" that were "abolished." *See Metger v. Department of the Navy*, 68 M.S.P.R. 225, 226, 227 n.*, 229-30 (1995) (agreeing with employee where his claim "amounted to a challenge to the agency's stated reason for running the RIF"). Plaintiffs rely on inapposite cases where employees did not challenge the lawfulness of abolishing their old position—and where, in any event, employees did receive relief through reinstatement to different positions. *Currier v. USPS*, 72 M.S.P.R. 191, 197-200 (1996); *Sink v. USPS*, 65 M.S.P.R. 628, 634 (1994); *Bullock v. Department of the Air Force*, 80 M.S.P.R. 361, 368-69 (1998).

Finally, plaintiffs fare no better in suggesting (at 46) *Elgin* is no longer good law because of this Court's decision in *Harris v. Bessent*, 160 F.4th 1235 (D.C. Cir. 2025). The Supreme Court has already held that unforeseen constitutional holdings do not affect a statutory scheme's preclusive

effect.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 76 (1996) (Courts are not "free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known that [scheme] was beyond its authority.").[1]

## B.    Plaintiffs Cannot Identify A Valid Cause Of Action.

Plaintiffs also lack a cause of action.  Neither of the two challenged actions—a February 10 email and a putative shutdown decision—is "agency action" that is "final, ripe for review, and discrete" under the APA.  Op. 18.  Plaintiffs abandon any reliance on an *ultra vires* claim.  And their attempt to repackage their challenge as a constitutional claim fails.

### 1.  Plaintiffs Cannot Bring An APA Action.

**a.**    Begin with the February 10 email, which directed staff not to perform any work without approval from CFPB's Chief Legal Officer.  *See* JA646; Opening Br. 33-35.  Such emails are how agencies conduct "the common business of managing government programs," *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006), not how

---

[1] The government's petition seeking summary reversal of *National Association of Immigration Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025), is pending.  *Margolin v. National Ass'n of Immigr. Judges*, No. 25-767 (U.S. filed Dec. 23, 2025).

agencies take final action.  Common sense underscores that such internal emails from new leadership rarely represent the "'consummation' of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  And this email certainly did not represent the culmination of the agency's decisionmaking process with respect to its continuing functions, as the agency's later conduct confirmed.  *See* Opening Br. 6-9, 49-51; Op. 25-26.  Put differently, the email was nonfinal not only because it was subject to change, *cf.* Resp. Br. 36, but more importantly because the agency plainly treated the since-superseded email as a temporary step toward gaining "operational control over the agency while ensuring that it would continue to fulfill its statutory duties,"  JA661; *see Southwest Airlines Co. v. Department of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (how "the agency subsequently treats the challenged action" affects finality).

Plaintiffs analogize (at 35) to *Biden v. Texas*, 597 U.S. 785 (2022), but the email is a far cry from a memorandum announcing a formal agency decision to "hereby terminat[e]" an outward-facing agency policy and "rescind" a former agency decision.  *Id.* at 808 (quotation marks omitted); *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 9 (2020) (addressing "memorandum terminating the [Deferred Action for Childhood Arrivals]

program"); *National Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014) (describing challenged action as a "settled agency position"). The email did not announce a decisive end or change to any policy or program; it "did not definitively decide anything." Op. 25. "[I]t merely directed employees to obtain advance approval before performing work, while remaining silent on legally mandated work and leaving the Chief Legal Officer with discretion to approve it," *id.*, during a transition period of new-leadership assessment.

The email also did not itself determine any "rights or obligations" or result in "legal consequences." *Bennett*, 520 U.S. at 177-78; Op. 26. Plaintiffs attempt (at 35-36) to pin a host of consequences on the email itself, but as explained (Opening Br. 35), each of those consequences followed from a subsequent act to terminate probationary employees, end contracts, or carry out a RIF. *See* JA674-77. Thus, even if the email "forecas[t]" the agency's "definitive" position, it would nonetheless not be final because it did not itself carry legal consequences. *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019); *see Dalton v. Specter*, 511 U.S. 462, 469-70 (1994) (holding agency recommendation regarding base closures was not final agency action even though it

11

supplied the predicate for presidential action and circumscribed his discretion).  And plaintiffs' attempt (at 35) to make reviewable any action with "[p]ractical consequences"—like employees' compliance with their superior's instructions—badly mistakes the final-agency-action analysis and would render all internal agency directions subject to APA review. *Independent Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004).

Notably, even if the stop-work email were somehow final agency action, plaintiffs' APA claim would fail.  Plaintiffs have not shown that the action was unlawful; plaintiffs argue only that a complete shutdown—which the email plainly does not order—would be unlawful.  Nor can the email support the injunction, since it inflicted no irreparable harm and the injunction extends well beyond work stoppages.

**b.**     Nor is a supposed, unexpressed decision to shut down CFPB reviewable final agency action, for four reasons.

***First,*** as explained (Opening Br. 36), courts may not review "abstract decisions apart from specific agency action, as defined in the APA."  Op. 28 (quoting *Biden*, 597 U.S. at 809); *see* 5 U.S.C. § 702.  Tellingly, plaintiffs ignore *Biden*'s discussion of "abstract decisions."  *See* Resp. Br. 29-30. Plaintiffs instead attack the strawman that an action must be written to be

reviewable. Resp. Br. 28-29. It is a rule's *expression*—not whether it is written or unwritten—that makes it a "statement" or the "equivalent" thereof under the APA. 5 U.S.C. § 551(4), (13). It is thus both obvious and irrelevant that a "memorandum announcing the Bureau's shutdown" effective immediately would be reviewable, Resp. Br. 29, because that is plainly a "statement."

Similarly, while "an agency may not avoid judicial review merely by choosing" an informal "form … to express its definitive position," *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986); *see* Resp. Br. 29, it does not follow that a position that has never been expressed is nonetheless reviewable. For all its inferences leading to its conclusion that defendants decided "to dismantle and disable the agency entirely," JA634, at no point did the district court find that defendants *expressed* the asserted shutdown decision. *See* Op. 33 ("[P]laintiffs point to no definitive statement regarding an agency shutdown but seek to infer one from various specific acts to downsize."). Plaintiffs' invocation (at 29) of "equivalent" in § 551(13) does not help them, since "[u]nexpressed decisions are the opposite of, not something 'equivalent' to" a "statement." Op. 30 n.5 (quoting 5 U.S.C. § 551(4), (13)); *see also Norton v. Southern Utah Wilderness All.* (*SUWA*), 542

U.S. 55, 62 (2004) (explaining that an "equivalent" in § 551 must share the same characteristics "or it would not be equivalent"). And cases in which courts found sufficient expression of unwritten policies bear no resemblance to the unexpressed decision here. *See* Op. 35-36 (distinguishing *Brotherhood of Locomotive Engineers & Trainmen v. FRA*, 972 F.3d 83 (D.C. Cir. 2020), and *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008)); *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018) ("extensive evidence" over multiple years of agency's "actual practice" manifested "the agency's *de facto* policy").

Policy considerations support defendants, not plaintiffs. Plaintiffs speculate that Executive officials might try to circumvent judicial review by "obfuscating" their decisions. Resp. Br. 29 (alteration omitted) (quoting Dissent 43). But as the panel explained, "[i]t is difficult to imagine a form of executive action sufficiently public and conclusive to inflict immediate injuries but not sufficiently public and conclusive to support judicial review, through the APA or otherwise." Op. 49 n.11. And plaintiffs' proposed approach to final agency action carries dangers of its own. If APA review is available whenever there exist factual disputes about officials' unannounced decisions, courts will need to "inquir[e] into the

14

mental processes of administrative decisionmakers," including at disruptive, rushed preliminary-injunction proceedings, despite the Supreme Court's repeated warnings that such inquiries are "usually to be avoided." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see United States v. Morgan*, 313 U.S. 409, 422 (1941) (warning "it was not the function of the court to probe the mental processes of the Secretary"); *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 577–78 (2025) ("Judicial inquiry into executive motivation represents a substantial intrusion … and should normally be avoided." (cleaned up)).

Indeed, if plaintiffs can state an APA claim by alleging otherwise lawful agency action is part of a broader unexpressed, unlawful agency decision, this effective new tool in plaintiffs' toolkits will proliferate. Rather than seeking judicial review of any controversial agency action directly, plaintiffs could file a complaint "postulating the existence of an agency decision wholly apart from any" concrete agency "statement[s]" qualifying as agency action. *Biden*, 597 U.S. at 809 (quoting 5 U.S.C. § 551(4)). On plaintiffs' view, there is no reason such allegations would not survive a motion to dismiss for lack of final agency action, triggering a factual inquiry into whether such a decision occurred. If plaintiffs convince

a single district-court judge (in a venue of their choosing) that it did, they could obtain sweeping injunctive relief preventing lawful agency actions with which they disagree.

*Second*, even assuming the unexpressed decision was "agency action," it was not final because "by itself," it did not "effec[t] the termination of any employees or the cancellation of any contracts." Op. 30. Such a decision was, if anything, the beginning of a process to decide what actions to take to implement an abstract strategy, not the "'consummation' of the agency's decisionmaking process" that affected any person's rights. *Bennett*, 520 U.S. at 178. Plaintiffs are correct that "fir[ing] employees" and "cancel[ing] contracts" imposed legal consequences, Resp. Br. 30, but plaintiffs insist they challenge only "a single decision … to eliminate the agency," *e.g.*, Resp. Br. 2, rather than the discrete agency actions carrying such consequences, *but see* JA46-47 (APA counts of complaint challenging only discrete actions, not any shutdown "decision").

*Third*, plaintiffs do not challenge a sufficiently discrete agency action; they cannot aggregate a "constellation of then-ongoing" discrete "actions" as a single supposed "shutdown decision." Op. 31 (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 890-93 (1990)). Despite relying on discrete

16

actions—"fir[ing] employees, cancel[ing] contracts, [and] g[iving] up its office space"—to attempt to establish finality, Resp. Br. 30, plaintiffs then try to reframe their suit as merely challenging the "policy governing those decisions," Resp. Br. 32, to identify a discrete action to "challenge all … at once," Op. 31.  Plaintiffs cannot have it both ways.  Nor could a challenge to a "single" shutdown decision justify plaintiffs' requested relief, which shifts the target back to that constellation of lawful management tools through which agencies may downsize.  *See* JA47-48; Dkt. 79-1.

    ***Finally*,** the purported shutdown decision is not ripe.  Op. 33.  Abandoning their repeated emphasis on the district court's factual findings, plaintiffs argue the case turns on the "purely legal issue" of whether shutting down the CFPB is lawful.  Resp. Br. 33.  But even assuming "interim CFPB leadership at one point made an abstract decision to shut down the Bureau," Op. 33-34, it remained unclear *whether* or *how* that decision would be implemented when this suit was filed.  Nor is it even clear *who* the district court found made the decision.[2]  And as the

---

[2] The district court referred to the "President's unlawful decision," JA732; *see* JA634, JA695, but conceded the President is not a defendant, JA665.  A presidential decision would not be "agency action."  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

panel explained, "the Bureau did change course" from any such decision—

it "reactivated certain contracts; refined its RIF plans; and issued a directive

to 'ensure that everyone is carrying out … statutorily required work.'"  Op.

34 (citations omitted).[3]  Plaintiffs respond (at 33) that the district court

predicted a shutdown would be completed absent an injunction, but the

very need to make "prediction[s about] how the Executive Branch might

eventually implement" an allegedly unlawful decision makes the case

unripe.  *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam).

### 2. Plaintiffs Cannot Rely On A Nonstatutory Cause Of Action.

Plaintiffs disclaim any *ultra vires* theory, and precedent makes clear

they have no freestanding constitutional claim.  The entire premise of

plaintiffs' suit is that *statutes* require CFPB to continue operating, and the

"supposed separation-of-powers violation turns entirely on whether CFPB

---

[3] Plaintiffs' voluntary-cessation argument (at 34) ignores that these subsequent actions "bea[r] directly on whether there was a *final* shutdown decision to begin with."  Op. 34 n.7.  "[A] central purpose of" the ripeness doctrine "is to allow an agency space to 'alter a tentative position.'  If [CFPB's] change in course here … went only to mootness, then the ripeness doctrine would be futile."  *Id.* (citations omitted).

officials violated [those] statutes."  Op. 47; *see* JA44-47; Resp. Br. 1-2, 38-42.[4]

In *Dalton*, the Supreme Court left no doubt that such a statutory claim

cannot be transfigured into a constitutional claim simply by relabeling it a

separation-of-powers claim.  *See* 511 U.S. at 472-74.

Plaintiffs' invocation (at 26-27) of *Youngstown Sheet & Tube Co. v.*

*Sawyer*, 343 U.S. 579 (1952), does not allow them to evade *Dalton*.  In

*Youngstown*, the Court faced a constitutional issue because the Executive

Branch justified the challenged actions based solely on its "inherent

constitutional power."  *Dalton*, 511 U.S. at 473 (describing *Youngstown*).  In

such a circumstance, "the case" then "necessarily turn[s] on whether the

Constitution authorized the … actions."  *Id.*  By contrast, when the

Executive Branch "concedes" it is not relying on inherent constitutional

powers, "no 'constitutional question whatever' is raised."  *Id.* at 474 n.6.

Here, defendants assert no constitutional authority to take the actions

plaintiffs attribute to them; they claim compliance with the statutes

plaintiffs invoke.

---

[4]  There is no inherent separation-of-powers problem with the
President closing an agency, which is lawful if authorized by statute.  *See,*
*e.g.*, War Claims Act of 1948, ch. 826, § 2(d), 62 Stat. 1240, 1241; Emergency
Price Control Act of 1942, ch. 26, § 1(b), 56 Stat. 23, 24.

Plaintiffs are wrong (at 25-26) that the availability of a separation-of-powers claim turns on a distinction between allegations that the Executive Branch *exceeded* its statutory authority and allegations that it *lacked* statutory authority. *See Sustainability Inst. v. Trump*, No. 25-1575, 2026 WL 157120, at *10 (4th Cir. Jan. 21, 2026) (rejecting argument based on this distinction). Whichever verb is used, claims like plaintiffs' go to whether the Executive violated statutes. *Cf. City of Arlington v. FCC*, 569 U.S. 290, 298 (2013) (explaining there is "no principled basis" to distinguish between "an incorrect application of agency authority" and "an assertion of authority not conferred"). Under plaintiffs' rule, challengers could "avoid statutory limits on review by reframing any alleged statutory violation by the President as a constitutional one," *Global Health Council v. Trump*, 153 F.4th 1, 14 (D.C. Cir. 2025), because every action "in excess" of statutory authority is one for which statutory authority is "absent," *see Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act … unless and until Congress confers power upon it"). Indeed, the incoherence of plaintiffs' two categories is clear from their own filings, in which they repeatedly argued that the "decision to shut down … exceeds [defendants'] statutory authority." Dkt. 14, at 4; *see id.* at 21; JA47.

20

### 3.  Plaintiffs Have Other Avenues For Judicial Review.

There also is no merit to plaintiffs' repeated suggestions that, absent a cause of action here, rogue agencies could immunize themselves from judicial oversight, whether by "conceal[ing] their decisions" or "by conceding" they lack authority.  Resp. Br. 3, 26.

As discussed, if agencies take non-employment "action sufficiently public and conclusive to inflict immediate injuries," the APA permits plaintiffs to challenge *those* actions—just not the inchoate agency decisions underlying them.  Op. 49 n.11; *see supra* p. 14.  If agencies take employment-related actions, plaintiffs may challenge them "in the context of concrete ... disputes" through the prescribed channels.  *AFGE*, 929 F.3d at 757; *supra* pp. 6-9.  And if agencies fail to provide a statutorily required service, the APA permits claims to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); *see infra* pp. 22-23.

Nor would nonstatutory review be unavailable if agency officials simply "conced[e] that they acted without the authority to do so."  Resp. Br. 26.  The language plaintiffs invoke (*id*.) from *Dalton* about the asserted "absence of any statutory authority" does not go to whether review is available but to what type of review is available.  If the Executive invokes

constitutional—not statutory—authority for its actions, a constitutional

claim is available, as in *Youngstown*. *See Dalton*, 511 U.S. at 473. If the

Executive does not invoke *any* authority for actions a plaintiff contends

conflict with statutes "Congress created," Resp. Br. 24-25, courts have

permitted *ultra vires* claims to go forward, *see, e.g., Federal Express Corp. v.*

*Department of Com.*, 39 F.4th 756 (D.C. Cir. 2022); Op. 48 (noting that under

*Dalton*, such claims "give rise to *ultra vires* claims but not implied

constitutional claims"). But plaintiffs have disclaimed any *ultra vires* claim

here, Op. 44, perhaps recognizing they cannot satisfy its high standard.

## II. The District Court's Legal And Factual Errors Also Warrant Vacating The Preliminary Injunction.

### A. Plaintiffs Cannot Evade The § 706(1) Legal Standard.

Plaintiffs stake their case on their claim that CFPB is taking "actions

and intended future actions to suspend or terminate CFPB's statutorily

mandated activities." JA46-47. Such claims are subject to the traditional

guardrails Congress carried forward in 5 U.S.C. § 706(1)'s provision

regarding "agency action unlawfully withheld," *see* Opening Br. 42-44;

*SUWA*, 542 U.S. at 63, and so must meet § 706(1)'s stringent standard.

Plaintiffs make no attempt to satisfy that standard. Instead, they reiterate the district court's puzzling suggestion that because "plaintiffs are not invoking" § 706(1), these limits are irrelevant. JA678 n.11. Plaintiffs claim (at 36-37) they evaded such limits by challenging an alleged *decision* to unlawfully withhold statutorily mandated duties rather than challenging the unlawful withholding of those duties. But plaintiffs cannot avoid § 706(1)'s standard by artful pleading. Such a rule would circumvent important APA limitations that preserve Article II officials' prerogative to "work out compliance" with statutes free from "pervasive oversight by federal courts … not contemplated by the APA." *SUWA*, 542 U.S. at 66-67.

## B. Plaintiffs Cannot Rehabilitate The District Court's Conclusion That Defendants Intend To Close CFPB.

The district court's conclusion that defendants intend to close CFPB entirely is founded on legal and factual error. *See* Opening Br. 45-56.

**1.** The district court's two legal errors underlying its closure finding each warrants disregarding that finding. Plaintiffs do not dispute that the court made either error; they merely dispute those errors' consequences. But under longstanding precedent, a court's factual inference "induced by an erroneous application of the law" cannot stand. *Case v. Morrisette*, 475

F.2d 1300, 1307-08 (D.C. Cir. 1973); *see Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18-19 (2024).

*First,* the district court failed to apply the presumption of regularity. Opening Br. 48-49. Plaintiffs do not dispute that the court should have but did not consider the presumption, arguing only that it is rebutted here. Resp. Br. 23. But that cannot rehabilitate the district court's failure to consider the presumption because the application of an incorrect legal standard means the resultant finding is not insulated by the clear-error standard, *Alexander*, 602 U.S. at 18-19, and the record falls far short of the "clear evidence" needed to overcome the presumption, Opening Br. 49 (quoting *United States v. Armstrong,* 517 U.S. 456, 465 (1996)).

*Second,* the district court wrongly drew adverse inferences from government counsel's correct legal argument that an injunction requiring adherence to unspecified "statutory obligations" would be ambiguous and unadministrable, instead characterizing counsel's objection to a follow-the-law injunction as evidence of an intent to not follow the law. JA729-31; *see* Opening Br. 46-47. Plaintiffs do not dispute that *if* this was legal error, it warrants disregarding the factual finding. Resp. Br. 22-23. And plaintiffs abandon their panel-stage argument that the district court's reasoning did

24

not rely "heavily" on this error, *compare* Panel Resp. Br. 23, *with* Resp. Br. 23; indeed, it was central to the court's finding.  JA730 (stating this exchange caused "defendants' contention they were intent on doing what the law required them to do [to] collaps[e] like a balloon at the end of the Macy's Thanksgiving Day Parade").

Instead, without any citation, plaintiffs assert that drawing a significant, adverse factual inference from defendants making a correct legal argument is a *factual* error, not a *legal* error.  They then cite precedent explaining that factual errors do not constitute clear error unless the finding is clearly erroneous in light of the rest of the record.  But there is no factual disagreement about what government counsel said; nor do plaintiffs dispute that government counsel correctly stated the law.  This is a legal dispute about whether the government asserting its right to be free from a follow-the-law injunction is a legally permissible basis on which to dismiss as unreliable all evidence demonstrating that the government intends to follow the law.

**2.**  Legal errors aside, the district court's finding that defendants intended to shut down CFPB "entirely," JA634, is impossible to reconcile with any fair view of the record as a whole.  From the first full business day

25

of Acting Director Vought's tenure, the record contains document after document reflecting defendants' actions to continue performing CFPB's statutory duties. *See* Opening Br. 49-51 & n.5 (collecting examples); JA284 (email confirming that consumer-complaint-database work and home-mortgage-disclosure-application work should continue); JA416-17, 648 (email by Chief Financial Officer asking all "contracts … support[ing] a statutory requirement" be identified); JA654 (email from Chief Legal Officer instructing employees "to not terminate or suspend any contracts without specific authorization from Acting Director Vought or me"); JA655 (Chief Legal Officer email directing rescission of contract termination notices); JA289 (Chief Operating Officer (COO) email confirming Legal can support all statutory requirements); JA106-07 (COO declaration explaining that work requests had been approved and unaware of any denials).

Despite this evidence, the district court found that "[a]s of" February 10, defendants were closing CFPB "entirely." JA634. The court did not explain why new leaders intent on closing CFPB would have made such repeated efforts to identify the agency's statutory duties and enable their continued performance. Indeed, the court conceded that defendants "authorize[d] the resumption of some work and the reactivation of some

26

contracts."  JA634; *see also* JA709-10 (acknowledging that "agency leadership circled back and took steps to approve certain activities or reactivate specific contracts related to statutorily mandated activities").

Plaintiffs share the same blinkered view of the record.  They, like the district court, dismiss evidence reflecting defendants' intention to continue CFPB's existence and discharge its statutory duties.  *See* Resp. Br. 21-23.  Plaintiffs do little to rehabilitate the district court's improper dismissal of "appropriate steps by the new leadership" to approve work[5] and contracts[6] necessary to accomplish "legally required" tasks.  JA709-10; *see* Opening Br. 49-53, 51 n.5.  They contend (at 22) dismissing such evidence was justified because RIF planning continued.  But as the panel's original partial-stay order reflects, a RIF is not inherently inconsistent with "the performance of defendants' statutory duties."  Order (Apr. 11, 2025).  In fact, COO

---

[5] Plaintiffs' assertions (at 10, 22) that employees "were privately told to stand down" mischaracterize a single employee's experience.  A middle manager forwarded the COO's email to his team explaining follow-up questions he asked the COO, and merely asked his team to wait for responses to those questions.  JA447-49; *see* JA249-50.

[6] Plaintiffs' own evidence belies their assertion (at 15) that contracts were terminated wholesale.  Sending "termination notices" merely starts a process that *might* end in terminations *if* CFPB later signs additional documents to finalize the terminations.  JA131; *accord* Op. 7-8.

Martinez testified repeatedly and without contradiction that agency leadership had instructed him that RIF planning should follow the February 26 government-wide memo, which requires agencies to ensure that any RIFs will preserve "delivery of [agencies'] statutorily-required functions." JA960-64, 1055-58, 1131, 1198-99; *see* Dkt. 70-2 (joint OMB-OPM memo). And plaintiffs do not dispute (at 21-22) that the district court ignored the February 10 email's instruction that employees could seek authorization to perform "urgent" work, JA646, and offer no real defense for the court's refusal to consider the entirety of the brief email.

### C. The Injunction's Profound Overbreadth Supports Vacatur.

Plaintiffs ignore the "well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs,'" such that "traditional standards" do not apply, and a plaintiff seeking "preliminary injunctive relief … at the very least must make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases." *Sampson v. Murray*, 415 U.S. 61, 83-84 (1974); *see* Opening Br. 57. This preliminary injunction's sweeping intrusion into CFPB's internal affairs is clearly improper.

Even under the less demanding principles governing injunctions against private parties, the injunction is fatally flawed because it is not tailored to "the inadequacy that produced the injury in fact that … plaintiff[s] ha[ve] established." *Gill v. Whitford*, 585 U.S. 48, 68 (2018). "[T]he Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law," and courts too must "follow the law," including "limits on judicial authority." *CASA*, 606 U.S. at 858.

Plaintiffs suggest (at 49-50) courts issuing *preliminary* injunctions may have more flexibility, but the cases they rely upon reiterate that courts "must … select a fitting remedy for the legal violations … identified." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017). This responsibility lies with the court, *see id.*, and "the movant has the burden to show" the preliminary-injunction factors "weigh in favor of the injunction," *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quotation marks omitted). And as the Supreme Court recently made clear, even "preliminary injunctions" must be tailored to what is "necessary to provide complete relief to each plaintiff." *CASA*, 606 U.S. at 861.

Plaintiffs object (at 52) that a narrower injunction would be unworkable, but the workability problem arises from the plaintiffs' desire

29

for universal relief rather than relief limited "to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861. "[F]ederal courts do not exercise general oversight of the Executive Branch," and may not issue universal injunctions simply to prevent legal violations. *Id.* Because each plaintiff's asserted injuries differ, *see* Resp. Br. 38-43, and each raises distinct standing questions, *see* Opening Br. 19-28, appropriate injunctive relief depends on who the Court determines has standing. If, for example, only the NAACP had standing, then an appropriate injunction would do no more than require defendants to provide the specific services to the NAACP and its members needed to prevent concrete, irreparable injury.

Plaintiffs similarly err in suggesting that courts may disregard these remedial limits if they seek to "restor[e] the agency to the status quo." Resp. Br. 12; *see id.* at 49-53. Consistent with equity's "long embrac[e of] the rule that courts generally 'may administer complete relief *between the parties*,'" *CASA*, 606 U.S. at 851, the status quo concept is similarly focused on returning the relationship "*between the parties*" to its "last peaceable uncontested status," *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (citation omitted) (emphasis added). Authority to preserve the status quo in terms of CFPB's interactions *with plaintiffs with standing* does not

justify broadly freezing the entire CFPB at particular staffing levels or generally divesting the Executive Branch of authority over the agency.

Finally, the grossly overbroad injunction cannot be justified on the principle that courts can sometimes enjoin "acts which may be entirely proper when viewed alone" if necessary to prevent the legal violation. *United States v. Loew's, Inc.*, 371 U.S. 38, 53 (1962); *see* Resp. Br. 50. The district court made no attempt to explain why the wide-ranging preliminary injunction was necessary to prevent a complete shutdown of the agency, much less to prevent plaintiffs' injuries, nor do plaintiffs attempt to explain their view that such principles should apply to orders barring the Executive Branch's lawful discharge of its constitutional responsibilities.

## III. The Equities Favor Defendants.

The equities support vacating the injunction so CFPB's politically accountable leaders can use lawful tools to control the agency without further delay. The district court erroneously concluded plaintiffs' potential loss of employment or access to CFPB services establishes irreparable harm. *See* JA734-38; Opening Br. 61-63. Even if such harms establish jurisdiction, they do not constitute irreparable injury. *See Sampson*, 415 U.S.

31

at 91-92, 92 n.68.  Plaintiffs offer no reason for their position (at 46-47) that a closed CFPB could never reopen should they prevail.  Plaintiffs' assertions that MSPB could not redress their employment claims is erroneous, as their own cases show. *See supra* p. 8; 5 U.S.C. §§ 1204(a)(2), 5596, 7701(g).  And the mandamus-like remedy afforded by APA § 706(1) is the effective equivalent of an adequate remedy at law for any denial of statutorily required services.

In contrast, the preliminary injunction directly and substantially harms both defendants and the public interest by thwarting the Executive Branch's lawful plans for CFPB.  *See* Opening Br. 63-64.  Plaintiffs may disagree with defendants' assessment about the appropriate size and priorities of CFPB, but such determinations are committed to Article II officials, not Article III judges acting on plaintiffs' policy preferences. Plaintiffs' observation (at 48) that defendants could *plan* a RIF even if they cannot effectuate it is no answer to the district court's inappropriate intrusion on the Executive's authority to lawfully downsize the agency.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and vacate the preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON

*/s/ Derek Weiss*
DEREK WEISS
SIMON GREGORY JEROME
*Attorneys, Appellate Staff*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*
*derek.l.weiss@usdoj.gov*

February 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,487 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Book Antiqua 14-point font, a proportionally spaced typeface.

*/s/ Derek Weiss*
Derek Weiss

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Derek Weiss*
Derek Weiss