**ATTACHMENT A**



Consumer Financial
Protection Bureau

1700 G Street NW, Washington, D.C. 20552

March 27, 2026

**RECOMMENDATION MEMORANDUM FOR THE ACTING DIRECTOR**

**FROM:**    Geoffrey Gradler, Deputy Director

**SUBJECT:**  CFPB Workforce Restructuring Plan

Recommendation:

Pursuant to your statutory authority to "fix the number of … all employees of the Bureau," 12 U.S.C. §5493(a)(1)(A), I recommend you approve the workforce restructuring plan outlined below, to be effectuated if the preliminary injunction of the District Court for the District of Columbia is lifted. This recommendation will allow CFPB to continue meeting its statutory obligations while expanding on the reforms that have dramatically increased its efficiency and stewardship of taxpayer funds, in line with Presidential and Congressional intent.

This workforce plan is essential to having a sustainable agency budget that complies with the law, specifically with the changes enacted into law by the One Big Beautiful Bill Act with respect to the funding transfer cap. It reflects and is driven by Bureau leadership's discretionary priorities and commitment to running the agency in the most efficient manner possible to fulfill its duties.

| Division | FY25 Authorized[1] | FY26 Onboard | Retain |
|---|---|---|---|
| CONSUMER RESPONSE EDUCATION DIV | 152 | 127 | 90 |
| DIRECTOR | 73 | 62 | 15 |
| ENFORCEMENT DIVISION | 254 | 137 | 50 |
| EXTERNAL AFFAIRS DIVISION | 45 | 30 | 5 |
| LEGAL DIVISION | 87 | 60 | 60 |
| OPERATIONS DIVISION | 341 | 255 | 133 |
| OTHER PROGRAMS | 5 | 11 | 1 |
| RESEARCH MONITORING AND REGULATIONS DIV | 228 | 142 | 125 |
| SUPERVISION DIVISION | 523 | 350 | 77 |
| **Grand Total** | **1723** | **1174** | **556** |

---

[1] Permanent authorized positions from the FY25 Budget approval. These totals do not include Time-limited positions.

**consumerfinance.gov**

Background:

On January 31, 2025, the President signed Executive Order 14192, <u>Unleashing Prosperity through Deregulation</u>, in order to eliminate substantial restraint on our economic growth and global competitiveness.  It is the policy of the executive branch to be prudent and fiscally responsible in the expenditure of funds, from both public and private sources, and to alleviate unnecessary regulatory burdens placed on the American people.  By eliminating waste, bloat, and insularity the Administration is empowering American families, workers, taxpayers, and our system of Government itself.

Each Agency Head was tasked with reforming the Federal Workforce to maximize efficiency and productivity.  This included evaluating functions currently being performed but not mandated by statute or other laws. As a result of a comprehensive review, the Bureau's leadership determined that workforce reshaping is necessary to align with the established executive orders.  The review of the Bureau's activities has resulted in the necessary changes outlined below.

On July 3, 2025 Congress passed the One Big Beautiful Bill Act (Public Law: 119-21), which among other things, reduced the Bureau's funding transfer cap from 12% to 6.5% ($466.8M for FY26) of the total operating expenses of the Federal Reserve System. This reflects a congressional desire for a more streamlined and efficient Bureau. In the FY25 Budget (approved during the prior administration), pay costs represented 65.27% ($526.4M) of the total budget ($806.4M). It would be mathematically impossible to comply with the law without a workforce restructuring and reduction.

Additionally, certain aspects of the Bureau's Non-Pay costs are directly tied to our staff levels (e.g. infrastructure costs, training costs, travel costs, etc.). Reducing the staffing levels will generate non-pay cost savings in addition to the direct pay cost savings.

The combination of these two effects translates into a significantly lower need for additional transfer amounts from the Federal Reserve, from approximately $268.6M for the remainder of the year (Q3 and Q4) to approximately $181.1M.

## Consumer Response and Education Division

The Consumer Response and Education Division (CRE) is responsible for answering questions, handling complaints, and sharing data and insights. Consumer Response manages the CFPB's toll-free number and complaint program from end-to-end. Consumer Response is also responsible for assisting complaint process stakeholders (e.g., responding to congressional members with their constituents' complaints, assisting Company Portal users as they respond to their customer's concerns) and sharing complaint information with Federal and State agencies. There are two offices within CRE: the Office of Financial Education and the Office of Consumer Response.

**Financial Education**. Dodd-Frank requires the Bureau to "establish an Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions." 12 U.S.C. §5493(d). Financial Education develops and implements initiatives intended to educate and empower consumers to make better informed financial decisions, 12 U.S.C. §5493(d)(1); develops and implements a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission, 12 U.S.C. §5493(d)(2); coordinates with other units within the Bureau in carrying out its functions, including working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and working with the research unit established by the Director to conduct research related to consumer financial education and counseling, 12 U.S.C. §5493(d)(3); and submits a report on its financial literacy activities and strategy to improve financial literacy of consumers, 12 U.S.C. §5493(d)(4).

**Consumer Response**. Dodd-Frank requires the Bureau to "establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database … to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products and or services." 12 U.S.C. §5493(b)(3)(A).  It also requires the CFPB "to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person." 15 U.S.C. §1681i(e) establishes a process by which the CFPB must act and report out on certain credit and consumer reporting complaints. Consumer Response must coordinate with certain CFPB offices and personnel, including the Private Student Loan Ombudsman and Office of Servicemember Affairs. *See* 12 U.S.C. §5493(e), 12 U.S.C. §5535. Consumer response also includes the escalated case management team.

The core function of consumer response is a largely automated system that routes consumer complaints to covered entities, receives a response from the covered entity, and then routes that response back to the consumer. Advancements in technology progressively ease the need for FTE hours. For example, the division is implementing additional automation systems to screen fraudulent and duplicative complaints. Such measures will significantly reduce FTE hours needed to maintain this system and allow remaining FTEs to focus on those complaints that require elevation due to insufficient, late, or defective responses from covered entities.

In consultation with the previous Associate Director for CRE, the Associate Director provided options for realigning the CRE resources while reducing any risk of destabilization of the Division's operations and jeopardizing service delivery to the public, including providing timely

responses to consumer complaints.  The current Acting Associate Director has recently concurred with the approach and agrees with the assessment.  Since mid-2025, CRE has lost approximately 10% of its staff through natural attrition (e.g., retirements, voluntary separations). The responsibilities of those departed have already been absorbed by other FTEs with different job titles.  The Associate Director reflected on his judgement of necessary staff resources having operated the CFPB's complaint function since its inception and the education function since 2023.

Additionally, some work has evolved over the past year.  For example, there are greater demands from congressional offices seeking complaint assistance for their constituents, from federal and state agencies, from oversight bodies (e.g., inspectors general), and from companies participating in the complaint process.  The CFPB has also received a record number of information requests under the Freedom of Information Act (FOIA) and the Privacy Act.  However, CRE Leadership has adjusted workload and processes to gain additional efficiency while still proposing and validating that the CRE will run sufficiently when retaining 90 FTEs/positions.  Further, the CRE can offer this staffing level because of past efforts and planning.  For example, FinEd has shifted largely to a "digital-first" strategy, prioritizing distribution through digital channels and intermediaries.  Consumer Responses has introduced automation into certain parts of its complaint handling process.  The CRE has also migrated certain routinized and technical support work to third-party contractors.

The Office of Financial Education (FinED) is responsible for managing a suite of more than 50 educational tools and resource, distributing those tools to users, and researching the effectiveness of financial education programs.  At the time of the Associate Director's recommendations, the FinEd tools and resources had received 5.8 million visits and more than 200,000 downloads.  They had also distributed more than 441,000 publications.

The CRE Division is a recent creation. In 2011, during the CFPB's startup, FinEd was a part of the Consumer Education and Engagement (CEE) Division, whereas Consumer Response was a part of the Operations Division. In 2018, under former Acting Director Mulvaney, Consumer Response became part of the Consumer Education and Engagement Division. Then in 2020, under former Director Kraninger, CEE merged with the External Affairs Division to become the Consumer Education and External Affairs (CEEA) Division. Most recently, in 2023, under former Director Chopra, the two offices split apart from CEEA to form the Consumer Response and Education Division.

CRE relies on several contracts to provide its service offerings to the public. These contracts include both contractor support (e.g., people who perform work on behalf of the CFPB) and subscription-based contracts (e.g., software licenses). CRE has already outsourced many functions that are eligible for contractor support in accordance with the Federal Acquisition Regulation (FAR). The functions that remain are those responsibilities that cannot be easily delegated to external parties because they are inherently governmental in nature—i.e., functions that involve the exercise of discretion, judgment, or authority on behalf of the Federal government. For example, the routing, monitoring, and investigating of complaints has long been regarded as work that must be performed by Federal employees to ensure accountability, protect the public interest, and otherwise comply with the FAR.

FinEd leads the CFPB's national efforts to develop and implement education initiatives to improve the financial literacy of consumer.  In carrying out this work, FinEd creates and maintains various tools, programs, outreach activities, and capabilities.  Currently the FinEd has 11 FTEs onboarded and the recommendation is to retain 9 FTEs and eliminate two positions.  One of the two positions is an attorney advisor, and the work may be transferred to the Legal Division who already provides legal advice to the CFPB.

Consumer Response is a complex organization, comprised of five interdependent sections (Stakeholder Services, Investigations, Product, Quality, and Data and Governance) and a Front Office.  These sections and the Front Office are made up of 25 functional teams, ranging in size from 1 FTE to 17 FTEs.  Under a reduction scenario no reductions would be taken in the Complaint Handling Team (7 FTEs), Portal Operations Team (6 FTEs), Escalated Case Management Team/Investigations Section (3 FTEs), Complaint Process Monitoring Team/Product Section (2 FTEs), and Management and Operations Team/Product Section (4 FTEs).

Reductions would be taken in the following teams, which includes approximately 20 currently vacant positions: Consumer Resource Center Team (-1 FTE), Management and Operations Team/Stakeholder Services Section (-3 FTEs), Company Monitoring Team/Investigation Section (-6 FTEs), Regulatory Compliance Team/Investigation Section (-5 FTEs), Complaint Research and Analysis Team/Investigations Section (-2 FTEs), Quality Assurance Team/Investigations Section (-5 FTEs), Management and Operations Team/Investigations Section (-1 FTE), Mosaic Program Team/Product Section (-2 FTEs), Complaint Sharing and Analysis Team/Product Section (-1 FTE), Quality Assurance Team/Quality Section (-3 FTEs),  Quality Monitoring Team/Quality Section (-4 FTEs), Data Quality and Reporting Team/Data and Governance Section (-1 FTE), Research and Development Team/Data and Governance Section (-1 FTE), Business Process Reengineering Team/Data and Governance Section (-3 FTEs), Portfolio Planning Team/Data and Governance Section (-3 FTEs), Management and Operations Team/Data and Governance Section (-1 FTE), Staff Director Team/Front Office (-2 FTEs),  Strategy and Planning Team/Front Office (-1 FTE, Product Management and Stakeholder Engagement Team/Front Office (-3 FTEs), Customer Experience Team/Front Office (-3 FTEs), and CRE Divisional Front Office (-3 FTEs).

CRE can reduce a significant number of employees and fulfill its statutory duties at current levels. Only modest reductions are proposed to CRE, particularly to Financial Education, given the Bureau's prioritization of consumer education. Consumer Response is supported by dozens of contractors for the maintenance of the complaint management system, which is largely automated. Consumer Response has been plagued for years by being too management-heavy. CRE is also implementing tools and measures to screen out fraudulent and duplicative complaints, which will decrease the volume of complaints that need to be screened by a human being.

Accordingly, Consumer Response can continue to field, distribute, elevate, and respond to, if necessary, the current volume of complaints with 81 FTEs, supported by additional contractors if necessary. Additionally, this number builds in cushion, particularly given the Bureau's efforts to ensure complaint verification to cut down on the surge of fraudulent complaints in recent years.

This FTE level will also be more than sufficient to generate the statutorily required reports to Congress. 12 U.S.C. §§5493(b)(3)(C), 5493(d)(4).

| Division | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **CONSUMER RESPONSE EDUCATION DIV** | **152** | **129** | **90** |
| CONSUMER RESPONSE | 136 | 116 | 81 |
| FINANCIAL EDUCATION | 16 | 11 | 9 |

**Director's Front Office**

The CFPB's Office of the Director contained more than 86 employees in early 2025, an unprecedentedly high number.  Most of these employees occupy administrative or support positions already performed in other parts of the Bureau.  The roles and positions grew over time due to multiple reorganizations and the need to find homes for excess staff.  Examples of excess staff include internal communications, project management personnel, administrative advisors, and temporary analysts.

It is imperative that the Bureau leadership reduce the size of the office and shift focus to the statutorily-required offices, such as the Office of Fair Lending and Equal Opportunity (OFLEO), §5493 (which covers Truth in Lending Act Home and Mortgage Disclosure Act), the Deputy Director, §5491(b) who has also been designated the CFPB's Private Education Loan Ombudsman §5535(a), and the Office of Minority and Women's Inclusion §5452. Under this recommendation, appropriate resources will be allocated to these offices in order to fulfill their specific requirements under the statute. The Director's Office will be supported by all divisions of the Bureau in its legislative obligations. *E.g.*, 12 U.S.C. §5496(c).

The Office of Women and Minority Inclusion (OMWI) can fulfill its statutory duties, primarily preparing an annual report, working with other components on contracting, and monitoring workforce diversity, with one FTE. However, I recommend retaining two FTEs for cushion. OMWI is currently responsible for reasonable accommodation intake and coordination required by the Rehabilitation Act of 1973; however, this function will be transferred to the Office of Human Capital where it once existed and where placement is consistent with other federal agencies. Eliminating this function from OMWI's portfolio will allow the staff to focus only on statutory requirements. OFLEO, which was once part of the Supervision and Enforcement divisions, continues to work closely with these entities, which provide the majority of the FTEs necessary to fulfill its mission, including the statutorily required report, 12 U.S.C. 5493(c)(2)(D). Particularly, in light of this cross-division support, four FTEs will be more than sufficient for OFLEO to perform its oversight, outreach, and coordinating functions and to provide the statutorily required report to Congress.

It should be noted that the Bureau's Operations Division has always supported and will continue to support the statutorily required offices and their statutory duties.  For example, the Office of Human Capital will continue to manage strategic hiring of personnel, and the Office of Finance and Procurement will continue to support the Bureau's purchasing from small and disadvantaged businesses.  This is also a shared responsibility across all Bureau components in fulfilling these requirements.  In addition, the Office of Legislative Affairs and the Office of Civil Rights will pool resources to fulfill requirements pursuant to common federal regulations and laws.

The performance and strategic planning function within the Director's Office of Planning & Strategy will be retained and moved to the Office of Finance and Procurement along with two FTE positions. This re-alignment will allow CFPB to better comply with requirements found in OMB Circular A-11 and the GPRA Modernization Act, to integrate performance and strategic information into budget and resource allocation decisions.  This reorganization furthers Bureau accountability by more directly linking the agency's strategic plan with the Bureau's budget and

performance.  This has been an identified weakness for many years leading to weakened performance accountability.

| Division | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **DIRECTOR** | **73** | **62** | **15** |
| LEGISLATIVE AFFAIRS | 5 | 2 | 2 |
| OFF OF POLICY PLANNING & STRATEGY | 3 | 3 | 0 |
| OFFICE OF CIVIL RIGHTS | 12 | 8 | 2 |
| OFFICE OF FAIR LENDING AND EQUAL OPP | 15 | 10 | 4 |
| OFFICE OF MINORITY AND WOMEN INCL | 12 | 14 | 2 |
| OFFICE OF THE DIRECTOR | 26 | 25 | 5 |

**Enforcement Division**

The Consumer Financial Protection Act instructs that the "Bureau shall . . . enforce consumer financial law . . . for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer products and services are fair, transparent, and competitive." 12 U.S.C. §5511. The Bureau "may take any action authorized" under its statutory enforcement powers "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abuse act or practice" involving consumer financial products and services. *Id*. §5531(a).

"[T]he public interest in the democratically-elected President's prerogative to pursue his policy objectives" "bears heavily on" evaluating "how vigorously the CFPB will enforce particular provisions within the statute." *NTEU v. CFPB*, 774 F.Supp.3d 1, 81 (D.D.C. 2025). In April 2025, the Bureau rescinded its prior supervisory and enforcement priorities. The Bureau also stated that it would focus on actual consumer fraud, where there are identifiable victims with material and measurable consumer damages as opposed to matters based on the Bureau's perception that consumers made "wrong" choices. The Bureau emphasized that it will focus on areas that are clearly within its statutory authority and would not pursue matters under novel legal theories, including of the Bureau's authority. The Bureau also noted that it will avoid duplicating similar oversight either at the federal or state level.

The Bureau also identified new priorities enforcement, including:

- Providing redress to servicemembers, veterans, and their families;
- Mortgages;
- Fair Credit Reporting Act (FCRA) and Regulation V data furnishing violations;
- Fair Debt Collection Practices Act (FDCPA) and Regulation F violations relating to consumer contracts and debts;
- Fraudulent overcharges and fees; and
- Inadequate controls to protect consumer information resulting in actual loss to consumers.

Moreover, the Bureau explained that it will focus on actual intentional discrimination with actual identified victims. Unlike in the past, it will not engage in or facilitate unconstitutional racial classification or discrimination in its enforcement of fair lending laws. That is, the Bureau will not engage in bias assessment supervisions or enforcement based solely on statistical evidence and/or stray remarks that may be susceptible to adverse inference.

Former Director Chopra significantly expanded the Enforcement Division by about 100 full time employees. He pursued an expansive enforcement agenda, increasing the Enforcement function itself by approximately 60%. Enforcement under his leadership attempted to regulate markets through tools such as its enforcement authorities that are not subject to the formal rulemaking process. Enforcement also advanced novel legal theories and expansive views of the Bureau's authorities.

**consumerfinance.gov**                                                                                       9

In line with the Bureau's revised 2025 Supervision and Enforcement priorities, and consistent with the Dodd-Frank Act, Bureau leadership has determined that Enforcement matters should be significantly reduced, enabling the Bureau focus on performing its core statutory requirements and concentrating on pursuing priority cases.

In line with these new priorities, this leadership has dismissed or withdrawn from multiple cases that were filed under former Director Chopra as they constituted agency overreach and should never have been initiated. The chart below summarizes the status of CFPB public enforcement actions. Among the cases that the CFPB withdrew from were duplicative enforcement actions, where State Attorneys General participated in the case brought together with the CFPB from the start; these State Attorneys General indeed had continued handling these cases, obtaining favorable results for consumers. These matters illustrate that the CFPB's involvement was not required and that the very active State Attorneys General are well positioned to enforce consumer protection laws.

Several of the actions that this leadership deemed appropriate to continue have been resolved during 2025, either through a consent order or a favorable court ruling, and only a handful are still pending. The few remaining cases are in an advanced stage and with intermediate favorable rulings for the CFPB. As such, they require significantly fewer resources than the staffing of the Enforcement Division at this time.

| CFPB Public Enforcement Action | Number of Public Enforcement Actions |
| --- | --- |
| Dismissed or withdrew as plaintiff | 19 |
| Terminated or modified a pending order, or issued a no-action letter | 22 |
| Resolved | 7 |
| Pending as of December 31, 2025 | 8 |

Going forward, exercising its discretion in how to conduct enforcement, the current leadership has green-lit certain investigations that continue to align with its priorities. But their number and scope also do not require the Enforcement Division staffing at the current levels. The investigations are focusing on specific areas for specific product markets and are tailored to determine whether a violation of law occurred. The goal, as with Supervision, is to take a collaborative and conciliatory approach. That means that our success is measured by issues resolved, such as by an entity voluntarily undertaking consumer redress and implementing changes to align with the law, instead of number of cases filed that could last years and drain resources on all sides.

Considering that the number of enforcement staff was inflated by 100 due to the hiring spree by the former Director Chopra, the FY25 authorized number was not representative of even prior

Enforcement staffing. Given the additional changes by this leadership, the proposed reductions are consistent with leadership's enforcement priorities.

| Division | Office | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **ENFORCEMENT DIVISION** | 254 | 137 | 50 |
| ENFORCEMENT | 254 | 137 | 50 |

**Supervision Division**

The Bureau is tasked by statute with performing supervisory activity, as it has supervisory authority over banks, thrifts, and credit unions with assets over $10 billion, as well as their affiliates, and certain non-depository institutions that pose threats to consumers. 12 U.S.C. §§5514-16. Under Dodd-Frank, supervision is "risk-based." 12 U.S.C. §5514(b)(2). That means that, unlike for certain other regulators, supervision does not conduct exams at every entity it could potentially supervise every year. Rather, risk-based assessment by the Bureau, within "the relevant product markets and geographic markets," is informed by: "(A) the asset size of the covered person; (B) the volume of transactions involving consumer financial products or services in which the covered person engages; (C) the risks to consumers created by the provision of such consumer financial products or services; (D) the extent to which such institutions are subject to oversight by State authorities for consumer protection; and (E) any other factors that the Bureau determines to be relevant to a class of covered persons." *Id*.

In line with the Bureau's revised 2025 Supervision and Enforcement priorities, and consistent with the Dodd-Frank Act, it is also recommended that both the quantity and scope of supervision matters should be reduced, while enabling the Bureau to perform its statutorily required functions. Whereas in 2024, the total number of exams was 107, with 46 at depository institutions and 61 at non-depository institutions, in 2026, the total exams will be 64, with 42 at depository institutions and 22 at non-depository institutions. "[T]he public interest in the democratically-elected President's prerogative to pursue his policy objectives" "bears heavily on" evaluating "whether agency resources should be allocated to facilitate more robust supervision of non-traditional, non-depository, lenders." *NTEU v. CFPB*, 774 F.Supp.3d 1, 81 (D.D.C. 2025).

In April 2025, the Bureau rescinded its prior supervisory and enforcement priorities and instituted a new policy. The Bureau announced that it will reduce supervisory exams by at least 50%. The Bureau also stated that it would focus supervision on depository institutions (as opposed to nondepository institutions), on actual consumer fraud, and on areas that are clearly within its statutory authority. The Bureau announced that it would not pursue supervision under novel legal theories, including of the Bureau's authority. The Bureau also noted that it will avoid duplicating similar oversight either at the federal or state level. The Bureau emphasized that it would focus its supervisory authorities on conciliation, correction, and remediation of harms subject to consumers' complaints.

The Bureau also identified new priorities for supervision, namely:
- Providing redress to servicemembers, veterans, and their families;
- Mortgages;
- Fair Credit Reporting Act (FCRA) and Regulation V data furnishing violations;
- Fair Debt Collection Practices Act (FDCPA) and Regulation F violations relating to consumer contracts and debts;
- Fraudulent overcharges and fees;
- Inadequate controls to protect consumer information resulting in actual loss to consumers;
- Actual intentional discrimination with actual identified victims;

- Compliance with disclosure statutes; and
- Actual fraud against consumers, where there are identifiable victims with material and measurable consumer damages.

In line with the Bureau supervision policy and its commitment to streamlining, supervisory examinations will be conducted in a much more targeted manner, focusing on ascertaining compliance of clearly identified product lines and based on specifically identified queries, directly tied to the governing statutory and regulatory regime.

Given this targeted focus, the supervisory teams will be appropriately and significantly scaled down from the former 8x8x8 model, where eight examiners spent eight weeks, eight hours a day, at a supervised institution, with practically no other limits to their remit. Examiners often spent much of this time working from hotel rooms at great cost to the Bureau. This model did not tailor the supervision resources to the risks by the supervised entities or the experience of the examiners. Instead, going forward, the team size and the length of the exam will be reduced to reflect targeted queries and be commensurate with the risk tier in which a particular entity's line, subject to supervision, appears.  There will be no more "fishing expeditions" for novel or unique regulatory and legal theory citations.  The supervision program will stick to the plain language letter of the law.  In the past, examinations would be extended in an effort to support novel or unique regulatory or legal theory citations that were identified in only a few instances.  However, an exam's scope may be expanded, based on the facts presented, and with the leadership's approval.

Moreover, the resource level (time and/or number of examiners) will decrease once Supervision receives the information request responses and is able to adjust the scope of individual exams based on these responses. Examination findings will be on substantive matters affecting large populations of consumers who are actually harmed and not potential consumers who could be harmed. Supervision will focus on the facts.  Examination teams will not unilaterally direct entities, nor expect entities to conduct exhaustive lookbacks without prior leadership authorization.  This will be done to ensure consistency across the supervision program and so that all entities are receiving consistent treatment based upon an evaluation of facts and data and not personal preferences regarding the suitability of products or services.

Likewise, Matters Requiring Attention (MRA) will focus on pattern and practice violations of law where there is substantive and identifiable consumer harm or clear violations of the disclosure requirements.  This is consistent with how Supervision now treats violations of the law.  In the past, nearly every matter, regardless of its significance, severity, pervasiveness or duration, required a MRA.  This resulted in unnecessary and highly burdensome MRAs on supervised entities for matters that could be corrected in the normal course of business and would sometimes include matters that were identified by the entity themselves.  Just in the past year, we have resolved a very substantial backlog:  Supervision has reviewed and satisfactorily resolved over 2,000 outstanding MRAs dating back as far as 2012.

Supervision also expects more cooperation of the supervised entities and, thus, shorter exams, given the focus on conciliation and remediation, rather than the Bureau's former posture, penalizing self-reporting and discouraging remediation by the entities.

Additionally, the Bureau has abolished the Regions in order to centralize and streamline Supervision. Unlike in the past, all examiners are expected to perform work at all times they are on duty, which, in conjunction with the targeted and shorter exams, will enable Supervision to efficiently utilize its resources and personnel. Further, under this plan, only commissioned examiners will remain; because they have the most experience, they can perform work much more efficiently and quickly than prior larger teams, which included many non-commissioned examiners. Relatedly, examiners will be encouraged and incentivized to complete the work promptly and under budget.

The Acting Director approved the proposed Supervision exam schedule for 2026 and the work has begun to implement it. That exam schedule is consistent with the levels of staffing proposed here.

| Division \| Office | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **SUPERVISION DIVISION** | **523** | **350** | **77** |
| DIVISION OF SUPERVISION | 5 | 2 | 1 |
| OFFICE OF SUPV POLICY AND OPS | 55 | 72 | 1 |
| SUPERVISION EXAMINATIONS | 463 | 276 | 75 |

**External Affairs Division**

While External Affairs Division contained approximately 42 employees in 2025, the only statutorily required component is the Community Affairs function, §5493(b)(2), which is shared across several other divisions. For several years, the CFPB leadership was aware that the size of the External Affairs Division was not sustainable and was subsequently realigned several times by prior directors. Given the size of the CFPB and nature of the work, it would be more realistic and appropriate to reduce these offices limiting to a singular expert to represent the equities of each component such as communications, intergovernmental affairs, private sector engagement, and public engagement. The statutorily required community affairs function has been a shared responsibility across the Bureau including through the Office of Financial Education and the Office of Consumer Populations, which supports reducing significantly the number of FTEs within this division. Community affairs functions within External Affairs can be significantly streamlined as they can be supported by the external facing components of other divisions, and also be supported by the non-statutorily required FTEs remaining in External Affairs.

| Division \| Office | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **EXTERNAL AFFAIRS DIVISION** | **45** | **30** | **5** |
| COMMUNICATIONS | 13 | 8 | 1 |
| EXTERNAL AFFAIRS DIVISION | 15 | 11 | 1 |
| INTERGOVERNMENTAL AFFAIRS | 6 | 3 | 1 |
| PRIVATE SECTOR ENGAGEMENT | 5 | 5 | 1 |
| PUBLIC ENGAGEMENT | 6 | 3 | 1 |

**Legal Division**

While a separate Legal Division is not required by statute, it is recommended that personnel remain in General Law and Oversight, Law and Policy, Litigation, and Ethics and Legal Administration to sufficiently perform support functions for the Bureau. The Division can be streamlined while continuing to perform its support functions such as ethics, litigation defense of Bureau actions, and support for rulemaking efforts. The Bureau has also built a strong relationship with the Department of Justice's Federal Programs Branch of the Civil Division for the defense of Bureau actions, thus supporting streamlining of the Legal Division.

| Division | Office | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **LEGAL DIVISION** | **87** | **62** | **60** |
| FRONT OFFICE | 1 | 0 | 1 |
| GENERAL LAW AND OVERSIGHT | 20 | 16 | 16 |
| LAW AND POLICY | 27 | 17 | 19 |
| ETHICS AND LEGAL ADMINISTRATION | 21 | 15 | 11 |
| LITIGATION | 18 | 12 | 13 |

**Operations Division**

While the Operations Division is not named by statute, many of its functions fall under Sec 1021(c)(6) "performing such support activities as may be necessary or useful to facilitate the other functions of the Bureau." In addition, many government-wide statutory requirements (e.g. FOIA, FISMA, etc.) are carried out by the Operations Division. Those are not listed here. Operations supports the statutorily required Consumer Advisory Board in the exercise of its functions. 12 U.S.C. §5494. Dodd Frank requirements exclusively performed by offices in the Division are listed below, noting that certain functions have been deemed necessary to also perform support functions for the Bureau.

Finance and Procurement:

The Office of Finance and Procurement (OFP) is the primary office that fulfills section 1017 requirements of Dodd Frank. Specifically: Funding 1017(a)(2), Budget and financial management 1017(a)(4), Investments 1017(b)(3), Penalties and Fines to include the Civil Penalty Fund 1017(d), Audit of the Bureau 1017(a)(5), contracts 1012(2), are all exclusively performed by OFP. Under this proposal OFP will see across the board significant reductions (over 60%) while still maintaining the staff to meet statutory requirements. Two areas are eliminated entirely and functions absorbed by remaining staff. In addition, the Office will absorb responsibility for the Bureau's strategic planning functions and the centralization of Enterprise Risk Management (ERM).

- Executive Leadership – *2 Positions*

OFP's executive leadership function provides executive oversight and leadership over the broad spectrum of activities in the office. The team was comprised of 7 positions: 3 executives (Chief Financial Officer, Deputy Chief Financial Officer and Senior Procurement Executive); 2 executive assistants, 1 acquisitions data specialist and 1 financial system specialist. This recommended restructuring streamlines this down to 2 positions: the Chief Financial Officer (and Assistant Director), and the Deputy Assistant Director. The functions associated with the previous structure will be sustained at a reduced level, some in other sections.

- Budget Formulation, Execution and Financial Management – *6 Positions*

All agency-wide financial functions in Dodd Frank (e.g., Funding 1017(a)(2), Budget and financial management 1017(a)(4), Investments 1017(b)(3)) are performed out of this team. In prior years these functions were performed by 2 supervisors and 9 staff members. With HR1, the Bureau has seen significant reductions in its overall budget. However, while the overall agency budget has been reduced, the associated workload reduction doesn't translate linearly.

Indeed, significant aspects of the budget team's work revolves around requirements that exist irrespective of the overall budget level. For example, generating required reports and tracking budget execution are activities that would be required at any budget level. For this reason, the workload approximation is more difficult, and the combination of Budget Line IDs (BLIDs) and

total budget gives a better proxy for workload and work requirements. Some core capabilities are kept intact in order to mitigate and account for this.

In FY24 there were 392 budget lines for $755.1M, in FY25 there were 290 budget lines for $692.7M and we anticipate approximately 220 budget lines for $568.6M in FY26. The restructuring recommendation reduces this team to 1 supervisor and 5 staff.

|  | Budget | Budget Lines | FTE |
|---|---|---|---|
| FY24 | $755.1M | 392 | 11 |
| FY25 | $692.7M | 290 | 9 |
| FY26 (to-date) | $568.6M | 220 | 7 |
| **Recommendation** |  |  | 6 |

- Civil Penalty Fund – *4 Positions*

Although Enforcement activity in FY25 and FY26 resulted in fewer Civil Penalty Fund deposits than prior years, there remains a substantial number of matters that have received allocations of funds in prior fiscal years that are in various stages of the distribution process. CFPB also continues to pursue matters with consumer redress and potential compensation from available funds in the Civil Penalty Fund. As of March 2026, there are a total of 40 open matters representing over $3.2 billion in Civil Penalty Fund allocations and redress collections. In FY26 to date, CFPB has distributed $120.3 million to 426,666 consumers in 5 matters and continues to monitor ongoing matters along with preparing new cases for distribution. Despite a similar level of work to prior years, the recommended restructuring streamlines the team from 6 to 4 positions, ensuring sufficient staff to continue to manage the ongoing distribution work through increased efficiencies.

|  | # of Matters | Amount Distributed *in millions* | # of Consumers *in thousands* | FTE |
|---|---|---|---|---|
| FY24 | 8 | $503M | 487K | 6 |
| FY25 | 8 | $2060.1M | 4581K | 6 |
| FY26 (to-date) | 5 | $120.3M | 427K | 4 |
| **Recommendation** |  |  |  | **4** |

- Contracting and Acquisition Management – *6 Positions*

    o   Warranted Contracting Officers
The Federal Acquisition Regulations (FAR) 1.602-1 confers to Warranted Contracting Officers (COs) the sole authority to enter, administer or terminate contracts on behalf of the government. The Dodd Frank Act confers on CFPB the authority to enter into contracts necessary to meet its statutory obligations.

In the past, CFPB maintained a hybrid and overly expensive model where the Bureau of Fiscal Service (BFS) supported some CFPB contracts while Bureau Contracting Officers supported others. In FY24 15 Warranted Contracting Officers (at BFS and CFPB) managed 533 contracts of

varying complexity (e.g. new awards vs option exercises). In FY25 all CFPB acquisition related support was moved from this hybrid shared service model to be fully in-house. This shift saved the taxpayer approximately $3M annually.

The recommended restructuring decreases the number of COs from the current 7 to 4. This recommendation is possible thanks to the overall reductions in contracts while recognizing that there will still be an increased workload per CO, somewhat mitigated by the retention of more senior COs, who are better equipped to handle more complex acquisitions.

|  | Active Contracts | # of COs |
|---|---|---|
| FY24 | 533 | $15^2$ |
| FY25 | 344 | 9 |
| FY26 (to-date) | 252 | 7 |
| **Recommendation** | | **4** |

o   Acquisition Management Specialists

In addition to COs, Contracting Officer Representatives are professionals appointed in writing by the CO to perform specific technical and administrative contracting tasks. Because of the large number of contracts that a CO typically manages, the FAR recognizes the need for this acquisition workforce to manage contracts at a day-to-day level, with delegated authority from the CO. The CFPB implemented a COR advisor team model that is tasked with managing the broader acquisition workforce training and certification as required by the FAR. In FY2025, a team of 5 COR Advisors managed 242 CORs. In addition to this team, one position managed the Bureau's Acquisition Policy, and one position managed the CFPB's purchase card program, overseeing 75 purchase cards and 28 Approving Officials. As of today, there are 194 CORs and further reductions are expected with bureau wide workforce restructuring initiatives; and the Bureau will have no more than 10 Purchase Cards and 2 Approving Officials.

This recommended restructuring moves the team from 4 positions to 2 positions, maintaining all functions at a reduced capacity. In addition, the acquisition data function that was previously housed in the Front Office, will be managed by this team.

|  | COR Certs | # of Acq. Spec. |
|---|---|---|
| FY24 | 242 | 7 |
| FY25 | 220 | 6 |
| FY26 (to-date) | 194 | 4 |
| **Recommendation** | | **2** |

---

[2] Includes COs from the Bureau of Fiscal Service

- Internal Controls – *4 Positions*

The Internal Controls (IC) team conducts annual reviews of CFPB including testing, identification of findings, and review of corrective actions. In FY24 the IC team tested 482 controls and issued 93 findings. In FY25 the team tested 498 controls and issued 74 findings. The team is developing its testing plan for FY26 and determining the appropriate number of controls to test with current and proposed staffing levels. In prior fiscal years, the IC team had contractor support in addition to the CFPB staff to effectively review and test all of the controls identified. The recommended restructuring decreases the number of IC staff from 7 to 4. This recommendation will require the team to reduce the number of controls tested annually, while recognizing that there will still be an increased workload per staff member.

| | Controls Tested | Findings Issued | # of Open Findings | FTE |
|---|---|---|---|---|
| FY24 | 482 | 93 | 209 | 7 |
| FY25 | 498 | 74 | 212 | 7 |
| **Recommendation** | | | | **4** |

- Travel – *2 Positions*

The travel team is responsible for ensuring CFPB employees are compliant with Federal Travel Regulations and other government wide regulations. This is the only team that processes travel for the entire bureau. For this reason, without this team, bureau operations requiring travel would cease. For example, Bureau attorneys would be unable to appear in court anywhere outside the DC metro area.

In FY24 CFPB processed 6625 travel actions (vouchers and authorizations), 2608 in FY25 and is expected to process approximately 500 actions in FY26. However, halfway through FY25, all bureau travel cards were cancelled following a directive by GSA. This now requires all travel to be processed by the travel team through the Centrally Billed Account (CBA). This is a significantly increased workload per employee, in addition to their compliance mandate. In FY25 that represented 15 actions and (thus far) in FY26 56 transactions. However, given the vastly reduced role and length of travel in Supervision's new policies, the number of positions can be reduced from 4 to 2. In the event of a ramp up in bureau travel, this level can be revised.

| | # of Actions | #of CBA Actions | FTE |
|---|---|---|---|
| FY24 | 6625 | | 4 |
| FY25 | 2608 | 15 | 4 |
| FY26 *(to-date)* | 56 | 56 | 4 |
| **Recommendation** | | | **2** |

- Strategic Planning and Enterprise Risk Management (ERM) – *2 Positions*

These functions are currently performed by 5 positions (outside of OFP): 3 positions for strategic planning and 2 positions for ERM. The scope and scale of the ERM program will be significantly pared down to strictly comply with OMB Circulars A-11 and A-123, more closely aligning it with OFP's existing Internal Controls and Budget functions. This will necessitate a lower number of

positions. These changes justify a recommendation of retaining (and transferring to OFP) 2 positions for the Strategic Planning and ERM functions.

Human Capital:

The Office of Human Capital provides support services pursuant to Section 1021(c)(6) to all offices and divisions fulfilling statutory requirements.  Since inception, the CFPB has taken an independent approach in complying with governmental best practices and standards not always to the benefit of the Bureau or American Taxpayers.  Management has already begun to shift to a Title 5 approach, which will enable the CFPB to consistently comply with federal laws, regulations, executive orders, circulars, and other government-wide mandates.  For example, the CFPB will begin receiving human capital operational services from the Office of Personnel Management starting in October 2026, which will be considered an extension of CFPB's Office of Human Capital.  The planning and transition are already underway.  Adopting federal policies and best practices will provide uniformity and reduce inconsistencies or duplication of effort.  This shift will eliminate the need for excess resources currently at the CFPB while aligning with the practices implemented by the entire federal government.  This further allows the 15 retained human capital staff to focus on providing management advisory services such as employee relations, labor relations, policy implementation, and Bureau specific requirements.  It also provides a level of agility that does not currently exist by allowing the human capital staff to support the Bureau if it expands or contracts.

Technology and Innovation and Chief Data Officer:

The Office of Technology and Innovation and the Chief Data Officer provide support services pursuant to Section 1021(c)(6) to all offices and divisions fulfilling statutory requirements.  The Bureau relies on these offices to coordinate activities related to the development of information system applications to support statutorily required functions including the Consumer Response Center, Home Mortgage Disclosure Act (HMDA), Average Prime Offer Rate (APOR), and Section 1071.  In addition, this office supports the necessary infrastructure such as maintaining the information technology assets of the Bureau, supporting data storage in the cloud environment, and cyber security monitoring.  While these two offices are currently separate entities, they will be merged, reverting to the previous long-standing structure at the Bureau. Resources will be shared. This will eliminate duplication of efforts and blurred lines of authority that emerged from the split several years ago. This office implements the statutory requirement to make "[a]ll public data assets published by the Bureau" publicly available and freely available for download."  12 U.S.C. §5499.  This includes the technology and cyber security support for more than 60 systems that contain sensitive data.

Since the start of this Administration, T&I has aggressively implemented the President's Management Agenda (PMA) by cutting wasteful spending and eliminating duplicative or unnecessary technologies. FY 26 T&I non-Pay expenditures are planned to be 61% lower than planned FY 25 T&I expenditures even with no further reductions to T&I federal headcount. Additionally, T&I's federal headcount has been reduced by 24% since the start of the administration due to routine transition (i.e., retirements and voluntary separations).

Despite the reduction in non-pay and pay spend, T&I has maintained support for CFPB systems needed to support all statutorily required functions such as consumer complaints.  Each T&I Section is responsible for discrete functions and will continue even with a reduction in positions and resources. The people facing functions provide support for either the basic IT "seat" provided to each employee (e.g., laptops, MS-Office, docking stations, etc.), a specific statutorily required mission function (regulations, research, consumer complaints, etc.), or a back-office/Operations support function (e.g., HR, finance, procurement, personnel security, etc.). Non-people functions include the activities to deliver IT (e.g., cybersecurity, privacy, development, project management, etc.), the platforms that host applications (e.g., Salesforce, ServiceNow, Microsoft, AWS, Databricks, etc.), and the Bureau's core infrastructure (network, data center, VPN, etc.).

The staffing needs of T&I to support CFPB's mission and operational functions do not scale relative to the Bureau's overall head count. The resource drivers are the breadth and complexity of activities supported. T&I still must maintain the majority of the major software platforms to support planned mission work that were implemented during previous administrations. Additionally, compliance requirements for technology including for cybersecurity, privacy, record retention, evidence use, accessibility, and digital technology have not been reduced.

A federal staff of 75 FTE will allow CFPB to support all statutorily required work and maintain compliance with federal cybersecurity, privacy, and other applicable laws and regulations. This is a 55% reduction from the FY 25 approved headcount, and a 38% reduction from the current T&I headcount. Combined with non-pay savings, this would be a 60% reduction in the T&I budget from FY 25.   The 75 FTEs will further support improving and continuing to stabilize the CFPB's cyber security posture and restore its effectiveness rating recently downgraded to a FISMA score of Ineffective by the CFPB's Office of Inspector General.

As T&I continues to implement the PMA by eliminating unneeded technology, simplifying the CFPB's technology architecture, and adopting AI to automate processes, the headcount could be revisited at a later time and potentially management may identify additional reductions.  Today, T&I manages fewer than 80 contracts that support applications for programs such as HMDA, Identity Management, Infrastructure, Cybersecurity, Salesforce, ServiceNow, and Microsoft teams.

Administrative Operations:

The Office of Administrative Services provides support services pursuant to Section 1021(c)(6) to all offices and divisions fulfilling statutory requirements.  In addition, the Administrative Services Team has been responsible for maintaining an entire building and its infrastructure on behalf of the CFPB.  The CFPB is currently working with the General Services Administration to reduce the Bureau's space footprint while complying with the provisions under Dodd-Frank requiring the Bureau to maintain a principal office in Washington, D.C. 12 U.S.C. §5491(c)(2). A reasonable number of positions have been identified to manage a smaller facility and footprint while continuing the other necessary services required by law such as the Freedom of Information Act (FOIA), records management, and personnel security.

Retaining 15 positions in Administrative Operations is sufficient based on the anticipated size of the Bureau.  Under a smaller office space and footprint, most services will be provided by the

General Services Administration and/or a third party who controls the majority of the rental space in a new building.  The CFPB will adopt all available non-information technology infrastructure that currently exists in the new space rather than place specialized infrastructure that is not agile and cost efficient.  Further, a modest number of personnel and physical security specialists will be retained to support a smaller CFPB team.  Several of the personnel security services are already provided by several third parties including the Office of Personnel Management, the Defense Counterintelligence and Security Agency, and the Department of Treasury.  The personnel security responsibility is straightforward as the CFPB is not a national security organization and does not require elevated and complicated security investigations.  Physical security will be managed by existing building security offered by the majority tenant in coordination with the Federal Protective Service, which only requires one to two physical security personnel to coordinate and focus on agency specific policies.  Resources retained in Administrative Services will be primarily allocated to those positions that support the FOIA and Records Management Teams, which are higher volume and legally required functions.

| Division \| Office | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **OPERATIONS DIVISION** | **341** | **268** | 133 |
| ADMINISTRATIVE OPERATIONS | 36 | 27 | 15 |
| CHIEF DATA OFFICER | 12 | 8 | 1 |
| FINANCE AND PROCUREMENT | 60 | 37[3] | 26 |
| HUMAN CAPITAL | 61 | 50 | 15 |
| OPERATIONS DIVISION | 12 | 6 | 1 |
| TECHNOLOGY AND INNOVATION | 160 | 127 | 75 |

---

[3] This figure does not include FTEs from transferred functions. With the current FTE from those functions, the total would be 41.

**Research, Monitoring and Regulations Division**

The Research, Monitoring and Regulations Division (RMR) includes the Office of Service Members Affairs, §5493(e), Office of Financial Protection for Older Americans, §5493(g), and Office of the Private Education Loan Ombudsman, §5535, which are statutorily required. The Research Unit is also required by statute. §5493(b)(1). Monitoring is also required by statute. §5512(c).

Consumer populations below include the Office of Service Member Affairs, Office of Protection for Older Americans, and Office of the Private Education Loan Ombudsman. These offices will be heavily supported by other divisions and thus can be significantly streamlined to focus on their statutory functions. The Office of Service Member Affairs will be focused on providing the best quality information to servicemembers and their families and on coordinating with Supervision and Enforcement on protecting service member rights. It will also coordinate with the Office of Financial Education on providing information geared toward service members. The Office of Financial Protection for Older Americans will similarly focus on working with the Office of Financial Education to provide information to individuals 62-years and older and coordinate with Supervision and Enforcement for the protection of such individuals' rights. Both offices will also coordinate with markets and research within RMR to monitor developments affecting service members and their families and individuals 62-years and older. The Private Education Loan Ombudsman will be supported by the other offices of RMR and also by Operations and will have sufficient resources to complete the statutorily required report. 12 U.S.C. §5535(d).

The Research Unit has a variety of statutory functions, including "researching, analyzing, and reporting" on "(A) developments in markets for consumer financial products or services, including market areas of alternative consumer financial products or services with high growth rates and areas of risk to consumers; (B) access to fair and affordable credit for traditionally underserved communities; (C) consumer awareness, understanding, and use of disclosures and communications regarding consumer financial products or services; (D) consumer awareness and understanding of costs, risks, and benefits of consumer financial products or services; (E) consumer behavior with respect to consumer financial products or services, including performance on mortgage loans; and (F) experiences of traditionally underserved consumers, including un-banked and under-banked consumers."

The Research Unit has been performing this function with 40 FTEs currently onboard and can reduce this number by at least 10 FTEs as a result of further streamlining. The modest reduction also reflects the capacity of other divisions, such as Operations, to aid Research in ministerial and technical tasks, allowing Research to focus on the substantive work of researching and drafting the required reports. This number will be also be more than sufficient to generate the reports required by 15 U.S.C. §§1646(a), (b), 1632(d)(3); 12 U.S.C. §§5493(b)(1), 2809(a), and 5512(c)(3).

RMR's monitoring office monitors "for risks to consumers in the offering or provision of consumer financial products or services, including developments in markets for such products or services." This office can be slightly streamlined at this time from its FY25 authorization while continuing to sufficiently monitor for risks and support RMR and Enforcement's activities.

| Division | Office | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **RESEARCH MONITORING AND REGULATIONS DIV** | **228** | **142** | **130** |
| COMPETITION AND INNOVATION | 8 | 6 | 3 |
| CONSUMER POPULATIONS | 47 | 33 | 9 |
| MARKETS | 36 | 21 | 20 |
| REGULATIONS | 71 | 32 | 59 |
| RESEARCH | 54 | 40 | 30 |
| RESEARCH MONITORING AND REGULATIONS DIV | 12 | 10 | 4 |

## Ombudsman's Office and Director's Financial Analysts

The Ombudsman is the only position required by statute within this area, and one individual is able to fulfill the statutory duties. The Ombudsman is required to "(i) act as a liaison between the Bureau and any affected person with respect to any problem that such party may have in dealing with the Bureau, resulting from the regulatory activities of the Bureau; and (ii) assure that safeguards exist to encourage complainants to come forward and preserve confidentiality." 12 U.S.C. 5493(a)(5). The Ombudsman is supported in this work by FTEs throughout the Bureau, including in the Operations Division. The Ombudsman, as supported by FTEs in other divisions, is more than capable of performing the statutory tasks with one FTE. In the event the Ombudsman is temporarily or permanently unavailable, the Director can swiftly designate another FTE with experience with the Ombudsman's work as Ombudsman.

The Director's Financial Analysts are temporary, term limited positions that will expire.  This is not a statutory or legal requirement, and these positions are not necessary to the Bureau's functioning.

| Division \| Office | FY25 Authorized | FY26 Onboard | Retain |
|---|---|---|---|
| **OTHER PROGRAMS** | **5** | **11** | **1** |
| DIRECTOR'S FINANCIAL ANALYSTS | 0 | 6 | 0 |
| OMBUDSMAN | 5 | 5 | 1 |